**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND NORTHERN DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, | |
| *Plaintiff,* | |
| | |
| v. | No. _____ |
| | |
| THE UNITED STATES NAVAL ACADEMY, | **VERIFIED COMPLAINT** |
|     121 Blake Road | |
|     Annapolis, Maryland 21402-1300 | |
|     Anne Arundel County | |
| | |
| THE UNITED STATES DEPARTMENT OF DEFENSE, | |
| | |
| LLOYD AUSTIN, in his official capacity as Secretary of Defense, | |
| | |
| CARLOS DEL TORO, in his official capacity as Secretary of the Navy, | |
| | |
| BRUCE LATTA, in his official capacity as Dean of Admissions for the United States Naval Academy, | |
|     121 Blake Road | |
|     Annapolis, Maryland 21402-1300 | |
|     Anne Arundel County | |
| | |
| REAR ADMIRAL FRED KACHER, in his official capacity as Acting Superintendent of the United States Naval Academy. | |
|     121 Blake Road | |
|     Annapolis, Maryland 21402-1300 | |
|     Anne Arundel County | |
| | |
| *Defendants.* | |

Plaintiff, Students for Fair Admissions, brings this civil action for declaratory and injunctive relief against Defendants and alleges as follows:

## INTRODUCTION

1.      The United States Naval Academy is one of the crown jewels of the American military. The Academy has trained the future leaders of the Navy since 1845, producing some of our nation's most revered admirals.

2.      The Academy's mission is to "develop midshipmen morally, mentally, and physically and to imbue them with duty, honor, and loyalty" for a career of service in the United States Navy. *Mission of USNA*, perma.cc/XQ6X-2NQT.

3.      For most of its history, the Academy has evaluated midshipmen based on merit and achievement. For good reasons: America's enemies do not fight differently based on the race of the commanding officer opposing them, sailors must follow orders without regard to the skin color of those giving them, and battlefield realities apply equally to all sailors regardless of race, ethnicity, or national origin. To that end, President Truman desegregated the military well before other institutions followed suit. *See* Executive Order 9981 (July 26, 1948) ("[T]here shall be equality of treatment and opportunity for all persons in the armed forces without regard to race, color, religion, or national origin.").

4.      Over the past few decades, however, the Academy has strayed from that approach. Instead of admitting midshipmen solely on leadership potential and objective metrics—the Academy stopped requiring applicants to submit standardized scores three years ago—the Academy focuses on race.

5.      The Academy has no justification for using race-based admissions. Those admissions are unconstitutional for all other public institutions of higher education. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141 (2023) ("*SFFA*"). The Academy is not exempt from the Constitution. *See, e.g.*, *Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976) ("A succession of cases in this circuit and others ha[s] reiterated the proposition that the military is subject to the Bill

of Rights and its constitutional implications."). And its calls for blind judicial deference to the military on questions of racial discrimination are "'gravely wrong,'" both legally and historically. *SFFA*, 143 S. Ct. at 2162 n.3 (discussing the overruling of *Korematsu v. United States*, 323 U.S. 214 (1944)).

6.    Because the Academy discriminates based on race, its admission policy should be declared unlawful and enjoined.

## PARTIES

7.    Plaintiff, Students for Fair Admissions, is a voluntary membership organization formed for the purpose of defending human rights and civil liberties, including the right of individuals to equal protection under the law, through litigation and any other lawful means. SFFA is a nonprofit membership group of tens of thousands of individuals across the country who believe that racial preferences in college admissions, including the academies, are unfair, unnecessary, and unconstitutional. SFFA has members who are ready and able to apply to the United States Naval Academy.

8.    Defendant United States Naval Academy is a military service academy created under federal law and operating under the command and supervision of the Department of the Navy and Department of Defense. The Academy and its leadership are responsible for creating and executing its admissions policies for prospective midshipmen, including the policy at issue here.

9.    Defendant United States Department of Defense is an executive agency headquartered in Washington, D.C., and is responsible for all aspects of the military, including the policy at issue here.

10.    Defendant Lloyd Austin is the Secretary of Defense and is responsible for all aspects of the military, including the policy at issue here. Secretary Austin is sued in his official capacity.

11.    Defendant Carlos Del Toro is the Secretary of the Navy and oversees all Navy operations and policies, including the policy at issue here. Secretary Del Toro is sued in his official capacity.

12.     Defendant Rear Admiral Fred Kacher is Acting Superintendent of the United States Naval Academy and responsible for the creation, implementation, and oversight of all Academy policies, including the policy at issue here. Rear Admiral Kacher is sued in his official capacity.

13.     Defendant Bruce Latta is Dean of Admissions at the United States Naval Academy and responsible for the creation, implementation, and oversight of all Academy admissions policies, including the policy at issue here. Latta is sued in his official capacity.

## JURISDICTION & VENUE

14.     This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §1331.

15.     Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred here. *See* 28 U.S.C. §1391(b).

16.     The Academy cannot invoke sovereign immunity. Federal courts routinely apply the APA's waiver of sovereign immunity to constitutional claims. *See Standage v. Braithwaite*, 526 F. Supp. 3d 56, 86 (D. Md. 2021) (explaining, in a Fifth Amendment case against the Academy, that "the §702 waiver encompasses qualifying claims arising under non-APA authority"); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011) ("[T]he waiver in §702 is not limited to claims brought pursuant to the review provisions contained in the APA itself." (collecting cases)); *Food Town Stores, Inc. v. EEOC*, 708 F.2d 920, 921-22 (4th Cir. 1983) (similar). The military and its service academies meet the APA's definition of "agency." *Standage*, 526 F. Supp. 3d at 84-89.

## BACKGROUND

### I.     The Academy's Admissions Process

17.     Appointment (*i.e.*, "admission") to the Academy involves two stages: First, applicants must pass medical examinations and a physical-fitness test and secure a "nomination" from a member of Congress, the Vice President, the President, or the Secretary of the Navy. Applicants who satisfy the requirements for the first step are considered "qualified" for admission. Second, after securing a

nomination, applicants must be accepted by the academy's admissions office. The Academy's racial preferences kick in at the second stage, once applicants have received a qualifying nomination.

18.    Admission to the Academy is highly selective: fewer than ten percent of applicants are given the honor of enrolling. *See, e.g.*, United States Naval Academy, *Class Portrait: Class of 2027*, perma.cc/2M9H-44RD.

19.    The Academy typically enrolls slightly fewer than 1,200 midshipmen in each class. *See, e.g.*, *id.*; United States Naval Academy Admissions, *Class of 2026 Snapshot*, perma.cc/8PAR-PJUU.

20.    ***Congressional Nominations.*** Representatives and senators have statutory authority to nominate their constituents for admission to the Academy. *See* 10 U.S.C. §8454(a). Legislators have unfettered discretion in how they allocate those nominations. However, each senator and congressman can have no more than five nominees attending the Academy at any given time. *See* §8454(a)(3)-(4).

21.    Members can nominate up to ten of their constituents for consideration for each vacancy. §8454(a). "Typically, one appointment per DoD academy per Senator and Representative is available annually." Congressional Research Service, *Report RL33213: Congressional Nominations to U.S. Service Academies: An Overview and Resources for Outreach and Management*, (April 21, 2016), perma.cc/29FK-LBUG; *see also* Senator Mark Warner, *Academy Admissions*, perma.cc/787E-Y22V ("Most members of Congress" stagger their vacancies to ensure that they have "one open vacancy" at the Academy each year.).

22.    Members of Congress have the option to either nominate all ten applicants equally or to nominate a "principal," or preferred, applicant, and nine ranked alternates. *See* §8454(a).

23.    Congressional nominees comprise the vast majority of the Academy applicant pool. *See, e.g.*, *Class of 2026 Snapshot*.

24.    ***Vice Presidential Nominations.*** Unlike members of Congress, who are authorized to nominate applicants from their home districts, the Vice President can nominate any U.S. citizen for admission to the Academy. *See* §8454(a)(2). Like members of Congress, the Vice President has unfettered discretion in how she allocates her nominations, but she cannot have more than five nominees enrolled at the Academy at any one time. *Id.*

25.    Accordingly, Vice Presidential nominees "normally" fill only "one or two" seats in each incoming class. *Service Academy Nomination Process*, The White House, perma.cc/A7Q6-FTSP.

26.    ***Presidential Nominations and Special Nominations.*** Presidential nominations occur automatically. They are awarded to the children of servicemembers who have either served at least eight consecutive years on active duty; served in the military reserves for the equivalent of eight active-duty years; or formally retired from military service and meet the requirements for retirement pay benefits. *See* §8454(b)(1)(A)-(D). One hundred seats are reserved for presidential nominees for each incoming class at the Academy. *See* §8454(b)(1).

27.    A total of sixty-five additional seats across all four classes are reserved for applicants who receive "special nominations" because their parents were killed in action or received a 100% disability rating from the Department of Veterans Affairs due to service-connected injuries. *See* §8454(a)(1). Like presidential nominations, special nominations occur automatically.

28.    If qualified applicants secure a presidential or special nomination in addition to a congressional nomination and they are not selected from the congressional nomination applicant pool, they can still be admitted if the admissions committee selects them from among the applicant pools for the other categories. The Academy does not publicly report the number of applicants who apply under these circumstances each year.

29.    ***Secretary of the Navy Nominations.*** The Secretary of the Navy may nominate up to 85 active-duty sailors and Marines and 85 Navy and Marine Corps reservists for admission each year.

*See* §8454(b)(2)-(3). This category includes nominations for applicants who unsuccessfully applied to the Academy in the previous admissions cycle but were given the chance to attend the United States Naval Academy Preparatory School.[1] Of the 59 Secretary nominees who received appointments and enrolled in the class of 2027, only 3 were "directly from the fleet" (*i.e.*, sailors or Marines serving with active units). *Class of 2027: Class Profile.*

30.    ***ROTC Nominations.*** Each Navy and Marine Corps ROTC or Junior ROTC detachment can nominate up to three of its members for admission each year. *See* United States Naval Academy, *Naval/Marine Corps Reserve Officer Training Corps*, perma.cc/2KG8-V372. Junior ROTC detachments that are designated "Honor Units with Distinction" can nominate up to six of their members per year. *Id.* Army and Air Force Junior ROTC detachments that are designated "Honor Units with Distinction" can each nominate up to three members each year. *Id.* A total of twenty seats in each class are available for ROTC and Junior ROTC nominees. *See* §8454(b)(4).

## II.    The Academy's Racial Preferences in Admissions Decisions

31.    The Academy openly admits that "race" is a "factor" that it considers when making admissions decisions. Lois Elfman, *Military Academies Retain Affirmative Action in Admissions*, Diverse Issues in Higher Education, (Sept. 5, 2023), bit.ly/3PARu9t (quoting Academy spokesperson). The Academy disclaims racial quotas and characterizes its use of race as "holistic," like Harvard's and UNC's admissions programs in *SFFA. See, e.g.*, Br. of United States as *Amicus Curiae* in Support of Resp'ts 15, *Students for Fair Admissions v. President and Fellows of Harvard College*, 2023 WL 4239254, No. 20-1199 (U.S. June 29, 2023) ("SFFA U.S. Brief") (comparing the academies' use of race to "colleges and universities across the country"); *id.* at 24 (similar).

---

[1] The Navy considers midshipmen at the Prep School to be on active duty status. *See* United States Naval Academy Preparatory School, *Academic Year 2023-2024*, at 4, perma.cc/9NSH-DG6S.

32.     Terminology aside, the Academy's focus on race plays out across all areas of its admissions policy. Much like Harvard and UNC, *see SFFA*, 143 S. Ct. at 2156 n.1, the Academy's use of racial preferences "gives minorities an edge on admissions," Adam Clymer, *Service Academies Defend Their Use of Race in Admissions Policies*, THE NEW YORK TIMES, (Jan. 28, 2003), perma.cc/7HNU-QBGD. For instance, a diversity task force created by the Chief of Naval Operations in July 2020 and chaired by a two-star admiral recently recommended that the Navy "deemphasiz[e] the use of standardized academic tests" and prioritize subjective factors instead. Task Force One Navy, *Final Report* 20, (Jan. 26, 2021), perma.cc/Q6GK-L8JV. The purpose of this radical shift was to "improv[e] … minority representation" and ensure the officer corps "reflect[s] relevant national demographic percentages" because "recruiting efforts have not achieved equitable demographic representation of officers." *Id.* at 20, 37.

33.     In a 2010 *New York Times* op-ed discussing the Academy's racial preferences, an Academy professor stated: "I can confirm from the years I spent on the admissions board in 2002 and '03 and from my conversations with more recent board members, [that] if an applicant identifies himself or herself as non-white, the bar for qualification immediately drops." Bruce Fleming, *The Academies' March Towards Mediocrity*, THE NEW YORK TIMES, (May 20, 2010), nyti.ms/468PqwB. Notably, the "non-white" category described by Professor Fleming does not include Asian applicants. *See* Bruce Fleming, *Not Affirmative, Sir*, THE WASHINGTON POST, (January 16, 2003), perma.cc/C5SP-NGYE ("Members of three racial groups receive preference: African Americans, Hispanics, and Native Americans.").

34.     The magnitude of those racial preferences is stunning. According to Professor Fleming, "[i]f a 'majority' student scored 600 or more on each part of the SAT I test, math and verbal, we put a check mark and went on to consider other aspects of the application. We did so in the case of a 'minority' student if the scores were in the neighborhood of 550." *Id.* Professor Fleming also

recounted an episode where the board of admissions "debated whether students of Brazilian origin 'counted' as Hispanics" and should be eligible for preferred consideration. *Id.*

35.     The demographics of the Academy's year-over-year enrollment reflect efforts to racially balance the incoming classes with surgical precision. Take the racial demographics of the Academy's classes of 2025 and 2026, for instance. For the class of 2025, the Academy enrolled 1,183 midshipmen, 672 of whom were white, 79 of whom were African American, and 115 of whom were Asian. *See Class of 2025: Snapshot*, perma.cc/NY52-FFBK. For the class of 2026, it enrolled 1,184 midshipmen, 676 of whom were white, 75 of whom were African American, and 117 of whom were Asian. *See Class of 2026 Snapshot*.

36.     The Academy goes to great lengths to achieve this precise balance: A U.S. General Accounting Office report to the Senate Armed Services Committee noted that "the Academy makes offers of appointment to the majority of qualified minorities to achieve the Chief of Naval Operations' commissioning goals for minorities." GAO/NSIAD Report 93-54, *Naval Academy: Gender and Racial Disparities* 38 (1993), perma.cc/6MUR-62V5.

37.     The Academy's racial preferences are determinative for hundreds of applicants each year. Congressional nominees comprise roughly 75% of each incoming class, and in most cases, up to ten qualified applicants compete against one another for the single slot afforded to their Senator or Representative each year. Because skin color can be—and often is—a decisive factor for successful applicants who are chosen from those congressional nominee pools, it is equally dispositive for the other qualified nominees who are turned away. Put differently, because race is a "positive" factor for some Academy applicants, it is necessarily a "negative" factor for others. *SFFA*, 143 S. Ct. at 2169.

## III.   The Academy's Flawed Justifications for Its Race-Based Admissions Practices

38.     Over the years, the Academy has offered several justifications for its use of race in admissions. In 2003, while the Supreme Court was considering Michigan's use of racial preferences in

*Grutter v. Bollinger*, 539 U.S. 306 (2003), the Academy's dean of admissions told the *New York Times* that its racial preferences were necessary because the Academy needs "a brigade [student body] that reflects our country." Clymer, *supra*. Racial preferences were also necessary, he said, because the Navy's officer corps needed to "reflect" the racial demographics "of the services of which we are a part." *Id.*

39.    Although the Solicitor General declined to defend Michigan's use of racial preferences in *Grutter*, a collection of retired former military officers submitted an amicus brief arguing that racial preferences in higher education served a national security interest. *See* Brief of Julius W. Becton, Jr., et al. as Amici Curiae Supporting Respondents at 6, *Grutter v. Bollinger* 539 U.S. 306 (2003) (No. 02-241) ("Becton Brief"). Unlike the Academy's then-dean of admissions, the *amici* did not argue that the racial makeup of the Navy's officer corps needed to reflect society at large. They argued that racial preferences were necessary because the racial composition of the military's officer corps needed to reflect the racial composition of its enlisted corps, and that proportional representation could only be achieved through racial preferences. *Id.*

40.    *Grutter* accepted the Becton brief's assertions, without any evidence or adversarial testing. It repeated the brief's assertion that, "to fulfill its mission, the military 'must be selective in admissions for training and education for the officer corps, *and* it must train and educate a highly qualified, racially diverse officer corps in a racially diverse educational setting.'" 539 U.S. at 331 (cleaned up). And it repeated the Becton brief's conclusory argument that "[a]t present, 'the military cannot achieve an officer corps that is both highly qualified and racially diverse unless the service academies and the ROTC use limited race-conscious … admissions policies.'" *Id.* (cleaned up).

41.    After *Grutter*, the Academy has leaned heavily on the justification put forth in the Becton brief: that the military "has a powerful interest in developing an officer corps that is prepared to lead a diverse force and that shares the diversity of the enlisted ranks." Br. of United States as *Amicus Curiae* in Support of Resp'ts 12, *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198 (No. 14-981) (2016)

("Fisher U.S. Brief"). A report of the Military Diversity Leadership Commission stressed that "[t]he military should mirror the demographic composition of the population it serves and that senior leaders should mirror the demographic composition of the troops they lead." Military Diversity Leadership Commission, *From Representation to Inclusion* 42, (Mar. 15, 2011), perma.cc/VR65-UFNE ("MDLC Report").

42.     Under this formulation, statistical parity with the racial makeup of the general population is not enough. Now, racial preferences are supposedly necessary to achieve racial balance between the enlisted corps—an all-volunteer force—and the officer corps. *See, e.g.*, SFFA U.S. Brief at 15 ("The military has not yet achieved its goal of building an officer corps that reflects the 'racial and ethnic composition' of the service members officers lead" because "White service members are 53% of the force but 73% of officers."); *see also id.* (listing similar statistical comparisons for black and Hispanic officers and enlisted service members).

43.     This goal is tantamount to a declaration that the Academy will *never* stop using race in admissions, since the percentage of sailors and Marines from certain racial categories who voluntarily enlist in the Navy will dictate the scope of the Academy's racial preferences. Indeed, the Defense Department acknowledges that the "demographic makeup" of society and the enlisted force is "continually changing" and states that the military "must change" alongside it "to maintain and sustain its future forces." Department of Defense, *DoD Diversity Strategic Plan 2012-2017* 3, perma.cc/TSN2-T62L.

44.     Even if the racial demographics of the officer corps do eventually mirror those of the enlisted corps, the continued use of race will be necessary to preserve that statistical parity going forward. In short, the Academy's use of race "lack[s] a 'logical end point.'" *SFFA*, 143 S. Ct. at 2170.

45.     As to *how* fostering diversity at the Academy through racial preferences is essential to fulfilling the Navy's mission to defend the nation, the Academy offers a scattershot of reasons devoid

of evidentiary support and naked appeals to deference. They can be broadly summarized as two propositions: (1) that racial preferences enhance the military's internal functioning; and (2) that racial preferences enhance the military's functional capacity by fostering internal confidence within the ranks and by bolstering its external legitimacy which, in turn, increases societal trust and recruitment efforts.

46.    Before the Supreme Court's decision in *SFFA*, the Academy also invoked the "educational benefits of diversity," like Harvard and UNC did in *SFFA*, as a third justification. Specifically, the Academy submitted that the racial "diversity" achieved through race-based admissions "reduc[ed] a sense of isolation and alienation" among ethnic minorities and "encourage[d] greater participation by minority students in the classroom." *Students for Fair Admissions v. President and Fellows of Harvard College*, No. 21-707, Tr. 145:1-146:11, (Oct. 31, 2022). Now that the Supreme Court has refused to allow colleges to justify their actions by reference to those undefined—and undefinable—"educational benefits," the Academy is left with its first two justifications.

A.    **Internal Functioning and Military Readiness**

47.    The Academy posits several ways that racial preferences are critical to having a well-functioning Navy in a pluralistic society. All of them view sailors and Marines primarily as members of racial groups, rather than as individuals, and are grounded in the assumption that minority service members all think and feel the same way.

48.    First, the Academy argues that statistical parity between the racial demographics of officers and enlisted sailors and Marines is necessary to preserve unit cohesion and ward off racial strife within units. In support of that assertion, it highlights anecdotal incidents of racial tension among enlisted servicemembers during the Vietnam War, most of which occurred in a brief period from 1969 to 1972. That talking point, raised for the first time by the Becton brief in *Grutter* and repeated in virtually every government defense of racial preferences since, cherry-picks a few unfortunate

incidents and extrapolates them to the American military in general. At best, it is a textbook example of conflating correlation with causation.

49.     In fact, "racial animosity had been negligible within the U.S. armed forces" prior to 1967, and it has been virtually nonexistent post-Vietnam. James Maycock, *War Within War*, The Guardian (Sept. 14, 2001), perma.cc/PX5M-ELMJ. During the Korean War—just a few years after President Truman ordered desegregation in the military—"practical measures outweighed racial beliefs," and integration "failed to produce the violence or poor morale the military brass expected." Walt Napier, *A Short History of Integration in the U.S. Armed Forces*, United States Air Force (July 1, 2021), perma.cc/PYT6-SDXA. The "military brass" of that era were pro-segregation, and their predictions of "violence" and "poor morale" did not bear out. *Id.*

50.     The brief period of racial unrest that the Academy retells over and over was not produced by colorblind policies. It was a tragic byproduct of broader factors: "a changing social environment, a controversial war, and new conscription strategies" that allowed wealthier Americans to escape the draft through college deferments while sending disproportionate numbers of low-income draftees to frontline combat units based on their educational backgrounds. Br. of Veterans for Fairness and Merit as *Amicus Curiae* in Support of Pet'r at 7, *Students for Fair Admissions v. President and Fellows of Harvard College*, -- S. Ct. --, 2023 WL 4239254, No. 20-1199 (U.S. June 29, 2023) ("VFM Brief"). In short, the incidents that the Academy cites to justify open-ended racial preferences were the product of a "perfect storm for racial conflict" that has not existed for the past half century. *Id.*

51.     Moreover, the underlying assumption of the Academy's argument is that sailors view their peers and superiors foremost in terms of race, rather than in terms of their ability or character traits like loyalty, devotion, and selflessness. Put differently, it assumes that sailors apply the same racial stereotypes to one another that the Academy applies to them. There is no evidence to suggest that's the case, and plenty of evidence suggests that it isn't. *See generally id.*

52.    The Academy makes a related argument that officers will "often fai[l] to perceive racial tensions among enlisted personnel" if the officer corps does not have the same levels of racial and ethnic diversity as the enlisted ranks. Fisher US Brief 11. That argument relies on the same misguided assumptions.

53.    Second, the Academy claims that statistical parity between the racial demographics of the officer corps and those of the enlisted corps is necessary to "foster trust between the enlisted corps and its leaders." SFFA U.S. Brief 15; *see also* Fisher U.S. Brief 12 ("military leaders have concluded that an officer corps that shares the diversity of the enlisted ranks improves performance by 'facilitating greater confidence' in leadership"); *Students for Fair Admissions*, No. 21-707, Tr. 145:1-146:11 (discussing military academies, Solicitor General asserts that benefits of increased racial diversity include "cross-racial understanding," which can "lead[] to positive developments with cognitive development.").

54.    The Academy has never provided evidence to support that assertion, and indeed, all available evidence says otherwise. This argument relies on crude and infantilizing stereotypes about the men and women who volunteer to serve in our armed forces, and it defies common sense. It assumes that black sailors will be more likely to trust a black officer or a chain of command that includes black officers, that Hispanic Marines are more likely to trust Hispanic officers, and so forth—because of their skin color, not their trustworthiness. And it completely ignores reams of evidence showing that trust between sailors at sea or Marines on the battlefield is formed through performance, and that servicemembers in war zones are more concerned with their leaders' competency than with their skin color. *See, e.g.*, VFM Brief 18 ("[T]he immutable human element of warfare requires a color-blind warrior ethos for trust, unit cohesion, and combat effectiveness.").

55.    Third, the Academy broadly claims that the diversity produced by racial preferences makes Navy units "more effective at accomplishing their missions." SFFA U.S. Brief 15. It does not

define what it means to be racially "diverse," nor does it provide concrete evidence that military units that choose their members based on race are more successful on the battlefield than units who select their members based on objective measures of tactical competency, regardless of skin color.

56.     In *Fisher*, the Solicitor General extrapolated on this theme and claimed that units with greater racial diversity are more capable of interacting with and understanding partner forces from international allies. *See* Fisher U.S. Brief 12 ("Maintaining a diverse leadership corps also ensures that the military contains the cultural and racial identities necessary to better understand our partner forces."). The government did not elaborate on why it thinks that's true. Apparently, it thought it self-evident that individuals who share the same skin color also share a common "understand[ing]."

**B.     External Legitimacy and Societal Trust**

57.     The Academy maintains that having an officer corps that does not reflect the racial makeup of the general population and the enlisted ranks will "undermine the military's legitimacy by fueling 'popular perceptions of racial/ethnic minorities serving as 'cannon fodder' for white military leaders." Fisher U.S. Brief 12 (quoting MDLC Report at 15); *see also* SFFA U.S. Brief 19 ("[G]overnment agencies that lack diversity risk losing legitimacy in the eyes of a diverse nation.").

58.     Again, this conclusory statement assumes that the American people assess the "legitimacy" and trustworthiness of an institution based on its racial makeup. That notion is both un-American and devoid of any evidentiary support. To the contrary, a significantly higher percentage of Americans expressed confidence in the U.S. military three decades ago than they do today. *See* Gallup, *Confidence in Institutions,* perma.cc/DEH2-M92Y. And half of Americans now think that military leaders' over-emphasis on social-justice issues and political correctness is "undermining military effectiveness." Ronald Reagan Institute, *Reagan National Defense Survey*, (Nov. 2022), perma.cc/32B9-RZTZ.

59.     Finally, the Academy argues that the Navy will lose "societal trust" if racial metrics between the officer and enlisted corps (and between the officer corps and society at large) are not

equivalent. The Academy further argues that this speculative loss of societal trust could, in turn, harm recruiting efforts. But today, at the apex of the Academy's use of racial preferences, the Navy is facing a recruiting crisis that is unprecedented in the modern, all-volunteer era. Navy recruiters are working six days a week, but the Navy still cannot meet recruiting goals. *See* Geoff Ziezulewicz, *Navy Forcing Its Recruiters to Work Six Days a Week*, Navy Times (June 29, 2023), perma.cc/P6HP-YBW2.

60.     If anything, the Academy's assertions about recruiting and retention are backwards. In-depth surveys and statistical studies of the military's personnel crisis—*i.e.,* the rigorous analyses that the Academy has failed to offer—show that the military's emphasis on non-merit factors in admissions and promotions decisions is a leading cause of junior officer attrition. "According to 9 out of 10 respondents, more officers would stay if the military was more of a meritocracy." Tim Kaine, *Why Our Best Officers Are Leaving*, The Atlantic, (February 2011), perma.cc/Y6AV-XZUC. And 71% of active-duty officers believe the military would retain more talent if opportunities were based solely on merit. Sayce Falk & Sasha Rogers, *Junior Military Officer Retention: Challenges and Opportunities*, Kennedy Sch. of Gov't, Harvard Univ. (2011), perma.cc/JW2V-Y24Y. To the extent that the Academy's mission is to solidify the public's trust, its race-based admissions policy shoots itself in the foot—especially since 70% of Americans agree that universities should not "be allowed" to "consider race in admissions." Anthony Salvanto, *CBS News Poll Finds Most Americans Say Colleges Shouldn't Factor Race Into Admissions*, CBSNews.Com, (June 21, 2023), perma.cc/PW5D-ZUAT.

61.     Flawed as they are, none of the Academy's justifications for racial preferences are new. In fact, nearly all its nebulous arguments for race-based admissions were made sixty-five years ago by opponents of desegregation. The military segregationists' arguments—like the arguments offered by the Academy—were long on racial stereotypes but short on actual evidence. Like the Academy, seg-regation proponents argued that a colorblind military would "create difficulties 'which would be re-flected in morale and military efficiency.'" President's Committee on Equality of Treatment and

Opportunity in the Armed Services, *Freedom to Serve* 12, (May 22, 1950), perma.cc/C2F5-6SCD. Like the Academy, they claimed that colorblind policies would degrade the military's ability to accomplish its national-defense mission. *Id.* at 49-50. And, like the Academy, they warned that a colorblind approach would be inconsistent with "civilian sentiment" and pose external risks to the institution. *Id.*

62.     Truman's commission rejected all those arguments as unsupported and ideologically driven conjecture. In the process, the commission unequivocally affirmed that servicemembers should be treated as individuals in all circumstances, and that drawing inferences from a person's membership in a particular racial or ethnic group was immoral and illogical. "To put racial restrictions on job opportunities seemed to the Committee to ignore completely the essential factor of individual differences." *Id.* at 13.

## IV.     *SFFA v. Harvard*

63.     The Supreme Court held in *SFFA* that racial preferences in college admissions violate the Equal Protection Clause of the Fourteenth Amendment.

64.     Harvard and UNC both admitted to using race in admissions, but both institutions strenuously insisted that they did so in a "holistic" manner that treated race only as an optional "tip." Both institutions defended their consideration of race as necessary to further a compelling interest in "the educational benefits of diversity."

65.     The Court held both policies unconstitutional for several reasons.

66.     The Court deemed the universities' reasons for using race impermissibly vague and unmeasurable. Harvard claimed that its consideration of race was crucial for "(1) training future leaders in the public and private sectors; (2) preparing graduates to 'adapt to an increasingly pluralistic society'; (3) 'better educating its students through diversity'; and (4) 'producing new knowledge stemming from diverse outlooks.'" *SFFA*, 143 S. Ct. at 2166. UNC made similar arguments but added a fifth

justification to the list: "enhancing appreciation, respect, and empathy, cross-racial understanding, and breaking down stereotypes." *Id.*

67.    The Court held that those goals could not justify race-based admissions because they could not "be subject to meaningful review" and were thus "[in]sufficiently coherent for purposes of strict scrutiny." *Id.* Federal courts had no way of measuring the Universities' self-assessed progress toward achieving those goals. *Id.* Moreover, "[e]ven if [those] goals could somehow be measured," there was no way for courts "to know when they have been reached, and when the perilous remedy of racial preferences may cease." *Id.*

68.    The universities also "measure[d] the racial composition of their classes using the following categories," which come from the federal government: "(1) Asian; (2) Native Hawaiian or Pacific Islander; (3) Hispanic; (4) White; (5) African-American; and (6) Native American." *Id.* at 2167. But those categories are "imprecise," "arbitrary," "undefined," "opaque," and both over- and "under-inclusive." *Id.*

69.    "The Universities' main response to these criticisms [was], essentially, 'trust us.'" *Id.* at 2168. Accepting that proposition, however, would have meant forgoing any meaningful judicial review. And although the Court recognized that some "degree of deference" applies to universities' educational decisions, "deference does not imply abandonment or abdication of judicial review." *Id.*

70.    Both universities strenuously protested that, although they used race as a "positive" for certain applicants, "an individual's race is never a negative factor in admissions." *Id.* The Court found that argument "hard to take seriously." *Id.* Because "[c]ollege admissions are zero-sum," a "benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* Thus, by using race as a "positive" for some applicants, Harvard and UNC necessarily used it as a negative attribute for others.

71.     Both universities assumed that increasing the percentage of racial minorities on campus would necessarily increase other students' exposure to different ideas and perspectives. In blunter terms, their policies assumed that all racial minorities had certain views and life experiences solely because of the color of their skin. But "[o]ne of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merits and essential qualities." *Id.* at 2170.

72.     Neither Harvard's nor UNC's use of race had a logical end point. *See id.* at 2170-71. Neither institution could identify when they would stop using race or under what circumstances.

73.     For example, UNC defined its racial "diversity" goals in relation to the racial demographics of the general population. *See id.* at 2171-72 ("The University frames the challenge it faces as 'the admission and enrollment of underrepresented minorities,' a metric that turns solely on whether a group's 'percentage enrollment within the undergraduate student body is lower than their percentage within the general population in North Carolina.'" (cleaned up)). As the Academy does, UNC claimed that it "ha[d] not yet fully achieved its diversity-related educational goals" because it still needed to "obtain closer to proportional representation." *Id.* at 2172.

74.     The Court rejected that metric out of hand. It reiterated that "'outright racial balancing' is 'patently unconstitutional'" because "at the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Id.* (cleaned up). UNC's use of race to obtain "proportional representation" in incoming classes was further unconstitutional, the Court held, because it "'effectively assur[ed] that race will always be relevant and that the ultimate goal of eliminating' race as a criterion 'will never be achieved.'" *Id.* (cleaned up).

75.     In sum, the Court held that both Universities failed strict scrutiny and their use of race was therefore unconstitutional because their "programs lack sufficiently focused and measurable

objectives warranting the use of race, unavoidably employ race in a negative manner, involve racial stereotyping, and lack meaningful end points." *Id.* at 2175.

76.     In a footnote to the opinion, the Court declined to analyze the use of race by the military academies because "none of the courts below addressed the propriety of race-based admissions systems in that context." *Id.* at 2166 n.4. But *SFFA*'s reasoning makes it perfectly clear that the Academy's use of race in admissions is unconstitutional. *Compare United States v. Windsor*, 570 U.S. 744, 778 (2013) (Roberts, C.J., dissenting) (noting that the majority opinion, which declared unconstitutional a federal definition of marriage, left open the constitutionality of "state marriage definitions")*, with Obergefell v. Hodges*, 576 U.S. 644, 662-63 (2015) (explaining that virtually every court of appeals concluded that the logic of *Windsor* also deemed the state definitions unconstitutional).

77.     The Academy has not changed its race-based admissions in light of *SFFA*. Officials at the academies told the press that "they would continue to use race as a factor while awaiting guidance from the Department of Defense"—guidance that has not been issued. Moreover, then-Superintendent Sean Buck reiterated to the House Armed Service Committee in July that the Academy will continue to consider applicants' race going forward.

## V.     Plaintiff and This Litigation

78.     SFFA has members who are ready and able to apply to the United States Naval Academy, including Members A and B.

79.     Member A is white, a U.S. citizen, and under the age of 23. He has long wanted to attend the United States Naval Academy.

80.     Member A applied for admission to the Naval Academy for the class of 2026 and secured a nomination from a Member of Congress to attend. The Academy rejected his application.

81.     Member A is currently in college, medically qualified, under the age of 23, and lives in the southeast. He is ready and able to apply to the Naval Academy again were a court to order it to cease the use of race and ethnicity as a factor in admissions.

82.     Member A joined Students for Fair Admissions because he supports its mission and this lawsuit. Member A wishes to remain pseudonymous, however, because he fears reprisal from the Academy and others if his participation in this litigation becomes public.

83.     Member B is Asian, a U.S. citizen, and under the age of 23. The United States Naval Academy has been his dream school since he was in the sixth grade.

84.     Member B applied for admission to the Naval Academy for the class of 2027 and secured a nomination from a Member of Congress to attend. The Naval Academy rejected his application.

85.     Member B is currently in college, medically qualified, under the age of 23, and lives in the Western United States. He is ready and able to apply to the Naval Academy again were a court to order it to cease the use of race and ethnicity as a factor in admissions.

86.     Member B joined Students for Fair Admissions because he supports its mission and this lawsuit. Like Member A, he wishes to remain pseudonymous, because he fears reprisal from the Academy and others if his participation in this litigation becomes public.

87.     If the Academy is allowed to continue making admissions decisions based on applicants' race, SFFA's members—including Members A and B, and other similarly-situated applicants—will suffer irreparable harm because they will be denied the opportunity to compete for an Academy appointment on equal grounds.

## CLAIM FOR RELIEF
### COUNT
**Violation of the Fifth Amendment**

88.     Plaintiff incorporates and restates all its prior allegations here.

89.   "It is undisputed that 'service academies are subject to the Fifth Amendment.'" *Lebrun v. England*, 212 F. Supp. 2d 5, 16 (D.D.C. 2002); *see also Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976) ("A succession of cases in this circuit and others ha[s] reiterated the proposition that the military is subject to the Bill of Rights and its constitutional implications."); *Frontiero v. Richardson*, 411 U.S. 677, 688 (1973) (similar).

90.   The Fifth Amendment contains an equal-protection principle that binds the federal government and is no less strict than the Equal Protection Clause that binds the States. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224 (1995). "[A]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Id.* That principle stems not only from the Fifth Amendment, but also from the Fourteenth Amendment's guarantee of equal citizenship, the Constitution's limits on the scope of federal power, and bedrock principles of equality laid out in the Declaration of Independence.

91.   Because the Academy's admissions policy relies on racial classifications, it must satisfy strict scrutiny. *Id.* In other words, it must employ measures that are "narrowly tailored" to "further compelling governmental interests." *SFFA*, 143 S. Ct. at 2162. The Academy's overt racial preferences cannot clear this bar.

92.   The Supreme Court has recognized compelling interests in the use of race in only the narrowest of circumstances, where those preferences are explicitly designed to remedy recent acts of discrimination and to make the *individual subjects* of that discrimination whole. *See id.* The Academy's admissions policy does not meet this standard, and the Academy makes no pretenses that it does.

93.   The Academy asserts compelling interests in facilitating organizational cohesion, forming culturally aware leaders, ensuring societal "legitimacy" (circularly defined by the Academy), and safeguarding the public trust. If those themes sound familiar, it's because the Supreme Court rejected

all of them in *SFFA*. *See* 143 S. Ct. at 2166-67 (rejecting Defendants' claim to have compelling interests in "training future leaders"; "preparing graduates to 'adapt to an increasingly pluralistic society'"; "better educating [their] students through diversity"; and "producing new knowledge stemming from diverse outlooks").

94.     None of the Academy's purportedly compelling interests can "be subjected to meaningful judicial review." *Id.* at 2166. There is no way for "courts … to measure these goals," and even if they could be measured, courts have no basis for assessing "when they have been reached." *Id.*; *see also id.* ("How is a court to know whether leaders have been adequately 'trained'; whether the exchange of ideas is 'robust'; or whether 'new knowledge' is being developed?" (cleaned up)).

95.     The Academy's appeal to the military benefits of diversity is no different from Harvard and UNC's appeal to the "educational benefits of diversity." In both instances, the purported benefits are vague and "elusive." *Id.* In fact, the only quantifiable aspects of the Academy's race-based admissions program are the racial and ethnic enrollment percentages set by the superintendent each year.

96.     Moreover, "the question in this context is not one of *no* diversity or of *some*: it is a question of degree. How many fewer leaders [the Academy] would create without racial preferences, or how much poorer the education at [the Academy] would be, are inquiries no court could resolve." *Id.* at 2167.

97.     The Academy's admissions program also fails narrow tailoring because it "fail[s] to articulate a meaningful connection between the means [it] employ[s] and the goals [it] pursue[s]." *Id.* The Academy claims that racial preferences are necessary to ensure an officer corps that reflects the racial demographics of the nation it serves and the enlisted corps it leads. That interest is not compelling; it is pure racial balancing.

98.     Besides, these categories are "imprecise in many ways." *Id.* "Some of them are plainly overbroad: by grouping together all Asian students, for instance, [the Academy is] apparently

uninterested in whether *South* Asian or *East* Asian students are adequately represented, so long as there is enough of one to compensate for a lack of the other." *Id.* (emphasis original). "Meanwhile, other racial categories, such as 'Hispanic,' are arbitrary or undefined." *Id.*

99.     Furthermore, the Academy produces only one-fifth of newly commissioned Navy officers each year. Federal law prohibits the Academy from increasing its annual enrollment in greater numbers than the annual increase in ROTC or Officer Candidate School enrollments. *See* §8454(h). Thus, even if it had a compelling interest in ensuring perfectly proportional racial representation between the officer corps and the general population, the Academy's use of the "invidious" practice of racial preferences barely moves the needle in terms of the demographics of the officer corps as a whole. *Id.* at 2166. Regardless, the Supreme Court has already rejected this premise for the civilian colleges and universities who produce eighty percent of the Navy's officers through ROTC and Officer Candidate School programs. *SFFA*, 143 S. Ct. at 2162-67; *see also id.* at 2247 (Sotomayor, J., dissenting) (the national security interests asserted by the military academies "are also implicated at civilian universities" with ROTC programs, but those universities' consideration of race is now unconstitutional).

100.     Nor has the government offered facts or evidence-based reasoning to support its excuses for using race at the academies. The government flatly asserts that the "service academies have carefully considered potential race-neutral alternatives" and "have concluded that, at present, those alternatives would not achieve the military's compelling interest in fostering a diverse officer corps." But it has never identified any studies, reports, or experiments "carefully considering" race-neutral alternatives.

101.     Contra the Academy, the service academies can achieve racially diverse student bodies through race-neutral means. The Coast Guard Academy provides a real-world example. Until 2010, that academy was prohibited by federal statute from using racial preferences in its admissions process.

In the two years before the Coast Guard Academy began considering race, it launched an aggressive advertising and recruiting campaign targeting minorities. At the end of those two years, the Coast Guard Academy had increased minority enrollment by 60%—from 15% to 24%. Those numbers were within a few percentage points of the other academies, which had been using explicit racial preferences for years.

102.    The Academy's race-based admissions violate the Fifth Amendment because "race may never be used as a 'negative'" or "operate as a stereotype." *Id.* at 2168 (cleaned up). As discussed above, the Academy openly acknowledges that race is determinative for some applicants. Because the Academy provides a racial "benefit" to "some applicants but not to others," it "necessarily advantages the former group at the expense of the latter." *Id.* Because race is a "positive" for minority applicants who receive preferences, it is necessarily a "negative" for all others. *Id.*

103.    The Academy's admissions program also relies on impermissible stereotypes. The Supreme Court has "long held that universities may not operate their admissions programs on the 'belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue,'" or "assum[e] that 'members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike.'" *Id.* at 2169 (cleaned up). The Academy does exactly that when it uses racial preferences to "foster trust between the enlisted corps and its leaders," to create "sociocultural competencies essential to multicultural leadership in the 21st century," and to "ensur[e] that the military contains the cultural and racial identities necessary to better understand our partner forces."

104.    By tethering its use of race to the racial demographics of the enlisted corps and the country as a whole, the Academy is violating equal protection by engaging in the "patently unconstitutional" practice of "[o]utright racial balancing." *Id.* 2172. It is not "'treat[ing] citizens as individuals,'" but as "'simpl[e] components of a racial … class.'" *Id.* (cleaned up).

105.    The Academy's use of race in admissions is also unconstitutional because it "lack[s] a 'logical end point.'" *Id.* at 2170 (cleaned up). Indeed, under its theory of "racial diversity," it would be impossible for the Academy to stop considering race. By tying its racial enrollment needs to the ever-shifting demographics of the country and the enlisted ranks, the Academy is essentially promising to use race in perpetuity. *Cf. id.* at 2172-74.

106.    The Academy's status as a military institution does not mean that courts must defer to its conclusory assertions that it needs to employ racial preferences, let alone diminish any of the constitutional violations described above. *See Owens v. Brown*, 455 F. Supp. 291, 300 (D.D.C. 1978) (courts are not compelled "to abdicate their responsibility to decide cases and controversies merely because they arise in the military context"). Although courts have been mindful of the military's unique role in society and the unique considerations that come with it, no level of deference justifies systematic racial discrimination. *See SFFA*, 143 S. Ct. at 2168 ("any deference must exist 'within constitutionally prescribed limits'").

107.    In fact, as the Court recognized in *SFFA*, blind deference to assertions of national security or military necessity can lead to "gravely wrong" outcomes and gross violations of civil rights. *Id.* at 2162 n.3. "[I]n the infamous case *Korematsu*," the "Court upheld the internment of 'all persons of Japanese ancestry in prescribed West Coast ... areas' during World War II because 'the military urgency of the situation demanded' it." *Id.* (cleaned up). The Supreme Court has "since overruled *Korematsu*, recognizing that it was 'gravely wrong the day it was decided.'" *Id.* (cleaned up).

108.    "The Court's decision in *Korematsu* nevertheless 'demonstrates vividly that even the most rigid scrutiny can sometimes fail to detect an illegitimate racial classification' and that '[a]ny retreat from the most searching judicial inquiry can only increase the risk of another such error occurring in the future.'" *Id.* (cleaned up).

109.    Because the Academy's use of racial classifications in admissions violates the Fifth Amendment, it should be declared unlawful and enjoined.

**WHEREFORE**, Plaintiff asks this Court to enter judgment in its favor and to provide the following relief:

a.   A declaratory judgment that the Academy's use of race in admissions is unconstitutional under the Fifth Amendment;

b.   A preliminary injunction prohibiting the Academy from considering or knowing applicants' race when making admissions decisions;

c.   A permanent injunction prohibiting the Academy from considering or knowing applicants' race when making admissions decisions; and

d.   All other relief that Plaintiff is entitled to, including but not limited to attorneys' fees and costs.

Respectfully submitted,

*s/ Cameron T. Norris*

Adam K. Mortara (*pro hac vice* forthcoming)
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

Dated: October 5, 2023

Thomas R. McCarthy (*pro hac vice* forthcoming)
Patrick Strawbridge (*pro hac vice* forthcoming)
J. Michael Connolly (*pro hac vice* forthcoming)
Cameron T. Norris
Bryan Weir (*pro hac vice* forthcoming)
James F. Hasson (*pro hac vice* forthcoming)
R. Gabriel Anderson
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
patrick@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
bryan@consovoymccarthy.com
james@consovoymccarthy.com
gabe@consovoymccarthy.com

*Counsel for Students for Fair Admissions*

**VERIFICATION**

I, Edward Blum, declare as follows:

1.      I am the President of Students for Fair Admissions, the plaintiff in this case.

2.      I have reviewed this complaint.

3.      For the allegations within my personal knowledge, I believe them all to be true.

4.      For the allegations not within my personal knowledge, I believe them all to be true based on my review of the cited policies and documents and based on my conversations with members of Students for Fair Admissions, including Members A and B.

5.      I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 5, 2023

_____

Edward Blum
President of Students for Fair Admissions