**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, | |
| *Plaintiff*, | |
| v. | |
| THE UNITED STATES NAVAL ACADEMY, *et al.*, | |
| *Defendants*. | |

No. 1:23-cv-02699

**MEMORANDUM OF LAW
IN SUPPORT OF MOTION
FOR PRELIMINARY
INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ......................................................................................................................... 2

    I.     The Academy's Race-Based Admissions Process ................................................ 2

    II.    The Academy's Justifications for Its Race-Based Admissions Practices .............. 4

    III.   Students for Fair Admissions and This Litigation ................................................ 6

ARGUMENT ............................................................................................................................... 7

    I.     SFFA is likely to prevail on the merits. ............................................................... 8

         A.    The Academy has no compelling interest in race-based admissions. ........ 8

             1.    Internal Functioning ..................................................................... 9

             2.    External Legitimacy and Societal Trust ...................................... 12

         B.    The Academy's use of race is not narrowly tailored. ............................... 14

    II.    SFFA satisfies the remaining preliminary-injunction criteria. ............................ 18

CONCLUSION ......................................................................................................................... 19

CERTIFICATE OF SERVICE ................................................................................................ 21

## TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995) ............................................................................................................. 8

*Agudath Israel of Am. v. Cuomo*,
983 F.3d 620 (2d Cir. 2020) ............................................................................................... 18

*Berkley v. United States*,
287 F.3d 1076 (Fed. Cir. 2002) ......................................................................................... 17

*Brown v. Board of Education*,
347 U.S. 483 (1954) ............................................................................................................. 8

*Centro Tepeyac v. Montgomery Cnty.*,
722 F.3d 184 (4th Cir. 2013) ............................................................................................... 7

*Coal. to Defend Affirmative Action v. Granholm*,
473 F.3d 237 (6th Cir. 2006) ............................................................................................. 18

*Coreas v. Bounds*,
458 F. Supp. 3d 352 (D. Md. 2020) ................................................................................... 19

*Crawford v. Cushman*,
531 F.2d 1114 (2d Cir. 1976) ............................................................................................... 1

*Dep't of Navy v. Egan*,
484 U.S. 518 (1988) ........................................................................................................... 17

*Doc's Assocs. v. Stuart*,
85 F.3d 975 (2d Cir. 1996) ................................................................................................. 19

*Giovani Carandola, Ltd. v. Bason*,
303 F.3d 507 (4th Cir. 2002) ............................................................................................. 19

*Greer's Ranch Café v. Guzman*,
2021 WL 2092995 (N.D. Tex.) (May 18, 2021) ................................................................ 18

*Grutter v. Bollinger*,
539 U.S. 306 (2003) ............................................................................................. 4, 5, 16, 17

*Johnson v. California*,
543 U.S. 499 (2005) ..................................................................................................... 12, 17

*Korematsu v. United States*,
323 U.S. 214 (1944) ....................................................................................................... 2, 17

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................................................... 19

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
831 F.3d 500 (D.C. Cir. 2016) ........................................................................................... 19

*Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*,
584 F. Supp. 2d 766 (D. Md. 2008) ................................................................................... 18

*Reed v. Franke*,
  297 F.2d 17, 21 (4th Cir. 1969) ............................................................. 1

*Ross v. Meese*,
  818 F.2d 1132 (4th Cir. 1987) ............................................................. 18

*Shelby Cnty., Ala. v. Holder*,
  570 U.S. 529 (2013) ............................................................. 10

*Singh v. Berger*,
  56 F.4th 88 (D.C. Cir. 2022) ............................................................. 17

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  143 S. Ct. 2141 (2023) ............................................................. passim

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) ............................................................. 17

*U.S. Navy Seals 1-26 v. Biden*,
  27 F.4th 336 (5th Cir. 2022) ............................................................. 17

*Winter v. NRDC*,
  555 U.S. 7 (2008) ............................................................. 7

*Wygant v. Jackson Bd. of Educ.*,
  476 U.S. 267 (1986) ............................................................. 16

**Statutes**

10 U.S.C. §8454 ............................................................. 2

10 U.S.C. §8458 ............................................................. 18

**Other Authorities**

Amicus Br. of Veterans for Fairness and Merit at 7, *Students for Fair Admissions v. President and Fellows of Harvard College*,
  2023 WL 4239254, No. 20-1199 (U.S. June 29) ............................................................. 10

Br. of United States as *Amicus Curiae* in Support of Resp'ts 12, *Fisher v. Univ. of Tex. at Austin*,
  136 S. Ct. 2198 (No. 14-981) (2016) ............................................................. passim

Br. of United States as *Amicus Curiae* in Support of Resp'ts 15, *Students for Fair Admissions v. President and Fellows of Harvard College*,
  2023 WL 4239254, No. 20-1199 (U.S. June 29, 2023) ............................................................. passim

Brief of Julius W. Becton, Jr., et al. as Amici Curiae Supporting Respondents at 6, *Grutter v. Bollinger*,
  539 U.S. 306 (No. 02-241) (2003) ............................................................. 5

Gallup, *Confidence in Institutions,* perma.cc/DEH2-M92Y ............................................................. 13

President's Committee on Equality of Treatment and Opportunity in the Armed Services,
  *Freedom to Serve* 12, (May 22, 1950), perma.cc/C2F5-6SCD ............................................................. 13, 14

*Students for Fair Admissions v. President and Fellows of Harvard College*, No. 21-707, Tr.
  145:1-146:11, (Oct. 31, 2022) ............................................................. 9, 10

## INTRODUCTION

The United States Naval Academy is one of the crown jewels of the American military. The Academy has trained the future leaders of the Navy since 1845, producing some of our nation's most revered admirals. The Academy's mission is to "develop midshipmen morally, mentally, and physically and to imbue them with duty, honor, and loyalty" for a career of service to the United States Navy. Ex. A.

For most of its history, the Academy has evaluated midshipmen based on merit and achievement. For good reasons: America's enemies do not fight differently based on the race of the commanding officer opposing them, sailors must follow orders without regard to the skin color of those giving them, and battlefield realities apply equally to all sailors regardless of race, ethnicity, or national origin. To that end, President Truman desegregated the military well before other institutions followed suit. *See* Executive Order 9981 (July 26, 1948) ("[T]here shall be equality of treatment and opportunity for all persons in the armed forces without regard to race, color, religion, or national origin.").

Yet the Academy has strayed from that approach. Instead of admitting midshipmen solely on leadership potential and objective metrics—the Academy stopped requiring applicants to submit standardized scores three years ago—the Academy focuses on race.

The Academy has no justification for using race-based admissions. Those admissions are unconstitutional for all other public institutions of higher education. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141 (2023) ("*SFFA*"). The Academy is not exempt from the Constitution. *See, e.g.*, *Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976) ("A succession of cases in this circuit and others ha[s] reiterated the proposition that the military is subject to the Bill of Rights and its constitutional implications."); *Reed v. Franke*, 297 F.2d 17, 21 (4th Cir. 1969) (similar). And calls for blind judicial deference to the military on

1

questions of racial discrimination are "'gravely wrong,'" both legally and historically. *SFFA*, 143 S. Ct. at 2162 n.3 (discussing the overruling of *Korematsu v. United States*, 323 U.S. 214 (1944)).

Because the Naval Academy discriminates based on race, its admissions policy should be declared unlawful and enjoined. Because its admissions cycle will begin and end before this case can be fully litigated (plus any appeals), SFFA respectfully requests that this Court preliminarily enjoin the Academy from considering race as a factor in admissions **by December 1, 2023**.

## BACKGROUND

### I. The Academy's Race-Based Admissions Process

Admission to the Academy is highly selective: fewer than ten percent of applicants are given the honor of enrolling. *See, e.g.*, Ex. B at 1. The Academy typically enrolls slightly fewer than 1,200 midshipmen in each class. *See, e.g.*, *id.*; Ex. C.

Appointment (*i.e.*, "admission") to the Academy involves two stages: First, applicants must pass medical examinations and a physical-fitness test and secure a "nomination" from a member of Congress, the Vice President, the President, the Secretary of the Navy, or ROTC. *See generally* 10 U.S.C. §8454; Ex. Y; Ex. Z. Applicants who satisfy the requirements for the first step are considered "qualified" for admission. Second, after securing a nomination, applicants must be accepted by the Academy's admissions office.

When making selections, the Academy openly admits that "race" is a "factor" that it considers. Ex. I. The Academy disclaims racial quotas and characterizes its use of race as "holistic," like Harvard's and UNC's admissions programs in *SFFA*. *See, e.g.*, Br. of United States as *Amicus Curiae* in Support of Resp'ts 15, *Students for Fair Admissions v. President and Fellows of Harvard College*, 2023 WL 4239254, No. 20-1199 (U.S. June 29, 2023) ("SFFA U.S. Brief") (comparing the academies' use of race to "colleges and universities across the country"); *id.* at 24 (similar).

Terminology aside, the Academy's focus on race plays out across all areas of its admissions policy. Much like Harvard and UNC, *see SFFA*, 143 S. Ct. at 2156 n.1, the Academy's use of racial preferences "gives minorities an edge on admissions." Ex. J at 1. For instance, a diversity task force created by the Chief of Naval Operations in July 2020 and chaired by a two-star admiral recently recommended that the Navy "deemphasiz[e] the use of standardized academic tests" in admissions and prioritize subjective factors instead. Ex. V at 20. The purpose of this radical shift was to "improv[e] … minority representation" and ensure the officer corps "reflect[s] relevant national demographic percentages" because "recruiting efforts have not achieved equitable demographic representation of officers." *Id.* at 20, 37.

In a 2010 *New York Times* op-ed discussing the Academy's racial preferences a current Naval Academy professor stated: "I can confirm from the years I spent on the admissions board in 2002 and '03 and from my conversations with more recent board members, [that] if an applicant identifies himself or herself as non-white, the bar for qualification immediately drops." Ex. K at 2. Notably, the "non-white" category does not include Asian applicants. *See* Ex. U at 2 ("Members of three racial groups receive preference: African Americans, Hispanics, and Native Americans.").

The magnitude of those racial preferences is stunning. According to the professor, "If a 'majority' student scored 600 or more on each part of the SAT I test, math and verbal, we put a check mark and went on to consider other aspects of the application. We did so in the case of a 'minority' student if the scores were in the neighborhood of 550." *Id.* at 4. The professor also recounted an episode where the board of admissions "debated whether students of Brazilian origin 'counted' as Hispanics" and should be eligible for preferred consideration. *Id.* at 2-3.

The demographics of the Academy's year-over-year enrollment reflect efforts to racially balance the incoming classes. Take the racial demographics of the Academy's classes of 2025 and

2026, for instance. For the class of 2025, the Academy enrolled 1,183 midshipmen, 672 of whom were white, 79 of whom were African American, and 115 of whom were Asian. *See* Ex. L. For the class of 2026, it enrolled 1,184 midshipmen, 676 of whom were white, 75 of whom were African American, and 117 of whom were Asian. *See* Ex. C. The Academy goes to great lengths to achieve this balance: a U.S. General Accounting Office report to the Senate Armed Services Committee noted that "the Academy makes offers of appointment to the majority of qualified minorities to achieve the Chief of Naval Operations' commissioning goals for minorities." Ex. W at 38.

The Academy's racial preferences are determinative for hundreds of applicants each year. Congressional nominees comprise roughly 75% of each incoming class, and in most cases, up to ten qualified applicants compete against one another for the single slot afforded to their Senator or Representative each year. Because skin color can be—and often is—a decisive factor for successful applicants who are chosen from those congressional nominee pools, it is equally dispositive for the other qualified nominees who are turned away. Put differently, because race is a "positive" factor for some Academy applicants, it is necessarily a "negative" factor for others. *SFFA*, 143 S. Ct. at 2169.

## II.     The Academy's Justifications for Its Race-Based Admissions Practices

Over the years, the Academy has offered several justifications for its use of race in admissions. In 2003, while the Supreme Court was considering Michigan's use of racial preferences in *Grutter v. Bollinger*, 539 U.S. 306 (2003), the Academy's dean of admissions told the *New York Times* that its racial preferences were necessary because the Academy needs "a brigade [student body] that reflects our country." Ex. J at 4. Racial preferences were also necessary, he said, because the Navy's officer corps needed to "reflect" the racial demographics "of the services of which we are a part." *Id.* at 2.

Although the Solicitor General declined to defend Michigan's use of racial preferences in *Grutter*, a collection of retired former military officers submitted an amicus brief arguing that racial preferences in higher education served a national security interest. *See* Brief of Julius W. Becton, Jr., et al. as Amici Curiae Supporting Respondents at 6, *Grutter v. Bollinger* 539 U.S. 306 (No. 02-241) (2003) ("Becton Brief"). Unlike the Academy's then-dean of admissions, the *amici* did not argue that the racial makeup of the Navy's officer corps needed to reflect society at large. They argued that racial preferences were necessary because the racial composition of the military's officer corps needed to reflect the racial composition of its enlisted corps, and that proportional representation could only be achieved through racial preferences. *Id.*

*Grutter* accepted the Becton brief's assertions, without any evidence or adversarial testing. It repeated the brief's assertion that, "to fulfill its mission, the military 'must be selective in admissions for training and education for the officer corps, *and* it must train and educate a highly qualified, racially diverse officer corps in a racially diverse educational setting.'" 539 U.S. at 331 (cleaned up). And it repeated the Becton brief's conclusory argument that "[a]t present, 'the military cannot achieve an officer corps that is both highly qualified and racially diverse unless the service academies and the ROTC use limited race-conscious … admissions policies.'" *Id.* (cleaned up).

After *Grutter*, the Academy has leaned heavily on the justification put forth in the Becton brief: that the military "has a powerful interest in developing an officer corps that is prepared to lead a diverse force and that shares the diversity of the enlisted ranks." Br. of United States as *Amicus Curiae* in Support of Resp'ts 12, *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198 (No. 14-981) (2016) ("Fisher U.S. Brief"). A report of the Military Diversity Leadership Commission stressed that "[t]he military should mirror the demographic composition of the population it serves

and that senior leaders should mirror the demographic composition of the troops they lead." Ex. O at 42. This is necessary, the Academy insists, to ensure unit cohesion and internal trust and to maintain societal legitimacy. *See, e.g.*, SFFA U.S. Brief 15-19.

Under this formulation, statistical parity with the racial makeup of the general population is not enough. Racial preferences are supposedly necessary to achieve racial balance between the enlisted corps—an all-volunteer force—and the officer corps. *See, e.g.*, *id.* at 15 ("The military has not yet achieved its goal of building an officer corps that reflects the 'racial and ethnic composition' of the service members officers lead" because "White service members are 53% of the force but 73% of officers."); *id.* (listing similar statistical comparisons for black and Hispanic officers and enlisted service members).

This goal is tantamount to a declaration that the Academy will *never* stop using race in admissions, since the percentage of sailors and Marines from certain racial categories who voluntarily enlist in the Navy will dictate the scope of the Academy's racial preferences. Indeed, the Defense Department acknowledges that the "demographic makeup" of society and the enlisted force is "continually changing" and states that the military "must change" alongside it "to maintain and sustain its future forces." Ex. X at 3. Even if the racial demographics of the officer corps do eventually mirror those of the enlisted corps, the continued use of race will be necessary to preserve that statistical parity going forward. In short, the Academy's use of race "lack[s] a 'logical end point.'" *SFFA*, 143 S. Ct. at 2170. And the Academy has never adopted a sunset date for its use of race.

## III.   Students for Fair Admissions and This Litigation

SFFA is a voluntary membership organization formed for the purpose of defending human rights and civil liberties, including the right of individuals to equal protection under the law, through litigation and any other lawful means. Blum Decl. ¶2. SFFA is a nonprofit membership

group of tens of thousands of individuals across the country who believe that racial preferences in college admissions, including the academies, are unfair, unnecessary, and unconstitutional. ¶3. SFFA has members who are ready and able to apply to the United States Military Academy. ¶4.

Member A, for example, is white and a U.S. citizen. Member A Decl. ¶2. He has "long wanted to attend the United States Naval Academy." *Id.* He applied to the Academy for the class of 2026 and secured a nomination from a Member of Congress to attend. ¶3. The Academy rejected his application. *Id.* Member A is currently attending college in the Southeast and is a Midshipman in the Naval Reserve Officers Training Corps. ¶4. He is medically qualified and ready and able to reapply to the Naval Academy were a court to order it to cease its use of racial preferences in admissions. *Id.*

Member B is Asian and a U.S. citizen. Member B Decl. ¶2. The Naval Academy has been his dream school since he was in the sixth grade. *Id.* In 2023, he applied to the Academy for the class of 2027. ¶3. He secured a nomination from a Member of Congress to attend the Academy. *Id.* The Academy, however, rejected his application. *Id.* Member B is now a freshman in college, and he is medically qualified and ready and able to reapply to the Naval Academy were a court to order it to cease its use of racial preferences in admissions. ¶4.

## ARGUMENT

SFFA is entitled to a preliminary injunction if it can satisfy four factors: it is "likely to succeed on the merits," it is "likely to suffer irreparable harm in the absence of preliminary relief," the "balance of equities tips in [its] favor," and "an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013). SFFA satisfies all four.

I.        **SFFA is likely to prevail on the merits.**

*Brown v. Board of Education* proclaimed that the right to public education—a right inti-

mately connected with "service in the armed forces"—"must be made available to all on equal

terms." *Brown v. Board of Education*, 347 U.S. 483, 493 (1954). *SFFA* built on *Brown*'s legacy,

holding that "the Constitution is color blind," 143 S. Ct. at 2160, and that all "racial discrimination

in public education"—including the race-based admissions programs practiced at "[m]any universi-

ties"—is unconstitutional. *Id*. at 2160, 2176.

The Academy's admissions system is one such program. When it was before the Supreme

Court, the government bragged that the Academy uses race in the same way that Harvard and UNC

did. *See, e.g.*, SFFA U.S. Brief 5 (comparing the academies' use of race to "colleges and universi-

ties across the country"); *id.* at 24 (similar); *id.* at 7-8 (explaining that the academies use "admis-

sions policies like the one this Court approved in *Grutter*"). That concession is fatal. The strict-

scrutiny test that the Fifth Amendment applies to the Academy is "'the same'" as the strict-scrutiny

test that the universities flunked in *SFFA. Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224

(1995). So while *SFFA* "does not address" the military academies, 143 S. Ct. at 2166 n.4, its logic

leads to a straightforward conclusion: the Academy cannot use race either. Under strict scrutiny's

"daunting two-step examination," *id*. at 2162-63, the Academy's interests are not sufficiently com-

pelling, and its race-based admissions program is not narrowly tailored.

A.        **The Academy has no compelling interest in race-based admissions.**

To begin, none of the Academy's interests survive *SFFA*. Though the Academy asserts that

fostering racial diversity is essential to the Navy's national-security mission, that assertion is de-

void of evidentiary support and rests on naked appeals to deference. The Academy's supposed

interests in using explicit racial classifications can be broadly summarized as two propositions: (1)

racial preferences improve the military's internal functioning; and (2) racial preferences enhance

the military's functional capacity by fostering internal confidence within the ranks and by bolstering its external legitimacy which, in turn, increases societal trust and recruitment efforts.[1] Neither interest is compelling.

### 1.     Internal Functioning

The Academy posits several ways that racial preferences are critical to having a well-functioning Navy in a pluralistic society. All of them view sailors and Marines as members of racial groups, rather than as individuals—and all are grounded in the assumption that minority service members all think and feel the same way.

First, the Academy argues that statistical parity between the racial demographics of officers and enlisted sailors and Marines is necessary to preserve unit cohesion and ward off racial strife within units. In support of that assertion, it highlights anecdotal incidents of racial tension among enlisted servicemembers during the Vietnam War, most of which occurred in a brief period from 1969 to 1972. Further undermining this justification is that it was raised for the first time by a private amicus brief in *Grutter*—not by the government itself. The government later adopted the talking point and has repeated it in virtually every defense of racial preferences since. Post-hoc cherry picking a few unfortunate incidents and extrapolating them to the entire American military is not enough for strict scrutiny.[2]

---

[1] Before the Supreme Court's decision in *SFFA*, the Academy also invoked the "educational benefits of diversity," like Harvard and UNC did in *SFFA*. Specifically, it said that racial "diversity" "reduc[ed] a sense of isolation and alienation" among midshipmen who are ethnic minorities and "encourage[d] greater participation by minority students in the classroom." *Students for Fair Admissions v. President and Fellows of Harvard College*, No. 21-707, Tr. 145:1-146:11, (Oct. 31, 2022). Now that the Supreme Court has refused to allow colleges to justify their actions by reference to those undefined—and undefinable—"educational benefits," the Academy is left with its other justifications. *See SFFA*, 143 S. Ct. at 2166 n.4 (stressing that the academies must, at a minimum, identify "distinct" interests).

[2] What's more, the brief period of racial unrest that the Academy retells over and over was not produced by colorblind policies. It was a tragic byproduct of broader factors: "a changing

History paints a different picture. "[R]acial animosity had been negligible within the U.S. armed forces" prior to 1967, and it has been virtually nonexistent post-Vietnam. Ex. M at 2. During the Korean War—just a few years after President Truman ordered desegregation in the military—integration "failed to produce the violence or poor morale the military brass expected." Ex. N at 3. Moreover, the underlying assumption of the Academy's argument is that sailors and Marines view their peers and superiors foremost in terms of race, rather than in terms of their ability or character traits like loyalty, devotion, and selflessness. It assumes that sailors apply the same racial stereotypes to one another that the Academy applies to them. There is no evidence to suggest that's the case.

Second, the Academy claims that statistical parity between the racial demographics of the officer corps and those of the enlisted corps is necessary to "foster trust between the enlisted corps and its leaders." SFFA U.S. Brief 15; *see also* Fisher U.S. Brief 12 ("military leaders have concluded that an officer corps that shares the diversity of the enlisted ranks improves performance by 'facilitating greater confidence' in leadership"); *Students for Fair Admissions*, No. 21-707, Tr. 145:1-146:11 (discussing military academies, Solicitor General asserts that benefits of increased racial diversity include "cross-racial understanding," which can "lea[d] to positive developments with cognitive development").

---

social environment, a controversial war, and new conscription strategies" that allowed wealthier Americans to escape the draft through college deferments while sending disproportionate numbers of low-income draftees to frontline combat units based on their educational backgrounds. Amicus Br. of Veterans for Fairness and Merit at 7, *Students for Fair Admissions v. President and Fellows of Harvard College*, 2023 WL 4239254, No. 20-1199 (U.S. June 29). In short, the incidents that the Academy cites to justify open-ended racial preferences were the product of a "perfect storm for racial conflict" that has not existed for the past half century. *Id.*; *cf. Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 545-57 (2013).

The Academy has never provided evidence to support that assertion. Boiled down to its core, this argument simply relies on crude and infantilizing stereotypes about the men and women who volunteer to serve in our armed forces: It assumes that black sailors will be more likely to trust a black officer and that Hispanic Marines are more likely to trust Hispanic officers—not because of their trustworthiness, but merely because of their self-reported ethnicity. That's precisely the type of racial stereotyping that *SFFA* condemns. 143 S. Ct. at 2170. And such sad stereotypes completely ignore that trust between servicemembers is formed through battlefield performance, and that sailors and Marines in war zones are more concerned with their leaders' competency than with their race.

Third, the Academy broadly claims that the diversity produced by racial preferences makes Navy and Marine units "more effective at accomplishing their missions." SFFA U.S. Brief 15. It does not define what it means to be racially "diverse," nor does it provide concrete evidence that military units that choose their members based on race are more successful on the battlefield than units who select their members based on objective measures such as tactical competency. In *Fisher*, the Solicitor General extended this idea further, claiming that units with greater racial diversity are more capable of interacting with and understanding partner forces from international allies. *See* Fisher U.S. Brief 12 ("Maintaining a diverse leadership corps also ensures that the military contains the cultural and racial identities necessary to better understand our partner forces."). The government, however, did not elaborate on why it thinks that's true. Apparently, the government thought it self-evident that individuals who share the same skin color also share a common "understand[ing]." But that sort of assumption is precisely the racial stereotyping that *SFFA* prohibits. 143 S. Ct. at 2170.

**2.      External Legitimacy and Societal Trust**

The Academy also maintains that having an officer corps that does not reflect the racial makeup of the general population and the enlisted ranks will "undermine the military's legitimacy by fueling 'popular perceptions of racial/ethnic minorities serving as "cannon fodder" for white military leaders.'" Fisher U.S. Brief 12 (quoting Ex. O at 15); *see also* SFFA U.S. Brief 19 ("[G]overnment agencies that lack diversity risk losing legitimacy in the eyes of a diverse nation"). Again, this conclusory statement assumes that the American people assess the "legitimacy" and trustworthiness of an institution based on its racial makeup.

And that just isn't true. Less than a third of Americans think "selective colleges and universities" should take "race and ethnicity into account." Ex. P at 3; *see also* Ex. T at 3 (70% of Americans agree that universities should not "be allowed to consider race in admissions"). Even fewer think "diversity" is "very important." Ex. P at 5. And three-fourths of Americans—decisive majorities of every race—think employers should "[o]nly take a person's qualifications into account" when considering whether to hire them. *Id.* at 4. In-depth surveys of military personnel (the type of rigorous analyses that the Academy has failed to offer) paint the same picture. So, if anything, the Academy's claims about "diversity," "legitimacy," and "public trust" have it backwards: If its mission is to solidify the public's trust, the Academy should do away with race-based admissions, not double down on them. *See Johnson v. California*, 543 U.S. 499, 510-11 (2005) ("compliance with the [Constitution's] ban on racial discrimination … bolsters the legitimacy of the [government]").

The Academy also argues that the Navy will lose "societal trust" if racial metrics between the officer and enlisted corps—and between the officer corps and society at large—are not equivalent. This speculative loss of societal trust, the Academy claims, could, in turn, harm recruiting efforts. Not so. Today, at the apex of the Academy's use of racial preferences, the Navy is facing

a recruiting crisis that is unprecedented in the modern era—a crisis fueled by a lack of public confidence in the military, that itself appears to be a direct result of the military's overemphasis on "social justice" issues. *See* Gallup, *Confidence in Institutions,* perma.cc/DEH2-M92Y; *see also* Ex. S at 2 (observing that over half of Americans think the military's overemphasis on social justice is "undermining military effectiveness").

The Academy's assertions about retention are again backwards. In-depth surveys and statistical studies of the military's personnel crisis confirm this. "According to 9 out of 10 respondents, more officers would stay if the military was more of a meritocracy." Ex. R. at 3. And 71% of active-duty officers believe the military would retain more talent if opportunities were based solely on merit. *See, e.g.*, Ex. Q at 63.

Flawed as they are, none of the Academy's justifications for racial preferences are new. In fact, nearly all its nebulous arguments for race-based admissions were made sixty-five years ago by opponents of desegregating the military. The military segregationists' arguments—like the arguments offered by the Academy—were long on racial stereotypes but short on actual evidence. Like the Academy, segregation proponents argued that a colorblind military would "create difficulties 'which would be reflected in morale and military efficiency.'" President's Committee on Equality of Treatment and Opportunity in the Armed Services, *Freedom to Serve* 12, (May 22, 1950), perma.cc/C2F5-6SCD. Like the Academy, they claimed that colorblind policies would degrade the military's ability to accomplish its national-defense mission. *Id.* at 49-50. And, like the Academy, they warned that a colorblind approach would be inconsistent with "civilian sentiment" and pose external risks to the institution. *Id*.

Truman's commission rejected all those arguments. In the process, the commission unequivocally affirmed that servicemembers should be treated as individuals in all circumstances, and

that drawing inferences from a person's membership in a particular racial or ethnic group was immoral and illogical. "To put racial restrictions on job opportunities seemed to the Committee to ignore completely the essential factor of individual differences." *Id.* at 13. So too today.

### B.    The Academy's use of race is not narrowly tailored.

The Academy's race-based admissions program also fails narrow tailoring. *See SFFA*, 143 S. Ct. at 2167 (requiring the Academy to prove that its "use of race" is "necessary" to achieve its interests). When *SFFA* reaffirmed that the Constitution is colorblind, it also reiterated many of the prohibitions that equal protection has long entailed. *Id.* at 2162. "[R]ace," the Court instructed, "may not operate as a stereotype." *Id.* at 2168. And it "may never be used as a negative." *Id.* Race-based admissions programs must always have a "logical end point." *Id.* at 2170. And they may never engage in "outright racial balancing." *Id.* at 2172. The Academy's admissions program transgresses each of these lines.

Taking them in reverse order, the Academy's intentional racial balancing scheme is "patently unconstitutional." *Id.* The Academy concedes that it tries to create "equitable demographic representation" in each class of newly minted ensigns and second lieutenants, Ex. V at 20, using the ever-shifting demographics of the enlisted ranks and the general population as a measuring stick. That's just a fancy way of saying that the Academy sorts applicants by skin color and admits them according to preset racial goals. And the Academy is committed to achieving those goals at all costs, even if doing so requires wholesale changes to its admissions policies. *See id.*

Because of this scheme—one that relies on racial balancing to preserve parity between officers, the enlisted, and the citizens they serve—the Academy's use of race "lack[s] a logical end point." *SFFA*, 143 S. Ct. at 2170. Indeed, under the Academy's theory, the only way it can "mirror the demographic composition of the population," Ex. O at 39, is by giving preferences to applicants of certain races, and adjusting the scope of those preferences year over year, to ensure the Academy

always "shares the diversity of the enlisted ranks and the general population." Fisher U.S. Brief 12. By tying its racial composition to the whims of demography, the Academy promises to use race in perpetuity—something that *SFFA* forbids. 143 S. Ct. at 2172-74.

The Academy's use of race also thwarts the fundamental command "that an individual's race may never be used against him." *Id*. at 2168. For starters, the Academy's admissions program, like all "[c]ollege admissions" programs, is "zero-sum," meaning that "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id*. at 2169. And because race can (and often is) a decisive "plus" factor for many Black, Hispanic, and Asian applicants, it's an equally dispositive "minus" for everyone else. *Id*. That's illegal. *Id.* at 2166.

If that weren't enough, the Academy's entire admissions program rests on racial stereotypes. The Supreme Court has "long held that universities may not operate their admissions programs on the 'belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue.'" *Id*. at 2170. But that's precisely what the Academy does. By relying on the "educational benefits of diversity," the Academy's program assumes "that there is an inherent benefit in race *qua* race"—an assumption which "rests on the pernicious stereotype that a black student" (or a white student, or a Hispanic student, or an Asian student) "can usually bring something that a [student of another race] cannot offer." *Id*. And by balancing its class to avoid "racial tensions among enlisted personnel" or to "foster trust between the enlisted corps and its leaders," Fisher U.S. Br. 11, the Academy is forced to assume that, among other stereotypes, some races won't respect or follow people who have a different skin color. Such sordid stereotyping is "contrary … to the 'core purpose'" of equal protection. *SFFA*, 143 S. Ct. at 2170.

The racial box-checking that the Academy uses also fails narrow tailoring. Such a system is borne of "incoherent and irrational" categories, which are "imprecise," "arbitrary," "undefined," "opaque," and "underinclusive." *Id*. at 2167. "[B]y grouping together all Asian students, for instance, [the Academy is] apparently uninterested in whether *South* Asian or *East* Asian students"—students who come from countries as diverse as Japan and Pakistan—"are adequately represented." *Id.* (emphasis original). And the Academy apparently thinks that a Mexican-American sailor is more likely to follow a white officer of Spanish descent, just because he checked the box for "Hispanic." It also seems not to know whether students of Brazilian heritage are sufficiently "Hispanic." *See* Ex. U at 2-3. This racial pseudoscience is not the stuff of strict scrutiny.

And, what's more, the Academy has never shown that comparable race-neutral programs won't work. Narrow tailoring demands "serious, good faith consideration of workable race-neutral alternatives." *Grutter*, 539 U.S. at 339; *accord Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 n.6 (1986) (narrow tailoring "require[s] consideration of whether lawful alternative[s] and less restrictive means could have been used"). The Academy has no studies, reports, or experiments "carefully considering" race-neutral alternatives. Yet the Coast Guard Academy provides a real-world example that these alternatives can (and do) work. Until 2010, that academy was prohibited from using racial preferences in its admissions process. *See* Ex. aa at 1. In the two years before the Coast Guard began considering race, it launched an aggressive advertising and recruiting campaign targeting minorities. *Id.* at 2. At the end of those two years, the Coast Guard had increased minority enrollment by 60%, from 15% to 24%. Ex. bb at 1-2. Those numbers were within a few percentage points of the other academies (which had been using explicit racial preferences for years), *see, e.g.*, Ex. cc, and nowhere does the Naval Academy try to prove that the difference stopped the Coast Guard from achieving its asserted interests. Nor could it: In *SFFA*, the government conceded that

the Merchant Marine Academy doesn't use race for most admissions, and that its admissions system (like the Coast Guard's admissions system) furthers the Academy's interests. *SFFA* U.S. Br. at 17 n. 3. The Naval Academy has long had a duty to prove that a race-based policy—rather than a race-neutral policy—is essential to its functioning. *Grutter*, 539 U.S. at 339. It cannot. And it's never tried, despite decades of opportunities.

For its final argument, the Academy tries the same path that Harvard and UNC tried in *SFFA*: "trust us." 143 S. Ct. at 2168. To be sure, courts must be mindful of the military's unique role in our nation. *See, e.g.*, *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988). But the Supreme Court "ha[s] been unmistakably clear that any deference must exist within constitutionally prescribed limits"—limits that categorically prohibit invidious racial discrimination. *SFFA*, 143 S. Ct. at 2168; *accord U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 349 (5th Cir. 2022); *Singh v. Berger*, 56 F.4th 88, 99 (D.C. Cir. 2022); *Berkley v. United States*, 287 F.3d 1076, 1091 (Fed. Cir. 2002). It has "refused to defer" to government officials' "judgments on race," even in "areas where those officials traditionally exercise substantial discretion." *Johnson*, 543 U.S. at 512 (prisons).

*Korematsu* provides a warning and a lesson. Deferring to the military's expert "judgment," the Supreme Court rubberstamped the systemic internment of Japanese Americans because "military authorities decided that the military urgency of the situation demanded that all citizens of [that race] be segregated." *Korematsu*, 323 U.S. at 223. The Supreme Court abrogated that case, *see Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018), and has cautioned courts to never "retreat from the most searching judicial inquiry" when considering "illegitimate racial classification[s]," *SFFA*, 143 S. Ct. at 2162 n.3. This Court should heed that instruction and find the Academy's race-based admissions program unconstitutional.

**II.      SFFA satisfies the remaining preliminary-injunction criteria.**

Because SFFA is likely to prevail on its constitutional claims, it readily meets the other preliminary-injunction criteria.

*Irreparable Harm:* A "presumption of irreparable injury flows from a violation of constitutional rights." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020) (cleaned up); *see also Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987) ("[T]he denial of a constitutional right … constitutes irreparable harm."). "An Equal Protection Clause violation ... is therefore an irreparable injury." *Agudath Israel of Am.*, 983 F.3d at 636. Because the Academy's admissions policy subjects SFFA's members to racial discrimination that violates the Fifth Amendment's equal-protection principle, they face irreparable harm without a preliminary injunction. *See id.*; *see also Greer's Ranch Café v. Guzman*, No. 4:21-cv-651, 2021 WL 2092995, at *8 (N.D. Tex.) (May 18, 2021) (finding irreparable harm and granting preliminary injunction because plaintiffs were "experiencing race and sex discrimination at the hands of government officials"); *Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*, 584 F. Supp. 2d 766, 795 (D. Md. 2008) ("Intentional discrimination under the Equal Protection Clause … constitute[s] irreparable injury.").

This irreparable harm is particularly acute because, without a preliminary injunction, entire admissions cycles will begin and end. SFFA's cases against *Harvard* and *UNC* took nearly a decade to litigate, including at least five years in district court alone. *See SFFA*, 143 S. Ct. at 2156. Yet Members A and B are only eligible to reapply until they turn twenty-three years old. *See* 10 U.S.C. §8458(a)(1). Unless they get a preliminary injunction, they will entirely miss the chance to apply on an equal footing to the Academy. That is quintessential irreparable harm. *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006).

*Balance of Harms and Public Interest:* The balance of the equities and the public interest factors "merge when the Government is the party opposing the preliminary injunction." *Nken v.*

*Holder*, 556 U.S. 418, 435 (2009); *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 512 (D.C. Cir. 2016) ("[T]he government's interest is the public interest."). The Academy will not be harmed by an injunction requiring it to stop illegally denying equal treatment to applicants. *See, e.g.*, *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (government is "'in no way harmed by issuance of a preliminary injunction which prevents [it] from [taking actions] likely to be found unconstitutional. If anything, the system is improved by such an injunction.'"). And "upholding constitutional rights surely serves the public interest." *Id.* Again, the Coast Guard Academy operated for years without considering race as a factor in admissions, with no discernible consequences. The Naval Academy—like every other university this cycle—can too.[3]

## CONCLUSION

For these reasons, the Court should grant SFFA's motion. By December 1, 2023, the Academy should be preliminarily enjoined from considering race as a factor in admissions.

---

[3] The court should not require a bond. "[T]he court 'retains the discretion to set the bond amount as it sees fit or waive the security requirement.'" *Coreas v. Bounds*, 458 F. Supp. 3d 352, 362 (D. Md. 2020). Waiving the bond requirement is particularly appropriate here because SFFA is likely to succeed on the merits, and "there has been no proof of likelihood of harm" to the Academy by an injunction that stops it from violating the Constitution. *Doc's Assocs. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).

Respectfully submitted,

*s/ Cameron T. Norris*

| | |
|---|---|
| Adam K. Mortara (*pro hac vice* forthcoming) | Thomas R. McCarthy (*pro hac vice* forthcoming) |
| LAWFAIR LLC | Patrick Strawbridge (*pro hac vice* forthcoming) |
| 40 Burton Hills Blvd., Ste. 200 | J. Michael Connolly (*pro hac vice* forthcoming) |
| Nashville, TN 37215 | Cameron T. Norris |
| (773) 750-7154 | Bryan Weir (*pro hac vice* forthcoming) |
| mortara@lawfairllc.com | James F. Hasson (*pro hac vice* forthcoming) |
| | R. Gabriel Anderson (*pro hac vice* forthcoming) |
| Dated: October 6, 2023 | CONSOVOY MCCARTHY PLLC |
| | 1600 Wilson Boulevard, Suite 700 |
| | Arlington, VA 22209 |
| | (703) 243-9423 |
| | tom@consovoymccarthy.com |
| | patrick@consovoymccarthy.com |
| | mike@consovoymccarthy.com |
| | cam@consovoymccarthy.com |
| | bryan@consovoymccarthy.com |
| | james@consovoymccarthy.com |
| | gabe@consovoymccarthy.com |

*Counsel for Students for Fair Admissions*

## CERTIFICATE OF SERVICE

I certify that on October 6, 2023, I electronically filed the foregoing with the Clerk of the Court using the Court's ECF system, which will automatically send email notification to all counsel of record. I am also serving the foregoing by email and by certified mail, return receipt requested, to the addresses below:

United States Naval Academy
121 Blake Road, Annapolis, MD 21402

United States Department of Defense
1400 Defense Pentagon Washington, DC 20301-1400

Hon. Lloyd J. Austin III
Secretary of Defense
United States Department of Defense
1400 Defense Pentagon Washington, DC 20301-1400

Hon. Carlos Del Toro
Secretary of the Navy
Attn: General Counsel of the Navy
Naval Litigation Office
720 Kennon St., SE, Room 233
Washington Navy Yard, DC 20374-5013

Rear Admiral Fred Kacher
Acting Superintendent, United States Naval Academy
Attn: General Counsel of the Navy
Naval Litigation Office
720 Kennon St., SE, Room 233
Washington Navy Yard, DC 20374-5013

Bruce Latta
Dean of Admissions, United States Naval Academy
Attn: General Counsel of the Navy
Naval Litigation Office
720 Kennon St., SE, Room 233
Washington Navy Yard, DC 20374-5013

*s/ Cameron T. Norris*