**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, *Plaintiff*, | |
| v. | No. 1:23-cv-02699 |
| THE UNITED STATES NAVAL ACADEMY, *et al.*, *Defendants*. | |

### DECLARATION OF JAMES HASSON

1.      I am an attorney at the law firm Consovoy McCarthy PLLC and counsel for Plaintiff Students for Fair Admissions.

2.      I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, I would competently testify to them.

3.      The following materials attached as exhibits are true and accurate copies of pages from public websites that were downloaded as PDF files in October 2023:

   a.   Exhibit A is a true and correct copy of a webpage on the Naval Academy's website, entitled *Mission*. That webpage can be accessed here: perma.cc/XQ6X-2NQT.

   b.   Exhibit B is a true and correct copy of a webpage on the Naval Academy's website, entitled *Class Portrait: Class of 2027*. That webpage can be accessed here: perma.cc/2M9H-44RD.

   c.   Exhibit C is a true and correct copy of a webpage on the Naval Academy's website, entitled *Class of 2026 Snapshot*. That webpage can be accessed here: perma.cc/8PAR-PJUU.

d.  Exhibit D is a true and correct copy of an April 21, 2016, report from the Congressional Research Service, entitled *Report RL33213: Congressional Nominations to U.S. Service Academies: An Overview and Resources for Outreach and Management*. That report can be accessed here: perma.cc/29FK-LBUG.

e.  Exhibit E is a true and correct copy of a webpage from Senator Mark Warner's website, entitled *Academy Admissions*. That webpage can be accessed here: perma.cc/787E-Y22V.

f.  Exhibit F is a true and correct copy of a webpage from the White House website, entitled *Service Academy Nomination Process*. That webpage can be accessed here: perma.cc/A7Q6-FTSP.

g.  Exhibit G is a true and correct copy of a webpage on the United States Naval Academy Preparatory School's website, entitled *Academic Year 2023-2024*. That webpage can be accessed here: perma.cc/9NSH-DG6S.

h.  Exhibit H is a true and correct copy of a webpage on the Naval Academy's website, entitled *Naval/Marine Corps Reserve Officer Training Corps*. That webpage can be accessed here: perma.cc/2KG8-V372.

i.  Exhibit I is a true and correct copy of a September 5, 2023, article written by Lois Elfman in the magazine *Diverse Issues in Higher Education*, entitled *Military Academies Retain Affirmative Action in Admissions*. That article can be accessed here: bit.ly/3PARu9t.

j.  Exhibit J is a true and correct copy of a January 28, 2003, New York Times article written by Adam Clymer, entitled *Service Academies Defend Their Use of Race in Admissions Policies*. That article can be accessed here: perma.cc/7HNU-QBGD.

k. Exhibit K is a true and correct copy of a May 10, 2010, New York Times op-ed written by Bruce Fleming, entitled *The Academies' March Towards Mediocrity*. That op-ed can be accessed here: nyti.ms/468PqwB.

l. Exhibit L is a true and correct copy of a webpage on the Naval Academy's website, entitled *Class of 2025: Snapshot*. That webpage can be accessed here: perma.cc/NY52-FFBK.

m. Exhibit M is a true and correct copy of a September 14, 2001, Guardian article by James Maycock, entitled *War Within War*. That article can be accessed here: perma.cc/PX5M-ELMJ.

n. Exhibit N is a true and correct copy of a July 1, 2021, article by Walt Napier, entitled *A Short History of Integration in the U.S. Armed Forces*. That article can be accessed here: perma.cc/PYT6-SDXA.

o. Exhibit O is a true and correct copy of a report by the Military Diversity Leadership Commission, entitled *From Representation to Inclusion*. That report can be accessed here: perma.cc/VR65-UFNE.

p. Exhibit P is a true and correct copy of a Pew Research poll, entitled *Americans and affirmative action*. That poll can be accessed here: https://perma.cc/829A-AP6F.

q. Exhibit Q is a true and correct copy of a Harvard study by Sayce Falk and Sasha Rogers, entitled *Junior Military Officer Retention: Challenges and Opportunities*. That study can be accessed here: perma.cc/JW2V-Y24Y.

r. Exhibit R is a true and correct copy of a February 2011 Atlantic Magazine article by Senator Tim Kaine, entitled *Why Our Best Officers Are Leaving*. That article can be accessed here: perma.cc/Y6AV-XZUC.

s.  Exhibit S is a true and correct copy of a November 2022 survey by the Ronald Reagan Institute, entitled *National Defense Survey*. That survey can be accessed here: perma.cc/32B9-RZTZ.

t.  Exhibit T is a true and correct copy of a June 21, 2023, CBS News article by Anthony Salvanto, entitled *CBS News Poll Finds Most Americans Say Colleges Shouldn't Factor Race Into Admissions*. That article can be accessed here: perma.cc/PW5D-ZUAT.

u.  Exhibit U is a true and correct copy of a February 16, 2003, Washington Post op-ed written by Bruce Fleming, entitled *Not Affirmative, Sir.* That op-ed can be accessed here: https://wapo.st/45heFLP.

v.  Exhibit V is a true and correct copy of a February 2021 Navy document, entitled *Task Force One Navy: Our Navy Team – Navigating a Course to True North*. That document can be accessed here: https://perma.cc/3SUZ-V999.

w.  Exhibit W is a true and correct copy of an April 1993 report by the United States General Accounting Office, entitled *Naval Academy: Gender and Racial Disparities*. That report can be accessed here:

x.  Exhibit X is a true and correct copy of a Department of Defense document entitled, *DoD Diversity Strategic Plan 2012-2017*. That document can be accessed here: perma.cc/TSN2-T62L.

y.  Exhibit Y is a true and accurate copy of a webpage on the Naval Academy's website, entitled *Application Instructions: The Candidate Fitness Assessment*. That webpage can be accessed here: https://perma.cc/67ZH-ZLPP.

z.  Exhibit Z is a true and correct copy of a document on the Naval Academy's website, entitled *Medical Considerations for Admission*. That document can be accessed here: https://perma.cc/75SB-HARJ.

aa. Exhibit aa is a true and correct copy of a January 22, 2011, article in The Day (formerly The Day of New London), authored by Jennifer McDermott and entitled *Ethnicity, Gender Now Factors in Academy Admissions*. That article can be accessed here: https://bit.ly/3ZJcCyY.

bb. Exhibit bb is a true and correct copy of a July 5, 2010, article in The Day of New London, authored by Jennifer McDermott and entitled *Coast Guard Cadet Diversity Surges With Minority Wave*. That article can be accessed here: https://bit.ly/3Q5YtJ7.

cc. Exhibit cc is a true and correct copy of a June 28, 2012, press release from the United States Military Academy at West Point, entitled *Class of 2016 to Enter West Point*. That press release can be accessed here: https://bit.ly/3ZHAUJL.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 6th day of October, 2023          */s/James Hasson*

| Index of Exhibits | | |
|---|---|---|
| **Exhibit** | **Description** | **Page Numbers** |
| **A** | A webpage on the Naval Academy's website, entitled Mission. That webpage can be accessed here: perma.cc/XQ6X-2NQT | p. 10-11 |
| **B** | A webpage on the Naval Academy's website, entitled *Class Portrait: Class of 2027*. That webpage can be accessed here: perma.cc/2M9H-44RD. | p. 12-15 |
| **C** | A webpage on the Naval Academy's website, entitled Class of 2026 Snapshot. That webpage can be accessed here: perma.cc/8PAR-PJUU. | p. 16-17 |
| **D** | A report from the Congressional Research Service, entitled Report RL33213: Congressional Nominations to U.S. Service Academies: An Overview and Resources for Outreach and Management. That can be accessed here: perma.cc/29FK-LBUG. | p. 18-35 |
| **E** | A webpage from Senator Mark Warner's website, entitled Academy Admissions. That webpage can be accessed here: perma.cc/787E-Y22V. | p. 36-41 |
| **F** | A webpage from the White House website, entitled Service Academy Nomination Process. That webpage can be accessed here: perma.cc/A7Q6-FTSP. | p. 40-42 |
| **G** | A webpage on the United States Naval Academy Preparatory School's website, entitled Academic Year 2023-2024. That webpage can be accessed here: perma.cc/9NSH-DG6S. | p. 42-76 |
| **H** | A webpage on the Naval Academy's website, entitled Naval/Marine Corps Reserve Officer Training Corps. That webpage can be accessed here: perma.cc/2KG8-V372. | p. 77-79 |
| **I** | A September 5, 2023, article written by Lois Elfman in the magazine Diverse Issues in Higher Education, entitled Military Academies Retain Affirmative Action in Admissions. That article can be accessed here: bit.ly/3PARu9t. | p. 80-82 |
| **J** | A January 28, 2003, New York Times article written by Adam Clymer, entitled Service Academies Defend Their Use of Race in Admissions Policies. That article can be accessed here: perma.cc/7HNU-QBGD. | p. 83-86 |

| | | |
|---|---|---|
| **K** | A May 10, 2010, New York Times op-ed written by Bruce Fleming, entitled The Academies' March Towards Mediocrity. That op-ed can be accessed here: nyti.ms/468PqwB. | p. 87-90 |
| **L** | A webpage on the Naval Academy's website, entitled Class of 2025: Snapshot. That webpage can be accessed here: perma.cc/NY52-FFBK. | p. 91-92 |
| **M** | A September 14, 2001, Guardian article by James Maycock, entitled War Within War. That article can be accessed here: perma.cc/PX5M-ELMJ. | p. 93-103 |
| **N** | A July 1, 2021, article by Walt Napier, entitled A Short History of Integration in the U.S. Armed Forces. That article can be accessed here: perma.cc/PYT6-SDXA. | p. 104-107 |
| **O** | A report by the Military Diversity Leadership Commission, entitled From Representation to Inclusion. That report can be accessed here: perma.cc/VR65-UFNE. | p. 108-270 |
| **P** | A Pew Research poll, entitled Americans and affirmative action. That poll can be accessed here: https://perma.cc/829A-AP6F. | p. 271-280 |
| **Q** | A Harvard study by Sayce Falk and Sasha Rogers, entitled Junior Military Officer Retention: Challenges and Opportunities. That study can be accessed here: perma.cc/JW2V-Y24Y. | p. 281-366 |
| **R** | A February 2011 Atlantic Magazine article by Senator Tim Kaine, entitled Why Our Best Officers Are Leaving. That article can be accessed here: perma.cc/Y6AV-XZUC. | p. 367-369 |
| **S** | A November 2022 survey by the Ronald Reagan Institute, entitled National Defense Survey. That survey can be accessed here: perma.cc/32B9-RZTZ. | p. 370-374 |
| **T** | A June 21, 2023, CBS News article by Anthony Salvanto, entitled CBS News Poll Finds Most Americans Say Colleges Shouldn't Factor Race Into Admissions. That article can be accessed here: perma.cc/PW5D-ZUAT. | p. 375-384 |
| **U** | A February 16, 2003, Washington Post op-ed written by Bruce Fleming, entitled Not Affirmative, Sir. That op-ed can be accessed here: https://wapo.st/45heFLP. | p. 385-390 |
| **V** | A February 2021 Navy document, entitled Task Force One Navy: Our Navy Team – Navigating a Course to True North. That document can be accessed here: https://perma.cc/3SUZ-V999. | p. 390-532 |

| W | An April 1993 report by the United States General Accounting Office, entitled *Naval Academy: Gender and Racial Disparities*. That report can be accessed here: | p. 533-605 |
|---|---|---|
| X | A Department of Defense document entitled, DoD Diversity Strategic Plan 2012-2017. That document can be accessed here: perma.cc/TSN2-T62L. | p. 606-622 |
| Y | A webpage on the Naval Academy's website, entitled Application Instructions: The Candidate Fitness Assessment. That webpage can be accessed here: https://perma.cc/67ZH-ZLPP. | p. 623-634 |
| Z | A document on the Naval Academy's website, entitled Medical Considerations for Admission. That document can be accessed here: https://perma.cc/75SB-HARJ. | p. 635-640 |
| aa | A January 22, 2011, article in The Day (formerly The Day of New London), authored by Jennifer McDermott and entitled Ethnicity, Gender Now Factors in Academy Admissions. That article can be accessed here: https://bit.ly/3ZJcCyY. | p.641-646 |
| bb | A July 5, 2010, article in The Day of New London, authored by Jennifer McDermott and entitled Coast Guard Cadet Diversity Surges With Minority Wave. That article can be accessed here: https://bit.ly/3Q5YtJ7. | p. 647-656 |
| cc | A June 28, 2012, press release from the United States Military Academy at West Point, entitled Class of 2016 to Enter West Point. That press release can be accessed here: https://bit.ly/3ZHAUJL. | p. 657-658 |

# EXHIBIT A



**Home** / **About** / Mission of USNA

# Mission of USNA

The Naval Academy has a unique clarity of purpose, expressed in our mission:

> *"To develop Midshipmen morally, mentally and physically and to imbue them with the highest ideals of duty, honor and loyalty in order to graduate leaders who are dedicated to a career of naval service and have potential for future development in mind and character to assume the highest responsibilities of command, citizenship and government."*

Our mission forms the basis for everything we do at the Academy. It also encourages a sense of spirit and pride found at few other schools.

# EXHIBIT B



# CLASS PORTRAIT
## Class of 2027

< **BACK**

## APPLICATIONS

10,231 MEN **14,727** **TOTAL** 4,496 WOMEN

## OFFERS OF APPOINTMENT

938 MEN **1,379** **TOTAL** 441 WOMEN

## CLASS SIZE

805 MEN **1,175** **TOTAL** 370 WOMEN

## NOMINATING CATEGORIES

| | |
|---|---|
| Congressional | 4,573 |
| Presidential | 556 |
| Secretary of the Navy | 460 |
| ROTC/JROTC | 277 |
| Children of Deceased/Disabled Veterans | 131 |

## COMPOSITION

| | |
|---|---|
| Varsity athletics | 90% |
| Community Service | 72% |
| Captain/Co-Captain of Sports Team | 68% |
| National Honor Society | 56% |
| Student Body Leader | 51% |
| Work Experience (>10 hrs/week) | 42% |
| Musical Activities (Band, Chorus, Etc.) | 37% |
| Tutor/Teacher/Mentor/Coach | 37% |
| Religious Group/Club | 32% |
| ROTC/JROTC/Sea Cadets/Civil Air Pat | 21% |

# DEMOGRAPHIC INFORMATION

| | |
|---|---|
| White, non-Hispanic | 633 (876) |
| Hispanic | 177 |
| African American (non-Hispanic) | 90 (146) |
| Asian American (non-Hispanic) | 125 (207) |
| Native American/Alaskan Native, non-Hispanic | 4 (30) |
| Native Hawaiian/Other Pacific Islander, non-Hispanic | 7( 16) |
| Two or more races, non-Hispanic | 106 (277) |
| Other/Declined to Respond | 18 |

Note: Information provided above follows reporting to OPNAV. Additional information in parenthesis includes those members of the incoming class that may have also self-
identified as multiple race and/or ethnic categories

# STANDARDIZED TEST DATA

SAT Verbal.........................610-700
SAT Math............................610-710
ACT English + Reading......51-64
ACT Math...........................26-31**

Middle 50th percentile*
* 50% of the class achieved SAT/ACT scores within the range between the 25 th and 75 th percentile
**ACT equivalent scores

# GEOGRAPHICAL DISTRIBUTION AND INTERNATIONAL STUDENTS

Midshipmen were admitted from every state in the Nation, as well as the District of Columbia, American Samoa, Guam, Northern Mariana

| | |
|---|---|
| First Generation American | 15% |
| Boy/Girl Scouts | 14% |
| First to Attend College in Family | 13% |
| School publication | 11% |
| Hardship or Adverse Life Experience | 11% |
| Primary Language in Home Not English | 7% |

# EDUCATIONAL BACKGROUND

The Class of 2026 includes 336 (28%) from college and post-high school preparatory programs which include:

| | |
|---|---|
| From Naval Academy Prep School in Newport, RI | 195 |
| From the U.S. Naval Academy Foundation and Civilian Preparatory Programs | 44 |
| Additional students have completed at least one semester of study at a college or university, and one at a post-secondary prep school | 97 |

# MILITARY BACKGROUND

Navy............................49
Marine Corps..............10
Army............................0
Total.............................59

* Former Enlisted
*This figure includes 3 who entered directly from the Fleet (2 USN, 1 USMC), 16 who entered from Nuclear Power School, and 40 from the Naval Academy Prep School (31 USN, 9 USMC).

# ALUMNI SONS AND DAUGHTERS (74)

The class of 2027 includes 46 sons and 28 daughters of alumni. Nine members of the entering class have both parents who are

Islands, and Puerto Rico. The Class of 2027

also includes 15 international students from:

Bangladesh (1), Ecuador (1), Egypt (1), Jordan

(1), Madagascar (1), Pakistan (1), Palua (1),

Peru (1), Philippines (1), Republic of Korea (1),

Romania (1) Singapore (1), Sri Lanka (1),

Taiwan (1), and Thailand (1)


2027 Snapshot Download
(https://www.usna.edu/Admissions/BGIS/_files/documents/2027_Class_Profile.pdf)

# EXHIBIT C

# CLASS OF 2026
# SNAPSHOT

## APPLICATIONS

Men.................................................................  9,345
Women ........................................................  3,582
Total.............................................................  12,927

## OFFERS OF APPOINTMENT

Men .................................................................  991
Women ...........................................................  399
Total  .............................................................  1,390

## CLASS SIZE

Men .................................................................  852
Women ...........................................................  332
Total  .............................................................  1,184

## NOMINATING CATEGORIES

Congressional..................................................  4,263
Presidential......................................................  632
Secretary of the Navy......................................  423
ROTC/JROTC................................................  253
Children of Deceased/Disabled Veterans............  110

## DEMOGRAPHIC INFORMATION

White, non-Hispanic ...................................... …..676 (773)
African American, non-Hispanic....................75 (108)
Asian American, non-Hispanic.....................117 (180)
Native American/Alaskan Native, non-Hispanic…..1 (16)
Native Hawaiian/Other Pacific Islander,
    non-Hispanic…………………………………4 (14)
Two or more races, non-Hispanic………………104
Declined to Respond……………………….....17

Hispanic……………………………………180

**Note:  Information provided above follows reporting to OPNAV.  Additional information in parenthesis includes those members of the incoming class that may have also self-identified as multiple race and/or ethnic categories**

## GEOGRAPHICAL DISTRIBUTION
## AND INTERNATIONAL STUDENTS

Midshipmen were admitted from every state in the Nation, as well as the District of Columbia, American Samoa, Guam, Puerto Rico, and the Virgin Islands.  The Class of 2026 also includes twelve international students from:
Albania (1), Bangladesh (1), Ecuador (1), Ghana (1), Indonesia (1), Malaysia (2), Montenegro (1), Republic of Korea (1), Romania (1), Taiwan (1), and Tunisia (1)

## STANDARDIZED TEST  DATA

Middle 50th percentile*
SAT Verbal  610-720        SAT Math   610-720
ACT English + Reading  51-67          ACT Math   26-32**
* 50% of the class achieved SAT/ACT scores within the range
    between the 25th and 75th percentile
**ACT equivalent scores

## MILITARY BACKGROUND

Former Enlisted*

Navy ....................................................  57
Marine Corps .......................................  15
Total.....................................................  72

*This figure includes 7 who entered directly from the Fleet (5 USN, 2 USMC), 19 who entered from Nuclear Power School, and 46 from the Naval Academy Prep School (33 USN, 13 USMC).

## COMPOSITION

| | |
|---|---|
| Varsity Athletics ...................................... | 90% |
| Community Service ............................... | 82% |
| Captain/Co-Captain of Sports Team...... | 67% |
| Student Body Leader…………………… | 62% |
| National Honor Society ........................ | 57% |
| Tutor/Teacher/Mentor/Coach…………. | 49% |
| Religious Group/Club............................ | 34% |
| Musical Activities (Band, Chorus, Etc.) | 28% |
| Work Experience (>10 hrs/week).......... | 26% |
| ROTC/JROTC/Sea Cadets/Civil Air Pat. | 17% |
| Boy/Girl Scouts ………………………… | 13% |
| School publication  ................................ | 12% |
| First Generation American ................... | 12% |
| First to Attend College in Family .......... | 12% |
| Primary Language in Home Not English | 10% |
| Hardship or Adverse Life Experience ... | 8% |

## ALUMNI SONS AND DAUGHTERS (60)

The class of 2026 includes 39 sons and 21 daughters of alumni. Three members of the entering class have both parents who are alumni of the Naval Academy

## EDUCATIONAL BACKGROUND

The Class of 2026 includes 336 (28%) from college and post-high school preparatory programs which include:

▪ 195 from Naval Academy Prep School in Newport, RI

▪ 44 from the U.S. Naval Academy Foundation and Civilian Preparatory Programs

▪ 97 additional students have completed at least one semester of study at a college or university, or post-secondary prep school

# EXHIBIT D

# Congressional Nominations to U.S. Service Academies: An Overview and Resources for Outreach and Management

April 21, 2016 (RL33213)
[Jump to Main Text of Report](#)

---

## Contents

- Congressional Approaches
- Appointment Criteria
- Department of Defense Academies
- Noncongressional DOD Service Academy Nominations and Appointments
- United States Merchant Marine Academy
- United States Coast Guard Academy
- Applicant Qualifications

## Figures

- Figure 1. General Timelines for Service Academy Nomination Application, and Appointment Processes

## Tables

- Table 1. Distribution of Non-Congressional Nominations to Department of Defense Service Academies, by Authority
- Table 2. Distribution of Seats Available for Congressional Nomination to the United States Merchant Marine Academy, by State
- Table 3. Websites for Preliminary Application to United States Service Academies

## Appendixes

- Appendix A. Sample Initial Contact Letter
- Appendix B. Sample Information Sheet
- Appendix C. Sample Application Information
- Appendix D. Sample Nomination Application
- Appendix E. Sample Post-Nomination Letter

## Summary

Members of Congress are authorized by law to nominate candidates for appointment to four U.S. service academies. These schools are the U.S. Military Academy, the U.S. Naval Academy, the U.S. Air Force Academy, and the U.S. Merchant Marine Academy. The fifth service academy, the U.S. Coast Guard Academy, does not require a congressional nomination for appointment. These institutions prepare college-age Americans to be officers of the U.S. uniformed services. Upon graduation, service academy graduates are commissioned as officers in the active or reserve components of the military or merchant marine for a minimum of five years.

The nomination of constituents to one of the service academies can provide Members of Congress with the opportunity to perform community outreach and other representational duties. In some states and congressional districts, nominations are highly competitive. Others are less competitive, and some offices do not receive expressions of interest from enough applicants to fill the number of nominations allocated. Consequently, some congressional offices might need to dedicate considerable staff resources to the selection process to identify qualified candidates, while others can incorporate service academy nominations alongside other constituent service work such as casework.

The nomination authorities, number of appointments, and criteria establishing the qualifications of potential service academy appointees are set by statute, federal regulations, and policies established by each academy. No laws or regulations govern congressional nomination processes, as long as nominations are submitted by deadlines established by the academies and comply with chamber ethics rules. Each congressional office with nominating authority may develop its own process for managing its service academy nominations. Some offices handle nominations internally, assigning the task of managing applicant files and developing nomination recommendations to a staff member. Other offices assign staff to oversee nominations-related activities but delegate the screening and development of nomination recommendations to a volunteer panel, which could be charged with screening or interviewing applicants.

This report describes statutory requirements for allocating congressional nominations to service academies. It also identifies the qualifications that must be met by potential nominees, as established by statute and each academy. Finally, sample documents that could be used by congressional offices at various stages of the nomination selection process are included. These documents provide basic information and can be customized to fit the specific needs of individual office policies.

---

Congressional Nominations to U.S. Service Academies: An Overview and Resources for Outreach and Management

Members of Congress are authorized by law to nominate candidates for appointment to four U.S. service academies.[1] These schools are the U.S. Military Academy (USMA), West Point, NY; the U.S. Naval Academy (USNA), Annapolis, MD; the U.S. Air Force Academy (USAFA), Colorado Springs, CO; and the U.S. Merchant Marine Academy (USMMA), Kings Point, NY. The fifth service academy, the U.S. Coast Guard Academy (USCGA), New London, CT, does not require a congressional nomination for appointment. These institutions provide college-age Americans with a tuition-free,[2] four-year undergraduate education and prepare them to be officers of some of the U.S. uniformed services.[3] Upon graduation, service academy graduates are commissioned as officers in the active or reserve components of the military or the merchant marine for a minimum of five years.

Although it is an essential component of the appointment process, a congressional nomination does not guarantee an individual's admission or appointment to a service academy. In addition to securing a nomination, a candidate must also submit an application packet and fulfill other service academy requirements, some of which are described in the "Applicant Qualifications" section of this report. Even when a candidate meets all these requirements and is deemed to be qualified for admission, he or she may not receive an official appointment, due to the limited number of spaces available at each service academy.[4]

The nomination of constituents to one of the service academies can provide Members of Congress with the opportunity to perform community outreach and other representational activities. In some states and congressional districts, nominations are highly competitive. Others are less competitive, and some offices do not receive expressions of interest from enough applicants to fill the number of nominations allocated. Consequently, some congressional offices may need to dedicate considerable staff resources to the selection process to identify qualified candidates, while others can incorporate service academy nominations alongside other constituent service activities such as casework.[5]

# Congressional Approaches

The nomination authorities, number of appointments, and criteria establishing the qualifications of potential service academy appointees are set in statute, federal regulations, and policies established by each academy. No laws or regulations govern congressional nomination processes, as long as nominations are submitted by deadlines established by the academies,[6] provide the information requested in the format required by the academies,[7] and comply with chamber ethics rules. Each congressional office with nominating authority has the opportunity to develop its own process for managing its service academy nominations. Some congressional offices have adapted and modified a "whole person" approach similar to that used by USMA, USNA, and USAFA to make their nomination decisions. This approach evaluates several broad components of a potential nominee's qualifications for appointment, including character, scholarship, leadership, physical aptitude, medical fitness, and motivation. Other congressional offices reach decisions through the consideration of a candidate's academic preparation, extracurricular participation, community service, and the recommendations of those familiar with their activities in those areas. To make these assessments, congressional offices often require prospective nominees to submit an application packet, which can be a combination of self-reported qualifications and additional documentation materials.

In addition to establishing criteria for nomination decisions, each congressional Member office may determine how to administer the decisionmaking process. Some offices handle nominations internally, assigning the task of managing applicant files and developing nomination recommendations to a staff member. Other offices assign staff to oversee nomination-related activities but delegate the screening and development of nomination recommendations to a volunteer panel, which could be charged with screening or interviewing applicants. A nominations review panel could include educators, service academy alumni, representatives of veterans' groups, and other community leaders from a Member's state or district. The decision to employ one approach or another could be based on the number of nomination applications received, the volume of other activity in a congressional office, the availability of qualified volunteers to sit on a nominations board, and other specific considerations related to individual states and congressional districts. The use of volunteers in congressional offices is governed by regulations issued by the Select Committee on Ethics in the Senate[8] and by the Committees on House Administration and Ethics in the House.[9]

It is common for Member offices to devote a page on their official websites to the service academy nomination process. This webpage can be used to explain the office's particular nomination process, provide application materials, announce deadlines, refer prospective nominees to service academy liaisons or websites, share information about past and/or present service academy nominees, or for other purposes. Many offices encourage digital delivery of all or part of the nominee's application, and some Member offices provide forms on their websites for nomination requests.

The service academies also offer guidance and support for congressional Member offices regarding the nomination and appointment process. Coordination with the service academies may help Members of Congress assist constituents throughout the appointment process. The service academies, for example, may be able to help identify prospective nominees or academy alumni, and clarify institutional policies. The service academies also encourage congressional Member offices to host Academy Days in their districts, which are informational sessions for prospective nominees, similar to college admissions fairs. When possible, each service academy will send currently enrolled cadets or midshipmen (often from a Member's state/district) and/or admissions officers to these events. The service academies can also publicize Academy Days or other congressional events on their websites.[10]

Statutory requirements regarding allocations of congressional nominations to service academies are described in the next section. A subsequent section describes qualifications of potential nominees to service academies established by statute, federal regulations, and each academy. **Figure 1** provides a generalized timeline of the application process for applicants, service academies, and congressional offices, which may be a helpful reference for offices that are creating or revising their nomination procedures. Appendixes to the report include sample documents that may be used by congressional offices at various stages of the nomination selection process. These documents, which are based on information and examples found on service academy and

congressional websites, provide basic information and can be customized to fit the specific needs of individual office policies. The documents include

- an initial contact letter that a congressional office could send to high schools in its state or district,
- an information sheet and application that could be sent to those potential applicants who respond to the contact letter or contact a congressional office on their own initiative,
- an instruction sheet for preparing an application for congressional nomination,
- an application for congressional nomination, and
- a follow-up letter to send to applicants once their nomination has been submitted.

Figure 1. General Timelines for Service Academy Nomination Application, and Appointment Processes

**Source:** CRS compilation based on information from the service academies' websites and congressional guides. Graphic created by [author name scrubbed], Visual Information Specialist.

**Notes:** This figure illustrates the typical events and activities congressional offices, applicants, and the service academies might undertake in the 18 months prior to the intake of a new academy class. Bars represent generalized information, representing when these events most frequently occur. Circles represent specific dates in the process. For more guidance, contact the service academies' admissions offices.

# Appointment Criteria

Appointment and nomination criteria are established by statute, by regulations issued by the appropriate executive branch authority, and by policies set by each academy. Three service academies, USMA, USNA, and USAFA, are housed in the military branches of the Department of Defense (DOD). USMMA is governed by regulations issued by the Department of Transportation. USCGA, which does not require a congressional nomination for admission, is an organizational unit of the Department of Homeland Security.

## Department of Defense Academies

Three service academies, USMA, USNA, and USAFA, are overseen by the three military branches of the DOD. Allocations for nomination by Members of Congress of prospective appointees to these academies are established by statute and are substantially similar for each academy.[11] The number of positions, or charges,[12] subject to congressional nomination at each DOD academy includes

- 10 from each state, 5 of whom are nominated by each Senator from that state;
- 5 from each congressional district, nominated by the Representative from the district;
- 5 from the District of Columbia, nominated by the Delegate from the District of Columbia;
- 4 from the U.S. Virgin Islands, nominated by the Delegate from the U.S. Virgin Islands;
- 5 from Puerto Rico, nominated by the Resident Commissioner from Puerto Rico;
- 4 from Guam, nominated by the Delegate from Guam;
- 3 from American Samoa, nominated by the Delegate from American Samoa; and
- 3 from the Commonwealth of the Northern Mariana Islands, nominated by the Delegate from the Commonwealth of the Northern Mariana Islands.

When a congressionally-nominated academy position is vacant, a Member of Congress may nominate 10 persons for possible appointment. As DOD service academy cadets or midshipmen who received a congressional nomination graduate, or as their appointments are otherwise terminated, a nominating Member office can make new nominations to fill any vacated positions. Typically, one appointment per DOD academy per Senator and Representative is available annually. In some years, however, a congressional office might have the opportunity to make nominations to fill multiple vacancies at an academy.[13] Appointments made by a predecessor are

10/2/23, 5:55 AM
everycrsreport.com/files/20160421_RL33213_b7ca6aac1389d723532ab83c1853cc83098aebec.html#ifn16
Case 1:23-cv-02699-RDB   Document 9-6   Filed 10/06/23   Page 23 of 366

considered part of the quota of a newly elected Member. Appointments made for candidates whose Representative changes as a result of legislative redistricting are considered as part of the new Member's allocation.[14] Nominees may be submitted in three categories: without ranking, with a principal candidate and nine ranked alternates, or with a principal candidate and nine unranked alternates.[15] When the Member specifies a principal candidate, that individual will be appointed to a DOD academy as long as he or she meets all other admission criteria.[16] If the principal candidate is disqualified, the service academies will appoint the first fully qualified, ranked alternate, if specified by the Member. In circumstances where Members do not specify a principal candidate or ranked alternates, one individual from among the Member's nominees who is found to be fully qualified will be appointed by the academies to serve as a cadet or midshipman.

Congressional nominees who are not initially offered appointments and are designated by the academies as qualified alternates may receive an appointment via a noncongressional appointment authority. Nominees who are not initially offered academy appointments may also be offered admission to an academy preparatory program.[17] Noncongressional appointees from a Member's state or district are not counted as part of the Member of Congress's statutory allotment of appointees, nor are students appointed to an academy prep school. Nominations are only valid for the admissions cycle in which they were submitted: if an applicant reapplies during a subsequent year, a new nomination is required.

## Noncongressional DOD Service Academy Nominations and Appointments

Although congressional offices provide most of the nominations to the DOD service academies each year, other nomination authorities exist. All qualified nominees not selected for appointment through the congressional nomination process are considered qualified alternates for the purposes of selection by the Secretaries of the Army, Navy, and Air Force and the academy superintendents to their respective academies. Applicants requesting congressional nominations are also eligible for nominations from the Vice President.[18] Vice presidential nominations are made for the nation at large, and applicants may apply for those through the White House website,[19] with supporting materials submitted through each DOD service academy. The governor of Puerto Rico may also nominate a candidate to each academy who is a native of Puerto Rico.

Other nomination and appointment sources are only available to those with a military service-connection. The President makes nominations for children of career military personnel and can appoint an unlimited number for children of Medal of Honor recipients. Children of armed forces personnel who were killed in action, who are missing in action,[20] or who had or have a 100% service-connected disability contracted in active service may also seek merit-based appointments, as determined by competitive examinations. The service secretaries can nominate individuals who serve as enlisted members of the regular and reserve components of their respective military branches, as well as participants in the reserve officer training corps of the service they oversee. The superintendents of the academies are also granted the authority to make a limited number of nominations for appointments each year, as well as the ability to nominate additional qualified candidates for the purposes of filling the class. The distribution of nominations by noncongressional authorities is listed in **Table 1**.

At the conclusion of the nomination and academy admissions processes, in his capacity as commander in chief of the military, the President is the appointing authority for all DOD service academy admissions.[21]

Table 1. Distribution of Non-Congressional Nominations to Department of Defense Service Academies, by Authority

| Nominating Authority | Number and Type |
| --- | --- |
| President[a] | One hundred children of members of the Armed Forces who have eight years of continuous active service or are credited with eight years of reserve duty service, retirement status, or who are deceased with one of those statuses. |

| | |
|---|---|
| | The President is also authorized to appoint an unlimited number of children whose parents have been awarded the Medal of Honor. |
| Vice President[b] | Five, at large. |
| | Eighty-five enlisted members of the regular service of the branch led by the Secretary. |
| | Eighty-five enlisted members of the reserve components of the branch led by the Secretary. |
| Service Secretary[c] | Twenty honor graduates of schools designated as honor schools by any military branch, and from members of the Secretary's service Reserve Officer Training Corps (ROTC). |
| | One hundred-fifty qualified alternates who received congressional nominations but were not appointed in order of merit. |
| | Fifty, at large. |
| Service Academy Superintendent | Sixty-five children of deceased, 100% disabled, or missing/captured Armed Forces veterans or missing/captured federal civilian personnel. |
| Governor, Puerto Rico | One, who must be a native of Puerto Rico. |

**Source:** 10 U.S.C. 9342, USAFA; 10 U.S.C. 6954, USNA; and 10 U.S.C. 4342, USMA.

**Notes:** These nomination authorities apply to nominations for appointment to USMA, USNA, and USAFA. They do not apply to nominations for appointment to USMMA, which has noncongressional nominations, or the USCGA, which requires does not require nominations.

a. In his capacity as commander in chief of the military, the President is the appointing authority for all service academy admissions.

b. If there is no Vice President, then the President Pro Tempore of the Senate makes those nominations.

c. The service secretary for USMA is the Secretary of the Army; USNA, Secretary of the Navy; and USAFA, Secretary of the Air Force. In addition to their numerical categorical nominating authority, military branch secretaries are also authorized, when the annual quota of cadets or midshipmen is not met, to nominate any qualified applicant who did not receive a nomination from any other source.

## United States Merchant Marine Academy

Members of Congress nominate individuals for appointment to USMMA. The number of seats in an entering class at this service academy is allocated by regulation issued by the Secretary of Transportation, who is also the appointment authority for the academy. Each state's allocated number of seats is determined proportionally to its representation in Congress.[22] Under the regulation, each Senator, Representative, Delegate, and the Resident Commissioner from Puerto Rico may nominate 10 candidates per vacancy to compete for admission to the academy. Members of the House of Representatives may nominate candidates from anywhere within their state, even if the candidate resides outside of the Representative's district.[23] The regulation allocates four vacancies to nominees from the District of Columbia and one vacancy each to nominees from Puerto Rico, Guam, Northern Mariana Islands, U.S. Virgin Islands, and American Samoa. The allocation of positions by state and territory is listed in **Table 2**. The regulation states that nominating officials may select individuals for nomination by any method they wish, including a screening examination.[24]

Table 2. Distribution of Seats Available for Congressional Nomination to the United States Merchant Marine Academy, by State

| State | Seats | State | Seats | State | Seats |
| --- | --- | --- | --- | --- | --- |
| Alabama | 4 | Kentucky | 2 | Ohio | 8 |
| Alaska | 1 | Louisiana | 4 | Oklahoma | 2 |
| American Samoa | 1 | Maine | 2 | Oregon | 3 |
| Arizona | 3 | Maryland | 5 | Pennsylvania | 10 |
| Arkansas | 2 | Massachusetts | 5 | Puerto Rico | 1 |
| California | 19 | Michigan | 7 | Rhode Island | 2 |
| Colorado | 4 | Minnesota | 3 | South Carolina | 4 |
| Connecticut | 4 | Mississippi | 3 | South Dakota | 1 |
| Delaware | 1 | Missouri | 3 | Tennessee | 4 |
| District of Columbia | 4 | Montana | 2 | Texas | 13 |
| Florida | 10 | Nebraska | 2 | Utah | 2 |
| Georgia | 5 | Nevada | 2 | Vermont | 1 |
| Guam | 1 | New Hampshire | 2 | U.S. Virgin Islands | 1 |
| Hawaii | 2 | New Jersey | 6 | Virginia | 5 |
| Idaho | 2 | New Mexico | 2 | Washington | 5 |
| Illinois | 9 | New York | 15 | West Virginia | 2 |
| Indiana | 3 | North Carolina | 6 | Wisconsin | 4 |
| Iowa | 4 | North Dakota | 1 | Wyoming | 1 |
| Kansas | 3 | Northern Mariana Islands | 1 | Â | Â |

**Source:** 46 U.S.C. 51302; 46 C.F.R. 310.53.

## United States Coast Guard Academy

Procedures for appointments to USCGA are established by regulations issued by the Secretary of Homeland Security.[25] Additional qualifications may be set by the superintendent of USCGA, who is responsible for appointments to the academy.[26] No congressional nomination is required for admission to this service academy.

# Applicant Qualifications

To qualify for an appointment to any service academy, an applicant must meet the following criteria:[27]

- be a U.S. citizen or national;
- be at least 17 years of age and not yet 23 years old on July 1 of the year the applicant would enter an academy (25 years old for USMMA);
- be unmarried;
- be not pregnant, and without legal obligation to support children or other dependents;
- demonstrate comprehensive academic preparation;
- demonstrate leadership in athletics and other extracurricular activities;
- take the SAT, or the ACT Assessment (ACT);
- be in good physical and mental health;
- pass a comprehensive medical examination; and
- pass a physical aptitude examination.

Beyond what is written in federal law and regulation, each academy can further specify academic, physical, and leadership requirements for admission. These requirements vary by academy and are revised regularly.[28] In preparation for making appointments, a congressional office might review each academy's most recent class

profile for specific information on test scores, class rankings, and activities of recently admitted students. Some of this information is available on the academies' websites.[29]

In addition to requesting a nomination from a Member of Congress or another nominating official, an individual seeking appointment to a service academy must separately apply to the service academies to which he or she seeks to be appointed. Each academy requires the submission of a preliminary application to initiate the admissions process. Preliminary application materials are available from the academies' websites listed in **Table 3**. Acceptance of a service academy appointment requires at least a nine-year service obligation, including four years at an academy and five years of active duty service.

Table 3. Websites for Preliminary Application to United States Service Academies

| | |
|---|---|
| U.S. Military Academy | http://admissions.usma.edu |
| U.S. Naval Academy | http://www.usna.edu/admissions |
| U.S. Air Force Academy | http://academyadmissions.com |
| U.S. Merchant Marine Academy | http://usmma.edu/admissions |
| U.S. Coast Guard Academy[a] | http://www.cga.edu/apply |

**Source:** CRS compilation.

a. The United States Coast Guard Academy does not require congressional nominations.

Appendix A. Sample Initial Contact Letter[30]

Dear High School Senior:

One of my favorite duties as a Member of Congress is nominating **[state's/town's/district's]** best and brightest young men and women to our nation's service academies. If you are a highly motivated, well-rounded, successful student, I invite you to consider the unique opportunity to develop physically, ethically, and intellectually while building a foundation for an exciting, challenging, and rewarding career as a military officer in the service of our nation. **[State/Town/District]**-area students traditionally are very successful at the academies, and I'm pleased to do my part to ensure that the community continues to provide some of the next generation's outstanding military leaders.

A congressional nomination is required for students wishing to enter the U.S. Military Academy, West Point, NY; the U.S. Naval Academy, Annapolis, MD; the U.S. Air Force Academy, Colorado Springs, CO; and the U.S. Merchant Marine Academy, Kings Point, NY. Successful applicants will have a broad academic background, the ability to pass a physical aptitude test, and strong leadership potential. An applicant must also be a U.S. citizen, a high school graduate between the ages of 17 and 23, unmarried, have no dependents, and be of high moral character. Acceptance of a service academy appointment requires at least a nine-year service obligation, including four years at an academy and five years of active duty service.

If you are interested in being considered for a service academy nomination, you must apply to me at my office by **[date]** to be considered for the class entering the service academies in July, **[year]**. Please contact my **[Washington/district/state]** office, at **[phone/e-mail/address]**, for further information and to request a nomination application.

Thank you for your interest in the service academies.

Sincerely,

**[Member]**

10/2/23, 5:55 AM   everycrsreport.com/files/20160421_RL33213_b7ca6aac1389d723532ab83c1853cc83098aebec.html#ifn16

Case 1:23-cv-02699-RDB Document 9-6 Filed 10/06/23 Page 27 of 366

United States **[Representative/Senator]**

Appendix B. Sample Information Sheet[31]

**[Representative/Senator]**

Service Academy Nomination Procedure and Basic Fact Sheet for **[year]** Admission

An appointment to the U.S. Military Academy, U.S. Naval Academy, U.S. Air Force Academy, or U.S. Merchant Marine Academy is a distinct and rare honor. Acceptance of an academy appointment requires at least a nine-year service obligation, including four years at an academy and five years of active duty service.

**Eligibility.** To be eligible for appointment, you must be an American citizen, at least 17 years old and not yet 23 years old on July 1 of the year you enter an academy (25 years old for United States Merchant Marine Academy). Further, you must not be married or pregnant, and you must not have any legal obligation to support children or other dependents. To apply for a nomination through my office, you must also be a legal resident of **[state/district]**. If you are not certain that your legal domicile is in the **[state/district]**, call my office and request address verification.[32]

**Nomination.** The nomination process is very competitive. I urge you to apply for a nomination from me as well as **[Representative and Senator/Senators]** from our state who can nominate qualified applicants to the four service academies. If you are interested in attending the U.S. Military Academy, U.S. Naval Academy, and U.S. Air Force Academy, you may also qualify for nomination through other sources, including

- President Barack H. Obama, who nominates children of career military personnel, deceased or disabled veterans, military or civilian personnel in missing status, and Medal of Honor recipients;
- Vice President Joseph R. Biden, who nominates five individuals from across the United Sates per year; and
- The Secretary of the Army, Navy, or Air Force, who nominates members of regular military, reserve components, and participants in the ROTC.

Further information regarding application procedures for these nominations is available through each academy's website, listed below. Applying for more than one nomination could increase your chances of securing a nomination. More than one nomination, however, is not required to gain an appointment. If someone else nominates you, please notify me so that I may allow other candidates the opportunity for nomination.

**Evaluation Criteria.** The academies consider evidence of character, scholarship, leadership, physical aptitude, medical fitness, personal goals, and motivation in performing each nominee's "whole-person" evaluation. These are also the criteria I use to determine nominations. Specific criteria in the "whole person" evaluation include character, scholarship, leadership, physical aptitude, medical fitness, and motivation.

**Character.** Absolutely critical in the course of evaluating a candidate is a positive determination of the candidate's character. Absence of good moral character is cause for disqualification. Candidates are considered to have good moral character unless evidence exists to suggest otherwise.

**Scholarship.** Each element of a candidate's academic record is carefully evaluated by a service academy's admissions board. The elements evaluated include a complete high school record (and college record, when applicable), class standing, and either the SAT or ACT scores. All strengths and weaknesses in a candidate's academic background are taken into account.

**Leadership.** Participation and achievement in organized athletics, student body and class government, clubs and class extracurricular activities, scouting, boys or girls state, and church or other community-related activities demonstrate evidence of leadership potential. Candidates who have found it necessary to work to provide family support are considered to have demonstrated desirable leadership potential.

**Physical Aptitude.** Measuring strength, endurance, agility, and coordination, the academies' fitness tests are designed to determine each candidate's readiness to undertake the rigorous athletic and physical education program at one of the academies. Each academy has its own test requirements. Results of the examination are evaluated, assigned a numerical score, and included in the whole-person evaluation by West Point. The Air Force, Naval, and Merchant Marine academies evaluate the results on a pass-or-fail basis.

**Medical Fitness.** A candidate who meets minimum scholastic standards will be scheduled to take a service academy qualifying medical examination at a military or civilian contract facility near the candidate's home. Although medical qualification standards vary among the academies, only one exam is required. Different tests may be necessary, however, depending upon the academy. Scheduling and evaluation of the exam are arranged by the Department of Defense Medical Examination Review Board (DODMERB). Candidates who have questions about their medical exam results should direct them to:

DODMERB
8034 Edgerton Drive
Suite 132
USAF Academy, Colorado 80840-2200
[phone number scrubbed]

Medical scheduling and evaluation are time-consuming processes, especially if consultation, re-testing, or corrective action is required. The process may take from six weeks to four months.

**Motivation.** Motivation is an intangible quality and difficult to evaluate; however, since it is most frequently the factor that determines an appointee's success or failure at a service academy, I make every effort to gauge a candidate's motivation. An attempt to measure motivation may be made through observation of the candidate's interest level in attending an academy and serving as an officer in the armed forces. Motivation may also be measured through an evaluation of correspondence, personal contacts, and care with which application materials are prepared.

## Applicant Evaluation by Service Academies

Each academy uses a questionnaire to make an initial assessment of an applicant's potential for appointment. The results of this evaluation are provided by each academy to Members of Congress to assist them in screening their applicants. Soon after the applicant returns the questionnaire, the admissions office will provide the applicant with an evaluation of the applicant's demonstrated ability to meet admissions standards. An applicant who meets the standards is declared a candidate; those who do not meet the standards at that point may later submit additional test scores or information to the academy for re-evaluation. The applicant must provide the following information: academic standardized test scores (SAT, ACT), rank in class and grade point average, Social Security number, and participation in high school extracurricular activities. Be sure to complete a pre-candidate questionnaire for each academy in which you are interested.

Service academy websites are:

| | |
|---|---|
| Military Academy | http://www.usma.edu |
| Naval Academy | http://www.usna.edu |
| Air Force Academy | http://www.usafa.edu |
| Merchant Marine Academy | http://www.usmma.edu |

## Contact Information

Address correspondence regarding your application for a nomination to

**[Member]**
**[Address]**

**[Telephone]**
**[E-mail]**

**Deadline**

**[Date]** is the deadline for applications.

Appendix C. Sample Application Information[33]

Dear _____:

Each year, **[Representative/Senator]** receives many inquiries from **[District/State]** students who wish to attend a military service academy. One of the application requirements of all of the United States service academies (except for the United States Coast Guard Academy) is nomination by a government official. The nominating official is usually a Member of Congress. The military service academies (Army, Navy and Air Force) also accept nominations from other government officials. If you are interested in attending one of these academies, I urge you to apply for a nomination from me as well as the other nomination sources:

- **[Appropriate Representative/Senator(s)];**
- President Barack H. Obama, who nominates children of career military personnel; deceased or disabled veterans; military or civilian personnel in missing status; and Medal of Honor recipients;
- Vice President Joseph R. Biden, who nominates five individuals from across the United Sates per year; and
- The Secretary of the Army, Navy, or Air Force, who nominates members of regular military, reserve components, and participants in the ROTC.

Information regarding application procedures for these nominations is available through each academy's website, listed below. Applying for more than one nomination increases your chances of securing a nomination. More than one nomination, however, is neither required nor of assistance in gaining an appointment. If another authority nominates you, please notify me so that I may allow other candidates the opportunity for nomination.

Please note that the United States Merchant Marine Academy only accepts congressional nominations.

Candidates for a service academy nomination should recognize that each academy has specific deadlines which must be met if an application is to be successful. Academy websites provide information about deadlines and other application requirements. Also please note that **[Congressman/Senator]** generally considers applications only from **[District/State]** residents and children of **[District/State]** residents.

Here are the steps to follow in seeking a nomination from **[Representative/Senator]** to the service academies:

Contact **[Representative/Senator]** in writing at **[his/her] [Washington/district/state]** office, expressing your interest in receiving a nomination to one or more of the academies. Your letter should include your

- name;
- permanent mailing address;
- telephone number;
- temporary mailing address, if applicable;
- high school; and
- year of graduation

A nomination is only one of the requirements for matriculation at one of our nation's service academies. You must also apply directly to each service academy individually. At the same time you contact this office, you should also request admissions information from each academy to which you plan to apply, by writing to them at the following addresses:

United States Naval Academy
USNA Candidate Guidance Office
Annapolis, MD 21402-5018
http://www.usna.edu/Admissions

United States Air Force Academy
Admissions Office
USAF Academy, CO 80840-5025
http://academyadmissions.com

United States Military Academy
Admissions Office
600 Thayer Road
West Point, NY 10996-9902
http://admissions.usma.edu

United States Merchant Marine Academy
Office of Admissions
Kings Point, NY 11024-1699
http://www.usmma.edu/admissions/

To be considered for nomination, you will need to submit the following to **[Representative's/Senator's]
[Washington/district/state]** office in order to complete your nomination file:

- a nomination application
- a copy of your high school transcripts, including your GPA, the size of your class, and your ranking
  within that class
- an official copy of your SAT or ACT scores
- 3 letters of recommendation: one from a teacher, principal, or guidance counselor; one from an employer,
  coach, or extracurricular faculty advisor; and one from any person of your choice who is not related to
  you.

Please forward the requested information at your earliest convenience. We do ask that you submit information
as you compile it, instead of waiting until you have everything together.

The deadline for submission of all required documentation is **[date]**.

Please contact **[Member staff]** in the **[Washington/district/state]** office at **[phone/e-mail]** if you have any
questions or if **[he/she]** can be of assistance in any way during this process.

Applying for Admission to the United States Coast Guard Academy

As noted above, the Coast Guard Academy (USCGA) is the only United States service academy that does not
require a nomination for appointment. For information about the USCGA, you may write to:

United States Coast Guard Academy
Admissions Office
New London, CT 06320
http://admissions.uscga.edu/i2e/admissions

Appendix D. Sample Nomination Application[34]

**[Representative/Senator]**
APPLICATION FOR NOMINATION FOR APPOINTMENT TO THE UNITED STATES SERVICE
ACADEMIES

Please complete and return this form. Type or print neatly. Fill out all information completely. Any missing information may adversely affect your chances for nomination.

Full Name (Last, First, Middle)
Date of Birth
Place of Birth

Permanent Mailing Address (Number, Street, City, State, and Zip)

Phone Number

Temporary Address (If different from above)

Social Security Number

Mother's/Father's/Legal Guardian's Name (Address if different from above)

School Principal or Academic Dean Date of Graduation

Names and Addresses of all High Schools and/or Colleges Attended

Month and year of graduation

Month and year you are requesting nomination

Are you a United States citizen? (Please circle) Yes No

Are you a **[State/District]** Resident? Yes No
If not, please state connection:

10/2/23, 5:55 AM
Case 1:23-cv-02699-RDB   Document 9-6   Filed 10/06/23   Page 32 of 366
everycrsreport.com/files/20160421_RL33213_b7ca6aac1389d723532ab83c1853cc83098aebec.html#ifn16

Which of the academies are you interested in attending? Please number according to your preference. You will be considered only for those academies for which you have indicated an interest, and in the order in which you have ranked them below.

AIR FORCE____   MERCHANT MARINE____   NAVAL ____   MILITARY ___

Have you requested that a pre-candidate file be initiated for you at any of the academies?
If so, which one(s)?

ACADEMIC HISTORY AND ACCOMPLISHMENTS

Latest cumulative grade point average: _____ on a scale of _____

Rank in class: _____ in a class of _____(# of students) as of _____(date)

**SAT Scores**

 Date(s) Taken Critical Reading Math

**ACT Scores**

 Date(s) Taken English Mathematics Reading Science Composite

You do not need to take both tests, but you must provide officials copies of either your SAT or ACT scores. If you have already taken either examination, you should contact the College Entrance Examination Board for SAT scores, or ACT for ACT scores, and request that a copy of your scores be sent directly to **[congressional office code assigned by each group]**. If you have not yet taken these examinations, please list **[congressional office code assigned by each group]** as one of the recipients of your scores at that time.

Please answer all questions completely (use another sheet of paper if necessary):

AWARDS AND HONORS (be specific):

SCHOOL RELATED EXTRACURRICULAR ACTIVITIES (Please indicate years of participation. 1=Ninth Grade, 2=Sophomore, 3=Junior, 4=Senior):

COMMUNITY ACTIVITIES (please indicate duration and hours per week):

WORK EXPERIENCE (please indicate duration and hours per week):

MILITARY EXPERIENCE (e.g. JROTC or Civil Air Patrol):

In a one-page essay on a separate sheet, describe why you wish to attend a service academy.

If you feel that there are special conditions or circumstances that we should take into consideration, please elaborate briefly (e.g. an extremely difficult course load, a traumatic event that affected your performance).

Appendix E. Sample Post-Nomination Letter[35]

Dear _____:

I have reviewed your request for a nomination to **[Service Academy]**, and I am pleased to inform you that I have nominated you for an appointment to join the Class of **[Presumed College Graduation Year]**. Your achievements are impressive, and I am proud to know of a young **[man/woman]** with such remarkable leadership abilities, scholastic aptitude, and extracurricular talents in our **[district/state]**.

I sincerely hope that you will soon receive an official appointment letter from **[Service Academy]**, but I must remind you that my nomination does not guarantee your acceptance into the academy. Competition for these appointments can be stiff, and each year, many well-deserving, fully-qualified candidates are unfortunately not accepted. This decision is ultimately made by the admissions officers at **[Service Academy]**. Please make sure you have fully completed their admissions requirements and be in touch with **[Service Academy]** to check on the overall status of your potential appointment.

Again, I would like to congratulate you on your nomination to **[Service Academy]**. You have worked hard to get to this point, and it is well-deserved. I look forward to hearing about your many future accomplishments in the years to come. If my office can be of any further assistance, please be in contact with us.

Author Contact Information

[author name scrubbed], Specialist in American National Government ([email address scrubbed], [phone number scrubbed])
[author name scrubbed], Analyst in American National Government ([email address scrubbed], [phone number scrubbed])

# Footnotes

1. Historical records indicate that the congressional nomination served to help democratize and diversify the ranks of military officers. Congressional nominations ensured that academy appointees represented all geographic areas of the United States, came from a diverse set of family backgrounds, and would not be subject to executive branch political patronage. See U.S. Congress, House Committee on Military Affairs, *Military Academy*, report to accompany Bill H.R. No. 367, 28th Cong., 1st sess., May 15, 1844, Rep. No.

476, pp. 14-16; U.S. Congress, House Committee on Military Affairs, *West Point Academy*, report to accompany Bill H.R. No. 444, 29th Cong., 1 sess., May 11, 1846, Rep. No. 660, p. 2.

2.  While tuition is covered for all students in service academies, some academies may require students to pay fees for some services and activities. See USMMA, "Description of Midshipman Fees," http://usmma.edu/admissions/aid/fees.shtml.

3.  This report does not discuss admission to the Uniformed Services University of the Health Sciences http://www.usuhs.mil/, which provides graduate education in medicine, nursing, and other health fields for members of the military and the United States Public Health Service http://www.usphs.gov/default.aspx, and for which no congressional nominations are required for admission.

4.  Based on admissions data for the class of 2019 from USMA, USNA, USAFA, and USMMMA, available on the academies' websites, about 50% of qualified applicants were granted academy appointments.

5.  See CRS Report RL33209, *Casework in a Congressional Office: Background, Rules, Laws, and Resources*, by [author name scrubbed].

6.  Typically, January 31 is the final deadline for service academies to receive congressional nominations, but the academies may also choose to change this deadline for subsequent application cycles. Some academies also have early action deadlines or rolling admissions deadlines during the fall that congressional Member offices should also be mindful of. Information on these other deadlines can be requested from the academies' admissions offices.

7.  Each service academy requires that Member offices submit their nominations online through a designated website portal run by the academy's admissions office. A congressional office may have to request access to the service academy's nomination portal from the academy's admissions office. Through these academy portals, Member offices are able to obtain real-time information about applicants from their districts, and applicants are also able to view the status and source(s) of their academy nomination(s).

8.  U.S. Congress, Senate, Select Committee on Ethics, *Senate Ethics Manual*, S. Pub. 108-1, 108th Cong., 1st sess. (Washington: GPO, 2003), pp. 113-115. The document is available on the web at http://ethics.senate.gov/downloads/pdffiles/manual.pdf.

9.  U.S. Congress, House, Committee on House Administration, *Member's Congressional Handbook*, http://cha.house.gov/handbooks/members-congressional-handbook#Members-Handbook-Staff-Volunteers; and U.S. Congress, House, Committee on Standards of Official Conduct, *House Ethics Manual*, 110th Cong., 2nd sess. (Washington: GPO, 2008), pp. 284-291.

10. Websites for the admissions office in each academy are listed in **Table 3** of this report, and the service academies also employ congressional liaisons and regional admissions officers who can assist congressional Member offices.

11. Appointment, number, and territorial distribution information are codified at 10 U.S.C. 9342, USAFA; 10 U.S.C. 6954, USNA; and 10 U.S.C. 4342, USMA.

12. This reflects language used in statute and often by the service academies. Once an individual receives an appointment, he or she is "charged" to a nominating authority. The cadets or midshipmen whose nominations came from a congressional office are sometimes referred to as the Member's "charges."

13. Nominations are attached to a particular vacancy, so if a congressional office has multiple appointments available to an academy in a given year, a set of nominations is submitted for each vacancy.

14. 10 U.S.C. 9347, USAFA; 10 U.S.C. 4347, USMA; 10 U.S.C. 6955, USNA.

15. No publicly available data regarding the number of offices that choose ranked or unranked options were identified.

16. 32 C.F.R. 901.27, USAFA; 32 C.F.R. 575.3(a)(2), USMA. There is no similar C.F.R. language for USNA, however, admissions officials at USNA indicate that this practice is also typically followed.

17. These are one-year programs, hosted at other military schools. Students who complete the preparatory program can matriculate into the service academies but need to reapply to the academy during the appropriate admissions cycle.

18. If the vice presidency is vacant, then the President pro tempore of the Senate makes those nominations.

19. See "Service Academy Nomination Process," at https://www.whitehouse.gov/administration/vice-president-biden/academy-nominations.

20. This also applies to children of federal civilian employees in missing status.

21. 10 U.S.C. 9341a, USAFA; 10 U.S.C. 4341a, USMA; 10 U.S.C. 6953, USNA.

22. 46 U.S.C. 51302.

23. 46 U.S.C. 51302(b)(2); 46 C.F.R. 310.53

24. 46 C.F.R. 310.53. There are no presidential, vice presidential, or service-connected nominations to USMMA. The superintendent of USMMA, however, may appoint up to 40 students.

25. 14 U.S.C. §§182, 633.

26. 33 C.F.R. §40.1

27. 10 U.S.C. §9346, 32 C.F.R. §901, USAFA; 10 U.S.C. §4346, 32 C.F.R. §575, USMA; 10 U.S.C. §6958, 46 C.F.R. §310, USNA; 46 C.F.R. §310.54, USMMA; 33 C.F.R. §40.1. For the DOD academies, see also Department of Defense Instruction 3122.22, September 24, 2015, at http://www.dtic.mil/whs/directives/corres/pdf/132222p.pdf.

28. The extent and nature of recommended high school preparation varies by academy. Detailed preparation and admissions information is available from each academy's website: USMA http://www.usma.edu/_layouts/AdmissionsGuide/#/4; USNA http://www.usna.edu/Admissions/faq.htm; USAFA http://www.academyadmissions.com/admissions/advice-to-applicants/all-applicants/academic-preparation/; and USMMA http://www.usma.edu/admissions/application/scholastic-requirements.

29. USMA http://www.usma.edu/admissions/SitePages/Class%20Profiles.aspx; USNA http://www.usna.edu/Admissions/_files/documents/ClassPortrait.pdf; USAFA http://www.academyadmissions.com/admissions/advice-to-applicants/all-applicants; USMMA http://www.usmma.edu/class-profile. Current class profile information is not available from the U.S. Coast Guard Academy.

30. This is a sample document and is not intended to be definitive. It is based on information and examples found on service academy and congressional websites. Any information may be deleted or modified as appropriate to individual Member office policies and procedures.

31. This is a sample document and is not intended to be definitive. It is based on information and examples found on service academy and congressional websites. Any information may be deleted or modified as appropriate to individual Member office policies and procedures.

32. An applicant to the USMMA can reside outside of a House Member's district, as long as the applicant lives within the state that the Member represents.

33. This is a sample document and is not intended to be definitive. It is based on information and examples found on service academy and congressional websites. Any information may be deleted or modified as appropriate to individual Member office policies and procedures.

34. This is a sample document and is not intended to be definitive. It is based on information and examples found on service academy and congressional websites. Any information may be deleted or modified as appropriate to individual Member office policies and procedures.

35. This is a sample document and is not intended to be definitive. Any information may be deleted or modified as appropriate to individual Member office policies and procedures, or to the recipient of this letter. The first paragraph, in particular, can be customized to include the particular activities or achievements of the nominee.

# EXHIBIT E

# ACADEMY NOMINATIONS

One of my most important responsibilities as your Senator is nominating young men and women for admission to our country's service academies. Admission to a service academy is a two-tiered process. First, the candidate must apply through the Academy directly. There are five (5) service academies that offer appointments to highly qualified individuals who meet eligibility requirements and are the most competitive in academic performance, physical fitness, medical standards, extracurricular involvement, leadership traits, motivation and aptitude for military service. The second tier in pursuing admission is the Congressional Nominations process. An individual must meet the admissions requirements of the Academy as well as receive a nomination in order to be offered an appointment to the Academy. You do not need a Congressional Nomination for the United States Coast Guard Academy.

Applicants should direct any questions regarding the admissions process of a particular Academy to that Academy's Admissions office. Information can be obtained through the contact information below:

 (https://www.usafa.af.mil/)

**United States Air Force Academy**

Director of Admissions

Colorado Springs, CO 82840-5651

1 (800) 443-9266

www.usafa.edu (http://www.usafa.edu/)

 (https://www.cga.edu/)

### United States Coast Guard Academy

31 Mohegan Avenue

New London, CT 06320-4195

(800) 883-USCG (8724)

www.uscga.edu (http://www.uscga.edu)

 (https://www.usmma.edu/)

### United States Merchant Marine Academy

300 Steamboat Road

Kings Point, NY 11024-1699

www.usmma.edu (http://www.usmma.edu/)

 (https://www.usma.edu/)

### United States Military Academy at West Point

Admissions, Building 606

West Point, NY 10996

(845)938-4041

www.usma.edu (http://www.usma.edu/)

 (https://www.usna.edu/)

**United States Naval Academy**

Candidate Guidance Office

117 Decatur Road

Annapolis, MD 21402-5018

(410) 293-4361

www.usna.edu (http://www.usna.edu/)

# Additional Information

## *Eligibility*

Candidates seeking a nomination to a service academy must meet the following eligibility requirements as of July 1 of the year of admission to an academy: be at least 17 years old but not have passed the 23rd birthday; be a U.S. citizen; be unmarried, not pregnant, and have no legal obligation to support children or other dependents.

## *Nomination Process*

Each United States Senator and United States Representative may have no more than five people attending each service academy at any given time. Most members of Congress allocate at least one open vacancy each year. For each vacancy, ten nominations may be submitted to the respective service academy admissions office. Offers of appointment are made by the admissions office on a competitive basis measuring the overall qualifications and eligibility of all nominees.  Service Academy nomination applications for those graduating from high school in 2023 are currently being considered.

## Nominating Sources

Service academy applicants are eligible for nomination by both United States Senators in the state of their legal residence and the United States Representative for the District in which they reside as well as the Vice President. Applicants should apply for nomination to all four nominating sources.

The application for nominations to service academies is now live. To apply CLICK HERE (https://oampublic.senate.gov/constituent/login/c1856a5a-cf6f-4f1d-8446-18727fe326bd/).

All documentation for your application must be received by 5:00 PM on Thursday, September 21, 2023.  The preferred method of receipt is through email to academy_noms@warner.senate.gov (mailto:academy_noms@warner.senate.gov). However, if express mail is warranted, to avoid delays documents should be expressed to: Office of U.S. Senator Mark R. Warner, Attn: Academy Nomination Coordinator, 101 W. Main Street, Suite 7771, Norfolk, VA 23510.  Due to potential U.S. Postal Service delays, items sent by regular mail are not guaranteed to be received on time.  If you have not submitted all of the required information by the deadline, your application will be considered incomplete and will not be considered for a nomination.

## Applying to Academies

You are encouraged to apply early to any and all service academies for which you have a sincere interest. You may apply online at the respective service academy web site. If you meet the minimum eligibility and entrance requirements, the academy will forward a formal application package. You should return all requested materials as directed by the academy as quickly as possible. If you are considered an "official" candidate by the academy, you will be scheduled for a medical examination by the Department of Defense Medical Review Board (DODMERB). You will also complete a Candidate Fitness Assessment (CFA).

If you have any additional questions, please email academy_noms@warner.senate.gov.

## Academy Day 2023

Academy Day 2023 has concluded. Details about Academy Day 2024 will be available in early 2024.

If you missed this year's event and want to get a sense of the information offered at Academy Day, please see the video below from the virtual 2022 event. **Please keep in mind this video references a previous application cycle, so some dates and times may**

**be different from this year's requirements. This year's deadlines are listed in the sections above.**

Academy Day 2022

# EXHIBIT F

# SERVICE ACADEMY NOMINATION PROCESS

**T**he Vice President is authorized to nominate individuals to the United States Military, Naval, and Air Force Academies but cannot nominate to the U.S. Merchant Marine Academy and does not nominate to the U.S. Coast Guard Academy.

The Vice President is the only authorized nominating authority who can nominate U.S. citizens without geographical restrictions. He or she may have a maximum number of five nominees in attendance at each authorized academy at any one time. Normally, he or she has one or two vacancies each year. To be entered into competition for a Vice Presidential nomination, applicants must complete the online nomination application during the application period of **March 1 to January 31** preceding the year of entrance to the academies. **The Office of the Vice President will not accept paper applications.**

- Steps for the Service Academies Application Process

- Procedures for the Service Academies Application Process

- Service Academies Application Form

Due to a large volume of applicants (usually several thousand per academy), the Vice President has authorized the academies to evaluate all applications and rank them according to qualifications. In screening candidates, the academies evaluate an individual's high school or college academic record, results of the ACT and SAT tests, recommendations from individuals who are in a position to judge the applicant's character and academic potential, and physical and medical qualifications. In view of this screening by the academies, any correspondence subsequent to an applicant's actual application (e.g., letters of recommendation, high school and college transcripts, and ACT/SAT examination results) must be sent directly to the academy when requested. Do not send this information directly to the Office of the Vice President.

Notification of those selected for a nomination is normally made in late winter or early spring of the year in which the class convenes.

For any additional information regarding Vice Presidential nominations, please contact the appropriate academy directly.

# EXHIBIT G



**ACADEMIC YEAR**

# 2023 − 2024

**NAVAL ACADEMY PREPARATORY SCHOOL**

**Information Brochure**

**-and-**

**Required Pre-reporting Checklists**



### DEPARTMENT OF THE NAVY

NAVAL ACADEMY PREPARATORY SCHOOL
440 MEYERKORD AVENUE
NEWPORT, RI 02841-1519

Dear Midshipman Candidate / Cadet Candidate,

Congratulations on your assignment to the U.S. Naval Academy Preparatory School (NAPS). This is an important step on the path to success at the United States Naval Academy (USNA), Coast Guard Academy (USCGA), or at a selected Navy Reserve Officer Training Corps unit. NAPS will challenge you to develop your moral, mental and physical foundations as you continue to grow and mature during our ten-month preparatory program.

As a midshipman candidate / cadet candidate, you will be held to much higher standards of conduct, academics and moral character than those attending a civilian collegiate program. These standards are not narrow in scope, but reflect the Navy Core Values of HONOR, COURAGE and COMMITMENT. We intend to strengthen your mind with an intense and demanding academic program in chemistry, mathematics, physics and English. These courses will give you the educational foundation necessary to succeed at your respective commissioning source. We will push you physically, during both the indoctrination phase of training and then daily throughout the academic year. We will cultivate your character and leadership abilities through a Character Development and Military Instruction program. Be prepared to train and learn from day one.

Completion of NAPS is an impressive accomplishment that will better prepare you for future success. Mastering the academic, physical, leadership and military aspects of the NAPS program, will start you off on the right foot as you begin life as a Midshipman or Cadet. Be ready to work as a team with the other members of the NAPS Battalion – your classmates and shipmates. The bonds you form at NAPS will follow you throughout your military career.

You should be justifiably proud to put service above self in deciding to join us at NAPS and begin your career as a member of our Nation's Sea Services. If I can offer one final piece of advice, arrive here in Newport in good physical condition and with a positive and motivated attitude. Welcome aboard, I look forward to meeting and serving with you over the next year!

Sincerely,

J. D. Bahr
Captain, USN
Commanding Officer

Table of Contents

<u>Subject</u>                                                            <u>Page</u>

<u>Mission of NAPS</u>                                                    1

<u>An Officer's Career</u>                                               1

<u>Introduction</u>                                                      1

<u>History of NAPS</u>                                                   2

<u>Admission to NAPS</u>                                                 2
    <u>General Requirements</u>                      2
    <u>Medical & Physical Requirements</u>           2

<u>Academics</u>                                                        3
    <u>English Composition</u>                       3
    <u>Mathematics</u>                               3
    <u>Physics</u>                                   3
    <u>Chemistry</u>                                 4
    <u>Study Skills Development</u>                   4

<u>Military</u>                                                         4
    <u>Honor Concept</u>                             4
    <u>Indoctrination</u>                            5
    <u>Character Development and Military Instruction</u>   5

<u>Athletics & Physical Mission</u>                                     6
    <u>NAPS Sports Program Schedule</u>              6
    <u>NAPS Club Opportunities</u>                   7

<u>Command Services and Support</u>                                     7
    <u>Admin</u>                                     7
    <u>Logistics</u>                                 7
    <u>Information Technology</u>                     7
    <u>Life Skills</u>                               7

<u>Appointment to the U. S. Naval Academy</u>                           8
    <u>Nomination Requirements</u>                   8
    <u>Post-Graduation Transfer</u>                  8

Table of Contents

| Subject | Page |
|---|---|
| Arrival and Checking Aboard | 8 |
| Newport, Rhode Island | 8 |
| Naval Station Newport | 8 |
| Transportation to NAPS | 9 |
| Arrival by Automobile | 9 |
| Maps and Directions | 10 |
| Map of Naval Station Newport | 11 |
| Indoc Timeline | 12 |
| Required Arrive Times | 12 |
| Arrival Protocol | 12 |
| Checking-In | 12 |
| Civilian Clothes | 12 |
| Prohibited Items | 12 |
| Medical Advisories, Information and Services | 13 |
| DoDMERB Advisory | 13 |
| Medical In-Processing | 13 |
| Dental In-Processing | 13 |
| Immunizations | 14 |
| Medical Care or Seriously Ill or Injured | 14 |
| Medications | 15 |
| Optometry | 15 |
| Injury Prevention | 15 |
| Health Insurance | 16 |
| Tattoos, Brands, Body Piercings | 16 |
| Alcohol and Drug Screening | 17 |
| Contact Information | 18 |
| Admissions & Enrollment | 18 |
| Medical | 18 |
| Pre-Arrival Checklists | 18 |
| Administrative Checklist (Direct Entry Civilians Only) | 19 |
| Administrative Checklist (Prior Enlisted Service Members) | 20 |
| Financial Checklist | 21 |
| Miscellaneous Items | 22 |
| Personal Items Checklist | 23 |
| Academic Supplies Checklist | 24 |
| Privately Owned Vehicle (POV) Checklist | 25 |
| Immunization Record | 26 |

## Mission of NAPS

To enhance midshipman and cadet candidates' moral, mental, and physical foundations in order to prepare them for success at the United States Naval Academy and the United States Coast Guard Academy or small group of other Navy programs.

## An Officer's Career. . .

Inscribed in Latin above the bronze doors of the Naval Academy Chapel are the words "Non Sibi Sed Patriae," which means "Not for Self, But for Country."  Midshipmen embrace the motto the moment they take the Midshipmen's Oath.  This commitment is



a part of their lives for as long as they are commissioned officers.

The education and training at the United States Naval Academy (USNA) is for one purpose only: to prepare young men and women morally, mentally, and physically to be officers in the naval service.  Students at the Naval Academy Preparatory School (NAPS) should be under no illusion in this regard.  The mission of NAPS is to prepare them for the Naval Academy and Coast Guard Academy.  As a midshipman/cadet candidate at NAPS, you will embark on a new and demanding way of life.  Your challenges will be great, but equally rewarding.

## Introduction

Chinese philosopher Lao-tzu wrote more than two thousand years ago, "The journey of a thousand miles begins with a single step."

For many officers in the Navy, Marine Corps and Coast Guard, their first step was

enrollment at NAPS.

The ten-month course of instruction at NAPS, lasting from July to May, emphasizes preparation in English, mathematics, chemistry, and physics.  Academic placement depends on demonstrated ability, previous education, and an individual's aptitude for success at the Academy.



Demanding military, physical, and character development programs complement the rigorous academics in order to prepare midshipman/cadet candidates for the challenges of Academy life.  As part of our development program, NAPS offers an in-season athletics program, which allows midshipman candidates to compete against other preparatory schools, junior colleges, and collegiate junior varsity teams.



NAPS is an opportunity to prepare oneself for the Naval Academy / Coast Guard Academy.  The 4 years spent at the Academy will be followed by a rewarding professional career as a commissioned Navy, Marine Corps or Coast Guard officer in the service of our country. There is a 5-year service obligation following graduation.

1

## History of NAPS



NAPS is the Navy's fourth oldest school; only the Naval War College, the Naval Post Graduate School, and the Naval Academy are older.  Informal preparatory classes began as early as 1915.

The first official classes were established at Naval Station Newport and Naval Station San Francisco in 1920.  A year later, the schools were moved to Norfolk, VA and San Diego, CA.  The San Diego classes were disestablished and the NAPS classes remained solely in Norfolk until 1942, when the new Naval Academy Preparatory School opened in Newport, RI.



In 1943, NAPS moved to the Bainbridge Naval Training Center, a facility of several hundred acres located above the Susquehanna River, 40 miles northeast of Baltimore, MD.  Then NAPS returned to Newport while the Bainbridge Center was temporarily inactive during a 15-month period around 1950.  When Bainbridge was reactivated in 1951 because of the Korean War, NAPS returned to Maryland.  In August 1974, NAPS returned to its permanent home in Newport.

## Admission to NAPS*

If you apply to the Naval Academy and are not offered a direct appointment, you will be considered for admission to NAPS.  Civilians selected to attend NAPS must enlist in the Navy Reserve prior to reporting to NAPS in July.

### General Requirements

Midshipman candidates at NAPS must be: of good moral character; not married; have no children (nor be pregnant); and at least 17 years of age, but not yet 23 by the start of plebe summer at the Naval Academy or Coast Guard Academy.

The Superintendent of the Naval Academy determines the admission standards for each midshipman candidate.

### Medical & Physical Requirements

Midshipman candidates must be in excellent physical condition and pass the same comprehensive medical examination required for acceptance to the Naval Academy.

Midshipman candidates should refer to the Medical Considerations for Admissions at: http://www.usna.edu/Admissions/_files/documents/MedicalAppendix1.pdf for a complete description of the medical and physical requirements, including height and weight standards.

**All midshipman and cadet candidates will undergo testing for drug and alcohol usage within 72 hours of arrival at NAPS.** This screening will detect recent alcohol use and drug use out to several months.  **A positive drug test will be grounds for immediate disenrollment from NAPS.**

Additional information regarding medical requirements and support while at NAPS can be found on pages 14-20 of this information brochure.

## Academics

2



The Academic Department faculty provides classroom and laboratory instruction as well as small group and individualized tutoring services in chemistry, English, mathematics, physics and learning skills.  The faculty provides each candidate with the opportunity to acquire the academic tools needed to succeed at the Naval Academy and Coast Guard Academy, and ROTC Units.

Development of the critical thinking skills required for students to reach their full potential is a top priority.  Outside the classroom, the faculty provides opportunities for individualized and small group instruction to help each midshipman candidate achieve their goals.  NAPS operates on a trimester system and final exams occur at the end of each trimester.

The academic curriculum constitutes the core of the NAPS program, but midshipman/ cadet candidates are active duty military members vice college students.  This is one of the distinctions that make the NAPS experience unique.

**English Composition**
English Composition assigns writing that generates critical thought and reflection. Using short and long readings, multi-media texts, essays in multiple genres, journaling, and discussion, the curriculum strives to produce:
- Independent writers capable of critiquing and editing their own work and the works of their peers
- Perceptive, critical readers capable of analyzing and synthesizing a broad range of texts.
The curriculum culminates with each student producing a final writing portfolio.

**Mathematics**



Mathematics at NAPS strengthens the students' knowledge of algebraic and trigonometric concepts providing a strong foundation for calculus.

Placement in the foundation, intermediate, or advanced mathematics program depends upon standardized test scores, transcripts, and a placement test administered during the Indoctrination phase of training.
- *Foundation program:* algebra, pre-calculus and trigonometry.
- *Intermediate program:* topics in the foundation program plus an introduction to calculus.
- *Advanced program:* for students with a strong mathematics background; consists of those topics included in the intermediate program plus differential calculus.

**Physics**



The physics program is a three-tiered system.  Placement is dependent upon the academic background in both physics and mathematics.  For the prior-enlisted, naval technical school records may be used in lieu of high school records.
- *Foundation program:* An algebra-based physics course covering a variety of topics including motion, forces, energy, and electric and magnetic fields.

3

- *Intermediate and Advanced programs:* Both programs include additional and more advanced topics in both mathematics and physics in order to develop a deeper understanding of physical concepts. The advanced program also introduces students to applications of basic calculus, although no prior knowledge of calculus is required.

## Chemistry

 The chemistry department has three tracks in its curriculum. Placement in the foundation, intermediate, or advance program depends upon standardized test scores, transcripts, and placement tests administered during indoctrination. All three tracks use the same collegiate text with the higher tracks covering more topics and generally in more depth. Topics include chemical stoichiometry, thermochemistry, atomic structure, periodic trends, gas laws, intermolecular forces, colligative properties, and chemical equilibrium, and acid/case equilibrium. Qualitative and quantitative exercises are used to help students develop a solid approach to problem solving. A mix of individual work, group exercises, demonstrations, and laboratories enhance the learning experiences.

## Learning Skills Development

The mission of learning skills provide academic support to all midshipman/cadet candidates to help improve their academic performance. This program develops and/or refines the individual student's learning skills regardless of their grade point average.

Through metacognition classes, one-on-one sessions, and workshops, the Learning Skills develops academic and professional skills. Attending a session provides a student the tools to succeed at NAPS and beyond.

During the academic year all students will have the opportunity to participate in workshops that introduce them to essential strategies for achieving academic success such as previewing, study cycle, time management, study skills, etc.

Students also receive individualized assistance outside of the classroom to include mentoring, specialized reading, and study plans.

Faculty members provide academic support during free periods, extra instruction periods (after classes), and scheduled study hours. They also reinforce the tenets of study skills in addition to providing the academic-discipline specific assistance.

## Military

**All midshipman/cadet candidates are in active duty military status for their year at NAPS which is the first step in a five-year officer accession program.**

The primary goals of the NAPS military staff are to develop character, personal integrity and honor; to nurture pride in oneself and the organization; to develop standards of personal appearance; and to introduce the Naval Service Core Values of Honor, Courage and Commitment. These are all qualities that are essential for successful military officers and future combat leaders.

## Honor Concept

A strong sense of personal honor has long been the hallmark of the United States military officer. When priceless human lives and expensive equipment are at stake, there is no room for those who lack integrity within our country's Officer Corps.

NAPS' honor concept demands the highest standards of personal honor. The honor

 concept is part of the daily life at NAPS, just as the honor concept is an integral part of every midshipman and cadet's life at the Naval and Coast Guard Academies. The honor concept is both practical and instructive. It provides a basic standard for living:

4

"Midshipman/Cadet Candidates are persons of integrity:  We stand for that which is right." It fosters an attitude of responsibility and accountability.

<u>Indoctrination</u>



The Indoctrination phase of training is a three-week course of basic military training during July and August.  A cadre of USNA/USCGA midshipmen/cadets assist NAPS' military staff in the military indoctrination before the academic year begins.

The daily routine and military discipline at NAPS will help the midshipman/cadet candidate prepare for the demanding military standards of the Academy. Approximately 250 midshipman candidates and 25 cadet candidates make up the NAPS Battalion.  It is then divided into three companies with approximately 90 students in each company. Each company is made up of two platoons.

There are many opportunities for candidates to develop leadership experience. Midshipman/cadet candidate battalion leadership positions are filled based on demonstrated leadership abilities.  Different leaders serve each trimester and are known as "Stripers".  Those midshipman/cadet candidates assigned to positions of leadership within the Battalion are responsible for the discipline, supervision and welfare of their fellow midshipman/cadet candidates.

With the exception of the stripers, all NAPS midshipman/cadet candidates have equal seniority and authority.  All midshipman/cadet candidates will wear the Navy Working uniform or service specific (Navy/Coast Guard) uniforms with the NAPS device affixed to the uniform.

Liberty is normally granted on the weekends, requiring midshipman/cadet candidates to return at a designated time each night.  As the year progresses, "overnight liberty" maybe awarded based on academic, athletic, and military performance.

While assigned to NAPS, all midshipman/cadet candidates will earn approximately 25 days of leave.  They will have opportunities to use their leave during scheduled leave periods at Thanksgiving, Winter Holiday and Spring Break.

<u>Character Development and Military Instruction</u>



Character Development and Military Instruction is conducted to instill Navy core values and promote the importance of team before self.   The foundations of moral courage, honorable conduct and ethical decision-making, are the primary focus.  The NAPS military staff leads dedicated training, reinforced by lessons imparted by the entire NAPS team of instructors, coaches, and support personnel.  Distinguished guest speakers from USNA and from the Navy, Marine Corps and civilian communities share their own motivating and inspirational messages. The objective is for midshipman / cadet candidates to develop their own value systems and to become exposed to how classmates with dissimilar backgrounds may approach the same complex issue or scenario.

The military training program at NAPS is enhanced by the inclusion of trips to other



military commands co-located on Naval Station Newport. When the NAPS Battalion participates in events hosted by Naval War College or Surface Warfare Officer School, they are exposed to other military commands as well as opportunities for mentorship by senior military officers.

# Athletics & Physical Mission

5

NAPS endorses a "whole person" approach to the development of each midshipman/cadet candidate.
Each afternoon during the academic year



midshipman/cadet candidates are given the opportunity for individual and team physical training. All are expected to improve their physical fitness during the academic year.



Each midshipman/cadet candidate will take the Naval Academy's Physical Readiness Test four times. This test will be used to judge improvement in personal physical fitness. Extra instruction is available to all who demonstrate a need for group or individual training through which to improve their fitness level.

Along with physical fitness, NAPS will test each midshipman/cadet candidate on their swimming abilities. Those who are non-swimmers are given optional individual instruction in the remedial swim program. The Athletic Department offers eight varsity sports throughout the academic year. Each sport will offer open tryouts for midshipman/cadet candidates. Athletes must be in good academic standing in order to participate on a NAPS athletic team. NAPS athletic teams play a competitive schedule consisting of regional college JV teams, junior college and prep schools, as well as NCAA D1, D2 and D3 schools.

NAPS athletic facilities include Nimitz Field (football, lacrosse) McCool Track (track), Prichard Field (lacrosse and track), Gym 302 (basketball, wrestling, and track). Gym 302 also houses one of three weight rooms available to the midshipman candidates. NAPS' primary weight room is located in Kay Hall, next to Nimitz Field.

Midshipman/cadet candidates are welcome

to use the Naval Station Newport gym, pool and fitness centers. These facilities provide a wide range of physical activities and opportunities in which to improve physical fitness.



### NAPS Sports Program Schedule
*Fall Sports*:
- Football
- Lacrosse
- Cross Country (co-ed)
- Cheer (all year)

*Winter Sports:*
- Wrestling
- Men's Basketball
- Indoor Track (co-ed)

*Spring Sports:*
- Lacrosse
- Outdoor Track (co-ed)

### NAPS Club Opportunities*
- Hiking Club
- Math Team
- Diversity & Inclusion Club
- Poetry Club
- Semper Fi Society
- Community Service Club
- Chess Club

\* Club offerings depend upon interest. Other opportunities may be offered if there is sufficient interest.

# Command Services & Support
To support the midshipman/cadet candidates, staff and faculty, the Command Services Department provides administrative, personnel, logistical, information technology (IT), and life skills support.

**6**



### Admin/Personnel*
The admin/personnel office provides direct support to the midshipman candidates for all of their administrative needs to include:
- Enrollment & military accession
- Identification and Documentation
- Pay and Allowances
- Military Orders, Evaluations and Advancements.

Additional information regarding the required enrollment paperwork each midshipman candidate must have upon arrival to NAPS can be found on pages 21 and 22.

**\* Note: Coast Guard cadet candidate administration is provided through USCGA.**

### Logistics
The supply office of NAPS provides fiscal and procurement services in support of all military, athletic and academic requirements. In addition, they operate the mail room ensuring receipt and delivery of letters and parcels.

### Information Technology (IT)
IT provides information services to the midshipman/cadet candidates, staff and faculty at NAPS.

NAPS' IT will issue a government computer to each midshipman/ cadet candidate. These computers are identical and use the latest Microsoft Windows operating system and the Office suite applications software.

Each midshipman/cadet candidate will be given an account on the NAPS network. The account will allow them to access the internet, their NAPS e-mail account, and

printing services to the network printers.

All midshipman/cadet candidates will be given training on various computer applications, network security requirements and proper use of government information technology equipment.

Midshipman/cadet candidates will not install or use software not provided by NAPS' IT division.  This includes all types of gaming or music software and instant messaging/chat software.  Due to network security concerns, the connection of personal electronic devices to any NAPS computer or to the NAPS network is STRICTLY prohibited.  This includes cell phones, smart watches, audio devices, digital cameras, wireless routers, hubs, extra storage devices/drives, and personal printers.

Midshipman/cadet candidates are allowed to bring their personal electronic devices (laptop/tablet/smart phone/smart watch) to NAPS.  Commercial WiFi service is available within Ripley Hall (the NAPS dormitory) and can be purchased through the provider (goWiFi Navy).

### Life Skills

A Life Skills instructor is available to provide resources to meet the social and developmental needs of the NAPS Battalion and to provide life skills instruction in a variety of areas.

# Appointment to the U. S. Naval Academy*

**\* For USCGA requirements consult with USCGA admissions**

The Naval Academy Admissions Board will offer USNA appointments to qualified midshipman candidates at the end of the academic year.  You will not be required to resubmit an application to USNA, but you are required to reapply for nominations. Appointment criteria include, but are not limited to:

- Successful completion of the course of instruction at NAPS ($\geq$ 2.0 GPA)
- No failing grade in any subject
- Pass the USNA Physical Readiness Test
- Body composition within USNA standards
- In good standing with honor and conduct
- Favorable recommendation from NAPS' Commanding Officer.

## Nomination Requirements

Every NAPS midshipman candidate is required to apply/re-apply for a nomination from each source for which he/she is eligible.  For most this includes the following:

- Vice President
- Both senators
- Congressional representative



Nominations received in your 2022 application process **do not carry over**, so all will need to reapply.  The nomination process must be started before reporting to NAPS.  The NAPS military staff will assist and track midshipman candidates through this process.  Nominations for USNA are distinct from applications to USNA.

## Post-Graduation Transfer

Midshipman candidates who entered NAPS as civilians; "Direct Entries," and who  receive their USNA appointment, will normally receive four to six weeks of leave without pay before reporting to the Naval Academy.  During this period, they will be authorized to receive urgent care at a military treatment facility if sick/injured.  However, parents should consider keeping their son/daughter on their health policy to ensure full coverage during this period.

Midshipman candidates who entered NAPS as "Direct Entries," and who do not receive their USNA appointment will be processed for discharge from the Navy.

Midshipman candidates who entered NAPS as prior enlisted and who receive their USNA appointment can utilize accrued leave between NAPS and USNA.

Midshipman candidates who entered NAPS as prior enlisted and do not receive their USNA appointment will receive orders/assignment based on their existing enlistment contracts.

# Arrival and Checking Aboard

## Newport, Rhode Island

Newport has been an important city in the history of this great country.  It was a major port during colonial times and later served as a vacation spot for the very wealthy.  It has a rich history in the U.S. Navy and is home to the Naval War College, as well as several Navy officer accession programs. From pristine shorelines to golden sunsets, Newport has become a favored tourist attraction for many.  Information regarding Newport and the surrounding area is available at: www.discovernewport.org

## Naval Station Newport

NAPS is located on the end of one of Naval Station Newport's many peninsulas.  It provides numerous facilities for use by midshipman/cadet candidates.

**8**

The Chapel of Hope provides religious services for several denominations as well as counseling for midshipman/cadet candidates upon request.



Midshipman/cadet candidates also have the privilege of shopping at the Navy Exchange (NEX) and base commissary. Also located in the NEX area is the recreation center, which includes bowling and a game room; and the uniform shop, which provides a variety of uniform items, tailoring and dry-cleaning services.

Many of the midshipman/cadet candidates take advantage of the Liberty Center which has a Computer Café with WIFI and free computer use for games and internet browsing. The Liberty Center also sponsors area weekend trips and outings to include day trips to local area attractions and activities.

### Transportation to NAPS
If you arrive by air it is recommended that you schedule your flight through the T.F. Green Airport (PVD) located in Warwick, Rhode Island.

Please note that midshipman candidates will only be reimbursed for the amount that it would cost the government to purchase the same ticket. For example:

*A one-way flight from Atlanta, GA. to T. F. Green Airport in Providence, RI has a government fare of approx. $264.00. The reimbursable amount to the midshipman candidate traveling from Atlanta therefore cannot exceed $264.00.*
*NOTE: Tickets purchased using frequent flyer miles cannot be reimbursed.*

NAPS will provide transportation from TF Green Airport to NAPS for those traveling alone (without family). Details on this transportation will be provided once the schedule is firm.

**\*NOTE**: The NAPS provided transportation from TF Green Airport is only available for incoming midshipman candidates, not family members. Car rental is recommended if traveling with family.

Car rental is available at the airport, as are taxi services and Uber. If you experience problems, contact the **NAPS Command Duty Officer (CDO) at 401-641-0752.**

\*NOTE: NAPS will not provide transportation from Boston to NAPS.

**Keep all of your receipts**, including your airline ticket voucher; without them you will not receive full reimbursement for your travel expenses. Airline receipts must indicate the cost and show payment – an itinerary without cost and payment info will not be sufficient. *No reimbursement can be made for tickets purchased using frequent flyer miles.* At check-in, each prospective midshipman candidate will complete a military travel claim (DD Form 1351-2) for reimbursement of allowable expenses. Having all required receipts will expedite the reimbursement process.

**Cadet candidates will initially report to the U.S. Coast Guard Academy in New London and will be transported to Newport by USCGA personnel on I-Day. USCGA Admissions will provide specific details to cadet candidates.**

### Arrival by Automobile
**\*Base Access:** Access to Naval Station Newport is strictly controlled. Those without regular access to Department of Defense (DoD) facilities (active duty or retired military; DoD civilian employees, etc) **must** be cleared for access via a background check. Prospective midshipman candidates will be granted access by showing their "Active Duty Orders" which direct them to report to NAPS. However, all others must be vetted prior to being granted base access. **NAPS will contact all prospective midshipman candidates to collect the personal information required to allow**

9

**base access for any individuals 18 years and older.** All those cleared for base access must have valid current identification.

The following documentation will be required:

- Military orders and/or correspondence directing you to report to NAPS (for the prospective midshipman candidate)
- A valid form of identification for each person 18 years and older cleared to enter the base. Examples of accepted identification:
- Driver's license or State ID issued by a Real ID compliant state **(must not say "Not for Federal Identification")**
- Student ID with photo (must be current)
- Passport
- Permanent Resident Card (Green Card)
- Military ID card
- Military dependent's ID card
- Vehicle registration or rental contract.
- Proof of insurance or rental contract.

You will be directed to enter the Naval Station through Gate 1. When passing through Gate 1, the driver will be required to show a picture identification card, i.e., passport, driver's license, state identification card, school identification card.

**Individuals who have not been cleared for base access will NOT be allowed to enter the base with their prospective midshipman candidate.**

**<span style="color:red">A Base Access form (SECNAV 5512)</span>**
**Map of Naval Station Newport**

Enter "**1 Training Station Road, Newport, RI**" into your GPS device to

**<span style="color:red">Instructions on how to submit the forms are posted on the USNA website:</span>**
**<span style="color:red">https://www.usna.edu/NAPS/Visit/visitor-base-access.php</span>**

**<span style="color:red">must be filled out for each person 18 years of age and older.</span>**

## Maps and Directions

From T.F. Green Airport, Providence (approx. 35 min)



From Logan Airport, Boston (approx. 1hr 30 min)



take you to Gate 1.
Upon entry to the Naval Station, "NAPS Event" signs will be posted along the road.



**Indoc timeline**

| | |
|---|---|
| Monday 24 July | Arrival time for Prior Enlisted M/Cs |
| Tuesday 25 July | Arrival day for direct entry prospective M/Cs |
| 25 July | Oath Ceremony; Families can attend |
| 14 August | Completion of Indoctrination |
| 15 August | First day of classes |

**ARRIVAL TIMES**



**Required Arrival Times**

*THERE ARE SEVERAL REPORT-TIME ARRIVAL WINDOWS. YOU WILL EACH BE GIVEN A SPECIFIC TIME WINDOW TO REPORT. ANTICIPATE ALL TIMES PRIOR TO NOON.*

**Do not make flight reservations until you receive your specific reporting instructions.**

**Arrival Protocol**

**Checking-In.** Expect the weather to be hot and humid. Dress comfortably and appropriately. Lightweight slacks, short sleeve shirt or blouse, and athletic shoes are recommended. Females should avoid skirts or summer dresses.

**Males must report with a satisfactory haircut. This will be a shaved head with a #1 guard (1/8 inch). Beards and mustaches are not allowed and all men must have a fresh shave.**

The day of arrival is a long and taxing event. It is important that you eat a good breakfast the morning of arrival. Additionally, the heat and humidity in July place a premium on proper hydration.

Prior military service members should arrive in Service Dress White (Navy) or Service "A" (USMC). You will be directed to change into the appropriate uniform upon completion of the check-in process.

Pack lightly. **IF YOU BRING IT, YOU CARRY IT**. Use collapsible luggage with a lockable device attached. The living quarters in Ripley Hall are small and storage is limited. Midshipman candidates will wear their military uniforms the majority of their time at NAPS.

** Civilian attire is not needed. **

Important documents needed for the check-in process are identified in the Administrative Checklist (pg. 21), should be kept in a pocket folder which will be carried with you to the initial check-in station. <u>Do not leave these documents in your baggage.</u>

**\*\*NOTE:  If unforeseen circumstances arise which will impact your on-time arrival on I-Day you should call the NAPS CDO at 401-641-0752 as soon as possible.**

**Civilian Clothes**. It is recommended that all direct candidates report in the following attire:

(1) collared shirt
(1) casual/dress slacks; can be khaki in material
(1) pair of non-athletic shoes (ie. loafers, boat shoes, etc).
(1) belt

\* Prior Service Members should bring these items. \*

**Prohibited Items.** Leave over the counter medication, liquor, fake IDs, pornographic material, firearms, and weapons (i.e. airsoft, orbeez, etc.) at home. Unauthorized contraband will be confiscated.  Introducing these items on to NAPS premises may result in immediate dismissal

*ARRIVE ON TIME, GET CHECKED-IN AND BE READY TO TRAIN!*

12

# Medical Advisories, Information and Services

## DoDMERB Advisory

If there are any changes in the prospective midshipman candidate's health since their Department of Defense Medical Exam Review Board (DoDMERB) examination, the USNA Admissions Medical Liaison must be notified in writing.  Areas of particular concern are:

- Any and all surgery (orthopedic, oral, etc)
- Any hospitalization
- Orthopedic injuries (broken bones, joint injuries or any other musculoskeletal injuries)
- Head injuries
- Pregnancy
- Vision changes
- Loss of consciousness
- Mental health changes
- <u>Any condition which might preclude full participation in the rigorous indoctrination phase of training.</u>

Mail or fax documentation of any changes in your health status since your DoDMERB examination to:

> **USNA Admissions Office**
> **Nominations and Appointments**
> Attn: Medical Liaison
> Halsey Field House
> 52 King George St.
> Annapolis, MD  21402-5018
>
> Contact Number: (410) 293-4381
> Fax:  (410) 293-1819

## Medical In-Processing

On I-Day, all prospective midshipman candidates will undergo a brief medical examination to ensure physical qualification for admission to the Naval Academy. Prospective midshipman candidates must pass this examination to be inducted. In most cases, this will be a routine screening examination to confirm that no problems have developed since the date of the last DoDMERB examination.  It is however, the responsibility of the prospective midshipman candidate to inform the medical screening team of any health changes so they may conduct a more in-depth medical screen.

**Be aware that on the day you report to NAPS, you must be within the weight and body fat standards applied at your DoDMERB examination, or you risk disqualification.**

## Dental In-Processing

The USNA Office of Admissions assumes that all new midshipman candidates will arrive at NAPS with excellent medical and dental health. Prospective midshipman candidates must report ready to undertake the extremely rigorous indoctrination phase of training, uninterrupted by medical or dental conditions that would detract from the training.

While assigned to NAPS, midshipman candidates will have access to the Branch Dental Clinic located on the naval station. The Branch Dental Clinic will provide all general and specialty dental care required. It is strongly suggested, that each prospective midshipman candidate have a complete dental examination performed by his/her family dentist prior to Induction-Day.  This will ensure any acute dental conditions are treated prior to enrollment.

Examples of acute dental conditions include:

- Any cavities or tooth decay requiring restoration or extraction
- Any wisdom teeth indicated for extraction.

Please note: any dental surgery must take place **at least four weeks prior to I-Day** in order to treat any post-operative complications.

All prospective midshipman candidates who are undergoing active orthodontic treatment will need a waiver from USNA Admissions Office.  A waiver to enroll into NAPS with braces will be submitted during the application process.  It is important to note that even if a waiver is granted, Branch Dental clinic does not provide this type of orthodontic service.  Since this type of service is considered cosmetic there will be

no financial compensation for outside civilian care.

On I-Day, prospective midshipman candidates with this type of orthodontic issue must have a copy of their initial treatment plan and all orthodontic records as well as any civilian orthodontic care they intend to seek while assigned to NAPS.

A dental screening examination will be conducted during the Indoctrination phase of training. Prospective midshipman candidates are to report their most recent dental check-up, including third molar (wisdom tooth) evaluations by a general dentist and/or an oral surgeon. Additional dental care will be provided throughout the NAPS academic year.

**Immunizations**

All prospective midshipman candidates must complete the demographics on the Immunization Record for United States Naval Academy Preparatory School. A physician or other licensed health care provider **MUST** complete the vaccination history. **\*\*Immunizations are mandatory\*\***

Prospective midshipman candidates are requested to mail one copy and hand carry two copies to the I-Day Immunization Station. Do not leave this paperwork in your bags. This form is very important, as it will decide which immunizations you require during your year at NAPS. (The form is located on pg. 30 of this brochure.)

Please mail one copy of the immunization record in ample time to ensure it arrives to NAPS prior to 1 July 2022, to the following address:

**Naval Academy Preparatory School**
ATTN: NAPS Medical
440 Meyerkord Ave
Newport, RI 02841

Prospective midshipman candidates must ensure all of the required immunizations are received. Any vaccines not received prior to I-Day will be given at the King Hall Medical facility. The following vaccines will be administered to both male and females while assigned to NAPS:

- Tdap and Menactra/Menveo vaccines are required. If your provider does not have these vaccines, please do not accept a substitute vaccination. NAPS will ensure each prospective midshipman candidate is inoculated with the necessary and appropriate vaccines.
- Human Papilomavirus (HPV), is an optional vaccine that will be provided.
- Gardasil, is a vaccine that will be provided unless a refusal form is signed on I-Day.
- Mantoux Tuberculin Skin Test (PPD) must have been performed and documented within the last six months prior to Induction-Day. The PPD form must be returned to the address listed below by **1 July 2023**.

**Naval Academy Preparatory School**
ATTN: NAPS Medical
440 Meyerkord Ave
Newport, RI 02841

In addition, prospective midshipman candidates MUST have **TWO** copies of their completed immunization record. If a healthcare provider has any questions regarding immunizations, the provider can contact the USNA Immunization Clinic at (410) 293-1774. This phone number is for health care providers only.

**Medical Care or Seriously Ill or Injured**

If a midshipman candidate becomes ill or injured, the Navy will provide or pay for the medical care and related expenses incurred as a result of the illness or injury. These are the same benefits provided to all active duty members of the U.S. Armed Forces, so long as the midshipman candidate remains physically qualified for commissioning.

The majority of medical care is provided by the Naval Health Clinic New England or by the Clinic's referral program to civilian care facilities. Medical care received in any civilian medical facility without a referral is not authorized and any expenses incurred

14

will not be reimbursed. Exceptions are made for emergent care only. All emergency care at Naval Station Newport is directed to the local civilian hospital in Newport.

If a midshipman candidate's medical condition brings their suitability for admissions to the Naval Academy into question, the USNA Admissions Medical Officer will make a recommendation to the Superintendent. If the Superintendent of the United States Naval Academy does not grant a waiver for the condition, the midshipman candidate will be disenrolled from NAPS.

## Medications

Any medications prescribed by a physician must be identified to the medical screening team on I-Day. The medication must be in a labeled container with its written prescription or certified physician's note. The written prescription must contain the following information:

- Name of the medication
- Dosage
- Dates of intended use
- Reason it was prescribed.

Prescription medications and written prescriptions must be removed from baggage and carried with the candidate when they begin I-Day processing so that they will be available for review by the medical screening team. The medical screening team will evaluate the documentation and the appropriateness of the medications. It will then be annotated in the prospective midshipman candidate's military medical record in order to authorize its continued use.

## Optometry
Please note the following advisories:

- Do not undergo corrective vision surgery (e.g. **PRK, LASEK or LASIK**) as this can be a disqualifier and may not be waived for commissioning.
- If you have a prescription for contacts or eye glasses the Navy will issue you military standard eye glasses.
- Naval Health Clinic New England

Optometry does not issue contact lenses, but will update prescriptions so that contact lenses may be purchased at your own expense.
- Tinted or lenses that become tinted with sunlight, are not permitted during military parades, training, formations and inspections. This type of eye wear will not be your primary set of eye glasses.
- Bring two pairs of your most recently prescribed eye glasses, a 6-10-month supply of contact lenses (if you choose to wear them).
- Color vision screening will be conducted to confirm normal color vision.
- Your eye glasses should be valid from at least July 2022 to July 2023 to be considered a current prescription. Mail one copy of your eye glasses prescription by July 1, 2023 to the address listed below:

**Naval Academy Preparatory School**
ATTN: NAPS Medical
440 Meyerkord Ave
Newport, RI 02841

- Bring two copies of your current eye glasses/contact lens prescription for the medical screening team.

- **DO NOT WEAR CONTACT LENSES TO I-DAY.** This will hinder an accurate eye exam.

## Injury Prevention
All prospective midshipman candidates should start physical training at least three months prior to their arrival. This will allow the time necessary for the body to adjust to the demanding schedule of the NAPS Indoctrination phase of training. Training during this phase will include:

- Distance running
- Long periods of standing on several different surfaces including a synthetic turf athletic field, athletic track, roads, trails, grass, sand, and gymnasium hardwood floor.
- Multiple periods of intense physical activity. This includes push-ups, pull-ups, sit-ups, squats, lunges,

and plyometrics.
- Long periods of marching.

Prospective midshipman candidates should not wait until the last minute to prepare for the physical demands of NAPS' physical and military training program.  It is expected that prospective midshipman candidates will build up their physical aptitude over a three-month period prior to arrival.



Be prepared for training with at least two QUALITY pairs of running shoes.  The running shoes should be less than 6 weeks old and "broken-in" in order to avoid training blisters.

Midshipman candidates with flat feet should have a high-quality motion control running shoe to allow for proper mechanics when running.  Any prospective midshipman candidate with a history of lower leg or foot stress fractures, shin splints, tendinitis, or plantar fasciitis should be evaluated at a reputable shoe store for foot position and gait before making shoe purchases.

The majority of injuries incurred during the Indoctrination phase of training are related to the body being overly stressed, due to a dramatic increase in physical training.  The only way to avoid or prevent a significant injury is to prepare your body daily over a 3-month period prior to arrival.

Prospective midshipman candidates should be actively participating in daily stretching, push-up, abs/core, lifting, and cardio programs involving outdoor running on multi-surfaces.  Training should not be the same every day and should involve a warm-up

and cool-down period.

All prospective midshipman candidates should be eating a healthy well-balanced diet.  A personalized eating plan can be generated at www.choosemyplate.gov.

Prospective midshipman candidates with a history of stress fractures or stress reactions with increased physical training should speak with a healthcare provider about vitamin D and calcium supplementation. This supplementation however, must be approved on I-Day by the same procedures as prescribed medication.

## Health Insurance

NAPS strongly recommends prospective midshipman candidates contact their local health insurance provider to discuss their options of procuring and maintaining private medical insurance in order to ensure continuous medical coverage in the rare case of medical disqualification from NAPS.

Reasons for medical disqualification can include epilepsy, diabetes mellitus, ulcerative colitis, and even serious injury. As a result of a medically based separation, the midshipman candidate could face significant issues upon return to the civilian sector in acquiring health insurance due to a "pre-existing condition."  For this reason alone, having private health insurance already in place is a wise investment.

## Tattoos, Brands, Body Piercing

Navy and USNA regulations prohibit tattoos, body art, or brands that are visible in Navy uniform; e.g., those on the head, face, neck, scalp, arms or hands.  Furthermore, the regulations amplify that any "…tattoos, body art, or brands that are prejudicial to good order, discipline and morale or are of a nature to bring discredit upon the Navy are prohibited."  The prohibition is applied to any body art and ornamentation that is:
- Excessive
- Obscene
- Sexually explicit

- Advocates, symbolizes or

**16**

discriminates against a particular sex, gender, race, religion, ethnic or national origin, affiliation to a gang, supremacist and extremist groups, or the glorification of drugs and/or their use.

Pre-existing body alterations must comply with the Naval Academy's policy or be removed at the midshipman or midshipman candidate's expense unless a waiver is granted by the Naval Academy Body Alteration Review Board.  All body alterations shall not be visible in the Summer White Uniform (short sleeve), "…either on the skin that shows outside of the uniform or through the fabric.  All tattoos/body art/brands on the head, face, neck or scalp are prohibited."

Included in each midshipman candidate's Offer of Appointment package is a statement of understanding regarding body alterations. It is required that this statement be completed and returned with your offer acceptance to USNA Admissions.

If you did not return the form, submit it immediately to the Head of Nominations and Appointments at:

> **USNA Admissions Office**
> **Nominations and Appointments**
> Attn: Medical Liaison
> Halsey Field House
> 52 King George St.
> Annapolis, MD  21402-5018
> Contact Number: (410) 293-4381
> Fax: (410) 293-1819

Any prospective Midshipman Candidate who reports to NAPS with a tattoo, brand, or body piercing that does not conform to the Naval Academy's policy AND who has not received a waiver from the Head of Nominations and Appointments should anticipate not being inducted into the NAPS Battalion.

### Alcohol and Drug Screening
The Navy definition of drug abuse includes the wrongful use, possession, manufacture, or distribution of a controlled substance. Drug abuse also includes the unlawful use of controlled substance analogues (designer drugs), natural substances (e.g., fungi, excretions), chemicals, (e.g., chemicals wrongfully used as inhalants), propellants, and/or prescribed or over the counter drugs or pharmaceutical compounds with the intent to induce intoxication, excitement, or stupefaction of the central nervous system, and will subject the violator to punitive action under the UCMJ and or adverse administrative action.

Examples of other substances, the wrongful use of which constitutes drug abuse, includes but is not limited to the following:

- Products that contain synthetic cannabinoid compounds, such as Spice, Genie, Blaze, Dream, Ex- ses, Spark, Fusion, Dark Knight, Yucatan Fire, and K2
- Natural substances such as salvia divinorum and mushrooms
- Common items abused by inhaling or huffing, such as Dust-Off
- Over the counter products such as Robitussin or Coricidin HBP
- Prescription Medications such as Oxycodone, Vicodin, Adderall, and Valium

Any midshipman candidate who wrongfully possess controlled substance analogues (designer drugs), salvia divinorum, or products containing synthetic cannabinoid compounds will be subject to punitive action under the UCMJ, adverse administrative action, or both, as well as immediate disenrollment from NAPS.

The Department of Defense, Navy, USNA and NAPS regulations clearly prohibit, with zero tolerance, the use of illegal drugs and designer drugs, including anabolic steroids.

The National Defense Authorization Act mandates that appointees to all officer accession programs undergo testing for drug and alcohol use **within 72 hours of being formally inducted.**  All prospective midshipman candidates will be required to submit a urine specimen for drug testing and will undergo a breathalyzer test for recent alcohol ingestion.  A confirmed positive

17

result in either test or a refusal to undergo testing will result in immediate disqualification. We **will** test you for drugs!*

**\*\*Marijuana use by any member of the military is prohibited**, even if such use occurred in a state where marijuana use has been legalized.  Navy regulations require mandatory separation of any candidate who tests positive for THC during entry testing. Innocent or accidental ingestion of a prohibited substance will not be excused.

## *Contact Information*

**Admissions & Enrollment**

**USNA Admissions Office**
**Nominations and Appointments**
Attn: Candidate Guidance Office
Halsey Field House
52 King George St.
Annapolis, MD  21402-5018
Contact Number: (410) 293-4361/1839
Fax: (410) 293-1829

**Naval Academy Preparatory School**
ATTN: Administration Office
440 Meyerkord Ave
Newport, RI 02841
Contact Number: (401) 841-6966

**Medical**

**USNA Admissions Office**
**Nominations and Appointments**
Attn: Medical Liaison
Halsey Field House
52 King George St.
Annapolis, MD  21402-5018
Contact Number: (410) 293-4381/1822
Fax: (410) 293-1819

**Naval Academy Preparatory School**
ATTN: NAPS Medical
440 Meyerkord Ave
Newport, RI 02841
Contact Number: (401) 841-3695

## Pre-Arrival Checklists

All prospective Midshipman Candidates are required to fill-out the following Pre-Arrival Checklists.

- Administrative Checklist
- Financial Checklist
- Miscellaneous Checklist
- Personal Items Checklist
- POV Checklist
- Academic Supply Checklist
- Immunization Record

**Additional information regarding NAPS can be found at:**

- Naval Academy Preparatory School's Facebook page (Naval Academy Preparatory School).  Please visit/like this page as frequent updates are disseminated via Facebook.

- NAPS Admissions website: https://www.usna.edu/admission/accepted/NAPS.php

- NAPS' homepage at www.usna.edu/naps

- Call NAPS at 401-841-6966

**18**

# Administrative Checklist <mark>(Direct-Entry Civilians Only)</mark>

**\*The following Checklist items are required for all "direct entry" prospective midshipman candidates.**

_____   Letter of Authorization to enlist in the Naval Reserve for NAPS from Director of Admissions, USNA.

_____   <u>Birth Certificate</u> (certified/notarized copy), <u>SSN Card</u>, and <u>legal identification</u> (driver's license, passport).

_____   DD Form 4 (Version May, 2020) Pages 1-4

_____   DD Form 1966 (Version Dec, 2021) Pages 1-4

_____   **Active Duty Orders filled in and signed.**

_____   Enlistment Statement of Understanding for Navy Reserve (NAVPERS 1070/613)

_____   Record of Emergency Data (DD FORM 93)

_____   Annex "A"

_____   W-4 (Version, 2022)

_____   DD Form 2058 (Version Jan, 2018)

_____   Arrange enlistee's transportation.  <u>If required</u>, make air reservations via SATO to Providence, RI. Shuttle buses from the Providence airport are arranged by NAPS -- OR the member may take taxi/Uber transportation to the base.

_____   Make three copies of the completed NAPS packet.
**---Copy (1)** Member reports to NAPS with in-hand.
**---Copy (2)** Faxed or FEDEX (preferred method) to the NAPS POC prior to reporting.
**---Copy (3)** Retain on file at the NRS or NRD for a minimum of 90 days.

_____   All travel receipts – airline/bus/train tickets, taxi or car service (show "zero" balance)
*(Please note, that receipts <u>must reflect the amount paid and the date it was paid</u>)*
***Airline tickets purchased with points or frequent flyer miles cannot be reimbursed.***

_____   Upon enrollment into NAPS, all midshipman candidates must reapply for a Congressional/Vice Presidential nomination to the USNA.  The process should be started prior to reporting to NAPS. Bring a folder which contains documentation that the process has been started and includes the names and address of your U.S. Senators and Representatives.  Screenshots of online applications and copies of letters of recommendation are recommended.

_____   SAT/ACT account # and password will be required for all who have previously taken the SAT/ACT exam.  Those who have not yet taken the SAT/ACT may be required to register while at NAPS.

_____   Copy of your immunization records (page 29 of this brochure – filled in). (Mail 1 copy by 1 July; hand carry 2 copies on I-Day)

_____   Copy of any changes to your medical record since your DoDMERB physical.  (Mail 1 copy by 1 July; hand carry 2 copies on I-Day)

## Administrative Checklist <mark>(Prior-Enlisted Service Members)</mark>

**The following Checklist items are required for all prior-enlisted service members only!**

Prior-enlisted service members must bring their Medical and Dental records or have them mailed to:

**NAVAL ACADEMY PREPARATORY SCHOOL**
ATTN: NAPS Medical
440 Meyerkord Ave
Newport, RI 02841

_____

If eligible for advancement: their current command to ensure the following is completed prior to arrival:
- Must read the applicable NAVADMIN that applies to the September Navy Wide Advancement Exam (NWAE)
- Must meet all eligibility requirements listed on the NAVADMIN to include PMK-EE completion
- Must have applicable EVALS in OMPF to be verified and calculated for the exam.
- Must have all applicable AWARDS updated in OMPF and ESR.
(If PMK-EE certificate, transfer EVAL, or awards are not in your record please bring a copy to be verified)

_____

Prior-enlisted Navy service members who have been accelerated advanced at their A-school or C-school to E-3 or E-4 <u>must</u> have that reflection on their record before departure from the schoolhouse.

_____

If possible, **report with a leave balance of approximately 30 days.** Those with insufficient leave will be required to remain at NAPS during leave and post-graduation periods until their leave balance is adequate.

_____

During the year at NAPS and subsequent 4 years at USNA very limited stowage for personal property and household goods is available. Household goods (furniture, appliances, large electronics, etc) should be disposed of through sale or donation or by shipping to family/friends. Government long term storage is not available in connection with orders to NAPS/USNA.

_____

Must report with **stamped transfer orders.** And all travel receipts – airline/bus/train tickets, taxi or car service (show "zero" balance)***Airline tickets purchased with points or frequent flyer miles cannot be reimbursed.***

# Financial Checklist

_____ Bring approximately $200.00 in small bills for incidental expenses. *(You may have some delay before receiving your initial paycheck)*

During the Check-In Process, the NAPS staff and Personnel Support staff will enroll you into the Navy's Direct Deposit Program. *(All pay and allowances midshipman candidates will receive while at NAPS will be distributed via this program)*

Direct-entry Midshipman Candidates will receive approximately $1,185 a month* (before taxes, BAF and Uniform deductions). Prior enlisted service members will receive the base pay of their enlisted pay-grade only. *(All additional allowances will be stopped upon their transfer to NAPS.)*

_____ * Payday occurs on the 1st and 15th of each month. Direct entry midshipman candidates typically receive approximately $220 per pay check after taxes and deductions. This amount must cover routine hygiene and convenience expenses. Travel expenses associated with leave periods, to include post-graduation leave, are the responsibility of the midshipman candidate.

Battalion Activities Fund (BAF): The BAF budget is approved annually and is funded through student payments. The annual fee is typically $1,700 - $2,100 and is collected from each midshipman candidate to cover the costs of the physical fitness clothing and equipment, textbooks, and various student activity expenses, including but not limited to Battalion trips and graduation events. Those who do not pay in full at the beginning of the academic year will have automatic deductions from their monthly pay established to satisfy their debt by graduation. NAPS is unable to set up deductions from non-USN pay, so USMC and Coast Guard students will be responsible for making periodic payments on their own recognizance. *This is a mandatory fee*.
_____ *NOTE*: Since a large portion of the BAF fee is used to cover up-front costs which are paid off over the course of the year, those who separate (voluntarily or involuntarily) prior to the end of the year will be required to pay off their balance prior to departing.

Military Uniform Issue: All midshipman candidates are required to pay for their military uniforms. The total cost of the military uniform issue for each individual is approximately $1,900.00.

The Uniform Issue is paid via automatic monthly payroll deductions which commence in October and continue through April. The deduction per month will be approximately $270.00**.
_____ **NOTE: The Navy Exchange (NEX) provides an interest free loan to cover the cost of uniforms. This loan is paid back through monthly payroll deductions. Those who separate (voluntarily or involuntarily) prior to the end of the year will be required to pay off their remaining balance prior to departing.

Scholarships may be used to pay for the BAF fee and uniform expenses mentioned above. Any scholarship amounts above the costs of these two fees must be held for use at USNA. If you do not _____ successfully complete NAPS or voluntarily/involuntarily separate from NAPS, you will be reimbursed by check a prorated amount after settlement of the remaining balance due.

NAPS is not a Title IV, "eligible educational institution" per U.S. tax code. As such student fees are _____ not tax deductible. There is also no code on the FAFSA for NAPS.

21

# Miscellaneous Items

Alarm clocks are permitted.  We suggest that you bring a small battery powered alarm clock.  You will be authorized to use electronic devices with headphones, after the Indoctrination Phase of training. Elaborate stereo systems are not permitted.

You may bring your favorite musical instrument, tennis racket, lacrosse stick, baseball bat or glove with you.  Do not bring heavy or bulky equipment such as weights.

Brief phone calls (not to exceed 15 minutes) will be scheduled 2-3 times during INDOC.  Other than for these scheduled calls cell phones are NOT permitted during the Indoctrination Phase of training.  Time to write personal letters is set aside each day.

Male midshipman/cadet candidates: are required to maintain a regulation military haircut.  Mustaches and beards are not permitted.  At the beginning of the Indoctrination Phase of training all males will report with a "close" haircut (shaved head with a #1 guard (1/8 inch)).

Female midshipman/cadet candidates: will not be required to get their hair cut, but their hairstyle and grooming must be in adherence with Navy Regulations. Please use this link for specific styles that may be worn: https://allhands.navy.mil/Features/Hair/

There will be limited time in the morning for hygiene and your hairstyle must follow Navy Regulations from reveille to taps.

NAPS Staff members will provide instruction to the female midshipman/cadet candidates on the proper way to wear their hair during I-Day and throughout Indoctrination period.

Your mailing address while at NAPS will be:
Midshipman/Cadet Candidate _____
Company _____, Platoon _____ *
Naval Academy Preparatory School
440 Meyerkord Ave.
Newport, RI 02841-1519

*Company and Platoon numbers will be provided on I-Day

Announcements, information and photos are frequently posted on the "Naval Academy Preparatory School" Facebook page.  If you use Facebook you should "like" this page to receive notifications of postings.

The routine during indoctrination requires adherence to regular meals and hydration.  If there are any dietary restrictions which could preclude this please contact NAPS at 401-841-3695 to discuss.

Gifts of food and packages are not allowed during the Indoctrination Phase of training.  However, letters or postcards are strongly encouraged.

Do not bring any electrical appliances (i.e. coffeepots, toasters, hotpots, televisions, or video games). These items will be confiscated.

Closet space is limited.

It is recommended that all midshipman/cadet candidates have at a minimum:
- (1) collared shirt
- (1) casual/dress slacks; can be khaki in material/color
- (1) pair non-athletic shoes (ie. slip-ons, boat shoes, etc).
- (1) belt

The first time you will get to go home will probably be Thanksgiving holiday period.  Parents, family and friends may have the opportunity to visit you at NAPS during the tentative Fall Open House weekend in September 2023.

# Personal Items Checklist

Prospective midshipman/cadet candidates are required to bring the following:

_____ Running shoes-2 pairs (do not substitute with basketball, tennis or cross-training shoes) It is very important that all bring running shoes that are in good condition.

Toiletries: to include but not limited to…
-   soap, shampoo                              - deodorant
-   razor                                            - feminine hygiene items to last 1 month
_____ -   shaving cream

_____ (for females) Swimsuit, solid color, dark blue or black one piece

_____ (4) envelopes with stamps

_____ (8) pair underwear

_____ (for females) (4) white sports bras (must be solid white, no logos, no lace, no push-up devices, no excessive padding)

_____ (4) pair of dark blue or black (6") compression shorts (must be a solid color).  (Compressions shorts, when worn with NAPS issue PT shorts, shall not be visible)

**Cosmetics and Jewelry**
_____ During the Indoctrination Phase of training the wearing of cosmetics and jewelry while in uniform is prohibited.

**Electrical Appliances and Electronic Devices**

The following are either OPTIONAL (*) or DO NOT BRING (-) items.

-   <u>Do not bring</u> hair clippers or barber utensils
-   <u>Do not bring</u> speakers, TVs, game systems (e.g. XBOX, PSP, PS3), or tobacco products
-   * Small hair dryers and electric razors are authorized (optional)
-   * Electronic equipment, (cell phones, smart watches. laptops, etc), will be under the custody of Ripley Hall staff until the Indoctrination Phase of training is complete.  During the post Indoctrination Phase of training the use of personal electronic equipment is considered a privilege and is controlled.  Therefore, NAPS faculty and staff may confiscate and secure from use the above-mentioned items or other personal items, if they become a distraction to a _____ midshipman candidate's ability to perform his/her duties. (optional)

23

# Academic Supplies Checklist

**You do NOT need to bring a calculator – one will be issued to you.**
 Prospective midshipman candidates should bring the following:

**PHYSICS:**

_____  Three ring binder (minimum 1.5 inch).  This binder will not be used for any other subject.

_____  Dividers that can be placed in your three-ring binder.

_____  A notebook (or loose-leaf paper) for your binder.

_____  Three-hole punch.  The kind that can be put into a three-ring binder is fine.

_____  Mechanical pencils

**CHEMISTRY:**

_____  Three ring binder (minimum 1.5 inch) with pockets or one without pockets and a folder that can be placed within (i.e., has three holes).  This binder will not be used for any other subject.

_____  Dividers that can be placed in your three-ring binder.

_____  One package of blank (no lines) index cards

**MATHEMATICS:**

_____  Three ring binder (minimum 1.5 inch).  This binder will not be used for any other subject.

_____  Dividers that can be placed in your three-ring binder.

_____  Three-hole punched Engineering Computation Pad

**ENGLISH:**

_____  Stapler and staples

_____  Three-ring binder (minimum 1.5 inch) with multiple pockets to store "Everything English"

_____  Loose leaf paper for in-class writing, etc.

_____  Notebook for in-class note taking

_____  Pens, pencils, erasers, highlighters, post-it notes

**OTHER:**

The following are not required, but are extremely helpful:
- Multi-colored pencils (not pens)
- Scissors
- Clear plastic tape
- Ruler with cm and mm markings on it
- Index cards
- Extra lead for pencils
- Extra erasers

_____  - Protractor

# Privately Owned Vehicle (POV)

Midshipman candidates are authorized to have their Privately-Owned Vehicles (POV) with them while attending NAPS.

At check-in on Induction-Day, midshipman candidates with vehicles will be required to present the following documentation:

- Current, valid, US driver's license that will not expire before June 2024
- Current Vehicle Registration.  If registration is in a name other than the midshipman candidate's; provide a notarized letter from the individual whose name it is in authorizing the midshipman candidate to drive the vehicle.
- Proof of Insurance with a liability minimum of $20,000

*(Failure to present these documents during the check-in process, will prevent the Midshipman Candidate from utilizing their POV on base while assigned to NAPS)*

25

| Name | SSN | DOB | Phone | Your Age on I-Day | Date you turned 16 |
|------|-----|-----|-------|-------------------|--------------------|
|      |     |     |       |                   |                    |

The appointee consents to receiving the required immunizations for induction into NAPS. The appointee will bring **TWO** completed copies of this form along with any updates to this form on I-Day. Do not mail updates. DO NOT LEAVE IN YOUR BAGS AT I-DAY. Any vaccines not verified on I-day will be given. Vaccine information sheets are available at http://www.cdc.gov/vaccines electronically if you have questions on the vaccines.

**Appointee Signature** _____

******REQUIRED IMMUNIZATIONS: Modifications in requirements can be made based on DOD guidance, CDC guidance and mission needs.*****

1. **Polio (Poliomyelitis)** – At least 3 doses are required to complete the series. Adult IPV booster is required for cadets age 17 or older.
2. **Tdap is REQUIRED**!! DTP, DT, Td – Childhood completion or catch up required per ACIP recommendations.
3. **MMR & Varicella** – At least 2 doses of each are required. Proof of immunity will be done on I-Day. Do not send proof of immunity.
4. **Hepatitis A & B** – REQUIRED. NOTE: Indicate if Twinrix, a combination vaccine, was used for HAV and HBV immunizations.
5. **Menactra or MENVEO-REQUIRED.** Menomune will not meet this requirement. One dose of Menactra or Menveo is required after patient turns 16 years.
6. Bexsero OR Trumenba for MenB will be required.
7. **HPV**– for men and women is highly recommended. We will offer and/or continue vaccine series on I-Day. HPV9 is the preferred vaccination.
**If a provider is uncomfortable with the above guidance, the required vaccines will be administered on I-Day at no cost to the midshipmen candidates.**

*** **THIS SECTION TO BE COMPLETED BY PATIENT'S HEALTH CARE PROVIDER***NO ATTACHMENTS ACCEPTED – Fill out this form. (PRINT)***

**Tuberculin Skin Test (PPD)** Provide documentation of a PPD skin test or QuantiFERON®-TB Gold after Jan 1 of this year. If the applicant has a history of a reactive PPD test, documentation of the medical evaluation to include chest x-ray results and medication prophylaxis must be provided at I-Day.

Date of PPD _____ PPD Reaction READING in mm _____ mm
(Record in *MILLIMETERS ONLY* – not " negative" or "positive")
QuantiFERON®-TB Gold results can be attached to this paperwork.

| Polio Mo/Day/Yr | DTP/DTaP Mo/Day/Yr | Td Mo/Day/Yr | Gardasil (HPV4) Mo/Day/Yr | Menactra Mo/Day/Yr | Bexsero Mo/Day/Yr | Hepatitis B Mo/Day/Yr | Hepatitis A Mo/Day/Yr |
|---|---|---|---|---|---|---|---|
| 1 | 1 |   | 1 | 1 | 1 | 1 | 1 |
|   |   | 1 |   |   |   |   |   |
| 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| 3 | 3 | 3 | 3 | Menveo Mo/Day/Yr |   | 3 |   |
| 4 | 4 | Tdap Mo/Day/Yr | HPV9 Mo/Day/Yr | 1 | Trumenba Mo/Day/Yr | Twinrix Mo/Day/Yr | Cervarix Mo/Day/Yr |
| 5 | 5 | 1 | 1 | 2 | 1 | 1 | 1 |
| MMR Mo/Day/Yr | Varicella Mo/Day/Yr | 2 | 2 | Menomune Mo/Day/Yr | 2 | 2 | 2 |
| 1 | 1 | 3 | 2 | 1 | 3 | 3 | 3 |
| 2 | 2 |   |   |   |   |   |   |

Name _____ Telephone _____ Signature _____ Date _____
This form must be completed and signed by an MD, DO, PA, CNP,or RN. Healthcare Providers may call (410)293-1774 for any questions.
**Mail to: Medical Records, NAPS, 440 Meyerkord Ave, Newport, RI 02841. Do not FAX.  Due NLT 1 July. Mail one copy and have appointee bring TWO copies of this form to I-Day along with any updates.  DO NOT LEAVE IN YOUR BAGS!**

***NAVAL ACADEMIC IMMUNIZATIONS STAFF ONLY: IDAY REQUIREMENTS***NAVAL ACADEMIC IMMUNIZATIONS STAFF ONLY: IDAY REQUIREMENTS***REQUIREMENTS***

| Prev Med for +PPD | PPD after Jan 1 | POLIO Adult dose after Age 17 required | TDAP One dose required | HPV 2nd dose 1 month later, 3rd dose 6 mon after 1st / Below 15 years 2 doses 6 months apart | MENVEO (One dose of Menveo or Menactra required after age 16) FOR NAPS or Prior service-dose must be in last 5 years | Bexsero (2nd dose at least 1 month later) / Trumenba 2nd dose 6 months later (otherwise 3 doses required) | HEP A PEDS 1-18YRS | HEP A ADULT 19 & UP (second dose 6 months later) | HEP B PEDS 0-19YRS 2nd dose 1 month later, 3rd dose 6 mon after 1st | HEP B ADULT 20 & UP 2nd dose 1 month later, 3rd dose 6 mon after 1st | TWINRIX 18 & UP 2nd dose 1 month later, 3rd dose 6 mon after 1st | N O N E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|   |   |   |   |   |   |   |   | (second dose 6 months later) |   |   |   |   |

Staff review prior to I-Day Initial _____  Front Table Review Initial _____  Final I-Day Review Signature _____  Updated in AHLTA ☐

This document may contain information covered under the Privacy Act, 5 USC 552(a) and/or the Health Insurance Portability and Accountability Act (PL104-191)and its various implementing regulations and must be protected in accordance with those provisions. **DO NOT REMOVE FROM MILITARY MEDICAL RECORD NMCLANNA 6230/7 (REV Feb 2017) Enclosure (1)**

26

# EXHIBIT H



# APPLY TO USNA
## Nomination Sources

••• 
Contact Us

< **BACK**

# Naval/Marine Corps Reserve Officers Training Corps Units

**Naval/Marine Corps Reserve Officers Training Corps (NROTC, MCROTC, NJROTC, MCJROTC), Honor Naval and Military Schools:**

All Navy and Marine Corps ROTC units and all Navy and Marine Corps JROTC units are eligible to nominate three candidates each year.  All Navy and Marine Corps JROTC units designated as Honor Units with Distinction are eligible to nominate an additional three candidates each. All Army and Air Force JROTC units designated as Honor Units with Distinction are eligible to nominate three candidates.  Army and Air Force units must submit a copy of their order along with the nominated. Student must currently be in the JROTC or ROTC unit.  Past participation does not qualify.

**ROTC Nomination Form** 

**Application Dates:**  Between September 1 of the year preceding entry into the Naval Academy and before January 31 of the year entering the U.S. Naval Academy.

Senior Military Instructors of the JROTC unit or Commanding Officer of the ROTC unit should submit nominations to:

*Office of Admissions*
*United States Naval Academy*
*ATTN:  Nominations and Appointments*
*52 King George Street*
*Annapolis, MD  21402*

This is an official **U.S. Navy Web Site**. URL: **https://www.usna.edu**   Page Last Updated: 2023-05-01

# EXHIBIT I

Subscribe
Diverse
ISSUES IN HIGHER EDUCATION
Students | Faculty & Staff | Leadership & Policy | Podcasts | Top 100 | Advertise | Jobs | Shop

ADVERTISEMENT
UNIVERSITY of SOUTH FLORIDA
A PROUD MEMBER OF THE AAU ASSOCIATION OF AMERICAN UNIVERSITIES, AMERICA'S LEADING RESEARCH UNIVERSITIES
THE COLLEGE OF ARTS & SCIENCES is now hiring full-time faculty across all academic disciplines.
APPLY HERE

FROM THE MAGAZINE

# Military Academies Retain Affirmative Action in Admissions

Lois Elfman
Sep 5, 2023

The U.S. Supreme Court decision rejecting race conscious admissions at colleges and universities includes an exemption for military service academies.

Although a challenge to the exemption is expected, the justices who struck down affirmative action in admissions noted that military academies have "potentially distinct interests" when it comes to promoting racial diversity. Thirty-five former military leaders filed a friend-of-the-court brief that referenced the national security interests at stake in sustaining the longstanding admissions policy.

ADVERTISEMENT
Accelerate Your Impact: Join Our Presidential Postdoctoral Fellows Program at Rutgers University
Applications due by October 16

"Our military's diversity is a strength, not a weakness," tweeted President Joe Biden on July 27. "It's a necessary part of warfighting and all successful military operations. And our unity out of many — not division — ensures good order and discipline, unit cohesion and effectiveness, and military readiness."

In 1968, African Americans made up 10.5% of the U.S. population and 12.6% of the U.S. Army, but only one of 520 generals was Black, notes Dr. Beth Bailey, a Foundation Distinguished Professor at the University of Kansas and author of *An Army Afire: How the U.S. Army Confronted Its Racial Crisis in the Vietnam Era*. Of the Army's 6,399 colonels, 42 were Black, which was less than 1%. In 1967, the Department of Defense (DoD) made it clear that it expected the service academies to increase the number and percentage of Black cadets.

"The military services must raise their own senior leaders, and that takes decades," said Bailey. "So, decisions made about who is admitted to the military academies, what institutions have ROTC programs and who comes to the officer corps through that path have major long-term consequences — as do decisions about assignments, the availability of mentoring and the evaluation process."

ADVERTISEMENT
Accelerate Your Impact with Rutgers Presidential Postdoctoral Fellows Program
Applications due by October 16

## Service academies

Bailey said affirmative action in admission was a key tool in attacking the ongoing and long-lasting legacy of racial discrimination and segregation, "which had produced an officer corps that did not correspond to the diversity of the enlisted ranks, the composition of the American public or represent the full range of talents and abilities that might strengthen the Army in fulfilling its mission of national defense."

Approximately 25% of the U.S. military's officer corps are graduates of the five federal service academies, which include the U.S. Military Academy (USMA) at West Point, the U.S. Naval Academy (USNA), the U.S. Air Force Academy (USAFA), the U.S. Coast Guard Academy and the U.S. Merchant Marine Academy. Most of the remainder of officers come from Reserve Officers Training Corps (ROTC) programs at colleges and universities. There is also Officer Candidate School (OSC) open to individuals with at least a bachelor's degree, including enlisted personnel. Some officers, notably physicians, have their professional schooling paid for by committing several years to military service after they complete their education.

Dr. Beth Bailey

ADVERTISEMENT
Accelerate Your Impact with Rutgers Presidential Postdoctoral Fellows Program
Applications due by October 16

"As part of the Naval Academy's admissions process, all candidates are evaluated using a holistic approach that includes many different factors and considerations associated with each applicant's individual record," said CDR Ashley Hockycko of the USNA. "Historically, race has been one of many non-determinative factors — such as geographic and socio-educational backgrounds, work experience, STEM interest/propensity, etc. — considered when holistically evaluating candidates for appointment consideration."

Dr. Charn McAllister is a 2005 graduate of the USMA and an associate professor of management at Northern Arizona University (NAU) and director of the NAU Institute for Public and Professional Ethics in Leadership. McAllister said it is incredibly important to preserve affirmative action in admissions at the military academies.

"The argument that a diverse officer corps is paramount for the success of the military is unquestionable," said McAllister, who served as an officer in the U.S. Army until 2012. "Having an officer corps that looks completely different than all the soldiers is awful."

McAllister said having affirmative action in the admissions process does not reduce the caliber of the officer corps. Academy graduates are commissioned officers after graduation, but they do not receive promotions in rank without showing skill and leadership ability.

"As you have a career in the military, you have to make it through each step," McAllister said. "People who make it to lieutenant colonel, colonel, [or] general have shown a pattern of success. In the case of colonels, it takes 15 to 20 years."

ADVERTISEMENT

## Effectiveness of diversity

"It's advantageous to have a military that reflects the country," said Dr. Gary Rose, a long-time professor of political science at Sacred Heart University in Connecticut and now a scholar in residence. "That way there's buy-in from all different components of society in defending our country. It's supposed to be a collective effort."

Rose said when he served in the Army decades ago, he could see the effort to diversify the officer corps. When the enlisted ranks are multi-racial and include both men and women, there needs to be officers who reflect that because diversity contributes to more trust and better leadership, said Rose, adding that an officer corps of mostly white men would lead to a less effective military.

"Can you imagine if people are going into combat and all the officers look one way and everyone else looks different," said McAllister. "It creates some kind of divide that I don't think is productive for the military."

Bailey said that, although the current officer corps does not mirror the enlisted ranks, it does reflect it. Sustaining that kind of diversity requires attention to the composition of the cadets at service academies in race and ethnicity as well as gender. More important, it requires a level of intentionality.

"It's odd to me that there's so many people who are against it when the military has made a decided effort to increase diversity because of how important it is," said McAllister. "Basically, other people thinking they know better than these leaders who have made this very clear decision over the course of decades is preposterous in many ways."

Dr. Charn McAllister

The current U.S. Secretary of Defense, Lloyd J. Austin III, graduated from the USMA in 1975. During his 41 years of military service, Austin rose to the rank of four-star general and set historic precedents as the first African American to serve as vice chief of staff of the Army and commander of U.S. Central Command (CENTCOM). McAllister notes that Austin's sustained success is due to his unrelenting excellence and proven ability to lead.

ADVERTISEMENT

The current Chief of Staff of the Air Force (the first African American to lead a branch of the U.S. military) and nominee for Chairman of the Joint Chiefs of Staff, Gen. Charles Q. Brown Jr., participated in an Air Force ROTC program at Texas Tech University. In addition to distinguished service and leadership, both Austin and Brown, a four-star general, earned advanced degrees as their military careers progressed.

## Potential negative impact

The USAFA is watching how the attacks on affirmative action may impact their ongoing efforts to diversify the military.

"We're aware of and acknowledge the Supreme Court decision concerning affirmative action in college admissions," said a USAFA spokesperson. "We're currently assessing the decision and its potential impacts on our practices."

If a challenge to affirmative action in admissions at service academies prevails and it is removed at the service academies, it will take more than 20 years to fix that mistake, according to McAllister. "Because you can't bring in a diverse body of colonels," he explains. "They have to start at lieutenant every single time."

It is unclear how the loss of affirmative action in admissions at colleges and universities will impact ROTC programs. McAllister said it may decrease the diversity of the officer corps.

Rose is the liaison for Sacred Heart's Air Force ROTC program. There has been a growing number of Hispanic students participating and a definite female presence, many of whom are nursing majors. The students attend their military science courses at nearby Yale University. He has seen students become commissioned officers, noting that when you create welcoming environments, more people of color participate in ROTC and OCS.

ADVERTISEMENT

"There should be points of access and more opportunities for people," said Rose. "It is beneficial to the country."

The battle to dismantle affirmative action in all sectors of society will likely reach the military. The question is, when?

"The Department is evaluating the implications of the Court's decision," notes a Defense official in a statement provided by the USNA. "We rely on a pipeline of highly qualified American patriots from all walks of life and backgrounds, which is crucial for our national security. Secretary Austin and the DoD remain deeply committed to developing a strong, highly qualified officer corps that is ready to lead a 21st Century military that draws on the full strength of the American people. Our service academies will keep working to educate the next generation of military leaders so that they can lead our increasingly diverse Joint Force."

READ NEXT
FROM THE MAGAZINE
Scholar Examines the Intersection of Black and Latino Identity
OCTOBER 1, 2023

ADVERTISEMENT

RELATED STORIES

FROM THE MAGAZINE
Scholar Examines the Intersection of Black and Latino Identity

FROM THE MAGAZINE
A Continued Commitment to Community

FROM THE MAGAZINE
What We're Learning About the Dual Enrollment Student Experience

FROM THE MAGAZINE
How Three Bronx Institutions are Intentionally Hispanic-...

FIND A JOB | POST A JOB

Featured Jobs

Prince George's Community College

Clinical Assistant Professors, Liberal Studies -FILM AND MEDIA PRODUCTION -WRITING
New York Univ Arts and Science

Director of Military Connection Center
Old Dominion University

Human Resources Analyst (Confidential) Employee Relations/Investigations
State Center Community College District

Dean, College of Health Sciences
East Stroudsburg University

Associate Vice President, Advancement Communications
Brown University

Premium Employers

The trusted source for all job seekers
We have an extensive variety of listings for both academic and non-academic positions at postsecondary institutions.
READ MORE

ADVERTISEMENT

*Diverse* Daily and Weekly Recap e-Newsletters
Keeping you abreast of late-breaking news and insights.
Email
example@gmail.com
SIGN UP

Topics: Students, Faculty & Staff, Leadership & Policy, Sports, Demographics, Institutions

Resources: Podcasts, Blog, Views, *Diverse* Talk Live! Webcasts, Community Colleges, Health, Jobs, Military, Keep it Real, Shop

Awards & Honors: Arthur Ashe, Diverse Champions, DOIT, Dr. John Hope Franklin Award, Emerging Scholars, Graduate Scholars, Most Promising Places to Work: Community Colleges, Most Promising Places to Work: Student Affairs, Top 100, Top Women

About: Advertise, Press Releases, About Us, Contact Us, Subscribe, Editorial Calendar

Follow Diverse: Issues In Higher Education

This website uses cookies to ensure you get the best experience on our website. Learn more
Got it!

# EXHIBIT J

Case 1:23-cv-02699-RDB   Document 9-6   Filed 10/06/23   Page 83 of 366

**The New York Times**

https://www.nytimes.com/2003/01/28/us/service-academies-defend-use-of-race-in-their-admissions-policies.html

# Service Academies Defend Use of Race in Their Admissions Policies

**By Adam Clymer**

Jan. 28, 2003

Even as the Bush administration sides with opponents of affirmative action at the University of Michigan, officials of the nation's service academies say their own minority admissions programs are necessary to maintain both integrated student bodies and officer corps.

By defending policies that are not ''race neutral,'' the admissions officers appear to contradict their commander in chief. On Jan. 15, President Bush criticized Michigan's polices, which he said gave preference to some applicants ''not because of any academic achievement or life experience, but solely because they are African-American, Hispanic or Native American.''

While the academy officials would not discuss the Michigan case, several outside legal experts argue that the administration's legal theories in briefs it filed with the Supreme Court in the case raise serious questions about the procedures at the elite training grounds for future military leaders at West Point, Annapolis and Colorado Springs.

Expressing similar concerns, a group of retired senior officers is planning to file a friend-of-the-court brief next month warning against any Supreme Court ruling that could imperil the academies' contribution to the integrated officer corps.

The Army, Navy and Air Force academies make strenuous efforts to achieve freshman classes with significant minority representation, though only West Point says it has specific percentage goals. Each recruits extensively, gives minorities an edge on admissions and bolsters their ranks by sending promising candidates who fall just short of their standards to one-year preparatory schools. Some enlisted personnel and athletes also attend those schools.

At each academy, which the federal government operates, admissions officers cited two main reasons for racial diversity in admissions, one singular to the military and one widely heard in higher education.

10/2/23, 6:06 AM
Service Academies Defend Use of Race in Their Admissions Policies - The New York Times
Case 1:23-cv-02699-RDB   Document 9-6   Filed 10/06/23   Page 84 of 366

The familiar argument, as expressed by Col. Michael L. Jones, dean of admissions at West Point, is: ''We like to represent the society we come from in terms of the student body's undergraduate experiences. So having a diverse student body allows personal growth in areas where people may not have gotten it otherwise. We want people to understand the society they will defend.''

The military argument is that with racial minorities making up from 28 percent of the enlisted personnel in the Air Force to 44 percent in the Army, almost all-white ranks of officers would hurt morale.

''We want to build an officer corps,'' said Dave Vetter, the Naval Academy dean of admissions, that ''reflects the military services of which we are a part.'' Colonel Jones said, ''Officers of color are important as role models in the Army.''

The Bush administration briefs in the Michigan case argued this month that the extra points given to minority undergraduate applicants and the less specific preferences given to minority law school applicants violated the constitutional guarantees of equal protection of the law. While the briefs said diversity in higher education was important, they suggested only one specific ''race-neutral'' way to achieve it, a system of admitting a specific percentage of students from every high school in a state that would not be applicable to national institutions like the academies.

Eric Schnapper, a law professor at the University of Washington, called the administration's insistence on race-neutral methods ''a dagger in the heart of what the service academies are doing.''

According to the administration's theory, said Walter E. Dellinger, a former acting solicitor general, ''a program that is designed to increase minority enrollment is itself race based.''

''What the academies apparently do would not withstand the application of the standards in these briefs,'' Mr. Dellinger said.

Asked to comment on these concerns, the Justice Department neither agreed nor disagreed. Monica Goodling, a spokeswoman for the department, said: ''The administration believes that racial diversity can and should be encouraged in higher education, without falling back on unconstitutional quotas. However, the only admission system the Justice Department has reviewed is the one at issue in Michigan, and the conclusions in our briefs were written to address their specific admissions systems. Absent litigation, the department would not comment on other systems, other than to note that the president has committed this administration to actively promote diversity and opportunity in every way that the law permits.''

Case 1:23-cv-02699-RDB   Document 9-6   Filed 10/06/23   Page 85 of 366

One particular argument that might be made for the service academies' efforts is that the national defense need for an integrated officer corps would outweigh equal protection concerns. Lee C. Bollinger, the legal scholar who is president of Columbia University (and the named defendant in the Michigan case, because he was president of that university when the suits were filed) said: ''You could argue national defense is different from education. I find it difficult to believe it would succeed. There is no question that it would be a very hard case to make.''

The retired officers who intend to file a brief have not settled on their arguments in the 30 pages permitted by the Supreme Court, but they began their efforts well before the administration took a stand.

While the administration briefs do not demand overruling the Supreme Court's 1978 Bakke decision, which barred fixed quotas but allowed race to be a consideration, the private plaintiffs in the case do want that ruling reversed. The military plaintiffs will call for affirming Bakke.

The generals and admirals would not agree to have their names made public now. But James M. Cannon, former chairman of the Naval Academy Board of Visitors under Presidents Ronald Reagan and George Bush, said many of their names would be familiar. Mr. Cannon has worked to recruit signers.

Race matters, openly, in the admissions process at all three service academies. At West Point, Colonel Jones said: ''Race might be a small edge. It's one of the considerations. We have goals for soldiers, for females, for recruited athletes, for minorities, for scholars and for leaders. We never hit our African-American goal of 10 to 12 percent. We normally hit 7 to 9 percent.''

Critics of affirmative action consider ''goals'' equivalent to ''quotas.'' And the administration's brief denounces the Michigan law school's slightly different term of a ''target'' of minority representation. It said, ''The fact that the law school's target may be a range, rather than a fixed percentage, does not make it any less a quota.''

Mr. Bollinger of Columbia said that meant clearly that it was impermissible ''for the military to say they have a goal of reaching 10, 12 percent.''

At the Air Force Academy, Rollie Stoneman, associate dean of admissions, said the academy did not have percentage goals, except for a minimum of applicants medically qualified for pilot training. On race, Mr. Stoneman said, ''we don't give any specific points in the process, but certainly it's one of any number of factors we consider.''

Case 1:23-cv-02699-RDB   Document 9-6   Filed 10/06/23   Page 86 of 366

At the Naval Academy, Mr. Vetter acknowledged that race was a factor, though without particular goals. ''Everybody that receives an offer to the academy has to be fully qualified,'' he said. ''But beyond that, we want a brigade that reflects our country, geographically diverse, we want it to be diverse in other regards, too.'' Of 299 minority students in the current first-year class, he said, only 78 are African-American, and ''that probably is our greatest challenge.''

The academies acknowledge that most of the minority students they seek could usually win full scholarships at private institutions that did not wake them up before dawn or expect them to serve five years of active duty after graduation.

So they all rely on recent or current minority undergraduates, recent graduates assigned to the academies and other alumni to make the case that a service academy education is worth the sacrifices and to coach applicants through the complicated admissions process that requires Congressional nominations and intense physicals that civilian institutions do not demand.

And all three send some candidates to their prep schools, in Newport, R.I., for the Navy; in Fort Monmouth, N.J., for the Army; and at Colorado Springs, on the Air Force Academy campus. At Annapolis, Mr. Vetter said, the purpose was ''to give them a little extra strength in the academic areas that we emphasize in the academy.''

A version of this article appears in print on , Section A, Page 17 of the National edition with the headline: Service Academies Defend Use of Race in Their Admissions Policies

# EXHIBIT K

Case 1:23-cv-02699-RDB   Document 9-6   Filed 10/06/23   Page 88 of 366

**The New York Times** | https://www.nytimes.com/2010/05/21/opinion/21fleming.html

OP-ED CONTRIBUTOR

# The Academies' March Toward Mediocrity

**By Bruce Fleming**

May 20, 2010

Annapolis, Md.

THE idea of a football star receiving lenient treatment after testing positive for drug use would raise no eyebrows at most colleges. But the United States Naval Academy "holds itself to a higher standard," as its administrators are fond of saying. According to policy set by the chief of naval operations, Adm. Gary Roughead, himself a former commandant of midshipmen at the academy, we have a "zero tolerance" policy for drug use.

Yet, according to Navy Times, a running back was allowed to remain at Annapolis this term because the administration accepted his claim that he smoked a cigar that he didn't know contained marijuana. (He was later kicked off the team for a different infraction, and has now left the academy.)

The incident brings to light an unpleasant truth: the Naval Academy, where I have been a professor for 23 years, has lost its way. The same is true of the other service academies. They are a net loss to the taxpayers who finance them, as well as a huge disappointment to their students, who come expecting reality to match reputation. They need to be fixed or abolished.

The service academies are holdovers from the 19th century, when they were virtually the only avenue for producing an officer corps for the nation's military and when such top-down institutions were taken for granted. But the world has changed, which the academies don't seem to have noticed, or to have drawn any conclusions from.

With the rise after World War II of the Reserve Officer Training Corps programs at universities around the country, the academies now produce 20 percent or less of the officers in each service, at an average cost to taxpayers of nearly half a million dollars per student, more than four times what an R.O.T.C.-trained officer costs.

The institutions are set on doing things their own way, yet I know of nobody in the Navy or other services who would argue that graduates of Annapolis or West Point are, as a group, better than those who become officers through other programs. A student can go to a civilian school like Vanderbilt, major in art history (which we don't offer), have the usual college social experience and nightlife (which we forbid), be commissioned through R.O.T.C. — and apparently be just as good an officer as a Naval Academy product.

Instead of better officers, the academies produce burned-out midshipmen and cadets. They come to us thinking they've entered a military Camelot, and find a maze of petty rules with no visible future application. These rules are applied inconsistently by the administration, and tend to change when a new superintendent is appointed every few years. The students quickly see through assurances that "people die if you do X" (like, "leave mold on your shower curtain," a favorite claim of one recent administrator). We're a military Disneyland, beloved by tourists but disillusioning to the young people who came hoping to make a difference.

In my experience, the students who find this most demoralizing are those who have already served as Marines and sailors (usually more than 5 percent of each incoming class), who know how the fleet works and realize that what we do on the military-training side of things is largely make-work. Academics, too, are compromised by the huge time commitment these exercises require. Yes, we still produce some Rhodes, Marshall and Truman Scholars. But mediocrity is the norm.



Brian Stauffer



Meanwhile, the academy's former pursuit of excellence seems to have been pushed aside by the all-consuming desire to beat Notre Dame at football (as Navy did last year). To keep our teams in the top divisions of the National Collegiate Athletic Association, we fill officer-candidate slots with students who have been recruited primarily for their skills at big-time sports. That means we reject candidates with much higher predictors of military success (and, yes, athletic skills that are more pertinent to military service) in favor of players who, according to many midshipmen who speak candidly to me, often have little commitment to the military itself.

It's no surprise that recruited athletes have been at the center of recent scandals, including a linebacker who was convicted of indecent assault on a female midshipman in 2007 and a quarterback who was accused of rape and dismissed from the academy for sexual misconduct in 2006. Sports stars are flattered on campus, avoid many of the onerous duties other midshipmen must perform, and know they're not going to be thrown out. Instead of zero tolerance, we now push for zero attrition: we "remediate" honor code offenses.

Another program that is placing strain on the academies is an unofficial affirmative-action preference in admissions. While we can debate the merits of universities making diversity a priority in deciding which students to admit, how can one defend the use of race as a factor at taxpayer-financed academies — especially those whose purpose is to defend the Constitution? Yet, as I can confirm from the years I spent on the admissions board in 2002 and '03 and from my conversations with more recent board members, if an applicant identifies himself or herself as non-white, the bar for qualification immediately drops.

Some in the administration have justified the admissions policies on the ground that it "takes all kinds" to be officers. But that's not really what the academies recruit. They don't give preference to accomplished cellists or people from religious minorities or cerebral Zen types.

We've even given less-qualified students a backdoor into Annapolis — the Naval Academy Preparatory School, our remedial institution in Newport, R.I., for admitted students who are not prepared to enter the academy itself. And if students struggle academically when they get to the academy, our goal is to get them to graduate at whatever cost. Thus we now offer plenty of low-track and remedial courses, and students who fail can often just retake classes until they pass: we have control over their summers and their schedules, and can simply drag them through with tutoring.

I've taught low-track English classes; the pace is slower and the papers shorter than in my usual seminars, but the students who complete them get the same credit. When I've complained about this, some administrators and midshipmen have argued that academics are irrelevant to being an officer, anyway. Really? Thinking and articulating are irrelevant to being an officer?

The picture I have drawn of the academy is not what most Americans imagine when they come to a parade and see all those clean-cut young men and women standing in nice rows with their chests out (as they will at next week's graduation ceremony). Some may argue that our abandonment of merit as a criterion for officer status is simply the direction the military overall has taken — the stress of fighting two wars has lowered the bar for enlistment, and R.O.T.C. standards have also declined. But I'd like to think we could do better.

We have two choices. One is to shut down Annapolis, West Point and the other academies, and to rely on R.O.T.C. to provide officers. Or we can embrace the level of excellence we once had and have largely abandoned. This means a single set of high standards for all students in admissions, discipline and academics. If that means downgrading our football team to Division III, so be it.

We also need a renaissance in our culture. We need to get our students on board with the program by explaining our goals and asking for feedback from cadets, graduates and the armed forces at large. Now, we're just frustrating the students and misleading taxpayers.

Case 1:23-cv-02699-RDB   Document 9-6   Filed 10/06/23   Page 90 of 366

Change won't happen from within. The short-term academy administrations want to keep the hype flowing, and tend to lack the big-picture thinking necessary to seeing the institution objectively. Rather, Secretary of Defense Robert Gates and other civilians need to mount a full re-conception of the academies: deciding what do we do that's wrong, what's irrelevant and what deserves to be saved. Otherwise, my most promising students will continue to tell me, "Sir, this place shows you what not to do."

Bruce Fleming, a professor of English at the United States Naval Academy, is the author of the forthcoming "Bridging the Military-Civilian Divide."

A version of this article appears in print on , Section A, Page 27 of the New York edition with the headline: The Academies' March Toward Mediocrity

# EXHIBIT L

# CLASS OF 2025
# SNAPSHOT

**APPLICATIONS**

| | |
|---|---|
| Men | 11,400 |
| Women | 4,865 |
| Total | 16,265 |

**OFFERS OF APPOINTMENT**

| | |
|---|---|
| Men | 961 |
| Women | 413 |
| Total | 1,374 |

**CLASS SIZE**

| | |
|---|---|
| Men | 837 |
| Women | 346 |
| Total | 1,183 |

**NOMINATING CATEGORIES**

| | |
|---|---|
| Congressional | 4,908 |
| Presidential | 632 |
| Secretary of the Navy | 373 |
| ROTC/JROTC | 313 |
| Children of Deceased/Disabled Veterans | 129 |

**RACIAL AND ETHNIC BREAKDOWN**

| | |
|---|---|
| White, non-Hispanic | 672 |
| African American, non-Hispanic | 79 |
| Asian American, non-Hispanic | 115 |
| Native American/Alaskan Native, non-Hispanic | 3 |
| Native Hawaiian/Other Pacific Islander, non-Hispanic | 4 |
| Two or more races, non-Hispanic | 105 |
| Hispanic | 178 |
| International | 16 |
| Declined to Respond | 10 |

**GEOGRAPHICAL DISTRIBUTION AND INTERNATIONAL STUDENTS**

Midshipmen were admitted from every state in the Nation, as well as the District of Columbia, American Samoa, Guam, Northern Mariana Islands, and Puerto Rico. The Class of 2025 also includes sixteen international students from: Egypt (1), Fiji (1), Ghana (1), Indonesia (2), Jordan (1), Malaysia (1), Maldives (1), Peru (1), Philippines (2), Sri Lanka (1), Taiwan (1), Thailand (1), and Tunisia (2)

**STANDARDIZED TEST DATA**
Middle 50th percentile*
SAT Verbal  620-710          SAT Math  610-720
ACT English + Reading 52-66   ACT Math  26-32 **
* 50% of the class achieved SAT/ACT scores within the range between the 25th and 75th percentile
**ACT equivalent scores

**MILITARY BACKGROUND**
Former Enlisted*

| | |
|---|---|
| Navy | 63 |
| Marine Corps | 13 |
| Army | 1 |
| Total | 77 |

*This figure includes 21 who entered directly from the Fleet (19 Navy, 2 USMC), and 56 from the Naval Academy Prep School (44 USN, 11 USMC;1 USA (Discharged).

**COMPOSITION**

| | |
|---|---|
| Varsity Athletics | 91% |
| Community Service | 77% |
| Captain/Co-Captain of Sports Team | 68% |
| National Honor Society | 59% |
| Church Group | 46% |
| Work Experience (>10 hrs/week) | 31% |
| Musical Activities (Band, Chorus, Etc.) | 29% |
| ROTC/JROTC/Sea Cadets/Civil Air Patrol | 18% |
| Boy/Girl Scouts | 15% |
| First Generation American | 13% |
| First to Attend College in Family | 11% |
| Primary Language in Home Not English | 10% |
| Hardship or Adverse Life Experience | 10% |
| School publication | 9% |

**ALUMNI SONS AND DAUGHTERS (77)**
The class of 2025 includes 55 sons and 22 daughters of alumni. Eleven members of the entering class have both parents who are alumni of the Naval Academy

**EDUCATIONAL BACKGROUND**

The Class of 2025 includes 383 (32%) from college and post-high school preparatory programs which include:

▪ 210 from Naval Academy Prep School in Newport, RI

▪ 43 from the U.S. Naval Academy Foundation and Civilian Preparatory Programs

▪ 130 additional students have completed at least one semester of study at a college, university, or post-secondary prep school

# EXHIBIT M

10/2/23, 6:08 AM
War within war | | The Guardian
Case 1:23-cv-02699-RDB    Document 9-6    Filed 10/06/23    Page 94 of 366

# War within war

**The Vietnam war saw countless numbers of America's young men -
both black and white - thrown into combat. They were there to
fight the Vietcong but, as tension grew in their ranks, they turned
on each other. James Maycock reports on how racism, prejudice -
and Black Power - were transposed to the battlefield**

## James Maycock

Fri 14 Sep 2001 21.25 EDT

At the height of the Vietnam war in 1969, John Lee Hooker recorded I Don't Want To Go
To Vietnam. In the song, he moaned grimly, "We've got so much trouble at home,"
before adding simply, "We don't need to go to Vietnam." But the black American
soldiers already in Vietnam, trudging tirelessly across that country's saturated rice
fields or creeping through its elephant grass and sticky, airless jungles, were
understandably more explicit in expressing themselves. Wallace Terry, the Vietnam
correspondent for Time magazine between 1967 and 1969, taped black soldiers airing
their anger in the summer of 1969. Throughout the recording, their rage is tangible.
Speaking about his team-mates, one black soldier declares, "What they been through in
the bush, plus what they have to go through back in the world [America], they can't
face it. They're ready to just get down and start another civil war." Another adds, "Why
should I fight for prejudice?" When Terry inquires, "Tell me what you think the white
man should be called?" a chorus of "devil... beast" erupts from the group.

Although President Johnson predicted that the Vietnam war would create a political
nightmare, he neglected to foresee the racial one. The ongoing domestic conflicts
between black and white Americans were reflected and exacerbated over in Vietnam,
principally because the very apex of this increasingly unpopular war, between 1968
and 1969, coincided explosively with the rise of the Black Power era in America. In
these years, there was a surge of inter-racial violence within the US forces in Vietnam.
Discrimination thrived and, as in America, a racial polarisation arose out of this
tension. Black soldiers embraced their culture as well as the emerging Black Power
politics and its external symbols.

In fact, the war in Vietnam was America's first racially integrated conflict. Black
soldiers had fought in all of America's preceding military engagements, but in
segregated units. Although President Truman put pressure on the US armed forces to
integrate in 1948, some units in the Korean war were still divided by race.

Case 1:23-cv-02699-RDB   Document 9-6   Filed 10/06/23   Page 95 of 366

Prior to 1967, racial animosity had been negligible within the US armed forces in Vietnam because the black men stationed there were professional soldiers seeking a permanent career. Generally, if there were racial slights, they were quietly ignored by these men. On his first exploratory trip to Vietnam in the spring of 1967, Terry today concedes that he sensed "democracy in the foxhole - 'same mud, same blood'." Within a year, however, his feelings had been transformed.

At the beginning of 1965, there were about 23,300 US servicemen in Vietnam. By the end of 1967, this number had jumped to a phenomenal 465,600, the result of Project 100,000, initiated by Johnson in 1966. This dramatically increased the number of US troops in Vietnam by dropping the qualification standards of the draft. Many black Americans who had received an inferior education and, consequently, had evaded the draft, discovered, like Muhammad Ali, that they were now eligible. Of the 246,000 men recruited under Project 100,000 between October 1966 and June 1969, 41% were black, although black Americans represented only 11% of the US population. With a bitter irony, the other group that Project 100,000 condemned was the poor, racially intolerant white man from the southern states of America.

In a country riddled with institutional racism, the draft boards were naturally infected. In 1967, there were no black Americans on the boards in Alabama, Arkansas, Mississippi and Louisiana. In fact, Jack Helms, a member of the Louisiana draft board, was a Grand Wizard in the Ku Klux Klan. In one fatuous outburst, he described the NAACP (National Association for the Advancement of Colored People), the highly respected and conservative black civil rights group, as "a communist-inspired, anti-Christ, sex-perverted group of tennis-short beatniks". Although a poll in 1966 established that three out of four black Americans supported the draft, by 1969 56% of the black American population opposed the Vietnam war.

In 1967 and 1968, indignation against the war accelerated among both black and white Americans. Some thought the draft was simply a covert mode of genocide instigated by the US government, while others watched aghast as monstrous sums of money that could ease the impoverished black communities such as Watts in Los Angeles, were pumped into the war machine. The Black Panther, Eldridge Cleaver, denounced these repellent contradictions, stating that black Americans "are asked to die for the system in Vietnam, in Watts they are killed by it".

The perception that the Vietnamese were parallel sufferers of white colonial racist aggression also flourished in the late 1960s and was reflected in a comment made by Muhammad Ali on the TV programme Soul! "They want me to go to Vietnam to shoot some black folks that never lynched me, never called me nigger, never assassinated my leaders." Before his murder in 1968, Martin Luther King also damned America's foreign policy. He charged the US government with being "the greatest purveyor of violence in

the world today", and urged those against the draft to seek the status of conscientious objectors.

Although the image of a white hippy tentatively depositing a flower in the barrel of a rifle is one of the most potent icons of anti-war sentiment from the 1960s, black Americans also fought against the draft. Groups such as the Black Panthers and the SNCC (Student Nonviolent Coordinating Committee) denounced the war, black Americans burned their draft cards in public and one man escaped to Canada, exclaiming: "I'm not a draft evader, I'm a runaway slave." Robert Holcomb, one of those interviewed in Bloods, Terry's oral history of the war by black veterans, describes how, after being hounded by the FBI, he was "sworn into the army in manacles". Like other young black Americans, he diagnosed the Vietnam war as "an attack on minority people, minority people being used to fight each other".

Robert Holcomb perhaps personified what Terry describes today as "a different breed of black soldier entering the battlefield" in the latter half of the 1960s. Terry adds that these hostile black recruits were "veterans of the civil rights movement or the urban upheavals, the riots in the streets. They were being told by judges: 'You'll either join the Marines or go to jail.' " In 1969, during a conversation with Terry, a black naval lieutenant stationed in Vietnam also characterised these black men forced to fight in southeast Asia as "a new generation". He added: "They are the ones who ain't going to take no more shit."

In the aftermath of Martin Luther King's assassination on April 4, 1968, black Americans rioted in more than 100 US cities. But in Vietnam many white soldiers flagrantly applauded his murder. At Cam Ranh Bay, a group of white men wore Ku Klux Klan robes and paraded around the military base. At another compound, the Confederate flag, so symbolic of racial persecution, was hoisted for three days. Don Browne, a black staff sergeant in Vietnam, overheard a white soldier protesting that King's image was always on TV. "I wish they'd take that nigger's picture off," the soldier said, a moment before Browne granted him "a lesson in when to use that word and when you should not use that word - a physical lesson". King's demise was, of course, a pivotal incident in the 1960s because it represented the switch from the nonviolent civil rights movement to the more militant and aggressive Black Power era. James Hawkins, a black soldier in Vietnam, understood this: "Dr King's death changed things, it made a lot of people angry, angry people with weapons."

At this stage, with the extraordinary increase of mostly reluctant troops - black and white - to Vietnam, covert and overt racism was now rife. The fledgling black American conscript was expected to endure the sight of the Confederate flag painted on Jeeps, tanks and helicopters, and sometimes encountered menacing graffiti, such as "I'd rather kill a nigger than a gook", scrawled on the walls in the latrines of US bases. Other

grisly practices, such as cross burnings, were uprooted from Alabama and Mississippi to the war theatre of Vietnam, and some commanders tolerated Ku Klux Klan "klaverns" on their bases.

Young black soldiers also discovered that white soldiers, notably at Da Nang, repeatedly refused to pick up exhausted black soldiers in their Jeeps and that army barbers were not trained to cut black hair, although the merest hint of an Afro was penalised. In Terry's recording from 1969, one black sailor describes how, "when they caught a brother with an Afro, they just took him down to the brig and cut all his hair off and throw him in jail. All these beast motherfuckers walking around with their hair looking like goddamn girls and we can't wear our hair motherfucking three inches long." White officers were either sympathetic to or simply disregarded white soldiers who printed "Fuck the war" or "Peace" on their helmets, yet black Americans were disciplined for comparable offences. One black soldier was ordered to remove a "Black is beautiful" poster from the inside of his locker.

The post exchanges and libraries on the bases did not stock black hair products, tapes of soul music or books on black American culture and history. Magazines such as Ebony and Jet were also scarce, as one black private grumbled: "Every time a soul brother over here gets an Ebony or Jet, there is a waiting line of at least 30 to 50 soul brothers waiting to read it." Terry once stated, "If blacks can account for up to 22% of the dying, they should at least have 22% of the jukebox or the music on Armed Forces radio." Yet black American music was neglected by the Armed Forces Radio Network and in the enlisted men's clubs in preference for country music.

Today, Terry comments, laughing: "I find it amusing to see a Vietnam movie and the white guys are popping their fingers to black music. That just didn't happen. This is revisionism." In fact, Terry Whitmore, the author of Memphis-'Nam-Sweden: The Story Of A Black Deserter, witnessed a minor riot in the Freedom Hill post exchange at Da Nang after the manager of the beer garden, irritated by the number of black marines socialising there, promptly withdrew all soul music from the jukebox. But such incidents weren't confined to land. Off the coast of Vietnam, on the USS Sumpter, Captain JS Keuger also banned the music of the Last Poets, whose recordings included When The Revolution Comes. The affronted black sailors subsequently signed a petition, a fight erupted and they were charged with mutiny. Dissension over music resulted in a multitude of other brawls and Jet magazine reported that a white officer was killed in Quang Tri after ordering black soldiers to turn down their music.

Military justice in Vietnam was also rarely racially impartial. Black servicemen were frequently sentenced to longer terms than their white counterparts and, once inside a military prison, black Muslim inmates were refused copies of the Koran. During this period, one black marine pointed out, "The Corps says it treats all men just one way - as

a marine. What it actually has done is treat everybody like a white marine." But, most disturbingly, black Americans were dying at a disproportionate rate and this only inflamed their indignation, as one black private remonstrated: "You should see for yourself how the black man is being treated over here and the way we are dying. When it comes to rank, we are left out. When it comes to special privileges, we are left out. When it comes to patrols, operations and so forth, we are first."

Their predicament was aggravated by a weakening in the chain of command. Many of the very young, naive white officers were incapable of diffusing the racial tension and, at times, white privates informed their superior black officers, including Allen Thomas, that they "weren't going to take orders from a nigger".

But, as the naval lieutenant informed Terry back in 1969, these black soldiers were "the ones who ain't going to take no more shit". The black Americans who were drafted from 1967 to 1970 called themselves Bloods, and many were influenced by the teachings and politics of Stokely Carmichael, the Black Panthers and Malcolm X.

Terry explains: "They would wear black amulets, they would wear black beads, black gloves to show their identity and racial pride." Some wore "slave bracelets" made out of boot laces and walked with "Black Power canes", sticks with the nub carved into a clenched fist. To offset the oppressive ubiquity of the Confederate flag, these soldiers flew black flags from their patrol boats and Jeeps. Another group of black servicemen, who were followers of Ron Karenga's US (United Slaves), created a flag that asserted in Swahili "My fear is for you". The "dap", a complicated ritualised handshake that changed from unit to unit , was also common among black personnel in Vietnam. Black privates and officers, too, acknowledged each other in public with a Black Power salute.

One black soldier, drained by the tense racial atmosphere in the enlisted men's clubs, commented: "Chuck's [euphemism for a white man] all right until he gets a beer under his belt and then it's nigger this and nigger that, and besides, to be honest, Chuck ain't too much fun, you dig?" Indeed, by the late 1960s in Vietnam, black and white soldiers were socialising in separate bars and clubs. In Saigon, the black servicemen congregated in the Khanh Hoi district and, sometimes, protected their preferred venues with signs that warned "No Rabbits [white soldiers] Allowed."

To increase their racial solidarity, some black troops also started semi-militant bodies. Blacks In Action, the Unsatisfied Black Soldier, the Ju Jus and the Mau Maus were just some of these groups that, as Terry explains, "supported each other and studied black history and talked about events in America and were willing to support each other in an enlisted club over black music. If they wanted something in the post exchange, they would collectively request it."

The tension between the races, though, was not tamed before it erupted into violence. White officers who didn't offer lifts to black marines were attacked, there was a major riot at the principal military prison, the Long Binh Stockade, in October 1968, and a critical inter-racial clash on the Kitty Hawk aircraft carrier in October 1972. At China Beach, some white soldiers started flinging rocks and abuse at black servicemen. Soon, the two racial groups were nervously facing each other with loaded weapons.

However, most assaults involved only a few participants, generally in a deserted corner of an army base at night. Such conduct was wholly advocated by members of the Black Panthers in America. Kathleen Cleaver, the wife of Eldridge Cleaver, urged black soldiers: "Right inside of the US imperialist beast's army, you are strategically placed to begin the process of destroying him from within." Huey Newton, the founder of the party, also suggested that black army personnel turn their weapons on white officers. "Fragging" was the term used to describe either wounding or killing an officer by rolling a fragmentation grenade into his tent. But both black and white soldiers were involved in this and only some of these attacks were racially motivated.

A few black soldiers chose to desert, and while some, like Terry Whitmore, were smuggled through the USSR to Sweden, most fugitives hid within Vietnam. By 1971, about 100 deserters were living furtively in a district of Saigon nicknamed "Soul Alley", beside Tan Son Nhut airport. Understandably, though, some of the young black troops cracked. Robert Holcomb recalled in Bloods: "This black soldier had taken some drugs and he just sort of went crazy. A lot of his anxieties and hostilities came out. He got an M-16 and he sprayed a sergeant, killed him and two others."

The Vietcong were quick to detect and exploit the racial conflicts within the US forces. They dropped thousands of propaganda leaflets on the battlefields. A typical one read: "If you go AWOL because you don't want to fight or because you can't put up with the army racism, the NFL will get you out of the country." But authentic images of US policemen beating black civil rights workers were also scattered across the war zones to undermine the black soldier's morale. Today, Wallace Terry recalls that, bizarrely, the Vietcong sometimes screamed, "Go home, soul man", at the black soldiers during combat and Browne, who was interviewed in Terry's Bloods, described how, "to play on the sympathy of the black soldier, the Vietcong would shoot at a white guy, then let the black guy behind him go through, then shoot at the next white guy". Other black servicemen, including the deserter Whitmore, reported identical cases. But the huge number of black soldiers killed in action and the maltreatment of black prisoners of war was ample proof that the Vietcong and the NVA were simply manipulating the racial discord within the American ranks.

Amazingly, though, it was in these very war zones that the antagonism between black and white infantrymen dissolved, as the black soldier James Hawkins admitted: "In the

jungle, you don't think in terms of black and white." Another said: "When I'm out in the bush carrying a grenade launcher, no white man is going to call me nigger." Arthur Woodley, a black long-range patrolman interviewed by Terry, explained: "No matter what his ethnic background is, or his ideals, you start to depend on that person to cover your ass."

In fact, Woodley rescued a wounded member of the Ku Klux Klan in his unit who had been discarded by his white team-mates. The man was forced to re-examine his bigotry and, throughout the war, there were other examples of white men whose racial prejudices were shattered by the selfless acts of black soldiers. Although, in 1969, one black lieutenant commented somewhat cynically that the "threat of death changes many things, but comradeship doesn't last after you get back to the village", the disparity in inter-racial hatred at the rear army bases and in the war theatre itself was immense.

Initially, white army officials reacted aggressively to both the potent exhibition of black unity and to the racial turmoil within the US army in Vietnam. They ordered crowds of black servicemen to be broken up, a few symbolic gestures, such as the "dap", were banned, numerous soldiers were disciplined and the more radical militants were presented with dishonourable discharges that subsequently disqualified them from financial aid back in America.

Ultimately, however, the military authorities were compelled to confront the deepening crisis, and in 1969 General Leonard Chapman conceded: "There is no question we've got a problem." Surprisingly, and to its credit, the army responded with impressive speed and instigated myriad reforms. It investigated and addressed each field in which discrimination and prejudice had thrived, from the post exchanges to the dearth of black officers. Mandatory Watch And Action Committees were introduced into each unit, and today, Terry confirms, the US military authorities "make it clear to their top officers that racism can cost you your career". He adds: "I call it the last civil rights movement. It started in the armed forces in Vietnam, and it spread into revolts on the high seas on certain ships and then to air force bases in the States and army bases in Germany."

In fact, in 1972 Wallace Terry was hired by the US Air Force to examine parallel racial predicaments in Germany; and today he is adamant that "Colin Powell would not have become chairman of the joint chiefs had it not been for those black kids protesting in Vietnam. You can draw a direct line."

But although the defiant black servicemen in Vietnam at the end of the 1960s created a robust and positive legacy for the next generation of black soldiers and sailors, it was, of course, forged at a price. If they survived their tour of duty, they returned to a frigid,

indifferent America, the country for which they had risked their lives. Sadly, the extraordinary unity that Terry had witnessed among the black soldiers in Vietnam crumbled. "They didn't come home together, they went to different cities and they returned at different times." Forty per cent of black veterans suffered from post-traumatic stress disorder, compared with 20% of white veterans, and in the early 1970s Richard Nixon's policy of "benign neglect" was dismantling the progress of the civil rights movement. One black veteran with an administrative discharge said bitterly,"I've got friends who've robbed liquor stores who can get jobs easier than me."

Arthur Woodley had enlisted in the US army to "escape from my environment and get ahead in life". On his return to America, he worked sporadically in miscellaneous jobs throughout the 1970s but, when interviewed by Terry in the early 1980s, he was unemployed. He had recently met, quite by chance, a South Vietnamese man he had befriended during the war and who was, years later, residing in Baltimore. "He's got a business, good home, driving cars, and I'm still struggling," he reported angrily. "Living in America in the 1980s is a war for survival among black folks, and black veterans are being overlooked more than everybody."

---

I hope you appreciated this article. Before you move on, I was hoping you would consider taking the step of supporting the Guardian's journalism.

From Elon Musk to Rupert Murdoch, a small number of billionaire owners have a powerful hold on so much of the information that reaches the public about what's happening in the world. The Guardian is different. We have no billionaire owner or shareholders to consider. Our journalism is produced to serve the public interest – not profit motives.

And we avoid the trap that befalls much US media – the tendency, born of a desire to please all sides, to engage in false equivalence in the name of neutrality. While fairness guides everything we do, we know there is a right and a wrong position in the fight against racism and for reproductive justice. When we report on issues like the climate crisis, we're not afraid to name who is responsible. And as a global news organization, we're able to provide a fresh, outsider perspective on US politics – one so often missing from the insular American media bubble.

Around the world, readers can access the Guardian's paywall-free journalism because of our unique reader-supported model. That's because of people like you. Our readers keep us independent, beholden to no outside influence and accessible to everyone – whether they can afford to pay for news, or not.

**If you can, please consider supporting us just once from $1, or better yet, support us every month with a little more. Thank you.**



**Betsy Reed**
*Editor, Guardian US*

| Single | **Monthly** | Annual |
|:---:|:---:|:---:|

| $5 per month | $7 per month | Other |
|:---:|:---:|:---:|

**Continue** →    ( **Remind me in November** )    VISA  mastercard  AMERICAN EXPRESS  PayPal

# Most viewed

# EXHIBIT N

An official website of the United States government  Here's how you know

 AIR FORCE

# A short history of integration in the US armed forces

  

Published July 1, 2021

By Walt Napier

514th Air Mobility Wing

**JOINT BASE MCGUIRE-DIX-LAKEHURST, N.J. (AFNS) --**  With the recent events in 2020, it is important to look back over the events that have been pivotal in breaking down racial barriers. This discussion will investigate the numerous examples of Black military service, with Black Americans fighting in every United States conflict from the American War for Independence to present day. It will also explore how the military valor of African Americans helped end limited martial involvement and segregated military service.

**American Revolution to the Civil War**

Black service members have fought in every single American conflict. The U.S. Army History Office estimates around 5,000 warriors in the American Revolution were Black. These men served in the artillery (the most advanced branch of service during the period), the infantry, as laborers, and even musicians. One particular unit, the 1st Rhode Island Regiment, drove George Washington to agree to allow Black Soldiers who were slaves, to earn freedom through service. The regiment earned a reputation for bravery and ferocity. At the Battle of Newport in 1778, the regiment fought so fiercely one of the Hessian officers resigned his commission rather than leading his men against the 1st Rhode Island.

Many of the smaller wars in the 19th century have limited records of service members; wars such as the War of 1812 and the Seminole Wars. It is an undisputed fact, however, that there were Black combatants in these national conflicts. At the Battle of New Orleans, Andrew Jackson promised free Black men who joined him equivalent pay to their white counterparts, while enslaved men were promised freedom. Around 900 freemen and slaves fought at the Battle of New Orleans. Unfortunately, their sacrifice went unrewarded, when after the battle, Andrew Jackson reneged on his promise and sent enslaved men back to their masters.

The next great war, perhaps the most terrible in America's history, came in 1861 when Southern states attempted to secede from the Union. To this day, the American Civil War remains the bloodiest conflict in U.S. history. Abraham Lincoln had won election in 1860 on an anti-slavery platform. The underlying problems, however, went as far back as the American Revolution. It was difficult to understand how a war for liberty could be fought while many on American soil lived in bondage. Following the Revolution, a sticking point to the drafting of the Constitution was the question of slavery. The congress eventually came up with the "Three-fifths Compromise," essentially stating a slave was worth three-fifths of a person for counting population in regards to government representation. The other sticking point was the slave trade itself. Article 1, Section 9, Clause 1 of the Constitution indicated the slave trade would continue for 20 years (ending in 1808) by any state that desired for it to remain legal.

Allowing states to decide whether they were free or not and ending the slave trade created new problems as time progressed. The first issue throughout the 19th century revolved around statehood. Each time a new state would come into the Union, would it be slave or free? From a political standpoint, this meant if slave or free outnumbered the other, political representation (and power) would reflect the disparity. The next issue came about since the slave trade ended in 1808, a slave state could no longer purchase new slaves. This placed a premium on enslaved persons. By the time of the Civil War, the great majority of southern wealth revolved around enslaved peoples. Both from the commodities they were forced to produce, but also the individuals themselves.

Returning to Lincoln's election; the South viewed his anti-slavery platform as cutting their political and fiscal power off at the knees. Despite the clear reasoning for the outbreak of the war, the Lincoln administration was hesitant to allow Black troops to shoulder arms and fight. Lincoln feared armed African Americans would cause a panic in border states, potentially pushing them to join the Confederacy. As the war carried on however, practical need replaced political gamesmanship.

In July of 1862, Congress passed a law freeing any person with a master in the Confederate Army and slavery was abolished in the Union. Needing manpower to continue the war, the Union began allowing Black men to join the fight.  One of the first Black units, the 54th Massachusetts Volunteer Infantry Regiment, would go on to be one of the most famous. Immortalized in the film "Glory," the 54th MVIR was at first forced to perform manual labor duties. On the outskirts of Fort Wagner, however, their role would change. The men of the 54th MVIR charged the ramparts of the fort over and over, eventually suffering 42% casualties including the death of their commander, Col. Robert Shaw.

Skip to main content (Press Enter).

Despite the tactical defeat, it provided a strategic and moral victory. The valor and ferocity of the 54th would convinced the U.S. Army to increase the number of African American recruits for the Army. By the end of the war ,186,000 men had served in the Union Army and



## Buffalo Soldiers to Harlem Hellfighters

In 1866, Congress authorized the creation of permanent all-Black regiments. Eventually those units would be designated the 9th and 10th Cavalry and the 24th and 25th Infantry, and would collectively become remembered as the "Buffalo Soldiers." The true source of the nickname is up for debate. The most believed origin is that the fierceness of the fighters reminded the Native Americans of the revered buffalo during the Indian Wars. The name was initially used to reference the cavalry, but quickly became synonymous with all four of the regiments.

The outstanding service of the Buffalo Soldiers continued during the Spanish American War. The war is often remembered by the charge of Lt. Col. Theodore Roosevelt up San Juan Hill. What is often forgotten is that the 24th Infantry, 9th and 10th Cavalry, charged alongside the 1st Volunteer Cavalry (Rough Riders). The Buffalo Soldiers fought with bravery, losing 26 men, but being recognized for valor and Edward L. Baker, Jr. being awarded the Medal of Honor.

Unfortunately, the period surrounding the Spanish American War corresponded with the rise of Jim Crow laws in the South. Following the Civil War, the various groups maneuvered to undermine equality for African Americans, with varying degrees of success. In 1896, however, the Supreme Court ruled in Plessy v. Ferguson racial segregation was legal. The policy would come to be known as "separate but equal."

By World War I, "separate but equal" and the rise of Jim Crow laws had created a new wave of racially-charged discrimination. The Navy is a striking example of this. Despite representing a quarter of the Navy during the Civil War and consistently being 20-30% of the Navy's manpower in the latter half of the 19th century, African American's opportunities in the Navy were abruptly curtailed in the early 1900s. During World War I, Black Sailors only represented 1.2% of the Navy, and these men were only allowed in the galley or the coal room.

The Army during World War I had more Black men serve in the branch but the situation was far from ideal. The first notable issue is the permanent Black regiments were sidelined in favor of newly-enlisted draftees. The permanent units were ordered to remain stateside and their leaders were pilfered to take up training posts for new recruits. This led to a situation in Houston, where the 24th Infantry was stationed. The local population were mistreating the Black Soldiers, who were upset about not fighting the war, lacking leadership after they had lost their senior noncommissioned officers and officers, and frustrated by the increasingly racist treatment by the local population. The situation erupted into what is known as the "Houston Riot of 1917" or the "Camp Logan Mutiny," when men from the 24th armed themselves and killed 15 civilians, while losing four of their own.

For those who went to France, life was not much better. The open bias against Black troops meant most of them never fired a shot at the enemy. The majority were placed in pioneer infantry units, largely labor positions. A few Black units were able to prove themselves in two segregated combat divisions, the 92nd and 93rd. Gen. John J. Pershing, American Expeditionary Force commander, was being pressured to provide replacement troops to the exhausted French Army. Pershing decided to give the 93rd Division to the French Army. The French readily accepted the help, and treated their new Black allies largely as equals. One particular regiment of the 93rd Division would stand out, the 369th Infantry Regiment "Harlem Hellfighters." The 369th spent more time on the front than any other American unit, and included the first Americans to be awarded the French Croix de Guerre. Some 404,000 Black officers and men would serve during World War I (an estimated 11% of the total force).

## World War II

Despite the proven valor of Black troops, Black Soldiers represented only 1.5% of the Army in June 1940, and roughly the same percentage of the Navy. The Marine Corps and Air Corps, on the other hand, were off limits completely. In that same year, Nazi troops were sweeping across France and Japan was solidifying its position in the Pacific. For this new war, Civil Rights leaders decided to take a different approach than their predecessors. In 1917, W.E.B. Du Bois said that Black Americans should not "bargain with our loyalty," suggesting the civil rights struggle be paused during World War I African Americans were not perceived to be taking advantage of the situation. This policy had backfired, as despite African American's willing service and exemplary record, they continued to face limitations. As World War II drew near, men from the National Association for the Advancement of Colored People, like Walter F. White, and T. Arnold Hill from the National Urban League, sought to use the new war to advance the status of the Black community.

This placed Black Americans in a tricky situation. If they supported the war effort fully, they feared the result would be similar to the events of World War I. If they didn't support the war effort, they would face accusations of being un-American. The solution was presented by The Pittsburgh Courier, one of the predominant Black newspapers of the period. Following Pearl Harbor, the paper published a letter by James G. Thompson, where Thompson asked if he should sacrifice his life to live "Half American?" The paper responded by creating the "Double V Campaign." Victory abroad and victory at home.

The campaign's ideas were taken up across the country. One million Black men and women served in the military, and six million more worked within the defense industry. There could be no question of their loyalty. Simultaneously, however, many of the same individuals pushed for more access to branches like the Army Air Service and combat arms, expecting their loyalty to be recognized. Many believe the Double V is the start of the coming skirmishes of the larger Civil Rights Movement of the 1950s and 1960s.

Skip to main content (Press Enter).

In combat, many African American units served with distinction. The famed "Red Tails" of the 332nd Fighter Group broke down the barrier for Black pilots and air crews. Products of the segregated Tuskegee Army Airfield (which gave them the nickname of the "Tuskegee Airmen"),

 AIR FORCE

---

would never see combat, as the war ended prior to their deployment.

On the ground, another famed unit would earn their place in American military lore, the 761st Tank Battalion "Black Panthers." In October of 1944, the all-Black tank battalion would reach France and serve under Gen. George S. Patton, who famously told them he didn't care what color they were as long as they were here to kill Germans. Patton continued, "Most of all, your race is looking forward to you. Don't let them down, and, and, damn you, don't let me down." The 761st would go on to fight in 183 days of continuous combat including the Battle of the Bulge and the Battle of the Rhine. The 761st were awarded 11 Silver Stars, 69 Bronze Stars, 300 Purple Hearts, a Presidential Unit Citation and one Medal of Honor to Sgt. Warren G. H. Crecy.

**Integration**

Following World War II, the push for civil rights and equality back home continued. The first victory abroad had been achieved. Victory at home, however, still proved elusive. Similar to Black veterans returning from World War I, the heroes of World War II often faced exclusion and aggression from the American populace. President Harry S. Truman was especially moved by the story of Isaac Woodard. Woodard had been arrested, beaten and blinded by South Carolina police officers on Feb. 12, 1946. Woodard had been honorably discharged from the Army only a few hours prior, and was even still in uniform when he was attacked.

President Truman took action by forming the President's Committee on Civil Rights in 1946. The committee reported to the president the pressing need to end segregation and discrimination within the Armed Forces. On July 26, 1948, Truman responded with Executive Order 9981 directing the military to end segregation. The first article stated, "There shall be equality of treatment and opportunity for all persons in the armed services without regard to race, color, religion or national origin."

Despite the order, the president faced push back from many of the leaders within the military. The leading generals argued that officers would not promote or send Black troops for schools, while their white counterparts would become violent due to being forced together. The recent experience of combat, however, showed this to be inaccurate. The majority of men and officers who fought with Black units, reported they performed admirably and would not have issues serving alongside black units again. White units which had not served with Black Soldiers tended to reflect the racial views the generals feared.

Despite the vast array of studies conducted during World War II, and despite the executive order, there were still delays.  The first branch to fully integrate (an integrated unit was considered any unit with 49% or less Black representation) was the United States Air Force. For the Air Force, not only did they have the excellent example of the 332nd to refer to, but they also faced the reality of the need for as many trained specialists as possible. Unlike the Army which could push vast numbers of unskilled recruits to labor units, the Air Force required technical skill and expertise to ensure aircraft remained functional. Under the old system, the Air Force only had one Black flying group, yet were required to have a 10% quota of Black recruits. Regardless of how many Black Airmen were serving, they only trained enough specialists to keep the single segregated flying group in the air. Despite these men's desire to perform their trade, the majority were prohibited from doing so. Recognizing this waste, the Air Force began adhering to the president's policy, fully integrating by 1952.

The other branches followed. Once again, practical measures outweighed racial beliefs. As the United States engaged in the Korean War, manpower was at a premium. By 1951, the Army's nine training divisions were integrated, and Black recruitment was on the rise. Additionally, Black members of the Army and Marine Corps were serving in combat at the same ratio as white men. Combat integration failed to produce the violence or poor morale the military brass had expected. By 1953, the number of Black Marines had grown from 1,900 in 1949 to 17,000. Finally, in November 1954, the Army reported it was fully integrated.

The military of any nation is a reflection of the social milieu within that nation's borders. The ending of segregation within the U.S. armed forces reflected a country that was ready for change. The same year the military completed integration the Supreme Court ruled in Brown v. Board of Education, overturning "separate but equal." Military service was vital in transforming how Black American's were viewed. Through sacrifice and valor, Black Soldiers, Sailors and Airmen earned their position among America's heroes. Their blood and sweat earned their freedom no different than any other patriot, despite it taking much longer for that sacrifice to be recognized.

# EXHIBIT O



# FROM REPRESENTATION TO INCLUSION:

## Diversity Leadership for the 21st-Century Military

**FINAL REPORT**

# FROM REPRESENTATION TO INCLUSION:

## Diversity Leadership for the 21st-Century Military

**FINAL REPORT**



## MILITARY LEADERSHIP DIVERSITY COMMISSION
**1851 South Bell Street**
**Arlington, VA 22202**



March 15, 2011

The Honorable Barack Obama, President of the United States
The 112th United States Congress

Mr. President and Members of Congress:

The National Defense Authorization Act for Fiscal Year 2009 established the Military Leadership Diversity Commission. The Commission was asked to conduct a comprehensive evaluation and assessment of policies and practices that shape diversity among military leaders. Sixteen interrelated tasks, given by Congress, informed the Commission's enclosed final report, *From Representation to Inclusion: Diversity Leadership for the 21st-Century Military*. As chairman of this Commission, I am proud to present this report for your consideration.

The Commission held itself to high standards of openness and transparency in all deliberations. Moreover, we modeled inclusiveness by inviting those with diverse backgrounds, expertise, and experience to have a say in our independent analysis. The Commission sought extensive input for our deliberations from the Department of Defense and the Services as well as the private sector. We hosted 13 public hearings, meeting in locations across the country where many active-duty servicemembers and veterans reside. We heard public testimony from top military leaders, subject matter experts, and diversity officers from leading corporations known for their diversity practices. In addition, we conducted interviews with servicemembers.

The Commission believes that the diversity of our servicemembers is the unique strength of our military. Current and future challenges can be better met by broadening our understanding of diversity and by effectively leading our uniformed men and women in ways that fully leverage their differences. While we find the promotion policies and practices of the Department of Defense and the Services to be fair, we find also that there are some barriers to improving demographic representation among military leaders.

Among the 20 recommendations given in this report is a new definition of diversity for the 21st century. We offer ways to remove barriers that are affecting the demographic

makeup of military leadership, and we suggest approaches to leadership, education, and assessment that can enable the Department of Defense and the Services to fully benefit from the increased diversity of military leadership. We are confident that these recommendations will positively shape our military leadership in ways that meet the unique challenges of this century. However, the Commission recognizes that presidential and congressional guidance and support are necessary if success is to be realized.

It has been both an honor and privilege for this Commission to support the U.S. military's continuing journey of becoming a preeminently inclusive institution.

Sincerely,

Lester L. Lyles, Chairman
Military Leadership Diversity Commission

# COMMISSIONER SIGNATURES

## Current Commissioners

## Former Commissioners

Kathlene Contres

Iselda Pinckney

# PREFACE

The U.S. Armed Forces became a deliberately inclusive organization in 1948, when President Harry S. Truman issued his historic Executive Order 9981 that called for "equality of treatment and opportunity for all persons in the armed services" (The White House, 1948). Since then, the U.S. military force has endeavored to become an inclusive organization dedicated to the equality of all its members, regardless of their background. Its dedication to equal opportunity has resulted in increased representation of racial/ethnic minorities and women among the top military leaders in recent decades. Despite undeniable successes, however, the Armed Forces have not yet succeeded in developing a continuing stream of leaders who are as diverse as the Nation they serve. Racial/ethnic minorities and women still lag behind non-Hispanic white men in terms of representative percentage of military leadership positions held. Marked changes in the demographic makeup of the United States will throw existing disparities into sharp relief, creating a recruiting pool that looks very different from the pool of 30–40 years ago, from which today's leaders were drawn.

Recognizing existing disparities and seeking to look ahead, Congress, in the National Defense Authorization Act for Fiscal Year 2009, Section 596, mandated the creation of the Military Leadership Diversity Commission (MLDC). The Commission was tasked to "conduct a comprehensive evaluation and assessment of policies that provide opportunities for the promotion and advancement of minority members of the Armed Forces, including minority members who are senior officers." Its charter required that a final report be delivered directly to the President and Congress one year after its first meeting.

An independent deliberative body, the Commission was itself an inclusive organization. Military Commissioners were active-duty and retired officers and senior enlisted personnel from both the Active and Reserve Components of all the Armed Forces, including the Coast Guard, as well as civilians. They included those who served in major armed conflicts from World War II to Iraq and Afghanistan. Civilian Commissioners included senior executives of major corporations, civil servants, and a law school chancellor.

The Commission's charter listed 16 specific tasks. To address these tasks, the Commission was divided into ten subcommittees, each supported by a research team. Each subcommittee produced issue papers on specific topics and a decision paper that reports the subcommittee's findings, conclusions, and recommendations.[1]

---

[1]   The Legal Implications Subcommittee did not produce a decision paper because the Commission made no recommendations specific to the subcommittee's findings. Rather, those findings served to inform all of the Commission's recommendations.

This final report, founded on rigorous research and enhanced by serious and open deliberation, presents the Commission's main findings and recommends policies and practices to develop future military leaders who represent the face of America.

# CONTENTS

Commissioner Signatures.................................................................... v
Preface.......................................................................................... vii
Figures and Table ........................................................................... xi
Summary ...................................................................................... xiii
Abbreviations ................................................................................ xxi

## SECTION I: INTRODUCTION

Chapter One: About the Study .......................................................... 3
Chapter Two: Defining Diversity for a New Era .................................. 11

## SECTION II: BUILDING THE FOUNDATION FOR CHANGE

Chapter Three: Ensuring Leadership Commitment to Diversity ............................. 21

## SECTION III: DEVELOPING FUTURE LEADERS

Chapter Four: The Demographic Composition of Today's Military Leadership .......... 39
Chapter Five: The Eligible Pool of Candidates.................................................. 47
Chapter Six: Outreach and Recruiting ........................................................... 53
Chapter Seven: Branching and Assignments.................................................... 63
Chapter Eight: Promotion........................................................................... 75
Chapter Nine: Retention............................................................................. 83
Chapter Ten: Going Beyond Race/Ethnicity and Gender .................................. 89

## SECTION IV: ENSURING CONTINUED PROGRESS

Chapter Eleven: Managing and Sustaining Diversity......................................... 95
Chapter Twelve: Conclusion........................................................................ 117

## APPENDIXES

A. The Military Leadership Diversity Commission Charter ............................... 119
B. Commission Members............................................................................ 121
C. Recommendations................................................................................ 125
D. Glossary.............................................................................................. 131

References ............................................................................................... 135

# FIGURES AND TABLE

## Figures

2.1.   21st-Century Inclusion Builds on the Foundation of 20th-Century Representation ................................................................ 14

3.1.   Best Practices for Managing Change ............................................ 26

3.2.   The 1998 DoD Human Goals Charter ............................................ 28

4.1.   Racial/Ethnic Minority and Female Shares of Officers and Enlisted Personnel, by Component, September 2008 ....................................... 41

4.2.   Racial/Ethnic Minority Shares of Enlisted Personnel, by Service and Rank, September 2008 ................................................................. 41

4.3.   Female Shares of Enlisted Personnel, by Service and Rank, September 2008 ........................................................................ 42

4.4.   Racial/Ethnic Minority Shares of Officers, by Service and Grade, September 2008 ........................................................................ 43

4.5.   Female Shares of Officers, by Service and Grade, September 2008 ........... 43

4.6.   All Stages of the Military Personnel Life Cycle Affect the Demographic Composition of Military Leadership .............................................. 45

5.1.   The Cumulative Effect of Individual Requirements on the Demographic Composition of the Eligible Enlisted Population, Marine Corps, 2009 ..... 48

5.2.   The Cumulative Effect of Individual Requirements on the Demographic Composition of the Eligible Officer Population, Marine Corps, 2009 ....... 48

6.1.   Comparison of Air Force ROTC Host Locations and Student Body Demographics .......................................................................... 58

7.1.   Percentage of AC Officers in Tactical/Operational Occupations, December 2008, by Pay Grade ..................................................... 65

7.2.   Percentage in Nontactical/Nonoperational and Tactical/Operational Occupations Who Were White Men, December 2008, by Service ........... 65

11.1.  The Centrality of the CDO Within the Proposed Diversity Management System ................................................................................. 98

## Table

11.1.  Court Martial Cases, by Race/Ethnicity Group, 2008 ........................ 105

# SUMMARY

This report presents the findings and recommendations of the MLDC. Under the provisions of the National Defense Authorization Act for Fiscal Year 2009, Section 596, Congress asked the Commission to "conduct a comprehensive evaluation and assessment of policies that provide opportunities for the promotion and advancement of minority members of the Armed Forces, including minority members who are senior officers." Congress charged the Commission to carry out 16 interrelated tasks. The nonpartisan, deliberative body of military and civilian leaders researched, reflected on, and recommended improvements to existing diversity-related policies and offered new initiatives designed to be supportive of the missions and goals of the Department of Defense (DoD).

The Commission's recommendations support two overriding and related objectives: (1) that the Armed Forces systematically develop a demographically diverse leadership that reflects the public it serves and the forces it leads and (2) that the Services pursue a broader approach to diversity that includes the range of backgrounds, skill sets, and personal attributes that are necessary to enhancing military performance.

The Commission acknowledges that the Services have been leaders in providing opportunities for all servicemembers, regardless of their racial/ethnic background or gender. Today's mission-effective force is a living testament to progress in the areas of military equal opportunity policies and related recruiting and management tactics. However, more needs to be done to address 21st-century challenges.

> [D]espite our progress today, too many people still suffer from what I call the *illusion of inclusion*, which is a condition you get when you rest on past laurels.
>
> —The Honorable Claiborne Haughton, Jr., remarks to the Commission, 2010

The Armed Forces have not yet succeeded in developing a continuing stream of leaders who are as demographically diverse as the Nation they serve. Current projections suggest that the proportion of racial/ethnic minority youth will increase in this century, while the proportion of non-Hispanic white youth will decline. More importantly, racial/ethnic minorities and women are still underrepresented among the Armed Forces' top leadership, compared with the servicemembers they lead. This disparity will become starkly obvious without the successful recruitment, promotion, and retention of racial/ethnic minorities among the enlisted force. Without sustained attention, this problem will only become more acute as the racial/ethnic and cultural makeup of the United States continues to change.

The Armed Forces must also acknowledge that diversity encompasses more than demographics, and they must take action to harness the range of knowledge, skills, and backgrounds needed to prevail in the rapidly changing operational environment. Leaders will need to address complex and uncertain emergent threats. For example,

FROM REPRESENTATION TO INCLUSION: DIVERSITY LEADERSHIP FOR THE 21ST-CENTURY MILITARY

> And the issue that we're talking about here today—diversity—is a readiness issue. Sustaining our all-volunteer force is a readiness issue.
>
> —The Honorable Clifford Stanley, remarks to the Commission, 2010

U.S. military and civilian cyber systems are becoming more complex to defend and utilize, and enemy techniques blur the line between combat and noncombat situations on the ground. The ability to work collaboratively with many stakeholders, including international partners, will also be critical in meeting such challenges and will require greater foreign-language, regional, and cultural skills. In that vein, expert testimony comes from General James Mattis, then–Commander, U.S. Joint Forces Command. Closing out the 2010 Joint Warfighting Conference, he stated,

> In this age, I don't care how tactically or operationally brilliant you are, if you cannot create harmony—even vicious harmony—on the battlefield based on trust across service lines, across coalition and national lines, and across civilian/military lines, you really need to go home, because your leadership in today's age is obsolete. We have got to have officers who can create harmony across all those lines. (quoted in Boyer, 2010)

To address these challenges, the Commission proposes 20 recommendations to

- establish a definition of diversity that addresses the complexity of today's environment
- build a foundation for change by ensuring leadership commitment to diversity
- develop and maintain a qualified and demographically diverse military leadership
- ensure continued progress through policy goals and metrics that allow DoD to manage and sustain diversity.

## Define Diversity for a New Era

Currently, each Service defines *diversity* differently. Developing a uniform definition of diversity to be used throughout DoD can inspire a common vision and elicit the needed changes. The Commission's recommended definition, presented below, brings together DoD's core values and the core values of each Service, and it addresses today's unique mission and demographic challenges:

> *Diversity is all the different characteristics and attributes of individuals that are consistent with Department of Defense core values, integral to overall readiness and mission accomplishment, and reflective of the Nation we serve.*

The definition acknowledges that individuals come to the military not only with different cultural backgrounds but also with different skills, experiences, and talents. It also acknowledges that these differences are operationally relevant. With proper leadership, diversity can increase military agility and responsiveness.

The definition is consistent with equal opportunity policies and practices. If policies resulting from the new definition are properly communicated, implemented, and assessed, the new concept will help to further eliminate discrimination and guide DoD along a path of inclusion.

## Build the Foundation for Change

Leveraging diversity as a vital strategic military resource will require the commitment, vision, and know-how of leaders at every level. Without this commitment to instill respect for diversity as a core value, the needed cultural change may not take place.

### Ensure Leadership Commitment to Diversity

Diversity leadership must become a core competency at all levels of the Armed Forces, and respect for diversity should be made an explicit core value of DoD and the Services. An effective leader promotes fairness and equity in his or her organization or work-group and knows how to focus a broadly diverse group to use its members' differences in ways that benefit the mission. Getting a diverse group to work together in ways that improve mission capabilities is a learned skill. The Services should provide diversity leadership education and training, distinct from traditional forms of general diversity training, to servicemembers at every level.

This requires a fundamental shift in institutional thinking about diversity. One clear message comes from both the literature on diversity management and the experience of organizations with a strong reputation for diversity: Such a shift requires the personal and visible commitment of top leaders. The Secretary of Defense, Chairman of the Joint Chiefs of Staff, Service Secretaries and Chiefs, and senior enlisted leaders will be critical to implementing the kind of change needed to inspire and manage reform.

> I've always considered myself, in addition to being the commander, a safety officer of every organization I led. That was something I couldn't hand off to anybody else. And the second thing that I always considered myself as being was the diversity officer . . . . Yes, there are other people who had staff responsibilities for all of this, but ultimately, those two responsibilities I saw as my own, because they are consequential of good and strong leadership.
>
> —The Honorable Eric Shinseki,
> remarks to the Commission, 2010

To meet emerging operational challenges, the Services need to identify and reward the range of skills required for mission success. To endure, the new understanding of diversity as a way to enhance mission effectiveness must become inherent in military culture and in the military's way of doing business.

Commitment to change is expressed fully by national leaders when new goals and values are made into law. Consistent with this insight, the Commission recommends that Congress revise Title 10, Section 113, to require the Secretary of Defense to report annually on the status and progress of DoD's diversity efforts.

## Develop Future Leaders

The Commission found that top military leaders are representative neither of the population they serve nor of the forces they lead. The extent to which racial/ethnic minorities and women are underrepresented varies across the Services, but the Commission found, on average, low racial/ethnic minority and female representation among senior military officers.

During the Vietnam War, the lack of diversity in military leadership led to problems that threatened the integrity and performance of the Nation's military (Becton et al., 2003). This is because servicemembers' vision of what is possible for their career is shaped by whether they see individuals with similar backgrounds excelling and being recognized in their Service. The performance of the Nation's military is tied to the individual's belief that he or she will be treated fairly regardless of his or her background.

The Commission found four explanations for discrepancies in representation among senior military leaders: low racial/ethnic minority and female presence among initial officer accessions, lower representation of racial/ethnic minority and female officers in career fields associated with advancement to flag/general officer rank, lower retention of midlevel female servicemembers across the enlisted and officer spectrum, and lower rates of advancement among racial/ethnic minority and female officers. To address these issues, the Commission recommends the actions summarized below.

### Increase the Pool of Eligible Candidates

Recent statistics from the Pentagon show that three out of four young people ages 17–24 are not eligible to enlist in the military (Gilroy, 2009). Many fail to meet entry requirements related to education, test scores, citizenship, health status, and past criminal history. Further, racial/ethnic minorities are less likely to meet eligibility requirements than are non-Hispanic whites, and that gap is widening. This is a national security issue requiring the attention and collected effort of top public officials, such as the President, members of Congress, and State and local leaders, all of whom can turn the tide by developing and executing strong, united, action-oriented programs to improve eligibility among the youth population. Together, these officials and other stakeholders, such as DoD, the Department of Education, the Department of Health and Human Services, and the Department of Homeland Security, can and should improve educational and physical readiness among American youth and foster new interest in military service.

### Improve Outreach and Recruiting Strategies

In the military's closed personnel system, tomorrow's leaders are developed and selected from today's recruits. Recognizing this constraint, the Services employ a variety of strategies to attract qualified youth to enlist or join officer commissioning programs, such as the Service academies, the Reserve Officers' Training Corps, and Officer Candidate School/Officer Training School programs. The Commission's review of recent accessions revealed that, in each Service, at least one racial/ethnic minority group was underrepresented. The review also revealed that women were underrepresented across

all the Services. The Commission's recommendations include that DoD and the Services explore untapped recruiting markets, require accountability for recruiting from underrepresented demographic groups, and develop a common application for Service academies and the Reserve Officers' Training Corps.

### Eliminate Barriers to Career Advancement

Increasing the racial/ethnic and gender diversity of senior leadership requires eliminating barriers that disproportionately affect the advancement of racial/ethnic minorities and women. This can be done on two levels. First, the Services should ensure that all servicemembers are equally well prepared to manage their own career progression. Related preparation steps include educating all servicemembers about the promotion process early in their careers and mentoring them at all stages of the career process. Multiple occasions for preparation can help servicemembers recognize career-enhancing opportunities and make choices that further their professional and personal goals.

Second, DoD and the Services must remove institutional barriers in order to open traditionally closed doors, especially those relating to assignments—both the initial career field assignment and subsequent assignments to key positions. An important step in this direction is that DoD and the Services eliminate combat exclusion policies for women, including removing barriers and inconsistencies, to create a level playing field for all servicemembers who meet the qualifications.

## Ensure Continued Progress

The changes recommended by the Commission cannot be managed or sustained without developing a stronger organizational structure and a system of accountability, monitoring, and enforcement.

### Realign the Organizational Structure

Currently, responsibility for DoD diversity management falls under the Office of Diversity Management and Equal Opportunity. This office is understaffed, isolated from top leadership, and unable to set the agenda or drive progress. The central feature of the new accountability system proposed by the Commission is the Chief Diversity Officer. This new position will report directly to the Secretary of Defense to ensure that diversity management is embraced as a "line" rather than "staff" responsibility. The second key feature of this system is a set of mutually reinforcing elements that work together to provide effective, consistent implementation and persistent accountability for achieving the goals of diversity and inclusion. Supported by the existing Office of the Under Secretary of Defense (Personnel and Readiness) Research & Analysis office, which will be enhanced to deal with diversity-related issues, the Chief Diversity Officer will monitor and advise on all facets of the system for the Secretary of Defense.

### Institute a System of Accountability

The Secretary of Defense will oversee the diversity effort of DoD and the Services through annual accountability reviews with the Service Secretaries, Chiefs, and senior enlisted leaders. In parallel, the Deputy Secretary of Defense will convene biannually the Deputy's Advisory Working Group to discuss the status and progress of diversity efforts throughout the Armed Forces. Finally, to ensure consistent implementation of the new diversity vision, each of the Service Chiefs will hold internal accountability reviews prior to meeting with the Secretary of Defense. Reviews will be conversations that focus on progress and areas for improvement. They will enable military leadership not only to see evidence about demographics but also to take stock of the diversity awareness and leadership of those in line to succeed current leaders. In particular, the reviews will provide a forum for senior leaders to assess whether and how leaders at lower levels are leveraging all types of diversity in their units to improve capability.

### Ensure the Succession of Leaders Committed to Diversity

To ensure that the diversity effort continues, demonstrated diversity leadership must be assessed throughout careers and made, in both DoD and the Senate, a criterion for nomination and confirmation to the 3- and 4-star ranks. Individuals considered for top leadership positions should be able to demonstrate their experience in providing diversity leadership and their understanding of its connection to readiness and mission accomplishment.

### Develop and Implement Robust Policies and Strategic Metrics

Successful implementation of diversity initiatives requires a deliberate strategy that ties the new diversity vision to desired outcomes via policies and metrics. DoD must revise and reissue existing equal opportunity policies, formalize the new diversity management goals in clear and robust policies, and clarify what the Services must do to meet those goals. At the same time, appropriate metrics and reporting tools must be put in place to ensure that progress is made. With such data and tools, military leaders at all levels can be held accountable for their performance in diversity management and rewarded for their efforts.

## Conclusion

Today's military operations are executed in complex, uncertain, and rapidly changing environments. Men and women representative of the U.S. population and with different skills, experiences, and backgrounds are needed to respond to new and emerging threats. To harness these differences in ways that increase operational effectiveness, the military must revise and develop policies consistent with the new diversity vision. Diversity needs to work—for the good of the Nation and of the Armed Forces that serve it.

Joint operations, imposed by Congress on an unwilling military 25 years ago, have since become a large-scale example of the strength that comes with diversity.

These operations do not level or eliminate each Service's unique traditions and capabilities: Each Service maintains its culture, heritage, and ways of engaging in battle and peacekeeping missions. Integrating the Services' differences into a single coordinated force is difficult, and the U.S. military has spent considerable time and funding to make joint effort possible. Despite challenges, however, joint operations have demonstrated that a seamless integration of differences can be accomplished and can positively influence the outcome of the fight.

The ultimate impact of the recommendations in this report depends on the unwavering commitment of the President of the United States, the resolute conviction of the Secretary of Defense, and the concerted effort of military leaders at all levels to bring about enduring change. The MLDC is the third deliberative body established by an external authority to find ways to transform the U.S. military to become a more inclusive institution. Its predecessors were the Fahy Committee (1949–1950), created by President Harry S. Truman, and the Gesell Committee (1962), appointed by President John F. Kennedy. Historians have hailed the Fahy Committee as instrumental in desegregating the Armed Forces and thus paving the way for the Nation to move closer to its ideals. On the other hand, few even remember that the Gesell Committee existed, despite the fact that it recommended policies that might have enabled the military to avoid the harmful racial tensions and conflicts that occurred in the Armed Forces during the Vietnam War.

The U.S. military is a learning organization capable of adapting to change and the needs of the Nation, provided that the Nation's highest leaders are willing both to change and to provide a clear vision of success that is followed by the sustained oversight needed to succeed. The Armed Forces have led the Nation in the struggle to achieve equality. To maintain this leadership, they must evolve once again, renewing their commitment to providing equal opportunity for all. The time has come to embrace the broader concept of diversity needed to achieve military goals and to move the Nation closer to embodying its democratic ideals.

# ABBREVIATIONS

| | |
|---|---|
| AC | Active Component |
| AFQT | Armed Forces Qualification Test |
| ANG | Air National Guard |
| ARNG | Army National Guard |
| CDO | Chief Diversity Officer |
| CEO | chief executive officer |
| CNO | Chief of Naval Operations |
| CONOPS | concept of operations |
| DACOWITS | Defense Advisory Committee on Women in the Services |
| DAWG | Deputy's Advisory Working Group |
| DEOC | Defense Equal Opportunity Council |
| DEOCS | DEOMI Organizational Climate Survey |
| DEOMI | Defense Equal Opportunity Management Institute |
| DHS | Department of Homeland Security |
| DMDC | Defense Manpower Data Center |
| DoD | Department of Defense |
| DoDD | DoD Directive |
| DUSD(EO) | Deputy Under Secretary (Equal Opportunity) |
| EEO | equal employment opportunity |
| EO | equal opportunity |
| FY | fiscal year |
| GED | General Educational Development |
| JROTC | Junior Reserve Officers' Training Corps |

| | |
|---|---|
| K–12 | kindergarten through grade 12 |
| MAVNI | Military Accessions Vital to the National Interest |
| MLDC | Military Leadership Diversity Commission |
| NH | non-Hispanic |
| OCS | Officer Candidate School |
| ODMEO | Office of Diversity Management and Equal Opportunity |
| OSD | Office of the Secretary of Defense |
| OTS | Officer Training School |
| PI | Pacific Islander |
| RC | Reserve Component |
| ROTC | Reserve Officers' Training Corps |
| SOFS | Status of Forces Survey |
| USA | U.S. Army |
| USAF | U.S. Air Force |
| USAFR | U.S. Air Force Reserve |
| USAR | U.S. Army Reserve |
| USCG | U.S. Coast Guard |
| USCGR | U.S. Coast Guard Reserve |
| USMC | U.S. Marine Corps |
| USMCR | U.S. Marine Corps Reserve |
| USN | U.S. Navy |
| USNR | U.S. Navy Reserve |
| WEOA | Workplace and Equal Opportunity Survey of Active-Duty Members |

# SECTION I:
# INTRODUCTION

CHAPTER ONE

# ABOUT THE STUDY

The U.S. Armed Forces have played a pivotal role in the Nation's pursuit of equality of opportunity for all citizens. In 1948, after the end of World War II, Commander in Chief of the Armed Forces President Harry S. Truman issued his historic Executive Order 9981. The order called for the desegregation of the Armed Forces by providing "equality of treatment and opportunity for all persons in the armed services" (The White House, 1948). Since then, the U.S. military has become a groundbreaking institution that is dedicated to the ideal that individual servicemembers should be rewarded for their performance and dedication, no matter their gender, skin color, ethnic background, or religion. This dedication to equal opportunity has resulted in the increased representation of racial/ethnic minorities and women at all ranks of the military, including among top leadership positions. Today, the Armed Forces have made impressive progress toward President Truman's vision of an inclusive military that reflects the ideals of the Nation it serves.

Despite this progress, however, the transformation of the Armed Forces remains unfinished. *Racial/ethnic minorities and women are still underrepresented in leadership positions.* Demographic changes in the United States are reshaping the pool from which the Services will recruit and promote future military leaders. Prolonged conflicts of unprecedented complexity require agile leadership that leverages all the capabilities at its disposal. Like the private sector, the U.S. military recognizes the need for a diverse workforce that includes a greater range of individual competencies, including skills, education, and professional backgrounds. Recognizing the needs of the new era, Congress mandated the creation of the Department of Defense (DoD) Military Leadership Diversity Commission (MLDC).

The Commission, an advisory body of active and retired military, academic, and corporate leaders, was tasked in its charter to "conduct a comprehensive evaluation and assessment of policies that provide opportunities for the promotion and advancement of minority members of the Armed Forces, including minority members who are senior officers."[1] This final report presents the results of that evaluation. It examines policies affecting the career life cycles of military personnel from the five Services—the Army, Navy, Air Force, Marine Corps, and Coast Guard—as well as the National Guard and Reserve. The report outlines a vision, strategy, and action plan for improving the inclusiveness of military leadership.

---

[1]  The charter is reproduced in Appendix A. The Commissioners are listed in Appendix B.

## Background

The MLDC is the third deliberative body established by an external authority to find ways to transform the U.S. military to become a more inclusive institution. As this Commission offers its report to the President of the United States and Congress, the Nation's top military leaders, and the American public, it is worth reflecting on the lessons learned from the two previous committees.

### The Fahy Committee

When President Truman declared that widespread racial/ethnic discrimination would be abolished in the Armed Forces, he stated that the new policy was to be "put into effect as rapidly as possible, having due regard to the time required to effectuate any necessary changes without impairing efficiency or morale" (The White House, 1948). He assigned responsibility for ensuring rapid implementation to the newly formed President's Committee on Equality of Treatment and Opportunity, which was commonly known as the Fahy Committee (after its chair). The order stated,

> The Committee is authorized on behalf of the President to examine into the rules, procedures and practices of the armed services in order to determine in what respect such rules, procedures and practices may be altered or improved with a view to carrying out the policy of this order. (The White House, 1948)

From January 1949 to July 1950, the Fahy Committee, which comprised three white and two black civilians, "advised, encouraged, and prodded each of the armed services into at least nominal compliance with the administration's expectations regarding Executive Order 9981" (Mershon & Schlossman, 1998). Although the committee had no formal administrative power, President Truman made it clear to all stakeholders that he stood behind its effort. In January 1949, at the first meeting of the committee, he said, "I want this job done. And I want to get it done in a way so everybody will be happy to cooperate to get it done. Unless it is necessary to knock somebody's ears down, I don't want to do that, but if it becomes necessary, it can be done. But that's about all I have to tell you" (quoted in Mershon & Schlossman, 1998).

The direct support it received from the President sets the Fahy Committee apart from all other such deliberative bodies. With President Truman's unequivocal support, the Fahy Committee brought about lasting changes to the U.S. military that went beyond desegregation. For instance, the Fahy Committee's systematic analysis exposed some long-held beliefs about policies toward racial/ethnic minorities in the Armed Forces and their impact on mission effectiveness. The Fahy Committee's findings also debunked an assertion that any inclusive policy designed to expand opportunities for blacks must come at the expense of other people and at the expense of the general welfare. More importantly, the findings showed that a more inclusive military that enables all members to use their talents and skills to the fullest is a more effective fighting force.

Despite this progress, however, desegregation of the military in the following years was neither smooth nor consistent. Official racial segregation in the military was not fully revoked until 1954, four years after President Truman dismissed the committee in a compromise with Secretary of Defense Louis A. Johnson (Mershon & Schlossman, 1998). The momentum to desegregate was sustained during the Korean War and brought to completion by military leaders in the theater, such as General Matthew B. Ridgeway (Mershon & Schlossman, 1998). But this momentum was difficult to sustain after the war, particularly because the U.S. military was ahead of the Nation in terms of race relations in the late 1950s (Mershon & Schlossman, 1998).

## The Gesell Committee

In recognition of the need to revitalize efforts to expand opportunities for racial/ethnic minorities in the military, President John F. Kennedy established a new investigative body in 1962, the President's Committee on Equality of Opportunity in the Armed Forces, which was commonly known as the Gesell Committee (after its chair). All seven members were civilians, and three were black (Mershon & Schlossman, 1998). The committee was asked to assess the status of blacks in the military and to find ways to improve their opportunities. More specifically, the committee addressed two questions:

- What measures should be taken to improve the effectiveness of current policies and procedures in the Armed Forces with regard to equality of treatment and opportunity for persons in the Armed Forces?
- What measures should be employed to improve equality of opportunity for members of the Armed Forces and their dependents in the civilian community, particularly with respect to housing, education, transportation, recreational facilities, community events, programs, and activities?

The Gesell Committee's report, released in 1964, called for "far-reaching proposals for greater institutionalization of the military's commitment to equality of treatment and opportunity." The Gesell Committee considered military commanders to be the central agents in this process. For instance, it proposed that "DoD establish a system for monitoring race relations. . . . Under this system, commanders would be held responsible for ensuring that race relations received continuous attention, and would be evaluated on their handling of racial matters." More important, according to Mershon and Schlossman (1998), the Gesell Committee "insisted that the results of such evaluations be incorporated into the regular promotion process," writing the following: "It should be made clear [that] officers showing initiative and achievement in this area will enhance their performance ratings and obtain favorable consideration for promotion and career advancement" (all Gesell Committee report quotations from Mershon & Schlossman, 1998).

Unlike the Fahy Committee, the Gesell Committee did not directly report to the President. Moreover, whereas the Fahy Committee was asked to implement a policy of the President, the Gesell Committee was asked to recommend new policies to the Sec-

retary of Defense. The Gesell Committee released its final report in 1964. The committee's recommendations to institutionalize the inclusive ideals in the U.S. military are still relevant today, especially because they were never fully implemented.

Unfortunately, Secretary of Defense Robert McNamara chose not to implement all of the Gesell Committee's recommendations. Instead, he issued DoD Directive (DoDD) 5120.36, *Equal Opportunity in the Armed Forces*, which addressed the recommendations related to the second question—but not the first—and dealt with external issues to address how DoD should deal with the fact that many institutions in the country remained racially segregated while the military had already ended segregation (Mershon & Schlossman, 1998).

Unlike the Fahey Committee, which is recognized for its historic achievements, the Gesell Committee is little known. Its recommendations, if implemented, would have institutionalized the process of monitoring and evaluating progress in race relations and equal opportunity within the military and the accountability system. However, Secretary McNamara failed to implement the recommendations that might have enabled the Armed Forces to avoid the harmful racial tensions and conflicts that occurred in the decades that followed.

DoD's failure to implement the Gesell Committee's recommendations had high costs. Inequities persisted at all levels of the military, particularly in the leadership ranks. The negative effects of such inequities were detailed in the 2003 amicus brief submitted by Becton et al. to the Supreme Court in the cases of *Gratz v. Bollinger* and *Grutter v. Bollinger*, which addressed whether the treatment of race as a favorable factor in admissions decisions at the University of Michigan Law School was constitutional. The brief—filed by 29 former military and civilian leaders, including several retired 4-star generals, Chairmen of the Joint Chiefs of Staff, and Secretaries of Defense—recounted that the lack of diversity in military leadership led to problems that threatened the integrity and performance of the Nation's military: "[T]he armed forces suffered increased racial polarization, pervasive disciplinary problems, and racially motivated incidents in Vietnam and on posts around the world" because the percentage of minority officers was "extremely low" relative to the percentage of blacks among the enlisted ranks (Becton et al., 2003).

## The Military Diversity Leadership Commission

The MLDC is building on the legacy of the two previous committees in the hope that the Nation's political and military leaders will embrace its recommendations so that a new commission on this subject will not be needed in the years ahead. The Commission has tackled the same issues as its predecessors and has focused on military leadership. It has also addressed two important trends of the past decade that may become more pronounced in the future: the growing demographic diversity of the American population and the sophisticated challenges of current warfare that require a broader set of qualifications in its leaders. Congress asked the Commission to reconsider the concept of diversity with these trends in mind.

The Commission recommends an expanded definition of diversity and a modern, systematic approach to diversity management in DoD. The new definition goes beyond

the traditional concept of diversity by shifting focus away from eliminating discrimination against members of certain groups and toward valuing and leveraging all kinds of human differences, including demographic differences, to improve capability and readiness. The Commission believes that institutionalizing this broader concept of diversity will ensure that the U.S. military will develop officers and senior enlisted servicemembers who not only are demographically diverse but also have the background and skills most needed to enhance military performance.

## Approach and Scope

Congress listed 16 specific tasks for the Commission in the National Defense Authorization Act for Fiscal Year 2009, Section 596. After careful review, the Commission grouped these tasks into ten substantive categories. Four were based on the military leadership career life cycle. The remaining categories were designed to cover topics critical to defining and managing diversity, tracking the progress of change, and ensuring that recommendations and affiliated policy changes were made in full accordance with U.S. law. In 2010, the National Defense Authorization Act for Fiscal Year 2010, Section 594, expanded the mission of the MLDC to include the National Guard and Reserve Component. Six new Commissioners were added to the MLDC in order to fulfill this new mandate.

The following subcommittees were formed to address the ten substantive categories:

- Definition of Diversity
- Legal Implications
- Outreach and Recruiting
- Leadership and Training
- Branching and Assignments
- Promotion
- Retention
- Implementation and Accountability
- Metrics
- National Guard and Reserve.

These subcommittees acquired pertinent information from the Services, including their definitions of diversity, ongoing initiatives, personnel data, outreach and recruiting strategies, retention efforts, promotion processes, and career development programs. They also received material on diversity management from the Office of the Secretary of Defense (OSD) and the Department of Homeland Security (DHS).

The Commission also gathered information through informational interviews with servicemembers and key stakeholders and through monthly public meetings that featured presentations from military leaders from DoD and each of the Services. Representatives of the diversity offices of OSD and the five Services presented demographic data and briefings on their current policies and practices. The Chairman of the Joint

Chiefs of Staff, the Under Secretary of Defense (Personnel and Readiness), and each of the five Service Chiefs spoke to the Commission as well, providing their perspectives on diversity. Additional speakers included the Honorable Claiborne Haughton, Jr., the Honorable Colin Powell, and the Honorable Eric Shinseki. Diversity experts from private industry and academia addressed the Commission and answered questions about their approaches to diversity management. Finally, a panel of male and female combat veterans addressed the Commission on issues surrounding women serving in combat.

With this information, the Commission and its staff conducted extensive investigation into the demographic profile of the Armed Forces today; the ways in which the Services recruit, train, assign, promote, and retain military personnel; the future missions the Armed Forces will likely face; current diversity policies and plans; and diversity best practices in the private sector. During this process, the Commission realized that it needed to give careful consideration to the evolving concept of diversity, which is moving beyond differences in race/ethnicity, religion, and gender to include a broader set of factors needed to create an inclusive workforce.

Based on the information collected, each subcommittee released a series of issue papers providing substantive background unique to the topic. Each subcommittee also developed a decision paper that reports both the subcommittee's main findings and the Commission-approved, topic-specific recommendations that resulted from the Commissioners' understanding and interpretation of the subcommittee's findings.[2] The final step of the process was to develop specific, final recommendations for improving the diversity of military leadership.

## Recommendations

The Commission determined that its final recommendations should serve three interrelated goals:

- Establish the foundation for effective diversity leadership with a definition of diversity that is congruent with DoD's core values and vision of its future.
- Develop future leaders who represent the face of America and are able to effectively lead a diverse workforce to maximize mission effectiveness.
- Implement policies and practices that will make leaders accountable for instilling diversity leadership as a core competency of the Armed Forces.

Each of the final recommendations was also required to meet several criteria defined by the Commission. Each needed to fulfill the Commission's charter, be supported by empirical evidence, be strategic rather than tactical, be feasible for implementation, meet legal requirements, and have a quantifiable intent. Commissioners evaluated recommendations based on how closely they adhered to these criteria. Rec-

---

[2]   The Legal Implications Subcommittee did not produce a decision paper because the Commission made no recommendations specific to the subcommittee's findings. Rather, those findings served to inform all of the Commission's recommendations.

ommendations that did not meet the criteria were modified or eliminated. If Commissioners in attendance did not approve the recommendations unanimously, the Commission deliberated until a consensus was reached. All final recommendations were approved by the conclusion of the final meeting in December 2010.[3]

Two important topics related to diversity were outside the scope of the Commission's work. First, the Commission did not study the civilian workforce and its top leadership. This omission should not imply, however, that the diversity of the civilian workforce is not important for DoD. On the contrary, a diverse civilian workforce is critical to the 21st-century military because this group is an essential element of the total force. But, because the civilian workforce is managed differently than the military workforce, to fully address the issues and challenges associated with improving the diversity of the civilian workforce requires a separate study.

Second, the Commission did not address issues related to the military service of openly gay men and women. Although the "Don't Ask, Don't Tell" policy certainly pertains to diversity and diversity leadership, a comprehensive examination of the issue was already in progress by the DoD Comprehensive Review Working Group. Two other efforts have addressed that issue in detail.[4]

## Organization of This Report

This report is divided into four sections. Section I, Introduction, introduces this study and, in Chapter Two, defines diversity for DoD. This definition incorporates but goes beyond equal opportunity to include a broader range of diversity factors, with important implications for Armed Forces core values, core competencies, training, and leadership skills.

Section II, Building the Foundation for Change, articulates the Commission's belief that leveraging diversity as a vital strategic military resource will require the commitment, vision, and know-how of all senior leadership. In Chapter Three, the Commission presents its most far-reaching recommendations: those related to ensuring leadership commitment to diversity. Without this commitment to instill respect for diversity as a core value, the needed cultural change may not take place.

Section III, Developing Future Leaders, describes recommendations that focus primarily on increasing racial/ethnic and gender representation within military leadership:

- Chapter Four offers an overview of the demographic composition of current military leadership, documenting that military officers today are less demographically

---

[3]  The recommendations are presented in full in Appendix C.

[4]  DoD General Counsel Jeh Johnson and Army General Carter Ham led DoD's comprehensive review of the policy and of how the U.S. military must prepare for and implement any associated changes in the law (see Johnson et al., 2010). In response to congressional tasking, the RAND Corporation recently published an update of its 1993 report on sexual orientation and U.S. military personnel policy (see National Defense Research Institute, 2010).

diverse than both the enlisted troops they lead and the broader civilian population they serve.

- Chapter Five discusses how eligibility requirements both define the eligible population from which the Services can recruit and affect the demographic profile of eligible recruits.
- Chapter Six describes current outreach and recruiting practices across the Services, reports on the demographic composition of recent accessions, and recommends policies to improve recruiting of racial/ethnic minorities and women.
- Chapter Seven describes how policy changes can remove structural and perceptual barriers that create potential demographic differences in career field preferences and command assignment opportunities—which, in turn, influence the future demographic diversity of senior military leadership.
- Chapter Eight discusses how potential barriers to promotion and resulting demographic differences in promotion rates can affect the future demographic diversity of senior military leadership.
- Chapter Nine examines whether there are demographic differences in who chooses to remain in and who chooses to separate from military service and identifies barriers that may influence demographic differences in retention.
- Chapter Ten describes how the Commission recommends tracking and improving other aspects of diversity within the military.

Section IV, Ensuring Continued Progress, describes how to manage and sustain the changes proposed in the earlier sections. Chapter Eleven proposes recommendations related to developing a stronger organizational structure and a system of accountability, monitoring, and enforcement to ensure continued progress toward greater diversity among all ranks of the military. Chapter Twelve advises that the ultimate impact of the recommendations in this report will depend on the unwavering commitment of the Commander in Chief (the President of the United States) and the resolute conviction of the Secretary of Defense.

CHAPTER TWO

# DEFINING DIVERSITY FOR A NEW ERA

The word *diversity* provokes mixed reactions from U.S. citizens. For some—especially those who grew up before and during the civil rights movement—the word conjures up the fight against racial segregation and inequality. For these Americans, diversity policies and programs are another name for equal opportunity (EO) programs, and most notably for affirmative action. But for other Americans, especially the young who have grown up under the protection of laws and regulations that provide equal opportunity for all, diversity means something broader. It goes beyond differences among demographic groups and requires more than affirmative action.

DoD and the Services have developed their own definitions, which vary widely in length and specificity and are not consistent with one another (see Issue Paper #20 and Lim et al., 2008). One of the first tasks the Commission tackled was to develop a uniform definition of diversity that could be used by DoD and the Services. Congress asked the Commission to define diversity in a way that is congruent with the core values of DoD and its vision of the future workforce. The Commission investigated existing definitions with these considerations in mind. DoD's core values are "leadership, professionalism, and technical know-how," which are upheld through the core values that everyone in uniform must live by: "duty, integrity, ethics, honor, courage, and loyalty" (U.S. Department of Defense, n.d.). Each Service has established its own core values as well, and these too were taken into consideration.

The Commission also examined DoD's vision of its future workforce and the factors that will affect its composition. Research on this subject confirms the importance of embracing a definition of diversity that goes beyond the concept of equal opportunity for all. The future workforce will be made up not only of men and women of different racial/ethnic backgrounds and different religious views but also of people with different talents, work backgrounds, and skill sets.

The Commission recognizes that the Nation is facing enemies who attack in nontraditional ways and must be countered with a wider range of capabilities. The Nation's warfighting forces must be willing and able to benefit from the talent of all individuals who are prepared to offer their unique skills, perspectives, and backgrounds in the service of their country. With this in mind, the Commission developed a new definition of diversity.

## The Department of Defense Should Adopt a New Definition of Diversity

*Recommendation 1—*

***DoD shall adopt the following definition: Diversity is all the different characteristics and attributes of individuals that are consistent with Department of Defense core values, integral to overall readiness and mission accomplishment, and reflective of the Nation we serve.***

The definition of diversity recommended by the Commission has evolved from the concept of diversity that has motivated the Services for decades. That concept is associated with equal employment opportunity (EEO) laws, initiatives, and programs that make it illegal to discriminate in the hiring or promotion of an individual on the basis of race, color, religion, sex, or other physical-appearance or individual characteristics. These laws were put in place to avoid a continuation of the historic discrimination and mistreatment experienced by certain groups.

After the Vietnam War, which highlighted the great disparities between the percentages of racial minority officers and racial minority enlisted personnel that resulted in racial polarization and harassment, the Services dedicated themselves to the goal of improving the fairness of their personnel practices, including recruitment, career opportunities, and promotion. They turned to civilian EEO laws and applied them to the military sector.[1] They embraced the guiding principle of EO programs, which declared that all individuals will have a chance to pursue the same opportunities and will not be discriminated against or harassed in their pursuit of a career or position (U.S. Equal Opportunity Employment Commission, n.d.). They implemented affirmative action policies that extended beyond EEO laws because these policies entailed actively reaching out to individuals from underrepresented demographic groups or groups that have been historically left out of the organization.

> Because of the success of affirmative action in the military, it is easy to forget just how segregated the officer corps once was. In 1968, African-American enrollment at West Point and Annapolis was less than 1 percent; as late as 1973, just 2.8 percent of all military officers were African-American. By contrast, during that period, African-Americans constituted as much as 17 percent of the rank and file. In Vietnam, the consequences of this de facto segregation were devastating.
>
> —Jerome Karabel, "Race and National Security," 2003

These efforts, sustained over decades, have made the U.S. military a groundbreaking institution that strives to advance the democratic equality of its workforce. The Services have pioneered outreach and recruiting strategies, management tools, and racial/ethnic minority representation goals arising from EO and affirmative action programs. Military men and women of different racial/ethnic backgrounds have learned to work together as a team to protect the Nation. Individuals expect to be promoted not on the basis of their background

---

[1]   Military equal opportunity regulations are separate from EEO. The latter is the suite of laws and regulations that apply to the civilian workforce.

or heritage but on the basis of the Services' standards of excellence and performance. Building on this foundation, the Commission's concept of diversity incorporates these goals and adds others.

## Moving Forward: From Representation to Inclusion

The new definition of diversity is based on a model of diversity management that incorporates the best ideals of EO and affirmative action with the practice of casting a wide net to recruit, train, foster, and promote people with a diversity of characteristics and attributes that can benefit the Services. The new definition aims to give all service-members equal treatment at every step in their military careers, but it also goes further: The words "all the different characteristics and attributes of individuals" in the definition refer not only to characteristics and attributes legally protected by EO laws but

to *any and all* characteristics and attributes that can benefit the Services, including thinking style, occupational background, and skill sets. In other words, diversity, as understood by the Commission, includes characteristics and attributes both included and not included in EO law; this is because *any* type of difference can affect mission effectiveness.

> [S]ome of these [diversity] consultants … would encourage you to sweep these directives on EO and EEO under the rug in the hope that they will go away and yes, they will simply want you to take down the sign off the EEO and the EO director's door and replace it with a sign that says "Director for Managing Diversity," but you can't manage diversity if you haven't first achieved diversity. So I stopped by here to tell you that if you think that you can manage diversity without first achieving diversity, in the words of Malcolm X, you have been had, took, bamboozled, and hoodwinked.
>
> —The Honorable Claiborne Haughton, Jr., remarks to the Commission, 2010

The Commission has heard concerns that defining diversity broadly in this manner will turn attention away from historically underrepresented demographic groups in military leadership positions. In other words, some critics believe that to define diversity in a way that goes beyond race/ethnicity and gender is to define away the very real challenges that specific groups still face.

The Commission recognizes this concern but believes that establishing a broad understanding of diversity throughout DoD will not harm the representation of these populations. In fact, understanding diversity more broadly can help to build the representation of these populations in military leadership because these populations have always offered the skills and talents that military leadership requires.

Furthermore, the broad definition of diversity reflects the realities faced by today's military. Just as changes in the demographic mix of the Nation's population are increasing the demographic diversity of new accessions, changes in the budgetary and conflict environments are calling for new skills, more integration across military components, better coordination with other government agencies, and smoother cooperation with global partners.

Figure 2.1 illustrates the progression from the EO model of diversity used in the past to the broader concept of inclusion proposed for the future. EO relies on compliance with regulations to eliminate discrimination; the concept of diversity as inclusion

**Figure 2.1. 21st-Century Inclusion Builds on the Foundation of 20th-Century Representation**



SOURCE: Adapted from Defense Business Board Task Group on Increasing Diversity in DoD's Flag and Senior Executive Ranks, 2004.

values individual differences *because they are critical to the new approaches and practices needed for a successful fighting force.* This concept is consistent with EO policies and practices because it is based on the fair and equitable treatment of all personnel, regardless of their membership in a protected class.

## America's Growing Diversity: A Resource for Leadership

It is critical for DoD leaders to understand that, by all accounts, *the racial/ethnic and cultural makeup of the United States is changing.* Current projections from the U.S. Census Bureau (n.d.) suggest that the proportion of racial/ethnic minority youth will increase in this century and that the proportion of non-Hispanic white youth will decline. If the Services wish to stay strong in numbers, they must attract more individuals from traditional racial/ethnic minority groups. Current military leadership undoubtedly recognizes the need to ensure the continuous replacement of departing servicemembers, especially during times of crisis or threat of crisis. A military stretched thin by a lack of new members and aspiring leaders can pose a serious threat to national security.

The Commission believes strongly that the Services need to develop and promote military leaders who reflect the forces they lead. It has always been in the best interest of the military to recruit and retain leaders who are representative of the many faces

of America.[2] Today's multiracial, multiethnic, and multicultural force is a living testament to the richly diverse population of the Nation it serves. Current Service leadership, however, does not reflect the demographics of those it leads or serves.

The Commission believes that leadership positions held by men and women from the many race/ethnicity groups that make up the United States have the potential to instill pride among the populations they represent and to secure greater trust in military leadership. A demographically representative leadership can also encourage servicemembers from underrepresented groups to aspire to leadership roles themselves, or they can inspire youth from different backgrounds to become interested in military service. One need only remember the popular perceptions of racial/ethnic

> Just as our military looks like America, so too must our general officers.
>
> —Rep. James E. Clyburn (D-SC), press release, 2008

> The truest melting pot in our society exists aboard aircraft carriers, in barracks, and on bases. Mess halls and exchange service stores, shooting ranges and training facilities are portraits of diversity. But in the officers' clubs, a much different picture emerges.
>
> —Rep. Kendrick B. Meek (D-FL), press release, 2008

> Leadership is what we need, because I believe that when someone who is attracted to the Navy . . . looks up that chain of command, they have to see themselves. If they can't see themselves, they won't believe.
>
> —Admiral Gary Roughead, remarks to the Commission, 2010

minorities serving as "cannon fodder" for white military leaders in Vietnam to understand how important ethnic, racial, and gender representation is to the psychological well-being and reputation of the U.S. military (Becton et al., 2003). Perceptions of a noninclusive military leadership can estrange the military from the people it represents and from which it ultimately draws its strength.

## Diversity as a Force Multiplier

Since the terrorist attacks of September 11, 2001, the United States has faced an increasingly wide range of threats. The gap between conventional and unconventional warfare continues to widen. The 2010 *Quadrennial Defense Review Report* communicates DoD's commitment "to ensure that tomorrow's leaders are prepared for the difficult missions they will be asked to execute" by placing "special emphasis on stability operations, counterinsurgency, and building partner capacity skill sets in its professional military education and career development policies" (U.S. Department of Defense, 2010). DoD's newly formed vision of its requirements implicitly suggests that greater diversity should be developed within and across the total defense workforce. Instead of relying on outdated strategies, the Armed Forces must expand military skill sets and

---

[2] The issue of representation in the military has existed as long as the Nation and represents "the legitimate concerns of the populace" about the motives and allegiances of its Armed Forces: "In a democracy, it is believed that a broadly representative military force is more likely to uphold national values and to be loyal to the government—and country—that raised it" (Armor, 1996).

train the force so that the right people with the right capabilities and backgrounds are brought to the fight when they are needed.

New challenges have made an emphasis on total force integration more critical than ever before, and DoD is facilitating a greater number of joint, coalition, and interagency collaborations that will allow threats to be analyzed and addressed from multiple points of view using multiple areas of expertise. Joint operations are a large-scale, military example of the strength that comes with diversity. The goal of joint operations is to bring together the Services' unique strengths and capabilities to maximize the odds of military success. Each Service has its own "personality"—traditions, culture, and modes of training, operating, and fighting. Joint operations do not level or eliminate each Service's unique traditions and capabilities but instead work toward seamlessly integrated tactical coordination and strategic direction. Army, Navy, Air Force, Marine Corps, and Coast Guard servicemembers are not outfitted with just one uniform or taught to employ one single way of fighting: Each Service maintains its culture, heritage, and ways of engaging in battle and peacekeeping missions. Joint operations have demonstrated that the inclusion of differences can enhance situational awareness, agility, and responsiveness to current and emergent threats. Integrating the Services' differences into a single coordinated force is difficult, and the Armed Forces have spent considerable time and treasure making it possible.

> We are going to be operating in diverse cultures, and having a diverse squad or a platoon gives you a lot of different views to deal with diverse culture and the complexities that they are going to be confronting. It's absolutely a combat multiplier, especially in the environments that we see coming at us and that we are dealing with today.
>
> —General George W. Casey, Jr., remarks to the Commission, 2010

The Commission similarly recognizes that individuals come to the military not only with different cultural, racial/ethnic, and religious backgrounds but also with myriad skill sets, talents, education levels, and work experience. The Commission believes that all of these characteristics and attributes, if properly managed, can help the Services reap optimum results from their most valuable resource: their people.

In the new model of diversity and diversity management put forth by the Commission, there are four dimensions of characteristics that can assist in meeting new missions:

1. *Demographic diversity* refers to immutable differences among individuals, such as race/ethnicity, gender, and age, as well as to differences in personal background, such as religion, education level, and marital status.
2. *Cognitive diversity* refers to different personality types, such as extroverted/introverted, and to different thinking styles, such as quick and decisive versus slow and methodical.
3. *Structural diversity* refers to organizational background differences, including Service, occupation, component (i.e., Active or Reserve), and work function.
4. *Global diversity* occurs through contact with those (e.g., members of foreign military services) who have national affiliations with countries other than the United States (Lim et al., 2008; Riche et al., 2007).

Although *demographic diversity* alone is not enough to meet the challenges that lie ahead, it is a critical component of overall diversity. Including a broad range of men and women from different backgrounds can increase the likelihood that the U.S. military "knows the enemy" and is better able to work with international partners by adding to the cultural and linguistic knowledge base from which U.S. forces may draw. Actively seeking demographic diversity also ensures that no talented individual will be "left behind" as a result of prejudice or discrimination. Engendering greater demographic diversity in both the rank and file and among leadership will result in a military that is representative of the citizenry it serves.

*Cognitive diversity* ensures that the military will be able to fill both traditional and novel positions. Different skill sets, personalities, and thinking styles are needed to manage, strategize, equip, fight, operate, repair, and otherwise engage in any of the hundreds of functions that the Services perform daily (Issue Paper #4; Kraus et al., 2007).

*Structural diversity* provides the expertise of servicemembers affiliated with particular occupations, Services, or components. It also enables needed capabilities to be brought to the table and fully incorporated into the mix. Exchanging information and perspectives across different branches or occupations can result in innovative ways of confronting the threat.

*Global diversity* is an inevitable part of today's missions. Both warfighting and peacekeeping are increasingly being done in cooperation with global coalition partners.

## Diversity Management: An Institutional Priority

Many nonmilitary organizations recognize that diversity can provide a competitive edge if it is developed and managed properly. The Commission reviewed relevant management literature and a number of diversity goals from successful businesses. These emphasize the importance of developing and utilizing the diversity of workforces in ways that improve outcomes, such as generating a larger customer base, boosting revenue, and improving cost-effectiveness. This set of organizational goals is usually referred to as the *business case for diversity*. The corporate diversity statements generally share two broad themes:

- Diversity, broadly defined, creates performance advantages through the synergy of people's different ideas and competencies.
- Good diversity management entails recognizing, appreciating, respecting, and utilizing a variety of human attributes, not just race/ethnicity.

Evidence suggests there is not a strong business case for diversity per se, but, given that demographic diversity is already here, pervasive, and growing, demographic business-case arguments stress the importance of managing diversity to achieve desired organizational and business outcomes (Issue Paper #14). The evidence also suggests that organizations may be able to mitigate diversity's potential costs: Diversity must be

managed, diversity management tools must be provided, and there must be agreement that the benefits are worth the investment (Issue Paper #29).

DoD and the Services are also interested in improving performance through diversity, but their desired outcomes differ from those of nonmilitary organizations. These different objectives include increasing regional and cultural capabilities, better coordinating military and civilian capabilities, more seamlessly integrating the National Guard and Reserve with the full-time, active-duty forces, and developing a broader inventory of specialized skills (such as foreign languages, medicine, and computer network operations).

The new definition of diversity and the focus on diversity management necessarily have profound implications for the way the military conducts big-picture and day-to-day personnel management. Therefore, the Commission suggests that DoD accompany the release of the recommended definition—or indeed any new definition—with a mission statement that prioritizes equity and inclusion and provides a purpose that is actionable, measurable, and accompanied by a concept of operations to advance implementation. As with any mission objective, diversity will require a clear presentation of goals, strategies, and tactics, as well as recommended processes for initiating and maintaining implementation to move closer toward success.

Diversity management calls for creating a culture of inclusion in which the diversity of knowledge and perspectives that members of different groups bring to the organization shapes how the work is done (see Holvino et al., 2004). Creating this culture will involve changing the way in which people relate to one another within a single unit, within a particular military branch, and throughout DoD. In particular, although good diversity management rests on a foundation of fair treatment, it is not about treating everyone the same. This can be a difficult concept to grasp, especially for leaders who grew up with the EO-inspired mandate to be both color and gender blind.

> And diversity in the Navy, diversity at home, makes us better, when we as a Navy are operating in support of our country's interests, because I really do believe the motivator for me when it comes to diversity is [that] diversity gives us better solutions. Diversity makes us stronger. It makes us more effective because we are able to draw from many different perspectives, and that is the power of diversity.
>
> —Admiral Gary Roughead, remarks to the Commission, 2010

Blindness to difference, however, can lead to a culture of assimilation in which differences are suppressed rather than leveraged (see Thomas & Ely, 1996).

Cultural assimilation, a key to military effectiveness in the past, will be challenged as inclusion becomes, and needs to become, the norm. Traditional basic training, for example, is focused on assimilating individuals into a fighting force tied together by the adoption of similar terminology, customs, and attitudes. However, current military operations are executed within more-complex, uncertain, and rapidly changing operational environments that defy the warfighting standards of the past and that need to be met with an adaptive and agile leadership that is ready to respond more flexibly and with a greater propensity for creative strategizing.

The need to leverage diversity while maintaining unit cohesion will require implementing new training and procedures and addressing new tensions—important elements of diversity management described later in this report.

# SECTION II:
# BUILDING THE FOUNDATION FOR CHANGE

CHAPTER THREE

# ENSURING LEADERSHIP COMMITMENT TO DIVERSITY

Leveraging diversity as a vital strategic military resource will require the commitment, vision, and know-how of leadership, as well as an organizational plan for achieving the desired outcomes. Two different but related paths will need to be taken. One involves following through on EO principles and practices. The Commission's recommendations in this area will help the Armed Forces systematically develop a demographically diverse leadership that reflects the forces it leads. The second path involves the new, broader understanding of diversity, which includes yet goes beyond demographics. Many of the Commission's recommendations are related to both of these aspects of diversity.

This chapter addresses what the Commission believes are its most far-reaching recommendations. They are the needed changes that will most securely set DoD and the Services on a path toward reaping the benefits of diversity.

## Diversity Leadership Must Become a Core Competency

*Recommendation 2—*

***To enhance readiness and mission accomplishment, effectively leading diverse groups must become a core competency across DoD and the Services. To implement this recommendation,***

- ***a. Leadership training at all levels shall include education in diversity dynamics and training in practices for leading diverse groups effectively.***

- ***b. DoD and the Services should determine the framework (e.g., curriculum, content, methods) for how to inculcate such education and training into leader development, including how to measure and evaluate its effectiveness.***

Both the Commissioners and guest speakers from corporate and military backgrounds believe that diversity has the potential to increase mission capability. However, to be effective, members of a broadly diverse unit or the entire force must be led in ways that value and include their differences while minimizing any negative influence that differences can have. Effective practices for leading a diverse group, referred to here as *diversity leadership*, address how leaders at all ranks and organizational levels shape the effect that diversity has on the forces under their command. *Diversity lead-*

21

*ership* thus refers to how leaders influence the ways in which people and groups under their command relate to one another.

The Commission strongly believes that diversity leadership must become a core competency at all levels of the Armed Forces. Diversity leadership is both a fundamental way of thinking and a set of skills at which all military leaders must excel in order to get the best performance possible from the servicemembers they lead every day. Diversity leadership can be inculcated by focusing on two strategies.

## Leadership Training at All Levels Shall Include Education in Diversity Dynamics and Training

The Commission identified a number of effective practices for leading diverse workgroups that can help the Services benefit from diversity and avoid some of the potential pitfalls (see Issue Paper #29). Studies suggest that effective diversity leadership begins with a leader looking through a "diversity lens" to identify and understand the diversity dynamics that are relevant in his or her command. Doing this requires the leader to

- recognize the "differences" that exist within the group
- both understand the dynamics that can cause those differences to have negative effects (e.g., loss of cohesion, communications difficulties, conflict) and create opportunities for those differences to have a positive effect on organizational performance
- apply leadership practices that can neutralize the potential negative effects and, if possible, leverage differences in support of the mission.

Diversity leadership involves applying practices that management professionals have long identified as successful personnel management techniques but that take on new significance for leaders of diverse workgroups. This is because leaders are responsible for the way group members communicate, cooperate, trust one another, and remain cohesive as a group.[1] Absent effective leadership, such as the leader focusing the group on the overarching mission, this fundamental and powerful human process can create in-groups and out-groups within a given work unit or organization. These dynamics can strongly affect the on-the-ground functioning of a diverse group in a planning room or in a war zone and at the platoon level or for the commander of a joint force. Facilitating strong communication, cooperation, trust, and cohesion can be challenging for leaders.

The Commission emphasizes education as part of the recommendation pertaining to diversity leadership. Developing leaders to lead diverse groups effectively goes beyond training them to understand diversity: It requires educating them about the

---

[1]  These elements are in play because the fundamental mechanism through which diversity affects capability is social identity and social categorization (see, for example, Jackson et al., 2003; Tsui & Gutek, 1999; and Tsui et al., 1992). People attach meaning to their memberships in identity groups, such as demographic or occupational groups, and these identity groups then shape behaviors and perceptions in different settings (see, for example, Mor Barak et al., 1998).

dynamics that diversity creates in workgroups and then training them in practices that can neutralize the negative dynamics and maximize their positive potential.

### Diversity Leadership Education and Training Are Not the Same as Diversity Training

A training assessment performed by the Defense Equal Opportunity Management Institute, Directorate of Research (2008), found that diversity training within each Service addresses respect for demographic differences. Current diversity training does not, however, teach leaders to utilize differences to improve mission effectiveness. Briefings from DoD and Service representatives to the Commission indicate that the Services are generally not instilling these practices in their leadership paradigms and that they are not teaching them. However, Service representatives indicated that each Service does teach practices that can be effective for leading both diverse and homogeneous teams.

The Commission stresses that diversity leadership training must be offered *at all levels* because it is leaders who are in direct contact with the workgroups that can make a difference in capability. The key term here is *workgroup* because it is in these groups that day-to-day interactions among different people take place. In other words, the Commission views diversity leadership practices as the things that all leaders do every day, not what others (e.g., EO advisors, diversity officers) may do on their behalf.

## DoD and the Services Need a Framework for Implementation and Assessment of Leader Development

The Commission, which found no DoD or Service syllabus that addresses diversity leadership, believes it is important to ensure that DoD develop an overall framework within which the Services can develop their own leadership training.

The Commission acknowledges the large training burden already placed on the Services. As one Commissioner said, "The last thing we want is another training requirement, but we need to shift from an EO to a diversity framework." The framework will both allow the Services to develop their own education and training modules and ensure that they address the same goal: creating a core competency at each level of leadership for leveraging diversity in the service of mission capability. In other words, the Commission is not proposing a new program but rather new modules for the Services to incorporate in their existing leadership programs.

Finally, the Commission recommends that once the curriculum, content, and methods are developed and implemented, they be evaluated. The Commission found no indication that the Services have thus far evaluated the effectiveness of either their leadership training or their diversity training. It did, however, hear about research showing that much of corporate sector diversity training is not effective for achieving the corporate goal of greater racial/ethnic minority and female representation in senior leadership positions (Dobbin, 2010; Kalev et al., 2006). Thus, evaluation is a serious concern and must be addressed in order for diversity leadership to become a true core competency.

FROM REPRESENTATION TO INCLUSION: DIVERSITY LEADERSHIP FOR THE 21ST-CENTURY MILITARY

## Leadership Must Be Personally Committed to Diversity

*Recommendation 3—*

**The leadership of DoD and the Services must personally commit to making diversity an institutional priority.**

Successful change in an organization depends on committed leadership. This is as true for the Services as for nonmilitary organizations. The Commission reviewed statements by chief executive officers (CEOs) and diversity professionals from a number of leading corporations and also examined statements by military leaders already committed to developing diversity. Time and again, it was stressed in documents and presentations that *leadership must personally and visibly lead a diversity effort in order to bring about meaningful and lasting change.*

Organizational change is a top-down process, and creating a powerful coalition of leaders to manage and maintain the change process is a critical component of success. Persons in top leadership positions are the ultimate drivers of change because they have both the authority to initiate new methods of operation and the final responsibility for ensuring the methods' success. The leaders responsible for driving a diversity paradigm shift throughout DoD and the Services include the President of the United States, the Secretary of Defense, members of Congress, and leaders from each of the Services. Each of these leaders must authorize change and oversee the success of military diversity management programs and initiatives. Together, active top leaders can develop, implement, and maintain change by constantly reinforcing one another (see Issue Paper #21).

It is important to remember how critical strong leadership is to servicemembers' performance and morale. When change comes into view, there can be strong resistance. Changes that address people's racial/ethnic, religious, and other differences can prove to be especially challenging because these topics can be emotionally charged for many people.

A model of diversity leadership from the top is Admiral Gary Roughead, the current Chief of Naval Operations (CNO). Alone among the Service Chiefs, Admiral Roughead, in his diversity policy statement,

> The first and most effective thing in any organization's desire to manage diversity is clear-cut support from the senior leader.
>
> —Luke Visconti, remarks to the Commission, 2010

> Senior leadership commitment in both word and action was the most commonly cited key to success mentioned in the Task Group's best-practices interviews. Interviewees were adamant that the Chief Executive Officer's (CEO's) leadership must be visible to the whole organization, that it must be plain-spoken, clear, convincing, frequent and supported by action. The CEO must incorporate this commitment into the corporate strategy, culture and values.
>
> —Defense Business Board Task Group on Increasing Diversity in DoD's Flag and Senior Executive Ranks, 2004

> Part of getting there . . . is if your senior leadership declares [diversity] as key to its success and the key leaders—the top leaders—are actively, not passively, but actively managing the process.
>
> —Michael Montelongo, remarks to the Commission, 2010

states clearly and unequivocally that he will lead diversity initiatives: "As the Chief of Naval Operations, I will lead diversity initiatives in the Navy. I challenge all who serve to do the same through leadership, mentorship, service, and example" (Chief of Naval Operations, 2008). He and his predecessor as CNO, the current Chairman of the Joint Chiefs of Staff, Admiral Mike Mullen, spoke to the Commission movingly and personally of their commitment to diversity (see Mullen, 2009, and Roughead, 2010).

## Diversity Needs to Become an Integral Part of DoD Culture

*Recommendation 4—*

*DoD and the Services should inculcate into their organizational cultures a broader understanding of the various types of diversity by*

- *a. Making respect for diversity a core value.*
- *b. Identifying and rewarding the skills needed to meet the operational challenges of the 21st century.*
- *c. Using strategic communications plans to communicate their diversity vision and values.*

Deep changes, like those called for in the Commission's recommendations, cannot be instituted with the push of a button. If DoD is to institutionalize the new definition of diversity so that all servicemembers understand its meaning and importance and act accordingly, leading diversity to enhance mission effectiveness must become inherent in military culture.

All personnel must be aligned with diversity objectives in order to truly reap the benefits of diversity. Making diversity and diversity leadership top priorities may call for individuals to step beyond their comfort zones from time to time. For example, if a leader is faced with a choice between two very different individuals of equal qualifications, he or she must be ready to choose the person who best enhances the effectiveness of the work unit, knowing that diversity has the potential to improve the work of that unit. This "difference" could relate to race/ethnicity, gender, or religion, but it could also relate to educational background, specialty, or international experience. Although this is one example of a decision, it is important to remember that increasing the diversity of DoD and each Service requires thousands of decision-makers in similar situations to go beyond the comfort and familiarity of old ways of thinking.

To inform its recommendation for effectively introducing and implementing the new understanding of diversity throughout DoD, the Commission reviewed management literature and found that the leaders who were most effective in undertaking fundamental change followed some variation of the model presented in Figure 3.1 (see Issue Paper #21). Leaders understand that, to last, change must be introduced by "unfreezing" old attitudes and behaviors, implemented through forward movement, and then sustained by "refreezing" new behaviors and attitudes.

**Figure 3.1. Best Practices for Managing Change**

| Phase One<br>Unfreezing | Phase Two<br>Movement | Phase Three<br>Refreezing |
|---|---|---|
| **Step 1: Create a Sense of Urgency**<br>It is important to demonstrate how an issue affects everyone in an organization and why the situation should be changed so that everyone sees the need for change.<br><br>**Step 2: Construct a Guiding Coalition**<br>A collaborative coalition of leaders should be established to serve as decision-makers who will plan and monitor the change process.<br><br>**Step 3: Create a Vision**<br>A vision energizes action toward the future state of the organization. Leaders should create an inspirational and clear vision that applies to all individuals in the organization.<br><br>**Step 4: Communicate the Vision**<br>A well-organized communication plan is vital to success. To disseminate the vision to all members of the organization, various forms of communication should be used. Messages should be memorable to all members. | **Step 5: Remove Psychological Obstacles**<br>Symbols of the new vision and subsequent polices and programs should immediately replace the old ones to remind the workforce of the promising future and to empower each member to move forward.<br><br>**Step 6: Create Short-Term Wins**<br>Short-term wins must be carefully constructed to be achievable and to represent steps in the right direction. Leadership needs to consider multiple avenues for guaranteed short-term wins. Short-term wins should be thought out carefully because, if they fail, they can provide fodder for those resistant to change. | **Step 7: Refrain from Declaring Victory Too Soon**<br>Implementing change takes time, and it is vital that the support for change continue so that the desired change and behaviors become inculcated into the culture of the organization. It is helpful to periodically evaluate the change initiative to determine areas for improvement and to assess the effects of change. By evaluating the actual change process and member reactions to the initiative, leaders can improve the process, manage resistance, and identify areas that need attention.<br><br>**Step 8: Anchor Change**<br>Once the change is embraced, leaders are responsible for maintaining the results. Leaders should adopt the notion that instituting change is a constant process: Old habits can easily reemerge if desired behaviors are not reinforced through an accountability system. Leaders can anchor change by constant and consistent mentorship and by communicating the vision. |

The eight steps presented in Figure 3.1 may help leadership institute the changes necessary to inculcate diversity into Service cultures while, at the same time, reducing resistance to those changes. Notably, this is not a quick-fix method; rather, it is a continuous process to improve the staying power of new programs and policies by developing servicemember commitment through planning and communication from the top down. It is critical that each leader subscribe to the same clear vision of diversity because these leaders will be communicating the vision to all of the organization's members. It is also important that the vision of diversity include the entire workforce. Leadership should express why the future state is better than the current state, explain how DoD and the Services will arrive at the future state, and inspire all members to reach new goals.

To carry out this recommendation, the Commission recommends three key strategies.

## All Members of DoD and the Services Must Understand Respect for Diversity as a Core Military Value

Core values are unchanging foundational principles that guide how people in an organization conduct their everyday business. An organization's core values do not require external justification. They are the internal structure that informs the way members interact with one another, and they guide the strategies that the organization employs to fulfill its mission. Ultimately, core values motivate how the organization works and give a shared identity to the people belonging to it.

In 1969, DoD issued the first DoD Human Goals Charter,[2] which explicitly and publicly recognized respect for diversity as a value integral to the DoD identity (U.S. General Accounting Office, 1995). From 1969 through 1998, evolving versions of the charter were signed by every incoming Secretary of Defense and by the leadership of the military departments and Services.[3] Excerpts of the 1998 Human Goals Charter, which is reprinted in full in Figure 3.2, follow:

> In all that we do, we must show respect for the serviceman, the servicewoman, the civilian employee, and family members, recognizing their individual needs, aspirations, and capabilities. . . . We [must] strive: . . .
>
> TO provide opportunity for everyone, military and civilian, to rise to as high a level of responsibility as possible, dependent only on individual talent and diligence;

---

[2]   The charter was ahead of its time in making the following statement of goals for the civilian workforce: "TO provide equity in civilian employment regardless of race, color, sex, religion, national origin, disability, age, or sexual orientation, and to provide an environment that is accessible to and usable by all."

[3]   DoDD 1440.1, *The DoD Civilian Equal Employment Opportunity (EEO) Program*, mandates that DoD "prepare a new DoD Human Goals Charter each time a new Secretary of Defense is appointed" (U.S. Department of Defense, 1987). However, the last charter was signed in 1998 by then–Secretary of Defense William Cohen. The charter was not renewed by the George W. Bush administration and, as of January 2011, had not been renewed by the Obama administration.

**Figure 3.2. The 1998 DoD Human Goals Charter**



# Department of Defense
# HUMAN GOALS

OUR Nation was founded on the principle that the individual has infinite dignity and worth. The Department of Defense, which exists to keep the Nation secure and at peace, must always be guided by this principle. In all that we do, we must show respect for the serviceman, the servicewoman, the civilian employee, and family members, recognizing their individual needs, aspirations, and capabilities.

THE defense of the Nation requires a well-trained volunteer force, military and civilian, regular and reserve. To provide such a force, we must increase the attractiveness of a career in the Department of Defense so that service members and civilian employees will feel the highest pride in themselves, their work, their organization, and their profession.

## THE ATTAINMENT OF THESE GOALS REQUIRES THAT WE STRIVE

TO attract to the Department of Defense people with ability, dedication, and capacity for growth;

TO provide opportunity for everyone, military and civilian, to rise to as high a level of responsibility as possible, dependent only on individual talent and diligence;

TO assure that equal opportunity programs are an integral part of readiness;

TO make military service in the Department of Defense a model of equal opportunity for all regardless of race, color, sex, religion, or national origin;

TO provide equity in civilian employment regardless of race, color, sex, religion, national origin, disability, age, or sexual orientation, and to provide an environment that is accessible to and usable by all;

TO hold those who do business with or receive assistance from the Department to full compliance with its equal opportunity policies;

TO help each service member in leaving the service to readjust to civilian life;

TO create an environment that values diversity and fosters mutual respect and cooperation among all persons; and

TO contribute to the improvement of our society, including its disadvantaged members, by greater utilization of our human and physical resources while maintaining full effectiveness in the performance of our primary mission.

_Chief of Staff, U.S. Army_

_Chief of Naval Operations_

_Chief of Staff, U.S. Air Force_

_Commandant, US. Marine Corps_

_Secretary of the Army_

_Secretary of the Navy_

_Secretary of the Air Force_

_Secretary of Defense_

_Deputy Secretary of Defense_

_Chairman, Joint Chiefs of Staff_

_Director, Administration and Management_

July 24, 1998

28

TO assure that equal opportunity programs are an integral part of readiness;

TO make military service in the Department of Defense a model of equal opportunity for all regardless of race, color, sex, religion or national origin; . . .

TO create an environment that values diversity and fosters mutual respect and cooperation among all persons[.]

A process was followed that helped the charter became part of DoD's culture. The Honorable Claiborne Haughton, Jr., recalled the procedure when he addressed the Commission at its March 2010 meeting:

[The charter] must go out to all of the major elements of the Department of Defense and be coordinated and get their concurrence. . . . [T]he signatories are the Secretary of Defense, Deputy Secretary of Defense, and the secretaries of the Army, Navy and Air Force, the Chairman of the Joint Chiefs of Staff, the Service Chiefs, and the DoD general counsel. Those are all the top leaders . . . and they must sign on to that charter before we can present it to the Secretary of Defense for signature, and so it is done that way each time that the new charter has been prepared and issued. And the wonderful thing about it is then we are authorized to make . . . a huge Styrofoam copy or a printed copy, a small copy, and you send them all over, and so when you walk into federal agencies you will see where they have maybe a picture of the President or the agency chief on the wall when you first walk in, well then, most of the DoD [offices] back in that period, they would get the charter. It's [in the] EEO office and the commander's office, different places like that, so they are clear that this is the policy and practice of the Department of Defense, and what I really love about it is it allows new political executives and new military leaders . . . to get a briefing on why should they sign that charter. They are briefed on what it is. They know what they are signing up to and they get a clear statement of the vision upfront. (Haughton, 2010)

However, the charter has not been renewed since 1998. The Commission believes that renewing the charter is an important statement for leadership to make. Of course, much more action will be required than simply reissuing the charter. For change to take root, appreciation and respect for diversity need to become an integral part of what it means to be a U.S. servicemember, and a strategic approach is required. Exposure to core values begins with recruitment, is forged during boot camp and officer induction training, and reinforced throughout a career, both in professional military education and in the unit. The Services must take this new core value on board and inculcate it into each of their cultures throughout the servicemember life cycle.

### Skills Critical to 21st-Century Mission Success Need to Be Identified and Rewarded

Military operations are changing, and the mix of skills required of the Armed Forces is also in flux. The Commission believes that future leadership in the officer corps will require a wider range of competencies to be effective in the future operational environment. This assumption is supported by changes that have already occurred since the attacks of September 11, 2001, and by forecasts of needed competencies made in such reports as the *Quadrennial Defense Review Report*. The Commission's research found that 21st-century military leaders will need

- the ability to work collaboratively in interagency environments, with different governments, and in nation-building activities
- keen decision-making skills, since leaders will need to address complex and uncertain emergent threats in 21st-century operational environments
- additional knowledge of foreign languages, regional expertise, and cultural skills
- technological skills, since U.S. military and civilian cyber systems are becoming more complex to defend and utilize.[4]

The Commission recognizes that DoD must also contend with its longstanding concerns that the Armed Forces may not possess enough people with the skills necessary for stability operations. Foreign-area officers, enlisted regional specialists, civil affairs personnel, military police, engineers, and psychological operations personnel are all professionals whose skills are needed for military success and who yet may be insufficiently represented in the personnel pipeline and sparsely represented among senior leadership.

Many needed skills may best be acquired through incorporating reservists, civilians, and contractors more closely into the total force. As demonstrated by the crucial role played by the National Guard and Reserve in the wars in Iraq and Afghanistan, DoD is already addressing structural diversity through its work in total force integration. The total force can provide skills that are in high demand but in short supply in the Active Component. Computer skills, language proficiency, civil affairs knowledge, and other relevant expertise are likely available in the civilian skill sets possessed by reservists. Efforts are also ongoing to incorporate government employees from a range of agencies into overseas operations.

To attract and retain the range of talent they need, the Services may need to broaden their conception of who belongs in the military and what it takes to be a member of the Armed Forces. Instead of total reliance on "growing their own," the Services may want to explore lateral entry, bringing into active duty older people who already possess the experience and expertise that would be difficult, costly, and time-consuming to create from scratch. A wider range of requirements will call for more types of people. For example, can the operator of a remotely piloted vehicle do his or

---

4   See, for example, U.S. Department of Defense, 2010.

her job from a wheelchair? To compete with the private sector, does the military need to adapt to the ethos of the "computer nerd"?

A broader range of expertise is needed not just at the deckplate but also in the wardroom and at the highest levels of the military hierarchy. The current composition of senior leadership is heavily weighted toward tactical/operational occupations (i.e., warfare specialties). Officers in these specialties, such as infantry (Army and Marine Corps), fighter pilot (Air Force and Navy), and surface warfare (Navy), have been recognized and rewarded because they possess the historical core competencies of their Services. An impartial observer may wonder, however, whether the skills that are valued match up with the competencies currently in highest demand. This is not merely a matter of providing opportunities to traditionally undervalued specialties. It becomes mission critical if needed expertise is not present at councils of war or at meetings of 4-star leaders—the venues in which the Services make decisions about their strategic direction.

The bottom line is that changing operational requirements requires new expertise to be sought out, developed, and integrated into both the workforce and the leadership. How do the Services implement this recommendation? How do they indicate that they value important new skills? At the June 2010 Commission meeting, Admiral Roughead recommended looking at promotion board precepts (the guidance provided to promotion boards). He indicated that he has revised the Navy's precepts to reflect changing needs, with visible results in the mix of skill sets among its 1-star officers. He suggested that the way to shape the force for tomorrow is to change the precepts today (Roughead, 2010).

## Use Strategic Communications Plans to Communicate Diversity Vision and Values

Leaders need to recognize that some servicemembers may react negatively if they feel that diversity management initiatives and programs are basically a repackaging of EO initiatives that will benefit some and not others. Other servicemembers may simply think things are fine the way they are and wonder why there is a need for the changes that a paradigm shift will undoubtedly elicit. Most troubling, research shows that, if it is not managed effectively, diversity—whether defined in traditional demographic terms or more broadly—can actually *reduce* workforce capability (Thompson & Gooler, 1996; Tsui & Gutek, 1999). This failure occurs most frequently because of decreased communication, the increased conflict that can result when some people are (or feel) excluded, or both. Thus, it is the leaders' responsibility to communicate the new vision and values and why they matter.

One of the first steps toward establishing the new diversity paradigm as part and parcel of DoD culture is to plan and execute a high-profile communication effort explaining the values and vision behind these policies. The change management literature suggests that successful introduction and maintenance of a new institutional culture requires multiple, interconnected exposures to core values (see Issue Paper #21). Any one such communicative effort—a poster, a briefing, a leader's orders—alone is

unlikely to have much effect. A thoughtful communications plan that ensures delivery of consistent messages from leaders at all levels is vital for successful cultural change.

The communications plan should have consistent internal and external components that explain the importance to the Armed Forces of diversity, inclusion, and diversity leadership. All communications engendered under the plan should explicitly address how diversity is critical to military success. Finally, the individual servicemember should be able to understand the expectations and implications of the new vision for his or her behavior.

## Congress Needs to Take Action to Ensure Sustained Progress in Diversity

*Recommendation 5—*

*Congress should revise Title 10, Section 113, to*

- *a. Require the Office of the Secretary of Defense to develop a standard set of strategic metrics and benchmarks to track progress toward the goal of having a dynamic and sustainable 20–30-year pipeline that yields (1) an officer and enlisted corps that reflects the eligible U.S. population across all Service communities and ranks and (2) a military force that is able to prevail in its wars, prevent and deter conflict, defeat adversaries and succeed in a wide range of contingencies, and preserve and enhance the all-volunteer force.*

- *b. Add diversity annual reports to the list of topics on which the Secretary of Defense reports to Congress and the President. Similar provisions should be added to Title 14 for Coast Guard reporting and to Title 32 for National Guard reporting.*

- *c. Require the Secretary of Defense to meet at least annually with Service Secretaries, Service Chiefs, and senior enlisted leaders to drive progress toward diversity management goals.*

Commitment to change is expressed fully by national leaders when new goals and values are made into law. Title 10, Section 113, requires that the Secretary of Defense report to Congress annually on a number of important topics concerning the operations and activities of DoD. These reports include information on the work, accomplishments, expenditures, and savings of the Armed Forces; the justification for projected military missions and force structure; and an account of the military and civilian personnel assigned to support positions in the past five fiscal years (FYs). The Commission found that the law does not require any reports that could help drive diversity management initiatives further across DoD. Many of the Services are performing assessments and reporting internally on diversity, but these efforts are focused on demographic diversity only and are not sufficiently consistent in terms of what they measure or how they measure it to allow for DoD-wide assessments.

The Commission wishes to stress that producing a 400-page report that presents undigested diversity-related data is *not* the intention of this recommendation. Any

report elicited by new diversity initiatives must ultimately drive improvement. Thus, reporting should focus on a key set of strategic metrics linked to the end state and include analysis and action items.

The Commission proposes the three key changes to reporting requirements.

### The Office of the Secretary of Defense Should Develop a Standard Set of Strategic Metrics and Benchmarks

The Commission recommends that Congress direct OSD to develop meaningful metrics that are clearly tied to its diversity goals. These metrics, focused at the strategic level, will not only give Congress and the President the ability to track DoD's progress: They will also improve the Secretary of Defense's understanding of where DoD and the Services stand in achieving their goals.

Diversity managers of major companies stressed to the Commission that strategic metrics must be driven from the top—the CEO level—and that there must be an accountability structure supporting the metrics. Simply put, collecting data without an idea of how to use them will not result in improvement. To drive improvement, the data must be linked to organizational goals, be demanded by leadership, and form the basis of an accountability structure.

The Commission found that the Services are at various stages in their work on diversity and have taken a variety of approaches. Although many of the Services are doing substantial work in this area, the work is primarily personality driven and is not institutionalized.[5] By developing DoD-wide metrics, OSD will facilitate the Services' work with their respective diversity initiatives and align each Service with DoD-wide goals. (Chapter Eleven's discussion of Recommendation 16 covers metrics in more detail as part of policy development and enforcement.)

The metrics and benchmarks that the Commission is calling for are those that support the understanding that the new diversity paradigm is a response both to U.S. demographic shifts and to the challenging mission environment. These metrics and benchmarks should be designed in a way that enables the Secretary of Defense to track progress toward the goal of having a dynamic and sustainable 20–30-year pipeline of individuals who represent the U.S. population and who have the diverse backgrounds and skills needed to face the challenges of the coming years.

### Assessment Should Result in Service and National Guard Annual Reports to Congress and the President, Authorized by Corresponding Laws

Reporting is one of the most powerful methods of communication available to the President, Congress, and military leadership needing to oversee and review the imple-

---

[5]   See, for example, the difference between the perspectives of CNO Admiral Roughead on the one hand and former Commandant of the Marine Corps General James T. Conway on the other (see Conway, 2010, and Roughead, 2010). These different personal perspectives translated into major policy and practice differences between the Navy and the Marine Corps. When questioned about why the Navy had a string of three CNOs who were out front on demographic diversity, Admiral Roughead (2010) said it was because one CNO had influence over who was picked to be the next CNO.

mentation of DoD policy. DoD- and Service-wide performance reports can ensure that the right information is put into the hands of the right decision-makers at the right time.

As previously stated, the Commission recommends that Congress revise Title 10, Section 113, to require that the Secretary of Defense report annually on progress toward diversity goals. It follows that similar provisions be made in Title 14, for the Coast Guard (which is part of DHS, not DoD), and in Title 32, for the National Guard.

As codified in Title 10, the President is the Commander in Chief of the Armed Forces of the United States, including the National Guard and Reserve when called to active duty. However, most of the time, the National Guard is not on active duty and, therefore, not under federal control.

Title 32 assigns command of State National Guard units to the Governor of the State; each Governor is the commander in chief of his or her State National Guard when it is not under federal control.[6] As commanders in chief, the Governors select the Adjutant Generals for their States.

The Commission recommends that Congress include the National Guard in its reporting requirements. This would mean revising Title 32 in a way that would require the National Guard Bureau to report annually to Congress and DoD on the status of progress toward its diversity management goals. This should include, but not be limited to, reporting on the extent to which each State's National Guard, including its leadership, is representative of that State's general population, relevant labor pool, and eligible population. The report should cover all ranks of the Army and Air National Guard in each State, territory, and the District of Columbia. Requiring these reports will ensure a persistent focus on diversity issues and place accountability at the State level.

### Regular Meetings Between the Secretary of Defense, Service Secretaries, Service Chiefs, and Senior Enlisted Leaders Should Be Held to Drive Progress

Like reports, meetings can drive collective progress toward goals. The Commission recommends that Congress require that the Secretary of Defense hold an annual meeting with the leadership of each of the Services. These meetings are an opportunity for the Secretary of Defense to monitor the state of diversity in each of the Services. The meetings could focus on and revisit diversity management goals by going over key strategic metrics, analyses of the root causes of potential concerns, and potential action items for improvement. (Additional information and ideas related to these meetings are provided in the discussion of Recommendation 17.)

## Conclusion

The Commission believes that developing diversity leadership skills, establishing diversity as a military core value, and reporting on new key milestones throughout DoD and the Services will firmly communicate that the leadership's commitment to diversity is

---

[6] The President is the Commander in Chief of the District of Columbia National Guard.

absolute. The recommendations presented in this report are founded on military and private sector best practices and are the foundation for the way forward in an era of mission uncertainty.

# SECTION III:
# DEVELOPING FUTURE LEADERS

CHAPTER FOUR

# THE DEMOGRAPHIC COMPOSITION OF TODAY'S MILITARY LEADERSHIP

Current and former military leaders have long argued that developing and maintaining qualified and demographically diverse leadership is critical for mission effectiveness (Becton et al., 2003; Lim et al., 2008). Specifically, they argue that the military should mirror the demographic composition of the population it serves and that senior leaders should mirror the demographic composition of the troops they lead. The chapters in this section (Chapters Four through Ten) present an analysis of how specific barriers at each stage of the military personnel life cycle influence the diversity of military leaders, and they provide recommendations designed to address these barriers and increase diversity at each of these stages.

Although the Commission's definition of diversity states that "diversity is all the different characteristics and attributes of individuals," the chapters in this section focus primarily on increasing racial/ethnic and gender representation within military leadership. The focus on racial/ethnic and gender representation is due to the fact that the MLDC charter specifically focuses on having the Commission evaluate "policies that provide opportunities for the promotion and advancement of minority members of the Armed Forces." In addition, these categories represent historically and socially relevant groups and are more easily measured than other, unobservable individual attributes (Cox, 1994). The importance of increasing racial/ethnic and gender representation within the military has also been a specific priority of senior military leaders and is argued to be critical to mission effectiveness (see Lim et al., 2008). Where appropriate, the Commission also makes recommendations for improving the representation of broader dimensions of diversity, such as structural, language, and cultural diversity.

This chapter offers an overview of the demographic composition of current military leadership. It documents that *military officers today are less demographically diverse than both the enlisted troops they lead and the broader civilian population they serve*. It concludes with the anatomy of the life cycle of a military career.

Chapters Five through Nine are organized around the stages of the military personnel life cycle, each of which promotes or impedes career advancement. Unlike other private and public organizations, the military operates as a closed personnel system. Senior leaders cannot be brought in from the outside but are instead brought up through the lower ranks. Therefore, each stage of the military personnel life cycle—from who is recruited to who is promoted—is intricately linked to the composition of future military leaders. By examining the policies and practices at each stage of the life cycle, the Commission was able to identify both barriers to advancement and potential

policy levers for reducing those barriers for members of underrepresented demographic groups. Chapter Ten makes recommendations for promoting aspects of diversity that go beyond race/ethnicity and gender.

## Current Military Leadership Still Lags in Terms of Demographic Representation

Overall, the data show that the demographic composition of the officer corps is far from representative of the American population and that officers are much less demographically diverse than the enlisted troops they lead. With some exceptions, racial/ethnic minorities and women are also underrepresented among senior noncommissioned officers and flag/general officers compared with their representation in the ranks below.

The following sections draw on a common dataset provided by the Defense Manpower Data Center (DMDC) to make descriptive comparisons among all five Services. They offer demographic snapshots of military leadership for both the Active Component (AC) and Reserve Component (RC) in September 2008.

### The Officer Corps

Figure 4.1 shows that, relative to the enlisted forces, non-Hispanic blacks, Hispanics, and non-Hispanic others (i.e., American Indians, Alaska natives, and those of more than one race) were underrepresented among officers in both the AC and RC.[1] Only AC non-Hispanic Asian/Pacific Islander officers had representational parity compared with the enlisted force. Compared with the enlisted force, women were roughly equally represented or slightly overrepresented among the officer corps. Finally, compared with the U.S. population as a whole, both racial/ethnic minorities and women were underrepresented to various degrees in the officer corps.

### Senior Noncommissioned Officers and Flag/General Officers

Racial/ethnic minorities were also largely underrepresented among senior noncommissioned officers and flag/general officers in most of the Services compared with their representation in the ranks below. Figure 4.2 shows that, compared with their representation in ranks E-1 through E-6, among senior noncommissioned officers, racial/ethnic minorities were underrepresented in the AC of the Air Force, the Coast Guard, and the Navy and overrepresented in the Army and the Marine Corps. In the RC,

---

[1]   These figures are intended to be descriptive in nature. In making comparisons across groups, we calculated representation indexes in which each representation index is equal to the ratio of the reference group's share of the population to its share of the population in the comparison group (e.g., the ratio of the share of officers to the share of enlisted personnel). Values greater than one indicate overrepresentation, values less than one indicate underrepresentation, and values equal to one indicate representational parity. As a rule of thumb, we identified a group as being over or underrepresented based on whether there was at least a ± 0.10 difference from 1.0. Only the conclusions based on these representation indexes, and not the indexes themselves, are presented in this chapter.

**Figure 4.1. Racial/Ethnic Minority and Female Shares of Officers and Enlisted Personnel, by Component, September 2008**



SOURCES: Defense Manpower Data Center, 2009; U.S. Census Bureau, 2008.

**Figure 4.2. Racial/Ethnic Minority Shares of Enlisted Personnel, by Service and Rank, September 2008**



SOURCE: Defense Manpower Data Center, 2009.

compared with ranks E-1 through E-6, racial/ethnic minorities were underrepresented in all Services except the Army and the Marine Corps Reserves.

Figure 4.3 shows that, compared with their representation in ranks E-1 through E-6, women were also underrepresented among senior noncommissioned officers across almost all the Services and in both the AC and RC. The only exception to this pattern was in the Marine Corps Reserves, where women in ranks E-1 through E-6 had approximate representational parity with noncommissioned officers. However, women in the Marine Corps Reserves constituted less than 5 percent of all enlisted Marine Corps Reserve personnel—the lowest share across all the Services.

Figure 4.4 shows that, compared with their representation among officers of ranks O-1 through O-6, racial/ethnic minorities were underrepresented among flag/general officers across all Services in both the AC and RC. However, it should be noted that, because the number of these officers was small, any change in the demographic composition could have significantly affected the percentages.

Figure 4.5 shows that, compared with their representation among officers of ranks O-1 through O-6, women were also underrepresented among flag/general officers across almost all Services in both the AC and RC. The only exceptions to the general pattern were the Marine Corps and Navy RCs, where women actually constituted a greater percentage of the flag/general officer population compared with their presence in ranks O-1 through O-6.[2]

**Figure 4.3. Female Shares of Enlisted Personnel, by Service and Rank, September 2008**



SOURCE: Defense Manpower Data Center, 2009.

---

[2]  It must be noted, however, that the *number* of female flag officers in the Marine Corps Reserve was one.

THE DEMOGRAPHIC COMPOSITION OF TODAY'S MILITARY LEADERSHIP

**Figure 4.4. Racial/Ethnic Minority Shares of Officers, by Service and Grade, September 2008**



SOURCE: Defense Manpower Data Center, 2009.

**Figure 4.5. Female Shares of Officers, by Service and Grade, September 2008**

SOURCE: Defense Manpower Data Center, 2009.

## Summary

These data show that, as of September 2008, officers were generally less demographically diverse than both the enlisted troops they led and the civilian population they served. In addition, compared with their representation in the ranks below, racial/ethnic minorities and women were underrepresented among senior noncommissioned officers across several Services in both the AC and RC. Finally, women (with the exceptions noted above) and racial/ethnic minorities were underrepresented among flag/general officers in both the AC and RC.

Given the desire to develop and maintain a military leadership that is demographically representative of the American public, it follows that military leadership should also represent the servicemembers it is entrusted to lead. Leaders from racial/ethnic and cultural backgrounds similar to those of the U.S. citizenry have the potential to inspire future servicemembers and engender trust among the population. Demographic similarities between the enlisted corps and its leaders can equally inspire and facilitate greater confidence. Also, given the fact that American demography is rapidly changing, it is important to design future polices that will shape personnel trends in desired ways. Advancing understanding of how the military personnel life cycle both promotes and impedes members of underrepresented demographic groups from achieving leadership positions is a critical first step.

## Stages of the Military Personnel Life Cycle

As previously explained, unlike other private and public organizations, the military operates as a closed personnel system. Senior leaders cannot be brought in from the outside but are instead brought up through the ranks. Therefore, each stage of the military personnel life cycle—from who is recruited to who is promoted—is intricately linked to the composition of future military leaders. Figure 4.6 provides an overview of the key stages of the military personnel life cycle and illustrates how the demographic composition of military leadership is shaped by the cumulative effects of barriers at each stage.

As Figure 4.6 shows, the demographic diversity of future military leaders is first shaped by who is eligible to serve and by the ability of outreach and recruiting strategies to attract members from all demographic groups. Following this, career field and assignment decisions, which are shaped by both policy and individual preferences, influence the overall demographic composition within each career field and within key assignments. The career fields and assignments held by servicemembers then play a role in overall career progression and in the resulting demographic composition of those who advance to higher ranks. In the military, however, career progression is a function of both retention and promotion. That is, potential differences in who chooses to remain in and who chooses to separate from the military influence the composition of the available promotion pool. Together, these stages of the military personnel life cycle—and the resulting demographic composition at each stage—determine the final demographic diversity of senior leaders.



**Figure 4.6. All Stages of the Military Personnel Life Cycle Affect the Demographic Composition of Military Leadership**

At any stage of the personnel life cycle, a number of barriers may arise to impede career progression to higher ranks. These barriers are both structural and perceptual. Structural barriers are "prerequisites or requirements that exclude minorities [and women] to a relatively greater extent than non-Hispanic whites [and men]" and are "inherent in the policies and procedures of the institution" (Kirby et al., 2000). Perceptual barriers are "perceptions, attitudes, or beliefs that lead minorities [and women] to think they cannot or should not pursue . . . a job or career option" (Kirby et al., 2000).

Chapters Five through Nine are organized around each stage of the military personnel life cycle and its associated barriers, as illustrated in Figure 4.6:

- military eligibility requirements
- outreach and recruiting
- branching and assignments
- promotion
- retention.

Each chapter describes the barriers that characterize that stage of the life cycle and explores their effects on the demographic composition of senior military leaders. Each chapter includes the Commission's recommendations for addressing those barriers and increasing the proportion of demographic minorities that make it to the next stage of the life cycle. Chapter Ten describes barriers and related policy recommendations for promoting other important diversity dimensions, such as language, cultural expertise, and structural diversity brought by the RC. A more in-depth discussion of methods and findings related to a specific stage in the military personnel life cycle can be found in the relevant Commission issue papers and decision papers.

CHAPTER FIVE

# THE ELIGIBLE POOL OF CANDIDATES

The pool of individuals from which the military can recruit is defined by specific eligibility requirements that can present a structural barrier to service. Although the specific eligibility requirements differ across the Services, in general, those who wish to serve must first meet standards related to age, citizenship, number of dependents, financial status, education level, aptitude, substance abuse, language skills, moral conduct, height and weight, physical fitness, and medical qualifications (see Asch et al., 2009).[1] Together, these requirements define the eligible population from which the Services can recruit. Currently, however, a large portion of young people are not eligible to join the military. In fact, statistics released by the Pentagon show that 75 percent of young people ages 17–24 are currently not eligible to enlist (Gilroy, 2009). Furthermore, racial/ethnic minorities and, in some cases, women tend to meet these eligibility requirements at lower rates than whites and men.

Figures 5.1 and 5.2 illustrate the impact of such requirements on the demographic profile of recruits. Figure 5.1 shows how some basic Marine Corps enlisted requirements shaped the profile of the population that was eligible to enlist in 2009. For example, the education requirement (i.e., high school graduation or General Educational Development diploma) and the minimum Armed Forces Qualification Test (AFQT) score requirement reduced the share of non-Hispanic blacks and Hispanics who could enlist, and the weight and body fat requirements decreased the share of women who could enlist.

Similar patterns are seen in the eligible officer population. Besides height, weight, and medical standards, commissioned officers must have U.S. citizenship and a bachelor's degree, and they must complete a commissioning program (i.e., the Reserve Officers' Training Corps [ROTC], Officer Candidate School/Officer Training School [OCS/OTS], or a Service academy), each of which has its own unique standards for admission. Again using Marine Corps requirements as an example, Figure 5.2 shows how the percentage shares of the eligible population for each demographic group in 2009 changed with the successive addition of each requirement. The share of non-Hispanic blacks and Hispanics decreased considerably with the addition of the college degree requirement, and the share of female and "other" representation increased.[2] The

---

[1]   In certain circumstances, some of these eligibility requirements can be waived. Which requirements can be waived (and when) varies by Service.

[2]   The order of the requirements is arbitrary. We could have applied the citizenship requirement before the college-attainment requirement, and it would have shown a "bigger" effect among Hispanics.

FROM REPRESENTATION TO INCLUSION: DIVERSITY LEADERSHIP FOR THE 21ST-CENTURY MILITARY

**Figure 5.1. The Cumulative Effect of Individual Requirements on the Demographic Composition of the Eligible Enlisted Population, Marine Corps, 2009**



SOURCES: Center for Human Research, 2005; Centers for Disease Control and Prevention, 2006; U.S. Census Bureau, 2007.
NOTES: The "other" category includes Asians, American Indians/Alaska natives, Pacific Islanders, and those of unknown/missing race/ethnicity.

**Figure 5.2. The Cumulative Effect of Individual Requirements on the Demographic Composition of the Eligible Officer Population, Marine Corps, 2009**



SOURCES: Centers for Disease Control and Prevention, 2006; U.S. Census Bureau, 2007.
NOTE: The "other" category includes Asians, American Indians/Alaska natives, Pacific Islanders, and those of unknown/missing race/ethnicity.

female share of the eligible population again decreased with the addition of weight and body fat requirements.

Thus, as illustrated above, the requirements to enlist and to become a commissioned officer shape the demographic profile of eligible recruits, with racial/ethnic minorities and, in some cases, women being disqualified at higher rates. Although there are some differences in how the other Services' requirements shape the profiles of their eligible populations, the overall patterns and effects are the same.

These same requirements also dramatically reduce the overall size of the eligible pool of candidates from which the Services can recruit. In addition to decreasing the number of racial/ethnic minorities and women that are eligible, they also decrease the number of white men that are eligible for Service—just at lower rates. This lack of eligibility among today's youth has been identified as a key concern in the recent *Quadrennial Defense Review Report*, which states that,

> in coming years, we will face additional challenges to our ability to attract qualified young men and women into the armed forces. Among them are a large and growing proportion of youth who are ineligible to serve in the military for medical, criminal, ethical, or physical reasons. (U.S. Department of Defense, 2010)

## Stakeholders Should Develop and Engage in Activities to Expand the Pool of Qualified Candidates

*Recommendation 6—*

*The shrinking pool of qualified candidates for service in the Armed Forces is a threat to national security. The stakeholders listed below should develop and engage in activities that will expand the pool of qualified candidates.*

- *a. The President, Congress, and State and local officials should develop, resource, and implement strategies to address current eligibility issues.*

- *b. DoD and DHS (Coast Guard) should*
    - *Create and leverage formal partnerships with other stakeholders.*
    - *Institutionalize and promote citizenship programs for the Services.*
    - *Require the Services to review and validate their eligibility criteria for military service.*

- *c. DoD and the Services should focus on early engagement. They should conduct strategic evaluations of the effectiveness of their current K–12 outreach programs and practices and increase resources and support for those that are found to be effective.*

This recommendation proposes that all stakeholders, and primarily key public officials, develop and engage in activities that will expand the pool of qualified candidates for military service. It is important to note that the intention of this recommendation is not to lower eligibility requirements but instead to involve stakeholders in activities designed to bring the qualifications of today's youth up to par with current

eligibility requirements. The Commission proposes three key strategies for achieving this goal.

## Develop, Resource, and Implement Strategies to Address Current Eligibility Issues

U.S. military readiness, and thus national security, will depend on the ability of the upcoming generation to serve. Therefore, a shrinking pool of eligible individuals poses a critical threat to military readiness. Although addressing this particular national security issue is well outside the control, missions, responsibilities, and resources of DoD and DHS, it is the collective national security responsibility of the President, Congress, and State and local officials. These top officials have the deep understanding and powerful capability to turn the tide on this issue by developing and executing strong, united, action-oriented programs to improve eligibility by crafting, resourcing, and implementing an integrated and sustainable set of strategies. Addressing such goals as high-quality early education and appropriate in-school fitness plans can ensure that more young Americans meet the standards of the U.S. military and that the military will be capable of keeping America strong and safe.

## DoD and DHS (Coast Guard) Should Engage in Several Initiatives

### Create and Leverage Formal Partnerships with Other Stakeholders

It is not part of the DoD or DHS mission to address the educational attainment issues or other problems affecting American youth. However, given the large number of young people who do not qualify for military service, and particularly the large number of racial/ethnic minority youth in this group, DoD and DHS could partner with other federal departments, federal agencies, and State and local agencies whose job it is to address these issues. Therefore, the Commission recommends that DoD and DHS develop or expand current formal partnerships with such entities as the Department of Education, the Department of Health and Human Services, and similar agencies at the State and local levels.

### Institutionalize and Promote Citizenship Programs for the Services

In an effort to further expand the pool of qualified candidates, the Commission recommends institutionalizing and promoting successful citizenship programs. One such program is the Military Accessions Vital to the National Interest (MAVNI) program, which was authorized as a pilot program on November 25, 2008, by the Secretary of Defense.

   Although noncitizens have served in the military throughout history, changes in law have limited their service. According to Title 10, Section 504(b)(1), enlisted personnel must be U.S. citizens, lawful permanent residents of the United States (i.e., green card holders), or citizens of the Federated States of Micronesia, the Republic of the Marshall Islands, or Palau. This requirement disqualifies thousands of otherwise eligible legal noncitizens from service in the U.S. military. However, a provision within this same law allows a Service Secretary to authorize the enlistment of a person, regardless of citizenship status, if the Secretary determines that such enlistment is "vital to the

national interest." This provision is the basis of the MAVNI program and, before the inception of the program, was used only extremely rarely.

Currently, the MAVNI program expands the eligible recruiting market to noncitizens who do not have green cards but are legally present in the United States if they are licensed health care professionals or if they speak at least one of 35 critical foreign languages. This group includes noncitizens with certain student or work visas, refugees, asylees, and individuals with temporary protected status. MAVNI recruits are not only individuals with specialized skills that could greatly benefit the military: They also tend to be among the more highly qualified recruits. Thus, MAVNI represents a viable option for expanding the eligible recruiting pool to highly qualified, legal noncitizens who could greatly increase not only racial/ethnic but also linguistic and cultural diversity throughout the military. The Commission recommends both institutionalizing this pilot program to make it a permanent Service option and increasing the number of slots available for eligible MAVNI candidates. In addition, the Commission recommends both allowing those with other critically needed specialties to access via MAVNI and exploring the possibility of expanding the program to the RC. (Currently, MAVNI permits only those who are health care professionals to serve in the RC.) Finally, although there are many barriers to clearance and citizenship for officers, the Commission also recommends exploring ways to expand MAVNI to precommissioning officer programs, such as ROTC.

### Review and Validate Eligibility Criteria for Military Service

The Commission recommends that DoD and DHS (Coast Guard) require the Services to review and validate their eligibility requirements to ensure that all requirements are mission essential. This recommendation is in no way advocating lowering the entrance standards. Instead, this recommendation is intended to ensure that all of the Service eligibility requirements are necessary and have been validated. In other words, the goal of this recommendation is to ensure that no individual is unnecessarily excluded from service. Furthermore, ensuring that all requirements have been validated or are important predictors of key performance outcomes within each Service will help ensure that the best candidates are selected to join the military. It is important to note that there has already been extensive research done to validate many military requirements, such as the Armed Services Vocational Aptitude Battery (see, for example, Armor & Roll, 1994; McHenry et al., 1990; and Ree & Earles, 1992). Therefore, those requirements that have been validated as strong predictors of key performance-related outcomes should continue to be used by the Services, and those that have not been validated should be examined to determine whether they are good predictors of key performance-related outcomes.

## DoD and the Services Should Focus on Early Engagement

To ensure that there is a large enough pool of qualified and demographically diverse candidates from which to recruit, the Commission believes in focusing on early engagement to help youth become and remain academically successful, physically fit, and successful citizens. It should be added that early engagement programs and initiatives

should not be created with the sole goal of recruiting youth for the military at young ages. Instead, the Commission recommends that there be a renewed focus on good-citizenship programs that provide youth with opportunities for and guidance about achieving more successful futures, regardless of whether they join the military.

The Services already have a variety of outreach programs for youth in kindergarten through grade 12 (K–12). These range from programs designed to help students stay in school to programs focused specifically on introducing youth to science, technology, engineering, and math. However, it does not appear that these programs are consistently evaluated to determine the extent to which they achieve their stated goals. To ensure that the more successful programs are continued or expanded and to identify potential gaps in the curricula of outreach programs, the Commission recommends that DoD and the Services conduct a strategic evaluation of the effectiveness of current outreach programs. At a minimum, the programs should be evaluated to determine the extent to which they improve performance on key eligibility requirements, such as physical fitness, high school graduation rates, and performance on aptitude tests. Following this strategic evaluation, DoD and the Services should focus on increasing resources for programs that have been found to be effective at addressing some of the primary military disqualification factors.

The Commission also recommends increasing funding for the Junior Reserve Officers' Training Corps (JROTC) program, a Service-sponsored program operating within high schools.[3] JROTC is designed to promote good citizenship, leadership, physical fitness, motivation, and teamwork among young people. Participating students are urged to remain drug free and to successfully graduate from high school. The Commission is unaware of any studies examining the effectiveness of JROTC at achieving these outcomes while controlling for self-selection bias. However, the Services report that they track JROTC participants' attendance, high school graduation rates, indiscipline rates, drop-out rates, and grade point averages and compare these outcomes with those of non-JROTC participants. According to the Services, JROTC participants tend to outperform their nonparticipating peers on these outcomes. Based on this evidence, the Commission believes that JROTC appears to provide an important opportunity for outreach to racial/ethnic minorities and is associated with positive outcomes, indicating the potential to expand the pool of qualified youth not only for military service but also for the general workforce.

Finally, it is also important to note that there are nonprofit organizations outside of the Services that provide education and training to familiarize students with military culture, such as the Army Cadet Corps, the Civil Air Patrol Cadet Program, the Young Marines, the Devil Pups (Marine Corps), the Naval Sea Cadet Corps, and the Navy League Cadet Corps. Because these programs are not under the authority and control of the Services, they are not included as part of the Commission's strategic evaluation recommendation. However, the Services may want to both explore whether these programs are effective at producing outcomes desired by the Services and determine whether the Services could provide additional resources to such programs.

---

[3] Detailed information on the JROTC Assessment can be found at ExpectMore.gov, 2006.

CHAPTER SIX

# OUTREACH AND RECRUITING

Given a limited pool of eligible candidates, outreach and recruiting strategies play a critical role in attracting *qualified* youth to military service. Furthermore, because the military operates as a closed personnel system, the demographic diversity of accessions directly influences the potential demographic diversity of future senior leaders. These factors underscore the importance of effective outreach and recruiting strategies within the Services. This chapter describes current outreach and recruiting practices across the Services, reports on the demographic composition of recent accessions, and recommends policies to improve the recruiting of racial/ethnic minorities and women.

## Outreach and Recruiting Programs Used Across the Services

During the Commission's October 2009 meeting, each Service presented a briefing on the outreach and recruiting programs it uses to attract members of currently underrepresented demographic groups. Although each Service has its own unique programs and practices, they often employ similar strategies. For example, the Services described establishing organizational divisions or offices specifically devoted to recruiting members of underrepresented demographic groups. They also conduct targeted advertising, such as creating marketing materials in multiple languages and advertising in college newspapers at Historically Black Colleges and Universities and Minority-Serving Institutions. They use media and entertainment marketing sources directed at demographically diverse audiences, such as Telemundo, Black Entertainment Television, and such racial/ethnic minority–oriented publications as *Jet*, *The Root*, and *The Black Collegian*. They work to establish connections with key community influencers (e.g., leaders, educators, administrators) and affinity groups, including by sending representatives to affinity-group events where high-quality candidates might be found. Such events include annual conferences conducted by the National Society of Black Engineers and the Society for Advancement of Chicanos and Native Americans in Science. Finally, the Services also work to increase their own general visibility through social networking sites and participation in community mentoring programs.

## Outreach and Recruiting Programs Across Officer Commissioning Sources

There are four main commissioning sources for officers (see Thirtle, 2001). These are direct appointments (usually of civilians who serve in occupations—such as law, medicine, and the chaplain corps—requiring advanced education), Service academies (which are four-year-degree–granting institutions), ROTC programs (which students attend

while pursuing their bachelor's degree), and OCS/OTS (which are designed for candidates that already have a bachelor's degree). These programs pursue similar recruiting strategies as those just described, but they also use a few methods and programs that are specific to their institutional needs.

For example, the Service academies report using a number of key strategies to attract high-quality applicants from all demographic groups. These include providing summer seminar programs and candidate-parent weekend visits to promote exposure of their academies and targeting recruiting at high schools that serve a high number of racial/ethnic minority students. They also report making use of academy preparatory schools and other academic-improvement programs designed to increase the eligibility of potential applicants. Finally, the academies reported holding a Service Academy Diversity Conference at which directors and chief diversity officers from the Service academies share knowledge and synchronize efforts.

Like the Service academies, ROTC and OCS/OTS programs use many of the outreach and recruiting methods of the general Services. However, they too have several programs designed specifically to attract, from all demographic backgrounds, high-quality applicants who either have a college degree or have expressed an intent to attend college. These include strategically establishing ROTC programs and academic scholarships at Historically Black Colleges and Universities and Minority-Serving Institutions and maintaining a targeted OCS/OTS recruiting presence at these same universities for students who are ready to graduate.

## Outreach and Recruiting Programs for the National Guard and Reserve

The National Guard and Reserve use many of the same recruiting strategies discussed above and, in fact, participate in some of the same programs used by their active-duty counterparts. However, because of their local nature, many National Guard and Reserve recruiting efforts are focused on their surrounding communities. This is particularly true of the National Guard because it is, in effect, composed of 54 separate State entities that recruit almost exclusively within their States.[1] Moreover, although Reserve units can recruit both nationally and locally, a good portion of Reserve recruiting efforts are also locally focused. This is because Reserve members are not generally reimbursed for the cost of traveling from home to drill site, so Reserve units are much more likely to attract and retain local members.

This means that the National Guard and Reserve have developed unique strategies focused on local communities. These include engaging key community leaders and educators and attending local fairs, sports games, and other community events. This close interaction with communities makes the National Guard and Reserve a particularly effective bridge between the Armed Forces and civilian communities.

---

[1]  Throughout the discussion of the National Guard, *States* includes U.S. territories and the District of Columbia. Note that, although it is not uncommon for individuals from out of state to join a local National Guard unit, State National Guards do not actively recruit outside their States.

## The Demographic Diversity of Recent Accessions

As previously described, the Services use a number of different outreach and recruiting programs targeted toward increasing the demographic diversity of accessions. Unfortunately, there is currently little research on the effectiveness of these individual programs at achieving their specified outcomes or attracting youth to enlist or enroll in precommissioning officer programs. Data on recent enlisted and officer accessions, however, can provide a baseline measure of how well current outreach and recruiting strategies are working to attract qualified candidates from all demographic groups. This section presents an overview of how recent AC enlisted and officer accessions compare with the eligible recruiting pool in terms of demographic representation. Data on recent RC accessions are not included because comparisons with the eligible population would need to be done on a State-by-State basis. In addition, a large percentage of RC enlisted accessions (i.e., 36 percent of Selected Reserve) and a majority of RC officer accessions (i.e., 87 percent of Selected Reserve) are "prior service" accessions who have transferred from the AC.[2] Issues related to helping servicemembers transition from the AC to the RC are addressed elsewhere in this report.

For accession data, the Commission used a common dataset from the Office of the Under Secretary of Defense (Personnel and Readiness) (FY 2002–FY 2008), which provides the data in a report series called *Population Representation in the Military Services*. The accession data presented below are from FY 2007 and FY 2008, which are the most recently published datasets. The eligible recruiting pool benchmark was created using data from the March 2008 Current Population Survey (U.S. Census Bureau, 1973–2008). For enlisted accessions, the eligible recruiting pool was defined as labor force participants (i.e., people who are either employed or actively seeking work) who hold high school degrees (or equivalents) through four years of college (but hold no bachelor's degree) and are between the ages of 18 and 24. For officer accessions, the eligible recruiting pool was defined as labor force participants who hold at least a bachelor's degree and are between the ages of 22 and 34.

### Enlisted Accessions

With the exception of the Navy, which had roughly equal or overrepresentation of every nonwhite race/ethnicity group, each Service had one or more racial/ethnic minority group that was underrepresented compared with its representation in the eligible recruiting pool:

- Hispanics and non-Hispanic Asians were underrepresented in recent Army accessions.
- Non-Hispanic blacks and Asians were underrepresented in recent Marine Corps accessions.

---

2   Based on data from Defense Manpower Data Center, 2010b.

- Hispanics and non-Hispanic Asians were underrepresented in recent Air Force accessions.
- Non-Hispanic blacks and Asians were underrepresented in recent Coast Guard accessions.

Additionally, although women constituted close to 50 percent of the eligible recruiting pool, they were underrepresented in recent enlisted accessions across all Services, constituting between only 7 percent (Marine Corps) and 22 percent (Air Force) of those accessions.[3] Thus, the data show that there were several underrepresented demographic groups in recent enlisted accessions across the Services.

## Officer Accessions

As in the recent enlisted accessions, there was considerable variation across the Services and, in particular, across the commissioning sources in terms of racial/ethnic and gender representation in recent officer accessions. Overall, the data showed that, compared with the eligible recruiting pool, there were in each Service several underrepresented race/ethnicity groups in the various officer commissioning sources:

- Hispanics and non-Hispanic Asians were underrepresented in recent Navy officer accessions.
- Hispanics, non-Hispanic Asians, and non-Hispanic others (American Indians, Pacific Islanders, Alaska natives, and those reporting more than one race) were underrepresented in recent Army officer accessions.
- Hispanics, non-Hispanic blacks, and non-Hispanic Asians were underrepresented in recent Marine Corps officer accessions.
- Hispanics, non-Hispanic blacks, and non-Hispanic Asians were underrepresented in recent Air Force officer accessions. However, the degree of "unknown" racial/ethnic accessions in the data was so large that it calls into question the accuracy of the data and the conclusions for the other groups.
- Hispanics, non-Hispanic blacks, and non-Hispanic Asians were underrepresented in recent Coast Guard officer accessions.

In addition, although women constituted more than 50 percent of the recruiting pool, they were underrepresented across all Services and commissioning sources.

Although the Services are currently engaged in a number of outreach and recruiting efforts, there is little information on the individual effectiveness of these various programs and practices. However, data on recent accessions suggest that, across the Services, racial/ethnic minorities and women are still underrepresented even when compared with only the eligible population. Therefore, if the Services wish to reflect the demographics of the larger population, there needs to be further improvement in the outreach and recruiting efforts targeting members of underrepresented demographic groups.

---

[3] As is discussed in more detail in Chapter Seven, not all occupations are open to women. This may influence accession shares for women.

## Improve Recruiting from the Currently Available Pool of Qualified Candidates

*Recommendation 7—*

*DoD and the Services should engage in activities to improve recruiting from the currently available pool of qualified candidates by*

- *a. Creating, implementing, and evaluating a strategic plan for outreach to, and recruiting from, untapped locations and underrepresented demographic groups.*

- *b. Creating more accountability for recruiting from underrepresented demographic groups.*

- *c. Developing a common application for Service ROTC and academy programs.*

- *d. Closely examining the preparatory school admissions processes and making required changes to ensure that accessions align with the needs of the military.*

## Create, Implement, and Evaluate a Strategic Plan for Outreach and Recruiting from Untapped Locations and Underrepresented Demographic Groups

All of the Services have recruiting strategies—including many promising outreach programs—directed at demographically diverse populations. The Commission would like to see these initiatives continue and be expanded through having the Services evaluate the effectiveness of current spending on minority marketing and recruiting initiatives and then develop a clear strategic plan that will be submitted to DoD and DHS (Coast Guard) for evaluation. The strategic plan should include an examination of untapped recruiting markets of qualified racial/ethnic minorities, such as recruiting at two-year colleges and strategically locating ROTC host units.

### Explore Recruiting at Two-Year Colleges

Recent data suggest that close to 50 percent of all students in college attended two-year colleges, with slightly higher percentages of blacks and Hispanics attending two-year colleges than average (National Center for Education Statistics, 2008). Specifically, close to 60 percent of Hispanics attending college went to two-year colleges, and a little over half of blacks attending college went to two-year colleges. Furthermore, research done for the Navy found that those with two-year college degrees had higher test scores and higher continuation and reenlistment rates than those with only high school degrees (Kraus et al., 2004). Therefore, two-year colleges may represent a rich market for recruiting not only high-quality enlisted recruits but also high-quality Hispanic and black recruits.

Two-year colleges may represent a rich market for ROTC recruits. A candidate must have completed a bachelor's degree before commissioning through an ROTC program. However, roughly 17 percent of all students attending two-year colleges transfer to four-year colleges. This includes roughly 19 percent of Hispanics and 8 percent of blacks who later transfer to four-year colleges. These members of underrepresented demographic groups could be targeted for ROTC.

***Examine Expanding ROTC Hosts to More–Demographically Diverse Locations***

A second way to improve recruiting of racial/ethnic minorities is to ensure that ROTC host locations match the geographic distribution of student populations. The map shown in Figure 6.1 uses Air Force ROTC units to illustrate this point. In the figure, all Air Force ROTC host locations are identified by red triangles. The locations of black students are represented by circles, with larger circles indicating larger populations. The locations of Hispanic students are represented by stars, with larger stars indicating larger populations. Locations that have large populations of black students or Hispanic students (or both) but no ROTC host are potential areas for expanding ROTC demographic diversity and increasing the production of officers. The map shows that there are potentially rich markets in Texas, the southeastern United States, California, and the mid-Atlantic region. Of course, the locations of other Service ROTC units should also be taken into account when examining potential areas for expansion.

In addition, given that the Services have limited resources and that the location of ROTC sites involves many stakeholders, the Commission recommends instituting an independent council similar to the Defense Base Realignment and Closure Commission to evaluate and decide where new ROTC units should be placed and where unproductive ROTC units would best be moved. A key factor to be considered as part

**Figure 6.1. Comparison of Air Force ROTC Host Locations and Student Body Demographics**



SOURCES: National Center for Education Statistics, 2008; U.S. Census Bureau, 2007.

of this process is the extent to which ROTC host units are located at colleges and universities with large student populations of racial/ethnic minorities.

## Create More Accountability for Recruiting from Underrepresented Demographic Groups

The Commission recommends that DoD and the Services create more accountability for recruiting racial/ethnic minorities and women by developing goals for qualified minority applicants to precommissioning officer programs, developing formal processes for coordinating enlisted and officer recruiting, and working to improve congressional nominations to the Service academies.

### Develop Goals for Qualified Minority Applicants

The Services have long employed incentive programs for recruiters to ensure that designated accession goals are met. This includes setting goals for the total number of accessions and goals for recruiting individuals with specific attributes, such as a high aptitude level (e.g., a high AFQT score) or specific skills or degrees (see Oken & Asch, 1997). One way to ensure that there is a demographically diverse candidate pool from which to select applicants into precommissioning officer programs is to develop goals for qualified minority applicants. This strategy is currently employed by the Navy and the Marine Corps but not by the other Services. The goals would not be used during the actual admissions decision but would help ensure that there is a demographically diverse pool from which to select new students each year. These goals should be developed with careful consideration of the demographics of the eligible population.

### Coordinate Enlisted and Officer Recruiting

The Commission recommends that the Services explore developing formal processes for coordinating enlisted and officer recruiting. Except in the Coast Guard, enlisted recruiters are primarily focused on finding enlisted recruits. If they find a prospect with a bachelor's degree, they are required to refer that person to the highest program for which he or she is eligible, and they must have the prospect sign a waiver if he or she prefers to enlist instead of joining an officer commissioning program. However, this coordination does not necessarily apply for high-quality applicants without a bachelor's degree, even if they have the potential to be successful in a precommissioning officer program. Therefore, a formal coordination process between enlisted recruiters on one hand and academy and ROTC programs on the other could help ensure that qualified applicants from all demographic backgrounds have the opportunity to become officers.

### Improve Congressional Academy Nominations

In addition to meeting the minimum eligibility requirements, potential applicants to the DoD Service academies must secure a nomination from the President, the Vice President, or a member of Congress to apply.[4] However, there was general agreement

---

[4]   For the United States Air Force Academy, the nomination must come from the Vice President or a member of Congress (U.S. Air Force, 2009). For the United States Military Academy, the nomination can be a Service-connected nomination or congressional nomination (U.S. Army, 2007). For the United States

among the Service academy representatives who briefed the Commission in October 2009 that available nomination slots are often not fully utilized. Furthermore, recent media reports have highlighted that lawmakers from areas with large racial/ethnic minority populations tend to rank near the bottom when it comes to making nominations for appointment to the academies (Witte, 2009). The Office of the Under Secretary of Defense (Personnel and Readiness), is working with members of Congress to improve their use of nominations, so efforts to engage members of Congress in the academy nomination process are already ongoing. The goal of this recommendation is both to encourage members of Congress to improve their use of nominations and to ensure that any current OSD efforts to improve congressional nominations are sustained over the long term.

### Develop a Common Application for Service ROTC and Academy Programs

Currently, each Service academy and ROTC program requires a separate application. Therefore, young people who are interested in multiple schools or programs must apply separately, with sharing of applicant files occurring inconsistently. Also, students may not be aware of all of their options in terms of military commissioning programs. Therefore, the Commission recommends a joint or common application for Service ROTC and academy programs. Through this coordination, students could apply simultaneously to multiple programs, ensuring that they are exposed to all of the options for becoming officers.

### Closely Examine the Preparatory School Admissions Process and Make Required Changes to Ensure That Accessions Align with the Needs of the Military

The Service academy preparatory schools originated when President Woodrow Wilson expanded the United States Military Academy's corps of cadets in 1916, authorizing 180 slots for prior enlisted personnel (Malstrom, 2009). The reality at the time, however, was that few enlisted personnel would be capable of transitioning directly to a Service academy without additional academic preparation. The idea of Service academy preparatory schools (for both the Army and the Navy) came about as a way to meet this need. Although there are also private military preparatory schools with programs designed to prepare prospective Service academy appointees, most of the cadets who reach Service academies via the preparatory school route attend the U.S. Military Academy Preparatory School, the Naval Academy Preparatory School, or the U.S. Air Force Academy Preparatory School. The Coast Guard Academy does not have its own preparatory school. Prior to 2009, the Coast Guard Academy sent some prospective cadets to the Naval Academy Preparatory School. Since 2009, however, the Coast Guard Academy has used only private programs to serve the preparatory school function because the private programs were found to be more cost-effective than the Naval Academy Preparatory School. The modern purpose of the preparatory schools still

---

Naval Academy, the nomination must come from from the President, the Vice President, or a member of Congress (U.S. Marine Corps, 2010). The Coast Guard Academy does not require a nomination.

includes their original mission of providing additional preparation for prior enlisted personnel, but it has been generalized to offer opportunities for civilian applicants.

According to data provided by the Services to the Commission, the preparatory schools are currently an important source of racial/ethnic minority enrollment at the Service academies. However, an examination of preparatory school records suggests that there is a large focus on developing athletes to enter into the academies. Approximately 35–40 percent of each of the preparatory school's recent classes consisted of recruited athletes. Although physical fitness is an important characteristic for military officers, the Commission feels some concern that the focus on preparing athletes for the Service academies may be coming at the expense of individuals with other skills that may be more beneficial to the current and future needs of the military. Therefore, the Commission recommends that DoD have the preparatory schools closely examine their admissions processes and make any required changes to ensure that accessions align with the needs of the future military workforce.

CHAPTER SEVEN

# BRANCHING AND ASSIGNMENTS

The next stage of the personnel life cycle is the selection of the particular career field and related assignments each servicemember fulfills during his or her time in the military. Together, these career field and assignment selections can affect potential promotion opportunities to higher ranks. However, due to both structural and perceptual barriers, there are potential demographic differences in career field preferences and command assignment opportunities that influence the future demographic diversity of senior military leadership. This chapter describes those barriers and how they can be addressed through policy changes.

## Career Fields, Key Assignments, and Demographic Diversity

As a first step in examining the role played by career fields and assignments in senior military leadership diversity, the Commission explored both the extent to which specific career fields and assignments are related to advancing to senior leadership ranks and the extent to which racial/ethnic minorities and women may be underrepresented in those key career fields and assignments. The Commission used common DMDC-provided AC and RC datasets for these analyses. The data presented in this section are from December 2008 for the AC and June 2010 for the RC. Data on the Coast Guard were not included in the analyses because DMDC personnel data for the Coast Guard were not available.

### Enlisted Career Fields

Based on recent data, it appears that functional support and administration occupations are most closely aligned with membership in the senior enlisted ranks in the AC. However, racial/ethnic minorities and women were not underrepresented in functional support and administrative occupations and were not overrepresented in occupations that are currently aligned with junior enlisted pay grades, such as services and supplies. Thus, for the enlisted corps, there is no evidence that career fields have played any significant role in the underrepresentation of racial/ethnic minorities and women in senior leadership ranks within the AC. Given these results, the Commission did not pursue this line of research for the RC.

### Officer Career Fields

For both the AC and RC officer corps, data indicate that flag/general officers were, in the periods under consideration, disproportionately drawn from tactical/operational

(i.e., combat) career fields. As Figure 7.1 shows, AC officers with tactical/operational backgrounds tended to increasingly populate the higher levels of military leadership.

Furthermore, compared with other occupations, tactical/operational occupations tended to have higher concentrations of white men. For example, Figure 7.2 shows the percentage of tactical/operational and nontactical/nonoperational AC officers in pay grade O-3 who were white men. (For reference, it also shows the percentage of white men among all flag/general officers.) Even at the O-3 level, 75 percent of all officers in tactical/operational occupations were white men, compared with 50 percent of the officers in nontactical/nonoperational occupations. A similar pattern was seen in the RC.

Of course, the demographics of recent flag/general officers depend on the demographics of their own cohorts and not on the demographics of officers recently at the O-3 level. Nonetheless, Figure 7.2 demonstrates that the tendency of tactical/operational occupations to contain higher fractions of white men persisted as recently as 2008.[1] Thus, as long as tactical/operational occupations continue to be associated with advancement to higher officer grades, and as long as these tactical/operational occupations continue to consist predominantly of white men, there is likely to be limited improvement in the demographic diversity of flag/general officers.

## Key Assignments

The demographic diversity of the officer corps is greatly affected by which career fields and specialties officers enter. However, the types of assignments that officers choose or are given once they enter their career fields can also affect the demographic diversity of the officer corps. In general, this is not a factor for the enlisted corps, so the Commission chose to focus specifically on key assignments for officers.

The Commission defined key assignments as those assignments that are recognized to be especially demanding, to have high visibility, and to provide competitive advantage for advancement. Although none of the Services has "a checklist of assignments required for promotion from one grade to the next," each Service branch, community, and career field has "a notional career path comprising work and educational assignments that will make a due-course officer effective and credible" (Schirmer et al., 2006). Based on the experiences of the Commissioners and presentations from the Services, these assignments include holding leadership and staff assignments during one's early career, holding command assignments, meeting certain educational milestones (e.g., getting advanced academic degrees, attending in-residence professional military education, particularly at war colleges), and holding executive officer or assistant positions to current flag/general officers. In addition, current law stipulates that AC officers are required to complete a full joint duty assignment and be designated a joint qualified officer prior to appointment to the rank of flag/general officer.

---

[1]   According to information provided to the Commission by the Coast Guard, a majority (about 71 percent) of Coast Guard tactical/operational (i.e., mission-execution) positions are currently filled by white male officers. However, the same can be said of nontactical/nonoperational (i.e., mission-support) positions, which are largely (about 70 percent) held by white male officers.

**Figure 7.1. Percentage of AC Officers in Tactical/Operational Occupations, December 2008, by Pay Grade**



SOURCE: Defense Manpower Data Center, 2009.

**Figure 7.2. Percentage in Nontactical/Nonoperational and Tactical/Operational Occupations Who Were White Men, December 2008, by Service**



SOURCE: Defense Manpower Data Center, 2009.

In general, the Services do not collect systematic data on demographic differences in the key assignments just described. However, for both the AC and RC, several of the Services do capture some data on command assignments. An examination of the AC O-5 and O-6 command selection/screening processes for the command selection boards in the Army, Marine Corps, and Navy[2] revealed that racial/ethnic and gender differences in O-5 and O-6 command selection rates were not the result of a clear bias for or against any particular group but that a vast majority of personnel (i.e., at least 80 percent) selected for O-5 or O-6 command during the period under review were white men. Similarly, RC data showed that, across all the Services, the majority of command billets in the RC were filled by white men.

These findings suggest that racial/ethnic minority and female representation in recent cohorts of command selectees was low because racial/ethnic minorities and women were not highly represented in the candidate pools for command assignments. The lower representation of racial/ethnic minorities and women in candidate pools for command assignments may be due to race/ethnicity and gender differences in accessions, branching, continuation, previous key assignments, and previous promotion rates prior to command.

## Barriers to Entering Tactical/Operational Career Fields and Serving in Key Assignments

For racial/ethnic minorities and women, barriers to entering tactical/operational career fields and serving in key assignments can affect their ability to reach the senior leadership ranks, particularly in the officer corps. This section describes two types of barriers that currently exist—structural barriers and perceptual barriers.

### Structural Barriers

The Commission identified two structural barriers related to tactical/operational career fields and key assignments—one for women and one for racial/ethnic minorities. The barrier for female officers is created by the collection of DoD and Service assignment policies known as the *combat exclusion policies*. These policies work at two levels. First, they explicitly prohibit women from serving in certain tactical/operational career fields, such as infantry in the Army. Second, within the career fields that are open to women, the policies may prevent women from getting key assignments because they prohibit women from being assigned to units that are likely to be involved in direct offensive ground combat (Harrell & Miller, 1997; Segal & Segal, 2004). Specifically, the assignment policy determines to which unit a female servicemember trained in a particular occupation can be assigned to perform her job. Thus, the assignment policy does

_____
[2]  Three of the Services provided AC command selection outcomes by race/ethnicity and gender. Specifically, the Commission was able to compare outcomes of the O-5 and O-6 command selection/screening processes for the command selection boards, by FY, in FY 2006–FY 2010 for the Army, FY 2007–FY 2009 for the Marine Corps, and FY 2007–FY 2009 for the Navy aviation community and the Navy surface warfare officer community.

not curtail what women can do, but it does affect the units to which women can be assigned.

These combat policies are most restrictive in the Army and the Marine Corps. Calculations from 2003 data show that women can serve in only 91 percent of Army and 92 percent of Marine Corps occupations, compared with 99 percent of Air Force and 94 percent of Navy occupations (Segal & Segal, 2004). The percentage of Navy occupations has likely increased since these data were reported because, in early 2010, the Secretary of Defense lifted the ban barring female officers from serving on submarines (Peck, 2010). All occupations in the Coast Guard have been open to women since 1978 (U.S. Coast Guard, n.d.).

Although the percentages presented above regarding the occupations open to women do not appear inordinately low, exclusion from these occupations has a considerable influence on advancement to higher positions. For example, in 2006, 92.3 percent of all Army occupations were open to women. However, the remaining 7.7 percent of Army occupations were the combat arms occupations of infantry, armor, artillery, cavalry, and special forces, which are closed to women because of the current DoD policies that exclude women from direct ground combat. This relatively small percentage of combat arms occupations was held by 29.4 percent of all Army personnel and, in this case, was held exclusively by men (Harrell et al., 2007). Additionally, 2006 data show that, in the Army, *80 percent of general officers (ranks O–7 and above) came from combat arms occupations* (Lim et al., 2009).

> We have one 4-star female, there is no doubt in my mind that she . . . [could have commanded a] division, she is that professional. She's done everything that any of us have done. So, the culture said no, simple as that.
>
> —Lieutenant General Julius W. Becton, Jr.,
> remarks to the Commission, 2010

The structural barrier related to tactical/operational career fields and key assignments for racial/ethnic minority officers is created by the interaction of two patterns related to accession source. First, nonwhite officers are less likely than white officers to commission via the Service academies. Second, the Army and the Air Force allocate a larger portion of tactical/operational slots to their Service academies compared with other officer commissioning sources. Therefore, in these Services, commissioning via a Service academy provides an advantage in terms of securing assignment to a tactical/operational career field.

Finally, the structural barriers that keep racial/ethnic minorities and women from entering tactical/operational career fields also function as barriers to obtaining command assignments. That is, the lower representation of racial/ethnic minorities and women in tactical/operational career fields means that those servicemembers have fewer opportunities for command.

## Perceptual Barriers

Although there are likely perceptual barriers for female servicemembers, the majority of prior research has focused on perceptual barriers for racial/ethnic minority male servicemembers. In particular, evidence suggests that more white men than racial/ethnic minority men prefer tactical/operational career fields in the Army (Lim et al.,

2009) and the Air Force (Haygood & Morris, 2009) and that more white men than minority men enter special operations forces in the Army, Navy, and Air Force (Kirby et al., 2000). These findings persist even after controlling for such factors as rankings on merit-based lists for initial branching.[3]

There are several potential reasons for the difference in preferences. For example, research has found that racial/ethnic minorities tend to prefer military career fields that they believe will provide skills (e.g., engineering skills) that will readily transfer to the civilian sector (Kirby et al., 2000). Generally, these skills are more likely to be found in nontactical/nonoperational occupations. Additionally, research suggests that, compared with white communities, racial/ethnic minority communities typically know less about certain career fields and are less supportive of decisions to pursue those career fields. For example, Kirby et al. (2000) found that, compared with racial/ethnic minorities, more of the white participants they interviewed knew about special operations forces, such as Navy SEALs, when they were children. The study also found that some racial/ethnic minorities perceive that people in certain military occupational specialties hold racist attitudes. For example, some of the racial/ethnic minority servicemembers interviewed commented that Army Green Berets and Rangers were believed by many to be white organizations with racist attitudes. Finally, anecdotal accounts suggest that identification with certain career fields may be lacking due to the absence of successful racial/ethnic minority role models in those career fields.

There are also potential perceptual barriers that prevent racial/ethnic minorities and women from obtaining key assignments, such as command. In particular, racial/ethnic minorities and women may lack sufficient knowledge about key assignment opportunities, perhaps because racial/ethnic minorities and women do not receive the same career counseling or mentoring about key assignments as their white male counterparts. If this is the case, they would be more likely to miss career-enhancing assignment opportunities.

## The Services Should Optimize the Ability of Servicemembers to Make Informed Career Choices from Accession to Retirement—with Special Emphasis on Mentoring

*Recommendation 8—*

**The Services should ensure that their career development programs and resources enhance servicemembers' knowledge of career choices, including Reserve Component opportunities,**

---

[3]  Most of the Services' officer commissioning sources have rankings of cadets/midshipmen in terms of "merit-based" factors. These rankings are used to make initial branching and assignment decisions. For example, Army ROTC cadets are put on an Order of Merit List based on a weighted composite of academic grade point average, leadership performance and skills, and physical fitness qualifications (Lim et al., 2009). Although the Services use different strategies when employing merit-based rankings, cadets/midshipmen who are higher on the list generally receive earlier consideration terms of career field preferences than do cadets/midshipmen who are lower on the list.

*to optimize the ability of servicemembers to make informed career choices from accession to retirement.*

- *a. Mentoring and career counseling efforts shall start prior to the initial career field decision point and continue throughout the servicemember's career.*

- *b. Mentoring programs shall follow effective practices and employ an active line of communication between protégé and mentor.*

The Services provide a variety of career development resources, including formal mentoring programs, career counseling events held at individual installations, and websites that provide links to career development information (such as career guides, contact information for career counselors or mentors, and information about enlisted-to-officer programs). However, there are few available data on the effectiveness of these programs and resources.

Additionally, research shows that, compared with nonmentored individuals, mentored individuals tend to be more highly compensated, to receive more promotions, to be more satisfied with their career, to have greater expectations for advancement, to be more committed to their career, and to be more satisfied with their job (Allen et al., 2004). For example, the autobiography of Lieutenant General Frank E. Petersen describes the importance of mentoring to his success. Lieutenant General Petersen describes how, in 1950, as a young cadet, he was having a particularly difficult time with an instructor and was seriously contemplating dropping out of the Naval Aviation Cadet Program. However, he then encountered a phenomenon he considered "an absolute miracle": He saw "a tall black Army Air Corps captain."

> When I was at the War College in 1975 to 1976, thanks to General Becton, I was supposed to go to the Army War College, but because he was sitting on the board for the National War College . . . he plucked me off and threw me into National War College, and I thank you for that again, Julius. I thank you many times.
>
> —The Honorable Colin Powell, remarks to the Commission, 2010

> [The captain] was Dan "Chappie" James, . . . holding forth at the Sugar Bowl on one of his trips home. I was feeling pretty down, and we talked for about two hours. I told him about the hard times, the racism, the possibility of never making it because of that. I laid it all out there, including the fact that the black guy just in front of me had been wiped out. I felt that "they" were simply waiting to wipe me out, too. . . . Chappie stayed so long that he had to cancel his civilian flight home. He could've run. He didn't. He stayed there and listened. He didn't say an awful lot at first, except that I could make it if I wanted it badly enough. . . . I looked at him and somehow felt new resolve. I mean, here was a living example that it could be done. I had a role model now. He patted me on the shoulder, then he said it again: "Just don't give up." That audience with Chappie helped get me through. (Petersen & Phelps, 1998)

Young Petersen became the first black Marine Corps aviator and retired from the Marine Corps as a lieutenant general.

Based on this evidence about the potential benefits of mentoring, the Commission assumes that servicemembers who receive high-quality mentoring relationships from their Services will be able to make more-informed career decisions. This ability is particularly important for minority male servicemembers, who may not choose tactical/operational career fields partly because of a lack of knowledge about the potential benefits of entering such career fields.

## Mentoring and Career Counseling Efforts Shall Start Prior to the Initial Career Field Decision Point and Continue Throughout the Servicemember's Career

The Commission found that the Services value mentoring relationships that benefit both ends of the relationship: Protégés gain from the experience and knowledge of their mentors, and mentors gain a sense of satisfaction and pride from helping to develop the careers of junior individuals. Like many organizations, the Services provide mentoring to inform servicemembers of their career options and to help them develop professionally and personally. However, the Services did not indicate to the Commission that there is a particular focus on mentoring prior to initial career path decisions. Furthermore, a Commission survey involving a small sample of AC servicemembers revealed that, although there were not strong opinions about these career development resources and the assignment process, servicemembers reported that they gained only moderate knowledge of the career process early in their careers. Given that officers in tactical/operational career paths are significantly more likely to be promoted into flag/general officer positions, it is important that newly commissioning officers make their initial career field decisions with full knowledge of these issues.

Mentoring can also have particular benefits for the RC. First, when it comes to retaining qualified and successful servicemembers, mentoring can help inform exiting active-duty members about opportunities available in the RC. Additionally, the RC has its own constraints and issues, particularly for servicemembers who have transitioned from active duty. These include knowledge of the force structure, knowledge of the promotion system, and the geographic distribution of billets that could affect career decisions. Therefore, the Commission recommends that the Services ensure that, for both the AC and RC, mentoring efforts start prior to the initial career decision point and continue throughout the career life cycle.

## Mentoring Programs Shall Follow Effective Practices and Employ an Active Line of Communication Between Protégé and Mentor

Mentoring can play an essential part in career development, but mentoring can also backfire if there is no solid understanding of what makes mentoring relationships successful. Descriptions of the Services' current mentoring programs and practices indicate that the Services are making extensive efforts to assist servicemembers in their career development. However, there is very little information about the effectiveness of these efforts, either collectively or for specific demographic groups.

Research on mentoring has shown that effective mentoring relationships and programs are characterized by practices that include establishing clear objectives, allow-

ing mentees and mentors to establish multiple mentoring relationships, providing high-quality training for both mentors and mentees, and (if relevant to the mentoring program) matching mentors and mentees based on multiple criteria that align with the goals of the mentoring program (Allen et al., 2006; Finkelstein & Poteet, 2007). These characteristics represent effective practices that can be adopted by the Services. In addition, mentoring programs should foster the development of continuous, active lines of communication between mentors and mentees. Finally, the Services should evaluate the outcomes of their mentoring programs against predetermined goals and criteria. The Services can do this through surveys, interviews, and focus groups used to gather information about mentoring experiences. The Services should also track over time the careers of individuals who use their mentoring programs and tools to assess the extent to which mentoring has helped individuals at key career points.

## DoD and the Services Should Eliminate Combat Exclusion Policies for Women

*Recommendation 9—*

*DoD and the Services should eliminate the "combat exclusion policies" for women, including the removal of barriers and inconsistencies, to create a level playing field for all qualified servicemembers. The Commission recommends a time-phased approach:*

- *a. Women in career fields/specialties currently open to them should be immediately able to be assigned to any unit that requires that career field/specialty, consistent with the current operational environment.*

- *b. DoD and the Services should take deliberate steps in a phased approach to open additional career fields and units involved in "direct ground combat" to qualified women.*

- *c. DoD and the Services should report to Congress the process and timeline for removing barriers that inhibit women from achieving senior leadership positions.*

The Commission recommends that DoD and the Services eliminate the combat exclusion policies that have barred women from direct ground combat fields and assignments since the early 1990s. As previously described, these policies constitute a structural barrier that prevents women from entering the tactical/operational career fields associated with promotion to flag/general officer grades and from serving in career-enhancing assignments. The Commission is *not* advocating a lowering of standards with the elimination of the combat exclusion policy. Qualification standards for combat arms positions should remain in place.

The Commission considered four strands of argument related to rescinding the policies. First, the Commission addressed arguments related to readiness and mission capability. One frequently cited argument in favor of the current policies is that having women serving in direct combat will hamper mission effectiveness by hurting unit morale and cohesion. Comparable arguments were made with respect to racial integration but were ultimately never borne out. Similarly, to date, there has been little evidence

> First of all, with regard to women in Combat Arms, I don't think you will see a change because I don't think our women want it to change, okay? There are certain demands of officers in a Combat Arms environment that our women see, recognize, appreciate, and say, I couldn't do that—in fact, I don't want to do that because I don't think it best prepares me for success if I am trying to do those things against the male population at Lieutenant, Captain, Major, and Lieutenant Colonel.
>
> —General James T. Conway, remarks to the Commission, 2010

that the integration of women into previously closed units or occupations has had a negative effect on important mission-related performance factors, such as unit cohesion (Defense Department Advisory Committee on Women in the Services, 2009; Harrell & Miller, 1997; McSally, 2007). A study by the Defense Department Advisory Committee on Women in the Services (2009) actually found that a majority of focus group participants felt that women serving in combat in Iraq and Afghanistan have had a positive effect on mission accomplishment. Additionally, panel members discussing this topic at a September 2010 Commission meeting cited the need to bring to bear all talent: The blanket restriction for women limits the ability of commanders in theater to pick the most capable person for the job. For example, Colonel Martha McSally noted,

> If you want to have the best fighting force, why would you exclude 51 percent of your population from even being considered for any particular job? I've seen recent statistics that say 75 percent of our Nation's youth between the ages of 17 and 25 are not even eligible to be in the military based on whether it's mental, medical, or other—criminal issues or whatever. So we just have a very small pool to pick from. So if we're trying to have the most ready force, why would we just exclude 51 percent of the population from even competing? (McSally, 2010)

Second, and relatedly, the Commission considered whether the policies are still appropriate given the changes in warfare and doctrine that have occurred over the last decade. DoD and Service policies that bar women from certain combat-related career fields, specialties, units, and assignments are based on standards associated with conventional warfare and well-defined, linear battlefields. However, the current conflicts in Iraq and Afghanistan have been anything but conventional. As a result, some of the female servicemembers deployed to Iraq and Afghanistan have already been engaged in activities that would be considered combat related, including being collocated with combat units and engaging in direct combat for self-defense (see Defense Department Advisory Committee on Women in the Services, 2009, and Harrell et al., 2007). Thus, the combat exclusion policies do not reflect the current operational environment.

Third, the Commission addressed arguments related to discrimination and fairness. Many Commissioners consider the policies fundamentally discriminatory because they stipulate that assignment decisions should be based solely on gender, without regard to capability or qualifications.

Finally, the Commission considered whether there might be unanticipated effects from rescinding the combat exclusion policies, especially with regard to opening career fields. In particular, the type of effect such a policy change would have on enlisted recruiting is unknown. If young women perceive the opening of combat career fields to mean that they will be *required* to enter these occupations rather than being *allowed* to volunteer for them, female propensity to enlist may drop, and the Services may find it difficult to achieve their recruiting missions.

> This is about discrimination of the first order. This is 2010, and as we look at outyears for war, it will probably be much more electronic than it is now. We have things from Creech Air Force Base fighting unmanned vehicles in Afghanistan right now. So we cannot look at the war that was fought in Vietnam and compare that to today or future wars. It's going to be totally different. This has to do with every American citizen being able to be considered for anything that they are qualified to do. It's about discrimination at its very basics.
>
> —Rear Admiral Mary O'Donnell, remarks to the Commission, 2010

Based on these considerations, the Commission recommends that DoD and the Services eliminate their combat exclusion policies for women, including the removal of barriers and inconsistencies, to create a level playing field for all qualified servicemembers. This should be done using a phased approach so that all potential issues, including how to best implement new policies, can be thought through. This recommendation was approved by a majority, but not all, of the Commissioners. Due to concerns regarding the potential effect of the policies' removal on unit effectiveness and to potential challenges associated with implementation, a small number of Commissioners did not approve recommending removal of the policies immediately but instead favored further study. On the other hand, a small number of other Commissioners believed that the recommendation is not strong enough. They would have preferred a more forceful recommendation to immediately eliminate the policies.

The Commission proposes three strategies for implementing this recommendation.

### Women in Career Fields/Specialties Currently Open to Them Should Be Immediately Able to Be Assigned to Any Unit That Requires That Career Field/Specialty, Consistent with the Current Operational Environment

As previously discussed, current DoD and Service assignment policies prohibit women from being assigned to units that may be involved in direct ground combat. Again, this means that, for a given occupation, the policies determine to which units a female servicemember may be assigned to do the job for which she has been trained. However, given the nature of the wars in Iraq and Afghanistan, women are currently engaged in direct combat, even when it is not part of their formally assigned role. Two key features of the policies have created the disconnect between the roles women may be formally assigned (policy) and the roles they may fill while deployed (practice).

First, many of the terms used in the policies have either lost or changed meaning: Such concepts as "enemy," "exposed to hostile fire," "forward," and "well forward" are no longer useful when determining which units should be closed to women. The enemy is no longer clearly and consistently identifiable, and all units are essentially exposed to hostile fire. Additionally, the spatial concepts of "forward" and "well for-

ward" are inadequate to convey the complexity of such operations as those in Iraq and Afghanistan.

Second, once a female servicemember has been assigned to a unit, the assignment policy prescribes neither what duties she can do nor with which other units she may interact. As a result, women are performing in combat roles. Indeed, local commanders have the authority to use their personnel as they see fit to fulfill the unit mission. Harrell et al. (2007) found examples of female servicemembers who had been trained as cooks having received the Combat Action Badge in Iraq, likely because contractor cooks obviated the need for U.S. servicemembers to cook. Instead, these women, along with their male colleagues trained as cooks, were performing other duties, such as guard duty, that placed them in greater danger.

The Commissioners were in near-unanimous agreement that this aspect of the combat exclusion policies should be eliminated immediately because, given current practices for employing women in the wars in Iraq and Afghanistan, it seems obsolete. The assignment policies constitute an *unnecessary* barrier to women's advancement.

### DoD and the Services Should Take Deliberate Steps in a Phased Approach to Open Additional Career Fields and Units Involved in "Direct Ground Combat" to Qualified Women

As previously discussed, tactical/operational career fields are associated with advancing to flag/general officer grades. Therefore, as long as the combat exclusion policies bar women from entering tactical/operational career fields and units, women will be at a disadvantage compared with men in terms of career advancement potential. The Commission is not arguing that women cannot reach senior leadership levels without being in tactical/operational career fields, and it is not asserting that a large number of women will necessarily choose to enter tactical/operational career fields, given the opportunity. However, the Commission believes that the existing policies are a structural barrier whose removal could help improve both the career advancement potential of qualified women and, ultimately, the demographic diversity of senior leaders. Therefore, the Commission recommends that DoD and the Services take steps to open all career fields and units to all qualified women.

### DoD and the Services Should Report to Congress the Process and Timeline for Removing Barriers That Inhibit Women from Achieving Senior Leadership Positions

Although there are no laws that specifically restrict women from being assigned to any career field, specialty, assignment, or unit, Title 10, Section 652, does require the Secretary of Defense to report to Congress about changes to the current combat exclusion policies. Therefore, the Commission recommends that DoD and the Services report to Congress the process and timelines for developing and implementing new policies based on recent combat experience. To be clear, this recommendation means that DoD and the Services will have to first determine *how* to develop and implement new policies, not *whether* to do so.

CHAPTER EIGHT

# PROMOTION

The next stage of the personnel life cycle is selecting servicemembers for promotion. In the military's closed personnel system,[1] the demographic diversity of senior leadership depends largely on the relative career progression rates of members of each demographic group: If racial/ethnic minorities and women advance at lower rates than white men, they will be underrepresented in the top leadership positions. Thus, potential barriers to promotion and resulting demographic differences in promotion rates can affect the future demographic diversity of senior military leadership.

Typically, there are more servicemembers eligible for promotion than can be selected, so selection depends critically on identifying the best and most-qualified candidates. To understand how racial/ethnic minorities and women are currently faring in the military promotion process, the Commission asked the Services to provide data regarding average promotion rates.[2] The findings presented in this chapter do not reflect RC data, however. The information requested from the RC either had not been compiled or collected or was not available in a comparable format.

## Demographic Differences in Average Promotion Rates

### Line Officer Promotion Rates

The Services were asked to provide data on line officers in pay grades O-4 through O-6. Line officers are officers who serve in combat-related specialties, and they constitute the majority of officers. Noncombat specialties include chaplains, lawyers, logisticians, and medical officers. Also, comparing line officers controls for potential occupational differences that may influence promotion rates, such as being in a tactical/operational career field.

In several cases, the data showed that promotion rates from O-4 through O-6 for several racial/ethnic minority groups were lower than the average. In particular,

---

[1] As described in Chapter Four, the military operates as a closed personnel system in that senior leaders cannot be brought in from the outside but are instead brought up through the lower ranks. Therefore, as previously noted, each stage of the military personnel life cycle—from who is recruited to who is promoted—is intricately linked to the composition of the future military leadership.

[2] Army and Air Force averages are based on data from FY 2007 to FY 2009, Navy and Coast Guard averages are based on data from FY 2007 to FY 2010, and Marine Corps averages are based on data from FY 2008 to FY 2010.

- In all the Services, black (Hispanic and non-Hispanic) officers' promotion rates were substantially lower than the pay grade–specific average promotion rates for their respective Services.
- Except in the Army, Hispanic officers' promotion rates were below the Service- and pay grade–specific averages. Across the Services, Hispanic officers tended to have higher promotion rates than black (Hispanic and non-Hispanic) officers.
- Officers from other race/ethnicity groups (i.e., Asians, Pacific Islanders, American Indians, Alaska natives, and individuals reporting more than one race) in each Service had substantially lower-than-average promotion rates to O-5. In the Air Force and Coast Guard, their promotion rates to O-4 were also below average.
- Female officers in the Navy and Coast Guard had substantially lower-than-average promotion rates to O-4 and O-5.

The Commission also examined demographic differences in flag/general officer promotion rates. However, discussion of flag/general officer promotion rates requires an important caveat: The racial/ethnic minority and female representation in the eligible populations for promotion to O-7, O-8, and O-9 can be very small. In those circumstances, a single promotion can cause a racial/ethnic minority or female promotion rate to change substantially. Therefore, flag/general officer promotion rates are provided for descriptive reference only. Overall, the data show that, in the period under review, the promotion rates of women to O-7 and O-8 roughly equaled the Service averages. This was also true of Asian/Pacific Islanders (except for promotions to O-8 in the Coast Guard). Although Hispanics had well-above-average promotion rates to O-7 in the Marine Corps and Coast Guard, the promotion rates of blacks (Hispanic and non-Hispanic) to this pay grade were below average for these Services. Finally, blacks (Hispanic and non-Hispanic) and Hispanics experienced very low promotion rates to O-8 in the Army and Marine Corps.

## E-7 to E-9 Promotion Rates

The Commission examined potential demographic differences in average promotion rates for AC senior noncommissioned officers (i.e., enlisted ranks E-7 through E-9). Overall, the data indicate that there were a few cases, especially in the Marine Corps, in which advancement differed by race/ethnicity or gender. However, below-average rates for racial/ethnic minority noncommissioned officers were not the widespread problem they were for officers. The key findings were that

- Black (Hispanic and non-Hispanic) marines had substantially lower-than-average promotion rates to E-7, E-8, and E-9.
- Hispanic Marines had promotion rates to E-7 and E-8 that were somewhat lower than average.
- Airmen from other race/ethnicity groups (i.e., Asians, Pacific Islanders, American Indians, Alaska natives, and individuals reporting more than one race) had a substantially lower-than-average promotion rate to E-9. Marines from these

other race/ethnicity groups had a promotion rate to E-7 that was somewhat below average.

- Female marines had a substantially lower-than-average promotion rate to E-9 but a higher-than-average promotion rate to E-7. Female soldiers had slightly below-average promotion rates to E-8 and E-9.

Thus, data on recent AC line officer promotion rates indicate that, overall, racial/ethnic minority officers had lower promotion rates than white officers for pay grades O-4 through O-6. With only a few exceptions—for example, Hispanic Army officers—this pattern appears to have held for all the Services and each race/ethnicity group. However, the gender differences for officers and the racial/ethnic or gender differences for enlisted servicemembers were more varied across both the Services and pay grades and thus do not signal the same widespread, persistent majority-minority gap.

## The Officer Promotion Process

It is hard to identify any single reason for or barrier that explains the lower promotion rates of racial/ethnic minorities and women in the military. The Commission did not have access to the required data to control for the effects of other variables when analyzing the rates presented above; however, the current rates tend to be similar to those found by past analyses that did control for factors other than race/ethnicity or gender (see Hosek et al., 2001). Because below-average officer promotion rates appear to be a widespread issue across several Services (rather than just one Service, as in the case of enlisted promotion rates), the Commission further explored the existence of institutional or individual bias in promotion selection boards, assignment histories, performance evaluations, and knowledge of the promotion process.

### Promotion Selection Boards

Overall, the Commission found that the promotion board process appears to be designed to be institutionally fair and to mitigate the effects of bias on the part of any individual board member. Selections are made not by a single individual but rather by multimember boards that are, to the extent possible, demographically representative of the pool of candidates. Furthermore, the guidance to these boards—delivered in the form of precepts, instructions, and laws—requires that selections be based on the needs of the Services and that they meet the best-and-fully-qualified criterion, without regard to race/ethnicity or gender.

### Assignment Histories and Performance Evaluations

The Commission explored the potential for unfairness in the inputs to the promotion process in terms of assignment histories and performance evaluations. For example, each functional community within each Service has a defined due-course career path describing the successive milestones that servicemembers need to achieve to be competitive for promotion to each rank. Because of the strict timing requirements of the

military promotion system, deviations from the due-course path can negatively affect an officer's competitiveness in the selection process. Similarly, bias in the performance evaluations an officer receives can influence the officer's competitiveness in the selection process.

To examine the potential for unfairness in these inputs to the promotion process, the Commission looked at survey data from several different sources. Overall, the survey data regarding servicemembers' perceptions of the fairness of both assignment opportunities and performance evaluations generated ambiguous results. According to the 2009 Workplace and Equal Opportunity Survey of Active-Duty Members (WEOA),[3] racial/ethnic minority servicemembers were more likely than whites to believe that race/ethnicity was a factor in both their assignments and their performance evaluations. In contrast, both the 2008 Status of Forces Survey (SOFS)[4] and a Commission supplement to the Defense Equal Opportunity Management Institute (DEOMI) Organizational Climate Survey (DEOCS)[5] indicated that white and non-white servicemembers had similar perceptions about the fairness of these two "inputs." These two surveys did, however, find significant differences by gender: According to responses on both the SOFS and the DEOCS, women were less likely than men to agree that they received the assignments they needed to be competitive for promotion.

In addition, prior research by Hosek et al. (2001) examining differences in career progression for officers in the 1970s and 1980s found that a potential explanation for the lag in black officer career progression was that black officers were more likely to be given assignments that took them off the due-course career path. Although this research is dated, the findings are consistent with the Commissioners' more recent

---

[3]   The survey targets active-duty members of the Air Force, Army, Coast Guard, Marine Corps, and Navy who had completed at least six months of service at the time the survey was first fielded and were below flag/general officer rank. For the 2009 WEOA, data were collected predominantly via the web in February, March, and April 2009, and completed surveys (defined as those with at least half the survey questions answered) were received from 26,167 eligible respondents. The resulting sample of respondents was 72 percent enlisted and 28 percent officers and 84 percent DoD and 16 percent Coast Guard.

[4]   The *Status of Forces Survey of Active Duty Members* is administered to DoD servicemembers three times a year; the Coast Guard does not participate in the SOFS. As with the WEOA, the target population is active-duty members who had completed at least six months of service and were below flag/general officer rank six months prior to data collection. Members of the National Guard and Reserve in active-duty programs were not eligible. The SOFS data used here were collected via the web between November 5 and December 19, 2008. A total of 10,435 eligible servicemembers returned usable surveys, again defined as those with at least half the questions answered. The final sample included 3,474 officers (33 percent), 6,303 enlisted servicemembers (61 percent), and 658 warrant officers (6 percent).

[5]   The Commission added several sets of questions to learn about servicemembers' perceptions of various aspects of the promotion system, and its questions were fielded during March 2010. During this period, a total of 2,196 servicemembers completed the survey, with 2,004 respondents providing usable information. The sample includes AC and RC servicemembers, but the RC sample was too small to allow for separate analysis by demographic group. Relevant shares of the final sample were 87 percent enlisted personnel, 12 percent officers, 1 percent warrant officers, and 60 percent white non-Hispanic. It is important to note that the DEOCS sample is much smaller than the WEOA and SOFS samples, and the DEOCS sample was collected without the use of any particular sampling methodology. Therefore, it is less likely to have been representative of the population of servicemembers as a whole.

experience in their Services. Furthermore, although the 2001 study by Hosek et al. and an OSD report based on the study's early findings (Gilroy et al., 1999) recommended that DoD conduct further research to determine whether black officers' promotion rates were indeed hampered by recruiting- and EO-related deviations from the due-course career path, the Commission was unable to find any indication that this recommendation was ever implemented.

## Knowledge of the Promotion Process

Finally, the Commission explored the extent to which servicemembers felt they had adequate knowledge of the promotion process. Overall, the Services reported using multiple approaches to educate servicemembers about how to be successful in general and about the promotion system in particular. These approaches include formal seminars, formal and informal mentoring, and the establishment of websites that provide general and community-specific information about key career milestones and due-course career paths. However, the Commission also found that no Service is systematically evaluating the effectiveness of these tools, either overall or for different demographic groups.

## Improve Transparency So That Servicemembers Understand Performance Expectations, Promotion Criteria, and Processes

*Recommendation 10—*

*DoD, the Services, and Chief, National Guard Bureau, must ensure that there is transparency throughout their promotion systems so that servicemembers may better understand performance expectations and promotion criteria and processes. To do this, they*

- *a. Must specify the knowledge, skills, abilities, and potential necessary to be an effective flag/general officer or senior noncommissioned officer.*

- *b. Shall formalize the process and requirements for 3- and 4-star officer selection in DoD Instruction 1320.4.*

- *c. Shall educate and counsel all servicemembers on the importance of, and their responsibility for, a complete promotion board packet.*

This recommendation calls for making the promotion system as transparent as possible to ensure that all servicemembers have adequate and equal knowledge in their efforts to proactively manage their own careers. Although the Commission did not have data for the RC with which to assess demographic differences in promotion rates or perceptions of the fairness of the RC promotion process, these recommendations should also help improve promotion opportunities for RC servicemembers. To implement this recommendation, the Commission proposes three strategies.

### Specify the Knowledge, Skills, Abilities, and Potential Necessary to Be an Effective Flag/General Officer or Senior Noncommissioned Officer

Many have noted that future leaders in the officer corps will require a greater mix of knowledge, skills, and abilities in order to be effective in changing operational environments. This claim is supported by changes that have already occurred as a result of the wars in Iraq and Afghanistan and against Al-Qaeda and its Violent Extremist Affiliates and by forecasts of needed competencies that have been laid out in such reports as the *Quadrennial Defense Review Report*. For example, many of the forecasts suggest a greater need for foreign-language, regional, and cultural expertise as well as improved expertise in cyber warfare. Although the demand for these skills is growing, in terms of career advancement, it is often risky for servicemembers to deviate from traditional career paths if they seek to reach the highest ranks of the military.

As previously discussed, research shows that the majority of flag/general officers are drawn from tactical/operational occupations. Although there are positions that must be filled by an officer from a tactical/operational occupation, there are other flag/general officer positions that do not require the knowledge, experience, skills, and abilities of an officer in a tactical/operational occupation. The experiences of some Commissioners suggest, for example, that key leadership positions in combat support and combat service support organizations are slated for combat arms officers instead of officers who have spent their entire careers in combat support and combat service support positions. This tendency to slate key flag/general officer positions for those in tactical/operational occupations limits the ability of officers in other occupations to fill key assignments that would increase their likelihood of further promotion.

> [W]hen I became an armor officer, supposed to be qualified with tanks and all of those kinds of things, I have never fired a tank on a tank range. I have never gone down range in any part of a tank, and yet I commanded an armor brigade with two tank battalions and an infantry battalion. When I went into combat in Vietnam, I had never been in a cavalry unit, yet I commanded an airborne cavalry unit. When I took command of a division that was converted to an armored division, I had never been on a tank range in a tank, so someone saw something in what I could do. . . . [W]e ought to keep that in mind . . . . I don't think we want to deny a person an opportunity when they may not be "qualified." It depends on how you define being qualified.
>
> —Lieutenant General Julius W. Becton, Jr., remarks to the Commission, 2011

Therefore, the Commission encourages a change to a more flexible officer career development system that starts with core competencies and progresses to a broader range of skills as the officer becomes more senior. In the short term, based on the knowledge, skills, abilities, and potential required for senior leadership positions, the Services should give consideration, where appropriate, to a wider range of officers. This approach may increase promotion opportunities for racial/ethnic minorities and women who would otherwise not be considered for more-senior levels of advancement.

### Formalize the Process and Requirements for 3- and 4-Star Selection

DoD Instruction 1320.4 contains some information on O-7 to O-8 and O-9 to O-10 promotions, but it lacks an overview of the entire process. Therefore, the Commission

recommends that the selection process for flag/general officers from ranks O-7 through O-10 be made transparent through description and documentation in DoD Instruction 1320.4, *Military Officer Actions Requiring Approval of the Secretary of Defense or the President, or Confirmation by the Senate*, which outlines the current promotion policy.

### Educate and Counsel All Servicemembers on the Importance of, and Their Responsibility for, a Complete Promotion Board Packet

As part of their educational efforts, the Services already provide officers with some instruction on how to construct a complete promotion packet in preparation for being evaluated by a promotion board. With this recommendation, the Commission calls out this fundamental step as necessary to ensuring that the promotion system works minimally well for all officers. This is a simple procedural step that, if not done properly, could decrease a servicemember's chances of promotion. The Services should ensure that education on constructing complete promotion packets is effective and that it reaches all servicemembers equally.

In addition to recommending improvements to the transparency of the promotion process, the Commission also makes a recommendation, described immediately below, to address potential unfairness in the inputs (i.e., assignment histories and performance evaluations) to the promotion process.

### Ensure That Promotion Board Precepts Provide Guidance on How to Value Service-Directed Special Assignments Outside Normal Career Paths or Fields

*Recommendation 11—*

***The Services shall ensure that promotion board precepts provide guidance regarding Service-directed special assignments outside normal career paths and/or fields. As appropriate, senior raters' evaluations shall acknowledge when a servicemember has deviated from the due-course path at the specific request of his or her leadership.***

Although the Commission was not able to conduct a systematic analysis of officer assignment patterns across the Services, there is some indication that officers who are members of demographically underrepresented groups are disproportionately diverted from their due-course career paths to fill recruiting and EO assignments, thus making them less competitive for promotion. This result is mainly supported by the Commissioners' collective wisdom and a study by Hosek et al. (2001). Acknowledging that this pattern has not been confirmed, the Commission feels strongly that officers should not be penalized for helping their Services execute their diversity efforts: It is not only unfair to the officers but also detrimental to the Services' demographic diversity goals. Therefore, the Commission recommends that the Services ensure that promotion board precepts provide guidance to board members on how to value Service-directed assignments that take officers off the due-course path and recommends that, when possible,

performance evaluations note whether a candidate has taken an unusual assignment at the request of his or her leadership.

Although the main motivation for this recommendation is to eliminate institutional bias that might contribute to the promotion gap between racial/ethnic minority and white officers, the wording is intentionally general, referring to any Service-directed assignment that falls outside the community norm. This wording reflects the Commission's position that diversity encompasses many kinds of human difference and contributes to mission capability. In particular, diversity of experience, potentially reflected in deviations from the due-course path, is expected to be of extra value in the context of changing warfighting environments and in the development of new doctrine. Indeed, the current conflicts in Iraq and Afghanistan may already be changing the Services' ideas about what is considered a "key" assignment. The recent *Quadrennial Defense Review Report*, for example, highlights the need to build expertise in foreign-language, regional, and cultural skills (U.S. Department of Defense, 2010). These changes mean that promotion boards must be open to nontraditional assignment histories until due-course career paths can be reevaluated.

CHAPTER NINE

# RETENTION

Because career progression depends on the ability to retain as well as promote servicemembers, it is important to examine whether there are demographic differences in who chooses to remain in and who chooses to separate from military service. It is also important to identify potential barriers that influence demographic differences in retention.

To calculate the retention behavior of different demographic groups for the AC, the Commission accessed records from FY 2000–FY 2008 from the Proxy Personnel Tempo files provided by DMDC and from information provided separately by the Coast Guard. For the RC, the Commission accessed records from FY 2004–FY 2009 from the Reserve Component Common Personnel Data System files provided by DMDC.[1] For the AC, the Commission calculated reenlistment rates based on those servicemembers who were eligible (i.e., who had completed at least 17 months of service) both to voluntarily leave active-duty service and to reenlist. Officer retention was based on continuation rates of officers, which are calculated as the percentage of officers in the same Service observed at year $t$ and again at year $t + 1$.[2] For the RC, retention for both enlisted servicemembers and officers was calculated based on continuation rates.

## Retention of Racial/Ethnic Minorities

### Active Component Retention

Among AC enlisted servicemembers, the reenlistment rates of non-Hispanic blacks, Hispanics, and non-Hispanic Asian/Pacific Islanders were higher than those of whites and members of other races or ethnicities (i.e., American Indians, Alaska Natives,

---

[1]   The data focus specifically on the Selected Reserve.

[2]   These continuation rates do not distinguish between voluntary and involuntary separation. Differences in personnel management in the enlisted and officer communities led the Commission to focus on reenlistment rates among active-duty enlisted servicemembers and on continuation rates among active-duty officers. Enlisted servicemembers enlist for a set period of time and, after the completion of that term of service, must decide either to leave or to reenlist for another term. If the servicemember chooses to stay, another stay/leave decision must be made at the end of the second service obligation, and so on. Therefore, retention behavior among enlisted servicemembers can be studied at the time of a decision point using reenlistment rates. In contrast, officers are free to leave active-duty service at any point after an initial obligation period and do not have to make specific recommitment decisions at any particular point. Therefore, retention behavior among officers is usually measured through continuation rates.

and individuals of more than one race). This pattern was consistent across all Services. However, the gap in reenlistment rates shrank as time in service increased.

For AC officers, on average, non-Hispanic black and Hispanic officers had cumulative continuation rates that were greater than or equal to whites' rates at every year-of-service point. Specifically, after the fourth year of service, non-Hispanic blacks and Hispanics had consistently higher rates of continuation than both whites and members of other racial/ethnicity minority groups. Until 20 years of service, when differences in retention begin to taper, the differences between non-Hispanic blacks, Hispanics, and whites became more pronounced as years of service increased. The one exception to this trend is found in the Air Force, where non-Hispanic blacks consistently had lower continuation rates than whites until year 20, at which point the gap began to close. The retention rates for other racial/ethnic minority officer groups are more complicated because the rates varied according to Service. On average, the rates of non-Hispanic Asian/Pacific Islanders and members of other minority races/ethnicities (i.e., American Indians, Alaska Natives, and individuals of more than one race) were less than or equal to the rates of whites. Thus, for both the AC enlisted and AC officer corps, racial/ethnic minorities were, overall, more than or equally as likely as whites to remain in service.

### Reserve Component Retention

Among RC enlisted servicemembers, average continuation rates varied somewhat across Service components and years of service. However, overall, non-Hispanic Asian/Pacific Islanders and Hispanics had higher average continuation rates than whites. On the other hand, non-Hispanic blacks and, in some Services, members of other minority races/ethnicities (i.e., American Indians, Alaska Natives, individuals of more than one race, and those of unknown race) had significantly lower average continuation rates than whites. However, the lower continuation rates of non-Hispanic blacks and members of other minority races/ethnicities (i.e., American Indians, Alaska Natives, individuals of more than one race, and those of unknown race) were small, ranging from only a 1- to 4-percentage–point difference.

Among officers in the RC, average continuation rates also varied somewhat across Service components and years of service. Overall, though, the continuation rates of racial/ethnic minorities were higher than or the same as the rates of whites. The only exceptions to this pattern were non-Hispanic blacks in the Air Force Reserve, the Marine Corps Reserve, and the Navy Reserve and non-Hispanic Asian/Pacific Islanders in the Coast Guard Reserve. Again, these differences in promotion rates were relatively small, ranging from only a 1- to 4-percentage–point difference.

## Retention of Women

### Active Component Retention

Examining retention among AC enlisted servicemembers, the Commission found that, across the Services, women were less likely than men to remain in service. There

are two notable exceptions: In the Air Force, women's reenlistment rates early on in their careers (between 17 months and six years of active service) were higher than men's during the mid-2000s. Similarly, men and women had very comparable reenlistment rates earlier on in their careers in the Marine Corps.

Similarly, female officers across the Services were less likely to be retained than male officers. During the first three years of service as an officer, men and women displayed similar continuation rates. However, by the time officers had completed their fourth year of service, differences between male and female continuation rates began to emerge and to increase with years of service through roughly years 8 to 12. By the tenth year of service, the percentage-point difference between male and female officer cumulative continuation rates was 10 in the Army, 15 in the Navy, and 20 in both the Marine Corps and Air Force. In other words, although both male and female officers separated from the military as years of service increased, female officers separated at higher rates during the period under consideration. This difference in later years is likely the result of retention rather than promotion because it occurs before the first competitive promotion point. However, after 20 years of service, the gender gap begins to narrow again, with a difference of less than 5 percentage points by 30 years of service. Thus, overall for both the AC enlisted and officer corps, women were less likely than men to remain in service.

### Reserve Component Retention

Women enlisted in the RC, no matter what the Service, were less likely than men to remain in service. Furthermore, continuation rates for women generally remained below those of their male counterparts across years of service, with only some increase in retention past 20 years of service.[3]

As in the case of enlisted trends, data on RC officer continuation rates show that, across all the Services, women were less likely than men to remain in service. In general, female continuation rates were lower than male rates until roughly ten years of service. Female continuation rates then rose above those of their male counterparts between ten and 20 years of service and then dropped back down below the rates of men after 20 years of service. Thus, overall, for both the RC enlisted and RC officer corps, women were less likely than men to remain in service.

### Gender Differences in Attitudes Toward Military Life

Although there were small differences in the retention rates of racial/ethnic minorities compared with those of whites, particularly in the RC, the largest gap in retention rates was between men and women. To explore why this gender gap in retention exists, the Commission examined potential differences in servicemembers' attitudes toward military life. Using data from the DMDC's November 2008 SOFS (found at Defense

---

[3]  RC servicemembers may have had prior service time in the AC before joining the RC. Therefore, the Commission uses the Years of Service Pay Entry Base Date as a measure of years of service rather than years of service in the RC. This Years of Service Pay Entry Base Date metric measures years of service from the time a servicemember first joins the Armed Forces.

Manpower Data Center, 2010c), the Commission assessed whether there were gender differences in satisfaction with military life, organizational commitment, and retention intentions.[4]

In the AC, female enlisted servicemembers were as likely as their male counterparts in the Army, Navy, Air Force, and Marine Corps both to be satisfied with the military way of life and to report that they intended to remain in the Armed Forces. Similarly, in the AC Air Force, Marine Corps, and Navy, female officers were as likely as their male counterparts both to be satisfied with the military way of life and to report that they intended to remain in the Armed Forces. There was an exception in the case of female Army officers, who, compared with their male counterparts, reported being less satisfied with the military and less likely to stay. Consistent with the AC, female servicemembers in the RC were as likely as their male counterparts to report that they were satisfied with the military way of life and that they intended to remain in the Armed Forces.

However, the results also showed that AC enlisted female soldiers and sailors were less likely than their male counterparts to report that they saw the military as a career. Similarly, across all four DoD Services, female AC officers were less likely than their male counterparts to report that they saw the military as a career. The Commission did not have data on RC servicemember attitudes toward a military career.

Finally, through the DEOCS, the Commission gathered additional AC data on potential reasons for leaving military service.[5] Overall, the results from the DEOCS suggest that men and women cited similar reasons for leaving active duty. Both genders reported dissatisfaction with their job, low pay, and lack of promotion or advancement opportunities as reasons for leaving. For male officers, the most frequently cited

---

[4]   The AC sample consisted of 37,494 servicemembers of the Air Force, Army, Marine Corps, and Navy who had completed at least six months of service and were below flag/general officer rank six months prior to data collection. A total of 10,435 eligible servicemembers returned usable surveys (3,474 officers, 6,303 enlisted servicemembers, and 658 warrant officers). The RC sample included responses from the Army National Guard, the Army Reserve, the Navy Reserve, the Marine Corps Reserve, the Air National Guard, and the Air Force Reserve. The Coast Guard does not participate in the SOFS.

[5]   Survey data were collected in two periods during February–March and May 2010. Although a total of 3,419 servicemembers completed the survey during this period, the Commission focused its attention on the 1,111 AC officers and enlisted servicemembers who reported that they either were leaving at the end of their current obligation (n = 592) or were not sure whether they were leaving at the end of their current obligation (n = 519) and whose responses were not missing data on race/ethnicity, gender, branch of Service, or rank.

Just over half of the servicemembers in the analytic sample were in the Army (616), and roughly one-third were in the Navy (315). The rest were spread throughout the Marine Corps (87), Coast Guard (70), and Air Force (23). The distribution of respondents across Services reflects differences in how each of the Services uses the DEOCS. The DEOCS is typically not used by the Air Force, which relies on its own internal climate survey. Therefore, it is likely that the Air Force respondents in the sample were in a cross-Service command. In the Navy and Marine Corps, unit participation in the DEOCS is required within 90 days of a new commander taking command and every year thereafter. The Army has its own climate survey that must be administered to units within 90 days of a new commander taking command, but the DEOCS is also available to commanders who choose to use it. The Coast Guard requires administration of the DEOCS to each unit annually, as long as the unit contains at least 16 servicemembers. In general, DEOMI does not generate a DEOCS report unless at least 16 assigned personnel complete the survey.

reason for leaving was failure to be promoted. Although there were fewer female officer responses to analyze, the high frequency of deployments and the desire to settle in one location were both listed as primary motivations for separating. Among male enlisted servicemembers, low pay and low allowances was the most frequently cited reason for leaving; among female enlisted servicemembers, involuntary separation or ineligibility to reenlist was the most frequently cited reason. Overall, however, none of the data points to a single reason or single set of reasons that can explain why women haven chosen to leave military service at higher rates than men.

## DACOWITS Should Expand Its Focus to Include an Explanation of the Gender Gap in Retention

*Recommendation 12—*

***Where appropriate, DACOWITS should expand its current focus on retention to include an explanation of the gender gap in retention. As part of this renewed focus, DACOWITS should examine the effects of retention programs, such as the sabbatical programs currently offered by the Navy and the Coast Guard as well as any other innovative Service-specific approaches to retention. Findings and recommendations from this research should be presented to the Secretary of Defense.***

Because the data do not clearly indicate why more women leave service earlier and at greater rates than men, the Commission recommends that the Defense Advisory Committee on Women in the Services (DACOWITS) expand its current focus on retention to examine the gender gap in retention. This examination should also explore why women are less likely to view the military as a career and should help to identify existing policies and practices that may effectively decrease the retention gap between men and women.

The Commission also suggests that DACOWITS examine the effectiveness of a number of sabbatical programs. All the Services currently offer a number of these programs to enhance retention among their servicemembers. However, because the law prohibits the award of benefits to individuals solely based on gender, designing retention programs specifically aimed at women is challenging. Thus, retention outcomes related to three potentially effective, and legal, sabbatical programs should be more fully explored.

In FY 2009, the Navy began to conduct a pilot program, the Career Intermission Pilot Program, to encourage retention through enhanced career flexibility. The National Defense Authorization Act for Fiscal Year 2009 allows 20 officers and 20 enlisted members in each Service to participate in the program each year. The program, which is open to both men and women, allows officers and enlisted personnel to temporarily (for up to three years) take time off from active duty. Participants in the program transition from the AC to the Individual Ready Reserve during this period. Although those who participate in a career intermission do not receive active-duty pay or allowances, they do retain medical and dental care benefits and continued access to

commissaries, exchanges, and Morale, Welfare, and Recreation programs. Service-members incur an additional active-duty service obligation of two months for every month of participation in this career intermission. Upon their return to active duty, participants return at the same rank they held upon entering the program.

The Coast Guard has two sabbatical programs worthy of exploring. The first, Care for Newborn Children, and the second, Temporary Separation Program, are restricted to individuals who are at the rank of E-4/O-3 or above. To qualify for Care for Newborn Children, at least four years of active-duty service in the Coast Guard are required; six years are required to qualify for the Temporary Separation Program. Both programs allow for up to a 24-month absence, and the servicemember receives no pay or benefits while away. Upon return, individuals are reinstated at the same rank they held upon leaving, assuming that they meet physical fitness requirements and return within two years. Servicemembers may take advantage of one sabbatical, but not both.

The Commission suggests that DACOWITS examine the available data on these leave programs as well as other innovative Service programs and assess the effect of their expansion on female retention. The Commission also recommends that DACOWITS disseminate the findings and recommendations from its review to a wide audience, including the Secretary of Defense. This can help facilitate the use of successful retention practices that close the gender gap across Services.

CHAPTER TEN

# GOING BEYOND RACE/ETHNICITY AND GENDER

Although the majority of Chapters Four through Nine has focused on increasing racial/ethnic and female representation within senior military leadership, the Commission also recommends tracking and improving other aspects of diversity within the military.

## DoD and the Services Must Better Manage Personnel with Mission-Critical Skill Sets

*Recommendation 13—*

***DoD and the Services must track regional and cultural expertise and relevant Reserve Component civilian expertise and continue to track language expertise upon military accession and throughout servicemembers' careers in order to better manage personnel with mission-critical skill sets.***

As noted in the recent *Quadrennial Defense Review Report*, DoD needs to build regional, cultural, and foreign-language expertise in order to prepare for future security needs (U.S. Department of Defense, 2010). Given that no one can predict where the next conflict might be and what future regional expertise would be needed, it is prudent to track all language and cultural expertise, not just that specified by the current *Quadrennial Defense Review Report*, throughout servicemembers' careers.

In addition, certain RC civilian expertise can be a critical aid to missions. RC personnel may, via their civilian careers and other experiences, possess skills that are in high demand in the military. Some of these skills, such as regional, cultural, and language expertise, are linked with demographic diversity. Others, such as those related to science and technology, go beyond demographics. Therefore, the Commission recommends that DoD and the Services codify and track civilian expertise that is deemed mission critical.

A mechanism that could be used to track relevant RC civilian expertise is the Civilian Employment Information program, which requires each member of the Ready Reserve to report employment status, employer's name and address, civilian job title, and years of experience in current civilian occupation. This information is stored in the Reserve Component Common Personnel Data System. This program could be expanded to collect information on servicemember skills, including regional, cultural,

language, technical, and scientific expertise. This information would then be available to commanders looking for servicemembers with specific skill sets.

## DoD Must Promote Structural Diversity, Total Force Integration, and Overall Retention

*Recommendation 14—*

*To promote structural diversity, total force integration, and overall retention,*

- *a. DoD must improve the personnel and finance systems affecting transition between Active and Reserve Components and internal Reserve Component transition protocols.*

- *b. The Assistant Secretary of Defense for Reserve Affairs and the Service Chiefs must assess how Reserve Component members can more effectively both gain operational experience and fulfill joint requirements within the constraints of their dual military/civilian lives and take action as appropriate.*

### Improve the Personnel and Finance Systems Affecting Transition Between Active and Reserve Components and Internal Reserve Component Transition Protocols

Personnel leaving the AC are valuable resources for the RC, but the current process for transitioning from the Active Duty List to the Reserve Active Status List is lengthy and inefficient. On average, it takes one to six months to transition from the AC to the RC. To encourage servicemembers to join the RC rather than leave the military, DoD needs to improve personnel and pay systems to facilitate the transition. For example, many steps in this process could be made more efficient through automation and better interfaces between personnel and financial (i.e., pay) systems across the Services. These improvements could include automatic checks and balances wherever possible, real-time updated billet availability for assignment approvals, and close-to-real-time transitions between personnel and pay systems across the Services. Overall, streamlining this process would give the RC access to a broader talent pool by making it easier for a servicemember leaving the AC to join the RC.

Additionally, flexible service opportunities, such as seamless transition within the RC, have the potential to improve structural integration within the RC. The force structure constraints of one RC Service may limit promotion opportunities for some qualified servicemembers; however, another RC Service may not have the same constraints. By moving from one RC Service to another, servicemembers can take advantage of a wider variety of promotion opportunities.

### Assess How RC Members Can More Effectively Gain Operational Experience and Fulfill Joint Requirements

Joint requirements are currently not aligned with the career path of traditional drilling reservists in the National Guard and Reserve. Unlike their AC counterparts, RC ser-

vicemembers must meet their military educational and operational requirements without detriment to or neglect of their civilian occupations. In addition, their window of opportunity to gain operational experience and credibility in their primary area of concentration and to complete a joint assignment is particularly narrow; thus, these two career milestones are often mutually exclusive. As a result, because they may lack joint qualifications or because they missed out on key operational assignments, many traditional RC servicemembers become uncompetitive for flag/general officer consideration.

To address this issue, the Commission recommends that DoD and the Services implement policy that provides flexible opportunities for officers to become joint-qualified to accommodate the constraints and requirements of the RC career path. In particular, the Services should provide mechanisms for officers to acquire both joint and operational experience, at the appropriate rank, and they should provide enough education slots so that all qualified National Guard and Reserve servicemembers can complete their joint professional military education and other education requirements in a timely fashion.

The purpose of this recommendation is to promote a highly qualified RC officer corps that can effectively compete for the highest ranks in the military. The Commission believes that this can add to the structural diversity of the upper ranks by ensuring that traditional reservists are qualified to be promoted to the highest ranks.

## Conclusion

The chapters in this section outlined how specific stages of the military personnel life cycle and related structural and perceptual barriers influence the diversity of future military leaders. In an effort to improve the career progression of racial/ethnic minorities and women at each stage, the Commission made detailed recommendations to address key barriers.

Through partnerships and outreach programs, DoD and the Services can attempt to address current eligibility issues. Improved recruiting efforts focused on members of underrepresented demographic groups can then help improve the demographic diversity of initial accessions. The removal of combat exclusion policies for women and further development of effective mentoring efforts can create opportunities for, and educate servicemembers regarding the importance of, career field selection and key assignments to career advancement. Ensuring that the promotion process is transparent and fair can then help ensure that members of all demographic groups receive opportunities for advancement. Further research into the current gender gap in retention can lead to changes that ensure that there is a demographically diverse pool of candidates for promotion. Finally, going beyond demographics, other important diversity dimensions, such as language skills, cultural expertise, and the structural diversity brought by the RC, should be promoted within the Services. Taken together, these recommendations can help develop and sustain a talented military leadership that truly represents the face of America.

# SECTION IV:
# ENSURING CONTINUED PROGRESS

CHAPTER ELEVEN

# MANAGING AND SUSTAINING DIVERSITY

So far, this report has suggested a new definition of diversity, proposed that diversity leadership be a core competency in the Services, and recommended ways that barriers to career advancement can be reduced at all stages of a military career both for underrepresented demographic groups and for people with desirable backgrounds and skill sets. These changes, however, cannot be managed and sustained without developing a stronger organizational structure and a system of accountability, monitoring, and enforcement to ensure continued progress toward greater diversity at all ranks of the military.

This chapter highlights the priorities in these areas and makes recommendations to address them. It begins with the need for a management system with oversight from a Chief Diversity Officer who reports directly to the Secretary of Defense. It then identifies the need for strategic diversity planning, new policies, and metrics for measuring progress across the Services and within DoD. Finally, it describes the importance of holding leaders accountable for progress toward achieving a military workforce that is not only diverse demographically but also inclusive of all the characteristics required for high performance in the future.

## Priority: Aligning the Organizational Structure to Support an Effective Diversity Management System

Currently, responsibility for diversity management in OSD is assigned to the Office of Diversity Management and Equal Opportunity (ODMEO). This office is charged with promoting EO throughout DoD and overseeing diversity policy for DoD, including coordinating the diversity efforts of the Services. The diversity mission was an added function initiated by ODMEO leadership to help DoD incorporate diversity management practices and processes into its workforce management culture.

ODMEO grew out of the Office of the Deputy Under Secretary (EO) (DUSD(EO)), which was established

> In addition to the CEO's leadership, responsibility for diversity in "best-practice" companies is seen as a line-management responsibility, not as a Human Resources . . . staff program or initiative.
>
> —Defense Business Board Task Group on Increasing Diversity in DoD's Flag and Senior Executive Ranks, 2004

under the Principal Deputy Under Secretary of Defense (Personnel and Readiness). DUSD(EO) was established in 2003, when the Deputy Assistant Secretary of Defense for EO was elevated to the position of DUSD(EO) and the position was filled by a

FROM REPRESENTATION TO INCLUSION: DIVERSITY LEADERSHIP FOR THE 21ST-CENTURY MILITARY

political appointee. When that political appointee departed in 2006, the Office of the DUSD(EO) was renamed ODMEO and placed under the Deputy Under Secretary (Plans). On one hand, this realignment mainstreamed diversity and EO by integrating responsibility for these functions into the established organization responsible for "developing and implementing change in high priority areas within Personnel and Readiness" (Under Secretary of Defense (Personnel and Readiness), 2006). On the other hand, this change dealt two blows: demotion in status and loss of a political appointee position to set and carry out the agenda (Haughton, 2010). In 2010, the position of Deputy Under Secretary (Plans) was eliminated, and ODMEO was placed under the Deputy Under Secretary (Readiness).

> I think . . . this office has been diluted, has been moved down in a food chain to a point where there is no punch. Taking away the Deputy Assistant Secretary position, burying them five dead letters down in an organization is not the answer.
>
> —The Honorable D. Michael Collins, remarks to the Commission, 2010

For some time, then, ODMEO has been isolated from top leadership and unable to set the agenda or drive progress. Although several key diversity initiatives have been undertaken, the diversity management function of ODMEO's portfolio has been slow to develop (Johnson, 2011).[1] Today, ODMEO remains an understaffed office several levels below the Secretary of Defense. In the military departments and the Services, the placement of—and funding and staffing for—the diversity offices varies considerably.

The Commission looked to industry to see how companies with exemplary diversity programs approach and organize for effective diversity management. The Commission found that the personal engagement of top leadership is the single most important factor in achieving diversity leadership and inclusion across any organization. In corporations, personal engagement from the CEO has been shown to be vital. In the U.S. military, the Secretary of Defense is analogous to the corporate CEO and, as such, should be responsible for pushing DoD forward on the path to inclusion. He and his successors will, however, need help and continuity to enforce new policies and ensure that progress continues to be made. *The Commission believes that a systems approach is needed to ensure the sustained emphasis on diversity that has been lacking in the past. Within that system, the establishment of a Chief Diversity Officer (CDO)—a practice common to all the diversity exemplars studied—is the key driver toward embedding diversity within the "DNA" of DoD.*

---

[1]  ODMEO's accomplishments include sponsoring a diversity summit, establishing the Defense Diversity Working Group, and promulgating DoDD 1020.02, *Diversity Management, Equal Employment Opportunity, and Military Equal Opportunity in the Department of Defense* (Issue Paper #7; Issue Paper #20; Lim et al., 2009).

## Establish the Position of Chief Diversity Officer

*Recommendation 15—*

**The Office of the Secretary of Defense organizational structure must be aligned to ensure a sustained focus on diversity and diversity initiatives and should include establishment of the position of a Chief Diversity Officer who reports directly to the Secretary of Defense.**

- **The existing Research & Analysis office should be directed and resourced to support the Chief Diversity Officer.**

- **Chief, National Guard Bureau, must establish and resource organizational structures that support DoD diversity initiatives and reinforce ongoing National Guard diversity leadership efforts.**

In the corporate world, the CDO does not have operational authority per se but depends on others for execution of diversity initiatives. Thus, he or she is a strategic business partner of others in the executive team, "helping them develop strategy for their business units and making sure that they understand what the organization is doing and why, how results are measured, who is accountable" (Dexter, 2010).

The Commission recommends that the DoD CDO report directly to the Secretary of Defense and receive support from the Under Secretary of Defense (Personnel and Readiness), who is analogous to a vice president of human resources. This practice is one way of ensuring that diversity management is embraced as a "line" rather than "staff" responsibility. In addition, this reporting relationship supports the goal of establishing diversity leadership as the CEO's responsibility. It is also consistent with military staff organizations, which typically have a small number of individuals with responsibilities of such importance (e.g., safety) that the commander keeps them close.

The CDO cannot work in isolation, however. *An integrated, holistic system for implementation and accountability is needed if progress is to be sustained.* Figure 11.1 illustrates such an approach and reveals the centrality of the CDO to all facets of the system.

This proposed diversity management system is a set of mutually reinforcing elements that work together to provide effective, consistent implementation and persistent accountability for achieving the goals of diversity and inclusion. Note that all of these components have counterparts in best practices in the Services, the corporate world, or both. The components are

- *Accountability reviews.* The Secretary of Defense meets annually with the leadership of each Service to go over progress toward diversity goals (see Recommendation 17). This prepares him or her for the diversity annual report to Congress.
- *The diversity annual report to Congress.* Called for in Recommendation 5, this report from the Secretary of Defense draws on the Services' accountability reviews to review DoD's progress toward its overarching diversity goals.
- *The early warning/inspector general function.* The set of activities undertaken by the CDO together provides the information needed to alert the Secretary of Defense to potential problems with diversity management progress, programs, or practices.

**Figure 11.1. The Centrality of the CDO Within the Proposed Diversity Management System**



- *The Diversity Policy Integration Group.* The CDO, acting as a strategic business partner, chairs a diversity policy integration group, through which OSD's policy offices take responsibility for implementation of diversity initiatives within their domains.[2]
- *Deputy's Advisory Working Group (DAWG) "Diversity Days."* The DAWG, the existing senior DoD leadership forum, follows up in a regular meeting on over-arching diversity issues (see Recommendation 19).
- *Expanded DACOWITS special studies.* DACOWITS expands the scope of its work to provide external oversight and special studies focused on the diversity issues of the day (see Recommendation 19).
- *CDO supervision of the Research & Analysis office.* The Research & Analysis office provides support for accountability reviews, the diversity annual report to Congress, barrier analyses, and early warning of systemic diversity issues.

## Provide the CDO with Research and Analysis Support

For the CDO to be effective, he or she needs timely, accurate, insightful research and analysis based on objective, standardized data. In its effort to provide recommendations that are executable, the Commission recommends that the CDO turn to the existing Research & Analysis office within the Office of the Under Secretary of Defense (Per-

---

[2]   This group would provide the CDO with access to policy offices that have not traditionally been involved with diversity, and it would ensure the implementation of diversity initiatives, using a "mainstreaming" approach to infuse a diversity perspective across the organization. Implementation of diversity initiatives would be carried out by the Under Secretary of Defense (Personnel and Readiness)'s "line" organizations (Reserve Affairs, Civilian Personnel Policy, Military Personnel Policy, and Readiness) and, ultimately, by the Services.

sonnel and Readiness).[3] This office must be properly resourced to support the many data and analysis requirements needed throughout the system, including accountability reviews, barrier analyses (see Recommendation 18), the diversity annual report to Congress, early warning of systemic diversity issues, the DAWG "Diversity Days," and the expanded DACOWITS special studies.

## Chief, National Guard Bureau, Must Reinforce Ongoing Efforts to Promote Diversity

The unique features of the National Guard require specific attention in terms of implementation and accountability.[4] As codified in Title 10, the President is the Commander in Chief of the Armed Forces of the United States, including the National Guard and Reserve when called to active duty. Most of the time, however, the National Guard is not on active duty and, therefore, not under federal control.

As explained in Chapter Three, Title 32 assigns command of State National Guard units to the Governors of the States when the units are not under federal control. As commander in chief, the Governors select the Adjutant General for their States. Title 10 and Title 32 effectively indicate that Chief, National Guard Bureau, has no command authority over each State's National Guard.

Given these governing laws, the National Guard has a very different command and control structure from that of the AC. The fact that National Guard members report to their State's Governor as commander in chief means that policies are often State-specific and lack national oversight. In September 2009, the National Guard Bureau established the position of Special Assistant to the Chief for Diversity. This "diversity office" has a single position, has no annual budget, and reports to the Comptroller and Director of Administration and Management for the National Guard Bureau. Thus, the current diversity office is not staffed, resourced, or placed appropriately in the organizational chart to influence policy or promote accountability, and top leaders are not involved.[5]

---

[3] To ensure broad knowledge of workforce issues, the Research & Analysis office should become a truly joint organization by including expert researchers from the major personnel centers of the Services. These Services' analysts could serve at Research & Analysis on a rotational basis. Such a program would institutionalize knowledge sharing among the Services and OSD. Additional expertise could be provided by diversity experts at the federally funded research and development centers. This talent base should serve as an advisory team to support the CDO and the Research & Analysis office.

[4] Because the major recommendations include the RC through each parent Service, the focus here is on the National Guard.

[5] The role of the Special Assistant for Diversity is to provide diversity policy for the entire National Guard. The Army and Air National Guard offices are responsible for supporting these policies in each of the states. The Army National Guard has a national diversity office and a diversity coordinator in each State. As of this writing, the Air National Guard planned to stand up a diversity office in January 2011, and it has a Human Resource Advisor in each State. However, these offices do not report directly to the National Guard Bureau's diversity office and are not obligated to advocate national diversity policy. Thus, much of the intended impact of this office is curtailed because it lacks direct implementation power. Given these limitations, good com-

Chief, National Guard Bureau, could take several steps to make the diversity office more effective. As with the Commission's recommendation to establish a CDO who reports directly to the Secretary of Defense, the Special Assistant to the Chief for Diversity should report directly to the Chief, National Guard Bureau, to maximize leadership visibility and involvement. In addition, this office should be properly staffed and resourced to support the policy objectives of the leadership.

A properly resourced diversity office within the Chief, National Guard Bureau, Personal Staff organization can act as the center of communication between the National Guard Bureau and OSD. It can also distribute policy and information to the Air and Army National Guard from the Chief, National Guard Bureau, Personal Staff position. These changes to reporting and resources will increase the ability of the Special Assistant for Diversity to influence National Guard Bureau diversity policy and its implementation.

## Priority: Developing Strategic Plans, Policies, and Metrics for a Diversity Management System

The CDO will need a solid foundation on which to build. First, to be effective and practical, the diversity management system must function within the framework of an overall DoD strategic plan that publicly states a diversity definition, vision, and goals for DoD. But individual Services need their own strategic plans for achieving diversity. Currently, only two Services have such plans: the Air Force and the Coast Guard. The release of the Air Force plan was announced during the writing of this report and was therefore not evaluated. The Coast Guard's plan has objectives, milestones, and metrics. Its focus, however, is primarily racial/ethnic and gender diversity, which is not consistent with the Coast Guard's broad definition of diversity. The other Services have pieces of plans, but they have not been synthesized and promulgated and do not provide detailed, coordinated strategies for achieving the diversity visions. Similarly, roles, responsibilities, authorities, and accountability have not been addressed in any coordinated fashion. Finally, DoD has a diversity policy (DoDD 1020.02), but no strategic plan.

Second, to support the strategic plan, DoD, the military departments, and the Services need a strong set of policies that spells out roles, assigns and aligns responsibilities and authorities, and specifies who is accountable. In addition, to compel progress toward the goals identified in the strategic plan, the Secretary of Defense needs to define a set of strategic metrics that are (1) directly linked to key organizational priorities and goals, (2) actionable, and (3) actively used to drive improvement.

In the area of EO, DoD had in place a number of directives and other policy statements, last revised in the 1990s. Together, these provided a rigorous accountability system designed to ensure the continuation of DoD's pioneering past. These documents included the following mandates:

---

munication about the importance of the message and support for implementing the policy are key elements for successful implementation of national policy in the States, territories, and District of Columbia.

- the DoD Human Goals Charter, part of DoD's EEO policy for civilian employees, to be reissued by each new Secretary of Defense
- the Military Equal Opportunity Assessment, to be compiled annually from reports and data submitted by the Services
- the Defense Equal Opportunity Council, consisting of DoD's top leadership, to promulgate policy and track progress.

However, these mandates were allowed to lapse during the George W. Bush administration and have not been revived under President Barack Obama. The Commission believes that DoD needs newly crafted policies and plans that not only restore its leadership in the area of EO but also address the realm of diversity, broadly defined. Ultimately, the goal of this effort is to embed the values of diversity and inclusion into the culture and practices of the military, as called for in Chapter Three.

Finally, the new system requires a set of metrics that enable leaders to monitor progress toward achieving the goals expressed in the strategic plan. Regular, rigorous evaluations and assessments can help military leaders understand how well the new diversity paradigm defined in the strategic plans is "sticking" and how effective each program is at furthering its goals.

## Implement Clear, Consistent, Robust Diversity Management Policies

*Recommendation 16—*

*DoD and the Services must resource and institute clear, consistent, and robust diversity management policies with emphasis on roles, responsibilities, authorities, and accountability.*

- *a. DoD and the Services shall implement diversity strategic plans that address all stages of a servicemember's life cycle. Each strategic plan shall include*
  - *a diversity mission statement that prioritizes equity and inclusion and provides a purpose that is actionable and measurable*
  - *a concept of operations to advance implementation.*

- *b. DoD must revise (if appropriate), reissue, and enforce compliance with its existing diversity management and equal opportunity policies to*
  - *Define a standard set of strategic metrics and benchmarks that enables the Secretary of Defense to measure progress toward the goals identified in the strategic plan, including the creation of an inclusive environment.*
  - *Establish standards that allow for the collection of data needed to generate these metrics and the analysis needed to inform policy action.*
  - *Provide oversight of, and support for, the Services' respective diversity initiatives and metrics to ensure that, at a minimum, they align with the end state established by DoD.*

## Create Diversity Strategic Plans

Under the umbrella of a DoD strategic diversity management plan, each of the Services needs its own strategic plan, crafted to articulate goals related to the amount and type of diversity in its forces and to explain how all types of diversity should be leveraged to improve mission capability. In particular, the strategic plans should highlight the creation of cultures that value equity and inclusion as a fundamental aspect of successful diversity management and should lay the groundwork for embedding diversity leadership as a core competency of the Armed Forces. The diversity plans must also address the whole personnel life cycle of military members to ensure that the Services both recruit effectively from an ever more demographically diverse eligible population and facilitate career progression for a force that will be increasingly diverse along many dimensions, including not just race/ethnicity and gender but also religion, functional expertise, and military component, among others. Within this diversity management construct, facilitating career progression means equipping servicemembers to proactively map out and follow their own career paths.

Finally, to ensure that strategic plans are translated into practical action, each plan should include a concept of operations (CONOPS) to clearly and concisely express what leadership intends to accomplish and how it will be done with available resources.[6] Specifically, the CONOPS should tell leaders how to plan for and monitor the way diversity is managed from recruiting through training, branching, assignment, education, retention, promotion, and command and should identify who will be held responsible for making progress at each stage.

## Revise, Reissue, and Enforce Compliance with Existing Diversity Management and EO Policies

Good policies outlast individual leaders and are required for institutionalization. Currently, the Services' diversity policy statements say nice things about diversity but contain no specifics about what diversity programs should cover, how they should be executed, or who is responsible for achieving the desired results. The DoD policy on diversity management and EO, DoDD 1020.02, provides a general framework by distinguishing between diversity management and EO, but it is vague about implementation and contains no real accountability mechanism.

Following the development of their diversity strategic plans, both DoD and the Services need to strengthen and finalize their diversity management policies, some of which have been in draft form for many years. Service policies will vary according to Service culture and practices, but, as with the DoD and Service-specific strategic plans, DoD needs to provide a fleshed-out policy umbrella under which those policies can operate. In addition, OSD should remedy some of the omissions of the past decade. The military already has several well-established and well-understood EEO and mili-

---

[6]  The U.S. Joint Chiefs of Staff (2010) define a CONOPS as "[a] verbal or graphic statement that clearly and concisely expresses what the joint force commander intends to accomplish and how it will be done using available resources. The concept is designed to give an overall picture of the operation."

tary equal opportunity policies, but some important pieces of DoD EO policies have been allowed to lapse.[7]

These policies will need to be revised in accordance with the vision defined in the DoD strategic diversity management plan and put into effect in ways that not only improve the representation of minorities and women in military leadership but also increase military readiness and support mission accomplishment.

### Define a Standard Set of Strategic Metrics and Benchmarks that Enables the Secretary of Defense to Measure Progress

The Commission's review of management literature and testimony by diversity managers of major companies suggested that metrics empower an organization by enabling managers and workers to evaluate and control the performance of the resources for which they are responsible and by helping them identify gaps between performance and expectation that, ideally, point to intervention and improvement. To do this effectively, however, metrics need to be designed carefully and to result in clearly communicated messages. The final results should provide the user of the metrics with a sense of knowing what needs to be done without requiring him or her to understand the intricacies of every related process. Poorly developed or poorly implemented metrics can lead to frustration and confusion and can send mixed messages.

DoD already has well-established metrics for measuring progress in demographic diversity. According to DoDD 1350.2, *Department of Defense Military Equal Opportunity (MEO) Program*, the Services are required to submit an annual Military Equal Opportunity Assessment that reports the demographic composition of promotions, retention, and assignments for that year and contains data on additional aspects of demographic diversity (U.S. Department of Defense, 1995). This assessment was the sole reporting mechanism required from the Services on their affirmative action and EO policies, and although the report is still a requirement according to policy, it was last produced in September 2004, using FY 2002 data. The Commission recommends that DoD enforce this reporting requirement and compliance with the goals of the Services' strategic plans.[8]

Although the Services do internally track the demographic profile of their personnel, they generally do not systematically track other aspects of diversity, such as cultural expertise and ability, and they do not explicitly evaluate the inclusiveness of the environment. To properly assess the broad diversity climate, DoD and each of the Services must begin tracking, reporting on, and reviewing programs and personnel accordingly.

This requires developing a new set of metrics to capture the inclusion and capability aspects of DoD's broader diversity goals. Assessment results will allow leaders to enforce accountability, identify which strategies are most effective, and acquire

---

[7]   DoDD 1020.02 refers to four major EO directives: DoDD 5500.11 and DoDD 1020.1 on nondiscrimination, DoDD 1440.1 on DoD civilian EEO policies, and DoDD 1350.2 on military equal opportunity policies.

[8]   The Commission recommends that the data continue to be reported but that the accountability review process be used (see Recommendation 17).

a big-picture view of how the new vision of diversity is being received and implemented across the Armed Forces. These metrics must go beyond the traditional "head-counting" metrics (e.g., how many women are in the Navy?) used to assess the success of diversity policies in the past. Relying entirely on the traditional metrics can send the wrong signal about diversity, suggesting that Armed Forces, to meet diversity "standards," need to reach a "quota" of certain people, regardless of their qualifications. Establishing an environment of inclusion is not about adhering to a set of regulations but about working with different people toward a common goal, and it is important to create metrics that are consistent with this new vision.

**The Characteristics of Good Metrics.** The Commission believes that the following are the characteristics of good metrics:

- *Developed with an end state in mind and systematically linked to strategic goals.* Metrics should link intended goals, strategies, and actual execution. Metrics not linked to a strategic end state do not create value for organizations.
- *Clearly stated.* Metrics should be easily understood and communicated.
- *Value-added.* Metrics should deliver value to the organization by providing information on key aspects of performance.
- *Actionable to drive improvements.* Good metrics must provide information that has implications for a clear plan of action.
- *Tracked over time.* Metrics must be tracked over time to provide information on the trend in the metric, not simply its status at one particular moment.
- *Verifiable.* Metrics should be based on an agreed upon set of data and a documented process for converting data into the measure.

The primary property of good diversity metrics is that they go beyond simply calculating representation of particular groups in the workforce and actually measure how those groups are integrated in the workforce. Some of the best measures of this kind can come from administrative data sources. The advantages of these sources are both that they release servicemembers from the burden of filling out surveys and that they are the result of standardized, rigorous administrative processes. The example of disciplinary data is used below to illustrate this point.

**Going Beyond Head-Counting.** Survey data are one means of assessing command climate and the extent to which it is inclusive. Data on EO and sexual harassment complaints provide another source of information.

A third metric for an inclusive environment is provided by discipline data: court martial cases and nonjudicial punishment. Discipline data are more reliable than survey data as an indicator of command climate. Each data point represents the results of an investigation that provided sufficient evidence to bring charges, whereas survey data are based on anonymous responses from self-selected samples of servicemembers.

The Services provided the Commission with recent data on courts martial. The Commission analyzed the available data for 2007 and 2008. Table 11.1 shows the 2008 data across court martial type for the four DoD Services combined. Because the data

**Table 11.1. Court Martial Cases, by Race/Ethnicity Group, 2008**

| Race/Ethnicity Group | No. of Court Martial Cases | Total No. of Military Personnel | Rate of Cases per Thousand |
|---|---|---|---|
| White | 2,937 | 895,965 | 3.28 |
| Black, non-Hispanic | 1,240 | 231,645 | 5.35 |
| Other | 715 | 259,641 | 2.75 |
| Total | 4,892 | 1,387,251 | 3.53 |

NOTE: "Other" encompasses American Indians/Alaska Natives, Asians/Pacific Islanders, Hispanics, and those whose race/ethnicity was unknown.

the Commission received did not use consistent race/ethnicity categories, we show the information for three categories: white, non-Hispanic black, and other.

The discipline data are normalized into rates of cases brought per thousand servicemembers, and they include all active-duty personnel (enlisted servicemembers, officers, and warrant officers). The patterns were consistent across Services and for both 2007 (not shown) and 2008 (shown): Blacks had a much higher rate of being court martialed. The differences were statistically significant: The probability that the differences are due to random chance is very low (less than 0.01). That level of statistical significance was also present in the analysis of each individual Service.

These discipline data can be interpreted in multiple ways. Note that the data presented here do not indicate the outcome of the court martial; information on outcome would add another level of meaning to the data. Differences in discipline rates might reflect difficulties in some servicemembers' feeling fully included in their unit, their Service, and, most importantly, the U.S. military. Differential rates by race/ethnicity might indicate that current acculturation processes have been less successful in getting racial/ethnic minorities to fully incorporate and internalize Service norms, or they might reflect a failure in diversity leadership. Without further investigation, one cannot pinpoint the locations of this potential failure in the existing acculturation process. But the data clearly indicate that the process has failed differentially for black servicemembers.

These data do not take into account an array of relevant factors that influence the numbers, and, due to lack of standardization, the Commission could not look in more depth at patterns for different race/ethnicity categories. It is worth noting, however, that in-depth analyses of such data could be undertaken by the CDO. Such information is a good candidate for a diversity metric at the strategic level.

### Establish Standards That Allow for the Collection of Data Needed to Generate These Metrics and the Analysis Needed to Inform Policy Action

Currently, consistency is lacking across the Services in terms of the data they collect and the metrics they employ. For meaningful metrics, a standard set of data definitions and collection procedures that are uniform across the Services must be employed and enforced. Currently, even basic demographic data are not uniform across DoD,

and such metrics as promotion and retention rates are not calculated in a consistent manner. The CDO should promulgate standards for these basic data elements and for the new types of information required to produce more-meaningful measures of diversity and inclusion. The CDO should also produce standards for analytical methodology to ensure that analysis of the data is rigorous, meaningful, and consistent over time and from one Service to the next.

### *Provide Oversight of, and Support for, the Services' Respective Diversity Initiatives and Metrics to Ensure That, at a Minimum, They Align with the End State Established by DoD*

The Secretary of Defense, through the accountability review process described in Recommendation 17, will meet annually with Service leadership to discuss the state of diversity within the Services and the Services' progress toward the two goals of demographic representation and mission capability. Annual meetings at this strategic level are necessary to ensure that top leadership across DoD is fully engaged in meeting the diversity goals established by the Secretary of Defense. The CDO will play a key role in this effort by ensuring the production of consistent, meaningful diversity metrics. He or she should also work with the Services' diversity offices to guide and monitor their Service-specific diversity work.

## Priority: Holding Leaders Accountable

Meaningful change is most likely to be sustained if leaders are held accountable for performance at all stages of implementation. Ongoing communication, ongoing assessment, and the establishment of a rewards system are effective approaches to take when trying to change the norms of an organization, but, ultimately, leaders should be responsible for developing an organizational culture that values and benefits from diversity.

The best accountability measures reviewed by the Commission did much more than have managers check a box on a form. Rather, organizations use both internal and external measures to assure top leadership that managers at all levels are committed and engaged. Internally, midlevel leaders are held accountable for their performance in carrying out plans and, if successful, are rewarded accordingly. Externally, all leaders, including those at the top, are reviewed by outside consultants that have the ability to ask the most-difficult questions and give tough feedback—activities that can be challenging for insiders due to lack of critical distance or fear of repercussion.

Once DoD develops a plan, policies, and metrics, it cannot just put them on the shelf. The most-senior leaders must make use of these tools to drive progress by holding themselves and leaders below them accountable for following the plan, implementing the policies, and measuring the results. The diversity annual report to Congress discussed earlier is the bedrock of accountability. It requires the Secretary of Defense to document, from a strategic level, the extent to which the Services are reaching their goals of achieving better racial/ethnic and gender representation across the ranks and creating a more inclusive environment. Later in this chapter, the Commission recommends that the Secretary of Defense add another subject to that annual report.

## Institute a System of Accountability Reviews

*Recommendation 17—*

*DoD must and DHS (Coast Guard) should institute a system of "accountability reviews" that is driven by the Secretaries of Defense and Homeland Security (Coast Guard).*

- *a. The Secretary of Defense shall meet at least annually with Service Secretaries, Service Chiefs, senior enlisted leaders, and Chief, National Guard Bureau, to drive progress toward the diversity management goals identified in the strategic plans. The Coast Guard should be subject to a similar review.*

- *b. The Secretary of Defense and Secretary of Homeland Security should send an annual report to Congress and the President on the progress made toward diversity management goals in the Services, including the Reserve Component; the report should include the barrier analyses described in Recommendation 18.*

- *c. The National Guard Bureau should report annually to Congress and DoD on the status of diversity in each State, territory, and the District of Columbia for all ranks of the Army and Air National Guard. This report shall show how reflective the Army and Air National Guard are of the eligible pool in their particular State or territory or in the District of Columbia.*

  - *Based on the report to Congress, the National Guard Bureau shall produce a "dashboard" of diversity metrics to be used by the Army and Air National Guard. This dashboard shall show comparisons across States, territories, and the District of Columbia and highlight best practices.*

The practice of annual accountability reviews was initiated for the Navy by then-CNO Admiral Mike Mullen and was expanded by his successor, Admiral Roughead. Admiral Roughead sits down annually, one on one, with each of his 16 enterprise heads (all flag officers) on the topic of racial/ethnic and gender diversity within that enterprise or community. In these reviews, each enterprise head discusses with the CNO the demographic diversity health of his or her community.

These meetings do not consist of a 100-slide briefing deck; rather, they are conversations that focus on both progress and problem areas. Enterprise heads are expected to speak knowledgably and comfortably about the current composition of their force, the factors that led to that composition, and any initiatives undertaken to affect that profile in the future.

The Commission considers Admiral Roughead's accountability review process a best practice that each Service can follow either on its own or in support of OSD-level reviews. This recommendation uses the Navy's accountability review construct

> [The accountability reviews] are extraordinarily valuable. . . . [They have] focused leadership in a way that is more than shouting louder. It's about substance, mentoring, development, understanding who you have, moving them along.
>
> —Admiral Gary Roughead, remarks to the Commission, 2010

as the model for a series of similar sessions across DoD that culminate in a meeting between the Secretary of Defense and each Service, represented by its Service Chief,

Service Secretary, and senior enlisted leader. At that meeting, Service leadership discusses with the Secretary of Defense progress in meeting the goals in the Service's diversity strategic plan.

One way for the Service Chief to prepare for the meeting is to sit down, one on one, with his or her enterprise heads or their equivalents. Another option is using the senior leadership forum in each Service to share community diversity status and lessons learned.[9]

Regardless of the specific process, a system of accountability reviews would force diversity accountability down as leaders prepared to brief up the chain. It would also serve as a powerful indicator of leader commitment to achieving and leading a diverse force. Finally, it would enable military leaders not only to see evidence on demographics but also to take stock of the diversity awareness and leadership of those in line to succeed them. In particular, it would provide a forum for senior leaders to assess whether and how leaders at lower levels are leveraging all types of diversity in their units to improve capability.

The roles of the CDO in the accountability review process are preparation and facilitation. The CDO's responsibilities might include analyzing data, assembling evidence, preparing the Secretary of Defense, coordinating with the Services, attending each Service's review, and monitoring compliance with directives.

The command and control structure of the National Guard makes holding leaders accountable at the State level a complex issue. To increase accountability at the State level, the National Guard Bureau should both prepare the diversity annual report to Congress (called for in Recommendation 5b) and set up and maintain a detailed diversity "dashboard" to help National Guard units, and their State leadership, assess their diversity efforts related to demographic representation.[10] The dashboard will include statistics on career progression and on racial/ethnic and gender representation compared with State-specific civilian population benchmarks. Easy access to such data should increase stakeholder and public awareness about diversity issues in the National Guard and, consequently, increase accountability.

The Air National Guard developed a web-based dashboard that enables continuous updating and interactivity. An expanded dashboard covering both the Air and Army National Guard could help each State identify diversity problem areas and solutions. This expanded dashboard should incorporate some of the same statistics included in the diversity annual report to Congress, augmented with diversity indicators at the unit level. Moreover, the dashboard website should include a compendium of diversity best practices and programs. Such a compilation will be a resource for States just beginning (or currently struggling) to implement diversity initiatives.

All of the information contained in the dashboard should be available to the States. Taken together, the statistics and best practices will help leaders assess the

---

[9]   This recommendation envisions focused annual meetings between the Secretary of Defense and the different Service Secretaries, Service Chiefs, and senior enlisted leaders. In contrast, the DAWG would focus on policy and take on specific issues as they arose.

[10]   A dashboard is a detailed display of key metrics.

diversity situation of their units or commands and facilitate improvement in State National Guard diversity programs.

## The Services Should Conduct Annual Barrier Analyses

*Recommendation 18—*

*As part of the accountability reviews, the Services, in conjunction with the Chief Diversity Officer (established in Recommendation 15), should conduct annual "barrier analyses" to review demographic diversity patterns across the military life cycle, starting with accessions.*

- *a. To ensure comparability across Services, DoD shall establish a universal data collection system, and the analyses of the data should be based on common definitions of demographic groups, a common methodology, and a common reporting structure.*

- *b. The annual analyses should include*
  - *accession demographics*
  - *retention, command selection, and promotion rates by race/ethnicity and gender*
  - *analysis of assignment patterns by race/ethnicity and gender*
  - *analysis of attitudinal survey data by race/ethnicity and gender*
  - *identification of persistent, group-specific deviations from overall averages and plans to investigate underlying causes*
  - *summaries of progress made on previous actions.*

The diversity annual reports and the accountability review process will provide military leaders of all components with the information they need to move toward the goals of representation and inclusion. However, the Commission believes that further steps are required to ensure that both the annual reports and the accountability reviews are based on accurate data and that appropriate analysis has converted the data into actionable information.

To prepare for the accountability reviews, each Navy enterprise conducts barrier analyses based on what the data show about how racial/ethnic minorities and women are progressing along the community's notional career path. This practice should be adopted by all the Services and should take place at the Service level. All steps along the career life cycle—recruiting, career field selection, assignment to command and other key billets, education milestones, retention, and promotion—should be assessed. The process should include not only assessments of statistical variances by race/ethnicity and gender and analyses of root causes for any differences (i.e., barriers) but also identification of corrective actions and creation of representation goals and metrics.

Each Service has its own career structures, career progression patterns, and other idiosyncrasies, which it understands best. For this reason, and to ensure that the Services take ownership of diversity initiatives, the Services should take the lead in preparing the barrier analyses. The CDO should serve as a consultant to each Service, ensuring analytical consistency across DoD and seeking to understand any inherent and valid differences. The CDO must ensure that all the Services are adhering to the

FROM REPRESENTATION TO INCLUSION: DIVERSITY LEADERSHIP FOR THE 21ST-CENTURY MILITARY

data and reporting standards described above. Once the standards are promulgated, accountability reviews within each Service can take advantage of the standards to produce consistent analysis both across communities and over time.

If the barrier analyses, accountability reviews, and annual reports are to be meaningful over time and across reporting groups (i.e., Services and components), consistent, comparable data must be collected from all the Services. OSD should define and DMDC should promulgate these standards and data structures to the Services, and the Services must be directed to follow them. In addition, analysis of the data must also adhere to common standards and methodology.

The Commission's research was hampered by the lack of such standards. All of the Commission subcommittees that analyzed personnel data faced the same problem: lack of consistency across the Services. For example, the Services do not use the same procedures for estimating retention rates or even consistent race/ethnicity categories for their calculations; they also do not regularly report retention results. This made it very hard to make comparisons across Services, but, more importantly, it also makes it difficult to formulate any DoD-wide assessments of retention patterns. This Commission recommendation asks all the Services to collect and analyze equivalent data in order to compare retention rates and other important aspects of career progression, but it still allows them to individually calculate whatever statistics may be meaningful within each Service.[11]

Regardless of the type of data collected, it must be consistent not only across Services but also over time. This can be achieved through the use of common methodologies, data definitions, and reporting conventions. By keeping track of consistent data year after year, DoD and each individual Service can assess when and where interventions may be necessary to address differential rates of career progression. They can also use the data to help assess whether policy or program changes have made a difference.

---

[11] The Commission recommends that three different types of data be collected for the purpose of tracking career progression across diverse groups:

- Personnel data can be used to show actual behavior and outcomes. Personnel data should go beyond race/ethnicity and gender to include other aspects of diversity (e.g., religion; language ability; other low-density, high-demand skills) as need dictates.
- Survey data that show attitudes and opinions can be used to assess why group-level differences in career progression may be occurring. For example, exit surveys could be used to collect information about reasons for leaving active-duty service. Currently, some Services do not conduct exit surveys, and there is no centralized system for collection or analysis of this type of data. In the National Defense Authorization Act for Fiscal Year 2000, Congress required that every member separating from active-duty service during a six-month period be surveyed regarding his or her reasons for leaving. The survey was conducted once by DMDC and never repeated (see Deak et al., 2002).
- Focused qualitative data can more specifically address the issues identified by personnel or survey data. Although exit surveys can be helpful in terms of quantitative analysis, they sometimes do not supply the nuanced reasons for separation from active-duty service. Thus, the Commission also recommends the use of focused qualitative data, such as that obtained in focus groups, to study personnel and manpower issues.

## Institute Mechanisms for Accountability and Internal and External Monitoring for Both the Active and Reserve Components

*Recommendation 19—*

*DoD must and DHS (Coast Guard) should institute mechanisms for accountability and internal and external monitoring for both the Active and Reserve Components.*

- *a. The Services must embed diversity leadership in performance assessments throughout careers.*

- *b. DoD must and DHS (Coast Guard) should establish diversity leadership as a criterion for nomination and appointment to senior enlisted leadership positions and flag/general officers, including 3- and 4-star positions and Service Chief.*

  - *The Senate Armed Services Committee should include this criterion in its confirmation questionnaire.*

- *c. The Secretary of Defense must transfer the functions of the former Defense Equal Opportunity Council to a minimum of biannual meetings of DoD's leadership, the existing Deputy's Advisory Working Group.*

- *d. The Secretary of Defense must expand the DACOWITS charter, where appropriate, to encompass diversity as a whole.*

Over the years, there have been many reports, studies, and bodies established to look at EO and racial/ethnic and gender diversity in the military. The Commission has heard that, in the past, when progress was made in increasing demographic diversity among senior officers, there was no deliberate, coordinated effort to monitor that progress and ensure that it continued. As a result, the same themes and recommendations can be found in studies conducted during the past 20 years.

Early in this chapter, the Commission laid out a system for diversity management, centered on the CDO. The CDO does not have the authority, however, to establish policies or ensure adherence to them. In particular, the CDO cannot, on his or her own, drive the cultural change needed to create an inclusive environment or embed the use of effective diversity leadership practices. Thus, the final piece of the Commission's recommended implementation and accountability system is aimed at institutionalizing diversity leadership throughout the Armed Forces, forcing continuing engagement on the part of senior leadership, and providing the means for sustained effort.

### Embed Diversity Leadership in Performance Assessments Throughout Careers

Accountability for internalizing and modeling diversity leadership is needed throughout the Armed Forces, not only at senior levels. Discussions about evaluating an individual's diversity leadership often center on the difficulty of measuring such a thing. But, a simple checkbox on an assessment form will accomplish nothing. In its research, the Commission discovered several practices that could be used by the Services to evaluate diversity leadership throughout a servicemember's career. Based on its understanding of private sector practices and military culture, the Commission believes that

the Services must incorporate such assessment mechanisms into their performance evaluation systems. Possible mechanisms for embedding diversity leadership into the core competencies expected of a servicemember include the following:

- documentation of one's diversity leadership in a self-statement
- incorporation of diversity perspective into leadership assessment
- 360-degree evaluations
- utilization of the following relevant indicators:
    - climate survey trends
    - discipline and EO data
    - retention rates.

One place to start could be following the Coast Guard practice of producing a self-statement that documents what one has done to foster an environment of inclusion. Another approach could be drawing from the Navy's incorporation of EO practices into its assessments of enlisted personnel. This approach could be expanded through incorporating diversity leadership and inclusion into the existing assessment of leadership in general.

And, even though it runs counter to the hierarchical military culture, the Services could experiment with 360-degree evaluations. These incorporate assessments from peers and subordinates, as well as supervisors. Sodexo uses these 360-degree evaluations to gauge its executive team's performance in diversity management, diversity leadership, and inclusion.

At higher levels of the hierarchy, other options are available, including a careful utilization of numerical indicators. For officers who have held command, possible metrics involve indicators of the climate within their units. These include trends in climate surveys, unit disciplinary and EO data, and retention rates. Although it is expected that such data will form part of the accountability reviews described in Recommendation 17, it may be worth examining their usage in individual assessment at a lower level.

Both quantitative and qualitative metrics are important and should be utilized. Whereas quantitative metrics are generally easier to collect, making the extra effort to integrate both types of metrics provides a more complete picture of an individual's diversity leadership. At Sodexo, for example,

> the quantitative metrics look at recruiting, retention, promotion of women and minorities. The qualitative metrics . . . are about behavior change. We look at things like mentoring, like engagement in the community. . . . So, the qualitative aspect of the scorecard [has] been very, very critical in changing the behaviors because otherwise it becomes just a numbers game, "the quota has to be filled" is how it's perceived. But here what we are saying is, their behavior systemically need[s] to be changed. If you get the right behaviors, you'll get to the numbers. So, we look at really both of those. (Anand, 2010)

### Diversity Leadership as a Criterion for Top Leadership

The assessment of diversity leadership performance must be extended to the highest levels of the Services. Demonstrated diversity leadership should be a topic of conversation in both the nomination and confirmation of flag/general officers to 3- and 4-star positions, both within DoD and during the congressional confirmation process. Although this is important for all senior leadership positions, it is especially relevant for Service Chiefs and senior enlisted leaders. As discussed elsewhere in this report, personal commitment at the top is a crucial ingredient in establishing and sustaining successful diversity leadership throughout an organization.

The Commission heard about effective diversity practices from CDOs at companies that have been acclaimed for their excellence in creating demographically diverse workforces and inclusive environments. One of the topics these CDOs spoke about was the need for an executive team committed to diversity.

In response to a question about how Sodexo ensures that executives hired from outside are as committed to diversity and inclusion as the rest of the senior team, Dr. Rohini Anand indicated the importance of including diversity leadership in the interview process:

> [T]he candidates who've come from the outside to Sodexo have actually said that they are very surprised [by] the emphasis that the organization places on diversity in the interview process, so they really are asked about their commitment, what they have done, their understanding. And if they are not articulate on this particular topic, we don't seriously consider them. (Anand, 2010)

Along these lines, the Commission believes that those individuals considered for top leadership positions, both senior enlisted appointments and 3- and 4-star nominations, should be expected to be "articulate on this particular topic." They should be able to address their experience in providing diversity leadership not only for race/ethnicity and gender but across all dimensions.

Congress can assist in establishing diversity leadership as a criterion for 3- and 4-star positions through the questionnaire each nominee must submit to the Senate Armed Services Committee. Requiring a self-statement that explains how the nomi-

Regardless of how staff support is provided or where it is placed, all "best practice" companies regard diversity as a line management leadership issue. This leadership imperative in several "best-practice" companies is active and visible through:

– Diversity Councils—heads of major business units that meet periodically with the CEO and . . . [Human Resources]/diversity head to review diversity progress and plan initiatives.

– Advisory Boards—distinguished outside advisors and experts who meet periodically with the business leaders and Affinity Group leaders . . . to bring external perspectives and developments to the company.

– Performance Appraisals and Leadership Assessments—that reinforce the importance of diversity by including assessments of creating a diverse culture and recruiting, developing and promoting a diverse talent pool in measuring executives' performance.

—Defense Business Board Task Group on Increasing Diversity in DoD's Flag and Senior Executive Ranks, 2004

nee has demonstrated diversity leadership will further emphasize diversity leadership's importance and will lead to sustained progress.

### Reestablish a Leadership Forum for Diversity

As part of an integrated, strategic approach to accountability, the Commission recommends that DoD revisit the goals and duties ascribed to the now-defunct Defense Equal Opportunity Council (DEOC) with an eye toward transferring applicable goals and duties to the DAWG. The membership of the DAWG is close to that of the former DEOC, and specifying diversity, broadly defined, as part of the DAWG's mission and purview will both reinstate the high-level attention to EO that had been allowed to lapse and expand it to encompass other aspects of diversity.[12]

DEOC, first established in 1987, was given the responsibility to advise the Secretary of Defense on EO policies, coordinate policy and review programs, and monitor progress of program elements. DEOC members presented regular progress reports on how well DoD was doing in meeting EO goals, and they appointed members to attend to specific issues by forming working committees, such as the DEOC Task Force on Discrimination and Sexual Harassment. This body was one of the mechanisms set forth in DoD's EO policies that, like the Human Goals Charter and the Military Equal Opportunity Assessment, fell into disuse in the past ten years.

The DAWG, established in conjunction with the Quadrennial Defense Review process, consists of the most-senior military and civilian leaders, including its co-chairs, the Vice Chairman of the Joint Chiefs of Staff and the Deputy Secretary of Defense. Meetings are held twice weekly and consist of presentations on and candid discussion of matters concerning military leadership. The Commission recommends that this body also hold regular meetings, at least annually, on diversity issues. Such meetings will form part of the strategic accountability system proposed by the Commission. They will also help anchor the concepts of diversity and inclusion among the most-senior leadership of the Armed Forces.

### Expand the DACOWITS Charter

In 1951, Secretary of Defense George C. Marshall established DACOWITS to provide advice and recommendations on issues related to women serving in the military. DACOWITS is now a Federal Advisory Committee, authorized by Congress. Currently, it comprises up to 35 civilian members distributed across demographic groups,

---

[12] The chair and membership of the DEOC differ in the two directives that establish it, DoDD 1440.1 and DoDD 1350.2. According to DoDD 1440.1, first published in 1987, the chair was to be the Assistant Secretary of Defense (Force Management & Personnel); members were to include the Assistant Secretary of Defense (Reserve Affairs) and the military departments' assistant secretaries for personnel policy and Reserve affairs. DoDD 1440.1, first published in 1995, raised the bar, with the Deputy Secretary of Defense as chair, the Under Secretary of Defense (Personnel and Readiness) as vice chair, and a membership including the under secretaries of defense, the secretaries of the military departments, and the Chairman of the Joint Chiefs of Staff. The more-senior membership of the latter directive is close to that of the DAWG, and, at the time, it ensured that the panel was sufficiently senior to assume leadership and take decisive action.

career fields, and geography. DACOWITS members come from the following groups: former servicemembers, military family members, and experts in women's workforce issues. DACOWITS's list of accomplishments over the past 60 years is long.[13]

The Commission suggests that DACOWITS expand its charter beyond gender to include diversity of all types. The group would continue to hold regular meetings, sponsor research, and undertake installation visits and other means of eliciting servicemembers' views. In addition, the expanded committee would receive briefings from DoD leadership on metrics and progress made toward implementing diversity management plans and policies. The Commission notes that DACOWITS dates to 1951 and has provided a clear, unapologetic forum on issues for women in the military. This focus must not disappear when other elements of diversity are addressed. Besides the example provided by DACOWITS, this concept—creating an external body to monitor progress toward achieving diversity goals—was recently adopted by Sodexo. Its CEO views this establishment as a "next phase in [Sodexo's] commitment to diversity and inclusion" (Sodexo, 2010).

Providing an external body to focus on diversity in the Services would help "keep things honest" and add an additional dimension to DoD's monitoring mechanisms. Expanding DACOWITS's charter would provide continuity and place gender issues within the broader context of diversity.

> The Committee is composed of civilian women and men who are appointed by the Secretary of Defense to provide advice and recommendations on matters and policies relating to the recruitment and retention, treatment, employment, integration, and well-being of highly qualified professional women in the Armed Forces. Historically, DACOWITS' recommendations have been very instrumental in effecting changes to laws and policies pertaining to military women.
>
> —Defense Department Advisory Committee on Women in the Services, n.d.-b

## Include an Assessment of Qualified Minority and Female Candidates for Top Leadership Positions in the Diversity Annual Report to Congress

*Recommendation 20—*

*In congruence with Recommendation 5, Congress should revise Title 10, Section 113, to require the Secretary of Defense to report annually an assessment of the available pool of qualified racial/ethnic minority and female candidates for the 3- and 4-star flag/general officer positions.*

- *The Secretary of Defense must ensure that all qualified candidates (including racial/ethnic minorities and women) have been considered for the nomination of every 3- and 4-star position. If there were no qualified racial/ethnic minority and/or female candidates, then a statement of explanation should be made in the package submitted to the Senate for the confirmation hearings.*

---

[13]  See the Defense Department Advisory Committee on Women in the Services, n.d.-a, for more information on DACOWITS's processes, research, and reports.

As part of the effort to improve accountability, the Commission suggests that Congress include an additional requirement to the revisions in Title 10 called for in Recommendation 5: The Secretary of Defense, in his or her diversity annual report to Congress, should provide an assessment of the pool of qualified minority and female candidates for 3- and 4-star positions. Developing a pool of strong nominees from traditionally underrepresented demographic groups must also become a DoD-wide goal. How well leaders are doing at promoting members of underrepresented groups should be made transparent through documentation.

This recommendation complements Recommendation 10b, which involves formalizing and documenting the process and requirements for promotion to 3- and 4-star rank. One of the reforms the Commission would like to see made permanent is the requirement for the Services to provide to the Secretary of Defense biannual "laydowns" of their flag/general officer corps.[14] These would focus on the up-and-coming 2-star officers and on the paths laid out for their advancement. With Recommendation 20, the Commission suggests that the racial/ethnic and gender aspects of the laydown be provided annually to Congress.

The second part of this recommendation carries this concern over to a case-by-case certification that, as each nomination is sent to the Senate, qualified racial/ethnic minority and female candidates were considered. If no qualified racial/ethnic minority or female candidates were identified, the Secretary of Defense should accompany each nomination with an explanation.

## Summary

This chapter has presented a combined approach to the challenges of designing and implementing diversity policies throughout DoD: It has taken the best from military diversity practices and from corporate diversity practices that are especially congruent with DoD concerns and culture.

Successful implementation of diversity initiatives requires a deliberate strategy. Piecemeal efforts will not effect the change in culture that is needed, and they will not address all of the stages of a servicemember's career. Among the issues that the Commission addressed are the need for a systems approach and for the designation of an individual to facilitate and sustain change. Clear, robust policies that specify roles, responsibilities, authorities, and accountability are required to institutionalize change. Appropriate Service-wide metrics and reporting tools must be put in place, and leaders must be held accountable for progress toward explicit diversity goals. Finally, the Commission believes that a continuing external monitoring mechanism will serve as an insurance policy, so that another military leadership diversity commission will never be needed.

---

[14] Former Secretary of Defense Donald Rumsfeld instituted the practice of requiring the Services to provide a comprehensive picture of their flag/general officers and the positions they held. Information in these "laydowns" included when positions were projected to become vacant and which candidates were likely to fill them.

CHAPTER TWELVE

# CONCLUSION

The Armed Forces have long been national leaders in securing advancement opportunities for men and women of different racial/ethnic backgrounds. This report describes how they can sustain that role in the future by institutionalizing a broad definition of diversity that includes both demographic representation and dimensions of diversity to develop military leaders who reflect the troops they lead and embody the qualifications the Services need to maintain readiness and perform their missions.

The Commission first recommends that all members of the Armed Forces embrace an understanding of diversity that goes beyond the traditional focus on eliminating discrimination against members of certain demographic groups and moves toward valuing all kinds of human differences for their contributions to military capability and readiness. Such a concept needs to become a core value that informs the way servicemembers interact with one another and helps motivate the way the organization works. Effectively leading diverse groups—i.e., diversity leadership—requires recognizing the differences among members of a group as assets that have the potential to improve performance, neutralizing the tensions that can arise within a diverse working group, and leveraging diversity in support of the mission. Top leaders need to make a personal and visible commitment to diversity for these needed changes to take hold; to sustain change, the Commission recommends that Congress revise Title 10 to require the Secretary of Defense to report annually on the progress of DoD's diversity efforts.

In its second set of recommendations, the Commission urges the Services to recognize the barriers that may have prevented racial/ethnic minorities and women from advancing through the stages of their careers to positions of leadership. Beginning with the pool of eligible recruits, racial/ethnic minorities are at an increasing disadvantage in terms of meeting military eligibility requirements. The Commission recommends that all stakeholders work together to improve the educational and physical readiness of American youth. It provides recommendations for improving current recruiting practices toward underrepresented demographic groups. The Commission also recommends the removal of existing institutional barriers relating to assignments—both the initial career field assignment and subsequent assignments to key positions. An important step in this direction is to remove the restrictions that prevent women from engaging in direct ground combat. Other recommendations address the need to educate and mentor all servicemembers about the promotion process, especially early in their careers.

Finally, the Commission offers recommendations to ensure continual progress toward inclusion by the Chief Diversity Officer, who works with the Services and OSD to achieve effective diversity management by developing policy goals for the Services to

achieve, metrics for measuring their achievements, and annual reporting requirements that hold military leaders accountable for progress toward stated goals.

This report began by comparing two previous committees dedicated to expanding diversity in the Armed Forces. Both committees identified gross inequities of opportunity in the Services and made detailed recommendations for reform, some of which are echoed in this report. In one case—that of the Fahy Committee—the committee not only received clear commitment from the President for its tasks but was also directly involved in the implementation of desegregation policies that helped shift the entire culture of the military. In the other case—that of the Gesell Committee—the committee played only an advisory role, and the Secretary of Defense ignored the most important recommendations in a setback that stalled progress toward equal opportunity and led to protracted conflicts among servicemembers in posts around the world.

The lesson in this contrast between the two earlier committees is that the ultimate impact of the recommendations in this Commission's final report will depend on the unwavering commitment of the President of the United States, the resolute conviction of the Secretary of Defense, and the concerted effort of military leaders at all levels to bring about enduring change. The U.S. military is a learning institution that can continue to evolve, but only if the highest leaders of the Nation provide a clear vision and sustained oversight. The Armed Forces have led the Nation in the struggle to achieve equality. To maintain that leadership, they must push forward once more, renewing their commitment to equal opportunity for all. The time has come to embrace the broader concept of diversity needed to achieve the Armed Forces' goals and to move the Nation closer to embodying its ideals.

APPENDIX A

# THE MILITARY LEADERSHIP DIVERSITY COMMISSION CHARTER

 **Military Leadership Diversity Commission Charter**

## Scope:

The commission shall conduct a comprehensive evaluation and assessment of policies that provide opportunities for the promotion and advancement of minority members of the Armed Forces, including minority members who are senior officers.

## Deliverables:

Not later than 12 months after the date on which the commission first meets, the commission shall submit to the President and Congress a report on the study. The report shall include the following:
  – The findings and conclusions of the commission.
  – The recommendations of the commission for improving diversity within the Armed Forces.
  – Such other information and recommendations as the commission considers appropriate

## Tasks:

• **Develop** a uniform definition of diversity to be used throughout DoD congruent with the core values and vision of DoD for the future workforce.
• **Incorporate** private sector practices successful in cultivating diverse leadership to DoD policy.
• **Assess** the ability of the current organizational structure to ensure effective and accountable diversity management across DoD, including ODMEO and other similar offices within the Military Departments.
• **Explore** options available to improve the substance and implementation of current plans and policies of DoD and the Military Departments.
• **Examine** existing metrics and milestones for evaluating DoD diversity plans (including the plans of the individual Services) and how to facilitate future evaluation and oversight.
• **Evaluate** efforts to develop and maintain diverse leadership at all levels of the Armed Forces.
• **Analyze** successes and failures of efforts to develop and maintain diverse leadership, particularly of flag officers.
• **Determine** the status of prior recommendations made to DoD and Congress concerning diversity initiatives within the Armed Forces.
• **Consider** the benefits of conducting an annual conference focused on diversity attended by DoD civilians, active duty and retired military personnel, and corporate leaders, to include a review of current policy and the annual demographic data from the DEOMI and DMDC.
• **Examine** the possible effect of expanding DoD secondary educational programs to diverse civilians populations, including military academy preparatory schools.
• **Evaluate** the ability of current recruitment and retention practices to attract and maintain a diverse pool of qualified individuals in sufficient numbers in pre-commissioning officer development programs.
• **Assess** the pre-command billet assignments of ethnic-specific officers.
• **Examine** command selection for officers of particular ethnicities.
• **Evaluate** the establishment and maintenance of fair promotion and command opportunities and their effect by gender and ethnicity for officers at O-5 and above.
• **Evaluate** the existence and maintenance of fair promotion, assignment, and command opportunities for ethnic- and gender-specific members of the Armed Forces at the levels of warrant officer, chief warrant officer, company and junior grade, field and mid-grade, and general and flag officer.
• **Measure** the ability of current activities to increase continuation rates for ethnic- and gender-specific members of the Armed Forces.

APPENDIX B

# COMMISSION MEMBERS

## Current Commissioners

General Lester L. Lyles (U.S. Air Force, Retired), *Chairman*
Lieutenant General Julius W. Becton, Jr. (U.S. Army, Retired), *Vice Chairman*

Major General LaRita A. Aragon (Air National Guard, Retired)
Major General Arthur M. Bartell (U.S. Army)
The Honorable Gilbert F. Casellas
Chief Master Sergeant Gary G. Coleman (U.S. Air Force, Retired)
The Honorable D. Michael Collins (Lieutenant Colonel, U.S. Air Force, Retired)
Marieli E. Colon-Padilla
Rear Admiral Jay DeLoach (U.S. Navy, Retired)
Mary M. Dixon
Brigadier General Rebecca Halstead (U.S. Army, Retired)
Vice Admiral Cecil D. Haney (U.S. Navy)
Lieutenant Colonel Alfred Harris (U.S. Army, Retired)
Colonel Mary Higley Hittmeier (U.S. Air Force)
Lieutenant General John Hopper, Jr. (U.S. Air Force, Retired)
Colonel Ronald M. Joe, Sr. (U.S. Army, Retired)
Sergeant Major Hallie Johnson (U.S. Army Reserve, Retired)
Colonel Jorge J. Martinez (U.S. Army National Guard, Retired)
Rear Admiral Edward Masso (U.S. Navy, Retired)
Senior Chief Petty Officer Thomas McGhee (U.S. Navy, Retired)
Lieutenant General Robert B. Neller (U.S. Marine Corps)
The Honorable Richard J. Noriega (Colonel, Army National Guard)
Rear Admiral Mary P. O'Donnell (U.S. Coast Guard, Retired)
Lieutenant General Frank Petersen (U.S. Marine Corps, Retired)
Master Chief Petty Officer Angela R. Rodriguez (U.S. Coast Guard)
Shamina Singh
Sergeant Major Jack L. Tilley (U.S. Army, Retired)
Sergeant Major William I. Whaley (U.S. Marine Corps, Retired)
Major General Leo V. Williams III (U.S. Marine Corps, Retired)
Frank H. Wu

## Former Commissioners

Captain Kathleen Contres (U.S. Navy, Retired)
Colonel Mohammed A. Khan, Jr. (U.S. Air Force, Retired)
Brigadier General Belinda Pinckney (U.S. Army, Retired)
Lieutenant General Willie J. Williams (U.S. Marine Corps)

## Commission Staff

### Executive Directors and Designated Federal Officers

Colonel James J. Campbell (U.S. Air Force, Retired)
Master Chief Petty Officer Steven Hady (U.S. Navy)

### Research Staff

Nelson Lim, RAND Corporation, *Research Director*
Amanda Kraus, CNA, *Associate Research Director*

Carolyn Chu, RAND Corporation
Kate Giglio, RAND Corporation
Jeremiah Goulka, RAND Corporation
Kimberly Curry Hall, RAND Corporation
Erin-Elizabeth Johnson, RAND Corporation
Kirsten Keller, RAND Corporation
Maria Lytell, RAND Corporation
Jennifer S. McCombs, RAND Corporation
Sarah Meadows, RAND Corporation
Ann Parcell, CNA
Martha Farnsworth Riche, CNA
Seema Sayala, CNA
First Lieutenant David Schulker (U.S. Air Force), RAND Corporation
Lynn Scott, RAND Corporation
Karen Domabyl Smith, CNA
Leopoldo E. Soto Arriagada, CNA
Madeleine Wells, RAND Corporation

*Staff from CNA and the RAND Corporation provided research and analysis to inform the Commissioners' deliberations; however, the findings and recommendations presented in this report are those of the Commissioners alone.*

### Office Staff

D'Oshemeka Amadi, Visionary Integration Professionals, LLC
Vergie Anderson, Visionary Integration Professionals, LLC
Ryan Callanan, Visionary Integration Professionals, LLC

Jennifer Conger, Visionary Integration Professionals, LLC
Ernest Duncan, Visionary Integration Professionals, LLC
Cassandra Gray, Visionary Integration Professionals, LLC
Patricia Grier, Visionary Integration Professionals, LLC
Beaulah Hall, Visionary Integration Professionals, LLC
Myrtle Johnson, Washington Headquarters Services (in memoriam)
Erica Dorosin, Visionary Integration Professionals, LLC
Patricia McClaine, Visionary Integration Professionals, LLC
Jessica Schroeder, Visionary Integration Professionals, LLC

APPENDIX C

# RECOMMENDATIONS

**Recommendation 1—**

DoD shall adopt the following definition: Diversity is all the different characteristics and attributes of individuals that are consistent with Department of Defense core values, integral to overall readiness and mission accomplishment, and reflective of the Nation we serve.

**Recommendation 2—**

To enhance readiness and mission accomplishment, effectively leading diverse groups must become a core competency across DoD and the Services. To implement this recommendation,

- a. Leadership training at all levels shall include education in diversity dynamics and training in practices for leading diverse groups effectively.
- b. DoD and the Services should determine the framework (e.g., curriculum, content, methods) for how to inculcate such education and training into leader development, including how to measure and evaluate its effectiveness.

**Recommendation 3—**

The leadership of DoD and the Services must personally commit to making diversity an institutional priority.

**Recommendation 4—**

DoD and the Services should inculcate into their organizational cultures a broader understanding of the various types of diversity by

- a. Making respect for diversity a core value.
- b. Identifying and rewarding the skills needed to meet the operational challenges of the 21st century.
- c. Using strategic communications plans to communicate their diversity vision and values.

**Recommendation 5—**

Congress should revise Title 10, Section 113, to

- a. Require the Office of the Secretary of Defense to develop a standard set of strategic metrics and benchmarks to track progress toward the goal of having a

dynamic and sustainable 20–30-year pipeline that yields (1) an officer and enlisted corps that reflects the eligible U.S. population across all Service communities and ranks and (2) a military force that is able to prevail in its wars, prevent and deter conflict, defeat adversaries and succeed in a wide range of contingencies, and preserve and enhance the all-volunteer force.

- b. Add diversity annual reports to the list of topics on which the Secretary of Defense reports to Congress and the President. Similar provisions should be added to Title 14 for Coast Guard reporting and to Title 32 for National Guard reporting.
- c. Require the Secretary of Defense to meet at least annually with Service Secretaries, Service Chiefs, and senior enlisted leaders to drive progress toward diversity management goals.

### Recommendation 6—

The shrinking pool of qualified candidates for service in the Armed Forces is a threat to national security. The stakeholders listed below should develop and engage in activities that will expand the pool of qualified candidates.

- a. The President, Congress, and State and local officials should develop, resource, and implement strategies to address current eligibility issues.
- b. DoD and DHS (Coast Guard) should
  - Create and leverage formal partnerships with other stakeholders.
  - Institutionalize and promote citizenship programs for the Services.
  - Require the Services to review and validate their eligibility criteria for military service.
- c. DoD and the Services should focus on early engagement. They should conduct strategic evaluations of the effectiveness of their current K–12 outreach programs and practices and increase resources and support for those that are found to be effective.

### Recommendation 7—

DoD and the Services should engage in activities to improve recruiting from the currently available pool of qualified candidates by

- a. Creating, implementing, and evaluating a strategic plan for outreach to, and recruiting from, untapped locations and underrepresented demographic groups.
- b. Creating more accountability for recruiting from underrepresented demographic groups.
- c. Developing a common application for Service ROTC and academy programs.
- d. Closely examining the preparatory school admissions processes and making required changes to ensure that accessions align with the needs of the military.

### Recommendation 8—

The Services should ensure that their career development programs and resources enhance servicemembers' knowledge of career choices, including Reserve Compo-

nent opportunities, to optimize the ability of servicemembers to make informed career choices from accession to retirement.

- a. Mentoring and career counseling efforts shall start prior to the initial career field decision point and continue throughout the servicemember's career.
- b. Mentoring programs shall follow effective practices and employ an active line of communication between protégé and mentor.

## Recommendation 9—

DoD and the Services should eliminate the "combat exclusion policies" for women, including the removal of barriers and inconsistencies, to create a level playing field for all qualified servicemembers. The Commission recommends a time-phased approach:

- a. Women in career fields/specialties currently open to them should be immediately able to be assigned to any unit that requires that career field/specialty, consistent with the current operational environment.
- b. DoD and the Services should take deliberate steps in a phased approach to open additional career fields and units involved in "direct ground combat" to qualified women.
- c. DoD and the Services should report to Congress the process and timeline for removing barriers that inhibit women from achieving senior leadership positions.

## Recommendation 10—

DoD, the Services, and Chief, National Guard Bureau, must ensure that there is transparency throughout their promotion systems so that servicemembers may better understand performance expectations and promotion criteria and processes. To do this, they

- a. Must specify the knowledge, skills, abilities, and potential necessary to be an effective flag/general officer or senior noncommissioned officer.
- b. Shall formalize the process and requirements for 3- and 4-star officer selection in DoD Instruction 1320.4.
- c. Shall educate and counsel all servicemembers on the importance of, and their responsibility for, a complete promotion board packet.

## Recommendation 11—

The Services shall ensure that promotion board precepts provide guidance regarding Service-directed special assignments outside normal career paths and/or fields. As appropriate, senior raters' evaluations shall acknowledge when a servicemember has deviated from the due-course path at the specific request of his or her leadership.

## Recommendation 12—

Where appropriate, DACOWITS should expand its current focus on retention to include an explanation of the gender gap in retention. As part of this renewed focus, DACOWITS should examine the effects of retention programs, such as the sabbatical programs currently offered by the Navy and the Coast Guard as well as any other

innovative Service-specific approaches to retention. Findings and recommendations from this research should be presented to the Secretary of Defense.

**Recommendation 13—**
DoD and the Services must track regional and cultural expertise and relevant Reserve Component civilian expertise and continue to track language expertise upon military accession and throughout servicemembers' careers in order to better manage personnel with mission-critical skill sets.

**Recommendation 14—**
To promote structural diversity, total force integration, and overall retention,

- a. DoD must improve the personnel and finance systems affecting transition between Active and Reserve Components and internal Reserve Component transition protocols.
- b. The Assistant Secretary of Defense for Reserve Affairs and the Service Chiefs must assess how Reserve Component members can more effectively both gain operational experience and fulfill joint requirements within the constraints of their dual military/civilian lives and take action as appropriate.

**Recommendation 15—**
The Office of the Secretary of Defense organizational structure must be aligned to ensure a sustained focus on diversity and diversity initiatives and should include establishment of the position of a Chief Diversity Officer who reports directly to the Secretary of Defense.

- The existing Research & Analysis office should be directed and resourced to support the Chief Diversity Officer.
- Chief, National Guard Bureau, must establish and resource organizational structures that support DoD diversity initiatives and reinforce ongoing National Guard diversity leadership efforts.

**Recommendation 16—**
DoD and the Services must resource and institute clear, consistent, and robust diversity management policies with emphasis on roles, responsibilities, authorities, and accountability.

- a. DoD and the Services shall implement diversity strategic plans that address all stages of a servicemember's life cycle. Each strategic plan shall include
  - a diversity mission statement that prioritizes equity and inclusion and provides a purpose that is actionable and measurable
  - a concept of operations to advance implementation.
- b. DoD must revise (if appropriate), reissue, and enforce compliance with its existing diversity management and equal opportunity policies to

– Define a standard set of strategic metrics and benchmarks that enables the Secretary of Defense to measure progress toward the goals identified in the strategic plan, including the creation of an inclusive environment.

– Establish standards that allow for the collection of data needed to generate these metrics and the analysis needed to inform policy action.

– Provide oversight of, and support for, the Services' respective diversity initiatives and metrics to ensure that, at a minimum, they align with the end state established by DoD.

**Recommendation 17—**
DoD must and DHS (Coast Guard) should institute a system of "accountability reviews" that is driven by the Secretaries of Defense and Homeland Security (Coast Guard).

- a. The Secretary of Defense shall meet at least annually with Service Secretaries, Service Chiefs, senior enlisted leaders, and Chief, National Guard Bureau, to drive progress toward the diversity management goals identified in the strategic plans. The Coast Guard should be subject to a similar review.
- b. The Secretary of Defense and Secretary of Homeland Security should send an annual report to Congress and the President on the progress made toward diversity management goals in the Services, including the Reserve Component; the report should include the barrier analyses described in Recommendation 18.
- c. The National Guard Bureau should report annually to Congress and DoD on the status of diversity in each State, territory, and the District of Columbia for all ranks of the Army and Air National Guard. This report shall show how reflective the Army and Air National Guard are of the eligible pool in their particular State or territory or in the District of Columbia.
  – Based on the report to Congress, the National Guard Bureau shall produce a "dashboard" of diversity metrics to be used by the Army and Air National Guard. This dashboard shall show comparisons across States, territories, and the District of Columbia and highlight best practices.

**Recommendation 18—**
As part of the accountability reviews, the Services, in conjunction with the Chief Diversity Officer (established in Recommendation 15), should conduct annual "barrier analyses" to review demographic diversity patterns across the military life cycle, starting with accessions.

- a. To ensure comparability across Services, DoD shall establish a universal data collection system, and the analyses of the data should be based on common definitions of demographic groups, a common methodology, and a common reporting structure.

- b. The annual analyses should include
  - accession demographics
  - retention, command selection, and promotion rates by race/ethnicity and gender
  - analysis of assignment patterns by race/ethnicity and gender
  - analysis of attitudinal survey data by race/ethnicity and gender
  - identification of persistent, group-specific deviations from overall averages and plans to investigate underlying causes
  - summaries of progress made on previous actions.

**Recommendation 19—**

DoD must and DHS (Coast Guard) should institute mechanisms for accountability and internal and external monitoring for both the Active and Reserve Components.

- a. The Services must embed diversity leadership in performance assessments throughout careers.
- b. DoD must and DHS (Coast Guard) should establish diversity leadership as a criterion for nomination and appointment to senior enlisted leadership positions and flag/general officers, including 3- and 4-star positions and Service Chief.
  - The Senate Armed Services Committee should include this criterion in its confirmation questionnaire.
- c. The Secretary of Defense must transfer the functions of the former Defense Equal Opportunity Council to a minimum of biannual meetings of DoD's leadership, the existing Deputy's Advisory Working Group.
- d. The Secretary of Defense must expand the DACOWITS charter, where appropriate, to encompass diversity as a whole.

**Recommendation 20—**

In congruence with Recommendation 5, Congress should revise Title 10, Section 113, to require the Secretary of Defense to report annually an assessment of the available pool of qualified racial/ethnic minority and female candidates for the 3- and 4-star flag/general officer positions.

- The Secretary of Defense must ensure that all qualified candidates (including racial/ethnic minorities and women) have been considered for the nomination of every 3- and 4-star position. If there were no qualified racial/ethnic minority and/or female candidates, then a statement of explanation should be made in the package submitted to the Senate for the confirmation hearings.

APPENDIX D

# GLOSSARY

*Accession:* in general, refers to the act of entering upon or attaining an office. For military purposes, accession refers to entering military service, and the term is applied to new recruits.

*Active Guard and Reserve:* National Guard and Reserve members who are on voluntary active duty providing full-time support to National Guard, Reserve, and Active Component organizations for the purpose of organizing, administering, recruiting, instructing, or training the Reserve Components (U.S. Joint Chiefs of Staff, 2010).

*Amicus curiae:* a phrase that literally means "friend of the court"; a person or group who is not a party to specific litigation but who believes that the court's decision may affect his, her, or its interest.

*Armed Forces of the United States:* a term used to denote collectively all components of the Army, Navy, Air Force, Marine Corps, and Coast Guard (when mobilized under Title 10 to augment the Navy) (U.S. Joint Chiefs of Staff, 2010).

*Barrier analysis:* the process by which an organization uncovers, examines, and removes barriers to equal participation at all levels of its workforce. A barrier is an organizational policy, principle, or practice that limits or tends to limit employment opportunities for members of particular groups (e.g., on the basis of race/ethnicity or gender).

*Benchmark:* any standard or reference by which something can be judged or evaluated. The benchmarks referenced in this report are used to evaluate racial/ethnic minority and female representation in the Armed Forces. For example, there are three commonly suggested external benchmarks for the military: racial/ethnic minority and female shares of the current national population, the future national population, and the military-eligible population.

*Billet:* a personnel position or assignment that may be filled by one person (U.S. Joint Chiefs of Staff, 2010).

*Capability:* the ability to execute a specified course of action (U.S. Joint Chiefs of Staff, 2010).

*Competency/core competency:* DoD- or Service-set requirements that holders of particular positions or ranks must meet and be accountable for meeting.

*Concept of operations:* a verbal or graphic statement that clearly and concisely expresses what the commander intends to accomplish and how it will be done using available resources (U.S. Joint Chiefs of Staff, 2010).

*Core values:* the foundational principles that guide how people in an organization will conduct their everyday business. The DoD core values are leadership, professionalism, and technical know-how. DoD also places particular emphasis on the special core values that everyone in uniform must live by: duty, integrity, ethics, honor, courage, and loyalty.

*Dashboard:* a visual interface that illustrates key measures that an organization has determined are tightly linked to its success or failure in executing strategy.

*Diversity:* differences among individuals involving any attributes (e.g., personal, work related, or other) that determine how they perceive one another. For strategic purposes, organizations define diversity based on the attributes that are relevant to their operations and cultures. Types of diversity and diversity related concepts are summarized below:

- Types of diversity:
  - *Demographic diversity:* diversity in terms of immutable differences among individuals, such as race/ethnicity, gender, or age, as well as personal background differences, such as religion, education level, and marital status
  - *Functional diversity:* diversity in terms of occupation, task, or training background
  - *Structural diversity:* diversity in terms of organizational units, including military rank, Service, and component
  - *Cognitive diversity:* differences pertaining to thinking styles, including the mental processes of perception, memory, judgment, and reasoning, as well as differences in personality types
  - *Global diversity:* diversity related to national affiliations resulting from working with coalition partners, host-country employees, etc.
- Diversity related concepts
  - *Diversity management:* how organizations drive or affect the impact of diversity on key organizational outcomes through plans, policies, and practices
  - *Diversity leadership:* how leaders at all ranks and organizational levels manage people in order to shape the impact of diversity dynamics in the forces under their command through the practices they employ day to day
  - *Diversity dynamics:* how human differences affect interactions between people
  - *Diversity climate:* the prevailing culture, leadership style, and personnel policies and practices of an organization.

*Flag/general officer:* a term applied to an officer holding the rank of general, lieutenant general, major general, or brigadier general in the Army, Air Force, or Marine Corps or admiral, vice admiral, or rear admiral in the Navy or Coast Guard (U.S. Joint Chiefs of Staff, 2010).

*Inclusion/inclusive environment:* An inclusive culture is one where individuals of all backgrounds experience a sense of belonging and experience their uniqueness as being valued. With effective diversity leadership, in a culture of inclusion, the diversity of knowledge and perspectives that members of different groups bring to the organization shapes how the work is done.

*Military personnel life cycle:* the phases of a servicemember's career, from recruitment and accession to assignment, training, advancement, and separation or retirement.

*Mission:* the task, together with the purpose, that clearly indicates the action to be taken and the reason therefore (U.S. Joint Chiefs of Staff, 2010).

*National Guard:* a joint reserve component of the Army and the Air Force that maintains two subcomponents: the Army National Guard of the United States for the Army and the Air Force's Air National Guard of the United States.

*Promotion board:* Promotion boards, also known as selection boards, recommend for promotion to the next higher permanent grade promotion-eligible officers in grades O-3 through O-6. Promotion boards are statutory selection boards because the rules governing them are found in Title 10.

*Racial/ethnic minorities:* members of historically excluded or underrepresented race/ethnicity groups (i.e., groups other than non-Hispanic whites).

*Readiness:* the ability of U.S. military forces to fight and meet the demands of the national military strategy. Readiness is the synthesis of two distinct but interrelated levels: (1) Unit readiness, which is the ability to provide capabilities required by the combatant commanders to execute their assigned missions. This is derived from the ability of each unit to deliver the outputs for which it was designed. (2) Joint readiness, which is the combatant commander's ability to integrate and synchronize ready combat and support forces to execute his or her assigned missions (U.S. Joint Chiefs of Staff, 2010).

*Ready Reserve:* the Selected Reserve, Individual Ready Reserve, and Inactive National Guard liable for active duty as prescribed by law (Title 10, Sections 10142, 12301, and 12302) (U.S. Joint Chiefs of Staff, 2010).

*Reserve Component:* The Armed Forces of the United States Reserve Component consists of (1) the Army National Guard of the United States, (2) the Army Reserve, (3) the Navy Reserve, (4) the Marine Corps Reserve, (5) the Air National Guard of the United States, (6) the Air Force Reserve, and (7) the Coast Guard Reserve (U.S. Joint Chiefs of Staff, 2010).

*Retention:* the proportion of individuals who remain in service, regardless of whether they have reached a decision point.

*Services:* the Army, Navy, Air Force, Marine Corps, and Coast Guard (U.S. Joint Chiefs of Staff, 2010).

*Title 10:* the part of U.S. law that provides the legal basis for the roles, missions, and organization of DoD and each of the Services.

*Title 14:* the part of U.S. law that establishes the Coast Guard as a military service and a branch of the Armed Forces and outlines its role.

*Title 32:* the part of U.S. law that outlines the role and organizational structure of the National Guard.

*Total force integration:* DoD's strategy to create a more capable, but also smaller and more affordable, force by purposefully balancing the expertise and experience of personnel from all its components (U.S. Joint Chiefs of Staff, 2010).

# REFERENCES

Allen, T. D., Eby, L. T., & Lentz, E. (2006). Mentorship behaviors and mentorship quality associated with formal mentoring programs: Closing the gap between research and practice. *Journal of Applied Psychology*, *91*, 567–578.

Allen, T. D., Eby, L. T., Poteet, M. L., Lentz, E., & Lima, L. (2004). Career benefits associated with mentoring for protégés: A meta-analysis. *Journal of Applied Psychology*, *89*, 127–136.

Anand, R. (2010, April). Remarks to the Military Leadership Diversity Commission, Fishkill, NY.

Armor, D. J. (1996). Race and gender in the U.S. military. *Armed Forces and Society*, *23*, 7–28.

Armor, D. J., & Roll, C. R., Jr. (1994). Military manpower quality: Past, present, and future. In B. F. Green & A. S. Mavor (Eds.), *Modeling cost and performance for military enlistment: Report of a workshop* (pp. 13–34). Washington, DC: National Academies Press.

Asch, B. J., Buck, C., Klerman, J. A., Kleykamp, M., & Loughran, D. S. (2009). *Military enlistment of Hispanic youth: Obstacles and opportunities* [MG-773-OSD]. Santa Monica, CA: RAND Corporation.

Becton, J. W., Jr. (2010, March). Remarks to the Military Leadership Diversity Commission, Annapolis, MD.

Becton, J. W., Jr. (2011, January). Remarks to the Military Leadership Diversity Commission, Charlottesville, VA.

Becton, J. W., Jr., et al. (2003, February 19). Amicus curiae brief in support of respondent, *Gratz v Bollinger*, 123 S. Ct. 2411, 539 U.S. 244, June 23, 2003, and *Grutter v Bollinger*, 123 S. Ct. 2325, 539 U.S. 306, June 23, 2003.

Boyer, J. (2010, May 13). *Mattis speaks to close out 2010 JWC*. Retrieved on January 31, 2011, from http://www.jfcom.mil/newslink/storyarchive/2010/pa051310.html

Casey, G. W., Jr. (2010, June). Remarks to the Military Leadership Diversity Commission, McLean, VA.

Center for Human Resource Research. (2005). *NLSY97 user's guide*. Columbus, OH: Center for Human Resource Research, 2005.

Centers for Disease Control and Prevention. (2006). *Behavioral risk factor surveillance system survey data*. Atlanta, GA: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention.

Chief of Naval Operations. (2008). *Diversity policy*.

Collins, D. M. (2010, March). Remarks to the Military Leadership Diversity Commission, Annapolis, MD.

Conway, J. T. (2010, March). Remarks to the Military Leadership Diversity Commission, Annapolis, MD.

Cox, T. (1994). *Cultural diversity in organizations: Theory, research, and practice*. San Francisco, CA: Berrett-Koehler.

Deak, M., Helba, C., Rockwell, D., Helmick, J., & Hoover, E. C. (2002). *Tabulations of responses from the 2000 Military Exit Survey*. Rockville, MD: Westat Inc.

Defense Business Board Task Group on Increasing Diversity in DoD's Flag and Senior Executive Ranks. (2004, March 1). *Increasing diversity in the Defense Department's flag ranks and senior executive service*.

Defense Department Advisory Committee on Women in the Services. (n.d.-a). Homepage. Retrieved November 30, 2010, from http://dacowits.defense.gov/

Defense Department Advisory Committee on Women in the Services. (n.d.-b). *About DACOWITS*. Retrieved November 30, 2010, from http://dacowits.defense.gov/tableabout_subpage.html

Defense Department Advisory Committee on Women in the Services. (2009). *2009 report*. Washington, DC: Defense Advisory Committee on Women in the Services.

Defense Equal Opportunity Management Institute, Directorate of Research. (2008, October 14). *DEOMI Organizational Climate Survey (DEOCS)*. Patrick Air Force Base, FL: Defense Equal Opportunity Management Institute.

Defense Manpower Data Center. (2009). *November 2008 Status of Forces Survey of Active Duty Members: Administration, datasets, and codebook* [Report No. 2008-033]. Arlington, VA: Defense Manpower Data Center.

Defense Manpower Data Center. (2010a). *2009 Workplace and Equal Opportunity Survey of Active Duty Members* [WEOA2009].

Defense Manpower Data Center. (2010b). Active duty transition files [Dataset].

Defense Manpower Data Center. (2010c). *Status of Forces Survey of Active Duty Members: Attitudes toward promotions*.

Dexter, B. (2010). *The chief diversity officer today: Inclusion gets down to business*. Heidrick & Struggles International.

Dobbin, F. (2010, June). Remarks to the Military Leadership Diversity Commission, McLean, VA.

ExpectMore.gov. (2006). *Detailed information on the Junior Reserve Officer Training Corps Assessment*. Retrieved October 10, 2010, from http://www.whitehouse.gov/omb/expectmore/detail/10003233.2006.html

Finkelstein, L. M., & Poteet, M. L. (2007). Best practices in workplace formal mentoring programs. In T. D. Allen & L. T. Eby (Eds.), *The Blackwell handbook of mentoring: A multiple perspectives approach* (pp. 345–367). Malden, MA: Blackwell Publishing.

Gilroy, C. (2009, March 3). *Recruiting, retention, and end strength overview: Prepared statement of Dr. Curtis Gilroy, Director for Accessions Policy, Office of the Under Secretary of Defense for Personnel and Readiness, before the House Armed Services Subcommittee*.

Gilroy, C., Eitelberg, M., Enns, J., Hosek, S., Kilburn, R., Laurence, J., Mehay, S., Tiemeyer, P., & Verdugo, N. (1999, August). *Career progression of minority and women officers*. Washington, DC: Office of the Under Secretary of Defense (Personnel and Readiness).

Harrell, M. C., Castaneda, L. W., Schirmer, P., Hallmark, B. W., Kavanagh, J., Gershwin, D., & Steinberg, P. (2007). *Assessing the assignment policy for Army women* [MG-590-1-OSD]. Santa Monica, CA: RAND Corporation.

Harrell, M. C., & Miller, L. L. (1997). *New opportunities for military women: Effects upon readiness, cohesion, and morale* [MR-896-OSD]. Santa Monica, CA: RAND Corporation.

Haughton, C., Jr. (2010, March). Remarks to the Military Leadership Diversity Commission, Annapolis, MD.

Haygood, A., & Morris, M. (2009, November). *Air Force accessions.* Briefing presented to the Military Leadership Diversity Commission, Melbourne, FL. Retrieved January 18, 2010, from http://mldc.whs.mil/download%5Cdocuments%5Cmeetings%5C200911% 5CAF1.pdf

Holvino, E., Ferdman, B. M., & Merrill-Sands, D. (2004). Creating and sustaining diversity and inclusion in organizations: Strategies and approaches. In M. S. Stockdale & F. J. Crosby (Eds.), *The psychology and management of workplace diversity* (pp. 245–276). Malden, MA: Blackwell.

Hosek, S. D., Tiemeyer, P., Kilburn, M. R., Strong, D. A., Ducksworth, S., & Ray, R. (2001). *Minority and gender differences in officer career progression* [MR-1184-OSD]. Santa Monica, CA: RAND Corporation.

*House Armed Services Committee approves senior military officer diversity commission; increases Junior Reserve Officer Training Corps units* [Press Release]. (2008, May 15).

Jackson, S. E., Joshi, A., & Erhardt, N. (2003). Recent research on team and organizational diversity: SWOT analysis and implications. *Journal of Management*, *29*, 801–830.

Johnson, C. (2011, January 14). *Memo to the Military Leadership Diversity Commission research director.*

Johnson, J., Ham, C., et al. (2010, November 30). *Report of the comprehensive review of the issues associated with a repeal of "Don't Ask, Don't Tell."* Retrieved December 20, 2010, from http://www.defense.gov/home/features/2010/0610_gatesdadt/DADTReport_FINAL_20101130(secure-hires).pdf

Kalev, A., Dobbin, F., & Kelly, E. (2006). Best practices or best guesses? Assessing the efficacy of corporate affirmative action and diversity policies. *American Sociological Review*, *71*, 589–617.

Karabel, J. (2003, March 28). Race and national security. *Christian Science Monitor.*

Kirby, S. N., Harrell, M. C., & Sloan, J. (2000). Why don't minorities join special operations forces? *Armed Forces and Society*, *26*, 523–545.

Kraus, A., Hodari, A. K., Riche, M. F., & Wenger, J. W. (2007, November). *The impact of diversity on Air Force mission performance: Analysis of deployed servicemembers' perceptions of diversity/capability relationship* [Research Memorandum D0015452.A2]. Alexandria, VA: CNA.

Kraus, A., Wenger, J., Houck, L., & Gregory, D. (2004). *College recruits in the enlisted Navy: Navy outcomes and civilian opportunities.* Alexandria, VA: CNA.

Lim, N., Cho, M., & Curry, K. (2008). *Planning for diversity: Options and recommendations for DoD leaders* [MG-743-OSD]. Santa Monica, CA: RAND Corporation.

Lim, N., Marquis, J., Hall, C., Schulker, D., & Zhuo, X. (2009). *Officer classification and the future of diversity among senior military leaders: A case study of the Army ROTC* [TR-731-OSD]. Santa Monica, CA: RAND Corporation.

Malstrom, F. (2009, June). Before there was a USAFA prep school. *Checkpoints*, 30–33.

McHenry, J. J., Hough, L. M., Toquam, J. L., Hanson, M. A., & Ashworth, S. (1990). Project A validity results: The relationship between predictor and criterion domains. *Personnel Psychology*, *43*, 335–354.

McSally, M. (2007). Women in combat: Is the current policy obsolete? *Duke Journal of Gender Law & Policy*, *14*, 1011–1059.

McSally, M. (2010, September). Remarks to the Military Leadership Diversity Commission, Baltimore, MD.

Mershon, S., & Schlossman, S. (1998). *Foxholes and color lines: Desegregating the U.S. Armed Forces.* Baltimore and London: The Johns Hopkins University Press.

Military Leadership Diversity Commission. (2009). *What is the relationship between demographic diversity and cognitive diversity?* [Issue Paper #4]. Arlington, VA: Military Leadership Diversity Commission.

Military Leadership Diversity Commission. (2009). *The Defense Diversity Working Group* [Issue Paper #7]. Arlington, VA: Military Leadership Diversity Commission.

Military Leadership Diversity Commission. (2010). *Business-case arguments for diversity and diversity programs and their impact in the workplace* [Issue Paper #14]. Arlington, VA: Military Leadership Diversity Commission.

Military Leadership Diversity Commission. (2010). *Demographic profile of the active-duty enlisted force: September 2008 snapshot* [Issue Paper #19]. Arlington, VA: Military Leadership Diversity Commission.

Military Leadership Diversity Commission. (2010). *Services' processes for developing definitions of diversity and diversity policy statements* [Issue Paper #20]. Arlington, VA: Military Leadership Diversity Commission.

Military Leadership Diversity Commission. (2010). *Change as a process: What business management can tell us about instituting new diversity initiatives* [Issue Paper #21]. Arlington, VA: Military Leadership Diversity Commission.

Military Leadership Diversity Commission. (2010). *Effective diversity leadership: Definition and practices* [Issue Paper #29]. Arlington, VA: Military Leadership Diversity Commission.

Montelongo, M. (2010, April). Remarks to the Military Leadership Diversity Commission, Fishkill, NY.

Mor Barak, M., Cherin, D. A., & Berkman, S. (1998). Organizational and personal dimensions in diversity climate: Ethnic and gender differences in employee perceptions. *The Journal of Applied Behavioral Science*, *34*(1), 82–104.

Mullen, M. (2009, September). Remarks to the Military Leadership Diversity Commission, Arlington, VA.

National Center for Education Statistics. (2008). Integrated Postsecondary Education Data System [Dataset].

National Defense Authorization Act for Fiscal Year 2006, Pub. L. 109-163, 119 Stat. 3136, January 6, 2006.

National Defense Authorization Act for Fiscal Year 2009, Pub. L. 110-417, 122 Stat. 4356, October 14, 2008.

National Defense Authorization Act for Fiscal Year 2010, Pub. L. 111-84, 123 Stat. 2190, October 28, 2009.

National Defense Research Institute. (2010). *Sexual orientation and U.S. military personnel policy: An update of RAND's 1993 study.* Santa Monica, CA: RAND Corporation.

O'Donnell, M. (2010, September). Remarks to the Military Leadership Diversity Commission, Baltimore, MD.

Office of the Under Secretary of Defense (Personnel and Readiness). (FY 2002–FY 2008). *Population representation in the military services.*

Oken, C. & Asch, B. J. (1997). *Encouraging recruiter achievement: A recent history of military recruiter incentive programs* [MR-845-OSD]. Santa Monica, CA: RAND Corporation.

Peck, T. R. (2010, March 6). *Women serving in Navy continue reaching milestones* [NNS100306-17]. Retrieved October 11, 2010 from http://www.navy.mil/search/display.asp?story_id=51758

Petersen, F. E., & Phelps, J. A. (1998). *Into the tiger's jaw: America's first black marine aviator.* Novato, CA: Presidio Press.

Powell, C. (2010, March). Remarks to the Military Leadership Diversity Commission, Annapolis, MD.

Ree, M. J., & Earles, J. A. (1992). Intelligence is the best predictor of job performance. *Current Directions in Psychological Science*, *1*, 86–89.

Riche, M. F., Kraus, A., & Hodari, A. K. (2007). *The Air Force diversity climate: Implications for successful total force integration*. Alexandria, VA: CNA.

Roughead, G. (2010, June). Remarks to the Military Leadership Diversity Commission, McLean, VA.

Schirmer, P., Thie, H. J., Harrell, M., & Tseng, M. S. (2006). *Challenging time in DOPMA: Flexible and contemporary military officer management* [MG-451-OSD]. Santa Monica, CA: RAND Corporation.

Segal, D. R., & Segal, M. W. (2004). America's military population. *Population Bulletin*, *59*(4).

Shinseki, E. (2010, September). Remarks to the Military Leadership Diversity Commission, Baltimore, MD.

Sodexo. (2010, September 24). *Sodexo launches diversity and inclusion advisory board to continue progress for minorities, women*. Retrieved November 30, 2010, from http://www.sodexousa.com/usen/newsroom/press/diversityandinclusionadvisoryboard.asp

Stanley, C. (2010, September). Remarks to the Military Leadership Diversity Commission, Baltimore, MD.

Thirtle, M. R. (2001). *Educational benefits and officer-commissioning opportunities available to U.S. military servicemembers* [MR-981-OSD]. Santa Monica, CA: RAND Corporation.

Thomas, D. A., & Ely, R. J. (1996, September–October). Making differences matter: A new paradigm for managing diversity. *Harvard Business Review*, 79–90.

Thompson, D. E., & Gooler, L. E. (1996). Capitalizing on the benefits of diversity through workteams. In E. E. Kossek & S. A. Lobel (Eds.), *Managing diversity: Human resource strategies for transforming the workplace* (pp. 392–437). Malden, MA: Blackwell.

Tsui, A. S., Egan, T. D., & O'Reilly, C. A. (1992). Being different: Relational demography and organizational attachment. *Administrative Science Quarterly*, *37*, 549–579.

Tsui, A. S., & Gutek, B. A. (1999). Demographic differences in organizations. Lanham, MD: Lexington.

Under Secretary of Defense (Personnel and Readiness). (2006, June 23). *Improving diversity through realignment of the Equal Opportunity Office* [Memorandum].

U.S. Air Force. (2009). *Officer opportunities: Commissioned programs*. Retrieved March 17, 2010, from http://www.airforce.com/opportunities/officer/education/

U.S. Army. (2007). *Three ways to become an officer*. Retrieved March 17, 2010, from http://www.usarmy.com/845/3-ways-to-become-us-army-officer/

U.S. Census Bureau. (n.d.). *2009 national population projections (supplemental)*. Retrieved December 20, 2010, from http://www.census.gov/population/www/projections/2009projections.html

U.S. Census Bureau. (1973–2008, March). Current population survey [Dataset].

U.S. Census Bureau. (2007). American community survey [Dataset].

U.S. Coast Guard. (n.d.). *Women & the U.S. Coast Guard: Moments in history*. Retrieved January 21, 2010, from http://www.uscg.mil/History/uscghist/WomenChronology.asp

U.S. Department of Defense. (n.d.). *DoD 101: An introductory overview of the Department of Defense*. Retrieved October 4, 2010, from http://www.defense.gov/pubs/dod101/dod101.html

U.S. Department of Defense. (1987, May 21). *The DoD Civilian Equal Employment Opportunity (EEO) Program* [DoDD 1440.1]. Certified current as of November 21, 2003.

U.S. Department of Defense. (1995, August 18). *Department of Defense Military Equal Opportunity (MEO) Program* [DoDD 1350.2].

U.S. Department of Defense. (2010, February). *Quadrennial Defense Review report*. Washington, DC: U.S. Department of Defense.

U.S. Equal Opportunity Employment Commission. (n.d.). *Overview*. Retrieved October 5, 2010, from http://www.eeoc.gov/eeoc/index.cfm

U.S. General Accounting Office. (1995, November). *Military equal opportunity: Certain trends in racial and gender data may warrant further analysis* [GAO/NSIAD-96-17]. Washington, DC: U.S. General Accounting Office.

U.S. Joint Chiefs of Staff. (2010, November 8). *Department of Defense dictionary of military and associated terms* [JP 1-02]. As amended though December 31, 2010.

U.S. Marine Corps. (2010). *U.S. Naval Academy*. Retrieved March 17, 2010, from http://officer.marines.com/marine/making_marine_officers/commissioning_programs/us_naval_academy

Visconti, L. (2010, April). Remarks to the Military Leadership Diversity Commission, Fishkill, NY.

The White House. (1948, July 26). *Establishing the President's Committee on Equality of Treatment and Opportunity in the Armed Services* [Executive Order 9981]. Washington, DC.

Witte, B. (2009, November 20). *Lawmakers send few minorities to academies*. Retrieved April 23, 2010, from http://www.msnbc.msn.com/id/34066952/

# EXHIBIT P

NUMBERS, FACTS AND TRENDS SHAPING YOUR WORLD    NEWSLETTERS | PRESS | DONATE | MY ACCOUNT | CONTACTED BY US?

Read our research on: World Leaders | Internet & Technology | Family & Relationships

 Pew Research Center

Search pewresearch.org…

RESEARCH TOPICS ▾    ALL PUBLICATIONS    METHODS    SHORT READS    TOOLS & RESOURCES    EXPERTS    ABOUT

Home › Research Topics › Politics & Policy › Political Issues › Discrimination & Prejudice › Affirmative Action

JUNE 16, 2023

# Americans and affirmative action: How the public sees the consideration of race in college admissions, hiring

**BY JOHN GRAMLICH**

The term "affirmative action" has a long history in the United States. One early reference appears in an executive order that President John F. Kennedy signed in 1961, directing federal contractors to "take affirmative action" to prevent discrimination against job applicants and employees on the basis of race or other factors.

Today, affirmative action generally refers to programs aimed at boosting educational or employment opportunities for racial and ethnic minority groups that historically have faced discrimination. But the idea has sparked many debates in recent years. Some Americans see these programs as an effective way to address past wrongs and increase racial and ethnic diversity in higher education and the workplace. Others view them as discriminatory in their own right.

Here's a closer look at what recent surveys have found about Americans' views of affirmative action, both in a broad sense and in specific settings.

**How we did this** ⊕

**How familiar is the public with affirmative action?**



**Most Americans have heard of affirmative action; opinions about it are mixed**

*% of U.S. adults who _____ the phrase "affirmative action"*



*Among those who have heard the phrase "affirmative action," % who say it is ...*

| | |
|---|---|
| A **good** thing | 36 |
| A **bad** thing | 29 |
| Don't know | 33 |

Source: Survey of U.S. adults conducted Dec. 5-11, 2022.

**PEW RESEARCH CENTER**

In a December 2022 Pew Research Center survey, around eight-in-ten U.S. adults (79%) said they had ever heard the phrase "affirmative action."

College graduates, those with higher incomes and older people were among the groups most likely have heard the term. For instance, 90% of Americans 65 and older said they had heard the phrase, compared with 65% of those ages 18 to 29. White and Black adults were also more likely than Asian or Hispanic adults to have heard the phrase.

**How do Americans feel about affirmative action?**

Public attitudes about affirmative action depend on how Americans are asked about it.

Americans who had heard the phrase affirmative action in the Center's December survey were asked whether they saw it as a good or a bad thing. Among those who had ever heard the term, 36% said affirmative action is a good thing, 29% said it is a bad thing and a third weren't sure.

By comparison, Gallup has asked U.S. adults whether they "generally favor or oppose affirmative action programs for racial minorities." In 2021, the last time Gallup asked this question, a [62% majority of Americans favored such programs](#).

Public attitudes about affirmative action can also vary depending on the specific context in which it is being discussed, such as in higher education or the workplace.

### How do Americans view race and ethnicity as a factor in college admissions?

**Half of U.S. adults disapprove of selective colleges considering race and ethnicity in admissions decisions, while a third approve**

*% who _____ of selective colleges and universities taking race and ethnicity into account in admissions decisions in order to increase the racial and ethnic diversity at the school*

| | Disapprove | Approve | Not sure |
|---|---|---|---|
| Total | 50 | 33 | 16 |
| Black | 29 | 47 | 24 |
| Hispanic | 39 | 39 | 20 |
| Asian* | 52 | 37 | 10 |
| White | 57 | 29 | 14 |
| Rep/Lean Rep | 74 | 14 | 12 |
| Dem/Lean Dem | 29 | 54 | 17 |

*Estimates for Asian adults are representative of English speakers only.
Note: Black, Asian and White adults include those who report being only one race and are not Hispanic; Hispanics are of any race. No answer responses not shown. See topline for full question wording.
Source: Survey of U.S. adults conducted March 27-April 2, 2023.

**PEW RESEARCH CENTER**

A larger share of Americans disapprove than approve of higher education institutions taking race and ethnicity into account when admitting students, according to several recent Center surveys.

In a survey conducted in spring 2023, half of U.S. adults said they disapprove of selective colleges and universities taking race and ethnicity into account in admissions decisions in order to increase racial and ethnic diversity. A third of adults approved of this, while 16% were not sure.

In the same survey, 49% of Americans said the consideration of race and ethnicity makes the overall admissions process less fair, while only 20% said it makes the process fairer. Another 17% said it does not affect the fairness of the admissions process, while 13% said they weren't sure.

Other Center surveys have also found more opposition than support for the consideration of race and ethnicity in college admissions decisions.

In the December 2022 survey, for example, 82% of U.S. adults said colleges should not consider race or ethnicity when deciding which students to accept, while only 17% said colleges should take this into account. Americans were far more likely to say that colleges should consider other factors, particularly high school grades and standardized test scores.

**How do Americans view race and ethnicity as a factor in hiring?**



Most Americans say companies should not take race and ethnicity into account when hiring or promoting workers, according to a 2019 Center survey.

In that survey, 74% of U.S. adults said that, when making decisions about hiring and promotions, companies and organizations should take only a person's qualifications into account, even if it results in less diversity. Around a quarter (24%) said companies and organizations *should* take a person's race and ethnicity into account – in addition to qualifications – to increase diversity.

While most Americans disapprove of the consideration of race and ethnicity in hiring and promotion decisions, they still see value in a diverse workplace. Three-quarters of adults said in the 2019 survey that it was very or somewhat important for companies and organizations to promote racial and ethnic diversity in their workplace. Around a quarter (24%) said this was not too or not at all important.

Case 1:23-cv-02699-RDB    Document 9-6    Filed 10/06/23    Page 276 of 366

## How do Americans view recent efforts related to diversity, equity and inclusion (DEI) in the workplace?

While public attitudes on DEI efforts in the workplace are much more positive than negative, a sizeable share of Americans say it is neither good nor bad, according to a February 2023 Center survey of employed Americans.

In the survey, 56% of workers said that, in general, focusing on increasing diversity, equity and inclusion at work is mainly a good thing, while far fewer (16%) said it is a bad thing. Another 28% said it is neither good nor bad.

Still, relatively few workers attached a great deal of importance to diversity in their workplace. Only about a third (32%) said it's extremely or very important to them to work somewhere with a mix of employees of different races and ethnicities.



**Workers have mixed opinions on the value of different aspects of diversity where they work**

*% of employed adults saying that regardless of how diverse the place where they work is, it is _____ to them personally to work at a place that has a mix of employees of ...*

| | Extremely/Very important | Somewhat important | Not too/Not at all important |
|---|---|---|---|
| Different races and ethnicities | 32 | 30 | 38 |
| Different ages | 28 | 34 | 37 |
| About an equal mix of men and women | 26 | 29 | 44 |
| Different sexual orientations | 18 | 24 | 58 |

Note: Based on workers who are not self-employed and work at a company or organization with 10 or more people. Share of respondents who didn't offer an answer not shown.
Source: Survey of U.S. workers conducted Feb. 6-12, 2023.
"Diversity, Equity and Inclusion in the Workplace"

**PEW RESEARCH CENTER**

## How do attitudes on these topics vary by race and ethnicity?

Racial and ethnic minorities – especially Black Americans – are more likely than White Americans to support the consideration of race and ethnicity in college admissions and hiring decisions.

In the Center's spring 2023 survey, around half of Black adults (47%) approved of selective colleges considering race and ethnicity in their admissions decisions, compared with 39% of Hispanic adults, 37% of Asian adults and 29% of White adults. In fact, Black adults were the only racial or ethnic group more likely to approve than disapprove of such efforts. Hispanic adults were evenly divided, while Asian and White adults were more likely to

Case 1:23-cv-02699-RDB    Document 9-6    Filed 10/06/23    Page 277 of 366

disapprove than approve. (These figures refer only to English-speaking Asian adults. For a closer look at views among Asian Americans – including those who do not speak English – read our recent report, "Asian Americans Hold Mixed Views Around Affirmative Action.")

When it comes to hiring and promotion decisions in the workplace, about four-in-ten Black adults (37%) said in the Center's 2019 survey that companies and organizations should take a person's race and ethnicity into account – in addition to their qualifications – in order to increase diversity. Hispanic (27%) and White (21%) adults were less likely to express this view. (There were not enough Asian adults in the survey sample to report their results separately.)

**Are there partisan differences on these issues?**

### Most Republicans say considering race and ethnicity in college admissions makes the process less fair

*% who say that when selective colleges and universities consider race and ethnicity as a factor in admissions decisions in order to increase the racial and ethnic diversity of the school …*



This makes the overall admissions process of these colleges …

| | Less fair | More fair | Neither | Not sure |
|---|---|---|---|---|
| Total | 49 | 20 | 17 | 13 |
| Rep/Lean Rep | 70 | 7 | 12 | 10 |
| Dem/Lean Dem | 30 | 33 | 23 | 13 |



The students who are accepted to these colleges are …

| | Less qualified | More qualified | Neither | Not sure |
|---|---|---|---|---|
| Total | 33 | 11 | 39 | 16 |
| Rep/Lean Rep | 55 | 6 | 24 | 14 |
| Dem/Lean Dem | 15 | 15 | 52 | 16 |



This makes students' overall educational experiences at these colleges …

| | Worse | Better | Neither | Not sure |
|---|---|---|---|---|
| Total | 26 | 27 | 30 | 16 |
| Rep/Lean Rep | 42 | 11 | 31 | 15 |
| Dem/Lean Dem | 11 | 45 | 29 | 14 |

This is ___ for ensuring equal opportunity for Americans of all racial and ethnic backgrounds

| | Bad | Good | Neither | Not sure |
|---|---|---|---|---|
| Total | 31 | 36 | 18 | 14 |
| Rep/Lean Rep | 51 | 16 | 20 | 12 |
| Dem/Lean Dem | 14 | 57 | 16 | 13 |

Note: No answer responses not shown. See topline for full question wording.
Source: Survey of U.S. adults conducted March 27-April 2, 2023.

**PEW RESEARCH CENTER**

Yes. Democrats are far more likely than Republicans to approve of colleges and employers considering race and ethnicity.

In the Center's spring 2023 survey, more than half of Democrats and Democratic-leaning independents (54%) approved of selective colleges and universities taking race and ethnicity into account when making admissions decisions. Roughly three-quarters of Republicans and Republican leaners (74%) disapproved.

There were also wide partisan differences over how the consideration of race and ethnicity affects the college admissions process. Democrats were divided over whether it makes the overall admissions process fairer or less fair (33% and 30%, respectively, held these views). But by a margin of 70% to 7%, Republicans said it makes the process less fair.

In the 2019 survey about hiring and promotion decisions, majorities of Democrats and Republicans alike said companies and organizations should take only a person's qualifications into account, even if it results in less diversity. But Republicans were far more likely than Democrats to express this view (90% vs. 62%).

Topics   Business & Workplace,   Education,   Higher Education,   Affirmative Action

SHARE THIS LINK:        https://pewrsr.ch/3PdumiV



**John Gramlich**  *is an associate director at Pew Research Center.*

POSTS  |  BIO  |  TWITTER  |  EMAIL

## Sign up for our weekly newsletter

Fresh data delivered Saturday mornings

Enter email address...                    SIGN UP

RELATED

SHORT READ | JUL 14, 2023

Private, selective colleges are most likely to use race, ethnicity as a factor in admissions decisions

SHORT READ | JUN 16, 2023

Case 1:23-cv-02699-RDB    Document 9-6    Filed 10/06/23    Page 279 of 366

Americans and affirmative action: How the public sees the consideration of race in college admissions, hiring

---

REPORT | JUN 8, 2023

Asian Americans Hold Mixed Views Around Affirmative Action

---

REPORT | JUN 8, 2023

More Americans Disapprove Than Approve of Colleges Considering Race, Ethnicity in Admissions Decisions

---

SHORT READ | OCT 7, 2022

Hispanic enrollment reaches new high at four-year colleges in the U.S., but affordability remains an obstacle

---

TOPICS

Business & Workplace

Education

Higher Education

Affirmative Action

---

MOST POPULAR

**1**  Majority of Americans continue to favor moving away from Electoral College

**2**  Black Americans' Experiences With News

**3**  Americans' Dismal Views of the Nation's Politics

**4**  Key facts about U.S. Latinos for National Hispanic Heritage Month

**5**  Women and Political Leadership Ahead of the 2024 Election

---

**Pew Research Center** ✺

1615 L St. NW, Suite 800
Washington, DC 20036
USA

(+1) 202-419-4300 | Main
(+1) 202-857-8562 | Fax
(+1) 202-419-4372 | Media
Inquiries

**RESEARCH TOPICS**

| | |
|---|---|
| Politics & Policy | Family & Relationships |
| International Affairs | Economy & Work |
| Immigration & Migration | Science |
| Race & Ethnicity | Internet & Technology |
| Religion | News Habits & Media |
| Age & Generations | Methodological Research |
| Gender & LGBTQ | Full topic list |

**FOLLOW US**

✉ Email Newsletters
⊙ Instagram
🐦 Twitter
in LinkedIn
▶ YouTube
🔊 RSS

**ABOUT PEW RESEARCH CENTER** Pew Research Center is a nonpartisan fact tank that informs the public about the issues, attitudes and trends shaping the world. It conducts public opinion polling, demographic research, media content analysis and other empirical social science research. Pew Research Center does not take policy positions. It is a subsidiary of The Pew Charitable Trusts.

Copyright 2023 Pew Research Center　About　Terms & Conditions　Privacy Policy　Cookie Settings

Reprints, Permissions & Use Policy　Feedback　Careers

# EXHIBIT Q

# JUNIOR MILITARY OFFICER RETENTION:

## Challenges & Opportunities

**POLICY ANALYSIS EXERCISE**

**Sayce Falk & Sasha Rogers**

*Masters in Public Policy Candidates 2011*
*John F. Kennedy School of Government*
*Harvard University*

**PREPARED FOR:**

**Meghan O'Sullivan**
*Faculty Advisor*

**Eric Rosenbach**
*IGA PAC Seminar Leader*

*March 2011*



# EXECUTIVE SUMMARY

*How can the military identify and retain a greater percentage
of its most talented young officers?*

The United States is currently approaching its tenth year of continuous warfare in Iraq and Afghanistan, conflicts that have been labeled by Secretary of Defense Gates as "the captains' wars." By all accounts, the military has performed superbly, with much of that success attributable to its junior leadership. Yet even as the military finds itself with the most capable corps of junior officers in its history, it has also found that some of these young leaders are taking their hard-won experience elsewhere. To ensure that it is capable of meeting future threats, the U.S. military must retain its most talented leaders in the service – this is not simply a matter of quantity, but also a question of quality.

**Junior Officers in Their Own Words**. Amid all the concern for the health of the junior officer corps in recent years, very few have paused to ask the individuals concerned – the former officers themselves. In this report, we survey nearly 250 former junior military officers who left the service between 2001-2010 about their experiences and the reasons driving their decisions to leave. 75% of the officers we spoke to said that this was their first opportunity to provide feedback to the military after leaving the service. By and large, these individuals remain dedicated to public service and proud of their military experiences. Their responses and recommendations were poignant, thoughtful, and constructive; here, we attempt to give them voice.

Fully 80% of our respondents reported that the best officers they knew had left the military before serving a full career. Yet some factors widely portrayed as driving young officers from service were less important to our junior officer cohort than we anticipated. For instance, only 9% of respondents indicated that deployment cycles and operational tempo were their most important reason for leaving. In the same vein, nearly 75% ranked compensation and financial reasons as their least important consideration.

What *does* matter? Two factors emerged as areas of surprising consensus among former officers: organizational inflexibility, primarily manifested in the personnel system, and a lack of commitment to innovation within the military services.

➢ <u>Organizational Flexibility.</u> The number one reported reason for separation among our respondents was limited ability to control their own careers. Frustration with a one-size-fits-all system was by far the most common complaint, with emphasis on bureaucratic personnel processes that respondents called "broken," "archaic," and "dysfunctional."

**Rate the following factors in terms of their importance in your decision to leave the military.**

*(Note: question employed forced ranking of the importance of each factor.)*



**Many of the best officers would stay if …**



**What factors would be most important to you in returning to active duty?**



➢ <u>Commitment to Innovation.</u> In second place, 41% of respondents ranked frustration with military bureaucracy as the most or a very important factor in their decision to leave. Nearly half felt the military did a poor job at identifying and rewarding traits such as creativity, as opposed to qualities such as endurance or ability to follow orders.

**The Active Duty Perspective.** Previous surveys of junior officers who have left the military have often been criticized for two reasons: (1) that such individuals are biased against the military (or as one active duty officer put it, "quitters shouldn't get a vote"); or (2) that all junior officers have complaints, and those who leave are not particularly more discouraged than those who choose to stay. To address these concerns, we additionally surveyed 30 active duty respondents with similar rank and demographic characteristics as a reality check on our results. We refer to this active duty cohort throughout this report to provide a counterpoint for our survey results. Members of our active duty cohort have had successful military careers to date and were generally positive about their military experience – two-thirds intend to stay in the service until eligible for retirement. Nevertheless, they echoed many of the concerns voiced by our target sample.

**Recommendations.** The U.S. military is among our most effective and respected national institutions – it does many things right. But even great organizations have room for improvement. In this report, we propose some low-cost, high-return reforms with a goal to introduce greater efficiency and flexibility, which in turn may help to retain more of our nation's most qualified young military leaders. Our recommendations are largely synergistic, and we have grouped them broadly into six categories:

➢ <u>Know who you have.</u> You can only target your best employees for retention if you can identify them. High-performing organizations regularly grade personnel using a wide variety of quantitative and qualitative indicators, with a focus on identifying the top and bottom performers. We recommend that the military update its officer evaluation processes to provide a more rigorous and comprehensive evaluation system.

➢ <u>Reward top performers.</u> Successful organizations integrate evaluation metrics that reflect institutional goals and explicitly reward the individuals who best reflect those values. In the military, a comprehensive rewards system should also include incentives such as new opportunities for assignments outside the military and mentorships with senior officers.

➢ <u>Give your people a say in their own careers.</u> High-performing organizations offer flexible opportunities for employees to pursue their interests while maintaining a work-life balance. Although there is little to be done about current op tempos, we believe the military should consider a market-based system that better matches available assignments with an officer's aptitude, interests, and career goals.

➢ <u>Promote innovation.</u> Senior leaders in successful organizations encourage and formalize systems that promote creativity and innovation. In the military, this should be reflected in revised officer evaluation reports that identify not only past performance but future potential in order to create a clearer impression of a military officer's true aptitude.

➢ <u>Be open to feedback.</u> Studies demonstrate that high-performing organizations seek feedback at all levels, including from those who leave the organization. Junior officers who leave the service should participate in a formalized lessons-learned system that includes exit interviews and aggregates suggestions and recommendations for review by senior officers.

➢ <u>Continue to recruit</u>. Junior officers value their own experiences but see few opportunities for challenge or professional development during the middle portion of their careers. Senior leaders should continue to "recruit" these officers even after commissioning through improved mentorship and by highlighting opportunities for interesting or unique careers.

We do not mean to say here that we have cracked the code on officer attrition – nor do we claim to identify causal relationships between officer concerns and retention. But we do believe we have highlighted areas for the Department of Defense and the military services to scrutinize more closely. In fact, much of what we report is intuitive – arduous deployment timelines, quality of life concerns, ineffective superior officers, and insufficient financial compensation are all reasons why officers claim to leave the service. Yet our most important message is perhaps this: many young officers say they leave simply because they do not believe their skills and talents will continue to be rewarded with increased responsibility and freedom of action as they progress.

# CONTENTS

INTRODUCTION ................................................................................................................. 1

    The Making of the Junior Officer Corps ....................................................................... 2

    Junior Officer Attrition: A Real Problem? ..................................................................... 3

    Who We Surveyed ........................................................................................................ 6

PART I: AREAS FOR CHANGE ........................................................................................ 9

    Organizational Flexibility and Personnel Management ............................................. 11

    Organizational Innovation and Improvement ........................................................... 19

PART II: OTHER ISSUES OF CONCERN ...................................................................... 23

    Operational Tempo and Quality of Life ...................................................................... 25

    Compensation ............................................................................................................. 33

RECOMMENDATIONS ..................................................................................................... 37

METHODOLOGY .............................................................................................................. 47

CONCLUSION .................................................................................................................. 51

APPENDIX A: SAMPLE DEMOGRAPHICS ..................................................................... 53

APPENDIX B: LIST OF FORMER-OFFICER ORGANIZATIONS CONTACTED ............... 55

APPENDIX C: SURVEY STRUCTURE ............................................................................ 57

APPENDIX D: ACTIVE DUTY AND OUT-OF-SERVICE RESULTS COMPARISON ......... 63

APPENDIX E: EXAMPLES OF OFFICER FITNESS REPORTS FOR EACH SERVICE ...... 64

# INTRODUCTION

Today's junior officers represent the future of the institution – among them may be the next Eisenhower, Black Jack Pershing, or Billy Mitchell. At the same time, the Department of Defense is undergoing perhaps its most significant transformation in the history of the modern force. This change, combined with a decade of near-constant use, has given rise to anxiety about retention within the junior officer corps, long a proverbial "canary in a coal mine" for the military's organizational health. Some theorize that the strain of repeated deployments is causing junior officers to flee the service; others insist that the personnel management and compensation systems are broken; while still others believe that the problem is simply exaggerated. The true impact, if there is one, may not be known for years. Yet as important as the overall attrition statistics are, this ongoing debate misses a more subtle point: it is not simply the quantity but also the *quality* of the officers retained that matters. Will the Army have its next George Marshall to call upon in a time of national need? The military, like any other institution, must not only be concerned with simply maintaining *enough* personnel, but also with retaining its best and most talented.

Yet interestingly, amid all the concern for the health of the junior officer corps, very few have paused to ask the individuals concerned – the former officers themselves. We interviewed 242 former military officers drawn from all four services about their experiences in the military and their reasons for leaving. We were surprised to discover that 75% of those we surveyed had no opportunity to provide feedback to the military after separation. What came through loud and clear in their responses was that the loss of junior military talent is not the problem; rather, it is a *symptom* of larger underlying institutional challenges. In this report, we attempt to place these junior officers' thoughtful and often thought-provoking observations in the context of the literature on military adaptation, human capital management, and organizational change. We then propose several ways in which the military might adapt to better retain its most talented junior officers in the future.

Throughout this report we refer in particular to challenges faced by the Army, and we wish to make clear that we are not singling out the Army for criticism. Rather, as the largest force and the service at highest risk of retention issues as a result of the ongoing conflicts in Iraq and Afghanistan, the Army's attempts to adapt serve as a useful proxy by which to examine the retention challenges facing all four military services.

## The Making of the Junior Officer Corps

Service end-strength requirements are set by Congress and revised annually, to include multiple increases throughout the last decade for both the Army and the Marine Corps.[1] End-strength by rank is also regularly scrutinized by Congress and civilian policymakers; the current numbers for company-grade officers are indicated below:[2]

| | Army | Air Force | Navy | Marine Corps |
|---|---|---|---|---|
| Total Officers | 90,795 | 65,496 | 52,031 | 20,709 |
| O-2 | 11,304 | 7,009 | 6,504 | 3,654 |
| O-3 | 27,585 | 22,486 | 16,550 | 6,225 |
| O-4 | 17,010 | 14,625 | 10,268 | 3,910 |

In 1980, Congress passed the Defense Officer Personnel Management Act, which mandated percentage promotion goals for Department of Defense uniformed personnel, in an attempt to centralize and standardize the different methods used by each service to promote officers. In combination with total officer end-strength requirements, DOPMA standards provide a two-part rubric for each service to determine its total officer make-up:

**TABLE 2.**
**DOPMA GUIDELINES FOR THE OFFICER PROMOTION SYSTEM**

| Officer Pay Grade | Opportunity for Promotion (Percentage promoted to grade) | Timing of Promotion (Years of service) |
|---|---|---|
| O-1 and O-2 | 100 if Fully Qualified | 1.5 |
| O-3 | 95 | 3.5 to 4 |
| O-4 | 80 | 10 ± 1 |
| O-5 | 70 | 16 ± 1 |
| O-6 | 50 | 22 ± 1 |

SOURCE: Congressional Budget Office using data from the Defense Officer Personnel Management Act of 1980, 10 U.S.C. 513, 94 Stat. 2835.

NOTE: DOPMA = Defense Officer Personnel Management Act.

[3]

As this chart demonstrates, developing military leaders is a long, arduous, and resource-intensive process. A captain cannot simply be created -- in the military's rigid hierarchy, all officers begin as lieutenants and must proceed through an "up or out" promotion process. Creating an additional class of majors can take up to 10 years; lieutenant colonels can take close to 20. The military typically accesses officers through three different programs: the service academies, Reserve Officer Training Corps (ROTC) at civilian institutions, and Officer Candidate School (OCS). After accession, officers are required to complete active duty service obligation (ADSO) commensurate with their accession route – typically between 3-5 years of service. Historically, many officers leave at the end of the ADSO period. After this

point, the military must compete with other potential employers in order to retain young officers.

### Junior Officer Attrition: A Real Problem?

Secretary Gates has repeatedly referred to the conflicts in Iraq and Afghanistan as the "captains' wars." In February 2011, he elaborated on this premise in a speech to cadets at West Point:

> "Junior leaders are given extraordinary opportunities to be innovative, take risks, and be responsible and recognized for the consequences….[They are] men and women in the prime of their professional lives, who may have been responsible for the lives of scores or hundreds of troops, or millions of dollars in assistance, or engaging in reconciling warring tribes…"[4]

Today's junior officer corps is under more pressure than ever before. This is most evident in the ground forces, which have borne much of the brunt of recent conflicts. Army officer retention spiked strongly in 2003, but fell in 2004. By 2005, as the first class of post-9/11 post-OIF officers completed their ADSO period, junior officer retention plummeted to near-critical levels.



One internal Army memo cited by multiple news sources indicated that the Army was concerned with a "disproportionate loss of high-potential, high-performance junior leaders."[6] Other reports indicated that more than one-third of West Point's Class of 2000

left the service as soon as their initial obligation was up.[7] Although this was largely in line with historical Army trends, some began to predict a crisis.[8] By 2007, the Army was predicting a total shortfall of over 3,000 officers, particularly in the crucial senior captain and major range – those who have stayed on past their initial required tour but who are not yet close to retirement.[9] These statistics prompted the Government Accountability Office (GAO) to conclude that the Army "faces many retention challenges … [and] does not have an integrated strategic plan to address its retention shortfalls."[10]

> **• • •**
>
> **Having the right number of officers is a necessary but not sufficient condition: the *quality* of officers retained must also be a benchmark.**
>
> **• • •**

Although it now appears as if the Army has righted its ship when it comes to retaining the right number of officers, it did so largely by filling shortages via across-the-board promotions to field-grade officer rank. Less than 85% of available billets at those ranks were filled by officers with the requisite rank and time in service – a critical shortfall, by the Army's own definition[11] -- and today's senior lieutenants and junior captains spend less time than ever before in critical development positions such as company command.[12] Furthermore, the Army does not conduct forced rankings of officers against their peers until they have reached field-grade level, nearly ten years into their service commitment.[13] In short, the Army's policy ignores a crucial distinction, which is that having the right number of officers is a necessary but not sufficient condition: the *quality* of officers retained must also be a benchmark for evaluating the impact of any military retention policy. Even as far back as 2007, Secretary Gates identified the critical importance of retention, saying "These men and women need to be retained, and the best and brightest advanced to the point that they can use their experience to shape the institution to which they have given so much."[14]

More than three years later, it is still not clear that the military services are effectively executing the Secretary's bidding. Although such conclusions are often hotly disputed, surveys of junior officers continue to suggest that those most capable are leaving the service. For instance, a 2008 survey of 100 active-duty officers indicated that 62% of them thought the 'best and brightest' captains were leaving active-duty service.[15] More recently, Tim Kane reported in *The Atlantic* that "an astonishing 93 percent" of active and recently-active junior officers thought that most or all of the best officers were leaving the service before completing their careers.[16] The dispute about who leaves and why rages on largely because the military's ability to track and target top young officers is limited – there are simply no available objective metrics on what the "best" officers look like.

In recent years, researchers have examined a number of factors that influence attrition. We asked our survey respondents to force rank the issues most important to them – in other words, only one factor could be most important.

**Rate the following factors in terms of their importance in your decision to leave the military.**



Based on these results, in this report we consider four factors in detail:

➢ <u>Operational tempo and deployment timelines.</u> In a 2008 survey, almost 40% of officers ranked operational tempo as the most important reason why they would leave service; it was first among all other reasons. In the words of one of our survey respondents, the pace of deployments was simply "exhausting."

➢ <u>Frustration with military bureaucracy.</u> In another 2010 survey, 82% of respondents agreed that frustration with the bureaucracy was one of their reasons for leaving. In our survey, we found that dissatisfaction with the personnel management system was particularly important in this regard.

➢ <u>Institutional innovation and flexibility.</u> The generation currently working its way through the officer ranks has grown up with vastly expanded notions of information filtering and accessibility. We found that young officers with significant on-the-ground experience were frustrated that their proposals for innovation and change were largely perceived as irrelevant to the institution.

➢ <u>Financial compensation.</u> Financial compensation is among the Department's most responsive tools for fine-tuning retention incentives, and has been the focus of numerous studies. In recent years, the services have implemented officer retention bonuses in an effort to induce their best officers to stay. However, our results indicate that such incentives have little influence on the officers who took our survey.

Among our active duty survey cohort, quality of life was the most important concern (57.7%), followed by career control (26%) and operational tempo (10%). The active duty sample largely agreed with our target out-of-service sample that compensation (38.5%) and weak superior officers (28%) were less of a problem for today's officer corps. Additionally, several commented that they chose to stay in the military out of a sense of obligation and duty to country.

Perhaps most importantly for purposes of this analysis, a majority of the active duty cohort disagreed with the statement that junior officers would leave regardless of changes to the personnel system, lending credence to the idea that small improvements can indeed have an outsize impact on the population in question. Specific breakdowns of the comparison between active duty and out-of-service samples are contained in Appendix D of this report.

## Who We Surveyed

To assess the opinions of former military officers, we conducted a cross-sectional survey of 242 junior military officers ranging in rank from O-2 to O-5 and who served between 2001 and 2010. The break-down in ranks and services of respondents is detailed below.

**Rank and Service of Survey Respondents.**

|  | USA | USMC | USN | USAF |
|---|---|---|---|---|
| **O-2** | 2 | 5 | 2 | 1 |
| **O-3** | 82 | 25 | 44 | 6 |
| **O-4** | 5 | 1 | 8 | 1 |
| **O-5** | 3 | 0 | 0 | 0 |

We discuss the methodological limitations of our survey approach later in this report, so here we simply note that our sample is not entirely representative of the overall population of military officers, or even of former officers. The officers we surveyed were more likely to be white and less likely to be married than the average officer. Our respondents were more likely to have graduated from one of the highly competitive military academies and to report that they graduated in the top quintile of their basic officer training class. They were more likely to have experienced combat, and also more likely to have obtained or are currently obtaining a graduate degree.

We readily acknowledge that in some ways, these demographics bias our results. Yet if these are indicators of talent, then our work is an initial (albeit highly subjective) effort to identify, track, and gather feedback from high-quality officers who recently left the service. While we do not claim to have identified the "best officers," we do believe our sample

effectively captures the opinions of a large number of talented officers who would have made a positive contribution to the military had they continued to serve.

---

[1]See, for example, P.L. 111-383, *The Ike Skelton National Defense Authorization Act for Fiscal Year 2011*. December 2010.

[2]"Department of Defense Active Duty Military Personnel by Rank/Grade." Defense Manpower Data Center, Statistical Information Analysis Division. 31 January 2011. Available at: http://tinyurl.com/4he93tw.

[3]Marvin M. Smith. "The Military Officer Personnel System and the Services' Plans for Downsizing." *The Drawdown of the Military Officer Corps.* November 1999. Available at: http://tinyurl.com/6cjrw66.

[4]Robert M. Gates. "Remarks by the Secretary of Defense at United States Military Academy (West Point, NY)." 25 February 2011. Available at: http://tinyurl.com/4qze7eh.

[5]Jaron Wharton. "Anecdotal Evidence of a Hollowing Force? A Closer Look at Junior Officer Retention." *Center for a New American Security Working Paper.* May 2008. Available at: http://tinyurl.com/6kqjlgx.

[6]Andrew Tilghman. "The Army's Other Crisis: Why the best and brightest young officers are leaving." *Washington Monthly.* December 2007. Available at: http://tinyurl.com/2njyck.

[7]Thom Shanker. "Young Officers Leaving Army at a High Rate." *The New York Times.* 10 April 2006. Available at: http://tinyurl.com/4mq5keh. The number of junior officers who left rose from about 6% in 2001 to over 8% in 2006 (the Army expects to commission between 3,000 and 4,000 new officers every year).

[8]The idea that today's military was at risk reached its peak in 2007, when Colin Powell described the Army as "about broken" while Lawrence Korb told Congress it was "stretched to [the] breaking point" and General Barry McCaffrey put it in his typically blunt manner, "the U.S. Army is starting to unravel."

[9]Charles A. Henning. "Army Officer Shortages: Background and Issues for Congress." Congressional Research Service, U.S. Library of Congress. 5 July 2006. Available at: http://tinyurl.com/38lcmq.

[10]U.S. Government Accountability Office. "Military Personnel: Strategic Plan Needed to Address Army's Emerging Officer Accession and Retention Challenges." Report to the Committee on Armed Services, House of Representatives. January 2007. Available at: http://tinyurl.com/4u53al3.

[11] Henning, "Army Officer Shortages: Background and Issues for Congress."

[12]Casey Wardynski, David Lyle, and Michael Colarusso. "Towards a U.S. Army Officer Corps Strategy for Success: Retaining Talent." U.S. Army War College, Strategic Studies Institute. May 2010. 6.

[13]Interview with Major Carl J. Wojtaszek, Assistant Professor of Economics, Office of Economic and Manpower Analysis, United States Military Academy. 9 February 2011.

[14] Robert M. Gates. "Remarks by the Secretary of Defense at Association of the United States Army (Washington, DC)." 10 October 2007. Available at: http://tinyurl.com/6g33ncd.

[15]Wharton, "Anecdotal Evidence of a Hollowing Force? A Closer Look at Junior Officer Retention."

[16]Tim J. Kane. "Why Our Best Officers Are Leaving." *The Atlantic.* January/February 2011. Available at: http://tinyurl.com/27r755a.

# PART I: AREAS FOR CHANGE

## Organizational Flexibility and Innovation

# ORGANIZATIONAL FLEXIBILITY AND PERSONNEL MANAGEMENT

*"There is no type of human endeavor where it is so important that the leader understands all phases of his job as that of the profession of arms."*

- Major General James Fry

## Background

Known as Millenials, the current generation of America's young workers is self-directed, networked and highly mobile; rather than building a career within one company or organization, they are more likely to view their work life as a progression of discrete and increasingly-challenging jobs. This population seeks rapid career advancement while simultaneously placing a high emphasis on maintaining a meaningful life outside of work.[17] Studies have demonstrated that Millennials are typically less motivated by guarantees of job security, and have less faith in the promise of employer-provided benefits than preceding generations.[18] Recognizing this generational shift, many top corporations are altering employment and retention practices to accommodate the Millennials' preferences. As a result, today's "hottest" companies emphasize opportunities for collaboration, embrace technology, highlight mentorship programs, and create chances for employees to engage in personally fulfilling work.[19]

With an average age of 32.2, the majority of our survey respondents fall clearly within the Millennial generation. Personnel management issues were clearly the largest reason why junior officers in our survey claimed they left active-duty service, as almost 57% of respondents said the limited ability to control their own careers was the first- or second-most important reason for leaving. 74% agreed that the military should expand early promotion abilities, and only 23% felt that talented officers were promoted more quickly than below-average officers. Tellingly, our active duty respondents also criticized the personnel system, and only 25% said they believe the military does a good job matching talent to jobs. In fact, when we asked both our out-of-service and active duty cohorts what word or words came to mind when they thought about the personnel system, the answers were resoundingly negative, and sometimes unprintable (see chart, next page).

In its function as an employer, the Department of Defense must compete against private sector corporations in the U.S. labor market for access to the best talent.[20] Yet the military is limited by certain constraints unique to the profession of arms. As large bureaucratic organizations with wide-ranging responsibilities, the services must rely upon rules and

standard operating procedures out of necessity. Furthermore, the deadly nature of the military requires a substantial investment not only in functional combat skills but also in a

**What word comes to mind when you think about the military personnel system?**



"warrior ethos" developed through years of progressive indoctrination and command responsibility.[21] As a result, while mid-career military officers often have little problem transitioning into middle management in corporate America, the converse is far less true. Options for lateral entry into the military are necessarily limited, and the most critical positions cannot be filled with just-in-time accessions; military officers must be grown from the bottom up.

This system is fundamentally sound – experience at lower ranks should be a requirement for top leadership. Even acknowledging these constraints, however, the military's programs for personnel tracking, assignment, and promotion are ossified. We believe there are significant dividends to be gained among young officers by incorporating some best practice reforms into the military human capital management system. The Pentagon has struggled for decades with this challenge, producing numerous iterative personnel management strategies and investing significant amounts of money in retention. As just one example, the recent Army Critical Skills Retention Bonus (CSRB) policy offered a bonus of up to $35,000 for an additional three years of service. Unfortunately, most compensation-based initiatives are insufficient strategies on their own. The Army's own survey data showed that many officers who accepted the bonus planned to extend their service independent of the monetary incentive. Without an emphasis on quality of officers retained or on retaining specific skill-sets, the returns on this policy implementation were quite low.[22]

The failures of the personnel system can be roughly divided into two areas of concern. The first is the failure to identify and reward top performers. Pay for performance is considered basic practice in corporate America - but with rare exceptions, a military officer's rank and paycheck are determined by number of years in service, rather than talent or military occupation. Exacerbating this disparity, President Bush in 2004 waived a legislative requirement for forced-distribution ratings that operated much like an academic curve to identify the best and worst performing officers.[23] Perhaps unsurprisingly, the result has been inflation in officer evaluations. Company-grade officers receive "virtually no performance ranking at all," and the Army today promotes more than 90% of its officers through the rank of lieutenant colonel.[24] The problems are not limited to ground forces, however – the Air Force promotes more than 90% of its officers to major and more than 75% to lieutenant colonel; the Navy promotes 84% to major and 79% to lieutenant colonel. This occurs despite legislation establishing promotion guidelines as 80% to major, 70% to lieutenant colonel, and 50% to colonel. Although it is impossible to determine whether the quality of these officers is higher or lower than the cadres before them, the perception that officers are promoted regardless of talent and capability is rampant. Or, as one respondent put it, "Anyone can become a Lieutenant Colonel in charge of 800 Soldiers merely by converting oxygen to carbon dioxide for 20 years and being automatically promoted 4 times."

Table 1: Recent Line Officer Promotion Rates

| Pay grade | All Officers: Average Promotion Rates (%) | | | | |
|---|---|---|---|---|---|
| | Navy | Air Force | Army | Marine Corps | Coast Guard |
| O-4 | 84 | 90 | 94 | 87 | 82 |
| O-5 | 79 | 76 | 90 | 69 | 73 |
| O-6 | 55 | 45 | 57 | 52 | 58 |

NOTE: Navy and Coast Guard averages are based on data from FY07-FY10; Army and Air Force averages are based on data from FY07-FY09, and Marine Corps averages are based on data from FY08-FY10.

**Average promotion rates of officers by service. DOPMA legislation sets promotion goals as 80% for O-4, 70% for O-5, and 50% for O-6.**

**If you were the chief of staff for your Service, what would you do to ensure the best and the brightest stay in the service?**

"Encourage more active mentoring."

"Flexible assignments and billets in more desirable locations."

"Be willing to fire people for poor performance (not just send them to another unit or higher echelon where they will do less work, which actually exacerbates the problem by giving them a more impressive resume)."

"Allow talented officers and soldiers who are happy with their current jobs to remain in those positions."

"Not have such a rigid career path. We shouldn't force people to be S-1s or S-4s just because everyone else has followed that path."

"Allow them to leave for a year or two without being separated. Think of it as a sabbatical."

"I would institute an accelerated merit promotion system where true achievers could stand out and be rewarded for their intellect and efforts."

High promotion rates and a lack of distinction between officers lead to frustration among high-achieving young officers who see little opportunity to distinguish themselves through military service.[25] 29% of respondents indicated that troubles with superior officers were one of the top two reasons for leaving service. More than 92% of officers disagreed with the statement that the current system does a good job retaining the strongest officers; 89% similarly disagreed that the current system does a good job of weeding out the weakest.

**The current military personnel system does a good job of:**



A second but related issue is the failure to allow officers the command time they need to learn effectively, particularly in the ground services. For instance, the Army's response to a shortfall in captains has been to access additional lieutenants. This action increased raw numbers but also created a series of unintended consequences: increased waiting times for essential schools and training opportunities, more make-work duties, and less time spent in critical early command positions.[26] As a result, today's captains have less overall experience, forcing commanders to assign much of the "captain-level" work instead to officers at the rank of major. The result is job dissatisfaction at all levels, as officers complain that the lack of quality developmental experiences leaves them unprepared to lead in full-spectrum operations.[27] The graph on the following page shows the relationship between increased lieutenant accessions and decreased platoon command time within the Army.

**Impact of Over-Accession on Developmental Opportunities for Lieutenants in the Army[28]**



Lastly, all four services largely fail to distinguish between officers with unique skill-sets or who have chosen non-traditional career paths in assignments and performance evaluations. Although certain skills are better suited to specific types of billets, the current officer evaluation system "provide[s] no unique or distinguishing information about its officers," meaning the military is selecting officers for specific billets nearly blindly, without regard for their unique skills or inclinations.[29] Nearly 83% of our respondents disagreed with the statement that the military does a good job of matching talent to jobs; 70% disagreed with the statement that talented officers received better jobs than average. For example, the Army relies heavily on the Officer Effectiveness Report (OER) – a standardized form that emphasizes command ability -- for promotions, despite the fact that only 12% of senior military billets are command positions.[30] As a result, service members with specific technical skills are often underpaid and underutilized in the military – leading many to seek opportunities to use their talents elsewhere.[31]

The paramount importance of reforms to the officer personnel system are identified by the following statistics: 22% of those surveyed felt dissatisfied with the billets they were assigned; 64% felt that having assignments more tailored to their personal preferences would have had a significant impact on their decision to leave active duty. The officers we surveyed told us that not only is the personnel system an identified weakness, but that reforms to it would have immediate and significant effects.

**Please indicate your level of agreement with the following statements.**



**The Active Duty Perspective**

Our active duty cohort was generally more forgiving of the military services than the out-of-service officers, but also agreed that the military personnel system was in need of reform. In fact, when asked what word or words came to mind when they thought about the military personnel system, the active duty cohort replied with universally (100%) negative terms. Only 18% of active duty respondents believed that the current system does a good job of weeding out the weakest leaders; a similar number believed it does a good job of retaining the best leaders.

Only 25% of active duty respondents believed their service personnel system does a good job of matching talent to jobs, although most said they are personally generally satisfied with the assignments they have received over the course of their careers.

Our active duty cohort diverged most significantly from the out-of-service cohort on the question of whether to expand early promotions. Both groups are relatively split on the question, but the active duty cohort tended to believe that military promotions should not be accelerated, because it takes longer to gain experience to command at a senior level in

the military. Looking forward at their futures, young officers desire faster promotions; looking back on their careers, more senior officers believe the pace was appropriate.  As a result, the military should carefully tailor any new initiatives concerning early promotion to ensure that only those capable of such increased responsibility receive it. Specific breakdowns of the comparison between active duty and out-of-service samples are contained in Appendix D.

**Summary**

More so than any other factor, our officers believed that improvements to the personnel system had the most potential to positively impact retention. As one respondent noted, "Officers are not afforded the opportunity to do jobs they love." Today's captains are the generals of the next generation; the inability to weed out the worst leaders and promote the best is a critical vulnerability. Small improvements to the personnel system to better capture and track the performance of officers will, we believe, produce outsize results.  Our recommendations for how best to do so are described in greater detail later in this report.

•   •   •

**High promotion rates and a lack of distinction between officers lead to frustration among high-achieving young officers who see little opportunity to distinguish themselves through military service.**

•   •   •

---

[17]Eddy Ng, Linda Schweitzer, and Sean Lyons. "New Generation, Great Expectations: A Field Study of the Millennial Generation." *Journal of Business & Psychology.* Vol. 25, Issue2. June 2010.

[18]"Millenials: A Portrait of Generation Next." Pew Research Center. February 2010. Available at: http://tinyurl.com/4a8oc77.

[19]Jean Ferri-Read. "The Keys to Engaging Millennials." *Journal for Quality & Participation.* Vol. 33, Issue 1. April 2010. Jeanne C. Meister and Karie Willyerd. "Mentoring Millennials." *Harvard Business Review.* Vol. 88, Issue 5. May 2010.

[20]Carolyn Kleiner and Andrew Vliet. "Enter the Era of Persistent Competition for Talent." Strategic Studies Institute. July 2010.

[21] Wardynski, Lyle, Colarusso, "Towards a U.S. Army Officer Corps Strategy for Success: Retaining Talent." 3.

[22]*Ibid.* 25-27.

[23]*Ibid.* 18.

[24]Casey Wardynski, David S. Lyle, Michael J. Colarusso. "Towards a U.S. Army Officer Corps Strategy for Success: Evaluating Talent." U.S. Army War College, Strategic Studies Institute. January 2010. This

is in contrast to previous decades, when the rank of major was used as a point to separate talented officers for continued promotion.

[25]"Recent Officer Promotion Rates by Race, Ethnicity, and Gender." Military Diversity Leadership Commission Issue Paper #45. June 2010. Available at: http://tinyurl.com/4s9rnc5.

[26]Wardynski, Lyle, Colarusso, "Towards a U.S. Army Officer Corps Strategy for Success: Retaining Talent."

[27]U.S. Army Training and Leader Development Panel. "The Army Training and Leader Development Panel Officer Study: Report to the Army." 2003. Available at: http://tinyurl.com/6fq295d.

[28]Wardynski, Lyle, Colarusso, "Towards a U.S. Army Officer Corps Strategy for Success: Retaining Talent." 6.

[29]*Ibid.*

[30]*Ibid.* 9.

[31]Cindy Williams. "Advice + Dissent: Forget the Draft." *Government Executive.* 15 September 2004. Available at: http://tinyurl.com/6dqooey.

# ORGANIZATIONAL INNOVATION AND IMPROVEMENT

*"[The future of conflict] is about leaders. We're going to need people who can think differently."*

-   General Raymond Odierno (USA)
    Commander, Joint Forces Command

## Background

The academic literature continues to demonstrate that creativity and innovation are essential elements of organizational success in the twenty-first century. Here we consider innovation to mean the introduction of new methods or products and creativity as the ability to conceive of new processes. In other words, the first is the output; the second is the process. They are similar but distinct; the military produces innovative new technologies all the time through established rules and procedures of equipment purchasing. In this sense, then, being innovative does not go far enough – we must include creativity in order to capture the essential element of 'newness' in both the approach and solution to a problem. Or, as one expert put it, creativity is "novelty that works."[32]

Such creativity and innovation are essential to the military's operations, where conventional wisdom proclaims that "victory goes to the most flexible command structure."[33] While the American military has historically excelled at creativity and adaptation on the battlefield, it has struggled recently to replicate these results within its institutional framework. Changes in the institution have been precluded by changes in the doctrine – that is, figuring out how to fight has denied leaders the time to figure out how to update and reorganize once the fight is over. Put simply, despite a decade of combat that has challenged the military's operating procedures, the military services "… have changed almost nothing about the way their promotional systems and their entire bureaucracies operate."[34]

Currently, there are few formal incentives to be innovative. As one of our respondents put it, "What is most often rewarded is the officer that is not willing to 'rock the boat.'" Although about half of our respondents thought that their unit commander rewarded their innovative ideas, only 31% thought the military as a whole was committed to innovation; this is in marked contrast to our active duty cohort, where 50% believe the military is committed to innovation. The problem is structural rather than personal – that is, officers who left personally recognized the value of being innovative but were continually frustrated with the institution's lack of flexibility. As one officer said in the survey, "At the

unit level individuals are identified, assigned, and rewarded effectively to the extent possible. The problem is that big Army is incapable of doing this."



Among junior officers the recent experience of the military's most visible innovators – individuals like H.R. McMaster, John Nagl, and Paul Yingling – are often parsed for meaning and to glean career direction. When McMaster was originally passed over for promotion to general officer, Fred Kaplan wrote, "every officer I spoke with knew about it and had pondered its implications."[35] Or, as Lieutenant General Barno so bluntly put it, "Bad generals – dumb generals – kill off innovation and risk-taking, poison the well of future talent, and leave a legacy of 'ducks picking ducks' in their wake."[36] Our respondents generally appeared to agree, ranking creativity as the military's lowest-valued skill out of 10 characteristics, just behind intelligence.





A second issue is a continued lack of broadening experiences. The evidence shows that thinking creatively is helped considerably by exposure to novel concepts and environments.[37] As then-Lieutenant Colonel Paul Yingling wrote in his scathing critique of the general officer corps, "It is unreasonable to expect that an officer who spends 25 years conforming to institutional expectations will emerge as an innovator in his late 40s."[38] The current military processes do little to encourage officers to try new experiences. Officers are not permitted to switch back and forth between military specialties. While 37% of officers have graduate degrees[39], far fewer obtain these degrees through civilian graduate schools while on active duty, despite a growing recognition that such experiences can be valuable at the senior level.[40] Officers often express concern about what the impact of taking a non-traditional assignment, such as serving on a Military Transition or Provincial Reconstruction Team, will do for their career prospects. As a result, some officers leave the service to seek greater diversity of experience elsewhere.

Our respondents reported mixed experiences with superior officers, but agreed that their influence can have an outsize influence on a young officer's experience – when this relationship works, they reported that it was one of the most rewarding parts of their military experience, but as one young officer told us, "the problem is one bad commander can waste an entire duty station assignment for a junior officer." Still, the results are not all bad. A majority of respondents were comfortable expressing their career ambitions to senior officers and thought that they took an active interest in their careers; such linkages are important to preventing what one author called "a brewing conflict between the Army's junior and senior officer corps."[41] If the military does not maintain the flexibility to bridge the divide between junior and senior leadership, some young officers may choose to leave the military and find a profession where such mentorship does occur.

• • •

**As one of our respondents put it, "What is most often rewarded is the officer that is not willing to 'rock the boat.'".**

• • •

Innovation and creativity come from being exposed to new experiences and new ideas. Currently, professional military schools are an almost mandatory requirement for promotion, but more than 76% of the officers in our survey believed that the best officers they knew would have stayed in the service if there were a greater variety of educational options, including at civilian institutions; 71% of our active duty cohort agreed. 40% of our respondents believe their current employer does a better job of informing them of opportunities for professional development and promotion than the military did. Such evidence lends support to the premise that much can be done to improve the military's ability to identify, evaluate, and reward innovation and creativity.

### The Active Duty Perspective

The active duty cohort diverged sharply from the out-of-service sample on the question of military innovation and the role for entrepreneurial spirit within the services. Half of the active duty sample said that the military was committed to innovation, and more than two-thirds said their personal entrepreneurial behavior has been rewarded by senior officers.

That being said, active duty officers also rated creativity low on the scale of behaviors that the military rewards – zero believed the military identifies and rewards creativity very well, and only 18% believe it does so well. However, the active duty officers believe the military does reward intellect – 73% say well or very well – which may be a proxy for insightful behavior. Still, as with the out-of-service cohort, the behaviors that scored most highly on the "identify-and-reward" scale included following orders (89%), decision-making (82%), endurance (73%), and military knowledge (70%). Specific breakdowns of the comparison between active duty and out-of-service samples are contained in Appendix D.

### Summary

Although the veterans we surveyed did not believe that the military as an institution valued creativity and innovation, they did think that senior officers took an interest in their careers and that their unit commanders valued their innovative ideas. Still, as one of our respondents said, "Some of the best officers are not seen as the best officers because often times these officers go against the grain." Our survey results provide evidence that the military could do more to formally encourage innovation and creativity in its junior officer corps, and this would increase the likelihood that they continue to serve.

---

[32]Interview with Teresa Amabile, Edsel Bryant Ford Professor of Business Administration, Harvard Business School. 10 March 2011.

[33]Barry R. Posen. *The Sources of Military Doctrine: France, Britain and Germany Between the World Wars.* Ithaca: Cornell Studies in Security Affairs. 1986. 48.

[34]Fred Kaplan. "Challenging the Generals." *The New York Times Magazine.* 26 August 2007. Available at: http://tinyurl.com/69qxr53.

[35] Kaplan, "Challenging the Generals."

[36]David Barno. "Dave Barno's top 10 tasks for General Dempsey, the new Army chief of staff." *The Best Defense.* 21 January 2011. Available at: http://tinyurl.com/6db5zed.

[37]Amabile interview, 10 March 2011.

[38]Paul Yingling. "A failure in generalship." *Armed Forces Journal.* 27 April 2007. Available at: http://tinyurl.com/2dqqav.

[39]"Population Representation in the Military Services 2008." Department of Defense, Office of the Under Secretary of Defense, Personnel and Readiness. Appendix B, Table 26. Available at: http://tinyurl.com/4d89ra5.

[40]See, for example, David Petraeus. "Beyond the Cloister." *The American Interest.* July/August 2007.

[41]Kaplan, "Challenging the Generals."

# PART II: OTHER ISSUES OF CONCERN

## Op Tempo & Compensation

# OPERATIONAL TEMPO AND QUALITY OF LIFE

*"Trends in retention are what the experts call 'trailing indicators.' In other words, the first time you know soldiers or officers might be leaving is when they have gone."*

-   Brigadier General Kevin Ryan (USA, Ret.)
Executive Director, Belfer Center for Science and International Affairs

Although the extent to which deployments drive attrition is debated, the increased operational tempo of recent years undoubtedly explains the decision by at least some military officers to leave the service. The current wars place an enormous burden on company-grade leaders, with counterinsurgency doctrine devolving incredible levels of responsibility to the small-unit level. Today's young officers have endured repeated back-to-back deployments; many have lost friends and colleagues in combat. Time spent at home is no less stressful, as units face high training demands conducted on deployment schedules and at deployment intensity.

## Deployment and Attrition

The problem of officer attrition as a result of deployment is not new to the wars in Iraq and Afghanistan, but has gathered top-level attention in recent years. In 2005, the Army's own internal concerns about losing its "best and brightest" were widely reported when a leaked memo warned of a crisis in junior officer retention.[42] Recent research has attempted to measure the effect of deployment tempo on military personnel, and to quantify its overall impact on retention. Interestingly, although service members continue to rate pace of deployment as a primary reason for intending to leave active duty, their observed behavior, as measured by reenlistment statistics, belies this claim.[43] Nevertheless, the military has invested significant time and effort into determining the impact of deployment on uniformed personnel.

96% of our survey respondents reported deploying during the course of their military career; 81% reported deployments to Iraq or Afghanistan. We asked respondents to identify the word or words that came to mind when they considered their deployment experience. Roughly 57% of those surveyed associated deployment with words with a negative connotation, while 28% reported words with a positive connotation (the remainder recorded value-neutral words, such as "individual augmentee" or "life experience").

**What word or words come to mind when you think about your deployment?**



Yet our survey data indicates that, of those individuals who chose to leave active duty, deployment was not the primary driver for leaving. In fact, only 9% rated it as the most important reason; in contrast, 33% said it was less or least important. Our active duty sample generally agreed, with 10% putting it as the first and 25% the second reason why they might leave in the future. We hypothesize that the disparity between the active duty and out-of-service cohorts is related to demographic differences – our active duty cohort was slightly older and more likely to be married, which may explain why deployment had a greater effect on their overall quality of life.

## Deployment Characteristics

There is evidence to indicate that some amount of deployment experience actually has a *positive* effect on reenlistment.[44] This may be due to the fact that deployment allows service members to use their skills; similar to police officers or firefighters responding to emergency calls, deployments are the proving ground that validates their training. However, the positive effect of deployment diminishes and eventually becomes negative as months deployed increase.[45]

The length and type of deployment play a significant role in its subsequent psychological and emotional impact. A 2000 RAND report distinguished between hostile and non-hostile deployments – perhaps unsurprisingly, while individuals who experienced non-hostile deployments were more likely to reenlist, hostile deployments mitigated this overall positive effect (though did not entirely erase it).[46] Expectation also plays a role. When matched by reality, deployment time had little impact on retention; in contrast, those who spent more time away from home than anticipated were less likely to reenlist.[47] In the

RAND model, military personnel maximize the value of their deployments when they are deployed in hostile situations approximately 22% of the time.

**Utility of Deployment as a Function of Percentage of Total Time Spent Deployed**[48]



With many Army and Marine Corps units operating on nearly 1:1 dwell-time ratio, expected utility is likely much lower. Although Army Chief of Staff General George Casey recently promised Congress to achieve a two-year dwell time by October 2011, the Army remains far from this goal.[49] Furthermore, little is known about the impact of combat on reenlistment over time.

Nearly 50% of our survey sample reported personally engaging in combat. Of this group, less than 7% indicated that deployment strain was their most important reason for leaving. This tends to reinforce the argument that deployment, even with combat, is not a primary driver of attrition among junior officers. Nearly three-fourths of the junior officers we surveyed commissioned during or after 2001, suggesting that not only did they understand they would deploy and see combat, but in fact that was precisely *why* they joined.

Neither returning to a 1:2 deployment-to-dwell ratio nor shorter deployment levels would have had induced most officers in our survey to remain in the service; the same held true among our active duty cohort as well. Such evidence supports other findings in this study – namely, that the officers concerned are less

**How would you change the training system?**

"Have officers and SNCOs specialize in certain regions of the world in order to become subject matter experts in the history, culture, geo-political dynamics, and languages of that region so as to enable them to operate more effectively over the course of their careers."

"There was no mechanism in place to capture the everyday tactics and techniques we developed during a long deployment … A two-week turnover was insufficient to capture of the all nuance of 13 months of combat work. Every time one of my units deployed it was like starting over from scratch."

"Opportunities to pursue language and other unique skills training without derailing your career."

"Teach how to think and plan - give open ended field problems. The training I received was great...if that is what my job required. I did not encounter a single mission remotely like my training."

"Officers should be encouraged to think on their feet and make mistakes. … When a real world scenario occurs, [officers] have little experience in reacting with critical thinking."

dissatisfied with rapid deployments and time overseas as they are with other aspects of their service.



**Please indicate your level of agreement with the following statements.**

**Training**

The combination of repeated deployments and immediate training cycles clearly took a toll on the officers who responded to our survey, a concern that has been echoed by other research, including by the services themselves. In fact, a 2003 Army report warned:

> "There is an undisciplined operational pace that affects every facet of Army life. Officers characterize it as too many short-term, back-to-back deployments and exercises. … Excessive operational pace is … detrimental to readiness, leader development, and officer job satisfaction; leads to micromanagement; and is a major reason for attrition among all cohorts."[50]

Still, our survey data indicated that the military has regained its effectiveness in personnel and unit training despite the rapid pace of deployments. This is no simple feat and should be regarded as an accomplishment – even officers who choose to leave are not doing so because they believe the institution is incapable of accomplishing its mission. Survey respondents indicated satisfaction with military capability at a variety of levels and over various periods – from a single training cycle to the entire post-September 11th era, and from the individual up through deploying-unit levels.



**Please indicate your level of agreement with the following statements.**

Approximately 61% of the officers we surveyed believed the military has adapted well to operational changes stemming from the current wars; slightly more than half thought the military effectively incorporated OIF- or OEF-specific skills into their training. Officers overwhelmingly indicated they were prepared for their deployments. 79% indicated they were personally prepared, and 76% were similarly satisfied with their unit preparation -- these numbers were broadly true for our active duty sample as well. Such a finding only reinforces the reforms needed in areas outside of warfighting capability – the American military remains fully capable of preparing itself for war; it is concerns in other areas that drive officers away.

## Quality of Life

An increasing number of officers list family separations as the reason driving their decision to leave active duty in the post-September 11th era. As one of our respondents said, "The military did not prevent me and my wife from having children, but the specter of another deployment looming ahead unknown in the distance definitely gave us pause about starting a family." Studies conducted over the last decade place the percentage of officers who leave for family reasons between 23% and 48%.[51] DOD senior leadership clearly recognizes the unique strain deployment tempo places on service members with spouses or children. Chairman of the Joint Chiefs Admiral Mike Mullen regularly speaks with junior officers, while First Lady Michelle Obama has made improving the lives of military families a highlighted initiative, and the Pentagon has taken many concrete steps to alleviate family stress in recent years.[52] These efforts appear to be bearing fruit. For instance, the Army's most recent family survey indicated that concerns by Army spouses have dropped from

their historical highs – in fact, 57% say they are now "satisfied" or "very satisfied" with the Army way of life.[53] (This may be because of the Army's changes, or simply because dissatisfied families have since left the service and others have readjusted their expectations of operational tempo.) Nevertheless, concerns about marital stress remain, as 14% of Army spouses reported marital problems in the last six months, an increase of four percentage points since 2005, and 56% reported using personal counseling during deployments, up from 49% in 2005.[54]

Although deployments largely did not drive our respondents to leave the military, our survey results do confirm what many civilian and military leaders already know: officers are unhappy with the pace of their deployments. Family and quality of life emerged as one of the three largest issues in our survey – 34% of our respondents said it was their most important reason for leaving. 79% of officers agreed that the demands of a military career made it difficult for them to have the family life they wanted. One commented, "I traded practically everything in my personal life for my military career." Only 11% of officers believed their quality of life was better in the military than out. One survey respondent even described post-military life as "glorious," writing, "It has exceeded my expectations."





Please indicate your level of agreement with the following statements.

Improving quality of life is understandably difficult. For example, one survey respondent told us, "The inability to choose where I lived was most detrimental to my quality of life," yet military bases are often located in areas isolated from major population and cultural centers for a reason. Likewise, the pace of operations is largely out of the hands of those who serve. Deployment tempo is driven by decisions made by political leaders to enter into conflict, and the decision to go to war is driven by factors which generally overwhelm

concerns about junior officer retention. Civilian policy-makers should understand the effect their decisions have on military personnel, but those effects must be placed within a larger context of national interests.

### The Active Duty Perspective

Surprisingly, the out-of-service cohort appeared to be less affected by operational tempo than our active duty respondents, perhaps lending support to the theory that deployment pace is not a primary cause for separation from service. Alternatively, the difference may be explained by the fact that the active duty cohort is slightly older – they have on average four more years in service – and slightly more likely to be married, both of which may play a role when considering the impact of deployments on quality of life. Nearly half of our active duty respondents said that shorter deployments or returning to a 1:2 dwell-time ratio would have a significant impact on their decision to remain on active duty in the future, a significantly higher number than the 28% of veterans who agreed. Family appeared to be the driving concern, with one active duty officer remarking "I feel that in order to assuage any family issues I may face in the future, I'd have to significantly lower my operational tempo."

**"The specter of another deployment looming ahead unknown in the distance definitely gave us pause about starting a family."**

The active duty and out-of-service cohorts were largely in agreement when it came to praising the training they had received. Among the active duty officers, 75% believed they were personally prepared for deployment, and 72% believe their unit was also prepared. Specific breakdowns of the comparison between active duty and out-of-service samples are contained in Appendix D.

### Summary

Overall, the evidence regarding junior officer retention and pace of deployments indicates that deployment schedules associated with recent conflicts have not had a major impact on retention. Generally speaking, the evidence supports a theory that military officers value the opportunity to use their skills in accomplishing a mission, as they originally anticipated when joining the military. They continue to find excellence throughout the training cycle and express satisfaction with how the military prepares them for war. However, the pace of deployments does have a significant impact on many officers, among both those who leave and those who stay. Returning to a more sustainable deployment pace and continuing to implement the many quality of life programs underway will undoubtedly ease the burden on the military's junior leadership.

[42] See, for example, Andrew Tilghman *Washington Monthly* piece.

[43] James Hosek and Francisco Martorell. "How Have Deployments During the War on Terrorism Affected Reenlistment?" RAND National Defense Research Institute. 2009. 14. The Hosek and Martorell study provides among the only publicly-available information on the relationship between deployment and attrition, although it considers only enlisted personnel.

[44] *Ibid.*

[45] *Ibid.*

[46] *Ibid.*

[47] James Hosek, Jennifer Erin Kavanagh, and Laura L. Miller. "How Deployments Affect Service Members." RAND National Defense Research Institute. 2006. Includes an analysis of Status of Forces survey data for active-duty personnel surveyed in March and July 2003.

[48] Hosek and Martorell, "How Have Deployments During the War on Terrorism Affected Reenlistment?" 21.

[49] Leo Shane III. "Casey: Two-year dwell time will be reality by October." *Stars and Stripes.* 2 March 2011. Available at: http://tinyurl.com/6ey5b25.

[50] U.S. Army Training and Leader Development Panel. "The Army Training and Leader Development Panel Officer Study: Report to the Army."

[51] Ronald D. Fricker. "The Effects of Perstempo on Officer Retention in the U.S. Military." RAND National Defense Research Institute. 2002. See also Henning, "Army Officer Shortages: Background and Issues for Congress."

[52] See, for example, Joseph L. Galloway. "Asking Too Much of Too Few." *McClatchy Newspapers.* 24 October 2007. Available at: http://tinyurl.com/6jmb5dw.

[53] Karen Jowers. "Survey: More spouses satisfied with Army life." *Army Times.* 7 March 2011. Available at: http://tinyurl.com/5wvqame.

[54] *Ibid.*

# COMPENSATION

The "pay gap" between the military and civilian professions has been an area of focus for policymakers in the past.[55] Some officers still leave for purely financial reasons. However, any pay disparity has all but disappeared after new incentives, pay structure updates, and deferred benefits such as the G.I. Bill and retirement plans were updated in the past decade.[56] In recent comprehensive reports on officer pay by the Center for Naval Analysis and the Government Accountability Office, total compensation for officers was estimated to be $50,000 in the first year of service and $140,000 at 20 years.[57] On average, CNA found that officers make $11,500 more than their civilian counterparts when only basic pay is compared; when healthcare, retirement, and tax preferences are included, the premium rises to $24,870 more per year. When measured on basic pay alone, military officers on average fall within the 70th percentile of civilian pay – that is, 70% of comparable civilians make less than they do, while 30% make more.[58] Still, we posited that perhaps the most talented officers look up toward the 90th percentile rather than down at the 50th, especially as they advance in rank and capability. As one respondent put it, "If you are capable, and with the skills given to you by the military, you can expect to garner a lot more in the private sector."

However, our junior officers clearly indicated that financial compensation was the least significant reason for leaving, with over 73% reporting it was the least important factor and only 3% listing it as the most important reason. Active duty officers gave similar responses. This finding comes despite the fact that our respondents were skewed towards military academies, post-graduate education, and self-reported high basic training performance – all indicators which would point towards a highly-talented survey group.

• • •

**One officer said simply, "This is not a job that you do for the pay."**

• • •

In a follow-up question designed to test what amount of pay increase would make a difference, most officers reported that it was of so little concern that they would not have reconsidered for any amount of money; the second-largest group demanded a raise of $1,000 or more per month, likely implausible in the current budget environment.

**What increase in compensation would have eliminated "financial reasons" as a reason to leave?**



This was true even when additional benefits such as pensions and health care access were considered. A little more than half of our respondents reported that they included these factors in their evaluation, indicating that most officers were considering the benefits of a military career comprehensively, and not just on basic pay alone.

Of course, the favorable comparison between officer and civilian pay is mitigated somewhat by the unique demands of the military – long hours, frequent moves, and rapid deployment tempo. Last but certainly not least, military officers must confront the likelihood of injury or death in combat, a consideration that is difficult to quantify or monetize. As one officer surveyed bluntly put it, "What salary would you be happy with if I told you to sit in a chair and have me fire rounds into the wall next to your head for 200 days straight?"[59] Many officers said they would have found it beneficial to reward deployment performance with financial bonuses – a key indication that junior officers remain sensitive to their remuneration levels even as they discount compensation as a reason for staying or leaving.

**Please indicate your level of agreement with the following statements.**



**The Active Duty Perspective**

As might be expected, the active duty cohort placed more emphasis on the comparatively robust military benefits package than did the out-of-service respondents; 78% of active duty respondents said that healthcare and retirement benefits played a significant role in their decision to remain on active duty. Military retirement vests at 20 years, and uniformed personnel understandably place a correspondingly greater emphasis on staying to retirement the closer they get to this mark. However, the active duty officers surveyed continued to insist that compensation was largely a marginal issue. We hypothesize that compensation acts as a background ameliorator. That is, those who choose to stay may do not do so because they perceive the benefits as better, but given that they stay, they value those benefits more. Unfortunately, our survey methods do not allow us to test this supposition statistically.

44% of active duty respondents said that an additional $1,000 or more per month in base pay would significantly impact their future calculations, but 41% also said that financial compensation is not a deciding factor for them. As with non-pay benefits, we believe this is an issue that may only influence the decision to leave in conjunction with other reasons. Concerns about compensation placed the lowest for both active duty and out-of-service respondents when they were forced to rank the issues they cared about most. In short, as one active duty respondent put it succinctly, "Military officers are not underpaid." Specific breakdowns of the comparison between active duty and out-of-service samples are contained in Appendix D.

**Summary**

Financial compensation was the least relevant reason for junior officers who participated in our survey to leave the military. This finding comes despite the fact that our respondents were skewed towards indicators that point towards a highly-talented survey group that would expect to be highly rewarded for their performance. As one officer put it simply, "This is not a job you do for the pay." Nearly three-fourths of our respondents commissioned after September 11th, and their reasons were clearly not financial. Past efforts to maintain compensation at a level equivalent to the private sector seem to have succeeded, as our survey respondents simply did not view increases in compensation as a relevant consideration.

---

[55]For instance, President Carter set up a Presidential Commission on Military Compensation in 1977, and the Department of Defense continues to track compensation closely. (See: http://militarypay.defense.gov/)

[56] James E. Grefer. "Comparing Military and Civilian Compensation Packages." Alexandria, VA: Center for Naval Analyses. March 2008.

[57] U.S. Government Accountability Office (GAO). "Military Personnel: Military and Civilian Pay Comparisons Present Challenges and Are One of Many Tools in Assessing Compensation." GAO-10-561R. 1 April 2010. 12.

[58] *Ibid.*

[59] Confidential interview with USMC Major. 24 January 2011.

# RECOMMENDATIONS

Any recommendations to improve retention must be considered in the context of two ongoing wars, a continuing economic recession, and forecasted reductions in the Department of Defense budget. With this in mind, we evaluated potential recommendations using the following criteria:

➢ Broad. The Department of Defense is a vast organization, and its programs varied and wide-ranging. Rather than propose specific or limited fixes, we seek instead to articulate general principles for institutional reform.

➢ Flexible. Each service has its own processes for managing personnel and procurement, its own way of fighting wars, and a history and set of traditions that make it unique. Any "one size fits all" recommendation must allow for an appropriate amount of flexibility to adapt to these diverse service-specific cultures.

➢ Measurable. There must be a way to judge the effect of any proposed policy recommendation. The impact of our proposed improvements can be measured using easily available and inexpensive metrics.

➢ Low-Cost. Given the current political, operating and budgetary environment, the need to maximize cost efficiency is paramount. Although we do not create detailed financial models here, we do attempt to propose recommendations that may be implemented at low cost, but which have high returns.

Keeping in mind these criteria, we group our recommendations into the following six broad-based categories:

➢ Know who you have.
➢ Reward your top performers.
➢ Give your people a say in their own careers.
➢ Promote innovation.
➢ Be open to feedback.
➢ Talk to your people.

## Know who you have.

The military collects a significant amount of personnel data, and each service administers a relatively robust annual performance evaluation process. However, in recent years the military has largely shied away from assigning a value or ranking for officers. For instance, the Army in 2004 requested and received a waiver to eliminate forced distribution ratings for lieutenants and captains, and neither the Navy nor the Air Force currently requires forced rankings.[60]

The services' inability to identify their top and bottom performers makes it much more difficult to tailor personnel policies to retain them. Leading private sector companies invest heavily in developing and refining performance management systems, and we recommend the military do the same. The elements of a successful rating system include:

➢ <u>Guard against inflation.</u> The current officer evaluation system is a cornucopia of different rating systems – for instance, the Air Force and Army only have two categories, while the Marine Corps has eight. To avoid what one expert calls the "B+ Problem" – demoralizing the average performers that an organization needs in order to function – rankings for all four services should focus only on identifying the top and bottom 10%, and group the remaining 80% into a middle bracket. This would allow better clarity in determining who should be transitioned out or offered remedial assistance and who should be offered greater opportunities. The 'word picture' is a valuable aspect of the system and should be retained, but focusing on the top and bottom performers would create better assessment of talent and fit well within the constraints of the military's vast size.

➢ <u>Implement 360-degree performance reviews.</u> Promotion boards should also receive input about officers from their peers and subordinates. We believe a new system that includes such input would provide a more accurate picture of an officer – there is very little one can do to hide bad leadership from subordinates. The process for doing so must be carefully weighed to ensure officers are not punished for leading units through necessary transitions or difficult assignments; some proposed evaluation systems incorporate such necessary safeguards.

➢ <u>Allow for growing pains.</u> Consider beginning forced distribution rankings at the O-2 rank to allow time for young officers to acclimate and adjust to military culture. Additionally, rank not only current performance but also potential to perform in the future, so that even officers who may not have skill-sets well-matched with their current positions are not weeded out unnecessarily.

**Reward your top performers.**

After identifying the set of officers with the greatest potential, the military must proactively target these individuals. One way of doing so (preferred by the majority of officers we surveyed) is to offer early or "below-the-zone" promotions. If legislative or operational demands make this difficult, the services should consider financial or other incentives to induce talented officers to remain in the service.

➢ <u>Broaden experiences.</u> Consider offering coveted non-monetary incentives, such as preference in choosing future assignments or locations to those who demonstrate exceptional performance and potential. Additional billets outside of DOD –

## GENERAL ELECTRIC: A REPUTATION FOR LEADERSHIP DEVELOPMENT

With nearly 350,000 employees and operations in over 100 countries, General Electric is one of America's largest and most respected corporations. Under the leadership of Jack Welch and now Jeff Immelt, GE has for decades maintained a reputation as an incubator for talent and management innovation, and a training ground for future CEOs. GE's leadership development processes are world-renown -- in fact, GE develops more talent than it can use, and encourages those not selected for the highest leadership positions within the company to seek out CEO positions with other corporations.[1]   Studies have demonstrated that firms who hire senior GE executives, as opposed to CEOs from other organization, are more likely to experience a sustained increase in their stock market valuation.[2]

How does GE continually produce such high-performing corporate executives?  It does so via candid and rigorous talent identification mechanisms, and uses this data to reward top performers with increased attention, opportunities, and personalized development plans:

Talent Identification. GE has long promoted intense annual reviews. In an exhaustive process known internally as "Session C," GE's main businesses conduct multi-level reviews that begin with the CEO himself and cascade through all 350,000 employees over a period of months.[3] GE's performance appraisal documents have a forced ranking component, and every employee has the opportunity to personally discuss their placement with a supervisor -- Immelt, the CEO, personally reviews the company's top 625 executives.[4] By the end, every individual employee exactly where he stands within the corporate structure, and what to do to improve his ranking.

Talent Development. All rising executives at GE have a performance package that follows them and identifies their goals, strengths and weaknesses, and developmental needs.  This package, updated annually, is scrutinized closely by senior leadership. The most successful junior executives receive a highly coveted invitation to attend GE's three-week professional development and training program in Crotonville, NY.  At Crotonville, up-and-coming executives are exposed to the organization's senior leadership as well as top outside executives and business thinkers. In addition to the learning and cross-functional networking that occurs, the signaling effect is tremendous -- "being tapped to spend weeks in training at the leafy corporate campus is a sure sign you're viewed as a potential leader."[5] Such rewards are also extended to the company's senior leadership, as well -- every January, the organization's top officers gather in Boca Raton to plot the upcoming year's business strategy.[6] *BusinessWeek* described an invitation to the annual leadership retreat, typically given to the company's top 500 executives, as "like winning an Olympic medal in GE's intense locker-room culture."[7]

[1]W. Glenn Rowe, Roderick E. White, Derek Lehmberg, John R. Phillips. "General Electric: An Outlier in CEO Talent Development." *Ivey Business Review.* Jan/Feb 2009. Vol. 73, Issue 1.
[2] *Ibid.*
[3]Thomas D. Cairns. "Talent Management at Homeland Security: A Corporate Model Suggests a Recipe for Success." *Employment Relations Today.* September 1, 2009.
[4]"GE's Talent Tool Kit." *BusinessWeek.* April 25, 2010. Issue 4175.
[5]*Ibid.*
[6] Cairns, "Talent Management at Homeland Security: A Corporate Model Suggests a Recipe for Success."
[7]"How Jack Welch Runs GE." *BusinessWeek.* 8 June 1998.

including in think-tanks, other executive branch agencies, or at multilateral institutions – would allow officers to expand their experiences, learn new techniques, and likely reinforce their satisfaction with their current careers.

➢ Establish mentorships. Top junior officers could be selected for professional one-on-one mentorships with high-ranking officers within their own service. The purpose of these high-to-low linkages would allow information about non-operational issues to flow more easily in both directions -- senior officers become more attuned to issues in the officer corps, and junior officers have an opportunity to learn and be heard. Lastly, such mentorship could leverage these personal relationships to encourage continued service as junior officers reach critical decision-points in their military careers. As with 360 evaluations, safeguards would be necessary to prevent senior officers from hand-picking their preferred subordinates.

**Give your people a say in their own careers.**

A desire for greater input into billeting and assignments is a consistent theme that emerged throughout our survey. The military should consider implementing a market-based system that matches the supply of officers looking for new jobs with the demand of organizations and units that need to fill billets. This need not require significant time and personnel; an IT system can be a key human resources enabler, with some pilot programs already occurring throughout the military.[61] The key characteristics of such a system should include:

➢ Searchable by applicants. Officers should be able to search open positions by a range of criteria, including but not limited to: geographic location, unit type, billet description, minimum and maximum time-in-service and time-in-grade requirements, and length of assignment.

➢ Searchable by commanders. At the same time, a unit commander with an opening should be able to search for a specific officer profile using a range of criteria, including but not limited to: MOS or equivalent, rank, availability, current duty station, previous assignments, special skills, and Fitness Report "highlights."

➢ Personalized. Officers should have access only to appropriate job openings. For instance, an O-3 might be able to view billets at the O-3 and O-4 levels but not above.

➢ Enhanced connections. Upgrade the matching process to the 21st century by encouraging commanders and subordinate officers to connect electronically or in person before assignment and arrival. Consider giving unit commanders the opportunity to highlight or request specific officers for consideration by the duty assignment boards. For key positions, allow interviews between commanders and subordinates before final assignments are made.

**Promote innovation.**

Under the maxim that what you measure is what you get, the current officer personnel report process fails to adequately incorporate measures of creativity, innovation, and entrepreneurial talent correlated with the services' strategic goals. A recent internal Army study called the Army OER "an increasingly toothless instrument" that fails to "fully inventory those talents required for success in demanding assignments" and actually "*hides* talent from the Army."[62] Personnel reforms that would encourage greater creativity and innovation would incorporate the following principles:

➢ Reduce risk-aversion where appropriate. Identify more clearly areas that must have a zero-defect mentality – ethical decisions, complicated machinery and weaponry – and areas where officers should feel free to try novel approaches even if a current solution already exists. Much like leading-edge technology companies, high-performing officers who request additional time to work on professionally-related individual projects while in non-deployable billets should be given the opportunity to do so.

➢ Enhance the diversity of experiences. Giving high-performing officers the opportunity to attend non-military professional education or attempt non-military foreign policy positions exposes them to best practices and 'doctrine' of other organizations that they could then bring back to their own units. Such opportunities might include time at civilian graduate schools, think tanks, multi-lateral organizations, or civilian agencies. This suggestion is related to the much-discussed concept of a Goldwater-Nichols for the interagency in the sense that it would encourage jointness and interoperability outside of the Department of Defense.

➢ No penalty for non-command track. We believe the military should be more flexible in allowing opportunities for officers to pursue their interests. Only 12% of billets at the highest levels are command opportunities;[63] the military should emphasize non-command career tracks that provide needed skill-sets within the services at an equivalent level. Allowing an officer with a unique or specific skill-set the opportunity to succeed in his chosen track without penalty means a greater chance of retaining that officer for when his skills are needed.

**Be open to feedback.**

Counterintuitively, a continuous relationship begins at the point of separation. In the private sector, exiting employees often serve as sources of referral, financing, and intellectual capital. This is no less true in the military, but 74% of our survey respondents report having minimal contact with the military post-separation beyond obligatory contact information for the Individual Ready Reserve (IRR). In failing to seek feedback from the

### U.S. DEPARTMENT OF STATE – AN INNOVATIVE ASSIGNMENT MATCHING PROCESS

The nation's several thousand Foreign Service Officers (FSOs) work closely with their uniformed counterparts and have much in common with the military services. Like military officers, FSOs must be "worldwide available" to deploy in over 265 countries, and Departmental needs are often prioritized above those of the individual officer. Yet FSOs are placed through a unique assignment process that is tasked with matching vacancies to personnel in a manner that is transparent, equitable, and benefits both the receiving post and the individual.

A junior FSO's first two postings are made via "directed assignment" by the Department – although officers have an opportunity to state a preference, these assignments are largely out of their hands. After the first two tours, however, assignments are organized through a preferential "bidding" process, in which FSOs compete with their peer group for upcoming open assignments via three steps:

> ➢ The "Bid List". An annual "bid list" of all available assignments is published and distributed to all FSOs eligible for reassignment in an upcoming year. The bid list includes information such as post location, cone, level, expected start date, and any requisite language or technical skills.  Some positions are advertised early to include time for training – for example, an FSO might require 6-12 months of Lithuanian language training before heading to Vilnius. Officers rank their personal preferences based on both professional development needs and personal considerations. For instance, one FSO may be seeking a position with job opportunities for a trailing spouse, whereas another may prioritize language learning.
> ➢ The "Handshake".  After officers submit their "bids" indicating where they would like to serve (or would be willing to go), the gaining post reviews applications and resumes.  At this point, the post may conduct telephone interviews, contact an officer's current supervisor, or otherwise investigate a prospective applicant.  Likewise, FSOs often informally lobby and network to obtain their preferred posting at this time. When the gaining post makes its selection, the chosen applicant is offered an electronic "handshake" -- essentially an unofficial agreement between post and officer, approved by the regional or functional Bureau in Washington DC.
> ➢ The Panel. After an unofficial agreement is recorded, the match is submitted for review by the Department's Bureau of Human Resources.  An officer is "paneled" or officially assigned to a posting only after a review of his record against post requirements by a panel in Washington, DC.

The State Department assignment system is highly competitive and rewards high-performing FSOs who have experience in "hardship" locations or strong recommendations in their current posts. Yet at the same time, officers have access to resources for assistance and support, including career development counselors, and can appeal an unjust decision. Of course, there are drawbacks to any system – FSOs complain about "conal bias" or occasional forced assignment to "hard to fill" postings – but generally, most agree that the system is an efficient way to move individuals around the world on a regular basis.[1]

---

[1]For information about the open assignment process, see *U.S. Department of State Foreign Affairs Manual Volume 3 Handbook 1 – Personnel Operations* (3 FAH-1 H-2420).

population of young officers who choose voluntarily to leave the service, the services are giving up a vast source of institutional knowledge and information unbiased by command influence. The military services should institute a more comprehensive exit interview process with the following characteristics:

➢ Consistency. Exit interviews should be conducted regularly, randomly, and with a consistent format. They should focus on three aspects of an officer's career: their personal experience, their recommendations for how to improve various aspects of the military, and their reasons for leaving.

➢ Neutrality. For open and honest feedback, exit interviews should be conducted by a neutral administrator and never by the departing officer's immediate superior or any senior officer in that individual's chain of command.

➢ Confidentiality. Although they are separating from the military, officers may be reluctant to provide negative feedback about superiors. The military should emphasize that all information obtained in an exit interview will be treated as confidential.

➢ Continuous. Data obtained from exit interviews should be aggregated for analysis at the Personnel- and Service-Chief level on an annual or semi-annual basis and form a continuous feedback loop. The services should use the information obtained to identify areas for improvement.

➢ Supported by chain of command. Unit commanders should encourage their subordinates to be frank and fair in their interviews. The vast majority of our respondents indicated in some way that they continue to believe deeply in the military and its positive role in their lives; framing exit interviews as a "lessons-learned" moment for the military can encourage constructive criticism.

**Talk to your people.**

Whether or not the perception is worse than the reality, there was a sense among the junior officers that we interviewed that innovation is not valued or rewarded by the Department of Defense. DOD is an enormous and complex bureaucracy – 50% larger than the largest private company in the world[64] – and such size requires bureaucratic rules and standard operating procedures in order to accomplish tasks. However, a continuing and personalized 'recruitment' process for the best officers already in service should be a focus of the services' personnel offices. This effort should focus on two key areas:

➢ Highlight interesting careers. Many of the officers we interviewed reported relying upon gossip about "how bad life is as a major" when considering their next assignment. The services should implement internal recruiting efforts to demonstrate unique and interesting career paths. Officers should learn not only

that the generals of the past were able to have interesting and fulfilling careers, but also that their current flag and general officers have led unusual, unique, and fascinating service careers. If the Department does not identify and deliver this positive message, it is all too easy for rumor ungrounded in the facts to take its place.

➤ Be realistic about the downsides. Our officers often saw their command or deployment billets as opportunities to flex their intelligence, will, and creativity in novel environments. They reported that when they return to institutional assignments, they must put this aside and become a cog in the machine. Senior leaders should be realistic about the necessities of working in a large bureaucracy but also reinforce the notion that intelligence, ethical behavior, and a strong will are just as highly valued in a non-deployable billet as they are while in command – and back it up by giving officers the ability to attack old problems in new ways.

## Implementation.

Policy analysis literature offers a wide variety of techniques through which the efficacy of a new program may be judged – everything from randomized controlled trials, analysis of historical data trends, comparative studies, and exploiting naturally-occurring experiments.[65]

We recommend the use of pilot studies as the best method available for testing out new programs. Given the comprehensive impact of many military systems on the lives of service members, randomized controlled trials increase the risk of negative outcomes that would have long-lasting effects on the officer corps. Unlike medicinal trials, where new drugs are often tested on diseases which currently have an inadequate or no cure, new military policies would replace ones that are, for the most part, fairly effective.

Instead of running the risk that forced and randomized inclusion into a new system might have major detrimental effects on the lives of officers, the military should use small pilot studies that rely on officers who feel comfortable volunteering for participation. This will require greater understanding of the demographic and other underlying factors differentiating a pilot study group from the general population, but pilot testing is the best way the military can test out new programs without unnecessarily hurting officers' careers.

Although financially modeling the effects of our proposed recommendations is beyond the scope of this report, we believe that our recommendations are broad and flexible enough to be implemented at low or neutral cost. Given the size of military programs such as healthcare, capital purchases, and overseas deployments, implementing reforms to the personnel system would have relatively low costs and would likely have very high returns. Many of the recommendations in this section are self-reinforcing – improving

comprehensive rewards will have best effects if those rewards are applied to the right officers, who will be better identified under a new personnel evaluation system. Implementation of these recommendations will be a slow process, but we believe it is absolutely essential that it begin right now, before so much of the experience and wisdom of today's young leaders are lost.

---

[60]We base this conclusion on an examination of the officer evaluation forms for each service (Air Force Form 707, Navy NAVPERS 1610/2, NAVMC 10835A, Army DA Form 67-9) and from interviews with current active-duty officers, some of whom have worked extensively on personnel issues.

[61]Interview with Cindy Williams, Principal Research Scientist, MIT Security Studies Program. 7 March 2011. One proposed system comes from the Army's engineer units, which use a platform that shows in greater detail the skill requirements needed for incoming officers – a discussion of it is found within the Strategic Studies Institute's recent discussion of Army personnel issues. The Navy also runs a limited form of a reverse auction, where the size of the bonus for certain geographical billet locations is determined by how many officers select it as a preference.

[62]Wardynski, Lyle, Colarusso, "Towards a U.S. Army Officer Corps Strategy for Success: Evaluating Talent." 9.

[63]*Ibid.*.

[64]W. Scott Gould, Deputy Secretary of Veterans Affairs. "Budget Presentation to Harvard Kennedy School." 8 March 2011.

[65]Diana Lien and Aline O. Quester. "Developing Tools to Assess Future Choices." In *Filling the Ranks*. Cindy Williams, Ed. Cambridge: MIT Press. 2004. 239-264.

# METHODOLOGY

### Survey Process

We designed our survey questions with input and assistance from many individuals, including Tim Kane, Julie Boatright Wilson, Josh Goodman, Jerry Carter, Victor DiTommaso, and Kate Glynn. The survey was conducted between February 1 – March 1, 2011 using an online survey tool. The survey is available for review at the following location: https://www.surveymonkey.com/s/PJXGM9K.[66] A list of survey questions can be found in this report at Appendix C. In recognition of privacy considerations and university standards for research involving human subjects, all respondents were granted anonymity and we avoided any questions and quotations that would cause a respondent's identity to be compromised.

### Methodological Limitations

Although we believe our data will be highly useful for policymakers, we acknowledge the limitations of our results, particularly with regard to sample size and collection methods. Below, we identify some specific concerns that limit the conclusions we are able to draw from our survey data:

➢ Random Selection. Our response generation was a non-random process, due in large part to our inability to access and sample from the entire population of recently-active junior military officers. Instead, we reached out to survey respondents through personal networks, graduate school organizations, ethnically- and geographically-based veterans groups, social networking sites, and ROTC alumni organizations. A list of the organizations we approached to identify potential survey respondents can be found in Appendix B. While we made every attempt to ensure diversity, as a result, the officers we surveyed were on average more highly educated, from higher socioeconomic backgrounds, and higher performers (as self-reported) than the average U.S. military officer. Although this was generally a weakness of the survey, it is also in some ways a strength -- for example, the skew towards combat arms officers with personal combat experience may mean our survey captured personnel most likely at highest risk of leaving as a result of deployment and training stress.

➢ Self-Reporting Bias. All information was self-reported by respondents after leaving the service, meaning that it may be biased by individual perceptions and recollections. Compounding this factor is the lack of objective quality indicators, as we discuss throughout the report – a key example of this is the fact that 71% of our

respondents report graduating in the top quintile from basic training. While it is possible that our sample is indeed more talented than the population of junior officers as a whole (as evidenced by the number of respondents who have since gone on to graduate programs or other comparatively prestigious opportunities), it is equally likely that some of this self-reporting has been inflated. Although we took self-reported data from the officers we surveyed as truthful, further research would be useful to more precisely evaluate officer ability.

➢ <u>External Validity.</u> Our sample is not fully representative of the population of interest. For instance, our data generally underreports the Air Force – Air Force officers make up approximately 25% of the overall military officer population, but only 4% of our sample. Recognizing that the ground forces (Army and Marine Corps) have been more significantly involved in combat operations in Iraq and Afghanistan than the other services, this may color our survey responses. We additionally lack representation from certain minority groups and individuals commissioned via Officer Candidate School. (A comparison between our sample demographics and the overall military officer population can be found in <u>Appendix A</u>.) Future analysis of our data (or a similar sample) might control for service orientation or demographic characteristics in order to mitigate such biases.

➢ <u>Non-Response Bias.</u> We have no effective way of identifying the population of former officers who received our survey prompt but chose not to respond, nor can we determine their reasons for abstention. If this population differs significantly from our respondent sample, our survey may be vulnerable to non-response bias. Unfortunately, we have no way of profiling the demographics of non-responders. Research indicates that non-response bias is typically associated with lower levels of education; however, given that our population of interest consists entirely of military officers (who by definition have at least a secondary degree) this is unlikely to be driving our non-responders. In our case, we hypothesize that non-response bias may be caused by a variety of factors, such as lack of interest in the subject matter or limited time to respond. This may have impacted our results.

➢ <u>Internal validity.</u> Last but not least, it is important to note that this work is an observational study. We did not conduct a randomized controlled trial that meets the standards of statistical rigor required for quantitatively-based social science research. There could easily have been other reasons why junior officers leave that we did not include in our survey; there could also have been interactions between reasons, or between demographic characteristics, that require more complex statistical analysis to seek out.

### Active Duty Survey

The demographic differences between the active duty and out-of-service cohorts are described in more detail in <u>Appendix A</u>. Our active duty sample was relatively small (N=30); as a result, we did not attempt to analyze statistically the differences between the two samples in this survey. Rather, we use the active duty survey as a check on our results, to indicate areas of significant disagreement between the two populations for future thought and analysis. Although the active duty cohort generally substantiated the results obtained in the out-of-service survey, there were some noteworthy areas of disagreement. We did not conduct regressions to determine the statistical significance of these differences because of the small size and non-random make-up of our samples, but this is certainly an area for future research. Having large, randomly-selected samples from each cohort would enable us to determine if a variable was merely correlated or was a causal factor for separation from service. If the officers who stay have very different concerns about their professional life than those who leave, for example, the problem becomes more complex – should the military be focusing on appeasing officers who stay or focus on preventing those who would otherwise leave? We believe the services could accomplish similar analysis themselves, if they undertook a more extensive and rigorous exit interview process.

### Other Interviews

We additionally conducted interviews with experts in organizational change, human resources, military history, and bureaucratic management. The table on the following page summarizes these interviews. We thank these individuals for their guidance and advice; all recommendations (and any mistakes contained therein) are our own.

| Name of Expert | Organization |
|---|---|
| Linda Bilmes | Daniel Patrick Moynihan Senior Lecturer in Public Policy, Harvard Kennedy School |
| Teresa Amabile | Edsel Bryant Ford Professor of Business Administration, Harvard Business School |
| Cyndi Williams | Principal Research Scientist, MIT Security Studies Program |
| COL Scott A. Snook (Ret.) | Senior Lecturer of Business Administration, Harvard Business School |
| Stephen Rosen | Beton Michael Kaneb Professor of National Security and Military Affairs, Harvard University |
| John P. White | Deputy Secretary of Defense (1995-1997) |
| Andrew Hill | Candidate, Doctor of Business Administration, Harvard Business School |
| Congressional Staffer | (anonymous at request of individual) |
| MAJ Carl Wojtaszek | U.S. Army, Office of Economic and Manpower Analysis |
| James Hosek | Senior Economist, RAND |
| BG Kevin Ryan (Ret.) | Executive Director for Research, Belfer Center for Science and International Affairs |
| LtGen Tad Oelstrom (Ret.) | Director, National Security Program, Harvard Kennedy School |
| Malcolm Sparrow | Professor of the Practice of Public Management, Harvard Kennedy School |
| MAJ Jaron Wharton | Author of CNAS white paper on military retention |
| Master Chief Steve Haydn | Military Diversity Leadership Commission |
| Josh Goodman | Assistant Professor of Public Policy, Harvard Kennedy School |
| LtCol Jerry Carter | U.S. Marine Corps National Security Fellow, Harvard Kennedy School |
| Albert Pierce | Director, Institute for National Security Ethics and Leadership, National Defense University |
| Tim Kane | Author of *Atlantic Monthly* article on military retention |
| Julie Boatright Wilson | Director, Malcolm Wiener Center for Social Policy, Harvard Kennedy School |
| LTC Timothy Watson | U.S. Army National Security Fellow, Harvard Kennedy School |
| LtCol Mark Ciero | U.S. Air Force National Security Fellow, Harvard Kennedy School |
| Andrew Tilghman | Defense Manpower Data Center |
| | Former *Washington Monthly* journalist, now staff writer at the *Military Times* |
| COL Walter Herd (Ret.) | Director, Army Career and Alumni Program and Transition, Human Resources Command, Fort Knox, Kentucky |

---

[66]We chose this online system after it was recommended by a number of professors with experience using survey tools. It is additionally used by a range of leading companies and organizations, ranging from Facebook to Lehigh University.

# CONCLUSION

*"It must be considered that there is nothing more difficult to carry out, nor more doubtful of success, nor more dangerous to handle, than to initiate a new order of things."*

-- - Niccolo Machiavelli, *The Prince*

The events of September 11th initiated a decade of war in which the military has been hard-pressed to evolve tactics and doctrine to adapt to those of the insurgent groups they have been fighting. Yet the American military has a storied history of reaction and adaption to changing domestic environments, battlefield advances, and foreign policy shifts. From President Truman's desegregation of the military in 1948, to the post-Vietnam shift to an All-Volunteer Force, to passage of the Goldwater-Nichols Act, to the Revolution in Military Affairs, the Department of Defense has consistently maintained superior warfighting capability while at the forefront of massive institutional change.

Those changes were not easy; nor will future changes be. Individuals often resist changing existing behavior because they value consistency and economy of effort[lxvii] or because they misunderstand the purpose of change or assess the proposed change as lacking value.[lxviii] Organizations tend to compound that resistance, as members often have a stake in the status quo ante.[lxix] Organizational change can be expensive and disruptive, and tacit or implicit knowledge is often lost in the process.[lxx] Change is often hardest at the very moment when the stakes are highest; never is that more true than with the military, where life, death, and the very survival of the state may be on the line. As a result, defense organizations in particular tend to fear uncertainty and resist change – indeed, as Barry Posen suggests, military organizations are likely to innovate only when they have failed or when civilians intervene to force change.[lxxi] Nevertheless, in the words of Harvey Sapolsky, "America's sustained ability to meet all types of challenges and to generate some surprises of its own was obviously important to its … triumph."[lxxii] Indeed, few today would dispute that each of the changes we list above improved military cohesiveness, force readiness, and combat capacity over the long term.



**The value of this report comes only if the military believes the type of individuals who took our survey are worth retaining.**

The vital importance of leadership and the difficulty of developing junior military leaders underscore the consequences of failing to retain the best company-grade officers. Such a failure is typically most associated with the period following the Vietnam War, but the current era poses its own challenges, as the United States has been at war for the longest period of time since its founding. As a result, failure to appropriately manage today's junior officer talent may have major implications both for the military's current operations and its future capabilities.

It may be too soon to know just how problematic the current retention trends are, but there is certainly ample anecdotal evidence for concern. As we have stated repeatedly, however, this concern should not simply be for quantity: the *quality* of officers retained must also be a benchmark for evaluating the impact of any military retention policy. We have undertaken to examine current policy by interviewing young men and women with experience in the ranks of the post-9/11 military. Many of them are recent graduates or are currently attending graduate schools. Others are pursuing careers as diverse as firefighters, construction managers, shipping experts, and office managers. Still others are unemployed. In all, they represent, we believe, a group of highly-capable officers who have recently left active-duty service. Still, it is important to state clearly what we have done – the value of this report comes only if the military believes the type of individuals who took our survey are worth retaining.

As we have demonstrated here, areas of concern among officers include pace of deployment, inability to start or raise a family, and lack of control over career choices. Some of these factors are largely out of the services' control, subordinate as they are to civilian policymakers who decide when to go to war and how. However, other factors, including career control and openness to innovation, are areas where the military can certainly make headway, either by itself or in conjunction with legislative leaders. The American military continues to demonstrate its superiority in battle with each passing week; it may very well be that it has all of the talented officers it needs. Yet the demands of the current war are high; young men and women continue to sacrifice their lives on foreign battlefields. These young officers represent both the nation's newest investment in its own security and the seeds from which will grow our future institutional leaders. If small changes in the institution can lead to better retention of these officers, then we believe such changes should be made – starting now.

---

[lxvii] John P. Kotter and Leonard A. Schlesinger. "Choosing Strategies for Change." *Harvard Business Review.* Vol. 86, Issue 7/8. July/August 2008.

[lxviii] Steve Kelman. *Unleashing Change: A Story of Organizational Renewal in Government.* Washington, DC: Brookings Institution Press. 2005. 22-30.

[lxix] Kotter and Schlesinger, "Choosing Strategies for Change."

[lxx] Robert S. Kaplan and David P. Norton. "How to Implement a New Strategy Without Disrupting Your Organization." *Harvard Business Review.* Vol. 84, Issue 3. March 2006.

[lxxi] Barry R. Posen. *The Sources of Military Doctrine: France, Britain and Germany Between the World Wars.* Ithaca: Cornell Studies in Security Affairs. 1986. Posen argues that the Prussians in 1806, French in 1940, and Russians in 1941 were defeated because they were attacked during a time of doctrinal transition.

[lxxii] Harvey M. Sapolsky, Eugene Gholz, and Allen Kaufman. "Security Lessons from the Cold War." *Foreign Affairs.* Vol. 78, Issue 4. July/August 1999.

# APPENDIX A: SAMPLE DEMOGRAPHICS

| | Out-of-Service Sample | Active Duty Sample | Overall Military Population[73] |
|---|---|---|---|
| Average Age: | 32.2 | 33.8 | 34.3[74] |
| Average Years Served: | 6.4 | 10.8 | |
| **Gender:** | | | |
| Male | 86% | 80% | 84%[75] |
| Female | 14% | 20% | 16% |
| **Race/Ethnicity:** | | | |
| White | 82% | 76% | 76%[76] |
| Black | 2% | 12% | 9% |
| Hispanic | 3% | 0% | 5% |
| Asian | 4% | 0% | 3% |
| Pacific Islander | 1% | 0% | 0% |
| American Indian | 2% | 0% | 0% |
| Other | 6% | 12% | 1% |
| **Marital Status:** | | | |
| Married | 60% | 72% | 68% |
| Unmarried | 39% | 28% | 32% |
| **Branch:** | | | |
| Army | 49% | 52% | 40% |
| Navy | 29% | 13% | 23% |
| Marine Corps | 17% | 13% | 14% |
| Air Force | 5% | 21% | 23% |
| **Rank:** | | | |
| O-2 | 5% | 4% | 16% |
| O-3 | 85% | 16% | 41% |
| O-4 | 8% | 44% | 26% |
| O-5 | 2% | 24% | 16% |
| **Commissioning Source:** | | | |
| ROTC | 39% | 28% | 37%[77] |
| Service Academy | 42% | 56% | 18% |
| OCS | 18% | 16% | 23% |

| | Out-of-Service Sample | Active Duty Sample | Overall Military Population |
|---|---|---|---|
| **Deployment History:** | | | |
| Iraq | 76% | 64% | N/A |
| Afghanistan | 24% | 24% | N/A |
| Other | 35% | 28% | N/A |
| Never deployed | 4% | 16% | N/A |
| **Mother's Education Level:** | | | |
| High School Diploma | 12% | 4% | N/A |
| Some College | 7% | 12% | N/A |
| Associate Degree | 9% | 12% | N/A |
| Bachelor Degree | 34% | 28% | N/A |
| Graduate Degree | 39% | 44% | N/A |
| **Post-Military Employment:** | | | |
| Unemployed | 15% | N/A | N/A |
| Self-Employed | 8% | N/A | N/A |
| Private Sector | 39% | N/A | N/A |
| Public Sector Civilian | 8% | N/A | N/A |
| Full-Time Student | 70% | N/A | N/A |
| Disability | 1% | N/A | N/A |
| Other | 11% | N/A | N/A |
| **Have you ever had an opportunity to provide feedback to the military about your experience?** | | | |
| Yes | 26% | N/A | N/A |
| No | 71% | N/A | N/A |

[73]These means were calculated to include only the military population of officers ranked O-2-O-5. Where this was not possible, we indicate the included population in a footnote.

[74] This number is an approximation and includes all ranks (including general and flag officers.)

[75]Data on overall military population branch, rank, and gender is taken from the Defense Manpower Data Center Personnel Reports. Branch and rank data is from January 2011; gender data is from September 2010.

[76] Data on overall military population race/ethnicity, marital status, commissioning source, and age is taken from the FY2009 "Population Representation in the Military Services" report, cited previously in this report.

[77]These statistics represent the mean for all ranks (including general and flag officers.)

# APPENDIX B: ORGANIZATIONS CONTACTED

AMVETS
American Legion
Air Force Association
Booth Armed Forces Group
Citadel Alumni Association
City College of New York ROTC Alumni Group
Columbia Law School Military Association
Darden Military Alumni
Fisher Veterans Association
Georgetown University Military Association
Haas Veterans Club
Harvard Business School Armed Forces Alumni Association
Harvard Kennedy School Armed Forces Committee
Iraq and Afghanistan Veterans of America
Johnson School Veterans Group
Kellogg Veterans Association
Kenan-Flagler Veterans Club
Marine Corps Association
Marine Corps League
McCombs Armed Forces Alumni Association
McDonough Military Association
Miami University Naval ROTC Alumni
Military Officers Association of America
Military Order of the Purple Heart
National Association for Black Veterans
Northwestern Law Veterans Association
Norwich University Alumni Association
Penn State Army ROTC Alumni
Ross Armed Forces Association
Sloan Veterans Association
Society of Hispanic Veterans
Stanford GSB and Law Veterans Clubs
Stern Military Veterans Club
Student Veterans Association at Duke University
Tepper Military Veterans Association
Texas A & M Corps of Cadets Alumni Association
Tuck Armed Forces Alumni Association
UCLA Law Veterans Society
USC Veterans Association
Virginia Law Veterans
Virginia Military Institute Alumni Agencies
Virginia Tech Army Alumni
Veterans Campaign
Wharton Veterans Club
West Point Association of Chicago

# APPENDIX C: SURVEY STRUCTURE

*The following is a complete text of the survey as given to the veteran officers which were the focus of our study.  The questions given to the active-duty sample were slightly altered to make grammatical sense.*

The purpose of this survey is to solicit opinions from former military officers like you on a variety of topics.

We are graduate students at the Harvard Kennedy School conducting research on junior officers in the U.S. military for our master's thesis. You will be asked general questions about your time in the military (including training and deployments), your reasons for leaving the military, as well as some basic demographic questions. Your answers will be kept confidential and will never be used in any way that would identify you – our data is aggregated and we will not quote you by name without your permission.

This interview is voluntary. If we come to any question which you do not want to answer, you may skip it and move on to the next one.

You should only take this survey if you have left active service after 2001.

## General Questions

1. Please rate the following factors in terms of their importance in your decision to leave the military. *(Force ranked; an unchecked row means that you did not consider it a factor at all).*

- Operational and deployment tempo
- Limited ability to control my own career
- Family and quality of life concerns
- Frustration with military bureaucracy
- Weak superior officers
- Financial reasons
- Other reasons (please specify)

2. Many of the best officers who leave the service would stay... *(Strongly Agree, Agree, Disagree, Strongly Disagree, N/A)*

- if the military offered better assignments to the best officers.
- if the military promoted the best officers more quickly.
- if they were not obliged to pursue a higher rank.
- if the pay was based on performance instead of time-in-service.
- if jobs were assigned through a market mechanism.
- if there were more options for schools to attend for professional development.
- They would leave regardless of reforms to the personnel system.

3. If you were the chief of staff for your Service, what would you do to ensure the best and the brightest stay in the service? *(Free response)*

4. What factors would be most important to you in determining whether you would consider returning to active service? *(Force ranked; an unchecked row means that you did not consider it a factor at all).*

- Operational and deployment tempo
- Career opportunities
- Family concerns and work-life balance

- Opportunity for promotion
- Financial incentives
- Educational opportunities
- Lack of opportunity in private sector

5. Would you advise your own children to enter the service? Why or why not? *(Free response)*

## Training and Deployment

6. What is the first word or words that come to mind when you think of your deployment(s)? *(Free response)*

7. Please indicate your level of agreement with the following statements. *(Strongly Agree, Agree, Disagree, Strongly Disagree, N/A)*

- The military has adapted well to changes in the operational environment stemming from the current wars.
- The military did a good job of incorporating OIF/OEF-specific skills into my training.
- I was personally prepared for my deployment(s).
- My unit was prepared for its deployment(s).
- The officer education system did an effective job of training me to lead my unit in full-spectrum operations.
- Returning to a 1:2 deployment-to-dwell-time ratio would have significantly increased the likelihood of staying on active duty.
- Shorter deployment length would have had a significant effect on my decision to leave active duty.

8. If you were the chief of staff of your military service, what changes would you make to the training system? *(Free response)*

## Family and Quality of Life

9. Please indicate your level of agreement with the following statements. *(Strongly Agree, Agree, Disagree, Strongly Disagree, N/A)*

- The demands of a military career made it difficult for me to have the kind of family life I would have liked.
- A military career did not allow me to maintain the kind of balance I want between my work and personal life.
- My quality of life has increased since I left the military.

## Personnel System

10. What is the first word or words that come to mind when you think about the military's personnel system? *(Free response)*

11. Please indicate your level of agreement with the following statements. *(Strongly Agree, Agree, Disagree, Strongly Disagree, N/A)*

- The current military personnel system does a good job of weeding out the weakest leaders.
- The current military personnel system does a good job retaining the best leaders.
- The rate of military promotions should not be accelerated because it takes longer to gain experience to command at a senior level in the military.
- The military should expand early promotion opportunities.

- In general, talented and capable officers advanced more quickly than average or below-average officers.
- In general, talented and capable officers received better assignments than average or below-average officers.
- The best officers I knew left the military before serving a full career.
- In general, I was satisfied with the rate at which I was promoted.
- In general, I was satisfied with the billets that I was assigned.
- I was informed of the opportunities available to me for my next billet assignment.
- Billet assignments more tailored to my personal preferences would have had a significant impact on my decision to leave active duty.
- The current military personnel system does a good job matching talent to jobs.
- The military should allow former officers to rejoin the service (lateral entry).

## Innovation

12. Please indicate your level of agreement with the following statements. *(Strongly Agree, Agree, Disagree, Strongly Disagree, N/A)*

- The military is focused on process more than product.
- Military leaders are willing to ignore conventional wisdom when necessary.
- The military is committed to innovation.
- The military valued my contributions.
- Better use of new technology would have made me more effective at my job.
- Better use of new technology would have made my unit more effective while deployed.

13. If you used social media applications while you were in the military, how often, on average, did you use them? How often did your superior officers use them? Your subordinates? *(Once a day, Once a week, Once a month, Less often than once a month, never, N/A)*

14. How well does the military do at identifying and rewarding the following personal and professional traits? *(Very Well, Well, Neutral, Not Well, Poorly)*

- Intellect
- Creativity
- Tact
- Endurance
- Following orders
- Courage
- Integrity
- Practicality
- Military knowledge and education
- Decision-making

## Senior Officers

15. Please indicate your level of agreement with the following statements. *(Strongly Agree, Agree, Disagree, Strongly Disagree, N/A)*

- I felt that senior officers took an active interest in my career.
- I was comfortable expressing my career ambitions with my superior officers.
- My commanders rewarded my innovative ideas.
- The military made the best use of my personal talents during my time on active duty.

## Compensation

16. The average active-duty Army captain with 4-6 years of service has monthly basic pay of approximately $5,000. What increase in compensation would have eliminated "financial reasons" as a reason to leave active duty? *(Multiple choice, single answer)*

- Not originally a reason (0%)
- $250 more a month ($3,000 annually)
- $500 more a month ($6,000 annually)
- $1,000 more a month ($12,000 annually)
- More than $1,000 a month

17. Please indicate your level of agreement with the following statements. *(Strongly Agree, Agree, Disagree, Strongly Disagree, N/A)*

- The military's healthcare and non-financial retirement benefits factored into my concerns about financial compensation.
- End-of-deployment bonuses based on deployment performance is an effective way to reward officers.

## After Service

18. Please indicate your level of agreement with the following statements. *(Strongly Agree, Agree, Disagree, Strongly Disagree, N/A)*

- My current employer has more flexible personnel and promotion policies than the military.
- My current employer does a better job of evaluating and rewarding talent and potential than the military.
- My current employer does a better job of informing me of educational opportunities for professional development and promotion than the military.

19. What factors would be most important to you in determining whether you would consider returning to active service? *(Force ranked; an unchecked row means that you did not consider it a factor at all).*

- Operational and deployment tempo
- Career opportunities
- Family concerns and work-life balance
- Opportunity for promotion
- Financial incentives
- Educational opportunities
- Lack of opportunity in private sector

20. Would you advise your own children to enter the service? Why or why not? *(Free response)*

## Demographics

21. In what year were you born? *(Drop-down menu)*

22. What is your gender? *(multiple choice, single answer)*

- Male
- Female
- Prefer not to answer/other

23. What is your race/ethnicity? *(multiple choice, single answer)*

- American Indian or Alaska Native

- Asian
- Black or African American
- Hispanic or Latino
- Native Hawaiian or Other Pacific Islander
- White
- Other/Prefer not to answer

24. What is your marital status? *(multiple choice, single answer)*

- Never married
- Married
- Widowed
- Divorced or Separated
- Other/Prefer not to answer

25. What was the highest level of education that your mother completed? *(multiple choice, single answer)*

- Less than high school
- High school diploma
- Some college
- Associate degree (2 year college)
- Bachelor degree (4 year college)
- Graduate or advanced degree

26. In what branch of the armed forces did you serve? *(multiple choice, single answer)*

- Coast Guard
- Marine Corps
- Navy
- Army
- Air Force

27. In what year were you commissioned? *(drop-down menu)*

28. How were you commissioned? *(multiple choice, single answer)*

- Service Academy
- ROTC
- Officer Candidate School
- Other

29. Did you have a combat arms MOS/AFSC/warfare specialty naval designation? *(Yes, No)*

30. In what quintile did you graduate from basic training? *(multiple choice, single answer)*

- Top 20%
- Second 20%
- Third 20%
- Fourth 20%
- Fifth 20%

31. If you deployed to any of the following locations, please enter the year(s) of your deployment. *(free response)*

- Iraq
- Afghanistan
- Other (please specify)

- Did not deploy

32. Did you personally engage in combat? *(Yes, No)*

33. Were you wounded in action? *(Yes, No)*

34. What was the highest rank you held as an active duty officer? *(multiple choice, single answer)*

- O-1 (Second Lieutenant or Ensign)
- O-2 (First Lieutenant or Lieutenant Junior Grade)
- O-3 (Captain or Lieutenant)
- O-4 (Major or Lieutenant Commander)
- O-5 (Lieutenant Colonel or Commander)

35. In what year did you leave the military? *(drop-down menu)*

36. Since leaving active duty, please check the employment status or statuses you have held. *(multiple choice, multiple answer)*

- Unemployed
- Self-employed
- Employed as a civilian by the U.S. government
- Employed in the private sector
- On sick, disability, or personal leave from a job
- Full-time student

37. Have you provided feedback to the military regarding your experience since leaving active duty? *(Yes, No)*

38. Is there anything else that you would like to share with us? *(free response)*

# APPENDIX D: SAMPLE RESULTS COMPARISON

| TOPIC | % Respondents Agree | | |
|---|---|---|---|
| | OOS (N=242) | AD (N=30) | Δ |
| **MORE OF THE BEST YOUNG OFFICERS WOULD STAY IF …** | | | |
| The military offered better assignments to the best officers. | 85% | 71% | 14% |
| The military promoted the best officers more quickly. | 83% | 52% | 31% |
| They were not obliged to pursue a higher rank. | 41% | 25% | 16% |
| The pay was based on performance instead of time-in-service. | 62% | 57% | 5% |
| Jobs were assigned through a market mechanism. | 67% | 63% | 4% |
| There were more options to attend schools for professional development. | 76% | 71% | 5% |
| They would leave regardless of reforms to the personnel system. | 38% | 29% | 9% |
| **PERSONNEL** | | | |
| The military personnel system does a good job of weeding out weak leaders. | 10% | 18% | 8% |
| The military personnel system does a good job of retaining the best leaders. | 7% | 18% | 11% |
| The military personnel system does a good job of matching talent to jobs. | 14% | 25% | 11% |
| Talented officers receive better assignments than average. | 29% | 43% | 14% |
| I was satisfied with the billets that I was assigned. | 76% | 86% | 10% |
| The military should expand early promotions. | 74% | 61% | 13% |
| The rate of military promotions should not be accelerated. | 42% | 54% | 12% |
| **INNOVATION** | | | |
| The military is committed to innovation. | 50% | 31% | 19% |
| My commanders reward(ed) my innovative ideas. | 68% | 54% | 14% |
| **OP TEMPO AND QUALITY OF LIFE** | | | |
| Returning to 1:2 dwell-time ratio would have a significant impact on my likelihood of staying on active duty. | 26% | 41% | 15% |
| Shorter deployment length would have had a significant effect on my decision to leave active duty. | 35% | 45% | 10% |
| I was personally prepared for my deployment(s). | 79% | 76% | 3% |
| My unit was prepared for its deployment(s). | 76% | 72% | 4% |
| The officer education system did an effective job of training me to lead my unit in full-spectrum operations. | 57% | 50% | 7% |
| **COMPENSATION** | | | |
| The military's healthcare and non-financial retirement benefits factored into my concerns about financial compensation. | 49% | 78% | 29% |
| End-of-deployment bonuses based on deployment performance is an effective way to reward officers. | 47% | 33% | 14% |

# APPENDIX E: SERVICE OFFICER FITNESS REPORTS



DA Form 67-9 (Officer Evaluation Report)

**OFFICER EVALUATION REPORT**
For use of this form, see AR 623-3; the proponent agency is DCS, G-1.

*FOR OFFICIAL USE ONLY (FOUO)*
*SEE PRIVACY ACT STATEMENT IN AR 623-3*

**PART I – ADMINISTRATIVE DATA**

DA FORM 67-9, MAR 2006    PREVIOUS EDITIONS ARE OBSOLETE.    Page 1 of 2    APD v2.01

| NAME | SSN | PERIOD COVERED | – | — |
|------|-----|----------------|---|---|

## PART V – PERFORMANCE AND POTENTIAL EVALUATION *(Rater)*

a. EVALUATE THE RATED OFFICER'S PERFORMANCE DURING THE RATING PERIOD AND HIS/HER POTENTIAL FOR PROMOTION

☐ **OUTSTANDING PERFORMANCE, MUST PROMOTE**   ☐ **SATISFACTORY PERFORMANCE, PROMOTE**   ☐ **UNSATISFACTORY PERFORMANCE, DO NOT PROMOTE**   ☐ **OTHER** *(Explain)*

b. COMMENT ON SPECIFIC ASPECTS OF THE PERFORMANCE, REFER TO PART III, DA FORM 67-9 AND PART IVa, b, AND PART Vb, DA FORM 67-9-1.

c. COMMENT ON POTENTIAL FOR PROMOTION.

d. IDENTIFY ANY UNIQUE PROFESSIONAL SKILLS OR AREAS OF EXPERTISE OF VALUE TO THE ARMY THAT THIS OFFICER POSSESSES.  FOR ARMY COMPETITIVE CATEGORY CPT ALSO INDICATE A POTENTIAL CAREER FIELD FOR FUTURE SERVICE.

## PART VI – INTERMEDIATE RATER

## PART VII –SENIOR RATER

a. EVALUATE THE RATED OFFICER'S PROMOTION POTENTIAL TO THE NEXT HIGHER GRADE

I currently senior rate _____ officer(s) in this grade
A completed DA Form 67-9-1 was received with this report and considered in my evaluation and review
☐ YES   ☐ NO  *(Explain in c)*

☐ **BEST QUALIFIED**   ☐ **FULLY QUALIFIED**   ☐ **DO NOT PROMOTE**   ☐ **OTHER** *(Explain below!)*

b. POTENTIAL COMPARED WITH OFFICERS SENIOR RATED IN SAME GRADE (OVERPRINTED BY DA)

c. COMMENT ON PERFORMANCE/POTENTIAL

☐ **ABOVE CENTER OF MASS**
(Less than 50% in top box; Center of Mass if 50% or more in top box)

☐ **CENTER OF MASS**

☐ **BELOW CENTER OF MASS RETAIN**

☐ **BELOW CENTER OF MASS DO NOT RETAIN**

d. LIST THREE FUTURE ASSIGNMENTS FOR WHICH THIS OFFICER IS BEST SUITED.
FOR ARMY COMPETITIVE CATEGORY CPT, ALSO INDICATE A POTENTIAL CAREER FIELD FOR FUTURE SERVICE.

**DA FORM  67-9, MAR 2006**                                Page 2 of 2
APD v2.01

**OFFICER PERFORMANCE REPORT** *(Lt thru Col)*

| I. RATEE IDENTIFICATION DATA   *(Read AFI 36-2406 carefully before filing in any item)* | | | | | |
|---|---|---|---|---|---|
| 1. NAME  *(Last, First, Middle Initial)* | 2. SSN | 3. GRADE | 4. DAFSC | 5. REASON FOR REPORT | 6. PAS CODE |
| 7. ORGANIZATION, COMMAND, LOCATION, AND COMPONENT | | | 8. PERIOD OF REPORT<br><br>THRU | | 9. NO. DAYS SUPV. |

| II. JOB DESCRIPTION   *(Limit text to 4 lines)* | 10. SRID |
|---|---|
| DUTY TITLE | |

**III. PERFORMANCE FACTORS**

| | DOES NOT MEET STANDARDS | MEETS STANDARDS | FITNESS EXEMPTION |
|---|---|---|---|
| Job Knowledge, Leadership Skills, Professional Qualities, Organizational Skills, Judgment and Decisions, Communication Skills, and Physical Fitness   *(See reverse if marked Does Not Meet Standards)* | ☐ | ☐ | |

**IV. RATER OVERALL ASSESSMENT**   *(Limit text to 6 lines)*

Last performance feedback was accomplished on: _____    (IAW AFI 36-2406) (if not accomplished, state the reason)

| NAME, GRADE, BR OF SVC, ORGN, COMMAND & LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| | SSN | SIGNATURE | |

**V. ADDITIONAL RATER OVERALL ASSESSMENT**   *(Limit text to 4 lines)*   ☐ CONCUR   ☐ NON-CONCUR

| NAME, GRADE, BR OF SVC, ORGN, COMMAND & LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| | SSN | SIGNATURE | |

**VI. REVIEWER**   *(If required, limit text to 4 lines)*   ☐ CONCUR   ☐ NON-CONCUR

| NAME, GRADE, BR OF SVC, ORGN, COMMAND & LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| | SSN | SIGNATURE | |

**VII. FUNCTIONAL EXAMINER/AIR FORCE ADVISOR**   *(Indicate applicable review by marking the appropriate box)*   ☐ FUNCTIONAL EXAMINER   ☐ AIR FORCE ADVISOR

| NAME, GRADE, BR OF SVC, ORGN, COMMAND & LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| | SSN | SIGNATURE | |

**VIII. RATEE'S ACKNOWLEDGMENT**

| I understand my signature does not constitute agreement or disagreement.  I acknowledge all required feedback was accomplished during the reporting period and upon receipt of this report. | Yes  No   ☐ ☐ | SIGNATURE | DATE |
|---|---|---|---|

**AF FORM 707, 20080618**   PREVIOUS EDITIONS ARE OBSOLETE (707A and 707B)   PRIVACY ACT INFORMATION:  The information in this form is FOR OFFICIAL USE ONLY.  Protect IAW the Privacy Act of 1974.

**RATEE NAME:**

**IX.  PERFORMANCE FACTORS**  *(If Section III is marked Does Not Meet Standards, fill in applicable block[s])*  **DOES NOT MEET STANDARDS** ☐

**1. Job Knowledge.**   Has knowledge required to perform duties effectively.  Strives to improve knowledge.  Applies knowledge to handle non-routine situations. ☐

**2. Leadership Skills.**   Sets and enforces standards.  Works well with others.  Fosters teamwork.  Displays initiative.  Self-confident.  Motivates subordinates.  Has respect and confidence of subordinates.  Fair and consistent in evaluation of subordinates. ☐

**3. Professional Qualities.**   Exhibits loyalty, discipline, dedication, integrity, honesty, and officership.  Adheres to Air Force standards.  Accepts personal responsibility.  Is fair and objective. ☐

**4. Organizational Skills.**   Plans, coordinates, schedules and uses resources effectively.  Meets suspenses.   Schedules work for self and others equitably and effectively.  Anticipates and solves problems. ☐

**5. Judgment and Decisions.**   Makes timely and accurate decisions.  Emphasizes logic in decision making.  Retains composure in stressful situations.  Recognizes opportunities.  Adheres to safety and occupational health requirements.  Acts to take advantage of opportunities. ☐

**6. Communication Skills.**   Listens, speaks, and writes effectively. ☐

**7. Physical Fitness.**   Maintains Air Force physical fitness standards. ☐

**X.  REMARKS**  *(use this section to spell out acronyms from the front)*

**XI.  REFERRAL REPORT**  *(Complete only if report contains referral comments or the overall standards block is marked as does not meet standards)*

I am referring this OPR to you according to AFI 36-2406, para 3.9.  It contains comment(s)/rating(s) that make(s) the report a referral as defined in AFI 36-2406, para. 3.9.  Specifically,

Acknowledge receipt by signing and dating below.  Your signature merely acknowledges that a referral report has been rendered; it does not imply acceptance of or agreement with the ratings or comments on the report.  Once signed, you are entitled to a copy of this memo.  You may submit rebuttal comments.  Send your written comments to:

not later than 10 calendar days (30 for non-EAD members) from your date below.  If you need additional time, you may request an extension from the individual named above.  You may submit attachments (limit to 10 pages), but they must directly relate to the reason this report was referred.  Pertinent attachments not maintained elsewhere will remain attached to the report for file in your personnel record.  Copies of previous reports, etc. submitted as attachments will be removed from your rebuttal package prior to filing since these documents are already filed in your records.  Your rebuttal comments/attachments may not contain any reflection on the character, conduct, integrity, or motives of the evaluator unless you can fully substantiate and document them.  Contact the MPF career enhancement section, or the AF Contact Center if you require any assistance in preparing your reply to the referral report.  It is important for you to be aware that receiving a referral report may affect your eligibility for other personnel related actions (e.g. assignments, promotions, etc.).  You may consult your commander and/or MPF or Air Force Contact Center if you desire more information on this subject.  If you believe this report is inaccurate, unjust, or unfairly prejudicial to your career, you may apply for a review of the report under AFI 36-2401, Correction of Officer and Enlisted Evaluation Reports, once the report becomes a matter of record as defined in AFI 36-2406, Attachment 1.

| NAME, GRADE, BR OF SVC OF REFERRING EVALUATOR | DUTY TITLE | DATE |
|---|---|---|
|  | SIGNATURE |  |

| SIGNATURE OF RATEE | | DATE |
|---|---|---|

**INSTRUCTIONS**

**ALL:**  Recommendations must be based on performance and the potential based on that performance.  Promotion recommendations are prohibited.  Do not comment on completion of or enrollment in Developmental Education, advanced education, previous or anticipated promotion recommendations on AF Form 709, OPR endorsement levels, family activities, marital status, race, sex, ethnic origin, age, or religion.  Evaluators enter only the last four numbers of SSN.

**RATER:**  Focus your evaluation in Section IV on what the officer did, how well he or she did it, and how the officer contributed to mission accomplishment.  Write in concise "bullet" format.  Your comments in Section IV may include recommendations for assignment.  Provide a copy of the report to the ratee prior to the report becoming a matter of record and provide follow-up feedback to let the ratee know how their performance resulted in this final product.

**ADDITIONAL RATER:**  Carefully review the rater's evaluation to ensure it is accurate, unbiased and uninflated.  If you disagree, you may ask the rater to review his or her evaluation.  You may not direct a change in the evaluation.  If you still disagree with the rater, mark "NON-CONCUR" and explain.  You may include recommendations for assignment.

**REVIEWER:**  Carefully review the rater's and additional rater's ratings and comments.  If their evaluations are accurate, unbiased and uninflated, mark "CONCUR" and sign the form.  If you disagree with previous evaluators, you may ask them to review their evaluations.  You may not direct them to change their appraisals.  If you still disagree with the additional rater, mark "NON-CONCUR" and explain in Section VI.  Do not use "NON-CONCUR" simply to provide comments on the report.

**RATEE:**  Your signature is merely an acknowledgement of receipt of this report.  It does not constitute concurrence.  If you disagree with the content, you may file an evaluation appeal through the Evaluation Reports Appeals Board IAW AFI 36-2401 (Correcting Officer and Enlisted Evaluation Reports), or through the Air Force Board for Correction of Military Records (AFI 36-2603 (Air Force Board for Correction of Military Records) and AFPAM 36-2607 (Applicants' Guide to the Air Force Board for Correction of Military Records (AFBCMR)).

**PRIVACY ACT STATEMENT**

*AUTHORITY:  Title 10 United States Code, Section 8013 and Executive Order 9397, 22 November 1943.*

*PURPOSE:  Information is needed for verification of the individual's name and Social Security Number (SSN) as captured on the form at the time of rating.*

*ROUTINE USES:  May specifically be disclosed outside the DoD as a routine use pursuant to 5 U.S.C. 552a(b)(3).*

*DISCLOSURE:  Disclosure is mandatory; SSN is used for positive identification.*

**AF FORM 707, 20080618**    PREVIOUS EDITIONS ARE OBSOLETE (707A and 707B)    **PRIVACY ACT INFORMATION:  The information in this form is FOR OFFICIAL USE ONLY.  Protect IAW the Privacy Act of 1974.**

# FITNESS REPORT & COUNSELING RECORD    (E7 – O6)

RCS BUPERS 1610-1

| 1. Name (Last, First  MI  Suffix) | | 2. Grade/Rate | 3. Desig | 4. SSN |
|---|---|---|---|---|

| 5.   ☐ ACT   ☐ TAR   ☐ INACT  ☐ AT/ADSW/265 | 6. UIC | 7. Ship/Station | 8. Promotion Status | 9. Date Reported |
|---|---|---|---|---|

Occasion for Report

| 10. Periodic ☐ | Detachment<br>11. of Individual ☐ | Detachment of<br>12. Reporting Senior ☐ | 13. Special ☐ | Period of Report<br>14. From: | 15. To: |
|---|---|---|---|---|---|

| 16. Not Observed<br>Report ☐ | Type of Report | | | 20.  Physical Readiness | 21. Billet Subcategory (if any) |
|---|---|---|---|---|---|
|  | 17. Regular ☐ | 18. Concurrent ☐ | 19. Ops Cdr ☐ | | |

| 22.  Reporting Senior (Last, FI  MI) | 23. Grade | 24. Desig | 25. Title | 26. UIC | 27. SSN |
|---|---|---|---|---|---|

28.  Command employment and command achievements.

29. Primary/Collateral/Watchstanding duties.  (Enter primary duty abbreviation in box.)

For Mid-term Counseling Use.  (When completing FITREP enter 30 and 31 from counseling worksheet sign 32.)

| 30. Date Counseled | 31.  Counselor | 32.  Signature of Individual Counseled |
|---|---|---|

PERFORMANCE TRAITS:  1.0 - Below standards/not progressing or UNSAT in any one standard;  2.0 - Does not meet all 3.0 standards;  3.0 - Meets all 3.0 standards;  4.0 - Exceeds most 3.0 standards;  5.0 - Meets overall criteria and most of the specific standards for 5.0.   Standards are not all inclusive.

| PERFORMANCE TRAITS | 1.0*<br>Below Standards | 2.0<br>Pro-<br>gressing | 3.0<br>Meets Standards | 4.0<br>Above Standards | 5.0<br>Greatly Exceeds Standards |
|---|---|---|---|---|---|
| 33.<br>**PROFESSIONAL EXPERTISE:**<br>Professional knowledge, proficiency, and qualifications.<br><br>NOB ☐ | - Lacks basic professional knowledge to perform effectively.<br>- Cannot apply basic skills.<br><br>- Fails to develop professionally or achieve timely qualifications.<br>☐ | -<br><br>☐ | - Has thorough professional knowledge.<br><br>- Competently performs both routine and new tasks.<br>- Steadily improves skills, achieves timely qualifications.<br>☐ | -<br><br>☐ | - Recognized expert, sought after to solve difficult problems.<br>- Exceptionally skilled, develops and executes innovative ideas.<br>- Achieves early/highly advanced qualifications.<br>☐ |
| 34.<br>**COMMAND OR ORGANIZATIONAL CLIMATE/EQUAL OPPORTUNITY:**<br>Contributing to growth and development, human worth, community.<br>NOB ☐ | - Actions counter to Navy's retention/reenlistment goals.<br>- Uninvolved with mentoring or professional development of subordinates.<br><br>- Actions counter to good order and discipline and negatively affect Command/Organizational climate.<br>- Demonstrates exclusionary behavior. Fails to value differences from cultural diversity. ☐ | -<br><br>☐ | - Positive leadership supports Navy's increased retention goals.  Active in decreasing attrition.<br>- Demonstrates appreciation for contributions of Navy personnel.  Positive influence on Command climate.<br>- Values differences as strengths. Fosters atmosphere of acceptance/inclusion per EO/EEO policy. ☐ | -<br><br>☐ | - Measurably contributes to Navy's increased retention and reduced attrition objectives.<br>- Proactive leader/exemplary mentor. Involved in subordinates' personal development leading to professional growth/sustained commitment.<br>- Initiates support programs for military, civilian, and families to achieve exceptional Command and Organizational climate.<br>- The model of achievement. Develops unit cohesion by valuing differences as strengths. ☐ |
| 35.<br>**MILITARY BEARING/ CHARACTER:**<br>Appearance, conduct, physical fitness, adherence to Navy Core Values.<br><br>NOB ☐ | - Consistently unsatisfactory appearance.<br>- Unsatisfactory demeanor or conduct.<br>- Unable to meet one or more physical readiness standards.<br>- Fails to live up to one or more Navy Core Values: HONOR, COURAGE, COMMITMENT.<br>☐ | -<br><br>☐ | - Excellent personal appearance.<br>- Excellent demeanor or conduct.<br>- Complies with physical readiness program.<br>- Always lives up to Navy Core Values: HONOR, COURAGE, COMMITMENT.<br>☐ | -<br><br>☐ | - Exemplary personal appearance.<br>- Exemplary representative of Navy.<br>- A leader in physical readiness.<br><br>- Exemplifies Navy Core Values: HONOR, COURAGE, COMMITMENT.<br>☐ |
| 36.<br>**TEAMWORK:**<br>Contributions towards team building and team results.<br><br><br>NOB ☐ | - Creates conflict, unwilling to work with others, puts self above team.<br>- Fails to understand team goals or teamwork techniques.<br>- Does not take direction well.<br>☐ | -<br><br>☐ | - Reinforces others' efforts, meets personal commitments to team.<br>- Understands team goals, employs good teamwork techniques.<br>- Accepts and offers team direction.<br>☐ | -<br><br>☐ | - Team builder, inspires cooperation and progress.<br>- Talented mentor, focuses goals and techniques for team.<br>- The best at accepting and offering team direction.<br>☐ |
| 37.<br>**MISSION ACCOMPLISHMENT AND INITIATIVE:**<br>Taking initiative, planning/prioritizing, achieving mission.<br><br>NOB ☐ | - Lacks initiative.<br><br>- Unable to plan or prioritize.<br><br>- Does not maintain readiness.<br><br>- Fails to get the job done.<br>☐ | -<br><br>☐ | - Takes initiative to meet goals.<br><br>- Plans/prioritizes effectively.<br><br>- Maintains high state of readiness.<br><br>- Always gets the job done.<br>☐ | -<br><br>☐ | - Develops innovative ways to accomplish mission.<br>- Plans/prioritizes with exceptional skill and foresight.<br>- Maintains superior readiness, even with limited resources.<br>- Gets jobs done earlier and far better than expected.<br>☐ |

NAVPERS 1610/2 (Rev. 3-02)

# FITNESS REPORT & COUNSELING RECORD    (E7 - O6)  (cont'd)

RCS BUPERS 1610-1

| 1.  Name (Last, First  MI  Suffix) | | 2.  Grade/Rate | 3.  Desig | 4.  SSN |
|---|---|---|---|---|

| PERFORMANCE TRAITS | 1.0* Below Standards | 2.0 Pro-gressing | 3.0 Meets Standards | 4.0 Above Standards | 5.0 Greatly Exceeds Standards |
|---|---|---|---|---|---|
| 38. **LEADERSHIP:** Organizing, motivating and developing others to accomplish goals.<br><br>NOB ☐ | - Neglects growth/development or welfare of subordinates.<br>- Fails to organize, creates problems for subordinates.<br>- Does not set or achieve goals relevant to command mission and vision.<br>- Lacks ability to cope with or tolerate stress.<br>- Inadequate communicator.<br>- Tolerates hazards or unsafe practices.<br><br>☐ | -<br>-<br>-<br>-<br>-<br>-<br><br>☐ | - Effectively stimulates growth/development in subordinates.<br>- Organizes successfully,implementing process improvements and efficiencies.<br>- Sets/achieves useful, realistic goals that support command mission.<br>- Performs well in stressful situations.<br>- Clear, timely communicator.<br>- Ensures safety of personnel and equipment.<br><br>☐ | -<br>-<br>-<br>-<br>-<br>-<br><br>☐ | - Inspiring motivator and trainer, subordinates reach highest level of growth and development.<br>- Superb organizer, great foresight, develops process improvements and efficiencies.<br>- Leadership achievements dramatically further command mission and vision.<br>- Perseveres through the toughest challenges and inspires others.<br>- Exceptional communicator.<br>- Makes subordinates safety-conscious, maintains top safety record.<br>- Constantly improves the personal and professional lives of others.<br><br>☐ |
| 39. **TACTICAL PERFORMANCE:** (Warfare qualified officers only) Basic and tactical employment of weapons systems.<br><br>NOB ☐ | - Has difficulty attaining qualifications expected for rank and experience.<br>- Has difficulty in ship(s), aircraft or weapons systems employment. Below others in knowledge and employment.<br>- Warfare skills in specialty are below standards compared to others of same rank and experience.<br><br>☐ | -<br>-<br><br>-<br><br>☐ | - Attains qualifications as required and expected.<br>- Capably employs ship(s), aircraft, or weapons systems.  Equal to others in warfare knowledge and employment.<br>- Warfare skills in specialty equal to others of same rank and experience.<br><br>☐ | -<br>-<br><br>-<br><br>☐ | - Fully qualified at appropriate level for rank and experience.<br>- Innovatively employs ship(s), aircraft, or weapons systems.  Well above others in warfare knowledge and employment.<br>- Warfare skills in specialty exceed others of same rank and experience.<br><br>☐ |

40.  I recommend screening this individual for next career milestone(s) as follows:  (maximum of two)
Recommendations may be for competitive schools or duty assignments such as:  LCPO, DEPT CPO,
SEA, CMC, CWO, LDO, Dept Head, XO, OIC, CO, Major Command, War College, PG School.

41.  COMMENTS ON PERFORMANCE.  * All 1.0 marks , three 2.0 marks, and 2.0  marks in Block 34 must be specifically substantiated in comments.  Comments must be verifiable.  Font must be 10 or 12 pitch (10 to 12 point) only.  Use upper and lower case.

| Promotion Recommendation | NOB | Significant Problems | Progressing | Promotable | Must Promote | Early Promote | 44.  Reporting Senior Address |
|---|---|---|---|---|---|---|---|
| 42.  INDIVIDUAL | | | | | | | |
| 43.  SUMMARY | ✕ | | | | | | |

| 45.  Signature of Reporting Senior<br><br>Date: | 46.  Signature of individual evaluated.  " I have seen this report, been apprised of my performance, and understand my right to make a statement."<br>I intend to submit a statement ☐    do not intend to submit a statement ☐ |
|---|---|
| Member Trait Average:          Summary Group Average: | Date: |

47.  Typed name, grade, command, UIC, and signature of Regular Reporting Senior on Concurrent Report



Date:

NAVPERS 1610/2 (Rev. 3-02)

| USMC FITNESS REPORT (1610) | ***DRAFT COPY*** | **DO NOT STAPLE** |
|---|---|---|
| NAVMC 10835A (Rev. 1-01) (WN 3.0) | | **THIS FORM** |
| PREVIOUS EDITIONS WILL NOT BE USED | **COMMANDANT'S GUIDANCE** | |

The completed fitness report is the most important information component in manpower management. It is the primary means of evaluating a Marine's performance and is the Commandant's primary tool for the selection of personnel for promotion, augmentation, resident schooling, command, and duty assignments. Therefore, the completion of this report is one of an officer's most critical responsibilities. Inherent in this duty is the commitment of each Reporting Senior and Reviewing Officer to ensure the integrity of the system by giving close attention to accurate marking and timely reporting. Every officer serves a role in the scrupulous maintenance of this evaluation system, ultimately important to both the individual and the Marine Corps. Inflationary markings only serve to dilute the actual value of each report. Reviewing Officers will not concur with inflated reports.

## A.  ADMINISTRATIVE INFORMATION

**1. Marine Reported On:**

| a. Last Name | b. First Name | c. MI | d. SSN | e. Grade | f. DOR | g. PMOS | h. BILMOS |
|---|---|---|---|---|---|---|---|

**2. Organization:**
a. MCC   b. RUC      c. Unit Description

**3. Occasion and Period Covered:** | **4. Duty Assignment ( descriptive title ):**

a. OCC   b. From         To       c. Type

| **5. Special Case:** | | | **6. Marine Subject Of:** | | | **7. Recommended For Promotion:** | | |
|---|---|---|---|---|---|---|---|---|
| a. Adverse | b. Not Observed | c. Extended | a. Commendatory Material | b. Derogatory Material | c. Disciplinary Action | a. Yes | b. No | c. N/A |
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**8. Special Information:**

**9. Duty Preference:**
a. Code   b. Descriptive Title

| a. QUAL | | d. HT(in.) | | g. Reserve Component | | 1st | |
| b. PFT | | e. WT | | h. Future Use | | 2nd | |
| c. Status | | f. Body Fat | | i. Future Use | | 3rd | |

**10. Reporting Senior:**

| a. Last Name | b. Init | c. Service | d. SSN | e. Grade | f. Duty Assignment |
|---|---|---|---|---|---|

**11. Reviewing Officer:**

| a. Last Name | b. Init | c. Service | d. SSN | e. Grade | f. Duty Assignment |
|---|---|---|---|---|---|

## B.  BILLET DESCRIPTION

## C.  BILLET ACCOMPLISHMENTS

| 1. Marine Reported On: | | | | **DRAFT COPY** | 2. Occasion and Period Covered: | | |
|---|---|---|---|---|---|---|---|
| a. Last Name | b. First Name | c. MI | d. SSN | | a. OCC | b. From | To |

## D. MISSION ACCOMPLISHMENT

**1. PERFORMANCE.** Results achieved during the reporting period. How well those duties inherent to a Marine's billet, plus all additional duties, formally and informally assigned, were carried out. Reflects a Marine's aptitude, competence, and commitment to the unit's success above personal reward. Indicators are time and resource management, task prioritization, and tenacity to achieve positive ends consistently.

| ADV | Meets requirements of billet and additional duties. Aptitude, commitment, and competence meet expectations. Results maintain status quo. | | Consistently produces quality results while measurably improving unit performance. Habitually makes effective use of time and resources; improves billet procedures and products. Positive impact extends beyond billet expectations. | | Results far surpass expectations. Recognizes and exploits new resources; creates opportunities. Emulated; sought after as an expert with influence beyond unit. Impact significant; innovative approaches to problems produce significant gains in quality and efficiency. | | N/O |
|---|---|---|---|---|---|---|---|

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**2. PROFICIENCY.** Demonstrates technical knowledge and practical skill in the execution of the Marine's overall duties. Combines training, education and experience. Translates skills into actions which contribute to accomplishing tasks and missions. Imparts knowledge to others. Grade dependent.

| ADV | Competent. Possesses the requisite range of skills and knowledge commensurate with grade and experience. Understands and articulates basic functions related to mission accomplishment. | | Demonstrates mastery of all required skills. Expertise, education and experience consistently enhance mission accomplishment. Innovative troubleshooter and problem solver. Effectively imparts skills to subordinates. | | True expert in field. Knowledge and skills impact far beyond those of peers. Translates broad-based education and experience into forward thinking, innovative actions. Makes immeasurable impact on mission accomplishment. Peerless teacher, selflessly imparts expertise to subordinates, peers, and seniors. | | N/O |
|---|---|---|---|---|---|---|---|

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**JUSTIFICATION:**

## E. INDIVIDUAL CHARACTER

**1. COURAGE.** Moral or physical strength to overcome danger, fear, difficulty or anxiety. Personal acceptance of responsibility and accountability, placing conscience over competing interests regardless of consequences. Conscious, overriding decision to risk bodily harm or death to accomplish the mission or save others. The will to persevere despite uncertainty.

| ADV | Demonstrates inner strength and acceptance of responsibility commensurate with scope of duties and experience. Willing to face moral or physical challenges in pursuit of mission accomplishment. | | Guided by conscience in all actions. Proven ability to overcome danger, fear, difficulty or anxiety. Exhibits bravery in the face of adversity and uncertainty. Not deterred by morally difficult situations or hazardous responsibilities. | | Uncommon bravery and capacity to overcome obstacles and inspire others in the face of moral or life-threatening danger. Demonstrated under the most adverse conditions. Selfless. Always places conscience over competing interests regardless of physical or personal consequences. | | N/O |
|---|---|---|---|---|---|---|---|

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**2. EFFECTIVENESS UNDER STRESS.** Thinking, functioning and leading effectively under conditions of physical and/or mental pressure. Maintaining composure appropriate for the situation, while displaying steady purpose of action, enabling one to inspire others while continuing to lead under adverse conditions. Physical and emotional strength, resilience and endurance are elements.

| ADV | Exhibits discipline and stability under pressure. Judgment and effective problem-solving skills are evident. | | Consistently demonstrates maturity, mental agility and willpower during periods of adversity. Provides order to chaos through the application of intuition, problem-solving skills, and leadership. Composure reassures others. | | Demonstrates seldom-matched presence of mind under the most demanding circumstances. Stabilizes any situation through the resolute and timely application of direction, focus and personal presence. | | N/O |
|---|---|---|---|---|---|---|---|

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**3. INITIATIVE.** Action in the absence of specific direction. Seeing what needs to be done and acting without prompting. The instinct to begin a task and follow through energetically on one's own accord. Being creative, proactive and decisive. Transforming opportunity into action.

| ADV | Demonstrates willingness to take action in the absence of specific direction. Acts commensurate with grade, training and experience. | | Self-motivated and action-oriented. Foresight and energy consistently transform opportunity into action. Develops and pursues creative, innovative solutions. Acts without prompting. Self-starter. | | Highly motivated and proactive. Displays exceptional awareness of surroundings and environment. Uncanny ability to anticipate mission requirements and quickly formulate original, far-reaching solutions. Always takes decisive, effective action. | | N/O |
|---|---|---|---|---|---|---|---|

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**JUSTIFICATION:**

NAVMC 10835B (Rev. 1-01) (WN 3.0)                                           PAGE 2 OF 5

| 1. Marine Reported On: | | *DRAFT COPY* | | | 2. Occasion and Period Covered: | | |
|---|---|---|---|---|---|---|---|
| a. Last Name | | b. First Name | c. MI | d. SSN | a. OCC | b. From | To |

## F. LEADERSHIP

**1. LEADING SUBORDINATES.** The inseparable relationship between leader and led. The application of leadership principles to provide direction and motivate subordinates. Using authority, persuasion and personality to influence subordinates to accomplish assigned tasks. Sustaining motivation and morale while maximizing subordinates' performance.

| ADV | Engaged; provides instructions and directs execution. Seeks to accomplish mission in ways that sustain motivation and morale. Actions contribute to unit effectiveness. | Achieves a highly effective balance between direction and delegation. Effectively tasks subordinates and clearly delineates standards expected. Enhances performance through constructive supervision. Fosters motivation and enhances morale. Builds and sustains teams that successfully meet mission requirements. Encourages initiative and candor among subordinates. | Promotes creativity and energy among subordinates by striking the ideal balance of direction and delegation. Achieves highest levels of performance from subordinates by encouraging individual initiative. Engenders willing subordination, loyalty, and trust that allow subordinates to overcome their perceived limitations. Personal leadership fosters highest levels of motivation and morale, ensuring mission accomplishment even in the most difficult circumstances. | N/O |
|---|---|---|---|---|

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**2. DEVELOPING SUBORDINATES.** Commitment to train, educate, and challenge all Marines regardless of race, religion, ethnic background, or gender. Mentorship. Cultivating professional and personal development of subordinates. Developing team players and esprit de corps. Ability to combine teaching and coaching. Creating an atmosphere tolerant of mistakes in the course of learning.

| ADV | Maintains an environment that allows personal and professional development. Ensures subordinates participate in all mandated development programs. | Develops and institutes innovative programs, to include PME, that emphasize personal and professional development of subordinates. Challenges subordinates to exceed their perceived potential thereby enhancing unit morale and effectiveness. Creates an environment where all Marines are confident to learn through trial and error. As a mentor, prepares subordinates for increased responsibilities and duties. | Widely recognized and emulated as a teacher, coach and leader. Any Marine would desire to serve with this Marine because they know they will grow personally and professionally. Subordinate and unit performance far surpassed expected results due to MRO's mentorship and team building talents. Attitude toward subordinate development is infectious, extending beyond the unit. | N/O |
|---|---|---|---|---|

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**3. SETTING THE EXAMPLE.** The most visible facet of leadership: how well a Marine serves as a role model for all others. Personal action demonstrates the highest standards of conduct, ethical behavior, fitness, and appearance. Bearing, demeanor, and self-discipline are elements.

| ADV | Maintains Marine Corps standards for appearance, weight, and uniform wear. Sustains required level of physical fitness. Adheres to the tenets of the Marine Corps core values. | Personal conduct on and off duty reflects highest Marine Corps standards of integrity, bearing and appearance. Character is exceptional. Actively seeks self-improvement in wide-ranging areas. Dedication to duty and professional example encourage others' self-improvement efforts. | Model Marine, frequently emulated. Exemplary conduct, behavior, and actions are tone-setting. An inspiration to subordinates, peers, and seniors. Remarkable dedication to improving self and others. | N/O |
|---|---|---|---|---|

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**4. ENSURING WELL-BEING OF SUBORDINATES.** Genuine interest in the well-being of Marines. Efforts enhance subordinates' ability to concentrate/focus on unit mission accomplishment. Concern for family readiness is inherent. The importance placed on welfare of subordinates is based on the belief that Marines take care of their own.

| ADV | Deals confidently with issues pertinent to individual welfare and recognizes suitable courses of action that support subordinates' well-being. Applies available resources, allowing subordinates to effectively concentrate on the mission. | Instills and/or reinforces a sense of responsibility among junior Marines for themselves and their subordinates. Actively fosters the development of and uses support systems for subordinates which improve their ability to contribute to unit mission accomplishment. Efforts to enhance subordinate welfare improve the unit's ability to accomplish its mission. | Noticeably enhances subordinates well-being, resulting in a measurable increase in unit effectiveness. Maximizes unit and base resources to provide subordinates with the best support available. Proactive approach serves to energize unit members to "take care of their own," thereby correcting potential problems before they can hinder subordinates' effectiveness. Widely recognized for techniques and policies that produce results and build morale. Builds strong family atmosphere. Puts motto *Mission first, Marines always*, into action. | N/O |
|---|---|---|---|---|

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**5. COMMUNICATION SKILLS.** The efficient transmission and receipt of thoughts and ideas that enable and enhance leadership. Equal importance given to listening, speaking, writing, and critical reading skills. Interactive, allowing one to perceive problems and situations, provide concise guidance, and express complex ideas in a form easily understood by everyone. Allows subordinates to ask questions, raise issues and concerns and venture opinions. Contributes to a leader's ability to motivate as well as counsel.

| ADV | Skilled in receiving and conveying information. Communicates effectively in performance of duties. | Clearly articulates thoughts and ideas, verbally and in writing. Communication in all forms is accurate, intelligent, concise, and timely. Communicates with clarity and purpose, ensuring understanding of intent or purpose. Encourages and considers the contributions of others. | Highly developed facility in verbal communication. Adept in composing written documents of the highest quality. Combines presence and verbal skills which engender confidence and achieve understanding irrespective of the setting, situation, or size of the group addressed. Displays an intuitive sense of when and how to listen. | N/O |
|---|---|---|---|---|

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**JUSTIFICATION:**




NAVMC 10835C (Rev. 1-01) (WN 3.0)                                                                 PAGE 3 OF 5

| 1. Marine Reported On: a. Last Name | | *DRAFT COPY* | | | 2. Occasion and Period Covered: | |
|---|---|---|---|---|---|---|
| | | b. First Name | c. MI | d. SSN | a. OCC | b. From    To |
| | | | | | | |

## G. INTELLECT AND WISDOM

**1.PROFESSIONAL MILITARY EDUCATION (PME).** Commitment to intellectual growth in ways beneficial to the Marine Corps. Increases the breadth and depth of warfighting and leadership aptitude. Resources include resident schools; professional qualifications and certification processes; nonresident and other extension courses; civilian educational institution coursework; a personal reading program that includes (but is not limited to) selections from the Commandant's Reading List; participation in discussion groups and military societies; and involvement in learning through new technologies.

| ADV | Maintains currency in required military skills and related developments. Has completed or is enrolled in appropriate level of PME for grade and level of experience. Recognizes and understands new and creative approaches to service issues. Remains abreast of contemporary concepts and issues. | | PME outlook extends beyond MOS and required education. Develops and follows a comprehensive personal program which includes broadened professional reading and/or academic course work; advances new concepts and ideas. | | Dedicated to life-long learning. As a result of active and continuous efforts, widely recognized as an intellectual leader in professionally related topics. Makes time for study and takes advantage of all resources and programs. Introduces new and creative approaches to services issues. Engages in a broad spectrum of forums and dialogues. | N/O |
|---|---|---|---|---|---|---|

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**2. DECISION MAKING ABILITY.** Viable and timely problem solution. Contributing elements are judgment and decisiveness. Decisions reflect the balance between an optimal solution and a satisfactory, workable solution that generates tempo. Decisions are made within the context of the commander's established intent and the goal of mission accomplishment. Anticipation, mental agility, intuition, and success are inherent.

| ADV | Makes sound decisions leading to mission accomplishment. Actively collects and evaluates information and weighs alternatives to achieve timely results. Confidently approaches problems; accepts responsibility for outcomes. | | Demonstrates mental agility; effectively prioritizes and solves multiple complex problems. Analytical abilities enhanced by experience, education, and intuition. Anticipates problems and implements viable, long-term solutions. Steadfast, willing to make difficult decisions. | | Widely recognized and sought after to resolve the most critical, complex problems. Seldom matched analytical and intuitive abilities; accurately foresees unexpected problems and arrives at well-timed decisions despite fog and friction. Completely confident approach to all problems. Masterfully strikes a balance between the desire for perfect knowledge and greater tempo. | N/O |
|---|---|---|---|---|---|---|

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**3. JUDGMENT.** The discretionary aspect of decision making. Draws on core values, knowledge, and personal experience to make wise choices. Comprehends the consequences of contemplated courses of action.

| ADV | Majority of judgments are measured, circumspect, relevant and correct. | | Decisions are consistent and uniformly correct, tempered by consideration of their consequences. Able to identify, isolate and assess relevant factors in the decision making process. Opinions sought by others. Subordinates personal interest in favor of impartiality. | | Decisions reflect exceptional insight and wisdom beyond this Marine's experience. Counsel sought by all; often an arbiter. Consistent, superior judgment inspires the confidence of seniors. | N/O |
|---|---|---|---|---|---|---|

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

JUSTIFICATION:

## H. FULFILLMENT OF EVALUATION RESPONSIBILITIES

**1. EVALUATIONS.** The extent to which this officer serving as a reporting official conducted, or required others to conduct, accurate, uninflated, and timely evaluations.

| ADV | Occasionally submitted untimely or administratively incorrect evaluations. As RS, submitted one or more reports that contained inflated markings. As RO, concurred with one or more reports from subordinates that were returned by HQMC for inflated marking. | | Prepared uninflated evaluations which were consistently submitted on time. Evaluations accurately described performance and character. Evaluations contained no inflated markings. No reports returned by RO or HQMC for inflated marking. No subordinates' reports returned by HQMC for inflated marking. Few, if any, reports were returned by RO or HQMC for administrative errors. Section Cs were void of superlatives. Justifications were specific, verifiable, substantive, and where possible, quantifiable and supported the markings given. | | No reports submitted late. No reports returned by either RO or HQMC for administrative correction or inflated markings. No subordinates' reports returned by HQMC for administrative correction or inflated markings. Returned procedurally or administratively incorrect reports to subordinates for correction. As RO nonconcurred with all inflated reports. | N/O |
|---|---|---|---|---|---|---|

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

JUSTIFICATION:

| 1. Marine Reported On:<br>a. Last Name | *DRAFT COPY*<br>b. First Name | c. MI | d. SSN | 2. Occasion and Period Covered:<br>a. OCC | b. From | To |
|---|---|---|---|---|---|---|
| | | | | | | |

## I. DIRECTED AND ADDITIONAL COMMENTS

## J. CERTIFICATION

| 1. I CERTIFY that to the best of my knowledge and belief all entries made hereon are true and without prejudice or partiality and that I have provided a signed copy of this report to the Marine Reported on. | _____<br>(Signature of Reporting Senior) | ☐☐☐☐ ☐☐ ☐☐<br>(Date in YYYYMMDD format) |
|---|---|---|

| 2. I ACKNOWLEDGE the adverse nature of this report and<br>☐ I have no statement to make<br>☐ I have attached a statement | _____<br>(Signature of Marine Reported On) | ☐☐☐☐ ☐☐ ☐☐<br>(Date in YYYYMMDD format) |
|---|---|---|

## K. REVIEWING OFFICER COMMENTS

| 1. OBSERVATION: ☐ Sufficient ☐ Insufficient | 2. EVALUATION: ☐ Concur ☐ Do Not Concur |
|---|---|

**3. COMPARATIVE ASSESSMENT:** Provide a comparative assessment of potential by placing an "X" in the appropriate box. In marking the comparison, consider all Marines of this grade whose professional abilities are known to you personally.

| DESCRIPTION | | COMPARATIVE ASSESSMENT |
|---|---|---|
| THE EMINENTLY QUALIFIED MARINE | ☐ | |
| ONE OF THE FEW EXCEPTIONALLY QUALIFIED MARINES | ☐ | |
| ONE OF THE MANY HIGHLY QUALIFIED PROFESSIONALS WHO FORM THE MAJORITY OF THIS GRADE | ☐ | |
| A QUALIFIED MARINE | ☐ | |
| UNSATISFACTORY | ☐ | |

**4. REVIEWING OFFICER COMMENTS:** Amplify your comparative assessment mark; evaluate potential for continued professional development to include: promotion, command, assignment, resident PME, and retention; and put Reporting Senior marks and comments in perspective.

| 5. I CERTIFY that to the best of my knowledge and belief all entries made hereon are true and without prejudice or partiality. | _____<br>(Signature of Reviewing Officer) | ☐☐☐☐ ☐☐ ☐☐<br>(Date in YYYYMMDD format) |
|---|---|---|

| 6. I ACKNOWLEDGE the adverse nature of this report and<br>☐ I have no statement to make<br>☐ I have attached a statement | _____<br>(Signature of Marine Reported On) | ☐☐☐☐ ☐☐ ☐☐<br>(Date in YYYYMMDD format) |
|---|---|---|

## L. ADDENDUM PAGE

ADDENDUM PAGE ATTACHED: ☐ YES

NAVMC 10835E (Rev. 1-01) (WN 3.0)                              PAGE 5 OF 5