**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS,<br><br>    *Plaintiff*,<br><br>  v.<br><br>THE UNITED STATES NAVAL<br>ACADEMY, *et al.*,<br><br>    *Defendants*. | Case No. 1:23-cv-02699-RDB |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

**Table of Contents**

INTRODUCTION ............................................................................................................1

BACKGROUND .............................................................................................................3

    I.   Procedural History ................................................................................................3

    II.  USNA's Admissions Process ...............................................................................3

        A.  Steps to Apply............................................................................................4

        B.  The Nomination Requirement ....................................................................5

        C.  Selection of Candidates .............................................................................6

        D.  USNA's Limited Consideration of Race and Ethnicity ..............................9

LEGAL STANDARDS....................................................................................................11

    I.   Preliminary Injunction Standard........................................................................11

    II.  Standard Applied to Admissions Policies that Consider Race ...........................13

    III. Deference to the Executive in Matters of National Security..............................13

ARGUMENT..................................................................................................................15

    I.   Plaintiff Has Not Met Its Burden to Establish Standing ...................................15

    II.  Plaintiff Fails to Demonstrate Irreparable Harm ..............................................17

    III. Plaintiff Cannot Demonstrate a Clear Likelihood of Success on the Merits......................21

        A.  The United States Military Has a Compelling National Security Interest in a Diverse Officer Corps ..............................................................................21

            1.   Racial Tension in the Military and Lack of Diversity in the Senior Ranks...............22

            2.   The Military's Judgment That a Diverse Officer Corps Is Vital to National Security..............................................................................26

                a.   Diversity in the Officer Corps is Critical to Cohesion and Lethality ....................29

                    i.   History of Combat Experience............................................................29

        ii.   Empirical Evidence Reveals that Diversity Aids Military Success ...................32

    b.   Diversity in the Officer Corps is Critical to Recruitment ......................................34

    c.   Diversity in the Officer Corps is Critical to Retention ..........................................36

    d.   Diversity in the Officer Corps is Critical to the Military's Legitimacy
in the Nation and the World ....................................................................................37

3.   The United States' Compelling National Security Interests are Distinct and
Measurable ...................................................................................................................38

    a.   The Military's Interest in Officer Diversity is Entirely Distinct from
Harvard and UNC's Interest in Student Diversity .........................................................38

    b.   These Goals Are Subject to Meaningful Judicial Review......................................40

B.   USNA's Admissions Process Is Narrowly Tailored .......................................................44

1.   USNA Considers Each Candidate as an Individual in the Admissions Process.........46

    a.   Letters of Assurance ................................................................................................46

    b.   Service-Connected and Congressional Nominations.............................................47

    c.   Superintendent Nominations ..................................................................................48

    d.   Additional Appointees ............................................................................................48

2.   USNA Does Not Use Quotas to Achieve Its Aspirational Diversity Goals ..............49

3.   USNA's Limited Consideration of Race and Ethnicity is Directly Related to the
Navy's Compelling Interest in a Diverse Officer Corps ...................................................51

4.   Race and Ethnicity are not Used as a Negative or Stereotype...................................52

5.   Race-Neutral Alternatives Are Not Sufficient..........................................................55

6.   USNA Does Not Intend to Use Race and Ethnicity as a Factor in its Admissions
Process Indefinitely ..........................................................................................................57

IV. The Balance of Equities and Public Interest Weigh in Favor of the Government ............58

CONCLUSION..............................................................................................................................59

## Table of Authorities

**Cases**

*Agudath Israel of America v. Cuomo,*
  983 F.3d 620 (2d Cir. 2020) ..........................................................................................18

*Austin v. U. S. Navy Seals 1-26,*
  142 S. Ct. 1301 (2022) .............................................................................................14, 29

*Berry v. Bean,*
  796 F.2d 713 (4th Cir. 1983) .........................................................................................15

*Berkley v. United States,*
  287 F.3d 1076 (Fed. Cir. 2002) .....................................................................................29

*Boumediene v. Bush,*
  553 U.S. 723 (2008) .......................................................................................................14

*Burns v. Wilson,*
  346 U.S. 137 (1953) .......................................................................................................15

*Cacchillo v. Insmed, Inc.,*
  638 F.3d 401 (2d Cir. 2011) ..........................................................................................15

*Cal. Ass'n of Priv. Postsecondary Sch. v. DeVos,*
  344 F. Supp. 3d 158 (D.D.C. 2018) ...............................................................................19

*Chappell v. Wallace,*
  462 U.S. 296 (1983) .......................................................................................................15

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio,*
  364 F. Supp. 3d 253 (S.D.N.Y. 2019),
  *aff'd,* 788 F. App'x 85 (2d Cir. 2019) ............................................................................59

*Church v. Biden,*
  2021 WL 5179215 (D.D.C. Nov. 8, 2021) .....................................................................17

*Clapper v. Amnesty Int'l, USA,*
  568 U.S. 398 (2013) .......................................................................................................18

*Coal. to Def. Affirmative Action v. Granholm,*
  473 F.3d 237 (6th Cir. 2006) .........................................................................................19

*Cooke v. Lancelotta,*
  2022 WL 22229 (D. Md. Mar. 3, 2022) .........................................................................12

*Def. Distributed v. U.S. Dep't of State,*
    838 F.3d 451 (5th Cir. 2016) .......................................................................58

*Dep't of Navy v. Egan,*
    484 U.S. 518 (1988) .................................................................... 13, 15, 40

*Direx Israel, Ltd. v. Breakthrough Med. Corp.,*
    952 F.2d 802 (4th Cir. 1991) .......................................................................18

*Dist. of Columbia v. U.S. Dep't of Agric.,*
    444 F. Supp. 3d 1 (D.D.C. 2020) ...............................................................19

*Do No Harm v. Pfizer Inc.,*
    646 F. Supp. 3d 490 (S.D.N.Y. 2022) ................................................ 15, 16

*Doolen v. Wormuth,*
    5 F.4th 125 (2d Cir. 2021) ..........................................................................15

*Elrod v. Burns,*
    427 U.S. 347 (1976) ....................................................................................18

*Fisher v. Univ. of Tex. at Austin,*
    570 U.S. 297 (2013) .................................................................... 13, 45, 55

*Fisher v. Univ. of Tex. at Austin,*
    579 U.S. 365 (2016) ..........................................................................*passim*

*FW/PBS, Inc. v. City of Dallas,*
    493 U.S. 215 (1990) ....................................................................................15

*Gilligan v. Morgan,*
    413 U.S. 1 (1973) ........................................................................ 14, 15, 40

*Goldman v. Weinberger,*
    475 U.S. 503 (1986) ....................................................................................14

*Grutter v. Bollinger,*
    539 U.S. 306 (2003) ..........................................................................*passim*

*Haig v. Agee,*
    453 U.S. 280 (1981) .................................................................... 15, 26, 58

*Henderson ex rel. Nat'l Lab. Rels. Bd. v. Bluefield Hosp. Co.,*
    902 F.3d 432 (4th Cir. 2018) .......................................................................17

*Holder v. Humanitarian L. Project,*
    561 U.S. 1 (2010) ........................................................................................26

*Howe v. Burwell*,
  No. 2:15-CV-6, 2015 WL 4479757 (D. Vt. July 21, 2015)....................................................18

*Johnson v. California*,
  543 U.S. 499 (2005) ..........................................................................................*passim*

*Korematsu v. United States*,
  323 U.S. 214 (1944) ...........................................................................................29

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014)........................................................................... 11, 12, 59

*Lewis v. Becerra*,
  2022 WL 123909 (D.D.C. Jan. 13, 2022)...........................................................20

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...........................................................................................15

*Microstrategy Inc. v. Motorola, Inc.*,
  245 F.3d 335 (4th Cir. 2001)............................................................................11

*Moore v. Circosta*,
  494 F. Supp. 3d 289 (M.D.N.C. 2020),
  *inj. pending appeal denied*, *Wise v. Circosta*, 978, F.3d 93 (4th Cir. 2020) ...........................59

*Moore v. Williamsburg Reg'l Hosp.*,
  2006 WL 8438614 (D.S.C. Aug, 21, 2006) ...........................................................18

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
  915 F.3d 197 (4th Cir. 2019)........................................................................17, 20

*Nat'l Urban League v. DeJoy*,
  2020 WL 6363959 (D. Md. Oct. 29, 2020) ...........................................................18

*Nken v. Holder*,
  556 U.S. 418 (2009) ...........................................................................................58

*Orloff v. Willoughby*,
  345 U.S. 83 (1953) ............................................................................................15

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
  551 U.S. 701 (2007) ...........................................................................................45

*Patrolman's Benevolent Ass'n  v. City of New York*,
  310 F.3d 43 (2d Cir. 2002)................................................................................39

*Petit v. City of Chicago*,
  352 F.3d 1111 (7th Cir. 2003)...........................................................................39

*Potomac Heritage Trail Ass'n v. U.S. Dep't of Trans.*,
   2022 WL 7051160 (D. Md. Oct. 11, 2022) ........................................................17

*Quince Orchard Valley Citizens Ass'n v. Hodel*,
   872 F.2d 75 (4th Cir. 1989).............................................................................17

*Regents of the Univ. of Cal. v. Bakke*,
   438 U.S. 265 (1978) ................................................................. 13, 44, 45, 50

*Richmond v. J.A. Croson Co.*,
   488 U.S. 469 (1989) ...............................................................................40, 41

*Roe v. Dep't of Def.*,
   947 F.3d 207 (4th Cir. 2020)...........................................................................14

*Ross v. Meese*,
   818 F.2d 1132 (4th Cir. 1987).........................................................................18

*Rostker v. Goldberg*,
   453 U.S. 57 (1981) .........................................................................................15

*Roswell v. Mayor & City Council of Baltimore*,
   2023 WL 3158728 (D. Md. Apr. 28, 2023) .....................................................17

*Rullan v. Goden*,
   2023 WL 3093406 (D. Md. Apr. 26, 2023) .....................................................18

*Schlesinger v. Councilman*,
   420 U.S. 738 (1975) .......................................................................................15

*Selland v. Perry*,
   905 F. Supp. 260 (D. Md. 1995),
   *aff'd*, 100 F.3d 950 (4th Cir. 1996).................................................................15

*SFFA v. UNC*,
   567 F. Supp. 3d 580 (M.D.N.C. 2021) ............................................................55

*Singh v. Berger*,
   56 F.4th 88 (D.C. Cir. 2022) ..........................................................................29

*Speech First, Inc. v. Shrum*,
   2023 WL 2905577 (W.D. Okla. Apr. 10, 2023),
   *appeal docketed*, No. 23-6054 (10th Cir. Apr. 11, 2023) ...............................16

*Students for Fair Admissions, Inc. v. Harvard College*,
   600 U.S. 181 (2023) ..............................................................................*passim*

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ......................................................................... 15, 16, 17

*Tiffany v. Forbes Custom Boats, Inc.*,
   959 F.2d 232 (4th Cir. 1992)................................................................ 12, 17

*U.S. Navy Seals 1-26 v. Biden*,
   27 F.4th 336 (5th Cir. 2022) ......................................................................29

*United States v. Nixon*,
   418 U.S. 683 (1974) ...................................................................................15

*Washington v. Lee*,
   263 F. Supp. 327 (M.D. Ala. 1966),
   *aff'd*, 390 U.S. 333 (1968) ..................................................................40, 41

*Wimmer v. Lehman*,
   705 F.2d 1402 (4th Cir. 1983)....................................................................15

*Winter v. Nat'l Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ......................................................................... 11, 14, 58

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ...................................................................................15

**Statutes**

10 U.S.C. § 8454................................................................................................3, 5

10 U.S.C. § 8454(b)(5).........................................................................................8

10 U.S.C. §§ 8453–58 ..........................................................................................4

**Other Sources**

DoD, Equal Opportunity in the Armed Forces,
   DODD 5120.36 (July 1963)........................................................................25

Exec. Order No. 9981,
   13 Fed. Reg. 4313 (July 26, 1948) .............................................................25

Military Leadership Diversity Comm'n, *From Representation to Inclusion: Diversity Leadership for the 21st-Century Military* (March 2011) ("MLDC Report"),
   https://perma.cc/QVW8-YZKP........................................................*passim*

President's Comm. on Equal. of Treatment & Opportunity in the Armed Serv.,
*Freedom to Serve: Equality of Treatment and Opportunity in the Armed Services*, United
States GPO, Washington, D.C. (1950) ....................................................................................25

United States Census Bureau, *2020 Census Frequently Asked Questions About Race and
Ethnicity* U.S. Naval Academy (Aug. 12, 2021),
https://perma.cc/2XE6-AH5R ...............................................................................................52

U.S. Department of Defense, 2022 National Defense Strategy of the United States of America,
https://perma.cc/K3FF-83W3................................................................................................30

## INTRODUCTION

An unparalleled fighting force is fundamental to this country's national security.  Based on more than two centuries of military history, decades of combat experience, and internal and external analyses, the most senior leaders in the Armed Forces have repeatedly concluded that a more diverse officer corps makes a more effective force:  more lethal, more likely to attract and retain top talent, and more legitimate in the eyes of the nation and the world.  In seeking an injunction prohibiting the United States Naval Academy ("USNA") from using race in a limited fashion to foster diversity in the Navy and Marine officer corps and promote operational effectiveness, Plaintiff Students for Fair Admissions, Inc. overreads *Students for Fair Admissions, Inc. v. Harvard College*, 600 U.S. 181 (2023) ("*SFFA*"), in which the Supreme Court invalidated two civilian universities' admissions policies but explicitly did not address the military academies' admissions policies "in light of the[ir] potentially distinct interests."  *Id.* at 213 n.4.  Plaintiff ignores critical differences between civilian and military universities and fails to demonstrate that it is entitled to the extraordinary remedy of a preliminary injunction.

*First*, Plaintiff fails to establish associational standing because it does not identify, by name, any member with standing.  This requirement exists to ensure that the alleged facts regarding the member(s) can be verified and that the Court can properly exercise jurisdiction—important purposes undermined by Plaintiff's exclusive reliance on anonymous members here.

*Second*, Plaintiff has failed to show that its members would suffer irreparable harm absent an injunction—a failure underscored by its substantial delay in moving for emergency relief.

*Third*, Plaintiff cannot meet its heavy burden of demonstrating a clear likelihood of success on the merits because USNA's admissions policies serve a compelling national security interest.  As the Supreme Court contemplated, USNA presents distinct interests from civilian universities: the operational interests of the United States Navy and Marine Corps.  USNA trains combat leaders

who must be equipped to wield lethal force, to establish cohesive rapport with subordinates who wield such force, and to lead an increasingly diverse Navy and Marine Corps in an increasingly diverse nation.  The military's most senior leaders have made the judgment—reiterated here by a three-star Vice Admiral of the Navy, the Deputy Assistant Secretary of the Department of the Navy for Military Manpower and Personnel, the Acting Under Secretary of Defense for Personnel and Readiness, and the Under Secretary's Senior Advisor—that the military's interest in building a diverse officer corps is integral to ensuring national security.  A long line of precedent establishes that interest as a compelling interest of the highest order and affords the military's judgment substantial deference.  And the military's interest in a diverse officer corps is both distinct and measurable, in stark contrast to the universities' admissions policies at issue in *SFFA*.

USNA's carefully calibrated means of achieving that interest are narrowly tailored.  USNA's admissions process treats each candidate as an individual and considers race flexibly as a nondeterminative factor at only limited points in the context of a holistic, individualized consideration.  Most candidates are unaffected by the consideration of race.  Moreover, there is a meaningful connection between the compelling interest the military pursues and the means USNA employs; race is not used as a negative, does not operate as a stereotype, and is not applied as a part of a quota; and USNA has seriously considered race-neutral alternatives in good faith.  As explained below, no available, workable alternative would suffice.

*Finally*, the balance of equities and the public interest weigh heavily in the Government's favor.  Any alleged burden on the constitutional rights of Plaintiff's members is far outweighed by the burden that would be created by an order from this Court requiring USNA to apply a different admissions policy in the middle of its admissions cycle, and countermanding the strategic judgment of the nation's military leaders on what national security requires.  The United States

therefore respectfully requests that the Court deny Plaintiff's motion for a preliminary injunction.

## BACKGROUND

### I.    USNA's Admissions Process

USNA was established in 1845 and prepares students to become leaders and officers in the Navy and Marine Corps.  Exhibit A, Declaration of Dean Stephen Bruce Latta ("Latta Decl.") ¶ 7.[1]  Upon entry at USNA, midshipmen are subject to the Uniform Code of Military Justice and must participate in rigorous military training.  *Id.* ¶¶ 7–10.  Upon graduation, midshipmen are commissioned as active-duty officers in the Navy or Marine Corps with an obligation to serve a minimum of five years, and 95% of each graduating class accesses specifically into the warfighting communities.  *Id.* ¶ 10.  Congress has set the size of the Brigade of Midshipmen at a limit of 4,400, *see* 10 U.S.C. § 8454; accordingly, each incoming USNA class currently consists of approximately 1,180 midshipmen before attrition, *id.* ¶ 11.

To become a Navy or Marine Corps officer, an individual must graduate from USNA; attend a civilian college or university while participating in a Reserve Officers' Training Corps program; attend Officer Candidate School after graduating from college; receive a direct commission after earning a professional degree; or advance through the enlisted ranks and then complete one of these officer training programs.  *Id.* ¶ 90 n.8.  Of those commissioning sources, USNA is the most prestigious, and each year approximately 28% of new Navy and Marine Corps officers in the warfighting communities are USNA graduates.  *Id.* ¶¶ 10, 90.  USNA graduates also account for a disproportionate percentage of senior officers (40% of flag officers) in the Navy.  *Id.* In fact, 91% of Chiefs of Naval Operations, which is one of the highest-ranking officers in the

---

[1] As explained in Dean Latta's declaration, Plaintiff's complaint and motion for preliminary injunction rely on decades-old documents that do not accurately describe USNA's current admissions process. Latta Decl. ¶¶ 108–12. As discussed below, this significant factual mischaracterization of USNA's admissions process renders much of the legal analysis in Plaintiff's motion inapt.

Navy, to the present date have been USNA graduates. *See* Exhibit F, Declaration of John Sherwood, PhD ("Sherwood Decl.") ¶ 60. Accordingly, USNA is a vital pipeline to the officer corps, and especially to senior leadership, in the Navy and Marine Corps. *See* Exhibit B, Declaration of Vice Admiral John V. Fuller ("Fuller Decl.") ¶ 15; Exhibit C, Declaration of Lisa M. Truesdale ("Truesdale Decl.") ¶¶ 20–21; Latta Decl. ¶¶ 10, 69, 90.

USNA's admissions process is governed by federal statute (10 U.S.C. §§ 8453–58), Department of Defense directives (DoDI 1322.22), Department of Navy regulations (SECNAVINST 1531.2D and OPNAVINST 5450.330B), and internal guidance. Latta Decl. ¶ 12. As discussed below, USNA's process differs substantially from those at civilian universities.

### A.     Steps to Apply

Candidates may begin the application process as early as January of the year before they would enter USNA (their junior year for candidates applying directly from high school). Latta Decl. ¶ 19. For the current admissions cycle, new applications will not be accepted after December 31, 2023, and applications must be completed by January 31, 2024. *Id.*

To be admitted to USNA, a candidate must successfully complete five steps, as well as receive a nomination. First, candidates must complete the Preliminary Application, which is used as a screening tool to determine whether a candidate meets the basic statutory eligibility requirements and is likely to meet minimum academic standards. *Id.* ¶¶ 21–23. Students meeting the age eligibility and citizenship requirements may then complete the remaining Application requirements, such as an essay, personal history and family background information, teacher recommendations, transcript, and whether the student is a member of a minority group or comes from a disadvantaged background. *Id.* ¶ 23.

Aside from completing the Preliminary Application and securing a nomination, the

candidate must complete four other steps: a candidate fitness assessment, medical evaluation, interview with a Blue and Gold Officer, and submit college entrance examination scores (absent a testing unavailability exemption).[2]  *Id.* ¶¶ 24–27.  Candidates need not complete these other steps in sequential order, but all must be completed by January 31 of the matriculation year.  *Id.* ¶ 18.

### B.      The Nomination Requirement

Unlike applicants to civilian universities, a USNA candidate must also secure a nomination for the admissions cycle in which they wish to be considered.  *See* 10 U.S.C. § 8454; Latta Decl. ¶ 29.  Nominations are necessary but not sufficient for admission to USNA.  *Id.*

There are two types of nominations:  those from a "statutory nominating authority" (or congressional nominations) and "service-connected" nominations.  10 U.S.C. § 8454; Latta Decl. ¶ 30.  Statutory nominating authorities include Members of Congress, the Vice President, Delegates to Congress from U.S. territories and the District of Columbia, and the Governor and the Resident Commissioner of Puerto Rico.  Latta Decl. ¶ 30.  Service-connected nominations are reserved for children of certain servicemembers; candidates who are already members of the Navy or Marine Corps, or members of ROTC programs; and candidates selected by the Superintendent. *Id.* ¶¶ 43–48.

Nominations from congressional authorities make up more than 80% of USNA's Brigade of Midshipmen.  *Id.* ¶ 31.  If a candidate is admitted (or "appointed") to USNA pursuant to a nomination by a Member of Congress, then they are "charged" to that member.  *Id.*  Each Member of Congress may have five "charges" at USNA at any one time.  *Id.*  When a Member has fewer than five charges at the end of the academic year, the Member is considered to have a "vacancy" for the following admissions cycle.  *Id.*  In a typical year, each Member of Congress will have one

---

[2] USNA can grant an exception to this requirement when standardized testing is unavailable to a candidate.  *Id.* ¶ 18 n.5.  USNA does not consider race or ethnicity in deciding whether to grant an exception.  *Id.*

USNA vacancy. *Id.* For each vacancy, Members can nominate up to ten candidates. *Id.*

Congressional nomination authorities, such as Members of Congress, may nominate their slate of candidates using one of three methods: (i) "competitive," in which the Member submits nominees to USNA without any order of preference, leaving it to USNA to select the best qualified candidate within that slate; (ii) "principal competitive-alternate," in which the Member identifies a principal nominee and a list of unranked alternates; or (iii) "principal numbered-alternate," in which the Member identifies a principal nominee and a ranked list of alternates. *Id.* ¶¶ 34–36.

Because of the nomination requirement, congressional nominating authorities play a large, and often determinative, role in USNA's admissions process. *Id.* ¶ 41. That is because candidates initially compete against other candidates in their nomination pool, rather than against all applicants to USNA. *Id.* USNA has no authority or control over which candidates Members of Congress nominate. *Id.* ¶ 33.

### C.    Selection of Candidates

USNA's process for selecting candidates also differs from the typical process used at civilian universities. Board members evaluate candidates using a numerical score, known as the "Whole Person Multiple" ("WPM"), which is based on candidates' records. Latta Decl. ¶¶ 50–56. WPM scores are based on both objective and subjective factors, such as class rank, GPA, extracurricular activities, athletic and non-athletic achievements, teacher evaluations, leadership, fitness, letters of recommendation, life experiences, ability to overcome adversity or hardship, low socioeconomic status, first-generation status, unique cultural experiences, and employment experience. *Id.* ¶ 53. WPMs generally range from 40,000 to 80,000. *Id.* ¶ 50. Candidates normally need a WPM of at least 58,000 to be considered "qualified" for admission to USNA, and applicants with scores at 70,000 or above are considered highly qualified. *Id.* ¶¶ 51–52. Neither race nor

ethnicity factors into the WPM.  *Id.* ¶¶ 53, 55.

Once an initial computer-generated WPM score is calculated, each candidate file is randomly assigned to a Board member for further review.  *Id.* ¶ 55.  The assigned Board member may seek an upwards or downwards adjustment, by up to 9,000 points, of the candidate's WPM based on factors like high school courses, demonstrated interest in science and mathematics, potential for leadership, and character-building experiences.  *Id.*  When a Board member recommends such an adjustment, they must make the case to the full Board for consideration and approval.  *Id.*  Race or ethnicity is not a factor in a WPM adjustment. *Id.*

Among the qualified candidates, USNA selects the vast majority of its incoming class based on the WPM, within the category of nomination obtained by the candidate.  *See id.* ¶¶ 57–58.  For example, when a slate of candidates is nominated by a Member of Congress under the "competitive method," USNA will generally offer an appointment to the fully qualified nominee from that Member's slate with the highest WPM.  *Id.* ¶ 58.

When a Member nominates candidates using the "principal competitive-alternate" or "principal numbered-alternate" methods, USNA must consider the order specified by the Member.  *Id.* ¶¶ 35–36, 60.  If the principal nominee is determined to be qualified, USNA must first offer an appointment to that candidate.  *Id.* ¶¶ 35–36.  Under the "numbered-alternate" method, if the principal nominee is determined *not* to be qualified or declines admission, USNA must offer admission to the fully qualified candidate who ranks *next* highest on the Member's list, even if that candidate has a *lower* WPM than others on the Member's list.  *Id.* ¶¶ 35, 60.  Where the principal nominee is either deemed unqualified or declines admission under the "competitive-alternate" method, USNA usually offers admission to the fully qualified candidate on the Member's list with the next highest WPM.  *Id.* ¶ 58.

In limited circumstances where the highest WPM scores are very close, qualified candidates with slightly lower WPMs are occasionally—but rarely—selected over candidates with slightly higher WPMs under the "competitive" method and the "principal competitive-alternate" method (when the principal candidate is determined not to be qualified or declines admission).  *Id.*  These decisions are made based on the strength of the candidates' entire record with the key considerations being the candidates' progression through academic subjects, leadership experiences, life experiences, and teacher recommendations.  *Id.*  As discussed below, race or ethnicity (across all minority groups) could potentially be one of many nondeterminative factors for these rare decisions.[3]

If a qualified candidate is not appointed to the vacancy for which he or she was nominated, that candidate may still be offered an appointment under two other statutory provisions.  First, USNA may appoint up to 150 "qualified alternates":  qualified candidates who received a statutory nomination but did not win the vacancy.  10 U.S.C. § 8454(b)(5).  USNA appoints these candidates solely based on WPM, which does not consider race or ethnicity.  Latta Decl. ¶¶ 53, 55, 62(a).  Second, if USNA has filled each nomination vacancy, admitted 150 qualified alternates, and still has not filled its class, it may offer appointment to other remaining qualified nominees, known as "additional appointees," so long as at least three-fourths are selected from the qualified alternate pool.  *Id.* ¶ 62(b).  For the Classes of 2026 and 2027, respectively, 310 candidates (59% of whom were nonminority candidates) and 255 candidates (62% of whom were nonminority candidates) were provided offers of appointment as additional appointees.  *Id.*  As explained below, USNA may consider race and ethnicity (across all minority groups) as a nondeterminative factor in a

---

[3] USNA uses the same process for candidates with certain non-congressional nominations, such as service-connected nominations, meaning USNA selects candidates on the strength of their applications, which typically correlates with WPM order except in the very limited circumstances described above.  *Id.* ¶ 59.

holistic assessment in extending offers to additional appointees.

D.     **USNA's Limited Consideration of Race and Ethnicity**

At four limited parts of the admissions process, USNA may consider race or ethnicity (across all minority groups) as one of many nondeterminative factors (including, *e.g.*, leadership, adversity, life experiences, socioeconomic status, academic progression, recommendations, and many others) in an individualized, holistic assessment of candidates.

First, the Board may extend a letter of assurance ("LOA") to an outstanding qualified candidate following an individualized review of the candidate's record. Latta Decl. ¶¶ 63–64, 66. Candidates that receive LOAs typically have WPM scores above 70,000, but those with a WPM below that number can still receive an LOA if they are qualified and their record is particularly compelling. *Id.* ¶ 67. An LOA is a conditional offer of admission—the candidate must still pass physical fitness standards, become medically qualified, receive a nomination, and complete any remaining requirements for admission. *Id.* ¶ 64.[4] Race or ethnicity (across all minority groups) could be one of the many nondeterminative factors that inform the decision to extend a qualified candidate an LOA, particularly for candidates with WPMs below 70,000. *Id.* ¶ 73. That said, any qualified candidates with WPMs under 70,000 may also receive LOAs, regardless of race. *Id.* No unqualified candidate (typically with a WPM of under 58,000) may receive an LOA. *Id.*

Second, for nominations using the "competitive" method, the "principal competitive-alternate" method (when the principal candidate is deemed unqualified or declines an offer of appointment), and service-connected nominations, candidates are ranked in their respective slate in WPM order and the candidate with the highest score is typically selected. *Id.* ¶ 77. In limited circumstances—where the highest WPM scores are very close—the qualified candidate with a

---

[4] If a candidate satisfies these conditions but is not selected to fill a congressional vacancy, non-congressional vacancy, or qualified alternate slot, they will receive an appointment as an additional appointee. *Id.* ¶ 75(a).

slightly lower WPM may be selected over the qualified candidate with the slightly higher WPM after an in-depth review of their entire records. *Id.* The key considerations in making this decision include class rank, grades, academic progression, leadership, life experiences, and teachers' recommendations. *Id.* ¶ 58. Race or ethnicity may also be one of many nondeterminative factors that inform this decision, but these selections are based on the strength of the candidate's overall record, and they may not occur *because of* race or ethnicity. *Id.* Nonminority candidates with slightly lower WPMs could also be, and have been, selected over minority candidates with slightly higher WPMs on the basis of a stronger overall record. *Id.* ¶ 77.

Third, race or ethnicity theoretically could be one of many nondeterminative factors considered in extending Superintendent nominations, although it has not played a factor in a Superintendent nomination since at least 2009. *See id.* ¶ 76. On the rare occasions in which Superintendent nominations are used, they are most often for top, highly sought-after athletes. *Id.* They have occasionally been used for other candidates that are highly qualified and motivated to attend USNA, and to compete for candidates applying to other service academies. *Id.* Although the Superintendent may nominate up to 50 candidates in any given year, the Superintendent only provided 14 nominations for the Class of 2027 (12 of which were for athletes) and 11 nominations for the Class of 2026 (8 of which were for athletes). *Id.* ¶ 48. The remaining few Superintendent nominations for those years were used to incentivize candidates considering other service academies. *Id.*

Fourth, at the end of the admissions cycle, if USNA has not reached its class size, USNA may consider race and ethnicity in extending offers to additional appointees. *Id.* ¶¶ 62(b), 75. USNA may consider race and ethnicity as one of many nondeterminative factors in its holistic assessment of candidates to identify those who are expected to make valuable contributions to the

Brigade of Midshipmen, but an additional appointee may not be selected *because of* race or ethnicity. *Id.* ¶ 75.  USNA selected 255 additional appointees for the Class of 2027 (62% of whom were White) and 310 for the Class of 2026 (59% of whom were White).  *Id.* ¶ 62(b).

USNA uses race in admissions in this limited fashion only to further the military's distinct operational interest in developing a diverse officer corps that enables the military to meet its critical national security mission, by enhancing cohesion and readiness, assisting recruitment and retention, and ensuring domestic and international legitimacy.  *Id.* ¶¶ 80–90; Fuller Decl. ¶¶ 9–15; Truesdale Decl. ¶¶ 6–23; Exhibit D, Declaration of Ashish S. Vazirani ("Vazirani Decl.") ¶¶ 8–30. It does not consider race and ethnicity solely in the interest of educational diversity or based on a stereotypical belief that minority students express a characteristic minority viewpoint on an issue. Latta Decl. ¶ 79.  Nor does USNA's aim to represent the nation impose ceilings or floors.  *Id.* USNA also reviews its admissions process, including the limited consideration of race and ethnicity, on an annual basis and has conducted substantive legal reviews at least four times in the past twenty years.  *Id.* ¶ 80.

## **LEGAL STANDARDS**

### I.    **Preliminary Injunction Standard**

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "to be granted only sparingly and in limited circumstances," *Microstrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001). To demonstrate entitlement to this "extraordinary remed[y]," the movant must make a "clear showing" that "(1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest."  *Winter*, 555 U.S. at 20; *League of Women Voters of N.C. v. North*

*Carolina*, 769 F.3d 224, 236 (4th Cir. 2014).  Moreover, where, as here, a movant seeks to "alter the status quo" by virtue of a "mandatory injunction[]," *League of Women Voters*, 769 F.3d at 236, "the movant [must] satisfy an *even heavier* burden of showing that the four factors listed above *weigh heavily and compellingly* in movant's favor before such an injunction," *Tiffany v. Forbes Custom Boats, Inc.*, 959 F.2d 232 (4th Cir. 1992) (Table) (emphases added).  In that case, the movant must make "a strong showing of irreparable injury," *id.* at 232, such that its "right to relief [is] indisputably clear," because mandatory preliminary injunctive relief in any circumstance "is disfavored," *League of Women Voters*, 769 F.3d at 235.

Plaintiff fails to acknowledge this heightened standard, even though its request for a preliminary injunction bears the hallmark of a mandatory injunction: seeking to alter the status quo.  *See* Dkt. No. 9-1 ("Pl. Br.") at 19.  To ascertain the status quo, the Court must identify "the last uncontested status between the parties which preceded the controversy." *League of Women Voters*, 769 F.3d at 236.  In *Cooke v. Lancelotta*, the court concluded that plaintiffs' request to remove a defendant from control of the companies at issue would alter the status quo and thus constitute a mandatory preliminary injunction because the defendant "clearly *contest[ed]* the validity of Plaintiffs' attempt to . . . expel him from control over the companies" and the status quo "had [the defendant] in control of the companies."  2022 WL 622229, at *4 (D. Md. Mar. 3, 2022) (emphasis in original).  The court declined to impose such an injunction as it was "far from 'indisputably clear'" that plaintiffs would succeed on the merits, and plaintiffs had failed to show that "imminent, irreparable harm [would] accrue absent an injunction."  *Id.* at *4–5.  Plaintiff's requested injunction here undoubtedly would alter the status quo, and the Court should reject any suggestion that the status quo is the admissions regime that existed decades before USNA began considering race in admissions.

## II.        Standard Applied to Admissions Policies that Consider Race

Governmental classifications based on race must satisfy "strict scrutiny." *SFFA*, 600 U.S. at 206–07.  To determine whether an action satisfies strict scrutiny, the Court must first consider whether consideration of race would "further compelling governmental interests." *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003).  It must then determine whether the government's use of race is "narrowly tailored"—meaning "necessary"—to achieve that interest." *SFFA*, 600 U.S. at 207 (quoting *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311–12 (2013) ("*Fisher I*")).  The Supreme Court has recognized that civilian universities may have a compelling interest in "obtaining the educational benefits that flow from an ethnically diverse student body." *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 306 (1978) (Powell, J.); *see also Fisher v. Univ. of Tex. at Austin*, 579 U.S. 365 (2016) ("*Fisher II*"); *Fisher I*, 570 U.S. at 310; *Grutter*, 539 U.S. at 325.  Recently, in *SFFA*, the Supreme Court concluded on a full trial record that the admissions programs of Harvard College and the University of North Carolina failed to satisfy strict scrutiny.  600 U.S. at 230.  But it left open the possibility that other admissions programs *could* satisfy strict scrutiny if they are designed to achieve one or more compelling interests that can be "subjected to meaningful judicial review" and are narrowly tailored to achieve those interests. *Id.* at 214. Moreover, of particular importance here, *SFFA* explicitly declined to "address[] the propriety of race-based admissions systems" in the context of the military academies given the "potentially distinct interests that [they] may present." *Id.* at 213 n.4.

## III.        Deference to the Executive in Matters of National Security

"[U]nless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988).  "The President, after all, is the 'Commander in

Chief of the Army and Navy of the United States.'" *Id.* at 527; *see also Austin v. U. S. Navy Seals 1-26*, 142 S. Ct. 1301, 1302 (2022) (Kavanaugh, J., concurring). The "complex[,] subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments," and it is "difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973); *see also Boumediene v. Bush*, 553 U.S. 723, 797 (2008) ("[N]either the Members of this Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people").

While "mindful that 'military interests do not always trump other considerations,'" courts "'give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.'" *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020). Thus, the Supreme Court has repeatedly deferred to the professional judgment of military authorities on military interests—even when challenged on constitutional grounds. *See, e.g.*, *Austin*, 142 S. Ct. at 1301 (partially staying order precluding the Navy from considering vaccination status in making "deployment, assignment, and other operational decisions"); *id.* at 1302 (Kavanaugh, J., concurring) (expressing concern over "judicial intrusion into military affairs . . . because the Navy has an extraordinarily compelling interest in maintaining strategic and operational control over the assignment and deployment [of] personnel"); *Winter*, 555 U.S. at 24 (reversing preliminary injunction prohibiting the Navy from conducting sonar exercises, and deferring to "declarations from some of the Navy's most senior officers, all of whom underscored the threat posed by enemy submarines and the need for extensive sonar training to counter this threat"); *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986) ("Our review of [a constitutional challenge to] military regulations . . . is far more deferential than constitutional review of similar

laws or regulations designed for civilian society."); *Rostker v. Goldberg*, 453 U.S. 57, 64–68 (1981) (judgments concerning registration and the draft "are based on judgments concerning military operations and needs" and "unquestionably due" deference).[5]

## ARGUMENT

## I.    Plaintiff Has Not Met Its Burden to Establish Standing

Plaintiff's burden to establish standing increases "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Where, as here, Plaintiff is seeking a preliminary injunction, its "burden to demonstrate standing 'will normally be no less than that required on a motion for summary judgment.'" *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011). Plaintiff seeks to establish associational standing on behalf of its members, which requires, among other things, "that it identify *by name* at least one member with standing." *Do No Harm v. Pfizer Inc.*, 646 F. Supp. 3d 490, 502 (S.D.N.Y. 2022) (emphasis added) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009) (holding that the "requirement of naming the affected members has never been dispensed with" except where "all the members of the organization are affected by the challenged activity"), and *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 235 (1990) (finding association lacked standing because an affidavit referencing but not naming "one or two" individuals with

---

[5] *See also Gilligan*, 413 U.S.at 4, 10; *Egan*, 484 U.S. at 530; *Chappell v. Wallace*, 462 U.S. 296, 301-02–302 (1983); *Haig v. Agee*, 453 U.S. 280, 291-94–294 (1981); *Schlesinger v. Councilman*, 420 U.S. 738, 757-58–758 (1975); *United States v. Nixon*, 418 U.S. 683, 710 (1974); *Orloff v. Willoughby*, 345 U.S. 83, 93–94 (1953); *Burns v. Wilson*, 346 U.S. 137, 142, 144 (1953); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 645 (1952) (Jackson, J., concurring) (the Court "should indulge the widest latitude" to sustain the President's "function to command the instruments of national force"); *Wimmer v. Lehman*, 705 F.2d 1402, 1403 (4th Cir. 1983) (upholding USNA's midshipmen removal process and deferring to Navy's interpretation of statutes guiding it); *Doolen v. Wormuth*, 5 F.4th 125, 133 (2d Cir. 2021) (similar); *Berry v. Bean*, 796 F.2d 713, 716 (4th Cir. 1983) ("[C]ourts accord decisions of military authorities great deference."); *Selland v. Perry*, 905 F. Supp. 260, 266 (D. Md. 1995), *aff'd*, 100 F.3d 950 (4th Cir. 1996) ("Deference towards Congressional and Presidential judgment in the military context . . . counsels that courts should proceed with caution even in an equal protection claim.").

standing "fail[ed] to identify the individuals.")), *appeal docketed*, No. 23-15 (2d Cir.).[6] "The weight of authority in federal courts [holds] that at least one member must be named for associational standing." *Do No Harm*, 646 F. Supp. 3d at 502–503 (collecting cases). Two district courts have recently dismissed complaints for lack of standing where the plaintiff, represented by the same counsel as Plaintiff in this case, submitted anonymous member declarations. *Id.* at 504; *Speech First, Inc. v. Shrum*, 2023 WL 2905577, at *3 (W.D. Okla. Apr. 10, 2023), *appeal docketed*, No. 23-6054 (10th Cir. Apr. 11, 2023).

The requirement that a Plaintiff "identify members by name" serves several "important purposes." *Do No Harm*, 646 F. Supp. 3d at 503. It "assure[s] that 'there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party,'" and that the plaintiff has "'such a personal stake in the outcome of the controversy' as to warrant . . . invocation of federal-court jurisdiction." *Id.* (quoting *Summers*, 555 U.S. at 493). And "absent identified members, courts would face 'the difficulty of verifying the facts' upon which standing depends." *Id.* (quoting *Summers*, 555 U.S. at 493).

In support of its standing, Plaintiff submitted only anonymous declarations from Member A and Member B. *Id.* at 497; Dkt. Nos. 9-3, 9-4. Accordingly, the Court has no way to know whether, and if so how, race and ethnicity would play a role in USNA's consideration of those Members' applications. As explained above, USNA's limited consideration of race and ethnicity does not affect most USNA appointments. There is a substantial likelihood, therefore, that Members A and B could fall into those categories in which the consideration of race plays no role. Because Plaintiff—who bears the burden of proof—has submitted only anonymous member

---

[6] Plaintiff does not and cannot allege that all SFFA's members, "more than 20,000 students, parents, and others," Dkt. No. 9-5, are "affected by the challenged activity," *Summers*, 555 U.S. 488, 498–99 (2009). As such, Plaintiff is required to identify at least one member by name.

declarations, the Court cannot determine whether "there is a real need to exercise the power of judicial review in order to protect" Members A and B's interests or whether they have a "personal stake in the outcome of th[is] controversy." *Summers*, 555 U.S. at 499.

## II.   Plaintiff Fails to Demonstrate Irreparable Harm

Plaintiff also has not made any showing—let alone a "strong showing"—that either Member A or Member B would suffer irreparable harm absent a preliminary injunction and before a final judgment on the merits. *Tiffany*, 959 F.2d at 232.  As the Fourth Circuit has recognized, "irreparable harm is critical." *Id.*; *Henderson for Nat'l Lab. Rels. Bd. v. Bluefield Hosp. Co.*, 902 F.3d 432, 439 (4th Cir. 2018).  Irreparable harm is harm that "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019).  And "[i]n the context of 'military personnel decisions . . . courts have held that the showing of irreparable harm must be *especially strong* before an injunction is warranted, given the national security interests weighing against judicial intervention in military affairs.'" *Church v. Biden*, 2021 WL 5179215, at *17 (D.D.C. Nov. 8, 2021) (emphasis in original).

In assessing irreparable harm, courts also consider "whether the moving party exhibited 'reasonable diligence' in seeking an injunction." *Roswell v. Mayor & City Council of Baltimore*, --- F. Supp. 3d ---, 2023 WL 3158728, at *5 (D. Md. Apr. 28, 2023) (Bennett, J.) (denying preliminary injunction alleging First Amendment violation where plaintiff delayed over one year). "Since an application for preliminary injunction is based upon an urgent need for the protection of [a] Plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required." *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 78, 80 (4th Cir. 1989) (nine-month delay justified denying motion); *see Potomac Heritage Trail Ass'n v. U.S. Dep't of Trans.*, 2022 WL 7051160, at *19 (D. Md. Oct. 11, 2022) ("months-long delay in seeking judicial intervention"

"reduces the weight the Court might afford to their claim of irreparable harm"); *Rullan v. Goden*, 2023 WL 3093406, at * 2 (D. Md. Apr. 26, 2023) (observing that courts have denied preliminary injunctions for delays as short as 36 to 95 days).  Plaintiff cannot meet its burden of showing that irreparable harm is likely before final resolution of the merits.

First, although Plaintiff argues that a presumption of irreparable injury flows from a violation of constitutional rights, any such *presumption* is easily overcome for the reasons that follow.[7]  In addition, Plaintiff's reliance on *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987), is misplaced.  That panel, faced with deciding whether the district court improperly granted a motion to dismiss rather than a motion for preliminary injunction, expressed "no views as to the extent of injunctive relief to which the plaintiff may be entitled if she proves her case" and made clear that "the denial of a constitutional right, if denial is established, constitutes irreparable harm *for purposes of equitable jurisdiction*." *Id.* at 1135 (emphasis added).[8]

Second, Plaintiff may argue that it is enough that Members A and B are "ready and able" to reapply to USNA but allegedly cannot compete on equal footing due to their race.  *See* Dkt. No. 9-3 ¶ 4; Dkt. No. 9-4 ¶ 4; Pl. Br. at 18.  Not so.  Even assuming such unsupported, conclusory

---

[7] Plaintiff's reliance on the out-of-circuit case *Agudath Israel of America v. Cuomo*, 983 F.3d 620 (2d Cir. 2020), for the proposition that "[a]n Equal Protection Clause violation . . . is therefore an irreparable injury," Pl. Br. at 18, is misplaced, as that quote does not come from *Agudath*, which does not involve equal protection violations.  *Agudath* involved a First Amendment challenge and relied on the Supreme Court's decision in *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  But *Elrod* did not hold that a First Amendment violation standing alone was sufficient to establish irreparable harm; rather, it concluded that a preliminary injunction was appropriate when it was "clear . . . that First Amendment interests were either *threatened or in fact being impaired* at the time relief was sought." *Id.* at 373 (emphasis added).  This District has followed this approach.  *See Nat'l Urban League v. DeJoy*, 2020 WL 6363959, at *8 (D. Md. Oct. 29, 2020) (noting that party moving for a preliminary injunction alleging constitutional violation "must show the *present* threat of irreparable harm") (emphasis in original) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991)).

[8] If Plaintiff claims irreparable harm in a refusal by Members A and B to reapply to USNA in the absence of a preliminary injunction, any such harm would be self-inflicted.  "A preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted." *Moore v. Williamsburg Reg. Hosp.*, 2006 WL 8438614, at *4 (D.S.C. Aug, 21, 2006); *see also Howe v. Burwell*, 2015 WL 4479757, at *6 (D. Vt. July 21, 2015) ("[A] party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted.") (quoting 11A Charles A. Wright, Fed. Prac. & Proc. § 2948.1 (3d ed, 1998)); *cf. Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 418 (2013) (reaffirming that "self-inflicted injuries" cannot support standing).

statements are sufficient to establish standing to challenge USNA's admissions policies, "the concepts of an Article III cognizable injury and an irreparable harm are not coterminous." *Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 40 (D.D.C. 2020); *Cal. Ass'n of Priv. Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) ("A prospective injury that is sufficient to establish standing . . . does not necessarily satisfy the more demanding burden of demonstrating irreparable injury."). To meet that more demanding burden, Plaintiff must provide evidence—beyond the fact that they simply will forgo reapplying to USNA—that Members A and B will be irreparably harmed before final judgment. That they have failed to do.[9]

Third, Plaintiff's substantial delay in filing this action and seeking emergency relief for the 2023-24 admissions cycle fatally undermines its claim of irreparable harm. USNA has considered race and ethnicity since at least the 1980s and has been transparent and public in doing so. *See* Latta Decl. ¶¶ 71, 86. Moreover, there can be no doubt that Plaintiff itself has specifically been aware of USNA's consideration of race and ethnicity for at least over a year.[10] Indeed, in August 2022, the United States submitted an amicus brief in support of respondents in *SFFA* explaining the United States' "vital interest in ensuring that the Nation's service academies . . . retain the ability to achieve [certain] benefits by considering race in the limited manner authorized by *Bakke*,

---

[9] Plaintiff claims that unless Members A and B obtain a preliminary injunction, "they will entirely miss the chance to apply on an equal footing to the Academy," relying on *Coalition to Defend Affirmative Action v. Granholm*, 473 F.3d 237 (6th Cir. 2006). Pl. Br. at 18. *Granholm* does not support this proposition, and it undermines Plaintiff's claimed irreparable harm. In *Granholm*, supporters of affirmative action sought a declaratory judgment that a state constitutional amendment prohibiting racial preferences in higher educational institutions was unconstitutional. After concluding that plaintiffs were unlikely to prevail on the merits, the Sixth Circuit held that "[t]he irreparable-injury factors do not meaningfully favor one set of parties over the other." *Id.* at 252. The Sixth Circuit explained that "[t]o respect university applicants who favor preferences this year is necessarily to slight those who oppose them—putting both equally at risk of disappointment when admissions decisions are made this year." *Id.* The Sixth Circuit's rejection of a preliminary injunction despite the recognition that some students would have the perception that they were not competing on an equal footing undermines Plaintiff's claimed irreparable harm.

[10] Notably, Plaintiff's complaint and brief cite to decades' old public documents discussing USNA's consideration of race and ethnicity in its admissions process, dispelling any suggestion that Plaintiff only recently learned of this issue. *See* Pl. Br. at 2–4.

*Grutter*, and *Fisher*." *SFFA v. Harvard*, No. 20-1199 (U.S.), Dkt. No. 120, Br. for the United States as Amicus Curiae Supporting Resp't, at 12. That same month, Plaintiff filed its reply brief in *SFFA*, expressly challenging the importance of the service academies' consideration of race. *Id.*, Dkt. No. 159, Reply Br. for Pet'r, at 12. Plaintiff fails to provide any justification for why it waited for more than a year—until October 2023—to seek "emergency" relief against USNA for the current admissions cycle.

Furthermore, Plaintiff's barebones declarations suggest that Member A applied to USNA by January 2022 and likely was rejected by April 2022, Dkt. No. 9-3 ¶ 3 (application for class of 2026); and that Member B applied to USNA by January 2023 and likely was rejected by April 2023, Dkt. No. 9-4 ¶ 3 (application for class of 2027); Latta Decl. ¶ 20 (explaining that "[m]ost candidates are notified of final admissions decisions by April 15 of the year the candidate would enter USNA"). Even measuring the delay from Member B's rejection letter, Plaintiff fails to justify the six-month delay in seeking emergency injunctive relief.[11]

Finally, any threatened harm would not impair the Court's ability to grant an effective remedy to Members A and B if Plaintiff were to succeed on its claim at the end of trial, and thus there is no need for preliminary relief. *Mountain Valley Pipeline*, 915 F.3d at 216. Member A and B's claimed harm is the missed opportunity "to apply on equal footing to the Academy," and the concern that they are only eligible to reapply until they turn twenty-three years old. Pl. Br. at

---

[11] If Plaintiff claims that it was waiting for the present admissions cycle to begin before filing suit against USNA and seeking a preliminary injunction based on harm to Members A and B, such an argument lacks merit. The applications process for the current admissions cycle began in January 2023—over ten months ago, *see* Latta Decl. ¶ 19—and Plaintiff fails to explain why it did not seek injunctive relief at that time. Any claim that Plaintiff was waiting for the Supreme Court to decide *SFFA* before initiating this challenge similarly lacks merit. Any strategic reasons Plaintiff may have had for waiting for the *SFFA* decision cannot excuse the delay in seeking emergency preliminary relief. *See, e.g.*, *Lewis v. Becerra*, 2022 WL 123909, at *9 (D.D.C. Jan. 13, 2022) (holding that "although the plaintiffs may have had valid strategic reasons for not requesting a preliminary injunction earlier," including the "development of case law to better support a motion for a preliminary injunction," such delay undermines a claim of irreparable harm). And in any event, Plaintiff waited nearly four months after the Supreme Court's decision in *SFFA* to act here. This period of unexplained delay alone weighs in favor of denying Plaintiff's motion requesting emergency relief.

18.  But given that Plaintiff has put forward no evidence that Members A and B are close to turning 23, *see* Dkt. No. 9-3 ¶ 4, Dkt. No. 9-4 ¶ 4, it is all but guaranteed that, under either an expedited or typical litigation schedule, a trial could be completed, and all appeals concluded, with ample time for them to apply and compete for appointment to USNA in several future admissions cycles.

### III.     Plaintiff Cannot Demonstrate a Clear Likelihood of Success on the Merits

The extensive evidentiary record fatally undermines Plaintiff's assertions that USNA has no compelling interest in considering race and ethnicity in admissions or that USNA's alleged justifications are "devoid of evidentiary support."  Pl. Br. at 8.  As discussed in detail below, the military's interest in a diverse officer corps is amply supported by research, the history of race relations in the military, and actual combat experience.  Fundamentally, the military has concluded that a diverse officer corps is critical to the military's ability to defend our nation—a judgment to which courts defer—and USNA's admissions policies are narrowly tailored to achieve that goal.

### A. The United States Military Has a Compelling National Security Interest in a Diverse Officer Corps

Our nation's security relies on its exceptional fighting force.  *See* Vazirani Decl. ¶ 8; Truesdale Decl. ¶ 6.  The United States cannot afford to lose its posture as the preeminent fighting force in the world with the continued increase and evolution of international threats.  *See* Vazirani Decl. ¶ 8.  For decades, senior military leaders have concluded that the fighting force is stronger when it is racially and otherwise diverse at all levels.  *See* Exhibit E, Declaration of Jeannette Haynie, PhD ("Haynie Decl.") ¶¶ 17–28; Vazirani Decl. ¶¶ 9, 12; Fuller Decl. ¶¶ 9–16; Truesdale ¶¶ 6–7; Exhibit G, Declaration of Beth Bailey, PhD ("Bailey Decl.") ¶¶ 8, 10; *see generally* Military Leadership Diversity Comm'n ("MLDC"), *From Representation to Inclusion: Diversity Leadership for the 21st-Century Military* (March 2011) ("MLDC Report"), https://perma.cc/QVW8-YZKP.  As Secretary of Defense Lloyd Austin recently testified before

Congress, "[b]uilding a talented workforce that reflects our nation . . . is a national security imperative" that "improves our ability to compete, deter, and win in today's increasingly complex global security environment." Exhibit I, FY 2023 Defense Budget Request: Hearing Before the House Armed Services Comm., 117th Cong., 2d Sess. 9 (2022).

In particular, the United States Armed Forces have long recognized that the nation's military strength and readiness depend on a pipeline of officers who are both highly qualified and racially and ethnically diverse, and who have been educated in environments that prepare them to lead increasingly diverse forces.  *See* Haynie Decl. ¶¶ 9–33; Vazirani Decl. ¶¶ 11–16; Fuller Decl. ¶¶ 9–16; Truesdale Decl. ¶¶ 18–23; Bailey Decl. ¶ 10.[12]

### 1.  Racial Tension in the Military and Lack of Diversity in the Senior Ranks

The Armed Forces learned this lesson the hard way.  The history of racial tension described below directly informed the military's judgment about the critical need for diversity in the Armed Forces generally and in the officer corps more specifically.   The historical record contradicts Plaintiff's assertion that racial animosities were "anecdotal," "brief," and "negligible."  *See* Dkt. No. 1 ¶¶ 48–49.  Rather, the military, including the Navy and Marine Corps, has faced internal racial strife that has risked mission readiness since its inception.  *See* Sherwood Decl. ¶¶ 7, 9, 11, 21; Exhibit H, Declaration of Jason Lyall, PhD ("Lyall Decl.") ¶ 55.

While racial minorities have served in the Armed Forces since the Revolutionary War, the military was racially segregated until the mid-20th century.  Bailey Decl. ¶ 17; Sherwood Decl. ¶¶ 12–17, 30–31.  Furthermore, from the Revolutionary War through World War II, the Navy frequently limited the number of Black Americans able to enlist, particularly during peacetime,

---

[12] If Plaintiff contends that *SFFA* overruled the government's national-security objections about the effect of invalidating civilian university admissions programs on ROTC, such that *SFFA* also overruled the government's national security interests in connection with the service academies, such a contention lacks merit.  The Supreme Court expressly declined to address the issue, recognizing that the interests might be "distinct."  600 U.S. at 213 n.4.

and the Marine Corps largely banned Black Americans altogether.  Sherwood Decl. ¶¶ 12–17.

Those that did serve were relegated to segregated units and Black sailors were often assigned to

menial positions such as cooks, stewards, and coal heavers, and worked at lower wages than White

sailors.  *See id.* ¶¶ 13–22; *see also* Exhibit K, Cong. Rsch. Serv., *Diversity, Inclusion, and Equal

*Opportunity in the Armed Services: Background and Issues for Congress* (June 5, 2019) ("CRS

Report"), at 13.  As a committee tasked by Secretary of the Navy Frank Knox put it in the early

1940s, this treatment "was consistent with discriminatory practices against [Blacks] and citizens

of Asian descent throughout the United States."  Sherwood Decl. ¶ 19.

This separate and unequal environment coincided with simmering racial tension.  During

the "Red Summer" of 1919, White sailors were involved in racially motivated attacks against local

Black community members in Charleston, SC; Washington, DC; and Chicago, IL.  *Id.* ¶ 18, 71.

These tensions boiled over in 1944 when Black sailors protested or rioted in response to their

oppressive conditions at Port Chicago, Mare Island, and Port Hueneme in California and Guam.

*Id.* ¶¶ 26–28, 38–41.  At that time, Black Americans were about 5% of the Navy's enlisted force

and just 0.02% of the sailors that received an officer's or warrant officer's commission.  *See id.* ¶

22.  In fact, the first Black officer was not commissioned until 1943 when the Navy mistook him

for being White, *id.*, and 62% of Black sailors still served as stewards as of 1948, *id.* ¶ 31.  The

other services experienced similar racial tensions and resulting disruption. *See* Bailey Decl. ¶ 26.

In 1948, President Truman directed the desegregation of the Armed Forces and established

the Fahy Committee to evaluate the impact of integration on military efficiency.  *See* Exec. Order

No. 9981, 13 Fed. Reg. 4313 (July 26, 1948).  The Fahy Committee ultimately concluded that "a

policy of equality of treatment and opportunity will make for a better Army, Navy, and Air Force"

and "will strengthen the nation."  President's Comm. on Equal. of Treatment & Opportunity in the

Armed Serv., *Freedom to Serve: Equality of Treatment and Opportunity in the Armed Services*, United States GPO, Washington, D.C. (1950), at 68.

The Korean War accelerated integration efforts due to the need to rapidly build and deploy armed forces, but the military still deeply resisted integration.  CRS Report at 14.  Black personnel constituted only 3.4% of the Navy at the start of the Korean War, rose to 9.5% during the war, and then fell to 5.1% by 1962.  Sherwood Decl. ¶ 32.  The numbers were even worse in the Navy's officer corps where only 0.2% of Navy officers were Black in 1962.  *Id.*

As discussed in a later report issued by a commission of senior military leaders, President Kennedy convened the Gessell Committee in 1962 to examine the military's continued racial disparities.  The Gessell Committee recommended that the Secretary of Defense pursue "greater institutionalization of the military's commitment to equality of treatment and opportunity."  MLDC Report at 5.  But Secretary of Defense Robert McNamara instead issued only a general policy directive ordering the Department of Defense ("DoD") to "conduct all of its activities in a manner which is free from racial discrimination."  DoD, Equal Opportunity in the Armed Forces, DoDD 5120.36 (July 1963).  As the MLDC concluded, "DoD's failure to implement the Gessell Committee's recommendation had high costs," as inequities persisted, "particularly in the leadership ranks."  MLDC Report at 6.

The United States' accelerating involvement in the Vietnam War around that time contributed to an eruption of racial violence in the Marine Corps.  During the Vietnam War, the Marines expanded their typical recruiting practices to fill their ranks, leading to a large influx of enlistees, including more Black Americans.  Sherwood Decl. ¶ 38.  Black Marines experienced a toxic environment in which certain units were still de facto segregated.  *Id.*  By the late 1960s, racial violence occurred both in Vietnam (the Army Stockade and the III Marine Amphibious

Force Brig) and in the United States (Fort Dix, Fort Hood, Fort Bragg, and Camp Lejeune, to name a few). *Id.* At Camp Lejeune alone, there were 160 assaults, muggings, and robberies described as having racial overtones in the first eight months of 1969. *Id.*

The Navy also experienced significant racial tensions. For example, in October 1969, a riot nearly broke out near Subic Bay in the Philippines when Black and White sailors from the destroyer *Collette* were on shore leave. *Id.* ¶ 40; *see also* Bailey Decl. ¶ 48. In 1972, Black sailors aboard the aircraft carrier *Constellation* staged a sit-in to protest the unfair treatment they faced due to their race. Sherwood Decl. ¶ 45. That same year, race riots occurred in the aircraft carrier *Kitty Hawk* and the fleet replenishment oiler *Hassayampa*. *Id.* ¶¶ 44–45. Over the next several years, the situation worsened as racial unrest spread to hundreds of ships and shore installations. *Id.* ¶ 47. From May 1 to June 30, 1974 alone, the Atlantic Fleet reported 57 racial incidents. *Id.*

Major incidents also occurred on the landing ship dock *Trenton*, Naval Station Midway Island, the aircraft carrier *Ticonderoga*, the aircraft carrier *Intrepid*, the landing platform helicopter *Inchon*, and at Kaohsiung Fleet Landing. *Id.* A subsequent investigation by the 2nd Marine Regiment Commanding Officer concluded that the common theme between these incidents was the dearth of Black Americans in the Navy's chain of command, among other contributing factors related to racial discrimination. *Id.* (characterizing the issue as "a breakdown in our traditional leadership . . . in the area of interpersonal relations" as some officers "don't know their job, do not know their people, and do not know themselves"). While many of the new sailors enlisting in the Navy were Black Americans, nearly all newly commissioned officers at that time were White. *Id.* ¶¶ 43–44. And a 1976 climate assessment into the Navy's equal opportunity programs reflected the same sentiment. It found that Black sailors were "the least likely to agree that military justice was equally administered to all individuals in their command" and "had less faith in the chain of

25

command as an effective means of resolving [equal opportunity] problems." *Id.* ¶ 48.

USNA's Brigade of Midshipmen mirrored this problem. Rather than having the opportunity to serve as midshipmen, Black Americans were confined to positions as mess attendants and fulfilled domestic duties for midshipmen for much of the 19th century. *Id.* ¶ 54. *See* Bailey Decl. ¶ 33. The first Black midshipman graduated from USNA in 1949, but then fewer than three dozen Black midshipmen graduated between 1949 to 1968. Sherwood ¶¶ 55–60 (synthesizing history of mistreatment of Black midshipmen at USNA).

### 2. The Military's Judgment That a Diverse Officer Corps Is Vital to National Security

This decades-long crisis left senior military leaders convinced that the level and extent of racial violence fundamentally threatened the military's ability to fulfill its national defense mission. Sherwood Decl. ¶¶ 41–44, 49; Vazirani Decl. ¶ 14. "It is obvious and unarguable that no government interest is more compelling than the security of the Nation." *Haig*, 453 U.S. at 307. Courts have repeatedly recognized that the government's interest in preserving national security is "an urgent objective of the highest order." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010); *see supra* at 13-15 & n.5 (collecting cases). The threat to the military's fundamental mission posed by racially segregated forces was so grave that, even in the middle of an all-consuming war in Vietnam, the Navy ordered extensive reforms, including requiring a commanding officer to "appoint an aware minority group officer or senior petty officer as his special assistant for minority affairs," ensuring that the "special needs" of minority personnel be met at base facilities, and creating focus groups of minority sailors to develop policies. Sherwood Decl. ¶ 41; *see also* Bailey Decl. ¶ 9 (noting Navy implementing "more than two hundred equal opportunity and affirmative action programs" from 1970 to 1972).

In particular, senior military leaders recognized that the scarcity of minority officers

created distrust within the force and the nation and helped fuel the racial tensions that so critically undermined mission readiness.  Bailey Decl. ¶ 75.  As a congressional commission comprised of military leaders later stated, "During the Vietnam War, the lack of diversity in military leadership led to problems that threated the integrity and performance of the Nation's military."  MLDC Report at xvi.  The Commission concluded that this was because "the performance of the Nation's military is tied to the individual's belief that he or she will be treated fairly regardless of his or her background," and because "the popular perceptions of racial/ethnic minorities serving as 'cannon fodder' for white military leaders" "estrange[d] the military from the people it represents and from which it ultimately draws its strength."  *Id.* at xvi, 15.

Thus, starting in at least 1963, the military's senior leadership determined that a diverse officer corps is vital to mission success and national security.  Bailey Decl. ¶ 77 (discussing the Gessell Committee's 1963 recommendation that the services recruit Black officers to address the "shocking" lack of Black officers); *see also* Sherwood Decl. ¶ 49 (discussing Navy Affirmative Action Plan's goal to increase percentage of Black officers and minority recruitment efforts).  And although early efforts led to "modest increases in minority demographic representation among junior to mid-grade officers," they failed to close the demographic gap and yielded even "less progress" in "diversifying the military's senior leadership."  Exhibit L, Department of Defense Board on Diversity and Inclusion Report: Recommendations to Improve Racial and Ethnic Diversity and Inclusion in the Military (2020) ("DoD D&I Report"), at 2.

The military has continued to evaluate the issue and reaffirmed its judgment that a diverse officer corps prepared to lead an increasingly diverse military is critical for success in war.  In 2009, the MLDC, made up of thirty active and retired military leaders from all branches of services, concluded that the Armed Forces must "develop a demographically diverse leadership

that reflects the public it serves and the forces it leads." MLDC Report at xiii. The Commission underscored the importance of "[d]evelop[ing] future leaders who represent the face of America and are able to effectively lead a diverse workforce," because it would "inspire future servicemembers," "engender trust among the population," and foster trust and confidence "between the enlisted corps and its leaders." *Id*. at 8, 44.[13] In 2020, a 15-member Board, led by the Secretary of the Air Force with officers from each service branch, once again concluded that "appropriate representation of minorities in military leadership positions is increasingly important in the context of the nation's demographic trends." DoD D&I Report at 9. And still today. The Navy has concluded, using its best military judgment, that "diversity, including racial diversity, enhances the Navy's ability to build successful teams and plan and prepare for, and if necessary, fight and win our Nation's wars." Fuller Decl. ¶ 16; *see also id.* ¶¶ 9–15 (explaining the myriad reasons for this judgment); Truesdale Decl. ¶¶ 6–23 (same, for the Department of the Navy and Marine Corps); Vazirani Decl. ¶¶ 9–30 (explaining why DoD has determined that diversity within the officer corps "is critical to mission readiness and efficacy"); Haynie Decl. ¶¶ 7–31 (similar).

The Armed Forces have made a strategic judgment that diversity, including racial and ethnic diversity, at all levels is imperative. In particular, as detailed below, the military has concluded that diversity in the officer corps is vital to national security because it (1) fosters cohesion and lethality; (2) aids in recruitment of top talent; (3) increases retention; and (4) bolsters its legitimacy in the eyes of the nation and the world. That judgment is entitled to deference. *See*

---

[13] *See also* MLDC Report at 12 (quoting Professor Jerome Karabel: "It is easy to forget just how segregated the officer corps once was. In 1968, African-American enrollment at West Point and Annapolis was less than 1 percent; as late as 1973, just 2.8 percent of all military officers were African-American. By contrast, during that period, African-Americans constituted as much as 17 percent of the rank and file. In Vietnam, the consequences of this de facto segregation were devastating.").

*supra* at 13-15 & n.5 (collecting cases).[14]

### a.   Diversity in the Officer Corps is Critical to Cohesion and Lethality

### i.      History of Combat Experience

As demonstrated most starkly in the Vietnam era, the military has determined that lack of internal unit cohesion jeopardizes mission success.  General James Mattis, then-Commander of United States Joint Forces Command and later Secretary of Defense, noted in 2010:

> I don't care how tactically or operationally brilliant you are, if you cannot create harmony—even vicious harmony—on the battlefield based on trust across service lines, across coalition and national lines, and across civilian/military lines, … your leadership in today's age is obsolete.

MLDC Report at xiv.  So too in the Navy. Three-star Navy Vice Admiral Fuller explains that in his 40 years of military experience, he has observed that "Navy readiness and effectiveness, at all levels, depends on achieving and maintaining unit cohesion," and "a more diverse officer corps" "create[s] more effective and ready teams than a less diverse officer corps."  Fuller Decl. ¶ 11. "Diverse teams are a force multiplier," and Vice Admiral Fuller has concluded that "[t]he best teams and force compositions incorporate[] a holistic mix of people, platforms, attributes and capabilities[.]"  *Id.* ¶ 16.  Today, DoD recognizes that "[o]ur efforts will ultimately fail if we allow

---

[14] Cases Plaintiff cites where courts have "refused to defer" to government officials' "judgments on race," Pl. Br. at 17, are inapposite.  *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336 (5th Cir. 2022), is unavailing, as the Supreme Court reached the opposite conclusion, staying the Fifth Circuit's decision and deferring to the Navy's judgment with respect to making deployment, assignment, and operational decisions during the pendency of litigation.  *See Austin*, 142 S. Ct. at 1301; *id.* at 1302 (Kavanaugh, J, concurring).  And while the D.C. Circuit invalidated the Marine Corps' grooming policy as applied to Sikh recruits based on their religious objections, *Singh v. Berger*, 56 F.4th 88, 99 (D.C. Cir. 2022), the court noted that the Corps had already granted a "'system of exceptions' to boot camp grooming rules," which "seriously 'undermine[d]' the Corps' contention" that it had a compelling interest in "brook[ing] no departures" from those rules.  Here, USNA applies the same policy to all candidates.  In *Berkley v. United States*, 287 F.3d 1076 (Fed. Cir. 2002), while the Federal Circuit concluded that the Air Force's instruction governing which officers should be selected for involuntary termination required differential treatment based on race and gender, the court did not evaluate whether the policy complied with equal protection.  Finally, *Johnson v. California*, 543 U.S. 499 (2005), did not involve the military; rather, the Court evaluated a corrections department's policy segregating inmates based on race.  Plaintiff appears to challenge military deference more generally by pointing to *Korematsu v. United States,* 323 U.S. 214 (1944), but this case bears no resemblance to *Korematsu*, which singled out members of a particular race for dramatically disfavored treatment.  The policy at issue here is a far cry from the military's decision to separate an entire group of Americans into internment camps.  And the Supreme Court, the Fourth Circuit, and this Court repeatedly have recognized and applied military deference even while repudiating the Court's decision in *Korematsu*.

problems in our own ranks to undermine our cohesion, performance, and ability to advance our mission." DoD 2022 National Defense Strategy at 21, https://perma.cc/K3FF-83W3 (committing to increase diversity, address sexual assault and harassment, and eradicate extremism); *see also* Vazirani Decl. ¶¶ 15–16 (explaining, on behalf of DoD, why diversity in the officer corps is a "force multiplier" "that enhances military effectiveness"); Truesdale Decl. ¶¶ 6–10 (explaining, on behalf of the Navy and Marine Corps, why a diverse officer corps is a "strategic imperative"); Bailey Decl. ¶ 8 (describing Navy leaders testifying before Congress that the "service's equal opportunity programs were critical to its efforts to maintain the highest level of combat effectiveness"). Thus, the military has concluded that, to be combat ready, Navy and Marine Corps units must act as one, and that racial diversity helps to ensure such teamwork.

But cohesion cannot exist when there is internal strife, which has sometimes resulted from perceived racial imbalances between enlisted members and officers. The military learned these lessons most acutely during the Vietnam War era, when the lack of diversity in military leadership led to racial conflict that "threatened the integrity and performance of the Nation's military." Haynie Decl. ¶ 26: *see also id.* ¶ 7 (because "officers set the tone and culture for their units and are responsible for key people- and mission-oriented decisions, [] diversity of the officer corps and the inclusive nature of the teams and units they belong to and lead is critical for overall mission success"); *id.* ¶¶ 10, 16 (exclusionary practices may lead to "less accuracy in information analysis, errors in decision-making, less innovation capacity, and may enable stagnation and risk aversion or worse"; and more diverse teams "make fewer mistakes" and have better "group thinking"); Fuller Decl. ¶ 12 (the "failure to understand and leverage the power of diversity, including racial and ethnic diversity, creates a risk to unit cohesion and readiness"); Vazirani Decl. ¶ 14 (non-diverse leadership "undermines the integrity and performance of the military, fostering an

environment that threatens unit cohesion and limits the vision [servicemembers] have for their future"); MLDC Report at 15 ("perceptions of racial/ethnic minorities serving as 'cannon fodder' for white military leaders" during the Vietnam war era reveal "how important ethnic, racial, and gender representation is to the psychological well-being and reputation of the U.S. military"); *id.* at 44 (concluding that "military leadership should [] represent the servicemembers it is entrusted to lead," and "[d]emographic similarities between the enlisted corps and its leaders can [] inspire and facilitate greater confidence"). And racial tension in the military remains a concern today, as demonstrated by recent efforts to "address extremism across DoD." *See, e.g.*, Exhibit M, Sec'y of Defense Memo (Apr. 9, 2021).[15]

This is not just a theoretical exercise, but rather the culmination of concrete military experience. In his four decades of military experience, Vice Admiral Fuller has personally observed that the least effective officers "did not demonstrate the ability to leverage diversity, and therefore introduced risk factors like failing to find common ground, not identifying and solving problems, or missing opportunities to learn from and adapt to unscripted challenges." Fuller Decl. ¶ 12. Conversely, diversity contributes to "the ability to build respect, foster cooperation and achieve enhanced interoperability in larger scale and international settings." *Id.* Diversity, accordingly, "including racial diversity, in the Navy's officer corps is a necessary element for officer development and therefore is key to our Navy's continuing success." *Id.* ¶ 9; *see also* Truesdale Decl. ¶ 6 (a diverse Navy and Marine Corps officer corps "is essential to the DON's ability to fulfill its principal missions and to provide national security").

---

[15] Plaintiff crudely mischaracterizes this interest. Pl. Br. at 9 (asserting that USNA views "sailors and Marines as members of racial groups, rather than as individuals"). The military seeks to foster a wide range of diversity of all kinds, including racial and ethnic diversity, not because a servicemember of one race or ethnicity views members of her race or ethnicity the same way, as Plaintiff insinuates, but because the military has experienced the repercussions of a non-diverse officer corps. *See* Haynie Decl. ¶ 26. Learning from that experience, the military has concluded that fostering a diverse and inclusive Navy at all levels enhances cohesion, increases lethality, and improves decision-making. *See generally* Truesdale Decl. and Vazirani Decl.

### ii.      Empirical Evidence Shows that Diversity Aids Military Success

Contrary to Plaintiff's arguments, *see* Pl. Br. at 11, numerous internal and external empirical studies demonstrate the importance of diversity, including racial and ethnic diversity, and the related concept of inclusion, to military effectiveness.  *See* Haynie Decl. ¶ 8 (explaining the connection between diversity and inclusion).  Because servicemembers are "the military's most valuable asset," in 2022, DoD's Office of People Analytics ("OPA") evaluated the relationship between diversity and inclusion climates in the military and key military readiness outcomes. Haynie Decl. ¶ 32; Exhibit N, DoD Office of People Analytics, *An Exploration of the Return on Investment for Diversity & Inclusion in the Military Using Cluster Analysis to Identify Force-Wide Climates, Correlates, and Implications: Executive Report* (October 2020) ("OPA Report") at ii, 6–9 (explaining study methodology).  Using statistical analysis, cluster analysis, and regression models, OPA analyzed active-duty survey response patterns and three years of associated personnel records and concluded that servicemembers who characterized their diversity climates as "healthy"—such as supervisors' attention to and efforts to stop "racial/ethnic harassment"—ranked their units' readiness far higher than those who characterized their diversity climates as "unhealthy."  OPA Report at 6, 16; *see also* Lyall Decl. ¶ 21 (explaining that officers "provide the leadership and command culture that either allows diversity to flourish or, conversely, proves toxic to it").  Those who characterized their diversity climates as unhealthy "were more likely to identify as underrepresented groups, such as racial or ethnic minorities."  Haynie Decl. ¶¶ 31–32; OPA Report at 14.

Professor Jason Lyall, the James Wright Chair in Transnational Studies at Dartmouth College and author of *Divided Armies: Inequality and Battlefield Performance in Modern War* (Princeton University Press, 2020), which informs DoD's work, *see* Haynie Decl. ¶ 11, has also

conducted extensive research regarding how diversity and equality affect combat performance. Creating a data set from information on nearly 300 armies, including Marines engaged in ground combat, in 250 wars since 1800, stress-tested by 134 coders over seven years, and using a Military Inequality Coefficient, Professor Lyall has concluded that "evidence from quantitative and historical case studies demonstrates that a diverse and inclusive military is critical for battlefield success." Lyall Decl. ¶¶ 9–12; *see also id.* ¶¶ 24–25 (explaining study methodology and statistical analyses). Professor Lyall determined that a diverse force is better at "problem-solving," "innovate[s] faster," is "more resilient and adaptive," and enhances "legitimacy at home." *Id.* ¶ 19. But the more armed forces treat their diverse ranks unequally, (1) the greater losses they suffer as compared to those they inflict on enemy forces, (2) the more desertion and defection from the ranks they experience, (3) the more commanders "coerce their soldiers to fight though fear of lethal punishment," and (4) the greater their "tactical inflexibility." *Id.* ¶¶ 22–38; *see also id.* at Table 1 & Figure 1. Professor Lyall concluded, therefore, that "high rates of military inequality are associated with a belligerent losing the war itself," such that whether a force is inclusive is often more decisive in battle than whether it has superior firepower. *See id.* ¶ 44.[16] He also observed that "[t]he negative effect of inequality on military effectiveness also extends to navies." *Id.* ¶ 44.

Extensive qualitative research has provided similar findings. Especially in the areas of conflict and security, research demonstrates that including "diverse perspectives of

---

[16] Plaintiff's other assertions about the realities of combat are likewise undermined by data. First, Plaintiff claims that "battlefield realities apply equally to all sailors regardless of race, ethnicity, or national origin," Pl. Br. at 1, but Professor Lyall has concluded that the risks that soldiers face are "often determined by their identity," including "exposure to battlefield risk [] and treatment if captured." Lyall Decl. ¶ 57 (surveying examples); *see also* Bailey Decl. ¶ 87. Second, "America's enemies" can indeed "fight differently based on the race of the commanding officer[s]," Pl. Br. at 1, as "[u]nits suffering from ethnic and racial inequalities have often been singled out by opposing commanders," Lyall Decl. ¶ 58 (providing examples). Finally, contrary to Plaintiff's claims that there is no evidence that parity in demographics of the officer and enlisted corps fosters trust, Pl. Br. 11, there is a "mountain of evidence gathered over decades." Lyall Decl. ¶ 60 ("Plaintiff's conjectures about the drivers of military effectiveness are based on an outmoded notion of how combat power is created and the dubious assumption that combat automatically creates a band of brothers mentality that overcomes any ethnic or racial differences.") (citing evidence).

[underrepresented] groups at every level of leadership" is key to "develop[ing] the fullest understanding of the operational environment" and "bring[ing] forth effective responses and strategies," and further that "diverse groups make fewer mistakes and improve group thinking." Haynie Decl. ¶¶ 10, 16; *see id.* ¶¶ 9–20 (discussing numerous studies).  In short, "organizations that possess diversity of identities prove more adept at complex problem solving because they are able to harness different life experiences and mental models." Lyall Decl. ¶ 31.

### b.  Diversity in the Officer Corps is Critical to Recruitment

Because the Navy and Marine Corps promote exclusively from within, the demographic diversity of future military leaders is directly shaped by who enters the officer corps.  Fuller Decl. ¶¶ 13, 15; Truesdale Decl. ¶ 22; Vazirani Decl. ¶ 23.  Currently, the military faces recruitment challenges, due to a shrinking population eligible for and interested in service.  *See* Vazirani Decl. ¶ 24 (identifying the main reasons for the military's present recruiting challenges); Haynie Decl. ¶ 29 (listing "fear of death, worries over post-traumatic stress disorder, and leaving friends and family" as the top three reasons in recent surveys).[17]  To recruit the top talent in the country, the Navy must therefore "mak[e] Naval service more attractive to both the officer and enlisted recruiting population," and a more diverse officer population helps do so.  Fuller Decl. ¶ 14.  When prospective officers, enlisted, and commissioned officers see senior people who look like them serving in the Navy, "they can better visualize themselves joining our ranks."  *Id.*; *see also* Truesdale Decl. ¶ 10 ("We need a diverse force, so every child in America can see themselves wearing the uniform or working in our civilian ranks tomorrow.") (quoting Secretary Del Toro), ¶ 13 ("The best way to accomplish [the Navy and Marine Corps' recruitment goals] is to build a

---

[17] As demonstrated by this evidence, Plaintiff's insinuation that the military's recruiting challenges is due to its "overemphasis on 'social justice' issues" is incorrect. Pl. Br. at 12–13. "Very few" have indicated being deterred from service due to "wokeness"; overwhelmingly, the reasons are what one might expect: fear of death, trauma, and leaving family behind. Haynie Decl. ¶ 29; Vazirani Decl. ¶ 24.

force that reflects the America it serves."); Vazirani Decl. ¶ 22 ("If those who are considering joining the DoD . . . do not see themselves represented amongst the leaders of the DoD's armed forces, it increases the likelihood that they will be discouraged from serving."); MLDC Report at 44 (diverse leaders can "inspire future servicemembers"); *id.* at 15 (quoting Rep. James E. Clyburn: "Just as our military looks like America, so too must our general officers"); *id.* (quoting Rep. Kendrick B. Meek: "The truest melting pot in our society exists aboard aircraft carriers, in barracks, and on bases. Mess halls and exchange service stores, shooting ranges and training facilities are portraits of diversity. But in the officers' clubs, a much different picture emerges").

USNA has therefore implemented a strategic plan recognizing that it must "attract[], retain[], and develop[] a diverse cadre of future . . . commissioned Navy and Marine Corps officers that are resilient, innovative, and equipped to lead in a highly diverse, socially complex, multi-generational workforce." Latta Decl., Exhibit 3 at 1. A diverse officer corps "encourage[s] future generations of warfighters to serve in the armed forces" by "demonstrating to them that they have a chance to reach the highest levels of military leadership." Vazirani Decl. ¶ 25; *id.* ¶ 17 (recounting his and his son's personal experiences of inspiring minority servicemembers); Fuller Decl. ¶ 14. Indeed, the former Chief of Naval Operations told the MLDC: "Leadership is what we need, because I believe that when someone who is attracted to the Navy [] looks up that chain of command, they have to see themselves. If they can't see themselves, they won't believe." MLDC Report at 15. And because the military promotes from within and the Naval Academy is a "key officer commissioning source," Fuller Decl. ¶ 15, representing 28% of the new officers in the warfighting communities every year, Latta Decl. ¶ 10, Naval Academy graduates directly impact recruiting. Thus, the needs of the military as a fighting force depend in unusually direct fashion on the admissions policies of USNA and other service academies.

### c.  Diversity in the Officer Corps is Critical to Retention

Retaining top talent is also essential to sustaining a mission-ready force that is adaptable, responsive, and effective.  Fuller Decl. ¶ 13; Truesdale Decl. ¶ 16; Vazirani ¶ 25.  The Navy and Marine Corps' ability to retain servicemembers, which is their "greatest asset," "directly impacts" their readiness, and thus, is a national security imperative.  Fuller Decl. ¶ 13; Truesdale Decl. ¶ 16 (explaining that both the Navy and Marine Corps have identified retaining racially diverse talent as a "strategic imperative because it serves a competitive warfighting advantage.").  Research "indicates that diversity and inclusion directly impact . . . retention" within the military.  Haynie Decl. ¶ 33; *see also* Lyall Decl. ¶ 49 (describing U.S. Navy study showing that "increasing representation among officers can have significantly positive effects on retention among the same groups").  OPA's quantitative analysis found that active-duty members who identified their diversity climates as unhealthy—experienced most often by minority servicemembers—were nearly twice as likely to separate at the end of the survey period than those who identified their diversity climates as healthy, even when controlling for other variables.  OPA Report at iv.  Diversity in leadership also impacts mentorship and advocacy for diverse servicemembers and junior officers.  Vice Admiral Fuller has "directly observed the benefits from the additional opportunities afforded to service members when interacting with, developing trust in, and receiving mentorship from leaders who share similar and dissimilar backgrounds and experiences," including to "help mitigate" broader "retention challenges."  Fuller Decl. ¶ 14; *see also* MLDC Report at 44 (concluding that diverse military leadership can inspire future leaders).  After all, when "[p]rospective officers, enlisted, and commissioned officers . . . see senior people who look like them serving in our Navy," they are "more likely to stay."  Fuller Decl. ¶ 14.

#### d. Diversity in the Officer Corps is Critical to the Military's Legitimacy in the Nation and the World

Since the public perception crisis during the Vietnam era, when some of the country believed that the almost entirely White military leadership was treating Black servicemembers as expendable—*see* MLDC Report at 15; Sherwood Decl. ¶ 77—DoD has made the military judgment that the all-volunteer force, and its leadership, "must represent the country it defends." Vazirani Decl. ¶ 26; *see* Haynie Decl. ¶ 36 ("African American troops, who rarely saw members of their own race in command positions, lost confidence in the military as an institution."); Sherwood Decl. ¶ 48 (noting that Black sailors surveyed in 1976 "did not feel that they could count on an officer corps with just 2 percent Black representation to treat them equally to Whites").

A diverse officer corps "that is reflective of the increasingly diverse population of the United States instills trust in the American public that the armed forces will faithfully execute their duty to protect all Americans." Vazirani Decl. ¶ 26. "If our military does not reflect those who it exists to protect, it calls that commitment into question." *Id.* DoD has therefore recognized that it must "ensure that the military across all grades reflects and is inclusive of the American people it has sworn to protect." DoD D&I Report at vii; *see also* MLDC Report at 44 (diverse military leadership "engender[s] trust among the population"); Haynie Decl. ¶¶ 15, 30 (similar); Truesdale Decl. ¶ 7 (explaining that DoD and the Navy "have made a military judgment that a racially diverse officer corps is necessary" for "the Navy's legitimacy in the United States and abroad"). USNA likewise has concluded that "[t]o cultivate a set of leaders with legitimacy in the eyes of the nation, it is necessary that the path to leadership in the Navy be visibly open to talented and qualified individuals of diverse backgrounds." Latta Decl. ¶ 89. And diversity is crucial to "maintain maritime superiority and dominance on the battlefield." Latta Decl., Exhibit 3 at 1; *see also* Lyall Decl. ¶ 19 (discussing research showing that a representative disconnect between the military and

the public generates civil-military friction that undermines military effectiveness).

Moreover, a diverse officer corps that reflects our increasingly diverse nation enables the military to protect its legitimacy among its international partners and strengthens its alliances and attracts new international partners.  *See* Vazirani Decl. ¶ 28 (explaining that this benefit is critical particularly as new threats and competitors emerge on the global stage); Fuller Decl. ¶ 11 (explaining that the lack of racial diversity "introduces risk factors" that "contribute to unsuccessful interactions with international partners and allies"); Haynie Decl. ¶¶ 13–15 (discussing research and DoD experiences).  The military has learned that "the more that military members are exposed to a wide range of demographic, cognitive, experiential, and cultural perspectives and backgrounds, the more they become attuned to the necessity of considering human-based elements across all operating environments."  Haynie Decl. ¶ 18; Vazirani Decl. ¶ 29; Latta Decl. ¶¶ 86–89.

### 3. The United States' Compelling National Security Interests are Distinct and Measurable

#### a. The Military's Interest in Officer Diversity is Entirely Distinct from Harvard's and UNC's Interest in Student Diversity

Fundamentally, the military's interest in diversity at military academies is of an entirely different nature than a civilian university's interest in educational diversity.  Unlike civilian universities, USNA prepares students for war.  Graduates are immediately commissioned as active-duty officers and required to serve a minimum of five years in the Navy and Marine Corps.  USNA midshipmen train in combat, learn to lead tactical operations, and endure physically demanding training.  *See, e.g.*, Latta Decl. ¶¶ 8–10.  Also, unlike civilian universities, USNA provides a vital pipeline for the future leaders of the Navy and Marine Corps:  "from the day a class graduates, commissions and enters the fleet together as ensigns . . . until as many as four decades later when the last flag officer in that class retires, Naval Academy graduates serve in

leadership roles and support [the] Navy's overall mission to 'recruit, train, equip, and organize to deliver combat-ready naval forces to deter, and if necessary, win conflicts and wars through sustained naval presence in support of the joint force.'"  Fuller Decl. ¶ 9; *see also* Truesdale Decl. ¶¶ 20–22.  The military has determined that for its future officers to perform these weighty and unique roles, its officers-in-training must comprise, and be exposed to, individuals of different backgrounds.   As Vice Admiral Fuller explains: "By embracing diversity, including racial diversity, the Naval Academy sets the conditions for its graduates to adapt and effectively lead diverse personnel and organizations around the globe."  Fuller Decl. ¶ 9.  Also unlike civilian universities, the Navy's closed-personnel system requires reliance on a diverse pipeline of future leaders, which it cannot achieve without the approximately 1,100 USNA graduates who commission every year.  Fuller Decl. ¶ 13; Truesdale Decl. ¶ 22.  Critically, USNA's graduating class serves as a pipeline for a diverse *senior* military leadership.  USNA graduates account for 40% of senior naval officers, Fuller Decl. ¶ 15, and 91% of Chiefs of Naval Operations—one of the highest-ranking officers in the Navy—have been USNA graduates, Sherwood Decl. ¶ 60.  In short, these unique requirements for military preparation reflect fundamentally distinct interests from those in the civilian educational context.  Indeed, several Circuits have recognized that the law enforcement context is one in which an operational need for diversity can constitute a compelling interest—and that is just as true, if not more so, in the military context.[18]

Further unlike civilian universities, the military has concluded that building a diverse

---

[18] *See, e.g., Patrolman's Benevolent Ass'n v. City of New York*, 310 F.3d 43, 52 (2d Cir. 2002) ("We have recognized that 'a law enforcement body's need to carry out its mission effectively, with a workforce that appears unbiased, is able to communicate with the public and is respected by the community it serves,' may constitute a compelling state interest . . . and several courts have relied on the 'operational need' of law enforcement and correctional agencies to uphold hiring or assignment practices that favored minorities, even in the absence of past discrimination.") (citing cases); *Petit v. City of Chicago*, 352 F.3d 1111, 1114 (7th Cir. 2003) (finding a "compelling need for diversity in a large metropolitan police force charged with protecting a racially and ethnically divided major American city like Chicago," and holding that Chicago "has set out a compelling operational need for a diverse police department").

officer corps is critical to mission success and national security. *See supra* at 29-38. That is exactly the type of "complex[,] subtle, and professional" military decision concerning national security affairs, *Gilligan*, 413 U.S. at 10, into which "courts traditionally have been reluctant to intrude," *Egan*, 484 U.S. at 530. *See also supra* at 13-15 & n.5 (collecting deference cases).[19]

### b. These Goals Are Subject to Meaningful Judicial Review

Unlike the "elusive" goals identified by Harvard and UNC, whether the military has achieved the benefits that flow from a diverse midshipmen—and eventually officer—corps is clear and measurable. In *SFFA*, the Court held that Harvard's and UNC's interest in educational diversity was not sufficiently measurable because a court could not know whether leaders have been adequately "train[ed]," whether the exchange of ideas is "robust," or whether "new knowledge" is being developed. 600 U.S. at 214. The Court contrasted those "elusive" goals with goals it previously found measurable: whether "temporary racial segregation of inmates will prevent harm to those in prison," such as a prison "race riot," *id.* at 207, 215 (citing *Johnson v. California*, 543 U.S. 499, 512–13 (2005)); *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 521 (1989) (Scalia, J., concurring in judgment); and whether "race-based remedial [school desegregation] action produces a distribution of students 'compar[able] to what it would have been in the absence of such constitutional violations,'" *SFFA*, 600 U.S. at 215 (citation omitted).

Here, while the military certainly derives educational benefits from a diverse USNA midshipmen corps, its diversity goals are designed to address a concrete problem never faced by

---

[19] While the Supreme Court has "refused to defer to state officials' judgments" on explicit racial segregation in the prison context, *Johnson*, 543 U.S. at 512, courts even in that context recognize that the "operation of penal institutions [] is a highly specialized endeavor, and the sober judgment of experienced correctional personnel [] deserves the most careful consideration of this Court," *Washington v. Lee*, 263 F. Supp. 327, 332 (M.D. Ala. 1966), *aff'd*, 390 U.S. 333 (1968). As in penal institutions, where "the association between men [] is closer and more fraught with physical danger and psychological pressures than is almost any other kind of association between human beings," *id.*, so too do the demands of military service involve unique and heightened pressures, and the views of experienced, senior leadership are likewise entitled to "careful consideration."

civilian universities:  creating and maintaining a lethal fighting force that is not weakened by racial

tension.  *See, e.g.*, Vazirani Decl. ¶ 14; Haynie Decl. ¶¶ 6–8.

To determine whether the military is meeting that goal, the Court can examine a number

of metrics.  First, a court can examine whether internal race riots have occurred since the Navy

and Marine Corps made an effort to diversify their officer corps.  None have.  *See* Sherwood Decl.

¶ 67; Bailey Decl. ¶ 91.  That alone demonstrates success.  But USNA must continue to foster

diversity in the officer corps to maintain this achievement and create a culture of inclusion and

espirit de corps, particularly to counter recent trends of extremism in the military. *See, e.g.*, Sec'y

of Defense Memo (Apr. 9, 2021); Exhibit O, Aaron Morrison, *'We Just Feel It': Racism Plagues*

*US Military Academies*, AP News (Dec. 3, 2021).[20]  The military's consideration of race and

ethnicity is therefore no less measurable than in the prison context, where success is measured by

the "prevent[ion] [of] harm."  *SFFA*, 600 U.S. 215; *Johnson*, 543 U.S. at 512–13; *Richmond*, 488

U.S. at 521 (Scalia, J., concurring in judgment).  If anything, prevention of such harm within the

military is of even greater significance than in prisons, given the national security consequences.[21]

Second, as in the prison context, the court can "careful[ly] consider" the views of senior

military leadership.  *Lee*, 263 F. Supp. at 332, *aff'd*, 390 U.S. 333 (1968).  Senior military

leadership has consistently concluded that officer diversity is a national security imperative.  *See*

Truesdale Decl. ¶ 6; Vazirani Decl. ¶ 19; Haynie Decl. ¶¶ 17–28.  That conclusion is a strategic

military judgment, and as described above, amply supported by military history, combat

---

[20] While USNA expects to stop using race-based admissions policies in the future, as discussed below, these internal tensions left unaddressed can erupt into violence.  While the Navy and Marine Corps have successfully prevented that for decades, they have a compelling interest in continuing to prevent it.

[21] Plaintiff's assertion—relying on an article in the British publication *The Guardian*—that "[r]acial animosity" "has been virtually non-existent [in the American army] post-Vietnam," Pl. Br. at 10, cuts against Plaintiff, because it demonstrates that increasing diversity has worked.  But the article is also misleading; while racial tension has not erupted into violence since the Vietnam era, servicemembers and officers unfortunately continue to experience discrimination and harassment within the military.  *See, e.g.*, OPA Report at 12–13.

experience, and qualitative and quantitative studies.

To the extent Plaintiff tries to suggest that the military has articulated different interests over time, *see* Pl. Br. at 4, it is wrong.  The military's goal in having an officer corps reflective of the nation, and of the enlisted corps, is one and the same.  As the enlisted corps continues to reflect an increasingly diverse country, *see* Haynie Decl. ¶ 25, so too must the officer corps.  Accordingly, the more the officer corps diversifies, the more it will reflect both the fighting force and the country.  Indeed, the Armed Forces gave this same rationale in the first brief it filed on this issue, stating this as it does today: "As both the enlisted ranks of the military and the Nation's population have become increasingly diverse, our military leaders have concluded that an officer corps that is markedly less diverse than the enlisted ranks, and that is unattuned to the perspectives and experiences of those they must lead, can undermine combat readiness.  Maintaining a pipeline of well-prepared and diverse officer candidates is therefore an urgent military priority."  *Fisher II*, Amicus Brief, 2015 WL 6735838, at *11 (S. Ct. Nov. 2, 2015).  Thus, as the most senior military leaders have consistently recognized, in this increasingly diverse nation, the military leaders must be prepared to lead an increasingly diverse military.

Third, the Court can also examine the same data that the military does: feedback from current servicemembers.  Among other things, the Navy measures unit cohesion and command climate through servicemember surveys and obtains feedback from sailors and Marines through focus groups and town halls.  Truesdale Decl. ¶ 17.  DoD obtains and assesses similar feedback as well.  *See* OPA Report at iv (multi-year study evaluating the impact of diversity on servicemembers' views of mission readiness, demonstrating that the more a servicemember felt his or her unit to be inclusive and free from racial tension, the more mission "prepared" a servicemember believed his or her unit to be).

Finally, because the military has concluded that it is mission critical that the officer corps reflects the diversity of the nation as a whole, the Court can examine demographic data to determine whether the Navy is meeting those goals.[22]  Per the most recent U.S. Census data, Black individuals comprise approximately 14% of the population and 17.5% of Navy sailors and 10.5% of Marines, but only 8.3% of the officer corps for the Navy and 5.9% for the Marines. *See* Exhibit P, DoD 2022 Demographics (2022), at 27; Exhibit Q, U.S. Census Data (2022).  Those of Asian and Pacific Islander origin make up approximately 6% of the population, and 7.3% of Navy sailors and 4.9% of the Marines, and 6.6% of the officer corps for the Navy and 4.8% for the Marines. *See* DoD 2022 Demographics (2022), at 27; U.S. Census Data (2022).  White individuals make up approximately 59% of the population, and 62.8% of Navy sailors and 56.5% of Marines, and 75.5% of the officer corps for the Navy and 81.4% for the Marines. *See* DoD 2022 Demographics (2022); U.S. Census Data (2022).  Accordingly, while the Navy has made progress in the representation of Asian and Pacific Islander officers, it has not achieved similar progress for Black officers.  And while USNA does not have any class-composition requirements, its limited use of race in admissions is informed by this data.

To determine whether diversity in the officer corps successfully increased recruitment and retention, the Court can examine the numbers.  The number of minority officers is increasing in the Navy; for example, whereas diverse officers represented 19.1% of the officer corps in 2010, they now represent 24.5%, with particular gains in the Asian (4.1% to 6.1%) and multi-racial (1.9% to 5.5%) populations. *Compare* Exhibit J, DoD Demographics 2010 (2010), at 23 *with* DoD 2022

---

[22] As discussed below, this examination of demographic data is wholly different from UNC's and Harvard's use of demographic data to meet "numerical commitment[s]" and enroll minorities in proportion to the general population. 600 U.S. at 222–25.  USNA does not have any such numerical commitments or otherwise "balance" its classes based on race.  Indeed, the fact that the percentages between the country, enlisted corps, and officer corps do not precisely mirror each other and, instead, fluctuate, *cf. SFFA*, 600 U.S. at 222 & n.7, further demonstrates that demographic goals do not act as quotas for USNA.  The data is relevant for one purpose: the Court can use it to measure whether the Navy and Marine Corps are meeting their goal to achieve diversity.

Demographics (2022), at 27.  Although the overall percentage of diverse Marine officers has not changed substantially over that same period, there have been gains in the Asian (2.4% to 4.1%), Black (5.7% to 5.9%), and multi-racial (1.3% to 2.5%) populations.  *Compare* DoD Demographics 2010 (2010), at 23 *with* DoD 2022 Demographics (2022), at 27.  The number of minority midshipmen at USNA is also increasing, from 24% in the class of 2002 to over 40% in the class of 2026.  Latta Decl. ¶ 72.  Finally, retention within the military is at an all-time high.  Vazirani Decl. ¶ 24.

And to determine whether diversity in the officer corps bolsters the Navy's legitimacy, the Court can examine whether the same type of public perception crisis resulting from the racial tensions around the Vietnam War plagues the military today (it does not), and evaluate whether there have been international incidents as occurred previously from racial tensions (there have not).  *See, e.g.*, Bailey Decl. ¶ 91.

### B.     USNA's Admissions Process Is Narrowly Tailored

USNA's use of race and ethnicity is also narrowly tailored to further the military's compelling national security interest.  "The purpose of the narrow tailoring requirement is to ensure that the means chosen fit the compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Grutter*, 539 U.S. at 333 (cleaned up).  To be narrowly tailored, an admissions program that considers race must treat each applicant "as an individual in the admissions process."  *Bakke*, 438 U.S. at 318; *see also Grutter*, 539 U.S. at 337.  "[T]ruly individualized consideration demands that race be used in a flexible, nonmechanical way," and thus universities *may* "consider race or ethnicity . . . flexibly as a 'plus' factor in the context of individualized consideration of each and every applicant." *Grutter*, 539 U.S. at 334; *see also Fisher I*, 570 U.S. at 312.  But universities *may not* "establish quotas for

members of certain racial groups," "put members of those groups on separate admissions tracks," or "insulate applicants who belong to certain racial or ethnic groups from the competition for admission." *Grutter*, 539 U.S. at 334; *see also Bakke*, 438 U.S. at 315–20.[23]

Courts also consider whether there is a meaningful connection between the means employed by universities and the goals pursued, *SFFA*, 600 U.S. at 215; whether race is used as a "negative" or stereotype, *id.* at 218; whether "workable race-neutral alternatives" were considered in "good faith," *Grutter*, 539 U.S. at 339; whether any such alternatives would produce the benefits of diversity sought, *Fisher I*, 570 U.S. at 312; and whether the use of race is "limited in time," *Grutter*, 539 U.S. at 342; *see also SFFA*, 600 U.S. at 212.

At the same time, the narrow tailoring inquiry "must be calibrated to fit the distinct issues raised" by the specific compelling interests asserted. *Grutter*, 539 U.S. at 333–34; *see also id.* at 327 ("Context matters when reviewing race-based governmental action."); *Parents Involved in Cmt. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 725 (2007) (explaining that *Grutter* arose in "the unique context of [civilian] higher education"). In other words, the narrow tailoring inquiry applicable to civilian universities' use of race to achieve educational diversity, *see Grutter*, 539 U.S. at 334, cannot be mechanistically applied to USNA's use of race to achieve the military's compelling national security interest that is altogether different. The Supreme Court has had "no occasion to define the contours of the narrow-tailoring inquiry" in this distinct military context. *Grutter*, 538 U.S. at 333; *see SFFA*, 600 U.S. at 213 n.4.

Applying this framework in this distinct context, USNA's admissions process bears all the hallmarks of processes that the Supreme Court has concluded satisfy narrow tailoring and none of

---

[23] To be clear, *SFFA* did not overrule *Grutter*, *Fisher*, or *Bakke* insofar as those cases define the contours of the narrow-tailoring inquiry. Indeed, the Court *relied* on those cases in striking down Harvard's and UNC's admissions programs that considered race, making clear that the guidance in those cases survives *SFFA* and should continue to guide lower courts as they consider such programs.

the hallmarks of those that do not.

### 1. USNA Considers Each Candidate as an Individual in the Admissions Process

As discussed above, USNA may consider race and ethnicity as a nondeterminative factor in its holistic assessment of candidates at only four stages: when considering candidates for LOAs, selecting candidates with service-connected and congressional nominations in very limited circumstances, selecting additional appointees, or (theoretically) for Superintendent nominations (although no Superintendent nominations have considered race or ethnicity since at least 2009). *See supra* at 9–11; Latta Decl. ¶¶ 74–77. Throughout its process, and especially at these limited points in which race and ethnicity may come into play for a subset of its class, USNA "engages in a highly individualized, holistic review of each applicant's file, giving serious consideration to all the ways an applicant might contribute" to the Brigade of Midshipmen at USNA and ultimately to the Navy and Marine Corps as a commissioned officer. *Grutter*, 539 U.S. at 337.

#### a. Letters of Assurance

When candidates are considered for LOAs, admissions officers engage in an individualized, holistic review of a candidate's application to identify candidates "who possess leadership potential and motivation to successfully complete the course of study at the Naval Academy and become combat leaders in the Naval Service" and to encourage them to complete their applications quickly. Latta Decl. ¶ 63. Though race and ethnicity may be considered as a nondeterminative factor in a holistic assessment of the individual, it is not a "defining feature" of the LOA review process. *Grutter*, 539 U.S. at 337. Indeed, USNA's LOA review process does not "limit . . . the broad range of qualities and experiences that may be considered valuable contributions" to considerations of only race and ethnicity. *Id.* at 338. Rather, "serious consideration" is given to the many ways a candidate might contribute as future military officers— including, for example, their overcoming of adversity, their life experiences, their leadership

potential, and their intellectual accomplishments.  *Id.* at 337.

USNA thus affords this holistic review equally to candidates of all races and ethnicities. *See Grutter*, 539 U.S. at 337 (noting the importance of "afford[ing] this individualized consideration to applicants of all races").  All qualified candidates (diverse or not) are evaluated to determine whether they should be issued an LOA.  Latta Decl. ¶¶ 64, 66, 74.  All candidates (diverse or not) with WPMs above 70,000 are eligible to receive an LOA.  *Id.* ¶ 67.  Similarly, qualified candidates, including those that are not diverse, could receive an LOA with WPMs under 70,000.  *Id.* ¶ 74.  There is no difference in the way that diverse and nondiverse candidates are holistically evaluated for LOAs.  *Id.* ¶¶ 64, 66–67, 74.  And ultimately, every candidate with an LOA (diverse or not) must still complete every other requirement for admission.  *Id.* ¶ 64.

### b.  Service-Connected and Congressional Nominations

Among qualified candidates, the vast majority of an incoming class is selected based on the highest WPM within the category of nomination obtained by the candidate or by order specified by the nominating authority, where applicable.  *See id.* ¶¶ 57–58.  For nominating sources using the "principal competitive-alternate" or "principal numbered-alternate" methods, USNA must offer an appointment to the principal candidate if he or she is deemed to be qualified.  *Id.* ¶¶ 35–36, 60.  When the principal nominee for a nominating source using the "numbered-alternate" method is determined to be unqualified or declines admission, USNA must offer admission to the fully qualified candidate who ranks next highest on that slate.  *Id.* ¶ 60.

Where a slate of candidates is nominated via the "competitive" method, the principal competitive-alternate" method (when the principal nominee is not determined to be qualified or declines admission), or obtains a service-connected nomination, USNA will typically select the candidate with the highest WPM within each slate.  *Id.* ¶¶ 58–59.  In limited circumstances, when candidates with the highest WPMs have very close WPMs, USNA may select the candidate with

the slightly lower WPM over the candidate with the slightly higher WPM. *Id.* These decisions are based on an in-depth, holistic review focusing on the strength of the candidate's record, in which race or ethnicity could be one of the many nondeterminative factors—along with, for example, academic progression, leadership, life experiences, and teacher recommendations. *Id.* ¶¶ 58, 77. This holistic review could also result in a White applicant with a slightly lower WPM being chosen over a diverse candidate with a slightly higher WPM. *Id.* ¶ 77.

### c.  Superintendent Nominations

A holistic review also is used when candidates are considered for Superintendent nominations. Throughout the admissions cycle, USNA conducts a holistic review of all candidates to identify qualified candidates who are highly desired for the valuable contributions they are expected to make but who lack a nomination and may warrant a Superintendent nomination. *Id.* ¶¶ 47, 76. While race and ethnicity may theoretically factor into the decision to provide a Superintendent nomination, it has not played a factor in Superintendent nominations since at least 2009. *Id.* ¶ 76. Rather, the vast majority of these nominations go to athletes. *Id.* ¶¶ 47, 76. For example, the Superintendent provided only 14 nominations for the Class of 2027—12 of which went to athletes—and 11 nominations for the Class of 2026—8 of which went to athletes. *Id.* ¶ 48. The few nominations that did not go to athletes were used to incentivize candidates considering other service academies. *Id.*

### d.  Additional Appointees

And the same holistic review is used when nominees who USNA determined are fully qualified, but who were not initially selected to fill a vacancy or qualified alternate slot, are considered for "additional appointee" slots. In extending such appointments, USNA may consider race and ethnicity as a nondeterminative factor in its holistic assessment of candidates to identify those who are expected to make valuable contributions to USNA. *Id.* ¶¶ 62(b), 75. Thus, race is

similarly not a defining feature of the additional appointee consideration process, and candidates of all races and ethnicities are afforded this holistic review equally.  For example, nearly 60% of additional appointees in the Class of 2026, and 62% in the Class of 2027, respectively, were White.  *Id.* ¶¶ 62(b), 75.  Thus, race and ethnicity could only have acted (but did not necessarily act) as a nondeterminative factor with respect to a small number of additional appointees (which themselves comprise only a small fraction of the entering midshipmen class) in those years.  This underscores that USNA "seriously weighs many other diversity factors besides race that can make a real and dispositive difference for nonminority applicants as well."  *Grutter*, 539 U.S. at 338.

Thus, at each of these four stages of the admissions process, race and ethnicity may be used in limited circumstances, and when it is, it is done in a "flexible, nonmechanical way," as one nondeterminative factor among many considered "in the context of [the] individualized consideration" of each candidate.  *Grutter*, 539 U.S. at 334.  And at each stage, the consideration of race and ethnicity is cabined by the fact that only qualified candidates may ultimately be appointed to USNA, and race is not a factor in determining whether a candidate is qualified.  Latta Declaration ¶¶ 50–55; *cf. Grutter*, 539 U.S. at 337–38 ("With respect to the use of race itself, all underrepresented minority students admitted by the Law School have been deemed qualified.").

### 2.  USNA Does Not Use Quotas to Achieve Its Aspirational Diversity Goals

USNA aims to "[a]ttract, retain, and develop a diverse cadre of young people destined to become commissioned Navy and Marine Corps officers that are resilient, innovative, and equipped to lead in a highly diverse, socially complex, and multi-generational workforce."  Latta Decl. ¶ 81 (quoting USNA *Diversity and Inclusion Strategic Plan* (Mar. 2021) at 3).  Furthering racial and ethnic diversity is a part of USNA's mission to build a diverse brigade.  *See id.* ¶ 69 (quoting OPNAVINST 5450.330B(2)(a)).  In building diverse incoming classes, USNA neither uses floors or ceilings for particular demographic groups nor offers appointments to candidates based on their

race or ethnicity. *See id.* ¶ 79; *cf. SFFA*, 600 U.S. at 221–22 (explaining that Harvard would track whether "a group [wa]s notably underrepresented or . . . suffered a dramatic drop off relative to the prior year," and, if so, would "give additional attention to applications from students within that group," resulting in minority students consistently being admitted in "tight band[s]").

Yet Plaintiff mischaracterizes USNA's admissions program as "sort[ing] applicants by skin color and admit[ting] them according to preset racial goals." Pl. Br. at 14. USNA does nothing of the sort. Instead, USNA's aim to build a diverse brigade constitutes a permissible goal that is far from a quota. A "quota," "[p]roperly understood," reserves "a certain fixed number or proportion of opportunities . . . exclusively for certain minority groups," thereby "impos[ing] a fixed number or percentage which must be attained, or which cannot be exceeded." *Grutter*, 539 U.S. at 335. In fact, USNA's goal is the type permitted by the Supreme Court. *See id.* (noting that "a permissible goal . . . require[s] only a good-faith effort . . . to come within a range demarcated by the goal itself"); *id.* at 336 ("Some attention to numbers, without more, does not transform a flexible admissions system into a rigid quota."). Plaintiff's assertions reflect a fundamental distortion of both USNA's admissions process and Supreme Court jurisprudence.

USNA also does not put members of certain racial groups on separate admissions tracks or insulate members of certain racial groups from competition for admission. *See Bakke*, 438 U.S. at 315–17; *Grutter*, 539 U.S. at 334. Regional admissions teams are responsible for recruiting potential applicants from their assigned states and territories and facilitating the review process for both minority and nonminority candidates. *See* Latta Decl. ¶¶ 17, 71. The same qualification standards and review process applies to all candidates. *Id.* ¶¶ 49–56. Every additional appointee, service-connected, and Superintendent nomination as well as any LOA recommendation is ultimately forwarded to the Dean of Admissions, who considers all such recommendations

together.  *Id.* ¶ 78.  In sum, minority candidates are never insulated from comparison with all other candidates, as in *Bakke*; instead, they are compared with all other candidates in competition for all available opportunities at each juncture.

Finally, USNA does not "desire 'some specified percentage of a particular group *merely because of* its race or ethnic origin,'" which would constitute impermissible "outright racial balancing." *SFFA*, 600 U.S. at 211, 223 (emphasis added); *Grutter*, 539 U.S. at 330.  The military's interest here is not simply in diversity for its own sake but rather in the cohesion and lethality, recruiting and retention, and legitimacy benefits that flow from a diverse Navy officer corps.  *See supra* at 29-38.  Because USNA treats racial diversity not as an end to be pursued in its own right but rather as a means by which it pursues the military's national security interest—including its interest in unit cohesion—it cannot be said to "desire 'some specified percentage of a particular group merely because of its race or ethnic origin.'"  *SFFA*, 600 U.S. at 211.

### 3.  USNA's Limited Consideration of Race and Ethnicity is Directly Related to the Navy's Compelling Interest in a Diverse Officer Corps

USNA's admissions policies are directly connected to the Navy's goal of building an officer corps that reflects the diversity of the country it serves.  USNA considers its diversity efforts in light of the demographics of the general population.  Latta Decl. ¶¶ 70, 72, 79, 89.  And with good reason.  USNA "strives to be the nation's preeminent leadership development institution." *Id.* ¶ 83.  To that end, it aims "to recruit and admit young women and men reflective of the nation they will serve." *Id.* at ¶ 89 (quoting *Testimony before the H. Armed Servs. Comm., Subcomm. on Mil. Personnel*, 118th Cong. (July 19, 2023)).  Recruiting candidates that reflect the nation will not only "cultivate a corps of officers with legitimacy in the eyes of the nation" and develop an "inclusive campus" to facilitate educational outcomes, *id.* ¶¶ 15, 81, but also train and retain

officers to guide the service, *supra* at 29-38.  In this way, USNA's means are meaningfully connected to the military's goal.

USNA's focus on national demographics underlies its goals to improve recruitment, retention, legitimacy, and lethality.  And to that end, even the specific race and ethnicity categories that USNA employs to measure its aspirational goals are also meaningfully connected to the Navy's goal that its officer corps reflect the diversity of the country it serves.  USNA employs the same race and ethnicity categories that the United States uses to measure the demographics of the general population of the *country the Navy and Marine Corps serves*.  *See* United States Census Bureau, *2020 Census Frequently Asked Questions About Race and Ethnicity* (Aug. 12, 2021), https://perma.cc/2XE6-AH5R; Latta Decl. ¶¶ 100–02 (noting that DoD entities are required to identify the race code and ethnicity code of an individual "in accordance with the 1997 OMB standards on race and ethnicity" in the Federal Register).

USNA's use of the same OMB race and ethnicity categories used across the federal government undercuts any suggestion that the "motive for the[se] classification[s]" is "illegitimate racial prejudice or stereotype."  *Grutter*, 539 U.S. at 333.  And it further distinguishes USNA from the civilian universities at issue in *SFFA*.  *See* 600 U.S. at 215–17.  USNA uses these categories to pursue an *entirely different* interest than was at issue in *SFFA*: national security.  "Context matters" in the narrow tailoring inquiry, *Grutte*r, 539 U.S. at 308, and, here, there is no "mismatch" between the means USNA employs and the goals the Navy pursues, *SFFA*, 600 U.S. at 217.

### 4.   Race and Ethnicity are not Used as a Negative or Stereotype

USNA's admissions process also does not use race and ethnicity as a "negative."  Race is used as a negative where it "unduly harms nonminority applicants."  *SFFA*, 600 U.S. at 212.  In *SFFA*, the Supreme Court cited evidence of such undue harm, *see id.* at 218, but Plaintiff offers no evidence in support of its motion for a preliminary injunction suggesting that USNA's far more

limited use of race and ethnicity has consequences like those in *SFFA*.  Nor is there reason to expect such evidence to emerge in discovery.  As discussed above, USNA's consideration of race could affect *appointment decisions* only with respect to congressional and service-connected nominations in limited circumstances, additional appointees, or (theoretically) Superintendent nominations.[24]  All other appointments are made by WPM score (which does not factor in race and ethnicity), or by the order specified by a Member of Congress where applicable.  *See* Latta Decl. ¶¶ 57–60, 62(a).  Each USNA class consists of approximately 1,180 midshipmen, and the Classes of 2026 and 2027 had, respectively, only 310 and 255 additional appointees (approximately 60% of whom were White), and 11 and 14 Superintendent nominations (none of which considered race or ethnicity).  *Id.* ¶¶ 11, 48, 62(b).  Thus, for the vast majority of midshipmen in each class, race and ethnicity played *no* role in their evaluation by and appointment to USNA.  As a result, it is unlikely that Plaintiff will be able to demonstrate undue harm to any racial or ethnic group here.  *See also id.* ¶¶ 58, 77 (out-of-WPM-order selections are "rarely the case" and can also benefit a White candidate over a diverse candidate), *id.* ¶ 73 (both diverse and nondiverse candidates receive LOAs); *id.* ¶ 76 (race or ethnicity has not played a factor in Superintendent nominations since at least 2009).[25]

SFFA erroneously suggests that harm to certain racial groups may be presumed in this context because use of race in college admissions is "zero-sum."  Pl. Br. at 15 (quoting *SFFA*, 600 U.S. at 218).  While admissions at civilian universities may be "zero-sum," most appointments to

---

[24] While race and ethnicity can also be considered as one factor in the issuance of LOAs, an LOA is not an appointment; the candidate must still satisfy all the other requirements for admission.  Latta Decl. ¶ 64.

[25] The fact that race and ethnicity "play[s] a role in only a small portion of admissions decisions" is also itself a "hallmark of narrow tailoring."  *Fisher II*, 579 U.S. at 384–85.  *SFFA*'s suggestion that this fact instead belies the necessity of considering race in admissions is inapposite here, *see SFFA*, 600 U.S. at 219, where USNA—like the University of Texas in *Fisher II*—is constrained by statute and regulation from considering race with respect to the vast majority of appointments.

USNA are made through a process—whereby USNA extends offers of appointment by WPM (or order specified by nominating authority, where applicable)—wholly unlike the admissions processes at civilian universities.  For these appointments (and Superintendent nominations since at least 2009), race is not used as either a "negative" or a "positive" in a zero-sum game: it is not used at all.  And with respect to additional appointees and the rare circumstances in which a candidate with a slightly lower WPM is selected over a candidate with a slightly higher WPM, the decision is based on the holistic strength of the selected candidate; it is not made *because of* that candidate's race or ethnicity.  Latta Decl. ¶ 58.[26]

USNA's admissions process also does not rely on impermissible racial stereotypes, the "offensive and demeaning assumption that [students] of a particular race, because of their race, think alike."  *SFFA*, 600 U.S. at 220–21.  USNA does not seek to admit diverse candidates on the assumption that they express a particular viewpoint shared by others of the same background. Latta Decl. ¶ 79.  Rather, USNA seeks to admit diverse candidates so that midshipmen can learn how to be effective battlefield commanders and so that the Navy can achieve its interest in cohesion and lethality, recruiting and retention, and legitimacy through a diverse officer corps.  Contrary to Plaintiff's contention, *see* Pl. Br. at 15–16, these are completely different considerations than those made by the civilian universities in *SFFA*.  And USNA's admissions process is grounded not in stereotyped *assumptions* about how midshipmen—and ultimately officers—of particular races and ethnicities will or will not contribute to those military interests; it is grounded in professional military judgments—supported by extensive experience and research—that those interests *cannot*

---

[26] And even if the holistic review process USNA uses for additional appointees and out-of-WPM-order selections could be characterized as "zero-sum" simply because it considers race and ethnicity as a nondeterminative factor among many other factors, this alone would not be fatal to USNA's admissions process.  If it were, the Supreme Court would have had no reason to carve out the military academies from its decision in *SFFA*.  *See SFFA*, 600 U.S. at 213 n.4.  The fact that it *did* suggests that this concern could be overcome if the military academies presented distinct compelling interests held by them and not shared by civilian colleges and universities.  *See id.*  The military has done so here.

be realized without a diverse officer corps. *See supra* at 29-38. In so grounding its admissions process, USNA does not make any assumptions about diversity for diversity's sake, but rather embraces the military judgment that there is a measured benefit in the diversity of the officer corps.

### 5. Race-Neutral Alternatives Are Not Sufficient

USNA has seriously considered race-neutral alternatives, but there currently are no available, workable alternatives that would suffice to produce the benefits of a diverse Navy officer corps. Narrow tailoring requires a "good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks." *Grutter*, 539 U.S. at 339; *see also Fisher I*, 570 U.S. at 312; *Fisher II*, 579 U.S. at 377. It does not require "exhaustion of every conceivable race-neutral alternative," nor does it require "a university to choose between maintaining a reputation for excellence or fulfilling a commitment to provide educational opportunities to members of all racial groups." *Grutter*, 539 U.S. at 339.[27]

As Dean Latta's declaration explains, USNA *has* considered and implemented several race-neutral alternatives, but none currently has proved a "workable means" for it "to attain the benefits of diversity" it seeks. *Fisher II*, 579 U.S. at 385. For example, USNA has increased outreach efforts to sailors and Marines to attempt to tap into the diversity present in the enlisted ranks. Latta Decl. ¶ 92. However, an increase in the number of sailor and marine candidates would have to be dramatic to have more than a marginal impact on diversifying the midshipmen corps given that they currently make up a small fraction of USNA candidates and midshipmen. *Id.* USNA also reaches out to students who participated in particular science, technology, engineering, and mathematics programs to boost recruitment and applications. *Id.* ¶ 93. While

---

[27] Unlike in *SFFA*, Plaintiff has come forward with no evidence that USNA could achieve its goals through race-neutral alternatives. *See, e.g.*, *SFFA v. UNC*, 567 F. Supp. 3d 580, 640–48 (M.D.N.C. 2021) (discussing expert testimony on race-neutral alternatives).

outreach related to these programs increases interest in USNA attendance, it has not resulted in an increase in the number of applications from diverse students to USNA. *Id.* USNA has also increased marketing to specific underrepresented demographics to increase the pool of diverse candidates with the help of an enrollment management company, but this effort has not yet resulted in increases in the acceptance rates for candidates from these demographic groups. *Id.* ¶ 94; *see Fisher II*, 579 U.S. at 385 (noting that intensifying outreach efforts to African-American and Hispanic applicants did not "succeed[]").

Those are not the only race-neutral measures USNA has taken. It has provided extra points in the calculation of the WPM for students with low socio-economic status, but that has not been successful at increasing diversity because many non-diverse applicants come from low socio-economic status. *Id.* ¶ 95. USNA also considered prioritizing first-generation status, but the number of such candidates applying to USNA is "so small that it has not made a significant impact on the diversity of the incoming class." *Id.* ¶ 96; *see Fisher II*, 579 U.S. at 385 (noting the "University tried, and failed, to increase diversity through enhanced consideration of socioeconomic and other factors").

USNA has further considered changing or eliminating the consideration of standardized test scores from its admissions process, which might increase diversity in the midshipmen corps, but it values a standardized measure of academic potential, especially considering the variance in academic rigor between high schools, to ensure that admitted midshipmen can succeed while at USNA. Latta Decl. ¶¶ 98, 110. And the "Equal Protection Clause does not force universities to choose between a diverse student body and a reputation for academic excellence." *Fisher II*, 579 U.S. at 385; *see also Grutter*, 539 U.S. at 340 (the Constitution does not "forc[e] the Law School

to abandon the academic selectivity that is the cornerstone of its educational mission").[28]

Finally, given the outsized role the nomination process plays in shaping the pool of qualified candidates available to USNA for appointment, USNA has also conducted outreach to encourage nomination sources—in particular, Members of Congress—"to increase the number of their nominations and to sponsor informational Academy Days."  Latta Decl. ¶ 99.  As it stands, congressional nominations are disproportionately provided to more White students than minorities.  *Id.*  However, this outreach has not resulted in a "significant shift in diversity applications or admissions based on outreach targeting enhanced nominations."[29]

### 6. USNA Does Not Intend to Use Race and Ethnicity as a Factor in its Admissions Process Indefinitely

USNA does not intend to use race as a factor in its admissions process indefinitely. Rather, USNA reviews its admissions process, including the limited use of race and ethnicity, annually and has conducted substantive legal reviews on at least four occasions in the past twenty years.  *Id.* ¶ 79.  Thus, through its periodic review and adjustment of its admissions policies that consider race and ethnicity, USNA "ensure[s] that race plays no greater role than is necessary to meet its compelling interest."  *Fisher II*, 579 U.S. at 380; *see also Grutter*, 539 U.S. at 342.

Plaintiff's insistence that USNA must have a defined "end point," relying on *SFFA*, Pl. Br. at 14, ignores the wholly distinct military interests at issue here, which are far more analogous to

---

[28] In any event, the current version of the Fiscal Year 2024 National Defense Authorization Act, as proposed by the United States Senate, would mandate that service academies require the submission and consideration of standardized test scores as part of the application process.  Latta Decl. ¶ 98.

[29] Any suggestion that USNA should adopt a lottery or percentage plan is untenable. For one, such a system would deprive USNA of the opportunity to holistically and individually consider the many and varied ways that candidates might contribute to the midshipmen environment and the future Navy officer corps.  *See Fisher II*, 579 U.S. at 385–87 (declining the invitation to compel the University of Texas to admit all students by class rank because "[c]lass rank is a single metric, and like any single metric, it will capture certain types of people and miss others").  Such a system also would not be administrable given the statutory and regulatory mandates under which USNA's admissions process operates.  *Cf. Grutter*, 539 U.S. at 340 (faulting a failure to "explain how such plans could work" in the "graduate and professional school" setting).

the interests in cases like *Johnson*, 543 U.S. 499, in which the Supreme Court addressed the use of race considerations to avoid serious risks to human safety in the prison context.  *See SFFA*, 600 U.S. at 207 (discussing *Johnson*).  Neither *SFFA* nor *Johnson* suggested that prison officials would have to cease such considerations at some defined end point, and for good reason; racial violence in prison is not a problem that simply evaporates after a set number of years.  Likewise here, in the military context, the strength and effectiveness of the armed forces is an enduring requirement with national security implications of the highest order.   Countermanding senior military judgments that a diverse officer corps is necessary to achieve that requirement by imposing an inapt "end point" on USNA would pose risks of a kind that the Supreme Court had no occasion to consider in *SFFA*.  These "relevant differences" must be taken "into account."  *Johnson*, 543 U.S. at 515; *Grutter*, 539 U.S. at 308 ("Context matters.").

## IV.   The Balance of Equities and Public Interest Weigh in Favor of the Government

The final two factors, balance of equities and the public interest, also weigh heavily in the Government's favor.  *See Nken v. Holder*, 556 U.S. 418, 434–435 (2009).  In contrast to Members A and B's individualized interest in changing USNA's policy mid-admissions cycle, the public interest is of paramount import in matters of national security.  *See, e.g.*, *Haig*, 453 U.S. at 307.  Thus, the Supreme Court has reversed a preliminary injunction on "[a] proper consideration of these factors alone," when the military provided evidence that it would result in an "adverse impact on the public interest in national defense."  *Winter*, 555 U.S. at 24; *id.* at 23, 24, 28 (criticizing lower courts' failure to "give sufficient weight to the views of several top Navy officers"); *see also Def. Distrib. v. U.S. Dep't of State*, 838 F.3d 451, 459 (5th Cir. 2016) (plaintiffs' First Amendment interest outweighed by government's stronger interest in national security).  For the reasons extensively discussed *supra*, the military has done just that here.

Further, in the context of admissions, the "balance of hardships" can weigh in favor of a defendant when it would be forced to make a late change to its policies.  In *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 276 (S.D.N.Y. 2019), *aff'd*, 788 F. App'x 85 (2d Cir. 2019), the court found that an injunction changing New York City's admissions policies would impose "an undue burden" because "administrators, teachers, students, and parents have all been proceeding for the last eight months under the assumption that the [challenged policies] will be in effect for the upcoming admissions cycle."  *See also id.* (noting that the burden "ha[d] been exacerbated" by plaintiffs' late filing date, which left "only two months to accommodate the possibility that Plaintiffs' motion will be granted").  The Fourth Circuit has held similarly in rejecting an injunction during the middle of an election cycle that would require the defendant to alter the status quo on a "very tight timeframe."  *League of Women Voters*, 769 F.3d at 236; *see also Moore v. Circosta*, 494 F. Supp. 3d 289, 322 (M.D.N.C. 2020) ("in the middle of an election, less than a month before Election Day itself, this court cannot cause 'judicially created confusion' by changing election rules"), *inj. pending appeal denied*, *Wise v. Circosta*, 978, F.3d 93 (4th Cir. 2020).  So too here, where a mid-cycle change to USNA's policies would burden the administrators and students who "have all been proceeding" under the existing policies, *Christa*, 364 F. Supp. 3d at 276, and also significantly impact the applicants who have already received LOAs or offers of appointment—and all applicants more generally—by subjecting them to different policies based on the date of their application.  *See* Latta Decl. ¶¶ 103–07.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny Plaintiff's motion for a preliminary injunction.

Dated: December 1, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch


___*/s/ Catherine M. Yang*_____
JOSHUA E. GARDNER
*By Special Appearance*
Special Counsel
CHRIS EDWARD MENDEZ
*By Special Appearance*
Trial Attorney
CATHERINE M. YANG
*By Special Appearance*
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 514-4336
Email: catherine.m.yang@usdoj.gov

MEDHA GARGEYA
*By Special Appearance*
Counsel
U.S. Department of Justice
Civil Division, Office of the Assistant
Attorney General
950 Pennsylvania Avenue NW
Washington, DC 20530

*Attorneys for Defendants*