# Exhibit K



# Diversity, Inclusion, and Equal Opportunity in the Armed Services: Background and Issues for Congress

**Hristy N. Hamarck**

Specialist in Military Manpower

Updated June 5, 2019

**Congressional Research Service**

7-....

www.crs.gov

R44321



**Congressional Research Service**
Informing the legislative debate since 1914

**SUMMARY**

R44321

June 5, 2019

**Kristy N. Kamarck**
Specialist in Military
Manpower
-re-acte--@crs.loc.gov

For a copy of the full report,
please call 7-.... or visit
www.crs.gov.

# Diversity, Inclusion, and Equal Opportunity in the Armed Services: Background and Issues for Congress

Under Article 1, Section 8 of the U.S. Constitution, Congress has the authority to raise and support armies; provide and maintain a navy; and provide for organizing, disciplining, and regulating them. Congress has used this authority to establish criteria and standards for individuals to be recruited, to advance through promotion, and to be separated or retired from military service. Throughout the history of the armed services, Congress has established some of these criteria based on demographic characteristics such as race, sex, and sexual orientation. In the past few decades there have been rapid changes to certain laws and policies regarding diversity, inclusion, and equal opportunity – in particular towards women serving in combat arms occupational specialties, and the inclusion of lesbian, gay, bisexual, and transgender (LGBT) individuals. Some of these changes remain contentious and face continuing legal challenges.

Military manpower requirements derive from the National Military Strategy and are determined by the military services based on the workload and competencies required to deliver essential capabilities. Filling these capability needs, from combat medics to drone operators, often requires a wide range of backgrounds, skills and knowledge. To meet their recruiting mission, the military services draw from a demographically diverse pool of U.S. youth. Some have argued that military policies and programs that support diversity, inclusion, and equal opportunity can enhance the services' ability to attract, recruit and retain top talent. Other advocates for a diverse force believe that it is in the best interest of the military to recruit and retain a military force that is representative of the nation as a "broadly representative military force is more likely to uphold national values and to be loyal to the government—and country—that raised it." They contend that in order to reflect the nation it serves, the military should strive for diversity that reflects the demographics of the entire country.

Some contend that a military that is representative of the nation should also reflect its social and cultural norms. Such observers argue that popular will for social change should be the driving or limiting factor for DOD policies. Others oppose the expansion of certain diversity and equal opportunity initiatives due to concerns about how these initiatives might be implemented. For example, some contend that diversity initiatives could harm the military's merit-based system, leading to accessions and promotions that put demographic targets ahead of performance standards. Others express concern that the inclusion of some demographic groups is antithetical to military culture and could affect unit cohesion, morale, and readiness. When addressing equal opportunity within the Armed Forces, some further note that the military has a unique mission that *requires* the exclusion of some individuals based on, for example, age, physical fitness level, education attainment, or other characteristics.

# Contents

Overview ........................................................................................................................ 1

Why Do Organizations Value Diversity? ...................................................................... 2
  Diversity and Cohesion ............................................................................................. 2
  Diversity and Effectiveness ....................................................................................... 4
  Diversity Management ............................................................................................... 4
  Diversity and the Civil-Military Relationship ........................................................... 5
  Diversity and Social Equality .................................................................................... 5

How Does DOD Define Diversity, Inclusion, and Equal Opportunity? .......................... 6
  Diversity and Inclusion Policy ................................................................................... 6
  Military Equal Opportunity Policy ............................................................................. 7

How Does DOD Manage Diversity and Equal Opportunity? ......................................... 9
  Office for Diversity, Equity, and Inclusion (ODEI) ................................................... 9
  Defense Equal Opportunity Management Institute (DEOMI) .................................... 10
  Military Departments ............................................................................................... 11

How Have the Definition and Treatment of Protected Classes Evolved in the Armed
  Forces? ...................................................................................................................... 11
  Racial/Ethnic Inclusion: Background and Force Profile .......................................... 12
    The Civil War to World War II, Racial Segregation ............................................. 12
    Desegregation in the Truman Era ........................................................................ 13
    Civil Rights Movement and Anti-Discrimination Policies .................................. 15
    The Vietnam War and Efforts to Improve Race Relations ................................... 17
    Is the Racial/Ethnic Profile of the Military Representative of the Nation? .......... 19
  Inclusion of Women: Background and Force Profile ................................................ 22
    Women's Participation in World War I and World War II ................................... 23
    Post-WWII and the Women's Armed Services Integration Act ........................... 24
    Equal Rights Movement and an All-Volunteer Force .......................................... 25
    The 1990s: Increasing Roles for Women ............................................................ 27
    Recent Changes to Women's Assignment Policies .............................................. 29
    Is the Gender Mix in the Military Representative of the Nation? ......................... 29
  Lesbian, Gay, Bisexual, and Transgender (LGBT) Inclusion: Background and Force
    Profile .................................................................................................................. 33
    Advocacy and DOD Policy Formation in the 1970s and 1980s .......................... 34
    The Evolution of Don't Ask Don't Tell .............................................................. 35
    Repeal of Don't Ask Don't Tell (DADT) ........................................................... 37
    Post-DADT Integration ...................................................................................... 38
    Transgender Service Policies .............................................................................. 39
  Religious Inclusion: Background and Force Profile ................................................. 44
    Is Religious Diversity in the Military Representative of the Nation? ................... 46

Military Diversity and Equal Opportunity Issues for Congress ................................... 47
  Diversity in Leadership ........................................................................................... 47
  Diversity and Inclusion at the Service Academies ................................................... 49
  Management of Harassment and Discrimination Claims .......................................... 51
  Inclusion of Transgender Servicemembers .............................................................. 53
  Religious Discrimination and Accommodation ........................................................ 56
  Other Aspects of Diversity ...................................................................................... 57

Are Diversity and Equal Opportunity Initiatives Needed in the Military?................................... 59

## Figures

Figure 1. DOD Active Duty Racial and Ethnic Representation ..................................................... 20
Figure 2. Women Serving on Active Duty as a Percentage of Total Active Duty Force .............. 27
Figure 3. Female Representation in the Active Component .......................................................... 31
Figure 4. Women in Combat Policy Changes and Female Propensity for Military Service.......... 32
Figure 5. Non-prior Service Applicants for Active Component Enlistment by Gender and
   Race/Ethnicity ......................................................................................................................... 33
Figure 6. Religious Diversity in the Active Duty Force ............................................................... 47
Figure 7. Representation Ratios for Non-prior Service Enlisted Accessions by State ................. 57
Figure 8. Active Component Enlisted Accessions by Median Household Income ....................... 58

## Tables

Table 1. Diversity Goals for DOD and the Federal Workforce ....................................................... 6
Table 2. Equal Opportunity Definitions in DOD Policy................................................................. 9
Table 3. Key Factors Measured in DEOCS ................................................................................. 10
Table 4. Selected Legislation for Command Climate Surveys .....................................................11
Table 5. Military Fatal Casualties as a Result of the Vietnam War .............................................. 18
Table 6. Race and Ethnic Representation in the Active Component and U.S. Population ........... 21
Table 7. Racial/Ethnic Representation Among Post-secondary Degree Holders ......................... 21
Table 8. 1992 Presidential Commission on Women in Combat ................................................... 28
Table 9. Female Representation in the Active Duty Armed Forces.............................................. 31
Table 10. Timeline for DOD Transgender Policy Changes .......................................................... 44
Table 11. Military Department Policy Regarding Religious Accommodation
   and Expression ....................................................................................................................... 46
Table 12. Female Enrollment at Service Academies ................................................................... 49
Table 13. Service Academy and U.S. Undergraduate Enrollment by Race/Ethnicity ................. 49
Table 14. Estimated Gender Discrimination and Sexual Harassment at Service Academies........ 50

## Contacts

Author Contact Information ......................................................................................................... 60

# Overview

Under Article 1, Section 8 of the U.S. Constitution, Congress has the authority to raise and support armies; to provide and maintain a navy; and to provide for organizing, disciplining, and regulating them. In the past, Congress has used this authority to establish criteria and standards for recruiting individuals into the military, promoting them, and separating or retiring them from military service. In many cases, Congress has delegated the authority to develop these criteria and standards to the Secretaries of Defense and the Military Departments. However, throughout the history of the armed services, Congress has passed legislation either limiting or expanding requirements for military service based on demographic characteristics such as race, sex, and sexual orientation. In the past decade, there have been rapid changes to laws and policies governing the integration of certain demographic groups in the Armed Forces. Since 2009, these changes have allowed individuals who are gay to serve openly[1] and recognized their same-sex spouses as dependents[2], opened submarine billets and combat assignments to women[3], and have modified policies relating to the service of transgender troops.[4] While all career fields are open to women, Congress has not passed legislation that would allow or require draft registration for women.[5]

Over the past decade, there have also been a number of efforts by Congress and the Administration to assess diversity, equal opportunity, and inclusion across the federal workforce. In the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009 (P.L. 110-417), Congress mandated the creation of a Military Leadership Diversity Commission (MLDC) tasked with conducting "a comprehensive evaluation and assessment of policies that provide opportunities for the promotion and advancement of minority members of the Armed Forces, including minority members who are senior officers."[6] The commission's final report, *From Representation to Inclusion: Diversity Leadership in the 21st-Century Military,* noted that while great strides had been made in developing a diverse force, women and racial and ethnic minorities are still underrepresented in top leadership positions. In May 2011, the commission's report was released, and in August 2011, then-President Barack Obama issued an Executive Order (EO 13583) calling for a coordinated government-wide initiative to promote diversity and inclusion in the federal workforce. In Section 528 of the National Defense Authorization Act for Fiscal Year 2016 (P.L. 114-92), Congress reaffirmed a commitment to maintaining a diverse military stating:

> Diversity contributes to the strength of the Armed Forces.... It is the sense of Congress that the United States should—(1) continue to recognize and promote diversity in the Armed

---

[1] P.L. 111-321.

[2] Secretary of Defense, *Extending Benefits to Same-Sex Domestic Partners of Military Members,* Memorandum for Secretaries of the Military Departments Acting Under Secretary of Defense for Personnel and Readiness, February 11, 2013.

[3] Department of Defense, "Secretary of Defense Remarks on the Women-in-Service Review," December 3, 2015.

[4] Cronk, Teri Moon, "Transgender Service Members Can Now Serve Openly, Carter Announces," DOD News, June 30, 2016.

[5] For a separate discussion of the selective service see CRS Report R44452, *The Selective Service System and Draft Registration: Issues for Congress.*

[6] The commission's reference to minorities includes racial/ethnic minorities and women (although not a minority in the general population, women make up a significantly smaller percentage of the total Armed Forces.) The commission did not address issues related to the service of openly gay men and women as that topic was being addressed by the DOD Comprehensive Review Working Group.

> Forces; and (2) honor those from all diverse backgrounds and religious traditions who have made sacrifices in serving the United States through the Armed Forces.

This report is intended to support congressional oversight of DOD's diversity, inclusion, and equal opportunity programs, policies, and management for uniformed personnel.[7] The report starts by giving an overview of recent research on diversity and organizational management to demonstrate why organizations value diversity and what the findings on diversity suggest in a military context. The next sections outline DOD's military personnel policies, processes and organizational structure for managing diversity, inclusion, and equal opportunity. Following that, the report examines how the concept of diversity and inclusion has evolved throughout the history of the Armed Forces and provides a snapshot of the current demographic composition of the military relative to the U.S. civilian population. Finally, the report addresses some of the current legislative and policy issues related to diversity in the Armed Forces.

# Why Do Organizations Value Diversity?

Diversity is often defined as the variation of traits within groups of two or more people and may include both traits that are visible (e.g., sex, age, race) and invisible (e.g., knowledge, culture, values). An internet search on "diversity initiatives in the workplace," produces more than one million results. Given the emphasis placed on diversity by modern organizations it is important to understand why workforce diversity is valued and what that can mean in the context of military personnel management.

Many argue that diversity is a core value of an egalitarian and multicultural society and organizations should seek diversity regardless of its relationship with performance metrics.[8] From a human resource perspective, diversity is typically studied with regard to its impact on group dynamics and other factors that contribute to organizational performance. Two key factors that have been studied in both the civilian and military context are

- cohesion: commitment to other members of the group and the group's shared objectives; and
- effectiveness: the ability of the group to efficiently meet its objectives.

Studies on the impact of diversity on these factors have had mixed findings, leading some to argue that diversity is beneficial to organizational success, and others to suggest that it might be harmful.

## Diversity and Cohesion

Military cohesion is often considered to be a positive group attribute that contributes to the team's ability to cooperate and perform at high levels under stressful conditions. There are varying definitions of cohesion. In the military context, the 1992 Presidential Commission on the Assignment of Women in the Armed Forces defined it as

> the relationship that develops in a unit or group where (1) members share common values and experiences; (2) individuals in the groups conform to group norms and behavior in order to ensure group survival and goals; (3) members lose their personal identity in favor

---

[7] This report does not provide extensive information on policies and programs for DOD civilian personnel, or for U.S. Coast Guard uniformed personnel who are operating under the Department of Homeland Security.

[8] O'Brien, Lauren T. and Patricia N. Gilbert, "Ideology: An Invisible yet Potent Dimension of Diversity," in *The Oxford Handbook of Diversity and Work*, ed. Quinetta M. Roberson (New York, NY: Oxford University Press, 2013), p. 135.

of a group identity; (4) members focus on group activities and goals; (5) unit members become totally dependent upon each other for the completion of their mission and survival; and (6) group members meet all standards of performance and behavior in order not to threaten group survival.[9]

Some studies have found that higher overall levels of cohesion are associated with individual benefits of increased job satisfaction, retention, and better discipline outcomes.[10] Meta-analysis of group performance and cohesiveness has suggested that, on average, cohesive groups perform better than non-cohesive groups.[11] Others note that where observed causal relationships between cohesion and group performance exist, it is more often the performance of the group that affects the level of cohesiveness (i.e., unit success leads to a more cohesive unit) rather than the reverse.[12]

Recent studies of group cohesion focus on two ways that group cohesion develops.[13]

- *Social cohesion* is the extent to which group members like each other, prefer to spend their social time together, enjoy each other's company, and feel emotionally close to one another.

- *Task cohesion* is the shared commitment among members to achieving a goal that requires the collective efforts of a group.

Some behavioral research has found that interpersonal relationships that lead to social cohesion are established more readily between individuals with similar backgrounds, experiences and demographic characteristics.[14] In addition, some studies have found that teams with high levels of social cohesion have less conflict[15] and stronger support networks, which may help individuals to better cope with stress.[16] In the military context, those who argue for more homogenous units[17] argue that these units develop stronger interpersonal bonds that provide important psychological benefits and bolster unit resiliency when operating in highly stressful and austere environments.[18] They also argue that "out-group" members—those with different characteristics than the majority

---

[9] Presidential Commission on the Assignment of Women in the Armed Forces, Report to the President, November, 15, 1992, p. C-80.

[10] Oliver, Laurel W. et al., "A Quantitative Integration of the Military Cohesion Literature," *Military Psychology*, vol. 11, no. 1 (1999). Oliver et al. (1999).

[11] Evans, Charles R. and Kenneth L. Dion, "Group Cohesion and Performance," *Small Group Research*, vol. 43, no. 6 (December 2012).

[12] Rostker, Bernard D. et al., *Sexual Orientation and U.S. Military Personnel Policy; An Update of RAND's 1993 Study*, RAND Corporation, Santa Monica, CA, 2010, p. 141.

[13] The distinction between these two lines of cohesion has become increasingly common in academic literature over the past two decades. These definitions are derived from definitions in Rostker, Bernard D. et al., *Sexual Orientation and U.S. Military Personnel Policy; An Update of RAND's 1993 Study*, RAND Corporation, Santa Monica, CA, 2010, p. 139.

[14] Reagans, Ray, "Demographic Diversity as Network Connections: Homophily and the Diversity-Performance Debate" in *The Oxford Handbook of Diversity and Work*, ed. Quinetta M. Roberson (New York, NY: Oxford University Press, 2012), p. 181.

[15] Ibid., p. 181.

[16] Ahronson, Arni and James E. Cameron, "The Nature and Consequences of Group Cohesion in a Military Sample," *Military Psychology*, vol. 19, no. 1 (2007), pp. 9-25.

[17] Over time, this argument has been used to advocate against integrated military units with regard to race, gender, and sexual orientation.

[18] See for example, U.S. Department of Veterans Affairs, Office of Research and Development, "Unit Cohesion Could be Key to PTSD Resiliency," September 12, 2014, at http://www.research.va.gov/currents/summer2014/summer2014-27.cfm.

of others in the groups—may experience negative individual psychological effects as a result of poor social integration.

Other studies have found shared experiences can contribute to task cohesion and that this type of cohesion is a stronger predictor of group performance than social cohesion.[19] This leads some to argue that the "sameness" of individuals in a military unit is less important than the shared experiences of the unit. In this regard, some argue that military units that operate in an integrated manner can build task cohesion through integrated training.[20]

## Diversity and Effectiveness

Some studies on the effectiveness of small groups have found that the presence of diversity (in particular racial and gender diversity) is associated with better creative problem solving, innovation, and improved decisionmaking.[21] These positive outcomes are sometimes attributed to the broader range of perspectives, knowledge, and experience available in diverse groups relative to homogenous groups. Those who argue for diversity initiatives in the military argue that a more diverse force has the potential to be more efficient and flexible, and able to meet a broader set of challenges.

Other studies have found that within diverse groups individuals with demographically similar characteristics tend to build strong in-group relationships to the detriment of the larger unit.[22] The presence of demographic *in-groups* has been found in some circumstances to negatively affect group productivity, particularly if active *fault lines* or biases exist between subgroups.[23] Those who argue against the integration of certain subgroups suggest that there are pervasive cultural biases that can contribute to interpersonal friction within military units and distract from the unit's ability to perform under stress.

## Diversity Management

While the direction and magnitude of the effects of diversity on group performance remain debatable, there is a wide body of literature that links the performance of diverse groups to leadership and management.[24] Among human resource professionals in the public and private sectors, the focus in workforce management has shifted from diversity acquisition (e.g., affirmative action and hiring quotas) to diversity management. Under the previous philosophy, employers set targets for accessions based on race, sex, or other attributes in order to bolster

---

[19] Mullen and Copper (1994) and Beat et al.

[20] In the past, training pipelines and in some instances units were segregated by race and gender. As of 2015 the Marine Corps has separated men and women for portions of basic training.

[21] See review of the literature in, Richard, Orlando C. and Carliss D. Miller, "Considering Diversity as a Source of Competitive Advantage in Organizations." in *The Oxford Handbook of Diversity and Work*, ed. Quinetta M. Roberson (New York, NY: Oxford University Press, 2012), p. 240.

[22] See review of the literature in, Jehn, Karen A. and Lindred L. Greer, "Diversity as Disagreement: The Role of Group Conflict" in *The Oxford Handbook of Diversity and Work*, ed. Quinetta M. Roberson (New York, NY: Oxford University Press, 2012), p. 181.

[23] Thatcher, Sherry M., "Moving Beyond a Categorical Approach to Diversity: The Role of Demographic Faultlines," in *The Oxford Handbook of Diversity and Work*, ed. Quinetta M. Roberson (New York, NY: Oxford University Press, 2012), p. 59.

[24] Ferguson, Melissa J. and Shanette C. Porter, "An Examination of Categorization Processes in Organizations: The Root of Intergroup Bias and a Route to Prejudice Reduction," in *The Oxford Handbook of Diversity and Work*, ed. Quinetta M. Roberson (New York, NY: Oxford University Press, 2013), p. 98.

historically underrepresented groups. More recent diversity management philosophies focus on building organizational culture and policies to better attract a diverse workforce and to accommodate career development for employees with different backgrounds.

## Diversity and the Civil-Military Relationship

Given the U.S. military's unique role in society there are additional reasons that diversity could be of value within the defense establishment. In the military, the value of diversity is sometimes discussed as a facet of the civil-military (civ-mil) relationship. Some explain this relationship as a trinity of civilian leadership, civil society, and military servicemembers.[25] Civilian leadership ultimately decides how to resource and employ the military. These decisionmakers are influenced by civilian society (their constituents). In an all-volunteer force, recruits are drawn from civil society. Some portion of civil society serves, has served, or is directly affected by those who serve. The strength of the relationship between civil society and those who serve has been tied to the willingness of a democratic populous to hold civilian leaders accountable for decisions to enter and engage in conflict and to expend national resources to sustain a military force.[26]

On the other end, civilian leaders oversee the implementation of national security policies and hold military leaders accountable. One concern many have is that a cadre of military leaders who lack meaningful connections with civil society could question the legitimacy of civilian authority in military matters.[27] In the context of such concern, advocates for a diverse force believe that such a force is in the best interest of society because "a broadly representative military force is more likely to uphold national values and to be loyal to the government—and country—that raised it."[28]

## Diversity and Social Equality

Another argument for demographic representation is based in social equality. From this perspective, many believe that the risks of military service should be shared equally among all qualified citizens, and not disproportionately the burden of certain geographic, demographic, or socioeconomic groups. Others note that military service confers various benefits, opportunities, and status within society (e.g., veterans' preference in federal or state hiring[29], education benefits, specialized training). As a result, some social equality advocates argue that all qualified individuals should have equal opportunities to participate, earn the benefits, and advance within the military.

---

[25] Evans, Col. Charles M., "Impact of Diversity on the Civil-Military Relationship," *School of Advanced Military Studies, United States Army Command and General Staff College.*, May 2013, p. 11.

[26] Owens, Mackubin Thomas, "What Military Officers Need to Know About Civil-Military Relations," *Naval War College Review*, vol. 65, no. 2 (Spring 2012).

[27] Ibid., p. 80.

[28] Armor, David J., "Race and Gender in the U.S. Military," *Armed Forces & Society*, vol. 23, no. 1 (Fall 1996), pp. 7-27.

[29] Veterans account for about 10% of the U.S. population; however account for 30% of the federal workforce, and nearly 50% of the defense civilian workforce. (https://www.federaltimes.com/home/2018/04/07/where-are-the-veterans-in-the-federal-workforce/).

# How Does DOD Define Diversity, Inclusion, and Equal Opportunity?

Diversity, inclusion, and equal opportunity initiatives often go hand-in-hand in workforce management. Although the three terms are frequently used interchangeably, there are some key differences in how they are interpreted and applied. While *diversity* is primarily used to discuss the variations in visible and invisible traits among employees in an organization, *inclusion* or *inclusiveness* is typically used to discuss the culture of organizations. An inclusive organization is often described as one with policies that promote respect for differences, enable individual contributions, and instill a sense of organizational belonging. *Equal opportunity* is used in the context of legal protections for individuals or groups of individuals from forms of discrimination in the workplace. Policies that promote diversity and equal opportunity are typically complementary and can help build an organizational culture of inclusiveness.

## Diversity and Inclusion Policy

DOD's current diversity policies and plans stem from congressional and administration actions between 2008 and 2011. In the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009 (P.L. 110-417, Section 596), Congress authorized the creation of the Military Leadership Diversity Commission (MLDC). The commission's charter includes 16 tasks, one of which was to "develop a uniform definition of diversity to be used throughout DOD congruent with the core values and vision of DOD for the future workforce."[30] In 2011, the commission released its final report. In the same year, then-President Obama issued an Executive Order (EO 13583) calling for a coordinated government-wide initiative to promote diversity and inclusion in the federal workforce.[31]

In 2012, DOD issued a five-year Diversity and Inclusion Strategic Plan that drew on many of the recommendations from the MLDC report and outlined three overarching goals intended to align with goals in the Government-Wide Diversity and Inclusion Strategic Plan published by the Office of Personnel Management (OPM) (see **Table 1**).[32]

**Table 1. Diversity Goals for DOD and the Federal Workforce**

| OPM Strategic Goals | DOD Strategic Goals |
| --- | --- |
| Workforce Diversity. Federal agencies shall recruit from a diverse, qualified group of potential applicants to secure a high-performing workforce drawn from all segments of society. | Employ an aligned strategic outreach effort to identify, attract, and recruit from a broad talent pool reflective of the best of the nation we serve. Position DOD to be an "employer of choice" that is competitive in attracting and recruiting top talent. |

---

[30] Military Leadership Diversity Commission, *From Diversity to Inclusion: Diversity Leadership for the 21st-Century Military*, Final Report, March 15, 2011, p. 119.

[31] Executive Order 13583, "Establishing a Coordinated Government-Wide Initiative to Promote Diversity and Inclusion in the Federal Workforce," 76 *Federal Register*, August 23, 2011.

[32] Department of Defense, *Diversity and Inclusion Strategic Plan* 2012-2017. The United States Coast Guard's Diversity & Inclusion Strategic Plan, 2015 – 2018, can be found here: https://www.dcms.uscg.mil/Portals/10/CG-1/diversity/docs/pdf/Diversity_Inclusion_Strategic_Plan.pdf?ver=2017-03-01-095434-610.

| OPM Strategic Goals | DOD Strategic Goals |
|---|---|
| Workplace Inclusion. Federal agencies shall cultivate a culture that encourages collaboration, flexibility, and fairness to enable individuals to contribute to their full potential and further retention. | Develop, mentor, and retain top talent from across the total force. Establish DOD's position as an employer of choice by creating a merit-based workforce life-cycle continuum that focuses on personal and professional development through training, education, and developing employment flexibility to retain a highly skilled workforce. |
| Sustainability. Federal agencies shall develop structures and strategies to equip leaders with the ability to manage diversity, be accountable, measure results, refine approaches on the basis of such data, and engender a culture of inclusion. | Ensure leadership commitment to an accountable and sustained diversity effort. Develop structures and strategies to equip leadership with the ability to manage diversity, be accountable, and engender an inclusive work environment that cultivates innovation and optimization within the Department. |

**Sources:** DOD Diversity and Inclusion Strategic Plan, 2012-2017; Government-Wide Diversity and Inclusion Strategic Plan, 2011.

**Note:** OPM is the U.S. Office of Personnel Management.

The DOD strategic plan placed an emphasis on diversity management over the workforce life-cycle (from recruitment to retirement) and highlighted the role of leadership in establishing an inclusive organizational climate. The plan also established new definitions of diversity and diversity management that apply to both uniformed personnel and DOD:

> Diversity: All the different characteristics and attributes of the DOD's total force, which are consistent with DOD's core values, integral to overall readiness and mission accomplishment, and reflective of the Nation we serve.

> Diversity Management: The plans made and programs undertaken to identify and promote diversity within the DOD to enhance DOD capabilities and achieve mission readiness.[33]

DOD's definition of diversity encompasses not only demographic characteristics, but also different backgrounds, skills, and experiences. The strategic plan does not outline targets or quotas for the recruitment, retention, or promotion of historically underrepresented demographic groups, nor does it prioritize diversity at the expense of military readiness. While DOD does not establish official diversity targets based on demographic profiles, an inherent goal within the current definition is that the characteristics of the force should reflect the demographic characteristics of the U.S. population.[34] Consistent with this, DOD regularly collects and reports on the demographic profile of the force which can then be compared to the demographic profile of the civilian population.

## Military Equal Opportunity Policy

Equal opportunity typically refers to nondiscrimination protections for certain classes of individuals. DOD has civilian and military employees and operates both a Civilian Equal Employment Opportunity (EEO) Program and a Military Equal Opportunity (MEO) Program.[35]

---

[33] Department of Defense, *Diversity Management and Equal Opportunity in the DOD*, DODD 1020.02E, June 8, 2015, Incorporating Change 2, Effective June 1, 2018.

[34] https://diversity.defense.gov/About/, May 2, 2019. However, the individual Military Departments have in the past announced recruiting and accession targets. For example, in a speech at the Naval Academy in May 2015 the Secretary of the Navy announced a recruitment goal of 25% women for the Navy and Marine Corps. See Perkins, Derrick, "Mabus: 1 in 4 Marine Recruits Should Be Women," *Marine Corps Times*, May 26, 2015.

[35] This report focuses only on diversity and equal opportunity policies for uniformed servicemembers, not DOD

Military equal opportunity policies generally follow the precepts set in civilian civil rights law; however, many statutes and regulations that are applicable to civilian employment are not applicable to military service. The sources of uniformed servicemembers' rights, and restrictions thereon, include the Constitution, statute—including the Uniform Code of Military Justice (UCMJ)—DOD and service-level policies and regulations, and Executive Orders.

Congress has the authority to establish qualifications for and conditions of service in the armed forces. Whereas civilian law prevents discrimination based on age[36] or disability[37], the military is allowed, and in some cases compelled, by law to deny service opportunities to those unable to meet certain physical standards, and those above a certain age. For example, by statute,[38] a commissioned officer may be appointed only if he or she is "able to complete 20 years of active commissioned service before his sixty-second birthday ... is physically qualified for active service ... and has such other special qualifications as the Secretary of the military department concerned may prescribe by regulation."[39] Likewise, the law specifies persons who are ineligible to enlist.[40]

The Secretary of Defense has the general authority to prescribe policies and regulations for DOD employees, including those regulations pertaining to equal opportunity and nondiscrimination.[41] In DOD's 2015 revision to its policy, the MEO definition more closely mirrors the civilian EEO definition. Another change in 2015 expanded the protected classes of individuals to prevent unlawful discrimination on the basis of sexual orientation. In announcing this change, then-Secretary of Defense Ashton Carter stated

> We have to focus relentlessly on the mission, which means the thing that matters most about a person is what they can contribute to it ... we must start from a position of inclusivity, not exclusivity.... Anything less is not just wrong—it's bad defense policy, and it puts our future strength at risk.[42]

**Table 2** shows a comparison of DOD's equal opportunity definitions for civilian employees and military servicemembers.[43] In 2016, DOD changed the MEO definition to include gender identity under those protected from discrimination and harassment.

---

civilian employees.

[36] The Age Discrimination in Employment Act of 1967 (P.L. 90-202) forbids employment discrimination against anyone at least 40 years of age.

[37] The Americans with Disabilities Act of 1990 (P.L. 101-336) prohibits discrimination based on disability and requires employers to provide reasonable accommodations for those with disabilities. For Federal employees the Rehabilitation Act of 1973 (P.L. 93-112) applies.

[38] The President has authority under 10 U.S.C. §531 to appoint officers. This authority is delegated by executive order to the Secretary of Defense.

[39] 10 U.S.C. §532(a).

[40] 10 U.S.C. §504.

[41] 5 U.S.C. §301.

[42] Cronk, Terri, M. "Carter: Diversity, Inclusion Critical to the Force of the Future," *DOD News, Defense News Media*, June 9, 2015.

[43] The previous definition of MEO from DODD, 1020.02, dated February 5, 2009, was: "The right of all military personnel to participate in and benefit from programs and activities for which they are qualified. These programs and activities shall be free from social, personal, or institutional barriers that prevent people from rising to the highest level of responsibility possible."

**Table 2. Equal Opportunity Definitions in DOD Policy**

| DOD Civilian Equal Employment Opportunity (EEO) Definition | Military Equal Opportunity (MEO) Definition |
| --- | --- |
| The right of all DOD employees to apply, work, and advance on the basis of merit, ability and potential, free from unlawful discrimination based on race, color, national origin, religion, sex (including pregnancy, gender identity, and sexual orientation when based on sex stereotyping), disability, age, genetic information, reprisal, or other unlawful factors. | The right of all servicemembers to serve, advance, and be evaluated based on only individual merit, fitness, capability, and performance in an environment free from unlawful discrimination on the basis of race, color, national origin, religion, sex (including gender identity), or sexual orientation. |

**Source:** Department of Defense, *Diversity Management and Equal Opportunity in the DOD,* DODD 1020.02E, June 8, 2015, Incorporating Change 1, Effective June 1, 2018.

**Note:** DODD 1020.02E states that the civilian EEO program is governed by 42 U.S.C. §§2000e through 2000e-17, part 1614 of Title 29 C.F.R., chapter 14 of 29 U.S.C., and 5 U.S.C. §§2302(b)(1) and 7201.

Discrimination and harassment as described in military issuances include sexual harassment, hazing, intimidation, disparaging remarks, or threats against other servicemembers or civilians based on protected characteristics. Harassment also includes creating an intimidating or hostile work environment for individuals on the basis of protected characteristics. Harassment by military personnel may result in administrative actions (e.g., letters of reprimand, counseling, or low marks on annual performance evaluations) and may also be punishable under the UCMJ.[44]

# How Does DOD Manage Diversity and Equal Opportunity?

DOD oversees diversity management and equal opportunity programs while the military departments implement them. Programmatic components include research and data collection, training, and processes and procedures for military equal opportunity complaint resolution.

## Office for Diversity, Equity, and Inclusion (ODEI)

The Office for Diversity, Equity, and Inclusion (formerly the Office of Diversity Management and Equal Opportunity, ODMEO) is the DOD organization responsible for promoting diversity in the DOD workforce.[45] The Office of the Under Secretary of Defense for Personnel and Readiness oversees this office. ODEI has oversight authority for the DOD Diversity and Inclusion Management Program, DOD Military Equal Opportunity Program, DOD Civilian Equal Employment Opportunity Program, DOD Civil Rights Program, and Harassment Prevention and Response in the Armed Forces Program. The Director also provides oversight and guidance to the Defense Equal Opportunity Management Institute (DEOMI). DOD component heads have oversight of MEO programs and are responsible for making required reports to the Secretary of Defense and Congress.[46]

---

[44] Harassment may be punishable under the UCMJ, Article 92, "Failure to Obey an Order or Regulation" and Article 15 "Nonjudicial Punishment." (10 U.S.C. §892) Other punitive articles may also apply depending on the nature of the incident.

[45] ODEI was first established in 1994 as the Office of the Assistant Secretary of Defense for Equal Opportunity.

[46] Section 579(b) of the National Defense Authorization Act (NDAA) for Fiscal Year 2013 required the Secretary of Defense to report on substantiated incidents of sexual harassment that involve members of the Armed Forces including

# Defense Equal Opportunity Management Institute (DEOMI)

In 1971, DOD established the Defense Race Relations Institute (DRRI) with a mandate to

> conduct training for Armed Forces personnel designated as instructors in race relations, develop doctrine and curricula in education for race relations, conduct research, perform evaluation of program effectiveness, and disseminate educational guidelines and materials for utilization throughout the Armed Forces.[47]

In 1979, DRRI became the Defense Equal Opportunity Management Institute as the organization evolved to address not only race, but other diversity and equal opportunity issues in DOD. Today DEOMI offers resident, nonresident and e-learning courses geared toward equal opportunity advisors, counselors, and program managers across all military departments and components. DEOMI also conducts research to support policy-making and training and development programs, and provides a range of online resources for diversity management and equal opportunity programming.

DEOMI's Research Directorate administers the *Defense Equal Opportunity Climate Survey* (DEOCS). This survey is intended to be a tool to help commanders better gauge morale in their units, identify potential issues or areas of strength, and improve their organizational culture. It measures factors associated with organizational effectiveness, equal opportunity/fair treatment, perceptions of sexual harassment, and sexual assault prevention and response (see **Table 3**). The DEOCS may be administered to any DOD agency and is used for both uniformed military personnel and civilian employees.

**Table 3. Key Factors Measured in DEOCS**

| Organizational Effectiveness | Equal Opportunity/ Fair Treatment | Sexual Assault Prevention and Response (SAPR) |
|---|---|---|
| • Organizational Commitment | • Favoritism | • Safety |
| • Trust in the Leadership | • Hazing | • Bystander Intervention |
| • Organizational Performance | • Demeaning Behaviors | • Training Quality |
| • Organizational Cohesion | • Sexist Behaviors | • Information/Resource Availability |
| • Leadership Cohesion | • Racist Behaviors | • Adequate Response |
| • Job Satisfaction | • Racial Discrimination | • Retaliation |
| • Diversity Management | • Sex Discrimination | |
| • Organizational Processes | • Sexual Harassment | |
| • Help Seeking Behaviors | • Religious Discrimination | |
| • Exhaustion/Burnout | • Civilian Only: | |
| • Intention to Stay |    • Age Discrimination | |
| |    • Disability Discrimination | |
| |    • Equal Pay | |
| |    • Genetic Information | |
| |    • Pregnancy | |

**Source:** DOD Sample DEOCS 4.0 Survey, DEOMI, January 1, 2014.

---

identifying cases in which a member is accused of multiple incidents of sexual harassment.

[47] Department of Defense Directive, *Education and Training in Human/Race Relations for Military Personnel,* DODD 1322.11, 24 June 1971 (cancelled).

**Note:** The survey also allows for the addition of locally developed questions and allows respondents to provide written comments directly associated with discrimination/sexual harassment/SAPR.

The DEOCS is used at the unit level to establish a baseline assessment of the command climate. Subsequent surveys are intended to track progress relative to the baseline. In recent years there has been a series of legislative initiatives that have enhanced requirements for the administration of command climate surveys (see **Table 4**). Many of these initiatives have come in response to growing concerns about command responses to sexual harassment and assault reports.[48]

### Table 4. Selected Legislation for Command Climate Surveys

| Public Law | Description |
|---|---|
| P.L. 112-239, FY2013 NDAA | Section 572: Requires commander of each military command to conduct a climate assessment for the purposes of preventing and responding to sexual assaults within 120 days of assuming command and at least annually thereafter. |
| P.L. 113-66 FY2014 NDAA | Section 587: Requires results of command climate surveys to be provided to the commander and the next higher up in the chain of command and requires that a failure to conduct a command climate survey be noted in the commander's performance evaluation. |
| | Section 1721: Requires the Secretaries of the military departments to track compliance with statutory command climate survey requirements. |
| | Section 1751: Expresses a sense of congress regarding the importance of establishing a command climate where criminal activity can be reported free from the fear of retaliation or ostracism. |

**Source:** Public Law.

## Military Departments

In practice, the military departments manage their own diversity programs and initiatives. MEO training, prevention, complaints, and resolutions are handled at the unit level through the chain of command. It is the commander's responsibility to establish a climate of inclusiveness and equal opportunity.[49] Accountability for senior leaders is achieved through command climate assessments (DEOCs) and through evaluations of character and organizational climate/equal opportunity on performance evaluations. For example, *character* is rated on senior enlisted evaluations for E7-E9's in the Navy. A *Greatly Exceeds Standards* rating for character requires that the individual "seamlessly integrate diversity into all aspects of the command," while a *Below Standards* rating describes the individual as "demonstrates exclusionary behavior, fails to value differences from cultural diversity."[50]

# How Have the Definition and Treatment of Protected Classes Evolved in the Armed Forces?

DOD's current definition of *military equal opportuni*ty protects servicemembers from unlawful discrimination on the basis of race, color, national origin, religion, sex (including gender identity) or sexual orientation. However, throughout the history of the Armed Forces, these currently protected classes were excluded to varying degrees from military participation and occupational

---

[48] For more on military sexual assault, see CRS Report R44944, *Military Sexual Assault: A Framework for Congressional Oversight*.

[49] See for example, Air Force Instruction 1-2, *Commander's Responsibilities,* AFI 1-2, May 8, 2014.

[50] Department of the Navy, *Navy Performance Evaluation System.* BUPERSINST 1610.10C, April 20, 2011.

assignments by policy and statute. The history of integration in the military is detailed and often dependent on the political, social, and cultural context of the era. This section describes statutory and policy changes that affected the treatment of various demographic groups over time. The following sections also provide a snapshot of the demographic profile of the Armed Forces.

# Racial/Ethnic Inclusion: Background and Force Profile

Racial minorities have volunteered or been drafted for service since the time of the American Revolution;[51] however, the military was a racially segregated institution until the mid-20th century. Under the widely accepted *separate but equal* philosophy of the time, these segregation policies were not considered to be unjust by many senior military and government officials. However, civil rights activists rejected this notion, and pushed for full racial integration across all segments of society, including the Armed Forces. Even as policy and statute changed over time to remove occupational and assignment barriers to racial/ethnic minorities, concerns about discrimination and equal opportunity have persisted.

## The Civil War to World War II, Racial Segregation

The recruitment of racial minorities into the service through most of the 1800s and 1900s was not driven by a desire for diversity, but rather by practical manpower requirements. During the Battle of New Orleans during the War of 1812, General Andrew Jackson's Army included both "Free Men of Color," and Choctaw Native Americans.[52] During the Civil War, approximately 186,000 black Americans served in the Union Army as part of sixteen segregated combat regiments, and some 30,000 served in the Union Navy. Following the Civil War, as part of what is commonly known as the Army Reorganization Act of 1866, Congress authorized the creation of permanent "colored" units consisting of two cavalry and four infantry regiments.[53] The act also authorized the recruitment and enlistment of 1,000 Native Americans to act as scouts. While the creation of these units guaranteed career opportunities for specific racial minorities, it also introduced an era of institutionalized segregation in the armed services.

In 1896, the Supreme Court case of *Plessy v. Ferguson* upheld state laws authorizing racial segregation under a "separate but equal" doctrine. Following the ruling, states proceeded to enact a series of segregation-based laws and the military services began active implementation of racial segregation policies. Due to pressing needs for additional manpower in the Army, black soldiers made up approximately 11% of the Army's total strength in World War I and 13% of all those conscripted (in racially separate "white" and "colored" draft calls).[54] Hispanics, Native Americans, and Asian Americans were mostly drafted as "whites."[55] However, there was

---

[51] Approximately 5,000 black soldiers served in the Revolutionary War. MacGregor, Morris, J. Jr., *Integration of the Armed Forces 1940-1965* (Washington, DC: Center of Military History, 1981), p. 4.

[52] Ward, Rufus, "Andrew Jackson and the Free Men of Color, *The Commercial Dispatch,* January 8, 2011. https://lowndeslibarchives.wordpress.com/2011/01/09/andrew-jackson-and-the-free-men-of-color/.

[53] 39th Congress, Sess.1. Ch. 299, July 28, 1866. *An Act to Increase and Fix the Military Peace Establishment of the United States.* The units created were the 9th and 10th Cavalry and the 38th, 39th, 40th, and 41st Infantry. In March of 1869, as part of reduction-in-strength measures, Congress combined the four infantry regiments into just two regiments (the 24th and 25th).

[54] MacGregor, Morris, J. Jr., *Integration of the Armed Forces 1940-1965* (Washington, DC: Center of Military History, 1981), p. 7.

[55] There was confusion as to whether these other minorities should be classified as "white" or "colored" and some may have appeared on either of the draft calls depending on local interpretations. Shenk, Gerald E., *"Work or Fight!" Race, Gender, and the Draft in World War One,* New York, New York, 2005.

confusion in some states as to how to treat draftees of Asian ethnicity. Chinese surnames appeared on both black and white draft lists.[56] While black soldiers in the Army were often directed towards unskilled combat support or service support jobs, many also served as frontline combat troops.

During World War II, the War Department again issued separate draft calls for black and white servicemembers and maintained segregated training and unit assignments. The Army upheld a quota policy for the recruitment of black soldiers with a ceiling of 10% of total recruits.[57] In this era, the distribution of white and black servicemember between the officer and enlisted ranks and occupational specialties suggested some inequities in accession and assignment policies. In 1941, black soldiers in the Army accounted for 5% of the Infantry and less than 2% of the Air Corps, whereas they accounted for 15% of the less-prestigious Quartermaster Corps[58] and 27% of unassigned or miscellaneous detachments.[59] About 2% of the Navy was black, and with the exception of six men rated as regular seaman, all of them were enlisted steward's mates. None were officers.[60] At peak WWII manpower strength in 1945, black servicemembers accounted for 7.2% of the total military force but only 0.6% of the officer corps.[61] Army practices did not allow black officers to outrank or command white officers in the same unit, and some commanders preferred to assign white officers for command of black units.[62]

Given Japan's role in the war there was a general public suspicion of Japanese Americans and some already serving in the military were removed from active duty or discharged.[63] However, approximately 6,000 Nisei (first-generation, American-born Japanese) served as interpreters or linguists in the war with about 3,700 serving in combat.[64] In addition, the Army formed a segregated unit comprised of about 4,500 Japanese-Americans within the 442d Regimental Combat Team (RCT) that fought in Italy and Central Europe.[65]

## Desegregation in the Truman Era

In December 1946, in response to what was seen as a worrisome increase in racial violence and tension across the United States, President Harry Truman issued an Executive Order establishing the President's Committee on Civil Rights.[66] The commission's mandate was to examine civil rights for all citizens; however, they did make certain recommendations for the military services.

---

[56] Shenk, Gerald E., *"Work or Fight!"; Race, Gender, and the Draft in World War I* (Palgrave Macmillian, 2005), p. 122.

[57] MacGregor, Morris, J. Jr., *Integration of the Armed Forces 1940-1965* (Washington, DC: Center of Military History, 1981), p. 37.

[58] Quartermaster functions included food service, laundry, and other logistical services.

[59] MacGregor, Morris, J. Jr., *Integration of the Armed Forces 1940-1965* (Washington, DC: Center of Military History, 1981), p. 24.

[60] President's Committee on Equality of Treatment and Opportunity in the Armed Forces, *Freedom to Serve: Equality of Treatment and Opportunity in the Armed Services,* United States GPO, Washington, DC, 1950. p. 25.

[61] The Report of the President's Committee on Civil Rights, *To Secure These Rights,* October 1947. p. 44.

[62] MacGregor, Morris, J. Jr., *Integration of the Armed Forces 1940-1965* (Washington, DC: Center of Military History, 1981), p. 37.

[63] Hajela, Deepti, "Asian American Soldier's Suicide Called a 'Wake-Up Call' for the Military," *Washington Post,* February 21, 2012.

[64] New Jersey Korean War Memorial Website, *Fact Sheet: Asian Americans in the United States Military during the Korean War,* Atlantic City, NJ, October 28, 2015.

[65] Ibid.

[66] Executive Order 9808, "Establishing the President's Commission on Civil Rights," December 5, 1946.

The commission's report, *To Secure These Rights*, noted that blacks and other minority servicemembers faced many barriers to equal treatment both within and outside the military. The commission advocated for (1) full racial integration within the military, (2) a ban on discrimination based on race or color, and (3) award of officer commissions and promotions based solely on merit.

In 1948, during his campaign for reelection, President Truman issued Executive Order 9981, which set in motion a purposeful desegregation effort.[67]

> It is hereby declared to be the policy of the President that there shall be equality of treatment and opportunity for all persons in the armed services without regard to race, color, religion or national origin.[68] This policy shall be put into effect as rapidly as possible, having due regard to the time required to effectuate any necessary changes without impairing efficiency or morale.

The order also established the President's Committee on Equality of Treatment and Opportunity in the Armed Forces under chairmanship of Charles Fahy to understand the potential impact of integration on military efficiency. During the commission's inquiry, some military leaders advocated for maintaining the status quo due to concerns about inefficiencies that might arise from "impaired morale in mixed units."[69] The Fahy Committee's final report, released in 1950, expressed serious doubts about military officials' claims that integration would negatively affect morale and efficiency, finding instead evidence that existing segregation policies were contributing to inefficiencies through unfilled billets, training backlogs, and less capable units. In their conclusion, the committee stated:

> As a result of its examination into the rules, procedures, and practices of the armed services, both past and present, the Committee is convinced that a policy of equality of treatment and opportunity will make for a better Army, Navy, and Air Force. It is right and just. It will strengthen the nation.[70]

Between 1949 and 1950 the military departments changed their policies regarding minority races to reflect the recommendations of the Fahy Committee and to echo the language of President Truman's Executive Order that there should be "equality of treatment and opportunity for all persons ... without regard to race, color, religion, or national origin."[71] By this time, Asian-Americans were no longer serving in segregated units; however, black units were still segregated.

The manpower needs of the Korean War (1950-1953) catalyzed racial integration in the services. Under pressure to rapidly build up and deploy forces, the Army lacked the time and resources to continue to operate separate training pipelines for black and white soldiers. On the battlefield, Army and Marine Corps commanders began assigning black soldiers to replace losses in white combat units by necessity. However, senior leaders in the Army were reluctant to change official policies, as stated by Army Lt. General Edward M. Almond in opposition to changes:

---

[67] Executive Order 9981, "Establishing the President's Committee on Equality of Treatment and Opportunity in the Armed Forces," July 26, 1948.

[68] At this time the policy did not mention discrimination based on gender.

[69] President's Committee on Equality of Treatment and Opportunity in the Armed Forces, *Freedom to Serve: Equality of Treatment and Opportunity in the Armed Services,* United States GPO, Washington, DC, 1950. p. 15.

[70] President's Committee on Equality of Treatment and Opportunity in the Armed Forces, *Freedom to Serve: Equality of Treatment and Opportunity in the Armed Services,* United States GPO, Washington, DC, 1950. p. 68.

[71] The Navy and Marine Corps' policy was issued on June 23, 1949, the Air Force policy was issued on May 11, 1949, and the Army policy was issued on January 16, 1950.

> I do not agree that integration improves military efficiency; I believe it weakens it. I believe that integration was and is a political solution for the composition of our military forces because those responsible for the procedures ... do not understand the characteristics of the two human elements concerned... This is not racism—it is common sense and understanding. Those who ignore these differences merely interfere with the combat effectiveness of combat units.[72]

In response to political pressures for change, the Army initiated two scientific research studies of the performance of integrated units; one conducted internally by the Army G-1, and one through a contracted agency that was code named "Project Clear." Both studies concluded that contrary to widely held beliefs, unit performance was not negatively affected by integration, and that the practice of segregating units was in fact damaging to military effectiveness.[73]

The Army dropped its 10% ceiling on the recruitment of black soldiers in 1950. By October 1953, basic training and unit assignments were no longer segregated, and the Army announced that 95% of African-American soldiers were serving in integrated units.[74] In 1951, the Marine Corps announced a policy of racial integration.[75] By 1954, then-Secretary of Defense Charles Erwin Wilson announced that the last all-black active duty unit had been abolished. However, some Reserve and National Guards remained segregated or closed to black entrants into the 1960s.[76]

## Civil Rights Movement and Anti-Discrimination Policies

While DOD had announced the full integration of the active duty military in 1954, segregation was still widespread in National Guard and Reserve units and discrimination on military installations and in surrounding communities persisted.[77] In 1962, President John F. Kennedy authorized the President's Committee on Equal Opportunity in the Armed Forces to be chaired by Gerhard A. Gesell. The commission was the first to address equal opportunity in the forces since the Fahy Commission in 1950; its mandate was to determine the following.

> 1. What measures should be taken to improve the effectiveness of current policies and procedures in the Armed Forces with regard to equality of treatment and opportunity for persons in the Armed Forces?

> 2. What measures should be employed to improve equality of opportunity for members of the Armed Forces and their dependents in the civilian community, particularly with respect to housing, education, transportation, recreational facilities, community events, programs and activities?[78]

The commission found that while armed services *policies* were not discriminatory as written, there was a need for the military to improve recruitment, assignment, and promotion *practices* to

---

[72] MacGregor, Morris, J. Jr., *Integration of the Armed Forces 1940-1965* (Washington, DC: Center of Military History, 1979), p. 441.

[73] Binkin, Martin et al., *Blacks and the Military*, Brookings Institution, Washington, DC, 1982, p. 29.

[74] In October 1953, the Army announced that 95% of African-American soldiers were serving in integrated units.

[75] However, black Marines were still restricted to certain assignments until 1962. MacGregor, Morris, J. Jr., *Integration of the Armed Forces 1940-1965* (Washington, DC: Center of Military History, 1979), p. 468.

[76] Until 1963 there were 10 states with large black populations and no black soldiers in their National Guard units and the Army Reserve maintained six all-black units. MacGregor, Morris, J. Jr., *Integration of the Armed Forces 1940-1965* (Washington, DC: Center of Military History, 1979), pp. 518 and 553.

[77] In 1964 the National Guard Bureau announced the integration of all States' National Guard.

[78] Letter from President John F. Kennedy to Gerhard A. Gesell, June 22, 1962. See http://chapters.rowmanlittlefield.com/07/425/0742545326ch3.pdf, September 2, 2015.

achieve equal treatment of black servicemembers.[79] In addition, the commission noted particular hardships imposed on black servicemembers and their families when assigned to or transferred to installations in communities with high levels of segregation and discrimination in education, housing, transportation, and employment. For example, one-fourth of all Army and Navy installations were located in communities with segregated public schools.[80] The commission noted that black servicemembers and their families were

> daily suffering humiliation and degradation in communities near bases at which they are compelled to serve ... community conditions are a constant affront and constant reminder that the society they are prepared to defend is a society that depreciates their rights to full participation as citizens.[81]

The commission's finding suggested that base commanders were not taking an aggressive role in identifying and addressing racial discrimination on base and within the communities. Some of the key recommendations of the commission were as follows.

- Expand and clarify the installation commander's role with respect to discrimination in the community.

- Develop mechanisms to tie an officer's performance ratings to their ability to establish a climate of equal opportunity.

- Initiate mandatory command training programs on discrimination and equal opportunity.

- Build biracial community working groups.

- Allow installation commanders to impose economic sanctions (boycotts/bans) on local businesses by prohibiting servicemembers from patronizing establishments that were racially discriminatory.[82]

- Establish equal opportunity offices and appoint officials for each of the military departments.

In response to the commission's recommendation, then-Secretary of Defense Robert McNamara[83] issued a new DOD policy in July 1963 to

---

[79] The commission found that promotion boards were made up of primarily white officers, and black officers made up a very small percentage of the total officer corps. The President's Committee on Equal Opportunity in the Armed Forces, *Equality of Treatment and Opportunity for Negro Military Personnel Stationed Within the United States,* June 13, 1963.

[80] The military traditionally did not offer on-base schools, but where it was available it was desegregated. The President's Committee on Equal Opportunity in the Armed Forces, *Equality of Treatment and Opportunity for Negro Military Personnel Stationed Within the United States,* Initial Report, June 13, 1963.

[81] The President's Committee on Equal Opportunity in the Armed Forces, *Equality of Treatment and Opportunity for Negro Military Personnel Stationed Within the United States,* June 13, 1963.

[82] This was one of the commission's most controversial recommendations and was seen by some critics as a threat to civil liberties and state sovereignty. During congressional debate, Rep. Durwood G. Hall of Missouri stated, "The recommendations made in the report and in the directive indicate a narrowness of vision which, in seeing only the civil rights issue, has blinded itself to the question of whether it is proper to use the Armed Forces to enforce moral or social, rather than a legal, issue in the civilian sector." MacGregor, Morris, J. Jr., *Integration of the Armed Forces 1940-1965* (Washington, DC: Center of Military History, 1979), p. 550.

[83] Some argue that McNamara did not go far enough in adopting the Gesell Commission's recommendations, particularly those relating to DOD internal processes for monitoring race relations and holding leaders accountable for command climate. See Military Leadership Diversity Commission, *From Diversity to Inclusion: Diversity Leadership for the 21st-Century Military*, Final Report, March 15, 2011, p. 5.

conduct all of its [DOD's] activities in a manner which is free from racial discrimination, and which provides equal opportunity for all uniformed members and all civilian employees irrespective of their color.[84]

One year after the DOD's policy issuance, the federal government passed the Civil Rights Act of 1964 (P.L. 88-352) that outlawed discrimination or segregation on the grounds of race, color, religion, sex, or national origin.[85] DOD responded by issuing a new policy that prescribed policies and procedures for processing servicemember requests for legal action under the new law in cases of discrimination faced off-base.[86]

## The Vietnam War and Efforts to Improve Race Relations

Despite the DOD's new policy in response to the Gesell Commission recommendations, the 1960s brought an era of conflict abroad and social unrest at home. In 1965 the U.S. deployed combat troops to Vietnam. While in previous wars, recruitment of blacks was limited by quotas or segregation policies, during Vietnam there was a perception that blacks were disproportionally drafted, sent to Vietnam, assigned to serve in high-risk/high-casualty combat units, and killed or wounded in battle.[87]

DOD draft data from 1964 show that among men aged 26-29, a greater percent of nonwhite males (50%) had been found unfit for service than white males (25%). However, of those who were qualified, 30.2% of the black male population was drafted compared with 18.8% of the white population.[88] The final report of the National Advisory Commission on Selective Service noted that in October 1966 only 1.3% of local draft board members were black and state draft boards had zero black members.[89] This lack of representation fed perceptions of favoritism towards white registrants. One of the recommendations of the commission was that local draft boards should "more realistically represent all elements, including ethnic, of the population of the country."[90]

Studies following the Vietnam era have found little evidence of sustained or widespread institutional racism in draft decisions. Generally, studies have found bias in draft deferments and inductions based on socioeconomic factors. Casualty statistics give a mixed picture as well. Black casualties in the early years of the war accounted for 22.4% of all troops killed in action in 1966; nevertheless, by 1973, at the end of U.S. military involvement in the war, total black fatalities were approximately 12.4% of the total casualties (see **Table 5**). In 1973, black servicemembers

---

[84] Department of Defense, *Equal Opportunity in the Armed Forces,* DODD 5120.36, July 1963 (Cancelled).

[85] Title VII of this law "Equal Employment Opportunity," did not apply to the employment of uniformed military personnel.

[86] Department of Defense, *Processing of Requests by Military Personnel for Action by the Attorney General Under the Civil Rights Act,* DODI 5525.2, July 24, 1964 (Cancelled).

[87] Between 1966 and 1969, Secretary of Defense Robert S. McNamara initiated "Project 100,000" which was intended to bring low-aptitude men out of poverty through military training and service. Inductees under this program were called "New Standards Men" reflecting the lowering of qualification standards on entrance examinations and requirements. Of the 236,000 Project 100,000 recruits, 47% were drafted, and 40% were black (relative to 9% of male enlistees that were black). About 37% of all Project 100,000 recruits were assigned to combat-type occupations and over half who entered the Army and Marine Corps were deployed to Vietnam. Binkin, Martin et al., *Blacks in the Military,* Brookings Institution, Washington, DC, 1982, p. 34.

[88] "In Pursuit of Equity: Who Serves When Not All Serve?," GPO, February 1967, p. 26.

[89] This commission was stablished on July 2, 1966 by Executive Order 11289. The final report was commonly known as the Marshall Report after its Chairman, Burke Marshall. It was published as "In Pursuit of Equity: Who Serves When Not All Serve?," GPO, February 1967.

[90] Ibid., p. 34

accounted for 18.4% of the active component Army enlisted corps and 16.9% of Marine Corps enlisted.[91]

**Table 5. Military Fatal Casualties as a Result of the Vietnam War**

| Race | Number of Fatalities | Percent of Total Fatalities |
|---|---|---|
| White | 49,830 | 85.5% |
| Black or African American | 7,243 | 12.4% |
| Other | 1,147 | 2.0% |
| **Total** | **58,220** | **100%** |

**Source:** Vietnam Conflict Extract Data File of the Defense Casualty Analysis System (DCAS), National Archives and Records Administration, http://www.archives.gov/research/military/vietnam-war/casualty-statistics.html#race.

**Notes:** Figures include those who died as a result of the Vietnam War and include deaths between June 8, 1956, and May 28, 2006. The "Other" category under race includes Asian, American Indian/Alaska Native, Native Hawaiian or Other Pacific Islander, Hispanic (one race), and Non-Hispanic (more than one race).

Between 1968 and 1970, perceived patterns of racial discrimination in both the military and surrounding communities contributed to an uptick in recorded violent incidents at military installations in the U.S. and overseas.[92] DOD ultimately was compelled to act after a 1971 incident at Travis Air Force Base, California, where an altercation in the barracks between a black Airman and a white Airman escalated into riots that ended in 135 arrests, 10 injuries, the death of a civilian firefighter, and significant property damage.[93] In 1971, in response to the incident at Travis AFB and the recommendations of an inter-service task force on racial relations, DOD established the Race Relations Education Board, required race relations training for all servicemembers, and opened the Defense Race Relations Institute (DRRI)[94] on Patrick Air Force Base, Florida.

On April 5, 1972, following concerns about discrimination in the military justice system, then-Secretary of Defense Melvin R. Laird established the Task Force on the Administration of Military Justice in the Armed Forces to

- identify the nature and extent of racial discrimination in the administration of military justice;
- identify and assess the impact of factors contributing to disparity in punishment rates between racially identifiable groups;
- identify and assess racial patterns or practices in initiation of charges against individuals; and
- recommend changes to enhance equal opportunity for servicemembers.[95]

---

[91] Office of the Secretary of Defense, *Population Representation in the Military Services, Fiscal Year 1997,* November, 1998, Table D-17. CRS has been unable to locate similar data for 1966.

[92] For example, racially motivated incidents occurred at Long Binh Jail outside Saigon (1968) and at Cam Ranh Bay (1969) in Vietnam, and domestically at Camp Lejeune, North Carolina (1969), and Camp Pendleton, California (1970).

[93] Leidholm, Nicole, *Race Riots Shape Travis' History,* U.S Air Force, November 8, 2013.

[94] In 1978, DRRI became the Defense Equal Opportunity Management Institute (DEOMI).

[95] Department of Defense, *Report of the Task Force on the Administration of Military Justice in the Armed Forces,* November 30, 1972.

The Task Force found evidence of both intentional and unintentional discrimination toward racial minorities in the military justice system stating,

> The Task Force believes that the military system does discriminate against its members on the basis of race and ethnic background. The discrimination is sometimes purposive; more often, it is not. Indeed, it often occurs against the dictates not only of policy but in the face of determined efforts of commanders, staff personnel and dedicated service men and women.[96]

The report proposed enactment of a specific legislative provision in the UCMJ to ban discrimination. However, this recommendation was not adopted and the UCMJ does not currently have any specific provision banning discrimination. The adoption of new antidiscrimination policies, programs and protections along with the advent of the All-Volunteer Force in 1973 helped to alleviate some of the racial tensions that had plagued the Armed Forces for the better part of the 20th century. Despite great strides in racial equality and nondiscrimination, some concerns about the treatment of and opportunities for racial minorities have persisted into the 21st century.[97] For example, some researchers have pointed to consistently higher rates of disciplinary action (i.e., court-martial or nonjudicial punishment) for black servicemembers relative to their white counterparts as evidence of persistent racial bias in the military justice system.[98]

## Is the Racial/Ethnic Profile of the Military Representative of the Nation?

For over 50 years DOD has not prohibited qualified U.S. citizens of different races or ethnicity from serving in any occupation in the military. Recent concerns by DOD and others have focused on whether the racial/ethnic composition of the military is representative of the broader society. The military's racial and ethnic profile shifted slightly over the past few decades. There was a surge in black enlistments in the late 1970s and 1980s, most significantly in the Army where black representation was above 30% from 1979 to 1981.[99] Black representation declined to approximately 20% of the active component throughout the 1990s, and has dipped below 20% in the past decade (see **Figure 1**). However, black representation in the Army remains above 20% and overall, the black members are overrepresented in the Armed Forces relative to the total U.S. population. The percentage of Hispanic servicemembers has grown consistently in the past two decades, and has doubled since 1997. This is consistent with the growth of the Hispanic population in the United States and its higher propensity to enlist, which sometimes varies by racial/ethnic group. Between 2004 and 2010 as reported by youth surveys, Hispanic youth (male and female) had a higher average aided propensity for enlistment than their white or black counterparts. The number of members identifying as mixed race has also grown, which contributes to growth in the other/unknown category in **Figure 1**.

---

[96] Department of Defense, *Report of the Task Force on the Administration of Military Justice in the Armed Forces,* November 30, 1972, p. 18.

[97] See for example, Tan, Michelle, "Army Investigates Alleged 'Racial Thursdays' at Unit," *Army Times*, March 19, 2015. Hajela, Deepti, "Asian American Soldier's Suicide Called a 'Wake-up Call' for the Military," *Washington Post*, February 21, 2012. Losey, Stephen, "Racial Slurs Written on Dorm Room Boards of Black Air Force Academy Cadet Candidates," *Air Force Times*, September 28, 2017.

[98] Christensen, Don, Col. (Ret.) et al., *Racial Disparities in Military Justice: Findings of Substantial and Persistent Racial Disparities Within the United States Military Justice System*, Protect Our Defenders, May 5, 2017.

[99] Burk, James and Evelyn Espinoza, "Race Relations Within the US Military," *Annual Review of Sociology*, vol. 38 (March 9, 2012), pp. 401-422.

### Figure 1. DOD Active Duty Racial and Ethnic Representation



**Source:** Defense Manpower Data Center.

**Notes:** Data includes all active duty members (officer and enlisted). Race and Hispanic origin are self-identified. The concept of race is separate from the concept of Hispanic origin. Hispanic may be more than one race (e.g., Hispanic and White or Hispanic and Black).

According to data from the Defense Manpower Data Center, the active duty enlisted corps is more racially diverse than the U.S. resident population with nonwhite servicemembers accounting for roughly one-third of all active duty enlisted and 23% of the total U.S. population ages 18-64. (see **Table 6**). Among enlisted minority groups in the active and reserve components, Asian servicemembers are underrepresented relative to the U.S. population and blacks and Pacific Islanders are overrepresented.

However, in the officer corps, and especially at the senior leadership level, racial and ethnic minorities are underrepresented relative to the enlisted corps and the U.S. population. For example, those of Hispanic origin (age 18-64) account for approximately 18% of the population and 18% of the active duty enlisted corps.[100] However, Hispanic officers account for roughly 8% of the officer corps and 2% of General/Flag officers. When considering the demographic makeup of the officer corps, it is important to note that certain requirements must be met to become a commissioned officer. For example, attaining a bachelor's degree (or higher) is a requirement for the appointment and advancement of most officers. Looking again at the Hispanic population, the percent of Hispanics in the officer corps is closer in terms of percentage of the pool of eligible officer candidates by educational attainment. While, those of Hispanic origin[101] account for nearly 18% of the U.S. population, they account for roughly 8% of all post-secondary degree holders (see **Table 7**).

---

[100] United States Census Bureau, *Annual Estimates of the Resident Population by Sex, Age, Race, and Hispanic Origin for the United States and States: April 1, 2010 to July 1, 201* , 2018, https://factfinder.census.gov/faces/tableservices/ jsf/pages/productview.xhtml?src=bkmk. Defense Manpower Data Center (DMDC), Active Duty by Service, December 2018. DMDC's Hispanic grouping includes members reporting Mexican, Puerto Rican, Cuban, Latin American with Hispanic descent, and other Hispanic descent ethnicities.

[101] The term Hispanic broadly refers to peoples, nations, and cultures that have a historical link to Spain as expressed through language, culture, or tradition.

### Table 6. Race and Ethnic Representation in the Active Component and U.S. Population

As of May 2018

| Rank and Grade | White | Black | Asian | American Indian/ Alaskan Native | Native Hawaiian/ Pacific Islander | Multi/ Unknown | Hispanic* |
|---|---|---|---|---|---|---|---|
| General/Flag Officer (O-7 and above) | 87.5% | 8.1% | 1.8% | none | 0.3% | 2.4% | 2.1% |
| Officer (all) | 77.3% | 8.1% | 5.2% | 10.1% | 0.5% | 8.2% | 7.6% |
| Warrant Officer | 69.0.% | 16.0% | 3.1% | 0.8% | 0.6% | 10.4% | 11.6% |
| Senior Enlisted (E-7 and above) | 63.1% | 19.1% | 3.8% | 1.3% | 1.2% | 11.5% | 14.3% |
| Enlisted (all) | 67.4% | 18.5% | 4.3% | 1.3% | 1.3% | 7.3% | 17.5% |
| **Total Active Duty** | **69.1%** | **16.8%** | **4.4%** | **1.2%** | **1.1%** | **7.5%** | **15.8%** |
| **U.S. Resident Population (age 18-64)** | **76.2%** | **13.7%** | **6.3%** | **1.2%** | **0.3%** | **2.2%** | **17.9%** |

**Sources:** Officer and Enlisted figures are as reported by the Defense Manpower Data Center, May 2018. Annual Estimates of the Resident Population by Sex, Age, Race and Hispanic Origin for the United States, States, and Counties: April 1, 2010, to July 1, 2017, U.S. Census Bureau, Population Division, Release Date: July 1, 2017.

**Notes:** Race and Hispanic origin are self-identified.

* The concept of race is separate from the concept of Hispanic origin. Hispanic may be more than one race (e.g., Hispanic and White or Hispanic and Black). Percentages for race should not be combined with percent Hispanic.

### Table 7. Racial/Ethnic Representation Among Post-secondary Degree Holders

U.S. Population compared with Active Duty Officer Corps

| Race/Ethnic Origin | % of Resident Population (age 18-64) | % of Total Active Duty Officer Corps | % of all Post-secondary Degree Holders (18 years and above) |
|---|---|---|---|
| White | 76.2% | 77.3% | 79.5% |
| Black | 13.7% | 8.1% | 8.6% |
| Asian | 6.3% | 5.2% | 9.7% |
| Hispanic* | 17.9% | 7.6% | 7.7% |

**Sources:** Officer and Enlisted figures are as reported by the Defense Manpower Data Center, May 2018. Educational Attainment of the Population 18 Years and Over, by Age, Sex, Race, and Hispanic Origin, U.S. Census Bureau, Current Population Survey, 2017 Annual Social and Economic Supplement.

**Notes:** Degree holders include Bachelor's, Master's, Professional, or Doctoral Degree.

* The concept of race is separate from the concept of Hispanic origin, Hispanic may be more than one race (e.g., Hispanic and White or Hispanic and Black).

Attaining the highest officer rankings (Admiral or General Officer) requires that individuals be competitively selected for promotion when eligible or *in zone* at different stages of their

careers.[102] A 2014 study of Air Force promotion rates found no evidence of differential rates of promotion by race/ethnicity for approximately 93% of the cases observed, suggesting overall fairness in the promotion system.[103] However, where disparities existed, whites had more favorable promotion outcomes than African Americans or Hispanics with similar characteristics.[104] The authors of the study found that career success is cumulative and that racial and ethnic minority officers, on average, were less likely to have achieved the early career milestones that are correlated with improved promotion prospects.[105]

Other potential factors in racial diversity among senior military leaders are career field preferences and career field assignment policies. In a 2009 study of assignments and preferences, of Army Reserve Officer Training Corps (ROTC) cadets, researchers found that African American cadets tend to prefer Combat Service Support branches whereas white cadets tended to gravitate towards Combat Arms branches.[106] Other studies have noted that racial minorities, particularly African Americans, are also underrepresented in Special Operations Forces (SOF) relative to their source population. For example, a 1999 RAND study found that black servicemembers were particularly underrepresented in SOF, compared to the source population.[107] This report cited both structural barriers (e.g., swimming requirements, Armed Service Vocational Aptitude Battery cutoff scores) and perceptual barriers (e.g., perceived racism, lack of knowledge/support in minority community for SOF careers, minority preferences for occupations with less risk or more civilian job transferability).[108]

## Inclusion of Women: Background and Force Profile

As with racial and ethnic groups, women have played a role in supporting and serving in the U.S. Armed Forces since the Revolutionary War. However, laws and policies regarding how many women may serve, their authorized benefits, and types of assignments have changed over the history of women's service. While the ceiling on the percentage of women allowed to serve in the military was repealed in 1967, women continued to be prohibited from serving in many occupations by statute and policy—particularly those occupations related to combat arms specialties.[109] In 1993, all laws prohibiting females from serving in any occupation were repealed; however, by DOD policy, women were still excluded from serving in units or occupations involved in direct ground combat. In 2013, the DOD rescinded the *Direct Ground Combat and Assignment Rule*, which had excluded women from assignment to units below the brigade level whose primary mission was to engage in direct combat on the ground. This rule had the effect of prohibiting women from assignments to certain combat arms occupations and units (e.g.,

---

[102] The officer promotion system was established in 1980 through the Defense Officer Personnel Management Act (DOPMA) (P.L. 96-513).

[103] The study did not address promotion rates for the other military departments.

[104] Lim, Nelson, Louis T. Mariano, and Amy G. Cox et al., *Improving Demographic Diversity in the U.S. Air Force Officer Corps*, RAND Corporation, Santa Monica, CA, 2014.

[105] Ibid., p. 48. For example, officers with higher military order of merit upon graduation from their commissioning program may get the opportunity to select career fields and assignments ahead of their peers.

[106] Lim, Nelson et al., *Officer Classification and the Future Diversity Among Senior Military Leaders; A Case Study of the Army ROTC*, RAND Corporation, Santa Monica, CA, 2009, p. xii.

[107] Harrell, Margaret C. et al., *Barriers to Minority Participation in Special Operations Forces*, RAND Corporation, Santa Monica, CA, 1999. The reasons cited by this report included structural and perceptual barriers that impede minority members from joining.

[108] Ibid., p. xv.

[109] P.L. 90-130; 81 Stat. 374; November 8, 1967. The ceiling was 2% enlisted women and 10% officers.

infantry) and its removal was the last major policy barrier to women's service in all occupational fields. The services were required to fully implement this change no later than January 1, 2016; however, they were allowed to request a waiver from the Secretary of Defense for further exclusion of women from certain positions.[110] On December 3, 2015, Secretary of Defense Ashton Carter ordered the military to open all combat jobs to women with no waivers or exceptions.[111]

## Women's Participation in World War I and World War II

The first uniformed women served in the Army Nurse Corps (established in 1901) and the Navy Nurse Corps (1908). Both Army and Navy nurses served abroad during WWI in field hospitals, mobile units, evacuation camps, and convalescent hospitals as well as on troop transports.[112] However, women who served in the Army and Navy Nurse Corps were not eligible for retirement or veterans' benefits. During World War I, under the Naval Act of 1916, which authorized the Navy to enlist "citizens,"[113] the Navy Department enlisted approximately 13,000 women for service in the Navy and Marine Corps in clerical occupations.[114] These enlisted women were eligible for the same pay and benefits as their male counterparts. While women served in the Army Nurse Corps, the Army did not officially enlist any women in the regular service.[115]

Before World War II, traditional attitudes towards women's roles in society and the military as a masculine organization were prevalent and thus there was little public interest in permanently integrating females into other occupations in the Armed Forces. In 1928, Major Everett S. Hughes, the chief Army planner for the development of the women's corps suggested that given shifting technology and rapid industrialization, women would inevitably play a role in future combat and as such they should be "indoctrinated" into the Army's culture and processes. He also argued that separate structures for women and men would be inefficient and that women should be afforded similar uniforms, ranks, and privileges.[116] Senior officials put aside Hughes' recommendations and planning efforts by and they were not adopted.

In 1941, then-Representative Edith Nourse Rogers introduced legislation that would have provided for a women's auxiliary to the Army. However, the bill did not move forward until after the attack on Pearl Harbor. On May 15, 1942, Congress approved the temporary establishment of a Women's Army Auxiliary Corps (WAAC), which then became the Women's Army Corps (WAC) in 1943.[117] In 1942, the Navy WAVES (Women Accepted for Volunteer Emergency Service), Coast Guard SPARs (Semper Paratus Always Ready), and Marine Corps (Marines) also established female divisions.[118] Occupational roles held by women during the war expanded from

---

[110] For more information on women in combat, please see CRS Report R42075, *Women in Combat: Issues for Congress.*

[111] The Secretary of the Army, the Secretary of the Air Force, and the Secretary of the Navy, as well as the Chief of Staff of the Army, the Chief of Staff of the Air Force, the Chief of Naval Operations, and the commander of U.S. Special Operations Command recommended no exceptions. The Marine Corps requested a partial exception in some areas such as infantry, machine gunner, fire support, reconnaissance, and others. Secretary of Defense Remarks on the Women-in-Service Review, December 3, 2015.

[112] See http://chnm.gmu.edu/courses/rr/s01/cw/students/leeann/historyandcollections/history/lrnmrewwinurses.html.

[113] The act did not specify *male* citizens, thus allowing a loophole for enlisting women.

[114] Binkin, Martin and Shirley J. Bach, *Women in the Military,* Brookings Institution, Washington, DC, 1977, p. 5.

[115] Women in Military Service for America Memorial Foundation, History and Collections.

[116] Binkin, Martin and Shirley J. Bach, *Women in the Military,* Brookings Institution, Washington, DC, 1977, p. 7.

[117] P.L. 77-554.

[118] While many expected the Marine Corps to develop a catchy name or acronym, the Marine Corps Commandant at

nursing and clerical positions to include airplane mechanics, air traffic controllers, instructors and other specializations with the exception of direct combat roles. Women also served for the first time as pilots of military fighter, bomber, transport, and training aircraft as part of a specialized paramilitary program called Women Airforce Service Pilots (WASP). The women who served with the WASPS were not officially part of the armed services and were not afforded military benefits or given veteran status until 1977.[119] During WWII, over 350,000 women served in the Armed Forces.[120]

## Post-WWII and the Women's Armed Services Integration Act

Following World War II, Congress made women a permanent part of the military services with the Women's Armed Services Integration Act of 1948.[121] This legislation excluded women from combat ships and aircraft and limited the proportion of women (as proposed by the Pentagon) to 2% of the enlisted force and 10% of officers.[122] While racial quotas during the same era were linked to the percentage of blacks in the U.S. population, there was not a clear basis for the ceiling on females who at the time accounted for nearly 30% of the civilian workforce. In addition, while the law allowed for permanent integration of women into the services it did not allow for equal treatment. Some of the limitations on women's service included

- women required parental consent for enlistment under the age of 21 (the age of consent was 18 for men);
- women could not hold a permanent rank above lieutenant colonel/commander (O-5);
- male spouses had to demonstrate dependency in order to receive female servicemembers' dependent's benefits and/or the female servicemember had to be the family's primary source of support for her children to be considered dependents.[123]

In 1951, then-Secretary of Defense George C. Marshall established the Defense Advisory Committee on Women in the Services (DACOWITS)[124] to serve as a board of civilian advisors to

---

the time, General Thomas Holcomb, told *Life* magazine "They are Marines. They don't have a nickname and they don't need one. They get their basic training in a Marine atmosphere at a Marine post. They inherit the traditions of Marines. They are Marines." See http://chnm.gmu.edu/courses/rr/s01/cw/students/leeann/historyandcollections/history/lrnmrewwiimar.html.

[119] P.L. 95-202, GI Bill Improvement Act of 1977. In 2009, Congress further recognized the WASPS by awarding a Congressional Gold Medal (P.L. 111-40).

[120] Binkin, Martin and Shirley J. Bach, *Women in the Military,* Brookings Institution, Washington, DC, 1977, p. 7.

[121] P.L. 80 - 625; 62 Stat. 356; June 12, 1948.

[122] The 10% cap excluded nurses. P.L. 625; 62 Stat. 356; June 12, 1948: "Women's Armed Services Integration Act of 1948." U.S. Congress, Senate Armed Services Committee, *Women's Armed Services Integration Act of 1947: Hearings on S. 1103, a bill to establish the Women's Army Corps in the regular Army, and for other purposes, S. 1527, a bill to authorize the enlistment and appointment of women in the regular Navy and Marine Corps and the Naval and Marine Corps Reserve, and for other purposes [and] S. 1641, a bill to establish the Women's Army Corps in the regular Army, to authorize the enlistment and appointment of women in the regular Navy and Marine Corps and the Naval and Marine Corps Reserve, and for other purposes.* , 80th Cong., 1st sess., July 1947 (Washington: GPO, 1947).

[123] These dependent benefits included increased housing allowances and medical benefits. At the time Social Security payments were also allotted on the assumption that men were the primary breadwinners and women were the dependent spouses.

[124] DACOWITS is authorized under the provisions of P.L. 92-463, the Federal Advisory Committee Act and meets on a quarterly basis to review issues and conducts information-gathering activities through installation visits, meetings, reports, and surveys. The committee provides recommendations to the Secretary of Defense through an annual report.

DOD on matters relating to the recruitment and retention, treatment, employment, integration, and well-being of women in the Armed Forces.

## Equal Rights Movement and an All-Volunteer Force

The 1960s and 1970s brought a rapid increase in the integration of women into the forces, due in part to the equal rights movement and the shift to an All-Volunteer Force (AVF) in 1973. The equal rights movement added momentum to efforts to eliminate discriminatory treatment of women in the armed forces. As with racial integration, the integration of women in the military was seen by some as a social catalyst for gender equity in the civilian sector. Some suggested that as females proved their abilities in military service, civilian employers would be "hard-pressed to deny jobs to women solely on the basis of their sex."[125]

A number of laws concerning gender discrimination in the civilian workforce were passed between 1963 and 1980, including the Equal Pay Act of 1963,[126] banning pay discrimination, and the Civil Rights Act of 1964, banning workplace discrimination based on a number of characteristics, including sex.[127] In 1967, Congress amended Titles 10, 32, and 37 of United States Code to remove restrictions on the careers of female officers. This legislation removed the limit on the percentage of women in the military, applied the same promotion rules to women as to men, and counted service as a nurse in the armed services as creditable commissioned service.[128] The first women Brigadier Generals for the Army (WAC), Elizabeth P. Hoisington and Anna Mae Hays, were appointed in 1970.[129]

In 1972, Congress passed the Equal Rights Amendment (ERA) with a ratification deadline of March 22, 1979 (later amended to June 30, 1982). The Amendment stated that "equal rights under the law shall not be abridged by the United States or by any State on account of sex." The ERA was never ratified, in part due to efforts by opponents who suggested that, if ratified, the ERA could pave the way for conscription of women into the armed forces, potentially putting them in combat roles.[130]

In the 1970s a series of policies for servicewomen's military benefits and eligibility for military service were changed. In 1973, in the Supreme Court case of *Frontiero v. Richardson,* the Court held that the policy requiring female servicemembers to prove the dependency of their spouses was unconstitutional, thus entitling female servicemembers to the same dependent benefits as male servicemembers for their spouses and children.[131] In 1974, Congress reduced the minimum

---

[125] Goldich, Robert, *Women in the Armed Forces: Proceedings of a CRS Seminar Held on November 2, 1979 and Selected Readings,* Congressional Research Service, February 14, 1980.

[126] 29 U.S.C. §206(d).

[127] 42 U.S.C. §§2000e et seq.

[128] P.L. 90-130; 81 Stat. 374; November 8, 1967.

[129] Army Chief of Staff General William C. Westmoreland congratulated them during their promotion ceremony by kissing them on the mouth, calling it "a new protocol for congratulating lady generals." Time Magazine, Vol, 95, No. 25, June 22, 1970.

[130] Schafly, Phyllis, "'Equal Rights' for Women: Wrong Then, Wrong Now," *Los Angeles Times*, April 8, 2007. Although the military draft ended in 1973, most male residents of the United States are required to register for the Selective Service. Women in the United States have never been required to register for the draft. For more information see, CRS Report R44452, *The Selective Service System and Draft Registration: Issues for Congress*.

[131] *Frontiero v. Richardson,* 411 U.S. 677 (1973).

age of consent for women to be consistent with the age of consent for men.[132] Until a DOD policy change in 1975, women could be involuntarily discharged for pregnancy.[133]

In 1972, the Reserve Officers' Training Corps (ROTC) was opened to women and in 1975, legislation was enacted allowing women to attend the military service academies.[134] By 1975 women accounted for approximately 5% of the active duty force (see **Figure 2**). In a 1978 DOD study of utilization of women in the military, researchers found that in the all-volunteer force, recruiting more women had the benefits of improving quality and saving money. In support of expanding female recruitment, the report stated

> The tradeoff in today's recruiting market is between a high quality female and a low quality male. The average woman available to be recruited is smaller, weighs less, and is physically weaker than the vast majority of male recruits. She is also much brighter, better educated, scores much higher on the aptitude tests and is much less likely to become a disciplinary problem.[135]

In 1978, the WAC was disestablished and women were assigned to Army branches for which they were eligible, in the same way as other soldiers.[136] In the same year, Congress authorized DOD to assign women to permanent duty on noncombatant Navy ships and up to six months of temporary duty on other ships.[137]

---

[132] P.L. 93-290; 88 Stat. 173; May 24, 1974.

[133] After the policy change, women could still voluntarily separate if pregnant. Women in Military Service for America Memorial Foundation, Inc., History and Collections.

[134] P.L. 94-106; 89 Stat. 537; October 7, 1975. Women had already been admitted to the Coast Guard and Merchant Marine Academies by administrative action.

[135] Officer of the Assistant Secretary of Defense (Manpower, Reserve Affairs, and Logistics), *Use of Women in the Military,* 2nd Edition, September, 1978.

[136] The WAC was disestablished by the Army in a ceremony on April 28, 1978. P.L. 95-485 abolished the WAC by statute.

[137] P.L. 95-485; 92 Stat. 1623; October 20, 1978.

**Figure 2. Women Serving on Active Duty as a Percentage of Total Active Duty Force**
1975-2018



Source: Defense Manpower Data Center data.

## The 1990s: Increasing Roles for Women

In the early 1990s there was an expansion of military occupations open to women. In 1991, Congress removed the restriction on women's assignment to combat aircraft. In the same year, the President's Commission on Women in the Armed Services was established. The commission's recommendation and votes are summarized in **Table 8**. Voting members of the commission overwhelmingly recommended retaining restrictions on women's assignment to direct ground combat and Special Operations roles and the commission members strongly favored both gender-neutral assignment policies and military readiness as the deciding factor in assignment decisions. The commission was sharply divided in terms of female assignments to combat aircraft and surface combatants, narrowly voting to reenact the law prohibiting women's assignments to combat aircraft. However, in the National Defense Authorization Act for Fiscal Year 1994, Congress allowed women to serve as permanent crew on combat vessels and did not enact restrictions on women's assignment to combat aircraft.[138] In response to concerns by the commission that instances of the use of quotas were perceived as discriminatory or negatively affected morale,[139] the same act also prohibited the Secretary of Defense from implementing any "gender quota, goal, or ceiling except as specifically authorized by law" for any occupational career field.[140]

---

[138] P.L. 103-160; 107 Stat. 1659 et seq.; November 30, 1993.

[139] Presidential Commission on the Assignment of Women in the Armed Forces, Report to the President, November, 15, 1992, p. 1.

[140] P.L. 103-160 §543.

**Table 8. 1992 Presidential Commission on Women in Combat**
Recommendations and Votes

| Commission Recommendation | Commission Votes | | |
|---|---|---|---|
| | Yes | No | Abstain |
| DOD should establish a policy to ensure that no person who is best qualified is denied access on the basis of gender to an assignment that is open to both men and women. | 9 | 6 | 0 |
| The Services should adopt gender-neutral assignment policies, providing the possibility of involuntary assignment of any qualified personnel to any position open to them. | 10 | 2 | 3 |
| The Services should retain gender-specific physical fitness tests and standards […], provided they do not compromise training or qualification programs for physically demanding combat or combat support MOSs. | 12 | 0 | 1 |
| The Services should adopt specific requirements for those specialties for which muscular strength/endurance and cardiovascular capacity are relevant | 9 | 4 | 2 |
| Entry level training may be gender-specific as necessary. | 8 | 6 | 1 |
| DOD should review policies regarding single parent military servicemembers and dual-service families. | 9 | 0 | 1 |
| Military readiness should be the driving concern regarding assignment policies; there are circumstances under which women might be assigned to combat positions. | 8 | 1 | 1 |
| Women should be excluded from direct land combat units and positions | 10 | 0 | 2 |
| The law prohibiting women to be assigned to aircraft on combat missions that was repealed in 1991 should be reenacted. | 8 | 7 | 0 |
| Laws prohibiting women to serve on combatant vessels except for submarines and amphibious vessels should be repealed. | 8 | 6 | 1 |
| Policies restricting assignment of women to Special Operations Forces should be retained. | 14 | 0 | 0 |
| DOD's "Risk Rule" for the assignment of women should be retained. | 9 | 4 | 2 |
| The integration process should be accomplished in an orderly fashion and without undue haste. | 11 | 3 | 1 |
| Women should not be required to register for or be subject to conscription (draft). | 11 | 3 | 1 |

**Source:** Presidential Commission on the Assignment of Women in the Armed Forces, Report to the President, November, 15, 1992.

Even as the armed services opened new roles for women, a series of incidents raised questions about how the military was handling sexual harassment and assault. In 1990, a female student (midshipman) at the Naval Academy left after an incident where she was handcuffed to a urinal in the men's bathroom and photographed by other midshipmen.[141] In response to this incident, then-Chairmen of the Senate Armed Services Committee and the Subcommittee on Manpower and Personnel asked GAO to conduct a study on the prevalence of sexual harassment at the Air Force, Naval, and Military academies. The GAO's 1994 report found that 93% to 97% of academy

---

[141] Barringer, Felicity, "Harassment of Woman Shakes Naval Academy," *New York Times*, May 20, 1990.

women experienced at least one form of sexual harassment during the 1990-91 academic year.[142] In 1992, complaints of sexual harassment and assault arose at a Las Vegas military aviation symposium hosted by the Tailhook Association. After what was deemed an inadequate investigation by Navy inspectors, the Office of the Inspector General (IG) launched an independent investigation. The IG's 1993 report identified 90 victims (83 women and 7 men) of indecent assault at Tailhook and highlighted a lack of leadership. In response to the IG report, then-Chief of Naval Operations Admiral Frank Kelso stated

> Tailhook brought to light the fact that we had an institutional problem in how we treated women. In that regard, it was a watershed event that has brought about institutional change.[143]

In 1996, a scandal at Aberdeen Proving Ground, an Army training base in Maryland, resulted in charges being brought against 12 male officers and enlisted trainers for sexual assault of females under their command. Sexual harassment and assault of female servicemembers continues to be a concern of both Congress and DOD with the integration of women in the military.[144]

## Recent Changes to Women's Assignment Policies

While laws prohibiting women from serving in combat units were repealed in the early 1990s, until recently it has been DOD policy to restrict women from certain military occupations and units, especially ground combat units. On January 24, 2013, DOD rescinded the ground combat restrictions for women, with the expectation that full implementation by the services would occur on January 1, 2016. The Air Force, Navy, Marine Corps, Army, and Special Operations Command were directed to develop implementation plans for the review of all closed occupations and units and the standards associated with entry and assignment to those units. Recommendations based on these reviews were reported to the Secretary of Defense by September 30, 2013.[145] On December 3, 2015, Secretary of Defense Ashton Carter ordered the military to open all combat jobs to women with no exceptions. This most recent policy change followed extensive studies on issues such as unit cohesion, women's health, equipment, facilities modifications, propensity to serve, and international experiences with women in combat.[146]

## Is the Gender Mix in the Military Representative of the Nation?

Female participation in the civilian and military workforce has been steadily rising over the past 50 years. In 1970, women accounted for less than 40% of the civilian workforce and less than 4% of the Armed Forces. In 2018, women accounted for nearly 17% of DOD's active duty force. In comparison, in 2016, women accounted for approximately 47% of the civilian workforce in the United States.[147] Growth in female representation in the military has mirrored growth in certain

---

[142] U.S. Government Accountability Office, *DOD Service Academies; More Actions Needed to Eliminate Sexual Harassment*, NSAID96-4, January 1994, p. 2.

[143] Gordon, Michael R., "Pentagon Report Tells of Aviators' 'Debauchery'," *New York Times*, April 23, 1993.

[144] For more information on congressional action, please see CRS Report R44944, *Military Sexual Assault: A Framework for Congressional Oversight*.

[145] A list of all research studies can be found in: U.S. Government Accountability Office, *DOD is Expanding Combat Service Opportunities for Women, but Should Monitor Long-Term Integration Progress*, GAO-15-589, July 20, 2015, http://www.gao.gov/products/GAO-15-589.

[146] U.S. Government Accountability Office, *DOD Is Expanding Combat Service Opportunities for Women, but Should Monitor Long-Term Integration Progress*, GAO-15-589, July 2015.

[147] Bureau of Labor Statistics, Household Data, Annual Averages, Employment Status of the Civilian Noninstitutional Population 16 years and over by Sex, 1976 to Date.

historically male-dominated civilian occupations. For example, female representation in the civilian police force rose from 3.7% in 1970 to 14.8% in 2010.[148]

In 2018, women accounted for approximately one-fifth of all officers in the Air Force, Navy, and Army, and 7.9% of officers in the Marine Corps (see **Table 9**). Among enlisted ranks, the Navy and Air Force again have about one-fifth of their active duty positions filled by female servicemembers while the Army has 14% women and the Marine Corps has 8.7%. While women make up almost 20% of the officer corps, they account for less than 10% of the highest leadership positions.

The disparity between female representation in General and Flag officer ranks relative to the officer corps in current data could be influenced by a number of factors. Some argue that limits on women's assignments, particularly to combat-related occupations and units, have harmed women's career and promotion potential to the highest leadership positions. For example, Retired Air Force General Lester L. Lyles, who chaired the Military Leadership Diversity Commission, stated

> We know that [the exclusion] hinders women from promotion. [ ... ] they're not getting credit for being in combat arms, [and] that's important for their consideration for the most senior flag ranks.[149]

The military personnel system does not typically allow lateral entry, thus the average general/flag officer (G/FO) has over 30 years of service. Therefore, today's females eligible for G/FO rank likely entered service in 1985 before restrictions were lifted on women serving on combat aircraft (1991), surface combatants (1993), submarines (2010), and before the "risk rule" was rescinded (1988).[150] Given this context, it may take some time before effects of current policy changes removing restrictions on female combat assignments can be observed in the data.

Another factor affecting the percentage of women in top positions may be related to retention rates for women in the military. Various studies have found that women leave the military at higher rates than men at various points during their career, meaning that while a new cohort of officer accessions may have a high percentage of females, that percentage may have dropped significantly by the time the cohort is eligible for promotion to senior ranks.[151] In some past surveys and focus groups, military women have suggested that reasons for leaving the service included perceptions of limited occupational roles, lack of career path flexibility, long hours/shift work, and concerns about harassment and family obligations.[152]

---

[148] U.S. Census Bureau, 1970 Equal Employment Opportunity Tabulation based on the decennial census and 2006-2010 Equal Employment Opportunity Tabulation based on the American Community Survey.

[149] Daniel, Lisa, "Panel says Rescind Policy on Women in Combat," *American Forces Press Service*, March 8, 2011.

[150] In 1988, DOD implemented the "risk rule" which excludes women from noncombat units or missions if the risk of exposure to direct combat, hostile fire, or capture were equal to or greater than the risks to the combat units they support.

[151] Previous studies have found that female officers generally have lower retention rates than their male counterparts. See for example, Keller, Kirsten M. et al., *Addressing Barriers to Female Officer Retention in the Air Force*, RAND Corporation, Santa Monica, CA, 2018. Asch, Beth J. et al., *A New Look at Gender and Minority Differences in Officer Career Progression in the Military*, RAND Corporation, Santa Monica, CA, 2012, p. xii.; or U.S. Government Accountability Office, *Women in the Military; Attrition and Retention*, NSAID-90-87BR, July 1990.

[152] Asch, Beth J. et al., *A New Look at Gender and Minority Differences in Officer Career Progression in the Military*, RAND Corporation, Santa Monica, CA, 2012. DiSilverio, Laura A.H., *Winning the Retention Wars: The Air Force, Women Officers, and the Need for Transformation*, Air University Press, Maxwell Air Force Base, AL, August 2003.

**Table 9. Female Representation in the Active Duty Armed Forces**

As of August 2018

| Service Branch | % of Total Active Duty Force | % of Total Enlisted | % of Senior Enlisted (E-7, E-8, E-9) | % of Total Officers (excludes Warrant Officers) | % of General/Flag Officers |
|---|---|---|---|---|---|
| Army | 15.0% | 14.4% | 12.0% | 18.7% | 6.8% |
| Navy | 19.7% | 19.7% | 12.0% | 19.3% | 8.6% |
| Marine Corps | 8.6% | 8.7% | 5.7% | 7.9% | 2.1% |
| Air Force | 20.2% | 19.9% | 20.4% | 21.1% | 9.2% |
| **All DOD** | **16.5%** | **16.2%** | **13.5%** | **18.6%** | **7.6%** |

**Source:** Defense Manpower Data Center (DMDC), https://www.dmdc.osd.mil/appj/dwp/dwp_reports.jsp.

**Notes:** *Total Officer* calculations exclude Warrant Officers for purposes of comparison as they are ineligible for General/Flag rank and the Air Force does not have Warrant Officers. Warrant officers are included *in Total Active Duty Force* calculation. *Total Active Duty Force does not include cadets and midshipmen General/Flag Officers* include O-7s and above.

**Figure 3. Female Representation in the Active Component**

August 2018



**Source:** Defense Manpower Data Center (DMDC), https://www.dmdc.osd.mil/appj/dwp/dwp_reports.jsp.

It is important to note that female participation in the military is a function not only of the number of occupations open to women, but also women's propensity to serve in the armed forces and desire to serve in a given occupation. Propensity to serve has historically been higher for men than women, and women are more likely to want to serve in the Navy or Air Force relative to the Army or Marine Corps. In recent youth polls, the percent of young women who said that they would "probably" or "definitely" be serving in the military in the next few years was 8% relative

to 18% for men.[153] Some have questioned whether the opening of direct combat roles to women would have an effect on female propensity to serve. DOD surveys have found that 35% of new recruits reported that this policy change made them more likely to serve; however only 2% of female recruits wanted a combat specialty in Armor, Artillery, or Infantry.[154]

### Figure 4. Women in Combat Policy Changes and Female Propensity for Military Service

Female youth ages 16 to 24, 2013-2016



**Source:** Fairley, Taylor, *An Overview Prepared for the Defense Advisory Committee for Women in the Services (DACOWITS)*, Department of Defense, Office of People Analytics, December 2017, p. 7, https://dacowits.defense.gov/Portals/48/Documents/General%20Documents/RFI%20Docs/Dec2017/OPA%20RFI%202.pdf?ver=2017-12-06-100540-760.

Interest in serving can also be measured by total applicants for enlistment. In FY2017, approximately 22% of DOD active component applicants were women, with the Navy and Air Force having the highest percent of applicants (27% and 29%, respectively) and the Marine Corps having the lowest (12%).[155] Among female applicants, black women were overrepresented relative to their representation in U.S. young adult population (18-24 years old); black women account for 15% of U.S. young female adults but 29% of all female applicants for enlistment (see **Figure 5**).

---

[153] Department of Defense Office of People Analytics, *An Overview Prepared for the Defense Advisory Committee for Women in the Services (DACOWITS)*, December 2017, https://dacowits.defense.gov/Portals/48/Documents/General%20Documents/RFI%20Docs/Dec2017/OPA%20RFI%202.pdf?ver=2017-12-06-100540-760.

[154] Ibid., slide 7.

[155] CNA, *Population Representation in the Military Services*, Fiscal Year 2015, Appendix A: Active Component Tables, Table A-3.

**Figure 5. Non-prior Service Applicants for Active Component Enlistment by Gender and Race/Ethnicity**

Comparisons with Civilian Cohort, FY2017



**Source:** Office of the Under Secretary of Defense, Personnel and Readiness, *Population Representation in the Military Services, Fiscal Year 2017*, Table A-3, Applicants1 for Active Component Enlistment, FY17: by Service, Gender, and Race/Ethnicity with Civilian Comparison Group.

**Notes:** Civilian data from Bureau of Labor Statistics Current Population Survey, non-institutional, age 18-24, October 2016-September 2017 average. *Applicants* are individuals whose first formal application (i.e., taking a screening physical exam or the Armed Services Vocational Aptitude Battery (ASVAB)) was in FY2015. The concept of race is separate from the concept of Hispanic origin. Hispanic may be more than one race (e.g., Hispanic and White or Hispanic and Black). Percentages for race should not be combined with percent Hispanic. The "Other" category includes Native Hawaiian and Other Pacific Islanders, and American Indian and Alaskan Natives.

# Lesbian, Gay, Bisexual, and Transgender (LGBT) Inclusion: Background and Force Profile[156]

Until the early 1990s individuals who were gay were not explicitly prohibited by U.S. law from serving in the Armed Forces. However, starting around World War I, such individuals were restricted by military personnel regulations or through application of military justice laws that prohibited sodomy.[157] In the early part of the 20th century Army physical standards also disqualified men with feminine physical characteristics (e.g., broad hips, narrow shoulders, and lack of facial hair).[158] During World War II, at the advice of psychiatric consultants, the Selective

---

[156] The term "gay" is used in this section to describe both men and women who identify as homosexual.

[157] The Articles of War of 1916 and as modified in 1920 established a new category for Miscellaneous Crimes and Offenses under the statutes governing military discipline and justice. Article 93 under that category stated that sodomy could be punishable by court-martial. Offenders could be subject to confinement and hard labor. Sodomy laws were later incorporated in the Uniform Code of Military Justice when adopted in 1951.

[158] Berube, Allan, *Coming Out Under Fire: The History of Gay Men and Women in World War II* (New York, NY: The Free Press, 1990), p. 14.

Service System added psychiatric screening, including questions about sexual behaviors and preferences, as part of the medical induction process. By 1941, Army directives disqualified men with "homosexual proclivities" due to "psychopathic personality disorders."[159] For men who wanted to serve, there were incentives to lie about their sexuality to be able to enter the service, to avoid draft rejection paperwork identifying them as a homosexual, and/or to avoid being labeled a *shirker* or *malingerer*.[160]

In terms of those men who had already entered the service and been identified as homosexual (through admission or behavior), military leaders recognized that that courts martial and/or confinement was not a sustainable punitive response in a time of war.[161] Between 1941 and 1943, in consultation with the psychiatric community (which largely viewed homosexuality as a mental illness) the Army and Navy developed new policies for the discharge of homosexual servicemembers who were not engaged in prohibited behavior. These "latent homosexuals" were offered an *undesirable discharge* (sometimes referred to as a *Section* 8) in lieu of prosecution for sexual acts.[162] Discharge paperwork often indicated the reason for discharge as *homosexual* or *sexual psychopath*.[163] This created problems for gay veterans returning to the civilian workforce after the war in an era where several states enacted *sex psychopath* laws and those who were suspected of being homosexual were generally viewed with high suspicion.[164] In 1952, the American Psychiatric Association (APA) established homosexuality as a "sociopathic personality disturbance" in the first edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-I).[165] Shortly after, in 1953, President Dwight D. Eisenhower issued Executive Order 10450 prohibiting federal employees from participation in groups considered "subversive" and listed "sexual perversion" as a security risk and grounds for termination or denial of employment.[166]

## Advocacy and DOD Policy Formation in the 1970s and 1980s

In 1972, gay rights advocacy groups announced a platform for social change that included a call for

> Issuance by the President of an executive order prohibiting the military from excluding for reasons of their sexual orientation, persons who of their own volition desire entrance into the armed services; and from issuing less-than-fully-honorable discharges for homosexuality; and the upgrading to fully honorable all such discharges previously issued, with retroactive benefits.[167]

---

[159] Women were not part of the draft, and there were no formal restrictions on lesbians entering the military until 1944. Berube, Allan, *Coming Out Under Fire: The History of Gay Men and Women in World War II* (New York, NY: The Free Press, 1990), p. 12 & 28.

[160] Ibid., p. 20-23.

[161] Ibid., p. 135.

[162] Ibid., p. 143

[163] Ibid., p. 258.

[164] Ibid., p. 259.

[165] In 1968, homosexuality was reclassified as a "sexual deviation" in the DSM-II, and in 1973 it was removed as a mental health diagnosis in the manual. Drescher, Jack, "Out of DSM: Depathologizing Homosexuality," *Behavioral Science*, vol. 5, no. 4 (December 2015).

[166] Executive Order 10540, *Security requirements for Government employment*, April 23, 1953.

[167] The 1972 Gay Rights Platform created at the National Coalition of Gay Organizations Convention, Chicago, Illinois, 1972.

In the late-1970s, the Joint Service Administrative Study Group released a study with two recommendations concerning homosexual behavior.

> One recommendation [was] to reaffirm the long-established ban on gays in the military. Specifically, the study group [had] proposed that the phrase "homosexuality is incompatible with military service" and "processing (for separation) is mandatory unless ... the allegations are groundless" be included in all subsequent DOD directives on personnel separations. The second recommendation [was] that, in cases of "unsuitability," i.e., those involving homosexual tendencies or homosexual acts between consenting adults, individual receive an *honorable* discharge.[168]

The recommendations from this study group provided the basis for DOD policy and in 1981, DOD issued a new directive stating that

> Homosexuality is incompatible with military service. The presence in the military environment of persons who engage in homosexual conduct or who, by their statements, demonstrate a propensity to engage in homosexual conduct, seriously impairs the accomplishment of the military mission. The presence of such members adversely affects the ability of the military services to maintain discipline, good order, and morale; to foster mutual trust and confidence among service members; to ensure the integrity of the system of rank and command; to facilitate assignment and worldwide deployment of service members who frequently must live and work under close conditions affording minimal privacy; to recruit and retain members of the military services; to maintain public acceptability of military service; and to prevent breaches of security.[169]

In addition, the 1981 policy stated that any servicemember attempting to engage in a homosexual act would be subject to mandatory discharge.

## The Evolution of Don't Ask Don't Tell

By the 1990s, there was pressure from some advocacy groups to rescind the DOD's policy on the grounds that it was a violation of civil rights and fair treatment. Proponents of maintaining the policy contended that allowing individuals who are gay to serve would prove disruptive to unit cohesion to the detriment of military readiness. In 1991, both the House and Senate introduced resolutions calling on President George H.W. Bush to rescind sections of the DOD policy that banned gay servicemembers; these resolutions were referred to committee and did not go any further.[170] In 1992, the GAO released a report estimating that between 1980 and 1990, approximately 17,000 servicemembers had been discharged under the DOD's separation policy and that the cost associated with replacing men and women discharged for homosexuality was $28,266 for each enlisted member and $120,722 for each officer.[171] In the same year during the presidential campaign, then-candidate Bill Clinton expressed support for allowing gay people to openly serve in the military.

After taking office in January 1993, President Clinton moved forward with his campaign promise, ordering DOD to undertake studies on how to best reform the policy. Secretary of Defense Les Aspin commissioned two studies, one by a panel of general and flag officers called the Military

---

[168] Snyder, William P., and Kenneth L. Nyberg, Policy Paper Gays and the Military: An Emerging Policy Issue, Journal of Political and Military Sociology, Vol. 8, No.1, Spring 1980: 74.

[169] Department of Defense Directive, *Enlisted Administrative Separations*, DOD 1332.14, January16, 1981.

[170] 102nd Congress, 1st Session, S.Res. 236, H.Res. 271.

[171] U.S. General Accounting Office, *Defense Force Management: DOD's Policy on Homosexuality*, NSAID-92-98, June 12, 1992, p. 4.

Working Group (MWG), and one by the RAND Corporation's National Defense Research Institute. While the MWG's proposal recommended maintaining the status quo, stating that "homosexuality is incompatible with military service,"[172] RAND's findings suggested that sexual orientation is "not germane to determining who should serve in the military."[173]

The Clinton proposal to allow gay individuals to serve openly was controversial with the military, the public, and many Members of Congress. The Senate and House Armed Services Committees held extensive hearings on the issue. The congressional consensus that emerged was an approach that prohibited DOD from asking questions concerning the sexuality of prospective members of the military and required individuals to keep their homosexuality to themselves. If the individual was already in the service he or she would be discharged. If seeking to join the service, he or she would be denied enlistment or appointment. On July 19, 1993, President Clinton announced his compromise the "don't ask, don't tell, don't pursue" policy.

The National Defense Authorization Act for Fiscal Year 1994 (P.L. 103-160, Section 571) codified DOD's accession and separation policies regarding gay individuals.[174] The justification provided in the act for continuing to prohibit such individuals from openly serving was

> The presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability.

This provision in the FY1994 NDAA also included a "sense of Congress" that the Secretary of Defense should consider issuing guidance governing the circumstances under which servicemembers or prospective recruits are questioned about their sexuality. In response to the law, the DOD amended policies for entry into the military services[175] and administrative separation.[176] These policies barred "homosexual conduct" but required that individuals, "[ ... ] shall not be asked or required to reveal their sexual orientation nor shall they be asked to reveal whether they have engaged in homosexual conduct." The grounds for discharge under the law were (1) the member has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts; (2) the member states that he or she is a homosexual or bisexual; or (3) the member has married or attempted to marry someone of the same sex. This law came to be known as "don't ask, don't tell" (DADT).

Critics of DADT suggested that it was harmful to gay, lesbian, and bisexual servicemembers and to military readiness. These critics suggested that it forced individuals into ethical conundrums where they felt obliged to conceal or lie about aspects of their personal lives to their peers and their leadership in order to keep their job. Some also suggested that ambiguity around the relationship between sexual orientation, proclivities, statements, and actions resulted in inconsistent implementation of discharge policies. Critics also suggested that the existence of

---

[172] Office of the Secretary of Defense, *Summary Report of the Military Working Group,* July 1, 1993.

[173] RAND Corporation, *Sexual Orientation and U.S. Military Personnel Policy: Options and Assessment*, Santa Monica, CA, 1993, p. 2.

[174] 10 U.S.C. §654, Policy Concerning Homosexuality in the Armed Forces.

[175] Department of Defense Instruction, *Qualification Standards for Enlistment, Appointment, and Induction*, DODI 1304.26, December 21, 1993.

[176] Department of Defense Directive, *Enlisted Administrative Separations*, DOD 1332.14, February 5, 1994. Department of Defense Directive, *Separations of Regular Officers*, DOD 1332.30, February 5, 1994.

DADT deterred some qualified and motivated individuals from joining the military and caused some individuals to be separated from the military at a time when critical skills were needed.[177]

Those in favor of maintaining DADT suggested that a very small portion of the total force was affected. Others suggested that if the law were repealed, the number of HIV-positive servicemembers would increase, which could harm military readiness by limiting individual deployability, or could place undue burdens on the military health system.[178] From FY1994 through the end of FY2009, approximately 13,000 servicemembers were administratively discharged for homosexual conduct under DADT, which accounted for less than 0.1% of the total active and reserve component force during that time.[179]

## Repeal of Don't Ask Don't Tell (DADT)

Between the mid-1990s and 2009, public support for gay people serving in the military grew[180] and there were several efforts to repeal DADT.[181] These bills would have amended Chapter 37 of Title 10 of the United States Code, to prohibit discrimination on the basis of sexual orientation. Discrimination on this basis was defined as

> (1) in the case of a member of the armed forces, the taking of any personnel or administrative action (including any action relating to promotion, demotion, evaluation, selection for an award, selection for a duty assignment, transfer, or separation) in whole or in part on the basis of sexual orientation; and

> (2) in the case of a person seeking to become a member of the armed forces, denial of accession into the armed forces in whole or in part on the basis of sexual orientation.[182]

During his 2010 State of the Union address, then-President Barack Obama announced that he would work with DOD and Congress to repeal DADT.[183] In February 2010, the Senate Armed Services Committee held a hearing on the issue, at which time the Secretary of Defense, Robert Gates, announced that DOD would establish a high-level working group to review implementation issues associated with a repeal of DADT.[184] On March 2, 2010, the Secretary of Defense issued a memorandum directing the Comprehensive Review on the Implementation of a Repeal of 10 U.S.C. Section 654.[185]

---

[177] For example, after the September 11th attacks, the government faced a shortage of Arabic linguists and some raised concerns that qualified linguists were being separated from the military due to their sexual orientation. See for example: "Gay Linguists Get the Boot," at https://www.cbsnews.com/news/gay-linguists-get-the-boot/, or "Don't Ask, Don't Translate," at http://www.nytimes.com/2007/06/08/opinion/08benjamin.html?_r=0.

[178] Von Ritter, Yihana, "Don't Keep "Don't Ask, Don't Tell" *Intersect*, vol. 3, no. 1 (2010).

[179] Data for the years 1980 through 1997 are from U.S. Department of Defense, Office of the Assistant Secretary of Defense (Personnel and Readiness), Report to the Secretary of Defense, Review of the Effectiveness of the Application and Enforcement of the Department's Policy on Homosexual Conduct in the Military, April 1998.. Data for later years are from the Department of Defense, Defense Manpower Data Center. Year 2005 data are from Files, John, "Military's discharges for being gay rose in '05," New York Times, August 15, 2006. Data from 2006-2009 are from DOD office of Legislative Affairs.

[180] McCabe, Brian J., "Public Opinion on 'Don't Ask, Don't Tell'," *FiveThirtyEight*, November 10, 2010.

[181] The Military Readiness Enhancement Act of 2005 (H.R. 1059), 2007 (H.R. 1246) and 2009 (H.R. 1283 & S. 3065) would have repealed DADT, but failed to advance out of committee.

[182] S. 3065.

[183] President Barack Obama, White House Officer of the Press Secretary, *Remarks by the President in State of the Union Address,* January 27, 2010.

[184] Volsky, Igor, "Making Gates' DADT 'Working Group' Work," *Think Progress*, February 3, 2010.

[185] Secretary of Defense Memorandum, *Comprehensive review on the Implementation of a Repeal of 10 U.S.C §654,*

On March 25, 2010, then-Secretary Gates changed DOD's enforcement policies by raising the discharge authority for homosexual conduct to the level of general or flag officer, and to limit certain statements and categories of information that were admissible as evidence in support of such separations. That same year, a federal district court ruled that DADT was unconstitutional.[186]

On November 30, 2010, DOD released the key findings of the working group regarding implementation of DADT repeal, which included

- More than two-thirds of military servicemembers who were surveyed did not object to gays and lesbians serving openly in uniform. (Higher levels of discontent were reported by individuals in combat arms specialties, combat units, and among the Chaplain corps.)

- Administrative concerns (e.g., sexual conduct, fraternization, billeting arrangements) associated with the repeal could be addressed through existing DOD policies and regulations with some changes.

- A repeal of DADT would impose minimal risk to military readiness in terms of unit cohesion, recruiting and retention, and performance.[187]

Secretary Gates also called for Congress to act on legislation to repeal DADT within the year. On December 15, 2010, the House voted to repeal DADT by passing H.R. 2965. Three days later the Senate passed S. 4023 and the repeal was signed into law (P.L. 111-321) by the President on December 22, 2010. The law included a provision that delayed the effective date until 60 days after the President, Secretary of Defense, and Chairman of the Joint Chiefs of Staff certified that they were prepared to implement all policies and regulations associated with the repeal.

## Post-DADT Integration

Although the DADT repeal allowed gay servicemembers to serve openly and to marry their same-sex partner where such a marriage was legal,[188] the federal government, under the 1996 Defense of Marriage Act (DOMA),[189] did not recognize same-sex marriages for the purpose of federal benefits. Therefore, as DOD employees, military servicemembers in same-sex marriages were not eligible to receive the same benefits (e.g., dependent ID cards, insurance benefits, counseling services) as married heterosexual couples. On February 11, 2013, then-Secretary of Defense Leon Panetta issued a memorandum[190] directing the military departments to extend 20 education, survivor, and travel and transportation benefits to same-sex domestic partners and children of same-sex domestic partners.

On June 26, 2013, in the U.S. Supreme Court case *United States v. Windsor*, the Court held that Section 3 of DOMA restricting federal interpretation of "marriage" and "spouse" to heterosexual unions was unconstitutional.[191] Following this decision, DOD issued a new policy extending all

---

March 2, 2010.

[186] Log Cabin Republicans v. United States, 2010 U.S. Dist. LEXIS 93612 (C.D. Cal. September 9, 2010).

[187] Department of Defense, Press Operations, *DOD News briefing with Secretary Gates and Adm. Mullen from the Pentagon,* November 30, 2010. http://archive.defense.gov/transcripts/transcript.aspx?transcriptid=4728.

[188] Same-sex marriage was legal in some but not all States.

[189] P.L. 104-199, 110 Stat. 2419.

[190] Secretary of Defense, *Extending Benefits to Same-Sex Domestic Partners of Military Members,* Memorandum for Secretaries of the Military Departments Acting Under Secretary of Defense for Personnel and Readiness, February 11, 2013.

[191] United States v. Windsor, 133 S. Ct. 2675, (2013).

military benefits for married couples to same-sex couples. Under the new policy, same-sex military couples married before or on June 26, 2013, were entitled to benefits and entitlements with an effective date of June 26; for same-sex couples married after June 26, their effective date of benefits and entitlements would be the actual date of marriage.[192]

On June 26, 2015, the Supreme Court, in the case *Obergefell v. Hodges*, decided that same-sex couples had the fundamental right to marry under the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.[193] This decision legalized same-sex marriage across the United States. While DOD had already recognized same-sex marriage for the purpose of military benefits, the Supreme Court's decision allowed marriages of same-sex military couples to be recognized in states that previously had banned these types of marriages. However, not all states have in place nondiscrimination laws that protect individuals from discrimination based on sexual orientation.[194] It is possible for gay servicemembers and their same-sex spouses to be assigned to installations in states that have varying levels of nondiscrimination protections for those seeking employment, housing, or other services within the local community.

The military does not track or report data on the number of gay or bisexual servicemembers in the military. In addition, the U.S. Census Bureau does not collect data on sexual orientation, sexual behavior, or attraction.[195] Therefore, survey data is typically used to estimate the size of the LGB population in the U.S. and the military. Based on the DOD's 2015 Health Related Behaviors Survey, an estimated 3.9% of men and 16.1% of women in the military self-identify as gay, lesbian or bisexual.[196] Demographic surveys for the total U.S. population have varying estimates. A 2015 demographic study estimated that among the U.S. adult population, 7.7% of men and 5.1% of women identify as gay, lesbian or bisexual.[197] Another Gallup survey estimated that in 2017, 4.5% of the total U.S. adult population identified as LGBT (3.9% of men and 5.1% of women).[198] In addition, the Gallup survey found that 8.1% of Millennials identified as LGBT and that the percent of the population identifying as LGBT has slowly increased over the past decade.

## Transgender Service Policies

On December 18, 2014, then-Attorney General Eric Holder announced that the Department of Justice would take the position in litigation that the protection of Title VII of the Civil Rights Act of 1964 extends to claims of discrimination based on an individual's gender identity, including transgender status.[199] Title VII applies to DOD civilians, but does not apply to military personnel.

---

[192] "Same-Sex Spouses of Soldiers Now Receiving Benefits," *Army G-1 Public Affairs Office*, September 4, 2013.

[193] Obergefell v. Hodges, 135 S. Ct. 1039 (2015).

[194] According to the American Civil Liberties Union (ACLU), at the end of 2016, 20 states and the District of Columbia had laws banning discrimination based on sexual orientation and/or gender identity in employment, housing, and public accommodations. See https://www.aclu.org/other/past-lgbt-nondiscrimination-and-anti-lgbt-bills-across-country, and https://www.aclu.org/files/pdfs/lgbt/discrim_map_bw.pdf.

[195] The Census Bureau has announced that they will be adding a question on same-sex couples to the 2020 Census, see United States Census Bureau, *Questions Planned for the 2020 Census and American Community Survey; Federal Legislative and Program Uses*, March 2018.

[196] Meadows, Sarah et al., *2015 Health Related Behaviors Survey*, RAND Corporation, Research Brief, Santa Monica, CA, March 27, 2019, https://www.rand.org/pubs/research_briefs/RB9955z6.html.

[197] Herbenick, Debby et al., "Sexual diversity in the United States: Results from a nationally representative probability sample of adult women and men," *PLoS One*, July 20, 2017.

[198] Newport, Frank, "In U.S., Estimate of LGBT Population Rises to 4.5%," *Gallup*, May 22, 2018.

[199] U.S. Department of Justice, "Attorney General Holder Directs Department to Include Gender Identity Under Sex

The medical definition of *transgender* is applied to individuals who do not identify or conform to their physical gender at birth and this may include, but is not limited to, those who self-identify as transgender, transsexual, gender-queer, gender nonconforming, or cross-gender.

For some individuals, the conflict between physical gender and the gender with which he/she/they identify can cause psychological distress. The American Psychiatric Association classifies this condition as *gender dysphoria*. The diagnosis of gender dysphoria, per the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), is based on the length of time the individual experiences such distress, and often a desire to gain the sex characteristics and be treated as the gender with which the individual identifies.[200] Treatment of gender dysphoria may include counseling, hormone therapy, and/or surgical interventions. However, some with gender dysphoria may merely seek social or legal recognition of gender identity.[201]

Until June 30, 2016, DOD treated the physical and psychological aspects of transgender conditions as disqualifying conditions for new accessions and grounds for the discharge of existing servicemembers.

Prior DOD policies

1. prohibited the appointment, enlistment, or induction of those with a "current or history of psychosexual conditions, including but not limited to transsexualism, exhibitionism, transvestism, voyeurism, and other paraphilias," or those with "history of major abnormalities or defects of the genitalia including but not limited to change of sex, hermaphroditism, pseudohermaphroditism, or pure gonadal dysgenesis;"[202] and

2. allowed servicemembers to be separated administratively on the basis of a diagnosis of a mental disorder. Mental disorders were further defined by military department regulations to include, "psychosexual, transsexual, and gender identity conditions to include ... change of sex or a current attempt to change sex."[203]

The first policy effectively banned entry into service of those who have undergone sex reassignment surgery and those who have a psychiatric history of the conditions listed above. In the case of military discharges, while DOD policies *allowed* for existing servicemembers to be administratively separated for psychiatric disorders, they did not *require* that the servicemember be separated. The DOD policy authorized the discharge of the servicemember only if the mental health provider's diagnosis "concludes that the disorder is so severe that the member's ability to function effectively in the military environment is significantly impaired."

On July 13, 2015, Secretary of Defense Ashton Carter announced that DOD would review its policies on transgender service. At the same time, he issued two directives:

1. The first created a working group composed of military and civilian personnel to study the policy and readiness implications of allowing transgender persons to serve openly.

---

Discrimination Employment Claims," December, 18, 2004.

[200] American Psychiatric Association, *What is Gender Dysphoria?* https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria.

[201] Ibid.

[202] Department of Defense, *Medical Standards for Appointment, Enlistment, or Induction into the Military Service*, DOD Instruction 6130.03, April 28, 2010.

[203] Department of the Army, *Standards of Medical Fitness*, Army Regulation 40-501, August 28, 2003.

2. The second appointed the Under Secretary of Defense for Personnel and Readiness as decision authority for administrative discharges for those diagnosed with gender dysphoria or who identify themselves as transgender, providing enhanced scrutiny over discharges of these members.

As part of the review, DOD asked the RAND Corporation to (1) identify the health care needs of the transgender population, transgender servicemembers' potential health care utilization rates, and the costs associated with extending health care coverage for transition-related treatments; (2) assess the potential readiness implications of allowing transgender servicemembers to serve openly; and (3) review the experiences of foreign militaries that permit transgender servicemembers to serve openly.[204] RAND found that the cost, readiness, and cohesion impacts of including transgender servicemembers would be relatively small and recommended policy changes in the areas of accession, retention, separation, and deployment.[205]

On June 30, 2016, then-Secretary of Defense Ashton Carter announced that "transgender Americans may serve openly, and they can no longer be discharged or otherwise separated from the military just for being transgender."[206] In terms of in-service transition, DOD issued a new policy (DODI 1300.28), effective October 1, 2016, that

- established a construct by which transgender servicemembers may transition gender while serving;
- enumerated prerequisites and prescribes procedures for changing a servicemember's gender marker in the Defense Enrollment Eligibility Reporting System (DEERS); and
- specified medical treatment provisions for Active Component (AC) and Reserve Component (RC) transgender servicemembers.[207]

In 2016, DOD began training and promulgated an implementation handbook designed to assist commanders, transgender servicemembers, peers, and others. The handbook addresses specific scenarios related to, inter alia, physical standards, privacy and cohabitation, and overseas assignment considerations.[208] Furthermore, in June 2016 then-Secretary Carter announced plans to begin to admit transgender recruits by July 1, 2017.

However, in a June 30, 2017, memo, then-Defense Secretary James Mattis delayed the decision to accept transgender recruits, stating that the additional time would be used to, "evaluate more carefully the impact of such accessions on readiness and lethality."[209] A Presidential Memorandum to the Secretaries of Defense and Homeland Security (secretary for the parent agency to the U.S. Coast Guard) followed on August 25, 2017, outlining the new policy parameters with respect to uniformed DOD and Coast Guard personnel.[210] President Trump's

---

[204] Schaefer, Agnes Gereban et al., *Assessing the Implications of Allowing Transgender Persons to Serve Openly*, RAND Corporation, Santa Monica, CA, 2016, p. ix.

[205] Ibid., p. xiv.

[206] Cronk, Teri Moon, "Transgender Service Members Can Now Serve Openly, Carter Announces," DOD News, June 30, 2016.

[207] More information and resources on these policy changes can be found at http://www.defense.gov/News/Special-Reports/0616_transgender-policy.

[208] Department of Defense, *Transgender Service in the U.S. Military, An Implementation Handbook,* September, 20, 2016, at https://dod.defense.gov/Portals/1/features/2016/0616_policy/DoDTGHandbook_093016.pdf.

[209] Baldor, Lolita C., "Pentagon OKs 6-month Delay in Transgender Enlistments," *AP News*, July 1, 2017.

[210] U.S. President (Trump), "Presidential Memorandum for the Secretary of Defense and the Secretary of Homeland Security," https://www.whitehouse.gov/the-press-office/2017/08/25/presidential-memorandum-secretary-defense-and-secretary-homeland, August 25, 2017.

directive to the Secretary of Defense announced a return to the pre-2016 policy that allowed consideration of transgender conditions as grounds for discharge and would indefinitely continue the policy prohibiting transgender individuals from joining the Armed Forces. The President also directed a halt to all DOD or DHS spending on sex reassignment surgeries "except to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his or her sex." These policies were to go into effect in March of 2018. In the interim, the President delegated decisions about transgender service, as such:

> The Secretary of Defense, in consultation with the Secretary of Homeland Security, shall determine how to address transgender individuals currently serving in the United States military.

On August 29, 2017 Secretary of Defense James Mattis announced that for the time being, "current policy with respect to currently serving servicemembers will remain in place." A September memorandum issued by Mattis stated :

> The policies and procedures set forth in DODI 1300.28, *In-Service Transition for Transgender Service Members,* dated July 1, 2016, remain in effect until I promulgate DOD's final guidance in this matter.[211]

The memorandum also designated a *Central Coordination Cell* under the Office of the Under Secretary of Defense for Personnel and Readiness to provide advice and assistance to the military departments, services, and commanders on implementing the interim guidance.[212]

On February 22, 2018, Secretary Mattis submitted the results of an internal DOD study with his policy recommendations to the President:

- Transgender persons with a history or diagnosis of gender dysphoria are disqualified from military service, except under the following limited circumstances: (1) if they have been stable for 36 consecutive months in their biological sex prior to accession; (2) servicemembers diagnosed with gender dysphoria after entering into the service may be retained if they do not require a change of gender and remain deployable within applicable retention standards; and (3) currently serving servicemembers who have been diagnosed with gender dysphoria since the previous administration's policy took effect and prior to the effective date of this new policy, may continue to serve in their preferred gender and receive medically necessary treatment for gender dysphoria.

- Transgender persons who require or have undergone gender transition are disqualified from military service.

- Transgender persons without a history or diagnosis of gender dysphoria, who are otherwise qualified for service, may serve, like other servicemembers, in their biological sex.[213]

---

[211] Secretary of Defense, James Mattis, *Military Service by Transgender Individuals - Interim Guidance*, Department of Defense, September 14, 2017.

[212] According to February 27, 2019, testimony to the House Armed Services Military Personnel Subcommittee by the Acting Secretary of Defense, the decisionmaking panel included Under Secretaries of the military departments, Armed Services Vice Chiefs, Acting Under Secretary of Defense for Personnel and Readiness, and senior enlisted members.

[213] Department of Defense, Secretary of Defense, *Memorandum for the President, Military Service by Transgender Individuals*, February 22, 2018.

In response to the policy shifts, several lawsuits were filed against the government on behalf of existing transgender servicemembers and transgender individuals who would like to enlist.[214] On January 22, 2019, the Supreme Court granted a Justice Department request to allow the government to enforce military transgender policies while lawsuits continue to be heard in lower courts.

On March 12, 2019, the Secretary of Defense released a Directive-type Memorandum outlining a new DOD policy.[215] This policy, effective April 12, 2019, disqualifies any individual from appointment, enlistment, or induction into the service if they have a history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery. It also disqualifies individuals with a history of gender dysphoria unless they were stable in their biological sex[216] for 36 consecutive months prior to applying for admission into the armed aervices. Those individuals in the service who initially seek military medical care after the effective date of the policy may receive counseling for gender dysphoria, and may be retained without a waiver if (1) a military medical provider has determined that gender transition[217] is not medically necessary to protect the health of the individual; and (2) the member is willing and able to adhere to all applicable standards associated with his or her biological sex.

According to this policy, *gender identity*, is not a basis for separation, discharge, or denial of reenlistment/continuation; however all non-exempt individuals are required to serve in and meet the standards of their biological sex (i.e., medical, physical fitness, body fat, and uniform and grooming standards). Those with a diagnosis of gender dysphoria may be separated through the Disability Evaluation System[218] or administratively separated for conditions that interfere with assignments or performance of duty or if they are "unable or unwilling to adhere to all applicable standards, including the standards associated with their biological sex." The new policy offers broad waiver authority for the Secretaries of the Military Departments that may be delegated no lower than the Military Service Personnel Chiefs.

For the most part, the new limits on transgender service do not apply to individuals in service who are openly transgender, have received a diagnosis of gender dysphoria from a military doctor prior to April 12, 2019, or who are/have undertaken medical or surgical treatments as part of their treatment to address gender dysphoria. These individuals will receive an exemption and may continue to serve, receive necessary treatment, and conform to the standards of their preferred gender. According to DOD, these exemptions include those with enlistment contracts or in commissioning programs before the effective date.[219]

---

[214] Doe v. Shanahan, No. 17-cv-1597 (D.D.C.), ECF No. 60 (October 30, 2017); Stone v. Trump, No. 17-cv-02459 (D. Md.), ECF No. 84 (November 21, 2017); Karnoski v. Trump, No. 17-cv-1297 (W.D. Wash.), ECF No. 103 (December 11, 2017); Stockman v. Trump, No. 17-cv-1799 (C.D. Cal.), ECF No. 79 (December 22, 2017).

[215] Department of Defense, *Military Service by Transgender Persons and Persons with Gender Dysphoria*, Directive-type Memorandum (DTM)-19-004, March 12, 2019, https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dtm/DTM-19-004.pdf?ver=2019-03-13-103259-670.

[216] The memorandum defines biological sex as a person's biological status as male or female based on chromosomes, gonads, hormones, and genitals.

[217] *Gender transition* includes treatments such as social transition or "real life experience," cross-sex hormone therapy, or sex reassignment surgery.

[218] Department of Defense Instruction, *Disability Evaluation System*, DODI 1332.18, August 5, 2014.

[219] Schogol, Jeff, "Here's everything you need to know about the DOD's transgender ban," *Task and Purpose*, March 13, 2019.

**Table 10. Timeline for DOD Transgender Policy Changes**
2015-2019

| Date | Action |
|---|---|
| July 13, 2015 | Secretary Carter announces review of policies on transgender service, and raised decision authority for administrative discharges to the Undersecretary level. |
| June 30, 2016 | Secretary Carter announces that transgender members may serve openly, can no longer be discharged or otherwise separated from the military just for being transgender, and plans to start allowing new transgender recruits by July 1, 2017. |
| October 1, 2016 | DOD releases new policy for in-service transition of transgender members. (DODI 1300.28) |
| June 30, 2017 | SECDEF Mattis issues memorandum delaying decision over whether to accept new recruits who are transgender. |
| August 25, 2017 | President Trump issues memorandum to the Secretaries of Defense and Homeland Security outlining plans to revert back to pre-2016 transgender discharge policies by March 2018. |
| September 18, 2017 | Secretary Mattis issues interim guidance maintaining the policies in DODI 1300.28 until new policy can be promulgated. |
| February 22, 2018 | Secretary Mattis provides memorandum for the President recommending policies that would disqualify transgender individuals for military service, except under certain conditions. |
| January 22, 2019 | Supreme Court grants Justice Department request to allow the government to enforce transgender policies while lawsuits continue to be heard in lower courts. |
| March 12, 2019 | Acting Deputy Secretary of Defense releases new policy memorandum implementing the February 22, 2018, recommended policies, effective April 12, 2019. |

**Source:** DOD and Executive Branch documents.

There is a lack of reliable data on the number of transgender individuals in the military and in the general population. DOD does not collect data on servicemembers who identify as transgender, nor does the U.S. Census Bureau or the U.S. Centers for Disease Control and Prevention. Some estimates based on survey data suggest that transgender individuals make up between 0.1% and 0.5% of the total U.S. population.[220] A recent DOD survey found that 8,980 active duty servicemembers identify as transgender, approximately 0.7% of the total active duty force.[221] As of February 2018, 937 servicemembers had been diagnosed with gender dysphoria.[222]

# Religious Inclusion: Background and Force Profile

Since the founding of the United States, individuals of all religions were allowed to serve in the military and in some cases allowed *not to serve* as a conscientious objector on the grounds of sincere religious beliefs.[223] The First Amendment of the Constitution provides that "Congress

---

[220] Chalabi, Mona, "Why We Don't Know the Size of the Transgender Population," FiveThirtyEight Life, July 29, 2014.

[221] Department of Defense Report and Recommendations on Military Service by Transgender Persons, February 2018.

[222] Ibid.

[223] DOD Instruction 1300.06, May 31, 2007, regarding Conscientious Objectors defines religious training and/or belief as belief in an external power or "being" or deeply held moral or ethical belief, to which all else is subordinate or upon which all else is ultimately dependent, and which has the power or force to affect moral well-being. The external power or "being" need not be one that has found expression in either religious or societal traditions. However, it should

Case 1:23-cv-02699-RDB   Document 46-12   Filed 12/01/23   Page 50 of 66

*Diversity, Inclusion, and Equal Opportunity in the Armed Services*

shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.... " Religion continues to be a protected category under military equal opportunity policies and DOD recognizes the rights of military servicemembers to observe the tenets of their respective religions or to observe no religion at all without discrimination.

In cases where religious practices might conflict with other regulations, servicemembers may request religious accommodation. Regulations specify five main areas where servicemembers might request religious accommodation.[224]

- Worship practices (e.g., observance of holy days or prayer times).
- Dietary practices (e.g., kosher or halal foods).
- Medical practices (e.g., vaccinations or blood transfusions).
- Uniform standards (e.g., head coverings, undergarments).
- Grooming standards (e.g., beards).

Accommodation requests are handled by commanders at the unit level (See **Table 11** for Military Department-level policies). DOD instructs military leaders to approve requests for religious accommodation unless accommodation would have an adverse effect on, "[ ... ] mission accomplishment, including military readiness, unit cohesion, good order, discipline, health and safety, or any other military requirement."[225]

The Armed Forces also has a Chaplain Corps consisting of uniformed clergy that have been endorsed by a recognized ecclesiastical endorsing agency of the chaplain's faith or denomination as being suitable to serve in the military. Although military chaplains may be of different faith traditions (e.g., Protestant, Jewish, Muslim) they provide support to military servicemembers of all religious backgrounds. Public law requires chaplains to conduct appropriate religious services for personnel at the command to which they are assigned at least once on each Sunday.[226] Chaplains are required to follow military regulations and also the rules imposed by their respective endorsing agency in order to maintain the agency's endorsement.

---

sincerely occupy a place of equal or greater value in the life of its possessor. Deeply held moral or ethical beliefs should be valued with the strength and devotion of traditional religious conviction. The term "religious training and/or belief" may include solely moral or ethical beliefs even though the applicant may not characterize these beliefs as '"religious" in the traditional sense, or may expressly characterize them as not religious. The term "religious training and/or belief" does not include a belief that rests solely upon considerations of policy, pragmatism, expediency, or political views.

[224] See for example, Department of the Army, *Army Command Policy*, Army Regulation 600-20, November 6, 2014, p. 45.

[225] Department of Defense, *Accommodation of Religious Practices within the Military Services*, DOD Instruction 1300.17, February 10, 2009, Incorporating Change 1, Effective January 22, 2014.

[226] 10 U.S.C. §3547 (Army), 10 U.S.C. §8547 (Air Force), 10 U.S.C. §6031 (Navy and Marine Corps). The language in statute regarding religious services for the Navy and Marine Corps differs slightly in that it is the responsibility of the commanders of vessels and naval activities to which chaplains are attached to "cause divine service to be performed on Sunday, whenever the weather and other circumstances allow it to be done…"

**Table 11. Military Department Policy Regarding Religious Accommodation and Expression**

| | Religious Accommodation and Expression |
|---|---|
| Air Force (AFI 1-1, Air Force Culture) | 2.11 Free Exercise of Religion and Religious Accommodation. Every Airman is free to practice the religion of their choice or subscribe to no religious belief at all. You should confidently practice your own beliefs while respecting others whose viewpoints differ from your own. Every Airman also has the right to individual expressions of sincerely held beliefs, to include conscience, moral principles or religious beliefs, unless those expressions would have an adverse impact on military readiness, unit cohesion, good order, discipline, health and safety, or mission accomplishment. [ ... ] Commanders and supervisors at all levels must fairly consider requests for religious accommodation.<br><br>2.12 Balance of Free Exercise of Religion and Establishment Clause. Leaders at all levels must balance constitutional protections for their own free exercise of religion, including individual expressions of religious beliefs, and the constitutional prohibition against governmental establishment of religion. They must ensure their words and actions cannot reasonably be construed to be officially endorsing or disapproving of, or extending preferential treatment for any faith, belief, or absence of belief. |
| Navy and Marine Corps (SECNAVIST 1730.8B, Accommodation of Religious Practices) | DON policy is to accommodate the doctrinal or traditional observances of the religious faith practiced by individual members when these doctrines or observances will not have an adverse impact on military readiness, individual or unit readiness, unit cohesion, health, safety, discipline, or mission accomplishment.<br><br>During a servicemember's career in the DON, he or she will be exposed to a wide variety of religious expressions from both chaplains and other servicemembers. It is DON policy to foster mutual respect for diverse religious expressions, which includes accommodating as many of them as possible at the command level. |
| Army (AR 600-20) | The Army places a high value on the rights of its Soldiers to observe tenets of their respective religions or to observe no religion at all. [ ... ] the Army will approve requests for accommodation of religious practices unless accommodation will have an adverse impact on unit readiness, individual readiness, unit cohesion, morale, good order, discipline, safety, and/or health. All requests for accommodation of religious practices will be assessed on a case-by-case basis. Each request must be considered based on its unique facts; the nature of the requested religious accommodation; the effect of approval or denial on the Soldier's exercise of religion; and the effect of approval or denial on military necessity. Accommodation of a Soldier's religious practices must be examined against military necessity and cannot be guaranteed at all times |

**Source:** Military Department-level Instructions and Regulations.

## Is Religious Diversity in the Military Representative of the Nation?

Religious diversity in the military is broadly representative of the U.S. population. Approximately 70% of active duty military personnel consider themselves to be of a Christian denomination. Less than 2% of active servicemembers identify with Judaism, Islam, or Eastern religions (see **Figure 6**). This breakdown is consistent with the religious makeup of the U.S. population.[227] Americans practicing non-Christian faiths account for 5.9% of the U.S. population suggesting that non-Christian faiths may be underrepresented in the military.[228]

---

[227] A 2014 Pew Research survey found that 70.6% of Americans describe themselves as Christians while 22.8% identify as atheist, agnostic, or "nothing in particular." Cooperman, Alan et al., *America's Changing Religious Landscape,* Pew Research Center, May 12, 2015.

[228] Ibid. Jews accounted for 1.9%, Muslims for 0.9%, Buddhist and Hindus for 0.7% respectively and other non-Christian faiths for 1.8%.

**Figure 6. Religious Diversity in the Active Duty Force**

January 2019



**Source:** Defense Manpower Data Center.

# Military Diversity and Equal Opportunity Issues for Congress

In the past, Congress has used its constitutional authority to establish criteria and standards that must be met for individuals to be recruited into the military, to advance through promotion, and to be separated or retired from military service. Throughout the history of the armed services, Congress has established some of these criteria based on demographic characteristics such as race, gender, and sexual orientation. Recent legislative efforts have focused on improving the reporting of demographic diversity data for recruitment, retention and promotion of servicemembers; developing and improving processes for managing, reporting and responding to harassment and discrimination; and ongoing oversight of the integration of women into combat occupations and unit assignments.

## Diversity in Leadership

In terms of diversity in leadership and effectiveness, some studies have shown that diversity in top management teams has a positive impact on organizational strategic and performance outcomes.[229] In addition, various studies and surveys have found that part of what attracts individuals to organizations and encourages retention is the individual's perception of how they will fit into the organization.[230] In this regard, diversity in leadership is considered by some to be

---

[229] Richard, Orlando C. and Carliss D. Miller, "Considering Diversity as a Source of Competitive Advantage in Organizations," in *The Oxford Handbook of Diversity and Work*, ed. Quinetta M. Roberson (New York, NY: Oxford University Press, 2012), p. 241.

[230] See for example, Saks, Alan, M. and Blake E. Ashforth, *A Longitudinal Investigation of the Relationships Between Job Information Source, Applicant Perception of Fit, and Work Outcomes,* Personnel Psychology, Vol. 50, Issue 2,

a key element in attracting and retaining a diverse workforce. As noted in regard to the Vietnam Era,

> African American troops, who rarely saw members of their own race in command positions, lost confidence in the military as an institution.[231]

Despite increases in demographic diversity in the Armed Forces over the past few decades, some have raised the concern that racial and gender diversity among senior leadership positions and the officer corps in general do not reflect the enlisted troops they lead and the nation they serve.

In the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009 (P.L. 110-417, Section 596), Congress mandated the creation of a Military Leadership Diversity Commission (MLDC) tasked with conducting "a comprehensive evaluation and assessment of policies that provide opportunities for the promotion and advancement of minority members of the Armed Forces, including minority members who are senior officers."[232] One of the commission's key findings was that the Armed Forces have not been successful in developing a continuous stream of leaders as demographically diverse as the nation they serve. The commission made 20 recommendations for improving diversity and inclusion and many have been implemented by subsequent law and policy changes.[233]

Section 519 of the National Defense Authorization Act for Fiscal Year 2013 (P.L. 112-239) required that DOD develop and implement a diversity in military leadership plan.[234] As part of this plan, Congress also required that the Secretary of Defense and the Secretary of Homeland Security develop a uniform definition of "diversity" (as discussed in a previous section of this report). This NDAA provision also stated that DOD's corps of senior officers and enlisted should, "reflect the diverse population of the United States eligible to serve in the armed forces, including gender specific, racial, and ethnic populations." While the NDAA provision discouraged the use of quotas based on diversity characteristics, it also required DOD to report data on rank, promotions, and reenlistment by gender and race or ethnicity in its annual manpower requirements report to Congress (as required by 10 U.S.C. Section 115a) f.[235]

Many believe that data reporting helps Congress monitor progress on diversity goals and prevent undue discrimination against historically underrepresented groups. Others argue that although quotas are discouraged, the emphasis on data collection and reporting exerts pressure on military leaders to meet informal promotion and retention targets by race or gender. They argue that this pressure puts the military's merit-based system at risk if demographics are weighted more heavily than performance in promotion decisions.

---

1997.

[231] Becton et al., 2003 as cited in Managing Diversity in the Military: The Value of Inclusion in a Culture of Uniformity.

[232] The commission did not address issues related to the service of openly gay men and women as that topic was being addressed by the DOD Comprehensive Review Working Group.

[233] Military Leadership Diversity Commission, *From Representation to Inclusion: Diversity Leadership for the 21st Century Military; Final Report,* March 15, 2011.

[234] Codified in 10 U.S.C.§656.

[235] The FY2019 Defense Manpower Requirements Report can be found at https://prhome.defense.gov/Portals/52/Documents/MRA_Docs/TFM/Reports/Final%20FY19%20DMRR%20for%20Posting%20(June%202018).pdf?ver=2018-06-15-103327-750.

## Diversity and Inclusion at the Service Academies

Developing a continuous pipeline of diverse senior leaders depends at least in part on recruitment, retention, and promotion of an equally diverse officer corps. While there are a number of commissioning sources for officers, including Officer Candidate School, Direct Commissions, and the Reserve Officer Training Course (ROTC), in recent years there has been congressional interest in diversity at the U.S. service academies. The U.S. Naval Academy (USNA), U.S. Air Force Academy (USAFA) and U.S. Military Academy (USMA) account for approximately 18% of all officer commissions.[236] Members of Congress have the authority to nominate candidates from their district (Representatives) and state (Senators) for appointment to the service academies.[237] This authority provides for geographic diversity in the recruitment and appointment of officers, but some have questioned whether the academies are demographically representative of the nation. **Table 12** and **Table 13** show academy enrollment by sex and race/ethnicity.

In 2016, females in the U.S. accounted for 56% of postsecondary enrolment in degree-granting institutions.[238] The percentage of women enrolled in service academies has steadily risen over the four decades since women were first admitted and has risen by 8% since 2008. As discussed in previous sections, enrollments also depend on propensity for military service (which is lower for women than for men).

### Table 12. Female Enrollment at Service Academies
#### 2008 and 2018

|  | September 2008 | September 2018 |
|---|---|---|
| U.S. Naval Academy | 20% | 28% |
| U.S. Military Academy (West Point) | 15% | 23% |
| U.S. Air Force Academy | 19% | 27% |

**Source:** Defense Manpower Data Center.

### Table 13. Service Academy and U.S. Undergraduate Enrollment by Race/Ethnicity

|  | White | Black or African American | Hispanic/ Latino | Asian | Two or more races* | Other/ Unknown |
|---|---|---|---|---|---|---|
| U.S. Naval Academy | 63% | 7% | 12% | 7% | 9% | 3% |
| U.S. Military Academy | 63% | 12% | 10% | 8% | 3% | 3% |
| U.S. Air Force Academy | 63% | 6% | 11% | 5% | 7% | 6% |
| U.S. Postsecondary Institutions | 54% | 13% | 19% | 7% | — | 7% |

**Source:** National Center for Education Statistics, College Navigator data for fall 2017. Data for all postsecondary enrolment at degree-granting institutions is from 2016 and can be found at https://nces.ed.gov/collegenavigator/.

---

[236] Department of Defense, *Population Representation in the Military Services, Fiscal Year 2017*, Table B-30.

[237] For more information on congressional nominations see, CRS Report RL33213, *Congressional Nominations to U.S. Service Academies: An Overview and Resources for Outreach and Management*.

[238] National Center for Education Statistics, May 2018, http://nces.ed.gov/programs/coe/indicator_cha.asp.

**Note:** * 'Two or more races' was not reported in source data for enrollment in U.S. postsecondary institutions. In this data set, Hispanic/Latino is reported as a race category.

Some have raised concerns about discrimination against or favoritism toward different demographic minorities at the academies. For example, in a 2003 congressionally directed report, the GAO found that between 10% and 17% of all minority students felt that the overall atmosphere at the service academies for racial minorities was "poor or below average;"[239] however, over 25% of African-Americans perceived discriminatory treatment.[240] The same report found that approximately 40% of women perceived discriminatory treatment and felt that the overall atmosphere for women at the academies was "poor or below average."[241]

Another form of potential discrimination is gender discrimination or sexual harassment. Since FY2007, Congress has required an annual report on sexual harassment and sexual violence at the military service academies.[242] For the 2016-2017 academic program year (APY), it is estimated that approximately half of the women at the service academies experienced sexual harassment and roughly one-third experienced gender discrimination (see **Table 14**). The Naval Academy saw the biggest rise in gender discrimination (4%) and sexual harassment (5%) from the previous year. It is estimated that for the same time period, less than 5% of service academy men experienced gender discrimination, and roughly 15% experienced sexual harassment. While there was little change in gender discrimination for men from the previous year, prevalence rates for sexual harassment went up across all three academies.

**Table 14. Estimated Gender Discrimination and Sexual Harassment at Service Academies**

Academic Program Year 2016-2017

|  | Gender Discrimination (change from APY 2015-2016) | | Sexual Harassment (change from APY 2015-2016) | |
|---|---|---|---|---|
|  | **Women** | **Men** | **Women** | **Men** |
| U.S. Military Academy | 32% (+1%) | 4% (no change) | 48% (+2%) | 17% (+4%) |
| U.S. Naval Academy | 37% (+4%) | 4% (-3%) | 56% (+5%) | 17% (+5%) |
| U.S. Air Force Academy | 28% (+4%) | 5% (+2%) | 46% (-1%) | 13% (+2%) |

**Source:** Department of Defense Office of People Analytics, *2018 Service Academy Gender Relations Survey Overview Report,* January 18, 2019, at http://www.airforcemag.com/Features/Documents/ SAGR1801_Report_1.29.2019_FINAL%281%29.pdf.

a. To be included in the estimated rate for gender discrimination students must have indicated experiencing at least one of two behaviors indicated below also endorsed the corresponding follow-up item: (1) heard someone say that someone of their gender is not as good as someone of the opposite gender as a future officer, or that someone of their gender should be prevented from becoming a future officer, and the student thought this person's beliefs about someone of his or her gender harmed or limited his or her cadet/midshipman career; or (2) mistreated, ignored, excluded, or insulted the student because of his or her gender, and the student thought this treatment harmed or limited his or her cadet/midshipman career.

b. Sexual harassment includes two types of unwanted behavior: sexually hostile work environment and sexual quid pro quo.

---

[239] U.S. Government Accountability Office, *Military Education; Student and Faculty Perceptions of Student Life at the Military Academies*, GAO-03-1001, September 2003, p. 32 & 34.

[240] In comparison, there were lower rates of perceived discrimination by Hispanics (4% to 8%), Asians (9% to 14%), Native Hawaiian/ other Pacific Islanders (4% to 18%), and American Indian/Alaska Natives (3% to 4%).

[241] U.S. Government Accountability Office, *Military Education; Student and Faculty Perceptions of Student Life at the Military Academies*, GAO-03-1001, September 2003, p. 26 & 34.

[242] P.L. 109-364.

The House Report (H.Rept. 110-279) for the FY2008 Department of Defense Appropriations Bill directed the Secretary of Defense to conduct an assessment of social representation at the service academies in recruiting, admissions, graduation rates, and career success rates. Results varied by academy; however, in general the study found lower graduation rates for black and Hispanic officer candidates relative to their white counterparts, while Asian candidates had higher or similar graduation rates. The study also found that graduation rates for racial minorities were higher than graduation rates for minorities at other elite civilian universities. For women the opposite was true.[243]

These studies analyzed results from 2003 and 2010; changes implemented by the service academies following those reviews aim to create a more favorable environment for racial minorities and women. Congress may conduct further reviews to understand demographic diversity from other commissioning sources or consider policies or programs (e.g., the Junior Reserve Officer Training Course (JROTC) and service academy preparatory schools) that can broaden outreach to underrepresented groups.

## Management of Harassment and Discrimination Claims

In recent years, Congress has had an interest in DOD's management of discrimination and harassment claims, particularly in the area of sexual harassment. Before 2013, DOD did not track or report sexual harassment (or other forms of harassment or discrimination) complaint data in any systematic way. The National Defense Authorization Act for Fiscal Year 2013 (P.L. 112-239, Section 572) required the Secretary of Defense, through ODMEO, to provide a report on substantiated incidents of sexual harassment that involved members of the Armed Forces, including identifying cases in which a member is accused of multiple incidents of sexual harassment. To comply with this requirement, DOD developed the *Department of Defense Report on Substantiated Incidents of Sexual Harassment in the Armed Forces*.[244]

Recent legislation has also formalized and enhanced the requirement for command climate assessments. Section 579(b) of the FY2013 NDAA required that a command climate assessment be conducted within 120 days of an officer assuming command and at least annually thereafter. This provision also required an assessment of commanders' responses to allegations of sexual harassment and assault.

The National Defense Authorization Act for Fiscal Year 2014 (P.L. 113-66) included a number of provisions that enhance compliance, reporting, and dissemination of command climate assessments:

> Section 587 requires that the results of command climate assessments are provided to the relevant individual commander and to the next higher level of command, and that performance evaluations of commanders indicate whether or not the commander had conducted the required assessment.

> Section 1721 requires Secretaries of the military departments to verify and track the compliance of commanding officers in conducting organizational climate assessments.

> Section 1751 expresses the sense of Congress that—(1) commanding officers in the Armed Forces are responsible for establishing a command climate in which sexual assault

---

[243] Kirby, Sheila N., Thie, Harry, J., and Naftel, Scott et al., *Diversity of Service Academy Entrants and Graduates*, RAND Corporation, Santa Monica, CA, 2010.

[244] Department of Defense, *FY2013 DOD Report on Substantiated Incidents of Sexual Harassment in the Armed Forces*, May 15, 2014, https://diversity.defense.gov/Portals/51/Documents/DoD%20FINAL%20REPORT-FY%2013%20Incidents%20of%20Sexual%20Harassment%20Report_15MAY2014%281%29.pdf.

allegations are properly managed and fairly evaluated and in which a victim can report criminal activity, including sexual assault, without fear of retaliation, including ostracism and group pressure from other members of the command; (2) the failure of commanding officers to maintain such a command climate is an appropriate basis for relief from their command positions; and (3) senior officers should evaluate subordinate commanding officers on their performance in establishing a command climate as described in paragraph (1) during the regular periodic counseling and performance appraisal process prescribed by the Armed Force concerned for inclusion in the systems of records maintained and used for assignment and promotion selection boards.

Congress has also expressed concern about DOD's organization for and management of sexual harassment cases. The FY2014 NDAA (P.L. 113-66, Section 1735) required a review of ODMEO to evaluate the relationship between ODMEO and the DOD's Sexual Assault Prevention and Response Office (SAPRO) in sexual harassment cases and to evaluate whether ODMEO has the resources and capability to track and address these cases.[245] Research has shown that sexual harassment and sexual assault are closely linked, leading some to argue that policy and oversight of both types of action should fall under the same office. In the conference report to accompany the FY2017 NDAA, the Senate Armed Services Committee expressed concern that

> the existing definition of sexual harassment has caused the military services to consider sexual harassment as a violation of equal opportunity policy instead of an adverse behavior that data have demonstrated is on the spectrum of behavior that can contribute to an increase in the incidence of sexual assault.[246]

Others note that there are very different reporting processes and legal implications for sexual assault (a criminal offense) and sexual harassment and aver that the oversight of sexual harassment complaints should remain functionally separate.

A 2017 RAND report on oversight of problematic behaviors found that ODMEO, as a policy-oriented office, is "not adequately resourced to actively oversee service policy compliance and implementation, and lacked a sexual harassment strategic plan."[247] In addition, the report noted that the office's mission focus and activities are mainly centered on promotion of diversity, equal opportunity, and inclusion, rather than countering negative behaviors.[248] Nevertheless, the authors noted opportunities for coordination between offices in order to optimize resources and reduce redundancies in service reporting requirements. In addition, the authors cautioned against organizational changes intended to consolidate OSD policymaking authority under a single office, noting the potential to "weaken existing program initiatives that have demonstrated positive results."[249]

---

[245] The FY2015 NDAA imposed a deadline of April 1, 2015 for this review to be submitted to the House and Senate Armed Services Committees. The SAPRO office is responsible for oversight of DOD's sexual assault policies and programs.

[246] Conference Report H.Rept. 114-840 to accompany S. 2943. Section 548 of the enacted bill modifies the definition of sexual harassment in 10 U.S.C. 1561(e) for purposes of investigating complaints of harassment by commanding officers.

[247] Marquis, Jeff, Coreen Farris, and Kimberly Curry Hall, et al., *Improving Oversight and Coordination of Department of Defense Programs That Address Problematic Behaviors Among Military Personnel*, RAND Corporation, Santa Monica, CA, 2017.

[248] Ibid., p. 81.

[249] The report noted that the "laser-like" focus of the SAPRO office on one issue (sexual assault) has generally been an effective approach, while ODMEO has also had some successes managing "its larger basket of behavioral issues."

# Inclusion of Transgender Servicemembers

There are no laws prohibiting transgender individuals or those with gender dysphoria from serving in the military. However, due to recent policy changes, members who are diagnosed with gender dysphoria or seek to transition socially, medically, or surgically after April 12, 2019, may be subject to certain restrictions and discharge under new rules. Some in Congress have proposed legislation that would prohibit involuntary separation, denial of reenlistment or continuation of servicemembers on the basis gender identity.[250] Others have advocated for a ban on all transgender servicemembers or proposed restrictions on military spending for transition-related health care.[251] None of these provisions has been enacted.

Those who advocate for restrictions on military service for those who identify as transgender express concerns about privacy of troops in terms of berthing assignments and toilet/shower facilities.[252] Some argue that female servicemembers might not feel comfortable sharing close quarters with a formerly male servicemember or vice versa. Some express concerns that these issues could affect unit cohesion in yet unforeseen ways. Generally, existing evidence from foreign militaries with policies allowing transgender service has not shown adverse effects on cohesion. Nevertheless, in these militaries, there were some reported incidences of initial resistance or hostility towards transgender personnel.[253] In past congressional hearings, senior military leaders across all services have testified that they are not aware of issues related to unit cohesion with openly transgender individuals currently serving.[254]

Others have noted that there are potentially significant medical costs associated with providing care for transgender individuals. These costs will most likely include counseling and may include hormone replacement therapy, and/or sex reassignment surgery.[255] Studies have found that, in general, those diagnosed with gender dysphoria have higher rates of comorbid mental health conditions (e.g., anxiety, depression) that may require additional care.[256] Other studies have also found that some transgender individuals experience *sex change regret* after transitioning.[257] For

---

[250] See for example, H.Res. 124 S. 373 and H.R. 1032.

[251] See for example H. Amdt to Rules Committee Print 115-23 or H. Amdt. to Div. A of Rules Committee Print 115-30 which would prohibit funds from being used to provide medical treatment related to gender transition.

[252] See for example, Hassan, James, "New Army Training Tells Female Soldiers to 'Accept' Naked Men in Showers," *The Federalist*, July 5, 2015.

[253] Schaefer, Agnes Gereban et al., *Assessing the Implications of Allowing Transgender Persons to Serve Openly*, RAND Corporation, Santa Monica, CA, 2016, p. 61.

[254] U.S. Congress, Senate Committee on Armed Services, *Hearing to Receive Testimony on the Posture of the Navy in Review of the Defense Authorization Request for Fiscal Year 2019 and the Future Years Defense Program*, Hearing Transcript, 115th Cong., April 19, 2018; U.S. Congress, Senate Committee on Armed Services, *Hearing to Receive Testimony on the Posture of the Department of the Air Force in Review of the Defense Authorization Request for Fiscal Year 2019 and the Future Years Defense Program*, Hearing Transcript, 115th Cong., April 24, 2018; and Senate Committee on Armed Services, *Hearing to Receive Testimony on the Posture of the Department of the Army in Review of the Defense Authorization Request for Fiscal Year 2019 and the Future Years Defense Program*, Hearing Transcript, 115th Cong., April 12, 2018

[255] There is no widely available data on costs. Actual costs for treatment may vary significantly by individual. For example, a study of transgender health insurance claims reported by the University of California found that the claims varied from $67,000 to $86,800 with an average cost of $29,929 per person requiring treatment. State of California Department of Insurance, "Economic Impact Assessment; Gender Nondiscrimination in Health Insurance," Los Angeles, CA, April 13, 2012, see http://transgenderlawcenter.org/wp-content/uploads/2013/04/Economic-Impact-Assessment-Gender-Nondiscrimination-In-Health-Insurance.pdf.

[256] See for example, Dhejne, C. et al., "Mental Health and Gender Dysphoria: a Review of the Literature," *International Review of Psychology*, vol. 28, no. 1 (2016), pp. 44-57.

[257] See for example, Cecilia Dhejne, Katarina Oberg, and Stefan Arver, et al., "An Analysis of All Applications for Sex

individuals who have undergone or would like to undergo physical transition, proponents of allowing them to serve note that certain hormone replacement therapies and cosmetic procedures for other conditions are already provided by TRICARE[258] at military medical facilities.[259] Currently, genital reassignment surgeries are not available through the military direct care system.[260]

Some have noted that sex reassignment surgeries may actually provide valuable experience to military surgeons who may be called on to provide reconstructive operations on troops with genitourinary injuries sustained in combat.[261] Other surgeries associated with sex reassignment are also routinely performed by military doctors for other conditions (e.g., mastectomy and hysterectomy). Other advocacy groups and medical professionals have expressed concern that the new DOD policy allowing involuntary separation for those diagnosed with gender dysphoria would cause some servicemembers to avoid seeking care, perhaps escalating risks for those members with comorbid conditions like depression.[262]

Although the Department of Veterans Affairs (VA) also does not fund sex reassignment surgery, the VA does provide medically necessary care to intersex[263] and transgender veterans including, "hormonal therapy, mental health care, pre-operative evaluation, and medically necessary post-operative and long-term care following sex reassignment surgery."[264]

DOD has estimated that annual TRICARE costs for counseling per transgender member would be approximately $1,000 per year and annual hormone therapy/laboratory costs would be $3,000.[265] In a 2016 report, RAND estimated that the total health care costs to DOD associated with gender-transition treatment for active component members under the Military Health System would be

---

Reassignment Surgery in Sweden, 1960-2010: Prevalence, Incidence, and Regrets," *Archives of Sexual Behavior*, vol. 43, no. 8 (November 2014), pp. 1535-1545.

[258] TRICARE Policy Manual 601060-M, *Gender Dysphoria*, Chap. 7, Section 1.2, April 1, 2015.

[259] TRICARE Policy Manual 6010.60-M, *Cosmetic, Reconstructive, and Plastic Surgery–General Guidelines*, Chap. 4, Section 2.1, April 1, 2015.

[260] Estimates suggest that approximately 2% of transgender individuals elect female to male genital surgeries and 23% elect male to female genital surgeries. Schaefer, Agnes Gereban et al., *Assessing the Implications of Allowing Transgender Persons to Serve Openly*, RAND Corporation, Santa Monica, CA, 2016, Table 4.2.

[261] "From 2009 to 2010, the percentage of wounded troops with genitourinary injuries transiting through Landstuhl Regional Medical Center in Germany nearly doubled from 4.8 percent to 9.1 percent." Geraben Schaefer, Agnes et al., *Assessing the Implications of Allowing Transgender Personnel to Serve Openly*, RAND Corportation, Santa Monica, CA, 2016, p. 8.

[262] See for example, Palm Center, *The Making of a Ban: How DTM-19-004 Works to Push Transgender People Out of Military Service*, March 20, 2019.

[263] Intersex is often used to describe individuals who do not have the typical XX or XY chromosomes or those who have reproductive or sexual anatomy anomalies that do not fit with typical definitions of male or female.

[264] Department of Veterans Affairs, *Providing Health Care for Transgender and Intersex Veterans,* VDA Directive 2013-003, February 8, 2013.

[265] Information provided to CRS by DOD in an email dated September 1, 2017. TRICARE costs-per-procedure for chest surgery are estimated to be $17,013 for male to female and $32,674 for female to male. TRICAREs cost for hysterectomy (female to male) is estimated to be $13,293 per procedure. Genital surgery costs are estimated to be $17,154 for male to female, and $22,037 for female to male.

between $2.4 million and $8.4 million.[266] DOD's medical expenditures for direct care in FY2018 were approximately $18 billion.[267]

Beyond the cost of medical treatment, some opponents also argue that allowing individuals diagnosed with or being treated for gender dysphoria to continue serving may affect readiness in terms of deployability or workdays lost in order to receive medical treatment. Others have suggested that a transgender servicemember's health might be at risk if the individual requires specialized medical treatments or therapies that are not easily accessible in remote assignments. Proponents of allowing transgender individuals to serve point out that other medical conditions (e.g., pregnancy) and surgical procedures (including elective procedures) may temporarily or permanently affect deployability; nevertheless, the services make some accommodations for this by allowing leave or placing the servicemember on a limited duty status.

DOD officials have defended the new transgender accession policy by noting that for entry into the military, there are certain medical standards that must be met. For example, a history of conditions such as Attention Deficit Disorder, or bariatric surgery (e.g., lap-band or gastric bypass surgery for weight loss) can be disqualifying factors.[268] In addition, servicemembers may be subject to separation while in entry-level status during the period of initial training if a medical condition impairs the member's ability to complete the training.[269] As such, DOD has argued that allowing new accessions with existing mental health conditions such as gender dysphoria, and/or those with past surgical procedures could increase the risks that, (1) existing conditions could be aggravated by military service, (2) a member may not be available for worldwide duty, and (3) the member may later be separated from service due to medical unfitness.[270]

Opponents of DOD's April 2019 policy limiting the service of transgender personnel suggest that this could affect unit readiness and personnel costs in other ways. Some argue that this policy would shrink the recruiting pool by turning away candidates meeting all other qualifications for service. Some have also pointed to the considerable investment the Services have made in recruiting and training existing servicemembers. Discharging members who are diagnosed with gender dysphoria following the April 2019 policy change could leave some units with skill gaps. The impact of these potential gaps has not yet been analyzed, largely due to a lack of data on the actual number of transgender servicemembers, their occupational specialties, unit assignments, or deployment status.

Congress may choose to defer decision or action, or delegate authority to DOD for policies and regulations regarding accession, separation, and health care for servicemembers diagnosed with gender dysphoria or those who are discharged for reasons related to failure to comply with standards associated with their biological sex. Alternatively, Congress may choose to draft legislation affecting Administration policy under its authority to make laws governing the Armed Forces. In its oversight role, Congress could also monitor the implementation of DOD's new

---

[266] This is based on the estimated number of transgender servicemembers and the estimated number that would seek transition-related medical services annually. Schaefer, Agnes Gereban et al., *Assessing the Implications of Allowing Transgender Persons to Serve Openly*, RAND Corporation, Santa Monica, CA, 2016.

[267] Department of Defense Evaluation of the TRICARE Program: Fiscal Year 2018 Report to Congress, *Access, Cost, and Quality Data through Fiscal Year 2017*, April 2018, p. 27.

[268] Department of Defense Instruction, *Medical Standards for Appointment, Enlistment, or Induction into the Military Services,* May 6, 2018.

[269] The period of initial training is defined as 180 days per DODI 1332.14.

[270] Department of Defense, Secretary of Defense, *Memorandum for the President, Military Service by Transgender Individuals*, February 22, 2018.

policies, the effect on the careers of transgender servicemembers who are grandfathered into the pre-2019 policy, and any associated impacts on cost, readiness, and unit cohesion.

## Religious Discrimination and Accommodation

There has been recent interest in Congress regarding rights of conscience and religious accommodations for servicemembers and chaplains in the military. Section 533 of the National Defense Authorization Act for Fiscal Year 2013 (P.L. 112-239) as amended, requires military departments to accommodate the sincerely held beliefs (conscience, moral principles, or religious beliefs) of servicemembers and requires that such beliefs not be used as the basis for adverse personnel action unless the servicemember's actions or speech threaten good order and discipline as proscribed under the Uniform Code of Military Justice (UCMJ).[271] The current DOD policy[272] incorporates these legislative changes.

Section 533 of the National Defense Authorization Act for 2014 (P.L. 113-66) required the DOD Inspector General (DODIG) to investigate compliance by the Armed Forces with

> the elements of such regulations on adverse personnel actions, discrimination, or denials of promotion, schooling, training, or assignment for members of the Armed Forces based on conscience, moral principles, or religious beliefs.

The NDAA provision also required that the resulting report identify the frequency of incidents involving conscience, moral principles, or religious beliefs of a servicemember.

The resulting report found a total of 398 incidents between 2011 and 2014 or chaplains regarding religious rights of conscience.[273] DODIG found no instance where a commander forced or attempted to force a chaplain to perform a service that was contrary to his or her conscience, moral principles, or religious beliefs. Nearly 60% of the contacts were categorized by DODIG as "command climate related" and included incidents of perceived discrimination based on religious belief or nonbelief, perceived forced engagement in religious practices or communications, perceived suppression of religious expression or opinion, reprisals or personnel action based on expressions of belief, unwanted proselytization, and incidents related to the repeal of DADT. Other notable findings of the DODIG were as follows.

- Religious accommodation requests were not being addressed consistently within established timeframes.

- Approved accommodation requests did not follow servicemembers through their career as they transitioned commands.

- Data on compliance with rights of conscience protections was not collected or reported in an efficient or systematic way.[274]

In response to the report, DOD indicated that it would implement some policy changes to address issues that the DODIG raised. These changes include reviewing the feasibility of timelines for approval of religious accommodation requests, allowing religious accommodation waivers to remain in effect until revoked, and establishing a working group to review data collection efforts.

---

[271] Chapter 47 of Title 10 United States Code.

[272] Department of Defense, *Accommodation of Religious Practices Within the Military Services*, DOD Instruction 1300.17, February 10, 2009, Incorporating Change 1, Effective January 22, 2014.

[273] This timeframe was chosen to ensure data would include impacts of the repeal of DADT and the Defense of Marriage Act.

[274] Department of Defense Inspector General, *Rights of Conscience Protections for Armed Forces Service Members and Their Chaplains*, DODIG-2015-148, July 22, 2015.

## Other Aspects of Diversity

This report has focused on demographic aspects of diversity that are considered protected classes under DOD's MEO policy. Nevertheless, generating a diverse force that is "reflective of the Nation" may require consideration of a broader set of demographic characteristics, for example, geography, socioeconomic status, and family ties. These measurable characteristics may also serve as proxies for less tangible aspects of diversity like culture or cognitive diversity.

Data suggest that there are imbalances in the geographical distribution of recruits. The South contributes more new recruits per capita than any other region of the United States. Roughly 44% of new recruits in FY2015 came from the South, while 13% were from the Northeast Region (see **Figure 7**).[275] Some of this disparity may be due to a higher concentration of large military installations and, thus, greater exposure to the military in the South. While every Member of Congress is likely to have servicemembers and veterans in his or her district, some may have a greater concentration of military-connected constituents. Thus, legislative priorities related to defense manpower, pay, and benefits can also vary depending on the size of local constituencies.

**Figure 7. Representation Ratios for Non-prior Service Enlisted Accessions by State**
FY2015



**Source:** Office of the Secretary of Defense, Personnel and Readiness, *Population Representation in the Military Services*, FY2015, at https://www.cna.org/pop-rep/2015/appendixb/b_41.html.

**Notes:** This figure depicts geographic population data generally eligible for recruitment (age 18-24) with the geographic distribution of recruit enlisted accessions. The representation ratio compares a state's accession

---

[275] Office of the Secretary of Defense, Personnel and Readiness, *Population Representation in the Military Services*, FY2015.

share to the state's share of the U.S. 18- to 24-year-old population. For example, Virginia was home to 2.4% of U.S. 18- to 24-year-olds, and accounted for 3.2% of all new recruits in FY2015. Civilian population data is derived from the Bureau of Labor Statistics Current Population Survey for 18-24 year-old non-institutional civilians.

Socioeconomic diversity, often measured by household income, has been a concern since the advent of the all-volunteer force, with some suggesting that the poor might be disproportionately represented in a volunteer military. Nevertheless, recent data indicate that a majority of recruits come from households in the middle quintile ranges. In FY2017, recruits from the bottom quintile of households (lower income) were generally underrepresented in the military, with the exception of the Army (see **Figure 8**).[276] Likewise, the top quintile was underrepresented among all recruits, particularly Army recruits.

### Figure 8. Active Component Enlisted Accessions by Median Household Income
#### FY2017



**Source:** CNA tabulations of DMDC FY2017 non-prior service accessions data and 2013–2017 American Community Survey data with matching done by census tract, at https://www.cna.org/pop-rep/2017/appendixb/b_41.html.

**Notes:** Information applies to the census tract reported by individual accessions who report a home of record in the 50 states or the District of Columbia and who were matched to a census tract. The median census tract income ranges used in this table represent the income quintiles for all U.S. households in the census.

Finally, recent research has also shown that a family connection to the military is one of the highest predictors for propensity to serve. It is estimated that over 25% of new recruits in 2015 had at least one parent who served in the military. Approximately 80% had at least one family member who served.[277] In particular, those whose parent or parents served a career in the military

---

[276] Office of the Secretary of Defense, Personnel and Readiness, *Population Representation in the Military Services*, FY2015. There are established links between poverty and other factors (e.g., educational outcomes, poor fitness/obesity). These factors may affect eligibility for enlistment and contribute to lower accessions in the lowest quintile.

[277] Department of Defense, Joint Advertising Market Research & Studies (JAMRS), DOD New Recruit Survey, Wave 1, as reported in Thompson, Mark, "Here's Why the U.S. Military Is a Family Business," *Time*, March 10, 2016.

have the highest propensity for service. While it is not unusual for children to follow their parents' example in other occupational fields, some have raised concerns about this trend in the military and its potential to skew the recruiting pool and promulgate "a separate group of citizens who are both responsible for and bear the burdens of military service."[278]

# Are Diversity and Equal Opportunity Initiatives Needed in the Military?

Over time, the federal government has taken actions to build a more diverse and representative military workforce in parallel with efforts to diversify the federal civilian workforce. Today's U.S. Armed Forces have a higher percentage of women and racial minorities in service and in leadership roles than at any time in history. In addition, policies, processes, training and structures have been put into place to monitor and reduce instances of discrimination and to improve and expand upon military equal opportunity. This has led some to ask if there is still more to be done to promote diversity, inclusiveness and equal opportunity in the military, and others to question whether the military has gone too far in some cases.

Proponents of expanding diversity initiatives contend that a more diverse force has the potential to be a better performing and more efficient force. They point out that the nature of modern warfare has been shifting, requiring a range of new skills and competencies, and that these skills have to be developed from a shrinking pool of eligible candidates.[279] Some note that the demographic characteristics of the nation have been rapidly shifting and that the pool of eligible candidates for military service will become increasingly racially and ethnically diverse over the next few decades.[280] Meanwhile, women have increased their workforce participation rates and educational attainment, thus increasing the pool of skilled women eligible for recruitment.[281] Many believe that it has always been in the best interest of the military to recruit and retain a military force that is representative of the nation as a "broadly representative military force is more likely to uphold national values and to be loyal to the government—and country—that raised it."[282] This leads some to say that in order to reflect the nation it serves, the military should strive for diversity that mirrors the demographic composition of the nation as a whole.

Those who advocate for continued focus on equal opportunity initiatives in the military contend that historically underrepresented or discriminated-against demographic groups are still at a disadvantage, particularly in their ability to ascend to the highest leadership positions. Proponents of equal opportunity protections argue that if the military is to remain competitive with private sector employers in recruiting a skilled workforce, DOD should offer the same level of rights and protections as civilian employers. In addition, some argue that even though equal protections may

---

[278] Schafer, Amy, *Generations of War*, Center for New American Security, The Rise of the Warrior Cast & the All-Volunteer Force, May 2017, p. 6.

[279] Military recruiting studies have noted that based on current demographics, the available pool of youth that are eligible for military service is shrinking. Some DOD estimates suggest that nearly 75% of 17- to 24-year-olds are ineligible to serve. The cited reasons for this are height/weight or medical issues, low aptitude (based on entry testing), and other legal or moral issues.

[280] The U.S. Census Bureau estimates that by 2050, racial minorities will comprise 54% of the total U.S. population relative to 35% racial minorities in 2010.

[281] Recent population surveys have shown that 25- to 34-year-old women were approximately 21% more likely than men to be college graduates and 48% more likely to have completed graduate school. Bidwell, Allie, "Women More Likely to Graduate College, but Still Earn Less than Men," *U.S. News and World Report*, October 31, 2014.

[282] Armor, D.J. "Race and Gender in the U.S. Military." *Armed Forces and Society,* 23, 7-28, 1996.

exist in policy, more needs to be done to ensure that servicemembers do not experience discrimination or ostracism on the basis of gender, religious beliefs, or sexual orientation.

Some are concerned about how diversity and equal opportunity initiatives might be implemented and whether they could harm military effectiveness. Some feel that diversity initiatives such as actual or perceived quotas could hurt the military's merit-based system. Others contend that a military that is representative of the nation should also reflect the social and cultural norms of the nation. They argue that the popular will for social change should be the driving factor for DOD policies. Meanwhile, others express concerns that that the inclusion of some demographic groups is antithetical to military culture and could affect unit cohesion, morale, and readiness—particularly in elite combat units.

In terms of equal opportunity, some point out that the military's mission is unique and, therefore, protections that apply in the civilian workplace are not relevant in the military context. They contend that eligibility for military service or certain occupations within the military necessitates some exclusion based on these special demands.

These are among the issues Congress may face as it exercises its oversight role and establishes the evolutions in standards needed for the U.S. Armed Forces of the 21st century.

# Author Contact Information

Kristy N. Kamarck
Specialist in Military Manpower
[redacted]@crs.loc.gov, 7-....

# Acknowledgments

Will Mackey provided data analysis support and Jamie Hutchinson provided graphic support to this report

# EveryCRSReport.com

The Congressional Research Service (CRS) is a federal legislative branch agency, housed inside the Library of Congress, charged with providing the United States Congress non-partisan advice on issues that may come before Congress.

EveryCRSReport.com republishes CRS reports that are available to all Congressional staff. The reports are not classified, and Members of Congress routinely make individual reports available to the public.

Prior to our republication, we redacted phone numbers and email addresses of analysts who produced the reports. We also added this page to the report. We have not intentionally made any other changes to any report published on EveryCRSReport.com.

CRS reports, as a work of the United States government, are not subject to copyright protection in the United States. Any CRS report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS report may include copyrighted images or material from a third party, you may need to obtain permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

Information in a CRS report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to members of Congress in connection with CRS' institutional role.

EveryCRSReport.com is not a government website and is not affiliated with CRS. We do not claim copyright on any CRS report we have republished.