**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS | |
| *Plaintiff,* | |
| v. | |
| THE UNITED STATES NAVAL ACADEMY, *et al.,* | |
| *Defendants.* | |

No. 1:23-cv-2699-RDB

**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ii

Introduction ...........................................................................................................1

Argument ...............................................................................................................2

    I.   SFFA will likely succeed on the merits.........................................................5

        A.  SFFA has standing. ..........................................................................5

        B.  Navy must satisfy strict scrutiny. .....................................................9

        C.  Navy fails strict scrutiny..................................................................12

            1.  Navy has no compelling governmental interest. ....................14

            2.  Navy's use of race is not narrowly tailored. .........................19

    II.  SFFA satisfies the remaining factors. .........................................................24

        A.  Irreparable harm.............................................................................24

        B.  Balance of harms and public interest..............................................28

Conclusion ............................................................................................................29

Certificate of Service .............................................................................................30

# TABLE OF AUTHORITIES

## Cases

*AAER v. Fearless Fund Mgmt.*,
  2023 WL 6295121 (N.D. Ga. Sept. 27) ............................................................................7, 8

*Abdul Wali v. Coughlin*,
  754 F.2d 1015 (2d Cir. 1985) ..............................................................................................3

*Able v. United States*,
  847 F. Supp. 1038 (E.D.N.Y. 1994) ....................................................................................24

*Adarand Constructors v. Peña*,
  515 U.S. 200 (1995) ...........................................................................................9, 11, 19

*Advocs. for Highway & Auto Safety v. FMCSA*,
  41 F.4th 586 (D.C. Cir. 2022) ..........................................................................................6, 7

*Aggarao v. MOL Ship Mgmt. Co.*,
  675 F.3d 355 (4th Cir. 2012) ...........................................................................................4, 5

*B.R. v. F.C.S.B.*,
  17 F.4th 485 (4th Cir. 2021) .................................................................................................8

*Berkley v. United States*,
  287 F.3d 1076 (Fed. Cir. 2002) .........................................................................................10

*Brewer v. W. Irondequoit Cent. Sch. Dist.*,
  212 F.3d 738 (2d Cir. 2000).............................................................................................26

*Carson v. Makin*,
  596 U.S. 767 (2022) ...............................................................................................................1

*Chamber of Com. v. CFPB*,
  2023 WL 5835951 (E.D. Tex. Sept. 8) ....................................................................... 6, 7, 8

*Christian v. United States*,
  46 Fed. Cl. 793 (2000) ...................................................................................................9, 10

*Coal. to Defend Affirmative Action v. Granholm*,
  473 F.3d 237 (6th Cir. 2006) .............................................................................................29

*Coastal Lab'ys, Inc. v. Jolly*,
  2021 WL 1599224 (D. Md. Apr. 23)....................................................................................3

*Cooke v. Lancelotta*,
  2022 WL 622229 (D. Md. Mar. 3).......................................................................................4

*D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*,
  917 F.3d 994 (8th Cir. 2019) .............................................................................................25

*Danjaq LLC v. Sony Corp.*,
  263 F.3d 942 (9th Cir. 2001) .............................................................................................26

*Do No Harm v. Pfizer Inc.*,
  646 F. Supp. 3d 490 (S.D.N.Y. 2022) ..................................................................................7

*Doe 2 v. Shanahan,*
  917 F.3d 694 (D.C. Cir. 2019)................................................................................................10

*E. Tenn. Nat. Gas Co. v. Sage,*
  361 F.3d 808 (4th Cir. 2004) ...................................................................................................5

*Espinoza v. Mont. Dep't of Revenue,*
  140 S. Ct. 2246 (2020) .............................................................................................................1

*Fair Hous. in Huntington Comm. Inc. v. Town of Huntington,*
  316 F.3d 357 (2d Cir. 2003).....................................................................................................8

*FAIR v. Rumsfeld,*
  291 F. Supp. 2d 269 (D.N.J. 2003), *aff'g on standing*, 547 U.S. 47 (2006) ...........................6

*Fairbanks Cap. Corp. v. Kenney,*
  303 F. Supp. 2d 583 (D. Md. 2003) .......................................................................................27

*Fish v. Kobach,*
  189 F. Supp. 3d 1107 (D. Kan.), *aff'd*, 840 F.3d 710 (10th Cir. 2016) .................................26

*Fisher v. Univ. of Tex. at Austin (Fisher I),*
  570 U.S. 297 (2013) .......................................................................................................2, 9, 23

*Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.,*
  25 F.3d 119 (2d Cir. 1994).....................................................................................................27

*Five Borough Bicycle Club v. N.Y.C.,*
  483 F. Supp. 2d 351 (S.D.N.Y. 2007) ...................................................................................26

*Foulke ex rel. Foulke v. Foulke,*
  896 F. Supp. 158 (S.D.N.Y. 1995).........................................................................................25

*Georgia Vocational Rehab. Agency Bus. Enter. Program v. United States,*
  354 F. Supp. 3d 690 (E.D. Va. 2018).....................................................................................25

*Gilder v. PGA Tour, Inc.,*
  936 F.2d 417 (9th Cir. 1991) ..................................................................................................27

*Gratz v. Bollinger,*
  539 U.S. 244 (2003) .........................................................................................................6, 7, 9

*Gresham v. Windrush Partners, Ltd.,*
  730 F.2d 1417 (11th Cir. 1984)..............................................................................................24

*Grutter v. Bollinger,*
  288 F.3d 732 (6th Cir. 2002) (en banc)..................................................................................15

*Grutter v. Bollinger,*
  539 U.S. 306 (2003) .........................................................................................................24, 26

*Hamdi v. Rumsfeld,*
  542 U.S. 507 (2004) ................................................................................................................12

*Hartmann v. Stone,*
  68 F.3d 973 (6th Cir. 1995) ....................................................................................................12

*Hirabayashi v. United States,*
   828 F.2d 591 (9th Cir. 1987) ................................................................................................11

*Hisp. Nat'l L. Enf't Ass'n NCR v. Prince George's Cnty.,*
   535 F. Supp. 3d 393 (D. Md. 2021) .....................................................................................24

*Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.,*
   2021 WL 535485 (S.D.N.Y. Feb. 12) ..................................................................................26

*I.R.A.P. v. Trump,*
   857 F.3d 554 (4th Cir. 2017), *rev'd on other grounds*, 583 U.S. 912 (2017) ...................24, 28

*Johnson v. California,*
   543 U.S. 499 (2005) .............................................................................................9, 10, 11

*Kane v. de Blasio,*
   19 F.4th 152 (2d Cir. 2021) ....................................................................................................3

*Kartman v. State Farm Mut. Auto. Ins. Co.,*
   634 F.3d 883 (7th Cir. 2011) ...................................................................................................4

*King v. Innovation Books,*
   976 F.2d 824 (2d Cir. 1992) .................................................................................................27

*Korematsu v. United States,*
   323 U.S. 214 (1944) ..........................................................................................................9, 11

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't,*
   2 F.4th 330 (4th Cir. 2021) (en banc) ..................................................................................24

*MacGinnitie v. Hobbs Grp.,*
   420 F.3d 1234 (11th Cir. 2005) ...........................................................................................25

*Marks Org. v. Joles,*
   784 F. Supp. 2d 322 (S.D.N.Y. 2011) ............................................................................27, 28

*Mastrovincenzo v. N.Y.C.,*
   435 F.3d 78 (2d Cir. 2006) ......................................................................................................3

*Mayor & City Council of Baltimore v. Azar,*
   392 F. Supp. 3d 602 (D. Md. 2019) ...............................................................................4, 14

*McDonald's Corp. v. Robertson,*
   147 F.3d 1301 (11th Cir. 1998) ..............................................................................................3

*Meghrig v. KFC W.,*
   516 U.S. 479 (1996) .................................................................................................................3

*Metro. Council, Inc. v. Safir,*
   99 F. Supp. 2d 438 (S.D.N.Y. 2000) ..................................................................................26

*Morris v. U.S. Army Corps of Engineers,*
   990 F. Supp. 2d 1082 (D. Idaho 2014) .................................................................................4

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,*
   22 F.3d 546 (4th Cir. 1994) ..................................................................................................25

*N.Y. Prog. & Prot. PAC v. Walsh,*
    733 F.3d 483 (2d Cir. 2013) ................................................................................28

*NAACP v. Trump,*
    298 F. Supp. 3d 209 (D.D.C. 2018), *aff'g on merits*, 140 S.Ct. 1891, 1916 (2020) ..............6

*Nat'l Ass'n for Gun Rts. v. Lamont,*
    2023 WL 4975979 (D. Conn. Aug. 3) ...................................................................4

*Ne. Fla. Ch. of AGC v. Jacksonville,*
    508 U.S. 656 (1993) .....................................................................................6, 7

*New York v. Dep't of Com.,*
    351 F. Supp. 3d 502 (S.D.N.Y.), *aff'g on standing*, 139 S.Ct. 2551 (2019) ........................6

*NPR v. Klavans,*
    560 F. Supp. 3d 916 (D. Md. 2021) .................................................................4, 28

*Obergefell v. Hodges,*
    576 U.S. 644 (2015) .........................................................................................1

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007) ....................................................................................18, 19

*PDE v. Olentangy,*
    2023 WL 4848509 (S.D. Ohio July 28) .................................................................8

*Pollock v. Marshall,*
    656 F. Supp. 957 (S.D. Ohio 1987), *aff'd*, 845 F.2d 656 (6th Cir. 1988) .........................10

*Porter v. Block,*
    156 F.2d 264 (4th Cir. 1946) ..............................................................................4

*R.A.V. v. St. Paul,*
    505 U.S. 377 (1992) .........................................................................................7

*Reaching Hearts Int'l, Inc. v. Prince George's Cnty.,*
    584 F. Supp. 2d 766 (D. Md. 2008), *aff'd*, 368 F. App'x 370 (4th Cir. 2010) ....................24

*Roe v. DOD,*
    947 F.3d 207 (4th Cir. 2020) .........................................................................4, 28

*S.C. State Conf. of NAACP v. Alexander,*
    2022 WL 453533 (D.S.C. Feb. 14) .......................................................................8

*Sample v. Diecks,*
    885 F.2d 1099 (3d Cir. 1989) ............................................................................10

*Saunders v. White,*
    191 F. Supp. 2d 95 (D.D.C. 2002) ......................................................................16

*Senior Executives Ass'n v. United States,*
    891 F. Supp. 2d 745 (D. Md. 2012) ....................................................................25

*Serco Inc. v. United States,*
    81 Fed. Cl. 463 (2008) ...................................................................................25

*SFFA v. Harvard,*
 2023 WL 3126414 (D. Mass. Apr. 27)...................................................................9

*SFFA v. Harvard,*
 261 F. Supp. 3d 99 (D. Mass. 2017)......................................................................8

*SFFA v. Harvard,*
 600 U.S. 181 (2023) ..........................................1, 2, 5, 6, 8, 9, 11, 12, 14, 16, 17, 18, 20, 21, 22, 23, 24

*SFFA v. UNC,*
 2018 WL 4688388 (M.D.N.C. Sept. 29)...............................................................8

*SFFA v. Univ. of Tex. at Austin (UT),*
 37 F.4th 1078 (5th Cir. 2022) .................................................................................6

*Singh v. Berger,*
 56 F.4th 88 (D.C. Cir. 2022) ................................................................................28

*Speech First, Inc. v. Sands,*
 69 F.4th 184 (4th Cir. 2023).....................................................................................8

*Speech First, Inc. v. Shrum,*
 2023 WL 2905577 (W.D. Okla. Apr. 10) ...............................................................8

*Steffan v. Perry,*
 41 F.3d 677 (D.C. Cir. 1994) (en banc) ..............................................................10

*Summers v. Earth Island Inst.,*
 555 U.S. 488 (2009) ................................................................................................6

*Tom Doherty Assocs., Inc. v. Saban Ent.,*
 60 F.3d 27, 39 (2d Cir. 1995) ..............................................................................26

*Trinity Lutheran v. Comer,*
 582 U.S. 449 (2017) ................................................................................................1

*Univ. of Tex. v. Camenisch,*
 451 U.S. 390 (1981) ................................................................................................3

*Vance v. United States,*
 434 F. Supp. 826 (N.D. Tex.), *aff'd,* 565 F.2d 1214 (5th Cir. 1977) ...................9

*Vitolo v. Guzman,*
 999 F.3d 353 (6th Cir. 2021) ...............................................................................24

*Wilson-Cook Med., Inc. v. Wiltek Med., Inc.,*
 927 F.2d 598 (4th Cir. 1991) .........................................................................25, 26

*Windsor v. United States,*
 570 U.S. 744 (2013) ................................................................................................1

*Wygant v. Jackson Bd. of Educ.,*
 476 U.S. 267 (1986) ..............................................................................................16

*Y.S. ex rel. Y.F. v. N.Y.C. Dep't of Educ.,*
 2021 WL 1164571 (S.D.N.Y. Mar. 26)...............................................................28

*Yang v. Kosinski,*
   960 F.3d 119 (2d Cir. 2020) ................................................................................................25

**Other Authorities**

43 Fed. Reg. 19,260 (May 4, 1978) .........................................................................................21

Bernstein, *The Modern American Law of Race,*
   94 S. Cal. L. Rev. 171 (2021) ...........................................................................................21

*Confession of Error: The Solicitor General's Mistakes During the Japanese-American Internment Cases* (May 20,
   2011), perma.cc/6RQM-Y9SN ........................................................................................11

Gov't Accountability Off., *Military Service Academies: Actions Needed to Better Assess Organizational
   Climate,* GAO-22-105130 (July 2022) ............................................................................17

Graham, *The Origins of Official Minority Designation* (2002) .............................................21

Lyall, *Divided Armies: Inequality and Battlefield Performance in Modern War* (Princeton U. Press 2020) .....18

MLDC, Issue Paper 36, *Compelling Interests and Diversity Policy* (May 2010) ..................17

## INTRODUCTION

*Harvard* didn't "carve out the military academies" from its rejection of race-based admissions. Opp. (Doc. 46) at 54 n.26. The Supreme Court knows how to clarify that certain policies remain lawful. *E.g.*, *SFFA v. Harvard*, 600 U.S. 181, 230 (2023) ("nothing in this opinion should be construed as prohibiting universities …"). In fact, as the government recently noted, there are "times where the [Supreme] Court technically reserves a question, but the logic of the prior decision effectively answers it." *SEC v. Jarkesy*, No. 22-859, O.A. Tr.79, perma.cc/YJA9-JD89. *Windsor*, for example, held that the federal government could not ban same-sex marriage but didn't address the States. *See Windsor v. United States*, 570 U.S. 744, 775 (2013). Yet most courts held that the logic of *Windsor* also governed the States, and the Supreme Court agreed. *See Obergefell v. Hodges*, 576 U.S. 644, 662-63 (2015). *Trinity Lutheran v. Comer* "d[id] not address" anything other than "playground resurfacing." 582 U.S. 449, 465 n.3 (2017). But the Court later held that its "principles" of religious neutrality applied equally to two different programs. *See Carson v. Makin*, 596 U.S. 767, 780 (2022); *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2254-60 (2020). Other examples are easy to find.

Instead of blessing their use of race, *Harvard* simply "does not address" the military academies and explained why: "in light of" the "potentially distinct interests" that they "may present." 600 U.S. at 213 n.4. The Court said "distinct" because *Harvard* rejects the educational benefits that the academies previously relied on from *Grutter*. And the Court said "potentially" and "may" because the academies could lack those interests. Or the academies could fail narrow tailoring. *See id.* ("No military academy is a party to these cases"). Or perhaps the Court expected the academies, given the writing on the wall in *Harvard*, to abandon or overhaul their use of race. But nothing in *Harvard* suggests that the academies would get special deference or lower scrutiny. The Court even cited the military as an example of why courts cannot tolerate any deviation from the strictest scrutiny for racial classifications. *See id.* at 207 n.3.

This Court now has evidence about how the Naval Academy uses race, and the Supreme Court has tasked it with "address[ing] the propriety of race-based admissions systems in that context." *Id.* at 213 n.4. At this stage, the Court must predict whether Navy will likely carry its burden of proving that its race-based admissions can survive strict scrutiny under *Harvard*. If the answer is no, then this Court must enjoin Navy from illegally discriminating against citizens in every admissions cycle while this case is pending, including the one that will start in earnest on February 1. Such imminent constitutional violations, after all, are clear irreparable harm.

The record now confirms that Navy is violating *Harvard*, badly. Navy concedes that it gives racial boosts to "minority groups," Opp.8, meaning it treats race as a negative for whites. It concedes that it uses the same racial categories that *Harvard* rejects as arbitrary. It has no firmer end date for when it will stop using race than Harvard or UNC. Its purported interests cannot be measured by courts—a fundamental problem that cannot be solved through racial balancing, stereotyping, or judicial deference. And even if those interests could be measured, Navy would have to prove they aren't met when academies abandon racial preferences, like the Coast Guard Academy did for years and the Merchant Marine Academy still does. But Navy doesn't even *mention* those academies. Navy has the burden under strict scrutiny. Because it has no prospect of meeting that burden, the equities require it to comply with equal protection until this case ends. This Court should grant a preliminary injunction at the December 14 hearing.

## ARGUMENT

Navy should be barred from considering race while this case is pending. Navy doesn't suggest that the record is inadequate or that this Court needs more information. (And any omissions should be held against Navy, which bears the burden under strict scrutiny. *Fisher v. Univ. of Tex. at Austin* (*Fisher I*), 570 U.S. 297, 310 (2013).) SFFA has also been careful to focus this motion on its *legal* arguments. Preliminary injunctions are "customarily granted on the basis of procedures that are less

formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Courts resolve these motions by making, based on what they know now, a "'prediction'" about the merits. *Coastal Lab'ys, Inc. v. Jolly*, 2021 WL 1599224, at *8 (D. Md. Apr. 23) (Bennett, J.). That prediction is needed because, if left to its own devices, Navy will racially discriminate every cycle until this case ends, including the upcoming selections that start on February 1. *See Kane v. de Blasio*, 19 F.4th 152, 163 (2d Cir. 2021) ("The purpose of a preliminary injunction is … to preserve the status quo by preventing during the pendency of the suit the occurrence of that irreparable sort of harm." (cleaned up)). Because Navy is so likely to lose under *Harvard* at the end of the case, the equities require that, until then, Navy bear the cost of complying with the Constitution's rule of racial neutrality, instead of requiring applicants to bear the cost of repeated cycles of discrimination. *See Coastal Lab'ys*, 2021 WL 1599224, at *6 ("The purpose of such equitable relief is 'not to conclusively determine the rights of the parties' but to 'balance the equities as the litigation moves forward.'").

Sensing its problems under the normal standard for preliminary injunctions, Navy tries to raise the bar. It claims that a "heightened" standard applies because SFFA seeks a "mandatory" injunction that would "alter the status quo." Opp.12. But that higher standard doesn't apply unless the injunction would *both* mandate positive action *and* alter the status quo. *See Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025-26 (2d Cir. 1985); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1307 n.2 (11th Cir. 1998). SFFA's injunction would do neither.

Far from mandatory, SFFA's injunction is a classic prohibitory injunction. A "mandatory" injunction "orders a responsible party to 'take action,'" while a "prohibitory" injunction "'restrains' a responsible party from further violating [the law]." *Meghrig v. KFC W.*, 516 U.S. 479, 484 (1996). SFFA's injunction is prohibitory because it would merely "prohibi[t] Defendants from considering applicants' race." PI-Mot. (Doc. 6) at 1; *see Mastrovincenzo v. N.Y.C.*, 435 F.3d 78, 90 (2d Cir. 2006). It would stop Navy from enforcing its policy of awarding racial preferences. It's no different from other

cases where government policies are judged under the normal preliminary-injunction standard. *E.g.*, *NPR v. Klavans*, 560 F. Supp. 3d 916, 922-24 (D. Md. 2021) (Bennett, J.) (applying normal standard to enjoin enforcement of state law); *Mayor & City Council of Baltimore v. Azar*, 392 F. Supp. 3d 602, 613-15 (D. Md. 2019) (Bennett, J.) (same when enjoining enforcement of federal regulation); *Roe v. DOD*, 947 F.3d 207, 219-20 (4th Cir. 2020) (same when enjoining Air Force from discharging certain officers). And it's very different from *Cooke v. Lancelotta*, where the injunction would have affirmatively ousted the defendant from control and put the plaintiffs in charge of the companies. 2022 WL 622229, at *1-4 (D. Md. Mar. 3). SFFA's injunction wouldn't require Navy to admit any applicant. Navy doesn't even explain how this injunction would require it "to perform an affirmative act." *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011); *cf. Porter v. Block*, 156 F.2d 264, 267 (4th Cir. 1946). And it's not enough for Navy to simply complain that the injunction would force it to *change* its behavior:

> While this [injunction] would require the [government] to change its practices, that type of change does not convert the injunction into a mandatory injunction. In the leading case of *Winter v.* [*NRDC*], the injunction required the Navy to stop using sonar in its training exercises—in other words, it caused the Navy to change its practices—but the Supreme Court evaluated the injunction under the standard test.

*Morris v. U.S. Army Corps of Engineers*, 990 F. Supp. 2d 1082, 1088 (D. Idaho 2014).

Nor would SFFA's injunction alter the status quo, properly defined. The "status quo" in this context is "not the circumstances existing at the moment the lawsuit … was actually filed," but is the "'last uncontested status between the parties which preceded the controversy.'" *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012). This controversy is about whether Navy can use race after *Harvard. See Nat'l Ass'n for Gun Rts. v. Lamont*, 2023 WL 4975979, at *6 (D. Conn. Aug. 3) (status quo ante was "the status quo pre-1993," when the challenged gun laws were passed, even though the case was filed 20 years later, after the Supreme Court decided *Bruen*). Before *Harvard*, Navy "relied on *Grutter*." U.S.-*SFFA*-Br. 24, 5. After *Harvard* eviscerated *Grutter*, Navy had a decision to make: Either

adopt race-blind admissions (like every civilian university did after *Harvard*), or continue using race based on new interests "distinct" from *Grutter*. *Harvard*, 600 U.S. at 213 n.4. Navy decided, for the upcoming admissions cycle, that it would use race. *Cf.* Latta Decl. ¶80 ("USNA reviews its admissions process annually, including its limited consideration of race and ethnicity."); Opp.57 (noting that Navy constantly "adjust[s] its admissions policies that consider race"); Opp.3 n.1 (stressing that Navy's "current admissions process" is substantially different from what it was "decade[s]" ago). Because Navy "'has recently disturbed the status quo,'" a preliminary injunction "to reverse its actions … restores, rather than disturbs, the status quo ante.'" *Aggarao*, 675 F.3d at 378.

But the standard isn't determinative here because, even under the heightened one, SFFA should get a preliminary injunction. Navy *will* lose under *Harvard*. It has no actual response to many of the restraints that the Supreme Court placed on race-based admissions. It instead relies heavily on the deference that *Harvard* rejects and that courts never give the military when it racially classifies citizens. And because Navy's discrimination violates constitutional rights, SFFA will suffer strong irreparable harm. That harm is right around the corner, once Navy starts making general admissions decisions in February. The "circumstances" are thus "sufficiently demanding" to justify any form of preliminary injunction. *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 830 (4th Cir. 2004).

## I.      SFFA will likely succeed on the merits.

Navy briefly contests SFFA's standing, even though no court has ever doubted SFFA's standing at any stage. Navy then concedes that its race-based admissions must satisfy strict scrutiny, but it backtracks by asking for the kind of deference that strict scrutiny abhors. And Navy tries to argue, based mostly on that same flawed plea for deference, that its use of race complies with *Harvard*. These arguments have no prospect of success.

### A.      SFFA has standing.

"Every court to have considered" whether SFFA has standing has held that it does. *Harvard*, 600 U.S. at 198-99 (citing *SFFA v. Univ. of Tex. at Austin* (*UT*), 37 F.4th 1078, 1084-86 & n.8 (5th Cir.

2022)). As an association, SFFA has standing if one of its members would, if this suit is germane to its purpose, and if its members needn't participate. *Id.* at 199. The latter two requirements are unchallenged and met. *See id.* The first is met too. By using race, Navy injures applicants by denying them the "'opportunity to compete for admission on an equal basis.'" *UT*, 37 F.4th at 1086. That injury is imminent, concrete, and particularized for SFFA's identified members, who are "'able and ready'" to apply once Navy stops using race. *Id.*; *see* Member A Decl. ¶4; Member B Decl. ¶4. Because a court can order that relief, causation and redressability are satisfied too. *Ne. Fla. Ch. of AGC v. Jacksonville,* 508 U.S. 656, 666 n.5 (1993). It doesn't matter whether the members apply to Navy, or whether they would get in. *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003).

SFFA did not somehow lose standing by referring to its members with pseudonyms. Though the government really likes this argument, courts keep rejecting it—including in high-profile cases that reached the Supreme Court. *E.g., New York v. Dep't of Com.*, 351 F. Supp. 3d 502, 606 n.48 (S.D.N.Y.), *aff'g on standing*, 139 S.Ct. 2551 (2019); *FAIR v. Rumsfeld*, 291 F. Supp. 2d 269, 286-89 (D.N.J. 2003), *aff'g on standing*, 547 U.S. 47, 52 n.2 (2006); *NAACP v. Trump*, 298 F. Supp. 3d 209, 225-26 & n.10 (D.D.C. 2018), *aff'g on merits*, 140 S.Ct. 1891, 1916 (2020). The government's argument "misunderstand[s] *Summers*," a case that didn't involve pseudonyms. *Chamber of Com. v. CFPB*, 2023 WL 5835951, at *6 (E.D. Tex. Sept. 8); *accord Advocs. for Highway & Auto Safety v. FMCSA*, 41 F.4th 586, 594 (D.C. Cir. 2022). The associations in *Summers* lacked standing because they failed to identify a *specific* member who had standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 497-99 (2009). They pointed to their membership generally and speculated that someone in there probably had standing. *Id.* at 497-98.

SFFA didn't violate the principle from *Summers*. It identified specific members; named them ("Member A," etc.); explained in detail why they currently have standing; and supported their standing with a verified complaint, a declaration from its president, and anonymous member declarations. *See*

*AAER v. Fearless Fund Mgmt.*, 2023 WL 6295121, at *2-3 (N.D. Ga. Sept. 27) (finding standing on the same record); *Chamber*, 2023 WL 5835951, at *6 (similar). The members' "anonymity is no barrier to standing on this record." *Highway Safety*, 41 F.4th at 594. *Summers* didn't say that associations must provide members' "*real* names" or "*legal* names"; those associations didn't identify any individual (let alone use a pseudonym). It would be "contrary to all traditions of our jurisprudence to consider the law on this point conclusively resolved by broad language in cases where the issue was not presented or even envisioned." *R.A.V. v. St. Paul*, 505 U.S. 377, 386 n.5 (1992).

Providing members' legal names "'adds no essential information'" about standing. *Highway Safety*, 41 F.4th at 594. The government says it needs to unmask Members A and B to determine whether race would "play a role" when Navy considers their applications. Opp.16. But Members A and B were rejected before, *see* Member A Decl. ¶3; Member B Decl. ¶3, meaning they weren't on one of the tracks where Navy says race plays no role. And divulging their first and last names *now* wouldn't reveal anything about what admissions track they would be on *this* time—after nominations come in, rankings are made, applications are finalized, vacancies are filled, alternates are picked, and the like. In all events, none of this is relevant to standing. If Members A and B were, say, Hispanic, they'd have a better chance of getting admitted because they could get racial preferences at the beginning, middle, and end of Navy's process. But because they are white, they have no chance at getting those preferences. This "inability to compete on an equal footing" is their "'injury in fact.'" *Jacksonville*, 508 U.S. at 666. Because Navy "makes it more difficult for members of one group to obtain a benefit," members in the outgroup need not allege that race was a "but for" cause of their non-admission. *Id.* They needn't even apply. *Id.* Their injury is "the denial of equal treatment resulting from the imposition of the barrier" itself. *Id.*; *accord Gratz*, 539 U.S. at 261-62 (same).

The government cites "[t]wo district courts" that have adopted its misreading of *Summers*, Opp.16 (citing *Do No Harm v. Pfizer Inc.*, 646 F. Supp. 3d 490 (S.D.N.Y. 2022); *Speech First, Inc. v. Shrum*,

2023 WL 2905577 (W.D. Okla. Apr. 10)), but this Court shouldn't follow those outliers. Both cases are on appeal. Both make the same mistakes discussed above. And both have been rejected by every court to consider this issue since. *See AAER*, 2023 WL 6295121, at *2-3; *Chamber*, 2023 WL 5835951, at *6; *PDE v. Olentangy,* 2023 WL 4848509, at *6 n.2 (S.D. Ohio July 28).

Navy's cases aren't good law anywhere, least of all the Fourth Circuit. This circuit has already held that "pseudonyms" are "immaterial to the case or controversy inquiry." *B.R. v. F.C.S.B.*, 17 F.4th 485, 495 (4th Cir. 2021). If pseudonymity affected standing, then named plaintiffs couldn't use them either; yet that practice is "common" and has "never" implicated a court's "*power* to adjudicate the dispute." *Id.* As another three-judge court recently explained, an association's "refus[al] to disclose the names of individual members" is "not evidence that [it] *lacks* the alleged members." *S.C. State Conf. of NAACP v. Alexander*, 2022 WL 453533, at *3 (D.S.C. Feb. 14) (Heytens, Gergel, Childs, JJ.). It "merely" suggests that the association "has reservations about revealing those member names"—a "discovery dispute" that "can and should be handled" later. *Id.* So too on this preliminary-injunction motion, where neither party has sought discovery. *Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 361-62 (2d Cir. 2003). In another pre-discovery case where the association was "represented by the same counsel as Plaintiff," Opp.16, the Fourth Circuit found that the association had standing to challenge a policy at the preliminary-injunction stage. *Speech First, Inc. v. Sands*, 69 F.4th 184, 199 n.12 (4th Cir. 2023). The Fourth Circuit was fully aware that the association's standing members were "anonymous." *Id.* at 190 n.3. It even granted the association leave to introduce new "anonymous" members on appeal, *id.*—overruling the defendant's objections to their "anonymity," CA4 Doc. 69 at 8, No. 21-2061 (4th Cir. Oct. 24, 2022).

Navy's cases also contradict *Harvard*. SFFA had standing against Harvard and UNC "when it filed suit." 600 U.S. at 200; *accord SFFA v. UNC*, 2018 WL 4688388 (M.D.N.C. Sept. 29) (denying 12(b)(1) motion); *SFFA v. Harvard*, 261 F. Supp. 3d 99 (D. Mass. 2017) (same). But when it filed suit,

its complaints referred to its members with pseudonyms. *See* Doc. 1 ¶15, No. 1:14-cv-14176 (D. Mass. Nov. 17, 2014) ("Applicant"); Doc. 1 ¶13, No. 1:14-cv-954 (M.D.N.C. Nov. 17, 2014) ("Applicant"). Their real names were never disclosed to the public and weren't disclosed to the defendants until much later in discovery. *SFFA v. Harvard*, 2023 WL 3126414, at *6 n.4 (D. Mass. Apr. 27). No party or court thought their anonymity was relevant to standing. It wasn't.

### B.    Navy must satisfy strict scrutiny.

Navy concedes that its race-based admissions "must satisfy 'strict scrutiny,'" Opp.13, but then repeatedly asks this Court for "deference," Opp.13, 14, 21, 28. Those positions are "fundamentally at odds." *Johnson v. California*, 543 U.S. 499, 506 n.1 (2005). Navy can't classify Americans based on their skin color without satisfying the strictest scrutiny.

Because "all" racial classifications must satisfy strict scrutiny, *id.* at 505-06, "[a]ny" governmental exception to race neutrality must pass that "daunting" test, *Harvard*, 600 U.S. at 206. "'[A]ny person … has the right to demand that any governmental actor … justify any racial classification … under the strictest of judicial scrutiny.'" *Gratz*, 539 U.S. at 270. And "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed … under strict scrutiny." *Adarand Constructors v. Peña*, 515 U.S. 200, 227 (1995). These any's and all's could not be clearer; the caselaw leaves no room for a bespoke military-academy exception.

Courts do, in fact, require the military to satisfy strict scrutiny when it classifies citizens based on race. Strict scrutiny was "first articulated," after all, in *Korematsu*—a case involving an (infamous) racial classification by the military. *Fisher I*, 570 U.S. at 316 (Thomas, J., concurring); *see Korematsu v. United States*, 323 U.S. 214, 216 (1944) (stating that courts must subject "all legal restrictions" based on race "to the most rigid scrutiny"). Courts have applied strict scrutiny to the military's racial classifications ever since. *E.g.*, *Vance v. United States*, 434 F. Supp. 826, 833-34 (N.D. Tex.), *aff'd*, 565 F.2d 1214 (5th Cir. 1977); *Christian v. United States*, 46 Fed. Cl. 793, 803-06 (2000). Per the D.C. Circuit,

strict scrutiny applies when "the military" makes decisions "based on race." *Steffan v. Perry*, 41 F.3d 677, 689 & n.9 (D.C. Cir. 1994) (en banc); *accord Doe 2 v. Shanahan*, 917 F.3d 694, 703 (D.C. Cir. 2019) (Wilkins, J., concurring) ("[E]ven in the military context, classifications based on race … trigger strict scrutiny." (cleaned up)). And per the Federal Circuit, "a strict scrutiny analysis is required" whenever the military "treat[s] any person unequally because of his or her race." *Berkley v. United States*, 287 F.3d 1076, 1084, 1090-91 (Fed. Cir. 2002).

When courts apply strict scrutiny to the military's racial classifications, they apply real strict scrutiny—not some watered-down version that gives the government special deference. *Christian* is a good example. There, the court applied the established strict-scrutiny standard to a "race-based affirmative action policy" issued by the Army. 46 Fed. Cl. at 804-13. In doing so, it cited the same strict-scrutiny cases that the Supreme Court applies outside the military context. *See id.* at 804-13 (relying on *Bakke*, *Adarand*, and others). And the court applied the traditional strict-scrutiny framework, recognizing that "the burden" is on "the government," that racial classifications "may not have an infinite life span," and that military leadership—like civilians—can consider race only when "most exact connection between justification and classification" exists. *Id.* at 806-11. It then held that "the Army's affirmative action program … does not come close to the exact fit required" by strict scrutiny. *Id.* at 814-15. Navy cites several cases about courts giving deference to the military; tellingly, not a single one involves racial classifications. *See* Opp.13-15 & n.5.

This lack of deference comes from the Supreme Court's precedents. Prisons, for example, normally get the same level of deference as the military. *Sample v. Diecks*, 885 F.2d 1099, 1109 (3d Cir. 1989); *Pollock v. Marshall*, 656 F. Supp. 957, 962 (S.D. Ohio 1987), *aff'd*, 845 F.2d 656 (6th Cir. 1988). But when they classify citizens based on race, the Supreme Court applies normal strict scrutiny. *Johnson*, 543 U.S. at 505-06. Giving "deference" to "prison officials" when they use race, the Court explained, would create a "hands-off approach to racial classifications" that "is fundamentally at odds with our

equal protection jurisprudence." *Id.* at 506 n.1. "[S]earching judicial review of racial classifications" is all the more "necessary" in contexts where "the government's power is at its apex." *Id.* at 511. Universities, too, usually get "'a degree of deference'" in their "'academic decisions.'" *Harvard*, 600 U.S. at 217. But not when they "us[e] race to benefit some applicants but not others." *Id.* As the Court held in *Harvard*, courts cannot "defer to universities and 'experts' in determining who should be discriminated against"; both "history" and "law" expose "the folly in that approach." *Id.* at 218 n.5. In *Harvard* itself, the Court outlawed the use of race at all universities, giving no deference to the government's assertion that it was "critically important" for universities to keep using race because far "more officers come from [civilian universities'] ROTC programs" than from the service academies. *Harvard* O.A. Tr. 150:8-17, perma.cc/3JEA-VMQK.

*Korematsu* offers an example and a warning. Though *Korematsu* was right to say that the military's racial classifications must pass strict scrutiny, all agree that the Court didn't faithfully apply that standard. It allowed the military to intern citizens because it deferred to the "judgment" of the "military authorities" that Japanese-Americans were a threat to national security. *Korematsu*, 323 U.S. at 218-19. As it turned out, the military's policy was "'carried out without adequate security reasons.'" *Adarand*, 515 U.S. at 236; *Hirabayashi v. United States*, 828 F.2d 591, 601 (9th Cir. 1987); *Confession of Error: The Solicitor General's Mistakes During the Japanese-American Internment Cases* (May 20, 2011), perma.cc/6RQM-Y9SN. *Korematsu* has since been "overruled," precisely because courts cannot tolerate "'any retreat from the most searching judicial inquiry'" in the race context. *Harvard*, 600 U.S. at 207 n.3 (cleaned up). Of course, rejecting applicants from Navy is not placing Americans in concentration camps. *Cf.* Opp.29 n.14. But it's notable that Navy asks this Court to defer—on matters of race—to the very institutions that authorized that internment and that (in Navy's words) have a long "history of racial tension," "racial violence," and "racial strife." Opp.22-24. Such institutions should be "the very *last*

ones to be allowed to make race-based decisions, let alone be accorded deference in doing so." *Harvard*, 600 U.S. at 227 n.8.

This Court should not repeat history's mistakes. *Korematsu* deferred to actual military tactics in an active world war, and yet *still* was "'gravely wrong the day it was decided.'" *Id.* at 207 n.3. Deference is even less warranted here, where the military is discriminating against high-schoolers when making college-admissions decisions in the hopes that some of them will attend, graduate, and become officers many years later. *Cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 535-36 (2004) (military policy violated "individual liberties" and didn't directly involve "the strategy or conduct of war"); *Hartmann v. Stone*, 68 F.3d 973, 985 (6th Cir. 1995) (military policy injured "people not in the Armed Forces"). And deference to whom? In *Grutter*, the same government "d[id] not accept" that the military academies needed racial preferences to achieve diversity and strongly rejected "the proposition that black soldiers will only fight for black officers." *Grutter* O.A. Tr.22, 19, perma.cc/7Y3S-SSY2.

But even if this Court gives Navy deference, no amount of "'careful consideration'" of the military's views could change the outcome. Opp.40 n.19. The government *agrees* that the judiciary should have overruled the military's judgment that Japanese internment was vital to national security. Opp.29 n.14. And surely the government agrees that courts should have overruled the same national-security arguments it is making today if they were pressed in defense of segregation. *Cf.* Opp.21-26. Deference, in other words, can never overcome clear violations of equal protection. And Navy's violations of *Harvard* are clear. SFFA should win under any reasonable version of strict scrutiny.

### C.    Navy fails strict scrutiny.

Until now, Navy has never detailed how it uses race. Its revelations are bleak. When processing applications, one of the first things Navy does is classify students by race. Opp.4; Latta Decl. ¶¶21-23. In its "Preliminary Application," Navy "asks candidates to self-report their … race/ethnicity." Latta Decl. ¶23. Navy then asks them to complete the "Candidate Academic Information" form,

which again requires a "school official" to answer "whether the student is a member of a minority group." Latta Decl. ¶23. Officials cannot specify which "minority group," nor can they explain how that applicant's race or ethnicity affected their life; they "can only answer 'yes' or 'no'" to "whether the student is … a minority." Latta Decl. ¶23.

Once an applicant's application is complete, Navy determines whether that applicant is entitled to "a conditional offer of admission," called a "letter of assurance" (or LOA). Opp.9. Race can be considered "when deciding to extend a[n] LOA." Latta Decl. ¶68; Opp. 53 n.24. Race is "particularly" important when "candidates" fall below the "Whole Person Multiple" score that is "typically" required for an LOA. Opp.6, 9; Latta Decl. ¶74. In those situations, "race and ethnicity" may be "a plus factor," Opp.44, 46—but only for "minority groups." Latta Decl. ¶74.

Race continues to be a plus for "minority candidates" throughout the rest of Navy's admissions. Latta Decl. ¶77. For some congressional and service-connected nominees, "race or ethnicity" can be a tiebreaker. Latta Decl. ¶77; Opp.9-10. When two applicants' Whole Person Multiple scores "are very close," Navy can even select a minority "candidate with a slightly lower" score over a nonminority candidate "with [a] slightly higher" one. Latta Decl. ¶77. But the opposite is not true: Navy cannot use a white candidate's race as a plus when picking between two applicants with close scores. *See* Latta Decl. ¶77. Race plays the same role in Superintendent nominations, which can fill up to five percent of Navy's spots. Opp.10; Latta Decl. ¶76.

"[A]t the end of the admissions cycle," Navy considers race again when selecting "additional appointees." Latta Decl. ¶75. Navy selects "additional appointees" in two ways, and both use racial preferences. Latta Decl. ¶75(a)-(b). Navy automatically "appoint[s]" anyone who received a letter of assurance—an award that, itself, can be influenced by race. Latta Decl. ¶75(a). Navy also "may consider race or ethnicity as a … factor" when appointing any remaining candidates. Latta Decl. ¶75(b). In either case, "race or ethnicity" can "be used" as a plus only for "minority groups." Latta

13

Decl. ¶¶75-76. Navy nowhere quantifies the weight that race gets in its process, or explains what its class would look like if it stopped awarding these racial preferences.

This regime cannot survive strict scrutiny, as articulated in *Harvard*. It pursues no valid, ascertainable interest. And it has all the narrow-tailoring shortcomings from *Harvard*, plus a few more. "To satisfy the showing for a preliminary injunction," SFFA "does not need to demonstrate that it is likely to succeed on the merits of all" these arguments—just one. *Baltimore*, 392 F. Supp. 3d at 613. But it's right about them all.

### 1.      Navy has no compelling governmental interest.

Navy cannot use race to pursue the so-called "educational benefits" of diversity. *Harvard* rejected these benefits as "inescapably imponderable" and "not sufficiently coherent for purposes of strict scrutiny." 600 U.S. at 214-15. No amount of deference could make them ponderable or coherent. Hence why *Harvard* said the military academies would need to identify "potentially *distinct* interests." *Id.* at 213 n.4 (emphasis added). And Navy must recognize this, as it disclaims the educational benefits of diversity as an interest that could sustain its use of race. Opp.11.

After *Harvard*, the Supreme Court's precedents identify "only two compelling interests that permit resort to race-based government action." 600 U.S. at 207. The first is "remediating specific, identified instances of past discrimination." *Id.* The second is "avoiding imminent and serious risks to human safety in prisons." *Id.* Navy claims neither: It identifies no discrimination that it's remedying, and it's not a prison. So to rule for Navy, this Court will have to recognize a new interest and announce—for the first time—that it allows the government to explicitly use race. Tall order.

Navy claims that admitting cadets based on race furthers four interests: cohesion, recruitment, retention, and legitimacy. Opp.28. None can justify explicit racial classifications. They are impossibly vague and unmeasurable, and there's no evidence that racial balancing furthers them. They're also fatally inconsistent.

***Unmeasurable.*** None of Navy's interests are "sufficiently measurable to permit judicial review." *Harvard*, 600 U.S. at 214 (cleaned up). According to Navy, racial preferences allow service members to see themselves as part of "a diverse and inclusive Navy." Opp.31 n.15, 34-35. And *that*, Navy says, "enhances cohesion, increases lethality, and improves decisionmaking," Opp.31 n.15, which, in turn, increases "military effectiveness," Opp.32.

The problem is: "It is unclear how courts are supposed to measure any of these goals," or "know when they have been reached." *Harvard*, 600 U.S. at 214. Navy never offers any metric that courts could use to determine whether a sufficient percentage of civilians "can better visualize themselves joining [the] ranks," Opp.34; Fuller Decl. ¶14, or whether units have attained the necessary cohesion levels for "innovation" and "problem-solving," Opp.30, 33; Lyall Decl. ¶19; *see also Harvard*, 600 U.S. at 214-15 ("There is no particular point at which there exists sufficient 'innovation and problem-solving…'"). And a discriminator cannot survive strict scrutiny by surveying the beneficiaries of its discrimination and asking them if they approve. *Grutter v. Bollinger*, 288 F.3d 732, 804-05 (6th Cir. 2002) (en banc) (Boggs, J., dissenting). UNC said it could measure its interests through "surveys," after all. UNC-*SFFA*-Br.6. Navy's interest in the supposed military benefits of diversity is as standardless as civilian universities' interest in the supposed educational benefits.

Navy's remaining interests—recruiting, retention, and public legitimacy—are even more elusory and amorphous. How can courts tell if Navy's racial preferences are causing it to recruit or retain "the top talent in the country"? Opp.34, 36. Or "creat[ing] a culture of inclusion and espirit de corps"? Opp.41. Navy doesn't say. It simply declares that "a more diverse officer population" makes "Naval service more attractive," even though diversity—as Navy admits—isn't a top factor that prospects regularly consider. Opp.34; *see* Haynie Decl. ¶29 (noting that "fear of death, worries over post-traumatic stress disorder, and leaving friends and family" were recruits' "top three" considerations). And Navy would still be racially diverse without racial preferences; it just might not

be the particular mix that Navy has now. In any event, the Supreme Court has already held that recruitment and retention are not compelling interests that could justify government classifications based on race. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 273-75 (1986). The "question [of] whether a particular mix of minority [cadets] produces" public and international legitimacy is not reliably knowable either. *Harvard*, 600 U.S. at 215; *see also Saunders v. White*, 191 F. Supp. 2d 95, 129 (D.D.C. 2002) ("The Army's desire to create the perception of equal treatment is not an important enough governmental interest to justify [its] racial classifications" in promotion procedures.).

In response, Navy says its interests "are far more analogous" to those in *Johnson*, Opp.57-58, a case that didn't involve admissions, affirmative action, or the military. In *Johnson*, a prison sought to avoid a violent race riot—an event that posed "imminent and serious risks to human safety" and could be averted only through "racial segregation." *Harvard*, 600 U.S. at 208, 215. Recounting that case in *Harvard*, the Supreme Court observed that the prison's interests were compelling only because the means for achieving them were "temporary" and "measurable": either the government "prevent[ed] harm to those in the prison," or it didn't. *Id.* at 214-15. Navy's metrics—"confidence," "cohesion," and "legitimacy," Opp.28—are intangible, abstract, and not reliably measured.

Even if these outcomes could be measured, a court would have to assess whether Navy's use of race was "'necessary'" to achieve them. *Harvard*, 600 U.S. at 207. It would need to assess whether racial preferences are *why* these outcomes are being achieved, and whether the outcomes would *no longer* be achieved if racial preferences ended and were replaced with race-neutral alternatives. *Id.* at 215. That task is impossible for courts. It's apparently impossible for Navy too, as it doesn't identify any method that even tries to answer these causal (or reverse causal) questions.

**Unsupported.** Navy makes the puzzling claim that its goals are "concrete" and "measurable" because courts can "carefully consider" the views of senior military leadership (and presumably defer to them). Opp.40-41. That's not the law, *supra* I.B, and even the MLDC knows it. "This is not an area

where traditional judicial deference to the military applies. Proof is needed." MLDC, Issue Paper 36, *Compelling Interests and Diversity Policy* 3 (May 2010). And it is "far from evident" that cohesiveness and Navy's other asserted interests depend on a "racially diverse" (*translation*: racially balanced) military. *Harvard*, 600 U.S. at 215. To be sure, Navy purports to have such evidence. *E.g.*, Opp.33 ("quantitative and historical case studies"); *id.* at 34 ("numerous studies"); *id.* at 41-42 ("qualitative and quantitative studies"). In reality, it simply repeats conclusory assertions that it recently made elsewhere and gestures towards studies that have nothing to do with the U.S. military. *See* Spoehr Decl. ¶¶34, 39-41, 43, 46, 49-54, 58-60, 67-69.

The sources that Navy cites are flawed, irrelevant, or misinterpreted. For example, Navy relies on information from the DoD's climate surveys and invites this Court to do the same. *See* Opp.32 (quoting Haynie Decl. ¶¶31-32). But the GAO has determined that "the DOD climate survey … does not provide complete and reliable information" due to "methodological issues concerning security, response rates, and post-survey weighting that limit its usability." Gov't Accountability Off., *Military Service Academies: Actions Needed to Better Assess Organizational Climate*, GAO-22-105130, at 1 (July 2022); *see also* Spoehr Decl. ¶73. And Navy's declarants offer up the same sort of general studies about the alleged benefits of diverse workforces that were before the Court in *Harvard* too, without avail. *E.g.*, 600 U.S. at 406 n.101 (Jackson, J., dissenting).

Navy's primary source, "which informs DoD work" today, is even less reliable. Opp.32-33 (discussing Lyall study); *see* Spoehr Decl. ¶¶45-59. From start to finish, Navy relies on Professor Lyall to suggest "how diversity and equality affect combat performance." Opp.33. But the key empirical studies that Professor Lyall cites are centuries old. *See* Lyall Decl. ¶39 ("Anglo-Egyptian force at Omdurman … in 1898"); ¶44 ("Royal Navy ships from 1740 to 1820"). And the Professor's remaining studies don't involve race, don't involve the military, or both. *See* Lyall Decl. ¶51 ("diverse peacekeeping units" in "Mali"); ¶52 ("studies of policing" in "Iraq" and "Chicago"); ¶53 ("all-women

Female Engagement Teams (FETs) in Afghanistan"); Spoehr Decl. ¶¶46-49, 52-55, 58, 61. And historical lessons from the Mongol armies and the ancient Greek phalanxes, or the mistreatment of conscripted soldiers in the Mahdist Army in Sudan in 1898, say nothing about whether Navy's racial preferences are necessary to make the U.S. military effective or efficient. *See* Lyall Decl. ¶¶17-18, 39; *cf.* Spoehr Decl. ¶¶43, 45-46, 49-54.

That Professor Lyall's research says little about western militaries is no accident. "The centerpiece of [his] research," Lyall Decl. ¶3, openly rejects "'theories of military effectiveness'" that are "'devised, tested, and refined'" on "'Western-centric'" conflicts. Spoehr Decl. ¶53 (quoting Lyall, *Divided Armies: Inequality and Battlefield Performance in Modern War* 22-23 (Princeton U. Press 2020)). Navy cannot explain how a study that purposefully ignores America's military performance can provide any meaningful insights about that exact topic. *See id.* This novel theory that openly splits from consensus views of military readiness cannot overcome the Constitution's heavy presumption against racial classifications. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 727 (2007).

Most crucially, none of Navy's sources even attempt to quantify the difference between the racial diversity that Navy gets with racial preferences and the racial diversity that Navy would get without racial preferences. *See Harvard*, 600 U.S. at 215 ("[T]he question in this context is not one of *no* diversity or of *some*: it is a question of degree."). Navy never even tells the Court what its racial numbers would *be* if it stopped using race (let alone if it also increased its use of race-neutral alternatives). For example, Navy's minority enrollment was 40% for the class of 2026, but it was nearly half that (24%) for the class of 2002. Latta Decl. ¶72. Yet Navy never suggests that anything noticeable or negative happened 20 years ago. And though Navy says race relations, recruitment, and retention are "at an all-time high," it consistently *fails* to meet its goal of having the race of officers mirror the race of the enlisted ranks. Opp.42-44. Nor has it investigated whether its use of racial preferences undermines its own goals by increasing stigma and self-doubt. *See* Spoehr Decl. ¶¶37-38; *Adarand*, 515

U.S. at 229. And despite its repeated insistence that the officer corps must "represent the face of America" and "reflec[t] the public it serves," Opp.27-28, Navy makes no discernible effort to measure any form of diversity besides race.

**Inconsistent.** Navy says racial classifications are "vital to national security," "essential" to the Navy, and "critical for overall mission success." Opp.26-31. But it's hard to imagine how those classifications are essential to the Navy—a 343,000 person fighting force—when they affect, at most, only a few hundred officers every year. The Naval Academy commissions "approximately 1,100" graduates per year, Opp.39, and the number who get in because of race, graduate, and are still serving is some fraction of that. So race cannot possibly be "essential." Opp.31. If anything, it's a drop in the bucket: "[E]ach year approximately 28% of new Navy and Marine Corps officers" are Navy grads, Opp.3, so unless Navy chose to admit only racial minorities, the racial composition of the ranks will hardly change. Strict scrutiny does not allow Navy to use race—the most odious classification known to law—for benefits that are "minimal" at best. *Parents Involved*, 551 U.S. at 733-35.

At bottom, Navy's purported interests in cohesiveness, recruiting, retention, and legitimacy boil down to racial balancing. Navy wants to admit cadets in proportion to their representation in the enlisted ranks, and it adjusts its preferences constantly based on that goal. *See* Opp.31, 42. "Racial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.'" *Parents Involved*, 551 U.S. at 732.

### 2.      Navy's use of race is not narrowly tailored.

Navy, as it now admits, violates many of *Harvard*'s rules about narrow tailoring. Navy thinks that's okay because *Harvard* "did not overrule *Grutter*, *Fisher*, or *Bakke*" on "the narrow-tailoring inquiry." Opp.45 n.23. That's true in one direction: If Navy is violating those decisions, then its use of race can't be lawful, as it would fail even the regime that came before *Harvard*. But it's not true in the other direction. *Harvard* clarified, strengthened, and added to what narrow tailoring means in this

context. Consider the aftermath. "Many universities" kept using race after *Fisher II*, the last of the prior line of cases. *Harvard*, 600 U.S. at 231. After *Harvard*, no civilian university has said it will continue using race. Navy should have followed suit.

*Race as a Negative.* Navy says it doesn't use race as a "negative," Opp.52-54, but it admits that it "consider[s] race or ethnicity flexibly as a 'plus' factor" for some races. Opp.44 (cleaned up); Latta Decl. ¶73 ("race or ethnicity" can be plus "factors" for "all minority groups"). In the "zero-sum" world of competitive admissions, "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Harvard*, 600 U.S. at 218-19. So by offering "a plus" to some races—as Navy admits it does, *e.g.*, Latta Decl. ¶¶74, 75, 76, 77—Navy awards a minus to all others. That violates *Harvard*, which holds repeatedly that "race may never be used as a 'negative'" and that universities can't "employ race in a negative manner," "use race as a … negative," or turn "an individual's race … against him." 600 U.S. at 212, 218, 230. Nothing in *Harvard* limits this rule to negative uses of race that "'*unduly* har[m] nonminority applicants.'" Opp.52 (emphasis added). And Navy, despite having the burden under strict scrutiny, doesn't disprove undue harm either, or even quantify for the Court the weight that race gets in its admissions process.

Navy seems to recognize that it can't overcome this rule from *Harvard*, which is why it suggests that the Court couldn't have meant for this rule to apply to military academies. Opp.54 n.26. But the Court surmised only that the military academies might have "potentially distinct interests." 600 U.S. at 213 n.4. It didn't suggest that, if those interests existed and were compelling, then the academies would get a pass on narrow tailoring. The Court simply noted that "[n]o military academy is a party to these cases," and so it didn't know how the military academies used race before or after *Harvard*. *Id.* This Court now knows: Navy uses race the same way that *Harvard* called illegally "negative."

*Incoherent Categories.* Navy admits that it relies on six racial categories: "Asian," "Native Hawaiian or Other Pacific Islander," "Hispanic," "White," "African American," and "American

Indian or Alaska Native." Latta Decl. ¶101-02; Opp.52. Harvard and UNC used the same categories. *Harvard*, 600 U.S. at 216. They come from the federal government. *Id.* at 291 (Gorsuch, J., concurring). But as *Harvard* explains, these racial categories are too "imprecise" to satisfy strict scrutiny. *Id.* at 215-16 (majority opinion, citing Justice Gorsuch's concurrence). "Asian," for example, sweeps in "60% of the world's population," lumping together Indians, Japanese, Pakistanis, and Koreans. *Id.* at 291-92 (Gorsuch, J., concurring). The "white" category covers Europe, West Asia, and North Africa, including peoples as diverse as Italians, Iranians, Norwegians, Moroccans, the Turkish, and the Welsh. *Id.* at 292. And "Pacific Islander" doesn't include all Pacific Islanders; "Filipino Americans remain classified as 'Asian.'" *Id.* The remaining categories are equally incoherent. *See generally* Bernstein, *The Modern American Law of Race*, 94 S. Cal. L. Rev. 171 (2021). Hence why *Harvard* found them "overbroad," "underinclusive," "incoherent," and "irrational." 600 U.S. at 216-17. People within these categories don't even reliably "look like" each other, *see id.* at 292 (Gorsuch J., concurring); Bernstein 182 n.43, putting the lie to the government's repeated use of that phrase, *e.g.*, Opp.34, 35, 36

Navy's racial categories weren't designed to achieve its interests. "[N]one of the career civil servants and appointed officials who shaped the [categories] had any awareness" that those categories would be used to "grant preference[s] in jobs, government contracts, and university admissions." Graham, *The Origins of Official Minority Designation* 289 (2002). And when the government issued them, it stressed that "[t]hese classifications should not … be viewed as determinants for eligibility for participation in any Federal [affirmative-action] program." 43 Fed. Reg. 19,260, 19,269 (May 4, 1978). Navy comes nowhere close to proving that, say, a Puerto Rican sailor from Brooklyn is less likely to follow a black officer from Brooklyn than a white Hispanic who grew up in Spain. Navy's "use of these opaque racial categories undermines … [its] goals." *Harvard*, 600 U.S. at 217.

**Racial Stereotyping.** Navy's purported interests in cohesion relies on "impermissible racial stereotypes." *Id.* at 220. Navy claims that its racial preferences will "foster trust and confidence

'between the enlisted corps and its leaders.'" Opp.28. Minority sailors, it says, are more likely to trust leaders "who look like them." Opp.34, 36. Navy thus assumes that minority sailors will be less "inspire[d]," "confiden[t]," and "trust[ing]," Opp.28—and "more likely to" leave the Navy altogether—whenever a different race is at the helm. Opp.36. So minority sailors are presumptively prejudiced: They trust certain races more than others simply because of their skin color. These unfounded assumptions are textbook stereotyping. *Harvard*, 600 U.S. at 219-21.

The same stereotypes underlie the remaining interests. Navy says that minority civilians will "los[e] confidence in the military" if it doesn't look like them, Opp.37; that minority recruits "will be discouraged from serving" if leaders don't look like them Opp.35; and that minority "leader[s]" are best suited to interact with people abroad because they *do* look like them, *e.g.*, Vazirani Decl. ¶29. All are stereotypes. The first two assume that minorities are so race-obsessed that they'll refuse to support the troops or defend their country whenever Navy's campus is too white. And the last one assumes that minorities can better interact with "diverse" overseas populations—not because of their unique traits or talents, but because their skin color more closely resembles that of our "international partners." Opp.38. This type of race essentialism, arguing that a black lieutenant from San Diego can better relate to an Afghan shepherd than his white counterpart from Houston, isn't the stuff of strict scrutiny.

**No End Date.** "All race-conscious admissions programs must have a termination point," *Harvard*, 600 U.S. at 212 (cleaned up), but Navy's doesn't. Because Navy balances every class to "reflec[t] the diversity of the nation," Opp.43, it promises to use race in perpetuity. The nation's racial composition will always change, so Navy's racial balancing will always need to adjust. Harvard and UNC had the same problem. 600 U.S. at 221. Like Navy, those universities said that they would stop considering race when the composition of their classes mirrored "the general population." *Id.* at 221-23. But, as *Harvard* observed, that was no real stopping point. "By promising to terminate their use of

race only when some rough percentage of various racial groups is admitted," these "admissions programs effectively assure that race will always be relevant." *Id.* at 223 (cleaned up). Promises of "periodic review" do not solve the problem. *Id.* at 225; *cf.* Opp.11.

Navy says *Harvard*'s end-date rule doesn't apply to it, Opp.57-58, but *Harvard* said that "*all* race-conscious admissions programs … must have a logical end point." 600 U.S. at 212 (emphasis added). And race-based admissions is what Navy is doing, not quelling prison race riots. *Cf.* Opp.58 (relying on *Johnson*). Even when the government is quelling prison riots, though, its use of race must be "temporary." *Harvard*, 600 U.S. at 215. The point is not that, over time, the *interest* will stop being important, but that the *explicit use of race to achieve* that interest will prove to be an unwarranted failure. *See id.* at 212-13. Racial preferences failed at civilian universities; they're failing Navy too.

***Race-Neutral Alternatives.*** Navy, notably, does not say a word about the Coast Guard or Merchant Marine Academies. The MMA "does not consider race" in its "general admissions process," U.S.-*SFFA*-Br.17 n.3, and before 2010, Coast Guard didn't either, PI-Br. (Doc.9-1) at 16-17. Both academies offer real-world, military-specific examples of race-neutral alternatives. Yet the government never even suggests, let alone proves with evidence, that these academies didn't achieve "diversity," or (more importantly) didn't achieve the military interests that diversity is supposed to unlock. The government has "the burden" on this question. *Fisher I*, 570 U.S. at 312. It can't carry it through silence. Far from silence, the government pointed to Coast Guard in *Grutter* and argued that "race neutral" alternatives are both available and "should be used in the academies." *Grutter* O.A. Tr.19-22.

Though Navy now says that it has "considered" layering "race-neutral alternatives" on top of its race-based admissions, Opp.55, narrow tailoring requires more. Navy had "the ultimate burden of demonstrating, *before* turning to racial classifications, that available, workable race-neutral alternatives do not suffice." *Fisher I*, 570 U.S. at 312 (emphasis added). In other words, Navy must at least study what the world would look like if it *abandoned* the use of race. No such "serious, good faith

consideration" appears anywhere in the record. *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003). That failure is fatal, especially given the real-world examples that Navy had to draw on, like Merchant Marine and Coast Guard. *Cf. Harvard*, 600 U.S. at 229 n.9 ("Three out of every five American universities do not consider race in their admissions decisions," and "several States … have prohibited [it] outright.").

## II.     SFFA satisfies the remaining factors.

"In constitutional cases, the first factor"—likely success on the merits—"is typically dispositive." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021). It's dispositive here. Navy's unconstitutional discrimination "constitute[s] irreparable injury," *Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*, 584 F. Supp. 2d 766, 795 (D. Md. 2008), *aff'd*, 368 F. App'x 370 (4th Cir. 2010), and "'is always in the public interest to prevent,'" *I.R.A.P. v. Trump*, 857 F.3d 554, 604 (4th Cir. 2017), *rev'd on other grounds*, 583 U.S. 912 (2017).

### A.     Irreparable harm

Navy spends only a footnote responding to SFFA's main source of irreparable harm: the imminent denial of its members' constitutional rights. Opp.18 n.7. Navy's violation of equal protection creates more than a "presumption" of irreparable harm. Opp.18. When "there is a likely constitutional violation" in this circuit, "the irreparable harm factor is satisfied." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc). There isn't any justification for carving out "equal protection claim[s]" from this rule, *Hisp. Nat'l L. Enf't Ass'n NCR v. Prince George's Cnty.*, 535 F. Supp. 3d 393, 427 (D. Md. 2021), especially given "the subtle, pervasive, and essentially irremediable nature of racial discrimination," *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1424 (11th Cir. 1984). "Intentional discrimination" that violates "Equal Protection Clause" thus "constitute[s] irreparable injury." *Reaching Hearts*, 584 F. Supp. 2d at 795; *accord Able v. United States*, 847 F. Supp. 1038, 1043 (E.D.N.Y. 1994) (same under the Fifth Amendment against the military).

Navy's objections to SFFA's other irreparable harm—its members' inability to compete for the upcoming admissions cycle—miss the mark. A lost opportunity to compete on a racially equal footing is an injury, Navy says, just not an *irreparable* injury. Opp.18-19. Courts disagree. "[A] lost opportunity to compete on a level playing field" is "sufficient to prove irreparable harm." *Serco Inc. v. United States*, 81 Fed. Cl. 463, 502 (2008); *accord Georgia Vocational Rehab. Agency Bus. Enter. Program v. United States*, 354 F. Supp. 3d 690, 696 (E.D. Va. 2018) (applying this principle when "the Army wrongfully deprives Plaintif[f] of its rights"). The same logic applies in the admissions context, since "the loss of an opportunity to attend a particular school" is likewise "irreparable." *Foulke ex rel. Foulke v. Foulke*, 896 F. Supp. 158, 161 (S.D.N.Y. 1995).

These injuries remain irreparable even if Members A and B have the opportunity to compete again next time. *E.g.*, *D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019) (inability to try out for the high-school dance as a junior); *Yang v. Kosinski*, 960 F.3d 119, 128 (2d Cir. 2020) (inability to compete in the upcoming primary). "These sorts of injuries, *i.e.*, deprivations of temporally isolated opportunities, are exactly what preliminary injunctions are intended to relieve." *D.M.*, 917 F.3d at 1003. Irreparable, after all, just means money damages are either "unavailable," *Senior Executives Ass'n v. United States*, 891 F. Supp. 2d 745, 755 (D. Md. 2012), or are "'difficult to ascertain,'" *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994). "[L]ost opportunities" are "difficult, if not impossible, to quantify." *MacGinnitie v. Hobbs Grp.*, 420 F.3d 1234, 1242 (11th Cir. 2005). And "money damages" are entirely unavailable here because "'sovereign immunity shields the Federal Government and its agencies'" from them. *Senior Executives*, 891 F. Supp. 2d at 755.

Navy cannot sidestep these harms by claiming "delay." Opp.19-20. Though a "[s]ignificant delay in applying for injunctive relief" can disprove irreparable harm in intellectual-property cases, it can't here. *Wilson-Cook Med., Inc. v. Wiltek Med., Inc.*, 927 F.2d 598, 598 n.4 (4th Cir. 1991)

(unpublished); *see Tom Doherty Assocs., Inc. v. Saban Ent.*, 60 F.3d 27, 39 (2d Cir. 1995) ("Most of the caselaw on this issue involves trademark and copyright disputes."). Significant delay "'in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm.'" *Wilson-Cook*, 927 F.2d at 598 n.4. But SFFA relies on no such presumption, and delay couldn't possibly undercut the irreparable nature of its injuries. Because SFFA "alleges future, though imminent, deprivation of its constitutional rights," any "delay in seeking the injunction does not undermine [its] contention that such a deprivation would be irreparable." *Metro. Council, Inc. v. Safir*, 99 F. Supp. 2d 438, 441 (S.D.N.Y. 2000). Delay would not make "an equal protection violation" any less "difficult to compensate monetarily." *Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744 (2d Cir. 2000). And it would not make Navy any less likely to violate the Constitution or to close the application window in early 2024, well before this case could be tried. A "plaintiff's past dilatoriness is unrelated to a defendant's ongoing behavior that threatens future harm." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 959-60 (9th Cir. 2001); *accord Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.*, 2021 WL 535485, at *6 (S.D.N.Y. Feb. 12) (excusing "delays where 'the harm largely is prospective and will arise from a discrete future event'"). And courts don't "'addres[s]'" delay at all under "'the irreparable harm prong of the preliminary injunction standard'" in cases alleging "a prospective constitutional violation." *Five Borough Bicycle Club v. N.Y.C.*, 483 F. Supp. 2d 351, 361 (S.D.N.Y. 2007).

There was no "significant delay" here anyway. SFFA sought a preliminary injunction on the same day it sued, and it sued three months after the Supreme Court decided *Harvard*. It wasn't acting based on "strateg[y]." Opp.20 n.11. It *couldn't* sue before *Harvard* because its claim—that the Constitution forbids Navy from using race—was foreclosed by *Grutter*, which let the "'service academies'" use race to pursue educational benefits. 539 U.S. at 331. Once *Harvard* eliminated that justification, the clock started, *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1147 (D. Kan.), *aff'd*, 840 F.3d 710 (10th Cir. 2016), and any delay after that "was reasonable" because SFFA used that time to

"investigat[e] the strength of [the] claims before filing a complaint in this court," *Fairbanks Cap. Corp. v. Kenney*, 303 F. Supp. 2d 583, 591 (D. Md. 2003); *accord Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 124-25 (2d Cir. 1994) ("[A] delay caused by a plaintiff's good faith efforts to investigate [a claim] should not … rebut presumption of irreparable harm.").

SFFA's investigation was more than reasonable. *E.g.*, *Fairbanks*, 303 F. Supp. 2d at 591 (11-month delay was reasonable); *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 423 (9th Cir. 1991) (nine months); *King v. Innovation Books*, 976 F.2d 824, 831 (2d Cir. 1992) (eight months). It wasn't even clear what Navy would do after *Harvard*, including whether and how it would use race, until it told the press in August that it will "use race as a factor" (and noted that the government was still reviewing *Harvard* and drafting guidance). Verif. Compl. (Doc. 1) ¶77. SFFA then had to piece together the facts, determine if any of its members were harmed by the policy, "investigate the strength of [their] claims," study the law on the military and race, and "fil[e] a complaint." *Fairbanks*, 303 F. Supp. 2d at 591; *Marks Org. v. Joles*, 784 F. Supp. 2d 322, 333 (S.D.N.Y. 2011). True, a questionnaire opened to applicants in early 2023. Opp.20 n.11. But SFFA sued several months before February 2024—when congressional nominations must be made, applications must be finished, and Navy admits the vast majority of the class. Latta Decl. ¶¶19-20.

Navy's "delay" argument also cuts both ways. SFFA was responsible, at most, for the three months between *Harvard* and this lawsuit. But Navy took lengthy extensions—getting roughly two months to respond to this motion—that pushed this Court's decision far closer to the close of applications on January 31. *Cf. King*, 976 F.2d at 831 (stressing that "a great deal of [the] alleged delay was attributable to" the nonmovant). If delay undercuts claims of harm, then it should undercut Navy's claim that a preliminary injunction would meaningfully disrupt its upcoming cycle. According to Navy, moreover, SFFA should have sought a preliminary injunction for the 2024 cycle "in January 2023." Opp.20 n.11. But Navy doesn't mean it. If SFFA had done that, then Navy would have argued

that SFFA "failed to show that" its harm was "imminent." Opp.12. And January *2024* is almost here. So if this Court agrees with Navy about delay, then it should at least enter a preliminary injunction that bars Navy from using race in every cycle after this next one. Better yet, it should reject Navy's position for what it is: a cynical argument that means that, at any time, a preliminary-injunction motion would always be too early or too late. This Court should "declin[e] to take the position that delay alone" could "requir[e] denial of a preliminary injunction motion" here, especially since the other factors so heavily favor SFFA. *Marks*, 784 F. Supp. 2d at 333.

**B.      Balance of harms and public interest**

The equities are "*always* 'best served' by ensuring [that] constitutional and civil rights are upheld." *Y.S. ex rel. Y.F. v. N.Y.C. Dep't of Educ.*, 2021 WL 1164571, at *5 (S.D.N.Y. Mar. 26) (emphasis added). The Government never "ha[s] an interest in the enforcement of an unconstitutional [policy]." *N.Y. Prog. & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). And "it is unequivocal that 'the public interest favors protecting constitutional rights.'" *NPR*, 560 F. Supp. 3d at 929; *accord I.R.A.P.*, 857 F.3d at 604 ("'It is always in the public interest to prevent the violation of a party's constitutional rights.'" (cleaned up)).

Contra Navy, these principles equally apply to the military. "Enforcement of an unconstitutional law is always contrary to the public interest," even "in the military" context. *Singh v. Berger*, 56 F.4th 88, 108 (D.C. Cir. 2022) (cleaned up). And the public "undoubtedly has an interest in seeing its governmental institutions follow the law," even when a case "involves complex, subtle, and professional decisions as to the composition [of the] military." *Roe*, 947 F.3d at 219 (cleaned up). Navy's "national security" arguments beg the question of the merits, Opp.58-59, a question that the government is highly likely to lose. And any harm from having to change policies was invited by Navy when it decided to use race after *Harvard* and "does not outweigh [SFFA's members] well-established and tangible interest in [their] constitutional rights." *NPR*, 560 F. Supp. 3d at 929. This Court could

also make clear that Navy need not revoke whatever small number of "LOAs or offers of appointment" it sent out before the preliminary injunction, Opp.59, so long as Navy doesn't consider race when making general admissions decisions starting February 1, *see* Latta Decl. ¶19.

The Sixth Circuit balanced the equities similarly in *Coalition to Defend Affirmative Action v. Granholm*. The question there was whether Michigan's universities would have to comply with the State's ban on race-based admissions while the case proceeded. Writing for the Sixth Circuit, Judge Sutton agreed that the universities would experience some harm if they had to change "their current admissions … programs during this enrollment cycle." 473 F.3d 237, 252 (6th Cir. 2006). And he agreed that the ban would "disappoin[t]" the applicants who could not get admitted without racial preferences. *Id.* But the Sixth Circuit decided to make the universities comply anyway based on who was most likely to win the underlying merits. *Id.*

The merits are decisive here too. Because SFFA is almost certainly correct, Navy's use of race *does* "violat[e]" its members' "federal constitutional rights." *Id.* That irreparable harm dwarfs Navy's interest in stopping its use of race, as well as some applicants' interest in continuing to benefit from unlawful discrimination. The equities here "'li[e] in a correct application' of the federal constitutio[n]" and "the will of the people" embodied in the Fifth Amendment. *Id.*

## CONCLUSION

This Court should grant SFFA's motion at the December 14 hearing.

Dated: December 8, 2023

Respectfully submitted,

*/s/ Cameron T. Norris*

Adam K. Mortara*
(TN Bar No. 40089)
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

Thomas R. McCarthy*
Patrick Strawbridge*
J. Michael Connolly*
Bryan K. Weir*
Cameron T. Norris
James F. Hasson*
R. Gabriel Anderson**
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
patrick@consovoymccarthy.com
mike@consovoymccarthy.com
bryan@consovoymccarthy.com
cam@consovoymccarthy.com
james@consovoymccarthy.com
gabe@consovoymccarthy.com

*pro hac vice
**pro hac vice forthcoming

*Counsel for Students for Fair Admissions*

## CERTIFICATE OF SERVICE

I certify that on December 8, 2023, I e-filed the foregoing via ECF, which will automatically email all counsel of record.

*/s/ Cameron T. Norris*