**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS,<br><div align="right">*Plaintiff,*</div><br>v.<br><br>THE UNITED STATES NAVAL ACADEMY;<br>THE UNITED STATES DEPARTMENT OF<br>DEFENSE; LLOYD AUSTIN, in his official<br>capacity as Secretary of Defense; CARLOS DEL<br>TORO, in his official capacity as Secretary of the<br>Navy; REAR ADMIRAL FRED KACHER, in<br>his official capacity as Acting Superintendent of<br>the United States Naval Academy; and BRUCE<br>LATTA, in his official capacity as Dean of<br>Admissions for the United States Naval<br>Academy,<br><div align="right">*Defendants.*</div> | No. 1:23-cv-02699 |

<div align="center">

**REBUTTAL DECLARATION OF
LIEUTENANT GENERAL (RET.) THOMAS W. SPOEHR**

</div>

I, Thomas W. Spoehr, pursuant to 28 U.S.C. §1746, declare the following:

1. I am a retired three-star general who served in the United States Army from 1980 to 2016.

2. I am aware of the allegations made by the Plaintiff in this lawsuit and the papers submitted by the Defendants in opposition. I submit this rebuttal declaration at the request of counsel for Plaintiff Students for Fair Admissions, Inc., who retained my services on November 26, 2023. I have closely reviewed the Defendants' opposition brief and all the declarations and related exhibits submitted in support thereof, and I disagree with all their key conclusions supporting racial preferences in selecting candidates for the Naval Academy.

3. The statements in this declaration are based on my personal knowledge, military judgment, experience, and the knowledge and information I obtained during my military career and

<div align="center">1</div>

my past seven years as a defense policy expert. In reaching these opinions I have reviewed and relied upon the documents referenced herein, as well as the papers both parties have submitted in this action.

4.      I am being paid $400 per hour for my work in this case. My compensation is not contingent upon reaching any opinion or achieving any outcome in this case; the opinions expressed herein are my own.

### I.      Army Background and Experience

5.      During my thirty-six years in the Army, I held command positions at nearly every level: from leading a military intelligence company during the invasion of Grenada to serving as a Deputy Commander of U.S. Forces, Iraq.

6.      I have extensive experience commanding in the Army's Training and Doctrine Command, leading units engaged in initial officer training, intermediate officer training, and basic training and advanced individual training courses for newly enlisted soldiers. While I was the Commander of 3rd Chemical Brigade at Fort Leonard Wood, we trained thousands of soldiers per year in these programs. During this time, I witnessed first-hand the magic of when a young volunteer is transformed into a confident young soldier by committed drill sergeants and trainers.

7.      I commissioned as an active-duty Army officer through the Reserve Officers Training Corps (ROTC) when I graduated from the College of William and Mary, in Williamsburg, Virginia, in May 1980. I commissioned as a Chemical Corps officer, which entails training and protecting Army and joint forces from the dangers of nuclear, chemical, biological, and radiological hazards and weapons. When I was promoted to Lieutenant General in 2013, I was the first Chemical Corps officer in the history of the Army to attain that rank.

8.      I spent my early Army career in a variety of units including military intelligence, armored units, logistics, and Chemical Corps units. My first assignment was to the 203rd Military Intelligence Battalion, Aberdeen Proving Ground, Maryland. Three years after arriving at the battalion,

I assumed command of a military intelligence company composed of dozens of different military occupational specialties, and men and women of different races and ethnicities. Shortly after I took command, my soldiers and I deployed to the island of Grenada as part of Operation Urgent Fury. We supported the 18th Airborne Corps by surveying and collecting captured enemy equipment. It was in this assignment that I began to learn how to form close-knit teams based on a common purpose, challenging training, and leading by example. Later I was assigned to the 1st Armored Division Support Command, Nuremburg, Germany, near the East German border where the constant threat was a cross-border Soviet invasion which required a high state of military readiness. My follow-on assignments included service on the staff of the Joint Chiefs of Staff at the Pentagon, and a posting at Fort Liberty (formerly Fort Bragg).

9.      While at Fort Liberty, I served in the 82nd Airborne Division as the Assistant Division Chemical Officer, G-3 (Training), and at the U.S. Army Special Operations Command as the command's Chemical Officer. While in the Special Operations Command and through my visits to subordinate Special Forces and Special Operations Aviation units, I was able to witness the extraordinary competence and cohesion that existed in those units.

10.     After my time with the 82nd Airborne and Special Operations Command, my assignments included a tour with the U.S. Space Command at Peterson Air Force Base, Colorado; commanding the 84th Chemical Battalion at Fort McClellan, Alabama; commanding the 3rd Chemical Brigade at Fort Leonard Wood, Missouri; and serving as the Commandant of the U.S. Army Chemical, Biological, Radiological, and Nuclear School at Fort Leonard Wood, Missouri.

11.     In 2011, I was deployed to Iraq as the Deputy Commander of U.S. Forces Iraq (Support), with responsibility for logistics, sustainment, and the withdrawal of U.S. forces during Operation New Dawn. While in Iraq, I oversaw 10,000 servicemembers engaged in logistics and sustainment in combat operations. As Deputy Commander, I served as one of two deputies under

then-General Lloyd Austin, who now serves as Secretary of Defense. My job was to support Gen. Austin's overall vision and mission, lead the men and women entrusted to me, ensure they had what they needed to succeed, and bring them home safely to their families. The command had a challenging mission, and it was only through the concerted effort of everyone on the U.S. Forces Iraq team—without regard to their race, gender or ethnicity—that we were able to succeed.

12.     After Iraq, I was the Director of Program Analysis and Evaluation for the Department of the Army Staff at the Pentagon. My final Army assignment was as the Director of the Office of Business Transformation, Secretary of the Army, Pentagon.

13.     During my military career I have served in multiple joint assignments with officers and enlisted personnel from all services. These included duty as an action officer on the staff of the Joint Chiefs of Staff, a staff officer at U.S. Space Command, and as Deputy Commander, U.S. Forces Iraq.

14.     In addition to my Bachelor of Science degree in Biology from the College of William and Mary, I hold a master's degree in strategic studies from the U.S. Army War College and a master's degree in public administration from Webster University.

15.     Among other decorations, I have been awarded the Distinguished Service Medal (with one oak leaf cluster), the Defense Superior Service Medal, the Legion of Merit (with two oak leaf clusters), the Iraq Campaign Medal, the Armed Forces Expeditionary Medal, and the Global War on Terrorism Medal. I have also been awarded the parachutist badge.

## II.     Post-Army Career

16.      Following my retirement from the Army in 2016, I joined the Heritage Foundation as the Director of the Center for National Defense. In that capacity, I was responsible for managing the Foundation's national defense research portfolio. I led a team of eight researchers investigating and publishing on matters of military readiness, strategy, budgets, equipment, personnel policies, and other related areas.

17.     In that position, I published over 90 reports and articles. In general, my research focused specifically on military recruiting, defense budgets, defense strategy, the U.S. Army, and force posture. I have testified before Congress on military strategy, and my research has been featured in multiple media outlets such as national television, newspapers and journals. My responsibilities required me to maintain close contact with the U.S. military and its leaders in order to produce accurate and timely research.

### III.     Preliminary Statement

18.     In no other field of endeavor are the penalties for failure so profound as in the profession of arms. Military leaders make daily decisions that can cost men and women their lives, and by extension, jeopardize the security of their country. For this reason, over the millennia that warfare has been conducted, countries have cared more about their military leaders' competence and skill than their immutable personal characteristics. Any emphasis on traits like race or ethnicity in the selection, promotion and advancement of military leaders will be accompanied by the risk of failure.

### IV.     The U.S. Military is most effective when it functions as a pure meritocracy

19.     After the Vietnam War, the military enacted widespread reforms with the goal of professionalizing the force and transforming the institution into a pure meritocracy. Though the war had been over for seven years when I joined the Army in 1980, its deleterious aftereffects were still evident in the ranks.

20.     Before 1973 the U.S. military suffered from multiple problems, including nepotism, careerism, and racial and ethnic discrimination and stereotyping. After the Vietnam War ended, the senior military officers at the time, having risen through the ranks witnessing these issues, set about to correct these ills. Many of the commissioned and noncommissioned officers I encountered when I entered the Army in 1980 had been drafted. Many of them, as well as the volunteers, carried painful memories of the military's tenure in Vietnam and the impacts of harmful personnel policies, cronyism,

prejudice, and careerism. Those who had served during that difficult period were determined to rebuild the military into a more competent, professional force. There were deliberate campaigns to eradicate drug use and improve the military's woefully poor education system. Military leaders painstakingly worked to rebuild their services into meritocracies where competence and skill mattered above all.

21.     As a result of incidents of racial unrest between 1968 to 1974, military leaders double-downed on their pursuit of an environment where a meritocracy would flourish, where soldiers, sailors, airmen and marines would be selected, promoted and schooled based on their competence and character, rather than the color of their skin or their ethnic origins.

22.     For example, on December 17, 1970, Admiral Elmo R. Zumwalt, Jr, the Chief of Naval Operations, published a personal message (called a Z-gram after the first letter of his last name) emphasizing his personal commitment to equal opportunity. Z-gram number 66 described all the actions Zumwalt expected of the Navy and ended with this directive: "Ours must be a Navy family that recognizes no artificial barriers of race, color or religion. there is no black navy, no white navy-- just one Navy-- the United States Navy."[1] The path to a meritocracy has not been straight nor consistent, but by the early 1970s military leaders have been steadfastly committed to that goal.

23.     In the Army where the bulk of my experience resides, previously, locally conducted promotion and selection boards were centralized and professionalized to reduce bias and nepotism.

24.     The Navy's pursuit of meritocracy continues to this day. Objective criteria have replaced subjective evaluations for the purposes of promoting enlisted personnel.[2] In an effort to

---

[1] Naval History and Heritage Command, *Z-Gram #66; dated 17 December 1970*, https://perma.cc/VNM6-MYYS.

[2] *See generally* Amos Golan, et al., *Does the U.S. Navy's Reliance on Objective Standards Prevent Discrimination in Promotions and Retentions?* National Library of Medicine (April 28, 2021), https://perma.cc/ZB6S-3YQF.

remove any potential for bias in the promotion system, in 2020 photographs were removed from officer's files being reviewed by boards.[3]

25.     Racial preferences, even when applied as early as the Naval Academy admissions process, release into the ranks a pernicious virus that chokes out meritocratic attitudes and undermines the basic tenets of professional militaries. Left unchecked, they erode the military ethos and the unit cohesion it builds by conditioning sailors and Marines to see themselves as individuals rather than as members of an organization with a single collective mission.

26.     As a former commander of units that oversaw basic training for new volunteers, I have come to believe that racial preferences in admissions, performance standards, or duty assignments—and any similar focus on the races and ethnicities of officers, noncommissioned officers, and junior enlisted soldiers alike—undermine the outcome the Army, and similarly the Navy, seeks to achieve during initial training. Part of the purpose of initial training is to break down pre-existing lines that may exist between new recruits based on class, race, ethnicity, religion, or other cultural factors, and to bring those recruits together as soldiers with a common mission and shared team membership. Policies emphasizing recruits' immutable traits and treating those traits as central to their identities will inevitably teach new volunteers, either explicitly or implicitly, to categorize their peers as members of different "identity groups" rather than seeing them simply as valued teammates.

## V.     The Navy in 2023 is far removed from the Navy of 1974.

27.     Just as American society has moved past many of the racial tensions that plagued the nation in the 1960s, the Navy, drawing primarily from young Americans of new generations, after 50 years, has also progressed. Defendants and their experts cite cases of racial unrest that plagued the Navy in its long history, including in World War I, World War II, and Vietnam. *See, e.g.*, Opp.22-26;

---

[3] Diana Stancy Correll, *CMP: Removing Photographs From Promotion Boards Has Hurt Diversity* Navy Times (Aug. 3, 2021), https://perma.cc/44WW-839R.

Bailey Decl. ¶¶8-68; Lyall Decl. ¶¶55-56; Haynie Decl. ¶¶22-24. But notably, they provide very few, if any, similar examples from the post-1974 era.

28.     An individual who served in the Navy of 1974 would have a hard time recognizing it in 2023. Indeed, even after a decade, change was already evident. Writing in 1983, doctoral candidate M. Frances Baldwin found in her research: "There has been observable social change in the Navy since 1971 in the areas of cultural awareness and the Navy's responsiveness to a multicultural population. An extensive educational base has been established, numerous EO policies have been created and enforced. Most significantly EO and Affirmative Action have been integrated into the reward and policy systems of the Navy, and EO is closely identified with command readiness."[4]

29.     The Naval Academy and its experts frequently reference cases of racial tension during and immediately after the Vietnam War, of fights and outbursts on ships and ashore. *See, e.g.*, Opp.24-26; Bailey Decl. ¶¶47-48; Haynie Decl. ¶26. It is important, however, to put these incidents in their proper historical context. The military is a subset of American society; while there were indeed incidents of racial tension in the military in the late 1960s to the early 1970s, by contrast in April 1968 there were violent race riots in over 110 American cities.[5] Washington D.C., the nation's capital, was engulfed in flames with 13 people killed and 1,180 fires set.[6]

30.     Contrast that experience with aftermath of the tragic murder of George Floyd on May 25, 2020. While curfews had to be imposed in over 200 American cities, and in many cases the military (in the form of the Army National Guard) was used to help restore order,[7] the government's experts

---

[4] M. Frances Baldwin, *Developing a Climate of Equal Opportunity in Large Systems: A Case Study of the United States Navy's Equal Opportunity Race Relations Program* 216 (1983), https://bit.ly/41f7L9I.

[5] United Press International, *Racial Violence Struck 110 Cities* N.Y. Times (Apr. 10, 1968), perma.cc/D3AD-VGBX.

[6] Jack Moore, *'Everything was on fire' — remembering the DC riots 50 years later* WTOP News (Apr. 2, 2018), perma.cc/V2TP-EN5C.

[7] *George Floyd is killed by a police officer, igniting historic protests* History (archived Dec. 3, 2023), perma.cc/8YW9-C8LS.

can identify no reports of unrest within the Navy, regardless of the relative ethnic makeup of the officers or enlisted of individual organizations.

31.    Same, too, for the civil unrest that followed the brutal beating of Rodney King in 1991. More than "51 deaths and over 2,000 injuries were attributed to the unrest," which included roughly 20,000 police, California Highway Patrol, and the military (again, in the form of the Army National Guard).[8] Yet the government's experts do not identify any reports of racial unrest within the Navy.

32.    The acceptance of homosexual soldiers in the military provides a similar situation. When President William Clinton first proposed the idea of open service by gays in the military in 1993, the resistance within the military was widespread, including even the Chairman of the Joint Chiefs of Staff, General Colin Powell.[9] Now, thirty years later, it is not even a discussion topic, because the Navy and society have moved on.

33.    In 1963, civil rights leader Martin Luther King Jr. expressed his dream that one day people "will not be judged by the color of their skin, but by the content of their character." That was the message the military sought to instill in me over my 36-year career. During my time in service, the military has striven to manifest King's dream of an environment that values people on the basis of their character, shared identity, and commitment to a common, noble purpose.

**VI.    Defendants' assertions in support of racial preferences.**

34.    The Naval Academy and its experts claim (1) that racial preferences enhance military readiness by fostering unit cohesion and providing various other intangibles that are unavailable to non-racially and ethnically-balanced units, *see* Opp.29-34; Lyall Decl. ¶¶22-51; (2) that racial preferences enhance military readiness by helping the Naval Academy recruit "top talent" who will go

---

[8] Kathleen J. Tierney & Lisa Reshaur, *Patterns Of Property Damage In The Los Angeles Unrest* University of Delaware (1994), perma.cc/WH6E-V3SY.
[9] Sarah Pruitt, *Once Banned, Then Silenced: How Clinton's 'Don't Ask, Don't Tell' Policy Affected LGBTQ Military* (July 3, 2019), perma.cc/EH4V-7V8Y.

on to serve as Navy officers, *see* Opp.34-36; Haynie Decl. ¶¶29-30; (3) that racial preferences support military readiness by helping the Navy retain talented officers who otherwise might leave the Navy if it were not sufficiently diverse, *see* Opp.36; Haynie Decl. ¶¶30-31; and (4) that racial preferences enhance the Navy's legitimacy in the eyes of the public and the international community by facilitating a racially balanced and therefore "representative" force, *see* Opp.37-38; Bailey Decl. ¶¶92-97. Based on my personal experience and four decades of institutional knowledge gained as a three-star Army general and a scholar of military readiness issues, I believe these assertions are incorrect.

> **A.    Assertions that racial diversity is a "strategic imperative" or an inherent force multiplier are misguided and rely on racial stereotypes.**

35.    ***Strategic Imperative.*** Defendants and their experts repeatedly declare diversity in the Navy officer corps to be a "strategic imperative." *See, e.g.*, Opp.30 (citing Truesdale Decl. ¶¶6-10; Vazirani Decl. ¶¶15-16; Bailey Decl. ¶8). They refer to it as an essential ingredient necessary for units to perform their missions in combat. Yet in my 36-year military career, which included significant experience in military unit readiness reporting, I have heard a military leader cite a lack of diversity as a reason why a unit performed poorly, nor to my knowledge does the military endeavor to track diversity at any level below the total force level.

36.    Instead, what any member of the military, from junior enlisted servicemember to grizzled general or admiral will tell you is that readiness is achieved through tough training and shared experiences built over time as units practice together. This progression of building cohesion and readiness is accelerated as servicemembers begin to learn they can count on their leaders, peers, and subordinates to competently perform their own responsibilities. Servicemembers will routinely vow they will follow any leader—no matter their race, gender or other characteristics—to the gates of hell and beyond, as long as they are convinced of their competence.

37.    Accordingly, anything that might cause servicemembers to question the competence and skill of their leaders subtracts cohesion from units. Any suggestion that a leader was selected for

his or her role for reasons other than competence could directly undermine unit cohesion. And yet, by maintaining the double standard that the Naval Academy applies to candidates of different races, Defendants are seeding the ground with precisely those types of suggestions about minority officers and midshipmen.

38.     Given the backdrop of the multiple Executive Orders that President Joe Biden has issued on the subject of diversity, equity, and inclusion which carry the force of law for DOD personnel,[10] and based on my experience of serving as a general officer in the Pentagon for several years, I am aware that senior uniformed leaders are very constrained in their ability to make public statements on this topic. For example, the government documents and declarations submitted in support of the Academy's opposition repeatedly categorize diversity as a "strategic imperative." *See, e.g.*, Opp.30; *see also* Dkt. 46-13 ("strategic imperative"); Vazirani Decl. ¶5 ("strategic advantage"); Haynie Decl. ¶17 (same). But commonality in these statements is not by happenstance, rather this wording flows directly from President Barack Obama's 2012 Department of Defense Diversity and Inclusion Strategic Plan[11]—which likewise provided no support for the assertion—and has been reiterated since by President Joe Biden's Administration.[12]

39.     The Naval Academy repeatedly endeavors to draw a correlation between combat readiness and diversity, stating: "to be combat ready, Navy and Marine Corps units must act as one, and that racial diversity helps to ensure such teamwork." Opp.39. Setting aside that the declarations do not support any particular level of minimum diversity that is necessary to achieve this readiness, this statement misunderstands how unit cohesion is formed and maintained.

---

[10] USAID, *Executive Orders on Diversity, Equity, Inclusion, and Accessibility* (archived Dec. 4, 2023), https://www.usaid.gov/equity/executive-orders-deia.

[11] Department of Defense, *Diversity and Inclusion Strategic Plan 2012-2017* 3, https://perma.cc/5GXL-45WC.

[12] C. Todd Lopez, *Defense, State Agree: Diversity, Inclusion Important for Mission Success* DoD News (June 16, 2021), https://perma.cc/ZA8J-L23L.

40.     Military unit cohesion is an intangible quality painstakingly built through multiple factors: tough training and high standards which lead to confidence, the knowledge that unit leaders are competent and care about the men and women under their charge, a clear sense of purpose, and the belief that the American people stand behind them. Matters of diversity in my experience are not part of that equation. If, in fact, diversity was important as the government suggests in developing unit cohesion, it strikes me that military leaders would be required to pay attention to managing the numbers and percentages of each race, ethnicity, and gender within their individual units and ships. But I have never heard any such discussions in my 36-year military career.

41.     Moreover, the claim that units are less effective when they are not racially balanced is inconsistent with observable realities throughout the Navy force structure. Take Navy Sea, Air and Land Teams, commonly called SEALS for instance. Navy SEAL units are widely considered among the most elite and competent organizations in the world. They are renowned for their proficiency and cohesion. Yet they are some of the least diverse organizations in the Navy, with approximately 95 percent white officers and 84 percent white enlisted members.[13] It is impossible to reconcile statements that diversity is a "strategic imperative" with these facts.

42.     The common Marine Corps practice of "detailing" company-level units to other battalions in a battlespace (*i.e.*, detaching them from their higher unit and placing them under the control of a separate unit operating elsewhere) is likewise instructive.[14] Marine Corps leaders consider many factors when deciding whether to detail a unit to a different command team, but the demographics of the unit and the racial makeup of its new temporary command team are never among them. The Naval Academy's experts do not contend otherwise.

---

[13] Lolita C. Baldor, *Pentagon's Elite Commando Forces Look to Expand Diversity* Military.Com (June 16, 2021), https://perma.cc/9DWS-J2A3.

[14] *See* Capt Patrick S. Hassett, *The Challenges of 'Training Like You Fight'* Marine Corps Gazette (May 2020), https://perma.cc/52BK-QFHD.

43.     If racial balancing were a prerequisite for battlefield success and inherently made units more formidable opponents, then the Navy and Marine Corps should be pursuing it across the service. If the Naval Academy is correct that racially balanced leadership has a significant impact across the Navy and Marine Corps, then it must have an equal or greater impact on smaller-scale organizations like Navy ships, squadrons and Strike Groups and Marine Corps Expeditionary Forces, brigades, battalions, companies, and platoons. Indeed, the Academy and its experts acknowledge this. *See* Fuller Decl. ¶11 ("This concept applies to the smallest tactical special operations unit, scales up to operating the most complex and largest warships in the world, and applies to multi-platform strike group and strike force operations."); Lyall Decl. ¶24 (expert's theory "can be applied equally to entire armies or individual formations within them"). Yet to my knowledge, the Navy makes no attempt to racially balance any of its formations. If, in fact, our leaders truly believed that proportional diversity is a *strategic imperative* that is critical to success for units heading into life-or-death situations, then the Navy and Marine Corps' failure to mimic the Naval Academy's racial balancing process force-wide, in all units, would be considered a gross dereliction of duty. That the Naval Academy's racial preferences are the exception, rather than the norm, speaks volumes.

44.     Relatedly, the Naval Academy and its experts frequently suggest that racial proportionality "amongst the [Navy's] senior leadership" is particularly important. Haynie Decl. ¶21; *see also* Vazirani Decl. ¶22; Opp.34. Yet the Navy does not claim to use race as a factor in determining promotions within the ranks, school and command selections, and other elements of advancement. In fact, the Academy's own exhibits show that the Navy "do[es] not track the racial or ethnic makeup of the individuals considered and selected" for "assignments which lead to positions in senior leadership." Dkt.46-13 at 28. But if a racially balanced officer corps is a military necessity and racial preferences further that goal, then employing racial preferences only when the Naval Academy selects high school seniors for enrollment makes no sense. Using racial preferences at the Naval Academy

alone appears even more arbitrary when one considers that the Naval Academy produces about one-fifth of new Navy officers[15] and less than one-sixth of new Marine Corps officers[16] each year, and that Naval Academy graduates are about as likely to stay in the Navy or Marines after their service obligation is complete compared to graduates of other Navy officer commissioning programs.[17]

45.     The Naval Academy offers evidence for the inherent military advantages of racial diversity by way of a declaration from an expert witness, Professor Jason Lyall. Because the Naval Academy states that Professor Lyall's conclusions "inform" its policies towards racial preferences, the accuracy and relevance of those conclusions are worth considering in detail.

46.     First, Professor Lyall concludes that "the evidence from quantitative data and historical case studies demonstrates that a diverse and inclusive military is critical for battlefield success. Diverse and inclusive militaries are typically more cohesive and lethal than their more exclusionary and discriminatory counterparts." Lyall Decl. ¶10. This conclusion is not supported by relevant facts.

47.     As a preliminary matter, Professor Lyall cites academic studies showing diverse teams have been able to obtain better results than homogeneous teams, but on examination, none of the examples cited are from the military. *See, e.g.*, Lyall Decl. ¶31 & n.30. The examples cited are either from academic settings or occupations not related to the military, such as stock trading and product innovation. Military units operate and make decisions in manners vastly different from stockbrokers and product developers.[18]

---

[15] Jatin G. Khona, et al., *Retention of Women in the Naval Officer Corps* United States Naval Institute (March 2022), https://perma.cc/Z4MK-RMX4.

[16] Kyle P. McCarley, *Marine Corps Officer Modeling: Retention Analysis Based on Source of Accession* 9 Naval Postgraduate School (June 2021), https://perma.cc/7EX9-CQSX.

[17] Institute for Defense Analyses, *Return on Investment in Graduates of the DOD Service Academies: Assessments and Improvements* 48-49 (July 2023), https://perma.cc/5ALB-TVEP

[18] *See* Joey Meneses, *"Shared Principles": A Comparison of Military and Civilian Approaches* Health System CIO (July 19, 2023), perma.cc/G5S5-4R7S.

48.     Furthermore, when Professor Lyall employs the term "diversity," he inexplicably narrows its meaning to just race and ethnicity. Those elements—race and ethnicity—may indeed be the *least* important elements of "diversity" in a military setting. Diversity of thought, thinking, experience, and talents contribute far more to military efficiency than diversity of race or ethnicity. Two ensigns or two second lieutenants—one white, one black—who lived across the street from one another in the same part of South Boston, attended the same schools, learned from the same teachers and coaches, and attended the Naval Academy together are unlikely to have different perspectives on a military problem. Conversely, two officers coming from different parts of the United States, who grew up experiencing regional cultures, were educated in different school systems, and attended different military schools will have vastly different approaches to a tactical problem, even if they are the same race. This latter type of diversity is much more useful than racial diversity in a military setting.

49.     Professor Lyall closes in support of his first conclusion by arguing that "Officers play a central role in fostering inclusive environments that allow servicemember diversity to be harnessed for enhanced problem-solving and innovation on the battlefield. Conversely, officers, if committed to exclusionary policies, can reinforce prewar discrimination or repression of targeted ethnic groups, throwing away the advantages of diversity and amplifying the negative effects of inequality within the military." Lyall Decl. ¶10. This assertion may be correct in certain settings, but it is only relevant if, in fact, there are officers who are "committed to exclusionary policies" and there is an ongoing "repression of targeted ethnic groups" for them to reinforce. Professor Lyall does not establish the existence of either premise: such officers may have existed in a past military, but they largely no longer exist today and are quickly removed from leadership positions when identified. And, as explained below, the U.S. Navy and Marine Corps and American society bear no resemblance to the militaries and societies examined in Professor Lyall's research.

50.     Professor Lyall's second conclusion is that "inequality within the military itself ('military inequality') along ethnic and racial lines is detrimental to the core missions of the military, including lethality, force protection, and resilience under fire." Lyall Decl. ¶11. Importantly, "Military inequality is defined as *the degree to which a military draws on ethnic groups that are subject to state-based discrimination or repression*; the higher the percentage, and the worse the treatment of these groups, the higher the military inequality." *Id.* (emphasis added). Professor Lyall further states that "[i]n wars since 1800, armies with high levels of inequality ('divided armies') experience higher casualties, great greater frequency of mass desertion and defection from the ranks, exhibit a greater reliance on coercion to manufacture cohesion, and suffer higher rates of defeat on the battlefield." *Id.*

51.     Professor Lyall constructs a strawman that doesn't exist in 2023. Today, the U.S. Navy in its core values and policies is committed to military *equality*, not inequality.[19] After 1973, the military became an all-volunteer force, meaning every single person in the military today is there because they volunteered to serve. Further, contrary to Professor Lyall's suggestion, there are no groups in the U.S. Navy or Marine Corps that are "subject to state-based discrimination or repression." Lyall Decl. ¶11; *see also* Lyall Decl. ¶32.

52.     The body of facts that Professor Lyall relies upon to demonstrate that armies possessing high degrees of "military inequality" are less effective is irrelevant to the question at hand. The U.S. military of 2023 is not one characterized by inequality, but rather is the envy of most other nations for its equality. In the world today there are still conscript militaries which have informal "caste systems" preventing certain ethnicities or races from advancing past the lowest levels. I know firsthand that these types of militaries—upon which Professor Lyall based his conclusions—cannot serve as a case study for the U.S. Navy, Marine Corps, or any other branch within the U.S. military. Put differently, examples of officers in the Mahdist army in Sudan in 1898 or the Soviet Red Army in 1941

_____

[19] Secretary of the Navy, *Department of the Navy Core Values Charter*, https://perma.cc/3FGD-33EA.

16

violently repressing their own conscripted soldiers are simply not germane to the question of whether racial preferences at the Naval Academy in 2023 enhance the United States Navy and Marine Corps' efficiency and lethality.

53.     Moreover, Professor Lyall's (and the Academy's) assertions about military effectiveness and battlefield performance are drawn from his findings in *Divided Armies: Inequality and Battlefield Performance in Modern War*, which themselves bear little relevance to the specific circumstances of this case or modern militaries in liberal Western democracies more generally. *See* Lyall Decl. ¶3 (describing *Divided Armies* as "[t]he centerpiece of [his] research" on this topic); Haynie Decl. ¶11 & n.5 ("findings" from *Divided Armies* "inform DoD's work on diversity"). They are irrelevant to modern Western militaries for several reasons, but not least because Professor Lyall intentionally shifted the focus of his research "away from Western-centric accounts."[20] That approach is grounded in Professor Lyall's "concern" that current "theories of military effectiveness continue to be devised, tested, and refined on a vanishingly small subset of th[e] (skewed) dataset" of Western-specific conflicts, "with the same wars (especially World Wars I and II) and belligerents (*the United States*, Germany, Israel) crowding out other, more representative cases."[21] Such an approach doubtlessly contains valuable insights for the broader academy, but it simply cannot serve as evidentiary support for any conclusions about *the United States's* military readiness.[22]

54.     And although the Naval Academy purports to cite additional sources that support Professor Lyall's conclusions, the cited sources do no such thing. For instance, the Haynie Declaration states: "Further supporting Professor Lyall's findings, RAND research identifies how more diverse

---

[20] Jason Lyall, *Divided Armies: Inequality and Battlefield Performance in Modern War* 3 (Princeton University Press 2020).
[21] *Divided Armies* at 22-23.
[22] For similar reasons, Professor Lyall's purported extension of his theory "to the modern era by comparing the battlefield performance of Ethiopia and the Democratic Republic of the Congo (DRC)" rests on the self-evidently inaccurate assumption that the Ethiopian and DRC militaries are somehow representative of the modern era and that systemic trends found within those institutions are analogous to those in the U.S. Military. *See Divided Armies* at 35.

organizations (including military and law enforcement) directly impact operational effectiveness because such organizations 'are more effective at accomplishing their missions.'" Haynie Decl. ¶11 (quoting Dwayne M. Butler & Sarah W. Denton, RAND Corp., *How Effective are Blinding Concepts and Practices to Promote Equity in the Department of the Air Force?* 4 (Dec. 2021), https://perma.cc/PNR8-SQLJ). But the RAND study quoted by Haynie does not "identif[y] how more diverse organizations … directly impact operational effectiveness" or anything of the sort—instead it measures whether actions such as removing photographs from promotion packets are effective at reducing discrimination. The passage quoted in Haynie's declaration is merely a one-sentence summary of Professor Lyall's findings.[23]

55. Finally, Professor Lyall claims that "the US military, far from being 'colorblind,' has a long, tortured, history of racial and ethnic tension and contestation within its ranks." This is particularly relevant, he says, because servicemembers' "identities are not rendered moot by combat conditions but indeed often shape the likelihood of survival on the battlefield." Lyall Decl. ¶12. The former assertion is correct but omits crucial context; while the latter, based on my experience, is simply wrong.

56. The Navy has existed as an institution since 1775, longer than the United States. It, like the American society from which it draws its members, has suffered from appalling racial and ethnic discrimination. Yet the Navy in wartime has often stood out as one of the few American institutions where minorities often believed they stood a better chance of fair treatment in American society. At the start of our nation, during the Revolution, over 10 percent of the Continental Navy was African American—a higher percentage than in the Army. In the War of 1812, Blacks represented one-sixth of naval personnel. They distinguished themselves at the Battle of Lake Erie and other significant campaigns. In the Civil War, Blacks served on 700 ships in the U.S. Navy and eight received

---

[23] *Id.*

the Congressional Medal of Honor.[24] Blacks and other minority individuals who fought bravely in those and subsequent conflicts established themselves in the eyes of the nation and fellow military members as respected defenders of the country. Unfortunately, when their service was over or when the Navy returned to a peacetime footing, these individuals often encountered a return to painful discrimination.

57. While the Navy and Marine Corps, like America, had a "long, tortured history of racial and ethnic tension," they have also acted as beacons of opportunity and hope for millions of ethnic and racial minorities to better their conditions and transcend their situations. Indeed, the RAND Corporation has found that a "majority of Black veterans experience improved economic stability compared with Black Americans who have never served, as measured by higher income, improved ability to cover costs of medical and dental care, higher rates of homeownership, and decreased reliance on food assistance programs."[25]

58. Professor Lyall cites historical figures suggesting that African-American and other minority servicemembers have suffered greater casualties than their fellow white servicemembers, implying their leaders choose to put them in the greatest danger. *See See* Lyall Decl. ¶54. But data from 2005, when the wars in Afghanistan and Iraq were raging, contradicts this premise. As the L.A. Times reported in September 2005: "Whites, who constitute 67% of the active-duty and reserve forces, accounted for 71% of the fatalities. African Americans are 17% of the overall force and were 9% of the fatalities. Hispanics are 9% of the force and were 10% of the fatalities."[26]

59. Lastly, Professor Lyall posits based on his scholarship that servicemembers in combat are preoccupied with matters of race and ethnicity. Lyall Decl. ¶56-57. In my experience, what matters

---

[24] Naval History and Heritage Command, *African American Sailors in the U.S. Navy: A Chronology*, https://perma.cc/2C3K-38FZ.
[25] Tepring Piquado, Stephanie Brooks Holliday, Samantha McBirney, et al., *Among Black Americans, Is Military Service Associated with Better Quality of Life?* Rand Corporation (2022), perma.cc/BZP3-2RJU.
[26] Tony Perry, *Whites Account for Most of Military's Fatalities* L.A. Times (Sept. 24, 2005), perma.cc/AFC2-UY43.

to soldiers, sailors, airmen, or Marines is whether their leaders are competent, fair, and make decisions that don't waste their lives. The bonds of brotherhood formed in war are perhaps best summarized by Langley Chavis, a young African-American soldier serving in the recently integrated 3rd Battalion, 15th Regiment, 3d Infantry Division in Korea in 1951. In his memoirs, he recounted the aftermath of a particularly fierce firefight:

> After debriefing, I went to my hole, and I began to do some serious thinking. It was that night that I am sure I lost all the racial prejudice I had ever felt. I realized it didn't matter the race of the man that got in the pass with me, but more important was that he was there of his own free will. That he was putting his life on the line for me. We needed each other, because he depended on me just as much as I depended on him.[27]

60.     ***"Innovation," "problem solving," and cultural awareness.*** I am aware that the Naval Academy proposes additional ways that racial preferences enhance combat readiness, besides its unit-cohesion argument. In particular, the Academy and its experts assert that racially diverse units are more innovative and superior at "problem solving," *see* Opp.30 (quoting Haynie Decl. ¶¶10, 16); Opp.33 (quoting Lyall Decl. ¶19), and better equipped to deal with cultural complexities in foreign countries, *see* Opp.33-34 (quoting Haynie Decl. ¶¶10, 16; Lyall Decl. ¶31). I address both assertions in order in the paragraphs below.

61.     The Naval Academy's assertion that diverse teams are inherently better at problem solving does not rely on any studies conducted in the context of military units. Moreover, while it has been my experience that a diversity of *viewpoints* can often lead to innovation and create more adaptive teams, it has never been my experience as a leader that a servicemember's race is a suitable proxy for how he or she might think about a particular issue or approach a particular problem. I have never encountered any military leader who believed that to be the case.

---

[27] Langley Chavis, *The Day You Discover Race Doesn't Matter* The Bitter Southerner (archived Dec. 3, 2023), perma.cc/9B8N-9K9L.

62.     When I was assigned to the 82nd Airborne Division from 1992-1993, I often participated in operational plan development. These sessions focused on producing plans for the division's likely deployments and exercises. The Navy conducts similar planning procedures. What made these sessions exceptionally productive was that they included officers and noncommissioned officers with an extraordinarily wide array of backgrounds and years of experience: weather officers from the Air Force, Army and Air Force pilots, artillerymen, aviators, infantrymen, intelligence, communications, engineers and others. When this group started brainstorming, the results were remarkable. The idea that the group also needed diversity of race, gender or ethnicity was never raised, and frankly would not have been countenanced. Individuals' views and recommendations were evaluated based on the strength of their thoughts versus their personal immutable characteristics.

63.     The Naval Academy's assertion that racial diversity automatically enhances cultural awareness and breaks down language barriers with local nationals is similarly flawed. The assertion appears to be founded on the premise that sailors and Marines will have greater insight into particular regions if they happen to share the same skin color or ancestral ethnicity as the people who actually live there. There is a useful example of this flawed thinking in the Army. Each special forces group in the Army is given responsibility over a different region of the world, and the special operators within those groups are expected to be knowledgeable about the region. If the Army were to assign black special operators to 3rd Special Forces Group solely because 3rd Group's Area of Operations is Africa, that decision would rightly be criticized as trading in demeaning stereotypes. The Naval Academy's suggestion here is no different.

64.     Regardless, the Naval Academy's use of racial preferences has little application to language proficiencies and cultural awareness. Under the Naval Academy's admissions process, a native Mandarin speaker whose parents are immigrants from Taiwan would not be offered any

preference.[28] Even though the military has designated the People's Republic of China as the "pacing challenge" for the U.S. military[29] and presumably an officer with Chinese language and cultural skills would be extraordinarily useful in understanding that formidable adversary, the system *reduces* his or her chances of acceptance into the Naval Academy rather than increasing them.

65.     Finally, the Academy's repeated invocation of the "conclu[sions]" of "senior military officials" attempts to portray an unanimity of belief that racial balancing is a military necessity where none exists. *See, e.g.*, Opp.41 ("Senior military leadership has consistently concluded that officer diversity is a national imperative."). To the contrary, some of our Nation's most prominent military leaders have vigorously rejected race-based admissions schemes like the Academy's. For example, retired Lieutenant General H.R. McMaster has stated that "nothing could be more debilitating to combat effectiveness" than allowing "people [to] be judged mainly by identity category rather than by character and ability to contribute to a team."[30] In his view, such classifications are "debilitating" and "destroy unit cohesion" and are thus "incompatible with the warrior ethos."[31]

66.     Former Chief of Staff of the Air Force, General Ronald R. Fogleman, has made similar observations. Relying on more than thirty years of experience—along with more than 6,000 flight hours, which included, 800 hours of combat flying, and 300 combat missions—General Fogleman has concluded that "[o]ur military most assuredly can defend America without resorting to extra-constitutional practices that require suspension of the Equal Protection Clause."[32] Accordingly, General Fogleman unequivocally believes that "[o]fficer-enlisted racial demographic parity" is

---

[28] *See 1997 Revisions to OMB Statistical Policy Directive No. 15, Race and Ethnic Standards for Federal Statistics and Administrative Reporting*, 19 (1997) (defining "white" as "a person having origins in any of the original peoples of the Middle East, Europe, or North Africa).

[29] U.S. Department of Defense, *2022 National Defense Strategy* III (Oct. 27, 2022), https://perma.cc/E3Y8-94SA.
[30] *Preserving the Warrior Ethos* Nat. Rev. (Oct. 28, 2021), perma.cc/6TV8-Q83Z.
[31] *Id.*
[32] *No, Affirmative Action In The Military Doesn't Boost National Security, It Erodes It* The Federalist (Oct. 25, 2022), perma.cc/WS4J-85UF.

"unnecessary for our military to be combat-effective."[33] And such racial balancing isn't only unnecessary—it's counterproductive. As General Fogleman noted, race-conscious officer accessions policies "dilute[] quality," "weaken merit," "erode morale," "undermine unit cohesion," and "compromise combat effectiveness."[34] Colorblind admissions are, therefore, "a moral and national security imperative."[35]

> ### B. Racial preferences likely hurt—and certainly do not help—recruiting and retention.

67.     Defendants and their experts also claim that the diversity produced by the Naval Academy's racial preferences are necessary for recruitment and retention across the Navy and Marine Corps. *See, e.g.*, Haynie Decl. ¶¶29-31; Vazirani Decl. ¶¶22-25.

68.     Considering the Navy in particular is in the middle of one of their worst periods of recruiting they have experienced since 1973, this argument appears particularly odd. The Navy missed its active-duty recruiting goal by 20 percent or 7,500 sailors in fiscal year 2023. [36]

69.     Indeed, evidence suggests the exact opposite: that Americans view measures such as racial preferences as a part of a growing body of evidence of the politicization of the military.

70.     In 2022, the annual Ronald Reagan National Defense Survey found 48 percent Americans—less than half—had a great deal of trust in the U.S. military. This level of trust is markedly down from 2017, when 70 percent of Americans expressed the same. No other institution has dropped so far and fast in the esteem of American citizens.[37] The leading reason why Americans say they have less trust in the military is that they perceive military leaders have become overly politicized. Of the

---

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] The Maritime Executive, *U.S. Navy Misses Enlisted Recruitment Target By 20 Percent* (Oct. 12, 2023), https://perma.cc/3PBH-4H83.

[37] Ronald Reagan Institute, *Reagan National Defense Survey* (Nov. 2022), perma.cc/A6JY-GYLQ.

Americans surveyed, 62 percent expressed either a great deal or some concern over this perception of politization.

71.     Moreover, numerous polls report that most Americans of all ethnicities oppose the use of racial preferences in college admissions.[38] Even though the Naval Academy has been using racial preferences at least as far back as 2002 and perhaps earlier,[39] this fact was not widely known, even among senior military officers. I was not aware of the use of the Naval Academy's or West Point's racial preferences until 2022, six years after I left the Army. Thus, the knowledge that the Naval Academy and the other military academies employ racial preferences in their admissions process could be a factor in the recent drop in the public's confidence and trust in the military. Given that most Americans do not favor racial preferences in college admissions, the Naval Academy's use of such unpopular means seems likely to only increase concerns about politicization of the military and harm, rather than help, military recruiting efforts.

72.     Regarding the Naval Academy's claim that a lack of diversity produced by racial balancing will prevent the Navy and Marine Corps from retaining the best and brightest officers, *see* Opp.34-36, I see no evidence to support that claim, and my experience indicates otherwise.

73.     The Naval Academy grounds this assertion in data largely collected from the DoD command climate surveys. *See* Opp.42. Whatever the results of those surveys, they are unlikely to reliably explain the causes of attrition or factors necessary for greater officer retention. That is because, as a 2022 Government Accountability Office report concluded, "the DOD climate survey—the academies' primary tool for collecting information—does not provide complete and reliable information. Specifically, the survey has methodological issues concerning security, response rates,

---

[38] Pew Research Center, *More Americans Disapprove Than Approve of Colleges Considering Race, Ethnicity in Admissions Decisions* (June 8, 2023), perma.cc/WWR5-DVRU.
[39] Bruce Fleming, *Not Affirmative, Sir* Washington Post (Feb. 16, 2003), https://perma.cc/K4T6-FWU8.

and post-survey weighting that limit its usability."[40] Further, my personal experience suggests that drawing conclusions regarding why servicemembers leave the military from impersonally administered surveys has very limited utility. Most servicemembers view surveys as an unpleasant task to be completed as quickly as possible.

### C.   Racial preferences will harm, rather than enhance, the Navy and Marine Corps' public legitimacy.

74.     The Naval Academy's brief and the declarations in support of it also assert that a racially "representative" military produced through racial preferences will enhance the Navy and Marine Corps in the eyes of the American public. *See, e.g.*, Vazirani Decl. ¶28. Neither Haynie nor the Naval Academy offers any documentary support for this assertion. As a general in the U.S. Army, however, I frequently encountered questions about civil-military relations and the public's perception of Army. In my experience, the American public's respect for the military flows from its perception that the military is a disciplined, results-oriented institution that prides itself on providing equal opportunity for Americans. Given that disposition, it is doubtful to me that racial preferences in Academy admissions—a policy most of the public disproves of even for civilian institutions—would lend additional legitimacy to the armed forces.

75.     The Naval Academy and Haynie also suggest that racial preferences will enhance the Navy's legitimacy in foreign countries. They provide little documentary support for this assertion either. For the assertion to have any relevance to the Naval Academy's admissions system though, it would first be necessary to identify the language and cultural skills that the Navy and Marine Corps need, identify those Naval Academy candidates which possess those skills and then, select them on that criterion. But that is not what the Academy is currently doing. Rather, the Academy's position

---

[40] Gov't Accountability Off., *Military Service Academies: Actions Needed to Better Assess Organizational Climate*, GAO-22-105130, at 1 (July 2022).

appears to be that a certain level of diversity in race or ethnicity automatically conveys legitimacy to overseas Navy and Marine Corps operations, which they have provided no factual basis to establish.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 8, 2023

LTG (Ret) Thomas W. Spoehr