```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF MARYLAND
 2                          NORTHERN DIVISION

 3    STUDENTS FOR FAIR ADMISSIONS,  )
                            Plaintiff, )
 4                                     )
                    vs.                )   CIVIL CASE NO.
 5                                     )   1:23-cv-02699-RDB
      THE UNITED STATES NAVAL          )
 6    ACADEMY, et al.,                 )
                            Defendants. )
 7    _____ )   2:08 p.m.

 8                      THURSDAY, DECEMBER 14, 2023
                              Courtroom 5D
 9                          Baltimore, Maryland

10                      TRANSCRIPT OF PROCEEDINGS
                     PRELIMINARY JUNCTION HEARING
11             BEFORE THE HONORABLE RICHARD D. BENNETT

12
      For the Plaintiff:
13
      Thomas R. McCarthy, Esquire
14    Cameron T. Norris, Esquire
      Patrick Strawbridge, Esquire (via telephone)
15    Consovoy McCarthy, PLLC
      1600 Wilson Boulevard, Suite 700
16    Arlington, VA 22209

17    For the Defendants:

18    Joshua E. Gardner, Esquire
      Catherine M. Yang, Esquire
19    Chris E. Mendez, Esquire
      Medha Gargeya, Esquire
20    Department of Justice Civil Division
      1100 L Street NW
21    Washington, DC 20005

22    _____

              (Computer-aided Transcription of Stenotype Notes)
23
              Reported by: Amanda L. Longmore, RPR, FCRR
24                 Federal Official Court Reporter
                   101 W. Lombard Street, 4th Floor
25                  Baltimore, Maryland  21201
                           410-962-4474
```

1                    P R O C E E D I N G S

2        (Call to Order of the Court.)

3            THE COURT:   This is calling the case of Students for

4    Fair Admissions versus the United States Naval Academy, Civil

5    Number RDB-23-2699.

6            The masking policies of this court previously required

7    that masks be worn in all public areas of the courthouse.  That

8    is no longer the case since November the 3rd, but it is still

9    within the discretion of the presiding judge.  I have been

10   fully vaccinated and boosted as recently as my third booster

11   six weeks ago, but we still do take precautions here in the

12   courtroom, particularly in light of the fact that my judicial

13   assistant called in today and she's got COVID.  So we still do

14   take precautions here in the courtroom so I do inquire of the

15   vaccination status of counsel and the parties before me as we

16   proceed.

17          So with that, welcome to all of you here.  First of all,

18   on behalf of the plaintiff Students for Fair Admissions, at

19   some point in time it will be referred to as SFFA as it is in

20   the pleadings.  If counsel will identify themselves for the

21   record, please.

22              MR. NORRIS:  Good afternoon, Your Honor.  Cam Norris.

23              THE COURT:   Yes.  And Mr. Norris, have you been fully

24   vaccinated?

25              MR. NORRIS:  Yes, Your Honor.

1       THE COURT:  It's nice to have you here.

2       MR. ANDERSON:  Richard Gabriel Anderson.

3       THE COURT:  Hold on one second, please.

4   Mr. Anderson, you are not listed.  It's nice to have you here,

5   but I don't see you being listed as -- you're not listed as an

6   attorney of record here for Students for Fair Admissions, so

7   you need to enter your appearance.

8       MR. ANDERSON:  More than happy to.  It was noted over

9   e-mail to the Clerk as well, and --

10       THE COURT:  Well, bottom line is you're not listed as

11   counsel of record here, and as of an hour ago you're not listed

12   on the docket sheet.  So welcome, but you'll need to enter your

13   appearance.

14       MR. ANDERSON:  Of course.

15       THE COURT:  All right.  And you are with the same law

16   firm as is Mr. Norris, is that correct, Consovoy McCarthy?

17       MR. ANDERSON:  Correct.

18       THE COURT:  Well, it's nice to have you here.  I'm

19   just noting that you're not listed as having entered your

20   appearance so you need to enter your appearance.

21       MR. ANDERSON:  Of course.

22       THE COURT:  And thirdly?

23       MR. MCCARTHY:  Thomas McCarthy, Your Honor.

24       THE COURT:  Yes, Mr. McCarthy.  Hold on one second,

25   please.  Yes, and you are clearly listed as counsel of record.

Preliminary Injunction Hearing 12/14/23

1    It's nice to have you all here.  And Patrick Strawbridge I
2    believe is calling from your Boston office and is on the
3    telephone line.
4        Mr. Strawbridge, it's nice to have you here.  Welcome.
5            MR. STRAWBRIDGE:   Thank you, Your Honor.
6            THE COURT:  All right.  With that, you all may be
7    seated for a minute over on the plaintiff's side.
8        And on behalf of the defendants, the named defendants
9    United States Naval Academy, Lloyd Austin in his official
10   capacity as Secretary of Defense, Carlos Del Toro in his
11   official capacity as Secretary of the Navy, Bruce Latta in his
12   official capacity as Dean of Admissions for the United States
13   Naval Academy, and Rear Admiral Fred Kacher in his official
14   capacity as Acting Superintendant of the Academy.
15       If counsel will identify themselves for the record,
16   please.
17           MR. GARDNER:  Good afternoon, Your Honor.  Josh
18   Gardner with the Department of Justice.
19           THE COURT:  Yes, Mr. Gardner.  Nice to have you here.
20   And you have been fully vaccinated?
21           MR. GARDNER:  Yes, I have.
22           THE COURT:  All right.
23           MS. YANG:  Good afternoon, Your Honor.  Catherine
24   Yang from the Department of Justice.  I am also fully
25   vaccinated.

1          THE COURT:  Nice to have you here as well.

2          MR. MENDEZ:  Good afternoon, Your Honor.  Chris

3     Mendez from the Department of Justice, and I have also been

4     fully vaccinated.

5          THE COURT:  Nice to have you.

6          MS. GARGEYA:  Good afternoon, Your Honor.  Medha

7     Gargeya with the Department of Justice, also fully vaccinated.

8          THE COURT:  Nice to have all of you here.

9          I would also note that an amicus brief has been filed on

10    behalf of the National Association of Black Military Women, the

11    American Civil Liberties Union, as well as the American Civil

12    Liberties Union of Maryland, as well as the NAACP Legal Defense

13    Fund.  Not that counsel needed to be here, but I'm not sure if

14    any of those counsel are here present or not.

15         MR. GARDNER:  Your Honor, they are.

16         THE COURT:  Okay.  And if they will please stand.  I

17    would just welcome them.  Nice to have you all here, all three

18    of you.  Ms. Kumar, Ms. Jeon, and Mr. Rocah, if I'm pronouncing

19    your names correctly, it's nice to have you here.  Welcome.

20         And so with that, those in the back, I note at least one,

21    I see one person wearing a mask.  If you have not been fully

22    vaccinated -- we sort of have an honor system here -- just so

23    indicate and Ms. Herndon, the Deputy Clerk of Court, has extra

24    masks that can be worn.  I don't see that there's any

25    indication of any need for that, so I think we are ready to

1    proceed here.

2         I would note that -- you all may be seated for a minute.

3    Let me set the procedural posture here.

4         (Public Access Line Interruption.)

5             THE COURT:  That's exactly what I was addressing.

6    This is a matter of public interest so it's an open line for

7    the public to listen in.  And the public doesn't have the right

8    to just chime in but it has the right to listen, so pursuant to

9    our local rules that public access line is available for the

10   public to listen.

11        This is a motions hearing that is scheduled with respect

12   to the pending motion for a preliminary injunction which was

13   filed consistent with the complaint that was filed by SFFA,

14   again, Students for Fair Admission, versus United States Naval

15   Academy.  The plaintiff is a nonprofit organization whose

16   self-described mission is to "eliminate racial and ethnic

17   classifications in preferences in school admissions," according

18   to its listing on the Internet, and it was SFFA's lawsuits

19   against Harvard University and the University of North Carolina

20   that led the Supreme Court to declare race-based admissions

21   policies unlawful in those institutions in I think the June

22   opinion of Students for Fair Admissions versus President and

23   Fellows of Harvard College earlier this year.

24        However, in that opinion -- I guess for the first time of

25   many times we will be referring to the footnote in that

1    opinion.  In that opinion, the Supreme Court specifically

2    excluded military academies from its decision in Footnote 4 of

3    the opinion, specifically noting that it was because of the

4    "potentially distinct interests that military academies may

5    present."

6         This litigation here as well as I believe in the Southern

7    District of New York with respect to the United States Military

8    Academy at West Point appears to respond to this footnote in

9    that SFFA now brings a one-count action here in this case

10   against the defendants United States Naval Academy, Lloyd

11   Austin, Carlos Del Toro, Bruce Latta, and Rear Admiral Fred

12   Kacher, all of whom I've already listed in their capacities,

13   various capacities and their official capacities as defendants.

14        And essentially the allegation in this case is that the

15   Naval Academy's race-conscious admissions practice violates the

16   Fifth Amendment's Equal Protection Principles and, as I've

17   said, a similar complaint and motion for preliminary injunction

18   has been filed in the Southern District of New York, which is

19   pending before Judge Philip M. Halpern as well in that

20   district.

21        On October the 6th of this year, the day after SFFA filed

22   its complaint, the plaintiff filed a motion for preliminary

23   injunction urging this Court to issue an injunction immediately

24   prohibiting the defendants from considering applicants' race

25   when making admissions decisions, and this hearing essentially

1    is focused upon the request for that injunctive relief.

2            We are not deciding -- again, so the public understands,

3    we are not deciding the ultimate merits of the case at this

4    point in time.  This is in the context of a motion for

5    preliminary injunction which has been fully briefed.  And

6    briefing, I think, concluded, according to my schedule, by

7    December the 8th, and I want to thank counsel for jumping very

8    quickly on trying to get moving with this matter.  In fact,

9    there was even a Notice of Corrected Declaration filed on

10   December the 12th, just two days ago.

11           So we are promptly having a hearing, and I want to thank

12   everyone for their diligent work in that regard on both sides

13   in terms of responding.  And including you, Mr. Anderson,

14   because it didn't give you the courtesy of putting you as a

15   listed counsel, but you worked as hard as anybody, I'm sure.

16           We're laughing here.

17           The pending motion was filed on October the 6th and, as

18   I've said, it's been fully briefed.  Let me just lay out just a

19   little bit more of a groundwork here and let me make a

20   suggestion as to how we will proceed.  As I've said, in June,

21   on June 29th, actually, of this year, the Supreme Court issued

22   its opinion in SFFA's lawsuit against Harvard and the

23   University of North Carolina and essentially held that the

24   Affirmative Action programs at Harvard and the University of

25   North Carolina violated the Equal Protection Clause of the

1    Fourteenth Amendment.  And while the Court declined to overturn

2    its 2003 decision in Grutter versus Bollinger, which held the

3    consideration of an applicant's race is one factor in an

4    admissions policy did not violate the Constitution, the Court

5    in what I'll refer to as the Harvard case in June, determined

6    that that school's program fell short of satisfying the burden

7    that their programs be sufficiently measurable to permit

8    judicial review under the rubric of strict scrutiny.  And the

9    majority opinion of Chief Justice Roberts declared that

10    classifying and assigning students based on their race requires

11    more than an amorphus end to justify it.

12        And as I've noted of import here, again for public

13    consumption so the public understands, there was a footnote in

14    that opinion, Footnote 4, expressly noting that the Court

15    declined to opine on the use of race in admissions within the

16    United States military academies, specifically noting that the

17    opinion did not address the issue in light of potentially

18    distinct interests that military academies may present.

19        And so that's the gravamen of what we start to deal with

20    right away in terms of seeking injunctive relief.  I would just

21    note parenthetically, again for purpose of the record and

22    public consumption, that to become a Navy or Marine Corps

23    officer, an individual must, one, either graduate from the

24    United States Naval Academy here in Annapolis; attend a

25    civilian college or university and participate in the Reserve

1    Officers' Training Corps, better known as ROTC; attend Officer
2    Candidate School, better known as OCS, after graduating from
3    college; or, four, receive a direct commission after earning a
4    professional degree; and finally, or five, advance through the
5    enlisted ranks and then complete officer training.  That is the
6    way one becomes a Naval officer or a Marine Corps officer here
7    in the United States Military.

8        Specifically, then, finally in terms of the setting the
9    posture of this case, the admissions process at the United
10   States Naval Academy is governed by federal statute, 10 United
11   States Code § 8453, as well as by Department of Defense
12   directives, as well as Department of Navy regulations, as well
13   as internal guidance with respect to Navy regulations.  So that
14   is the posture in which we find ourselves here today.

15       Now, I would -- essentially, in terms of the way the
16   argument has been presented in the papers, I think we'll start
17   with the fact that I once saw that Justice Sotomayor quoted
18   herself as saying she had a "hot bench" when she was a trial
19   judge, and I thought, I guess that's what I have.  I guess I
20   have a hot bench.  And she acknowledged that she asked
21   questions.  I tend to ask questions.  I have a hearing for a
22   reason.  I enjoy the advocacy of lawyers and I will definitely
23   ask questions because I would always find that -- when I was
24   trying cases frustrated that the judge asked no questions.  I
25   decided either he or she hadn't read anything or they had

1    already formed an opinion and so that would trouble me.  So

2    you'll find that I will engage all of you in terms of questions

3    that I have as we move through this.

4         And in that regard, I note that the SFFA has essentially,

5    one, responded to the suggestion of the defendants, the

6    Government -- I'll refer to it as the Government -- with

7    respect to standing.  And then we go through the analysis with

8    respect to the preliminary injunction and the requirements

9    because preliminary injunctions are extraordinary remedies.

10        And there are four criteria that have to be satisfied, as

11   we'll be discussing later, the four:  that the moving party is

12   likely to succeed on the merits; the moving party is likely to

13   suffer irreparable harm absent preliminary relief; the balance

14   of equities favors the moving party; and finally, an injunction

15   is in the public interest.  And we will get to that shortly,

16   but I think the issue has been raised as to standing.

17        I think that the gravamen of what we're going to be

18   dealing with here seems to me, Mr. McCarthy or Mr. Gardner or

19   whoever wants to opine, but you all -- generally I've found

20   whoever's close enough in is going to do the most talking and

21   whoever is farthest out has done the most research.  That's the

22   inverse proportion.  I see Mr. Gardner laughing so that means

23   he's affirmed that.  So Ms. Gargeya, you may be very busy here

24   and, Mr. Norris, you as well.

25        But my point is -- we're laughing.  The point is, what I

1    think we ought to do is address the issue of standing.  I'll
2    hear argument on it.  And then I'm inclined to deal with
3    irreparable harm, balance of the equities, and the public
4    interest, all of which ultimately, I think, are going to depend
5    in no small measure on likelihood of success on the merits, and
6    the briefing itself obviously reflects that emphasis.
7         I would note that the defense briefing, I think of the
8    60-some pages, I think 35 are directed to likelihood of success
9    on the merits.  So it seems to me that the best way to handle
10   this is to deal with some of those preliminary matters and then
11   make sure we then zero in on likelihood of success on the
12   merits.
13        Does that sound agreeable to you, Mr. McCarthy or
14   Mr. Norris?  Is that agreeable to you?
15             MR. NORRIS:  Yes, Your Honor.
16             THE COURT:   Mr. Gardner, is that agreeable to you?
17             MR. GARDNER:  Yes, Your Honor.
18             THE COURT:   So we'll deal with standing first.  I'll
19   hear argument from both sides on that, and we will then proceed
20   in that fashion here.
21        So with that, Mr. Gardner, I'll be glad to hear from you.
22   I think you have challenged the standing of the plaintiffs, and
23   I'll be glad to hear from you, and then I'll give Mr. Norris an
24   opportunity to respond.  You all can stay at the tables, you
25   can use the podium, whatever is convenient for you.  I don't

1    care.  That's fine.  Use the podium, you're welcome.  My

2    courtroom is still somewhat partially retrofitted with

3    Plexiglass, but I'll be able to hear you back there,

4    Mr. Gardner, I think.

5            MR. GARDNER:  Thank you, Your Honor.  And first of

6    all, let me affirm your intuition.  The people that are sitting

7    at the table to my right have worked extremely hard on the

8    briefing in this case.  I just wanted to publicly acknowledge

9    that.

10           THE COURT:  Sure.

11           MR. GARDNER:  With respect to standing, Members A and

12   B, the primary issue here is it's failed to meet its burden

13   through the submission of the two bare-bone declarations that

14   lack any detail as to actual concrete harm they've suffered as

15   a result of the Naval Academy's admissions policies.

16       The fact that they are proceeding anonymously simply

17   compounds the problem because it prevents the Government, and

18   ultimately Your Honor, from ascertaining the necessary facts

19   for standing, such as by determining whether they have met the

20   bare minimum requirements for consideration such as submission

21   of a nomination, passing the medical and physical evaluations.

22       First, plaintiff claims that in each case where SFFA was a

23   plaintiff they were allowed to proceed anonymously, but in each

24   of the cases that they've identified where they were a

25   plaintiff, they provided the identity of the members to the

1    defendants and the defendants were able to then vet whether or

2    not standing had been established.

3            THE COURT:   Was that at the stage of a preliminary

4    injunction or was it at the stage of the ultimate bench trials?

5            MR. GARDNER:   Your Honor, I am not entirely clear

6    about that.  I think SFFA could attest to that.  I know it was

7    before trial because certainly there were depositions taken, at

8    least in the SFFA case, according to --

9            THE COURT:   But you're not necessarily proffering

10   that it was at the stage of one seeking a preliminary

11   injunction.

12           MR. GARDNER:   I can't represent that one way or the

13   other.  Although, I will say this, now that I think about it.

14   In SFFA they did not seek a preliminary injunction, so it by

15   definition could not have been in that context or that posture.

16           THE COURT:   Neither in the United States District

17   Court for the Middle District of North Carolina or the District

18   of Massachusetts they did not seek a preliminary injunction.

19           MR. GARDNER:   That is my understanding, Your Honor.

20   If I am incorrect about that, I'm sure my colleagues will

21   correct me, but that's my understanding.

22           THE COURT:   They probably didn't have the same

23   posture in terms of Supreme Court jurisprudence that they have

24   now, obviously.

25           MR. GARDNER:   I would argue, Your Honor, that that

1    posture is really meaningless in terms of standing.
2    Plaintiff's essential argument here is they could not have sued
3    the Naval Academy or any of the service academies until the
4    Harvard decision because under Grutter, the Naval Academy's
5    admissions policies were lawful.
6        The problem with that argument is that the same could have
7    been said for Harvard and UNC's policies, which were equally
8    lawful under Grutter.  The whole point of the SFFA lawsuit was
9    to change the law for civilian universities, which they were
10   successful in doing.  So the notion that they could not have
11   sued until SFFA is just simply incorrect.  They chose not to,
12   and presumably they chose not to because they wanted to get a
13   Supreme Court decision that struck down civilian universities.
14       THE COURT:  But did not -- Mr. Gardner, did not the
15   Supreme Court note that SFFA had standing against Harvard and
16   UNC when it filed suit?
17       MR. GARDNER:  Correct.
18       THE COURT:  At the time it filed suit?
19       MR. GARDNER:  Correct.  And what happened there, Your
20   Honor, just to be clear, is that the Supreme Court, the sole
21   issue about standing was the germaneness of the organization's
22   missions to the lawsuit.  We're not challenging the germaneness
23   here.  What we are challenging is the inability to vet whether
24   Member A or B have actually been injured by the Naval Academy's
25   policies.

1          THE COURT:  At this stage, my question to you is that

2    I thought that -- what I refer to as in the Harvard case, I

3    thought that at least initially there was reference to members

4    with pseudo names and the real names were never actually

5    disclosed to the public and they were ultimately disclosed to

6    the defendants later in discovery.  Isn't that how it played

7    out?

8          MR. GARDNER:  Correct.  They were never publicly

9    disclosed but they were disclosed to the defendants, who then

10   had the opportunity to vet those claims.

11         THE COURT:  Ultimately in discovery.

12         MR. GARDNER:  Correct.

13         THE COURT:  During the discovery period.

14         MR. GARDNER:  Correct.  But again, in SFFA they did

15   not seek a preliminary injunction so the issue of standing was

16   not before the Court.  But there's one other, I think,

17   incredibly important distinction between SFFA and all other

18   cases where the challenge is to an "unconstitutional barrier."

19       In public universities, you need to apply, and when you

20   apply, then you are obviously subject to whatever those

21   barriers are.  The thing that's different about the Naval

22   Academy and all the service academies are there are

23   prerequisites to even being considered for admission, among

24   other things, getting a nomination, traditionally a

25   congressional nomination but not necessarily.  So there is a

1    big distinction --

2           THE COURT:   You can have a superintendant nomination,

3    for example.

4           MR. GARDNER:   You could have a superintendant

5    nomination.  But plaintiffs have not alleged that they have

6    that.  In fact, what plaintiffs have alleged is they have not

7    even applied.  And that's significant as well, Your Honor,

8    because the deadline for submitting the initial application is

9    in two weeks and the typical deadline for submitting the

10   nomination is the end of January.

11          And so this is the big distinction.  We are not arguing

12   that to be ready and able one has to show that they will be

13   admitted.  That's not what we're arguing.  What we are arguing

14   is they have to show that they are capable of being considered

15   for being admitted, and that is what they cannot do here

16   because of the distinction between the Naval Academy, which has

17   prerequisites like, again, a nomination, being medically

18   cleared, being -- the medical exam, the physical exam.

19          They have not established they've done any of those things

20   and therefore they can't even be within the pool of people that

21   are considered.  That is why they cannot show an injury.  And

22   all we have are two bare-bone declarations that are a single

23   page apiece where they have a single sentence, which, by the

24   way, if you look, they literally are just verbatim legal

25   conclusions that they are ready and able without any showing

1    that they've actually done the prerequisites that would allow

2    them to be within the pool of people who could actually be

3    considered for a nomination -- or, sorry, an offer of

4    admission.

5         So that is our fundamental argument with respect to

6    standing, that it is their burden.  On a PI they've got that

7    same standing burden that they would have on summary judgment,

8    and with a single-page declaration with one sentence that is

9    conclusory, they cannot meet that burden.

10            THE COURT:  Well, thank you, Mr. Gardner.

11         Mr. Norris, I'll be glad to hear from you on this.

12            MR. NORRIS:  Thank you, Your Honor.  I'd also like to

13   confirm your intuition that I have done very little of the

14   research but will do a lot of the talking.

15            THE COURT:  Actually, the chair you were in would

16   imply that you've done a lot of research, Mr. Norris.

17            MR. NORRIS:  Oh, yeah.  I've done it all, that's

18   right.

19         So my friend's argument is not really about the fact that

20   our members are pseudonymous at this stage.  He's saying he

21   doesn't have certain information that we need to prove

22   standing.  That's an argument that you don't have certain

23   information that we need to prove standing, not an objection to

24   their pseudonymity.  I don't think that argument's really in

25   the case.  Even if it were, he has not explained why he needs

Preliminary Injunction Hearing 12/14/23

1    their real first and last name to assess whether they have

2    standing in this context.

3        The B.R. case from the Fourth Circuit says the use of

4    pseudonyms is irrelevant to Article III standing.  The Speech

5    First case, which I litigated in the Fourth Circuit, found that

6    we did have standing in the preliminary injunction posture on

7    behalf of anonymous standing members because this is very early

8    in the case, before discovery, when that information would be

9    exchanged.

10       You asked about the SFFA case.  Our members were

11   pseudonymous in the complaint early in the case.  We did not

12   give that information to Harvard and UNC until years later in

13   discovery under seal under a protective order.  That's where

14   this debate would happen.

15           THE COURT:  There was discovery for years,

16   Mr. Norris?

17           MR. NORRIS:  It was years.  Well, the case was stayed

18   for awhile because of the Fisher litigation.

19           THE COURT:  I want to put you all notice that I don't

20   really let discovery go for years.

21       (Laughter.)

22           MR. NORRIS:  I'll say Amen to that.

23           THE COURT:  So that frightens me because we're not

24   going to have years of discovery here.  We're going to have

25   months of discovery, not years.

1          MR. NORRIS:  Your Honor, we were not happy that the

2     Harvard litigation took five years in the District Court,

3     either.  We hope this one goes faster, especially given the --

4          THE COURT:  I'm prepared to make a promise to all the

5     parties here as well as members of the public, this case isn't

6     going to go for five years here.

7          MR. NORRIS:  Excellent.  So I think where this debate

8     will happen is, if they ask for that information in discovery,

9     we will likely give it to them under a protective order under

10    seal where the names are not revealed to the public and they

11    can ask any questions they'd like to.

12         This is prediscovery preliminary injunction motion.  They

13    are not entitled to information now.  It's not even relevant to

14    standing, as the Fourth Circuit held in B.R. and the DC Circuit

15    held in this exact context in the Highway Safety case that we

16    cite in our brief overruling the same argument by DOJ.

17         But in terms of, you know, the information they said they

18    don't have, they just misunderstand the nature of the injury in

19    these cases.  The injury is the inability to compete on an

20    equal footing, not the inability to get in or to meet all of

21    the requirements that Navy would actually assess in terms of

22    deciding whether they should be admitted to the Academy.  It's

23    the existence of the racial preference, the racial

24    discrimination that is the harm.  The Court has said that in

25    the Jacksonville case, it said it again in the Harvard case, it

1    said in the Gratz case.  That's always been the rule, really
2    the unique rule in this area of the law.
3         Now, I think the argument that they made in the brief is
4    that maybe our students would get in anyway through one of the
5    so-called race-neutral ways that the Naval Academy admits
6    people.  But for one, there really aren't very many
7    race-neutral parts of their process.  If our students were not
8    white, for example, they could get a Letter of Assurance from
9    Navy very early on in the process with a much lower score than
10   they would need because they are not a minority race.  They
11   also get in through the additional --
12        THE COURT:  You're basing that upon an affidavit from
13   one of the professors at the Academy in terms of the 600 as
14   opposed to 550 score.  Is that what you are referring to?
15        MR. NORRIS:  I'm not sure we have those specifics,
16   Your Honor.  They say that when they send out those letters,
17   race is a reason that they will send out a letter to someone
18   who gets a lower score than they would otherwise send the
19   letter to.  They also say they use race when doing additional
20   appointees, which is sort of the pool that's left over at the
21   end.
22        And the corrected declaration that they filed shows that
23   race plays a large role in those decisions.  It's over 55
24   percent of people who get in that way who are racial
25   minorities.  They also say that if we are -- 65 percent of

1   congressmen do the competitive method where they say, you know,

2   choose who you want among our nominees.  When they do the

3   competitive method, they can use race, you can have a lower

4   score than someone, but if you're a racial minority, you get in

5   instead of them.  So they use race throughout the process.

6       I'm not sure what race-neutral avenue they're talking

7   about.  But under Gratz, we don't have to prove that race would

8   be the reason we did or didn't get in.  It's the inability to

9   compete on an equal footing, and under Gratz our members don't

10  even have to submit an application in order to have standing.

11  They just need to be ready and able to apply.

12      We have satisfied that standard, just like in Gratz,

13  because we have members who proved that they're ready and able

14  to apply because they've applied before and been rejected.  And

15  when they applied before, they were fully qualified, they got a

16  congressional nomination, which makes it likely enough for

17  Article III standing that if a court ordered Navy to stop

18  considering race, they would apply again.  That's all they need

19  to show to have Article III standing.

20          THE COURT:  Mr. Norris, I think the thrust of your

21  response on this standing issue is that your clients don't lose

22  standing, your organization does not lose standing just by

23  referring to its members with pseudo names.  That's the thrust

24  of your response.

25          MR. NORRIS:  Correct.  I think that was the thrust of

Preliminary Injunction Hearing 12/14/23

1    the argument in our brief.

2              THE COURT:  You've cited other cases.  This all has

3    to do with the, I think -- just for the record, the ambit of

4    the Supreme Court's opinion in Summers versus Earth Island, the

5    2009 opinion I think it is, in which there was some issue as to

6    lack of -- failure to identify a specific member.  And your

7    point is is that generally in these types of cases, its use of

8    pseudonyms at least early in the litigation is not prohibited,

9    is your point.

10             MR. NORRIS:  Correct, Your Honor.  We did identify

11   specific people, two specific people, and named them.  We just

12   didn't give their legal names, which has nothing to do with

13   Summers.

14             THE COURT:  Thank you very much.

15             MR. NORRIS:  Thank you.

16             THE COURT:  Mr. Gardner, do you want to be heard

17   further on this?

18             MR. GARDNER:  Yes, Your Honor.  Very briefly, if you

19   don't mind.

20             THE COURT:  Yes.  Our review here in chambers, I will

21   just note that there appears to be abundant authority that

22   there can be use of pseudonyms in high-profile cases such as

23   this, and it doesn't mean that they remain anonymous forever

24   and it doesn't mean that eventually you're not able to pursue

25   whether or not they satisfied the physical requirements and

Preliminary Injunction Hearing 12/14/23

1    what have you, obviously.  But I think you've cited -- if I'm

2    not mistaken, you've cited two District Court opinions in

3    support of your position, but there is a fair amount of

4    authority on a Circuit Court level that uses pseudonyms as

5    appropriate.  It doesn't bar standing here.

6             MR. GARDNER:  I will acknowledge that there is a

7    split of authority on that issue, Your Honor.  I absolutely

8    will acknowledge that.  I'll also acknowledge that the SDNY

9    case that we cite to is currently on appeal in the Second

10   Circuit.  The law is certainly uncertain on that issue.  But

11   what isn't uncertain is that plaintiff needs to show that they

12   otherwise would have the opportunity to be considered for a

13   slot at the Naval Academy in the absence of this

14   unconstitutional barrier.

15            THE COURT:  That's clearly something that can be

16   raised down the road in discovery in this matter, correct?

17            MR. GARDNER:  What my position --

18            THE COURT:  We're just dealing with standing in the

19   context of this hearing and a motion for preliminary

20   injunction.

21            MR. GARDNER:  Correct.

22            THE COURT:  In terms of the proffer of the anonymous

23   persons, the two plaintiffs, A and B I think is how they're --

24   I think they are called A and B, are they not, Mr. Norris?

25            MR. NORRIS:  That's right.

1            THE COURT:  A and B.

2            MR. GARDNER:  They are.

3            THE COURT:  And it doesn't mean in perpetuity and it

4     doesn't mean that you can't -- ultimately during discovery if

5     it turns out that one of them may have a severe disability of

6     some sort and couldn't pass a physical examination for the

7     Academy, then that's a separate matter.  But for purposes of

8     this hearing in terms of questioning the standing, I think that

9     the case law seems to be pretty strong that the use of

10    pseudonyms is very common in these kinds of cases.

11            MR. GARDNER:  And the specific argument I'm advancing

12    now, Your Honor, has nothing to do with whether or not the

13    plaintiffs are anonymous.  It has to do with the fact that by

14    alleging only that they are ready and able to apply without

15    separately showing that they are even within the pool of

16    applicants who could be considered because they've not met the

17    special requirements for the Naval Academy, which are things

18    like a nomination.

19        I know plaintiff's counsel just explained, well, they got

20    a nomination last time so it stands to reason they may get one

21    in the future.  That's speculative, Your Honor.  And the fact

22    is that given that they need a nomination by the end of

23    January, generally speaking, to even be considered, putting

24    aside this alleged barrier, that in and of itself is an

25    insufficient injury.  They cannot show that any injury could be

Preliminary Injunction Hearing 12/14/23

1    remedied by this Court because there's a separate --

2              THE COURT:   We should explore that because it seems

3    to me that we're clearly not going to have this case get

4    resolved by the end of January, but maybe we're going to get it

5    resolved by the end of the following January, correct?

6              MR. GARDNER:   That would be my hope, Your Honor.

7              THE COURT:   So correct me if I'm wrong, but the bar

8    is that one cannot be over the age of 23 and apply for

9    admission.

10             MR. GARDNER:   That's correct.

11             THE COURT:   And they have proffered that they are

12   clearly below the ages of 23, so the issue of standing isn't

13   determined just as to January of 2024.  It would certainly

14   appear that that's not correct, that they can reapply next year

15   or seek to apply depending on how the litigation goes, and it

16   may be January of 2025 that's determinative of that.

17             MR. GARDNER:   And Your Honor, that goes to our

18   argument -- I don't want to step on my arguments about

19   irreparable harm, but that's one of our primary points, is

20   there's nothing that stops them from actually reapplying in the

21   future, and if they could meet these statutory requirements

22   that get them in the pool of people that can even be

23   considered, then certainly that would go a long way to

24   establishing standing.

25        The point is that there's nothing this Court can do to

1    address their injury because even if the Court said the Naval
2    Academy can't consider race, if they can't show that they would
3    even be subject to consideration because they don't have things
4    like, again, a nomination, that they've passed the medical and
5    physical exams, then this becomes a real advisory opinion.
6    That's the primary point and that has nothing to do with
7    whether they're anonymous.
8             THE COURT:   I'm not going to rule from the bench on
9    any of these yet, but I'll just tell you I think your -- pardon
10   the pun -- you're in shallow water here with respect to this
11   because on that theory, on that theory, with respect to having
12   had a congressional nomination and the process -- as a matter
13   of fact, Congressman Ruppersberger is a friend of mine and he's
14   interviewing people this Saturday, December the 16th, with
15   respect to nominations down the road for the class of 2025, not
16   for January, for a year from now.
17            MR. GARDNER:   Yeah.
18            THE COURT:   So on that theory, in terms of if one
19   doesn't have a nomination in his or her pocket they don't move
20   forward, I don't know how anyone could ever move forward,
21   Mr. Gardner.   How would they ever move forward?
22            MR. GARDNER:   I think it -- I can give you a very
23   concrete example.
24        At the end of January, a plaintiff who has a nomination in
25   hand and could show that they're otherwise able to compete in

1     the pool because they have the -- you know, the physical

2     evaluation done and the medical evaluation done could then say,

3     look, I am now subject to these barriers and now I would have

4     standing and that's --

5              THE COURT:  I don't want to get too deep into this

6     but I think really in terms of standing, I think to accept that

7     argument really would place the bar on standing in this kind of

8     case almost -- it would be almost unachievable.  It's

9     unachievable in terms of trying to be interviewed by a member

10    of Congress and get a congressional nomination if you're not

11    going to get a superintendant's nomination, for example, from

12    the Naval Academy.  And the papers have clearly shown, you've

13    acknowledged in your papers that that many times goes to

14    outstanding athletes.

15             MR. GARDNER:  Correct.

16             THE COURT:  We'll get there in a little bit.  Just

17    for members of the public, I think in the two years that you

18    referred to, the class of 2026 at the Naval Academy currently

19    and the class of 2027, which would be the junior and

20    sophomore -- it used to be called the yearling classes -- as

21    well as the junior year, 11 out of 14 superintendents'

22    nominations were for outstanding athletes and another year 8

23    out of 11 were outstanding athletes.

24         I mean, my point is is that the notion that standing is to

25    be dependent upon all the other steps before you get there,

1    I'll just tell you early in the game on this, Mr. Gardner, I am

2    definitely not inclined to go down that path because I think

3    that just sets the bar way, way too high.  And we'll deal with

4    this probably on another day and you can probably try to brief

5    this on a Motion to Dismiss or something, but I just don't

6    think that's an accurate summary of standing law.  It can't be

7    in the context of this.  If you note that someone has to have a

8    congressional nomination in his or her pocket or they don't

9    indicate and move forward on a case like this, I just don't

10   think it bears fruit, quite frankly.

11            MR. GARDNER:  I understand your position, Your Honor.

12            THE COURT:  Thank you very much, Mr. Gardner.

13       So with that, we'll let that sit, but I will tell you it's

14   pretty clear to me that the standing issue here, as far as I'm

15   concerned, in light of the complaint that's been filed and the

16   reference to Member A and Member B, that standing is satisfied,

17   but I'll follow up with an opinion on this pretty quickly.

18       I always make my law clerks nervous when I say "I" and

19   they look over at me meaning "they" will draft an opinion

20   pretty quickly.  But we'll get on it.  I promise you we'll get

21   an opinion out within a week of today's hearing on some of

22   these matters, but I don't have any difficulty with the matter

23   of the SFFA's organizational standing here.

24       So let's, if we can -- now, I would note that we really

25   didn't get into the matter of judicial deference to judgment of

1    military authorities, but I don't think I really need to get

2    into that at this stage.  So with respect to the standing

3    issue, I've indicated I'll rule as I've indicated that there is

4    standing here.

5          Essentially, the standard for a preliminary injunction, so

6    the record is clear, is that the purpose of a preliminary

7    injunction is merely to preserve the relative positions of the

8    parties until a trial on the merits can be held.  This is a

9    declaratory judgment action.  It's a nonjury trial that would

10   be scheduled, as it was a nonjury bench trial in the District

11   of Massachusetts as well as -- was it the Middle District of

12   North Carolina in UNC?  I think it was the Middle District of

13   North Carolina at the University of North Carolina.

14         And it is an extraordinary remedy.  And it has to be

15   emphasized for the members of the public and those of interest

16   here, we're not deciding this case today.  We're dealing with

17   the question of a preliminary injunction being granted.  But

18   this is an extraordinary remedy that involves the exercise of

19   very far-reaching power to be granted only sparingly and in

20   limited circumstances, as the Fourth Circuit has consistently

21   held here.

22         And the criteria that have to be satisfied to issue -- for

23   this Court to issue a preliminary injunction must essentially

24   follow the test set forth by the United States Supreme Court in

25   Winter versus Natural Resources Defense Council in 2008, and

Preliminary Injunction Hearing 12/14/23

1      that is that there are four criteria that have to be satisfied:

2      one, as I've already mentioned, the moving party is likely to

3      succeed on the merits; two, that the party is likely to suffer

4      irreparable harm; three, that the balance of equities favors

5      the moving party; and, four, that an injunction is in the

6      public interest.

7           And this Court cannot issue a preliminary injunction

8      absent a clear showing that all four requirements are

9      satisfied, as the Fourth Circuit summarized in a case of two

10     years ago, Leaders of a Beautiful Struggle versus Baltimore

11     Police Department.  That was, in fact, reversed on other

12     grounds based upon a ruling that I made, but it was not

13     reversed on that basic standard.

14          So we've addressed an initial issue as to standing here,

15     but the next of the three I want to address immediately before

16     we get to the matter of the likelihood to succeed on the merits

17     is the matter of irreparable harm.

18          And with that, I think I'll be glad to hear from you

19     first, Mr. Norris, because essentially in terms of the elements

20     that you must satisfy for there to be a preliminary injunction

21     in this matter, we'll first address irreparable harm.  And I'll

22     give Mr. Gardner an opportunity, or whoever else is going to

23     argue to respond, and then we'll proceed accordingly as to the

24     balance of the equities as well as public interest after we

25     have argument presented on each one.

Preliminary Injunction Hearing 12/14/23

1       So with that, I'll be glad to hear from you on irreparable

2   harm, Mr. Norris.

3       MR. NORRIS:  Yes, Your Honor.  And we fully

4   appreciate that preliminary injunctions are extraordinary

5   remedies, and we think this is an extraordinary case.

6       After Harvard, the Naval Academy is not just likely to

7   lose this case at the end, it is extremely likely to lose,

8   which means what's at stake is whether the Naval Academy is

9   going to be able to racially discriminate against one, maybe

10  two, maybe three cycles of young Americans based on their skin

11  color until the end of this case, or will it have to comply

12  with the constitutional command of racial neutrality while this

13  case is pending, which merely requires it to pause what it says

14  is its limited consideration of race.  And we're prepared to

15  talk mostly, Your Honor, today about the merits because --

16      THE COURT:  Well, I guess just so we're clear, the

17  Supreme Court -- and I think it's careful for purposes of

18  public consumption, it can't be emphasized too much,

19  Mr. Norris.

20      Again, I'm making sure, members of the public who are

21  listening in on this, the Supreme Court was very specific.

22  There wasn't any ambiguity on the Supreme Court on this.  The

23  Supreme Court specifically held that the military academies

24  were excluded from its decision and the exact language of Chief

25  Justice Roberts' opinion was because the "potentially distinct

1    interests that military academies may present."

2         So the issue really comes down to whether or not there are

3    distinct interests that may be presented.  It isn't a question

4    of whether any of those will satisfy.  That's not what the

5    Supreme Court said.  The Supreme Court said whether potentially

6    distinct interests may be presented, and I think that's a more

7    accurate summary of the status here in terms of the Harvard

8    decision.

9              MR. NORRIS:  I don't want to push back too much, Your

10   Honor, because we think they clearly don't satisfy that.

11             THE COURT:  Sure.

12             MR. NORRIS:  But the Court also said --

13             THE COURT:  Well, I'm not arguing with you.  I'm

14   quoting the Chief Justice.  To the extent that you're not

15   summarizing it in my eyes correctly, it's important for the

16   public to understand this judge does not agree with your

17   summary that you just made.

18        The Supreme Court was very specific as to what it said,

19   and that is what was said.  It doesn't mean that you don't

20   prevail someday.  You may or may not.  But the question is the

21   matter of whether or not there are distinct interests that may

22   be presented is what is before the Court, and that's ultimately

23   how it will have to be determined here.

24             MR. NORRIS:  And I believe that's how we teed it up

25   in our reply brief as well, Your Honor.  I just want to add

1    because I think it's important.

2                THE COURT:  Sure.

3                MR. NORRIS:  The Court also said no Academy is a

4    party to this case, which I think what the Court was getting at

5    is we don't actually know how they use race or not in

6    admissions.  Nobody knew really until they filed their

7    opposition with 650 pages of exhibits in this case.  It was a

8    black box.  We knew that they did it in some capacity, but we

9    didn't know how they did it and we didn't know whether they

10   would continue after reading Harvard, which makes it very

11   difficult for anyone to use race in admissions.

12       But the merits really are key even though there are four

13   factors for a preliminary injunction because this is a

14   constitutional case, much like Leaders of a Beautiful Struggle,

15   where once you conclude that they are likely violating the

16   Fifth Amendment, the other factors really fall.  So of course

17   violating someone's constitutional rights is the irreparable

18   injury.  Constitutional rights are difficult to quantify and

19   cannot easily be repaired with damages.

20       Nothing, nothing about our injuries can be remedied with

21   damages in this case because the Government has sovereign

22   immunity.  You can't get damages against it.  That's the key

23   test for irreparable harm.

24       Our students will also lose the opportunity to compete for

25   a spot in the Naval Academy this year if you do not grant a

1    preliminary injunction, which the Courts have said is also an

2    irreparable form of injury that's hard to quantify.  I could go

3    on, but if there's any injury, any constitutional injury that's

4    irreparable, it's got to be racial discrimination which comes,

5    the Supreme Court said, with -- it demeans people.  It doesn't

6    treat them as equals.  It carries extra baggage besides just

7    having your constitutional rights violated, which that by

8    itself is enough.

9        Now, that's the irreparable harm.  The other factors also

10   just really follow from there.  The public interest is with

11   enforcing the Constitution correctly.  Several Courts have said

12   that, including in the Leaders case.  And the balance of the

13   harms in the public interest really merge when the Government's

14   on the other side.  And the public interest, the balance of

15   harms, the Government is not harmed by not being able to

16   enforce a policy that is likely unconstitutional anyway.

17   That's impossible for them to suffer harm.

18       And I just want to talk about the harm they've identified.

19   Now, they've said that, look, we are in the middle of the

20   admissions process.  I think that's quite overstated.  The

21   admissions process, the general admissions process does not

22   start until February 1st.  You don't even have to turn in your

23   application until January 31st.  Most admissions decisions are

24   made from February to April.  That's in their declarations.

25       Now, they have an early admissions process, sort of.

1    They're not really allowed to do these early admissions so they

2    have these Letters of Assurance that they send out.  The Latta

3    declaration at, let's see, at Paragraph 64 says as of the date

4    of that declaration 15 people have accepted offers of admission

5    to the Naval Academy this year.  15 people.  That's not very

6    disruptive.  That's not very much.  That's movement that's

7    happened so far in the admissions process.

8         And injunctions are prospective by their very nature.

9    We've said in our brief and we say again today the Naval

10   Academy -- and the Court can make this clear, the Naval Academy

11   does not need to rescind any offer that's been made prior to a

12   preliminary injunction.  We're talking about the big chunk of

13   people in the general admissions process that's coming up.

14   That's where our members would compete.  That's where the vast

15   majority of decisions were made.  The preliminary injunction

16   would stop them from considering race as a factor, which they

17   say is just a limited part of their admissions process for that

18   group of people.

19        Now, that's some disruption, but that disruption is vastly

20   outweighed by illegal racial discrimination, the violation of

21   constitutional rights.  And Footnote 9 of the Harvard opinion

22   says that universities really have assumed that risk in some

23   respects because they have continued to use race even though

24   Grutter says that you have to have an expiration date on your

25   use of race and even though strict scrutiny by its very nature

Preliminary Injunction Hearing 12/14/23

1    means you have to constantly be re-evaluating whether you're
2    allowed to use race.  So this is an unstable practice as it is.
3    They don't have much ability to rely on its continuing
4    validity.
5         THE COURT:  Again, your viewpoint, I think as you've
6    said, is that this very much depends upon the analysis in terms
7    of likelihood to succeed on the merits --
8         MR. NORRIS:  Absolutely.
9         THE COURT:  -- for the constitutional violation.
10   You're correct that loss of any constitutional freedom,
11   regardless of the time period, will then constitute an
12   irreparable injury if there is a constitutional violation
13   that's occurred.
14        MR. NORRIS:  Correct.
15        THE COURT:  Well, thank you very much, Mr. Norris.
16        MR. NORRIS:  Thank you.
17        THE COURT:  On that, Mr. Gardner, I'll be glad to
18   hear from you.
19        MR. GARDNER:  Thank you, Your Honor.  I didn't hear
20   my colleague speak at all about the justification for the delay
21   in seeking preliminary injunctive relief, and that's
22   significant here because plaintiff's suggestion that delay has
23   no relevance where constitutional rights are asserted has been
24   squarely rejected by both the Supreme Court and Your Honor.
25        In the Supreme Court's case Benisik versus Lamone from

1    2018, the Supreme Court found that in a constitutional

2    gerrymandering case the plaintiff's unnecessary yearlong delay

3    in asking for preliminary injunctive relief weighed against

4    their request.  And in your very recent decision, Roswell v.

5    Baltimore, Your Honor concluded that a more than yearlong delay

6    in seeking a preliminary injunction in a First Amendment speech

7    challenge undermined the claim of irreparable harm.

8    Accordingly, the issue --

9             THE COURT:  On that case, it was a gentleman with

10   signs on the street corner.  He'd been doing it for years and

11   waited a couple years before he filed the lawsuit.

12            MR. GARDNER:  Correct.  And here you've had a policy

13   that has been in place for decades that plaintiffs could have

14   challenged at any time since the existence of organization.

15            THE COURT:  Just in fairness to them, Mr. Gardner,

16   clearly the Harvard -- what I'll call the Harvard case was a

17   transformative case that then opened up other avenues to the

18   plaintiff.  I think that's pretty clear.  I'm not so sure

19   that -- given the fact that Chief Justice Roberts' opinion in

20   Footnote 4 sort of dodges the military academies issue, it

21   remains to be seen for another day to what extent private

22   universities are on the same footing with military academies

23   when it comes to these issues, is the point.

24            MR. GARDNER:  Sure, Your Honor, but the fact that --

25            THE COURT:  As you've noted in your papers.

Preliminary Injunction Hearing 12/14/23

1          MR. GARDNER:  Yes.

2          THE COURT:  Okay.  So I'm not sure you can go with

3    the matter of delay when it comes to this.  You've actually

4    moved pretty quickly, it seems to me.  Chief Justice Roberts'

5    opinion was June 29th and they filed a lawsuit here in this

6    court October the 6th, and that includes summertime, so that's

7    a pretty quick turn around, it seems to me.

8          MR. GARDNER:  Your Honor, if you measured it from the

9    Harvard decision, but I will respectfully suggest that

10   measurement from the Harvard decision is irrelevant because

11   what plaintiff's argument is is they essentially wanted for

12   strategic reasons to get the benefit of the Harvard decision to

13   then make their claims here, you know, more strong, I guess is

14   the better word.  Terrible language on my part, but you

15   understand what I'm saying.

16         That's a strategic call, Your Honor.  That's not a legal

17   call.  There is nothing that prevented plaintiffs from

18   challenging the Naval Academy's consideration of race at the

19   same time that they challenged Harvard and UNC.  And they knew

20   that UNC considered race because they responded to the

21   Solicitor General's amicus brief more than a year and a half

22   ago when they were litigating in the Harvard and UNC case.

23         So the fact that the Harvard case carved out the service

24   academies tells this Court nothing about the unjustified delay

25   in waiting years to bring this lawsuit.  And again, what we're

1    talking about now is not the merits, just irreparable harm for
2    purposes of the extraordinary remedy of a mandatory injunction.
3    And because plaintiffs cannot explain at all any nonstrategic
4    reason for that delay, that should weigh against the imposition
5    of a preliminary injunction.  They cannot show irreparable
6    harm.
7        Members A and B also claim that the alleged future lost
8    opportunities to compete on a racially equal footing
9    constitutes an irreparable injury sufficient to establish
10   irreparable harm.  But the cases the plaintiffs cite to are all
11   distinguishable because in all of the cases they cite to, the
12   opportunity would be forever foreclosed.
13       So for example, in the Foulke case they cite -- it's from
14   the Southern District of New York -- a five-year-old child had
15   an offer of acceptance that was revoked and if she did not get
16   in that year, she would be forever barred from getting in.
17       Similarly in the D.M. case from the Eighth Circuit that
18   they cite to, two high school junior boys wanted to participate
19   on the dance team and if they did not get a preliminary
20   injunction getting them in immediately, they would have lost
21   the opportunity to compete both their junior and senior year;
22   in other words, those opportunities would have been forever
23   foreclosed.
24       And in the two cases they cite from the Court of Federal
25   Claims and the Eastern District of Virginia, Serco and Georgia

1      Vocational Rehab, those cases involved bidding on a particular

2      contract and if the Court did not issue a preliminary

3      injunction, they would have been forever foreclosed from

4      bidding on that contract.

5          Here, as we discussed earlier, plaintiffs have every

6      opportunity to reapply up until the age of 23.  And although we

7      don't know their ages because, again, their bare-bones

8      declarations don't say it, I think we can assume that because

9      one of them applied last year and one of them applied this

10     year, they've got to be close to 18 or 19 years old.  So the

11     bottom line is this is not --

12             THE COURT:  Correct me if I'm wrong.  I believe that

13     there is specific reference to Member A currently attending

14     college and is a midshipman in the Naval Reserve Officers'

15     Training Corps.

16             MR. GARDNER:  That's right.

17             THE COURT:  And Member B is now a freshman in

18     college.  So both of them have clearly graduated from high

19     school.

20             MR. GARDNER:  And no dispute there.  My only point is

21     they are likely 18 or 19 years old.  They're nowhere close to

22     the 23-year age limit.

23         So again, when we're just talking about irreparable harm

24     now, not standing, the question is, have plaintiffs been

25     diligent in pursuing their rights and, I think more

1  fundamentally, if this case were to proceed to final judgment

2  without a preliminary injunction, could their harms be

3  resolved?  And the answer here is, yes, they could.

4        And so the Government's position is that this case should

5  proceed on the normal course and if a final judgment is

6  ultimately issued against the Government, they will obtain all

7  the relief that they are seeking.

8        THE COURT:  Thank you, Mr. Gardner.

9     Mr. Norris, do you want to be heard further on this?

10       MR. NORRIS:  Please, Your Honor.

11       THE COURT:  Do I have that correct?  I believe

12 through my notes here your complaint is noted, I believe, or in

13 the papers that Member A is currently attending college and he

14 or she is a midshipman in the NROTC, correct?

15       MR. NORRIS:  Correct, Your Honor.

16       THE COURT:  And the other, Member B, is now attending

17 another college and is a freshman in college, correct?

18       MR. NORRIS:  Correct.

19       THE COURT:  So they certainly would have ample time

20 to, depending upon the ruling of this Court and the validity or

21 lack thereof of any kind of racial considerations, would still

22 have time to apply to the Academy if they so chose, correct?

23       MR. NORRIS:  That's correct, Your Honor.  This case

24 won't become moot if they miss this cycle, but that doesn't

25 mean the irreparable harm would go away.

1    THE COURT:   I know.   The point is -- essentially your

2    point is is if there is a constitutional violation for even a

3    minimal period of time then there is an irreparable injury.

4    MR. NORRIS:   Absolutely.   And if I could just -- one

5    point about the length of the so-called delay.

6    THE COURT:   Sure.

7    MR. NORRIS:   Your Honor's Roswell case, the delay was

8    over a year.   The Benisik case my friend just cited, the delay

9    was over six years.   We think our delay at most was two months.

10   Harvard was a bombshell about whether the service academies

11   could continue to use race.   Grutter was the existing law, said

12   they could.   Harvard overruled the existing rationale for why

13   that legal regime could exist.

14      Then, we really were not sure whether the military

15   academies would read Harvard and then use race for the 2024

16   admissions cycle.   They told the press in August for the first

17   time that they would use race in 2024 after reviewing Harvard.

18   So then 60 days later is when we sued and sought a preliminary

19   injunction.   I know my friends can't think 60 days is

20   unreasonable because they asked you for 60 days just to

21   respond.

22   THE COURT:   60 days included August, and how would

23   you get anybody to really work?   I mean, the partners, the

24   lawyers work in August but none of the older lawyers work in

25   August.   I see people laughing here in the courtroom.   It's

1    impossible to get an older lawyer to work in August.  After a
2    certain age, it's just not going to happen.
3        (Laughter.)
4        MR. NORRIS:  Your Honor, this is not an evidentiary
5    hearing but I'll submit the bags under Mr. Anderson's eyes are
6    proof that we worked really fast and really hard.
7        THE COURT:  I noticed Mr. McCarthy and Mr. Gardner
8    were both looking down when I made that comment about how much
9    they worked in August.  We're all laughing here.
10       Well, thank you very much, Mr. Norris, on that.
11       MR. NORRIS:  Thank you.
12       THE COURT:  And I think again, the irreparable harm
13   here is all four criteria have to be satisfied here, and on
14   irreparable harm it really is very much dependent upon whether
15   or not there is a likelihood of success on the merits with
16   respect to the constitutional claim.
17       The record does reflect that Member A and Member B, who
18   are specifically referenced in this matter, one is at NROTC at
19   another college and the other is a freshman in college, so
20   there's plenty of time depending how this case plays out, and
21   that's why probably my strong view that this case isn't going
22   to take five years to resolve probably should be of good use to
23   them in some way.
24       And I think that the same analysis applies with respect to
25   the balance of the equities here, that balancing the harm to

1    the plaintiff if the injunction is erroneously denied versus
2    harm to the defendant if the injunction is erroneously granted.
3    And I think that that's some of the Planned Parenthood
4    litigation of recent years and certainly again the balance of
5    the hardships would weigh in favor of the defendant.  But once
6    again, it depends upon whether or not there's a constitutional
7    violation, as Mr. Norris has aptly noted.  So it also is
8    dependent upon the analysis as to the likelihood to succeed on
9    the merits.
10        And public interest, I would just note, the defendants
11   have argued that public interest is of paramount import in
12   matters of national security, and essentially the defendants
13   are arguing national security.  The plaintiff is asserting
14   constitutional violation.  I don't know that any decision
15   exactly has an immediate effect upon national security.  But
16   obviously, as we'll be discussing in a few minutes, the matter
17   of commissioning of officers in the military and the
18   considerations that go into that certainly have national
19   security implications in terms of the diversity of the Officer
20   Corps and what have you in the military.
21        So again, I will be dealing with this and ruling as a
22   matter of record here before we finish today but will be
23   following up with an opinion.
24        So with that, I think that we are ready to wade into the
25   main issue here that clearly has dominated the briefing by both

1    the plaintiff and the defendant, by the Government -- I say the

2    Government, the Academy -- and that is the likelihood of

3    success, likelihood to succeed on the merits.  Specifically,

4    the standard is whether or not the movant is likely to succeed

5    on the merits and likelihood of success on the merits of the

6    case with respect to the constitutional challenge here in light

7    of the Harvard case.

8         So with that, with the plaintiff bearing the burden of

9    seeking this extraordinary remedy, Mr. Norris, I'll be glad to

10   hear from you, and your point is to clear a likelihood of

11   success on the merits, and then I'll hear from Mr. Gardner.

12        As to this, I would just certainly note that with respect

13   to the factors to be applied here, everyone agrees that with

14   respect to the standard to be applied here, there's no question

15   that it's a matter of strict scrutiny.  That's the standard.

16        You agree with that, correct, Mr. Gardner?

17             MR. GARDNER:  Absolutely, Your Honor.

18             THE COURT:  No question about that.  It's strict

19   scrutiny.  It's not just intermediate scrutiny; it's strict

20   scrutiny in light of the allegations here.

21        And, Mr. Norris, I'll be glad to hear from you.

22             MR. NORRIS:  Yes, Your Honor.  I count five ways that

23   the Harvard opinion says that race-based admissions are

24   unlawful.  We think Navy has all five problems.  I'll just take

25   them in any order Your Honor would like to go in.  I've got my

1      own order I think from easiest to hardest.

2           THE COURT:  As to that, you go with whatever order

3      you want.

4           MR. NORRIS:  Thank you, Your Honor.

5           First, Navy uses race as a negative.  Harvard says

6      universities necessarily use race as a negative if they use it

7      to benefit some applicants in a zero-sum process.  Navy

8      concedes it uses race as a benefit.  It concedes its process is

9      zero sum.  Only about 10 percent of people who apply actually

10     get into Navy, and it concedes that if it switched to

11     race-neutral alternatives, more white students would get in

12     than would get in now, which Harvard says by definition means

13     their race is being held against them as a negative.

14          That's a very clear violation of Harvard.  I don't think

15     they have an answer except to say, well, we have a footnote

16     that says the opinion doesn't decide one way or the other about

17     the military academies.  That's very true, but the Supreme

18     Court did not say that they would get a pass on narrow

19     tailoring, which is what this requirement goes to.

20          I think the second violation is that Navy concedes it uses

21     the same racial categories that UNC and Harvard were using to

22     sort students.  Those categories come from the federal

23     government itself.  Civilian universities have to use them

24     under a system called IPEDS where they have to report their

25     data to the feds.  They use it because the census uses it and

1    because they are the federal government.

2         But Harvard calls those categories arbitrary, incoherent,

3    irrational, and both over- and under-inclusive.  They are not

4    tailored to any goal and they certainly were never designed to

5    achieve military objectives.  That was not why they were used.

6    They were used by the Government as sort of broad catchalls to

7    loosely categorize people for purposes of the census, not for

8    military readiness, cohesion, or any other purpose.  The

9    Supreme Court said the very use of those categories makes it

10   impossible for us to decide -- to measure whether you are

11   satisfying your goals and is a big disconnect between your

12   stated interests and your means of achieving them.

13        And I think the Navy's actually even worse than Harvard on

14   this.  Throughout their brief they don't just use those

15   categories.  They categorize people into two groups:  minority

16   and nonminority.  If you look at their brief, part of their

17   process has school officials check a box yes/no, are you a

18   minority or not.  Not what race are you but, yes or no, are you

19   a racial minority?

20        And then they group everyone together in terms of the

21   numbers that they use to see whether they are meeting their

22   metrics, and they even use the term "nondiverse" to refer to

23   certain people.  Certain people are nondiverse in their eyes.

24   That term appears throughout their brief.  Just kind of a wild

25   thing to say about individual human beings.  But they really

1    bifurcate people into two groups, which that kind of crude
2    sorting is not tailored to any goal.  But even if you just
3    stuck them with the categories, the categories the Supreme
4    Court has already rejected.
5        Third, Navy does not have either a logical end point or a
6    sunset date on its use of race.  It concedes it has no sunset
7    date.  It says it engages instead in periodic review of its use
8    of race, which Harvard says is not sufficient to satisfy the
9    Constitution, and it does not say that it plans to stop using
10   race anytime soon, which Harvard says violates narrow
11   tailoring.
12       Even if they had a sunset date, they had no logical end
13   point for the same reasons that Harvard and UNC didn't.  Their
14   interest is tied to balancing the racial makeup of the Officer
15   Corps against the racial makeup of the general population and
16   perhaps also the Enlisted Corps.  It is tied to an ever-moving
17   target, which means it will constantly have to readjust and
18   apply race to get the numbers right.  Harvard says that's
19   exactly why those universities failed narrow tailoring.  The
20   same analysis applies here.
21       Fourth, Navy gives benefits based on race, what Harvard
22   called "race qua race."  You get a benefit because of your race
23   and for no other particularized, individualized reason.
24   Harvard says that's illegal racial stereotyping.  It at a
25   minimum assumes that there's something that makes racial

1  minorities, because of their race, "different from

2  nonminorities."  That's what Harvard says is the first illegal

3  racial stereotype.

4         They also engage in the exact same racial stereotype that

5  Harvard and UNC did.  They assume that if you increase racial

6  diversity by using race you will increase overall diversity,

7  which is diversity of thought, experience, identity, viewpoint,

8  all of those things.  That actually relies on a hidden

9  stereotype that because of someone's race that they will come

10  with a specific view or identity or background and you can

11  reliably predict that based on race alone.  Harvard says that's

12  an illegal stereotype.

13         But the Naval Academy really invents a couple of new

14  stereotypes that aren't even addressed in Harvard:  They assume

15  that racial minorities, because of their race, care about the

16  precise racial mix of the Officer Corps coming out of the Naval

17  Academy; they assume that minorities are more likely to follow,

18  trust, or respect officers of the same race rather than instead

19  of on their leadership abilities; they assume that people of

20  one race are more likely -- racial minorities are more likely

21  to prefer mentors of the same race, which is why they're more

22  likely to stay in the Navy longer; they assume that minorities

23  look at the racial makeup of the Naval Academy and then decide

24  whether to join the military instead of based on other concerns

25  like duty or wanting to serve their country.

1         And again, this is they are making assumptions about a

2    group writ large, treating people as members of a racial group

3    instead of looking at them as individuals.  They do not make

4    those assumptions about White applicants which Harvard calls

5    illegal racial stereotyping.

6         And lastly, which I think Your Honor got to at the

7    beginning of our last discussion, Navy's interests are not --

8    cannot be meaningfully subjected to judicial review, the

9    measurability point that the Court made in Harvard.  I don't

10   even think courts can measure the ends that Navy is seeking.  I

11   don't know how a court is able to tell whether the military is

12   sufficiently lethal, sufficiently cohesive, sufficiently

13   attractive to racial minorities and others, or sufficiently

14   legitimate in the eyes of the public or the international

15   community.  That's not law.  That's not things that courts are

16   able to assess reliably.  But even if you could assess those

17   ends, the question is whether you can assess the means and

18   whether the means achieve those ends.

19        So the test under Harvard the Navy has to satisfy is that

20   their use of race in admissions is necessary to achieving those

21   ends, which means it's really a question of the delta.  What do

22   our racial numbers look like if we stop using race and crank up

23   race-neutral alternatives versus what do our racial numbers

24   look like if we use racial preferences, and is the delta

25   between those two things going to stop us from achieving our

1    compelling interests.

2         Now, I don't know how a court could ever determine that.

3    I don't even think they have an expert or anyone who even tries

4    to determine that.  Harvard says that's even more impossible

5    than the original task of measuring their ends.  And really the

6    proof positive that you can't do that as a court is that Navy

7    doesn't even try to answer that question.  They don't even tell

8    you what their racial numbers would be if they turned off

9    racial preferences and cranked up race-neutral alternatives.

10         Now, we have a pretty good idea of what they could achieve

11   because the Coast Guard was banned by Congress for quite awhile

12   from using race in its admissions process.  During that time

13   the Coast Guard made a concerted effort to ramp up its

14   race-neutral alternatives, and it got almost to parity with

15   West Point in terms of the racial minorities who attended

16   there.  They don't explain why they can't do the same thing.

17   They don't even give you the numbers that you would need to

18   make that determination.  Even if they had those numbers, they

19   don't have a study or an expert who even studies the use of

20   race in admissions, the core question in the case.

21         They have some experts who discussed the concept of

22   overall diversity, diversity of thought, viewpoint, et cetera,

23   and they have some experts that talk about the presence of

24   racism in the military and racist views and exclusions.  But of

25   course Navy will still be a very diverse place without racial

1    preferences, just like the University of California, the
2    University of Florida, all sorts of places where the use of
3    race in admissions is banned.  They are still incredibly
4    diverse places.  The question is whether the difference between
5    that system and this system is going to prevent it from
6    achieving its interest.  Nobody tries to measure that.  No one
7    even tries to tell you what the minimum level of racial
8    diversity in the Officer Corps coming out of the Naval Academy
9    needs to be.  They don't even give you a number.
10        And their experts don't consider race-based admissions,
11   which is important because the Supreme Court in cases like
12   Adarand and Croson says that it's not just about diversity.
13   Diversity doesn't just materialize and now you have a diverse
14   system.  It's about how you got diversity.  And if we're using
15   explicit racial preferences, that has counteracting costs.
16   Racial preferences cause stigma, they cause resentment among
17   the people who don't get them, they reenforce the notion that
18   race is relevant and is a basis that you should treat people
19   differently upon.  They have costs that counteract their goals
20   that they say that they are pursuing.
21        Now, they also give you some metrics, some alternative
22   metrics they say you could use to measure whether they are
23   achieving their goals.  Some of them are downright
24   indefensible, like the presence of race riots in the Navy.  If
25   there's no race riots then they must be narrowly tailored to

Preliminary Injunction Hearing 12/14/23

1    achieving their interests.  That doesn't make any sense.  The
2    presence of race riots or not doesn't even try to measure the
3    delta that I've been talking about, and no serious person
4    thinks that the Navy is not having race riots because the Naval
5    Academy uses race in some parts of its admissions process.
6    It's just silly to even say out loud.  And, you know, of course
7    the Coast Guard was not having race riots either when it was
8    strictly race-neutral up until 2010.
9            THE COURT:  Are you suggesting, Mr. Norris, that
10   there has not been issues of race in the military?
11           MR. NORRIS:  Not suggesting that at all, Your Honor.
12   I'm suggesting that they can't say that race-based admissions
13   at the Naval Academy is either solving those problems, that
14   they would be worse without that process, or they'd be better
15   because of it.
16           THE COURT:  Nor can you at that point say they do.
17           MR. NORRIS:  Well, I have the burden to --
18           THE COURT:  You talking about assumptions on one side
19   and then, with all due respect to you, Mr. Norris, you have the
20   same assumptions on the other.  I mean, you just can't stand up
21   here and avoid and say, well, that's really not happening.  I
22   mean, how could anybody possibly say that?  Anybody my age
23   knows of all the racial tensions during the Vietnamese War was
24   an absolute given.  There's no one who would seriously contest
25   that.

Preliminary Injunction Hearing 12/14/23

1      MR. NORRIS:  Absolutely.

2      THE COURT:  Just let me finish.  No one would
3  seriously contest that.  So I've heard what you have to say,
4  but you're rambling on with your assumptions and talking that
5  they haven't proved their assumptions.  You're the plaintiff.
6  You have a burden.  And the burden is here to get an
7  extraordinary remedy to ask me to issue an injunction.

8      And so the burden is upon you.  It is a heavy burden.  So
9  I think you need to tread softly when you talk about the
10  assumptions they're making because you are now off at the end
11  of the diving board making your own assumptions.  And to the
12  extent that you suggest for a minute that there's not been any
13  racial tension in the military, I'm afraid, sir, based on my
14  own personal experience that is just totally baseless.  We'll
15  deal with that down the road.  But to even suggest that is -- I
16  don't want to say it's absurd, but it is a stretch to suggest
17  there hasn't been racial tension.  Of course there's been
18  racial tension.

19      MR. NORRIS:  I did not mean to suggest that, Your
20  Honor.  I meant to say if there is or isn't, they have to tie
21  it to their use of race-based admissions as the solution.

22      THE COURT:  I'm trying to help you with this.  For
23  you to say Harvard fits perfectly into it, people at Harvard
24  and UNC are not necessarily leading people into combat.  Do you
25  understand?

Preliminary Injunction Hearing 12/14/23

1          MR. NORRIS:  Yes, Your Honor.

2          THE COURT:  They're not leading people into death

3     situations.  And so to that -- and it's a very serious issue

4     that I'll have to deal with, but to just say you just fit like

5     a cookie cutter Harvard in here and here it is, I waited -- I

6     made a note.  My note here says, "How long will he take before

7     he talks about race situations?"  And I noted you were about to

8     go right past it.  And, quite frankly, that's why we're having

9     this hearing because I'm not going to let you go right past it.

10    That's a very crucial fact.

11         I've looked at the complaint filed in this case, and I

12    would note that Page 11 of the complaint, it's specifically

13    noted in your complaint that you filed that "racial parity

14    based on general population is not enough" and that it must

15    reflect the diversity of the enlisted ranks.  That's

16    essentially the thrust of it.

17         And your point is well taken with respect to Chief Justice

18    Roberts' opinion in the Harvard case, where is the logical end

19    point?  Because your point is well taken.  How is there ever a

20    logical end point because these matters are in variance.  It's

21    something that's very much before the Court because it's a

22    given there has been a challenge to the all-volunteer force.

23    You concur with that?

24         MR. NORRIS:  Yes, Your Honor.

25         THE COURT:  All right.  And you've said so in your

1    complaint.  There are difficulties with respect to the

2    all-volunteer force, and essentially there's some reference in

3    your complaint, your complaint on Page 16 to the Navy facing a

4    crisis with an all-volunteer force, correct?  That's what

5    you've alleged in your complaint?

6              MR. NORRIS:  Yes, Your Honor.

7              THE COURT:  All right.  So that's my point is that

8    these problems have been exasperated, and in terms of the

9    merits of this case, it is fundamental of which before the

10   Court is to try to deal with this in terms of how the Naval

11   Academy is seeking to deal with it and whether or not it

12   warrants support or whether or not it survives strict scrutiny.

13   And whether or not it survives strict scrutiny, as you've aptly

14   noted in your papers, is going to depend upon the results of

15   these.

16        But to say that we just stick in Harvard and it's

17   speculative as to racial tension, I'm just afraid that the

18   history of the American Military, and certainly since the

19   Vietnam War, is not the case.  That doesn't mean that the

20   Government walks free of this because the Government might have

21   to explain according to its own papers why in terms of the

22   officers of flag rank overwhelmingly come from the Naval

23   Academy and officers in terms of the Chief of Naval Operations,

24   something like 91 percent of all of them come from the Naval

25   Academy.  They don't come from the enlisted ranks, climbing the

1   ranks.  They don't come from the ROTC programs.

2        All of those are valid facts that the plaintiff is free to

3   explore, but I think that to just say that you just fit in

4   Harvard and that there's not been any issue or the Government

5   is suggesting and speculating that there hasn't been an issue

6   recently, that doesn't really solve the problem.  To suggest

7   that because there haven't been any race riots that really the

8   problems are exaggerated, the problems are never exaggerated in

9   the extent of individuals who are leading people into combat

10  situations where they may die.

11       And so that's the focus you have here and the

12  extraordinary relief to summarily say we just fit Harvard in

13  and the distinct possibilities that are unique to the military

14  academies is something you must address.  And I do think your

15  point is well taken with respect to where does it end.  That's

16  a very good point.  But we're going to have to figure out where

17  it ends vis-à-vis the military because it does seem like it's a

18  shifting sand constantly.  But I don't think you can just blow

19  past a matter of racial tension in the military.

20            MR. NORRIS:  No, Your Honor.  I misspoke.  I was

21  trying to characterize their argument, not say that these are

22  not real problems.  I was trying to say that they don't have

23  the solution, and the solution is not race-based admissions.

24  At least a court could not measure whether race-based

25  admissions are the solution.  I think that was the Chief

Preliminary Injunction Hearing 12/14/23

1    Justice's point.

2              THE COURT:  Well, I guess we'll get down there.  I

3    don't know that that's correct, Mr. Norris.  I don't know that

4    Chief Justice Roberts' language in Footnote 4 means that a

5    court can't assess it.  It means a court does its best to

6    assess it, and that's really going to be the task here in this

7    litigation.

8         To the extent that you have consideration of race with

9    respect to Naval Academy midshipmen, how does that translate up

10   the line?  Somewhere along the way there is reference to the --

11   I saw in the papers here the matter of the -- essentially going

12   up the tunnel, and I made a note.  Essentially how far up the

13   tunnel do you go, I guess is the point in terms of it's going

14   to be very interesting to see what the level of racial

15   diversity is as you go up the ranks and whether or not the

16   racial diversity of the Officer Corps, whether the racial

17   diversity of flag rank officers and the source of flag rank

18   officers, whether or not that can match the level of diversity

19   on the lower ranks.  Because there clearly is tension in that

20   regard.  And that's the point I was just trying to make sure we

21   don't just blow past that because that's a very important fact.

22             MR. NORRIS:  Absolutely.  One thing the Chief Justice

23   does say, though, is that an institution with such history of

24   racial tension and problems with race is the very last one you

25   should trust and give deference to in how they use race.  I

Case 1:23-cv-02699-RDB   Document 58   Filed 12/18/23   Page 60 of 145

1    think that's an important point not to lose.

2        But Your Honor's point about the numbers as you go up the

3    chain is important, too.  The Naval Academy says one way you

4    can figure out whether we're doing a good job is you can just

5    defer to the military, which that's not -- that doesn't make

6    their interest measurable.  That's just a refusal to measure.

7    That's not what Harvard says is the test for narrow tailoring.

8    But then they say you could look at our numbers, look at

9    whether we're achieving racial diversity in the Officer Corps,

10   in our admitted class, and up the chain.  And I would

11   respectfully submit, Your Honor, that the Naval Academy, which

12   it does have the burden under strict scrutiny even though we

13   have the burden on the PI, they have not come forward with that

14   evidence.  And so for one, that evidence is --

15            THE COURT:  Just so the public is clear, just so the

16   public is clear what you just said is absolutely accurate but

17   it means that you have the burden here to come into court this

18   afternoon and ask me to issue a preliminary injunction.  You

19   have that burden to prove likelihood of success on the merits.

20   Your point is well taken in terms of the course of discovery

21   and how this case plays out in terms of a bench trial if the

22   Government can have its policy survive strict scrutiny, but not

23   this afternoon is the point.

24            MR. NORRIS:  Right, Your Honor.  I believe the

25   technical legal question would be is have we proved that it's

1    likely that they will not be able to prove that they satisfy

2    strict scrutiny?

3              THE COURT:  Well, I think to make it easier for the

4    public if they're listening in, again, it's that you have to

5    today show likelihood of success on the merits in order to have

6    the extraordinary relief of me summarily issuing an injunction.

7         Your point is well taken in terms of the issue of strict

8    scrutiny.  And I'm throwing this out so you understand where

9    I'm coming from, and I want to make sure Mr. Gardner and the

10   lawyers in the Department of Justice understand that you have

11   to follow the chain, so to speak.

12        You know, to the extent that you have -- in terms of

13   strict scrutiny, to the extent you have the proffer of this is

14   the policy here for racial diversity in the Officer Corps to

15   equal the enlisted ranks to lessen racial tension which has

16   existed in the military and still exists in the military,

17   that's a matter that has to survive strict scrutiny and that's

18   going to be the analysis.  And it will be very interesting as

19   this case proceeds as far as I'm concerned as to what the

20   implications are when 91 percent of all of the Chiefs of Naval

21   Operations -- and this is according to the defendant's

22   memorandum, says 91 percent of all those Chiefs of Naval

23   Operations have been Naval Academy graduates.

24             MR. NORRIS:  Yeah.

25             THE COURT:  And I'll just note -- I don't mean to

Preliminary Injunction Hearing 12/14/23

1    interrupt you.  Let me finish my thought.  And that there's a
2    disproportionate number of flag officers.  For the public, that
3    means becoming an Admiral or above.  And something like 40
4    percent of all those are from the Naval Academy.  They're not
5    people who were in the enlisted ranks and were commissioned.
6    They're not from ROTC officers.  They're not from universities.
7    They are numbers that the Government itself -- I say the
8    Government, the Naval Academy has cited, and there may be some
9    implications to that down the road when you really get deep
10   into the merits of the case.  That's the point I'm just trying
11   to emphasize now for the purpose of public consumption.
12           MR. NORRIS:  Yes, absolutely.  And it's interesting
13   that the citation of numbers starts to drop out as they go up
14   the chain in their brief.  So I would submit that they have to
15   prove that their use of race in admissions at the Naval Academy
16   is necessary at a minimum to achieve racial diversity in the
17   Navy.
18           So that's difficult because if you look at their numbers
19   of admissions, they say that Black Americans are 14 percent of
20   the population and yet are 6 percent of admissions to the Naval
21   Academy.  They're not even hitting 50 percent of what they say
22   their goal is.
23           Then as you go up to the chain of officers in the Navy,
24   the Naval Academy accounts for only about 1 in 5 officers in
25   the Navy and 1 in 6 officers in the Marines.  If they were 100

1    percent racial minorities they still would not make a

2    meaningful difference to the overall racial makeup of the

3    Officer Corps.

4         Then here's where the numbers drop out.  How do they

5    contribute, then, to the racial diversity of the high-ranking

6    officers?  We don't have any numbers about what their diversity

7    is because their experts even let on that those numbers are not

8    diverse whatsoever.  And one reason our expert -- who is a

9    three-star General who's got experience on the Army side but

10   has looked at all of this, he says that the Army and the Navy

11   are not actually quite committed to this interest because they

12   don't racially balance the units, they don't racially balance

13   the formations, they don't racially balance the missions, and

14   they don't use race purportedly when they make promotion

15   decisions to the higher-ranking officers.  So I would submit --

16        THE COURT:   Just so we're clear, I understand what

17   your argument is, and indeed you're referring to portions of

18   the Naval Academy's brief in this case on the numbers.  And I'm

19   going to go over those numbers just to repeat in a minute

20   because your point's well taken, but what you're saying there

21   has to bear proof here in discovery in this case.

22        You know, in terms of exact -- I don't know -- as we sit

23   here, I don't know what the percentages are.  Even the

24   defendant, the Academy has noted 1 out of 5 are from the Naval

25   Academy as officers.  And the Academy has even in its papers

1    essentially has said White individuals make up approximately 59

2    percent of the population and 62.8 percent of Navy sailors and

3    56.5 percent of Marines and 75.5 percent of the Officer Corps

4    of the Navy and over 81 percent of the Marines.

5         So the Academy in its papers has bluntly acknowledged,

6    just for public consumption, the Navy has made progress in the

7    representation of Asian and Pacific Islander officers.  It has

8    not achieved similar progress for Black officers, and that's in

9    the submission of the Academy.

10        So what you're saying there is absolutely correct, but my

11   point is we have to be careful for purposes of public

12   consumption where we are now as to what are these numbers, how

13   do they translate as you go up the chain because that is

14   relevant to the Court ultimately in terms of what this means in

15   terms of strict scrutiny when you start to apply these racial

16   factors.

17        But where we are now in terms of likelihood of success on

18   the merits, we have a lot of sea to cover, a lot of land to

19   cover to try to figure out what the numbers are here is the

20   point I'm trying to make, Mr. Norris, for purpose of public

21   consumption.  And I'm not trying to interrupt you, but it's

22   important for the public to understand where we are on this

23   right now.

24             MR. NORRIS:  That is important, Your Honor,

25   especially under cases like Parents Involved which says if

Preliminary Injunction Hearing 12/14/23

1   you're using the poison of racial classifications which come
2   with real, severe harms, then you need to at least be
3   accomplishing what you say you set out to do.  And I would say
4   that the numbers that we've seen prove that the Navy is not
5   doing so and does not even actually follow through on its
6   supposed commitment after people graduate from the Naval
7   Academy, which is not how you satisfy strict scrutiny.

8         I'll just say the last thing that they say you should look
9   at to measure whether they're doing a good job is the surveys
10  they give to sailors about whether they're doing a good job.
11  In Harvard, that evidence was also before the Court.  In
12  Harvard, the surveys about the diversity climate, that was not
13  sufficient to satisfy strict scrutiny.  We don't normally poll
14  people about whether they're allowed to racially discriminate.
15  These surveys are particularly unreliable, as the GAO has said,
16  in terms of their response rate and all those things.

17        And I'll just say, it's interesting that the surveys don't
18  actually even ask the most obvious question, which is, should
19  the Naval Academy use race as a factor in admissions?  They
20  don't dare ask that question.  We know from the evidence that
21  the use of race in admissions is overwhelmingly unpopular among
22  people of all races and all partisan backgrounds.  It is more
23  likely to decrease the legitimacy of the Army and Navy than
24  increase it.

25             THE COURT:  Well, your proffer of that fact will

1    await discovery in the case, the fact that you're proffering

2    that.  And we know what your argument is and I don't know that

3    it necessarily has to be accepted by the public at this point.

4    That's what this case is about, essentially, I understand, but

5    that's your proffer as an advocate of what you believe the

6    facts are.

7                MR. NORRIS:  And I don't believe that's disputed by

8    them, at least the way the public views the use of race.

9    There's no contrary evidence.  But Your Honor started with I

10   think exactly the right point.  This is a preliminary

11   injunction.  You're being asked to predict who is likely to win

12   based on the more limited record you have now.  It's not a

13   final determination on the merits.  And I would say that we are

14   way ahead on the narrow tailoring and strict scrutiny prong.

15        And I think the last thing I'll say about the

16   measurability of their interests is if you thought they were

17   measurable -- which is a requirement from Harvard under strict

18   scrutiny is that courts have to be able to assess whether your

19   use of race is necessary.  That's a bare minimum.  But you can

20   go ahead and try to assess it.  I think we have the better of

21   the debate in terms of the evidence that exists in the record,

22   but I think when you try to assess it you're going to find that

23   this is not something that courts can reliably do.

24        So in terms of their interests and cohesion, the use of

25   racial preferences is exactly contrary to what sailors and

1   soldiers are taught in basic training about forgetting your

2   individuality and becoming part of a group.  It is more likely

3   to cause stigma and make people unfairly question the

4   qualifications of people of certain races.  That's what our

5   General says in his expert declaration.  It causes that stigma

6   that the Supreme Court predicted in cases like Adarand.  The

7   military's success, even among people inside the military, our

8   General says no one has ever said I think that that unit failed

9   because it was not sufficiently racially diverse in terms of

10  its makeup.  They fail because of bad leadership.  Bad leaders

11  make bad leaders, not being a certain race or a different race.

12         And I think it's important, there's only two flag officers

13  who've submitted declarations in this case; our declaration and

14  then they have Admiral Fuller on that side.  Admiral Fuller

15  does not sign on to the broad sort of conclusory statements

16  about diversity writ large that some of their other experts do.

17         He says in Paragraph 12 of his declaration that what

18  matters for the military is the leader's ability to "harness

19  diversity," and I think he goes on to say what he means by

20  that.  He means a leader's ability to make people from

21  different backgrounds work together and resolve conflicts and

22  achieve the unified goal and mission.  That's exactly what our

23  General says is what makes a good leader, but that's about

24  being a good leader, not having a particular skin color.  I

25  think that's pretty obvious but it's backed up by both sides, I

1    think, in this case.

2        They also have an interest in recruiting and retaining

3    racial minorities in the Navy.  The Supreme Court's decision in

4    Wygant says that that theory, the role model theory that people

5    won't join or stay unless they see people who look like them in

6    the ranks, that does not survive strict scrutiny.  That's

7    really just racial balancing in disguise.  It's not a

8    compelling interest.

9        Even if it were, they've cited evidence about the reasons

10   people give for why they joined or why they didn't join or why

11   they left the military.  Racial diversity does not even crack

12   the list.  And we have evidence.  Exhibit Q that we've

13   submitted says that people are more likely to stay in the

14   military if they think it's a pure meritocracy and more likely

15   to leave if they think that merit is not being rewarded, which

16   tends to counteract the idea that racial preferences are a good

17   idea.

18       And they really don't even have what I will call macro

19   correlation between their means and their ends.  So they are

20   using race now but recruitment in the Navy has never been

21   lower.  I think there's not even a relationship between these

22   two factors that you could observe at the macro level.  And the

23   reason it's so low is not -- you know, they can't solve it by

24   using race more, continuing to use race as a factor in

25   admissions.  It's due to things like obesity, generational

1   gaps, and willingness to serve in the military, things like
2   that.
3       And then lastly, I think I've already gotten into this a
4   little bit, they say they have an interest in making the
5   military appear legitimate to the public.  The public
6   overwhelmingly opposes the use of race by selective
7   universities, by employers, just about in every aspect of
8   society.  I don't know how that increases legitimacy.
9       The Supreme Court in the Johnson case says the way to
10  increase legitimacy is to force institutions like prisons in
11  that case to strictly follow the principle of race neutrality.
12      And again, as a macro correlation problem, the public's
13  view of the military has almost -- in almost two decades has
14  never been lower despite their use of race, so the correlation
15  is off there.  And the number one reason that's cited, and our
16  experts gets into this, is that people view the military as
17  overly politicized, which our expert says racial preferences
18  only contribute to that problem.
19      And the last thing I'll say is there's, again, a macro
20  correlation problem.  One of the most respected units and most
21  well-known units in our US military are the Navy Seals.  They
22  are not racially diverse, but they are still seen as
23  legitimate.  They are still extremely lethal and effective on
24  the battlefield.  I do not think under strict scrutiny that
25  they've proved a sufficient connection between their means and

1    their ends.

2         THE COURT:  Well, thank you very much, Mr. Norris.

3    And just, again, this will have to await -- there are a lot of

4    facts you proffered in your view as an advocate, some of which

5    may or may not be accurate, and I don't say that you meant that

6    intentionally.  It's just that some of these are debatable

7    points.

8         You talk about the respect for the military is less.  The

9    respect for the entire American Government is less.  January

10   6th, for only the second time in our history, we had people

11   attack the Capitol.  And I sit in an office where you are sworn

12   to support the Constitution against all enemies, foreign and

13   domestic.  You had domestic enemies attack the Capitol.  Only

14   other time anybody's ever attacked the Capitol, they were

15   British in 1814 and they came up to the harbor here in

16   Baltimore.

17        So the matter of lack of respect, I really don't think,

18   don't even try to in this case go the path what is the respect

19   for the military.  The military is still far more respected

20   than the United States Congress, I can assure you.  There's

21   probably no institution less respected right now than the

22   extremes that have been represented here.  I'm not going to let

23   that pass.

24        So to throw out numbers about the respect for the

25   military, I'm afraid that applies to the American Government

1    across the board, across the board with the Executive Branch.

2    And even the Judicial Branch has taken hits on this and that's

3    because of a lot of nonsense thrown out there by people who

4    should know better.

5         So a matter of the loss of respect for the military has

6    nothing to do -- from my view, nothing to do with how we have

7    to analyze this case, but we just can't throw those numbers

8    out.  So thank you for your advocacy, Mr. Norris.

9              MR. NORRIS:  Thank you.

10             THE COURT:  To the extent I corrected you on a few

11   things, it was because some things you said are your view and

12   are not facts, and so we deal with facts here.  So I understand

13   what your argument is and it remains to be seen what the facts

14   are in the case.

15        And with that, Mr. Gardner, if you're still so inclined,

16   step into the barrel now with me.

17        (Laughter.)

18             MR. GARDNER:  Your Honor -- I am --

19             THE COURT:  I told you I have a hot bench, so I have

20   questions to ask.

21             MR. GARDNER:  I am more than inclined and I am

22   absolutely ready and able to answer your questions to the best

23   of my ability.

24             THE COURT:  That's fine.

25             MR. GARDNER:  Plaintiff's entire argument proceeds

1    from two flawed assumptions.  The first is that the Naval

2    Academy is like any other civilian educational institution, and

3    the second is that the Harvard decision should mechanistically

4    apply to the Naval Academy's consideration of race.  Both of

5    those assumptions are fundamentally flawed.

6        And let me start at the very beginning.  As Your Honor

7    acknowledged, unlike a civilian university, the Naval Academy

8    is training students to be officers to lead a lethal fighting

9    force.  The Naval Academy is a critical pipeline for senior

10   Naval and Marine Corps officers in combat where approximately

11   95 percent of Naval Academy graduates are placed into the

12   war-fighting community.  These are the service members who

13   pilot submarines, carriers, and serve as the tip of the spear

14   on the front lines of battle.

15       And as Your Honor noted, 40 percent of all senior Naval

16   flag officers are Naval Academy graduates.  Because officers

17   cannot be recruited from outside the military, it is critical

18   that the military develop its officers internally.

19           THE COURT:  Someday, Mr. Gardner, if not today, one

20   of these days down the road I'm going to ask you what

21   percentage of those officers are Black.

22           MR. GARDNER:  Of the overall Officer Corps?

23           THE COURT:  Yes.  I mean in terms how many Black

24   Admirals are there.  These are things we're going to have to

25   deal with in this case.  All these numbers sound fine and to

1    translate them and exactly how does this translate going up the

2    chain in terms of the 91 percent, or all of the Chief of Naval

3    Operations have all been Academy graduates, how many of them

4    were Black?

5              MR. GARDNER:  That's precisely the issue, Your Honor,

6    because today's Naval Academy graduates are going to be the

7    senior Naval officers 30 and 40 years in the future.  So this

8    isn't that we graduate a class in 2023 and, poof, in 2024, we

9    now have a diverse senior Officer Corps.  That's the whole

10   point.  It is a closed pipeline that takes decades to progress.

11   So plaintiff's suggestion that somehow the consideration of

12   race translates into a more diverse senior Officer Corps

13   tomorrow simply does not understand the Naval process or the

14   military process writ large.

15             THE COURT:  Again, Mr. Gardner, to put as much

16   pressure on you as I did Mr. Norris, that will depend upon what

17   the facts in this case divulge about how many stay in the

18   Academy after -- how many people of minority, both Islanders,

19   Pacific Islanders and African Americans, how many stay in the

20   military after five years or how many dispair.  I mean, I don't

21   know what the facts are.  We're dealing in a vacuum here.

22   We're not going to decide this afternoon.

23             MR. GARDNER:  Understood.

24             THE COURT:  But I hear you saying these future

25   Admirals and these future Chiefs of Naval Operations, we'll

1   have to wait 30 years to see how it happens.  Well, one indicia

2   we're going to have to look at is exactly what is the -- what

3   is the percentage in terms of leadership positions and command

4   positions and how many people stay in the military, how many

5   people meet their five-year minimum and decide they've had

6   enough and leave?  All of these things we don't know what they

7   are.

8           MR. GARDNER:  I agree, Your Honor, and that's all the

9   more reason why issuing a mandatory preliminary injunction in

10  this context would be inappropriate.

11          But I think the punchline that I wanted to get to is given

12  the unique and critical role the Naval Academy plays in the

13  officer pipeline, senior military leaders have made the

14  judgment that the Naval Academy's limited consideration of race

15  in the admissions process is necessary to meet its critical

16  national security mission.

17          In particular, as Your Honor I think noted with my

18  colleague, the military has made a judgment that having a

19  racially diverse Officer Corps is necessary to build cohesive

20  teams critical to developing combat-ready forces, to aid in

21  officer recruitment and retention, and to foster domestic and

22  international legitimacy.  And that military judgment, and I

23  didn't hear a lot about this from my colleague, is based on

24  history, real-world combat experience, as well as quantitative

25  and qualitative data.

1          Plaintiff essentially is asking this Court to force the
2    military to engage in an actual experiment where the military
3    should simply forgo its consideration of race and we'll see
4    what happens.  But the Constitution simply does not require
5    such an unethical experiment that would use American service
6    members as Guinea pigs, particularly when the military has made
7    a judgment that the limited consideration of race is critical
8    for national security.
9          Now, I want to turn first to the compelling Government
10   interest because I didn't hear much about that from my
11   colleague.  I think much of the focus was on narrow tailoring.
12         Like I said earlier, plaintiff's entire theory hinges upon
13   the notion that the Naval Academy is just like any other
14   institution and that the Harvard decision should
15   mechanistically apply to the Naval Academy.  But there's at
16   least three critical differences between the Naval Academy and
17   what was at issue at Harvard.
18         And the first, I think Your Honor has identified multiple
19   times that in Harvard, the Court expressly carved out the Naval
20   Academy from consideration recognizing they could have
21   potentially different compelling interests.  The eight
22   declarations we have provided to Your Honor conclusively shows
23   there is a very different interest here than what was at issue
24   in Harvard and UNC.  And this is critically significant because
25   the narrowly tailored analysis in both Harvard and in Grutter

1    is necessarily informed by the nature of the interest asserted.

2         And as the Court recognized in Grutter, and I will quote

3    now, "Strict scrutiny must take relevance differences into

4    account and courts must calibrate their narrow tailoring

5    inquiry to the relevant context."  That was at Page 327 of the

6    opinion.

7         I heard my colleague simply say Harvard applies without

8    any consideration for those very distinct and unique interests

9    at issue here.

10        THE COURT:  Do I correctly understand, Mr. Gardner,

11   on this point that the matter of diversity is essentially the

12   Navy is looking at diversity based upon percentage of minority

13   participation in the enlisted ranks or is it basing it upon

14   percentage in the population at large?  I thought I understood

15   there to be a view that you are looking at diversity in the

16   context of what is the diversity population, both Pacific

17   Islanders and African Americans, in the enlisted ranks.  Is

18   that a significant factor or not?

19        MR. GARDNER:  That's not correct, Your Honor.  The

20   Navy has explained that it is looking at the general population

21   for its, you know -- sorry.  It is looking at the general

22   population in assessing the diversity of the Officer Corps, and

23   that is the benchmark it has decided to use.

24        The second key distinguishing feature between Harvard and

25   this case is that unlike Harvard and Grutter, the military's

1      judgment in this case is entitled to substantial deference, and
2      that is a complete difference between the civilian educational
3      institutions in that case.
4          And what does that mean, to have substantial deference to
5      the military's judgment?  Well, one thing it means is as
6      Goldman said, the Supreme Court decision, this isn't a battle
7      of the experts, and it's entirely inappropriate to consider
8      plaintiff's rebuttal expert whose view is, in his judgment,
9      race shouldn't be considered, because in Goldman the Court held
10     that you must defer to the military's judgment.  So that is
11     just one real-world consequence as to how military deference
12     comes into play.
13                THE COURT:  Well, again, in terms of public
14     consumption, I've read the papers with respect to the amicus
15     briefs filed in the Harvard case, and there was an amicus brief
16     I believe filed with respect to the Government amicus brief
17     that included declarations from many retired military officers,
18     including General Wesley Clark, for example, a former commander
19     of NATO, in terms of supporting some consideration of race.
20     But those affidavits aren't before me yet but they were
21     certainly in the record in the Harvard case.  Were they not?
22                MR. GARDNER:  They were.  They were.  And again, I
23     don't view those as being rebuttal expert opinions or anything
24     like that at all.  I think that was simply trying to show
25     historically how, you know, the Naval academies -- the military

1    academies have considered race.  What plaintiffs are doing is

2    something very different.  They are seeking to have the Court

3    second-guess those military judgments through the submission of

4    an expert report, and that's exactly what Goldman says this

5    Court cannot do.

6         Finally, Your Honor, on the facts, the Naval Academy's

7    admissions policy is substantially different than the policy

8    that was struck down by the Court in Harvard.  And with the

9    Court's indulgence, I think I need to back up a bit and explain

10   that there are some significant mischaracterizations of the

11   Naval Academy's admissions policy in plaintiff's reply brief.

12   And I want to be very clear I'm not casting aspersions.

13        THE COURT:  I know.  I understand.

14        MR. GARDNER:  But I do think I need to clarify the

15   record.

16        First, plaintiff repeatedly states that the Naval Academy

17   considers race as a "plus factor."  Dean Latta's declaration

18   conclusively refutes that characterization.

19        THE COURT:  He's the Dean of Admissions at the

20   Academy.

21        MR. GARDNER:  Yes.  And as he notes in Paragraph 78

22   of the declaration and consistent with the admissions guidance,

23   Paragraph 5, the Naval Academy uses a wholistic approach in

24   which at no point, and I'm quoting now, "during the admissions

25   process should race, ethnicity, or gender be the basis for

1    points in favor of or against an applicant.  Such factors may

2    only be considered as one of many nondeterminative factors in

3    the applicant's file."

4         Second, Your Honor, plaintiff mischaracterizes the Letter

5    of Assurance or LOA process and contends, and I want to quote

6    here directly from what they say, "Race is particularly

7    important when candidates fall below the Whole Person Multiple

8    score that is typically required for an LOA."  That's on Page

9    13 of their reply brief.

10        The evidence contradicts that statement.  As Dean Latta

11   explains in his declaration in Paragraph 74, it is not that

12   race is particularly important for Whole Person Multiples under

13   70,000.  Rather, for applicants who have scores over 70,000,

14   those students are deemed "well qualified" and less of a

15   wholistic analysis is necessary there because those are sort of

16   the top-scoring candidates.

17        But for students with scores below 70,000, a more

18   wholistic assessment of every candidate is conducted.  It's in

19   that context, that wholistic assessment for those under 70,000,

20   where race can be one of many nondeterminative factors.  And

21   that also includes, Your Honor, factors like unusual life

22   experience, interest in STEM, the ability to speak multiple

23   languages, among many other factors, and Dean Latta explains

24   that in Paragraph 67 of his declaration.

25             THE COURT:  And as to a superintendant nomination, it

1    may depend upon his or her athletic ability.

2             MR. GARDNER:  Generally speaking, Your Honor, the

3    superintendant nominations are given to Blue Chip athletes.

4             THE COURT:  Sure.

5             MR. GARDNER:  And they're very sparingly given.  And

6    what the record reflects is that since 2008, no superintendant

7    nominations reflected any consideration of race.  So that

8    process I don't understand them to really be challenging

9    seriously.

10            But here I think is the kicker about the LOAs.  Even where

11   race can be one of a multitude --

12            THE COURT:  LOAs stands for Letters of Admission.

13            MR. GARDNER:  Letters of Admission, that's right, and

14   that was one of the things they were talking about earlier,

15   that even where race is a consideration in the Letters of

16   Assurance -- I'm sorry, Letters of Assurance.  I'm sorry, not

17   Letters of Admission.  Letters of Assurance.

18            Even where race can be considered, candidates may not

19   receive an LOA because of their race and White applicants are

20   equally eligible to receive LOAs with scores under 70,000, and

21   Dean Latta explains that in detail in Paragraph 74 of his

22   declaration.

23            Just two more quick points, Your Honor, I want to clarify

24   about the admissions process because I think this is important.

25            Plaintiff's next claim that race can be a "tie breaker" in

1    considering out-of-order nominations, that contention is also

2    contradicted by the record.  The key consideration for these

3    out-of-order selections includes, among other things, class

4    rank, grades, progression through academic subjects, and

5    leadership experiences, among others.

6         Although race can be one of many factors considered as

7    part of that wholistic review, it is not a plus factor, and

8    when race is considered, it is not determinative and offers are

9    not provided because of the candidate's race.  That's in

10   Paragraph 58 of Dean Latta's declaration.

11        In addition, Your Honor, I think this is important,

12   out-of-order admission offers are extended to White applicants

13   as well as minority applicants based on that same wholistic

14   assessment.  And even where the higher-scoring Whole Person

15   Multiple applicant isn't initially selected, that candidate may

16   still receive an offer as either a qualified alternate or as an

17   additional appointee.  And so the bottom line here, Your Honor,

18   is that both the higher- and lower-scoring applicant would be

19   admitted in that circumstance and no one is being displaced as

20   plaintiff suggests.

21        Finally, and I think this is important in terms of the

22   urgency of this motion, plaintiffs repeatedly state in their

23   briefing, particularly in their reply, that the Naval Academy

24   selection process for "general admissions" begins on February

25   1st.  I do not understand plaintiff's attached significance to

1    the February 1st date in their brief, other than that

2    applications must be completed by January 31st and

3    congressional sources typically get their nominations in by the

4    end of that month.

5         And while it's true that most offers of appointment are

6    tendered between the middle of January and the beginning of

7    April, that's explained in Dean Latta's declaration at

8    Paragraph 61, nothing prevents the Naval Academy from extending

9    offers before then, which it already has done, as plaintiffs

10   have acknowledged.

11        As Dean Latta explained again in Paragraph 64, LOAs are

12   often provided at the beginning of an admission cycle in

13   September and, in fact, that's exactly what has happened.  So

14   as of November 27th, shortly before we submitted the

15   declaration, the Naval Academy has extended 174 Letters of

16   Assurance.  It's also extended 27 Offers of Appointment, and

17   again, as of the end of November, 15 candidates have already

18   accepted offers.

19        I wanted to be clear about that factual background because

20   it matters with respect to the comparison with Harvard.  In

21   Harvard, race was a dispositive factor and it was a dispositive

22   factor at least twice.  One, at the very beginning of the

23   process, points were explicitly added based solely upon race.

24   The Whole Person Multiple, which is the main driver of

25   admissions at the Naval Academy, does not consider race, hard

1    stop.

2         Second, at the end of Harvard's admissions process, it

3    engaged in what I understand is called the LOP, in which it

4    considers four factors and four factors only, and one of those

5    factors is race.  And therefore the Supreme Court concluded

6    that race by definition had to be a determinative factor for at

7    least some, if not many applicants because race was a mandatory

8    feature of their admissions process.

9         As I just went through, that is quite different than the

10   policy here.  And those three differences, the fact that we are

11   dealing with a military institution with a different compelling

12   interest, with military deference, and a very different policy

13   than what was at issue at Harvard makes all the difference on

14   the merits and shows the plaintiffs are not likely to succeed

15   at a minimum in the context of a mandatory preliminary

16   injunction.

17        I don't think I need to get too far into deference, Your

18   Honor.  I think you may understand our views on that.

19             THE COURT:  Well, I don't know that we need to get

20   too deep into it today.  Much of it I think revolves around, I

21   think it's the Goldman versus Weinberger case, if I'm not

22   mistaken, in 1986 by the Supreme Court with respect to

23   deference to professional judgment of military authorities as

24   to the relevant importance of a particular military interest.

25             MR. GARDNER:  That's exactly right.  And Your Honor

1    recently recognized that --

2              THE COURT:  Again, Mr. Gardner, just in terms of for

3    future reference, it's going to depend upon the consistency of

4    that.  It doesn't apply when you're dealing with young men and

5    young women trying to become midshipmen at the Naval Academy,

6    but it sort of wanes as people go up the chain of command in

7    terms of command positions.  That's something that's going to

8    be an interesting issue to address during discovery in this

9    case because the matter of military deference, judicial

10   deference to the military is not unlimited and I'm going to

11   look -- I'm going to be very interested to see what percentages

12   apply as those go up the rank in terms of years of service,

13   command positions.

14        As I've already mentioned a few times, I'm very curious as

15   to the matter of flag rank officers and those that are really

16   in the pipeline for major command positions, if the same focus

17   is focused there as it is apparently at some point with respect

18   to the admission to the Naval Academy.

19             MR. GARDNER:  Understood, Your Honor.  And you know,

20   to be clear, we are not asking for judicial abdication, and I

21   think that is really the main source of dispute between the

22   parties, where plaintiff's view seems to be because strict

23   scrutiny applies, therefore judicial deference doesn't.  And

24   our view is, no, strict scrutiny does apply, as does judicial

25   deference.  Those two principles are not mutually inconsistent

1    as Goldman shows, as Rostker shows, as Your Honor recently

2    recognized in the PI context in Hrdlicka versus Del Toro where

3    that was a challenge to a decision, as Your Honor knows, to

4    boot someone out of the -- not the training academy, the -- I'm

5    sorry.  What do we call it?  I'm sorry, Your Honor.  Sorry, the

6    NAPS program.

7              THE COURT:  Yes.

8              MR. GARDNER:  Thank you.  And there, and I'll just

9    remind the Court --

10             THE COURT:  NAPS program, for the public, is the

11   Naval Academy Preparatory School.

12             MR. GARDNER:  That's right.

13             THE COURT:  In terms of people who spend a year doing

14   that before being admitted into the Academy.

15             MR. GARDNER:  And I apologize in advance, Your Honor,

16   because I also speak in shorthand sometimes.  But what the

17   Court said there and which we absolutely agree with is courts

18   are traditionally reluctant to interfere with the military's

19   establishment, including military personnel decisions.  And it

20   further explained that courts are not equipped to review

21   professional military judgments and that courts afford the

22   Executive utmost deference in the areas of national defense and

23   military affairs.  And that is simply all we are asking for

24   here, Your Honor, is that deference to the military judgments

25   in the eight declarations that we have submitted.

1           THE COURT:  Well, the deference, I don't know that

2     you need to rely upon deference here with respect to a motion

3     for preliminary injunction, but there are limits to that as

4     this case unfolds.  We'll have to see how the case unfolds,

5     Mr. Gardner, quite frankly.

6           MR. GARDNER:  I fully understand that.  And again, I

7     think we're on the same page here as we are talking about a

8     preliminary injunction, and a mandatory preliminary injunction

9     at that, that seeks to change the status quo.

10          Now, plaintiff is asking, and I heard a lot of this when

11    my colleague was up on the podium, to scrutinize the rationales

12    the military uses.  And again, we think that is inappropriate

13    in the context of judicial deference but I am happy to walk the

14    Court through and explain how each and every one of the

15    Government's important objectives lead to a national security

16    judgment.

17          THE COURT:  I understand what the briefings have

18    been.  I don't think that Mr. Norris overstated that.  I think

19    that was just his focus in terms of bringing it into question.

20    Clearly strict scrutiny applies here, and it's a much higher

21    level of scrutiny than intermediate scrutiny.

22          MR. GARDNER:  Absolutely.  I guess what I'm getting

23    at, Your Honor, is I understood plaintiff to be arguing that

24    our objectives are not measurable, and we think they are.  And

25    I can just very quickly explain.

1          With respect to unit cohesion, this Court could look at

2     Dr. Lyall's declaration and analysis which measures cohesion

3     and explains how less diverse groups are less cohesive and

4     therefore less effective.

5          Your Honor could look at Dr. Haynie's declaration from the

6     Department of Defense which describes the substantial body of

7     research supporting the conclusion of racial diversity enhances

8     cohesion and lethality.  And this includes, among other things,

9     the Rand report that she refers to in her declaration which

10    specifically included the military and law enforcement.  That's

11    in Paragraph 11 of her declaration.

12         You could also look at the Navy's Office of People

13    Analytics study.  That's Exhibit N to our submission.  And that

14    determined that unhealthy diversity climates were associated

15    with negative readiness outcomes.

16         This Court can also look at the fact that no race riots

17    have occurred since the Navy has started to consider race in

18    its admissions process.  And why is that?  Because this is just

19    as measurable as in the prison violence context where success

20    is measured by the prevention of harm.  And you might recall,

21    Your Honor, in the Harvard case itself, it favorably cited to

22    that context as one in which the consideration of race is

23    appropriate and ostensibly appropriately measurable.

24         And you can also look at in terms of unit cohesion things

25    like feedback from current service members through surveys,

1    focus groups, and town halls.  I heard my colleague say, if a
2    survey doesn't ask how do you feel about Affirmative Action,
3    how useful can it be?  I think my colleague misunderstands the
4    purpose of these surveys.  The purpose of these surveys is to
5    get an understanding of how they feel in racially diverse or
6    less racially diverse environments and whether the lack of
7    diversity is causing concerns with morale and cohesion.  That
8    is an entirely appropriate way to measure cohesiveness in a
9    unit and plaintiffs have provided no evidence to contradict
10   that.
11        And with respect to recruitment and retention, again, Your
12   Honor can look at the studies such as the Navy's OPA study
13   which looked at the return on investment on diversity in
14   retention and mission readiness.
15        It can also be showed by -- it can also be measured by
16   showing an increase in the diversity of the Officer Corps over
17   time.  For example, with the Navy, the number of diverse
18   officers increased from 19.1 percent in 2010 to 24.5 percent
19   today.  And at the Naval Academy, the number of diverse
20   midshipmen has increased from 24 percent in 2002 to over 40
21   percent in the class of 2026.  So we know that it is having an
22   impact.
23        Now, plaintiff is relying upon the Supreme Court's
24   decision in Wygant and claims that recruitment and retention
25   may not be compelling interests supporting classifications

1    based on race.  Respectfully, Your Honor, Wygant has no

2    application here.  In Wygant, the Court characterized the

3    interest as providing minority role models for its minority

4    students in an attempt to alleviate the effects of societal

5    discrimination.  It then concluded that "societal

6    discrimination alone is not sufficient to justify a racial

7    classification."  Here, the military's interest in retention

8    and recruitment is to further its compelling national security

9    interest.  Therefore, Wygant simply has no application.

10       And with respect to legitimacy, both here and abroad, it

11   can review the declaration of Dr. Haynie, who explains, based

12   on research, the important role military diversity plays in

13   domestic and international legitimacy.  That's in Paragraphs 13

14   through 15 of her declaration.

15       In short, Your Honor, plaintiff's invitation to measure

16   the military's national security interest lacks precedent and

17   is wrong.  But if the Court were inclined to go down that path,

18   they have failed to meet their burden to show these are not

19   measurable interests.

20       I want to -- I want to respect the Court's time and move

21   ahead.  I do want to address a few issues about narrow

22   tailoring, if I may.

23       First of all, the Naval Academy's consideration of race

24   does not treat race as a negative or engage in racial

25   stereotypes.  It does not intend to consider race indefinitely,

1    and despite its good-faith consideration of alternatives to

2    race, none are currently feasible.

3         Let me take on using race as a negative first.  In

4    Harvard, the Court said race was used as a negative when it

5    was, quote, determinative.  So, for example, in Harvard, at the

6    end of the admissions process as I mentioned, only four pieces

7    of information was considered, one of which was the applicant's

8    race.  In that circumstance, race was a determinative tip for a

9    significant percentage of all admitted Black and Hispanic

10   applicants.

11        Conversely, in Grutter, the Court held that race was not a

12   negative where the school considered all pertinent elements of

13   diversity and nondiverse candidates could be and were selected

14   over minority applicants.

15        Dean Latta expressly explains in his declaration in

16   Paragraph 70 that in the limited circumstances where race is

17   considered as part of a wholistic assessment, it is not

18   determinative.  And plaintiff doesn't dispute that in each of

19   the four circumstances where the Naval Academy's admission

20   process can consider race, White applicants are also selected

21   for admission.

22        Now, plaintiff simply ignores these facts and instead

23   seems to argue that any consideration of race in the admissions

24   process is inherently treating race as a stereotype.  This is a

25   misreading of Harvard.  Harvard did not hold that any

1    consideration of race in admissions, no matter how contextual

2    or how nondeterminative, is inherently negative.

3        Of course, if the Court had meant that in Harvard, there

4    would have been no need to have assessed the compelling

5    interest in that case or the other narrow tailoring issues in

6    that case or to even carve out the service academies from its

7    decision because if the consideration of race was always a

8    negative, it would have made that conclusion, full stop.  It

9    did not.

10       With respect to stereotyping, if I can very quickly, I

11   know we're going long, Your Honor.

12            THE COURT:  That's all right.  Take your time.

13            MR. GARDNER:  In Harvard, what the Court found to be

14   an impermissible stereotype was that the admissions policy

15   invited or risked assumption that people of a particular racial

16   group have a particular racial viewpoint or opinion on some

17   issue such that it would enhance the richness of classroom

18   discussion.  But again, as Dean Latta explains clearly in his

19   declaration in Paragraph 79, and they do not contradict this

20   with any evidence.

21       The Naval Academy does not seek to admit diverse

22   candidates on the assumption that they express a particular

23   viewpoint shared by others of the same background.  Rather,

24   what the Naval Academy seeks to do is to admit diverse

25   candidates so that midshipmen can learn how to be effective

1    battlefield commanders and so the Navy and the Marine Corps can

2    achieve its ultimate national security interest.

3          Now, plaintiff nevertheless contends that the Naval

4    Academy is engaged in stereotyping because it has concluded

5    that a racially diverse Officer Corps will foster trust and

6    confidence between the Enlisted Corps and its members.

7          Your Honor, that is not based on a stereotype or

8    assumptions, but rather data, history, and real-world combat

9    experience indicating that racial diversity enhances military

10   readiness, recruitment, retention, and legitimacy.

11         As I've already mentioned, Your Honor, the research by

12   Dr. Lyall reflects racially diverse units are more cohesive.

13   And that is supported again by the Navy's OPA study, which is

14   Exhibit N, and the extensive history of troublesome race

15   relations in the military as explained in detail by Dr. Bailey,

16   and Dr. Sherwood highlight that point.  Again, plaintiffs do

17   not dispute any of that history in response to our experts.

18         Plaintiffs also argue that the racial categories

19   considered by the Naval Academy are too imprecise to satisfy

20   strict scrutiny, again relying upon the Harvard Court's

21   rejection of similar categories.  But here again, as Grutter

22   commands, context is critical.

23         Here, the Naval Academy relies upon the same OMB racial

24   and ethic categories used throughout the Government, including

25   the Census Bureau, and it's using it for an entirely different

1    purpose than was used in Harvard.  That purpose is to further
2    its important national security interest.
3        Now, remember, Your Honor, given that the Naval Academy's
4    goal is for the incoming class to have rough parity with the
5    demographics of the general population and the general
6    population data is reported by the Census Bureau using those
7    same OMB categories, it is entirely reasonable and appropriate
8    for the Naval Academy to use those same classifications in
9    citing its goals.
10       And while the Court in Harvard was clearly concerned that
11   the racial categories were undefined, that's not the issue here
12   because OMB does define the various racial and ethnic
13   categories.  Simply put, Your Honor, context matters, and here
14   there is no mismatch between the military's goals and the means
15   by which it is seeking to achieve those goals.
16       I want to address endpoint, Your Honor, because I know
17   that's a concern for you and I want to make sure I'm addressing
18   your concerns and that I answer any questions.
19       With respect to an end point, plaintiff's contention that
20   Harvard mandates a defined end point once again wholly ignores
21   the distinct military interest at issue here, which is more
22   analogous to the penological interests in the prison case
23   Johnson than the interest in educational diversity at Harvard.
24       THE COURT:   Johnson is not a military case; it's a
25   prison case.

1        MR. GARDNER:  Correct, Your Honor, but it's also

2   dealing with the issue of harms in the prison context and

3   trying to prospectively address those harms.  That is much more

4   analogous than the interest of educational diversity for the

5   sake of classrooms which was at issue at Harvard.

6        THE COURT:  Just as we're winding up here,

7   Mr. Gardner, but does the language in Chief Justice Roberts'

8   opinion in the Harvard decision with respect to holding, among

9   other holdings -- the sixth of the six holdings was that the

10  admission programs at Harvard failed strict scrutiny by lacking

11  a logical end point.  What is the logical end point with

12  respect to these numbers in the military is not one that's

13  continually changing?

14       MR. GARDNER:  I do -- I want to answer that question

15  and I absolutely will, but I want to just for clarification

16  point you to Page 213 of Chief Justice Roberts' opinion where

17  he explained that the end date discussed in Grutter was based

18  on the expectation that -- I'm going to quote now -- "the use

19  of racial preferences will no longer be necessary to further

20  the interest approved today."  That interest, again, is quite

21  different than the military's interest in national security.

22       So I wanted to be very clear about that, that the Harvard

23  decision does not address the very different interests we're

24  dealing with here.

25       And remember, Your Honor, in the Johnson case that the

1    Court in Harvard cited to approvingly, the Court never

2    suggested that prison officials had to identify a time at which

3    it would no longer consider race to prevent racial violence in

4    prisons, and with good reason, because such danger is going to

5    be ever present.  The same is true with maintaining a lethal

6    fighting force.

7          But I do want to emphasize, because I know you have this

8    question, what is relevant is that the Naval Academy annually

9    reviews its admissions processes, including the use of race,

10   and over the years has adjusted that process accordingly to

11   ensure that its consideration of race remains narrowly

12   tailored, and the Fifth Amendment requires nothing more.

13         What we know from Dean Latta is as the numbers of racially

14   diverse applicants -- or admitted applicants, I should say, has

15   increased, the consideration of race has decreased, and that's

16   what I think is fundamentally at issue here.

17         I do want to briefly talk about race-neutral alternatives,

18   and I want to talk about it because I didn't hear my colleague

19   talk about that at all.  We explained in Dean Latta's

20   declaration, and this is unchallenged, that the Naval Academy

21   has considered at least seven race-neutral alternatives, yet

22   none have been successful.  That's in Dean Latta's declaration,

23   Paragraphs 91 through 99.

24         Plaintiff does not seriously challenge any of this or even

25   suggest other race-neutral options that the Naval Academy

1    somehow should have considered to allow it to accomplish its

2    national security mission.   Instead, it makes the argument that

3    the Merchant Marines do not consider race in its "general

4    admissions process."

5         I want to be very clear with Your Honor.  What they are

6    relying upon is the Solicitor General's brief in Grutter, Page

7    17, Note 3.  And I'd like to read that to Your Honor, because

8    it's entirely inconsistent with plaintiff's arguments.

9         The Merchant Marine does consider race for the seats it

10   fills through the appointments process.  That is exactly what

11   the Naval Academy is doing as well, so there is no daylight

12   between what the Merchant Marines are doing, what the Coast

13   Guard is doing, and what the Naval Academy is doing.

14        I would note, however, that neither the Merchant Marines

15   nor the Coast Guard are under the direct supervision of the

16   Department of Defense.  Rather, the Coast Guard is under the

17   Department of Homeland Security and the Merchant Marines are

18   under -- I'm sorry, I do not remember right now but it's not

19   the Department of Defense.

20        Plaintiff's only other argument on this point is that the

21   Naval Academy has to study what the world would look like if it

22   abandoned the consideration of race.  But of course, Your

23   Honor, it has done that as reflected by the research of

24   Professor Lyall, the Department of the Navy's OPA study, and

25   the expert judgment of the military's leaders based on history

1   and real-world combat experience.  Plaintiff has simply failed
2   to rebut these conclusions.
3       For these reasons, Your Honor, we strongly believe that
4   the Court should deny the plaintiff's motion for a preliminary
5   injunction.
6           THE COURT:  Thank you very much, Mr. Gardner.
7       Mr. Norris, I'll be glad to hear from you on this in
8   rebuttal and we'll wind it up.
9           MR. NORRIS:  Thank you, Your Honor.  I'll be brief.
10  Just a couple of points.
11          THE COURT:  Take your time.
12          MR. NORRIS:  The first is, I still believe and I
13  don't think I've heard rebutted there are some clear violations
14  of Harvard if you assume Harvard applies to the Naval Academy.
15  There is no end point that's any more definitive than the one
16  that was offered by Harvard and UNC.  They still admittedly use
17  the categories to sort people for military interest that the
18  Supreme Court has called utterly arbitrary, and of course they
19  use race as a negative because they use it as a positive in a
20  zero-sum system.
21      Now, I think the gist of the argument is that, well,
22  Harvard does not apply to us in the same way, and I think the
23  only way you get there is if you think that something other
24  than strict scrutiny applies to the Naval Academy's use of
25  race, which they've conceded is not true, or that when applying

1  strict scrutiny that deference plays such a large role that it
2  could change, it could alter those rules from Harvard so that
3  they no longer apply to the military, which I think is my
4  friend's argument.
5      There is zero cases that they've cited where that has been
6  the case, where the military has gotten deference when it uses
7  race to classify citizens.  They've cited Goldman I think the
8  most in the argument.  Goldman is a case about religion, not
9  race.  They have no race cases.  Johnson versus California says
10 race is unique.  It's the one where you're not going to get
11 deference.  And in fact, the fact that we're talking about
12 Government power here at its apex is all the more reason not to
13 give deference is the holding of Johnson.
14      More importantly, we've talked a lot about Footnote 4 of
15 Harvard.  Footnote 3 of Harvard addresses giving deference to
16 the military on questions of race.  It talks about Korematsu
17 and says one of the gravest mistakes in the Supreme Court's
18 history is giving deference to the military when it racially
19 classified citizens.  It says --
20           THE COURT:  The Korematsu case, is that what you're
21 talking about?
22           MR. NORRIS:  Yes.
23           THE COURT:  The Japanese internment case.
24           MR. NORRIS:  Absolutely.  And they say that is why,
25 and they say this in Footnote -- I believe there's other

1   footnotes from the Chief Justice's opinion that say history

2   shows the folly of deferring to the Government when it uses

3   race.  And Korematsu, which is the military, is actually the

4   first time the Court ever articulated strict scrutiny is the

5   example given.

6        And if you had any doubts about this, there's important

7   context -- and I believe this is part of the dissent in the

8   Harvard case, but there's important context about what happened

9   in that case.  The Government's argument in Harvard was not so

10  much about the military academies.  They said we get most of

11  our officers from ROTC, so if you stop civilian universities

12  from using race, that will directly affect the racial diversity

13  of the Officer Corps of all branches of the military.  You

14  should defer to us on that national security interest and keep

15  letting civilian universities use race.

16       The Supreme Court did not entertain that argument at all

17  and now all civilian universities are barred from using race in

18  admissions.  For every one officer that the Academy sends, ROTC

19  sends three.  The exact same interest did not sway the Court in

20  Harvard.  And this is all about narrow tailoring is really

21  where I think this case is ultimately going to be decided, and

22  narrow tailoring --

23            THE COURT:  What were the facts in the Harvard case

24  with respect to their ROTC program?

25            MR. NORRIS:  There's not a lot of facts.  The

1   Government's brief said that we get most of our officers from
2   ROTC so therefore you should let --
3            THE COURT:   What is the status of the ROTC program at
4   Harvard?
5            MR. NORRIS:   I mean, Harvard is now race-neutral for
6   the first time this cycle.
7            THE COURT:   There still is Naval ROTC at Harvard?
8            MR. NORRIS:   There is.  I think it recently came
9   back.  It was gone for a long time.
10           THE COURT:   It was gone for a considerable period of
11  time.
12           MR. NORRIS:   Yeah.  But it came back I think five or
13  six years ago, so it's back.  It is a totally race-neutral
14  process.  It's sending officers to the military triply as much
15  as the academies.
16       But I'm not sure what role deference is really supposed to
17  play even under the Grutter regime, which is no longer good
18  law.  The Fisher case said you get deference on articulating
19  your interests, you get deference on whether those interests
20  are important.  You never get deference on whether those
21  interests whether your use of race is narrowly tailored to
22  achieving those interests.  So I don't think deference is going
23  to get them that far even if you afford it to them.
24       The second point is, my friend spent a lot of his time
25  saying that they only use race a little bit in their process.

1    I don't think that's true factually.  But even if you do only

2    use it a little bit, that still triggers strict scrutiny.

3    That's long been the law, including starting with the Fisher

4    cases.  Harvard itself says -- UNC said that it only used

5    race -- that race only affected 1.2 percent of the admissions

6    decisions for in-state students.  The Chief Justice cited that

7    figure and said, that's still too much.  Any amount of racial

8    discrimination is too much.  It triggers strict scrutiny.

9    Eliminating racial discrimination means eliminating all of it.

10   There's no de minimus exception to that rule.

11        Harvard did not use points, race-based points.  I don't

12   know where that's coming from.  If you read the Solicitor

13   General's brief, it will tell you in Harvard that Harvard was

14   not using a point system.  That would have been grossly illegal

15   under Gratz.  That's not what they were doing.  They were using

16   race similarly to the way the Academy now has revealed it uses

17   race.  If you read the Solicitor General's brief, it says, we

18   use race just like Harvard and UNC in the Academy.  So there is

19   a real factual distinction to be made.

20        But if race doesn't really matter, if it's not

21   determinative for any person getting into the Naval Academy,

22   then why are they using it?  If it serves no purpose, they

23   can't possibly meet strict scrutiny.  If your numbers would be

24   the same if you took away race, the Parents Involved says that

25   means you fail strict scrutiny.  It's not a reason to let you

Preliminary Injunction Hearing 12/14/23

1    off the hook.

2              THE COURT:   Just so the record's clear, Mr. Norris,

3    that point is well taken but I think really the reality is what

4    is going to be explored in this case is the extent of racial

5    diversity throughout the military and the Navy particularly and

6    what is the rate of diversity with respect to enlisted

7    personnel and how does that relate to what its rate of

8    diversity is and the Officer Corps.

9         And strict scrutiny of this Court is going to have to be

10   focused upon that because the briefing has already indicated

11   that there's no question, as I've earlier noted when I maybe

12   got a little too hard on you in questioning, that there had

13   been racial tensions in the military.  There have always been

14   racial tensions in the military for a long time.  And they've

15   lessened but they are still there and it's understandable from

16   the point of view of minorities when you have -- there was a

17   time when minorities could only work as chefs and cooks and

18   what have you, and obviously President Truman in 1948

19   desegregated the military and it still didn't solve all the

20   problems.

21        And that is where the strict scrutiny analysis is going to

22   have to go and it may rise or fall on that in terms of if

23   you're really going to make this effort then you got to be

24   consistent all the way through, and that's what the dynamics

25   are with respect to -- it's easy to have opinions offered by

1      experts in terms of cohesiveness in battle situations, but the

2      proof in the pudding is going to be what do the numbers

3      indicate in terms of whether there's actually been that

4      diversity that has achieved the result and if there is not, if

5      the numbers don't indicate it, then it increasingly becomes

6      difficult to justify.

7          The flip is is that it may show that there has been

8      cohesiveness.  It may show greater diversity as you go up the

9      chain.  I don't know, but I do think that, just so you all know

10     where I'm coming from, Harvard is not an absolute cookie cutter

11     and just fits here.  All this language is very important and

12     Chief Justice Roberts' view has been long known for a long

13     time.  I think one of his great quotes was you deal with racial

14     discrimination by not discriminating on the basis of race, I

15     think is one of his great quotes one time in an earlier case.

16         Well, it doesn't totally apply and perfect fitting with

17     the military but there's got to be a record here and we're

18     going to have to explore that in terms of what the record bears

19     in that regard to see whether or not we're not going to be able

20     to opine as to success or failure but it certainly is going to

21     be a factor in strict scrutiny, and so your point is well taken

22     on the strict scrutiny point.  It is going to require that.

23                  MR. NORRIS:  Absolutely.  I understood all that, Your

24     Honor.  I think that takes me to my last point exactly, which

25     is there's a concern that maybe you don't have enough

1    information now to rule on this motion, but the nature of

2    preliminary injunctions are that you have to make a prediction

3    based on what you do know now given the likelihood of

4    irreparable harm that's coming down the pike in February once

5    the application window closes, and I would just suggest that

6    there is enough evidence in the record.

7          My friends have submitted 650 pages of exhibits defending

8    what they do.  My friends say at Page 21 of their brief that

9    this Court has a, quote, extensive evidentiary record before

10   it.  And we've been really careful in this case.  We think all

11   of the arguments -- I totally understand where Your Honor is

12   coming from.  I think there are plenty of ways for them to lose

13   once the factual records gets developed further, but we've

14   focused this motion on our legal arguments.

15         Whether you use race as a negative is conceded factually

16   in a legal determination.  Whether they use arbitrary

17   categories is conceded factually.  It's a legal question.  Same

18   thing with an end point and there's other parts of Harvard that

19   are purely legal.  We think they can be decided now and they

20   need to be decided now so that another wave or two of high

21   schoolers and young college students are not discriminated

22   against while this case proceeds.

23         And you know, I think I heard Your Honor say that you plan

24   to rule today.  Even if --

25              THE COURT:  I'm going the rule from the bench today

1    and I'm going to follow up with an opinion in the next week.

2            MR. NORRIS:  That's excellent, Your Honor.  We

3    appreciate it because whoever loses this case has to move

4    quickly likely to two more courts.  We really appreciate that.

5            THE COURT:  Sure.

6            MR. NORRIS:  I would just say, and I hope it's not

7    the case, if it's our side that loses today, I also just want

8    to move from the podium for -- I'd like to move for an

9    injunction pending appeal giving us the same relief, so

10   stopping the Naval Academy from using race as a factor.

11           THE COURT:  Well, I'll deal with that, Mr. Norris.

12   The reality is this:  If your interest is truly to move this

13   case and to move it, then I think you have to recognize -- I

14   know appellate courts take -- some district judges take

15   exception to the latitude that Circuit Court judges take on

16   some finding factual matters, but I will say that -- you may or

17   may not be aware of this, but in the last two years I took

18   Senior Status.  I sat with the Ninth Circuit about nine times,

19   so I really kind of look at it from the Circuit Court point of

20   view and I still sit here on the bench here in Baltimore,

21   Maryland.

22       There are facts here.  There are facts that have to be

23   evaluated.  There has to be a record developed.  Harvard had a

24   bench trial.  University of North Carolina had a bench trial.

25   There was a full record upon which the Court could deal.  And

1    the notion that we get lost in the weeds here and try to run to

2    Richmond for Richmond to evaluate it and eight months from now

3    say we've got to remand it back for factual findings, I don't

4    think it's in the interest of the parties here.  That's my own

5    view.

6         You can do what you want to do, but it's clear to me that

7    there are factual issues that need to be resolved as quickly as

8    possible and studies need to be made.  There are questions I've

9    asked in this hearing that clearly are factual questions.  With

10   all due respect to the United States Court of Appeals for the

11   Fourth Circuit, they are not in the fact finding business or

12   reviewing records like that.

13        So I would just urge that I'm more than willing to get

14   this case moving on a track, but I can't control what the legal

15   analysis is if you all decide if you really want to move the

16   case or you just want to see how long it takes.  I certainly

17   don't think this case should take five or six years to resolve.

18        And just having at least nine times in the last years worn

19   the Circuit Court hat, I've seen it helps if the District Court

20   can develop the record and both sides have argued certain

21   inferences or facts.  And some facts, really, they are going to

22   sit.  There's some things I've already said several times I'd

23   like to know of the 40 percent of officers who get flag rank

24   because they are from the Naval Academy how many, if any, are

25   African American or of a minority, and all the Chiefs of Naval

1   Operations, and then to say, well, we're in the process of
2   solving that problem, well, that may or may not be the case.
3        For example, we haven't even begun to deal with the fact
4   that I noted in terms of congressional nominations on Page 66
5   of the defendant's brief -- actually it's an ECF listing, that
6   it's noted by the defendant's brief, the Government's brief
7   from the Academy.  As it stands, congressional nominations are
8   disproportionally provided to more White students than
9   minorities.
10       Well, that's a factor I looked at and I said I really want
11  to find out why that is and what is done vis-à-vis the matter
12  of congressional nominations and how all this blends together.
13  There are just lots of facts that require the building of a
14  record.
15       And I would just note that's my view of it and it doesn't
16  preclude you trying to then get in the line for five months of
17  waiting to have argument in front of the Fourth Circuit.  All
18  this is not just on legal argument, trying to have someone say
19  Harvard is this or Harvard fits in perfectly, ergo.  I don't
20  think that's what can be taken from a footnote in Chief Justice
21  Roberts' opinion.  I think it guides us, without question, but
22  we have to look at it in terms of whether or not there are any
23  distinct issues as to the military.  And there may or may not
24  be, but that's really a factual finding.  That's not a legal
25  analysis in terms of conducting strict scrutiny in terms of

1    building a record.  That's the only comment I make in response

2    to you, and it seems to me that's what we ought to do.

3              MR. NORRIS:  I understand, Your Honor.  As I stand

4    here today, I can't, you know, let a cycle go by where my

5    client, the members of our organization are discriminated

6    against.

7              THE COURT:  I understand.  Sure.

8              MR. NORRIS:  I think the answer as I stand here today

9    is both.  We should try to go up on the legal issues while we

10   try to accelerate the trial and get the factual issues totally

11   figured out.

12             THE COURT:  We'll see.  We'll see.

13             MR. NORRIS:  But that's why, you know, we've had

14   conversations with the Government.  I think we tried, both

15   sides tried in earnest to negotiate a fast trial schedule.  We

16   weren't able to do it.

17             THE COURT:  I'm going to address that right now, as a

18   matter of fact.

19             MR. NORRIS:  Okay.  I did want to just for house --

20   just to preserve my ability to go up quickly, we would like to

21   move for an injunction pending appeal in the event that our

22   motion is denied.

23             THE COURT:  I'm not going to grant that.

24             MR. NORRIS:  I assumed so.  Thank you.

25             THE COURT:  I'm sorry, no disrespect to the Fourth

1    Circuit, you can brief that if you want.  It's not in your
2    clients' interest.  You're talking about the need for your
3    clients to get decisions and now you make a 180-degree turn
4    that will clearly drag this on for another six to eight months.
5    So all the arguments you made as to your clients needing to
6    have a decision by the end of February and suddenly you make a
7    complete 180-degree turn.  It is absolutely not in your
8    clients' interest to have that be the case and wait six, eight
9    months for the Fourth Circuit to deal with it, then maybe come
10   back to this Court, and it's certainly not in the interest of
11   the Naval Academy.
12       So I have no intentions of granting an interlocutory
13   appeal on my denial of an injunction here.  And if the Fourth
14   Circuit wants to determine that there's no legitimate issue of
15   fact here and that the criteria with respect to preliminary
16   injunction are that you are likely to succeed on the merits,
17   that certainly sounds like a factual finding to me.
18       But having said that, you know that I was reversed
19   eight-seven by the Fourth Circuit in the City Struggle case
20   over the flier and it was subject to some pretty strenuous
21   dissents by 7 of the 15 members of the Fourth Circuit because I
22   was reversed because I did not grant a preliminary injunction.
23       So who knows, but it certainly doesn't speed the process
24   for your client so I'm not just going to grant injunctive
25   relief at this point in time or enjoin it until you go to

1   Richmond and I don't -- you can do what you want to do on that

2   in terms of we'll have to research it and whether or not you

3   think you have the right to have an interlocutory appeal on it.

4   You can take that route if you want, but we're prepared to do

5   the work here.  We've gone almost two hours now in this matter

6   and we're prepared to do the work.

7        And just with all due respect to my colleagues down in

8   Richmond on the Fourth Circuit, there are factual matters to be

9   addressed here and this is the Court that's equipped to do

10  that, to weigh those affidavits, to look at the facts, ask the

11  questions, develop the factual record.  And I think that is

12  something we're prepared to do, and then whichever side

13  prevails, clearly there will be appeal to the Fourth Circuit, I

14  understand that, and it may or may not go to the Supreme Court.

15  But it develops a factual record and I think it's important to

16  develop a factual record here is my only thought.

17        MR. NORRIS:  And Your Honor, we haven't decided what

18  strategy we're going to pursue.

19        THE COURT:  I understand.  You do the best you can

20  and you can file it and I'm just telling you flat out now what

21  my view of it is.  And indecisiveness is not one of my

22  problems, Mr. Norris, as you may have already realized by now.

23  And, you know, to talk about how crucial it is to have a

24  decision for your clients and then to take the very interesting

25  legal step to take seven or eight months to go to the Fourth

1    Circuit certainly does belie some interest in trying to get

2    relief for your clients.

3            MR. NORRIS:  Your Honor, respectfully, that assumes

4    the case here would be stayed while we took the preliminary

5    injunction up on appeal, which is not necessarily the case.

6            THE COURT:  That's exactly -- it's dead in the water.

7            MR. NORRIS:  I'm sorry?

8            THE COURT:  If the Fourth Circuit grants a relief on

9    appeal with respect to the injunctive relief here, this case

10   will stop dead in the water, not one minute of discovery,

11   nothing.  Because I'm a very busy judge here.  I'm not going to

12   spend time on this case if you're going to go to Richmond and,

13   if that's the case, if the Fourth Circuit feels like they can

14   do it, fine.  The case will stop dead in the water and it will

15   be a stay.  Nothing will happen.

16           MR. NORRIS:  Thank you, Your Honor.  Now that we know

17   that, that will affect our decision.

18           THE COURT:  I'm telling you flat out, and you can

19   take that to the Fourth Circuit as well.  We're pretty busy

20   here.  And so the notion of going through this while you appeal

21   that, that's perfectly fine.  If you want to do that, let me

22   know right away.  It will save a lot of time for these law

23   clerks who have been working hard on this.  But I have no

24   intentions of granting that and the Fourth Circuit can educate

25   me on what factual findings it thinks it makes.  I suspect that

1    the Fourth Circuit would say there's a record that has to be

2    developed.

3         You've cited Harvard a great deal, Mr. Norris.  You are

4    ignoring the fact Harvard was a bench trial and was, what, 15

5    days of a bench trial.  North Carolina was, what, nine or ten

6    days of a bench trial.  North Carolina, last time I checked, is

7    in the Fourth Circuit.  I would think the Fourth Circuit might

8    take note of the fact it took a North Carolina judge, one of my

9    colleagues, nine days to conduct a bench trial.

10        So the notion that you go to Richmond and say, well,

11   Harvard applies, it's very easy a matter of law, I don't think

12   that has much merit.  But I'll enter a scheduling order and

13   we'll go over that right now after I deny the motion for

14   preliminary injunction, which I'm obviously going to do.

15        And I'm going to give you a trial date.  I'm going to set

16   a trial date here, set a scheduling order, and I'll enter that

17   tomorrow and I do not -- I'm not going to grant any injunction

18   in any way, shape, or form pending a stay for an appeal to the

19   Fourth Circuit.  You're free to do that, and the Fourth Circuit

20   is certainly free to overrule me on that and grant that.  If

21   that's the case, that's perfectly fine.  This case will stop

22   dead in the water.  There won't be one deposition.  There won't

23   be one exchange of documents under the auspices of this Court.

24   This case will be listed as stayed and it will be stopped dead

25   in the water.

Preliminary Injunction Hearing 12/14/23

1        I see some Naval officers here.  That is an apt analogy,

2    it will stop dead in the water.  I see the officers are

3    laughing.  Everybody will stand down.  We will take the ship,

4    put it into the harbor, and you'll have to get recommissioned

5    to get the ship out of the harbor and that's where we'll stay.

6             MR. NORRIS:  I appreciate the clarity, Your Honor.

7    That helps us.

8             THE COURT:  I hope I made myself clear.

9             MR. NORRIS:  Yes.

10            THE COURT:  I suspect I did and I didn't mean to

11   raise my voice.  If I did, I apologize.  We're laughing here.

12        Let me just go over, first of all, a ruling here.

13        Anything further, Mr. Norris, on this?

14            MR. NORRIS:  I don't think so, Your Honor.  No.

15            THE COURT:  Thank you all very much for the very

16   thorough briefing in this matter.  It's been well argued and

17   ahead of time I warned you I have a hot bench, but I don't mean

18   anything by it.  I want to ask questions to get answers and let

19   you know where we're going because this is important to the

20   litigants here, Members A and B, it's definitely important to

21   the Naval Academy, and we have to get some resolution, have

22   this thing moving.

23        A preliminary injunction, as I've already noted, is an

24   extraordinary remedy involving the exercise of very

25   far-reaching power to be granted only sparingly and it is in

1   limited circumstances.  And the Fourth Circuit has noted that

2   in MicroStrategy versus Motorola in 2001, 245 F.3d 335, and it

3   cites its earlier opinion in Direx Israel at 952 F.2d 802.  And

4   mandatory preliminary injunctions, those that either alter --

5   that alter rather than preserve the status quo are disfavored

6   as has been specifically noted by the Fourth Circuit in

7   Mountain Valley Pipeline, 915 F.3d 197, a Fourth Circuit

8   opinion in 2019.

9         And certainly Students for Fair Admissions, with respect

10   to this request here, would certainly alter the status quo, and

11   as far as my view is at that stage, at this stage in the

12   proceedings, it has not made a clear showing that it will

13   succeed in its claim that the Naval Academy's race-conscious

14   admissions practice violates the Fifth Amendment's Equal

15   Protection Principles at this stage in the proceeding.

16         Clearly, when the case proceeds with discovery, the

17   Academy has to proceed under a strict scrutiny analysis.  But

18   it is imperative, in my view, that a factual record be

19   developed in this matter such that the Court can determine

20   whether the "potentially distinct interests that the military

21   may present," as noted by Chief Justice Roberts, "can survive

22   strict scrutiny."  And my view is the best and most legitimate

23   way for the Judiciary to deal with this matter is to proceed as

24   I think it should with a scheduling order here and a trial date

25   and move forward on it so that.  So that -- to deploy the

1    equitable powers of this Court in this case would I think be

2    counterproductive.

3          So with that, it will be denied for the reasons set forth

4    here on the record to be expounded upon by an opinion that

5    we'll do our best.  Tomorrow is the courthouse party, you're

6    all welcome to come if you'd like, but really I can still

7    operate very well with that but my law clerks don't function as

8    well after the courthouse party.  I'm teasing them over there.

9          So I'm not going to make them -- we're laughing here in

10   court -- I'm not going to make them stay late tomorrow but

11   we're going to do our best to get the opinion out middle of

12   next week because again, Mr. Norris, to the extent you all want

13   to seek a stay of these proceedings and appeal to the Fourth

14   Circuit, you're certainly entitled to that.

15         Under my ruling, I'm not going to note that an

16   interlocutory appeal will be granted and we're going to stay

17   these proceedings, but if the Fourth Circuit reverses me on

18   that, then fine.  The stay will be issued and you prepare

19   briefs for the Fourth Circuit and this case will be frozen

20   probably until being remanded back here for factual findings

21   eight months from now, but that's, again, that's your choice.

22         I'm prepared to issue a scheduling order here that would

23   date back from the bench trial.  If I issued a scheduling order

24   tomorrow here, there would be a December 28th deadline for

25   request for modifications.  You don't have to report all these.

1    This is what would happen if I issued a scheduling order

2    tomorrow.  Report about deposition hours, et cetera, et cetera,

3    Rule 26 disclosures by February 12, discovery deadline, April

4    29, 2024, requests for admissions in May, pretrial motions

5    deadline May 28th.

6         I'm certainly prepared to do that.  I think the start of

7    it is normally these kinds of situations I think the start of

8    it is the bench trial.  Now, I think that from what I've seen

9    of this and what I anticipate to be the factual necessity here

10   and, indeed, some of the things that I think need to be

11   developed in the factual record and then perhaps an explanation

12   or lack thereof, I would think that we probably should set

13   aside certainly ten days for a bench trial, two full weeks for

14   a bench trial.  If it took longer in the Harvard matter but the

15   same in the North Carolina matter, I don't know.

16        What is your reaction on that, Mr. McCarthy?  How long do

17   you think this will take, a bench trial will take place?  And I

18   will tell you this.  You will get right-away status.  You will

19   not get bumped for a criminal trial.  I've had a pretty steady

20   record for that in 20 years on the bench.  When I set a civil

21   case it doesn't get bumped.  There won't be any change.  If I

22   drop dead, I'll make sure I've got another judge lined up

23   behind me, okay?  So it's as simple as that.  You will have a

24   trial date.  I'm going to give it to you.  And once we set it,

25   I tend not to want to postpone it.  Some people accuse me of

1    having my own mini version of the Rocket Docket from the

2    Eastern District of Virginia over here, but I think it's

3    helpful to the parties and everyone to get a date.

4         Let me hear from you in terms of how long you think it

5    would take, and I'll set a trial date in sometime in the

6    summer.  I tend to think the safest process might be a trial

7    date in September that we would set and that would give plenty

8    of time for discovery and what have you and also some delays in

9    the summer months, but I'm at your disposal on this,

10   Mr. McCarthy.  Tell me how long you think the case would take

11   and tell me what trial date you would like and I'm more than

12   prepared to move that whole calendar up if you think so.  So

13   tell me what your pleasure would be, then I'll hear from

14   Mr. Gardner.

15        MR. MCCARTHY:  Your Honor, I think ten days will be

16   plenty sufficient for a bench trial in this matter.

17        THE COURT:  What date would you like?  I mean, right

18   now a discovery deadline of April 29 would mean that we

19   could -- and a dispositive motions deadline of May 28 allow for

20   the briefing.  Usually in dispositive motions with bench

21   trials, I have found that it doesn't always work out this way

22   but many times it works out that we just go ahead and have a

23   bench trial as opposed to -- that's probably the tightest way

24   for the record as I was suggesting to Mr. Norris.

25        So that if we have the briefs finished by May 28th, reply

1    briefs, we could set this in for July at the earliest, but when

2    you run into summer calendars or whatever, it seems to me that

3    my instincts are telling me the safest, most definitive trial

4    date which would not get bumped for vacation plans or anything

5    would be a maybe like a week after Labor Day next September and

6    then we move back everything from that date.  But I'll hear

7    from you in terms of what your pleasure would be.

8            MR. MCCARTHY:  Your Honor, obviously we would like to

9    process this as quick as possible that allows us sufficient

10   discovery.  I think in terms of when a trial might be, I

11   appreciate Your Honor's concern about summer schedules and the

12   like.  I don't know that I can give Your Honor a date right

13   now.

14       I'm certain if you allowed the parties to consult for even

15   24 hours we could probably come up with something in the time

16   that you're thinking of.  It would probably end of summer, and

17   certainly no later than September.

18           THE COURT:  And I could be wrong, I have a discovery

19   deadline here of April 29, but I could be wrong about that.  It

20   could be maybe you feel that a discovery deadline and discovery

21   could be moved up to some extent.

22           MR. MCCARTHY:  I would imagine, and I don't want to

23   speak for our friends on the other side here, but I'm certain

24   that if we could put our heads together we could probably come

25   up with something in terms of a schedule for the Court within a

1    few business days.

2                THE COURT:  Write these dates down, so the measuring

3    marks.

4          The scheduling order that would go, and I'm not going to

5    file it tomorrow, it would normally be filed tomorrow, would be

6    you make a report about deposition hours December 28th.  You

7    would -- essentially moving for additional parties would not be

8    a factor here, but you have your Rule 26 disclosures by

9    February and March.  You have a discovery deadline of April 29.

10   A request for admissions May 6th.  Dispositive motions deadline

11   May 28.  And then we could stick in a trial date, say, in July,

12   whatever you want.  I'll make my calendar around yours.  If I

13   have any criminal trials scheduled those days, I will have

14   those reassigned.  You all will take high priority on this, so

15   I'm more than willing to work with you on it.

16               MR. MCCARTHY:  Appreciate that, Your Honor.

17               THE COURT:  So you let me know you.  And you and

18   Mr. Gardner can talk about it.  You probably should allow the

19   input of Mr. Anderson and Mr. Norris because I know Mr. Gardner

20   will ask Ms. Yang and Mr. Mendez and Ms. Gargeya because their

21   vacation schedules are really adversely affected by it and

22   they're the ones that will be buried on the computer, so you

23   know.

24               MR. MCCARTHY:  We appreciate that, Your Honor.

25               THE COURT:  You just let me know.  I will schedule

1    however you want to schedule it and, as I've said, if suddenly

2    there's an appeal, a stay in terms of a preliminary injunction,

3    everything will stop.  You can let me know tomorrow, by e-mail

4    Monday.

5             MR. MCCARTHY:   Certainly we can let you know by

6    Monday.

7             THE COURT:   Thank you, Mr. McCarthy.

8             MR. MCCARTHY:   Thank you, Your Honor.

9             THE COURT:   Mr. Gardner, on this I'll let you

10   precariously wade these waters as your young compatriots look

11   up here smiling at me, maybe you and Mr. McCarthy can talk

12   about this.  It may not be that April 29th is a necessary

13   discovery deadline.  Whatever you think.

14            MR. GARDNER:   Sure.  And I completely concur, we get

15   along very well.  I expect that will continue.  The only thing

16   I just want to flag for Your Honor, and I don't expect this is

17   going to be an issue, we think it is critical that there be

18   discovery coordination with the West Point case.  We are using

19   many of the same witnesses.  They should not be deposed more

20   than once.  I am confident we can achieve that goal, but I

21   wanted to flag that for Your Honor that that is I think one of

22   the primary concerns from the Government's perspective.

23        From a trial perspective, my only big concern is that my

24   colleague here is getting married in September, so I want to

25   just be very sensitive to that date.

Preliminary Injunction Hearing 12/14/23

```
1            THE COURT:  Mr. Mendez is getting married in
2    September?
3            MR. GARDNER:  He is.
4            THE COURT:  Congratulations, Mr. Mendez.
5            MR. MENDEZ:  Thank you very much.
6            THE COURT:  Have you warned your spouse as to what it
7    means to be married to a lawyer?  I assume your spouse --
8            MR. MENDEZ:  She has an idea, yeah.  I've been
9    practicing for five years so she has an idea already.
10            MR. GARDNER:  And I didn't mean to embarrass him.
11            THE COURT:  Make sure your spouse doesn't call my
12    wife.  I will tell you that.
13        (Laughter.)
14            MR. GARDNER:  And I didn't mean to embarrass him but
15    I do want to celebrate him.  But in terms of -- we can work
16    collaboratively.  I think the only other thing I would say, and
17    this is obvious, is that the quicker we go I think the more we
18    need to think about, you know, framing discovery narrowly so
19    that we can get this done.  So I think if they are willing to
20    cooperate in terms of reasonable discovery, you know,
21    limitations, I don't see why this should be a problem.
22            THE COURT:  That's fine.  I would note that this
23    is -- I'm not trying to rush what's going on up at West Point.
24    I mean, the facts may or may not be different in terms of some
25    questions I have.  This is probably dangerous to say this after
```

1    Navy failing on the goal line against Army last Saturday.

2        (Laughter.)

3            MR. GARDNER:  You're in a hostile audience now, Your

4    Honor.

5            THE COURT:  Two Naval officers are trying to smile

6    but they can't get a smile out.  But the point is that it may

7    be different numbers.  I'm more than a little interested in

8    terms of the 91 percent Chief of Naval Operations, 40 percent

9    flag rank, and it may not be the same numbers as to West Point.

10   I don't know what the numbers are.

11           MR. GARDNER:  Absolutely.  And I'm not suggesting the

12   facts are going to be identical.  All I'm saying is many of our

13   witnesses are the same witnesses, for example experts.  And

14   again, I am confident we'll be able to work collaboratively.

15           THE COURT:  That's fine.  Just get an e-mail to my

16   chambers on Monday, and don't make it 5 o'clock on Monday.

17   Just sometime Monday during the day get an e-mail to my

18   chambers about this and we will enter an order today with

19   respect to for the reasons set forth on the record and to be

20   further developed and explained in an opinion to follow

21   shortly, the motion for preliminary injunction in this matter

22   is denied for the reasons set forth on the record and to be

23   developed more fully in an opinion, and then I will await the

24   issuing of a scheduling order when you get back to me.

25           And as I say, I'll make this work.  We will make this

Preliminary Injunction Hearing 12/14/23

1    work.  This is very important and I've got it and I know
2    there'll be a history of it.  And clearly my view is, as I
3    indicated to Mr. Norris, when the time is right it clearly is
4    going to go up to the Fourth Circuit and it may or may not go
5    to the Supreme Court.  But I think it's important to get the
6    record as developed now as we can and then up it goes because,
7    along with the issues you've raised, I may or may not have
8    raised issues that you haven't thought about because I have
9    several times some of the issues raised by the plaintiffs
10   certainly struck a nerve with me, but I'm like, well, we have
11   to develop the factual record.  I don't know what the factual
12   record is so we have to develop a record on it.  So that's
13   where we are.
14        Okay.  Well, thank you.  Unless there's anything else,
15   thank you all very much.  And I thank Ms. Herndon here for her
16   work, and Ms. Longmore particularly, thank you for keeping up
17   with me a few times when I got rolling.
18        Okay.  So with that, this Court stands adjourned for the
19   day.  Thank you very much.
20        (The proceedings concluded at 4:48 p.m.)
21
22
23
24
25

1    CERTIFICATE OF OFFICIAL REPORTER

2        I, Amanda L. Longmore, Registered Professional Reporter
and Federal Certified Realtime Reporter, in and for the United
3    States District Court for the District of Maryland, do hereby
certify, pursuant to 28 U.S.C. § 753, that the foregoing is a
4    true and correct transcript of the stenographically-reported
proceedings held in the above-entitled matter and that the
5    transcript page format is in conformance with the regulations
of the Judicial Conference of the United States.

6

                          Dated this 18th day of December 2023
7                          -S-

                          _____
8                          AMANDA L. LONGMORE, RPR, FCRR
                           FEDERAL OFFICIAL COURT REPORTER
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Preliminary Injunction Hearing 12/14/23

**1**

**1** [3] - 62:24; 63:24
**1.2** [1] - 101:5
**10** [2] - 10:10; 47:9
**100** [1] - 62:25
**11** [4] - 28:21, 23; 56:12; 87:11
**12** [2] - 67:17; 116:3
**12th** [1] - 8:10
**13** [2] - 79:9; 89:13
**14** [2] - 28:21; 62:19
**15** [6] - 36:4; 82:17; 89:14; 109:21; 112:4
**16** [1] - 57:3
**16th** [1] - 27:14
**17** [1] - 96:7
**174** [1] - 82:15
**18** [2] - 41:10, 21
**180-degree** [2] - 109:3, 7
**1814** [1] - 70:15
**19** [2] - 41:10, 21
**19.1** [1] - 88:18
**1948** [1] - 102:18
**197** [1] - 114:7
**1986** [1] - 83:22
**1st** [3] - 35:22; 81:25; 82:1

**2**

**20** [1] - 116:20
**2001** [1] - 114:2
**2002** [1] - 88:20
**2003** [1] - 9:2
**2008** [2] - 30:25; 80:6
**2009** [1] - 23:5
**2010** [2] - 54:8; 88:18
**2018** [1] - 38:1
**2019** [1] - 114:8
**2023** [1] - 73:8
**2024** [5] - 26:13; 43:15, 17; 73:8; 116:4
**2025** [2] - 26:16; 27:15
**2026** [2] - 28:18; 88:21
**2027** [1] - 28:19
**21** [1] - 104:8
**213** [1] - 94:16

**23** [3] - 26:8, 12; 41:6
**23-year** [1] - 41:22
**24** [2] - 88:20; 118:15
**24.5** [1] - 88:18
**245** [1] - 114:2
**26** [2] - 116:3; 119:8
**27** [1] - 82:16
**27th** [1] - 82:14
**28** [2] - 117:19; 119:11
**28th** [4] - 115:24; 116:5; 117:25; 119:6
**29** [4] - 116:4; 117:18; 118:19; 119:9
**29th** [3] - 8:21; 39:5; 120:12

**3**

**3** [2] - 96:7; 98:15
**30** [2] - 73:7; 74:1
**31st** [2] - 35:23; 82:2
**327** [1] - 76:5
**335** [1] - 114:2
**35** [1] - 12:8
**3rd** [1] - 2:8

**4**

**4** [5] - 7:2; 9:14; 38:20; 59:4; 98:14
**40** [6] - 62:3; 72:15; 73:7; 88:20; 106:23; 122:8
**4:48** [1] - 123:20

**5**

**5** [4] - 62:24; 63:24; 78:23; 122:16
**50** [1] - 62:21
**55** [1] - 21:23
**550** [1] - 21:14
**56.5** [1] - 64:3
**58** [1] - 81:10
**59** [1] - 64:1

**6**

**6** [2] - 62:20, 25
**60** [4] - 43:18-20,

22
**60-some** [1] - 12:8
**600** [1] - 21:13
**61** [1] - 82:8
**62.8** [1] - 64:2
**64** [2] - 36:3; 82:11
**65** [1] - 21:25
**650** [2] - 34:7; 104:7
**66** [1] - 107:4
**67** [1] - 79:24
**6th** [5] - 7:21; 8:17; 39:6; 70:10; 119:10

**7**

**7** [1] - 109:21
**70** [1] - 90:16
**70,000** [5] - 79:13, 17, 19; 80:20
**74** [2] - 79:11; 80:21
**75.5** [1] - 64:3
**78** [1] - 78:21
**79** [1] - 91:19

**8**

**8** [1] - 28:22
**802** [1] - 114:3
**81** [1] - 64:4
**8453** [1] - 10:11
**8th** [1] - 8:7

**9**

**9** [1] - 36:21
**91** [6] - 57:24; 61:20, 22; 73:2; 95:23; 122:8
**915** [1] - 114:7
**95** [1] - 72:11
**952** [1] - 114:3
**99** [1] - 95:23

**A**

**abandoned** [1] - 96:22
**abdication** [1] - 84:20
**abilities** [1] - 50:19
**ability** [7] - 37:3; 67:18, 20; 71:23; 79:22; 80:1; 108:20

**able** [19] - 13:3; 14:1; 17:12, 25; 22:11, 13; 23:24; 25:14; 27:25; 32:9; 35:15; 51:11, 16; 61:1; 66:18; 71:22; 103:19; 108:16; 122:14
**abroad** [1] - 89:10
**absence** [1] - 24:13
**absent** [2] - 11:13; 31:8
**absolute** [2] - 54:24; 103:10
**absolutely** [16] - 24:7; 37:8; 43:4; 46:17; 55:1; 59:22; 60:16; 62:12; 64:10; 71:22; 85:17; 86:22; 94:15; 98:24; 109:7; 122:11
**Absolutely** [1] - 103:23
**absurd** [1] - 55:16
**abundant** [1] - 23:21
**academic** [1] - 81:4
**academies** [20] - 7:2, 4; 9:16, 18; 15:3; 16:22; 32:23; 33:1; 38:20, 22; 39:24; 43:10, 15; 47:17; 58:14; 77:25; 78:1; 91:6; 99:10; 100:15
**Academy** [103] - 2:4; 4:9, 13-14; 6:15; 7:8, 10; 9:24; 10:10; 15:3; 16:22; 17:16; 20:22; 21:5, 13; 24:13; 25:7, 17; 27:2; 28:12, 18; 32:6, 8; 34:3, 25; 36:5, 10; 42:22; 46:2; 50:13, 17, 23; 53:8; 54:5, 13; 57:11, 23, 25; 59:9; 60:3, 11; 61:23; 62:4, 8, 15, 21, 24; 63:24; 64:5, 9;

65:7, 19; 72:2, 7, 9, 11, 16; 73:3, 6, 18; 74:12; 75:13, 15-16, 20; 78:16, 20, 23; 81:23; 82:8, 15, 25; 84:5, 18; 85:11, 14; 88:19; 91:21, 24; 92:4, 19, 23; 93:8; 95:8, 20, 25; 96:11, 13, 21; 97:14; 99:18; 101:16, 18, 21; 105:10; 106:24; 107:7; 109:11; 113:21; 114:17
**academy** [1] - 85:4
**Academy's** [15] - 7:15; 13:15; 15:4, 24; 39:18; 63:18; 72:4; 74:14; 78:6, 11; 89:23; 90:19; 93:3; 97:24; 114:13
**accelerate** [1] - 108:10
**accept** [1] - 28:6
**acceptance** [1] - 40:15
**accepted** [3] - 36:4; 66:3; 82:18
**Access** [1] - 6:4
**access** [1] - 6:9
**accomplish** [1] - 96:1
**accomplishing** [1] - 65:3
**according** [5] - 6:17; 8:6; 14:8; 57:21; 61:21
**accordingly** [3] - 31:23; 38:8; 95:10
**account** [1] - 76:4
**accounts** [1] - 62:24
**accurate** [4] - 29:6; 33:7; 60:16; 70:5
**accuse** [1] - 116:25
**achieve** [8] - 48:5; 51:18; 52:10; 62:16; 67:22;

92:2; 93:15; 120:20
**achieved** [2] - 64:8; 103:4
**achieving** [8] - 48:12; 51:20, 25; 53:6, 23; 54:1; 60:9; 100:22
**acknowledge** [4] - 13:8; 24:6, 8
**acknowledged** [5] - 10:20; 28:13; 64:5; 72:7; 82:10
**Acting** [1] - 4:14
**Action** [2] - 8:24; 88:2
**action** [2] - 7:9; 30:9
**actual** [2] - 13:14; 75:2
**Adarand** [2] - 53:12; 67:6
**add** [1] - 33:25
**added** [1] - 82:23
**addition** [1] - 81:11
**additional** [4] - 21:11, 19; 81:17; 119:7
**address** [12] - 9:17; 12:1; 27:1; 31:15, 21; 58:14; 84:8; 89:21; 93:16; 94:3, 23; 108:17
**addressed** [3] - 31:14; 50:14; 110:9
**addresses** [1] - 98:15
**addressing** [2] - 6:5; 93:17
**adjourned** [1] - 123:18
**adjusted** [1] - 95:10
**Admiral** [4] - 4:13; 7:11; 62:3; 67:14
**admiral** [1] - 67:14
**Admirals** [2] - 72:24; 73:25
**Admission** [4] - 6:14; 80:12, 17
**admission** [10] - 16:23; 18:4; 26:9; 36:4;

Preliminary Injunction Hearing 12/14/23

81:12; 82:12;
84:18; 90:19,
21; 94:10
**admissions** [60] -
6:17, 20; 7:15,
25; 9:4, 15;
10:9; 13:15;
15:5; 34:6, 11;
35:20, 23, 25;
36:1, 7, 13, 17;
43:16; 46:23;
51:20; 52:12,
20; 53:3, 10;
54:5, 12; 55:21;
58:23, 25;
62:15, 19-20;
65:19, 21;
68:25; 74:15;
78:7, 11, 22, 24;
80:24; 81:24;
82:25; 83:2, 8;
87:18; 90:6, 23;
91:1, 14; 95:9;
96:4; 99:18;
101:5; 114:14;
116:4; 119:10
**Admissions** [7] -
2:4, 18; 3:6;
4:12; 6:22;
78:19; 114:9
**admit** [2] - 91:21,
24
**admits** [1] - 21:5
**admitted** [8] -
17:13, 15;
20:22; 60:10;
81:19; 85:14;
90:9; 95:14
**admittedly** [1] -
97:16
**advance** [2] -
10:4; 85:15
**advancing** [1] -
25:11
**adversely** [1] -
119:21
**advisory** [1] -
27:5
**advocacy** [2] -
10:22; 71:8
**advocate** [2] -
66:5; 70:4
**affairs** [1] - 85:23
**affect** [2] - 99:12;
111:17
**affected** [2] -
101:5; 119:21
**affidavit** [1] -
21:12
**affidavits** [2] -

77:20; 110:10
**affirm** [1] - 13:6
**affirmed** [1] -
11:23
**afford** [2] - 85:21;
100:23
**afraid** [3] - 55:13;
57:17; 70:25
**African** [3] -
73:19; 76:17;
106:25
**afternoon** [8] -
2:22; 4:17, 23;
5:2, 6; 60:18,
23; 73:22
**age** [5] - 26:8;
41:6, 22; 44:2;
54:22
**ages** [2] - 26:12;
41:7
**ago** [6] - 2:11;
3:11; 8:10;
31:10; 39:22;
100:13
**agree** [4] - 33:16;
46:16; 74:8;
85:17
**agreeable** [3] -
12:13, 16
**agrees** [1] - 46:13
**ahead** [5] - 66:14,
20; 89:21;
113:17; 117:22
**aid** [1] - 74:20
**all-volunteer** [3] -
56:22; 57:2, 4
**allegation** [1] -
7:14
**allegations** [1] -
46:20
**alleged** [5] - 17:5;
25:24; 40:7;
57:5
**alleging** [1] -
25:14
**alleviate** [1] - 89:4
**allow** [4] - 18:1;
96:1; 117:19;
119:18
**allowed** [5] -
13:23; 36:1;
37:2; 65:14;
118:14
**allows** [1] - 118:9
**almost** [6] - 28:8;
52:14; 69:13;
110:5
**alone** [2] - 50:11;
89:6
**alter** [4] - 98:2;

114:4, 10
**alternate** [1] -
81:16
**alternative** [1] -
53:21
**alternatives** [7] -
47:11; 51:23;
52:9, 14; 90:1;
95:17, 21
**ambiguity** [1] -
32:22
**ambit** [1] - 23:3
**Amen** [1] - 19:22
**Amendment** [4] -
9:1; 34:16; 38:6;
95:12
**Amendment's**
[2] - 7:16; 114:14
**American** [4] -
5:11; 57:18;
70:9, 25; 75:5;
106:25
**Americans** [4] -
32:10; 62:19;
73:19; 76:17
**amicus** [5] - 5:9;
39:21; 77:14
**amorphus** [1] -
9:11
**amount** [2] - 24:3;
101:7
**ample** [1] - 42:19
**analogous** [2] -
93:22; 94:4
**analogy** [1] -
113:1
**analysis** [13] -
11:7; 37:6;
44:24; 45:8;
49:20; 61:18;
75:25; 79:15;
87:2; 102:21;
106:15; 107:25;
114:17
**Analytics** [1] -
87:13
**analyze** [1] - 71:7
**ANDERSON** [5] -
3:2, 8, 14, 17,
21
**Anderson** [4] -
3:2, 4; 8:13;
119:19
**Anderson's** [1] -
44:5
**Annapolis** [1] -
9:24
**annually** [1] -
95:8
**anonymous** [5] -

19:7; 23:23;
24:22; 25:13;
27:7
**anonymously** [2]
- 13:16, 23
**answer** [7] - 42:3;
47:15; 52:7;
71:22; 93:18;
94:14; 108:8
**answers** [1] -
113:18
**anticipate** [1] -
116:9
**anytime** [1] -
49:10
**anyway** [2] - 21:4;
35:16
**apex** [1] - 98:12
**apiece** [1] - 17:23
**apologize** [2] -
85:15; 113:11
**appeal** [13] - 24:9;
105:9; 108:21;
109:13; 110:3,
13; 111:5, 9, 20;
112:18; 115:13,
16; 120:2
**Appeals** [1] -
106:10
**appear** [2] -
26:14; 69:5
**appearance** [4] -
3:7, 13, 20
**appellate** [1] -
105:14
**applicant** [3] -
79:1; 81:15, 18
**applicant's** [3] -
9:3; 79:3; 90:7
**applicants** [13] -
25:16; 47:7;
51:4; 79:13;
80:19; 81:12;
83:7; 90:10, 14,
20; 95:14
**applicants'** [1] -
7:24
**application** [6] -
17:8; 22:10;
35:23; 89:2, 9;
104:5
**applications** [1] -
82:2
**applied** [7] - 17:7;
22:14; 41:9;
46:13
**applies** [9] -
44:24; 49:20;
70:25; 76:7;
84:23; 86:20;

97:14, 24;
112:11
**apply** [20] - 16:19;
22:11, 14, 18;
25:14; 26:8, 15;
42:22; 47:9;
49:18; 64:15;
72:4; 75:15;
84:4, 12, 24;
97:22; 98:3;
103:16
**applying** [1] -
97:25
**appointee** [1] -
81:17
**appointees** [1] -
21:20
**appointment** [1] -
82:5
**Appointment** [1] -
82:16
**appointments** [1]
- 96:10
**appreciate** [7] -
32:4; 105:3;
113:6; 118:11;
119:16, 24
**approach** [1] -
78:23
**appropriate** [4] -
24:5; 87:23;
88:8; 93:7
**appropriately** [1]
- 87:23
**approved** [1] -
94:20
**approvingly** [1] -
95:1
**April** [7] - 35:24;
82:7; 116:3;
117:18; 118:19;
119:9; 120:12
**apt** [1] - 113:1
**aptly** [2] - 45:7;
57:13
**arbitrary** [3] -
48:2; 97:18;
104:16
**area** [1] - 21:2
**areas** [2] - 2:7;
85:22
**argue** [4] - 14:25;
31:23; 90:23;
92:18
**argued** [3] -
45:11; 106:20;
113:16
**arguing** [6] -
17:11, 13;
33:13; 45:13;

86:23
**argument** [30] -
10:16; 12:2, 19;
15:2, 6; 18:5,
19, 22; 20:16;
21:3; 23:1;
25:11; 26:18;
28:7; 31:25;
39:11; 58:21;
63:17; 66:2;
71:13, 25; 96:2,
20; 97:21; 98:4,
8; 99:9, 16;
107:17
**argument's** [1] -
18:24
**arguments** [5] -
26:18; 96:8;
104:11, 14;
109:5
**Army** [4] - 63:9;
65:23; 122:1
**Article** [3] - 19:4;
22:17, 19
**articulated** [1] -
99:4
**articulating** [1] -
100:18
**ascertaining** [1] -
13:18
**Asian** [1] - 64:7
**aside** [2] - 25:24;
116:13
**aspect** [1] - 69:7
**aspersions** [1] -
78:12
**asserted** [2] -
37:23; 76:1
**asserting** [1] -
45:13
**assess** [10] - 19:1;
20:21; 51:16;
59:5; 66:18, 20,
22
**assessed** [1] -
91:4
**assessing** [1] -
76:22
**assessment** [4] -
79:18; 81:14;
90:17
**assigning** [1] -
9:10
**assistant** [1] -
2:13
**associated** [1] -
87:14
**Association** [1] -
5:10
**assume** [8] - 41:8;

50:5, 14, 17, 19, 22; 97:14; 121:7
**assumed** [2] - 36:22; 108:24
**assumes** [2] - 49:25; 111:3
**assumption** [2] - 91:15, 22
**assumptions** [11] - 51:1, 4; 54:18, 20; 55:4, 10-11; 72:1, 5; 92:8
**Assurance** [7] - 21:8; 36:2; 79:5; 80:16; 82:16
**assure** [1] - 70:20
**athletes** [4] - 28:14, 22-23; 80:3
**athletic** [1] - 80:1
**attached** [1] - 81:25
**attack** [2] - 70:11, 13
**attacked** [1] - 70:14
**attempt** [1] - 89:4
**attend** [2] - 9:24; 10:1
**attended** [1] - 52:15
**attending** [3] - 41:13; 42:13, 16
**attest** [1] - 14:6
**attorney** [1] - 3:6
**attractive** [1] - 51:13
**audience** [1] - 122:3
**August** [6] - 43:16, 22, 24-25; 44:1, 9
**auspices** [1] - 112:23
**Austin** [2] - 4:9; 7:11
**authorities** [2] - 30:1; 83:23
**authority** [3] - 23:21; 24:4, 7
**available** [1] - 6:9
**avenue** [1] - 22:6
**avenues** [1] - 38:17
**avoid** [1] - 54:21
**await** [3] - 66:1; 70:3; 122:23
**aware** [1] - 105:17
**awhile** [2] - 19:18; 52:11

**B**

**B.R** [2] - 19:3; 20:14
**backed** [1] - 67:25
**background** [3] - 50:10; 82:19; 91:23
**backgrounds** [2] - 65:22; 67:21
**bad** [3] - 67:10
**baggage** [1] - 35:6
**bags** [1] - 44:5
**bailey** [1] - 92:15
**balance** [11] - 11:13; 12:3; 31:4, 24; 35:12, 14; 44:25; 45:4; 63:12
**balancing** [3] - 44:25; 49:14; 68:7
**Baltimore** [4] - 31:10; 38:5; 70:16; 105:20
**banned** [2] - 52:11; 53:3
**bar** [4] - 24:5; 26:7; 28:7; 29:3
**bare** [5] - 13:13, 20; 17:22; 41:7; 66:19
**bare-bone** [2] - 13:13; 17:22
**bare-bones** [1] - 41:7
**barred** [2] - 40:16; 99:17
**barrel** [1] - 71:16
**barrier** [3] - 16:18; 24:14; 25:24
**barriers** [2] - 16:21; 28:3
**based** [27] - 6:20; 9:10; 31:12; 32:10; 46:23; 49:21; 50:11, 24; 53:10; 54:12; 55:13, 21; 56:14; 58:23; 66:12; 74:23; 76:12; 81:13; 82:23; 89:1, 11; 92:7; 94:17; 96:25; 101:11; 104:3
**baseless** [1] - 55:14
**basic** [2] - 31:13;

67:1
**basing** [2] - 21:12; 76:13
**basis** [3] - 53:18; 78:25; 103:14
**battle** [3] - 72:14; 77:6; 103:1
**battlefield** [2] - 69:24; 92:1
**bear** [1] - 63:21
**bearing** [1] - 46:8
**bears** [2] - 29:10; 103:18
**Beautiful** [2] - 31:10; 34:14
**become** [3] - 9:22; 42:24; 84:5
**becomes** [3] - 10:6; 27:5; 103:5
**becoming** [2] - 62:3; 67:2
**beginning** [5] - 51:7; 72:6; 82:6, 12, 22
**begins** [1] - 81:24
**begun** [1] - 107:3
**behalf** [4] - 2:18; 4:8; 5:10; 19:7
**behind** [1] - 116:23
**beings** [1] - 48:25
**belie** [1] - 111:1
**below** [3] - 26:12; 79:7, 17
**bench** [25] - 10:18, 20; 14:4; 27:8; 30:10; 60:21; 71:19; 104:25; 105:20, 24; 112:4-6, 9; 113:17; 115:23; 116:8, 13-14, 17, 20; 117:16, 20, 23
**benchmark** [1] - 76:23
**benefit** [4] - 39:12; 47:7; 49:22
**benefits** [1] - 49:21
**Benisik** [2] - 37:25; 43:8
**best** [7] - 12:9; 59:5; 71:22; 110:19; 114:22; 115:5, 11
**better** [6] - 10:1;

39:14; 54:14; 66:20; 71:4
**between** [16] - 16:17; 17:16; 48:11; 51:25; 53:4; 68:19, 21; 69:25; 75:16; 76:24; 77:2; 82:6; 84:21; 92:6; 93:14; 96:12
**bidding** [2] - 41:1, 4
**bifurcate** [1] - 49:1
**big** [5] - 17:1, 11; 36:12; 48:11; 120:23
**bit** [6] - 8:19; 28:16; 69:4; 78:9; 100:25; 101:2
**Black** [7] - 5:10; 62:19; 64:8; 72:21, 23; 73:4; 90:9
**black** [1] - 34:8
**blends** [1] - 107:12
**blow** [2] - 58:18; 59:21
**Blue** [1] - 80:3
**bluntly** [1] - 64:5
**board** [3] - 55:11; 71:1
**body** [1] - 87:6
**Bollinger** [1] - 9:2
**bombshell** [1] - 43:10
**bone** [2] - 13:13; 17:22
**bones** [1] - 41:7
**boosted** [1] - 2:10
**booster** [1] - 2:10
**boot** [1] - 85:4
**Boston** [1] - 4:2
**bottom** [3] - 3:10; 41:11; 81:17
**box** [2] - 34:8; 48:17
**boys** [1] - 40:18
**Branch** [2] - 71:1
**branches** [1] - 99:13
**breaker** [1] - 80:25
**brief** [28] - 5:9; 20:16; 21:3; 23:1; 29:4; 33:25; 36:9;

39:21; 48:14, 16, 24; 62:14; 63:18; 77:15; 78:11; 79:9; 82:1; 96:6; 97:9; 100:1; 101:13, 17; 104:8; 107:5; 109:1
**briefed** [2] - 8:5, 18
**briefing** [9] - 8:6; 12:6; 13:8; 45:25; 81:23; 102:10; 113:16; 117:20
**briefings** [1] - 86:17
**briefly** [2] - 23:18; 95:17
**briefs** [4] - 77:15; 115:19; 117:25; 118:1
**bring** [1] - 39:25
**bringing** [1] - 86:19
**brings** [1] - 7:9
**British** [1] - 70:15
**broad** [2] - 48:6; 67:15
**Bruce** [2] - 4:11; 7:11
**build** [1] - 74:19
**building** [2] - 107:13; 108:1
**bumped** [3] - 116:19, 21; 118:4
**burden** [16] - 9:6; 13:12; 18:6, 9; 46:8; 54:17; 55:6, 8; 60:12, 17, 19; 89:18
**Bureau** [2] - 92:25; 93:6
**buried** [1] - 119:22
**business** [2] - 106:11; 119:1
**busy** [3] - 11:23; 111:11, 19

**C**

**calendar** [2] - 117:12; 119:12
**calendars** [1] - 118:2
**calibrate** [1] - 76:4
**California** [2] -

53:1; 98:9
**cam** [1] - 2:22
**candidate** [2] - 79:18; 81:15
**Candidate** [1] - 10:2
**candidate's** [1] - 81:9
**candidates** [7] - 79:7, 16; 80:18; 82:17; 90:13; 91:22, 25
**cannot** [12] - 17:15, 21; 18:9; 25:25; 26:8; 31:7; 34:19; 40:3, 5; 51:8; 72:17; 78:5
**capable** [1] - 17:14
**capacities** [3] - 7:12
**capacity** [5] - 4:10-12, 14; 34:8
**Capitol** [3] - 70:11, 13
**care** [2] - 13:1; 50:15
**careful** [3] - 32:17; 64:11; 104:10
**Carlos** [2] - 4:10; 7:11
**Carolina** [12] - 6:19; 8:23, 25; 14:17; 30:12; 105:24; 112:5, 8; 116:15
**carriers** [1] - 72:13
**carries** [1] - 35:6
**carve** [1] - 91:6
**carved** [2] - 39:23; 75:19
**case** [131] - 2:3, 8; 7:9, 14; 8:3; 9:5; 10:9; 13:8, 22; 14:8; 16:2; 18:25; 19:3, 5, 8, 10-11, 17; 20:5, 15, 25; 21:1; 24:9; 25:9; 26:3; 28:8; 29:9; 30:16; 31:9; 32:5, 7, 11, 13; 34:4, 7, 14, 21; 35:12; 37:25; 38:2, 9, 16-17; 39:22; 40:13,

17; 42:1, 4, 23;
43:7; 44:20;
46:6; 52:20;
56:11, 18; 57:9,
19; 60:21;
61:19; 62:10;
63:18, 21; 66:1,
4; 67:13; 68:1;
69:9, 11; 70:18;
71:7, 14; 72:25;
73:17; 76:25;
77:1, 3, 15, 21;
83:21; 84:9;
86:4; 87:21;
91:5; 93:22,
24-25; 94:25;
98:6, 8, 20, 23;
99:8, 21, 23;
100:18; 102:4;
103:15; 104:10,
22; 105:3, 7, 13;
106:14, 16-17;
107:2; 109:8,
19; 111:4, 9,
12-14; 112:21,
24; 114:16;
115:1, 19;
116:21; 117:10;
120:18
**cases** [18] - 10:24;
13:24; 16:18;
20:19; 23:2, 7,
22; 25:10;
40:10, 24; 41:1;
53:11; 64:25;
67:6; 98:5, 9;
101:4
**casting** [1] -
78:12
**catchalls** [1] -
48:6
**categories** [15] -
47:21; 48:2, 9,
15; 49:3; 92:18,
21, 24; 93:7, 11,
13; 97:17;
104:17
**categorize** [2] -
48:7, 15
**Catherine** [1] -
4:23
**causes** [1] - 67:5
**causing** [1] - 88:7
**celebrate** [1] -
121:15
**Census** [2] -
92:25; 93:6
**census** [2] -
47:25; 48:7
**certain** [10] -

18:21; 44:2;
48:23; 67:4, 11;
106:20; 118:14,
23
**certainly** [26] -
14:7; 24:10;
26:13, 23;
42:19; 45:4, 18;
46:12; 48:4;
57:18; 77:21;
103:20; 106:16;
109:10, 17, 23;
111:1; 112:20;
114:9; 115:14;
116:6, 13;
118:17; 120:5;
123:10
**cetera** [3] - 52:22;
116:2
**chain** [9] - 60:3,
10; 61:11;
62:14, 23;
64:13; 73:2;
84:6; 103:9
**chair** [1] - 18:15
**challenge** [6] -
16:18; 38:7;
46:6; 56:22;
85:3; 95:24
**challenged** [3] -
12:22; 38:14;
39:19
**challenging** [4] -
15:22; 39:18;
80:8
**chambers** [3] -
23:20; 122:16,
18
**change** [4] - 15:9;
86:9; 98:2;
116:21
**changing** [1] -
94:13
**characterization**
[1] - 78:18
**characterize** [1] -
58:21
**characterized** [1]
- 89:2
**check** [1] - 48:17
**checked** [1] -
112:6
**chefs** [1] - 102:17
**Chief** [19] - 9:9;
32:24; 33:14;
38:19; 39:4;
56:17; 57:23;
58:25; 59:4, 22;
73:2; 94:7, 16;
99:1; 101:6;

103:12; 107:20;
114:21; 122:8
**Chiefs** [4] - 61:20,
22; 73:25;
106:25
**child** [1] - 40:14
**chime** [1] - 6:8
**Chip** [1] - 80:3
**choice** [1] -
115:21
**choose** [1] - 22:2
**chose** [3] - 15:11;
42:22
**Chris** [1] - 5:2
**chunk** [1] - 36:12
**Circuit** [39] - 19:3,
5; 20:14; 24:4,
10; 30:20; 31:9;
40:17; 105:15,
18-19; 106:11,
19; 107:17;
109:1, 9, 14, 19,
21; 110:8, 13;
111:1, 8, 13, 19,
24; 112:1, 7, 19;
114:1, 6-7;
115:14, 17, 19;
123:4
**circumstance** [2]
- 81:19; 90:8
**circumstances**
[4] - 30:20;
90:16, 19; 114:1
**citation** [1] -
62:13
**cite** [7] - 20:16;
24:9; 40:10, 13,
18, 24
**cited** [13] - 23:2;
24:1; 43:8; 62:8;
68:9; 69:15;
87:21; 95:1;
98:5, 7; 101:6;
112:3
**cites** [1] - 114:3
**citing** [1] - 93:9
**citizens** [2] - 98:7,
19
**City** [1] - 109:19
**Civil** [3] - 2:4;
5:11
**civil** [1] - 116:20
**civilian** [10] -
9:25; 15:9, 13;
47:23; 72:2, 7;
77:2; 99:11, 15,
17
**claim** [5] - 38:7;
40:7; 44:16;
80:25; 114:13

**Claims** [1] - 40:25
**claims** [4] - 13:22;
16:10; 39:13;
88:24
**clarification** [1] -
94:15
**clarify** [2] - 78:14;
80:23
**clarity** [1] - 113:6
**Clark** [1] - 77:18
**class** [8] - 27:15;
28:18; 60:10;
73:8; 81:3;
88:21; 93:4
**classes** [1] -
28:20
**classification** [1]
- 89:7
**classifications**
[4] - 6:17; 65:1;
88:25; 93:8
**classified** [1] -
98:19
**classify** [1] - 98:7
**classifying** [1] -
9:10
**classroom** [1] -
91:17
**classrooms** [1] -
94:5
**Clause** [1] - 8:25
**clear** [23] - 14:5;
15:20; 29:14;
30:6; 31:8;
32:16; 36:10;
38:18; 46:10;
47:14; 60:15;
63:16; 78:12;
82:19; 84:20;
94:22; 96:5;
97:13; 102:2;
106:6; 113:8;
114:12
**cleared** [1] -
17:18
**clearly** [19] - 3:25;
24:15; 26:3, 12;
28:12; 33:10;
38:16; 41:18;
45:25; 59:19;
86:20; 91:18;
93:10; 106:9;
109:4; 110:13;
114:16; 123:2
**Clerk** [2] - 3:9;
5:23
**clerks** [1] - 29:18;
111:23; 115:7
**client** [2] - 108:5;
109:24

**clients** [5] - 22:21;
109:3, 5;
110:24; 111:2
**clients'** [2] -
109:2, 8
**climate** [1] - 65:12
**climates** [1] -
87:14
**climbing** [1] -
57:25
**close** [3] - 11:20;
41:10, 21
**closed** [1] - 73:10
**closes** [1] - 104:5
**Coast** [6] - 52:11,
13; 54:7; 96:12,
15
**Code** [1] - 10:11
**cohesion** [7] -
48:8; 66:24;
87:1, 8, 24; 88:7
**cohesive** [4] -
51:12; 74:19;
87:3; 92:12
**cohesiveness** [3]
- 88:8; 103:1, 8
**collaboratively**
[2] - 121:16;
122:14
**colleague** [10] -
37:20; 74:18,
23; 75:11; 76:7;
86:11; 88:1, 3;
95:18; 120:24
**colleagues** [3] -
14:20; 110:7;
112:9
**College** [1] - 6:23
**college** [10] -
9:25; 10:3;
41:14, 18;
42:13, 17;
44:19; 104:21
**color** [2] - 32:11;
67:24
**combat** [7] -
55:24; 58:9;
72:10; 74:20,
24; 92:8; 97:1
**combat-ready** [1]
- 74:20
**coming** [8] -
36:13; 50:16;
53:8; 61:9;
101:12; 103:10;
104:4, 12
**command** [6] -
32:12; 74:3;
84:6, 13, 16
**commander** [1] -

77:18
**commanders** [1] -
92:1
**commands** [1] -
92:22
**comment** [2] -
44:8; 108:1
**commission** [1] -
10:3
**commissioned**
[1] - 62:5
**commissioning**
[1] - 45:17
**commitment** [1] -
65:6
**committed** [1] -
63:11
**common** [1] -
25:10
**community** [2] -
51:15; 72:12
**comparison** [1] -
82:20
**compatriots** [1] -
120:10
**compelling** [8] -
52:1; 68:8; 75:9,
21; 83:11;
88:25; 89:8;
91:4
**compete** [7] -
20:19; 22:9;
27:25; 34:24;
36:14; 40:8, 21
**competitive** [2] -
22:1, 3
**complaint** [13] -
6:13; 7:17, 22;
19:11; 29:15;
42:12; 56:11-13;
57:1, 3, 5
**complete** [3] -
10:5; 77:2;
109:7
**completed** [1] -
82:2
**completely** [1] -
120:14
**comply** [1] -
32:11
**compounds** [1] -
13:17
**computer** [1] -
119:22
**conceded** [3] -
97:25; 104:15,
17
**concedes** [1] -
47:8, 10, 20;
49:6

concept [1] - 52:21

concern [4] - 93:17; 103:25; 118:11; 120:23

concerned [3] - 29:15; 61:19; 93:10

concerns [4] - 50:24; 88:7; 93:18; 120:22

concerted [1] - 52:13

conclude [1] - 34:15

concluded [6] - 8:6; 38:5; 83:5; 89:5; 92:4; 123:20

conclusion [2] - 87:7; 91:8

conclusions [2] - 17:25; 97:2

conclusively [1] - 75:22; 78:18

conclusory [2] - 18:9; 67:15

concrete [2] - 13:14; 27:23

concur [2] - 56:23; 120:14

conduct [1] - 112:9

conducted [1] - 79:18

conducting [1] - 107:25

confidence [1] - 92:6

confident [2] - 120:20; 122:14

confirm [1] - 18:13

conflicts [1] - 67:21

congratulations [1] - 121:4

Congress [3] - 28:10; 52:11; 70:20

congressional [9] - 16:25; 22:16; 27:12; 28:10; 29:8; 82:3; 107:4, 7, 12

Congressman [1] - 27:13

congressmen [1] - 22:1

connection [1] -

69:25

conscious [2] - 7:15; 114:13

consequence [1] - 77:11

consider [10] - 27:2; 53:10; 77:7; 82:25; 87:17; 89:25; 90:20; 95:3; 96:3, 9

considerable [1] - 100:10

consideration [26] - 9:3; 13:20; 27:3; 32:14; 39:18; 59:8; 72:4; 73:11; 74:14; 75:3, 7, 20; 76:8; 77:19; 80:7, 15; 81:2; 87:22; 89:23; 90:1, 23; 91:1, 7; 95:11, 15; 96:22

considerations [2] - 42:21; 45:18

considered [21] - 16:23; 17:14, 21; 18:3; 24:12; 25:16, 23; 26:23; 39:20; 77:9; 78:1; 79:2; 80:18; 81:6, 8; 90:7, 12, 17; 92:19; 95:21; 96:1

considering [4] - 7:24; 22:18; 36:16; 81:1

considers [2] - 78:17; 83:4

consistency [1] - 84:3

consistent [3] - 6:13; 78:22; 102:24

consistently [1] - 30:20

Consovoy [1] - 3:16

constantly [3] - 37:1; 49:17; 58:18

constitute [1] - 37:11

constitutes [1] - 40:9

Constitution [5] -

9:4; 35:11; 49:9; 70:12; 75:4

constitutional [17] - 32:12; 34:14, 17-18; 35:3, 7; 36:21; 37:9, 12, 23; 38:1; 43:2; 44:16; 45:6, 14; 46:6

consult [1] - 118:14

consumption [8] - 9:13, 22; 32:18; 62:11; 64:6, 12, 21; 77:14

contends [2] - 79:5; 92:3

contention [2] - 81:1; 93:19

contest [2] - 54:24; 55:3

context [20] - 8:4; 14:15; 19:2; 20:15; 24:19; 29:7; 74:10; 76:5, 16; 79:19; 83:15; 85:2; 86:13; 87:19, 22; 92:22; 93:13; 94:2; 99:7

contextual [1] - 91:1

continually [1] - 94:13

continue [3] - 34:10; 43:11; 120:15

continued [1] - 36:23

continuing [2] - 37:3; 68:24

contract [2] - 41:2, 4

contradict [2] - 88:9; 91:19

contradicted [1] - 81:2

contradicts [1] - 79:10

contrary [2] - 66:9, 25

contribute [2] - 63:5; 69:18

control [1] - 106:14

convenient [1] - 12:25

conversations [1] - 108:14

conversely [1] - 90:11

cookie [2] - 56:5; 103:10

cooks [1] - 102:17

cooperate [1] - 121:20

coordination [1] - 120:18

core [1] - 52:20

corner [1] - 38:10

Corps [26] - 9:22; 10:1, 6; 41:15; 45:20; 49:15; 50:16; 53:8; 59:16; 60:9; 61:14; 63:3; 64:3; 72:10, 22; 73:9, 12; 74:19; 76:22; 88:16; 92:1, 5-6; 99:13; 102:8

correct [34] - 3:16; 14:21; 15:17, 19; 16:8, 12, 14; 22:25; 23:10; 24:16, 21; 26:5, 7, 10, 14; 28:15; 37:10, 14; 38:12; 41:12; 42:11, 14-15, 17-18, 22-23; 46:16; 57:4; 59:3; 64:10; 76:19; 94:1

Corrected [1] - 8:9

corrected [2] - 21:22; 71:10

correctly [4] - 5:19; 33:15; 35:11; 76:10

correlation [4] - 68:19; 69:12, 14, 20

costs [2] - 53:15, 19

Council [1] - 30:25

counsel [10] - 2:15, 20; 3:11, 25; 4:15; 5:13; 8:7, 15; 25:19

count [2] - 7:9; 46:22

counteract [2] - 53:19; 68:16

counteracting [1] - 53:15

counterproducti ve [1] - 115:2

country [1] - 50:25

couple [3] - 38:11; 50:13; 97:10

course [11] - 3:14, 21; 34:16; 42:5; 52:25; 54:6; 55:17; 60:20; 91:3; 96:22; 97:18

Court [101] - 2:2; 5:23; 6:20; 7:1, 23; 8:21; 9:1, 4, 14; 14:17, 23; 15:13, 15, 20; 16:16; 20:2, 24; 24:2, 4; 26:1, 25; 27:1; 30:23; 31:7; 32:17, 21-23; 33:5, 12, 18, 22; 34:3; 35:5; 36:10; 37:24; 38:1; 39:24; 40:24; 41:2; 42:20; 47:18; 48:9; 49:4; 51:9; 53:11; 56:21; 57:10; 64:14; 65:11; 67:6; 69:9; 75:1, 19; 76:2; 77:6, 9; 78:2, 5, 8; 83:5, 22; 85:9, 17; 86:14; 87:1, 16; 89:2, 17; 90:4, 11; 91:3, 13; 93:10; 95:1; 97:4, 18; 99:4, 16, 19; 102:9; 104:9; 105:15, 19, 25; 106:10, 19; 109:10; 110:9, 14; 112:23; 114:19; 115:1; 118:25; 123:5, 18

COURT [157] - 2:3, 23; 3:1, 3, 10, 15, 18, 22, 24; 4:6, 19, 22; 5:1, 5, 8, 16; 6:5; 12:16, 18; 13:10; 14:3, 9, 16, 22; 15:14,

18; 16:1, 11, 13; 17:2; 18:10, 15; 19:15, 19, 23; 20:4; 21:12; 22:20; 23:2, 14, 16, 20; 24:15, 18, 22; 25:1, 3; 26:2, 7, 11; 27:8, 18; 28:5, 16; 29:12; 32:16; 33:11, 13; 34:2; 37:5, 9, 15, 17; 38:9, 15, 25; 39:2; 41:12, 17; 42:8, 11, 16, 19; 43:1, 6, 22; 44:7, 12; 46:18; 47:2; 54:9, 16, 18; 55:2, 22; 56:2, 25; 57:7; 59:2; 60:15; 61:3, 25; 63:16; 65:25; 70:2; 71:10, 19, 24; 72:19, 23; 73:15, 24; 76:10; 77:13; 78:13, 19; 79:25; 80:4, 12; 83:19; 84:2; 85:7, 10, 13; 86:1, 17; 91:12; 93:24; 94:6; 97:6, 11; 98:20, 23; 99:23; 100:3, 7, 10; 102:2; 104:25; 105:5, 11; 108:7, 12, 17, 23, 25; 110:19; 111:6, 8, 18; 113:8, 10, 15; 117:17; 118:18; 119:2, 17, 25; 120:7, 9; 121:1, 4, 6, 11, 22; 122:5, 15

court [11] - 2:6; 22:17; 39:6; 51:11; 52:2, 6; 58:24; 59:5; 60:17; 115:10

Court's [8] - 23:4; 37:25; 68:3; 78:9; 88:23; 89:20; 92:20; 98:17

courtesy [1] - 8:14

courthouse [3] - 2:7; 115:5, 8

Preliminary Injunction Hearing 12/14/23

**courtroom** [4] -
2:12, 14; 13:2;
43:25
**Courts** [2] - 35:1,
11
**courts** [10] -
51:10, 15;
66:18, 23; 76:4;
85:17, 20-21;
105:4, 14
**cover** [2] - 64:18
**COVID** [1] - 2:13
**crack** [1] - 68:11
**crank** [1] - 51:22
**cranked** [1] - 52:9
**criminal** [2] -
116:19; 119:13
**crisis** [1] - 57:4
**criteria** [5] -
11:10; 30:22;
31:1; 44:13;
109:15
**critical** [9] - 72:9,
17; 74:12, 15,
20; 75:7, 16;
92:22; 120:17
**critically** [1] -
75:24
**Croson** [1] -
53:12
**crucial** [2] -
56:10; 110:23
**crude** [1] - 49:1
**curious** [1] -
84:14
**current** [1] - 87:25
**cutter** [2] - 56:5;
103:10
**cycle** [5] - 42:24;
43:16; 82:12;
100:6; 108:4
**cycles** [1] - 32:10

# D

**D.M** [1] - 40:17
**damages** [3] -
34:19, 21
**dance** [1] - 40:19
**danger** [1] - 95:4
**dangerous** [1] -
121:25
**dare** [1] - 65:20
**data** [4] - 47:25;
74:25; 92:8;
93:6
**date** [22] - 36:3,
24; 49:6, 12;
82:1; 94:17;
112:15; 114:24;

115:23; 116:24;
117:3, 5, 7, 11,
17; 118:4, 6, 12;
119:11; 120:25
**dates** [1] - 119:2
**daylight** [1] -
96:11
**days** [13] - 8:10;
43:18-20, 22;
72:20; 112:5, 9;
116:13; 117:15;
119:1, 13
**DC** [1] - 20:14
**de** [1] - 101:10
**dead** [7] - 111:6,
10, 14; 112:22,
24; 113:2;
116:22
**deadline** [12] -
17:8; 115:24;
116:3, 5;
117:18; 118:19;
119:9; 120:13
**deal** [18] - 9:19;
12:2, 10, 18;
29:3; 55:15;
56:4; 57:10;
71:12; 72:25;
103:13; 105:11,
25; 107:3;
109:9; 112:3;
114:23
**dealing** [9] -
11:18; 24:18;
30:16; 45:21;
73:21; 83:11;
84:4; 94:2, 24
**Dean** [14] - 4:12;
78:17, 19;
79:10, 23;
80:21; 81:10;
82:7, 11; 90:15;
91:18; 95:13,
19, 22
**death** [1] - 56:2
**debatable** [1] -
70:6
**debate** [3] -
19:14; 20:7;
66:21
**decades** [3] -
38:13; 69:13;
73:10
**December** [5] -
8:7, 10; 27:14;
115:24; 119:6
**decide** [6] - 47:16;
48:10; 50:23;
73:22; 74:5;
106:15

**decided** [6] -
10:25; 76:23;
99:21; 104:19;
110:17
**deciding** [4] - 8:2;
20:22; 30:16
**decision** [23] -
7:2; 9:2; 15:4,
13; 32:24; 33:8;
38:4; 39:9, 12;
45:14; 68:3;
72:3; 75:14;
77:6; 85:3;
88:24; 91:7;
94:8, 23; 109:6;
110:24; 111:17
**decisions** [8] -
7:25; 21:23;
35:23; 36:15;
63:15; 85:19;
101:6; 109:3
**declaration** [25] -
18:8; 21:22;
36:3; 67:5, 13,
17; 78:17, 22;
79:11, 24;
80:22; 81:10;
82:7, 15; 87:2,
5, 9, 11; 89:11,
14; 90:15;
91:19; 95:20, 22
**Declaration** [1] -
8:9
**declarations** [8] -
13:13; 17:22;
35:24; 41:8;
67:13; 75:22;
77:17; 85:25
**declaratory** [1] -
30:9
**declare** [1] - 6:20
**declared** [1] - 9:9
**declined** [2] - 9:1,
15
**decrease** [1] -
65:23
**decreased** [1] -
95:15
**deemed** [1] -
79:14
**deep** [3] - 28:5;
62:9; 83:20
**defendant** [4] -
45:2, 5; 46:1;
63:24
**defendant's** [1] -
61:21; 107:5
**defendants** [12] -
4:8; 7:10, 13,
24; 11:5; 14:1;

16:6, 9; 45:10,
12
**defending** [1] -
104:7
**defense** [2] -
12:7; 85:22
**Defense** [7] -
4:10; 5:12;
10:11; 30:25;
87:6; 96:16, 19
**defer** [3] - 60:5;
77:10; 99:14
**deference** [28] -
29:25; 59:25;
77:1, 4, 11;
83:12, 17, 23;
84:9, 23, 25;
85:22, 24; 86:1,
13; 98:1, 6, 11,
13, 15, 18;
100:16, 18-20,
22
**deferring** [1] -
99:2
**define** [1] - 93:12
**defined** [1] -
93:20
**definitely** [3] -
10:22; 29:2;
113:20
**definition** [3] -
14:15; 47:12;
83:6
**definitive** [2] -
97:15; 118:3
**degree** [1] - 10:4
**Del** [3] - 4:10;
7:11; 85:2
**delay** [11] - 37:20,
22; 38:2, 5;
39:3, 24; 40:4;
43:5, 7
**delays** [1] - 117:8
**delta** [3] - 51:21,
24; 54:3
**demeans** [1] -
35:5
**demographics** [1]
- 93:5
**denial** [1] - 109:13
**denied** [4] - 45:1;
108:22; 115:3;
122:22
**deny** [2] - 97:4;
112:13
**Department** [13] -
4:18, 24; 5:3, 7;
10:11; 31:11;
61:10; 87:6;
96:16, 19, 24

**dependent** [3] -
28:25; 44:14;
45:8
**deploy** [1] -
114:25
**deposed** [1] -
120:19
**deposition** [3] -
112:22; 116:2;
119:6
**depositions** [1] -
14:7
**Deputy** [1] - 5:23
**described** [1] -
6:16
**describes** [1] -
87:6
**desegregated** [1]
- 102:19
**designed** [1] -
48:4
**despite** [2] -
69:14; 90:1
**detail** [3] - 13:14;
80:21; 92:15
**determination** [3]
- 52:18; 66:13;
104:16
**determinative** [7]
- 26:16; 81:8;
83:6; 90:5, 8,
18; 101:21
**determine** [4] -
52:2, 4; 109:14;
114:19
**determined** [4] -
9:5; 26:13;
33:23; 87:14
**determining** [1] -
13:19
**develop** [6] -
72:18; 106:20;
110:11, 16;
123:11
**developed** [8] -
104:13; 105:23;
112:2; 114:19;
116:11; 120:20,
23; 123:6
**developing** [1] -
74:20
**develops** [1] -
110:15
**die** [1] - 58:10
**difference** [4] -
53:4; 63:2; 77:2;
83:13
**differences** [3] -
75:16; 76:3;
83:10

**different** [16] -
16:21; 50:1;
67:11, 21;
75:21, 23; 78:2,
7; 83:9, 11-12;
92:25; 94:21,
23; 121:24;
122:7
**differently** [1] -
53:19
**difficult** [4] -
34:11, 18;
62:18; 103:6
**difficulties** [1] -
57:1
**difficulty** [1] -
29:22
**diligent** [2] - 8:12;
41:25
**direct** [2] - 10:3;
96:15
**directed** [1] - 12:8
**directives** [1] -
10:12
**directly** [2] - 79:6;
99:12
**Direx** [1] - 114:3
**disability** [1] -
25:5
**disclosed** [4] -
16:5, 9
**disclosures** [2] -
116:3; 119:8
**disconnect** [1] -
48:11
**discovery** [30] -
16:6, 11, 13;
19:8, 13, 15, 20,
24-25; 20:8;
24:16; 25:4;
60:20; 63:21;
66:1; 84:8;
111:10; 114:16;
116:3; 117:8,
18; 118:10, 18,
20; 119:9;
120:13, 18;
121:18, 20
**discretion** [1] -
2:9
**discriminate** [2] -
32:9; 65:14
**discriminated** [2]
- 104:21; 108:5
**discriminating** [1]
- 103:14
**discrimination** [8]
- 20:24; 35:4;
36:20; 89:5;
101:8; 103:14

Preliminary Injunction Hearing 12/14/23

discussed [3] - 41:5; 52:21; 94:17
discussing [2] - 11:11; 45:16
discussion [2] - 51:7; 91:18
disfavored [1] - 114:5
disguise [1] - 68:7
Dismiss [1] - 29:5
dispair [1] - 73:20
displaced [1] - 81:19
disposal [1] - 117:9
dispositive [5] - 82:21; 117:19; 119:10
disproportionally [1] - 107:8
disproportionate [1] - 62:2
dispute [4] - 41:20; 84:21; 90:18; 92:17
disputed [1] - 66:7
disrespect [1] - 108:25
disruption [2] - 36:19
disruptive [1] - 36:6
dissent [1] - 99:7
dissents [1] - 109:21
distinct [11] - 7:4; 9:18; 32:25; 33:3, 6, 21; 58:13; 76:8; 93:21; 107:23; 114:20
distinction [5] - 16:17; 17:1, 11, 16; 101:19
distinguishable [1] - 40:11
distinguishing [1] - 76:24
District [14] - 7:7, 18; 14:16; 20:2; 24:2; 30:10-12; 40:14, 25; 106:19; 117:2
district [2] - 7:20; 105:14
diverse [19] - 52:25; 53:4, 13;

63:8; 67:9; 69:22; 73:9, 12; 74:19; 87:3; 88:5, 17, 19; 91:21, 24; 92:5, 12; 95:14
diversity [45] - 45:19; 50:6; 52:22; 53:8, 12-14; 56:15; 59:15-18; 60:9; 61:14; 62:16; 63:5; 65:12; 67:16, 19; 68:11; 76:11, 15-16, 22; 87:7, 14; 88:7, 13, 16; 89:12; 90:13; 92:9; 93:23; 94:4; 99:12; 102:5, 8; 103:4, 8
diving [1] - 55:11
divulge [1] - 73:17
Docket [1] - 117:1
docket [1] - 3:12
documents [1] - 112:23
dodges [1] - 38:20
DOJ [1] - 20:16
domestic [4] - 70:13; 74:21; 89:13
dominated [1] - 45:25
done [12] - 11:21; 17:19; 18:1, 13, 16-17; 28:2; 82:9; 96:23; 107:11; 121:19
doubts [1] - 99:6
down [16] - 15:13; 24:16; 27:15; 29:2; 33:2; 44:8; 55:15; 59:2; 62:9; 72:20; 78:8; 89:17; 104:4; 110:7; 113:3; 119:2
downright [1] - 53:23
Dr [6] - 87:2, 5; 89:11; 92:12, 15
draft [1] - 29:19
drag [1] - 109:4
driver [1] - 82:24
drop [3] - 62:13; 63:4; 116:22

due [1] - 54:19; 68:25; 106:10; 110:7
during [7] - 16:13; 25:4; 52:12; 54:23; 78:24; 84:8; 122:17
duty [1] - 50:25
dynamics [1] - 102:24

# E

e-mail [4] - 3:9; 120:3; 122:15, 17
earliest [1] - 118:1
early [7] - 19:7, 11; 21:9; 23:8; 29:1; 35:25; 36:1
earnest [1] - 108:15
earning [1] - 10:3
Earth [1] - 23:4
easier [1] - 61:3
easiest [1] - 47:1
easily [1] - 34:19
Eastern [2] - 40:25; 117:2
easy [2] - 102:25; 112:11
ECF [1] - 107:5
educate [1] - 111:24
educational [4] - 72:2; 77:2; 93:23; 94:4
effect [1] - 45:15
effective [3] - 69:23; 87:4; 91:25
effects [1] - 89:4
effort [2] - 52:13; 102:23
eight [8] - 75:21; 85:25; 106:2; 109:4, 8, 19; 110:25; 115:21
eight-seven [1] - 109:19
Eighth [1] - 40:17
either [8] - 9:23; 10:25; 20:3; 49:5; 54:7, 13; 81:16; 114:4
elements [2] - 31:19; 90:12
eligible [1] - 80:20

eliminate [1] - 6:16
eliminating [1] - 101:9
embarrass [1] - 121:10, 14
emphasis [1] - 12:6
emphasize [2] - 62:11; 95:7
emphasized [2] - 30:15; 32:18
employers [1] - 69:7
end [28] - 9:11; 17:10; 21:21; 25:22; 26:4; 27:24; 32:7, 11; 49:5, 12; 55:10; 56:18, 20; 58:15; 82:4, 17; 83:2; 90:6; 93:19; 94:11, 17; 97:15; 104:18; 109:6; 118:16
endpoint [1] - 93:16
ends [8] - 51:10, 17-18, 21; 52:5; 58:17; 68:19; 70:1
enemies [2] - 70:12
enforce [1] - 35:16
enforcement [1] - 87:10
enforcing [1] - 35:11
engage [4] - 11:2; 50:4; 75:2; 89:24
engaged [2] - 83:3; 92:4
engages [1] - 49:7
enhance [1] - 91:17
enhances [2] - 87:7; 92:9
enjoin [1] - 109:25
enjoy [1] - 10:22
enlisted [8] - 10:5; 56:15; 57:25; 61:15; 62:5; 76:13, 17; 102:6
Enlisted [2] -

49:16; 92:6
ensure [1] - 95:11
enter [6] - 3:7, 12, 20; 112:12, 16; 122:18
entered [1] - 3:19
entertain [1] - 99:16
entire [3] - 70:9; 71:25; 75:12
entirely [4] - 14:5; 77:7; 88:8; 92:25; 93:7; 96:8
entitled [3] - 20:13; 77:1; 115:14
environments [1] - 88:6
Equal [3] - 7:16; 8:25; 114:14
equal [4] - 20:20; 22:9; 40:8; 61:15
equally [2] - 15:7; 80:20
equals [1] - 35:6
equipped [2] - 85:20; 110:9
equitable [1] - 115:1
equities [5] - 11:14; 12:3; 31:4, 24; 44:25
ergo [1] - 107:19
erroneously [2] - 45:1
especially [2] - 20:3; 64:25
essential [1] - 15:2
essentially [20] - 7:14, 25; 8:23; 10:15; 11:4; 30:5, 23; 31:19; 39:11; 43:1; 45:12; 56:16; 57:2; 59:11; 64:1; 66:4; 75:1; 76:11; 119:7
establish [1] - 40:9
established [2] - 14:2; 17:19
establishing [1] - 26:24
establishment [1] - 85:19
et [3] - 52:22; 116:2

ethic [1] - 92:24
ethnic [2] - 6:16; 93:12
ethnicity [1] - 78:25
evaluate [1] - 106:2
evaluated [1] - 105:23
evaluating [1] - 37:1
evaluation [2] - 28:2
evaluations [1] - 13:21
event [1] - 108:21
eventually [1] - 23:24
ever-moving [1] - 49:16
evidence [12] - 60:14; 65:11, 20; 66:9, 21; 68:9, 12; 79:10; 88:9; 91:20; 104:6
evidentiary [2] - 44:4; 104:9
exact [5] - 20:15; 32:24; 50:4; 63:22; 99:19
exactly [14] - 6:5; 45:15; 49:19; 66:10, 25; 67:22; 73:1; 74:2; 78:4; 82:13; 83:25; 96:10; 103:24; 111:6
exaggerated [2] - 58:8
exam [2] - 17:18
examination [1] - 25:6
example [11] - 17:3; 21:8; 27:23; 28:11; 40:13; 77:18; 88:17; 90:5; 99:5; 107:3; 122:13
exams [1] - 27:5
exasperated [1] - 57:8
excellent [2] - 20:7; 105:2
except [1] - 47:15
exception [2] - 101:10; 105:15
exchange [1] -

112:23
**exchanged** [1] -
19:9
**excluded** [2] -
7:2; 32:24
**exclusions** [1] -
52:24
**Executive** [2] -
71:1; 85:22
**exercise** [2] -
30:18; 113:24
**Exhibit** [3] -
68:12; 87:13;
92:14
**exhibits** [2] -
34:7; 104:7
**exist** [1] - 43:13
**existed** [1] - 61:16
**existence** [2] -
20:23; 38:14
**existing** [2] -
43:11
**exists** [2] - 61:16;
66:21
**expect** [2] -
120:15
**expectation** [1] -
94:18
**experience** [7] -
50:7; 55:14;
63:9; 74:24;
79:22; 92:9;
97:1
**experiences** [1] -
81:5
**experiment** [2] -
75:2, 5
**expert** [9] - 52:3,
19; 63:8; 67:5;
69:17; 77:8, 23;
78:4; 96:25
**experts** [10] -
52:21, 23;
53:10; 63:7;
67:16; 69:16;
77:7; 92:17;
103:1; 122:13
**expiration** [1] -
36:24
**explain** [6] - 40:3;
52:16; 57:21;
78:9; 86:14, 25
**explained** [10] -
18:25; 25:19;
76:20; 82:7, 11;
85:20; 92:15;
94:17; 95:19;
122:20
**explains** [7] -
79:11, 23;

80:21; 87:3;
89:11; 90:15;
91:18
**explanation** [1] -
116:11
**explicit** [1] - 53:15
**explicitly** [1] -
82:23
**explore** [3] - 26:2;
58:3; 103:18
**explored** [1] -
102:4
**expounded** [1] -
115:4
**express** [1] -
91:22
**expressly** [3] -
9:14; 75:19;
90:15
**extended** [3] -
81:12; 82:15
**extending** [1] -
82:8
**extensive** [2] -
92:14; 104:9
**extent** [11] -
33:14; 38:21;
55:12; 58:9;
59:8; 61:12;
71:10; 102:4;
115:12; 118:21
**extra** [2] - 5:23;
35:6
**extraordinary** [11]
- 11:9; 30:14,
18; 32:4; 40:2;
46:9; 55:7;
58:12; 61:6;
113:24
**extremely** [3] -
13:7; 32:7;
69:23
**extremes** [1] -
70:22
**eyes** [4] - 33:15;
44:5; 48:23;
51:14

# F

**F.2d** [1] - 114:3
**F.3d** [2] - 114:2, 7
**facing** [1] - 57:3
**fact** [28] - 2:12;
8:8; 10:17;
13:16; 17:6;
18:19; 25:13,
21; 27:13;
31:11; 38:19,
24; 39:23;

56:10; 59:21;
65:25; 66:1;
82:13; 83:10;
87:16; 98:11;
106:11; 107:3;
108:18; 109:15;
112:4, 8
**factor** [14] - 9:3;
36:16; 65:19;
68:24; 76:18;
78:17; 81:7;
82:21; 83:6;
103:21; 105:10;
107:10; 119:8
**factors** [15] -
34:13, 16; 35:9;
46:13; 64:16;
68:22; 79:1,
20-21, 23; 81:6;
83:4
**facts** [21] - 13:18;
58:2; 66:6; 70:4;
71:12; 73:17,
21; 78:6; 90:22;
99:23, 25;
105:22; 106:21;
107:13; 110:10;
121:24; 122:12
**factual** [21] -
82:19; 101:19;
104:13; 105:16;
106:3, 7, 9;
107:24; 108:10;
109:17; 110:8,
11, 15-16;
111:25; 114:18;
115:20; 116:9,
11; 123:11
**factually** [3] -
101:1; 104:15,
17
**fail** [2] - 67:10;
101:25
**failed** [6] - 13:12;
49:19; 67:8;
89:18; 94:10;
97:1
**failing** [1] - 122:1
**failure** [2] - 23:6;
103:20
**Fair** [6] - 2:4, 18;
3:6; 6:14, 22;
114:9
**fair** [1] - 24:3
**fairness** [1] -
38:15
**faith** [1] - 90:1
**fall** [3] - 34:16;
79:7; 102:22
**far** [10] - 29:14;

30:19; 36:7;
59:12; 61:19;
70:19; 83:17;
100:23; 113:25;
114:11
**far-reaching** [2] -
30:19; 113:25
**farthest** [1] -
11:21
**fashion** [1] -
12:20
**fast** [2] - 44:6;
108:15
**faster** [1] - 20:3
**favor** [2] - 45:5;
79:1
**favorably** [1] -
87:21
**favors** [2] - 11:14;
31:4
**feasible** [1] - 90:2
**feature** [2] -
76:24; 83:8
**February** [1] -
35:22, 24;
81:24; 82:1;
104:4; 109:6;
116:3; 119:9
**Federal** [1] -
40:24
**federal** [3] -
10:10; 47:22;
48:1
**feds** [1] - 47:25
**feedback** [1] -
87:25
**fell** [1] - 9:6
**Fellows** [1] - 6:23
**few** [6] - 45:16;
71:10; 84:14;
89:21; 119:1;
123:17
**Fifth** [4] - 7:16;
34:16; 95:12;
114:14
**fighting** [3] - 72:8,
12; 95:6
**figure** [4] - 58:16;
60:4; 64:19;
101:7
**figured** [1] -
108:11
**file** [3] - 79:3;
110:20; 119:5
**filed** [20] - 5:9;
6:13; 7:18,
21-22; 8:9, 17;
15:16, 18;
21:22; 29:15;
34:6; 38:11;

39:5; 56:11, 13;
77:15; 119:5
**fills** [1] - 96:10
**final** [3] - 42:1, 5;
66:13
**finally** [5] - 10:4,
8; 11:14; 78:6;
81:21
**findings** [3] -
106:3; 111:25;
115:20
**fine** [9] - 13:1;
71:24; 72:25;
111:14, 21;
112:21; 115:18;
122:12; 122:15
**finish** [3] - 45:22;
55:2; 62:1
**finished** [1] -
117:25
**firm** [1] - 3:16
**first** [20] - 2:17;
6:24; 12:18;
13:5; 19:1;
31:19, 21;
43:16; 47:5;
50:2; 72:1; 75:9,
18; 78:16;
89:23; 90:3;
97:12; 99:4;
100:6; 113:12
**First** [3] - 13:22;
19:5; 38:6
**Fisher** [3] - 19:18;
100:18; 101:3
**fit** [3] - 56:4; 58:3,
12
**fits** [3] - 55:23;
103:11; 107:19
**fitting** [1] - 103:16
**five** [13] - 10:4;
20:2, 6; 40:14;
44:22; 46:22,
24; 73:20; 74:5;
100:12; 106:17;
107:16; 121:9
**five-year** [1] -
74:5
**five-year-old** [1] -
40:14
**flag** [11] - 57:22;
59:17; 62:2;
67:12; 72:16;
84:15; 106:23;
120:16, 21;
122:9
**flat** [2] - 110:20;
111:18
**flawed** [2] - 72:1,
5

**flier** [1] - 109:20
**flip** [1] - 103:7
**Florida** [1] - 53:2
**focus** [5] - 58:11;
75:11; 84:16;
86:19; 88:1
**focused** [4] - 8:1;
84:17; 102:10;
104:14
**follow** [9] - 29:17;
30:24; 35:10;
50:17; 61:11;
65:5; 69:11;
105:1; 122:20
**following** [2] -
26:5; 45:23
**folly** [1] - 99:2
**footing** [4] -
20:20; 22:9;
38:22; 40:8
**footnote** [6] -
6:25; 7:8; 9:13;
47:15; 98:15;
107:20
**Footnote** [7] - 7:2;
9:14; 36:21;
38:20; 59:4;
98:14, 25
**footnotes** [1] -
99:1
**force** [7] - 56:22;
57:2, 4; 69:10;
72:9; 75:1; 95:6
**forces** [1] - 74:20
**foreclosed** [3] -
40:12, 23; 41:3
**foreign** [1] - 70:12
**forever** [5] -
23:23; 40:12,
16, 22; 41:3
**forgetting** [1] -
67:1
**forgo** [1] - 75:3
**form** [2] - 35:2;
112:18
**formations** [1] -
63:13
**formed** [1] - 11:1
**former** [1] - 77:18
**forth** [4] - 30:24;
115:3; 122:19,
22
**forward** [6] -
27:20; 29:9;
60:13; 114:25
**foster** [2] - 74:21;
92:5
**Foulke** [1] - 40:13
**four** [12] - 10:3;
11:10; 31:1, 5,

8; 34:12; 44:13;
83:4; 90:6, 19
**Fourteenth** [1] -
9:1
**fourth** [1] - 49:21
**Fourth** [31] - 19:3,
5; 20:14; 30:20;
31:9; 106:11;
107:17; 108:25;
109:9, 13, 19,
21; 110:8, 13,
25; 111:8, 13,
19, 24; 112:1, 7,
19; 114:1, 6-7;
115:13, 17, 19;
123:4
**framing** [1] -
121:18
**frankly** [3] -
29:10; 56:8;
86:5
**Fred** [2] - 4:13;
7:11
**free** [4] - 57:20;
58:2; 112:19
**freedom** [1] -
37:10
**freshman** [3] -
41:17; 42:17;
44:19
**friend** [3] - 27:13;
43:8; 100:24
**friend's** [2] -
18:19; 98:4
**friends** [4] -
43:19; 104:7;
118:23
**frightens** [1] -
19:23
**front** [2] - 72:14;
107:17
**frozen** [1] -
115:19
**fruit** [1] - 29:10
**frustrated** [1] -
10:24
**full** [3] - 91:8;
105:25; 116:13
**Fuller** [2] - 67:14
**fully** [13] - 2:10,
23; 4:20, 24;
5:4, 7, 21; 8:5,
18; 22:15; 32:3;
86:6; 122:23
**function** [1] -
115:7
**Fund** [1] - 5:13
**fundamental** [2] -
18:5; 57:9
**fundamentally** [3]

- 42:1; 72:5;
95:16
**future** [7] - 25:21;
26:21; 40:7;
73:7, 24-25;
84:3

## G

**Gabriel** [1] - 3:2
**game** [1] - 29:1
**GAO** [1] - 65:15
**gaps** [1] - 69:1
**GARDNER** [67] -
4:17, 21; 5:15;
12:17; 13:5, 11;
14:5, 12, 19, 25;
15:17, 19; 16:8,
12, 14; 17:4;
23:18; 24:6, 17,
21; 25:2, 11;
26:6, 10, 17;
27:17, 22;
28:15; 29:11;
37:19; 38:12,
24; 39:1, 8;
41:16, 20;
46:17; 71:18,
21, 25; 72:22;
73:5, 23; 74:8;
76:19; 77:22;
78:14, 21; 80:2,
5, 13; 83:25;
84:19; 85:8, 12,
15; 86:6, 22;
91:13; 94:1, 14;
120:14; 121:3,
10, 14; 122:3,
11
**Gardner** [33] -
4:18; 11:18, 22;
12:16, 21; 13:4;
15:14; 18:10;
23:16; 27:21;
29:1, 12; 31:22;
37:17; 38:15;
42:8; 44:7;
46:11, 16; 61:9;
71:15; 72:19;
73:15; 76:10;
84:2; 86:5; 94:7;
97:6; 117:14;
119:18; 120:9
**GARGEYA** [1] -
5:6
**Gargeya** [3] - 5:7;
11:23; 119:20
**gender** [1] - 78:25
**general** [10] -
35:21; 36:13;

49:15; 56:14;
76:20; 81:24;
93:5; 96:3
**General** [5] - 63:9;
67:5, 8, 23;
77:18
**General's** [4] -
39:21; 96:6;
101:13, 17
**generally** [4] -
11:19; 23:7;
25:23; 80:2
**generational** [1] -
68:25
**gentleman** [1] -
38:9
**Georgia** [1] -
40:25
**germaneness** [2]
- 15:21
**gerrymandering** [1]
- 38:2
**gist** [1] - 97:21
**given** [11] - 20:3;
25:22; 38:19;
54:24; 56:22;
74:11; 80:3, 5;
93:3; 99:5;
104:3
**glad** [9] - 12:21,
23; 18:11;
31:18; 32:1;
37:17; 46:9, 21;
97:7
**goal** [7] - 48:4;
49:2; 62:22;
67:22; 93:4;
120:20; 122:1
**goals** [6] - 48:11;
53:19, 23; 93:9,
14
**Goldman** [7] -
77:6, 9; 78:4;
83:21; 85:1;
98:7
**good-faith** [1] -
90:1
**governed** [1] -
10:10
**government** [2] -
47:23; 48:1
**Government** [23]
- 11:6; 13:17;
34:21; 35:15;
42:6; 46:1; 48:6;
57:20; 58:4;
60:22; 62:7;
70:9, 25; 75:9;
77:16; 92:24;
98:12; 99:2;

108:14
**Government's** [7]
- 35:13; 42:4;
86:15; 99:9;
100:1; 107:6;
120:22
**grades** [1] - 81:4
**graduate** [3] -
9:23; 65:6; 73:8
**graduated** [1] -
41:18
**graduates** [5] -
61:23; 72:11,
16; 73:3, 6
**graduating** [1] -
10:2
**grant** [6] - 34:25;
108:23; 109:22,
24; 112:17, 20
**granted** [5] -
30:17, 19; 45:2;
113:25; 115:16
**granting** [2] -
109:12; 111:24
**grants** [1] - 111:8
**Gratz** [5] - 21:1;
22:7, 9, 12;
101:15
**gravamen** [2] -
9:19; 11:17
**gravest** [1] -
98:17
**great** [3] - 103:13,
15; 112:3
**greater** [1] - 103:8
**grossly** [1] -
101:14
**grounds** [1] -
31:12
**groundwork** [1] -
8:19
**group** [6] - 36:18;
48:20; 51:2;
67:2; 91:16
**groups** [4] -
48:15; 49:1;
87:3; 88:1
**Grutter** [13] - 9:2;
15:4, 8; 36:24;
43:11; 75:25;
76:2, 25; 90:11;
92:21; 94:17;
96:6; 100:17
**Guard** [6] - 52:11,
13; 54:7; 96:13,
15
**guess** [9] - 6:24;
10:19; 32:16;
39:13; 59:2, 13;
78:3; 86:22

**guidance** [2] -
10:13; 78:22
**guides** [1] -
107:21
**Guinea** [1] - 75:6

## H

**half** [1] - 39:21
**halls** [1] - 88:1
**Halpern** [1] - 77:18
**hand** [1] - 27:25
**handle** [1] - 7:22
**happy** [3] - 3:8;
20:1; 86:13
**harbor** [3] - 70:15;
113:4
**hard** [7] - 8:15;
13:7; 35:2; 44:6;
82:25; 102:12;
111:23
**hardest** [1] - 47:1
**hardships** [1] -
45:5
**harm** [25] - 11:13;
12:3; 13:14;
20:24; 26:19;
31:4, 17, 21;
32:2; 34:23;
35:9, 17-18;
38:7; 40:1, 6,
10; 41:23;
42:25; 44:12,
14, 25; 45:2;
87:20; 104:4
**harmed** [1] -
35:15
**harms** [6] - 35:13,
15; 42:2; 65:2;
94:2
**harness** [1] -
67:18
**Harvard** [121] -
6:19, 23; 8:22,
24; 9:5; 15:4, 7,
15; 16:2; 19:12;
20:2, 25; 32:6;
33:7; 34:10;
36:21; 38:16;
39:9, 12, 19,
22-23; 43:10,
12, 15, 17; 46:7,
23; 47:5, 12, 14,
21; 48:2, 13;
49:8, 10, 13, 18,
21, 24; 50:2, 5,
11, 14; 51:4, 9,
19; 52:4; 55:23;
56:5, 18; 57:16;
58:4, 12; 60:7;

65:11; 66:17;
72:3; 75:14, 17,
19, 24-25; 76:7,
24-25; 77:15,
21; 78:8; 82:20;
83:13; 87:21;
90:4, 25; 91:3,
13; 92:20; 93:1,
10, 20, 23; 94:5,
8, 10, 22; 95:1;
97:14, 16, 22;
98:2, 15; 99:8,
20, 23; 100:4, 7;
101:4, 11, 13,
18; 103:10;
104:18; 105:23;
107:19; 112:3,
11; 116:14
**Harvard's** [1] -
83:2
**hat** [1] - 106:19
**Haynie** [1] - 89:11
**Haynie's** [1] -
87:5
**heads** [1] - 118:24
**hear** [12] - 12:2,
19, 21, 23; 13:3;
18:11; 31:18;
32:1; 37:18;
46:10, 21;
73:24; 74:23;
75:10; 95:18;
97:7; 117:4, 13;
118:6
**heard** [8] - 23:16;
42:9; 55:3; 76:7;
86:10; 88:1;
97:13; 104:23
**hearing** [10] -
6:11; 7:25; 8:11;
10:21; 24:19;
25:8; 29:21;
44:5; 56:9;
106:9
**heavy** [1] - 55:8
**held** [10] - 8:23;
9:2; 20:14; 30:8,
21; 32:23;
47:13; 77:9;
90:11
**help** [1] - 55:22
**helpful** [1] - 117:3
**helps** [2] - 106:19;
113:7
**Herndon** [1] -
5:23; 123:15
**herself** [1] - 10:18
**hidden** [1] - 50:8
**high** [7] - 23:22;
29:3; 40:18;

Preliminary Injunction Hearing 12/14/23

41:18; 63:5;
104:20; 119:14
**high-profile** [1] -
23:22
**high-ranking** [1] -
63:5
**higher** [4] - 63:15;
81:14, 18; 86:20
**higher-ranking**
[1] - 63:15
**higher-scoring**
[1] - 81:14
**highlight** [1] -
92:16
**Highway** [1] -
20:15
**hinges** [1] - 75:12
**Hispanic** [1] -
90:9
**historically** [1] -
77:25
**history** [11] -
57:18; 59:23;
70:10; 74:24;
92:8, 14, 17;
96:25; 98:18;
99:1; 123:2
**hits** [1] - 71:2
**hitting** [1] - 62:21
**hold** [3] - 3:3, 24;
90:25
**holding** [2] - 94:8;
98:13
**holdings** [2] -
94:9
**Homeland** [1] -
96:17
**honor** [1] - 5:22
**Honor** [120] -
2:22, 25; 3:23;
4:5, 17, 23; 5:2,
6, 15; 12:15, 17;
13:5, 18; 14:5,
19, 25; 15:20;
17:7; 18:12;
20:1; 21:16;
23:10, 18; 24:7;
25:12, 21; 26:6,
17; 29:11; 32:3,
15; 33:10, 25;
37:19, 24; 38:5,
24; 39:8, 16;
42:10, 15, 23;
44:4; 46:17, 22,
25; 47:4; 51:6;
54:11; 55:20;
56:1, 24; 57:6;
58:20; 60:11,
24; 64:24; 66:9;
71:18; 72:6, 15;

73:5; 74:8, 17;
75:18, 22;
76:19; 78:6;
79:4, 21; 80:2,
23; 81:11, 17;
83:18, 25;
84:19; 85:1, 3,
5, 15, 24; 86:23;
87:5, 21; 88:12;
89:1, 15; 91:11;
92:7, 11; 93:3,
13, 16; 94:1, 25;
96:5, 7, 23;
97:3, 9; 103:24;
104:11, 23;
105:2; 108:3;
110:17; 111:3,
16; 113:6, 14;
117:15; 118:8,
12; 119:16, 24;
120:8, 16, 21;
122:4
**Honor's** [3] - 43:7;
60:2; 118:11
**hook** [1] - 102:1
**hope** [4] - 20:3;
26:6; 105:6;
113:8
**hostile** [1] - 122:3
**hot** [4] - 10:18,
20; 71:19;
113:17
**hour** [1] - 3:11
**hours** [4] - 110:5;
116:2; 118:15;
119:6
**house** [1] -
108:19
**Hrdlicka** [1] - 85:2
**human** [1] - 48:25

**I**

**idea** [5] - 52:10;
68:16; 121:8
**identical** [1] -
122:12
**identified** [3] -
13:24; 35:18;
75:18
**identify** [5] - 2:20;
4:15; 23:6, 10;
95:2
**identity** [3] -
13:25; 50:7, 10
**ignores** [2] -
90:22; 93:20
**ignoring** [1] -
112:4
**III** [3] - 19:4;

22:17, 19
**illegal** [6] - 36:20;
49:24; 50:2, 12;
51:5; 101:14
**imagine** [1] -
118:22
**immediate** [1] -
45:15
**immediately** [3] -
7:23; 31:15;
40:20
**immunity** [1] -
34:22
**impact** [1] - 88:22
**imperative** [1] -
114:18
**impermissible** [1]
- 91:14
**implications** [3] -
45:19; 61:20;
62:9
**imply** [1] - 18:16
**import** [2] - 9:12;
45:11
**importance** [1] -
83:24
**important** [27] -
16:17; 33:15;
34:1; 53:11;
59:21; 60:1, 3;
64:22, 24;
67:12; 79:7, 12;
80:24; 81:11,
21; 86:15;
89:12; 93:2;
99:6, 8; 100:20;
103:11; 110:15;
113:19; 123:1, 5
**importantly** [1] -
98:14
**imposition** [1] -
40:4
**impossible** [4] -
35:17; 44:1;
48:10; 52:4
**imprecise** [1] -
92:19
**in-state** [1] -
101:6
**inability** [4] -
15:23; 20:19;
22:8
**inappropriate** [3]
- 74:10; 77:7;
86:12
**inclined** [5] -
12:2; 29:2;
71:15, 21; 89:17
**included** [3] -
43:22; 77:17;

87:10
**includes** [4] -
39:6; 79:21;
81:3; 87:8
**including** [7] -
8:13; 35:12;
77:18; 85:19;
92:24; 95:9;
101:3
**inclusive** [1] -
48:3
**incoherent** [1] -
48:2
**incoming** [1] -
93:4
**inconsistent** [2] -
84:25; 96:8
**incorrect** [2] -
14:20; 15:11
**increase** [5] -
50:5; 65:24;
69:10; 88:16
**increased** [3] -
88:18, 20; 95:15
**increases** [1] -
69:8
**increasingly** [1] -
103:5
**incredibly** [2] -
16:17; 53:3
**indecisiveness**
[1] - 110:21
**indeed** [2] -
63:17; 116:10
**indefensible** [1] -
53:24
**indefinitely** [1] -
89:25
**indicate** [4] -
5:23; 29:9;
103:3, 5
**indicated** [4] -
30:3; 102:10;
123:3
**indicating** [1] -
92:9
**indication** [1] -
5:25
**indicia** [1] - 74:1
**individual** [2] -
9:23; 48:25
**individuality** [1] -
67:2
**individualized** [1]
- 49:23
**individuals** [3] -
51:3; 58:9; 64:1
**indulgence** [1] -
78:9
**inferences** [1] -

106:21
**information** [9] -
18:21, 23; 19:8,
12; 20:8, 13, 17;
90:7; 104:1
**informed** [1] -
76:1
**inherently** [2] -
90:24; 91:2
**initial** [2] - 17:8;
31:14
**injunction** [56] -
6:12; 7:17, 23;
8:5; 11:8, 14;
14:4, 11, 14, 18;
16:15; 19:6;
20:12; 24:20;
30:5, 7, 17, 23;
31:5, 7, 20;
34:13; 35:1;
36:12, 15; 38:6;
40:2, 5, 20;
41:3; 42:2;
43:19; 45:1;
55:7; 60:18;
61:6; 66:11;
74:9; 83:16;
86:3, 8; 97:5;
105:9; 108:21;
109:13, 16, 22;
111:5; 112:14,
17; 113:23;
120:2; 122:21
**injunctions** [5] -
11:9; 32:4; 36:8;
104:2; 114:4
**injunctive** [6] -
8:1; 9:20; 37:21;
38:3; 109:24;
111:9
**injured** [1] - 15:24
**injuries** [1] -
34:20
**injury** [13] - 17:21;
20:18; 25:25;
27:1; 34:18;
35:2; 37:12;
40:9; 43:3
**input** [1] - 119:19
**inquire** [1] - 2:14
**inquiry** [1] - 76:5
**inside** [1] - 67:7
**instead** [7] - 2:5;
49:7; 50:18, 24;
51:3; 90:22;
96:2
**instincts** [1] -
118:3
**institution** [5] -
59:23; 70:21;

72:2; 75:14;
83:11
**institutions** [3] -
6:21; 69:10;
77:3
**insufficient** [1] -
25:25
**intend** [1] - 89:25
**intentionally** [1] -
70:6
**intentions** [2] -
109:12; 111:24
**interest** [46] - 6:6;
11:15; 12:4;
30:15; 31:6, 24;
35:10, 13-14;
45:10; 49:14;
53:6; 60:6;
63:11; 68:2, 8;
69:4; 75:10, 23;
76:1; 79:22;
83:12, 24; 89:3,
7, 9, 16; 91:5;
92:2; 93:2, 21,
23; 94:4, 20-21;
97:17; 99:14,
19; 105:12;
106:4; 109:2, 8,
10; 111:1
**interested** [2] -
84:11; 122:7
**interesting** [6] -
59:14; 61:18;
62:12; 65:17;
84:8; 110:24
**interests** [23] -
7:4; 9:18; 33:1,
3, 6, 21; 48:12;
51:7; 52:1; 54:1;
66:16, 24;
75:21; 76:8;
88:25; 89:19;
93:22; 94:23;
100:19, 21-22;
114:20
**interfere** [1] -
85:18
**interlocutory** [3] -
109:12; 110:3;
115:16
**intermediate** [2] -
46:19; 86:21
**internal** [1] -
10:13
**internally** [1] -
72:18
**international** [3] -
51:14; 74:22;
89:13
**Internet** [1] - 6:18

Preliminary Injunction Hearing 12/14/23

**internment** [1] - 98:23
**interrupt** [2] - 62:1; 64:21
**Interruption** [1] - 6:4
**interviewed** [1] - 28:9
**interviewing** [1] - 27:14
**intuition** [2] - 13:6; 18:13
**invents** [1] - 50:13
**inverse** [1] - 11:22
**investment** [1] - 88:13
**invitation** [1] - 89:15
**invited** [1] - 91:15
**involved** [1] - 41:1
**Involved** [2] - 64:25; 101:24
**involves** [1] - 30:18
**involving** [1] - 113:24
**IPEDS** [1] - 47:24
**irrational** [1] - 48:3
**irrelevant** [2] - 19:4; 39:10
**irreparable** [24] - 11:13; 12:3; 26:19; 31:4, 17, 21; 32:1; 34:17, 23; 35:2, 4, 9; 37:12; 38:7; 40:1, 5, 9-10; 41:23; 42:25; 43:3; 44:12, 14; 104:4
**Island** [1] - 23:4
**Islander** [1] - 64:7
**Islanders** [3] - 73:18; 76:17
**Israel** [1] - 114:3
**issue** [44] - 7:23; 9:17; 11:16; 12:1; 13:12; 15:21; 16:15; 22:21; 23:5; 24:7, 10; 26:12; 29:14; 30:3, 22-23; 31:7, 14; 33:2; 38:8, 20; 41:2; 45:25; 55:7; 56:3; 58:4; 60:18; 61:7;

73:5; 75:17, 23; 76:9; 83:13; 84:8; 91:17; 93:11, 21; 94:2, 5; 95:16; 109:14; 115:22; 120:17
**issued** [5] - 8:21; 42:6; 115:18, 23; 116:1
**issues** [11] - 14:25; 38:23; 54:10; 89:21; 91:5; 106:7; 107:23; 108:9; 123:7
**issuing** [3] - 61:6; 74:9; 122:24
**itself** [7] - 12:6; 25:24; 35:8; 47:23; 62:7; 87:21; 101:4

**J**

**Jacksonville** [1] - 20:25
**January** [12] - 17:10; 25:23; 26:4, 13, 16; 27:16, 24; 35:23; 70:9; 82:2, 6
**Japanese** [1] - 98:23
**Jeon** [1] - 5:18
**job** [3] - 60:4; 65:9
**Johnson** [6] - 69:9; 93:23; 94:25; 98:9, 13
**join** [3] - 50:24; 68:5, 10
**joined** [1] - 68:10
**Josh** [1] - 4:17
**Judge** [1] - 7:19
**judge** [7] - 2:9; 10:19, 24; 33:16; 111:11; 112:8; 116:22
**judges** [2] - 105:14
**judgment** [16] - 18:7; 29:25; 30:9; 42:1, 5; 74:14, 18, 22; 75:7; 77:1, 5, 8, 10; 83:23; 86:16; 96:25
**judgments** [3] - 78:3; 85:21, 24
**Judicial** [1] - 71:2

**judicial** [9] - 2:12; 9:8; 29:25; 51:8; 84:9, 20, 23-24; 86:13
**Judiciary** [1] - 114:23
**July** [2] - 118:1; 119:11
**jumping** [1] - 8:7
**June** [5] - 6:21; 8:20; 9:5; 39:5
**junior** [4] - 28:19, 21; 40:18, 21
**jurisprudence** [1] - 14:23
**Justice** [20] - 4:18, 24; 5:3, 7; 9:9; 10:17; 32:25; 33:14; 38:19; 39:4; 56:17; 59:4, 22; 61:10; 94:7, 16; 101:6; 103:12; 107:20; 114:21
**Justice's** [2] - 59:1; 99:1
**justification** [1] - 37:20
**justify** [3] - 9:11; 89:6; 103:6

**K**

**Kacher** [2] - 4:13; 7:12
**keep** [1] - 99:14
**keeping** [1] - 123:16
**key** [4] - 34:12, 22; 76:24; 81:2
**kicker** [1] - 80:10
**kind** [5] - 28:7; 42:21; 48:24; 49:1; 105:19
**kinds** [2] - 25:10; 116:7
**known** [4] - 10:1; 69:21; 103:12
**knows** [1] - 54:23; 85:3; 109:23
**Korematsu** [1] - 98:16, 20; 99:3
**Kumar** [1] - 5:18

**L**

**Labor** [1] - 118:5
**lack** [6] - 13:14; 23:6; 42:21; 70:17; 88:6;

116:12
**lacking** [1] - 94:10
**lacks** [1] - 89:16
**Lamone** [1] - 37:25
**land** [1] - 64:18
**language** [5] - 32:24; 39:14; 59:4; 94:7; 103:11
**languages** [1] - 79:23
**large** [6] - 21:23; 51:2; 67:16; 73:14; 76:14; 98:1
**last** [13] - 19:1; 25:20; 41:9; 51:7; 59:24; 65:8; 66:15; 69:19; 103:24; 105:17; 106:18; 112:6; 122:1
**lastly** [2] - 51:6; 69:3
**late** [1] - 115:10
**latitude** [1] - 105:15
**Latta** [10] - 4:11; 7:11; 36:2; 79:10, 23; 80:21; 82:11; 90:15; 91:18; 95:13
**Latta's** [5] - 78:17; 81:10; 82:7; 95:19, 22
**laughing** [8] - 8:16; 11:22, 25; 43:25; 44:9; 113:3, 11; 115:9
**laughter** [1] - 44:3
**Laughter** [4] - 19:21; 71:17; 121:13; 122:2
**law** [15] - 3:15; 15:9; 21:2; 24:10; 25:9; 29:6, 18; 43:11; 51:15; 87:10; 100:18; 101:3; 111:22; 112:11; 115:7
**lawful** [2] - 15:5, 8
**lawsuit** [6] - 8:22; 15:8, 22; 38:11; 39:5, 25
**lawsuits** [1] - 6:18
**lawyer** [2] - 44:1; 121:7

**lawyers** [4] - 10:22; 43:24; 61:10
**lay** [1] - 8:18
**lead** [2] - 72:8; 86:15
**leader** [2] - 67:23
**leader's** [2] - 67:18, 20
**Leaders** [3] - 31:10; 34:14; 35:12
**leaders** [4] - 67:10; 74:13; 96:25
**leadership** [4] - 50:19; 67:10; 74:3; 81:5
**leading** [4] - 55:24; 56:2; 58:9
**learn** [1] - 91:25
**least** [12] - 5:20; 14:8; 16:3; 23:8; 58:24; 65:2; 66:8; 75:16; 82:22; 83:7; 95:21; 106:18
**leave** [2] - 68:15; 74:6
**led** [1] - 6:20
**left** [2] - 21:20; 68:11
**Legal** [1] - 5:12
**legal** [14] - 17:24; 23:12; 39:16; 43:13; 60:25; 104:14, 16-17, 19; 106:14; 107:18, 24; 108:9; 110:25
**legitimacy** [7] - 65:23; 69:8, 10; 74:22; 89:10, 13; 92:10
**legitimate** [5] - 51:14; 69:5, 23; 109:14; 114:22
**length** [1] - 43:5
**less** [4] - 70:8, 21; 79:14; 87:3; 88:6
**lessen** [1] - 61:15
**lessened** [1] - 102:15
**lethal** [4] - 51:12; 69:23; 72:8; 95:5
**lethality** [1] - 87:8
**Letter** [2] - 21:8;

79:4
**letter** [2] - 21:17, 19
**Letters** [6] - 36:2; 80:12, 15-17; 82:15
**letters** [3] - 21:16; 80:13, 17
**letting** [1] - 99:15
**level** [6] - 24:4; 53:7; 59:14, 18; 68:22; 86:21
**Liberties** [2] - 5:11
**life** [1] - 79:21
**light** [5] - 2:12; 9:17; 29:15; 46:6, 20
**likelihood** [15] - 12:5, 8, 11; 31:16; 37:7; 44:15; 45:8; 46:2, 5, 10; 60:19; 61:5; 64:17; 104:3
**likely** [25] - 11:12; 20:9; 22:16; 31:2; 32:6; 34:15; 35:16; 41:21; 46:4; 50:17, 20, 22; 61:1; 65:23; 66:11; 67:2; 68:13; 83:14; 105:4; 109:16
**limit** [1] - 41:22
**limitations** [1] - 121:21
**limited** [8] - 30:20; 32:14; 36:17; 66:12; 74:14; 75:7; 90:16; 114:1
**limits** [1] - 86:3
**line** [9] - 3:10; 4:3; 6:6, 9; 41:11; 59:10; 81:17; 107:16; 122:1
**Line** [1] - 6:4
**lined** [1] - 116:22
**lines** [1] - 72:14
**list** [1] - 68:12
**listed** [10] - 3:4, 10-11, 19, 25; 7:12; 8:15; 112:24
**listen** [3] - 6:7, 10
**listening** [2] - 32:21; 61:4
**listing** [2] - 6:18;

107:5
**literally** [1] - 17:24
**litigants** [1] - 113:20
**litigated** [1] - 19:5
**litigating** [1] - 39:22
**litigation** [7] - 7:6; 19:18; 20:2; 23:8; 26:15; 45:4; 59:7
**Lloyd** [2] - 4:9; 7:10
**LOA** [3] - 79:5, 8; 80:19
**LOAs** [4] - 80:10, 12, 20; 82:11
**local** [1] - 6:9
**logical** [6] - 49:5, 12; 56:18, 20; 94:11
**Longmore** [1] - 123:16
**look** [26] - 17:24; 28:3; 29:19; 35:19; 48:16; 50:23; 51:22, 24; 60:8; 62:18; 65:8; 68:5; 74:2; 84:11; 87:1, 5, 12, 16, 24; 88:12; 96:21; 105:19; 107:22; 110:10; 120:10
**looked** [4] - 56:11; 63:10; 88:13; 107:10
**looking** [6] - 44:8; 51:3; 76:12, 15, 20
**loosely** [1] - 48:7
**LOP** [1] - 83:3
**lose** [7] - 22:21; 32:7; 34:24; 60:1; 104:12
**loses** [2] - 105:3, 7
**loss** [2] - 37:10; 71:5
**lost** [3] - 40:7, 20; 106:1
**loud** [1] - 54:6
**low** [1] - 68:23
**lower** [7] - 21:9, 18; 22:3; 59:19; 68:21; 69:14; 81:18
**lower-scoring** [1] - 81:18

**Lyall** [2] - 92:12; 96:24
**Lyall's** [1] - 87:2

**M**

**macro** [4] - 68:18, 22; 69:12, 19
**mail** [4] - 3:9; 120:3; 122:15, 17
**main** [3] - 45:25; 82:24; 84:21
**maintaining** [1] - 95:5
**major** [1] - 84:16
**majority** [2] - 9:9; 36:15
**makeup** [5] - 49:14; 50:23; 63:2; 67:10
**mandates** [1] - 93:20
**mandatory** [6] - 40:2; 74:9; 83:7, 15; 86:8; 114:4
**March** [1] - 119:9
**Marine** [5] - 9:22; 10:6; 72:10; 92:1; 96:9
**Marines** [7] - 62:25; 64:3; 96:3, 12, 14, 17
**marks** [1] - 119:3
**married** [3] - 120:24; 121:1, 7
**Maryland** [2] - 5:12; 105:21
**mask** [1] - 5:21
**masking** [1] - 2:6
**masks** [2] - 2:7; 5:24
**Massachusetts** [2] - 14:18; 30:11
**match** [1] - 59:18
**materialize** [1] - 53:13
**matter** [37] - 6:6; 8:8; 24:16; 25:7; 27:12; 29:22, 25; 31:16, 21; 33:21; 39:3; 44:18; 45:16, 22; 46:15; 58:19; 59:11; 61:17; 70:17; 71:5; 76:11; 84:9, 15; 91:1; 101:20; 107:11;

108:18; 110:5; 112:11; 113:16; 114:19, 23; 116:14; 117:16; 122:21
**matters** [9] - 12:10; 29:22; 45:12; 56:20; 67:18; 82:20; 93:13; 105:16; 110:8
**McCarthy** [10] - 3:16, 23-24; 11:18; 12:13; 44:7; 116:16; 117:10; 120:7, 11
**MCCARTHY** [8] - 3:23; 117:15; 118:8, 22; 119:16, 24; 120:5, 8
**mean** [24] - 23:23; 25:3; 28:24; 33:19; 42:25; 43:23; 54:20, 22; 55:19; 57:19; 61:25; 72:23; 73:20; 77:4; 100:5; 113:10, 17; 117:17; 121:10, 14, 24
**meaning** [1] - 29:19
**meaningful** [1] - 63:2
**meaningfully** [1] - 51:8
**meaningless** [1] - 15:1
**means** [23] - 11:22; 32:8; 37:1; 47:12; 48:12; 49:17; 51:17, 21; 59:4; 60:17; 62:3; 64:14; 67:19; 68:19; 69:25; 77:5; 93:14; 101:9, 25; 121:7
**meant** [3] - 55:20; 70:5; 91:3
**measurability** [1] - 51:9; 66:16
**measurable** [7] - 9:7; 60:6; 66:17; 86:24; 87:19, 23; 89:19
**measure** [11] -

12:5; 48:10; 51:10; 53:6, 22; 54:2; 58:24; 60:6; 65:9; 88:8; 89:15
**measured** [3] - 39:8; 87:20; 88:15
**measurement** [1] - 39:10
**measures** [1] - 87:2
**measuring** [2] - 52:5; 119:2
**mechanistically** [2] - 72:3; 75:15
**Medha** [1] - 5:6
**medical** [4] - 13:21; 17:18; 27:4; 28:2
**medically** [1] - 17:17
**meet** [8] - 13:12; 18:9; 20:20; 26:21; 74:5, 15; 89:18; 101:23
**meeting** [1] - 48:21
**Member** [9] - 15:24; 29:16; 41:13, 17; 42:13, 16; 44:17
**member** [2] - 23:6; 28:9
**Members** [3] - 13:11; 40:7; 113:20
**members** [20] - 13:25; 16:3; 18:20; 19:7, 10; 20:5; 22:9, 13, 23; 28:17; 30:15; 32:20; 36:14; 51:2; 72:12; 75:6; 87:25; 92:6; 108:5; 109:21
**memorandum** [1] - 61:22
**men** [1] - 84:4
**MENDEZ** [3] - 5:2; 121:5, 8
**Mendez** [4] - 5:3; 119:20; 121:1, 4
**mentioned** [4] - 31:2; 84:14; 90:6; 92:11
**mentors** [1] - 50:21
**Merchant** [5] -

96:3, 9, 12, 14, 17
**merely** [2] - 30:7; 32:13
**merge** [1] - 35:13
**merit** [2] - 68:15; 112:12
**meritocracy** [1] - 68:14
**merits** [26] - 8:3; 11:12; 12:5, 9, 12; 30:8; 31:3, 16; 32:15; 34:12; 37:7; 40:1; 44:15; 45:9; 46:3, 5, 11; 57:9; 60:19; 61:5; 62:10; 64:18; 66:13; 83:14; 109:16
**met** [2] - 13:19; 25:16
**method** [2] - 22:1, 3
**metrics** [3] - 48:22; 53:21
**MicroStrategy** [1] - 114:2
**middle** [3] - 35:19; 82:6; 115:11
**Middle** [3] - 14:17; 30:11
**midshipman** [2] - 41:14; 42:14
**midshipmen** [4] - 59:9; 84:5; 88:20; 91:25
**might** [5] - 57:20; 87:20; 112:7; 117:6; 118:10
**Military** [4] - 5:10; 7:7; 10:7; 57:18
**military** [89] - 7:2, 4; 9:16, 18; 30:1; 32:23; 33:1; 38:20, 22; 43:14; 45:17; 20; 47:17; 48:5, 8; 50:24; 51:11; 52:24; 54:10; 55:13; 58:13, 17, 19; 60:5; 61:16; 67:7, 18; 68:11, 14; 69:1, 5, 13, 16, 21; 70:8, 19, 25; 71:5; 72:17; 73:14, 20; 74:4, 13, 18, 22; 75:2,

6; 77:11, 17, 25; 78:3; 83:11, 23-24; 84:9; 85:19, 21, 23-24; 86:12; 87:10; 89:12; 92:9, 15; 93:21, 24; 94:12; 97:17; 98:3, 6, 16, 18; 99:3, 10, 13; 100:14; 102:5, 13-14, 19; 103:17; 107:23; 114:20
**military's** [10] - 67:7; 76:25; 77:5, 10; 85:18; 89:7, 16; 93:14; 94:21; 96:25
**mind** [1] - 23:19
**mine** [1] - 27:13
**mini** [1] - 117:1
**minimal** [1] - 43:3
**minimum** [7] - 13:20; 49:25; 53:7; 62:16; 66:19; 74:5; 83:15
**minimus** [1] - 101:10
**minorities** [13] - 21:25; 50:1, 15, 17, 20, 22; 51:13; 52:15; 63:1; 68:3; 102:16; 107:9
**minority** [12] - 21:10; 22:4; 48:15, 18-19; 73:18; 76:12; 81:13; 89:3; 90:14; 106:25
**minute** [5] - 4:7; 6:2; 55:12; 63:19; 111:10
**minutes** [1] - 45:16
**mischaracterizat ions** [1] - 78:10
**mischaracterize s** [1] - 79:4
**mismatch** [1] - 93:14
**misreading** [1] - 90:25
**miss** [1] - 42:24
**mission** [5] - 6:16; 67:22; 74:16; 88:14; 96:2

Preliminary Injunction Hearing 12/14/23

**missions** [2] - 15:22; 63:13
**misspoke** [1] - 58:20
**mistaken** [2] - 24:2; 83:22
**mistakes** [1] - 98:17
**misunderstand** [1] - 20:18
**misunderstands** [1] - 88:3
**mix** [1] - 50:16
**model** [1] - 68:4
**models** [1] - 89:3
**modifications** [1] - 115:25
**Monday** [5] - 120:4, 6; 122:16
**month** [1] - 82:4
**months** [9] - 19:25; 43:9; 106:2; 107:16; 109:4, 9; 110:25; 115:21; 117:9
**moot** [1] - 42:24
**morale** [1] - 88:7
**most** [13] - 11:20; 35:23; 43:9; 65:18; 69:20; 82:5; 98:8; 99:10; 100:1; 114:22; 118:3
**mostly** [1] - 32:15
**Motion** [1] - 29:5
**motion** [15] - 6:12; 7:17, 22; 8:4, 17; 20:12; 24:19; 81:22; 86:2; 97:4; 104:1, 14; 108:22; 112:13; 122:21
**motions** [5] - 6:11; 116:4; 117:19; 119:10
**Motorola** [1] - 114:2
**Mountain** [1] - 114:7
**movant** [1] - 46:4
**move** [10] - 11:3; 27:19-21; 29:9; 89:20; 105:3, 8, 12-13; 106:15; 108:21; 114:25; 117:12; 118:6
**moved** [2] - 39:4; 118:21

**movement** [1] - 36:6
**moving** [10] - 8:8; 11:11, 14; 31:2, 5; 49:16; 106:14; 113:22; 119:7
**MR** [154] - 2:22, 25; 3:2, 8, 14, 17, 21, 23; 4:5, 17, 21; 5:2, 15; 12:15, 17; 13:5, 11; 14:5, 12, 19, 25; 15:17, 19; 16:8, 12, 14; 17:4; 18:12, 17; 19:17, 22; 20:1, 7; 21:15; 22:25; 23:10, 15, 18; 24:6, 17, 21, 25; 25:2, 11; 26:6, 10, 17; 27:17, 22; 28:15; 29:11; 32:3; 33:9, 12, 24; 34:3; 37:8, 14, 16, 19; 38:12, 24; 39:1, 8; 41:16, 20; 42:10, 15, 18, 23; 43:4, 7; 44:4, 11; 46:17, 22; 47:4; 54:11, 17; 55:1, 19; 56:1, 24; 57:6; 58:20; 59:22; 60:24; 61:24; 62:12; 64:24; 66:7; 71:9, 18, 21, 25; 72:22; 73:5, 23; 74:8; 76:19; 77:22; 78:14, 21; 80:2, 5, 13; 83:25; 84:19; 85:8, 12, 15; 86:6, 22; 91:13; 94:1, 14; 97:9, 12; 98:22, 24; 99:25; 100:5, 8, 12; 103:23; 105:2, 6; 108:3, 8, 13, 19, 24; 110:17; 111:3, 7, 16; 113:6, 9, 14; 117:15; 118:8, 22; 119:16, 24; 120:5, 8, 14; 121:3, 5, 8, 10, 14; 122:3, 11
**MS** [2] - 4:23; 5:6

**multiple** [2] - 75:18; 79:22
**Multiple** [3] - 79:7; 81:15; 82:24
**Multiples** [1] - 79:12
**multitude** [1] - 80:11
**must** [10] - 9:23; 30:23; 31:20; 53:25; 56:14; 58:14; 76:3; 77:10; 82:2
**mutually** [1] - 84:25

## N

**NAACP** [1] - 5:12
**name** [1] - 19:1
**named** [2] - 4:8; 23:11
**names** [6] - 5:19; 16:4; 20:10; 22:23; 23:12
**NAPS** [2] - 85:6, 10
**narrow** [11] - 47:18; 49:10, 19; 60:7; 66:14; 75:11; 76:4; 89:21; 91:5; 99:20, 22
**narrowly** [5] - 53:25; 75:25; 95:11; 100:21; 121:18
**National** [1] - 5:10
**national** [15] - 45:12, 15, 18; 74:16; 75:8; 85:22; 86:15; 89:8, 16; 92:2; 93:2; 94:21; 96:2; 99:14
**NATO** [1] - 77:19
**Natural** [1] - 30:25
**nature** [5] - 20:18; 36:8, 25; 76:1; 104:1
**Naval** [114] - 2:4; 4:9, 13; 6:14; 7:10, 15; 9:24; 10:6, 10; 13:15; 15:3, 24; 16:21; 17:16; 21:5; 24:13; 25:17; 27:1; 28:12, 18; 32:6, 8; 34:25;

36:5, 9-10; 39:18; 41:14; 50:13, 16, 23; 53:8; 54:4, 13; 57:10, 22-24; 59:9; 60:3, 11; 61:20, 22-23; 62:4, 8, 15, 20, 24; 63:18, 24; 65:6, 19; 72:1, 4, 7, 9-11, 15-16; 73:2, 6-7, 13, 25; 74:12, 14; 75:13, 15-16, 19; 77:25; 78:6, 11, 16, 23; 81:23; 82:8, 15, 25; 84:5, 18; 85:11; 88:19; 89:23; 90:19; 91:21, 24; 92:3, 19, 23; 93:3, 8; 95:8, 20, 25; 96:11, 13, 21; 97:14, 24; 100:7; 101:21; 105:10; 106:24; 109:11; 113:1, 21; 114:13; 122:5, 8
**Navy** [41] - 4:11; 9:22; 10:12; 20:21; 21:9; 22:17; 46:24; 47:5, 7, 10, 20; 49:5, 21; 50:22; 51:10, 19; 52:6, 25; 53:24; 54:4; 57:3; 62:17, 23, 25; 63:10; 64:2, 4, 6; 65:4, 23; 68:3, 20; 69:21; 76:12, 20; 87:17; 88:17; 92:1; 102:5; 122:1
**Navy's** [6] - 48:13; 51:7; 87:12; 88:12; 92:13; 96:24
**necessarily** [7] - 14:9; 16:25; 47:6; 55:24; 66:3; 76:1; 111:5
**necessary** [9] - 13:18; 51:20; 62:16; 66:19; 74:15, 19; 79:15; 94:19;

120:12
**necessity** [1] - 116:9
**need** [28] - 3:7, 12, 20; 5:25; 16:19; 18:21, 23; 21:10; 22:11, 18; 25:22; 30:1; 36:11; 52:17; 55:9; 65:2; 78:9, 14; 83:17, 19; 86:2; 91:4; 104:20; 106:7; 109:2; 116:10; 121:18
**needed** [1] - 5:13
**needing** [1] - 109:5
**needs** [3] - 18:25; 24:11; 53:9
**negative** [12] - 47:5, 13; 87:15; 89:24; 90:3, 12; 91:2, 8; 97:19; 104:15
**negotiate** [1] - 108:15
**nerve** [1] - 123:10
**nervous** [1] - 29:18
**neutral** [13] - 21:5, 7; 22:6; 47:11; 51:23; 52:9, 14; 54:8; 95:17, 21, 25; 100:5, 13
**neutrality** [2] - 32:12; 69:11
**never** [8] - 16:4, 8; 48:4; 58:8; 68:20; 69:14; 95:1; 100:20
**nevertheless** [1] - 92:3
**new** [1] - 50:13
**New** [3] - 7:7, 18; 40:14
**next** [6] - 26:14; 31:15; 80:25; 105:1; 115:12; 118:5
**nice** [11] - 3:1, 4, 18; 4:1, 4, 19; 5:1, 5, 8, 17, 19
**nine** [4] - 105:18; 106:18; 112:5, 9
**Ninth** [1] - 105:18
**nobody** [2] - 34:6; 53:6
**nomination** [20] -

13:21; 16:24; 17:2, 5, 10, 17; 18:3; 22:16; 25:18, 20, 22; 27:4, 12, 19, 24; 28:10; 29:8; 79:25
**nominations** [9] - 27:15; 28:22; 80:3, 7; 81:1; 82:3; 107:4, 7, 12
**nominees** [1] - 22:2
**nondeterminative** [3] - 79:2, 20; 91:2
**nondiverse** [3] - 48:22; 90:13
**none** [3] - 43:24; 90:2; 95:22
**nonjury** [1] - 30:9
**nonminorities** [1] - 50:2
**nonminority** [1] - 48:16
**nonprofit** [1] - 6:15
**nonsense** [1] - 71:3
**nonstrategic** [1] - 40:3
**normal** [1] - 42:5
**normally** [3] - 65:13; 116:7; 119:5
**NORRIS** [70] - 2:22, 25; 12:15; 18:12, 17; 19:17, 22; 20:1, 7; 21:15; 22:25; 23:10, 15; 24:25; 32:3; 33:9, 12, 24; 34:3; 37:8, 14, 16; 42:10, 15, 18, 23; 43:4, 7; 44:4, 11; 46:22; 47:4; 54:11, 17; 55:1, 19; 56:1, 24; 57:6; 58:20; 59:22; 60:24; 61:24; 62:12; 64:24; 66:7; 71:9; 97:9, 12; 98:22, 24; 99:25; 100:5, 8, 12; 103:23; 105:2, 6; 108:3, 8, 13, 19, 24;

110:17; 111:3, 7, 16; 113:6, 9, 14
**Norris** [38] - 2:22; 3:16; 11:24; 12:14, 23; 18:11, 16; 19:16; 22:20; 24:24; 31:19; 32:2, 19; 37:15; 42:9; 44:10; 45:7; 46:9, 21; 54:9, 19; 59:3; 64:20; 70:2; 71:8; 73:16; 86:18; 97:7; 102:2; 105:11; 110:22; 112:3; 113:13; 115:12; 117:24; 119:19; 123:3
**North** [12] - 6:19; 8:23, 25; 14:17; 30:12; 105:24; 112:5, 8; 116:15
**note** [22] - 5:9, 20; 6:2; 9:21; 11:4; 12:7; 15:15; 23:21; 29:7, 24; 45:10; 46:12; 56:6, 12; 59:12; 61:25; 96:14; 107:15; 112:8; 115:15; 121:22
**Note** [1] - 96:7
**noted** [18] - 3:8; 9:12; 38:25; 42:12; 45:7; 56:7, 13; 57:14; 63:24; 72:15; 74:17; 102:11; 107:4, 6; 113:23; 114:1, 6, 21
**notes** [2] - 42:12; 78:21
**nothing** [15] - 23:12; 25:12; 26:20, 25; 27:6; 34:20; 39:17, 24; 71:6; 82:8; 95:12; 111:11, 15
**Notice** [1] - 8:9
**notice** [1] - 19:19
**noticed** [1] - 44:7
**noting** [4] - 3:19; 7:3; 9:14, 16
**notion** [7] - 15:10; 28:24; 53:17;

75:13; 106:1; 111:20; 112:10
**November** [3] - 2:8; 82:14, 17
**nowhere** [1] - 41:21
**NROTC** [2] - 42:14; 44:18
**number** [5] - 53:9; 62:2; 69:15; 88:17, 19
**Number** [1] - 2:5
**numbers** [31] - 48:21; 49:18; 51:22; 52:8, 17-18; 60:2, 8; 62:7, 13, 18; 63:4, 6-7, 18-19; 64:12, 19; 65:4; 70:24; 71:7; 72:25; 94:12; 95:13; 101:23; 103:2, 5; 122:7, 9

## O

**o'clock** [1] - 122:16
**obesity** [1] - 68:25
**objection** [1] - 18:23
**objectives** [3] - 48:5; 86:15, 24
**observe** [1] - 68:22
**obtain** [1] - 42:6
**obvious** [3] - 65:18; 67:25; 121:17
**obviously** [8] - 12:6; 14:24; 16:20; 24:1; 45:16; 102:18; 112:14; 118:8
**occurred** [2] - 37:13; 87:17
**OCS** [1] - 10:2
**October** [3] - 7:21; 8:17; 39:6
**offer** [4] - 18:3; 36:11; 40:15; 81:16
**offered** [2] - 97:16; 102:25
**Offers** [1] - 82:16
**offers** [6] - 36:4; 81:8, 12; 82:5, 9, 18

**Office** [1] - 87:12
**office** [2] - 4:2; 70:11
**officer** [7] - 9:23; 10:5; 74:13, 21; 99:18
**Officer** [19] - 10:1; 45:19; 49:14; 50:16; 53:8; 59:16; 60:9; 61:14; 63:3; 64:3; 72:22; 73:9, 12; 74:19; 76:22; 88:16; 92:5; 99:13; 102:8
**officers** [34] - 45:17; 50:18; 57:22; 59:17; 62:2, 6, 23-25; 63:6, 15, 25; 64:7; 67:12; 72:8, 10, 16, 18, 21; 73:7; 77:17; 84:15; 88:18; 99:11; 100:1, 14; 106:23; 113:1; 122:5
**Officers'** [2] - 10:1; 41:14
**official** [5] - 4:9, 11-13; 7:13
**officials** [2] - 48:17; 95:2
**often** [1] - 82:12
**old** [3] - 40:14; 41:10, 21
**older** [2] - 43:24; 44:1
**OMB** [2] - 92:23; 93:7, 12
**once** [8] - 10:17; 34:15; 45:5; 93:20; 104:4, 13; 116:24; 120:20
**one** [73] - 3:3, 24; 5:20; 7:9; 9:3, 23; 10:6; 11:5; 14:10, 12; 16:16; 17:12; 18:8; 20:3; 21:4, 6, 13; 25:5, 20; 26:8, 19; 27:18; 31:2, 25; 32:9; 41:9; 43:4; 44:18; 47:16; 50:20; 53:6; 54:18, 24; 55:2; 59:22, 24; 60:3,

14; 63:8; 67:8; 69:15, 20; 72:19; 74:1; 77:5, 11; 79:2, 20; 80:11, 14; 81:6, 19; 82:22; 83:4; 86:14; 87:22; 90:7; 94:12; 97:15; 98:10, 17; 99:18; 103:13, 15; 110:21; 111:10; 112:8, 22-23; 120:21
**one-count** [1] - 7:9
**ones** [1] - 119:22
**OPA** [3] - 88:12; 92:13; 96:24
**open** [1] - 6:6
**opened** [1] - 38:17
**operate** [1] - 115:7
**Operations** [7] - 57:23; 61:21, 23; 73:3, 25; 107:1; 122:8
**opine** [3] - 9:15; 11:19; 103:20
**opinion** [37] - 6:22, 24; 7:1, 3; 8:22; 9:9, 14, 17; 11:1; 23:4; 27:5; 29:17, 19, 21; 32:25; 36:21; 38:19; 39:5; 45:23; 46:23; 47:16; 56:18; 76:6; 91:16; 94:8, 16; 99:1; 105:1; 107:21; 114:3, 8; 115:4, 11; 122:20, 23
**opinions** [3] - 24:2; 77:23; 102:25
**opportunities** [2] - 40:8, 22
**opportunity** [8] - 12:24; 16:10; 24:12; 31:22; 34:24; 40:12, 21; 41:6
**opposed** [2] - 21:14; 117:23
**opposes** [1] - 69:6
**opposition** [1] -

34:7
**options** [1] - 95:25
**Order** [1] - 2:2
**order** [19] - 19:13; 20:9; 22:10; 46:25; 47:1; 61:5; 81:1, 3, 12; 112:12, 16; 114:24; 115:22; 116:1; 119:4; 122:18, 24
**ordered** [1] - 22:17
**organization** [4] - 6:15; 22:22; 38:14; 108:5
**organization's** [1] - 15:21
**organizational** [1] - 29:23
**original** [1] - 52:5
**ostensibly** [1] - 87:23
**otherwise** [3] - 21:18; 24:12; 27:25
**ought** [2] - 12:1; 108:2
**ourselves** [1] - 10:14
**out-of-order** [3] - 81:1, 3, 12
**outcomes** [1] - 87:15
**outside** [1] - 72:17
**outstanding** [3] - 28:14, 22
**outweighed** [1] - 36:20
**overall** [4] - 50:6; 52:22; 63:2; 72:22
**overly** [1] - 69:17
**overrule** [1] - 112:20
**overruled** [1] - 43:12
**overruling** [1] - 20:16
**overstated** [2] - 35:20; 86:18
**overturn** [1] - 9:1
**overwhelmingly** [3] - 57:22; 65:21; 69:6
**own** [6] - 47:1; 55:11, 14; 57:21; 106:4;

117:1

## P

**p.m** [1] - 123:20
**Pacific** [3] - 64:7; 73:19; 76:16
**page** [3] - 17:23; 18:8; 86:7
**Page** [8] - 56:12; 57:3; 76:5; 79:8; 94:16; 96:6; 104:8; 107:4
**pages** [3] - 12:8; 34:7; 104:7
**papers** [1] - 10:16; 28:12; 38:25; 42:13; 57:14, 21; 59:11; 63:25; 64:5; 77:14
**Paragraph** [13] - 36:3; 67:17; 78:21, 23; 79:11, 24; 80:21; 81:10; 82:8, 11; 87:11; 90:16; 91:19
**Paragraphs** [2] - 89:13; 95:23
**paramount** [1] - 45:11
**pardon** [1] - 27:9
**parenthetically** [1] - 9:21
**Parenthood** [1] - 45:3
**Parents** [2] - 64:25; 101:24
**parity** [3] - 52:14; 56:13; 93:4
**part** [7] - 36:17; 39:14; 48:16; 67:2; 81:7; 90:17; 99:7
**partially** [1] - 13:2
**participate** [2] - 9:25; 40:18
**participation** [1] - 76:13
**particular** [7] - 41:1; 67:24; 74:17; 83:24; 91:15, 22
**particularized** [1] - 49:23
**particularly** [8] - 2:12; 65:15; 75:6; 79:6, 12; 81:23; 102:5;

123:16
parties [8] - 2:15;
20:5; 30:8;
84:22; 106:4;
117:3; 118:14;
119:7
partisan [1] -
65:22
partners [1] -
43:23
parts [3] - 21:7;
54:5; 104:18
party [9] - 11:11,
14; 31:2, 5;
34:4; 115:5, 8
pass [3] - 25:6;
47:18; 70:23
passed [1] - 27:4
passing [1] -
13:21
past [4] - 56:8;
58:19; 59:21
path [3] - 29:2;
70:18; 89:17
Patrick [1] - 4:1
pause [1] - 32:13
pending [7] -
6:12; 7:19; 8:17;
32:13; 105:9;
108:21; 112:18
penological [1] -
93:22
people [52] - 13:6;
17:20; 18:2;
21:6, 24; 23:11;
26:22; 27:14;
35:5; 36:4, 13,
18; 43:25; 47:9;
48:7, 15, 23;
49:1; 50:19;
51:2; 53:17;
55:23; 56:2;
58:9; 62:5; 65:6,
14, 22; 67:3, 7,
20; 68:4, 10, 13;
69:16; 70:10;
71:3; 73:18;
74:4; 84:6;
85:13; 91:15;
97:17; 116:25
People [1] - 87:12
percent [27] -
21:24; 47:9;
57:24; 61:20,
22; 62:4, 19-21;
63:1; 64:2-4;
72:11, 15; 73:2;
88:18, 20-21;
101:5; 106:23;
122:8

percentage [5] -
72:21; 74:3;
76:12, 14; 90:9
percentages [2] -
63:23; 84:11
perfect [1] -
103:16
perfectly [4] -
55:23; 107:19;
111:21; 112:21
perhaps [2] -
49:16; 116:11
period [4] - 16:13;
37:11; 43:3;
100:10
periodic [1] - 49:7
permit [1] - 9:7
perpetuity [1] -
25:3
Person [4] - 79:7,
12; 81:14; 82:24
person [3] - 5:21;
54:3; 101:21
personal [1] -
55:14
personnel [2] -
85:19; 102:7
persons [1] -
24:23
perspective [2] -
120:22
pertinent [1] -
90:12
Philip [1] - 7:19
physical [6] -
13:21; 17:18;
23:25; 25:6;
27:5; 28:1
PI [3] - 18:6;
60:13; 85:2
pieces [1] - 90:6
pigs [1] - 75:6
pike [1] - 104:4
pilot [1] - 72:13
Pipeline [1] -
114:7
pipeline [4] -
72:9; 73:10;
74:13; 84:16
place [4] - 28:7;
38:13; 52:25;
116:17
placed [1] - 72:11
places [2] - 53:2,
4
plaintiff [27] -
2:18; 6:15; 7:22;
13:22, 25;
24:11; 27:24;
38:18; 45:1, 13;

46:1, 8; 55:5;
58:2; 75:1;
78:16; 79:4;
81:20; 86:10,
23; 88:23;
90:18, 22; 92:3;
95:24; 97:1
plaintiff's [19] -
4:7; 15:2; 25:19;
37:22; 38:2;
39:11; 71:25;
73:11; 75:12;
77:8; 78:11;
80:25; 81:25;
84:22; 89:15;
93:19; 96:8, 20;
97:4
plaintiffs [19] -
12:22; 17:5;
24:23; 25:13;
38:13; 39:17;
40:3, 10; 41:5,
24; 78:1; 81:22;
82:9; 83:14;
88:9; 92:16, 18;
123:9
plan [1] - 104:23
Planned [1] - 45:3
plans [2] - 49:9;
118:4
play [2] - 77:12;
100:17
played [1] - 16:6
plays [6] - 21:23;
44:20; 60:21;
74:12; 89:12;
98:1
pleadings [1] -
2:20
pleasure [2] -
117:13; 118:7
plenty [4] - 44:20;
104:12; 117:7,
16
Plexiglass [1] -
13:3
plus [2] - 78:17;
81:7
pocket [2] -
27:19; 29:8
podium [4] -
12:25; 13:1;
86:11; 105:8
Point [5] - 7:8;
52:15; 120:18;
121:23; 122:9
point [63] - 2:19;
8:4; 11:25; 15:8;
23:7, 9; 26:25;
27:6; 28:24;

38:23; 41:20;
43:1, 5; 46:10;
49:5, 13; 51:9;
54:16; 56:17,
19-20; 57:7;
58:15; 59:1, 13,
20; 60:1, 20, 23;
61:7; 62:10;
64:11, 20; 66:3,
10; 73:10;
76:11; 78:24;
84:17; 92:16;
93:19; 94:11,
16; 96:20;
97:15; 100:24;
101:14; 102:3,
16; 103:21, 24;
104:18; 105:19;
109:25; 122:6
point's [1] - 63:20
points [8] - 26:19;
70:7; 79:1;
80:23; 82:23;
97:10; 101:11
poison [1] - 65:1
Police [1] - 31:11
policies [6] - 2:6;
6:21; 13:15;
15:5, 7, 25
policy [11] - 9:4;
35:16; 38:12;
60:22; 61:14;
78:7, 11; 83:10,
12; 91:14
politicized [1] -
69:17
poll [1] - 65:13
poof [1] - 73:8
pool [6] - 17:20;
18:2; 21:20;
25:15; 26:22;
28:1
population [1] -
49:15; 56:14;
62:20; 64:2;
76:14, 16, 20,
22; 93:5
portions [1] -
63:17
position [4] -
24:3, 17; 29:11;
42:4
positions [6] -
30:7; 74:3; 84:7,
13, 16
positive [2] -
52:6; 97:19
possibilities [1] -
58:13
possible [2] -

106:8; 118:9
possibly [2] -
54:22; 101:23
postpone [1] -
116:25
posture [7] - 6:3;
10:9, 14; 14:15,
23; 15:1; 19:6
potentially [6] -
7:4; 9:17; 32:25;
33:5; 75:21;
114:20
power [3] - 30:19;
98:12; 113:25
powers [1] -
115:1
practice [3] -
7:15; 37:2;
114:14
practicing [1] -
121:9
precariously [1] -
120:10
precautions [2] -
2:11, 14
precedent [1] -
89:16
precise [1] -
50:16
precisely [1] -
73:5
preclude [1] -
107:16
predict [2] -
50:11; 66:11
predicted [1] -
67:6
prediction [1] -
104:2
prediscovery [1] -
20:12
prefer [1] - 50:21
preference [1] -
20:23
preferences [10] -
6:17; 51:24;
52:9; 53:1,
15-16; 66:25;
68:16; 69:17;
94:19
preliminary [52] -
6:12; 7:17, 22;
8:5; 11:8, 13;
12:10; 14:3, 10,
14, 18; 16:15;
19:6; 20:12;
24:19; 30:5, 17,
23; 31:7, 20;
32:4; 34:13;
35:1; 36:12, 15;

37:21; 38:3, 6;
40:5, 19; 41:2;
42:2; 43:18;
60:18; 66:10;
74:9; 83:15;
86:3, 8; 97:4;
104:2; 109:15,
22; 111:4;
112:14; 113:23;
114:4; 120:2;
122:21
Preparatory [1] -
85:11
prepare [1] -
115:18
prepared [8] -
20:4; 32:14;
110:4, 6, 12;
115:22; 116:6;
117:12
prerequisites [3]
- 16:23; 17:17;
18:1
presence [3] -
52:23; 53:24;
54:2
present [6] - 5:14;
7:5; 9:18; 33:1;
95:5; 114:21
presented [5] -
10:16; 31:25;
33:3, 6, 22
preserve [3] -
30:7; 108:20;
114:5
President [2] -
6:22; 102:18
presiding [1] - 2:9
press [1] - 43:16
pressure [1] -
73:16
presumably [1] -
15:12
pretrial [1] - 116:4
pretty [12] - 25:9;
29:14, 17, 20;
38:18; 39:4, 7;
52:10; 67:25;
109:20; 111:19;
116:19
prevail [1] - 33:20
prevails [1] -
110:13
prevent [2] - 53:5;
95:3
prevented [1] -
39:17
prevention [1] -
87:20
prevents [2] -

Preliminary Injunction Hearing 12/14/23

13:17; 82:8
**previously** [1] -
2:6
**primary** [4] -
13:12; 26:19;
27:6; 120:22
**principle** [1] -
69:11
**Principles** [2] -
7:16; 114:15
**principles** [1] -
84:25
**priority** [1] -
119:14
**prison** [5] - 87:19;
93:22, 25; 94:2;
95:2
**prisons** [2] -
69:10; 95:4
**private** [1] - 38:21
**problem** [8] -
13:17; 15:6;
58:6; 69:12, 18,
20; 107:2;
121:21
**problems** [9] -
46:24; 54:13;
57:8; 58:8, 22;
59:24; 102:20;
110:22
**procedural** [1] -
6:3
**proceed** [10] -
2:16; 6:1; 8:20;
12:19; 13:23;
31:23; 42:1, 5;
114:17, 23
**proceeding** [2] -
13:16; 114:15
**proceedings** [4] -
114:12; 115:13,
17; 123:20
**proceeds** [4] -
61:19; 71:25;
104:22; 114:16
**process** [42] -
10:9; 21:7, 9;
22:5; 27:12;
35:20, 25; 36:7,
13, 17; 47:7;
48:17; 52:12;
54:5, 14; 73:13;
74:15; 78:25;
79:5; 80:8, 24;
81:24; 82:23;
83:2, 8; 87:18;
90:6, 20, 24;
95:10; 96:4, 10;
100:14, 25;
107:1; 109:23;

117:6; 118:9
**processes** [1] -
95:9
**professional** [3] -
10:4; 83:23;
85:21
**Professor** [1] -
96:24
**professors** [1] -
21:13
**proffer** [4] -
24:22; 61:13;
65:25; 66:5
**proffered** [2] -
26:11; 70:4
**proffering** [2] -
14:9; 66:1
**profile** [1] - 23:22
**program** [5] - 9:6;
85:6, 10; 99:24;
100:3
**programs** [4] -
8:24; 9:7; 58:1;
94:10
**progress** [3] -
64:6, 8; 73:10
**progression** [1] -
81:4
**prohibited** [1] -
23:8
**prohibiting** [1] -
7:24
**promise** [2] -
20:4; 29:20
**promotion** [1] -
63:14
**promptly** [1] -
8:11
**prong** [1] - 66:14
**pronouncing** [1] -
5:18
**proof** [4] - 44:6;
52:6; 63:21;
103:2
**proportion** [1] -
11:22
**prospective** [1] -
36:8
**prospectively** [1]
- 94:3
**Protection** [3] -
7:16; 8:25;
114:15
**protective** [2] -
19:13; 20:9
**prove** [7] - 18:21,
23; 22:7; 60:19;
61:1; 62:15;
65:4
**proved** [4] -

22:13; 55:5;
60:25; 69:25
**provided** [6] -
13:25; 75:22;
81:9; 82:12;
88:9; 107:8
**providing** [1] -
89:3
**pseudo** [2] - 16:4;
22:23
**pseudonymity** [1]
- 18:24
**pseudonymous**
[2] - 18:20;
19:11
**pseudonyms** [5] -
19:4; 23:8, 22;
24:4; 25:10
**Public** [1] - 6:4
**public** [44] - 2:7;
6:6, 9-10; 8:2;
9:12, 22; 11:15;
12:3; 16:5, 19;
20:5, 10; 28:17;
30:15; 31:6, 24;
32:18, 20;
33:16; 35:10,
13-14; 45:10;
51:14; 60:15;
61:4; 62:2, 11;
64:6, 11, 20, 22;
66:3, 8; 69:5;
77:13; 85:10
**public's** [1] -
69:12
**publicly** [2] -
13:8; 16:8
**pudding** [1] -
103:2
**pun** [1] - 27:10
**punchline** [1] -
74:11
**pure** [1] - 68:14
**purely** [1] -
104:19
**purportedly** [1] -
63:14
**purpose** [10] -
9:21; 30:6; 48:8;
62:11; 64:20;
88:4; 93:1;
101:22
**purposes** [5] -
25:7; 32:17;
40:2; 48:7;
64:11
**pursuant** [1] - 6:8
**pursue** [2] -
23:24; 110:18
**pursuing** [2] -

41:25; 53:20
**push** [1] - 33:9
**put** [5] - 19:19;
73:15; 93:13;
113:4; 118:24
**putting** [2] - 8:14;
25:23

## Q

**qua** [1] - 49:22
**qualifications** [1]
- 67:4
**qualified** [3] -
22:15; 79:14;
81:16
**qualitative** [1] -
74:25
**quantify** [2] -
34:18; 35:2
**quantitative** [1] -
74:24
**questioning** [2] -
25:8; 102:12
**questions** [15] -
10:21, 23-24;
11:2; 20:11;
71:20, 22;
93:18; 98:16;
106:8; 110:11;
113:18; 121:25
**quick** [3] - 39:7;
80:23; 118:9
**quicker** [1] -
121:17
**quickly** [9] - 8:8;
29:17, 20; 39:4;
86:25; 91:10;
105:4; 106:7;
108:20
**quite** [8] - 29:10;
35:20; 52:11;
56:8; 63:11;
83:9; 86:5;
94:20
**quo** [3] - 86:9;
114:5, 10
**quote** [5] - 76:2;
79:5; 90:5;
94:18; 104:9
**quoted** [1] - 10:17
**quotes** [2] -
103:13, 15
**quoting** [2] -
33:14; 78:24

## R

**race** [178] - 6:20;
7:15, 24; 9:3,

10, 15; 21:5, 7,
10, 17, 19, 23;
22:3, 5-7, 18;
27:2; 32:14;
34:5, 11; 36:16,
23, 25; 37:2;
39:18, 20;
43:11, 15, 17;
46:23; 47:5, 8,
11, 13; 48:18;
49:6, 8, 10, 18,
21-22; 50:1, 6,
9, 11, 15, 18,
20-21; 51:20,
22-23; 52:9, 12,
14, 20; 53:3, 10,
18, 24-25; 54:2,
4-5, 7-8, 10, 12;
55:21; 56:7;
58:7, 23-24;
59:8, 24-25;
62:15; 63:14;
65:19, 21; 66:8,
19; 67:11;
68:20, 24; 69:6,
11, 14; 72:4;
73:12; 74:14;
75:3, 7; 77:9,
19; 78:1, 17, 25;
79:12, 20; 80:7,
11, 15, 18-19,
25; 81:6, 8-9;
82:21, 23, 25;
83:5-7; 87:16,
22; 89:1, 23-25;
90:2-4, 8, 11,
16, 20, 23-24;
91:1, 7; 92:14;
95:3, 9, 11, 15,
17, 21, 25; 96:3,
9, 22; 97:19, 25;
98:7, 9-10, 16;
99:3, 12, 15, 17;
100:5, 13, 21,
25; 101:5, 11,
16-18, 20, 24;
103:14; 104:15;
105:10; 114:13
**Race** [1] - 79:6
**race-based** [8] -
6:20; 46:23;
53:10; 54:12;
55:21; 58:23;
101:11
**race-conscious**
[2] - 7:15;
114:13
**race-neutral** [13] -
21:5, 7; 22:6;
47:11; 51:23;
52:9, 14; 54:8;

95:17, 21, 25;
100:5, 13
**races** [2] - 65:22;
67:4
**racial** [80] - 6:16;
20:23; 21:24;
22:4; 32:12;
35:4; 36:20;
42:21; 47:21;
48:19; 49:14,
24-25; 50:3-5,
15-16, 20, 23;
51:2, 5, 13,
22-24; 52:8, 15,
25; 53:7, 15-16;
54:23; 55:13,
17-18; 56:13;
57:17; 58:19;
59:14, 16, 24;
60:9; 61:14;
62:16; 63:1, 5;
64:15; 65:1;
66:25; 68:3, 7,
11, 16; 69:17;
87:7; 89:6, 24;
91:15; 92:9, 18,
23; 93:11;
94:19; 95:3;
99:12; 101:7, 9;
102:4, 13-14;
103:13
**racially** [15] -
32:9; 40:8;
63:12; 65:14;
67:9; 69:22;
74:19; 88:5;
92:5, 12; 95:13;
98:18
**racism** [1] - 52:24
**racist** [1] - 52:24
**raise** [1] - 113:11
**raised** [5] - 11:16;
24:16; 123:7
**rambling** [1] -
55:4
**ramp** [1] - 52:13
**Rand** [1] - 87:9
**rank** [8] - 57:22;
59:17; 81:4;
84:12, 15;
106:23; 122:9
**ranking** [2] - 63:5,
15
**ranks** [11] - 10:5;
56:15; 57:25;
58:1; 59:15, 19;
61:15; 62:5;
68:6; 76:13, 17
**rate** [3] - 65:16;
102:6

Amanda L. Longmore, RPR, FCRR, Federal Official Court Reporter

**rather** [6] - 50:18; 79:13; 91:23; 92:8; 96:16; 114:5
**rationale** [1] - 43:12
**rationales** [1] - 86:11
**RDB-23-2699** [1] - 2:5
**re** [1] - 37:1
**re-evaluating** [1] - 37:1
**reaching** [2] - 30:19; 113:25
**reaction** [1] - 116:16
**read** [6] - 10:25; 43:15; 77:14; 96:7; 101:12, 17
**readiness** [4] - 48:8; 87:15; 88:14; 92:10
**reading** [1] - 34:10
**readjust** [1] - 49:17
**ready** [9] - 5:25; 17:12, 25; 22:11, 13; 25:14; 45:24; 71:22; 74:20
**real** [10] - 16:4; 19:1; 27:5; 58:22; 65:2; 74:24; 77:11; 92:8; 97:1; 101:19
**real-world** [4] - 74:24; 77:11; 92:8; 97:1
**reality** [2] - 102:3; 105:12
**realized** [1] - 110:22
**really** [52] - 15:1; 18:19, 24; 19:20; 21:1, 6; 28:6; 29:24; 30:1; 33:2; 34:6, 12, 16; 35:10, 13; 36:1, 22; 43:14, 23; 44:6, 14; 48:25; 50:13; 51:21; 52:5; 54:21; 58:6; 59:6; 62:9; 68:7, 18; 70:17; 80:8; 84:15, 21; 99:20; 100:16; 101:20; 102:3, 23; 104:10; 105:4, 19; 106:15, 21; 107:10, 24; 115:6; 119:21
**reapply** [2] - 26:14; 41:6
**reapplying** [1] - 26:20
**Rear** [2] - 4:13; 7:11
**reason** [13] - 10:22; 21:17; 22:8; 25:20; 40:4; 49:23; 63:8; 68:23; 69:15; 74:9; 95:4; 98:12; 101:25
**reasonable** [2] - 93:7; 121:20
**reasons** [7] - 39:12; 49:13; 68:9; 97:3; 115:3; 122:19, 22
**reassigned** [1] - 119:14
**rebut** [1] - 97:2
**rebuttal** [3] - 77:8, 23; 97:8
**rebutted** [1] - 97:13
**receive** [4] - 10:3; 80:19; 81:16
**recent** [2] - 38:4; 45:4
**recently** [5] - 2:10; 58:6; 84:1; 85:1; 100:8
**recognize** [1] - 105:13
**recognized** [3] - 76:2; 84:1; 85:2
**recognizing** [1] - 75:20
**recommissioned** [1] - 113:4
**record** [40] - 2:21; 3:6, 11, 25; 4:15; 9:21; 23:3; 30:6; 44:17; 45:22; 66:12, 21; 77:21; 78:15; 80:6; 81:2; 103:17; 104:6, 9; 105:23, 25; 106:20; 107:14; 108:1; 110:11, 15-16; 112:1; 114:18; 115:4; 116:11, 20; 117:24; 122:19, 22; 123:6, 11
**record's** [1] - 102:2
**records** [2] - 104:13; 106:12
**recruited** [1] - 72:17
**recruiting** [1] - 68:2
**recruitment** [6] - 68:20; 74:21; 88:11, 24; 89:8; 92:10
**reenforce** [1] - 53:17
**refer** [4] - 9:5; 11:6; 16:2; 48:22
**reference** [6] - 16:3; 29:16; 41:13; 57:2; 59:10; 84:3
**referenced** [1] - 44:18
**referred** [2] - 2:19; 28:18
**referring** [4] - 6:25; 21:14; 22:23; 63:17
**refers** [1] - 87:9
**reflect** [2] - 44:17; 56:15
**reflected** [2] - 80:7; 96:23
**reflects** [3] - 12:6; 80:6; 92:12
**refusal** [1] - 60:6
**refutes** [1] - 78:18
**regard** [4] - 8:12; 11:4; 59:20; 103:19
**regardless** [1] - 37:11
**regime** [2] - 43:13; 100:17
**regulations** [2] - 10:12
**Rehab** [1] - 41:1
**rejected** [3] - 22:14; 37:24; 49:4
**rejection** [1] - 92:21
**relate** [1] - 102:7
**relations** [1] - 92:15
**relationship** [1] - 68:21
**relative** [1] - 30:7
**relevance** [2] - 37:23; 76:3
**relevant** [6] - 20:13; 53:18; 64:14; 76:5; 83:24; 95:8
**reliably** [3] - 50:11; 51:16; 66:23
**relief** [13] - 8:1; 9:20; 11:13; 37:21; 38:3; 42:7; 58:12; 61:6; 105:9; 109:25; 111:2, 8
**relies** [2] - 50:8; 92:23
**religion** [1] - 98:8
**reluctant** [1] - 85:18
**rely** [2] - 37:3; 86:2
**relying** [3] - 88:23; 92:20; 96:6
**remain** [1] - 23:23
**remains** [3] - 38:21; 71:13; 95:11
**remand** [1] - 106:3
**remanded** [1] - 115:20
**remedied** [2] - 26:1; 34:20
**remedies** [2] - 11:9; 32:5
**remedy** [6] - 30:14, 18; 40:2; 46:9; 55:7; 113:24
**remember** [3] - 93:3; 94:25; 96:18
**remind** [1] - 85:9
**repaired** [1] - 34:19
**repeat** [1] - 63:19
**repeatedly** [2] - 78:16; 81:22
**reply** [5] - 33:25; 78:11; 79:9; 81:23; 117:25
**report** [6] - 47:24; 78:4; 87:9; 115:25; 116:2; 119:6
**reported** [1] - 93:6
**represent** [1] - 14:12
**representation** [1] - 64:7
**represented** [1] - 70:22
**request** [5] - 8:1; 38:4; 114:10; 115:25; 119:10
**requests** [1] - 116:4
**require** [3] - 75:4; 103:22; 107:13
**required** [2] - 2:6; 79:8
**requirement** [2] - 47:19; 66:17
**requirements** [7] - 11:8; 13:20; 20:21; 23:25; 25:17; 26:21; 31:8
**requires** [3] - 9:10; 32:13; 95:12
**rescind** [1] - 36:11
**research** [8] - 11:21; 18:14, 16; 87:7; 89:12; 92:11; 96:23; 110:2
**resentment** [1] - 53:16
**Reserve** [2] - 9:25; 41:14
**resolution** [1] - 113:21
**resolve** [3] - 44:22; 67:21; 106:17
**resolved** [4] - 26:4; 42:3; 106:7
**Resources** [1] - 30:25
**respect** [51] - 6:11; 7:7; 10:13; 11:7; 13:11; 18:5; 27:10, 15; 30:2; 44:16, 24; 46:6, 12, 14; 50:18; 54:19; 56:17; 57:1; 58:15; 59:9; 70:8, 17-18, 24; 71:5; 77:14, 16; 82:20; 83:22; 84:17; 86:2; 87:1; 88:11; 89:10, 20; 91:10; 93:19; 94:8, 12; 99:24; 102:6, 25; 106:10; 109:15; 110:7; 111:9; 114:9; 122:19
**respected** [3] - 69:20; 70:19, 21
**respectfully** [4] - 39:9; 60:11; 89:1; 111:3
**respects** [1] - 36:23
**respond** [4] - 7:8; 12:24; 31:23; 43:21
**responded** [2] - 11:5; 39:20
**responding** [1] - 8:13
**response** [5] - 22:21, 24; 65:16; 92:17; 108:1
**result** [2] - 13:15; 103:4
**results** [1] - 57:14
**retaining** [1] - 68:2
**retention** [6] - 74:21; 88:11, 14, 24; 89:7; 92:10
**retired** [1] - 77:17
**retrofitted** [1] - 13:2
**return** [1] - 88:13
**revealed** [2] - 20:10; 101:16
**reversed** [4] - 31:11, 13; 109:18, 22
**reverses** [1] - 115:17
**review** [7] - 9:8; 23:20; 49:7; 51:8; 81:7; 85:20; 89:11
**reviewing** [2] - 43:17; 106:12
**reviews** [1] - 95:9
**revoked** [1] - 40:15
**revolves** [1] - 83:20
**rewarded** [1] -

68:15
**Richard** [1] - 3:2
**Richmond** [6] -
  106:2; 110:1, 8;
  111:12; 112:10
**richness** [1] -
  91:17
**right-away** [1] -
  116:18
**rights** [6] - 34:17;
  35:7; 36:21;
  37:23; 41:25
**riots** [7] - 53:24;
  54:2, 4, 7; 58:7;
  87:16
**rise** [1] - 102:22
**risk** [1] - 36:22
**risked** [1] - 91:15
**road** [5] - 24:16;
  27:15; 55:15;
  62:9; 72:20
**Roberts** [2] - 9:9;
  114:21
**Roberts'** [9] -
  32:25; 38:19;
  39:4; 56:18;
  59:4; 94:7, 16;
  103:12; 107:21
**Rocah** [1] - 5:18
**Rocket** [1] - 117:1
**role** [7] - 21:23;
  68:4; 74:12;
  89:3, 12; 98:1;
  100:16
**rolling** [1] -
  123:17
**Rostker** [1] - 85:1
**Roswell** [2] -
  38:4; 43:7
**ROTC** [9] - 10:1;
  58:1; 62:6;
  99:11, 18, 24;
  100:2, 7
**rough** [1] - 93:4
**route** [1] - 110:4
**rubric** [1] - 9:8
**Rule** [2] - 116:3;
  119:8
**rule** [8] - 21:1;
  27:8; 30:3;
  101:10; 104:1,
  24
**rules** [2] - 6:9;
  98:2
**ruling** [5] - 31:12;
  42:20; 45:21;
  113:12; 115:15
**run** [2] - 106:1;
  118:2
**Ruppersberger**

[1] - 27:13
**rush** [1] - 121:23

# S

**safest** [2] - 117:6;
  118:3
**Safety** [1] - 20:15
**sailors** [3] - 64:2;
  65:10; 66:25
**sake** [1] - 94:5
**sand** [1] - 58:18
**sat** [1] - 105:18
**satisfied** [8] -
  11:10; 22:12;
  23:25; 29:16;
  30:22; 31:1, 9;
  44:13
**satisfy** [9] - 31:20;
  33:4, 10; 49:8;
  51:19; 61:1;
  65:7, 13; 92:19
**satisfying** [2] -
  9:6; 48:11
**Saturday** [2] -
  27:14; 122:1
**save** [1] - 111:22
**saw** [2] - 10:17;
  59:11
**schedule** [5] -
  8:6; 108:15;
  118:25; 119:25;
  120:1
**scheduled** [3] -
  6:11; 30:10;
  119:13
**schedules** [2] -
  118:11; 119:21
**scheduling** [8] -
  112:12, 16;
  114:24; 115:22;
  116:1; 119:4;
  122:24
**School** [2] - 10:2;
  85:11
**school** [5] - 6:17;
  40:18; 41:19;
  48:17; 90:12
**school's** [1] - 9:6
**schoolers** [1] -
  104:21
**score** [5] - 21:9,
  14, 18; 22:4;
  79:8
**scores** [3] -
  79:13, 17; 80:20
**scoring** [3] -
  79:16; 81:14, 18
**scrutinize** [1] -
  86:11

**scrutiny** [43] - 9:8;
  36:25; 46:15,
  19-20; 57:12;
  60:12, 22; 61:2,
  8, 13, 17; 64:15;
  65:7, 13; 66:14,
  18; 68:6; 69:24;
  76:3; 84:23;
  86:20; 92:20;
  94:10; 97:24;
  98:1; 99:4;
  101:2, 8, 23, 25;
  102:9, 21;
  103:21; 107:25;
  114:17, 22
**SDNY** [1] - 24:8
**sea** [1] - 64:18
**seal** [2] - 19:13;
  20:10
**Seals** [1] - 69:21
**seated** [2] - 4:7;
  6:2
**seats** [1] - 96:9
**Second** [1] - 24:9
**second** [10] - 3:3,
  24; 47:20;
  70:10; 72:3;
  76:24; 78:3;
  79:4; 83:2;
  100:24
**second-guess** [1]
  - 78:3
**Secretary** [2] -
  4:10
**security** [14] -
  45:12, 15, 19;
  74:16; 75:8;
  86:15; 89:8, 16;
  92:2; 93:2;
  94:21; 96:2;
  99:14
**Security** [1] -
  96:17
**see** [20] - 3:5;
  5:21, 24; 11:22;
  36:3; 43:25;
  48:21; 59:14;
  68:5; 74:1; 75:3;
  84:11; 86:4;
  103:19; 106:16;
  108:12; 113:1;
  121:21
**seek** [6] - 14:14,
  18; 16:15;
  26:15; 91:21;
  115:13
**seeking** [10] -
  9:20; 14:10;
  37:21; 38:6;
  42:7; 46:9;

**51:10; 57:11;
  78:2; 93:15
**seeks** [2] - 86:9;
  91:24
**seem** [1] - 58:17
**selected** [3] -
  81:15; 90:13, 20
**selection** [1] -
  81:24
**selections** [1] -
  81:3
**selective** [1] -
  69:6
**self** [1] - 6:16
**self-described** [1]
  - 6:16
**send** [4] -
  21:16-18; 36:2
**sending** [1] -
  100:14
**sends** [2] - 99:18
**Senior** [1] -
  18:10
**senior** [7] - 40:21;
  72:9, 15; 73:7,
  9, 12; 74:13
**sense** [1] - 54:1
**sensitive** [1] -
  120:25
**sentence** [2] -
  17:23; 18:8
**separate** [2] -
  25:7; 26:1
**separately** [1] -
  25:15
**September** [6] -
  82:13; 117:7;
  118:5, 17;
  120:24; 121:2
**Serco** [1] - 40:25
**serious** [2] - 54:3;
  56:3
**seriously** [4] -
  54:24; 55:3;
  80:9; 95:24
**serve** [3] - 50:25;
  69:1; 72:13
**serves** [1] -
  101:22
**service** [9] - 15:3;
  16:22; 39:23;
  43:10; 72:12;
  75:5; 84:12;
  87:25; 91:6
**set** [14] - 6:3;
  30:24; 65:3;
  112:15; 115:3;
  116:12, 20, 24;
  117:5, 7; 118:1;
  122:19, 22

**sets** [1] - 29:3
**setting** [1] - 10:8
**seven** [3] - 95:21;
  109:19; 110:25
**several** [3] -
  35:11; 106:22;
  123:9
**severe** [2] - 25:5;
  65:2
**SFFA** [15] - 2:19;
  6:13; 7:9, 21;
  11:4; 13:22;
  14:6, 8, 14;
  15:8, 11, 15;
  16:14, 17; 19:10
**SFFA's** [3] - 6:18;
  8:22; 29:23
**shallow** [1] -
  27:10
**shape** [1] - 112:18
**shared** [1] - 91:23
**sheet** [1] - 3:12
**Sherwood** [1] -
  92:16
**shifting** [1] -
  58:18
**ship** [2] - 113:3, 5
**short** [2] - 9:6;
  89:15
**shorthand** [1] -
  85:16
**shortly** [3] -
  11:15; 82:14;
  122:21
**show** [14] - 17:12,
  14, 21; 22:19;
  24:11; 25:25;
  27:2, 25; 40:5;
  61:5; 77:24;
  89:18; 103:7
**showed** [1] -
  88:15
**showing** [5] -
  17:25; 25:15;
  31:8; 88:16;
  114:12
**shown** [1] - 28:12
**shows** [6] - 21:22;
  75:22; 83:14;
  85:1; 99:2
**side** [8] - 4:7;
  35:14; 54:18;
  63:9; 67:14;
  105:7; 110:12;
  118:23
**sides** [5] - 8:12;
  12:19; 67:25;
  106:20; 108:15
**sign** [1] - 67:15
**significance** [1] -

81:25
**significant** [6] -
  17:7; 37:22;
  75:24; 76:18;
  78:10; 90:9
**signs** [1] - 38:10
**silly** [1] - 54:6
**similar** [3] - 7:17;
  64:8; 92:12
**similarly** [2] -
  40:17; 101:16
**simple** [1] -
  116:23
**simply** [12] -
  13:16; 15:11;
  73:13; 75:3;
  76:7; 77:24;
  85:23; 89:9;
  90:22; 93:13;
  97:1
**single** [3] - 17:22;
  18:8
**single-page** [1] -
  18:8
**sit** [5] - 29:13;
  63:22; 70:11;
  105:20; 106:22
**sitting** [1] - 13:6
**situations** [4] -
  56:3, 7; 58:10;
  103:1; 116:7
**six** [7] - 2:11;
  43:9; 94:9;
  100:13; 106:17;
  109:4, 8
**sixth** [1] - 94:9
**skin** [2] - 32:10;
  67:24
**slot** [1] - 24:13
**small** [1] - 12:5
**smile** [2] - 122:5
**smiling** [1] -
  120:11
**so-called** [2] -
  21:5; 43:5
**societal** [2] - 89:4
**society** [1] - 69:8
**softly** [1] - 55:9
**soldiers** [1] - 67:1
**sole** [1] - 15:20
**solely** [1] - 82:23
**Solicitor** [4] -
  39:21; 96:6;
  101:12, 17
**solution** [4] -
  55:21; 58:23, 25
**solve** [3] - 58:6;
  68:23; 102:19
**solving** [2] -
  54:13; 107:2

Preliminary Injunction Hearing 12/14/23

**someday** [2] - 33:20; 72:19
**someone** [5] - 21:17; 22:4; 29:7; 85:4; 107:18
**sometime** [2] - 117:5; 122:17
**sometimes** [1] - 85:16
**somewhat** [1] - 13:2
**somewhere** [1] - 59:10
**soon** [1] - 49:10
**sophomore** [1] - 28:20
**sorry** [10] - 18:3; 76:21; 80:16; 85:5; 96:18; 108:25; 111:7
**sort** [11] - 5:22; 21:20; 25:6; 35:25; 38:20; 47:22; 48:6; 67:15; 79:15; 84:6; 97:17
**sorting** [1] - 49:2
**sorts** [1] - 53:2
**Sotomayor** [1] - 10:17
**sought** [1] - 43:18
**sound** [2] - 12:13; 72:25
**sounds** [1] - 109:17
**source** [2] - 59:17; 84:21
**sources** [1] - 82:3
**Southern** [3] - 7:6, 18; 40:14
**sovereign** [1] - 34:21
**sparingly** [3] - 30:19; 80:5; 113:25
**speaking** [2] - 25:23; 80:2
**spear** [1] - 72:13
**special** [1] - 25:17
**specific** [8] - 23:6, 11; 25:11; 32:21; 33:18; 41:13; 50:10
**specifically** [10] - 7:1, 3; 9:16; 10:8; 32:23; 44:18; 46:3; 56:12; 87:10; 114:6

**specifics** [1] - 21:15
**speculating** [1] - 58:5
**speculative** [2] - 25:21; 57:17
**speech** [1] - 38:6
**Speech** [1] - 19:4
**speed** [1] - 109:23
**spend** [2] - 85:13; 111:12
**spent** [1] - 100:24
**split** [1] - 24:7
**spot** [1] - 34:25
**spouse** [3] - 121:6, 11
**squarely** [1] - 37:24
**stage** [9] - 14:3, 10; 16:1; 18:20; 30:2; 114:11, 15
**stake** [1] - 32:8
**stand** [5] - 5:16; 54:20; 108:3, 8; 113:3
**standard** [6] - 22:12; 30:5; 31:13; 46:4, 14
**standing** [44] - 11:7, 16; 12:1, 18, 22; 13:11, 19; 14:2; 15:1, 15, 21; 16:15; 18:6, 22-23; 19:2, 4, 6-7; 20:14; 22:10, 17, 19, 21-22; 24:5, 18; 25:8; 26:12, 24; 28:4, 6-7, 24; 29:6, 14, 16, 23; 30:2, 4; 31:14; 41:24
**stands** [4] - 25:20; 80:12; 107:7; 123:18
**star** [1] - 63:9
**start** [7] - 9:19; 10:16; 35:22; 64:15; 72:6; 116:6
**started** [2] - 66:9; 87:17
**starting** [1] - 101:3
**starts** [1] - 62:13
**state** [2] - 81:22; 101:6
**statement** [1] - 79:10
**statements** [1] -

67:15
**States** [15] - 2:4; 4:9, 12; 6:14; 7:7, 10; 9:16, 24; 10:7, 10-11; 14:16; 30:24; 70:20; 106:10
**states** [1] - 78:16
**status** [7] - 2:15; 33:7; 86:9; 100:3; 114:5, 10; 116:18
**Status** [1] - 105:18
**statute** [1] - 10:10
**statutory** [1] - 26:21
**stay** [15] - 12:24; 50:22; 68:5, 13; 73:17, 19; 74:4; 111:15; 112:18; 113:5; 115:10, 13, 16, 18; 120:2
**stayed** [3] - 19:17; 111:4; 112:24
**steady** [1] - 116:19
**STEM** [1] - 79:22
**step** [3] - 26:18; 71:16; 110:25
**steps** [1] - 28:25
**stereotype** [7] - 50:3, 9, 12; 90:24; 91:14; 92:7
**stereotypes** [2] - 50:14; 89:25
**stereotyping** [4] - 49:24; 51:5; 91:10; 92:4
**stick** [2] - 57:16; 119:11
**stigma** [3] - 53:16; 67:3, 5
**still** [23] - 2:8, 11, 13; 13:2; 42:21; 52:25; 53:3; 61:16; 63:1; 69:22; 70:19; 71:15; 81:16; 97:12, 16; 100:7; 101:2, 7; 102:15, 19; 105:20; 115:6
**stop** [13] - 22:17; 36:16; 49:9; 51:22, 25; 83:1; 91:8; 99:11; 111:10, 14;

112:21; 113:2; 120:3
**stopped** [1] - 112:24
**stopping** [1] - 105:10
**stops** [1] - 26:20
**strategic** [2] - 39:12, 16
**strategy** [1] - 110:18
**Strawbridge** [2] - 4:1, 4
**STRAWBRIDGE** [1] - 4:5
**street** [1] - 38:10
**strenuous** [1] - 109:20
**stretch** [1] - 55:16
**strict** [39] - 9:8; 36:25; 46:15, 18-19; 57:12; 60:12, 22; 61:2, 7, 13, 17; 64:15; 65:7, 13; 66:14, 17; 68:6; 69:24; 84:22, 24; 86:20; 92:20; 94:10; 97:24; 98:1; 99:4; 101:2, 8, 23, 25; 102:9, 21; 103:21; 107:25; 114:17, 22
**Strict** [1] - 76:3
**strictly** [2] - 54:8; 69:11
**strong** [3] - 25:9; 39:13; 44:21
**strongly** [1] - 97:3
**struck** [3] - 15:13; 78:8; 123:10
**Struggle** [3] - 31:10; 34:14; 109:19
**stuck** [1] - 49:3
**students** [13] - 9:10; 21:4, 7; 34:24; 47:11, 22; 72:8; 79:14, 17; 89:4; 101:6; 104:21; 107:8
**Students** [6] - 2:3, 18; 3:6; 6:14, 22; 114:9
**studies** [3] - 52:19; 88:12; 106:8
**study** [6] - 52:19; 87:13; 88:12;

92:13; 96:21, 24
**subject** [4] - 16:20; 27:3; 28:3; 109:20
**subjected** [1] - 51:8
**subjects** [1] - 81:4
**submarines** [1] - 72:13
**submission** [5] - 13:13, 20; 64:9; 78:3; 87:13
**submit** [5] - 22:10; 44:5; 60:11; 62:14; 63:15
**submitted** [5] - 67:13; 68:13; 82:14; 85:25; 104:7
**submitting** [2] - 17:8
**substantial** [3] - 77:1, 4; 87:6
**substantially** [1] - 78:7
**succeed** [10] - 11:12; 31:3, 16; 37:7; 45:8; 46:3; 83:14; 109:16; 114:13
**success** [13] - 12:5, 8, 11; 44:15; 46:3, 5, 11; 60:19; 61:5; 64:17; 67:7; 87:19; 103:20
**successful** [2] - 15:10; 95:22
**suddenly** [2] - 109:6; 120:1
**sued** [3] - 15:2, 11; 43:18
**suffer** [3] - 11:13; 31:3; 35:17
**suffered** [1] - 13:14
**sufficient** [7] - 40:9; 49:8; 65:13; 69:25; 89:6; 117:16; 118:9
**sufficiently** [6] - 9:7; 51:12; 67:9
**suggest** [8] - 39:9; 55:12, 15-16, 19; 58:6; 95:25; 104:5
**suggested** [1] -

95:2
**suggesting** [6] - 54:9, 11-12; 58:5; 117:24; 122:11
**suggestion** [4] - 8:20; 11:5; 37:22; 73:11
**suggests** [1] - 81:20
**suit** [2] - 15:16, 18
**sum** [3] - 47:7, 9; 97:20
**summarily** [2] - 58:12; 61:6
**summarized** [1] - 31:9
**summarizing** [1] - 33:15
**summary** [4] - 18:7; 29:6; 33:7, 17
**summer** [3] - 117:6, 9; 118:2, 11, 16
**Summers** [2] - 23:4, 13
**summertime** [1] - 39:6
**sunset** [3] - 49:6, 12
**Superintendant** [1] - 4:14
**superintendant** [5] - 17:2, 4; 79:25; 80:3, 6
**superintendant's** [1] - 28:11
**superintendents'** [1] - 28:21
**supervision** [1] - 96:15
**support** [3] - 24:3; 57:12; 70:12
**supported** [1] - 92:13
**supporting** [3] - 77:19; 87:7; 88:25
**supposed** [2] - 65:6; 100:16
**Supreme** [36] - 6:20; 7:1; 8:21; 14:23; 15:13, 15, 20; 23:4; 30:24; 32:17, 21-23; 33:5, 18; 35:5; 37:24; 38:1; 47:17; 48:9; 49:3;

Preliminary Injunction Hearing 12/14/23

53:11; 67:6;
68:3; 69:9; 77:6;
83:5, 22; 88:23;
97:18; 98:17;
99:16; 110:14;
123:5
**survey** [1] - 88:2
**surveys** [7] - 65:9,
12, 15, 17;
87:25; 88:4
**survive** [4] -
60:22; 61:17;
68:6; 114:21
**survives** [2] -
57:12
**suspect** [2] -
111:25; 113:10
**sway** [1] - 99:19
**switched** [1] -
47:10
**sworn** [1] - 70:11
**system** [7] - 5:22;
47:24; 53:5, 14;
97:20; 101:14

**T**

**table** [1] - 13:7
**tables** [1] - 12:24
**tailored** [6] - 48:4;
49:2; 53:25;
75:25; 95:12;
100:21
**tailoring** [11] -
47:19; 49:11,
19; 60:7; 66:14;
75:11; 76:4;
89:22; 91:5;
99:20, 22
**talks** [2] - 56:7;
98:16
**target** [1] - 49:17
**task** [2] - 52:5;
59:6
**taught** [1] - 67:1
**team** [1] - 40:19
**teams** [1] - 74:20
**teasing** [1] -
115:8
**technical** [1] -
60:25
**teed** [1] - 33:24
**telephone** [1] -
4:3
**ten** [3] - 112:5;
116:13; 117:15
**tend** [3] - 10:21;
116:25; 117:6
**tendered** [1] -
82:6

**tends** [1] - 68:16
**tension** [8] -
55:13, 17-18;
57:17; 58:19;
59:19, 24; 61:15
**tensions** [3] -
54:23; 102:13
**term** [2] - 48:22,
24
**terms** [68] - 8:13;
9:20; 10:8, 15;
11:2; 14:23;
15:1; 20:17, 21;
21:13; 24:22;
25:8; 27:18;
28:6, 9; 31:19;
33:7; 37:6;
45:19; 48:20;
52:15; 57:8, 10,
21, 23; 59:13;
60:20; 61:7, 12;
63:22; 64:14,
17; 65:16;
66:21, 24; 67:9;
72:23; 73:2;
74:3; 77:13, 19;
81:21; 84:2, 7,
12; 85:13;
86:19; 87:24;
102:22; 103:1,
3, 18; 107:4, 22,
25; 110:2;
117:4; 118:7,
10, 25; 120:2;
121:15, 20, 24;
122:8
**terrible** [1] - 39:14
**test** [4] - 30:24;
34:23; 51:19;
60:7
**THE** [157] - 2:3,
23; 3:1, 3, 10,
15, 18, 22, 24;
4:6, 19, 22; 5:1,
5, 8, 16; 6:5;
12:16, 18;
13:10; 14:3, 9,
13:12; 18:10, 15;
19:15, 19, 23;
20:4; 21:12;
22:20; 23:2, 14,
16, 20; 24:15,
18, 22; 25:1, 3;
26:2, 7, 11;
27:8, 18; 28:5,
16; 29:12;
32:16; 33:11,
13; 34:2; 37:5,

9, 15, 17; 38:9,
15, 25; 39:2;
41:12, 17; 42:8,
11, 16, 19; 43:1,
6, 22; 44:7, 12;
46:18; 47:2;
54:9, 16, 18;
55:2, 22; 56:2,
25; 57:7; 59:2;
60:15; 61:3, 25;
63:16; 65:25;
70:2; 71:10, 19,
24; 72:19, 23;
73:15, 24;
76:10; 77:13;
78:13, 19;
79:25; 80:4, 12;
83:19; 84:2;
85:7, 10, 13;
86:1, 17; 91:12;
93:24; 94:6;
97:6, 11; 98:20,
23; 99:23;
100:3, 7, 10;
102:2; 104:25;
105:5, 11;
108:7, 12, 17,
23, 25; 110:19;
111:6, 8, 18;
113:8, 10, 15;
117:17; 118:18;
119:2, 17, 25;
120:7, 9; 121:1,
4, 6, 11, 22;
122:5, 15
**themselves** [2] -
2:20; 4:15
**theory** [6] - 27:11,
18; 68:4; 75:12
**there'll** [1] - 123:2
**therefore** [6] -
17:20; 83:5;
84:23; 87:4;
89:9; 100:2
**thereof** [2] -
42:21; 116:12
**they've** [18] -
13:14, 24;
17:19; 18:1, 6;
22:14; 25:16;
27:4; 35:18;
41:10; 68:9;
69:25; 74:5;
97:25; 98:5, 7;
102:14
**thinking** [1] -
118:16
**thinks** [2] - 54:4;
111:25
**third** [2] - 2:10;

49:5
**thirdly** [1] - 3:22
**Thomas** [1] - 3:23
**thorough** [1] -
113:16
**three** [8] - 5:17;
31:4, 15; 32:10;
63:9; 75:16;
83:10; 99:19
**three-star** [1] -
63:9
**throughout** [5] -
22:5; 48:14, 24;
92:24; 102:5
**throw** [2] - 70:24;
71:7
**throwing** [1] -
61:8
**thrown** [1] - 71:3
**thrust** [4] - 22:20,
23, 25; 56:16
**tie** [2] - 55:20;
80:25
**tied** [2] - 49:14, 16
**tightest** [1] -
117:23
**tip** [2] - 72:13;
90:8
**today** [17] - 2:13;
10:14; 30:16;
32:15; 36:9;
45:22; 61:5;
72:19; 83:20;
88:19; 94:20;
104:24; 105:7;
108:4, 8; 122:18
**today's** [2] -
29:21; 73:6
**together** [4] -
48:20; 67:21;
107:12; 118:24
**tomorrow** [9] -
73:13; 112:17;
115:5, 10, 24;
116:2; 119:5;
120:3
**took** [6] - 20:2;
101:24; 105:17;
111:4; 112:8;
116:14
**top** [1] - 79:16
**top-scoring** [1] -
79:16
**Toro** [3] - 4:10;
7:11; 85:2
**totally** [5] - 55:14;
100:13; 103:16;
104:11; 108:10
**town** [1] - 88:1
**track** [1] - 106:14

traditionally [2] -
16:24; 85:18
**Training** [2] -
10:1; 41:15
**training** [4] - 10:5;
67:1; 72:8; 85:4
**transformative**
[1] - 38:17
**translate** [4] -
59:9; 64:13;
73:1
**translates** [1] -
73:12
**tread** [1] - 55:9
**treat** [3] - 35:6;
53:18; 89:24
**treating** [1] - 51:2;
90:24
**trial** [33] - 10:18;
14:7; 30:8-10;
60:21; 105:24;
108:10, 15;
112:4-6, 9,
15-16; 114:24;
115:23; 116:8,
13-14, 17, 19,
24; 117:5, 11,
16, 23; 118:3,
10; 119:11;
120:23
**trials** [3] - 14:4;
117:21; 119:13
**tried** [2] - 108:14
**tries** [3] - 52:3;
53:6
**triggers** [2] -
101:2, 8
**triply** [1] - 100:14
**trouble** [1] - 11:1
**troublesome** [1] -
92:14
**true** [5] - 47:17;
82:5; 95:5;
97:25; 101:1
**truly** [1] - 105:12
**Truman** [1] -
102:18
**trust** [3] - 50:18;
59:25; 92:5
**try** [11] - 29:4;
52:7; 54:2;
57:10; 64:19;
66:20, 22;
70:18; 106:1;
108:9
**trying** [18] - 8:8;
10:24; 28:9;
55:22; 58:21;
59:20; 62:10;
64:20; 77:24;

84:5; 94:3;
107:16, 18;
111:1; 121:23;
122:5
**tunnel** [2] - 59:12
**turn** [5] - 35:22;
39:7; 75:9;
109:3, 7
**turned** [1] - 52:8
**turns** [1] - 25:5
**twice** [1] - 82:22
**two** [29] - 8:10;
13:13; 17:9, 22;
23:11; 24:2, 23;
28:17; 31:3, 9;
32:10; 40:18,
24; 43:9; 48:15;
49:1; 51:25;
67:12; 68:22;
69:13; 72:1;
80:23; 84:25;
104:20; 105:4,
17; 110:5;
116:13; 122:5
**types** [1] - 23:7
**typical** [1] - 17:9
**typically** [2] -
79:8; 82:3

**U**

**ultimate** [3] - 8:3;
14:4; 92:2
**ultimately** [9] -
12:4; 13:18;
16:5, 11; 25:4;
33:22; 42:6;
64:14; 99:21
**unachievable** [2]
- 28:8
**UNC** [14] - 15:16;
19:12; 30:12;
39:19, 22;
47:21; 49:13;
50:5; 55:24;
75:24; 97:16;
101:4, 18
**UNC's** [1] - 15:7
**uncertain** [2] -
24:10
**unchallenged** [1]
- 95:20
**unconstitutional**
[3] - 16:18;
24:14; 35:16
**undefined** [1] -
93:11
**under** [28] - 9:8;
15:4, 8; 19:13;
20:9; 22:7, 9;

Preliminary Injunction Hearing 12/14/23

44:5; 47:24;
48:3; 51:19;
60:12; 64:25;
66:17; 69:24;
79:12, 19;
80:20; 96:15,
18; 100:17;
101:15; 112:23;
114:17; 115:15
**under-inclusive**
[1] - 48:3
**undermined** [1] -
38:7
**understandable**
[1] - 102:15
**understood** [5] -
73:23; 76:14;
84:19; 86:23;
103:23
**unethical** [1] -
75:5
**unfairly** [1] - 67:3
**unfolds** [2] - 86:4
**unhealthy** [1] -
87:14
**unified** [1] - 67:22
**Union** [2] - 5:11
**unique** [5] - 21:2;
58:13; 74:12;
76:8; 98:10
**unit** [4] - 67:8;
87:1, 24; 88:9
**United** [15] - 2:4;
4:9, 12; 6:14;
7:7, 10; 9:16,
24; 10:7, 9:10;
14:16; 30:24;
70:20; 106:10
**units** [4] - 63:12;
69:20; 92:12
**universities** [13] -
15:9, 13; 16:19;
36:22; 38:22;
47:6, 23; 49:19;
62:6; 69:7;
99:11, 15, 17
**university** [2] -
9:25; 72:7
**University** [8] -
6:19; 8:23;
30:13; 53:1;
105:24
**unjustified** [1] -
39:24
**unlawful** [2] -
6:21; 46:24
**unless** [2] - 68:5;
123:14
**unlike** [2] - 72:7;
76:25

**unlimited** [1] -
84:10
**unnecessary** [1] -
38:2
**unpopular** [1] -
65:21
**unreasonable** [1]
- 43:20
**unreliable** [1] -
65:15
**unstable** [1] -
37:2
**unusual** [1] -
79:21
**up** [45] - 29:17;
33:24; 36:13;
38:17; 41:6;
45:23; 51:22;
52:9, 13; 54:8,
20; 59:9, 12, 15;
60:2, 10; 62:13,
23; 64:1, 13;
67:25; 70:15;
73:1; 78:9; 84:6,
12; 86:11; 94:6;
97:8; 103:8;
105:1; 108:9,
20; 111:5;
116:22; 117:12;
118:15, 21, 25;
120:11; 121:23;
123:4, 6, 16
**urge** [1] - 106:13
**urgency** [1] -
81:22
**urging** [1] - 7:23
**US** [1] - 69:21
**useful** [1] - 88:3
**uses** [11] - 24:4;
47:5, 8, 20, 25;
54:5; 78:23;
86:12; 98:6;
99:2; 101:16
**utmost** [1] - 85:22
**utterly** [1] - 97:18

**V**

**vacation** [2] -
118:4; 119:21
**vaccinated** [7] -
2:10, 24; 4:20,
25; 5:4, 7, 22
**vaccination** [1] -
2:15
**vacuum** [1] -
73:21
**valid** [1] - 58:2
**validity** [2] - 37:4;
42:20

**Valley** [1] - 114:7
**variance** [1] -
56:20
**various** [2] - 7:13;
93:12
**vast** [1] - 36:14
**vastly** [1] - 36:19
**verbatim** [1] -
17:24
**version** [1] -
117:1
**versus** [14] - 2:4;
6:14, 22; 9:2;
23:4; 30:25;
31:10; 37:25;
45:1; 51:23;
83:21; 85:2;
98:9; 114:2
**vet** [3] - 14:1;
15:23; 16:10
**Vietnam** [1] -
57:19
**Vietnamese** [1] -
54:23
**view** [22] - 44:21;
50:10; 69:13,
16; 70:4; 71:6,
11; 76:15; 77:8,
23; 84:22, 24;
102:16; 103:12;
105:20; 106:5;
107:15; 110:21;
114:11, 18, 22;
123:2
**viewpoint** [5] -
37:5; 50:7;
52:22; 91:16, 23
**views** [3] - 52:24;
66:8; 83:18
**violate** [1] - 9:4
**violated** [2] -
8:25; 35:7
**violates** [3] - 7:15;
49:10; 114:14
**violating** [2] -
34:15, 17
**violation** [8] -
36:20; 37:9, 12;
43:2; 45:7, 14;
47:14, 20
**violations** [1] -
97:13
**violence** [2] -
87:19; 95:3
**Virginia** [2] -
40:25; 117:2
**vis-à-vis** [2] -
58:17; 107:11
**Vocational** [1] -
41:1

**voice** [1] - 113:11
**volunteer** [3] -
56:22; 57:2, 4

**W**

**wade** [2] - 45:24;
120:10
**wait** [2] - 74:1;
109:8
**waited** [2] - 38:11;
56:5
**waiting** [2] -
39:25; 107:17
**walk** [1] - 86:13
**walks** [1] - 57:20
**wanes** [1] - 84:6
**wants** [2] - 11:19;
109:14
**War** [2] - 54:23;
57:19
**war** [1] - 72:12
**war-fighting** [1] -
72:12
**warned** [2] -
113:17; 121:6
**warrants** [1] -
57:12
**water** [7] - 27:10;
111:6, 10, 14;
112:22, 25;
113:2
**waters** [1] -
120:10
**wave** [1] - 104:20
**ways** [3] - 21:5;
46:22; 104:12
**wearing** [1] - 5:21
**weeds** [1] - 106:1
**week** [4] - 29:21;
105:1; 115:12;
118:5
**weeks** [3] - 2:11;
17:9; 116:13
**weigh** [3] - 40:4;
45:5; 110:10
**weighed** [1] - 38:3
**Weinberger** [1] -
83:21
**welcome** [7] -
2:17; 3:12; 4:4;
5:17, 19; 13:1;
115:6
**well-known** [1] -
69:21
**Wesley** [1] - 77:18
**West** [5] - 7:8;
52:15; 120:18;
121:23; 122:9
**whatsoever** [1] -

63:8
**whichever** [1] -
110:12
**White** [8] - 21:8;
47:11; 51:4;
64:1; 80:19;
81:12; 90:20;
107:8
**who've** [1] - 67:13
**whoever's** [1] -
11:20
**whole** [3] - 15:8;
73:9; 117:12
**Whole** [4] - 79:7,
12; 81:14; 82:24
**wholistic** [7] -
78:23; 79:15,
18-19; 81:7, 13;
90:17
**wholly** [1] - 93:20
**wife** [1] - 121:12
**wild** [1] - 48:24
**willing** [3] -
106:13; 119:15;
121:19
**willingness** [1] -
69:1
**win** [1] - 66:11
**wind** [1] - 97:8
**winding** [1] - 94:6
**window** [1] -
104:5
**Winter** [1] - 30:25
**witnesses** [3] -
120:19; 122:13
**women** [1] - 84:5
**Women** [1] - 5:10
**word** [1] - 39:14
**words** [1] - 40:22
**works** [1] - 117:22
**world** [5] - 74:24;
77:11; 92:8;
96:21; 97:1
**worn** [2] - 2:7;
5:24; 106:18
**worse** [2] - 48:13;
54:14
**writ** [3] - 51:2;
67:16; 73:14
**write** [1] - 119:2
**Wygant** [5] - 68:4;
88:24; 89:1, 9

**Y**

**YANG** [1] - 4:23
**Yang** [2] - 4:24;
119:20
**year** [18] - 6:23;
7:21; 8:21;

26:14; 27:16;
28:21; 34:25;
36:5; 39:21;
40:14, 16, 21;
41:9; 43:8; 74:5;
85:13
**yearling** [1] -
28:20
**yearlong** [2] -
38:2, 5
**years** [29] - 19:12,
15, 17, 20,
24-25; 20:2, 6;
28:17; 31:10;
38:10; 39:25;
41:10, 21; 43:9;
44:22; 45:4;
73:7, 20; 74:1;
84:12; 95:10;
100:13; 105:17;
106:17; 116:20;
121:9
**yes/no** [1] - 48:17
**York** [3] - 7:7, 18;
40:14
**young** [5] - 32:10;
84:4; 104:21;
120:10

**Z**

**zero** [5] - 12:11;
47:7, 9; 97:20;
98:5
**zero-sum** [2] -
47:7; 97:20

**§**

**§** [1] - 10:11