IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STUDENTS FOR FAIR ADMISSIONS,   *

        *Plaintiff*,             *

        v.                 *       Civil Action No. RDB-23-2699

THE UNITED STATES NAVAL      *
ACADEMY, *et al.*,
                              *

        *Defendants*.

  *    *    *    *    *    *    *    *    *    *    *    *    *

## **MEMORANDUM OPINION**

Plaintiff Students for Fair Admissions ("Plaintiff" or "SFFA") brings this action against Defendants United States Naval Academy (the "Naval Academy," "USNA," or "the Academy"); Lloyd Austin, in his official capacity as Secretary of Defense; Carlos Del Toro, in his official capacity as Secretary of the Navy; Bruce Latta, in his official capacity as Dean of Admissions for the United States Naval Academy; and Rear Admiral Fred Kacher, in his official capacity as Acting Superintendent of the United States Naval Academy (collectively, "Defendants"). (ECF No. 1.)[1] Students for Fair Admissions alleges that the Naval Academy's race-conscious admissions practice violates the Fifth Amendment's equal protection principles.[2] (*Id.* ¶¶ 88–109.)

This matter comes before the Court on Plaintiff's Motion for Preliminary Injunction

---

[1] For clarity, this Memorandum Opinion cites to the ECF generated page number, rather than the page number at the bottom of the parties' various submissions, unless otherwise indicated.

[2] SFFA filed a similar complaint and motion for preliminary injunction against the United States Military Academy at West Point ("West Point"). *Students for Fair Admissions v. United States Military Academy at West Point*, No. 7:23-cv-08262 (S.D.N.Y. filed Sept. 19, 2023).

(the "Motion") (ECF No. 9).  The Motion has been briefed (ECF Nos. 46, 54, 55),[3] and the Court heard oral argument on December 14, 2023.  (ECF No. 56.)  At the conclusion of oral argument, the Court ruled from the bench and DENIED the Motion (ECF No. 9), promising an opinion to follow.  (ECF Nos. 57, 58.)  This Memorandum Opinion expounds upon the Court's reasoning.

A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (internal quotations omitted). "[M]andatory preliminary injunctions—those that alter rather than preserve the status quo— are disfavored," and should only be granted where the applicants' right to relief [is] indisputably clear." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019) (internal quotations omitted).

This Court's analysis is clearly guided by the Supreme Court's recent decision in *Students for Fair Admissions v. President & Fellows of Harvard College* ("*Harvard*"), 600 U.S. 181 (2023). Specifically, as reflected in oral argument at the hearing on December 14, 2023, great focus must be placed upon a footnote in the *Harvard* opinion noting that there may be "potentially distinct interests" presented by military academies.  *Id.* at 213 n.4.  SFFA's requested injunctive relief would undoubtedly alter the status quo, and at this stage, SFFA has not made a clear showing that it will succeed in its claim that the Naval Academy's race conscious admissions

---

[3] In addition to the parties' submissions, the National Association of Black Military Women ("NABMW"), the American Civil Liberties Union ("ACLU"), the American Civil Liberties Union of Maryland ("ACLU of Maryland"), and the NAACP Legal Defense Fund ("LDF") (collectively, "amici") submitted a brief as Amici Curiae in Opposition to Plaintiff's Motion for a Preliminary Injunction (ECF No. 52).

practice violates the Fifth Amendment's equal protection principles.  As discussed below, it is imperative that a factual record be developed in this matter such that this Court can determine whether the "potentially distinct interests that military academies may present" allow the Naval Academy's admissions practices to survive strict scrutiny.  *Id.*

## BACKGROUND

### I.      Background on Students for Fair Admissions

According to its Complaint, Students for Fair Admissions is a "nonprofit membership group of tens of thousands of individuals across the country who believe that racial preferences in college admissions, including the [military] academies, are unfair, unnecessary, and unconstitutional."  (ECF No. 1 ¶ 7.)  The organization's website describes their mission as "support[ing] and participat[ing] in litigation that will restore the original principles of our nation's civil rights movement: *A student's race and ethnicity should not be factors that either harm or help that student to gain admission to a competitive university*."  *See Help Us Eliminate Race and Ethnicity from College Admissions*, STUDENTS FOR FAIR ADMISSIONS, available at https://studentsforfairadmissions.org/ (emphasis in original).  As further detailed *infra*, it was SFFA's prior lawsuits against Harvard and the University of North Carolina ("UNC") that led the Supreme Court to declare race-based admissions policies unlawful at civilian universities and colleges earlier this year.

### II.     *Students for Fair Admissions v. Presidents and Fellows of Harvard College*

On June 29, 2023, the Supreme Court issued its decision in *Students for Fair Admissions v. President and Fellows of Harvard College* ("*Harvard*"), 600 U.S. 181 (2023), holding that affirmative action programs at Harvard and UNC violated the Equal Protection Clause of the

Fourteenth Amendment. While the Court declined to overturn its 2003 decision in *Grutter v. Bollinger*, 539 U.S. 306 (2003),[4] which held that consideration of an applicant's race as one factor in admissions did not violate the Constitution, the Court determined the schools' programs fell "short of satisfying the burden" that their programs be "'sufficiently measurable to permit judicial review' under the rubric of strict scrutiny." 600 U.S. at 214 (citation omitted). The majority opinion authored by Chief Justice John Roberts declared, "'[c]lassifying and assigning' students based on their race 'requires more than . . . an amorphous end to justify it.'" *Id.* (citation omitted).

Of import to SFFA's instant case against the Naval Academy, the Court included a footnote expressly declining to opine on the use of race in admissions within the nation's military academies, noting that the "opinion . . . does not address the issue, in light of the potentially distinct interests that military academies may present." *Id.* at 213 n.4. The footnote appeared to respond to an amicus brief from 34 top former military leaders. *See* Brief of Adm. Charles S. Abbot *et al.* as Amici Curiae in Support of Respondents, *Students for Fair Admissions*

---

[4] SFFA suggests that *Harvard* "eviscerated" *Grutter*, (ECF No. 54 at 12–13), and that *Grutter* is no longer good law. (ECF No. 58 at 100 ¶ 17.) SFFA called for an overruling of *Grutter* in *Harvard*. *See* Brief for Petitioner at 49–71, *Students for Fair Admissions v. Pres. & Fellows of Harv. Coll.*, 600 U.S. 181 (2023) (Nos. 20-1199, 21-707). While the Supreme Court decided that Harvard and UNC's admissions programs were unlawful, 600 U.S. at 230, the Court did not expressly say it was overruling *Grutter* and its progeny in *Harvard*. The majority opinion relied heavily on *Grutter* as authority. *Id.* at 211–13 (reasoning that the Court had permitted race-based admissions "only within the confines of narrow restrictions" and that the respondents' admissions programs failed each of these criteria), 220 ("Yet by accepting race-based admissions programs in which some students may obtain preferences on the basis of race alone, respondents' programs tolerate the very thing that *Grutter* foreswore: stereotyping."), 221 (reasoning that the respondent's admissions programs were unconstitutional under *Grutter* because they lacked a logical end point). Justice Brett Kavanaugh wrote separately "explain[ing] why the Court's decision . . . is consistent with and follows from . . . the Court's precedents on race-based affirmative action." *Id.* at 311 (Kavanaugh, J., concurring). This Court notes that Justice Clarence Thomas wrote separately and stated "*Grutter* is, for all intents and purposes, overruled," *id.* at 287 (Thomas, J., concurring), and Justice Sonia Sotomayor's dissent accused the majority of "overruling decades of precedent" while "'disguis[ing]' its rulings as an application of 'established law.'" *Id.* at 341–42 (Sotomayor, J., dissenting). Still, given that *Harvard* relied heavily on *Grutter* as authority, this Court finds it prudent to note that *Harvard*, at most, partially overruled *Grutter*.

*v. Pres. & Fellows of Harv. Coll.*, 600 U.S. 181 (2023) (Nos. 20-1199, 21-707).  Therein, the military's highest leadership noted that "[d]iversity in the halls of academia directly affects performance in the theaters of war."  *Id.* at 1.  The brief outlined the specific interests of the military in cultivating "a diverse, highly qualified officer corps."  *Id.* at 1–2.  It emphasized the military's unique interest in maintaining diverse leadership, the absence of which would "seriously undermine its institutional legitimacy and operational effectiveness."  *Id.* at 3.  The brief also explained that the military's international presence and engagement abroad with both foreign military and civilians "requires diversity in the officer corps."  *Id.* at 9–14.

## III.    The Instant Lawsuit

Appearing to respond to the limitation in the *Harvard* opinion with respect to military academies, SFFA initiated the instant lawsuit on October 5, 2023, filing a one-count Complaint against Defendants, alleging the Naval Academy's race-conscious admissions practice violates the Fifth Amendment's equal protection principles.  (ECF No. 1.)  In general, the Complaint questions the measurability of the need for diversity proffered by the Naval Academy.  (*Id.* ¶¶ 93–95.)   The Complaint outlines the highly competitive and unique admissions process for the Naval Academy, which enrolls fewer than 1,200 midshipmen in each class.  (*Id.* ¶¶ 17–30.)  The Complaint provides an overview of the Academy's admissions process, which SFFA alleges involves two stages: (1) a medical examination and physical fitness test, along with a nomination from a Member of Congress, the Vice President, President, or Secretary of the Navy; and (2) acceptance by the Naval Academy's admissions office.  (*Id.* ¶ 17.)  Plaintiff alleges this second stage unconstitutionally considers race.  (*Id.* ¶¶ 17, 31–62.)  Plaintiff's Complaint notes that "SFFA has members who are ready and able

to apply to the [Academy]."  (*Id.* ¶ 7.)

On October 6, 2023—the day after SFFA filed its Complaint—SFFA filed a Motion for Preliminary Injunction, urging the Court to issue an injunction prohibiting Defendants from considering applicants' race when making admissions decisions by December 1, 2023. (ECF No. 9.)   Attached thereto are declarations of "Member A" (ECF No. 9-3) and "Member B" (ECF No. 9-4), declaring both members previously applied to the Naval Academy after securing nominations from members of Congress and were subsequently rejected.  (ECF No. 9-3 ¶ 3; ECF No. 9-4 ¶ 3.)  Both members note they are currently in college, under the age of 23, medically qualified, U.S. citizens, and "ready and able to apply to the Naval Academy were a court to order it to cease the use of race and ethnicity as a factor in admissions."  (ECF No. 9-3 ¶¶ 2, 4; ECF No. 9-4 ¶¶ 2, 4.)

**IV.   Factual Overview**

The Court's factual findings are based on Plaintiff's Complaint and the parties' sworn declarations and exhibits submitted in support of their positions.  The Court's factual findings here are provisional and not binding in future proceedings.  *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[F]indings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits[.]") (citations omitted).

In support of its Motion, Plaintiff submitted four declarations—the aforementioned declarations from Members A and B (ECF No. 9-3; ECF No. 9-4), as well as declarations from SFFA's President Edward Blum (ECF No. 9-5) and Plaintiff's Counsel James Hasson of the law firm Consovoy McCarthy PLLC (ECF No. 9-6)—and attached over 550 pages of

exhibits.[5]  In support of their Reply, Plaintiff submitted a "Rebuttal Declaration" of Lietenant

General (Ret.) Thomas W. Spoehr, a retired three-star general who served in the U.S. Army

from 1980 to 2016.  (ECF No. 54-1.)  In support of their Opposition, Defendants submitted

eight declarations—one from Defendant Bruce Latta, including 30 pages of exhibits (ECF

No. 46-2); Vice Admiral John V. Fuller, the Naval Inspector General (ECF No. 46-3); Lisa M.

Truesdale, the Deputy Assistant Secretary of the Navy for Military Manpower and Personnel

(ECF No. 46-4); Ashish S. Vazirani, the Acting Deputy Under Secretary of Defense for

Personnel and Readiness ("P&R") for the Department of Defense ("DoD") (ECF No. 46-5);

Jeannette Haynie, Ph.D., Senior Adviser to the Office of the Under Secretary of P&R at the

DoD on matters relating to diversity and inclusion and the Department's mission (ECF

No. 46-6); John Sherwood, Ph.D., a historian (GS-13) with the Naval History and Heritage

Command, which is part of the Department of the Navy (ECF No. 46-7); Beth Bailey, Ph.D.,

a Foundation Distinguished Professor and founding director of the Center for Military, War,

and Society Studies at the University of Kansas, who currently serves, by appointment of the

Secretary of the Army, as chair of the Department of the Army Historical Advisory

Subcommittee (ECF No. 46-8); and Jason Lyall, Ph.D., the James Wright Chair of Transnational

Studies and Associate Professor of the Department of Government at Dartmouth College and

---

[5]  Plaintiff's exhibits include material from the websites of USNA, the U.S. Navy, the Department of Defense ("DoD"), West Point, the White House, and Senator Mark Warner (D-VA); a 2016 report from the Congressional Research Service ("CRS") on congressional nominations to military academies; a 2011 report from the Military Leadership Diversity Commission ("MLDC") on diverse leadership in the military; a report on 2019, 2022, and 2023 surveys conducted by the Pew Research Center on American public opinion of affirmative action; a 2011 study by Sayce Falk and Sasha Rogers on retention of junior military officers; a 2022 survey by the Ronald Regan Institute on national defense; a 1993 report by the United States General Accounting Office (now General Accountability Office) on gender and racial disparities at the Naval Academy; and several articles and op-eds.  (ECF Nos. 9-6, 9-7.)

director of the Police Violence FieldLab (ECF No. 46-9)—as well as over 300 pages of

exhibits.[6] Information relevant to the matter presently before the Court is summarized below.

### A.  Becoming an Officer in the Navy or Marine Corps

To become a Navy or Marine Corps officer, an individual must (1) graduate from the

Naval Academy; (2) attend a civilian college or university and participate in the Reserve

Officers' Training Corps ("ROTC") program; (3) attend Officer Candidate School after

graduating from college; (4) receive a direct commission after earning a professional degree;

or (5) advance through the enlisted ranks and then complete officer training.  (ECF No. 46 at

12 (citing ECF No. 46-2 ¶ 90 n.8).)  The Defendants' response emphasizes that the Naval

Academy is a "vital pipeline to the officer corps, and especially to senior leadership, in the

Navy and Marine Corps."  (*Id.* at 13 (citing ECF No. 46-3 ¶ 15; ECF No. 46-4 ¶¶ 20–21; ECF

No. 46-2 ¶¶ 10, 69, 90).)  Defendants note that each year, approximately 28% of the new Navy

and Marine Corps officers in warfighting communities are Naval Academy graduates, (*id.* at

12 (ECF No. 46-2 ¶¶ 10, 90)); that Naval Academy graduates "account for a disproportionate

percentage of senior officers (40% of flag officers) in the Navy," (*id.*); and that 91% of Chiefs

of Naval Operations—one of the highest-ranking officers in the Navy—to present date have

---

[6]  Defendants' exhibits include the defense budget request from fiscal year 2023 (ECF No. 46-10); DoD demographics from 2010 and 2022 (ECF Nos. 46-11, 46-17); U.S. census data from 2022 (ECF No. 46-18); a 2019 report from the CRS on diversity, inclusion, and equal opportunity in the Armed Forces (ECF No. 46-12); the 2020 DoD diversity and inclusion report (ECF No. 46-13); a memo from the Secretary of Defense dated April 9, 2021 (ECF No. 46-14); an October 2020 executive report from the DoD Office of People Analytics on the return of investment for diversity and inclusion in the military (ECF No. 46-15); and a December 2021 AP News article by Aaron Morris titled *We Just Feel It': Racism Plagues US Military Academies* (ECF No. 46-16).

been graduates of the Academy.  (*Id.* at 12–13 (citing ECF No. 46-7 ¶ 60).)

### B.  The United States Naval Academy

The Naval Academy was established on October 10, 1845 to "prepare[] [midshipmen] to become professional Officers of competence, character[,] and compassion in the U.S. Navy and Marine Corps."  *See History of USNA*, U.S. NAVAL ACAD., available at https://www.usna.edu/USNAHistory/index.php; *About USNA*, U.S. NAVAL ACAD., available at https://www.usna.edu/About/index.php.  The Naval Academy is highly selective—for example, fewer than ten percent of applicants for the class of 2027 were admitted.  (ECF No. 1 ¶ 18 (citing *Class Portrait: Class of 2027*, U.S. NAVAL ACAD., available at https://www.usna.edu/Admissions/Apply/Class-Portrait.php).)  Congress has set the size of the Brigade of Midshipmen at a limit of 4,400.  10 U.S.C. § 8454.  As such, each incoming class currently consists of approximately 1,180 midshipmen before attrition.  (ECF No. 1 ¶ 19 (citation omitted); ECF No. 46 at 12 (citing ECF No. 46-2 ¶ 11).)  Under current law, midshipmen who graduate from the Academy will receive a commission in either the Navy or Marine Corps and are obligated to a 5-year active duty service commitment following commissioning.  10 U.S.C. § 8459(a)(2)(A).

### C.  An Overview of the Academy's Admissions Process

The admissions process at the United States Naval Academy is governed by (1) federal statute—10 U.S.C. §§ 8453–8458; (2) Department of Defense directives—DoDI 1322.22; (3) Department of Navy regulations—SECNAVINST 1531.2D and OPNAVINST 5450.330B; and (4) internal guidance.  (ECF No. 46 at 13 (citing ECF No. 46-2 ¶ 12).)  It

functions as follows.

### 1. The Application Process in General

Candidates may begin the application process as early as January of the year before matriculation.  (*Id.* (citing ECF No. 46-2 ¶ 19).)  For the current admissions cycle—the class of 2028—new applications will not be accepted after December 31, 2023, and applications must be completed by January 31, 2024.  (*Id.*)

SFFA alleges that the Academy's admissions process involves two stages: (1) a medical examination and physical fitness test, along with a nomination from a Member of Congress, the Vice President, President, or Secretary of the Navy; and (2) acceptance by the Naval Academy's admissions office.  (ECF No. 1 ¶ 17.)  Plaintiff alleges this second stage unconstitutionally considers race.  (*Id.* ¶¶ 17, 31–62.)

Defendants' response provides additional insight.  It explains that there are five steps for admission to the Naval Academy, in addition to the nomination requirement.  (ECF No. 46 at 13.)  In addition to receiving a nomination, an applicant must complete the following steps to be eligible for admission: (1) complete a two-part application;[7] (2) pass a fitness assessment; (3) pass a medical evaluation; (4) interview with Blue and Gold Officer; and (5) submit college entrance exam scores (absent a testing unavailability exemption).[8]  (*Id.* at 13–14 (citing ECF

---

[7] The preliminary application (part one) is used as a screening tool to determine whether a candidate meets the basic statutory eligibility requirements and is likely to meet minimum academic standards.  (ECF No. 46 at 13 (citing ECF No. 46-2 ¶¶ 21–23).)  Applicants meeting the age eligibility and citizenship requirements may then complete the remaining application requirements (part two), which include an essay, personal history, and family background information; teacher recommendations; transcripts; and notation whether the student is a member of a minority group or comes from a disadvantaged background.  (*Id.*)

[8] Defendants note that the Academy can grant an exception to this requirement where standardized testing is unavailable to a candidate, and race and ethnicity are not considered when deciding whether to grant an exception.  (ECF No. 46 at 14 n.2 (citing ECF No. 46-2 ¶ 18 n.5).)

No. 46-2 ¶¶ 21–27).)  All of these requirements must be completed by January 31 of the matriculation year.  *See Steps for Admission*, U.S. NAVAL ACAD., available at https://www.usna.edu/Admissions/Apply/index.php#fndtn-panel9-Steps-for.

### 2.  The Nomination Requirement

As noted *supra*, candidates must also secure a nomination for the admissions cycle in which they wish to be considered.  10 U.S.C. § 8454; (ECF No. 1 ¶ 17; ECF No. 46 at 14 (citing ECF No. 46-2 ¶¶ 29–30).)  There are two types of nominations: (1) nominations from a "statutory nominating authority" (or congressional nominations); and (2) "service-connected" nominations.  10 U.S.C. § 8454.  Statutory nominating authorities include Members of Congress, the Vice President, Delegates to Congress from U.S. territories and the District of Columbia, and the Governor and the Resident Commissioner of Puerto Rico.  *Id*. Service-connected nominations are reserved for children of certain servicemembers, candidates who are already members of the Navy or Marine Corps or members of ROTC programs, and candidates selected by the Naval Academy's Superintendent.  *Id*.

Generally, individuals that received congressional nominations account for more than 80% of the Brigade of Midshipmen.  (ECF No. 1 ¶ 23; ECF No. 46 at 14–15 (citing ECF No. 46-2 ¶ 31).)  If a candidate is appointed to the Naval Academy pursuant to a nomination by a Member of Congress, that candidate is "charged" to that Member.  (ECF No. 46 at 14– 15 (citing ECF No. 46-2 ¶ 31).)  Each Member may have five "charges" at the Naval Academy at one time.  (*Id*.); 10 U.S.C. § 8454(a).  When a Member has fewer than five charges at the end of the academic year, the Member has a "vacancy" for the following admissions cycle.  (ECF No. 46 at 14–15 (citing ECF No. 46-2 ¶ 31)); 10 U.S.C. § 8454(a).  For each vacancy, Members

11

can nominate up to ten candidates, and in a typical year, any given Member will have one vacancy.  (ECF No. 1 ¶ 21; ECF No. 46 at 14–15 (citing ECF No. 46-2 ¶ 31)); 10 U.S.C. § 8454(a).

Congressional nominating authorities may nominate their slate of candidates using one of three methods: (1) "competitive"—where the Member submits nominees to the Academy without any order of preference, allowing the Academy to select the best qualified candidate within that slate; (2) "principal competitive-alternate"—where the Member identifies a principal nominee and a list of unranked alternates; and (3) "principal numbered-alternate"— where the Member identifies a principal nominee and a ranked list of alternates.  (ECF No. 1 ¶ 22; ECF No. 46 at 15 (citing ECF No. 46-2 ¶¶ 34–36)); 10 U.S.C. § 8454(a).

### 3. Selecting the Brigade of Midshipmen

Once an application to the Naval Academy is completed, a computer-generated score known as the "Whole Person Multiple" ("WPM") is calculated based on a candidate's records. (ECF No. 46 at 15 (citing ECF No. 46-2 ¶¶ 50–56).)  WPMs are based on both objective and subjective factors, such as class rank, GPA, extracurricular activities, athletic and non-athletic achievements, teacher evaluations, leadership, fitness, letters of recommendation, life experiences, ability to overcome adversity or hardship, low socioeconomic status, first-generation status, unique cultural experiences, and employment experience.  (*Id.* (citing ECF No. 46-2 ¶ 53).)  Defendants assert that neither race nor ethnicity factors into the WPM. (*Id.* at 15–16 (citing ECF No. 46-2 ¶¶ 53, 55).)

WPMs generally range from 40,000 to 80,000.  (*Id.* at 15 (citing ECF No. 46-2 ¶ 50).) Candidates normally need a WPM of at least 58,000 to be considered "qualified" for admission

to the Naval Academy, with scores of 70,000 or above considered highly qualified. (*Id.* (citing ECF No. 46-2 ¶¶ 51–53).)

Each candidate file is then randomly assigned to a Board member for further review. (*Id.* at 16 (citing ECF No. 46-2 ¶ 55).) The reviewing Board member may seek an upwards or downwards adjustment by up to 9,000 points of the candidate's WPM based on factors like high school courses, demonstrated interest in science and mathematics, leadership potential, and character-building experiences. (*Id.*) Defendants assert that race and ethnicity cannot justify a WPM adjustment. (*Id.*) If an adjustment is recommended, the Board member recommending the adjustment must make the case to the full Board for consideration and approval. (*Id.*)

The Naval Academy asserts that it "selects the majority of its incoming class based on the WPM, within the category of nomination obtained by the candidate." (*Id.* (citing ECF No. 46-2 ¶¶ 57–58).) For candidates nominated by a congressional authority under the "competitive" method, the Academy generally offers appointment to the fully qualified nominee from that Member's slate with the highest WPM. (*Id.* (citing ECF No. 46-2 ¶ 58).) For candidates nominated by a Member of Congress under the "principal competitive-alternate" or "principal numbered-alternate" methods, the Naval Academy must consider the order specified by the Member. (*Id.* (citing ECF No. 46-2 ¶¶ 35–36).) Where the principal nominee is either deemed unqualified or declines admission under the "competitive-alternate" method, the Naval Academy usually offers admission to the fully qualified candidate on the Member's list with the highest WPM. (*Id.* (citing ECF No. 46-2 ¶ 58).) Under the "numbered-alternate" method, if the principal nominee is determined unqualified or declines

admission, the Naval Academy must offer admission to the fully qualified candidate who ranks next highest on the Member's list, even if that candidate has a lower WPM than others on the Member's list.  (*Id.* (citing ECF No. 46-2 ¶¶ 35, 60).)

In some limited circumstances under the "competitive" method and "principal-competitive" method (when the principal candidate is determined unqualified or declines admission), qualified candidates with slightly lower WPMs are occasionally selected over candidates with slightly higher WPMs.  (*Id.*)  The Naval Academy notes "[t]hese decisions are made based on the strength of the candidates' entire record with the key considerations being the candidates' progression through academic subjects, leadership experiences, life experiences, and teacher recommendations."  (*Id.*)  As further explained below, race or ethnicity could potentially be one of many nondeterminative factors for these decisions.  (*Id.*)

If a qualified candidate is not appointed to the vacancy for which they were nominated, the candidate may be offered an appointment under two other statutory provisions.  First, the Naval Academy may appoint up to 150 "qualified alternates"—qualified candidates who receive a statutory nomination but did not win the vacancy.  10 U.S.C. § 8454(b)(5).  The Naval Academy appoints qualified alternates solely based on WPM, which does not consider race or ethnicity.  (*Id.* at 17 (citing ECF No. 46-2 ¶¶ 53, 55, 62(a)).)

Second, if the Naval Academy has filled each nomination vacancy, admitted 150 qualified alternates, and has still not filled its class, it may offer appointment to other remaining qualified nominees, known as "additional appointees," so long as at least three-fourths are

selected from the qualified alternate pool.[9]  10 U.S.C. § 8456; (ECF No. 46 at 17 (citing ECF No. 46-2 ¶ 62(b)).)   For additional appointees, the Naval Academy may consider race or ethnicity as a nondeterminative factor in a holistic assessment in extending offers to additional appointees.  (ECF No. 46 at 17–18.)

### 4.  The Naval Academy's Consideration of Race and Ethnicity in Admissions

Plaintiff's Complaint and Motion for Preliminary Injunction note that the Naval Academy "openly admits that 'race' is a factor that it considers" when making admissions decisions, though it "disclaims racial quotas and characterizes its use of race as 'holistic.'" (ECF No. 1 ¶ 31; ECF No. 9-1 at 6.)  Students for Fair Admissions asserts that "the [Naval] Academy's focus on race plays out across all areas of its admissions policy."  (ECF No. 1 ¶ 32; ECF No. 9-1 at 7.)

In its response, the Naval Academy asserts that it considers race and ethnicity "[a]t four limited parts of the admissions process" as one of many nondeterminative factors in an individualized, holistic assessment of candidate.  (ECF No. 46 at 18.)  Specifically, the Naval Academy may consider race and ethnicity (1) when offering letters of assurance; (2) when deciding between two candidates with very close WPMs for nominations using the "competitive" method, service-connected nominations, and in some circumstances the "principal competitive-alternate" method; (3) when extending Superintendent nominations; and (4) when extending offers to additional appointees.  (*Id.* at 18–20.)  The Naval Academy asserts that it uses race and ethnicity in these four limited circumstances "only to further the

---

[9]  For the classes of 2026 and 2027 respectively, the Naval Academy admitted 310 candidates (53% of whom were minority candidates) and 255 candidates (56% of whom were minority candidates) as additional appointees.  (ECF No. 55-1 ¶ 3.)

military's distinct operational interest in developing a diverse officer corps that enables the military to meet its critical national security mission, by enhancing cohesion and readiness, assisting recruitment and retention, and ensuring domestic and international legitimacy." (*Id.* at 20.).

First, the Board may extend a letter of assurance ("LOA") to an outstanding qualified candidate following an individualized review of the candidate's record. (*Id.* at 18 (citing ECF No. 46-2 ¶¶ 63–64, 66). Candidates that receive LOAs typically have WPM scores above 70,000, but those with a WPM below that number can still receive an LOA if they are qualified and their record is particularly compelling. (*Id.* (citing ECF No. 46-2 ¶ 67).) LOAs are conditional offers of admission—the candidate must still pass physical fitness standards, become medically qualified, receive a nomination, and complete any remaining requirements for admission. (*Id.* (citing ECF No. 46-2 ¶ 64).) Defendants note that race or ethnicity could be one of the many nondeterminative factors that inform the Board's decision to extend a qualified candidate an LOA. (*Id.* (citing ECF No. 46-2 ¶ 73).)

Second, for nominations using the "competitive" method, the "principal competitive-alternate" method (when the principal candidate is deemed unqualified or declines an offer of appointment), and service-connected nominations, candidates are ranked in their respective slate in WPM order and the candidate with the highest score is typically selected. (*Id.* at 18–19 (citing ECF No. 46-2 ¶ 77).) In limited circumstances—where the highest WPM scores are very close—the qualified candidate with a slightly lower WPM may be selected over the qualified candidate with the slightly higher WPM after an in-depth review of their entire records. (*Id.*) The key considerations in making this decision include class rank,

grades, academic progression, leadership, life experiences, and teachers' recommendations. (*Id.* at 19 (citing ECF No. 46-2 ¶ 58).)   Race or ethnicity may also be one of many nondeterminative factors that inform this decision, but the Naval Academy asserts that such selections are based on the strength of the candidate's overall record.  (*Id.*)

Third, race or ethnicity could be one of many nondeterminative factors considered in extending Superintendent nominations, though the Naval Academy claims that it has not played a factor in a Superintendent nomination since at least 2009.  (*Id.* (citing ECF No. 46-2 ¶ 76).)  On the rare occasions in which Superintendent nominations are used, they are typically used for sought-after athletes, for candidates that are highly qualified and motivated to attend the Academy, and for candidates applying to other service academies.  (*Id.*)

Fourth, at the end of the admissions cycle, if the Naval Academy has not reached its class size, USNA may consider race and ethnicity as one of many nondeterminative factors in its holistic assessment of candidates to identify those who are expected to make valuable contributions in extending offers to additional appointees. (*Id.* at 19–20 (citing ECF No. 46-2 ¶¶ 62(b), 75).)

## V.   Students for Fair Admissions' Requested Injunctive Relief

Through its Motion for Preliminary Injunction, Students for Fair Admissions sought to enjoin the Naval Academy from considering race as a factor in admissions.  After the Motion for Preliminary Injunction was fully briefed, (ECF Nos. 46, 52, 54, 55), the Court heard oral argument from counsel on December 14, 2023.  (ECF No. 58.)  Based on the parties' filings and oral argument presented, the Court denied Plaintiff Students for Fair Admissions' Motion for Preliminary Injunction (ECF No. 9) at the conclusion of the

December 14 hearing.  (ECF Nos. 57, 58 at 115 ¶ 3.)  The remainder of this Memorandum Opinion expounds on that holding.

## STANDARD OF REVIEW

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1992).  "[M]andatory preliminary injunctions—those that alter rather than preserve the status quo—are disfavored," and should only be granted where "the applicants' right to relief [is] indisputably clear." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019) (internal quotation marks omitted); *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (explaining that a preliminary injunction may be characterized as either prohibitory, "aim[ing] to maintain the status quo," or mandatory, "alter[ing] the status quo," and noting the status quo has been defined for this purpose as "the last uncontested status between the parties which preceded the controversy") (citing *Pashby v. Delia*, 709 F.3d 307, 319–20 (4th Cir. 2013)).

In determining whether to issue a preliminary injunction, the Court must follow the test set forth by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), which requires a showing that: (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm absent preliminary relief; (3) the balance of

equities favors the movant; and (4) an injunction is in the public interest.  555 U.S. at 20; *accord Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020); *League of Women Voters*, 769 F.3d at 236.

A court cannot issue a preliminary injunction absent a "clear showing" that all four requirements are satisfied.  *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 979 F.3d 219, 226 (4th Cir. 2020), *rev'd on other grounds*, 2 F.4th 330 (4th Cir. 2021) (en banc); *accord Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013).  The plaintiff "bears the burden of establishing that each of these factors supports granting the injunction."  *Direx*, 952 F.2d at 812 (citation omitted). Thus, a court need not address all four *Winter* factors if one or more factors is not satisfied. *Henderson ex rel. NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018).

## ANALYSIS

Through its Motion for Preliminary Injunction, Students for Fair Admissions sought to enjoin the Naval Academy from considering race as a factor in admissions, which it contends violates the equal protection component of the Fifth Amendment.   In their opposition, Defendants challenge SFFA's organizational standing, (ECF No. 46 at 24–26), and further argue that SFFA cannot satisfy any of the four *Winter* factors.   (*Id.* at 26–68.) Before turning to the merits of SFFA's request for injunctive relief, the Court first addresses Defendants' challenge to SFFA's standing to ensure this Court's jurisdiction.

### I.      Standing

In their opposition, Defendants challenge SFFA's organizational standing.   (ECF No. 46 at 24–26.)  "As the Supreme Court has consistently emphasized, Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies."  *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 619 n.5 (4th Cir. 2018) (internal quotation

marks omitted).  "The requirement that a [p]laintiff possess standing to sue emanates from that constitutional provision."  *Id.* (internal quotation marks omitted).

To possess standing to sue under Article III, a plaintiff must have "(1) . . . suffered an injury-in-fact that was concrete and particularized and either actual or imminent; (2) there [must have been] a causal connection between the injury and the defendant's conduct (i.e.[,] traceability); and (3) the injury [must have been] likely to be redressable by a favorable judicial decision."  *Hutton*, 892 F.3d at 618–19 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  The burden of sufficiently establishing these three elements falls on the party invoking federal jurisdiction—here, Students for Fair Admissions.  *Lujan*, 504 U.S. at 561; *Hutton*, 892 F.3d at 619.  An organization like SFFA can assert standing based on two distinct theories.  It can assert standing in its own right to seek judicial relief for injury to itself and as a representative of its members who have been harmed.  *See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013).  It is the latter option—known as representational or organizational standing—that is at issue here.

To invoke organizational standing, an organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Defendants challenge whether the first requirement of organizational standing is met.  (ECF No. 46 at 24–26).

Defendants appear to argue that SFFA must identify Members A and B by name in order to have organizational standing to pursue claims on their behalf.  This challenge to

SFFA's standing—which significantly overreads the Supreme Court's decision in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009)—does not have merit.

An organization can satisfy the first prong of the associational standing analysis by offering proof "establishing that at least one identified member ha[s] suffered or would suffer harm." *Summers*, 555 U.S. at 498. To require an organization to name the member who might have standing in his or her own right overreads the word "identified" in this context. First, such specific identifying information is often unnecessary to determine whether a person would have Article III standing. For example, as in this case, whether a person will be denied the opportunity to compete for admission at the Naval Academy on an equal basis does not depend on his or her name. Where those (or other relevant) facts are proved, a court need look no further to conclude that the organization has members who would have standing to pursue a particular claim in their own right. Second, to hold that Article III requires an organization to name those of its members who would have standing would be in tension with one of the fundamental purposes of the organizational standing doctrine—namely, protecting individuals who might prefer to remain anonymous. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 458–60 (1958).

Here, SFFA has identified specific—though unnamed—members who applied to and were rejected by the Naval Academy. As such, this Court is satisfied, at this stage,[10] that SFFA has alleged "facts sufficient to establish that one or more of its members has suffered, or is

---

[10] Of course, Defendants are free to challenge standing if, during discovery, it becomes apparent that SFFA cannot prove that its members would otherwise have standing to sue in their own right.

threatened with, an injury." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State Inc.*, 454 U.S. 464, 487 n.23 (1982).

## II.     Motion for Preliminary Injunction

As noted *supra*, in determining whether a preliminary injunction is appropriate, the Court must follow the test set forth by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), which requires a showing that:

(1) the movant is likely to succeed on the merits;
(2) the movant is likely to suffer irreparable harm absent preliminary relief;
(3) the balance of equities favors the movant; and
(4) an injunction is in the public interest.

555 U.S. at 20.   Preliminary injunctions that alter the status quo—such as the one sought here—are "disfavored," and should only be granted where "the applicants' right to relief [is] indisputably clear." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019) (internal quotation marks omitted).

Students for Fair Admissions contends that it is entitled to a preliminary injunction enjoining the Naval Academy from considering race in its admissions process.   Defendants argue that SFFA cannot satisfy any of the four factors, though both parties' arguments are chiefly focused on the first factor: whether SFFA is likely to succeed on the merits.   The parties' arguments are discussed below in turn.

### A.  Likelihood of Success on the Merits

Students for Fair Admissions argues that the Naval Academy's use of race in

admissions violates the equal protection component of the Fifth Amendment.[11]  (ECF No. 1.)
"Any exception to the Constitution's demand for equal protection must survive a daunting
two-step examination known [as] 'strict scrutiny.'"  *Students for Fair Admissions v. Pres. & Fellows
of Harv. Coll.* ("*Harvard*"), 600 U.S. 181, 206–07 (2023) (citing *Adarand Constructors, Inc. v. Peña*,
515 U.S. 200, 227 (1995)).  Under that standard, courts must ask, first, whether the racial
classification is used to "further compelling governmental interests."  *Grutter v. Bollinger*, 539
U.S. 306, 326 (2003).  Second, if so, courts ask whether the government's use of race is
"narrowly tailored"—meaning "necessary"—to achieve that interest.  *Fisher v. Univ. of Tex. at
Austin*, 570 U.S. 297, 311–12 (2013) (internal quotation marks omitted).

　　In *Harvard*, the Supreme Court held that affirmative action programs at Harvard and
UNC violated the Equal Protection Clause of the Fourteenth Amendment.  600 U.S. at 213.
While the Court declined to overturn its 2003 decision in *Grutter v. Bollinger*, 539 U.S. 306
(2003), which held that consideration of an applicant's race as one factor in admissions policy
did not violate the Constitution, the Court determined the schools' program fell "short of
satisfying the burden" that their programs be "'sufficiently measurable to permit judicial
review' under the rubric of strict scrutiny."  600 U.S. at 214 (citation omitted).  The Court
explained that "'[c]lassifying and assigning' students based on their race 'requires more
than . . . an amorphous end to justify it.'"  *Id.* (citation omitted).  However, as Defendants

---

[11]  Although the Fifth Amendment does not contain an explicit equal protection clause as is provided in the
Fourteenth Amendment, the Supreme Court has interpreted the Fifth Amendment's due process clause as
incorporating an equal protection aspect.  *See Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 217 (1995)
(discussing equal protection aspect of the Fifth Amendment's due process clause).  The Supreme Court has
held that the method of analyzing equal protection claims brought under the Fifth Amendment is no different
than the analysis of such claims under the Fourteenth Amendment.  *See Buckley v. Valeo*, 424 U.S. 1, 93 (1976)
("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth
Amendment.");  *see also United States v. Jones*, 735 F.2d 785, 792 n.8 (4th Cir. 1984) (same).

note, and SFFA concedes, the Supreme Court's ruling in *Harvard* explicitly excluded military academies, noting that military academies may have "potentially distinct interests" from other institutions. *Id.* at 213 n.4.

While the burden of demonstrating the constitutionality of the Naval Academy's consideration of race and ethnicity in admissions would fall on the government in the usual course of business, when a plaintiff seeks a preliminary injunction, the burden switches to the movant to prove that he is likely to succeed on the merits. *Winter*, 555 U.S. at 20. Students for Fair Admissions has not satisfied that burden.

### 1.  Compelling Government Interest

Here, Defendants submit that the Naval Academy's consideration of race and ethnicity in admissions serves a compelling national security interest. Specifically, Defendants submit that they have a compelling national security interest in a diverse officer corps, as the military's senior leadership has determined that a diverse officer corps is critical to cohesion and lethality, to recruitment, to retention, and to the military's legitimacy in the eyes of the nation and the world. (ECF No. 46 at 30–47.) In support of this position, they attach, among other things, declarations of a three-star Vice Admiral of the Navy (ECF No. 46-3), the Deputy Assistant Secretary of the Department of the Navy for Manpower and Personnel (ECF No. 46-4), the Acting Under Secretary of Defense for Personnel and Readiness (ECF No. 46-5), and the Under Secretary's Senior Advisor. (ECF No. 46-6.)

Plaintiff argues that none of the Defendants' proffered interests—cohesion, recruitment, retention, and legitimacy—are compelling government interests that justify explicit racial classifications. (ECF No. 9-1 at 12–18; ECF No. 54 at 22–27.) In support of

this position, Students for Fair Admissions attaches the declaration of a retired three-star general who served in the U.S. Army from 1980 to 2016.  (ECF No. 54-1.)  Plaintiff also points out that after *Harvard*, the Supreme Court's precedents identify "only two compelling interests that permit resort to race-based government action": "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," *Harvard*, 600 U.S. at 207 (citing *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 727 (2007); *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996)), and "avoiding imminent and serious risks to human safety in prisons, such as a race riot." *Id.* (citing *Johnson v. California*, 543 U.S. 499, 512–13 (2005)).

While it is true that "acceptance of race-based state action has been rare for a reason," *Harvard*, 600 U.S. at 208, this Court is not convinced that Plaintiff has met its burden in demonstrating that it is likely to succeed in showing that the Naval Academy's consideration of race and ethnicity in admissions does not serve a compelling national security interest.  First, and most significantly, in overturning the legality of race-based affirmative action at higher education institutions, the Supreme Court excluded military service academies, acknowledging "the potentially distinct interests that military academies may present." *Id.* at 213 n.4.  That language employed in footnote 4 of *Harvard* suggests that compelling government interests may justify affirmative action at military academies.

Second, "[c]ourts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) (citations omitted).  While Students for Fair Admissions contends that "[w]hen courts apply strict scrutiny to the military's racial classifications, they apply real strict scrutiny—not

some watered-down version that gives the government special deference," (ECF No. 54 at 17–20), courts have consistently deferred to the military regarding its personnel decisions. *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020).  Accordingly, the Naval Academy is due more deference than were the private and public universities in *Harvard* given the explicit caveat in footnote 4 of *Harvard*.  600 U.S. at 213 n.4 (explaining that the "opinion . . . does not address the issue, in light of the potentially distinct interests that military academies may present").

In *Winter*, the Supreme Court considered preliminary injunction relief aimed at the military.  555 U.S. at 12.  As was noted by the Supreme Court in that case, "[t]his case involves 'complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force.'"  *Id.* at 24 (quoting *Gilligan v. Morgan,* 413 U.S. 1, 10 (1973)); *see also Roe*, 947 F.3d at 219.  Accordingly, "[this Court] 'give[s] great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.'"  *Winter*, 555 U.S. at 24 (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)).  Still, this Court is mindful that "military interests do not always trump other considerations." *Id.* at 26.

Relatedly, this Court briefly addresses Students for Fair Admissions' argument that the Naval Academy's position is "unsupported," attacking the sources cited by Defendants as "flawed, irrelevant, or misinterpreted."[12]  The factual record has yet to be developed in this

_____

[12] SFFA also attacks the Navy's proffered interests as "inconsistent," noting that strict scrutiny does not allow the use of race for benefits that are minimal at best.  (ECF No. 54 at 27 (citing *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 727 (2007)).)  Plaintiff appears to argue that the Navy is a 343,000 person fighting force, and the Naval Academy's use of race in admissions affects at most only a few hundred officers every year, and unless Navy chose to admit only racial minorities, the racial composition of the ranks would

matter.  It is appropriate to note that both the Plaintiff and Defendants need the opportunity to develop the appropriate record in this case.  At this stage, SFFA bears the burden to prove that it is likely to succeed on the merits.  *Winter*, 555 U.S. at 20.  In light of the language employed in *Harvard* and judicial deference due to the military, at this stage this Court is unpersuaded that the evidence proffered by Plaintiff overwhelms the evidence advanced by Defendants.  Quite simply, the issue of a compelling government interest requires development of a factual record.

### 2.  **Sufficiently Measurable**

Defendants argue that "the military's interest in diversity at military academies is of an entirely different nature than a civilian university's interest in educational diversity," as the Naval Academy prepares students for war, provides a vital pipeline to the military's officer corps—a closed-personnel system; and the military has determined that "a diverse officer corps is critical to mission success and national security."  (ECF No. 46 at 47–49.)  Defendants further argue that "[u]nlike the 'elusive' goals identified [in *Harvard*], whether the military has achieved the benefits that flow from a diverse midshipmen—and eventually officer—corps is clear and measurable."  (*Id.* at 49.)  Defendants assert that "[t]he military's consideration of race and ethnicity is therefore no less measurable than in the prison context, where success is measured by "prevent[ion] [of] harm."  (*Id.* at 50 (citing *Johnson v. California*, 543 U.S. 499, 512–13 (2005)).)  To determine whether the Navy is meeting their goals, Defendants assert that

---

hardly change.  (*Id.*)  This Court is unpersuaded by SFFA's suggestion that because the Navy could only achieve its proffered goals by admitting only racial minorities—something the Navy legally cannot do (e.g., use racial quotas)—its current use of race in admissions does not serve a compelling government interest.  Moreover, claiming that the Navy has not met its goal of mirroring the racial diversity of its enlisted ranks does not negate the existence of the goal itself.

courts can examine: "whether internal race riots have occurred since the [military] made an effort to diversify their officer corps," (*id.* at 50); "the views of senior military leadership," (*id.* at 50–51); "feedback from current servicemembers," (*id.* at 51–52); "demographic data," (*id.* at 52–53); and "whether the same type of public perception crisis resulting from the racial tensions around the Vietnam War plagues the military today . . . and whether there have been international incidents as occurred previously from racial tensions." (*Id.* at 53.)

Students for Fair Admissions contends that the Navy's proffered interests are immeasurable such that they cannot be subjected to meaningful judicial review. (ECF No. 54 at 23–34.) They note that the Supreme Court rejected UNC's suggestion that courts could measure their interest in pursuing the educational benefits of diversity via survey in the *Harvard* decision. (*Id.* (citing *Harvard*, 600 U.S. at 214).) SFFA also rejects the Defendants' suggestion that the government's interests are more analogous to those in *Johnson v. California*, 543 U.S. 499 (2005), noting that *Johnson* did not involve admissions, affirmative action, or the military, but rather prisons, and further that the Supreme Court found that the prison's interests were compelling only because the means for achieving them were "temporary" and "measurable." (ECF No. 54 at 24.)

While Plaintiff attacks Defendants' position that courts can examine whether there have been any internal race riots since the military made an effort to diversify their officer corps and feedback from current servicemembers, Students for Fair Admissions does not meaningfully address the other means of measurement proffered by Defendants, and this Court is confident that, at a minimum, a court could examine demographic data to determine whether the government is meeting its goals.

Moreover, the Supreme Court's determination that Harvard and UNC's interests were "inescapably imponderable" was based on a factual record much further developed than that of the instant case.  600 U.S. at 215.  The record in the Harvard case was developed during a fifteen-day bench trial, *Students for Fair Admissions, Inc. v. Pres. & Fellows of Harv. Coll.*, No. 1:14cv14176 (D. Mass. Filed Nov. 17, 2014), and the record in the UNC case was developed during an eight-day bench trial.  *Students for Fair Admissions, Inc. v. Univ. of N.C.*, No. 1:14cv954 (M.D.N.C. filed Nov. 17, 2014).[13]  At present, this Court is unpersuaded by Plaintiff's conclusory assertions that the Navy's interests of cohesion, recruitment, retention, and legitimacy are immeasurable.

### 3.  Narrowly Tailored

"To be narrowly tailored, a race-conscious admissions program cannot use a quota system—it cannot 'insulate each category of applicants with certain desired qualifications from competition with all other applicants.'"  *Grutter*, 539 U.S. at 334 (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 315 (1978)).  Instead, a university may consider race or ethnicity only as a plus in a particular applicant's file, without insulating the individual from comparison with all other candidates for the available seats.  *Bakke*, 438 U.S. at 317.  In other words, an admissions program must be "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight."  *Id.*

---

[13]  By separate Order, this case shall be set for a bench trial commencing within the next nine months on September 9, 2024.

Here, SFFA asserts that the Naval Academy's use of race is not narrowly tailored.  It alleges that the Naval Academy uses race as a negative; the USNA's racial categories are "incoherent;" the Navy's racial preferences rely on "impermissible racial stereotypes;" the Navy's use of race in admissions has no end date; and the Navy has not sufficiently considered race-neutral alternatives.  (ECF No. 9-1 at 14–21; ECF No. 54 at 27–32.)  The Naval Academy emphasizes that each candidate is evaluated as an individual in the admissions process; that it does not use quotas to achieve its goals; that race and ethnicity are not used as a negative or stereotype; that race-neutral alternatives are not sufficient; and that they do not intend to use race and ethnicity as a factor in its admissions process indefinitely.  (ECF No. 46 at 53–67.)

This Court first considers SFFA's argument that the Naval Academy uses race as a negative.  In *Harvard*, the Supreme Court stressed that the "twin commands" required that race may never be used as a negative or a stereotype.  600 U.S. at 218.  The Court noted that the United States Court of Appeals for the First Circuit had found that Harvard's consideration of race had led to a 11.1% decrease in the number of Asian-Americans admitted to Harvard.  *Id.*  In rejecting the *Harvard* respondents' contention that an individual's race was never a negative factor in their admissions program, the Supreme Court explained: "College admissions are zero-sum.  A benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter."  *Id.* at 218–19.  Here, the Naval Academy submits:

> [R]ace and ethnicity "may only be considered as one of many non-determinative factors in the applicant's file" when considering a candidate for admission at USNA.  However, neither race nor ethnicity can "be the basis for 'points' in favor of or against an applicant" at any "point during the admissions process." In other words, a candidate's racial or ethnic background may provide context

to ensure a fulsome evaluation of his or her application but candidates may not
be admitted (or denied) *because of* their race or ethnicity.

(ECF No. 46-2 ¶ 70 (internal citations omitted).)  The Naval Academy's admissions policy is
distinguishable from the admissions policies at issue in *Harvard*, where the respondents
"maintain[ed] that the demographics of their admitted classes would meaningfully change if
race-based admissions were abandoned" and "acknowledge[d] that race is determinative for
at least some . . . of the students they admit."  600 U.S. at 219.  This Court is unpersuaded, at
this stage, that the Naval Academy's use of race in admissions, which Defendants assert is
limited and never determinative, is inherently negative.

SFFA's argument that the USNA's racial categories are "incoherent" relies on the
*Harvard* Court's rejection of the same categories.  *Id.* at 216–18.  The context of that rejection
is critical.  In *Harvard*, the Supreme Court explained: "It is far from evident . . . how assigning
students to these racial categories and making admissions decisions based on them furthers
the educational benefits that the universities claim to pursue."  *Id.* at 216.  An entirely different
interest is before this Court, namely one of national security rather than educational benefits,
and this distinction undermines SFFA's argument at this stage.

Considering SFFA's argument that the Navy's racial preferences rely on "impermissible
racial stereotypes," the Supreme Court has long held that universities may not operate their
admissions programs on the "belief that minority students always (or even consistently)
express some characteristic minority viewpoint on any issue."  *Grutter*, 539 U.S. at 333 (internal
quotation marks omitted).  In *Harvard*, the Court asserted that the respondents' admissions
programs promoted stereotypes because they assume that "a black student can usually bring
something that a white person cannot offer."  600 U.S. at 220 (citing *Bakke*, 438 U.S. at 316).

31

Here, the Naval Academy submits: "USNA further does not consider race or ethnicity on a belief that diverse students always express stereotypically characteristic viewpoints on an issue. USNA's application process centers on a candidates' individualized experiences." (ECF No. 46-2 ¶ 79.)  At this stage, Students for Fair Admissions has not convinced this Court that it is likely to succeed in its argument that the Naval Academy's admissions policy ascribes an inherent benefit in race *qua* race.

With respect to SFFA's argument that the Naval Academy's use of race in admissions has no end date, Defendants note that Plaintiff's contention wholly ignores the distinct military interest at issue here.  In *Harvard*, the Court explained:

> *Grutter* thus concluded with the following caution: "It has been 25 years since Justice Powell first approved the use of race to further an interest in student body diversity in the context of public higher education. . . . We expect that 25 years from now, *the use of racial preferences will no longer be necessary to further the interest approved today*." Twenty years later, no end is in sight. . . . But we have permitted race-based admissions only within the confines of narrow restrictions. University programs must comply with strict scrutiny, they may never use race as a stereotype or negative, and—at some point—they must end.

600 U.S. at 213 (internal citations omitted) (emphasis added).  In light of this language, this Court is unpersuaded that *Harvard* applies automatically and without thought to the Naval Academy given the "potentially distinct interests that [it] may present." *Id.* at 213 n.4.

Lastly, considering SFFA's argument that the Naval Academy has not sufficiently considered race-neutral alternatives, the Naval Academy submits that it has considered several race-neutral alternatives, yet none have been effective to date.  (ECF No. 46-2 ¶¶ 91–99.)  Such alternatives include: targeted recruiting efforts to increase Naval Academy applications from Fleet Sailors and Marines; hosting a Summer Seminar and a Science, Technology, Engineering, and Mathematics Camp for rising ninth-to-eleventh graders; marketing to specific

underrepresented demographics through an enrollment management companies; consideration of socio-economic status during the application process; prioritizing first-generation college candidates; adjusting admission metrics and consideration of standardized tests; and increased outreach to low-density congressional districts and encouraging Members of Congress to increase the number of nominations and to sponsor informational Academy Days.  (*Id.*)  This Court is unpersuaded by SFFA's assertion that no "serious, good faith consideration" appears anywhere in the record.  *Grutter*, 539 U.S. at 349.

While SFFA encourages this Court to find that the Naval Academy's use of race in admissions fails strict scrutiny's narrow tailoring requirement, it would be imprudent to make such a determination at the preliminary injunction stage, as it is imperative that the factual record in this matter be developed.  Simply stated, it is unclear whether SFFA is likely to succeed on the merits at this stage.  As a preliminary injunction is an extraordinary remedy, Plaintiff "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Miranda v. Garland*, 34 F.4th 338, 358 (4th Cir. 2022) (quoting *Winter*, 555 U.S. at 20).  Courts cannot issue a preliminary injunction absent a "clear showing" that all four requirements are satisfied.  *Leaders of a Beautiful Struggle*, 979 F.3d at 226.  Thus, a court need not address all four *Winter* factors if one or more factors is not satisfied.  *Henderson ex rel. NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018).  As SFFA has failed to satisfy its burden on likelihood of success on the merits, this Court need not address the remaining three parts of the preliminary injunction test. Nevertheless, the Court for completeness also addresses irreparable harm, balance of the

equities, and public interest.

### B. Irreparable Harm

Having found that Students for Fair Admissions has failed to carry its burden to clearly show a likelihood of success on the merits, this Court briefly considers the extent to which Plaintiff has shown irreparable harm. "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Leaders of a Beautiful Struggle*, 2 F.4th at 346. Because it is unclear whether the Naval Academy's use of race and ethnicity in admissions is unconstitutional, the irreparable harm factor is not automatically satisfied in this instance.

Nevertheless, delayed admission to a university can cause irreparable injury when the person harmed has no comparable opportunities elsewhere. *See Faulkner v. Jones*, 10 F.3d 226, 233 (4th Cir. 1993). Here, Member A is "currently attending college . . . and is a Midshipman in the Naval Reserve Officers Training Corps," and "Member B is now a freshman in college." (ECF No. 9-1 at 11.) While the ages of Member A and Member B have not been revealed, 10 U.S.C. § 7446 provides that to be eligible for admission to the Naval Academy, "a candidate must be at least 17 years of age and must not have passed his twenty-third birthday on July 1 of the year in which he enters the Academy." Member A and Member B are presently enrolled in college and SFFA appears to concede that both are far away from their twenty-third birthdays. As such, and because it is unclear whether Plaintiff is likely to succeed on the merits, this Court finds that SFFA has not satisfied the requirement that it is likely to suffer irreparable harm in the absence of preliminary relief.

### C.  Balance of Equities

Having found that Students for Fair Admissions has failed to carry its burden to clearly show a likelihood of success on the merits and irreparable harm, this Court briefly addresses the balance of the equities.  In considering the balance of the equities, this Court is required to consider the harm that will befall SFFA if the injunction fails to be issued against the harm that will result to Defendants from being enjoined.  Stated another way, the court must balance the "harm to the plaintiff if the injunction is erroneously denied versus harm to the defendant if the injunction is erroneously granted."  *Planned Parenthood of Ind. & Ky., Inc. v. Adams*, 937 F.3d 973, 980 (7th Cir. 2019); *see also Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021); *Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 923 (6th Cir. 2020).  Here, the Naval Academy is mid-admissions cycle.  Moreover, SFFA has not clearly demonstrated a likelihood of success on the merits or that its members will suffer irreparable harm absent injunctive relief. Accordingly, this Court would be hard-pressed to find that the balance of the equities favors SFFA.

### D.  Public Interest

For similar reasons noted above and addressed at the hearing in this case, public interest simply does not favor an injunction at this stage of the proceedings.  Serious issues remain in the wake of the Supreme Court's opinion in *Harvard*.  This compels a careful establishment of a record in this case.

**CONCLUSION**

For the reasons stated above, and in accordance with the Court's decision from the bench on December 14, 2023 (ECF No. 58) and Order dated December 15, 2023 (ECF No. 57), Plaintiff's Motion for Preliminary Injunction (ECF No. 9) has been DENIED.

The Clerk of Court shall file this Memorandum Opinion electronically and notify all counsel of record accordingly.

Dated: December 20, 2023

_____
/s/
Richard D. Bennett
United States Senior District Judge