# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### NORTHERN DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS<br>*Plaintiff*,<br><br>v.<br><br>THE UNITED STATES NAVAL<br>ACADEMY, *et al.*,<br>*Defendants*. | No. 1:23-cv-2699-RDB |

## NOTICE OF RECENT DECISION

On July 24, 2024, Plaintiff Students for Fair Admissions (SFFA) filed a motion to compel in the U.S. District Court for the District of Columbia to require the United States Coast Guard to comply with a subpoena served in the District of Columbia seeking documents relevant to this case. *See In re Motion to Compel Compliance with Subpoena Directed to the United States Coast Guard*, No. 1:24-mc-92-DLF (D.D.C.) (Exhibit 1). The Coast Guard opposed the motion. *See* Exhibit 2. SFFA filed a reply brief on August 5. *See* Exhibit 3. Two days later, on August 7, Judge Dabney L. Friedrich issued an order transferring the motion to compel to this Court. *See* Exhibit 4. The transfer is scheduled to occur by Saturday, August 17. *See* Exhibit 5.

SFFA intends to discuss a different discovery dispute during the call with the Court on Thursday. But SFFA can make itself available if the Court wishes to hold oral argument on the motion to compel against the Coast Guard.

Dated: August 13, 2024

Respectfully submitted,

 /s/ Thomas R. McCarthy

Adam K. Mortara*
(TN Bar No. 40089)
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

Thomas R. McCarthy*
Patrick Strawbridge*
J. Michael Connolly*
Bryan K. Weir*
Cameron T. Norris***
James F. Hasson*
R. Gabriel Anderson**
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
patrick@consovoymccarthy.com
mike@consovoymccarthy.com
bryan@consovoymccarthy.com
cam@consovoymccarthy.com
james@consovoymccarthy.com
gabe@consovoymccarthy.com

*pro hac vice
**pro hac vice forthcoming
***admitted to practice in the District of Maryland

*Counsel for Students for Fair Admissions*

## CERTIFICATE OF SERVICE

I certify that on August 13, 2024, I e-filed the foregoing via ECF, which will automatically email all counsel of record.

*/s/ Thomas R. McCarthy*

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: MOTION TO COMPEL COMPLIANCE WITH SUBPOENA DIRECTED TO THE UNITED STATES COAST GUARD | Case: 1:24–mc–00092<br>Assigned To : Friedrich, Dabney L.<br>Assign. Date : 7/24/2024<br>Description: Misc. (O–Deck) |
| STUDENTS FOR FAIR ADMISSIONS,<br><br>                                   *Plaintiff*,<br><br>V.<br><br>THE UNITED STATES NAVAL ACADEMY, *et al.*,<br><br>                                   *Defendants*. | Related Case:<br>No. 1:23-cv-02699<br>(District of Maryland) |

## STUDENTS FOR FAIR ADMISSIONS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS

Pursuant to Federal Rules of Civil Procedure 26, 37, and 45, and Local Civil Rule 7, Movant Student for Fair Admissions ("SFFA") respectfully moves this Court to compel non-party the United States Coast Guard to comply with a subpoena served in this district.  Pursuant to Local Civil Rule 7(m), Plaintiff has conferred with the United States Coast Guard, which opposes this motion. A proposed order is included with this motion.

SFFA seeks information about the Coast Guard's admissions procedures and its use of race-neutral strategies in its admissions process. This information is exclusively within the Coast Guard's possession and relevant to SFFA's case against the United States Naval Academy. The documents SFFA seeks are relevant and producing them would not result in any undue burden to the Coast Guard.

1

For these reasons, and those stated more fully in the accompanying brief, SFFA respect-
fully requests that this Court grant this motion and enter an order compelling the Coast Guard to
produce the requested documents within fourteen days from the Court's order.

Date: July 24, 2024

Respectfully submitted,

J. Michael Connolly
Thomas R. McCarthy
Cameron T. Norris
Brandon Haase
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
brandon@consovoymccarthy.com

*Counsel for Movant Students for Fair Admissions*

## CERTIFICATE OF SERVICE

On July 24, 2024, I hereby certify that I served this filing on counsel of record listed below

by email and first-class mail, postage pre-paid:

Joshua Gardner
Civil Division, Federal Programs Branch
UNITED STATES DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
Washington, DC 20530
Tel: (202) 514-4336
joshua.e.gardner@usdoj.gov

*Counsel for the United States Naval Academy*

Brian Judge
Office of Claims and Litigation
UNITED STATES COAST GUARD
Commandant CG-LCL,
US Coast Guard HQ,
2703 Martin Luther King Jr. Ave. SE,
Stop 7213,
Washington, DC 20593-7213
(202) 372-3740
brian.judge@uscg.mil

*Counsel for the United States Coast Guard*

By:

Brandon Haase (DC Bar No. 1616834)
Consovoy McCarthy PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
brandon@consovoymccarthy.com

*Counsel for Movant*
*Students for Fair Admissions*

3

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: MOTION TO COMPEL COMPLIANCE WITH SUBPOENA DIRECTED TO THE UNITED STATES COAST GUARD | Case: 1:24–mc–00092<br>Assigned To : Friedrich, Dabney L.<br>Assign. Date : 7/24/2024<br>Description: Misc. (O–Deck) |
| STUDENTS FOR FAIR ADMISSIONS,<br><br>*Plaintiff*,<br><br>v.<br><br>THE UNITED STATES NAVAL ACADEMY, *et al.*,<br><br>*Defendants*. | Related Case:<br>No. 1:23-cv-02699<br>(District of Maryland) |

# MEMORANDUM OF LAW IN SUPPORT OF
# <u>MOTION TO COMPEL PRODUCTION OF DOCUMENTS</u>

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 2

    A.   The Underlying Litigation. ................................................................................. 2

    B.   SFFA's Subpoenas to the Coast Guard ............................................................. 2

ARGUMENT .................................................................................................................. 3

I.     SFFA is entitled to the documents it seeks under Federal Rule of Civil Procedure 45. ......... 3

    A.   The subpoena seeks relevant information. ....................................................... 4

    B.   Complying with the subpoena will not impose an undue burden. ......................... 6

CONCLUSION ............................................................................................................... 8

# TABLE OF AUTHORITIES

**Cases**

*Fisher v. Univ. of Texas at Austin,*
  570 U.S. 297 (2013) ................................................................................................... 4

*Grutter v. Bollinger,*
  539 U.S. 306 (2003) ................................................................................................... 2

*In re Barnwell Enterprises Ltd,*
  265 F. Supp. 3d 1 (D.D.C. 2017) ............................................................................... 8

*In re Denture Cream Prod. Liab. Litig.,*
  292 F.R.D. 120 (D.D.C. 2013) ................................................................................... 4

*McDowell v. Gov't of D.C.,*
  233 F.R.D. 192 (D.D.C. 2006) ................................................................................... 7

\* *Stati v. Republic of Kazakhstan,*
  2020 WL 3259244 (D.D.C. June 5, 2020) ......................................................... 6, 7, 8

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
  600 U.S. 181 (2023) ................................................................................................... 2

*United States ex rel. Touhy v. Ragen,*
  340 U.S. 462 (1951) ................................................................................................... 4

\* *US Dominion Inc. v. My Pillow Inc.,*
  2024 WL 2880425 (D.D.C. June 7, 2024) ............................................................. 3, 4

*Watts v. S.E.C.,*
  482 F.3d 501 (D.C. Cir. 2007) ................................................................................... 4

*Wygant v. Jackson Bd. of Educ.,*
  476 U.S. 267 (1986) ................................................................................................... 4

**Other Authorities**

Br. of United States as *Amicus Curiae* in Supp. of Resp'ts 17, *Students for Fair Admissions v. President and Fellows of Harvard College,*
  2022 WL 3108833, No 20-1199 (U.S. August 1, 2022) ............................................ 6

O.A. Tr.19-22, *Grutter v. Bollinger,*
  02-241 (U.S. April 1, 2003) ....................................................................................... 6

**Rules**

Fed. R. Civ. P. 26 ........................................................................................................... 8

\* Fed. R. Civ. P. 45 ..................................................................................................... 3, 8

## INTRODUCTION

In October 2023, Students for Fair Admissions ("SFFA") sued the United States Naval Academy, alleging that its race-based admissions process is unconstitutional. Because the Naval Academy admits that it uses race in the admissions process, one of the key issues in the case is whether the Naval Academy has race-neutral alternatives. SFFA says that race-neutral alternatives are available. For proof, SFFA has repeatedly pointed to the example of the United States Coast Guard Academy, which successfully increased minority admissions from 2008 to 2010 using race-neutral policies.

SFFA recently served a subpoena *duces tecum* on the United States Coast Guard to obtain additional information about the Coast Guard Academy's efforts and results. SFFA requested documents concerning (1) the Coast Guard Academy's efforts to boost minority admissions during the relevant period and (2) basic admissions statistics, *viz.*, the total number of applicants, admitted students, matriculants, and graduates broken down by race for the Coast Guard Academy classes from 2008 to 2017.

Yet the Coast Guard refuses to produce any of these documents. The Coast Guard concedes that it has records responsive to SFFA's subpoena, but it claims that SFFA's subpoena is irrelevant, overly burdensome, and deficient under Rule 45 and the Coast Guard's housekeeping regulations.

These arguments all fail. The requested documents are probative of a key issue in the underlying case: the feasibility of race-neutral alternatives in admissions to a service academy. Nor do the Coast Guard's excuses regarding burden pass muster. This Court should order the Coast Guard to comply with the subpoena.

# BACKGROUND

## A.    The Underlying Litigation.

On October 5, 2023, SFFA sued the Naval Academy and other government defendants, alleging that the Naval Academy's use of race in the admissions process is unconstitutional. *See* Ex. F, *Students for Fair Admissions v. Naval Academy*, No. 23-cv-2699-ABA, Dkt. 1 (D. Md.). Because the Academy admits that it uses race in the admissions process, strict scrutiny applies. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 214 (2023). As such, the Naval Academy must show, among other things, that it engaged in a "serious, good faith consideration of workable race-neutral alternatives." *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003).

Relevant here, SFFA alleges that the Naval Academy's use of race is unlawful because the Academy could achieve student body diversity through race-neutral means. In its Complaint, SFFA alleged:

> The Coast Guard Academy provides a real-world example. Until 2010, that academy was prohibited by federal statute from using racial preferences in its admissions process. In the two years before the Coast Guard Academy began considering race, it launched an aggressive advertising and recruiting campaign targeting minorities. At the end of those two years, the Coast Guard Academy had increased minority enrollment by 60%—from 15% to 24%. Those numbers were within a few percentage points of the other academies, which had been using explicit racial preferences for years.

Ex. F at ¶101, 24-25.

Discovery is ongoing, and the case is scheduled for a two-week bench trial before Judge Bennett starting on September 9, 2024. *See Naval Academy*, No. 23-cv-2699-ABA, Dkt. 71.

## B.    SFFA's Subpoenas to the Coast Guard

Last month, SFFA served a subpoena *duces tecum* on the United States Coast Guard, seeking three categories of information related to the Coast Guard Academy's strategies to increase

minority admissions from 2008 and onward. *See* Ex. C at 7. In response, the Coast Guard served

objections to the subpoena on SFFA and declined to produce any records. *See* Ex. D. The Coast

Guard refused to produce the requested records, claiming, among other things, that SFFA's request

was "unduly burdensome and inappropriate" and "not in the public interest." *See* Ex. D at 2-4.

In response to the Coast Guard's objections, SFFA issued a more limited subpoena,

eliminating one of its original requests and clarifying the scope of its remaining requests. Ex. A.

This second subpoena seeks only the following categories of documents:

> 1. All documents from the Relevant Period prepared by You concerning any programs, initiatives, strategies, plans, or other organized efforts undertaken for the purpose of (a) increasing the number of racial or ethnic minority students who applied, were admitted, and/or matriculated to the Coast Guard Academy; or (b) increasing the percentage of all applicants, admitted students, and/or matriculants to the Coast Guard Academy who are racial or ethnic minorities, including but not limited to the strategies discussed in the following article: Jennifer McDermott, *Coast Guard Cadet Diversity Surges With Minority Wave*, The Day (July 5, 2010), perma.cc/U4AR-MJQV.

> 2. Documents sufficient to show the total number of applicants, admitted students, matriculants, and graduates of each race for the Coast Guard Academy Classes of 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

Ex. A at 7.

On July 10, 2024, the Coast Guard objected again and refused to produce records. *See* Ex.

B. The Coast Guard refused to comply with SFFA's subpoena largely "for the same reasons as

before." Ex. B at 1-3.

## ARGUMENT

**I.      SFFA is entitled to the documents it seeks under Federal Rule of Civil Procedure 45.**

Rule 45 governs third party subpoenas. *See* Fed. R. Civ. P. 45. "When a third party lodges

timely objections to a subpoena, the serving party 'may move the court for the district where

compliance is required for an order compelling production or inspection.'" *US Dominion Inc. v.

My Pillow Inc.*, 2024 WL 2880425, at *3 (D.D.C. June 7, 2024) (quoting Fed. R. Civ. P.

45(d)(2)(B)). "When considering a motion to compel under Rule 45, a court 'must first consider whether the discovery sought is relevant to a party's claim or defense in the underlying litigation.'" *Id.* (citations omitted). "If relevance is established, the Court considers objections to the subpoena under Rule 45, including whether the subpoena requests privileged material or would cause an undue burden on the third party." *Id.* "It falls on the objecting party to show that compliance would pose an undue burden." *Id.* An agency's *Touhy* regulations "do not alter the procedures set forth in the Federal Rules of Civil Procedure or preclude the production of documents that are relevant to a judicial proceeding.'" *Id.* at *4 (cleaned up); *accord Watts v. S.E.C.*, 482 F.3d 501, 509 (D.C. Cir. 2007) (*Touhy* regulations do not confer a privilege or other basis for objecting to a subpoena); *see also United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951). SFFA satisfies both requirements.

### A.    The subpoena seeks relevant information.

"[W]ith respect to a Rule 45 subpoena, a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party." *In re Denture Cream Prod. Liab. Litig.*, 292 F.R.D. 120, 123 (D.D.C. 2013) (cleaned up). In the underlying litigation, a key issue is whether the Naval Academy has "workable race-neutral alternatives" available. *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 312 (2013); *accord Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 n.6 (1986) (narrow tailoring "require[s] consideration of whether lawful alternative[s] and less restrictive means could have been used").

In its prior preliminary-injunction motion, SFFA explained the importance of the Coast Guard's history to this case:

> The [Naval] Academy has no studies, reports, or experiments "carefully considering" race-neutral alternatives. Yet the Coast Guard Academy provides a real-world example that these alternatives can (and do) work. Until 2010, that academy was prohibited from using racial preferences in its admissions process. See Ex. aa at 1. In the two years before the Coast Guard began considering race, it launched an aggressive advertising and recruiting campaign targeting minorities. *Id.* at 2. At the end of those two years, the Coast Guard had increased minority

enrollment by 60%, from 15% to 24%. Ex. bb at 1-2. Those numbers were within a few percentage points of the other academies (which had been using explicit racial preferences for years), *see, e.g.,* Ex. cc, and nowhere does the Naval Academy try to prove that the difference stopped the Coast Guard from achieving its asserted interests.

Ex. G, Memo in Supp. of Mot. for Prel. Inj., *Naval Academy*, No. 23-cv-2699-ABA, Dkt. 9-1 at 16 (citing Dkt. 9-7 at 276, 282-83, 292).

Here, SFFA's two discovery requests seek additional evidence to undermine the Naval Academy's assertion that no race-neutral alternatives exist. SFFA's first request seeks details about the Coast Guard Academy's race-neutral admissions strategies to show that the Naval Academy failed to consider lawful alternatives. SFFA's second request seeks demographic statistics on the Coast Guard Academy's classes to rebut the Naval Academy's claim that race-neutral alternatives are unworkable or unsuccessful.

The Coast Guard does not dispute that SFFA's first request seeks relevant information. The Coast Guard only disputes the relevance of SFFA's second request, which seeks statistics on the demographic makeup of applicants, admitted students, and matriculants to the Coast Guard Academy over a ten-year period. *See* Ex. A at 7. The Coast Guard's sole argument is that the Coast Guard Academy and the Naval Academy have "admissions processes [that] are too dissimilar to offer a useful comparison." Ex. D at 3. But this argument misses the mark.

The Naval Academy and the Coast Guard are obviously useful comparisons. Both are service academies and both have similar missions.[1] The United States also has conceded that the

---

[1] *Compare* Ex. H, United States Coast Guard Academy, *Mission*, (accessed July 22, 2024), https://perma.cc/5XD7-2TYK ("To graduate young men and women with sound bodies, stout hearts, and alert minds, with a liking for the sea and its lore, and with that high sense of honor, loyalty, and obedience which goes with trained initiative and leadership; well-grounded in seamanship, the sciences, and amenities, and strong in the resolve to be worthy of the traditions of commissioned officers in the United States Coast Guard in the service of their country and humanity."), *with* Ex. I, United States Naval Academy, *Mission of USNA*, (accessed July 22, 2024),

service academies have similar applicant pools and admissions procedures. *See* Br. of United States as *Amicus Curiae* in Support of Resp'ts 17, *SFFA v. Harvard*, 2022 WL 3108833, No 20-1199 (U.S. August 1, 2022) (explaining that "[t]he service academies" all draw from "a nationwide applicant pool and require a combination of academic excellence, leadership skills, physical ability, and personal character for success"). The United States in *Grutter* likewise pointed to the Coast Guard Academy as evidence that "race neutral" alternatives are available and "should be used in the [service] academies." O.A. Tr.19-22, *Grutter v. Bollinger*, 02-241 (U.S. April 1, 2003). Differences in the two academies' admissions processes or class size does not eliminate the relevance of the Coast Guard Academy's experience. Indeed, the fact that SFFA has repeatedly pointed to the historical example of the Coast Guard—in its complaint and both preliminary-injunction filings—should remove any doubt as to the relevance of this issue. *See* Ex. F at ¶101, 24-25; Ex. G at 20-21; *see also* Reply in Supp. of Mot. for Prel. Inj. *Naval Academy*, No. 23-cv-2699-ABA, Dkt. 54 at 10, 31-32.

**B.      Complying with the subpoena will not impose an undue burden.**

"The burden lies on the party resisting discovery to show that the documents requested are either unduly burdensome or privileged." *Stati v. Republic of Kazakhstan*, 2020 WL 3259244, at *4 (D.D.C. June 5, 2020). "A party resisting a subpoena on undue burden grounds 'cannot rely on a mere assertion that compliance would be burdensome and onerous without showing the manner and extent of the burden and the injurious consequences of insisting upon compliance with the

---

https://perma.cc/AJK2-R83F ("To develop Midshipmen morally, mentally and physically and to imbue them with the highest ideals of duty, honor and loyalty in order to graduate leaders who are dedicated to a career of naval service and have potential for future development in mind and character to assume the highest responsibilities of command, citizenship and government.").

subpoena.'" *Id.* (quoting Wright & Miller, *Federal Practice and Procedure* §2463.1 (3d ed. 2008)).

To begin, the Coast Guard never asserts that it would be an undue burden to comply with SFFA's second request for admissions statistics. Nor could it. The request simply seeks basic numbers and demographic statistics about the Coast Guard's classes over a ten-year period— information that the Coast Guard admits that it has and thus could presumably easily produce. Ex. A at 7; Ex. D at 3. And the Coast Guard regularly publishes similar information in digest form. *See, e.g.*, Ex. E.

The Coast Guard offers a handful of reasons for why SFFA's first request would cause it an "undue burden," *see* Ex. B at 3; Ex. D at 3, but none is persuasive. As an initial matter, the Coast Guard cannot claim undue burden because it failed to "actually conduct[] a preliminary search to determine the nature and scope of its records," which is a "crucial[]" aspect of demonstrating burden. *Stati*, 2020 WL 3259244, at *9. The Coast Guard speculates that the responsive documents "*likely* have been destroyed" and that it would be burdensome to search for documents that "*might* not have been disposed of."  Ex. D. at 2 (emphasis added). But speculation is no substitute for a good-faith effort to determine the scope of responsive documents *before* claiming it would be burdensome to produce them.

The Coast Guard also has failed to "show[] the manner and extent of the burden and the injurious consequences of insisting upon compliance with the subpoena." *Stati*, 2020 WL 3259244, at *4. The Coast Guard offers only nebulous excuses about "understaff[ing]," the pending retirement of its Director of Admissions, and the fact that its records are "not well organized" or "might have been destroyed." Ex. D at 2. But "to allow a defendant [who] generates massive records to frustrate discovery by creating an inadequate filing system, and then claiming undue

burden, would defeat the purposes of the discovery rules." *McDowell v. Gov't of D.C.*, 233 F.R.D. 192, 203 (D.D.C. 2006) (cleaned up). These excuses fall well short of demonstrating why it would be unduly burdensome for the Coast Guard to, in its own words, "search shared electronic drives and remotely stored physical files" for responsive documents. Ex. D at 2.

That the documents in question were apparently created by Coast Guard Admissions officers who are no longer with the Coast Guard Academy is also irrelevant. *See* Ex. D at 2. Rule 45 requires a party to "produce … documents, electronically stored information, or tangible things in [its] possession, custody, or control." Fed. R. Civ. P. 45; *In re Barnwell Enterprises Ltd*, 265 F. Supp. 3d 1, 16 (D.D.C. 2017) (control includes "the right, authority, or practical ability to obtain the documents"). The Coast Guard does not dispute that it possesses the requested documents and concedes that it has the right and ability to search its shared electronic drives and physical for them. Ex. D at 2. To the extent the Coast Guard possesses or controls responsive documents, it must produce them.

Finally, even if SFFA's request imposes some burden, "'the importance of the issues at stake in the action'" far outweighs any inconvenience to the Coast Guard. *Stati*, 2020 WL 3259244, at *4 (quoting Fed. R. Civ. P. 26). SFFA has alleged that one of the nation's most prestigious military institutions is engaging in unconstitutional race-based discrimination despite the existence of race-neutral alternative means. The importance of this case weighs heavily in favor of SFFA.

## CONCLUSION

The Court should grant this motion and enter an order compelling the Coast Guard to produce the requested documents within fourteen days from the Court's order.

Date: July 24, 2024                          Respectfully submitted,

                                             J. Michael Connolly
                                             Thomas R. McCarthy
                                             Cameron T. Norris
                                             Brandon Haase
                                             CONSOVOY MCCARTHY PLLC
                                             1600 Wilson Blvd., Suite 700
                                             Arlington, VA 22209
                                             (703) 243-9423
                                             tom@consovoymccarthy.com
                                             mike@consovoymccarthy.com
                                             cam@consovoymccarthy.com
                                             brandon@consovoymccarthy.com

          *Counsel for Movant Students for Fair Admissions*

## CERTIFICATE OF SERVICE

On July 24, 2024, I hereby certify that I served this filing on counsel of record listed

below by email and first-class mail, postage pre-paid:

Joshua Gardner
Civil Division, Federal Programs Branch
UNITED STATES DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
Washington, DC 20530
Tel: (202) 514-4336
joshua.e.gardner@usdoj.gov

*Counsel for the United States Naval Academy*

Brian Judge
Office of Claims and Litigation
UNITED STATES COAST GUARD
Commandant CG-LCL,
US Coast Guard HQ,
2703 Martin Luther King Jr. Ave. SE,
Stop 7213,
Washington, DC 20593-7213
(202) 372-3740
brian.judge@uscg.mil

*Counsel for the United States Coast Guard*

By: _____

Brandon Haase (DC Bar No. 1616834)
Consovoy McCarthy PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
brandon@consovoymccarthy.com

*Counsel for Movant
Students for Fair Admissions*

10

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: MOTION TO COMPEL COMPLIANCE WITH SUBPOENA DIRECTED TO THE UNITED STATES COAST GUARD | Case: 1:24–mc–00092 Assigned To : Friedrich, Dabney L. Assign. Date : 7/24/2024 Description: Misc. (O–Deck) |
| STUDENTS FOR FAIR ADMISSIONS, *Plaintiff*, V. THE UNITED STATES NAVAL ACADEMY, *et al.*, *Defendants*. | Related Case: No. 1:23-cv-02699 (District of Maryland) |

**DECLARATION OF BRANDON HAASE**

1.     I am an attorney at the law firm Consovoy McCarthy PLLC and counsel for movant, Students for Fair Admissions.

2.     I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

3.     The following materials attached as exhibits are true and accurate copies of documents exchanged between the parties and a page from a public website:

    a.   Exhibit A is a copy of Plaintiff's second subpoena *duces tecum*, served on the United States Coast Guard, courtesy of the Office of General Counsel, Department of Homeland Security, on June 26, 2024.

1

b.  Exhibit B is a copy of the Coast Guard's objections to Plaintiff's second subpoena *duces tecum*, served by Brian Judge, counsel for the United States Coast Guard, to Cameron Norris, counsel for Students for Fair Admissions, on July 10, 2024.

c.  Exhibit C is a copy of Plaintiff's first subpoena *duces tecum*, served on the United States Coast Guard, courtesy of the Office of General Counsel, Department of Homeland Security, on June 10, 2024

d.  Exhibit D is a copy of the Coast Guard's objections to Plaintiff's first subpoena *duces tecum*, served by Brian Judge, counsel for the United States Coast Guard, to Cameron Norris, counsel for Students for Fair Admissions, on June 18, 2024.

e.  Exhibit E is a document entitled "United States Coast Guard Academy Class of 2021 Profile," last accessed July 23, 2024, and available at https://perma.cc/W4Z4-LPL9.

f.  Exhibit F is a copy of the Complaint filed by Students for Fair Admissions in *Students for Fair Admissions v. The United States Naval Academy, et al.*, in the United States District Court for the District of Maryland (No. 1:23-cv-02699), Dkt. 1.

g.  Exhibit G is a copy of the Memorandum in Support of Motion for Preliminary Injunction Students filed by Students for Fair admissions in *Students for Fair Admissions v. The United States Naval Academy, et al.*, in the United States District Court for the District of Maryland (No. 1:23-cv-02699), Dkt. 9-1.

h.  Exhibit H is a webpage from the United States Coast Guard Academy entitled "Mission," last accessed July 23, 2024, and available at https://perma.cc/5XD7-2TYK.

i. Exhibit I is a webpage from the United States Naval Academy entitled "Mission of USNA," last accessed July 23, 2024, and available at United States Naval Academy, Mission of USNA, (accessed July 22, 2024), https://perma.cc/AJK2-R83F.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed July 24, 2024

Brandon Haase (DC Bar No. 1616834)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
brandon@consovoymccarthy.com

*Counsel for Movant*
*Students for Fair Admissions*

# Exhibit A

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### DISTRICT OF MARYLAND
### NORTHERN DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS | ) |
| *Plaintiff* | ) |
| v. | )  Civil Action No.  No. 1:23-cv-2699-RDB |
| | ) |
| THE UNITED STATES NAVAL ACADEMY, et al., | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  United States Coast Guard, Commandant CG-LCL, US Coast Guard HQ Visitor Center, Gate 4, 1790 Ash St. SE, Washington, DC 20032

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material listed in the attached document.

| Place:  Mayflower Hotel<br>1127 Connecticut Ave NW<br>Washington, DC 20036 | Date and Time:<br>July 26, 2024 10:00AM ET |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  June 26, 2024

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | /s/ *Cameron Norris* |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  Students for Fair Admissions , who issues or requests this subpoena, are:

Cameron Norris, Consovoy McCarthy PLLC, 1600 Wilson Blvd, Arlington, VA 22209, (703) 243-9423, cam@consovoymccarthy.com

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

|  |  |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS<br><br>*Plaintiff*,<br><br>v.<br><br>THE UNITED STATES NAVAL ACADEMY,<br>*et al.*,<br><br>*Defendants*. | No. 1:23-cv-2699-RDB |

## <u>SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS</u>

To: The United States Coast Guard, Commandant CG-LCL, US Coast Guard HQ Visitor

Center, Gate 4, 1790 Ash St. SE, Washington, DC 20032.

### PRODUCTION

You, or your representatives, are commanded to produce to Plaintiffs' Counsel, Consovoy

McCarthy PLLC, on or before July 26, 2024 at 10:00 A.M., the documents and electronically

stored information described in the Attachment at the lobby of the Mayflower Hotel, 1127

Connecticut Ave NW, Washington, DC 20036.

Respectfully submitted,

s/Cameron T. Norris

Adam K. Mortara (*pro hac vice*)          Thomas R. McCarthy (*pro hac vice*)
LAWFAIR LLC                               Patrick Strawbridge (*pro hac vice*)
40 Burton Hills Blvd., Ste. 200           J. Michael Connolly (*pro hac vice*)
Nashville, TN 37215                       Cameron T. Norris
(773) 750-7154                            Bryan Weir (*pro hac vice*)
mortara@lawfairllc.com                    James F. Hasson (*pro hac vice*)
                                          CONSOVOY MCCARTHY PLLC
Dated: June 26, 2024                      1600 Wilson Boulevard, Suite 700
                                          Arlington, VA 22209
                                          (703) 243-9423
                                          tom@consovoymccarthy.com
                                          patrick@consovoymccarthy.com
                                          mike@consovoymccarthy.com
                                          cam@consovoymccarthy.com
                                          bryan@consovoymccarthy.com
                                          james@consovoymccarthy.com

                                          *Counsel for Students for Fair Admissions*

2

## CERTIFICATION

I hereby certify that on June 26, 2024, a true copy of the foregoing was emailed to the

following counsel of record, so serving all parties:

JOSHUA GARDNER
Civil Division, Federal Programs Branch
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Tel: (202) 514-4336
joshua.e.gardner@usdoj.gov

*s/Cameron T. Norris*

## ATTACHMENT

The instructions, rules of construction, and definitions set forth in Rules 26, 34, and 45 of the Federal Rules of Civil Procedure are incorporated herein as if fully set forth.

## DEFINITIONS

1.     The "Coast Guard Academy" means the United States Coast Guard Academy and all present and former officers, directors, employees, agents, consultants, representatives, attorneys, subdivisions, and any other persons acting for or on behalf of any of these entities or individuals.

2.     "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

3.     "Complaint" means the Complaint SFFA filed in this action on October 5, 2023.

4.     "Concerning" means referring to, describing, evidencing, or constituting. Requests for "documents concerning" any subject matter include documents concerning communications regarding that subject matter.

5.     "Document" shall mean all items listed in Federal Rule of Civil Procedure 34(a)(1)(A) & (B) and L.R.26.5(c)(2).

6.     "Including" means including but not limited to.

7.     "Plaintiff" or "SFFA" means Students for Fair Admissions, Inc. and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals.

8.     The "present" means the date on which Your responses to these requests are submitted.

4

9.      The term "race" means race, ethnicity, or national origin.

10.      The term "racial or ethnic minorities" means individuals who are African American, Hispanic, Asian American, Pacific Islander, Native American, Native Hawaiian, or Native Alaskan.

11.      "Relate" means consisting of, referring to, reflecting, evidencing, or being in any way legally, logically or factually connecting with the matter referred to or having a tendency to prove or disprove the matter referred to.

12.      "Representative" means any and all agents, servants and employees.

13.      "You" and "Yours" means (a) the Office of The U.S. Coast Guard Headquarters, including the Office of the Commandant, Vice Commandant, and Chief Petty Officer of the United States Coast Guard; and (b) the Board of Visitors, Board of Trustees, Office of the Superintendent, Office of the Assistant Superintendent, Office of the Command Master Chief, and Admissions Office of the United States Coast Guard Academy, and all present and former officers or persons acting for or on behalf of any of these entities or individuals.

## **INSTRUCTIONS**

1.      In responding to these document requests, You shall produce separately all documents in Your possession, custody, or control, including documents in the possession, custody, or control of Your agents and representatives.

2.      Any request concerning a partnership, limited liability company, or corporate entity includes its subsidiaries, affiliates, employees, members, agents, representatives, or attorneys.

3.      Unless stated otherwise, requests concerning applications, admitted students, and enrolled students are limited to the application, admission, and enrollment of freshman and transfer students at the United States Coast Guard Academy.

5

4.      The term "or" is to be read in both the conjunctive and disjunctive and shall serve as a request for documents that would be responsive under a conjunctive reading in addition to all documents that would be responsive to a disjunctive reading.

5.      If You claim any form of privilege or any other objection, whether based on statute, common law, or otherwise as a ground for not producing any requested document, please furnish a list identifying each document for which the privilege or other objection is claimed together with the following information: date, sender, recipient, persons to whom copies were provided together with their job titles, subject matter, basis on which a privilege or other objection is claimed, and the paragraph(s) of this request to which such document responds.  If You claim privilege or any other objection with regard to only part of a document, produce the part as to which there is no objection.

6.      If any document or copy was, but is no longer in Your possession, custody, or subject to Your control, please state and specify in detail for each such document: date, sender, recipient, persons to whom copies were provided together with their job titles, the information contained therein, the date upon which it ceased to exist, the disposition that was made of it and the identity of all persons having knowledge of the contents thereof.

7.      Produce all documents in complete form, as kept in the normal course of business, and identify the file from which each document was taken.

8.      This Request for Production principally seeks documents and information prepared, sent, provided, received, in possession during, or relating to, the time period beginning with January 1, 2008, and continuing through April 1, 2013, or relating to this time period whenever prepared.  Any request seeking documents from this time period refer to the "Relevant Period." Any request seeking documents beyond the Relevant Period refer to documents "from any time."

**DOCUMENTS TO BE PRODUCED**

1.     All documents from the Relevant Period prepared by You concerning any programs, initiatives, strategies, plans, or other organized efforts undertaken for the purpose of (a) increasing the number of racial or ethnic minority students who applied, were admitted, and/or matriculated to the Coast Guard Academy; or (b) increasing the percentage of all applicants, admitted students, and/or matriculants to the Coast Guard Academy who are racial or ethnic minorities, including but not limited to the strategies discussed in the following article: Jennifer McDermott, *Coast Guard Cadet Diversity Surges With Minority Wave*, The Day (July 5, 2010), perma.cc/U4AR-MJQV.

2.     Documents sufficient to show the total number of applicants, admitted students, matriculants, and graduates of each race for the Coast Guard Academy Classes of 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

# Exhibit B

**U.S. Department of
Homeland Security**

**United States
Coast Guard**

Commandant
United States Coast Guard

2703 Martin Luther King Jr. Ave. SE
Stop 7213
Washington, DC 20593-7213
Staff Symbol: CG-LCL
Phone: (202) 372-3740
Fax: (202) 372-8325
Email: Valerie.willis@uscg.mil

5891

JUL 1 0 2024

Consovoy McCarthy PLLC
1600 Wilson Blvd
Suite 700
Arlington, VA 22209

Re: Subpoena Students for Fair Admissions v. The United Sates Naval Academy et al Case No.
    1:23-cv-2699-RDB

Dear Mr. Norris:

On June 26, 2024, the U.S. Coast Guard's Office of Claims and Litigation received your
subpoena dated June 26, 2024, concerning the above-named litigation. Our office previously
received a virtually identical subpoena from you, which the Coast Guard treated as a request
made pursuant to its *Touhy* regulations and was denied on June 18, 2024. In that denial, I
informed you that because your subpoena relates to a matter that is currently in litigation in the
District Court for the District of Maryland, your subpoena would be handled in accordance with
the Department of Homeland Security *Touhy* regulations set forth in 6 C.F.R. § 5 (5.41-4.49).
Despite this, your June 26th subpoena was not accompanied by a cover letter or any other writing
addressing the reasons why your first subpoena was denied. Nor did the June 26th subpoena
comply with the general regulatory requirements for making a *Touhy* request, *e.g.*, setting forth
in writing the "relevance of the official information sought." 6 C.F.R. § 5.45(a). This alone is a
basis for denying your request; nevertheless, I will again treat your subpoena as a *Touhy* request.

Your June 26th subpoena, like the first, broadly seeks documents related to Coast Guard
Academy admissions efforts and strategies related to the period January 1, 2008, and continuing
through April 1, 2013, along with demographic breakdowns for the Coast Guard Academy
Classes of 2008 through 2017. Because your June 26th subpoena contains the same requests as
your June 6th subpoena, save the second category of documents, a change to the definition of
"You", and the deletion of Instruction 9 from the first subpoena, production of any documents or
testimony related to the June 26, 2024, subpoena is denied for the same reasons as before. Please
refer to my June 18, 2024, letter for the full articulation of those reasons.

In addition, consistent with Federal Rule of Civil Procedure 45(d)(2)(B), this letter provides the
Coast Guard's written objections to the subpoena.

When determining whether to comply with a *Touhy* request, the Coast Guard must consider the
factors set forth in 6 C.F.R. § 5.48. After evaluating these factors (particularly § 5.48(a)(1), (3),
(4), (5) and (7)), I deny your request for the following reasons.

Your first request seeks:

5891

Re: Subpoena Students for Fair Admissions v. The United Sates Naval Academy et al Case No. 1:23-cv-2699-RDB

All documents from [January 1, 2008, and continuing through April 1, 2013, or relating to this time period whenever prepared] prepared by You concerning any programs, initiatives, strategies, plans, or other organized efforts undertaken for the purpose of (a) increasing the number of racial or ethnic minority students who applied, were admitted, and/or matriculated to the Coast Guard Academy; or (b) increasing the percentage of all applicants, admitted students, and/or matriculants to the Coast Guard Academy who are racial or ethnic minorities, including but not limited to the strategies discussed in the following article: Jennifer McDermott, *Coast Guard Cadet Diversity Surges With Minority Wave*, The Day (July 5, 2010), perma.cc/U4AR-MJQV.

Your subpoena amended the definition of "You" from consisting of the entire United States Coast Guard, including all present and former secretaries, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals, to consisting of (a) all of Coast Guard Headquarters;[1] and (b) the Board of Visitors, Board of Trustees, Office of the Superintendent, Office of the Assistant Superintendent, Office of the Command Master Chief, and Admissions Office of the United States Coast Guard Academy, and all present and former officers or persons acting for or on behalf of any of these entities or individuals.

This change does not meaningfully limit the definition of "You." Almost 4,000 civilian employees and military members work at Coast Guard Headquarters with the vast majority being military members who change billets every two to four years. Your "Relevant Period" definition covers more than five years so responding to your request as drafted would likely require identifying approximately 10,000 individuals who were assigned to Headquarters more than a decade ago. Undertaking this task would be unduly burdensome given that almost all these individuals would have no connection to the Coast Guard Academy's admissions process. Furthermore, any documents that might be located would almost certainly be duplicative of documents in the possession of the Coast Guard Academy (CGA) Admissions Office, rendering this effort superfluous.

In addition, both the CGA's Board of Visitors and Board of Trustees include individuals who are not members or employees of the Coast Guard. Accordingly, those individuals' documents are not in the possession, custody, or control of the Coast Guard.

Your amended definition of "You" also does not respond to my June 18, 2024, letter articulating the burdens of narrowing this term even to the CGA Admissions Office, which is the office most likely to have responsive records. All those burdens, which your subpoena does not address, remain just as significant now. Please refer to my June 18, 2024, letter for the full articulation of those burdens, which the Coast Guard incorporates by reference here.

---

[1] This includes the Office of the Commandant, Vice Commandant, and Chief Petty Officer of the Coast Guard. There is no Chief Petty Officer of the Coast Guard, but I understand your definition to mean the Master Chief Petty Officer of the Coast Guard.

2

5891

Re: Subpoena Students for Fair Admissions v. The United Sates Naval Academy et al Case No.
1:23-cv-2699-RDB

Your second and final request seeks:

Documents sufficient to show the total number of applicants, admitted students,
matriculants, and graduates of each race for the Coast Guard Academy Classes of 2008,
2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

Your first subpoena dated June 6, 2024, made an identical request, and this request in your
second subpoena remains unchanged notwithstanding the detailed *Touhy* response the Coast
Guard previously identified. Please refer to my June 18, 2024, letter for the full articulation of
that response to this request, which the Coast Guard incorporates by reference here.

Considering that you have now propounded two successive subpoenas on the Coast Guard, any
future Touhy request from you in connection with this litigation must include "a plan of all
reasonably foreseeable demands" for testimony or documents pursuant to 6 C.F.R. § 5.45(b).

Consistent with Rule 45, the Coast Guard also objects to the subpoena. Although Instruction 9
has been deleted, this subpoena continues to include instructions that are identical to the
instructions in the previous subpoena, despite the detailed objections the Coast Guard previously
identified. Please refer to my June 18, 2024, letter for the full articulation of the Coast Guard's
objections to Instructions Nos. 5, 6, and 7, as well as to the time provided for compliance.

For all the reasons stated above and those included in my June 18, 2024, denial, the Coast Guard
again denies your *Touhy* request and objects under Rule 45 to your subpoena. Please note that
the Coast Guard does not, by this letter, waive any other legal objections to your *Touhy* requests.

Sincerely,

BRIAN JUDGE
U.S. Coast Guard
Office of Claims and Litigation
By direction of the Commandant

3

# Exhibit C

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### DISTRICT OF MARYLAND
### NORTHERN DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS | ) |
| *Plaintiff* | ) |
| v. | )     Civil Action No.   No. 1:23-cv-2699-RDB |
| | ) |
| THE UNITED STATES NAVAL ACADEMY, et al., | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:    United States Coast Guard, Commandant CG-LCL, US Coast Guard HQ
Visitor Center, Gate 4, 1790 Ash St. SE, Washington, DC 20032

*(Name of person to whom this subpoena is directed)*

   ✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached document.

| Place:   Consovoy McCarthy PLLC<br>         1600 Wilson Blvd, Suite 700<br>         Arlington, VA 22209 | Date and Time:<br>      July 8, 2024 10:00AM ET |
|---|---|

   ❐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

       The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   June 7, 2024

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | */s/ Cameron T. Norris* |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Students for Fair Admissions                       , who issues or requests this subpoena, are:

Cameron T. Norris, 1600 Wilson Blvd., Ste. 700, Arlington VA, 22209, cam@consovoymccarthy.com, 703-243-9423

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

   **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

|  |  |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS<br><br>*Plaintiff*,<br><br>v.<br><br>THE UNITED STATES NAVAL ACADEMY,<br>*et al.*,<br><br>*Defendants*. | No. 1:23-cv-2699-RDB |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS

To: The United States Coast Guard, Commandant CG-LCL, US Coast Guard HQ Visitor Center, Gate 4, 1790 Ash St. SE, Washington, DC 20032.

### PRODUCTION

You, or your representatives, are commanded to produce on or before July 8, 2024, the documents and electronically stored information described in Attachment A at the law firm of Consovoy McCarthy PLLC, 1600 Wilson Blvd, Ste. 700, Arlington, VA 22209.

Attached hereto as Attachment B is the text of:

    a.   Federal Rule of Civil Procedure ("FRCP") 45(c), relating to the place of compliance;

    b.   FRCP 45(d), relating to your protection as a person subject to a subpoena; and

    c.   FRCP 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Respectfully submitted,

*s/Cameron T. Norris*

Adam K. Mortara (*pro hac vice*)
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

Dated: June 7, 2024

Thomas R. McCarthy (*pro hac vice*)
Patrick Strawbridge (*pro hac vice*)
J. Michael Connolly (*pro hac vice*)
Cameron T. Norris
Bryan Weir (*pro hac vice*)
James F. Hasson (*pro hac vice*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
patrick@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
bryan@consovoymccarthy.com
james@consovoymccarthy.com

*Counsel for Students for Fair Admissions*

2

## <u>CERTIFICATION</u>

I hereby certify that on June 7, 2024, a true copy of the foregoing was emailed to the

following counsel of record, so serving all parties:

JOSHUA GARDNER
Civil Division, Federal Programs Branch
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Tel: (202) 514-4336
joshua.e.gardner@usdoj.gov

<em><u>s/Cameron T. Norris</u></em>

## ATTACHMENT A

The instructions, rules of construction, and definitions set forth in Rules 26, 34, and 45 of the Federal Rules of Civil Procedure are incorporated herein as if fully set forth.

## DEFINITIONS

1.     The "Coast Guard Academy" means the United States Coast Guard Academy and all present and former officers, directors, employees, agents, consultants, representatives, attorneys, subdivisions, and any other persons acting for or on behalf of any of these entities or individuals.

2.     "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

3.     "Complaint" means the Complaint SFFA filed in this action on October 5, 2023.

4.     "Concerning" means referring to, describing, evidencing, or constituting. Requests for "documents concerning" any subject matter include documents concerning communications regarding that subject matter.

5.     "Document" shall mean all items listed in Federal Rule of Civil Procedure 34(a)(1)(A) & (B) and L.R.26.5(c)(2).

6.     "Including" means including but not limited to.

7.     "Plaintiff" or "SFFA" means Students for Fair Admissions, Inc. and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals.

8.     The "present" means the date on which Your responses to these requests are submitted.

9.      The term "race" means race, ethnicity, or national origin.

10.     The term "racial or ethnic minorities" means individuals who are African American, Hispanic, Asian American, Pacific Islander, Native American, Native Hawaiian, or Native Alaskan.

11.     "Relate" means consisting of, referring to, reflecting, evidencing, or being in any way legally, logically or factually connecting with the matter referred to or having a tendency to prove or disprove the matter referred to.

12.     "Representative" means any and all agents, servants and employees.

13.     "You" and "Yours" means the United States Coast Guard and all of its sub-components, to include the United States Coast Guard Academy, and all present and former secretaries, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals.

## INSTRUCTIONS

1.      In responding to these document requests, You shall produce separately all documents in Your possession, custody, or control, including documents in the possession, custody, or control of Your agents and representatives.

2.      Any request concerning a partnership, limited liability company, or corporate entity includes its subsidiaries, affiliates, employees, members, agents, representatives, or attorneys.

3.      Unless stated otherwise, requests concerning applications, admitted students, and enrolled students are limited to the application, admission, and enrollment of freshman and transfer students at the Coast Guard Academy.

4.      The term "or" is to be read in both the conjunctive and disjunctive and shall serve as a request for documents that would be responsive under a conjunctive reading in addition to all documents that would be responsive to a disjunctive reading.

5.      If You claim any form of privilege or any other objection, whether based on statute, common law, or otherwise as a ground for not producing any requested document, please furnish a list identifying each document for which the privilege or other objection is claimed together with the following information: date, sender, recipient, persons to whom copies were provided together with their job titles, subject matter, basis on which a privilege or other objection is claimed, and the paragraph(s) of this request to which such document responds.  If You claim privilege or any other objection with regard to only part of a document, produce the part as to which there is no objection.

6.      If any document or copy was, but is no longer in Your possession, custody, or subject to Your control, please state and specify in detail for each such document: date, sender, recipient, persons to whom copies were provided together with their job titles, the information contained therein, the date upon which it ceased to exist, the disposition that was made of it and the identity of all persons having knowledge of the contents thereof.

7.      Produce all documents in complete form, as kept in the normal course of business, and identify the file from which each document was taken.

8.      This Request for Production principally seeks documents and information prepared, sent, provided, received, in possession during, or relating to, the time period beginning with January 1, 2008, and continuing through April 1, 2013, or relating to this time period whenever prepared.  Any request seeking documents from this time period refer to the "Relevant Period." Any request seeking documents beyond the Relevant Period refer to documents "from any time."

9.      These requests shall be deemed to be continuing so as to require supplemental answers from time to time until the date of trial.

## DOCUMENTS TO BE PRODUCED

1.      All documents from the Relevant Period prepared by You concerning any programs, initiatives, strategies, plans, or other organized efforts undertaken for the purpose of (a) increasing the number of racial or ethnic minority students who applied, were admitted, and/or matriculated to the Coast Guard Academy; or (b) increasing the percentage of all applicants, admitted students, and/or matriculants to the Coast Guard Academy who are racial or ethnic minorities, including but not limited to the strategies discussed in the following article: Jennifer McDermott, *Coast Guard Cadet Diversity Surges With Minority Wave*, The Day (July 5, 2010), perma.cc/U4AR-MJQV.

2.      All communications from the Relevant Period by or among Your employees or agents regarding the programs, initiatives, strategies, plans, or other organized efforts referenced in Paragraph 1 of this section.

3.      Documents sufficient to show the total number of applicants, admitted students, matriculants, and graduates of each race for the Coast Guard Academy Classes of 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

## ATTACHMENT B

### Federal Rule of Civil Procedure 45 (c), (d), (e), and (g)

(c) Place of Compliance.

(1) For a Trial, Hearing, or Deposition. A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

(2) For Other Discovery. A subpoena may command:

(A) production of documents, electronically stored information, or tangible things  at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises at the premises to be inspected.

(d) Protecting a Person Subject to a Subpoena; Enforcement.

(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction--which may include lost earnings and reasonable attorney's fees--on a party or attorney who fails to comply.

(2) Command to Produce Materials or Permit Inspection.

(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises--or to

8

producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) Quashing or Modifying a Subpoena.

(A) When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

9

(ii) ensures that the subpoenaed person will be reasonably compensated.

(e) Duties in Responding to a Subpoena.

(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:

(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.

(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) Claiming Privilege or Protection.

(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that

10

received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(g) Contempt. The court for the district where compliance is required--and also, after a motion is transferred, the issuing court--may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

# Exhibit D

**U.S. Department of**
**Homeland Security**

**United States**
**Coast Guard**

Commandant
United States Coast Guard

2703 Martin Luther King Jr. Ave. SE
Stop 7213
Washington, DC 20593-7213
Staff Symbol: CG-LCL
Phone: (202) 372-3740
Fax: (202) 372-8325
Email: Valerie.willis@uscg.mil

5891

JUN 1 8 2024

Consovoy McCarthy PLLC
1600 Wilson Blvd
Suite 700
Arlington, VA 22209

Re: Subpoena Students for Fair Admissions v. The United Sates Naval Academy et al Case No.
1:23-cv-2699-RDB

Dear Mr. Norris:

On June 10, 2024, the U.S. Coast Guard's Office of Claims and Litigation received your
subpoena dated June 8, 2024, concerning the above-named litigation. Your subpoena broadly
seeks documents related to Coast Guard Academy admissions efforts and strategies related to the
period January 1, 2008, and continuing through April 1, 2013, along with demographic
breakdowns for the Coast Guard Academy Classes of 2008 through 2017.

Your subpoena relates to a matter that is currently in litigation in the District Court for the
District of Maryland. In cases where the Coast Guard is not a party to litigation and receives a
request for information the Coast Guard adheres to the *Touhy* regulations set forth in 6 C.F.R. § 5
(5.41-4.49) and 49 C.F.R. § 9, which are incorporated by reference pursuant to 6 C.F.R. §
5.41(b). Therefore, the Coast Guard will treat your subpoena as a *Touhy* request. In addition,
consistent with Federal Rule of Civil Procedure 45(d)(2)(B), this letter provides the Coast
Guard's written objections to the subpoena.

When determining whether to comply with a *Touhy* request, the Coast Guard must consider the
factors set forth in 6 C.F.R. § 5.48. After evaluating these factors (particularly § 5.48(a)(1), (3),
(4), (5) and (7)), I deny your request for the following reasons.

Your first request seeks:

All documents from [January 1, 2008, and continuing through April 1, 2013, or relating
to this time period whenever prepared] prepared by You concerning any programs,
initiatives, strategies, plans, or other organized efforts undertaken for the purpose of (a)
increasing the number of racial or ethnic minority students who applied, were admitted,
and/or matriculated to the Coast Guard Academy; or (b) increasing the percentage of all
applicants, admitted students, and/or matriculants to the Coast Guard Academy who are
racial or ethnic minorities, including but not limited to the strategies discussed in the
following article: Jennifer McDermott, *Coast Guard Cadet Diversity Surges With
Minority Wave*, The Day (July 5, 2010), perma.cc/U4AR-MJQV.

5891

Re: Subpoena Students for Fair Admissions v. The United Sates Naval Academy et al Case No.
1:23-cv-2699-RDB

As a preliminary matter, because you have defined You to consist of the entire United States
Coast Guard, including all present and former secretaries, officers, employees, agents,
consultants, representatives, attorneys, and any other persons acting for or on behalf of any of
these entities or individuals, your request is overly broad and unduly burdensome. In addition
to implicating privilege and work product protection by the inclusion of attorneys, the Coast
Guard cannot identify all such entities that may have possibly possessed responsive documents
for that time period. I therefore am considering only the burden of searching for and locating
responsive documents in the possession of the Coast Guard Academy (CGA) Admissions Office,
which is the office most likely to have responsive records.

Even narrowing the scope, your request remains unduly burdensome and inappropriate under the
Federal Rules of Civil Procedure, not in the public interest, a failure to conserve the time of CGA
military members and civilian employee resources, and would adversely impact the CGA's
ability to fulfill its mission at a time of strained resources.

First, the documents you seek are all over ten years old and would likely have been destroyed in
compliance with the Coast Guard's records disposition schedule.

Second, searching for documents that might not have been disposed of would be extremely
burdensome, particularly at this time. The CGA Admissions Office is currently understaffed.
The Director of Admissions is retiring, and the Deputy position is currently vacant. Of the
remaining staff, none of the current Admissions Officers were serving in the office during the
period in question. As active-duty military members, they generally serve a three-year
assignment in the Admissions Office and rotate to another position elsewhere in the Coast
Guard. In fact, one will be transferring this summer. In addition, all the Directors of Admissions
for the period you are seeking have retired from the Coast Guard, as well as some of the other
staff. Consequently, the Coast Guard cannot search for these documents by contacting the
officers who would have been responsible for developing and implementing any responsive
policies. At best, we could search shared electronic drives and remotely stored physical files that
are not well organized for retrieving relevant documents. Furthermore, given the remoteness in
time and lack of knowledge of the staff of the particular material, the Coast Guard would be
unable to know if it located a full documentation of the policies and efforts at issue or merely a
non-representative fragment. Consequently, the parties would face significant difficulty
determining what, if any, probative value such evidence would have in this case. This would not
be in the public interest.

Your second request is broader still:

> All communications from [January 1, 2008, and continuing through April 1, 2013, or
> relating to this time period whenever prepared] by or among Your employees or agents
> regarding the programs, initiatives, strategies, plans, or other organized efforts referenced
> in Paragraph 1 of this section.

2

5891

Re: Subpoena Students for Fair Admissions v. The United Sates Naval Academy et al Case No.
1:23-cv-2699-RDB

All my reasons for denying your first request apply here as well. In addition, we could not
electronically search e-mail accounts for personnel who may have been assigned to the
Admissions Office during the period. The Coast Guard manages its e-mail and other electronic
messages under a Capstone Approach approved by the National Archives and Records
Administration. None of the personnel assigned to the Admissions Office are among the few
senior officials whose e-mails are permanent records. As a result, e-mail from the members of
the Admissions Office are temporary records and are disposed of after ten years.

Your third and final request seeks:

> Documents sufficient to show the total number of applicants, admitted students,
> matriculants, and graduates of each race for the Coast Guard Academy Classes of 2008,
> 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

The Coast Guard does have documents responsive to this request, but I am also denying this
request. Based on the news article from The Day describing an increase in diversity for the
incoming Class of 2014 that you reference in your subpoena, my understanding is that you intend
to use this information to show that the racial diversity of an entering military academy class can
be increased using methods other than considering race. This theory ignores several important
distinctions between the CGA and the Naval Academy, other potential causal factors, and would
require more than just the demographic information to be probative and effective. In short, as
explained below, the Coast Guard's admissions practices are not relevant to the Naval
Academy's distinct admissions process.

While the CGA and the Naval Academy are both military institutions, as the article in The Day
notes the admissions process is quite different with the Naval Academy's process heavily based
on a system of congressional nominations while the CGA has no such process. The two services
also have different mission sets—in addition to its military mission the Coast Guard is tasked
with search and rescue, law enforcement, safety and security of the marine transportation system,
and marine environmental response— which attract different applicants. The two academies are
also vastly different in size. A Naval Academy incoming class typically will have over 400
minority midshipmen while an entire CGA incoming class will likely number less than 300. The
small size of a CGA class also means that variations in the composition of a class from one year
to the next may have less statistical significance, particularly when unknown variables may have
changed from year to year. For example, during the period that you have requested, the law
governing CGA admissions changed. The Coast Guard Authorization Act of 2010 removed the
requirement that appointment of cadets be made without regard to the sex, race, color, or
religious beliefs of an applicant. This might have had a greater impact on class composition than
any changes in recruiting strategy making the changes referenced in the article an anomaly.

In sum, the benefit of this information to the parties in this litigation is minimal. The two
admissions processes are too dissimilar to offer a useful comparison. Furthermore, the burden on
the Coast Guard is almost certainly more than it appears. Merely providing the demographic
information requested would likely lead to greater Coast Guard involvement in this case, not end

3

Case 1:24-mc-00092-DLE   Document 1-2   Filed 07/24/24   Page 38 of 105
Case 1:23-cv-02699-RDB   Document 72   Filed 08/13/24   Page 58 of 191

5891

Re: Subpoena Students for Fair Admissions v. The United Sates Naval Academy et al Case No.
1:23-cv-2699-RDB

it. Both parties would desire more information about causal factors that may have caused any
demographic changes in class composition. This would lead to renewed calls to perform the
searches necessary to respond to your first two requests and likely deposition testimony as well.
This is the type of undue burden imposed on a nonparty that has supported quashing subpoenas.
*See Virginia Dep't of Corrections v. Jordan,* 921 F.3d 180, 189 (4th Cir. 2019) (stating that
"courts must give the recipient's nonparty status 'special weight,' leading to an even more
'demanding and sensitive' inquiry than the one governing discovery generally").

Consistent with Rule 45, the Coast Guard also provides the following written objections to the
subpoena. As an initial matter, the Coast Guard incorporates the above discussion regarding
relevance, burden, and proportionality into its Rule 45 objections. In addition, USCG objects to
the following instructions:

- Instruction No. 5 to the extent it requires a privilege log inconsistent with the
  requirements of Federal Rule of Civil Procedure 45(e)(2). Any privilege log USCG
  provides in this case will be made in accordance with Rule 45.

- Instruction No. 6 is inconsistent with the requirements of Federal Rule of Civil Procedure
  45. Any information produced in response to Plaintiff's subpoena will be made
  consistent with the requirements of Rule 45.

- Instruction No. *Ts* requirement that USCG "identify the file from which each document
  was taken" is inconsistent with the requirements of Rule 45. Any production of
  documents will be made consistent with the requirements of Rule 45.

- Instruction No. 9 is inconsistent with the requirements of Rule 45. As a non-party,
  USCG does not have, and will not undertake, a continuing supplementation duty. *See,
  e.g., Alexander v. FBI,* 192 F.R.D. 37, 38 (D.D.C. 2000) ("a non-party served with a
  subpoena duces tecum is under no duty to supplement its discovery responses"); *Munive
  v. Town of Cicero,* 2016 WL 8673072, at *9 (N.D. Ill. Oct. 14, 2016); *Lea/cs v. Target
  Corp.,* 2015 WL 092450, at *2 n.3 (S.D. Ga. July 6, 2015).

- Finally, USCG objects to the time that the subpoena provides for compliance. The
  subpoena requests documentation that would require the agency to undertake a time- and
  labor-intensive process to locate, review, and produce responsive, non-privileged
  documents. The Subpoena seeks voluminous information from January 1, 2008 to April
  1, 2013, as well as "all documents" "relating to this time period whenever prepared," and
  documents additionally pertaining to the classes 2008 through 2017. Accordingly, the
  July 8, 2024 compliance date is not reasonable-particularly given USCG's status as a
  non-party.

4

5891

Re: Subpoena Students for Fair Admissions v. The United Sates Naval Academy et al Case No. 1:23-cv-2699-RDB

For all the reasons stated above, the Coast Guard denies your *Touhy* request and objects under Rule 45 to your subpoena. Please note that the Coast Guard does not, by this letter, waive any other legal objections to your *Touhy* requests.

Sincerely,

BRIAN JUDGE
U.S. Coast Guard
Office of Claims and Litigation
By direction of the Commandant

5

# Exhibit E



# United States Coast Guard Academy
# Class of 2021 Profile

## 2021 Admissions Funnel

| | |
|---|---|
| Online Applications received | 2314 |
| Applications Completed | 2021 |
| Appointed | 433 |
| Enrolled | 294* |

*plus ten International Cadets

## Background information

| | |
|---|---|
| 33% | Female |
| 35% | Underrepresented Minorities (URM) |
| 91% | High School Varsity Letter |
| 77% | Sports Team Captain |
| 22% | Band/Performing Arts Member |
| 41% | Attended AIM Program |
| 35% | Parents with Military Service |
| 18% | Attended CGA Scholars (Prep) |
| 9% | Attended College (1+ Year) |
| 74% | Intended Technical Majors |
| 228 | Average Applicant PFE Score* |

* 300 point scale

## Corps of Cadets*

| | Class of 2020 | | Entire Corps | |
|---|---|---|---|---|
| | # | % | # | % |
| Total** | 294 | - | | - |
| | | | 1036 | |
| Men** | 196 | 67 | 670 | 65 |
| Women** | 98 | 33 | 366 | 35 |
| URM** | 104 | 35 | 339 | 33 |
| Int'l | 10 | - | 28 | - |
| Total w/ Int'l | 304 | - | 1064 | - |

*On 26 June 2017
**Does not include International Cadets

## Academic Data

### High School Class Rank

% of Incoming Class of 2021

(bar chart: Top 5%, Top 10%, Top 25%)

### High School Grade Point Average
(converted to a 4.0 scale*)

% of Incoming Class of 2021

* Some Honors/ Advanced Placement coursework can result in a GPA over 4.0

(bar chart: 4.0 & Above, 3.5 & Above, 3.0 & Above)

### SAT Scores
(25th through 75th Percentiles)

(bar chart: SAT MATH, SAT VERBAL)

Score (on a scale of 200 to 800)

### ACT Scores
(25th through 75th Percentiles)

(bar chart: ACT MATH, ACT READING)

Score (on a scale of 1 to 36)

**For more information contact:**

| | |
|---|---|
| **Director of Admissions** | **1-800-883-USCG** |
| **U.S. Coast Guard Academy** | **www.uscga.edu** |
| **New London, CT 06320** | **Admissions@uscga.edu** |



# UNITED STATES COAST GUARD ACADEMY
# CLASS OF 2022 PROFILE

## 2022 ADMISSIONS FUNNEL

| | |
|---|---|
| Online Applications received | 2274 |
| Applications Completed | 2045 |
| Appointed | 390 |
| Enrolled | 279* |

*plus Eleven International Cadets

## BACKGROUND INFORMATION

| | |
|---|---|
| 41% | Female |
| 36% | Underrepresented Minorities (URM) |
| 85% | High School Varsity Letter |
| 70% | Sports Team Captain |
| 20% | Band/Performing Arts Member |
| 44% | Attended AIM Program |
| 41% | Parents with Military Service |
| 18% | Attended CGA Scholars (Prep) |
| 23% | Attended College (1+ Year) |
| 76% | Intended Technical Majors |
| 225 | Average Applicant PFE Score* |

* 300 point scale

## CORPS OF CADETS*

| | Class of 2022 # | Class of 2022 % | Entire Corps # | Entire Corps % |
|---|---|---|---|---|
| Total** | 279 | - | 1065 | - |
| Men** | 164 | 59 | 679 | 64 |
| Women** | 115 | 41 | 386 | 36 |
| URM** | 100 | 36 | 360 | 34 |
| Int'l | 11 | - | 31 | - |
| Total w/ Int'l | 290 | - | 1096 | - |

*On 2 July 2018
**Does not include International Cadets

## ACADEMIC DATA



**High School Class Rank**
(Top 5%, Top 10%, Top 25%)
% of Incoming Class of 2022

**High School Grade Point Average**
(converted to a 4.0 scale*)
(4.0 & Above, 3.5 & Above, 3.0 & Above)
% of Incoming Class of 2022
* Some Honors/ Advanced Placement coursework can result in a GPA over 4.0

**SAT Scores**
(25th through 75th Percentiles)
SAT MATH
SAT VERBAL
Score (on a scale of 200 to 800)

**ACT Scores**
(25th through 75th Percentiles)
ACT MATH
ACT READING
Score (on a scale of 1 to 36)

**For more information contact:**

**Director of Admissions**  1-800-883-USCG
**U.S. Coast Guard Academy**  www.uscga.edu
**New London, CT 06320**  Admissions@uscga.edu

# Exhibit F

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, | |
| *Plaintiff,* | |
| v. | No. _____ |
| THE UNITED STATES NAVAL ACADEMY, | **VERIFIED COMPLAINT** |
|    121 Blake Road | |
|    Annapolis, Maryland 21402-1300 | |
|    Anne Arundel County | |
| | |
| THE UNITED STATES DEPARTMENT OF DEFENSE, | |
| | |
| LLOYD AUSTIN, in his official capacity as Secretary of Defense, | |
| | |
| CARLOS DEL TORO, in his official capacity as Secretary of the Navy, | |
| | |
| BRUCE LATTA, in his official capacity as Dean of Admissions for the United States Naval Academy, | |
|    121 Blake Road | |
|    Annapolis, Maryland 21402-1300 | |
|    Anne Arundel County | |
| | |
| REAR ADMIRAL FRED KACHER, in his official capacity as Acting Superintendent of the United States Naval Academy. | |
|    121 Blake Road | |
|    Annapolis, Maryland 21402-1300 | |
|    Anne Arundel County | |
| *Defendants.* | |

Plaintiff, Students for Fair Admissions, brings this civil action for declaratory and injunctive relief against Defendants and alleges as follows:

## INTRODUCTION

1.      The United States Naval Academy is one of the crown jewels of the American military. The Academy has trained the future leaders of the Navy since 1845, producing some of our nation's most revered admirals.

2.      The Academy's mission is to "develop midshipmen morally, mentally, and physically and to imbue them with duty, honor, and loyalty" for a career of service in the United States Navy. *Mission of USNA*, perma.cc/XQ6X-2NQT.

3.      For most of its history, the Academy has evaluated midshipmen based on merit and achievement. For good reasons: America's enemies do not fight differently based on the race of the commanding officer opposing them, sailors must follow orders without regard to the skin color of those giving them, and battlefield realities apply equally to all sailors regardless of race, ethnicity, or national origin. To that end, President Truman desegregated the military well before other institutions followed suit. *See* Executive Order 9981 (July 26, 1948) ("[T]here shall be equality of treatment and opportunity for all persons in the armed forces without regard to race, color, religion, or national origin.").

4.      Over the past few decades, however, the Academy has strayed from that approach. Instead of admitting midshipmen solely on leadership potential and objective metrics—the Academy stopped requiring applicants to submit standardized scores three years ago—the Academy focuses on race.

5.      The Academy has no justification for using race-based admissions. Those admissions are unconstitutional for all other public institutions of higher education. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141 (2023) ("*SFFA*"). The Academy is not exempt from the Constitution. *See, e.g.*, *Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976) ("A succession of cases in this circuit and others ha[s] reiterated the proposition that the military is subject to the Bill

of Rights and its constitutional implications."). And its calls for blind judicial deference to the military on questions of racial discrimination are "'gravely wrong,'" both legally and historically. *SFFA*, 143 S. Ct. at 2162 n.3 (discussing the overruling of *Korematsu v. United States*, 323 U.S. 214 (1944)).

6.      Because the Academy discriminates based on race, its admission policy should be declared unlawful and enjoined.

## PARTIES

7.      Plaintiff, Students for Fair Admissions, is a voluntary membership organization formed for the purpose of defending human rights and civil liberties, including the right of individuals to equal protection under the law, through litigation and any other lawful means. SFFA is a nonprofit membership group of tens of thousands of individuals across the country who believe that racial preferences in college admissions, including the academies, are unfair, unnecessary, and unconstitutional. SFFA has members who are ready and able to apply to the United States Naval Academy.

8.      Defendant United States Naval Academy is a military service academy created under federal law and operating under the command and supervision of the Department of the Navy and Department of Defense. The Academy and its leadership are responsible for creating and executing its admissions policies for prospective midshipmen, including the policy at issue here.

9.      Defendant United States Department of Defense is an executive agency headquartered in Washington, D.C., and is responsible for all aspects of the military, including the policy at issue here.

10.     Defendant Lloyd Austin is the Secretary of Defense and is responsible for all aspects of the military, including the policy at issue here. Secretary Austin is sued in his official capacity.

11.     Defendant Carlos Del Toro is the Secretary of the Navy and oversees all Navy operations and policies, including the policy at issue here. Secretary Del Toro is sued in his official capacity.

12. Defendant Rear Admiral Fred Kacher is Acting Superintendent of the United States Naval Academy and responsible for the creation, implementation, and oversight of all Academy policies, including the policy at issue here. Rear Admiral Kacher is sued in his official capacity.

13. Defendant Bruce Latta is Dean of Admissions at the United States Naval Academy and responsible for the creation, implementation, and oversight of all Academy admissions policies, including the policy at issue here. Latta is sued in his official capacity.

## JURISDICTION & VENUE

14. This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §1331.

15. Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred here. *See* 28 U.S.C. §1391(b).

16. The Academy cannot invoke sovereign immunity. Federal courts routinely apply the APA's waiver of sovereign immunity to constitutional claims. *See Standage v. Braithwaite*, 526 F. Supp. 3d 56, 86 (D. Md. 2021) (explaining, in a Fifth Amendment case against the Academy, that "the §702 waiver encompasses qualifying claims arising under non-APA authority"); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011) ("[T]he waiver in §702 is not limited to claims brought pursuant to the review provisions contained in the APA itself." (collecting cases)); *Food Town Stores, Inc. v. EEOC*, 708 F.2d 920, 921-22 (4th Cir. 1983) (similar). The military and its service academies meet the APA's definition of "agency." *Standage*, 526 F. Supp. 3d at 84-89.

## BACKGROUND

### I.  The Academy's Admissions Process

17. Appointment (*i.e.*, "admission") to the Academy involves two stages: First, applicants must pass medical examinations and a physical-fitness test and secure a "nomination" from a member of Congress, the Vice President, the President, or the Secretary of the Navy. Applicants who satisfy the requirements for the first step are considered "qualified" for admission. Second, after securing a

nomination, applicants must be accepted by the academy's admissions office. The Academy's racial preferences kick in at the second stage, once applicants have received a qualifying nomination.

18.     Admission to the Academy is highly selective: fewer than ten percent of applicants are given the honor of enrolling. *See, e.g.*, United States Naval Academy, *Class Portrait: Class of 2027*, perma.cc/2M9H-44RD.

19.     The Academy typically enrolls slightly fewer than 1,200 midshipmen in each class. *See, e.g.*, *id.*; United States Naval Academy Admissions, *Class of 2026 Snapshot*, perma.cc/8PAR-PJUU.

20.     ***Congressional Nominations.*** Representatives and senators have statutory authority to nominate their constituents for admission to the Academy. *See* 10 U.S.C. §8454(a). Legislators have unfettered discretion in how they allocate those nominations. However, each senator and congressman can have no more than five nominees attending the Academy at any given time. *See* §8454(a)(3)-(4).

21.     Members can nominate up to ten of their constituents for consideration for each vacancy. §8454(a). "Typically, one appointment per DoD academy per Senator and Representative is available annually." Congressional Research Service, *Report RL33213: Congressional Nominations to U.S. Service Academies: An Overview and Resources for Outreach and Management*, (April 21, 2016), perma.cc/29FK-LBUG; *see also* Senator Mark Warner, *Academy Admissions*, perma.cc/787E-Y22V ("Most members of Congress" stagger their vacancies to ensure that they have "one open vacancy" at the Academy each year.).

22.     Members of Congress have the option to either nominate all ten applicants equally or to nominate a "principal," or preferred, applicant, and nine ranked alternates. *See* §8454(a).

23.     Congressional nominees comprise the vast majority of the Academy applicant pool. *See, e.g.*, *Class of 2026 Snapshot*.

24.     ***Vice Presidential Nominations.*** Unlike members of Congress, who are authorized to nominate applicants from their home districts, the Vice President can nominate any U.S. citizen for admission to the Academy. *See* §8454(a)(2). Like members of Congress, the Vice President has unfettered discretion in how she allocates her nominations, but she cannot have more than five nominees enrolled at the Academy at any one time. *Id.*

25.     Accordingly, Vice Presidential nominees "normally" fill only "one or two" seats in each incoming class. *Service Academy Nomination Process*, The White House, perma.cc/A7Q6-FTSP.

26.     ***Presidential Nominations and Special Nominations.*** Presidential nominations occur automatically. They are awarded to the children of servicemembers who have either served at least eight consecutive years on active duty; served in the military reserves for the equivalent of eight active-duty years; or formally retired from military service and meet the requirements for retirement pay benefits. *See* §8454(b)(1)(A)-(D). One hundred seats are reserved for presidential nominees for each incoming class at the Academy. *See* §8454(b)(1).

27.     A total of sixty-five additional seats across all four classes are reserved for applicants who receive "special nominations" because their parents were killed in action or received a 100% disability rating from the Department of Veterans Affairs due to service-connected injuries. *See* §8454(a)(1). Like presidential nominations, special nominations occur automatically.

28.     If qualified applicants secure a presidential or special nomination in addition to a congressional nomination and they are not selected from the congressional nomination applicant pool, they can still be admitted if the admissions committee selects them from among the applicant pools for the other categories. The Academy does not publicly report the number of applicants who apply under these circumstances each year.

29.     ***Secretary of the Navy Nominations.*** The Secretary of the Navy may nominate up to 85 active-duty sailors and Marines and 85 Navy and Marine Corps reservists for admission each year.

*See* §8454(b)(2)-(3). This category includes nominations for applicants who unsuccessfully applied to the Academy in the previous admissions cycle but were given the chance to attend the United States Naval Academy Preparatory School.[1] Of the 59 Secretary nominees who received appointments and enrolled in the class of 2027, only 3 were "directly from the fleet" (*i.e.*, sailors or Marines serving with active units). *Class of 2027: Class Profile.*

30.    ***ROTC Nominations.*** Each Navy and Marine Corps ROTC or Junior ROTC detachment can nominate up to three of its members for admission each year. *See* United States Naval Academy, *Naval/Marine Corps Reserve Officer Training Corps*, perma.cc/2KG8-V372. Junior ROTC detachments that are designated "Honor Units with Distinction" can nominate up to six of their members per year. *Id.* Army and Air Force Junior ROTC detachments that are designated "Honor Units with Distinction" can each nominate up to three members each year. *Id.* A total of twenty seats in each class are available for ROTC and Junior ROTC nominees. *See* §8454(b)(4).

## II.    The Academy's Racial Preferences in Admissions Decisions

31.    The Academy openly admits that "race" is a "factor" that it considers when making admissions decisions. Lois Elfman, *Military Academies Retain Affirmative Action in Admissions*, Diverse Issues in Higher Education, (Sept. 5, 2023), bit.ly/3PARu9t (quoting Academy spokesperson). The Academy disclaims racial quotas and characterizes its use of race as "holistic," like Harvard's and UNC's admissions programs in *SFFA. See, e.g.*, Br. of United States as *Amicus Curiae* in Support of Resp'ts 15, *Students for Fair Admissions v. President and Fellows of Harvard College*, 2023 WL 4239254, No. 20-1199 (U.S. June 29, 2023) ("SFFA U.S. Brief") (comparing the academies' use of race to "colleges and universities across the country"); *id.* at 24 (similar).

---

[1] The Navy considers midshipmen at the Prep School to be on active duty status. *See* United States Naval Academy Preparatory School, *Academic Year 2023-2024*, at 4, perma.cc/9NSH-DG6S.

32.     Terminology aside, the Academy's focus on race plays out across all areas of its admissions policy. Much like Harvard and UNC, *see SFFA*, 143 S. Ct. at 2156 n.1, the Academy's use of racial preferences "gives minorities an edge on admissions," Adam Clymer, *Service Academies Defend Their Use of Race in Admissions Policies*, THE NEW YORK TIMES, (Jan. 28, 2003), perma.cc/7HNU-QBGD. For instance, a diversity task force created by the Chief of Naval Operations in July 2020 and chaired by a two-star admiral recently recommended that the Navy "deemphasiz[e] the use of standardized academic tests" and prioritize subjective factors instead. Task Force One Navy, *Final Report* 20, (Jan. 26, 2021), perma.cc/Q6GK-L8JV. The purpose of this radical shift was to "improv[e] … minority representation" and ensure the officer corps "reflect[s] relevant national demographic percentages" because "recruiting efforts have not achieved equitable demographic representation of officers." *Id.* at 20, 37.

33.     In a 2010 *New York Times* op-ed discussing the Academy's racial preferences, an Academy professor stated: "I can confirm from the years I spent on the admissions board in 2002 and '03 and from my conversations with more recent board members, [that] if an applicant identifies himself or herself as non-white, the bar for qualification immediately drops." Bruce Fleming, *The Academies' March Towards Mediocrity*, THE NEW YORK TIMES, (May 20, 2010), nyti.ms/468PqwB. Notably, the "non-white" category described by Professor Fleming does not include Asian applicants. *See* Bruce Fleming, *Not Affirmative, Sir*, THE WASHINGTON POST, (January 16, 2003), perma.cc/C5SP-NGYE ("Members of three racial groups receive preference: African Americans, Hispanics, and Native Americans.").

34.     The magnitude of those racial preferences is stunning. According to Professor Fleming, "[i]f a 'majority' student scored 600 or more on each part of the SAT I test, math and verbal, we put a check mark and went on to consider other aspects of the application. We did so in the case of a 'minority' student if the scores were in the neighborhood of 550." *Id.* Professor Fleming also

recounted an episode where the board of admissions "debated whether students of Brazilian origin 'counted' as Hispanics" and should be eligible for preferred consideration. *Id.*

35.     The demographics of the Academy's year-over-year enrollment reflect efforts to racially balance the incoming classes with surgical precision. Take the racial demographics of the Academy's classes of 2025 and 2026, for instance. For the class of 2025, the Academy enrolled 1,183 midshipmen, 672 of whom were white, 79 of whom were African American, and 115 of whom were Asian. *See Class of 2025: Snapshot*, perma.cc/NY52-FFBK. For the class of 2026, it enrolled 1,184 midshipmen, 676 of whom were white, 75 of whom were African American, and 117 of whom were Asian. *See Class of 2026 Snapshot*.

36.     The Academy goes to great lengths to achieve this precise balance: A U.S. General Accounting Office report to the Senate Armed Services Committee noted that "the Academy makes offers of appointment to the majority of qualified minorities to achieve the Chief of Naval Operations' commissioning goals for minorities." GAO/NSIAD Report 93-54, *Naval Academy: Gender and Racial Disparities* 38 (1993), perma.cc/6MUR-62V5.

37.     The Academy's racial preferences are determinative for hundreds of applicants each year. Congressional nominees comprise roughly 75% of each incoming class, and in most cases, up to ten qualified applicants compete against one another for the single slot afforded to their Senator or Representative each year. Because skin color can be—and often is—a decisive factor for successful applicants who are chosen from those congressional nominee pools, it is equally dispositive for the other qualified nominees who are turned away. Put differently, because race is a "positive" factor for some Academy applicants, it is necessarily a "negative" factor for others. *SFFA*, 143 S. Ct. at 2169.

## III.     The Academy's Flawed Justifications for Its Race-Based Admissions Practices

38.     Over the years, the Academy has offered several justifications for its use of race in admissions. In 2003, while the Supreme Court was considering Michigan's use of racial preferences in

*Grutter v. Bollinger*, 539 U.S. 306 (2003), the Academy's dean of admissions told the *New York Times*
that its racial preferences were necessary because the Academy needs "a brigade [student body] that
reflects our country." Clymer, *supra*. Racial preferences were also necessary, he said, because the Navy's
officer corps needed to "reflect" the racial demographics "of the services of which we are a part." *Id.*

39.     Although the Solicitor General declined to defend Michigan's use of racial preferences
in *Grutter*, a collection of retired former military officers submitted an amicus brief arguing that racial
preferences in higher education served a national security interest. *See* Brief of Julius W. Becton, Jr., et
al. as Amici Curiae Supporting Respondents at 6, *Grutter v. Bollinger* 539 U.S. 306 (2003) (No. 02-241)
("Becton Brief"). Unlike the Academy's then-dean of admissions, the *amici* did not argue that the racial
makeup of the Navy's officer corps needed to reflect society at large. They argued that racial prefer-
ences were necessary because the racial composition of the military's officer corps needed to reflect
the racial composition of its enlisted corps, and that proportional representation could only be
achieved through racial preferences. *Id.*

40.     *Grutter* accepted the Becton brief's assertions, without any evidence or adversarial test-
ing. It repeated the brief's assertion that, "to fulfill its mission, the military 'must be selective in ad-
missions for training and education for the officer corps, *and* it must train and educate a highly quali-
fied, racially diverse officer corps in a racially diverse educational setting.'" 539 U.S. at 331 (cleaned
up). And it repeated the Becton brief's conclusory argument that "[a]t present, 'the military cannot
achieve an officer corps that is both highly qualified and racially diverse unless the service academies
and the ROTC use limited race-conscious … admissions policies.'" *Id.* (cleaned up).

41.     After *Grutter*, the Academy has leaned heavily on the justification put forth in the Bec-
ton brief: that the military "has a powerful interest in developing an officer corps that is prepared to
lead a diverse force and that shares the diversity of the enlisted ranks." Br. of United States as *Amicus
Curiae* in Support of Resp'ts 12, *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198 (No. 14-981) (2016)

("Fisher U.S. Brief"). A report of the Military Diversity Leadership Commission stressed that "[t]he military should mirror the demographic composition of the population it serves and that senior leaders should mirror the demographic composition of the troops they lead." Military Diversity Leadership Commission, *From Representation to Inclusion* 42, (Mar. 15, 2011), perma.cc/VR65-UFNE ("MDLC Report").

42.     Under this formulation, statistical parity with the racial makeup of the general population is not enough. Now, racial preferences are supposedly necessary to achieve racial balance between the enlisted corps—an all-volunteer force—and the officer corps. *See, e.g.*, SFFA U.S. Brief at 15 ("The military has not yet achieved its goal of building an officer corps that reflects the 'racial and ethnic composition' of the service members officers lead" because "White service members are 53% of the force but 73% of officers."); *see also id.* (listing similar statistical comparisons for black and Hispanic officers and enlisted service members).

43.     This goal is tantamount to a declaration that the Academy will *never* stop using race in admissions, since the percentage of sailors and Marines from certain racial categories who voluntarily enlist in the Navy will dictate the scope of the Academy's racial preferences. Indeed, the Defense Department acknowledges that the "demographic makeup" of society and the enlisted force is "continually changing" and states that the military "must change" alongside it "to maintain and sustain its future forces." Department of Defense, *DoD Diversity Strategic Plan 2012-2017* 3, perma.cc/TSN2-T62L.

44.     Even if the racial demographics of the officer corps do eventually mirror those of the enlisted corps, the continued use of race will be necessary to preserve that statistical parity going forward. In short, the Academy's use of race "lack[s] a 'logical end point.'" *SFFA*, 143 S. Ct. at 2170.

45.     As to *how* fostering diversity at the Academy through racial preferences is essential to fulfilling the Navy's mission to defend the nation, the Academy offers a scattershot of reasons devoid

of evidentiary support and naked appeals to deference. They can be broadly summarized as two propositions: (1) that racial preferences enhance the military's internal functioning; and (2) that racial preferences enhance the military's functional capacity by fostering internal confidence within the ranks and by bolstering its external legitimacy which, in turn, increases societal trust and recruitment efforts.

46. Before the Supreme Court's decision in *SFFA*, the Academy also invoked the "educational benefits of diversity," like Harvard and UNC did in *SFFA*, as a third justification. Specifically, the Academy submitted that the racial "diversity" achieved through race-based admissions "reduc[ed] a sense of isolation and alienation" among ethnic minorities and "encourage[d] greater participation by minority students in the classroom." *Students for Fair Admissions v. President and Fellows of Harvard College*, No. 21-707, Tr. 145:1-146:11, (Oct. 31, 2022). Now that the Supreme Court has refused to allow colleges to justify their actions by reference to those undefined—and undefinable—"educational benefits," the Academy is left with its first two justifications.

### A. Internal Functioning and Military Readiness

47. The Academy posits several ways that racial preferences are critical to having a well-functioning Navy in a pluralistic society. All of them view sailors and Marines primarily as members of racial groups, rather than as individuals, and are grounded in the assumption that minority service members all think and feel the same way.

48. First, the Academy argues that statistical parity between the racial demographics of officers and enlisted sailors and Marines is necessary to preserve unit cohesion and ward off racial strife within units. In support of that assertion, it highlights anecdotal incidents of racial tension among enlisted servicemembers during the Vietnam War, most of which occurred in a brief period from 1969 to 1972. That talking point, raised for the first time by the Becton brief in *Grutter* and repeated in virtually every government defense of racial preferences since, cherry-picks a few unfortunate

incidents and extrapolates them to the American military in general. At best, it is a textbook example of conflating correlation with causation.

49.     In fact, "racial animosity had been negligible within the U.S. armed forces" prior to 1967, and it has been virtually nonexistent post-Vietnam. James Maycock, *War Within War*, The Guardian (Sept. 14, 2001), perma.cc/PX5M-ELMJ. During the Korean War—just a few years after President Truman ordered desegregation in the military—"practical measures outweighed racial beliefs," and integration "failed to produce the violence or poor morale the military brass expected." Walt Napier, *A Short History of Integration in the U.S. Armed Forces*, United States Air Force (July 1, 2021), perma.cc/PYT6-SDXA. The "military brass" of that era were pro-segregation, and their predictions of "violence" and "poor morale" did not bear out. *Id.*

50.     The brief period of racial unrest that the Academy retells over and over was not produced by colorblind policies. It was a tragic byproduct of broader factors: "a changing social environment, a controversial war, and new conscription strategies" that allowed wealthier Americans to escape the draft through college deferments while sending disproportionate numbers of low-income draftees to frontline combat units based on their educational backgrounds. Br. of Veterans for Fairness and Merit as *Amicus Curiae* in Support of Pet'r at 7, *Students for Fair Admissions v. President and Fellows of Harvard College*, -- S. Ct. --, 2023 WL 4239254, No. 20-1199 (U.S. June 29, 2023) ("VFM Brief"). In short, the incidents that the Academy cites to justify open-ended racial preferences were the product of a "perfect storm for racial conflict" that has not existed for the past half century. *Id.*

51.     Moreover, the underlying assumption of the Academy's argument is that sailors view their peers and superiors foremost in terms of race, rather than in terms of their ability or character traits like loyalty, devotion, and selflessness. Put differently, it assumes that sailors apply the same racial stereotypes to one another that the Academy applies to them. There is no evidence to suggest that's the case, and plenty of evidence suggests that it isn't. *See generally id.*

52.     The Academy makes a related argument that officers will "often fai[l] to perceive racial tensions among enlisted personnel" if the officer corps does not have the same levels of racial and ethnic diversity as the enlisted ranks. Fisher US Brief 11. That argument relies on the same misguided assumptions.

53.     Second, the Academy claims that statistical parity between the racial demographics of the officer corps and those of the enlisted corps is necessary to "foster trust between the enlisted corps and its leaders." SFFA U.S. Brief 15; *see also* Fisher U.S. Brief 12 ("military leaders have concluded that an officer corps that shares the diversity of the enlisted ranks improves performance by 'facilitating greater confidence' in leadership"); *Students for Fair Admissions*, No. 21-707, Tr. 145:1-146:11 (discussing military academies, Solicitor General asserts that benefits of increased racial diversity include "cross-racial understanding," which can "lead[] to positive developments with cognitive development.").

54.     The Academy has never provided evidence to support that assertion, and indeed, all available evidence says otherwise. This argument relies on crude and infantilizing stereotypes about the men and women who volunteer to serve in our armed forces, and it defies common sense. It assumes that black sailors will be more likely to trust a black officer or a chain of command that includes black officers, that Hispanic Marines are more likely to trust Hispanic officers, and so forth— because of their skin color, not their trustworthiness. And it completely ignores reams of evidence showing that trust between sailors at sea or Marines on the battlefield is formed through performance, and that servicemembers in war zones are more concerned with their leaders' competency than with their skin color. *See, e.g.*, VFM Brief 18 ("[T]he immutable human element of warfare requires a color-blind warrior ethos for trust, unit cohesion, and combat effectiveness.").

55.     Third, the Academy broadly claims that the diversity produced by racial preferences makes Navy units "more effective at accomplishing their missions." SFFA U.S. Brief 15. It does not

define what it means to be racially "diverse," nor does it provide concrete evidence that military units that choose their members based on race are more successful on the battlefield than units who select their members based on objective measures of tactical competency, regardless of skin color.

56.     In *Fisher*, the Solicitor General extrapolated on this theme and claimed that units with greater racial diversity are more capable of interacting with and understanding partner forces from international allies. *See* Fisher U.S. Brief 12 ("Maintaining a diverse leadership corps also ensures that the military contains the cultural and racial identities necessary to better understand our partner forces."). The government did not elaborate on why it thinks that's true. Apparently, it thought it self-evident that individuals who share the same skin color also share a common "understand[ing]."

### B.      External Legitimacy and Societal Trust

57.     The Academy maintains that having an officer corps that does not reflect the racial makeup of the general population and the enlisted ranks will "undermine the military's legitimacy by fueling 'popular perceptions of racial/ethnic minorities serving as 'cannon fodder' for white military leaders." Fisher U.S. Brief 12 (quoting MDLC Report at 15); *see also* SFFA U.S. Brief 19 ("[G]overnment agencies that lack diversity risk losing legitimacy in the eyes of a diverse nation.").

58.     Again, this conclusory statement assumes that the American people assess the "legitimacy" and trustworthiness of an institution based on its racial makeup. That notion is both un-American and devoid of any evidentiary support. To the contrary, a significantly higher percentage of Americans expressed confidence in the U.S. military three decades ago than they do today. *See* Gallup, *Confidence in Institutions,* perma.cc/DEH2-M92Y. And half of Americans now think that military leaders' over-emphasis on social-justice issues and political correctness is "undermining military effectiveness." Ronald Reagan Institute, *Reagan National Defense Survey*, (Nov. 2022), perma.cc/32B9-RZTZ.

59.     Finally, the Academy argues that the Navy will lose "societal trust" if racial metrics between the officer and enlisted corps (and between the officer corps and society at large) are not

equivalent. The Academy further argues that this speculative loss of societal trust could, in turn, harm recruiting efforts. But today, at the apex of the Academy's use of racial preferences, the Navy is facing a recruiting crisis that is unprecedented in the modern, all-volunteer era. Navy recruiters are working six days a week, but the Navy still cannot meet recruiting goals. *See* Geoff Ziezulewicz, *Navy Forcing Its Recruiters to Work Six Days a Week*, Navy Times (June 29, 2023), perma.cc/P6HP-YBW2.

60.     If anything, the Academy's assertions about recruiting and retention are backwards. In-depth surveys and statistical studies of the military's personnel crisis—*i.e.,* the rigorous analyses that the Academy has failed to offer—show that the military's emphasis on non-merit factors in admissions and promotions decisions is a leading cause of junior officer attrition. "According to 9 out of 10 respondents, more officers would stay if the military was more of a meritocracy." Tim Kaine, *Why Our Best Officers Are Leaving*, The Atlantic, (February 2011), perma.cc/Y6AV-XZUC. And 71% of active-duty officers believe the military would retain more talent if opportunities were based solely on merit. Sayce Falk & Sasha Rogers, *Junior Military Officer Retention: Challenges and Opportunities*, Kennedy Sch. of Gov't, Harvard Univ. (2011), perma.cc/JW2V-Y24Y. To the extent that the Academy's mission is to solidify the public's trust, its race-based admissions policy shoots itself in the foot—especially since 70% of Americans agree that universities should not "be allowed" to "consider race in admissions." Anthony Salvanto, *CBS News Poll Finds Most Americans Say Colleges Shouldn't Factor Race Into Admissions*, CBSNews.Com, (June 21, 2023), perma.cc/PW5D-ZUAT.

61.     Flawed as they are, none of the Academy's justifications for racial preferences are new. In fact, nearly all its nebulous arguments for race-based admissions were made sixty-five years ago by opponents of desegregation. The military segregationists' arguments—like the arguments offered by the Academy—were long on racial stereotypes but short on actual evidence. Like the Academy, seg-regation proponents argued that a colorblind military would "create difficulties 'which would be re-flected in morale and military efficiency.'" President's Committee on Equality of Treatment and

Opportunity in the Armed Services, *Freedom to Serve* 12, (May 22, 1950), perma.cc/C2F5-6SCD. Like the Academy, they claimed that colorblind policies would degrade the military's ability to accomplish its national-defense mission. *Id.* at 49-50. And, like the Academy, they warned that a colorblind approach would be inconsistent with "civilian sentiment" and pose external risks to the institution. *Id.*

62.     Truman's commission rejected all those arguments as unsupported and ideologically driven conjecture. In the process, the commission unequivocally affirmed that servicemembers should be treated as individuals in all circumstances, and that drawing inferences from a person's membership in a particular racial or ethnic group was immoral and illogical. "To put racial restrictions on job opportunities seemed to the Committee to ignore completely the essential factor of individual differences." *Id.* at 13.

**IV.     *SFFA v. Harvard***

63.     The Supreme Court held in *SFFA* that racial preferences in college admissions violate the Equal Protection Clause of the Fourteenth Amendment.

64.     Harvard and UNC both admitted to using race in admissions, but both institutions strenuously insisted that they did so in a "holistic" manner that treated race only as an optional "tip." Both institutions defended their consideration of race as necessary to further a compelling interest in "the educational benefits of diversity."

65.     The Court held both policies unconstitutional for several reasons.

66.     The Court deemed the universities' reasons for using race impermissibly vague and unmeasurable. Harvard claimed that its consideration of race was crucial for "(1) training future leaders in the public and private sectors; (2) preparing graduates to 'adapt to an increasingly pluralistic society'; (3) 'better educating its students through diversity'; and (4) 'producing new knowledge stemming from diverse outlooks.'" *SFFA*, 143 S. Ct. at 2166. UNC made similar arguments but added a fifth

justification to the list: "enhancing appreciation, respect, and empathy, cross-racial understanding, and breaking down stereotypes." *Id.*

67.    The Court held that those goals could not justify race-based admissions because they could not "be subject to meaningful review" and were thus "[in]sufficiently coherent for purposes of strict scrutiny." *Id.* Federal courts had no way of measuring the Universities' self-assessed progress toward achieving those goals. *Id.* Moreover, "[e]ven if [those] goals could somehow be measured," there was no way for courts "to know when they have been reached, and when the perilous remedy of racial preferences may cease." *Id.*

68.    The universities also "measure[d] the racial composition of their classes using the following categories," which come from the federal government: "(1) Asian; (2) Native Hawaiian or Pacific Islander; (3) Hispanic; (4) White; (5) African-American; and (6) Native American." *Id.* at 2167. But those categories are "imprecise," "arbitrary," "undefined," "opaque," and both over- and "under-inclusive." *Id.*

69.    "The Universities' main response to these criticisms [was], essentially, 'trust us.'" *Id.* at 2168. Accepting that proposition, however, would have meant forgoing any meaningful judicial review. And although the Court recognized that some "degree of deference" applies to universities' educational decisions, "deference does not imply abandonment or abdication of judicial review." *Id.*

70.    Both universities strenuously protested that, although they used race as a "positive" for certain applicants, "an individual's race is never a negative factor in admissions." *Id.* The Court found that argument "hard to take seriously." *Id.* Because "[c]ollege admissions are zero-sum," a "benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* Thus, by using race as a "positive" for some applicants, Harvard and UNC necessarily used it as a negative attribute for others.

71.     Both universities assumed that increasing the percentage of racial minorities on cam-
pus would necessarily increase other students' exposure to different ideas and perspectives. In blunter
terms, their policies assumed that all racial minorities had certain views and life experiences solely
because of the color of their skin. But "[o]ne of the principal reasons race is treated as a forbidden
classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of
by his or her own merits and essential qualities." *Id.* at 2170.

72.     Neither Harvard's nor UNC's use of race had a logical end point. *See id.* at 2170-71.
Neither institution could identify when they would stop using race or under what circumstances.

73.     For example, UNC defined its racial "diversity" goals in relation to the racial de-
mographics of the general population. *See id.* at 2171-72 ("The University frames the challenge it faces
as 'the admission and enrollment of underrepresented minorities,' a metric that turns solely on whether
a group's 'percentage enrollment within the undergraduate student body is lower than their percentage
within the general population in North Carolina.'" (cleaned up)). As the Academy does, UNC claimed
that it "ha[d] not yet fully achieved its diversity-related educational goals" because it still needed to
"obtain closer to proportional representation." *Id.* at 2172.

74.     The Court rejected that metric out of hand. It reiterated that "'outright racial balancing'
is 'patently unconstitutional'" because "at the heart of the Constitution's guarantee of equal protection
lies the simple command that the Government must treat citizens as individuals, not as simply com-
ponents of a racial, religious, sexual or national class." *Id.* (cleaned up). UNC's use of race to obtain
"proportional representation" in incoming classes was further unconstitutional, the Court held, be-
cause it "'effectively assur[ed] that race will always be relevant and that the ultimate goal of eliminating'
race as a criterion 'will never be achieved.'" *Id.* (cleaned up).

75.     In sum, the Court held that both Universities failed strict scrutiny and their use of race
was therefore unconstitutional because their "programs lack sufficiently focused and measurable

objectives warranting the use of race, unavoidably employ race in a negative manner, involve racial stereotyping, and lack meaningful end points." *Id.* at 2175.

76.     In a footnote to the opinion, the Court declined to analyze the use of race by the military academies because "none of the courts below addressed the propriety of race-based admissions systems in that context." *Id.* at 2166 n.4. But *SFFA*'s reasoning makes it perfectly clear that the Academy's use of race in admissions is unconstitutional. *Compare United States v. Windsor*, 570 U.S. 744, 778 (2013) (Roberts, C.J., dissenting) (noting that the majority opinion, which declared unconstitutional a federal definition of marriage, left open the constitutionality of "state marriage definitions")*, with Obergefell v. Hodges*, 576 U.S. 644, 662-63 (2015) (explaining that virtually every court of appeals concluded that the logic of *Windsor* also deemed the state definitions unconstitutional).

77.     The Academy has not changed its race-based admissions in light of *SFFA*. Officials at the academies told the press that "they would continue to use race as a factor while awaiting guidance from the Department of Defense"—guidance that has not been issued. Moreover, then-Superintendent Sean Buck reiterated to the House Armed Service Committee in July that the Academy will continue to consider applicants' race going forward.

## V.     Plaintiff and This Litigation

78.     SFFA has members who are ready and able to apply to the United States Naval Academy, including Members A and B.

79.     Member A is white, a U.S. citizen, and under the age of 23. He has long wanted to attend the United States Naval Academy.

80.     Member A applied for admission to the Naval Academy for the class of 2026 and secured a nomination from a Member of Congress to attend. The Academy rejected his application.

81.     Member A is currently in college, medically qualified, under the age of 23, and lives in the southeast. He is ready and able to apply to the Naval Academy again were a court to order it to cease the use of race and ethnicity as a factor in admissions.

82.     Member A joined Students for Fair Admissions because he supports its mission and this lawsuit. Member A wishes to remain pseudonymous, however, because he fears reprisal from the Academy and others if his participation in this litigation becomes public.

83.     Member B is Asian, a U.S. citizen, and under the age of 23. The United States Naval Academy has been his dream school since he was in the sixth grade.

84.     Member B applied for admission to the Naval Academy for the class of 2027 and secured a nomination from a Member of Congress to attend. The Naval Academy rejected his application.

85.     Member B is currently in college, medically qualified, under the age of 23, and lives in the Western United States. He is ready and able to apply to the Naval Academy again were a court to order it to cease the use of race and ethnicity as a factor in admissions.

86.     Member B joined Students for Fair Admissions because he supports its mission and this lawsuit. Like Member A, he wishes to remain pseudonymous, because he fears reprisal from the Academy and others if his participation in this litigation becomes public.

87.     If the Academy is allowed to continue making admissions decisions based on applicants' race, SFFA's members—including Members A and B, and other similarly-situated applicants—will suffer irreparable harm because they will be denied the opportunity to compete for an Academy appointment on equal grounds.

## CLAIM FOR RELIEF

### COUNT
### Violation of the Fifth Amendment

88.     Plaintiff incorporates and restates all its prior allegations here.

89.     "It is undisputed that 'service academies are subject to the Fifth Amendment.'" *Lebrun v. England*, 212 F. Supp. 2d 5, 16 (D.D.C. 2002); *see also Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976) ("A succession of cases in this circuit and others ha[s] reiterated the proposition that the military is subject to the Bill of Rights and its constitutional implications."); *Frontiero v. Richardson*, 411 U.S. 677, 688 (1973) (similar).

90.     The Fifth Amendment contains an equal-protection principle that binds the federal government and is no less strict than the Equal Protection Clause that binds the States. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224 (1995). "[A]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Id.* That principle stems not only from the Fifth Amendment, but also from the Fourteenth Amendment's guarantee of equal citizenship, the Constitution's limits on the scope of federal power, and bedrock principles of equality laid out in the Declaration of Independence.

91.      Because the Academy's admissions policy relies on racial classifications, it must satisfy strict scrutiny. *Id.* In other words, it must employ measures that are "narrowly tailored" to "further compelling governmental interests." *SFFA*, 143 S. Ct. at 2162. The Academy's overt racial preferences cannot clear this bar.

92.     The Supreme Court has recognized compelling interests in the use of race in only the narrowest of circumstances, where those preferences are explicitly designed to remedy recent acts of discrimination and to make the *individual subjects* of that discrimination whole. *See id.* The Academy's admissions policy does not meet this standard, and the Academy makes no pretenses that it does.

93.     The Academy asserts compelling interests in facilitating organizational cohesion, forming culturally aware leaders, ensuring societal "legitimacy" (circularly defined by the Academy), and safeguarding the public trust. If those themes sound familiar, it's because the Supreme Court rejected

all of them in *SFFA*. *See* 143 S. Ct. at 2166-67 (rejecting Defendants' claim to have compelling interests in "training future leaders"; "preparing graduates to 'adapt to an increasingly pluralistic society'"; "better educating [their] students through diversity"; and "producing new knowledge stemming from diverse outlooks").

94.     None of the Academy's purportedly compelling interests can "be subjected to meaningful judicial review." *Id.* at 2166. There is no way for "courts … to measure these goals," and even if they could be measured, courts have no basis for assessing "when they have been reached." *Id.*; *see also id.* ("How is a court to know whether leaders have been adequately 'trained'; whether the exchange of ideas is 'robust'; or whether 'new knowledge' is being developed?" (cleaned up)).

95.     The Academy's appeal to the military benefits of diversity is no different from Harvard and UNC's appeal to the "educational benefits of diversity." In both instances, the purported benefits are vague and "elusive." *Id.* In fact, the only quantifiable aspects of the Academy's race-based admissions program are the racial and ethnic enrollment percentages set by the superintendent each year.

96.     Moreover, "the question in this context is not one of *no* diversity or of *some*: it is a question of degree. How many fewer leaders [the Academy] would create without racial preferences, or how much poorer the education at [the Academy] would be, are inquiries no court could resolve." *Id.* at 2167.

97.     The Academy's admissions program also fails narrow tailoring because it "fail[s] to articulate a meaningful connection between the means [it] employ[s] and the goals [it] pursue[s]." *Id.* The Academy claims that racial preferences are necessary to ensure an officer corps that reflects the racial demographics of the nation it serves and the enlisted corps it leads. That interest is not compelling; it is pure racial balancing.

98.     Besides, these categories are "imprecise in many ways." *Id.* "Some of them are plainly overbroad: by grouping together all Asian students, for instance, [the Academy is] apparently

uninterested in whether *South* Asian or *East* Asian students are adequately represented, so long as there is enough of one to compensate for a lack of the other." *Id.* (emphasis original). "Meanwhile, other racial categories, such as 'Hispanic,' are arbitrary or undefined." *Id.*

99.     Furthermore, the Academy produces only one-fifth of newly commissioned Navy officers each year. Federal law prohibits the Academy from increasing its annual enrollment in greater numbers than the annual increase in ROTC or Officer Candidate School enrollments. *See* §8454(h). Thus, even if it had a compelling interest in ensuring perfectly proportional racial representation between the officer corps and the general population, the Academy's use of the "invidious" practice of racial preferences barely moves the needle in terms of the demographics of the officer corps as a whole. *Id.* at 2166. Regardless, the Supreme Court has already rejected this premise for the civilian colleges and universities who produce eighty percent of the Navy's officers through ROTC and Officer Candidate School programs. *SFFA*, 143 S. Ct. at 2162-67; *see also id.* at 2247 (Sotomayor, J., dissenting) (the national security interests asserted by the military academies "are also implicated at civilian universities" with ROTC programs, but those universities' consideration of race is now unconstitutional).

100.     Nor has the government offered facts or evidence-based reasoning to support its excuses for using race at the academies. The government flatly asserts that the "service academies have carefully considered potential race-neutral alternatives" and "have concluded that, at present, those alternatives would not achieve the military's compelling interest in fostering a diverse officer corps." But it has never identified any studies, reports, or experiments "carefully considering" race-neutral alternatives.

101.     Contra the Academy, the service academies can achieve racially diverse student bodies through race-neutral means. The Coast Guard Academy provides a real-world example. Until 2010, that academy was prohibited by federal statute from using racial preferences in its admissions process.

In the two years before the Coast Guard Academy began considering race, it launched an aggressive advertising and recruiting campaign targeting minorities. At the end of those two years, the Coast Guard Academy had increased minority enrollment by 60%—from 15% to 24%. Those numbers were within a few percentage points of the other academies, which had been using explicit racial preferences for years.

102.    The Academy's race-based admissions violate the Fifth Amendment because "race may never be used as a 'negative'" or "operate as a stereotype." *Id.* at 2168 (cleaned up). As discussed above, the Academy openly acknowledges that race is determinative for some applicants. Because the Academy provides a racial "benefit" to "some applicants but not to others," it "necessarily advantages the former group at the expense of the latter." *Id.* Because race is a "positive" for minority applicants who receive preferences, it is necessarily a "negative" for all others. *Id.*

103.    The Academy's admissions program also relies on impermissible stereotypes. The Supreme Court has "long held that universities may not operate their admissions programs on the 'belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue,'" or "assum[e] that 'members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike.'" *Id.* at 2169 (cleaned up). The Academy does exactly that when it uses racial preferences to "foster trust between the enlisted corps and its leaders," to create "sociocultural competencies essential to multicultural leadership in the 21st century," and to "ensur[e] that the military contains the cultural and racial identities necessary to better understand our partner forces."

104.    By tethering its use of race to the racial demographics of the enlisted corps and the country as a whole, the Academy is violating equal protection by engaging in the "patently unconstitutional" practice of "[o]utright racial balancing." *Id.* 2172. It is not "'treat[ing] citizens as individuals,'" but as "'simpl[e] components of a racial … class.'" *Id.* (cleaned up).

105.     The Academy's use of race in admissions is also unconstitutional because it "lack[s] a 'logical end point.'" *Id.* at 2170 (cleaned up). Indeed, under its theory of "racial diversity," it would be impossible for the Academy to stop considering race. By tying its racial enrollment needs to the ever-shifting demographics of the country and the enlisted ranks, the Academy is essentially promising to use race in perpetuity. *Cf. id.* at 2172-74.

106.     The Academy's status as a military institution does not mean that courts must defer to its conclusory assertions that it needs to employ racial preferences, let alone diminish any of the constitutional violations described above. *See Owens v. Brown*, 455 F. Supp. 291, 300 (D.D.C. 1978) (courts are not compelled "to abdicate their responsibility to decide cases and controversies merely because they arise in the military context"). Although courts have been mindful of the military's unique role in society and the unique considerations that come with it, no level of deference justifies systematic racial discrimination. *See SFFA*, 143 S. Ct. at 2168 ("any deference must exist 'within constitutionally prescribed limits'").

107.     In fact, as the Court recognized in *SFFA*, blind deference to assertions of national security or military necessity can lead to "gravely wrong" outcomes and gross violations of civil rights. *Id.* at 2162 n.3. "[I]n the infamous case *Korematsu*," the "Court upheld the internment of 'all persons of Japanese ancestry in prescribed West Coast ... areas' during World War II because 'the military urgency of the situation demanded' it." *Id.* (cleaned up). The Supreme Court has "since overruled *Korematsu*, recognizing that it was 'gravely wrong the day it was decided.'" *Id.* (cleaned up).

108.     "The Court's decision in *Korematsu* nevertheless 'demonstrates vividly that even the most rigid scrutiny can sometimes fail to detect an illegitimate racial classification' and that '[a]ny retreat from the most searching judicial inquiry can only increase the risk of another such error occurring in the future.'" *Id.* (cleaned up).

109.    Because the Academy's use of racial classifications in admissions violates the Fifth

Amendment, it should be declared unlawful and enjoined.

**WHEREFORE**, Plaintiff asks this Court to enter judgment in its favor and to provide the

following relief:

a.  A declaratory judgment that the Academy's use of race in admissions is unconstitutional under the Fifth Amendment;

b.  A preliminary injunction prohibiting the Academy from considering or knowing applicants' race when making admissions decisions;

c.  A permanent injunction prohibiting the Academy from considering or knowing applicants' race when making admissions decisions; and

d.  All other relief that Plaintiff is entitled to, including but not limited to attorneys' fees and costs.

Respectfully submitted,

*s/Cameron T. Norris*

| | |
|---|---|
| Adam K. Mortara (*pro hac vice* forthcoming) | Thomas R. McCarthy (*pro hac vice* forthcoming) |
| LAWFAIR LLC | Patrick Strawbridge (*pro hac vice* forthcoming) |
| 40 Burton Hills Blvd., Ste. 200 | J. Michael Connolly (*pro hac vice* forthcoming) |
| Nashville, TN 37215 | Cameron T. Norris |
| (773) 750-7154 | Bryan Weir (*pro hac vice* forthcoming) |
| mortara@lawfairllc.com | James F. Hasson (*pro hac vice* forthcoming) |
| | R. Gabriel Anderson |
| Dated: October 5, 2023 | CONSOVOY MCCARTHY PLLC |
| | 1600 Wilson Boulevard, Suite 700 |
| | Arlington, VA 22209 |
| | (703) 243-9423 |
| | tom@consovoymccarthy.com |
| | patrick@consovoymccarthy.com |
| | mike@consovoymccarthy.com |
| | cam@consovoymccarthy.com |
| | bryan@consovoymccarthy.com |
| | james@consovoymccarthy.com |
| | gabe@consovoymccarthy.com |
| | |
| | *Counsel for Students for Fair Admissions* |

**VERIFICATION**

I, Edward Blum, declare as follows:

     1.      I am the President of Students for Fair Admissions, the plaintiff in this case.

     2.      I have reviewed this complaint.

     3.      For the allegations within my personal knowledge, I believe them all to be true.

     4.      For the allegations not within my personal knowledge, I believe them all to be true based on my review of the cited policies and documents and based on my conversations with members of Students for Fair Admissions, including Members A and B.

     5.      I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 5, 2023

_____
Edward Blum
President of Students for Fair Admissions

# Exhibit G

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | | |
|---|---|---|
| STUDENTS FOR FAIR ADMISSIONS, | | |
| | *Plaintiff*, | |
| v. | | No. 1:23-cv-02699 |
| THE UNITED STATES NAVAL ACADEMY, *et al.*, | | **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| | *Defendants*. | |

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ........................................................................................................ 1

BACKGROUND .......................................................................................................... 2

    I.      The Academy's Race-Based Admissions Process ................................... 2

    II.     The Academy's Justifications for Its Race-Based Admissions Practices ............. 4

    III.    Students for Fair Admissions and This Litigation ................................. 6

ARGUMENT ................................................................................................................ 7

    I.      SFFA is likely to prevail on the merits. .................................................. 8

        A.      The Academy has no compelling interest in race-based admissions. ........ 8

            1.      Internal Functioning ........................................................... 9

            2.      External Legitimacy and Societal Trust ....................... 12

        B.      The Academy's use of race is not narrowly tailored .............................. 14

    II.     SFFA satisfies the remaining preliminary-injunction criteria. ............................ 18

CONCLUSION ........................................................................................................... 19

CERTIFICATE OF SERVICE ................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Pena*,
   515 U.S. 200 (1995) ............................................................................... 8

*Agudath Israel of Am. v. Cuomo*,
   983 F.3d 620 (2d Cir. 2020) ................................................................. 18

*Berkley v. United States*,
   287 F.3d 1076 (Fed. Cir. 2002) ........................................................... 17

*Brown v. Board of Education*,
   347 U.S. 483 (1954) ............................................................................... 8

*Centro Tepeyac v. Montgomery Cnty.*,
   722 F.3d 184 (4th Cir. 2013) ................................................................. 7

*Coal. to Defend Affirmative Action v. Granholm*,
   473 F.3d 237 (6th Cir. 2006) ............................................................... 18

*Coreas v. Bounds*,
   458 F. Supp. 3d 352 (D. Md. 2020) ..................................................... 19

*Crawford v. Cushman*,
   531 F.2d 1114 (2d Cir. 1976) ................................................................. 1

*Dep't of Navy v. Egan*,
   484 U.S. 518 (1988) ............................................................................. 17

*Doc's Assocs. v. Stuart*,
   85 F.3d 975 (2d Cir. 1996) ................................................................... 19

*Giovani Carandola, Ltd. v. Bason*,
   303 F.3d 507 (4th Cir. 2002) ............................................................... 19

*Greer's Ranch Café v. Guzman*,
   2021 WL 2092995 (N.D. Tex.) (May 18, 2021) ................................. 18

*Grutter v. Bollinger*,
   539 U.S. 306 (2003) ............................................................ 4, 5, 16, 17

*Johnson v. California*,
   543 U.S. 499 (2005) ..................................................................... 12, 17

*Korematsu v. United States*,
   323 U.S. 214 (1944) ....................................................................... 2, 17

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................................. 19

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
   831 F.3d 500 (D.C. Cir. 2016) ............................................................ 19

*Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*,
   584 F. Supp. 2d 766 (D. Md. 2008) ..................................................... 18

*Reed v. Franke,*
   297 F.2d 17, 21 (4th Cir. 1969) ................................................................ 1

*Ross v. Meese,*
   818 F.2d 1132 (4th Cir. 1987) .................................................................. 18

*Shelby Cnty., Ala. v. Holder,*
   570 U.S. 529 (2013) ................................................................................ 10

*Singh v. Berger,*
   56 F.4th 88 (D.C. Cir. 2022) .................................................................... 17

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
   143 S. Ct. 2141 (2023) ...................................................................... passim

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018) ............................................................................. 17

*U.S. Navy Seals 1-26 v. Biden,*
   27 F.4th 336 (5th Cir. 2022) .................................................................... 17

*Winter v. NRDC,*
   555 U.S. 7 (2008) ...................................................................................... 7

*Wygant v. Jackson Bd. of Educ.,*
   476 U.S. 267 (1986) ................................................................................ 16

**Statutes**

10 U.S.C. §8454 ............................................................................................ 2

10 U.S.C. §8458 .......................................................................................... 18

**Other Authorities**

Amicus Br. of Veterans for Fairness and Merit at 7, *Students for Fair Admissions v. President and Fellows of Harvard College,*
   2023 WL 4239254, No. 20-1199 (U.S. June 29) ..................................... 10

Br. of United States as *Amicus Curiae* in Support of Resp'ts 12, *Fisher v. Univ. of Tex. at Austin,*
   136 S. Ct. 2198 (No. 14-981) (2016) ................................................. passim

Br. of United States as *Amicus Curiae* in Support of Resp'ts 15, *Students for Fair Admissions v. President and Fellows of Harvard College,*
   2023 WL 4239254, No. 20-1199 (U.S. June 29, 2023) ....................... passim

Brief of Julius W. Becton, Jr., et al. as Amici Curiae Supporting Respondents at 6, *Grutter v. Bollinger,*
   539 U.S. 306 (No. 02-241) (2003) ............................................................. 5

Gallup, *Confidence in Institutions,* perma.cc/DEH2-M92Y ...................... 13

President's Committee on Equality of Treatment and Opportunity in the Armed Services,
   *Freedom to Serve* 12, (May 22, 1950), perma.cc/C2F5-6SCD ......... 13, 14

*Students for Fair Admissions v. President and Fellows of Harvard College,* No. 21-707, Tr.
   145:1-146:11, (Oct. 31, 2022) .............................................................. 9, 10

# INTRODUCTION

The United States Naval Academy is one of the crown jewels of the American military. The Academy has trained the future leaders of the Navy since 1845, producing some of our nation's most revered admirals. The Academy's mission is to "develop midshipmen morally, mentally, and physically and to imbue them with duty, honor, and loyalty" for a career of service to the United States Navy. Ex. A.

For most of its history, the Academy has evaluated midshipmen based on merit and achievement. For good reasons: America's enemies do not fight differently based on the race of the commanding officer opposing them, sailors must follow orders without regard to the skin color of those giving them, and battlefield realities apply equally to all sailors regardless of race, ethnicity, or national origin. To that end, President Truman desegregated the military well before other institutions followed suit. *See* Executive Order 9981 (July 26, 1948) ("[T]here shall be equality of treatment and opportunity for all persons in the armed forces without regard to race, color, religion, or national origin.").

Yet the Academy has strayed from that approach. Instead of admitting midshipmen solely on leadership potential and objective metrics—the Academy stopped requiring applicants to submit standardized scores three years ago—the Academy focuses on race.

The Academy has no justification for using race-based admissions. Those admissions are unconstitutional for all other public institutions of higher education. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141 (2023) ("*SFFA*"). The Academy is not exempt from the Constitution. *See, e.g.*, *Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976) ("A succession of cases in this circuit and others ha[s] reiterated the proposition that the military is subject to the Bill of Rights and its constitutional implications."); *Reed v. Franke*, 297 F.2d 17, 21 (4th Cir. 1969) (similar). And calls for blind judicial deference to the military on

1

questions of racial discrimination are "'gravely wrong,'" both legally and historically. *SFFA*, 143 S. Ct. at 2162 n.3 (discussing the overruling of *Korematsu v. United States*, 323 U.S. 214 (1944)).

Because the Naval Academy discriminates based on race, its admissions policy should be declared unlawful and enjoined. Because its admissions cycle will begin and end before this case can be fully litigated (plus any appeals), SFFA respectfully requests that this Court preliminarily enjoin the Academy from considering race as a factor in admissions **by December 1, 2023**.

## BACKGROUND

### I.    The Academy's Race-Based Admissions Process

Admission to the Academy is highly selective: fewer than ten percent of applicants are given the honor of enrolling. *See, e.g.*, Ex. B at 1. The Academy typically enrolls slightly fewer than 1,200 midshipmen in each class. *See, e.g.*, *id.*; Ex. C.

Appointment (*i.e.*, "admission") to the Academy involves two stages: First, applicants must pass medical examinations and a physical-fitness test and secure a "nomination" from a member of Congress, the Vice President, the President, the Secretary of the Navy, or ROTC. *See generally* 10 U.S.C. §8454; Ex. Y; Ex. Z. Applicants who satisfy the requirements for the first step are considered "qualified" for admission. Second, after securing a nomination, applicants must be accepted by the Academy's admissions office.

When making selections, the Academy openly admits that "race" is a "factor" that it considers. Ex. I. The Academy disclaims racial quotas and characterizes its use of race as "holistic," like Harvard's and UNC's admissions programs in *SFFA*. *See, e.g.*, Br. of United States as *Amicus Curiae* in Support of Resp'ts 15, *Students for Fair Admissions v. President and Fellows of Harvard College*, 2023 WL 4239254, No. 20-1199 (U.S. June 29, 2023) ("SFFA U.S. Brief") (comparing the academies' use of race to "colleges and universities across the country"); *id.* at 24 (similar).

2

Terminology aside, the Academy's focus on race plays out across all areas of its admissions policy. Much like Harvard and UNC, *see SFFA*, 143 S. Ct. at 2156 n.1, the Academy's use of racial preferences "gives minorities an edge on admissions." Ex. J at 1. For instance, a diversity task force created by the Chief of Naval Operations in July 2020 and chaired by a two-star admiral recently recommended that the Navy "deemphasiz[e] the use of standardized academic tests" in admissions and prioritize subjective factors instead. Ex. V at 20. The purpose of this radical shift was to "improv[e] … minority representation" and ensure the officer corps "reflect[s] relevant national demographic percentages" because "recruiting efforts have not achieved equitable demographic representation of officers." *Id.* at 20, 37.

In a 2010 *New York Times* op-ed discussing the Academy's racial preferences a current Naval Academy professor stated: "I can confirm from the years I spent on the admissions board in 2002 and '03 and from my conversations with more recent board members, [that] if an applicant identifies himself or herself as non-white, the bar for qualification immediately drops." Ex. K at 2. Notably, the "non-white" category does not include Asian applicants. *See* Ex. U at 2 ("Members of three racial groups receive preference: African Americans, Hispanics, and Native Americans.").

The magnitude of those racial preferences is stunning. According to the professor, "If a 'majority' student scored 600 or more on each part of the SAT I test, math and verbal, we put a check mark and went on to consider other aspects of the application. We did so in the case of a 'minority' student if the scores were in the neighborhood of 550." *Id.* at 4. The professor also recounted an episode where the board of admissions "debated whether students of Brazilian origin 'counted' as Hispanics" and should be eligible for preferred consideration. *Id.* at 2-3.

The demographics of the Academy's year-over-year enrollment reflect efforts to racially balance the incoming classes. Take the racial demographics of the Academy's classes of 2025 and

2026, for instance. For the class of 2025, the Academy enrolled 1,183 midshipmen, 672 of whom were white, 79 of whom were African American, and 115 of whom were Asian. *See* Ex. L. For the class of 2026, it enrolled 1,184 midshipmen, 676 of whom were white, 75 of whom were African American, and 117 of whom were Asian. *See* Ex. C. The Academy goes to great lengths to achieve this balance: a U.S. General Accounting Office report to the Senate Armed Services Committee noted that "the Academy makes offers of appointment to the majority of qualified minorities to achieve the Chief of Naval Operations' commissioning goals for minorities." Ex. W at 38.

The Academy's racial preferences are determinative for hundreds of applicants each year. Congressional nominees comprise roughly 75% of each incoming class, and in most cases, up to ten qualified applicants compete against one another for the single slot afforded to their Senator or Representative each year. Because skin color can be—and often is—a decisive factor for successful applicants who are chosen from those congressional nominee pools, it is equally dispositive for the other qualified nominees who are turned away. Put differently, because race is a "positive" factor for some Academy applicants, it is necessarily a "negative" factor for others. *SFFA*, 143 S. Ct. at 2169.

## II.    The Academy's Justifications for Its Race-Based Admissions Practices

Over the years, the Academy has offered several justifications for its use of race in admissions. In 2003, while the Supreme Court was considering Michigan's use of racial preferences in *Grutter v. Bollinger*, 539 U.S. 306 (2003), the Academy's dean of admissions told the *New York Times* that its racial preferences were necessary because the Academy needs "a brigade [student body] that reflects our country." Ex. J at 4. Racial preferences were also necessary, he said, because the Navy's officer corps needed to "reflect" the racial demographics "of the services of which we are a part." *Id.* at 2.

Although the Solicitor General declined to defend Michigan's use of racial preferences in *Grutter*, a collection of retired former military officers submitted an amicus brief arguing that racial preferences in higher education served a national security interest. *See* Brief of Julius W. Becton, Jr., et al. as Amici Curiae Supporting Respondents at 6, *Grutter v. Bollinger* 539 U.S. 306 (No. 02-241) (2003) ("Becton Brief"). Unlike the Academy's then-dean of admissions, the *amici* did not argue that the racial makeup of the Navy's officer corps needed to reflect society at large. They argued that racial preferences were necessary because the racial composition of the military's officer corps needed to reflect the racial composition of its enlisted corps, and that proportional representation could only be achieved through racial preferences. *Id.*

*Grutter* accepted the Becton brief's assertions, without any evidence or adversarial testing. It repeated the brief's assertion that, "to fulfill its mission, the military 'must be selective in admissions for training and education for the officer corps, *and* it must train and educate a highly qualified, racially diverse officer corps in a racially diverse educational setting.'" 539 U.S. at 331 (cleaned up). And it repeated the Becton brief's conclusory argument that "[a]t present, 'the military cannot achieve an officer corps that is both highly qualified and racially diverse unless the service academies and the ROTC use limited race-conscious … admissions policies.'" *Id.* (cleaned up).

After *Grutter*, the Academy has leaned heavily on the justification put forth in the Becton brief: that the military "has a powerful interest in developing an officer corps that is prepared to lead a diverse force and that shares the diversity of the enlisted ranks." Br. of United States as *Amicus Curiae* in Support of Resp'ts 12, *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198 (No. 14-981) (2016) ("Fisher U.S. Brief"). A report of the Military Diversity Leadership Commission stressed that "[t]he military should mirror the demographic composition of the population it serves

and that senior leaders should mirror the demographic composition of the troops they lead." Ex. O at 42. This is necessary, the Academy insists, to ensure unit cohesion and internal trust and to maintain societal legitimacy. *See, e.g.*, SFFA U.S. Brief 15-19.

Under this formulation, statistical parity with the racial makeup of the general population is not enough. Racial preferences are supposedly necessary to achieve racial balance between the enlisted corps—an all-volunteer force—and the officer corps. *See, e.g.*, *id.* at 15 ("The military has not yet achieved its goal of building an officer corps that reflects the 'racial and ethnic composition' of the service members officers lead" because "White service members are 53% of the force but 73% of officers."); *id.* (listing similar statistical comparisons for black and Hispanic officers and enlisted service members).

This goal is tantamount to a declaration that the Academy will *never* stop using race in admissions, since the percentage of sailors and Marines from certain racial categories who voluntarily enlist in the Navy will dictate the scope of the Academy's racial preferences. Indeed, the Defense Department acknowledges that the "demographic makeup" of society and the enlisted force is "continually changing" and states that the military "must change" alongside it "to maintain and sustain its future forces." Ex. X at 3. Even if the racial demographics of the officer corps do eventually mirror those of the enlisted corps, the continued use of race will be necessary to preserve that statistical parity going forward. In short, the Academy's use of race "lack[s] a 'logical end point.'" *SFFA*, 143 S. Ct. at 2170. And the Academy has never adopted a sunset date for its use of race.

## III.   Students for Fair Admissions and This Litigation

SFFA is a voluntary membership organization formed for the purpose of defending human rights and civil liberties, including the right of individuals to equal protection under the law, through litigation and any other lawful means. Blum Decl. ¶2. SFFA is a nonprofit membership

group of tens of thousands of individuals across the country who believe that racial preferences in college admissions, including the academies, are unfair, unnecessary, and unconstitutional. ¶3. SFFA has members who are ready and able to apply to the United States Military Academy. ¶4.

Member A, for example, is white and a U.S. citizen. Member A Decl. ¶2. He has "long wanted to attend the United States Naval Academy." *Id.* He applied to the Academy for the class of 2026 and secured a nomination from a Member of Congress to attend. ¶3. The Academy rejected his application. *Id.* Member A is currently attending college in the Southeast and is a Midshipman in the Naval Reserve Officers Training Corps. ¶4. He is medically qualified and ready and able to reapply to the Naval Academy were a court to order it to cease its use of racial preferences in admissions. *Id.*

Member B is Asian and a U.S. citizen. Member B Decl. ¶2. The Naval Academy has been his dream school since he was in the sixth grade. *Id.* In 2023, he applied to the Academy for the class of 2027. ¶3. He secured a nomination from a Member of Congress to attend the Academy. *Id.* The Academy, however, rejected his application. *Id.* Member B is now a freshman in college, and he is medically qualified and ready and able to reapply to the Naval Academy were a court to order it to cease its use of racial preferences in admissions. ¶4.

## ARGUMENT

SFFA is entitled to a preliminary injunction if it can satisfy four factors: it is "likely to succeed on the merits," it is "likely to suffer irreparable harm in the absence of preliminary relief," the "balance of equities tips in [its] favor," and "an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013). SFFA satisfies all four.

## I.    SFFA is likely to prevail on the merits.

*Brown v. Board of Education* proclaimed that the right to public education—a right inti-

mately connected with "service in the armed forces"—"must be made available to all on equal

terms." *Brown v. Board of Education*, 347 U.S. 483, 493 (1954). *SFFA* built on *Brown*'s legacy,

holding that "the Constitution is color blind," 143 S. Ct. at 2160, and that all "racial discrimination

in public education"—including the race-based admissions programs practiced at "[m]any universi-

ties"—is unconstitutional. *Id*. at 2160, 2176.

The Academy's admissions system is one such program. When it was before the Supreme

Court, the government bragged that the Academy uses race in the same way that Harvard and UNC

did. *See, e.g.*, SFFA U.S. Brief 5 (comparing the academies' use of race to "colleges and univer-

sities across the country"); *id.* at 24 (similar); *id.* at 7-8 (explaining that the academies use "admis-

sions policies like the one this Court approved in *Grutter*"). That concession is fatal. The strict-

scrutiny test that the Fifth Amendment applies to the Academy is "'the same'" as the strict-scrutiny

test that the universities flunked in *SFFA*. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224

(1995). So while *SFFA* "does not address" the military academies, 143 S. Ct. at 2166 n.4, its logic

leads to a straightforward conclusion: the Academy cannot use race either. Under strict scrutiny's

"daunting two-step examination," *id*. at 2162-63, the Academy's interests are not sufficiently com-

pelling, and its race-based admissions program is not narrowly tailored.

### A.    The Academy has no compelling interest in race-based admissions.

To begin, none of the Academy's interests survive *SFFA*. Though the Academy asserts that

fostering racial diversity is essential to the Navy's national-security mission, that assertion is de-

void of evidentiary support and rests on naked appeals to deference. The Academy's supposed

interests in using explicit racial classifications can be broadly summarized as two propositions: (1)

racial preferences improve the military's internal functioning; and (2) racial preferences enhance

the military's functional capacity by fostering internal confidence within the ranks and by bolstering its external legitimacy which, in turn, increases societal trust and recruitment efforts.[1] Neither interest is compelling.

### 1.    Internal Functioning

The Academy posits several ways that racial preferences are critical to having a well-functioning Navy in a pluralistic society. All of them view sailors and Marines as members of racial groups, rather than as individuals—and all are grounded in the assumption that minority service members all think and feel the same way.

First, the Academy argues that statistical parity between the racial demographics of officers and enlisted sailors and Marines is necessary to preserve unit cohesion and ward off racial strife within units. In support of that assertion, it highlights anecdotal incidents of racial tension among enlisted servicemembers during the Vietnam War, most of which occurred in a brief period from 1969 to 1972. Further undermining this justification is that it was raised for the first time by a private amicus brief in *Grutter*—not by the government itself. The government later adopted the talking point and has repeated it in virtually every defense of racial preferences since. Post-hoc cherry picking a few unfortunate incidents and extrapolating them to the entire American military is not enough for strict scrutiny.[2]

---

[1] Before the Supreme Court's decision in *SFFA*, the Academy also invoked the "educational benefits of diversity," like Harvard and UNC did in *SFFA*. Specifically, it said that racial "diversity" "reduc[ed] a sense of isolation and alienation" among midshipmen who are ethnic minorities and "encourage[d] greater participation by minority students in the classroom." *Students for Fair Admissions v. President and Fellows of Harvard College*, No. 21-707, Tr. 145:1-146:11, (Oct. 31, 2022). Now that the Supreme Court has refused to allow colleges to justify their actions by reference to those undefined—and undefinable—"educational benefits," the Academy is left with its other justifications. *See SFFA*, 143 S. Ct. at 2166 n.4 (stressing that the academies must, at a minimum, identify "distinct" interests).

[2] What's more, the brief period of racial unrest that the Academy retells over and over was not produced by colorblind policies. It was a tragic byproduct of broader factors: "a changing

History paints a different picture. "[R]acial animosity had been negligible within the U.S. armed forces" prior to 1967, and it has been virtually nonexistent post-Vietnam. Ex. M at 2. During the Korean War—just a few years after President Truman ordered desegregation in the military—integration "failed to produce the violence or poor morale the military brass expected." Ex. N at 3. Moreover, the underlying assumption of the Academy's argument is that sailors and Marines view their peers and superiors foremost in terms of race, rather than in terms of their ability or character traits like loyalty, devotion, and selflessness. It assumes that sailors apply the same racial stereotypes to one another that the Academy applies to them. There is no evidence to suggest that's the case.

Second, the Academy claims that statistical parity between the racial demographics of the officer corps and those of the enlisted corps is necessary to "foster trust between the enlisted corps and its leaders." SFFA U.S. Brief 15; *see also* Fisher U.S. Brief 12 ("military leaders have concluded that an officer corps that shares the diversity of the enlisted ranks improves performance by 'facilitating greater confidence' in leadership"); *Students for Fair Admissions*, No. 21-707, Tr. 145:1-146:11 (discussing military academies, Solicitor General asserts that benefits of increased racial diversity include "cross-racial understanding," which can "lea[d] to positive developments with cognitive development").

---

social environment, a controversial war, and new conscription strategies" that allowed wealthier Americans to escape the draft through college deferments while sending disproportionate numbers of low-income draftees to frontline combat units based on their educational backgrounds. Amicus Br. of Veterans for Fairness and Merit at 7, *Students for Fair Admissions v. President and Fellows of Harvard College*, 2023 WL 4239254, No. 20-1199 (U.S. June 29). In short, the incidents that the Academy cites to justify open-ended racial preferences were the product of a "perfect storm for racial conflict" that has not existed for the past half century. *Id.*; *cf. Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 545-57 (2013).

The Academy has never provided evidence to support that assertion. Boiled down to its core, this argument simply relies on crude and infantilizing stereotypes about the men and women who volunteer to serve in our armed forces: It assumes that black sailors will be more likely to trust a black officer and that Hispanic Marines are more likely to trust Hispanic officers—not because of their trustworthiness, but merely because of their self-reported ethnicity. That's precisely the type of racial stereotyping that *SFFA* condemns. 143 S. Ct. at 2170. And such sad stereotypes completely ignore that trust between servicemembers is formed through battlefield performance, and that sailors and Marines in war zones are more concerned with their leaders' competency than with their race.

Third, the Academy broadly claims that the diversity produced by racial preferences makes Navy and Marine units "more effective at accomplishing their missions." SFFA U.S. Brief 15. It does not define what it means to be racially "diverse," nor does it provide concrete evidence that military units that choose their members based on race are more successful on the battlefield than units who select their members based on objective measures such as tactical competency. In *Fisher*, the Solicitor General extended this idea further, claiming that units with greater racial diversity are more capable of interacting with and understanding partner forces from international allies. *See* Fisher U.S. Brief 12 ("Maintaining a diverse leadership corps also ensures that the military contains the cultural and racial identities necessary to better understand our partner forces."). The government, however, did not elaborate on why it thinks that's true. Apparently, the government thought it self-evident that individuals who share the same skin color also share a common "understand[ing]." But that sort of assumption is precisely the racial stereotyping that *SFFA* prohibits. 143 S. Ct. at 2170.

## 2.     External Legitimacy and Societal Trust

The Academy also maintains that having an officer corps that does not reflect the racial makeup of the general population and the enlisted ranks will "undermine the military's legitimacy by fueling 'popular perceptions of racial/ethnic minorities serving as "cannon fodder" for white military leaders.'" Fisher U.S. Brief 12 (quoting Ex. O at 15); *see also* SFFA U.S. Brief 19 ("[G]overnment agencies that lack diversity risk losing legitimacy in the eyes of a diverse nation"). Again, this conclusory statement assumes that the American people assess the "legitimacy" and trustworthiness of an institution based on its racial makeup.

And that just isn't true. Less than a third of Americans think "selective colleges and universities" should take "race and ethnicity into account." Ex. P at 3; *see also* Ex. T at 3 (70% of Americans agree that universities should not "be allowed to consider race in admissions"). Even fewer think "diversity" is "very important." Ex. P at 5. And three-fourths of Americans—decisive majorities of every race—think employers should "[o]nly take a person's qualifications into account" when considering whether to hire them. *Id.* at 4. In-depth surveys of military personnel (the type of rigorous analyses that the Academy has failed to offer) paint the same picture. So, if anything, the Academy's claims about "diversity," "legitimacy," and "public trust" have it backwards: If its mission is to solidify the public's trust, the Academy should do away with race-based admissions, not double down on them. *See Johnson v. California*, 543 U.S. 499, 510-11 (2005) ("compliance with the [Constitution's] ban on racial discrimination … bolsters the legitimacy of the [government]").

The Academy also argues that the Navy will lose "societal trust" if racial metrics between the officer and enlisted corps—and between the officer corps and society at large—are not equivalent. This speculative loss of societal trust, the Academy claims, could, in turn, harm recruiting efforts. Not so. Today, at the apex of the Academy's use of racial preferences, the Navy is facing

a recruiting crisis that is unprecedented in the modern era—a crisis fueled by a lack of public confidence in the military, that itself appears to be a direct result of the military's overemphasis on "social justice" issues. *See* Gallup, *Confidence in Institutions,* perma.cc/DEH2-M92Y; *see also* Ex. S at 2 (observing that over half of Americans think the military's overemphasis on social justice is "undermining military effectiveness").

The Academy's assertions about retention are again backwards. In-depth surveys and statistical studies of the military's personnel crisis confirm this. "According to 9 out of 10 respondents, more officers would stay if the military was more of a meritocracy." Ex. R. at 3. And 71% of active-duty officers believe the military would retain more talent if opportunities were based solely on merit. *See, e.g.*, Ex. Q at 63.

Flawed as they are, none of the Academy's justifications for racial preferences are new. In fact, nearly all its nebulous arguments for race-based admissions were made sixty-five years ago by opponents of desegregating the military. The military segregationists' arguments—like the arguments offered by the Academy—were long on racial stereotypes but short on actual evidence. Like the Academy, segregation proponents argued that a colorblind military would "create difficulties 'which would be reflected in morale and military efficiency.'" President's Committee on Equality of Treatment and Opportunity in the Armed Services, *Freedom to Serve* 12, (May 22, 1950), perma.cc/C2F5-6SCD. Like the Academy, they claimed that colorblind policies would degrade the military's ability to accomplish its national-defense mission. *Id.* at 49-50. And, like the Academy, they warned that a colorblind approach would be inconsistent with "civilian sentiment" and pose external risks to the institution. *Id.*

Truman's commission rejected all those arguments. In the process, the commission unequivocally affirmed that servicemembers should be treated as individuals in all circumstances, and

that drawing inferences from a person's membership in a particular racial or ethnic group was immoral and illogical. "To put racial restrictions on job opportunities seemed to the Committee to ignore completely the essential factor of individual differences." *Id.* at 13. So too today.

### B.    The Academy's use of race is not narrowly tailored.

The Academy's race-based admissions program also fails narrow tailoring. *See SFFA*, 143 S. Ct. at 2167 (requiring the Academy to prove that its "use of race" is "necessary" to achieve its interests). When *SFFA* reaffirmed that the Constitution is colorblind, it also reiterated many of the prohibitions that equal protection has long entailed. *Id.* at 2162. "[R]ace," the Court instructed, "may not operate as a stereotype." *Id.* at 2168. And it "may never be used as a negative." *Id.* Race-based admissions programs must always have a "logical end point." *Id.* at 2170. And they may never engage in "outright racial balancing." *Id.* at 2172. The Academy's admissions program transgresses each of these lines.

Taking them in reverse order, the Academy's intentional racial balancing scheme is "patently unconstitutional." *Id.* The Academy concedes that it tries to create "equitable demographic representation" in each class of newly minted ensigns and second lieutenants, Ex. V at 20, using the ever-shifting demographics of the enlisted ranks and the general population as a measuring stick. That's just a fancy way of saying that the Academy sorts applicants by skin color and admits them according to preset racial goals. And the Academy is committed to achieving those goals at all costs, even if doing so requires wholesale changes to its admissions policies. *See id.*

Because of this scheme—one that relies on racial balancing to preserve parity between officers, the enlisted, and the citizens they serve—the Academy's use of race "lack[s] a logical end point." *SFFA*, 143 S. Ct. at 2170. Indeed, under the Academy's theory, the only way it can "mirror the demographic composition of the population," Ex. O at 39, is by giving preferences to applicants of certain races, and adjusting the scope of those preferences year over year, to ensure the Academy

always "shares the diversity of the enlisted ranks and the general population." Fisher U.S. Brief 12. By tying its racial composition to the whims of demography, the Academy promises to use race in perpetuity—something that *SFFA* forbids. 143 S. Ct. at 2172-74.

The Academy's use of race also thwarts the fundamental command "that an individual's race may never be used against him." *Id*. at 2168. For starters, the Academy's admissions program, like all "[c]ollege admissions" programs, is "zero-sum," meaning that "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id*. at 2169. And because race can (and often is) a decisive "plus" factor for many Black, Hispanic, and Asian applicants, it's an equally dispositive "minus" for everyone else. *Id*. That's illegal. *Id*. at 2166.

If that weren't enough, the Academy's entire admissions program rests on racial stereotypes. The Supreme Court has "long held that universities may not operate their admissions programs on the 'belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue.'" *Id*. at 2170. But that's precisely what the Academy does. By relying on the "educational benefits of diversity," the Academy's program assumes "that there is an inherent benefit in race *qua* race"—an assumption which "rests on the pernicious stereotype that a black student" (or a white student, or a Hispanic student, or an Asian student) "can usually bring something that a [student of another race] cannot offer." *Id*. And by balancing its class to avoid "racial tensions among enlisted personnel" or to "foster trust between the enlisted corps and its leaders," Fisher U.S. Br. 11, the Academy is forced to assume that, among other stereotypes, some races won't respect or follow people who have a different skin color. Such sordid stereotyping is "contrary … to the 'core purpose'" of equal protection. *SFFA*, 143 S. Ct. at 2170.

The racial box-checking that the Academy uses also fails narrow tailoring. Such a system is borne of "incoherent and irrational" categories, which are "imprecise," "arbitrary," "undefined," "opaque," and "underinclusive." *Id.* at 2167. "[B]y grouping together all Asian students, for instance, [the Academy is] apparently uninterested in whether *South* Asian or *East* Asian students"— students who come from countries as diverse as Japan and Pakistan—"are adequately represented." *Id.* (emphasis original). And the Academy apparently thinks that a Mexican-American sailor is more likely to follow a white officer of Spanish descent, just because he checked the box for "Hispanic." It also seems not to know whether students of Brazilian heritage are sufficiently "Hispanic." *See* Ex. U at 2-3. This racial pseudoscience is not the stuff of strict scrutiny.

And, what's more, the Academy has never shown that comparable race-neutral programs won't work. Narrow tailoring demands "serious, good faith consideration of workable race-neutral alternatives." *Grutter*, 539 U.S. at 339; *accord Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 n.6 (1986) (narrow tailoring "require[s] consideration of whether lawful alternative[s] and less restrictive means could have been used"). The Academy has no studies, reports, or experiments "carefully considering" race-neutral alternatives. Yet the Coast Guard Academy provides a real-world example that these alternatives can (and do) work. Until 2010, that academy was prohibited from using racial preferences in its admissions process. *See* Ex. aa at 1. In the two years before the Coast Guard began considering race, it launched an aggressive advertising and recruiting campaign targeting minorities. *Id.* at 2. At the end of those two years, the Coast Guard had increased minority enrollment by 60%, from 15% to 24%. Ex. bb at 1-2. Those numbers were within a few percentage points of the other academies (which had been using explicit racial preferences for years), *see, e.g.*, Ex. cc, and nowhere does the Naval Academy try to prove that the difference stopped the Coast Guard from achieving its asserted interests. Nor could it: In *SFFA*, the government conceded that

the Merchant Marine Academy doesn't use race for most admissions, and that its admissions system (like the Coast Guard's admissions system) furthers the Academy's interests. *SFFA* U.S. Br. at 17 n. 3. The Naval Academy has long had a duty to prove that a race-based policy—rather than a race-neutral policy—is essential to its functioning. *Grutter*, 539 U.S. at 339. It cannot. And it's never tried, despite decades of opportunities.

For its final argument, the Academy tries the same path that Harvard and UNC tried in *SFFA*: "trust us." 143 S. Ct. at 2168. To be sure, courts must be mindful of the military's unique role in our nation. *See, e.g.*, *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988). But the Supreme Court "ha[s] been unmistakably clear that any deference must exist within constitutionally prescribed limits"—limits that categorically prohibit invidious racial discrimination. *SFFA*, 143 S. Ct. at 2168; *accord U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 349 (5th Cir. 2022); *Singh v. Berger*, 56 F.4th 88, 99 (D.C. Cir. 2022); *Berkley v. United States*, 287 F.3d 1076, 1091 (Fed. Cir. 2002). It has "refused to defer" to government officials' "judgments on race," even in "areas where those officials traditionally exercise substantial discretion." *Johnson*, 543 U.S. at 512 (prisons).

*Korematsu* provides a warning and a lesson. Deferring to the military's expert "judgment," the Supreme Court rubberstamped the systemic internment of Japanese Americans because "military authorities decided that the military urgency of the situation demanded that all citizens of [that race] be segregated." *Korematsu*, 323 U.S. at 223. The Supreme Court abrogated that case, *see Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018), and has cautioned courts to never "retreat from the most searching judicial inquiry" when considering "illegitimate racial classification[s]," *SFFA*, 143 S. Ct. at 2162 n.3. This Court should heed that instruction and find the Academy's race-based admissions program unconstitutional.

## II.    SFFA satisfies the remaining preliminary-injunction criteria.

Because SFFA is likely to prevail on its constitutional claims, it readily meets the other preliminary-injunction criteria.

**Irreparable Harm:** A "presumption of irreparable injury flows from a violation of constitutional rights." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020) (cleaned up); *see also Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987) ("[T]he denial of a constitutional right … constitutes irreparable harm."). "An Equal Protection Clause violation ... is therefore an irreparable injury." *Agudath Israel of Am.*, 983 F.3d at 636. Because the Academy's admissions policy subjects SFFA's members to racial discrimination that violates the Fifth Amendment's equal-protection principle, they face irreparable harm without a preliminary injunction. *See id.*; *see also Greer's Ranch Café v. Guzman*, No. 4:21-cv-651, 2021 WL 2092995, at *8 (N.D. Tex.) (May 18, 2021) (finding irreparable harm and granting preliminary injunction because plaintiffs were "experiencing race and sex discrimination at the hands of government officials"); *Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*, 584 F. Supp. 2d 766, 795 (D. Md. 2008) ("Intentional discrimination under the Equal Protection Clause … constitute[s] irreparable injury.").

This irreparable harm is particularly acute because, without a preliminary injunction, entire admissions cycles will begin and end. SFFA's cases against *Harvard* and *UNC* took nearly a decade to litigate, including at least five years in district court alone. *See SFFA*, 143 S. Ct. at 2156. Yet Members A and B are only eligible to reapply until they turn twenty-three years old. *See* 10 U.S.C. §8458(a)(1). Unless they get a preliminary injunction, they will entirely miss the chance to apply on an equal footing to the Academy. That is quintessential irreparable harm. *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006).

**Balance of Harms and Public Interest:** The balance of the equities and the public interest factors "merge when the Government is the party opposing the preliminary injunction." *Nken v.*

*Holder*, 556 U.S. 418, 435 (2009); *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 512 (D.C. Cir. 2016) ("[T]he government's interest is the public interest."). The Academy will not be harmed by an injunction requiring it to stop illegally denying equal treatment to applicants. *See, e.g.*, *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (government is "'in no way harmed by issuance of a preliminary injunction which prevents [it] from [taking actions] likely to be found unconstitutional. If anything, the system is improved by such an injunction.'"). And "upholding constitutional rights surely serves the public interest." *Id.* Again, the Coast Guard Academy operated for years without considering race as a factor in admissions, with no discernible consequences. The Naval Academy—like every other university this cycle—can too.[3]

## CONCLUSION

For these reasons, the Court should grant SFFA's motion. By December 1, 2023, the Academy should be preliminarily enjoined from considering race as a factor in admissions.

---

[3] The court should not require a bond. "[T]he court 'retains the discretion to set the bond amount as it sees fit or waive the security requirement.'" *Coreas v. Bounds*, 458 F. Supp. 3d 352, 362 (D. Md. 2020). Waiving the bond requirement is particularly appropriate here because SFFA is likely to succeed on the merits, and "there has been no proof of likelihood of harm" to the Academy by an injunction that stops it from violating the Constitution. *Doc's Assocs. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).

19

Respectfully submitted,

*s/ Cameron T. Norris*

| | |
|---|---|
| Adam K. Mortara (*pro hac vice* forthcoming) | Thomas R. McCarthy (*pro hac vice* forthcoming) |
| LAWFAIR LLC | Patrick Strawbridge (*pro hac vice* forthcoming) |
| 40 Burton Hills Blvd., Ste. 200 | J. Michael Connolly (*pro hac vice* forthcoming) |
| Nashville, TN 37215 | Cameron T. Norris |
| (773) 750-7154 | Bryan Weir (*pro hac vice* forthcoming) |
| mortara@lawfairllc.com | James F. Hasson (*pro hac vice* forthcoming) |
| | R. Gabriel Anderson (*pro hac vice* forthcoming) |
| Dated: October 6, 2023 | CONSOVOY MCCARTHY PLLC |
| | 1600 Wilson Boulevard, Suite 700 |
| | Arlington, VA 22209 |
| | (703) 243-9423 |
| | tom@consovoymccarthy.com |
| | patrick@consovoymccarthy.com |
| | mike@consovoymccarthy.com |
| | cam@consovoymccarthy.com |
| | bryan@consovoymccarthy.com |
| | james@consovoymccarthy.com |
| | gabe@consovoymccarthy.com |

*Counsel for Students for Fair Admissions*

## CERTIFICATE OF SERVICE

I certify that on October 6, 2023, I electronically filed the foregoing with the Clerk of the

Court using the Court's ECF system, which will automatically send email notification to all coun-

sel of record. I am also serving the foregoing by email and by certified mail, return receipt re-

quested, to the addresses below:

United States Naval Academy
121 Blake Road, Annapolis, MD 21402

United States Department of Defense
1400 Defense Pentagon Washington, DC 20301-1400

Hon. Lloyd J. Austin III
Secretary of Defense
United States Department of Defense
1400 Defense Pentagon Washington, DC 20301-1400

Hon. Carlos Del Toro
Secretary of the Navy
Attn: General Counsel of the Navy
Naval Litigation Office
720 Kennon St., SE, Room 233
Washington Navy Yard, DC 20374-5013

Rear Admiral Fred Kacher
Acting Superintendent, United States Naval Academy
Attn: General Counsel of the Navy
Naval Litigation Office
720 Kennon St., SE, Room 233
Washington Navy Yard, DC 20374-5013

Bruce Latta
Dean of Admissions, United States Naval Academy
Attn: General Counsel of the Navy
Naval Litigation Office
720 Kennon St., SE, Room 233
Washington Navy Yard, DC 20374-5013

*s/ Cameron T. Norris*

# Exhibit H

# MISSION

In Service of Country and Humanity

ABOUT (HTTPS://USCGA.EDU/ABOUT/)

ACADEMICS (HTTPS://USCGA.EDU/ACADEMICS/)

ADMISSIONS (HTTPS://USCGA.EDU/ADMISSIONS/)

ATHLETICS (HTTPS://USCGA.EDU/ATHLETICS/)

CADET LIFE (HTTPS://USCGA.EDU/CADET-LIFE/)

MISSION (HTTPS://USCGA.EDU/MISSION/)

(https://uscga.edu/)

🏠 HOME (HTTPS://USCGA.EDU/) / MISSION

CAREERS (HTTPS://USCGA.EDU/CAREERS/)   **APPLY** (/ADMISSIONS/APPLY)

## Mission Conquered

The focus of the U.S. Coast Guard Academy is to develop officer-ready leaders of character who embody Coast Guard values

Mission - United States Coast Guard Academy

Case 1:24-mc-00092-DLE   Document 1-2   Filed 07/24/24   Page 100 of 105
Case 1:23-cv-02699-RDB   Document 72   Filed 08/13/24   Page 120 of 191

7/23/24, 11:00 PM

ready" cadets of character who embody Coast Guard values, who influence and inspire others, and who decide what is right and demonstrate the courage to act accordingly.

## USCGA Mission

*"To graduate young men and women with sound bodies, stout hearts, and alert minds, with a liking for the sea and its lore, and with that high sense of honor, loyalty, and obedience which goes with trained initiative and leadership; well-grounded in seamanship, the sciences, and amenities, and strong in the resolve to be worthy of the traditions of commissioned officers in the United States Coast Guard in the service of their country and humanity."*

EXPLORE

# OUR MISSION



Future cadets are hardworking ordinary Americans who share one thing in common, the resolve to be worthy.

**WATCH VIDEO**

Mission - United States Coast Guard Academy

Case 1:24-mc-00092-DLE   Document 1-2   Filed 07/24/24   Page 101 of 105
Case 1:23-cv-02699-RDB   Document 72   Filed 08/13/24   Page 121 of 191

7/23/24, 11:00 PM

## Our Process

Leader development at the Coast Guard Academy is intentional, collaborative and continuous. Our process includes several components:

> **LEARN MORE**
> **(HTTPS://USCGA.EDU/MISSION/LEADER-DEVELOPMENT-PROCESS/)**

## Professional Development

Developing leaders and professionally ready officers is an integrated four-year process. The many components include: Curriculum, summer experiences, internships, simulation, career exploration weeks, speakers, and more.

> **LEARN MORE**
> **(HTTPS://USCGA.EDU/MISSION/NAUTICAL-SCIENCE-CURRICULUM/)**

## Four Year Leadership Journey

Experiential and fully integrated with the professional development program, cadets' leadership journeys are guided by a comprehensive curriculum, a dedicated team, and a culture of assessment.

# Four Years At a Glance

The Corps of Cadets is largely a self-directed organization that follows a standard military chain of command.

### Fourth Class Year



Fourth class cadets (freshmen) serve as followers, assimilating into the rigors of military life, while developing essential teamwork skills.

### Third Class Year



Third class cadets (sophomores) serve as personal and professional mentors for 4th class cadets.

**READ MORE**

Mission - United States Coast Guard Academy

Case 1:24-mc-00092-DLE    Document 1-2    Filed 07/24/24    Page 102 of 105
Case 1:23-cv-02699-RDB    Document 72    Filed 08/13/24    Page 122 of 191

7/23/24, 11:00 PM

READ MORE
(HTTPS://USCGA.EDU/MISSION/FOURTH-
CLASS-YEAR/)

(HTTPS://USCGA.EDU/MISSION/THIRD-
CLASS-YEAR/)

## Second Class Year

Second class cadets
(juniors) serve as Assistant
Division Officers,
mentoring, leading and
supervising third and fourth
class cadets.

READ MORE
(HTTPS://USCGA.EDU/MISSION/SECOND-
CLASS-YEAR/)

## First Class Year

First class cadets (seniors)
serve as leaders of the
corps, as Regimental Staff
Officers, Company
Commanders, Department
Heads, and Division Officers.

READ MORE
(HTTPS://USCGA.EDU/MISSION/FIRST-
CLASS-YEAR/)

31 Mohegan Avenue New London, CT
06320

Admissions: 800.883.USCG (8724)

## Helpful Links

Jobs (/about/jobs)

Search

FOIA
(https://www.dcms.uscg.mil/Our-
Organization/Assistant-
Commandant-for-
C4IT-CG-6/The-
Office-of-
Information-
Management-CG-
61/FOIA-Library/)

Accessibility
(/cadet-
life/accessibility/)

Contact Us
(/about/contact-
us/)

Download Reader
(https://get.adobe.com/reader/otherversions/)

## Connect

Facebook
(https://www.facebook.com/CoastGuard

Twitter
(https://twitter.com/USCGAcademy)

YouTube
(https://www.youtube.com/user/CGAP

Instagram
(https://www.instagram

LinkedIn
(https://www.linked

viewAsMember=tru

(/cadet-
life/cadet-
blogs/)

# Exhibit I

**Home** / **About** / **Mission of USNA**

# Mission of USNA

The Naval Academy has a unique clarity of purpose, expressed in our mission:

> *"To develop Midshipmen morally, mentally and physically and to imbue them with the highest ideals of duty, honor and loyalty in order to graduate leaders who are dedicated to a career of naval service and have potential for future development in mind and character to assume the highest responsibilities of command, citizenship and government."*

Our mission forms the basis for everything we do at the Academy. It also encourages a sense of spirit and pride found at few other schools.

This is an official **U.S. Navy Web Site**. URL: **https://www.usna.edu**   Page Last Updated: 2019-01-04

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE: MOTION TO COMPEL COMPLIANCE WITH SUBPOENA DIRECTED TO THE UNITED STATES COAST GUARD | Case: 1:24–mc–00092<br>Assigned To : Friedrich, Dabney L.<br>Assign. Date : 7/24/2024<br>Description: Misc. (O–Deck) |
| STUDENTS FOR FAIR ADMISSIONS,<br><br>*Plaintiff*,<br><br>V.<br><br>THE UNITED STATES NAVAL ACADEMY, *et al.*,<br><br>*Defendants*. | Related Case:<br>No. 1:23-cv-02699<br>(District of Maryland) |

## PROPOSED ORDER COMPELLING PRODUCTION OF DOCUMENTS

Upon review of Movant Students for Fair Admissions' Motion to Compel Production of Documents to the United States Coast Guard, the supporting motion papers, the applicable law, and the record herein, the Court finds that good cause exists for Students for Fair Admissions' Motion and therefore, it is **ORDERED** and **ADJUDGED** as follows:

1. Students for Fair Admissions' Motion to Compel is hereby **GRANTED**;

2. The United States Coast Guard is hereby ordered to produce documents in response to Students for Fair Admissions' subpoena *duces tecum* within 14 days of entry of this Order.

Dated: _____

_____
United States District Court Judge
District of Columbia

Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
Brandon Haase
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
brandon@consovoymccarthy.com

*Counsel for Students for Fair Admissions*

Brian Judge
Office of Claims and Litigation
UNITED STATES COAST GUARD
Commandant CG-LCL,
US Coast Guard HQ,
2703 Martin Luther King Jr. Ave. SE,
Stop 7213,
Washington, DC 20593-7213
(202) 372-3740
brian.judge@uscg.mil

*Counsel for the United States Coast Guard*

# EXHIBIT 2

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: MOTION TO COMPEL COMPLIANCE WITH SUBPOENA DIRECTED TO THE UNITED STATES COAST GUARD | No. 1:24-mc-00092-DLF |

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, <br><br> *Plaintiff*, <br><br> v. <br><br> THE UNITED STATES NAVAL ACADEMY, *et al.*, <br><br> *Defendants*. | District of Maryland <br> No. 1:23-cv-02699-RDB |

**NON-PARTY UNITED STATES COAST GUARD'S
<u>OPPOSITION TO MOTION TO COMPEL</u>**

The underlying litigation in this case challenges the United States Naval Academy's limited consideration of race in its admissions process, and trial begins in the District of Maryland on September 16, 2024. Yet Students for Fair Admissions' ("SFFA") motion to compel seeks irrelevant, unduly burdensome discovery, across a period of more than ten years, from a non-party to the litigation, about the United States Coast Guard Academy—a different service academy under a different Executive Department that employs a different admissions process. And SFFA seeks this irrelevant, unduly burdensome third-party information when discovery closes and trial exhibit lists are due in less than two weeks, motions *in limine* are due in less than three weeks, and trial begins in a mere six weeks. SFFA's motion should be denied.

## <u>BACKGROUND</u>

SFFA initiated the underlying litigation against the Naval Academy in the District of

Maryland in October 2023, and sought expedited resolution, first through a motion for preliminary injunction (which the court denied) and then through an expedited discovery and pre-trial schedule. No. 1:23-cv-2699, Dkt. Nos. 1, 9, 59 (D. Md.). Under that expedited schedule, fact discovery opened in January 2024 and closes on August 14, 2024; witness and exhibit lists are due August 14, 2024; motions *in limine* and Rule 26(a)(3) objections are due August 21, 2024; the pre-trial conference and motions *in limine* hearing will be held on September 5, 2024; and trial will begin on September 16, 2024. *Id.*, Dkt. Nos. 61, 71.

SFFA served expansive discovery requests on the Naval Academy at its first opportunity in January 2024, and served additional requests over the following months. Yet despite SFFA's belief as early as its October 2023 Complaint that information about the Coast Guard Academy is somehow relevant to its claims against the Naval Academy, *see* Dkt. No. 1 at 2, SFFA took no action over nearly the entirety of the discovery period to pursue such information. Rather, SFFA waited until June 7, 2024 to issue its first subpoena to the Coast Guard. Dkt. No. 1-2, Ex. C. The Coast Guard timely objected and provided a detailed response on June 18, 2024. *Id.*, Ex. D. In that response, the Coast Guard alerted SFFA to the requisite process under its *Touhy* regulations and explained that both under *Touhy* and Rule 45, SFFA sought third-party discovery that was not relevant and imposed significant burden. *Id.*; *see also, e.g. Watts v. SEC*, 482 F.3d 501, 509 (D.C. Cir. 2007) ("[D]iscovery under Rules 26 and 45 must properly accommodate 'the government's serious and legitimate concern that its employee resources not be commandeered into service by private litigants to the detriment of the smooth functioning of government operations.'").

SFFA did not respond to the Coast Guard, serve a *Touhy* request in accordance with applicable regulations, or otherwise contact the Coast Guard to attempt resolution of its objections. Ex. 1, Declaration of Brian Judge, ¶ 3. Instead, SFFA served a second, successive subpoena on

June 26, 2024, that was largely identical to its first. Dkt. No. 1-2, Ex. A. SFFA's second subpoena

made only three changes:

- SFFA changed the definition of "You" from the entire "United States Coast Guard and all of its sub-components, to include the United States Coast Guard Academy, and all present and former secretaries, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals," *see* Dkt. No. 1-2 at 27 ¶ 13, to "(a) the Office of The U.S. Coast Guard Headquarters, including the Office of the Commandant, Vice Commandant, and Chief Petty Officer of the United States Coast Guard; and (b) the Board of Visitors, Board of Trustees, Office of the Superintendent, Office of the Assistant Superintendent, Office of the Command Master Chief, and Admissions Office of the United States Coast Guard Academy, and all present and former officers or persons acting for or on behalf of any of these entities or individuals," *see* Dkt. No. 1-2 at 12 ¶ 13.

- SFFA withdrew one request, for "All communications from the Relevant Period by or among Your employees or agents regarding the programs, initiatives, strategies, plans, or organized efforts referenced in [Request] 1." *Compare* Dkt. No. 1-2 at 29, *with id.* at 14.

- SFFA withdrew an instruction that "These requests shall be deemed to be continuing so as to require supplemental answers from time to time until the date of trial." *Compare* Dkt. No. 1-2 at 29 ¶ 9, *with id.* at 13.

SFFA's remaining requests in its second subpoena were identical to those in its first

subpoena. *Compare* Dkt. No. 1-2 at 26-29, *with id.* at 11-14. The Coast Guard again timely

objected and provided a detailed response on July 10, 2024. Dkt. No. 1-2, Ex. B. The Coast Guard

reiterated that the requests in SFFA's second subpoena reflected the same issues previously

identified, that SFFA had once again failed to comply with applicable *Touhy* regulations, and that

"any future Touhy request from you in connection with this litigation" must comply with the

identified regulations. *Id.*

SFFA still did not take corrective action. Instead, SFFA informed the Coast Guard that it

intended to move to compel. Ex. 1, ¶ 6. When asked if there were opportunities to narrow the areas

of disagreement, the Coast Guard responded that because SFFA had not responded to either of the

Coast Guard's letters, it was not in a position to determine whether there were such opportunities.

*Id.* The Coast Guard thus invited SFFA once again to provide "any such response or … any

suggestions for narrowing [SFFA's] requests." *Id.* SFFA did not do so. Rather, after more than a week of silence, SFFA called the Coast Guard on July 24, 2024 and stated that it would move to compel. Ex. 1, ¶ 7. SFFA filed the instant motion that same day.

## ARGUMENT

### I.   The Court Should Transfer the Motion to the District of Maryland District Court Presiding Over the Underlying Litigation

As an initial matter, "[w]hen the court where compliance is required did not issue the subpoena," the compliance court may transfer a subpoena-related motion to the issuing court in either one of two conditions: (1) "the person subject to the subpoena consents" or (2) "the court finds exceptional circumstances." Fed. R. Civ. P. 45(f).

Here, the person subject to the subpoena, non-party Coast Guard, consents to and requests transfer of this motion to the Maryland District Court, given that Judge Bennett "is in a better position to rule on the [] motion to compel in light of [his] history and familiarity with the parties and the issues underlying the subpoena dispute," and "the risks of delaying" the impending pre-trial and trial deadlines established by Judge Bennett's case management order. *Honeywell Int'l Inc. v. Law Offices of Peter T. Nicholl*, 2022 WL 43494, at *4 (D.D.C. Jan. 5, 2022). "[T]he rule plainly affords the nonparty a modicum of choice," and when the nonparty consents to transfer, there is "no impediment to granting that request." *Bogard Constr. Inc. v. Oil Price Info. Serv.*, 2022 WL 1213307, at *3 (D. Md. Apr. 25, 2022).

Although the Coast Guard's consent is dispositive on the issue of transfer, "exceptional circumstances" also warrant transfer. Fed. R. Civ. P. 45(f). "[S]ubstantial caselaw" establishes that the standard in Rule 45(f) is met "when the subpoena dispute implicates the underlying litigation and requires an understanding of the full scope of the underlying litigation to properly assess the need for subpoenaed documents." *In re Subpoena to Nat'l Acad. of Scis.*, 2024 WL 3370249, at

*3 (D.D.C. July 10, 2024) (emphasizing that the issuing court is "in a much better position … to evaluate relevance" of the subpoena to the litigation, and collecting cases); *XY, LLC v. Trans Ova. Genetics,* 307 F.R.D. 10, 12 (D.D.C. 2014) (additionally looking to whether the issuing court "has already supervised substantial discovery and begun preparations for trial," and collecting cases). Moreover, when the motion (and its resolution) risks disrupting the issuing court's case management order, the issuing court "is better positioned to assess whether the value to be gained from [the subpoena] justifies a discovery modification." *CFA Inst. v. Am. Soc'y of Pension Pros.*, 2020 WL 1695050, at *2 (D.D.C. Apr. 7, 2020).

Judge Bennett in the District of Maryland is intimately familiar with the issues in the litigation, against which the relevance of the subpoena must be assessed; has already supervised substantial discovery (which closes imminently) and resolved discovery disputes between the parties; and has established rapidly approaching pre-trial deadlines and scheduled trial to begin in a mere six weeks. These factors weigh overwhelmingly in favor of transfer.[1]

## II.     The Court Should Deny the Motion for Failure to Confer

Regardless of whether this motion is transferred to the District of Maryland, the Court should deny it due to SFFA's failure to satisfy its conferral obligations. *See* D.D.C. Loc. R. 7(m); D. Md. Loc. R. 104.7; *see also* Fed. R. Civ. P. 45(d)(1) (the issuing party "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena"). "[E]ven if the movant is sure that his opponent will not concede one inch of ground, he must still make a good-faith effort to confer," and that "obligation to confer may not be satisfied by perfunctory

---

[1] It is unclear why the motion is before this Court in the first place, considering that the issuing court is within 100 miles of the Coast Guard, Fed. R. Civ. P. 45(c)(2); SFFA's first subpoena listed its counsel's office in Virginia as the place of compliance, Dkt. No. 1-2 at 20; and its successive subpoena—the one at issue here—changed the place of compliance to a hotel in Washington, D.C. with no connection to the litigation, the parties, or non-party Coast Guard, *id.* at 5.

action." *United States v. All Assets*, 202 F. Supp. 3d 1, 6-7 (D.D.C. 2016). "[W]ait[ing] until the day of filing to call opposing counsel regarding the motion" is not sufficient. *Alberts v. HCA Inc.*, 405 B.R. 498, 501 (D.D.C. 2009). And when a non-party has provided its objections to a subpoena, the issuing party's failure to "attempt to narrow the scope of the document subpoena, offer to share the cost of compliance, or otherwise facilitate the resolution of the differences in position" demonstrates lack of "'sincere attempts' to resolve a discovery dispute." *Crete Carrier Corp. v. Sullivan*, 2022 WL 1203652, at *24 (D. Md. Apr. 21, 2022).

Here, SFFA made no effort to narrow areas of disagreement after receiving non-party Coast Guard's objections on July 10. The Coast Guard noted that SFFA had not "responded to either" of the Coast Guard's letters and invited SFFA to discuss "any such response" or "any suggestions for narrowing [SFFA's] requests." Ex. 1, ¶ 6. SFFA took neither action, instead calling the Coast Guard more than a week later to declare impasse, and then filing its motion the same day. Ex. 1, ¶ 7. That is not a good faith effort to narrow areas of disagreement, and it "is grounds for denial of a discovery motion." *All Assets*, 202 F. Supp. 3d at 6; *accord Alberts*, 405 B.R. at 501; *Crete Carrier*, 2022 WL 1203652, at *24.

### III.    The Court Should Deny the Motion for Delay and Disruption to Impending Pretrial and Trial Deadlines

SFFA's substantial delay in pursuing its subpoena, and the ensuing prejudice to non-party Coast Guard and Defendants, as well as the disruption to Judge Bennett's case management order, provide further reason to deny the motion. *See, e.g.*, *Dag Enters. v. Exxon Mobil Corp.*, 226 F.R.D. 95, 104, 108-10 (D.D.C. 2005); *Crete Carrier*, 2022 WL 1203652, at *20-21. Fact discovery in the underlying litigation opened in January 2024, and closes imminently, on August 14, 2024.[2]

---

[2] The deadline for all expert reports, July 31, 2024, has already passed. No. 1:23-cv-2699, Dkt. No. 71 (D. Md.).

No. 1:23-cv-2699, Dkt. Nos. 61, 71 (D. Md.). More significantly, trial exhibit lists are due in less than two weeks, motions *in limine* are due in less than three weeks, and trial is scheduled to begin in just six weeks. *Id.*, Dkt. No. 71. Yet with full knowledge of the expedited discovery schedule and the extremely compressed post-discovery pre-trial schedule, SFFA waited months to issue its subpoena, and even after receiving non-party Coast Guard's timely objections, waited weeks more to seek enforcement. In full recognition of the prejudice and disruption caused by its own delay, SFFA asks the Court to require non-party Coast Guard's production within two weeks of an order enforcing the subpoena—an artificially compressed timeline that would be extremely prejudicial to and not feasible for non-party Coast Guard to meet. *See* Ex. 2, Declaration of CAPT Andrew Behnke, ¶ 11.

But even under the terms of SFFA's request, there is no circumstance in which such production could be made before the close of discovery and service of trial exhibit lists on August 14. Nor is there a circumstance in which such production could be made with enough time for Defendants to move *in limine* by August 21 for the documents' exclusion from trial, for Judge Bennett to resolve motions *in limine* before trial, and for trial to begin in just six weeks with the full disclosure of the universe of documents and testimony to be presented at trial.

Indeed, as the Coast Guard correctly noted in its June 18 response, the information sought through SFFA's subpoena would only "lead to greater Coast Guard involvement in the case"— notwithstanding the Coast Guard's status as a non-party—as "[b]oth parties would desire more information about causal factors" to explain the information sought from the Coast Guard. Dkt. No. 1-2, Ex. D. At this stage of the litigation, on the eve of pre-trial filings and mere weeks from trial, SFFA's request will inevitably upend a trial schedule that has long been in place.

In short, "there is now no practical way that the [subpoenaed information] could be

produced in time to be analyzed by expert witnesses or presented at trial," and that inevitability "is attributable solely to [SFFA's] strategic decisions throughout discovery." *Texas v. Holder*, 2012 WL 13070110, at *3-4 (D.D.C. June 8, 2012) (denying motion to compel); *see also Ike-Ezunagu v. Deco, Inc.*, 2010 WL 4822511, at *2 (D. Md. Nov. 22, 2010) (denying "emergency motion" to compel "[g]iven Plaintiff's dilatoriness" and the fact that the discovery could not be undertaken by the deadlines in the court's scheduling order "without imposing on [the subpoena recipients] an undue burden").

## IV. The Court Should Deny the Motion for Lack of Relevance and Undue Burden on a Non-Party

SFFA's subpoena additionally fails to satisfy Rule 45's strict standards governing relevance and burden—particularly acute for requests directed at a non-party such as the Coast Guard—and the Court should therefore deny the motion.

### A. SFFA Does Not Correctly Apply Rule 45

At the outset, SFFA's motion ignores the heightened standard that applies under Rule 45. Discovery served on a non-party government agency under Rule 45 "must properly accommodate 'the government's serious and legitimate concern that its employee resources not be commandeered into service by private litigants to the detriment of the smooth functioning of government operations.'" *Watts*, 482 F.3d at 509. Accordingly, the subpoena must "avoid imposing undue burden or expense on a person subject to the subpoena," Fed. R. Civ. P. 45(d)(1), and "courts must give the recipient's nonparty status 'special weight,' leading to an even more 'demanding and sensitive' inquiry than the one governing discovery generally," *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019). *Accord Watts*, 482 F.3d at 509 (citing additional circuit court of appeals cases emphasizing the importance of closely examining subpoenas issued to non-parties). SFFA's motion omits any consideration of the Coast Guard's non-party status and

falls far short of the even more demanding and sensitive inquiry required for non-parties.

### B. SFFA's Subpoena Does Not Seek Relevant Information

SFFA's motion also fails at the threshold because its subpoena does not seek information relevant to the underlying claims against the Naval Academy. The subpoena seeks documents about the Coast Guard Academy regarding (1) the Coast Guard Academy's "programs, initiatives, strategies, plans, or other organized efforts"—from more than 10 years ago—to increase the number or percentage of "all applicants, admitted students, and/or matriculants" who are racial or ethnic minorities; and (2) the number of "applicants, admitted students, matriculants, and graduates of each race for the Coast Guard Academy Classes of 2008 [through] 2017." Dkt. No. 1-2 at 14.[3] SFFA contends that these requests are relevant because they "seek additional evidence to undermine the Naval Academy's assertion that no race-neutral alternatives exist." Dkt. No. 1 at 5. This argument is wrong several times over.

Neither category of documents is relevant to the underlying claims against the Naval Academy because the two academies are not appropriate comparators. *See, e.g.*, *Ross v. U.S. Capitol Police*, 2023 WL 4562924, at *8 (D.D.C. Apr. 27, 2023) (denying motion to compel information on individuals who are not relevant comparators); *Coleman v. District of Columbia*, 275 F.R.D. 33, 37-38 (D.D.C. 2011) (similar, and cautioning that "the relevance standard is 'not so liberal as to allow a party to roam in shadow zones of relevancy'"). As the Coast Guard has

---

[3] SFFA incorrectly states that the Coast Guard does not dispute the relevance of the first request. Dkt. No. 1 at 5. As reflected in the Coast Guard's June 18 letter, incorporated by reference in its July 10 letter, both of SFFA's requests appear to be intended to argue "that the racial diversity of an entering military academy class can be increased using methods other than considering race," and the Coast Guard explained at length why "the Coast Guard's admissions practices are not relevant to the Naval Academy's distinct admissions process." Dkt. No. 1-2 at 37; *see also id.* at 36 (articulating the difficulty "determining what, if any, probative value such evidence would have in this case").

explained, the Coast Guard Academy is an entirely different service academy, under a different Executive Department (the Department of Homeland Security, versus the Department of Defense for the Naval Academy), with a different mission and applicant pool, with a dramatically different class size (less than 300 at the Coast Guard Academy, versus more than 1,100 at the Naval Academy), and with significantly different admissions processes (most notably, no congressional nomination system at the Coast Guard Academy, versus the congressional nomination system that accounts for the vast majority of appointments at the Naval Academy). Dkt. No. 1-2, Ex. B; *see also* Ex. 2, ¶¶ 12-13.[4] As a result of these fundamental differences, the Coast Guard Academy's efforts to increase the diversity of its distinct student body more than 10 years ago has no probative value on the Naval Academy's present efforts to increase the diversity of its brigade of midshipmen. Indeed, the very premise of SFFA's argument—that the Naval Academy does not employ race-neutral alternatives, *see* Dkt. No. 1 at 5-6—is incorrect and has been disproven by copious documents and testimony obtained from the Naval Academy during the discovery period. *See, e.g.*, No. 1:23-cv-2699, Dkt. No. 46-2 ¶¶ 79-80, 91-99 (D. Md.).

This lack of relevance alone warrants denying SFFA's motion, and all the more so given the Coast Guard's status as a non-party. *Jordan*, 921 F.3d at 188-89; *Watts*, 482 F.3d at 507.

### C. SFFA's Requests Impose an Undue Burden

The undue burden of SFFA's subpoena—a burden SFFA refused to mitigate, as Rule 45(d) requires—further confirms that the Court should deny the motion.

First, SFFA's requests are necessarily unduly burdensome because of their lack of

---

[4] SFFA's reliance on general references to "service academies" in prior cases, Dkt. No. 1 at 5-6, reveals its inability to contest the specific, meaningful differences the Coast Guard Academy identified in both its correspondence and the attached evidence. *See* Dkt. No. 1-2 at 36-38; Ex. 2, ¶¶ 12-13.

relevance. *See, e.g.*, *Jimenez v. City of Chicago*, 733 F. Supp. 2d 1268, 1273 (W.D. Wash. 2010) ("The compulsion of production of irrelevant information is an inherently undue burden."); *Monte H. Greenawalt Revocable Trust v. Brown*, 2013 WL 6844760, at *2 (D. Nev. Dec. 19, 2013) ("Plaintiffs' subpoenas subject persons 'to undue burden' as a matter of law because the subpoenas seek irrelevant information."); *see also* Ex. 2, ¶ 12.

Second, SFFA's requests are unduly burdensome on their face, as they seek information from the entirety of the Coast Guard Headquarters and six other entities within the Coast Guard Academy—comprising approximately 4,000 rotating individuals every 2-4 years—across a more than 10-year period. *See* Ex. 2, ¶ 5; Dkt. No. 1-2 at 17. Just the process of identifying those individuals alone—not even accounting for the ensuing time required for search and review of documents—would take approximately 1,000 hours. Ex. 2, ¶ 5. Such broad, unduly burdensome requests cannot be sustained even against parties to a litigation, let alone a non-party such as the Coast Guard. *See, e.g.*, *Brown v. Chemonics Int'l*, 2022 WL 22233224, at *6-7 (D.D.C. Mar. 22, 2022) (rejecting requests that would require a party to search companywide across thousands of employees); *Diaz v. Md. Nat'l Capital Park Police*, 2006 WL 8457045, at *2 (D. Md. June 12, 2006) (rejecting "the use of a five year period and the failure to specify any terms or parameters" in a subpoena to a non-party).

Third, even narrowing SFFA's requests to the Coast Guard Academy Admissions Office, as the Coast Guard did in responding to the subpoena, does not resolve the undue burden. As the Coast Guard has explained, the burden is multi-fold. First, only three of the people who worked in the Admissions Office during the requested time period still work there, and all three held low-level positions that would not make them a likely source for responsive documents. Ex. 2, ¶ 7. Nevertheless searching their files despite their lack of relevance would entail significant effort for

a likely futile result. Second, because the former employees (including the Director of Admissions and Deputy Director from the requested time period) cannot provide their institutional knowledge as to the location and existence of any responsive material, the subpoena would require current personnel to review the entirety of those former employees' files and the Admissions Office's digital files across a more than 10-year period. That search and review could take more than 4,000 hours. Ex. 2, ¶¶ 8-9; *see also id.* ¶ 10. The Coast Guard Academy Admissions Office simply does not have the resources to undertake such a search: it is significantly understaffed, its current employees are engaged full-time on mission-critical and time-sensitive work that they are employed by the Coast Guard to perform, and even diverting personnel to respond to the subpoena would still require more than a year's worth of time to complete the search. Ex. 2, ¶ 11. Extensive caselaw holds that Rule 45 does not permit these burdens on a non-party. *See, e.g.*, *Watts*, 482 F.3d at 509 (Rule 45 "must properly accommodate 'the government's serious and legitimate concern that its employee resources not be commandeered into service by private litigants to the detriment of the smooth functioning of government operations'"); *Jordan*, 921 F.3d at 189-90 ("A nonparty should not have to do the work of tailoring a subpoena to what the requesting party needs; the requesting party should have done that before serving it."); *N.C. Right to Life v. Leake*, 231 F.R.D. 49, 52 (D.D.C. 2005) ("It is a great burden to require an organization to sacrifice such a large proportion of its staff for several weeks," "particularly in light of the fact that [the subpoena recipient] is neither a party, nor even an amicus, in the underlying action.").

Fourth, SFFA's lack of need for the requested material solidifies the subpoena's undue burden. *See, e.g.*, *Jordan*, 921 F.3d at 189 (holding that courts should consider "the requesting party's need for" the information and "what information is available to the requesting party from other sources"); *Fuerth v. Winarsky*, 2006 WL 1896094, at *2 (D. Md. Apr. 18, 2006) ("Even if

the information sought is relevant, discovery is not allowed where no need is shown…."). By SFFA's own admission, it already has the material it needs to attempt its desired comparison between the Coast Guard Academy and the Naval Academy; its subpoena here simply "seek[s] *additional* evidence." Dkt. No. 1 at 5 (emphasis added). Indeed, SFFA cites to public information that "the Coast Guard regularly publishes," *id.* at 7, and SFFA has already served expert reports that offer opinions based on the Coast Guard's admissions process over the time period covered by SFFA's subpoena.[5] Caselaw does not support the imposition of the significant burdens on non-party Coast Guard here when SFFA has not shown genuine "substantial need." *See also* Fed. R. Civ. P. 45(d)(3)(C)(i).

SFFA cannot overcome these substantial burdens on non-party Coast Guard. At bottom, SFFA's attempt to resist these demonstrated burdens reflects its effort to treat the Coast Guard as "a defendant." *See* Dkt. No. 1 at 7. But the Coast Guard is not a defendant. In light of the Coast Guard's non-party status, the lack of relevance of the information SFFA seeks, and the substantial undue burden of SFFA's subpoena, the Court should deny the motion to compel.

## <u>CONCLUSION</u>

For the foregoing reasons, non-party Coast Guard respectfully requests that the Court (whether the compliance court or, in the event of transfer, the issuing court) deny SFFA's motion to compel.

---

[5] Because SFFA has designated its expert reports Highly Confidential under the protective order in the underlying litigation, an excerpt of the portions discussing the Coast Guard is not attached to this filing. If the Court wishes to see the reports, counsel for the government will take appropriate action to provide them to the Court.

Dated: August 1, 2024

Respectfully submitted,

BRIAN M. BOYTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

 _/s/ Catherine M. Yang_____
JOSHUA E. GARDNER
Special Counsel
CHRIS EDWARD MENDEZ
JOHN ROBINSON
CATHERINE M. YANG
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 514-4336
Email: catherine.m.yang@usdoj.gov

MEDHA GARGEYA
Counsel
U.S. Department of Justice
Civil Division, Office of the Assistant
Attorney General
950 Pennsylvania Avenue NW
Washington, DC 20530

*Counsel for Non-Party United States Coast Guard*

Exhibit 1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: MOTION TO COMPEL COMPLIANCE WITH SUBPOENA DIRECTED TO THE UNITED STATES COAST GUARD | No. 1:24-mc-00092-DLF |

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS,<br><br>    *Plaintiff,*<br><br>    v.<br><br>THE UNITED STATES NAVAL ACADEMY, *et al.,*<br><br>    *Defendants.* | District of Maryland<br>No. 1:23-cv-02699-RDB |

## DECLARATION OF BRIAN JUDGE

I, Brian Judge, hereby state and declare as follows:

1.       I am the Chief, Office of Claims and Litigation, at the United States Coast Guard. I have held this position for over ten years.  As the Chief, Office of Claims and Litigation, I am authorized to make determinations concerning the testimony of Coast Guard employees or the production of documents in connection with litigation in which the Coast Guard is not a party pursuant to 6 C.F.R. § 5.44.

2.       On Monday, June 10, 2024, I received a subpoena from Students for Fair Admissions (SFFA) dated Friday, June 7, 2024.  *See* Dkt. No. 1-2, Ex. C.  Because this was a subpoena in connection with litigation in which the Coast Guard is not a party, I treated the subpoena as a request under the Department of Homeland Security's *Touhy* regulations found at 6 C.F.R. Part 5.  After reviewing the subpoena, I determined that the Coast Guard unit

most likely to possess responsive documents was the United States Coast Guard Academy. I

consulted with colleagues at the Coast Guard Academy to determine the burden of

responding to this subpoena and the likelihood that we would be able to find any responsive

documents. Using that information and my knowledge of the Coast Guard's organizational

structure and records management practices, I applied the factors found at 6 C.F.R. § 5.48

and determined that complying with the subpoena would present an undue burden to the

Coast Guard. I explained this decision in a letter to SFFA dated June 18, 2024, which I sent

to counsel for SFFA via email on the same date. Dkt. No. 1-2, Ex. D. The letter also

contained the Coast Guard's Rule 45 objections to the subpoena, including both to the lack of

relevance and the undue burden.

3.    I did not receive any response to my June 18, 2024 letter.

4.    On June 26, 2024, SFFA served a second, successive subpoena on the Coast

Guard. Dkt. No. 1-2, Ex. A. There was no cover letter, or any communication that

responded to my June 18, 2024, letter. I reviewed this subpoena and determined that it was

substantively unchanged from the first subpoena except for three changes: (1) a change in

the definition of You (which still included not just the Coast Guard Academy, but all of Coast

Guard Headquarters); (2) withdrawal of one category of requests; and (3) the removal of an

instruction which required the Coast Guard to continue to supplement its responses until the

date of the trial (which was insignificant because the trial date is September 16, 2024). The

subpoena also changed the location for producing documents from SFFA's counsel's offices

in Virginia to a hotel lobby in the District of Columbia.

5.    Although the second subpoena again did not comply with the requirements of our

*Touhy* regulations, I again considered it under those regulations, applied the applicable

factors, and determined that the minor changes did not address my concerns with the earlier subpoena. I detailed my explanation, along with the Coast Guard's Rule 45 objections to relevance and undue burden, in a July 10, 2024, letter which I sent to SFFA's counsel by e-mail that same day. Dkt. No. 1-2, Ex. B.

6.    On Friday, July 12, 2024, I received an e-mail from SFFA's counsel stating they intended to file a motion to compel and stating, "Please advise on whether the Coast Guard will oppose and if there are any opportunities to narrow the areas of disagreement." I responded: "I'm not capable of determining whether there are any opportunities to narrow areas of disagreement since you haven't responded to either letter. I'm happy to discuss if you have any such response or have any suggestions for narrowing your requests." Exhibit A.

7.    I received no response to my July 15, 2024, e-mail. On July 24, 2024, I received a call from Michael Connelly, one of the attorneys representing SFFA, who informed me that they would be filing a motion to compel that day. After informing me they would be filing the motion to compel, he informed me that he had no response to my July 12, 2024, e-mail, because he felt we were at an impasse despite any attempt by SFFA to narrow the areas of disagreement. The entire conversation took approximately one minute and thirty-seven seconds.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 1st, 2024 in Washington, DC.

_____
Brian Judge
Chief, Office of Claims and Litigation
U.S. Coast Guard

EXHIBIT A

**Judge, Brian M CIV (USA)**

| | |
|---|---|
| **From:** | Judge, Brian M CIV (USA) |
| **Sent:** | Monday, July 15, 2024 2:55 PM |
| **To:** | Brandon Haase |
| **Cc:** | Michael Connolly; Thomas McCarthy; Cam Norris; Joshua.E.Gardner@usdoj.gov |
| **Subject:** | RE: [Non-DoD Source] Motion to Compel Subpoena // Seeking USCG's Position |
| **Signed By:** | brian.judge@uscg.mil |

Brandon,

Thanks for reaching out to me about your subpoenas.

As discussed in my letters, your subpoenas are governed by the Department of Homeland Security's Touhy regulations found at 6 C.F.R. Part 5. I'm not capable of determining whether there are any opportunities to narrow areas of disagreement since you haven't responded to either letter. I'm happy to discuss if you have any such response or have any suggestions for narrowing your requests. Otherwise, if you simply file a motion to compel the Coast Guard would object to any such motion.

v/r,

Brian

**From:** Brandon Haase <brandon@consovoymccarthy.com>
**Sent:** Friday, July 12, 2024 9:29 AM
**To:** Judge, Brian M CIV (USA) <Brian.Judge@uscg.mil>
**Cc:** Michael Connolly <mike@consovoymccarthy.com>; Thomas McCarthy <tom@consovoymccarthy.com>; Cam Norris <cam@consovoymccarthy.com>; Joshua.E.Gardner@usdoj.gov
**Subject:** [Non-DoD Source] Motion to Compel Subpoena // Seeking USCG's Position

Dear Mr. Judge,

We received the Coast Guard's objections to our subpoena dated June 26, 2024. Per the D.C. District's local civil rule 7(m), we are notifying you that we intend to file a motion to compel the Coast Guard's response. Please advise on whether the Coast Guard will oppose and if there are any opportunities to narrow the areas of disagreement.

Regards,


--
Brandon M. Haase
**Consovoy McCarthy PLLC**
1600 Wilson Boulevard, Ste. 700
Arlington, VA 22209
(703) 243-9423
www.consovoymccarthy.com

# Exhibit 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: MOTION TO COMPEL COMPLIANCE WITH SUBPOENA DIRECTED TO THE UNITED STATES COAST GUARD | No. 1:24-mc-00092-DLF |

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, *Plaintiff,* v. THE UNITED STATES NAVAL ACADEMY, *et al.,* *Defendants.* | District of Maryland No. 1:23-cv-02699-RDB |

## DECLARATION OF CAPT ANDREW BEHNKE

I, Andrew Behnke, pursuant to the provisions of 28 U.S.C. § 1746, declare, under penalty of perjury, as follows:

1.       I am the Director of Admissions at the United States Coast Guard Academy.

2.       My duties include oversight of the cadet recruitment process, the establishment and implementation of strategic priorities for meeting enrollment goals, and oversight of the collection and analysis of data pertinent to Coast Guard Academy admissions.

3.       I have reviewed the subpoena from Students for Fair Admissions ("SFFA") that is the subject of the motion to compel in this action and considered the effort it would take the United States Coast Guard in general and the Coast Guard Academy in particular to respond to this subpoena.

4.       SFFA's subpoena seeks two categories of documents.  The first seeks "[a]ll

documents from the Relevant Period prepared by You concerning any programs, initiatives, strategies, plans, or other organized efforts undertaken for the purpose of (a) increasing the number of racial or ethnic minority students who applied, were admitted, and/or matriculated to the Coast Guard Academy; or (b) increasing the percentage of all applicants, admitted students, and/or matriculants to the Coast Guard Academy who are racial or ethnic minorities, including but not limited to the strategies" discussed in a 2010 news article. The second category of documents sought includes "[d]ocuments sufficient to show the total number of applicants, admitted students, matriculants, and graduates of each race for the Coast Guard Academy Classes of 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017."

5. The subpoena, by its terms, requires the Coast Guard to search all of Coast Guard Headquarters for documents responsive to the first category of documents. Approximately 4,000 people are assigned to Coast Guard Headquarters with the majority being military members who change billets every two to four years. The defined "Relevant Period" for the first requested category in the subpoena covers documents from January 1, 2008, and continuing through April 1, 2013, as well as documents relating to this time period whenever prepared, so the subpoena would include approximately 10,000 individuals who were assigned to Headquarters more than a decade ago. The Coast Guard does not have a database that can be easily searched to determine which individuals were assigned to Coast Guard Headquarters during this period. The Coast Guard could attempt to search individual personnel files, but with over 50,000 active duty and reserve members and 9,500 civilian employees any attempt to electronically review individual personnel files one at a time to determine if the individual was assigned to Coast Guard Headquarters during the Relevant Period would take approximately 1,000 hours even assuming an unrealistic review time of one minute per file. Only after the process of identifying all individuals assigned to Coast

Guard Headquarters during the relevant period could the Coast Guard begin to search for responsive records.

6.     Even limiting the search to the Coast Guard Academy Admissions Office, which is the office most likely to have responsive documents, if any, would be unduly burdensome and complicated by a number of factors.

7.     The Admissions Office is comprised of a mix of uniformed and civilian personnel. It is usually headed by a rotating Captain ("O6") who serves roughly 2-3 years in that role. I have recently taken on this position following the retirement of the former Director of Admissions. None of my predecessors remain on active duty. The Deputy position, a civilian position, is also currently vacant. The current Admissions Officers are all active-duty military members, and none were serving in the Admissions Office during the period in question. As active-duty military members, the Admissions Officers generally serve a two or three year tour of duty and rotate to another billet elsewhere in the Coast Guard. As a result, only three of the people who worked in the Admissions Office from 2008 through 2013 work there now. None of those three individuals held positions of decision-making authority or had any influence on admission selection policies at the time – one worked in Processing/Application Support, one in Marketing, and the third in Campus Programs Support – and therefore are not likely to have responsive documents.

8.     The next problem is that the other people who worked in the Admissions Office from 2008 through 2013—including the Director of Admissions and the Deputy Director during that time—no longer work there. None of my predecessors as the Director of Admissions remain on active duty with the Coast Guard so their individual electronic records no longer exist. The same is true of other former members of the Admissions Office who have left the Coast Guard. In addition, the Coast Guard only retains e-mails for a period of seven years so Admissions Office e-

mails from the Relevant Period no longer exist. As a result, the Coast Guard cannot search by using the electronic records of the individuals most likely to have responsive documents.

9.      The Admissions Office has a digital common drive but searching that would also require significant and undue burden. Again, the former employees most likely to have knowledge of the location and existence of any responsive records no longer work at the Admissions Office, and therefore would not be able to guide the conduct of such a search. In that absence, current personnel would be required to conduct a search "blind," clicking into and reviewing over 47,000 individual digital files to determine whether they are responsive. Such a search could easily take more than 4,000 hours. Moreover, the Coast Guard Academy uses multiple network servers at the Coast Guard Academy, i.e., the ".mil" and ".edu" servers. Military members and civilian employees use both servers and have both a .mil and a .edu address. In 2022, the Coast Guard as a whole transitioned to a new Microsoft-based cloud storage system. This process drastically changed the way digital information was stored on the ".mil" server. While this process did not impact the local ".edu" server, this change would make accessing admissions-related documents on the ".mil" server infeasible as electronic folders would have created dates that reflect the migration. Also, not all data would have been migrated to the new system prior to the aforementioned transition.

10.     Finally conducting a complete search would require dedicating personnel to "searching the attic," meaning going through the Coast Guard Academy's paper files stored in the library -- by hand -- from a decade ago. It is not currently the practice of the Admissions Office to store such documents in this manner, but I cannot say the Admissions Office did not store paper records there during the Relevant Period. This being the case, any such search would likely take days and be both extremely burdensome and likely fruitless.

11.     In addition to the burdens described above, any such search for responsive documents would also impose a substantial burden on the Admissions Office because we are currently short-staffed. Currently, nearly one-third of the Admissions Office (6 out of 20 positions) is vacant. The remaining 14 employees are engaged full-time on numerous mission-critical and time-sensitive work, such as recruiting/outreach travel and planning, processing thousands of applications, and managing daily interactions with guests and prospective cadets. I do not have any personnel I can task with the search and review required by the subpoena without diverting them from the work they are employed by the Coast Guard to perform. And even if I were to re-assign personnel to respond to the subpoena, it would take well over a year for two people to complete the work. By that time, I understand that the trial in the underlying case against the Naval Academy would be over. Needless to say, the request for production of documents in the short time (two weeks) that SFFA requests is not feasible.

12.     The undue burden posed by SFFA's subpoena (inclusive of both its requests) is further compounded because of the lack of relevance of the information SFFA seeks to the underlying litigation against the Naval Academy. The Coast Guard Academy admissions process differs substantially from the Naval Academy admissions process and that of all the other U.S. service academies. For instance, the Coast Guard Academy is the only service academy that does not include a nomination requirement in the application process. This allows the Coast Guard Academy to review and consider for appointment all applications without the additional filtering and procedures associated with the nomination process. The lack of a nomination process better enables our staff to matriculate an incoming class that meets the needs of the Coast Guard and the Academy ranging from obtaining the right mix of academic majors to feed the critical skills the Coast Guard will need in the future officer corps to filling the Academy's twenty-four inter-

collegiate sports teams and other extra-curricular activities. This also makes it easier to assemble a racially diverse class.

13. There is also a significant difference in size between the academies. An incoming class at the Coast Guard Academy will generally consist of less than three hundred cadets while the Naval Academy offers over 1,250 appointments each year. As a result, when measured by percentage, as SFFA's subpoena references, a change in the racial composition at the Coast Guard will have very different meaning when compared to a change in the racial composition at the Naval Academy. Furthermore, despite its small size, the Coast Guard Academy produces approximately 45% of the Coast Guard officer corps, a much larger percentage than the Naval Academy. As a result, the Coast Guard Academy must produce a greater percentage of the various skills sets and backgrounds required by the officer corps than the Naval Academy. Finally, while the Coast Guard Academy and the Naval Academy do attract similar applicants, there are also significant differences in the applicant pools, including because of the Coast Guard's lack of a nomination requirement and because the Coast Guard has a number of missions beyond national defense and therefore attracts applicants who would not be interested in applying to the Naval Academy. In sum, the application processes and recruitment strategies for the two academies are quite different, making any comparison of the use of race neutral alternatives between the two academies particularly inapt.

Executed on August 1, 2024, in New London, CT.

Andrew Behnke
Captain, U.S. Coast Guard

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE: MOTION TO COMPEL COMPLIANCE WITH SUBPOENA DIRECTED TO THE UNITED STATES COAST GUARD | No. 1:24-mc-00092-DLF |
| STUDENTS FOR FAIR ADMISSIONS, <br><br> *Plaintiff*, <br><br> V. <br><br> THE UNITED STATES NAVAL ACADEMY, *et al.*, <br><br> *Defendants*. | Related Case: <br> No. 1:23-cv-02699 <br> (District of Maryland) |

## REPLY IN SUPPORT OF
## <u>MOTION TO COMPEL COMPLIANCE WITH A SUBPOENA</u>

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

I.     This Court should decide the motion. .................................................................. 2

II.    SFFA narrowed the subpoena, and further conferral was pointless. ................... 5

III.   SFFA did not delay in bringing this motion. ....................................................... 6

IV.    The documents that SFFA seeks are relevant and do not unduly burden the
       Coast Guard. ........................................................................................................ 7

CONCLUSION ...................................................................................................................... 10

## TABLE OF AUTHORITIES

**Cases**

*Alberts v. HCA Inc.*,
   405 B.R. 498 (D.D.C. 2009) ................................................................... 5

*Bogard Constr. Inc. v. Oil Price Info. Serv., LLC*,
   No. 21-cv-3005, 2022 WL 1213307 (D. Md. Apr. 25, 2022) ................ 3

*CFA Inst. v. Am. Soc'y of Pension Pros. & Actuaries*,
   No. 20-mc-18, 2020 WL 1695050 (D.D.C. Apr. 7, 2020) ................... 4

*COMSAT Corp. v. Nat'l Sci. Found.*,
   190 F.3d 269 (4th Cir. 1999) ................................................................. 4

*Crete Carrier Corp. v. Sullivan & Sons, Inc.*,
   No. 21-cv-328, 2022 WL 1203652 (D. Md. Apr. 21, 2022) ............. 5, 6

*Dag Enters., Inc. v. Exxon Mobil Corp.*,
   226 F.R.D. 95 (D.D.C. 2005) ................................................................ 6

*Dell Inc. v. DeCosta*,
   233 F. Supp. 3d 1 (D.D.C. 2017) .......................................................... 9

*Fisher v. Univ. of Tex. at Austin*,
   570 U.S. 297 (2013) .............................................................................. 2

*GFL Advantage Fund, Ltd. v. Colkitt*,
   216 F.R.D. 189 (D.D.C. 2003) .............................................................. 5

*Ghawanmeh v. Islamic Saudi Acad.*,
   268 F.R.D. 108 (D.D.C. 2010) .............................................................. 6

*Grutter v. Bollinger*,
   539 U.S. 306 (2003) .............................................................................. 7

*Honeywell Int'l Inc. v. Law Offices of Peter T. Nicholl*,
   No. 21-mc-151, 2022 WL 43494 (D.D.C. Jan. 5, 2022) ..................... 3

*Hood v. City of Chicago*,
   No. 19-mc-123, 2019 WL 5295169 (D.D.C. Oct. 18, 2019) ............... 4

*HT S.R.L. v. Velasco*,
   No. 15-mc-664, 2015 WL 13759884 (D.D.C. Nov. 13, 2015) ............ 3

*Ike-Ezunagu v. Deco, Inc.*,
   No. 9-cv-526, 2010 WL 4822511 (D. Md. Nov. 22, 2010) ................. 6

*In re Subpoena to Nat'l Acad. of Scis.*,
   No. 24-mc-59, 2024 WL 3370249 (D.D.C. July 10, 2024) ................. 3

*In re Subpoena to Nat'l Telecomms. & Info. Admin.*,
   No. 19-mc-40 (D.D.C.) ...................................................................... 2, 4

*Johnson v. ACB Ideas, LLC*,
   No. 23-cv-2944, 2024 WL 3225994 (D.D.C. June 28, 2024) .............. 6

*Kriebel v. Life Ins. Co. of N. Am.*,
    No. 15-cv-151, 2015 WL 11347968 (D.D.C. Oct. 14, 2015) ...................................... 6

*Nasreen v. Capitol Petrol. Grp., LLC*,
    340 F.R.D. 489 (D.D.C. 2022) ...................................................................................... 5

*SFFA v. USMA*,
    144 S. Ct. 716 (2024) ..................................................................................................... 2

*SFFA v. USNA*,
    No. 23-cv-2699 (D. Md.) ............................................................................................... 3

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023) ................................................................................................. 1, 7

*Texas v. Holder*,
    No. 12-cv-128, 2012 WL 13070110 (D.D.C. June 8, 2012) ........................................ 6

*United States v. All Assets*,
    202 F. Supp. 3d 1 (D.D.C. 2016) ................................................................................. 5

*US Dominion Inc. v. My Pillow Inc.*,
    No. 21-cv-445, 2024 WL 2880425 (D.D.C. June 7, 2024) .......................................... 7

*Watts v. SEC*,
    482 F.3d 501 (D.C. Cir. 2007) ..................................................................................... 4

*XY, LLC v. Trans Ova Genetics*,
    307 F.R.D. 10 (D.D.C. 2014) ....................................................................................... 4

**Other Authorities**

9 James Wm. Moore et al., Moore's Fed. Prac. §45.05 (3d ed. 2006) ............................... 4

Hearing Transcript, Subcommittee on Coast Guard and Maritime Transportation,
    111th Congress (June 19, 2009), tinyurl.com/mr3shd5y ............................................ 9

O.A. Tr., *Grutter v. Bollinger*, 02-241 (U.S. Apr. 1, 2003) ............................................... 8

Press Release, *USMA Hosted the 62nd Annual COSAS* (Apr. 11, 2023),
    tinyurl.com/4d7ew9zs ................................................................................................... 8

**Rules**

Fed. R. Civ. P. 45 .............................................................................................................. 2

Fed. R. Civ. Proc. 45, 2013 Advisory Committee Notes ............................................. 3, 4

LCvR 7(m) ......................................................................................................................... 5

## INTRODUCTION

The Coast Guard—represented by the same trial attorneys defending the United States Naval Academy ("USNA")—opposes the motion of Students for Fair Admissions ("SFFA") to compel production of (1) information concerning its prior use of race-neutral alternatives to achieve diversity at the United States Coast Guard Academy ("USCGA"); and (2) statistical information that the USCGA has readily available regarding minority representation on campus. The Coast Guard makes four arguments resisting SFFA's subpoena. None of them have merit.

- *First*, the Coast Guard contends that this matter should be transferred to the District of Maryland. But doing so would delay adjudication of this motion with trial fast approaching and it would alter the law that governs SFFA's request. Either is a sufficient ground to deny the Coast Guard's transfer bid.

- *Second*, the Coast Guard contends that the dispute is unripe because there have not been adequate attempts to meet and confer. This is wrong. SFFA took the Coast Guard's initial objections seriously and substantially narrowed the subpoena, only to be met with identical objections. SFFA emailed and followed up by telephone, and the Coast Guard offered no prospect that any further narrowing would be sufficient—indeed, even now in opposition, it conspicuously declines to produce any documents whatsoever.

- *Third*, the Coast Guard contends that the motion is too late. This contradicts the Coast Guard's prior two arguments and is wrong in any event. The matter at issue is on an extremely fast trial schedule, the subpoena was served within the discovery period, and SFFA has moved quickly to bring this dispute to the Court's attention.

- *Fourth*, the Coast Guard contends that Rule 45 excuses it from producing *anything*. Wrong again. The governing law imposes obligations on USNA to consider race-neutral alternatives; the service academies often discuss their admissions policies with one another; and the Coast Guard's Chief of Staff testified before Congress about a specific plan to increase outreach and recruiting at the USCGA at a time when the law prohibited the academy from using race. Moreover, the information that SFFA seeks—especially the statistical information—is reasonably available to the USCGA and can be produced in time for trial.

This Court should reject the Coast Guard's obstruction and compel compliance with the narrowed subpoena. Whether "our Nation's military academies" can use race-based admissions, after *SFFA v. Harvard* outlawed the practice everywhere else, is a crucially important question that will likely be resolved by the Supreme Court. 600 U.S. 181, 213 n.4 (2023). This case will be

the first to reach it, and the Supreme Court has stated its preference that the record on this question

not be "underdeveloped." *SFFA v. USMA*, 144 S. Ct. 716 (2024). USNA's lawyers should not get

to argue that race-based admissions are "necessary" for the military academies, while also blocking

all discovery into the one service academy that didn't use race-based admissions for years.

## ARGUMENT

This is not a complex or difficult motion. SFFA contends that another service academy's

experience using race-neutral admissions to obtain a racially diverse student body is probative

evidence in determining whether the USNA's race-conscious admissions policies can satisfy strict

scrutiny. *See* Mot. to Compel 4-5 (citing *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312

(2013)). The Government contends such evidence is wholly irrelevant. SFFA has the better of the

merits and none of the procedural roadblocks the Coast Guard tries to erect are sufficient to block

this highly relevant evidence in this highly consequential case. This Court should reject the Coast

Guard's arguments and compel compliance with the subpoena as soon as possible.

## I.     This Court should decide the motion.

The Coast Guard contends that this motion should be transferred to the District of Maryland

for two reasons: the Coast Guard wants it transferred (Opp. 4) and "exceptional circumstances"

require its transfer. (Opp. 4-5). Neither argument is correct.

The consent argument is easily dispatched. Contrary to the Coast Guard's claim that its

consent is "dispositive" (Opp. 4), nothing in Rule 45 *requires* transfer if the recipient consents; the

rule merely *permits* a court to do so. *See* Fed. R. Civ. P. 45(f) (providing that a court "*may* transfer

a motion … if the person subject to the subpoena consents or if the court finds exceptional

circumstances" (emphasis added)). Courts in this district do not automatically transfer motions to

compel when the subpoena recipient consents. *See, e.g.*, Minute Order, *In re Subpoena to Nat'l*

*Telecomms. & Info. Admin.*, No. 19-mc-40 (D.D.C. May 29, 2019) ("Where, as here, the transfer

is contested, the Court must consider whether the transfer would be in the interest of judicial economy and fairness to the parties."); *HT S.R.L. v. Velasco*, No. 15-mc-664, 2015 WL 13759884, at *2 n.2 (D.D.C. Nov. 13, 2015) ("[D]espite any consent from the respondent to have the petitioner's motion to compel transferred to the Maryland district court, the Court may still choose to resolve the motion.").

Nor are there "*exceptional* circumstances" that weigh in favor of transfer. The fact that the underlying case is pending in another district cannot be an exceptional circumstance; if it was, then Rule 45(f) would always require transfer.[1] Indeed, the 2013 Advisory Committee Notes specifically warn that courts should not "assum[e] that the issuing court is in a superior position to resolve subpoena-related motions." *Id.* Beyond that, the Coast Guard observes that the time for discovery ends soon—an argument that cuts in favor of a decision by this Court now, not further delay via a transfer order. Nor is there anything improper or unusual about serving the Coast Guard a subpoena in the district in which it resides. Unlike the Coast Guard's cited cases,[2] this dispute

---

[1] The Coast Guard overstates the extent to which Judge Bennett has "supervised … discovery" and "resolved discovery disputes" in this case (Opp. 5); the parties held a single telephonic conference more than a month ago on unrelated issues, only some of which concerned discovery disputes and none of which touched upon the issues raised by this subpoena, *see generally SFFA v. USNA*, No. 23-cv-2699 (D. Md.).

[2] *Honeywell Int'l Inc. v. Law Offices of Peter T. Nicholl*, No. 21-mc-151, 2022 WL 43494, at *2-4 (D.D.C. Jan. 5, 2022), involved a case where the party moving to compel itself sought the transfer, and "[a]t least one other court ha[d] already transferred motions to compel and quash regarding a subpoena … relating to the [underlying] [l]itigation to the court in which that case [was] pending," so that, "without a transfer, there [was] a risk of conflicting rulings." No potential conflict issue is presented here. And the Coast Guard's other cases involved questions either more complex than the one presented here or tied to ongoing disputes in the other court that justified transfer. *See Bogard Constr. Inc. v. Oil Price Info. Serv., LLC*, No. 21-cv-3005, 2022 WL 1213307, at *3 (D. Md. Apr. 25, 2022) (the underlying case was "especially complex," and the motion raised a question of whether the "issuing court lack[ed] subject matter jurisdiction," which was "best suited for the court whose jurisdiction [was] being challenged); *In re Subpoena to Nat'l Acad. of Scis.*, No. 24-mc-59, 2024 WL 3370249, at *2-3 (D.D.C. July 10, 2024) (the underlying case had a "unique procedural posture" with "1,700 civil actions … consolidated in the E.D.N.C.," and this

presents a distinct and straightforward question of law that is "neither complicated nor so bound up with prior rulings in the underlying case such that it would be imprudent for th[e] court to rule." *Hood v. City of Chicago*, No. 19-mc-123, 2019 WL 5295169, at *3 (D.D.C. Oct. 18, 2019). The Coast Guard thus cannot meet its burden of showing exceptional circumstances that justify transfer. *See* Fed. R. Civ. Proc. 45(f), 2013 Advisory Committee Notes (placing the burden on the party seeking transfer).

In fact, the only truly unusual circumstance in play here goes unmentioned by the Coast Guard, because it strongly favors SFFA. Transferring this case to the District of Maryland would arguably strengthen the Coast Guard's attempts to use its *Touhy* regulations to block compliance.[3] Judge Moss denied a motion to transfer on almost an identical posture precisely because the Fourth Circuit gives greater weight to *Touhy* arguments. *In re Subpoena to Nat'l Telecomms. & Info. Admin.*, No. 19-mc-40 (D.D.C. May 29, 2019), attached as Ex. A. Because "the convenience of the parties would not be promoted by transfer but transfer would alter the governing law," Judge Moss found that transfer "would not serve the purpose of Rule 45(f)" and the Government's bid to transfer was denied. *Id.* The same result should follow here.

---

"multidistrict litigation" was "carefully managed" by the issuing court); *XY, LLC v. Trans Ova Genetics*, 307 F.R.D. 10, 11-12 (D.D.C. 2014) (the underlying litigation was a "large and complex patent infringement suit," and the issuing court had "already supervised substantial discovery"); *CFA Inst. v. Am. Soc'y of Pension Pros. & Actuaries*, No. 20-mc-18, 2020 WL 1695050, at *2 (D.D.C. Apr. 7, 2020) (the underlying litigation involved "nuances of … trademark infringement").

[3] *Compare, e.g.*, *COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d 269, 278 (4th Cir. 1999) ("When an agency is not a party to an action, its choice of whether or not to comply with a third-party subpoena is essentially a policy decision about the best use of the agency's resources."), *with Watts v. SEC*, 482 F.3d 501, 508-09 (D.C. Cir. 2007) ("'[T]hough an agency regulation may provide the method by which an agency head will comply with or oppose a subpoena, the legal basis for any opposition to the subpoena must derive from an independent source of law such as a governmental privilege or the rules of evidence or procedure.'") (quoting 9 James Wm. Moore et al., Moore's Fed. Prac. §45.05[1][b] (3d ed. 2006)).

## II.    SFFA narrowed the subpoena, and further conferral was pointless.

The government contends that SFFA did not comply with its meet-and-confer obligations under Local Rule 7(m). (Opp. 5-6). This argument is belied by the record. In response to the initial subpoena, the Coast Guard refused to produce a single document on the ground that all of SFFA's requests were, among other things, "inappropriate" and "not in the public interest." Mot. Ex. D. When SFFA revised and narrowed the scope of the subpoena, the Coast Guard reiterated its same objections and again refused to produce anything. A subsequent email and phone call from SFFA's counsel to the Coast Guard to confirm the impasse yielded no suggestion at all that a compromise could be had—and even now, the Coast Guard does not say that it is willing to produce *anything* in response to any part of the subpoena.

Parties are not required to engage in endless attempts to resolve discovery disputes; good-faith attempts met with "'stonewall[ing]'" satisfy the rule. *Nasreen v. Capitol Petrol. Grp., LLC*, 340 F.R.D. 489, 495 (D.D.C. 2022) (the non-moving party "refused to engage in any substantive discussions" (quoting *GFL Advantage Fund, Ltd. v. Colkitt*, 216 F.R.D. 189, 194 (D.D.C. 2003))). Especially here, where the time for discovery is short and an attempt to narrow was met with no compromise at all, SFFA easily satisfies the requirements of Local Rule 7(m).[4]

In any event, the Coast Guard's opposition makes clear that even if the Court denied SFFA's motion for non-compliance with Local Rule 7(m), the Coast Guard still has no intention of compromising here. Thus, after another impasse, SFFA would simply "refile [its] motion" and

---

[4] SFFA's efforts in this case, which included a narrowed subpoena, an email, and a phone call, go beyond those of counsel in the cases cited by the Coast Guard. *See Alberts v. HCA Inc.*, 405 B.R. 498, 501 (D.D.C. 2009) (no telephone call or in-person meeting); *Crete Carrier Corp. v. Sullivan & Sons, Inc.*, No. 21-cv-328, 2022 WL 1203652, at *5, 24 (D. Md. Apr. 21, 2022) (same). And noncompliance with Rule 7(m) was not the basis for the denial of the subpoena in *Alberts* or the denial of most of the categories of documents subpoenaed in *United States v. All Assets*, 202 F. Supp. 3d 1, 6-7 (D.D.C. 2016).

the Coast Guard would "refile [its] opposition." *Ghawanmeh v. Islamic Saudi Acad.*, 268 F.R.D. 108, 111 (D.D.C. 2010). "[T]he resulting expense to defendants [would] not in itself warrant denying plaintiff's motion." *Id.*; *see also Johnson v. ACB Ideas, LLC*, No. 23-cv-2944, 2024 WL 3225994, at *4 (D.D.C. June 28, 2024) (similar); *Kriebel v. Life Ins. Co. of N. Am.*, No. 15-cv-151, 2015 WL 11347968, at *2-3 (D.D.C. Oct. 14, 2015) (similar).

### III.   SFFA did not delay in bringing this motion.

The Coast Guard's next procedural argument is that SFFA delayed in serving the subpoena and filing its motion. Opp. 6-8. Again, this argument lacks merit. SFFA was not required to serve its subpoena at the outset of the extremely truncated discovery schedule. Among other things, SFFA was entitled to see if some of the information it wanted would be yielded in party discovery, and to see if the discovery schedule might be extended. When it was clear that neither of these possibilities was likely, SFFA acted well within the discovery time frame. Nothing else is required.

Again, the Coast Guard's cases are easily distinguishable. In *Dag Enters., Inc. v. Exxon Mobil Corp.*, 226 F.R.D. 95, 104, 108-10 (D.D.C. 2005), the subpoena was issued outside of the court's discovery period in the scheduling order. In *Crete Carrier*, 2022 WL 1203652, at *20-21, the motion to compel was filed outside the discovery period. *Texas v. Holder*, No. 12-cv-128, 2012 WL 13070110, at *3-4 (D.D.C. June 8, 2012), deals with the necessity of a subpoena in the first place (which the movant failed to serve) and thus has no application here. And this case is nothing like *Ike-Ezunagu v. Deco, Inc.*, No. 9-cv-526, 2010 WL 4822511, at *2 (D. Md. Nov. 22, 2010), where the plaintiff had "thirteen months" of discovery, but "afforded the deponents eight days between the date of her request for subpoenas and the date of the scheduled depositions" in the "two to three days before Thanksgiving." *Id.* at *2. No deposition or holiday schedule is presented here. The Coast Guard's timeliness objection should be denied.

## IV.   The documents that SFFA seeks are relevant and do not unduly burden the Coast Guard.

Finally, turning to the substance of the narrowed subpoena, the Coast Guard argues that its experience conducting race-neutral admissions at USCGA simply has no relevance to the USNA and thus does not meet Rule 45's requirements.[5] This argument is on its face absurd: The Coast Guard's race-neutral admissions policy was discussed at oral argument in both *SFFA v. Harvard*, 600 U.S. 181 (2023) and *Grutter v. Bollinger*, 539 U.S. 306 (2003). The two academies often exchange information about their admissions process and diversity efforts, and they draw from the same applicant base. And Coast Guard officials, when testifying in support of changing the USCGA's admission policies, said they wanted to do so to bring their process in line with the other academies. The Coast Guard's burden arguments, moreover, are neither the fault of SFFA nor an excuse to resist the subpoena *in toto*.

To begin, there is no merit to the Coast Guard's argument (at Opp. 9-10) that the Coast Guard is too different a comparator for purposes of assessing a race-neutral alternative. As SFFA noted in its motion, the United States itself has previously used the USCGA as a comparator in arguments about race-neutral admissions at the service academies. Mot. 5-6. The United States has also itself emphasized the similarity of the applicant pools. *Id.*

Moreover, discovery produced by the USNA in the underlying action completely undermines the Coast Guard's contention that the academies are simply too different to compare. Admissions and diversity officers at both schools communicate with one another and compare

---

[5] The Coast Guard wrongly claims that SFFA "ignore[d]" Rule 45's standards in its motion to compel; in fact, SFFA specifically cited case law from this district applying Rule 45. *See* Mot. 3 (citing *US Dominion Inc. v. My Pillow Inc.*, No. 21-cv-445, 2024 WL 2880425, at *3 (D.D.C. June 7, 2024)).

notes, and some examples are attached here. *See* Ex. B (email between admissions deans at USNA and USCGA discussing application rates); Ex. C (email between diversity officers discussing attrition among minority students). Indeed, the Superintendents of all the academies—including USNA and USCGA—meet in person every year for the Conference of Service Academy Superintendents (COSAS), which is attended by the admissions directors and at which admissions trends and policies are discussed. *See* Ex. D (admissions deans coordinating COSAS gatherings); Ex. E (draft 2023 COSAS report noting that admissions deans of all the academies—including USCGA—discussed the achievement in diversity among the service academies' applicants if race cannot be used in the admission process).[6]

Given this regular communication between admissions personnel at USCGA and USNA about their similar processes, there is no basis for the Coast Guard's contention that the subpoena seeks completely irrelevant information that lies in the "'shadow zones of relevancy.'" Opp. 9. The United States certainly did not see it this way in *Grutter*. *See* Mot. 6 (citing O.A. Tr.19-22, *Grutter v. Bollinger*, 02-241 (U.S. Apr. 1, 2003)). USNA of course is free to point out these distinctions at trial, but there is no basis to resist this subpoena on relevancy grounds given the record establishing that USCGA and USNA do not consider each other's admissions processes irrelevant.

As to burden, the Coast Guard makes *no argument at all* that the subpoena's request for certain admissions demographic data is burdensome. Nor could it, given that the USCGA regularly compiles and discloses some of this information publicly. *See* Mot. 7 & Ex. E. Of course, those

---

[6] *See also* Press Release, *USMA Hosted the 62nd Annual COSAS* (Apr. 11, 2023), tinyurl.com/4d7ew9zs (noting that the "annual meeting of the superintendents is hosted by the academies on a rotating basis and includes the commandants, the deans, the directors of Admissions and Athletics" who "discuss performance measures and other matters of collective interest").

public disclosures are not compiled in one place nor complete, which is why the Coast Guard is wrong to argue (Opp. 13) that this information is already available to SFFA.

As to SFFA's other document request, the Coast Guard for the first time expands upon its general and vague burden concerns by massively overstating the number of hours required to locate and produce documents concerning its race-neutral admissions process. For example, the Coast Guard's Chief of Staff testified to Congress in 2009 about the USCGA's "2013 strategic plan focusing on diversity, leadership, and character development" that had a "goal … to increase underrepresented minorities in the corps of cadets from our current 14.4 percent to 25 to 30 percent by 2015." *See* Hearing Transcript, Subcommittee on Coast Guard and Maritime Transportation, 111th Congress (June 19, 2009), tinyurl.com/mr3shd5y. With the lodestar of that strategic plan and the ability to deploy electronic search terms, it does not take 4000 hours to locate relevant documents concerning the Coast Guard's use of a race-neutral admissions plan to increase racial diversity.[7] Had the Coast Guard not opposed the subpoena *in toto* as "inappropriate," SFFA would have been (and still is) prepared to discuss reasonable limits in terms of search terms and custodians. And this Court can further narrow the subpoena if necessary to relieve the Coast Guard of any truly undue burden. *See Dell Inc. v. DeCosta*, 233 F. Supp. 3d 1, 3-4 (D.D.C. 2017). But the very timing concerns that the Coast Guard highlights elsewhere in its opposition weigh in favor of the Court overruling the Coast Guard's blanket resistance and compelling compliance with the subpoena as soon as possible.

---

[7] The Coast Guard contends, without basis, that the information is too outdated to be useful. The USCGA's race-neutral admissions process is most relevant as a comparator *for the time period when it was race-neutral*; this is not some dragnet request with an arbitrary date.

**CONCLUSION**

The Court should grant this motion and compel the Coast Guard to comply with Plaintiff's subpoena.


Date: August 5, 2024                              Respectfully submitted,

                                                  */s/ Thomas R. McCarthy*
                                                  Thomas R. McCarthy
                                                  J. Michael Connolly
                                                  Cameron T. Norris
                                                  Brandon Haase
                                                  CONSOVOY MCCARTHY PLLC
                                                  1600 Wilson Blvd., Suite 700
                                                  Arlington, VA 22209
                                                  (703) 243-9423
                                                  tom@consovoymccarthy.com
                                                  mike@consovoymccarthy.com
                                                  cam@consovoymccarthy.com
                                                  brandon@consovoymccarthy.com

                                                  *Counsel for Students for Fair Admissions*

**CERTIFICATE OF SERVICE**

On August 5, 2024, service of this motion was made on counsel of record via the court's

ECF filing system.

*/s/ Thomas R. McCarthy*
Thomas R. McCarthy

*Counsel for Students for Fair Admissions*

# Exhibit A

8/4/24, 8:07 PM

Case 1:24-mc-00092-DLF   Document 7-1   Filed 08/05/24   Page 2 of 14
Case 1:23-cv-02699-RDB   Document 72   Filed 08/13/24   Page 173 of 191

Query    Reports    Utilities    Help    Log Out

CLOSED,STAYED

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:19-mc-00040-RDM

In Re SUBPOENA TO NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION
Assigned to: Judge Randolph D. Moss
Case in other court: USDC for the SD of VA, 2:14cv15947
Cause: Motion to Compel

Date Filed: 03/22/2019
Date Terminated: 07/05/2022
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**In Re**

**SUBPOENA TO NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION**

represented by **Benton Gregory Peterson**
U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 252-2534
Fax: (202) 252-2599
Email: benton.peterson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Darrell C. Valdez**
DOJ-USAO
Patrick Henry Building
601 D Street, N.W.
Washington, DC 20530
(202) 252-2507
Email: darrell.valdez@usdoj.gov
*TERMINATED: 06/07/2022*

**Plaintiff**

**CITYNET, LLC**
*On behalf of the United States of America*

V.

**Defendant**

**FRONTIER WEST VIRGINIA INC.**

represented by **Cameron Edlefsen**
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
202-263-3171
Email: cedlefsen@mayerbrown.com
*ATTORNEY TO BE NOTICED*

**Elizabeth Anne Hutson**

8/4/24, 8:07 PM

Case 1:24-mc-00092-DLF   Document 7-1   Filed 08/05/24   Page 3 of 14
Case 1:23-cv-02699-RDB   Document 72   Filed 08/13/24   Page 174 of 191

DOJ-USAO
950 Pennsylania Avenue NW
Washington, DC 20530
202-532-5578
Email: Elizabeth.Hutson@usdoj.gov
*TERMINATED: 09/23/2019*

**Jeremy S. Byrum**
MCGUIRE WOODS LLP
800 East Canal Street
Richmond, VA 23219
804-775-4305
Email: jeremy.byrum@truist.com
*TERMINATED: 04/08/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Marcia G. Madsen**
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
(202) 263-3274
Fax: (202) 263-5274
Email: mgmadsen@mayerbrown.com
*ATTORNEY TO BE NOTICED*

**Nicholas James Giles**
MCGUIRE WOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
804-775-4760
Email: ngiles@mcguirewoods.com
*TERMINATED: 05/10/2022*
*ATTORNEY TO BE NOTICED*

**Sean P. McDonnell**
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
202-263-3244
Email: smcdonnell@mayerbrown.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**KENNETH ARNDT**               represented by   **Nicholas James Giles**
(See above for address)
*TERMINATED: 05/10/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cameron Edlefsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Anne Hutson**
(See above for address)
*TERMINATED: 09/23/2019*

**Jeremy S. Byrum**
(See above for address)
*TERMINATED: 04/08/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Marcia G. Madsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean P. McDonnell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARK MCKENZIE**     represented by   **Nicholas James Giles**
(See above for address)
*TERMINATED: 05/10/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cameron Edlefsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Anne Hutson**
(See above for address)
*TERMINATED: 09/23/2019*

**Jeremy S. Byrum**
(See above for address)
*TERMINATED: 04/08/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Marcia G. Madsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean P. McDonnell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DANA WALDO**     represented by   **Nicholas James Giles**
(See above for address)
*TERMINATED: 05/10/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cameron Edlefsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Anne Hutson**
(See above for address)
*TERMINATED: 09/23/2019*

**Jeremy S. Byrum**
(See above for address)
*TERMINATED: 04/08/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Marcia G. Madsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean P. McDonnell**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/22/2019 | 1 | MOTION to Compel ( Filing fee $ 47 receipt number 4616097299.) filed by FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO, KENNETH ARNDT. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Text of Proposed Order)(jf) (Entered: 03/27/2019) |
| 04/05/2019 | 2 | MOTION to Dismiss *or in the Alternative*, MOTION to Transfer Case by SUBPOENA TO NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION (Attachments: # 1 Exhibit 1)(Peterson, Benton) (Entered: 04/05/2019) |
| 04/12/2019 | 3 | REPLY to opposition to motion re 2 MOTION to Dismiss *or in the Alternative* MOTION to Transfer Case *Reply Brief in Support of Motion to Compel Production of Documents* filed by FRONTIER WEST VIRGINIA INC.. (Attachments: # 1 Affidavit Affidavit of Service re National Telecommunications and Information Administration ICO Office of General Counsel's Agent of Process Service, # 2 Declaration Declaration of Jeremy S. Byrum)(Hutson, Elizabeth) (Entered: 04/12/2019) |
| 04/17/2019 | | MINUTE ORDER: It is hereby ORDERED that the parties shall appear for oral argument on April 24, 2019 at 2:30 p.m in Courtroom 21. Signed by Judge Randolph D. Moss on 4/17/2019. (lcrdm2, ) (Entered: 04/17/2019) |
| 04/17/2019 | | Set/Reset Hearings: Motion Hearing set for 4/24/2019, at 2:30 PM, before Judge Randolph D. Moss. (kt) (Entered: 04/17/2019) |
| 04/18/2019 | 4 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Jeremy S. Byrum, :Firm-McGuireWoods LLP, :Address- 800 East Canal Street, Gateway Plaza, Richmond VA 23219. Phone No. - 804-775-4305. Fax No. - 804-698-2080 Filing fee $ 100, receipt number 0090-6067435. Fee Status: Fee Paid. by FRONTIER WEST VIRGINIA INC. (Hutson, Elizabeth) (Entered: 04/18/2019) |

| 04/18/2019 | | MINUTE ORDER: Upon consideration of the motion for leave to appear pro hac vice, Dkt. 4, it is hereby ORDERED that the motion is GRANTED. Jeremy S. Bynum may appear pro hac vice in this case. Signed by Judge Randolph D. Moss on 4/18/2019. (lcrdm2, ) (Entered: 04/18/2019) |
|---|---|---|
| 04/24/2019 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Motion Hearing held on 4/24/2019 re: 2 MOTION to Dismiss *or in the Alternative* MOTION to Transfer Case filed by SUBPOENA TO NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION. For the reasons stated on the record, the parties shall meet and confer; Joint Status Report due by 5/24/2019. (Court Reporter: Jeff Hook.) (kt) (Entered: 04/24/2019) |
| 04/30/2019 | 5 | TRANSCRIPT OF MOTION HEARING before Judge Randolph D. Moss held on April 24, 2019. Page Numbers: 1 - 33. Date of Issuance: April 30, 2019. Court Reporter: Jeff Hook. Telephone number: 202-354-3373. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter reference d above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 5/21/2019. Redacted Transcript Deadline set for 5/31/2019. Release of Transcript Restriction set for 7/29/2019.(Hook, Jeff) (Entered: 04/30/2019) |
| 05/24/2019 | 6 | Joint STATUS REPORT by SUBPOENA TO NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Peterson, Benton) (Entered: 05/24/2019) |
| 05/29/2019 | | MINUTE ORDER: Upon consideration of NTIA's motion to transfer, Dkt. 2, it is hereby ORDERED that the motion is DENIED. The Court notes that, although NTIA, as the moving party, "consents to the transfer," Dkt. 2 at 8, the language of Rule 45(f) is permissive, not mandatory. *See* Fed. R. Civ. P. 45(f) ("[The Court] *may* transfer a motion under this rule") (emphasis added). Where, as here, the transfer is contested, the Court must consider whether the transfer would be in the interest of judicial economy and fairness to the parties. Based on the materials submitted to the Court and the parties' representations at oral argument, the present dispute centers on whether the Frontier Defendants allegedly complied with NTIA's *Touhy* regulations. *See* Dkt. 2 at 6-8. That issue neither requires a detailed understanding of the underlying litigation nor otherwise necessitates resolution in the Southern District of West Virginia. The Court notes, moreover, that the case law in the Fourth Circuit is more favorable to the NTIA than the law of this Circuit. *Compare COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d 269, 278 (4th Cir. 1999) *with Watts v. S.E.C.*, 482 F.3d 501, 508 (D.C. Cir. 2007); *see also* Dkt. 3 at 11 n.3. According to the Advisory Committee Notes to the 2013 amendments of Rule 45, "[t]he prime concern [of Rule 45] should be avoiding burdens on local nonparties subject to subpoenas." Here, the convenience of the parties would not be promoted by transfer but transfer would alter the governing law. Because transfer to the Southern District of West Virginia would not serve the purpose of Rule 45(f), and in light of the Frontier Defendants' opposition, the Court denies the motion to transfer. |

8/4/24, 8:07 PM
Case 1:24-mc-00092-DLF   Document 7-1   Filed 08/05/24   Page 7 of 14
Case 1:23-cv-02699-RDB   Document 72   Filed 08/13/24   Page 178 of 191

| | | |
|---|---|---|
| | | In light of the parties' joint status report, Dkt. 6, it is further ORDERED that NTIA shall file an opposition to the motion to compel, Dkt. 1, on or before June 11, 2019, and the Frontier Defendants shall file a reply brief on or before June 18, 2019. It is further ORDERED that the parties shall appear for a motions hearing on the motion to compel at 2:15 p.m., June 21, 2019 in Courtroom 21. Signed by Judge Randolph D. Moss on 5/29/2019. (lcrdm2, ) (Entered: 05/29/2019) |
| 05/30/2019 | | Set/Reset Deadlines/Hearings: Opposition due by 6/11/2019; Reply due by 6/18/2019. Motion Hearing set for 6/21/2019, at 2:15 PM, in Courtroom 21, before Judge Randolph D. Moss. (kt) (Entered: 05/30/2019) |
| 06/11/2019 | 7 | MOTION to Quash *and Oppostion to Motion to Compel* by SUBPOENA TO NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION (Attachments: # 1 Exhibit #1, # 2 Declaration)(Peterson, Benton) (Entered: 06/11/2019) |
| 06/11/2019 | 8 | RESPONSE (Opposition) re 1 Motion to Compel, filed by SUBPOENA TO NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION. (ztd); (See docket entry no. 7 to view.) (Entered: 06/13/2019) |
| 06/14/2019 | 9 | ERRATA by SUBPOENA TO NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION 7 MOTION to Quash *and Oppostion to Motion to Compel* filed by SUBPOENA TO NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION. (Attachments: # 1 Exhibit)(Peterson, Benton) (Entered: 06/14/2019) |
| 06/18/2019 | 10 | REPLY to opposition to motion re 1 MOTION to Quash *and Oppostion to Motion to Compel* filed by KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. (Attachments: # 1 Exhibit Exhibit A)(Hutson, Elizabeth) Modified linkage on 6/19/2019 (ztd). (Entered: 06/18/2019) |
| 06/18/2019 | 11 | Memorandum in opposition to re 7 MOTION to Quash *and Oppostion to Motion to Compel* filed by FRONTIER WEST VIRGINIA INC.. (ztd); (See docket entry 10 to view.) (Entered: 06/19/2019) |
| 06/21/2019 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Status Conference held on 6/21/2019. Case called for a Motion Hearing but not held. For the reasons stated on the record, the pending motions are held in abeyance. The parties shall submit a Joint Status Report on or before 6/27/2019. (Court Reporter: Jeff Hook.) (kt) (Entered: 06/21/2019) |
| 06/27/2019 | 12 | Joint STATUS REPORT by KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. (Byrum, Jeremy) (Entered: 06/27/2019) |
| 07/02/2019 | | MINUTE ORDER: In light of the parties' joint status report, Dkt. 12, it is hereby ORDERED that the parties shall submit a further joint status report on or before July 9, 2019. Signed by Judge Randolph D. Moss on 7/2/2019. (lcrdm2, ) (Entered: 07/02/2019) |
| 07/02/2019 | | Set/Reset Deadlines: Joint Status Report due by 7/9/2019. (kt) (Entered: 07/02/2019) |
| 07/09/2019 | 13 | Joint STATUS REPORT by KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. (Attachments: # 1 Exhibit A)(Byrum, Jeremy) (Entered: 07/09/2019) |
| 07/10/2019 | | MINUTE ORDER: In light of the parties' joint status report, Dkt. 13, it is hereby ORDERED that the parties shall submit a further joint status report on or before July 23, 2019. Signed by Judge Randolph D. Moss on 7/10/2019. (lcrdm2, ) (Entered: 07/10/2019) |
| 07/10/2019 | | Set/Reset Deadlines: Joint Status Report due by 7/23/2019. (kt) (Entered: 07/10/2019) |

8/4/24, 8:07 PM

| 07/23/2019 | 14 | Joint STATUS REPORT by KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. (Byrum, Jeremy) (Entered: 07/23/2019) |
| --- | --- | --- |
| 07/25/2019 | | MINUTE ORDER: Upon consideration of the parties' joint status report, Dkt. 14, it is hereby ORDERED that the parties shall file a further joint status report on or before July 26, 2019. Signed by Judge Randolph D. Moss on 07/24/2019. (lcrdm2, ) (Entered: 07/25/2019) |
| 07/25/2019 | | Set/Reset Deadlines: Joint Status Report due by 7/26/2019. (kt) (Entered: 07/25/2019) |
| 07/26/2019 | 15 | Joint STATUS REPORT by KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. (Attachments: # 1 Text of Proposed Order, # 2 Text of Proposed Order)(Byrum, Jeremy) (Entered: 07/26/2019) |
| 08/05/2019 | 16 | ORDER: Upon consideration of the parties' joint status report, Dkt. 15, it is hereby ORDERED that the parties shall abide by the agreed upon search protocol and production process as set forth in Dkt. 15-1 and Dkt. 15-2. See document for details. It is further ORDERED that parties shall file a joint status report on or before December 9, 2019. Signed by Judge Randolph D. Moss on 08/5/2019. (lcrdm2, ) Modified on 8/6/2019 to remove "Minute Order" from docket entry text (kt). (Entered: 08/05/2019) |
| 08/06/2019 | | Set/Reset Deadlines: Joint Status Report due by 12/9/2019. (kt) (Entered: 08/06/2019) |
| 09/23/2019 | 17 | NOTICE OF WITHDRAWAL OF APPEARANCE as to KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. Attorney Elizabeth A. Hutson terminated. (Hutson, Elizabeth) (Entered: 09/23/2019) |
| 12/09/2019 | 18 | Joint STATUS REPORT by KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. (Byrum, Jeremy) (Entered: 12/09/2019) |
| 12/10/2019 | | MINUTE ORDER: Upon consideration of the parties' joint status report, Dkt. 18, it is hereby ORDERED that the parties shall submit a further joint status report on or before January 20, 2020, which shall (i) apprise the Court of the parties' respective position on whether NTIA's production is in accord with the parties' agreement and the Court's Order, and (ii) recommend proposed next steps, if any. Signed by Judge Randolph D. Moss on 12/10/2019. (lcrdm2, ) (Entered: 12/10/2019) |
| 12/10/2019 | | Set/Reset Deadlines: Joint Status Report due by 1/20/2020. (dot) (Entered: 12/11/2019) |
| 01/21/2020 | 19 | Joint STATUS REPORT by KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. (Attachments: # 1 Exhibit Custodian List, # 2 Exhibit Search Terms, # 3 Exhibit 1.17.2020 Letter to NTIA)(Byrum, Jeremy) (Entered: 01/21/2020) |
| 01/22/2020 | | MINUTE ORDER: Upon consideration of the parties' joint status report, Dkt. 19, it is hereby ORDERED that the parties shall file a further joint status report on or before February 21, 2020, identifying what, if any, issues remain in dispute and how the parties propose to proceed. Signed by Judge Randolph D. Moss on 01/22/2020. (lcrdm2, ) (Entered: 01/22/2020) |
| 02/21/2020 | 20 | Joint STATUS REPORT by KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. (Byrum, Jeremy) (Entered: 02/21/2020) |
| 02/24/2020 | | MINUTE ORDER: In light of the parties' joint status report, Dkt. 20, it is hereby ORDERED that the parties shall file a further joint status report on or before March 20, 2020, identifying what, if any, issues remain in dispute and how the parties propose to proceed. Signed by Judge Randolph D. Moss on 02/24/2020. (lcrdm2, ) (Entered: 02/24/2020) |

| 03/20/2020 | [21](#) | Joint STATUS REPORT by KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. (Byrum, Jeremy) (Entered: 03/20/2020) |
|---|---|---|
| 03/22/2020 | | MINUTE ORDER: In light of the issues identified in the parties' joint status report, Dkt. 21, it is hereby ORDERED that a Telephone Conference is set for April 14, 2020, at 11:00a.m. It is further ORDERED that the parties shall file a joint status report on or before April 3, 2020 identifying the issues in dispute, and setting forth their respective positions, as well as the authorities upon which they rely. Signed by Judge Randolph D. Moss on 03/22/2020. (lcrdm2, ) (Entered: 03/22/2020) |
| 03/23/2020 | | Set/Reset Deadlines/Hearings: Joint Status Report due by 4/3/2020. Telephone Conference set for 4/14/2020, at 11:00 AM, in Courtroom 21, before Judge Randolph D. Moss. (kt) (Entered: 03/23/2020) |
| 04/03/2020 | [22](#) | Joint STATUS REPORT by KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. (Attachments: # [1](#) Exhibit 1, # [2](#) Exhibit 2)(Byrum, Jeremy) (Entered: 04/03/2020) |
| 04/14/2020 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Telephone Conference held on 4/14/2020. By 4/17/2020, the Government shall file under seal and ex parte, for in camera review by the Court, the materials discussed on the record. For the reasons stated on the record, the parties shall file a further Joint Status Report by 4/27/2020. (Court Reporter: Jeff Hook.) (kt) (Entered: 04/14/2020) |
| 04/15/2020 | [23](#) | SUGGESTION OF BANKRUPTCY Upon the Record as to Frontier West Virginia Inc. by FRONTIER WEST VIRGINIA INC.. (Attachments: # [1](#) Exhibit A)(Byrum, Jeremy) (Entered: 04/15/2020) |
| 04/16/2020 | | MINUTE ORDER: In light of Frontier's notice of bankruptcy proceedings, Dkt. 23, this case is hereby STAYED. *See* 11 U.S.C. § 362(a) (providing that a voluntary bankruptcy petition under the applicable statutes "operates as a stay"). It is further ORDERED that Frontier shall file a status report with the Court when the automatic stay is lifted. Signed by Judge Randolph D. Moss on 04/16/2020. (lcrdm2, ) (Entered: 04/16/2020) |
| 04/16/2020 | | Case STAYED. (kt) (Entered: 04/16/2020) |
| 05/03/2021 | [24](#) | NOTICE *of Emergence from Bankruptcy and Termination of Automatic Stay* by KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO (Attachments: # [1](#) Exhibit A)(Byrum, Jeremy) (Entered: 05/03/2021) |
| 05/04/2021 | | MINUTE ORDER: In light of the notice of emergence from bankruptcy and termination of the automatic stay, Dkt. [24](#) , it is hereby ORDERED that the parties shall file a joint status report on or before May 18, 2021, proposing next steps in this proceeding. Signed by Judge Randolph D. Moss on 5/4/2021. (lcrdm2) (Entered: 05/04/2021) |
| 05/18/2021 | [25](#) | Joint STATUS REPORT by KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. (Byrum, Jeremy) (Entered: 05/18/2021) |
| 05/19/2021 | | MINUTE ORDER: On April 14, 2020, the Court ordered the NTIA to file under seal and ex parte, for the Court's in camera review, records the agency is withholding under the deliberative process privilege, with a deadline of April 17, 2020. *See* Minute Entry (April 14, 2020). But one day before that submission was due, the Court stayed the case in light of Frontier's notice of bankruptcy. *See* Minute Order (April 16, 2020). More than a year later, Frontier emerged from bankruptcy. Dkt. [24](#) . The Court therefore terminated the automatic stay and ordered the parties to submit a joint status report. Minute Order (May 4, 2021). Upon consideration of the parties' joint status report, Dkt. [25](#) , it is hereby ORDERED that the NTIA shall submit the contested records under seal and ex parte, for the Court's in camera review, on or before May 26, 2021. It is further ORDERED that the parties shall |

8/4/24, 8:07 PM

Case 1:24-mc-00092-DLF   Document 7-1   Filed 08/05/24   Page 10 of 14
Case 1:23-cv-02699-RDB   Document 72   Filed 08/13/24   Page 181 of 191

| | | appear telephonically for a hearing on June 2, 2021, at 1 p.m. The Courtroom Deputy Clerk will distribute the necessary dial-in information. Signed by Judge Randolph D. Moss on 5/19/2021. (lcrdm2) (Entered: 05/19/2021) |
|---|---|---|
| 05/26/2021 | 26 | NOTICE of Filing by SUBPOENA TO NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION re Order,,,,, Set Deadlines/Hearings,,,, (Peterson, Benton) (Entered: 05/26/2021) |
| 05/28/2021 | 27 | **TRANSCRIPT OF TELEPHONE CONFERENCE** before Judge Randolph D. Moss held on April 14, 2020. Page Numbers: 1 - 63. Date of Issuance: May 28, 2021. Court Reporter: Jeff Hook. Telephone number: 202-354-3373. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporte r referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 6/18/2021. Redacted Transcript Deadline set for 6/28/2021. Release of Transcript Restriction set for 8/26/2021.(Hook, Jeff) (Entered: 05/28/2021) |
| 06/02/2021 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Telephonic Motion Hearing held on 6/2/2021 re: 7 MOTION to Quash *and Oppostion to Motion to Compel* filed by SUBPOENA TO NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION. For the reasons stated on the record, the parties shall file a Joint Status Report by 7//9/2021. (Court Reporter : Jeff Hook.) (kt) (Entered: 06/02/2021) |
| 07/08/2021 | 28 | Joint STATUS REPORT by SUBPOENA TO NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION. (Peterson, Benton) (Entered: 07/08/2021) |
| 07/09/2021 | | MINUTE ORDER: Upon consideration of the parties' joint status report, Dkt. 28 , it is hereby ORDERED that the parties shall file a further joint status report on or before August 10, 2021. Signed by Judge Randolph D. Moss on 7/9/2021. (lcrdm2) (Entered: 07/09/2021) |
| 08/10/2021 | 29 | Joint STATUS REPORT by KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. (Byrum, Jeremy) (Entered: 08/10/2021) |
| 08/11/2021 | | MINUTE ORDER: Upon consideration of the parties' joint status report, Dkt. 29 , it is hereby ORDERED that the parties shall file a further joint status report on or before September 10, 2021. Signed by Judge Randolph D. Moss on 8/11/2021. (lcrdm2) (Entered: 08/11/2021) |
| 09/09/2021 | 30 | Joint STATUS REPORT by SUBPOENA TO NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION. (Peterson, Benton) (Entered: 09/09/2021) |
| 09/10/2021 | | MINUTE ORDER: Upon consideration of the parties' joint status report, Dkt. 30 , it is hereby ORDERED that the parties shall file a further joint status report on or before October 11, 2021. Signed by Judge Randolph D. Moss on 09/10/2021. (lcrdm2) (Entered: 09/10/2021) |
| 10/11/2021 | 31 | Joint STATUS REPORT by KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. (Byrum, Jeremy) (Entered: 10/11/2021) |

| 10/12/2021 | | MINUTE ORDER: Upon consideration of the parties' joint status report, Dkt. 31 , it is hereby ORDERED that the parties shall file a further joint status report on or before October 25, 2021. Signed by Judge Randolph D. Moss on 10/12/2021. (lcrdm2) (Entered: 10/12/2021) |
| --- | --- | --- |
| 10/25/2021 | 32 | Joint STATUS REPORT by KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Byrum, Jeremy) (Entered: 10/25/2021) |
| 11/08/2021 | 33 | Unopposed MOTION for Leave to File *Memorandum Regarding In Camera Review of Documents Withheld Pursuant to Deliberative Process Privilege* by KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. (Attachments: # 1 Exhibit Memorandum Regarding In Camera Review of Documents Withheld Pursuant to Deliberative Process Privilege, # 2 Exhibit A)(Byrum, Jeremy) (Entered: 11/08/2021) |
| 11/10/2021 | | MINUTE ORDER: Upon consideration of the movants' motion for leave to file, Dkt. 33 , it is hereby ORDERED that the motion is GRANTED. The Court further ORDERS that the parties shall appear for a telephonically for a hearing on December 17, 2021, at 2:00 p.m. The parties are directed to use the dial-in information previously provided by the Courtroom Deputy Clerk. Signed by Judge Randolph D. Moss on 11/10/2021. (lcrdm2) (Entered: 11/10/2021) |
| 11/10/2021 | 34 | MEMORANDUM *Regarding In Camera Review of Documents Withheld Pursuant to Deliberative Process Privilege* by KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. (Attachments: # 1 Exhibit A)(znmw) (Entered: 11/10/2021) |
| 11/12/2021 | 35 | NOTICE of Appearance by Darrell C. Valdez on behalf of SUBPOENA TO NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION (Valdez, Darrell) (Entered: 11/12/2021) |
| 12/10/2021 | | MINUTE ORDER: The Court hereby ORDERS that the status conference set for December 17, 2021, at 2:00 p.m. is VACATED and RESCHEDULED for December 23, 2021, at 2:00 p.m. It is further ORDERED that the parties shall appear via Zoom. The Courtroom Deputy Clerk will provide the necessary login information. Signed by Judge Randolph D. Moss on 12/10/2021. (lcrdm2) (Entered: 12/10/2021) |
| 12/13/2021 | 36 | Unopposed MOTION to Continue *Reschedule Status Conference* re Set Deadlines/Hearings, by SUBPOENA TO NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION. (Attachments: # 1 Text of Proposed Order)(Valdez, Darrell) Modified event title on 12/14/2021 (znmw). (Entered: 12/13/2021) |
| 12/13/2021 | | MINUTE ORDER: Upon consideration of the NTIA's motion to continue 36 , it is hereby ORDERED that the motion is GRANTED. The Court further ORDERS that the Zoom status conference set for December 23, 2021, at 2:00 p.m. is VACATED and RESCHEDULED for January 18, 2022, at 2:00 p.m. Courtroom Deputy Clerk will provide the necessary login information. Signed by Judge Randolph D. Moss on 12/13/2021. (lcak) Modified on 12/14/2021 to correct date. (dot). (Entered: 12/13/2021) |
| 12/13/2021 | | Set/Reset Hearings: Status Conference set for 1/18/2022 at 2:00 PM via Telephonic/VTC before Judge Randolph D. Moss. (dot) (Entered: 12/14/2021) |
| 01/14/2022 | 37 | NOTICE of Appearance by Nicholas James Giles on behalf of FRONTIER WEST VIRGINIA INC. (Giles, Nicholas) (Entered: 01/14/2022) |
| 01/18/2022 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Video (Zoom) Status Conference held on 1/18/2022. For the reasons stated on the record, Defendants shall file a |

8/4/24, 8:07 PM

Case 1:24-mc-00092-DLF   Document 7-1   Filed 08/05/24   Page 12 of 14
Case 1:23-cv-02699-RDB   Document 72   Filed 08/13/24   Page 183 of 191

list of factual assertions of documents in dispute by 1/25/2022; Government's response, if any, due by 2/1/2022. (Court Reporter: Nancy Meyer.) (kt) (Entered: 01/18/2022)

| 01/25/2022 | 38 | SUPPLEMENTAL MEMORANDUM re 34 Memorandum filed by FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, KENNETH ARNDT, DANA WALDO by KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. (Byrum, Jeremy) Modified event title on 1/26/2022 (znmw). (Entered: 01/25/2022) |
| --- | --- | --- |
| 02/01/2022 | 39 | RESPONSE re 38 Memorandum, filed by SUBPOENA TO NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION. (Valdez, Darrell) (Entered: 02/01/2022) |
| 04/08/2022 | 40 | NOTICE of Appearance by Nicholas James Giles on behalf of KENNETH ARNDT, MARK MCKENZIE, DANA WALDO (Giles, Nicholas) (Entered: 04/08/2022) |
| 04/08/2022 | 41 | NOTICE OF WITHDRAWAL OF APPEARANCE as to KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. Attorney Jeremy S. Byrum terminated. (Byrum, Jeremy) (Entered: 04/08/2022) |
| 05/06/2022 | 42 | NOTICE of Appearance by Marcia G. Madsen on behalf of KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO (Madsen, Marcia) (Entered: 05/06/2022) |
| 05/06/2022 | 43 | NOTICE of Appearance by Sean P. McDonnell on behalf of KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO (McDonnell, Sean) (Entered: 05/06/2022) |
| 05/10/2022 | 44 | ENTERED IN ERROR.....NOTICE OF WITHDRAWAL OF APPEARANCE as to KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. Attorney Nicholas James Giles terminated. (Giles, Nicholas); Modified on 5/10/2022 (ztth). (Entered: 05/10/2022) |
| 05/10/2022 | | NOTICE OF ERROR regarding 44 Notice of Withdrawal of Appearance. The following error(s) need correction: Incorrect document or case. Docket Entry entered in error at the request of counsel. (ztth) (Entered: 05/10/2022) |
| 05/10/2022 | 45 | NOTICE OF WITHDRAWAL OF APPEARANCE as to KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. (Giles, Nicholas) (Entered: 05/10/2022) |
| 05/31/2022 | | MINUTE ORDER: The parties are hereby ORDERED to appear for a motions hearing on the motion to compel 1 and motion to quash 7 on June 2, 2022, at 1:00 p.m. in Courtroom 8. The Court will discuss the disputed records; the parties are thus directed to have copies of the redacted records in front of them, and the government is further directed to have copies of the unredacted records in front of it. If the parties prefer to proceed remotely rather than in person, either party may file a notice with the Court indicating that preference. Any such notice must contain the position of the opposing party. Signed by Judge Randolph D. Moss on 5/31/2022. (lcrdm2) (Entered: 05/31/2022) |
| 05/31/2022 | | MINUTE ORDER: Due to a conflict in the Court's schedule, it is hereby ORDERED that the motions hearing set for June 2, 2022, at 1:00 p.m. is RESCHEDULED for June 2, 2022, at 10:30 a.m., in Courtroom 8. Signed by Judge Randolph D. Moss on 5/31/2022. (lcrdm2) (Entered: 05/31/2022) |
| 05/31/2022 | 46 | Joint MOTION to Continue *Reschedule Motions Hearing* by KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. (Attachments: # 1 Text of Proposed Order)(Madsen, Marcia) (Entered: 05/31/2022) |

8/4/24, 8:07 PM

| 05/31/2022 | | MINUTE ORDER: In light of the parties' joint motion to continue, Dkt. 46 , it is hereby ORDERED that the parties shall appear for a status conference tomorrow, June 1, 2022, at 11:30 a.m., to occur via Zoom. Signed by Judge Randolph D. Moss on 5/31/2022. (lcrdm2) (Entered: 05/31/2022) |
| --- | --- | --- |
| 06/01/2022 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Video (Zoom) Status Conference held on 6/1/2022. For the reasons stated on the record, the parties shall file a Joint Status Report by 6/15/2022. Motion Hearing set for 6/17/2022, at 2:00 PM, by video, before Judge Randolph D. Moss. (Court Reporter: Jeff Hook.) (kt) (Entered: 06/01/2022) |
| 06/01/2022 | | MINUTE ORDER: For the reasons stated on the record at today's status conference, *see* Minute Entry (June 1, 2022), it is hereby ORDERED that the motions hearing set for June 2, 2022, is VACATED. Signed by Judge Randolph D. Moss on 6/1/2022. (lcrdm2) (Entered: 06/01/2022) |
| 06/07/2022 | 47 | NOTICE OF WITHDRAWAL OF APPEARANCE as to SUBPOENA TO NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION. Attorney Darrell C. Valdez terminated. (Valdez, Darrell) (Entered: 06/07/2022) |
| 06/13/2022 | 48 | NOTICE of Appearance by Cameron Edlefsen on behalf of KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO (Edlefsen, Cameron) (Entered: 06/13/2022) |
| 06/15/2022 | 49 | Joint STATUS REPORT by KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. (Madsen, Marcia) (Entered: 06/15/2022) |
| 06/17/2022 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Video (Zoom) Motion Hearing held on 6/17/2022 re: 1 MOTION to Compel filed by FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO, KENNETH ARNDT, and 7 MOTION to Quash *and Opposition to Motion to Compel* filed by SUBPOENA TO NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION. Oral rulings made on the record by the Court as to in camera documents discussed. For the reasons stated on the record, Plaintiff shall file a status report a week from today as to document 1034. Order forthcoming to memorialize today's matter. (Court Reporter: Nancy Meyer.) (kt) (Entered: 06/17/2022) |
| 06/17/2022 | | MINUTE ORDER: For the reasons stated on the record, the Court hereby ORDERS the NTIA to take the following actions with respect to the redacted documents that remain at issue in this case, *see* Dkt. 49 (describing twelve documents in dispute): Doc. 917: Disclose paragraphs 2a, 2b, and 2c, and the sentence on page 2 that begins with "The only logical conclusion;" Doc. 919: disclose the text on the bottom of page 22 of 44, beginning with "Project benefits," through the third sentence of paragraph 3 on page 23 of 44, which begins with "The state will leverage", and on page 24 of 44, disclose (i) the sentence that begins with "The State focused," (ii) the sentence that begins with "Seven middle mile applications," (iii) the sentence that begins with "The applicant proposes a middle mile project," and (iv) the clause that begins with "while there was some identification" and ends with "incumbents;" Doc. 942: No further disclosures necessary; Doc. 946: Disclose any text related to overbuild or peering through the existing network; Doc. 980: No further disclosures necessary; Doc. 983: No further disclosures necessary; Doc. 997: No further disclosures necessary; Doc. 1014: Disclose the same information as is described with respect to Doc. 919, provided that the government does not determine that there are material differences between Docs. 1014 and 919; Doc. 1018: No further disclosures necessary; Doc. 1029: No disclosure necessary; Doc. 1030: Disclose, subject to protective order (as discussed on the record); Doc. 1034: The government shall, per the Court's Minute Entry, file a joint status report on or before June 24, 2022, describing the nature of |

8/4/24, 8:07 PM

Case 1:24-mc-00092-DLF   Document 7-1   Filed 08/05/24   Page 14 of 14
Case 1:23-cv-02699-RDB   Document 72   Filed 08/13/24   Page 185 of 191

| | | this document and stating the reasons, if any, justifying its withholding. Signed by Judge Randolph D. Moss on 6/17/2022. (lcrdm2) (Entered: 06/17/2022) |
|---|---|---|
| 06/24/2022 | 50 | Joint STATUS REPORT by KENNETH ARNDT, FRONTIER WEST VIRGINIA INC., MARK MCKENZIE, DANA WALDO. (Attachments: # 1 Proposed Protective Order) (Madsen, Marcia) (Entered: 06/24/2022) |
| 07/01/2022 | 51 | PROTECTIVE ORDER: The parties shall comply with the directives in the attached Protective Order. Signed by Judge Randolph D. Moss on 7/1/2022. (lcrdm2) (Entered: 07/01/2022) |
| 07/05/2022 | | MINUTE ORDER: Upon consideration of the parties' joint status report, Dkt. 50 , it is hereby ORDERED that Document No. 1034 is properly withheld pursuant to the deliberative process privilege. According to the government, the record was "prepared by NTIA staffer Scott Woods on or about October 2014 and provides Mr. Woods' assessment and subjective impression of the issues raised by OIG." Dkt. 50 at 2. Based on that representation, and the Court's examination of the document in question, the record appears to contain internal Department of Commerce communications about an ongoing OIG investigation. Communications of that type "reflect[] the give-and-take of the consultative process" and are thus protected by the deliberative process privilege. *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). Furthermore, Frontier's "need for the information" does not "outweigh[] the interest of the government in preventing disclosure of the information" because the pertinent information contained in Document No. 1034 is reflected in the 2017 OIG report and elsewhere in the NTIA's production. *Cobell v. Norton*, 213 F.R.D. 1, 5 (D.D.C. 2003). Put differently, on the Court's review of Document No. 1034, it does not appear that the document contains information that might be important to Frontier's defense in the underlying *qui tam* suit that is not reflected in the 2017 OIG report or other documents already disclosed to Frontier. Accordingly, the Court will DENY Frontier's request for disclosure of Document No. 1034. For the reasons stated in this Order, as well as in the Court's prior Minute Order dated June 17, 2022, and on the record during a hearing on June 17, 2022, it is hereby ORDERED that the NTIA's motions to dismiss 2 and to quash 7 are DENIED. The Clerk of Court is directed to terminate this case. Signed by Judge Randolph D. Moss on 7/5/2022. (lcrdm2) (Entered: 07/05/2022) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/04/2024 21:07:18 | | |
| **PACER Login:** | ConsovoyMcCarthyLLC | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:19-mc-00040-RDM |
| **Billable Pages:** | 12 | **Cost:** | 1.20 |

# EXHIBIT 4

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: MOTION TO COMPEL COMPLIANCE WITH SUBPOENA DIRECTED TO THE UNITED STATES COAST GUARD | No. 24-mc-00092 (DLF) |

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, <br><br> *Plaintiff*, <br><br> v. <br><br> THE UNITED STATES NAVAL ACADEMY, *et al.*, <br><br> *Defendants.* | District of Maryland <br> No. 23-cv-02699 (RDB) |

## <u>ORDER</u>

Before the Court is Students for Fair Admissions' (SFFA) Motion to Compel the United States Coast Guard to comply with a discovery subpoena.  Dkt. 1. The underlying litigation challenges the United States Naval Academy's consideration of race in its admissions process.  *See Students for Fair Admissions v. The United States Naval Academy*, No. 1:23-cv-2699 (D. Md) (Bennett, J.).  SFFA seeks to compel the Coast Guard—a non-party to the litigation—to produce information related to the Coast Guard's prior use of race in its admissions process, as well as statistical data about minority representation on campus.  Opp'n to Mot. to Compel at 4, Dkt. 6. For the reasons stated, the Court will transfer the motion to the United States District Court for the District of Maryland.

A party to a litigation may subpoena documents from a non-party under Federal Rule of Civil Procedure 45(a).  If the subpoena is contested, subsequent motions to compel compliance

with the subpoena are handled in the district where compliance is required.  *See* Fed. R. Civ. P. 45(d)(3).  The subsequent court may, however, transfer any motion to compel back to the court that issued the subpoena "if the person subject to the subpoena consents" or "if the court finds exceptional circumstances." *Id.* R. 45(f).

The Court recognizes that Rule 45(f) is permissive and not mandatory.  *See* Reply at 2–3, Dkt. 7.  Nonetheless, it will exercise its discretion and transfer SFFA's motion to compel to the District of Maryland because the Coast Guard consents to transfer.  Opp'n to Mot. to Compel at 4; *see In re Braden*, 344 F. Supp. 3d 83, 90 (D.D.C. 2018) (noting the "prime concern" with nonparty subpoenas is the burden on the nonparty); *Bogard Constr. Inc. v. Oil Price Info. Serv.*, 2022 WL 1213307, at *2 (D. Md. Apr. 25, 2022) ("[The nonparty's consent] alone ends the matter."); *Hall v. Marriott Int'l Inc.*, 2021 WL 3129598, at *2 (N.D. Cal. July 23, 2021) ("[The nonparty's] proactive consent to the transfer provides sufficient grounds for this Court to grant [the] motion to transfer.").  Moreover, the District of Maryland "is in a better position to rule on the [] motion to compel in light of [Judge Bennett's] history and familiarity with the parties and the issues underlying the subpoena dispute."  Opp'n to Mot. to Compel at 4 (quoting *Honeywell Int'l Inc. v. Law Offices of Peter T. Nicholl*, 2022 WL 43494, at *4 (D.D.C. Jan. 5, 2022)).  Accordingly, it is

**ORDERED** that SFFA's Motion to Compel Compliance with the Subpoena Directed to the United States Coast Guard shall be transferred to the United States District Court for the District of Maryland.

**SO ORDERED.**

DABNEY L. FRIEDRICH
United States District Judge

August 7, 2024

# EXHIBIT 5

**U.S. District Court**
**District of Columbia (Washington, DC)**
**CIVIL DOCKET FOR CASE #: 1:24–mc–00092–DLF**

IN RE MOTION TO COMPEL COMPLIANCE WITH
SUBPOENA DIRECTED TO THE UNITED STATES COAST
GUARD
Assigned to: Judge Dabney L. Friedrich
Cause: Motion to Compel

Date Filed: 07/24/2024
Jury Demand: None
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: Federal Question

**In Re**

**MOTION TO COMPEL**
**COMPLIANCE WITH SUBPOENA**
**DIRECTED TO THE UNITED**
**STATES COAST GUARD**

**Petitioner**

**STUDENTS FOR FAIR**              represented by   **Brandon Haase**
**ADMISSIONS**                                      CONSOVOY MCCARTHY PLLC
                                                    1600 Wilson Boulevard
                                                    Suite 700
                                                    Arlington, VA 22209
                                                    864–421–4575
                                                    Email: brandon@consovoymccarthy.com
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **John Michael Connolly**
                                                    CONSOVOY MCCARTHY PLLC
                                                    1600 Wilson Boulevard
                                                    Suite 700
                                                    Arlington, VA 22209
                                                    703–243–9423
                                                    Fax: 703–243–9423
                                                    Email: mike@consovoymccarthy.com
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Cameron Thomas Norris**
                                                    CONSOVOY MCCARTHY PLLC
                                                    1600 Wilson Blvd.
                                                    Suite 700
                                                    Arlington, VA 22209
                                                    (703) 243–9423
                                                    Email: cam@consovoymccarthy.com
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Thomas R. McCarthy**
                                                    CONSOVOY MCCARTHY, PLLC
                                                    1600 Wilson Boulevard
                                                    Suite 700
                                                    Arlington, VA 22209
                                                    703–243–9423
                                                    Email: tom@consovoymccarthy.com
                                                    *ATTORNEY TO BE NOTICED*

V.

**Respondent**

**UNITED STATES COAST GUARD**       represented by   **Catherine Yang**
                                                    1100 L Street NW
                                                    Washington, DC 20005

202–514–4336
Email: catherine.m.yang@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/24/2024 | 1 | MOTION to Compel ( Filing fee $ 52 receipt number 207823.) filed by STUDENTS FOR FAIR ADMISSIONS. (Attachments: # 1 Memorandum in Support, # 2 Declaration, # 3 Text of Proposed Order)(znmw) (Entered: 07/25/2024) |
| 07/24/2024 | 2 | NOTICE OF RELATED CASE by STUDENTS FOR FAIR ADMISSIONS. Case related to Case No. 23cv2699 (Maryland). (znmw) (Entered: 07/25/2024) |
| 07/24/2024 | 3 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by STUDENTS FOR FAIR ADMISSIONS (znmw) (Entered: 07/25/2024) |
| 07/26/2024 | 4 | NOTICE of Appearance by Cameron Thomas Norris on behalf of STUDENTS FOR FAIR ADMISSIONS (Attachments: # 1 Certificate of Service)(Norris, Cameron) (Entered: 07/26/2024) |
| 07/26/2024 | 5 | NOTICE of Appearance by Thomas R. McCarthy on behalf of STUDENTS FOR FAIR ADMISSIONS (Attachments: # 1 Certificate of Service)(McCarthy, Thomas) (Entered: 07/26/2024) |
| 07/26/2024 | | MINUTE ORDER. In light of the September 16 trial date for the related litigation, the defendants shall file a response to plaintiffs' 1 Motion to Compel on or before August 1, 2024. The plaintiffs shall file any reply on or before August 7, 2024. So Ordered by Judge Dabney L. Friedrich on July 26, 2024. (lcdlf1) (Entered: 07/26/2024) |
| 07/26/2024 | | Set/Reset Deadlines: Responses due by 8/1/2024. Replies due by 8/7/2024. (zjch, ) (Entered: 07/29/2024) |
| 08/01/2024 | 6 | RESPONSE re 1 Motion to Compel filed by UNITED STATES COAST GUARD. (Attachments: # 1 Exhibit 1 – Judge Declaration, # 2 Exhibit 2 – Behnke Declaration)(Yang, Catherine) (Entered: 08/01/2024) |
| 08/05/2024 | 7 | REPLY re 6 Response to motion filed by STUDENTS FOR FAIR ADMISSIONS. (Attachments: # 1 Exhibit A)(McCarthy, Thomas) (Entered: 08/05/2024) |
| 08/05/2024 | 8 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by STUDENTS FOR FAIR ADMISSIONS (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit B, # 2 Exhibit C, # 3 Exhibit D, # 4 Exhibit E)(McCarthy, Thomas) (Entered: 08/05/2024) |
| 08/06/2024 | | MINUTE ORDER granting the defendant's 8 Sealed Motion for Leave to File Document Under Seal, in light of the protective order in the underlying case. *See Students for Fair Admissions v. The United States Naval Academy*, No. 1:23–cv–2699, Dkts. 62–63 (D. Md). Accordingly, the defendant's 8 attached exhibits are filed under seal. So Ordered by Judge Dabney L. Friedrich on August 6, 2024. (lcdlf1) (Entered: 08/06/2024) |
| 08/07/2024 | 9 | ORDER transferring 1 Motion to Compel to the United States District Court for the District of Maryland. See text for details. Signed by Judge Dabney L. Friedrich on August 7, 2024. (lcdlf1) (Entered: 08/07/2024) |
| 08/07/2024 | | Set/Reset Deadlines: Transfer due by 8/17/2024. (zjch, ) (Entered: 08/07/2024) |