**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: MOTION TO COMPEL COMPLIANCE WITH SUBPOENA DIRECTED TO THE UNITED STATES COAST GUARD | Case: 1:24–mc–00092<br>Assigned To : Friedrich, Dabney L.<br>Assign. Date : 7/24/2024<br>Description: Misc. (O–Deck) |
| STUDENTS FOR FAIR ADMISSIONS,<br><br>                              *Plaintiff*,<br><br>V.<br><br>THE UNITED STATES NAVAL ACADEMY, *et al.*,<br><br>                              *Defendants*. | Related Case:<br>No. 1:23-cv-02699<br>(District of Maryland) |

**DECLARATION OF BRANDON HAASE**

1.      I am an attorney at the law firm Consovoy McCarthy PLLC and counsel for movant, Students for Fair Admissions.

2.      I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

3.      The following materials attached as exhibits are true and accurate copies of documents exchanged between the parties and a page from a public website:

   a.   Exhibit A is a copy of Plaintiff's second subpoena *duces tecum*, served on the United States Coast Guard, courtesy of the Office of General Counsel, Department of Homeland Security, on June 26, 2024.

1

b.   Exhibit B is a copy of the Coast Guard's objections to Plaintiff's second subpoena *duces tecum*, served by Brian Judge, counsel for the United States Coast Guard, to Cameron Norris, counsel for Students for Fair Admissions, on July 10, 2024.

c.   Exhibit C is a copy of Plaintiff's first subpoena *duces tecum*, served on the United States Coast Guard, courtesy of the Office of General Counsel, Department of Homeland Security, on June 10, 2024

d.   Exhibit D is a copy of the Coast Guard's objections to Plaintiff's first subpoena *duces tecum*, served by Brian Judge, counsel for the United States Coast Guard, to Cameron Norris, counsel for Students for Fair Admissions, on June 18, 2024.

e.   Exhibit E is a document entitled "United States Coast Guard Academy Class of 2021 Profile," last accessed July 23, 2024, and available at https://perma.cc/W4Z4-LPL9.

f.   Exhibit F is a copy of the Complaint filed by Students for Fair Admissions in *Students for Fair Admissions v. The United States Naval Academy, et al.*, in the United States District Court for the District of Maryland (No. 1:23-cv-02699), Dkt. 1.

g.   Exhibit G is a copy of the Memorandum in Support of Motion for Preliminary Injunction Students filed by Students for Fair admissions in *Students for Fair Admissions v. The United States Naval Academy, et al.*, in the United States District Court for the District of Maryland (No. 1:23-cv-02699), Dkt. 9-1.

h.   Exhibit H is a webpage from the United States Coast Guard Academy entitled "Mission," last accessed July 23, 2024, and available at https://perma.cc/5XD7-2TYK.

i. Exhibit I is a webpage from the United States Naval Academy entitled "Mission of USNA," last accessed July 23, 2024, and available at United States Naval Academy, Mission of USNA, (accessed July 22, 2024), https://perma.cc/AJK2-R83F.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed July 24, 2024

Brandon Haase (DC Bar No. 1616834)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
brandon@consovoymccarthy.com

*Counsel for Movant*
*Students for Fair Admissions*

3

# Exhibit A

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### DISTRICT OF MARYLAND
### NORTHERN DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  No. 1:23-cv-2699-RDB |
| | ) |
| THE UNITED STATES NAVAL ACADEMY, et al., | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: United States Coast Guard, Commandant CG-LCL, US Coast Guard HQ Visitor Center, Gate 4, 1790 Ash St. SE, Washington, DC 20032

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material listed in the attached document.

| Place:   Mayflower Hotel | Date and Time: |
|---|---|
| 1127 Connecticut Ave NW | |
| Washington, DC 20036 | July 26, 2024 10:00AM ET |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   June 26, 2024

| CLERK OF COURT | | |
|---|---|---|
| | OR | |
| _____ | | /s/ *Cameron Norris* |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Students for Fair Admissions _____ , who issues or requests this subpoena, are:

Cameron Norris, Consovoy McCarthy PLLC, 1600 Wilson Blvd, Arlington, VA 22209, (703) 243-9423, cam@consovoymccarthy.com

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                                *Server's signature*

                                 _____
                                                *Printed name and title*

                                 _____
                                                *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS<br><br>*Plaintiff*,<br><br>v.<br><br>THE UNITED STATES NAVAL ACADEMY,<br>*et al.*,<br><br>*Defendants.* | No. 1:23-cv-2699-RDB |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS

To: The United States Coast Guard, Commandant CG-LCL, US Coast Guard HQ Visitor Center, Gate 4, 1790 Ash St. SE, Washington, DC 20032.

## PRODUCTION

You, or your representatives, are commanded to produce to Plaintiffs' Counsel, Consovoy McCarthy PLLC, on or before July 26, 2024 at 10:00 A.M., the documents and electronically stored information described in the Attachment at the lobby of the Mayflower Hotel, 1127 Connecticut Ave NW, Washington, DC 20036.

Respectfully submitted,

*s/Cameron T. Norris*

Adam K. Mortara (*pro hac vice*)
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

Dated: June 26, 2024

Thomas R. McCarthy (*pro hac vice*)
Patrick Strawbridge (*pro hac vice*)
J. Michael Connolly (*pro hac vice*)
Cameron T. Norris
Bryan Weir (*pro hac vice*)
James F. Hasson (*pro hac vice*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
patrick@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
bryan@consovoymccarthy.com
james@consovoymccarthy.com

*Counsel for Students for Fair Admissions*

2

## **CERTIFICATION**

I hereby certify that on June 26, 2024, a true copy of the foregoing was emailed to the

following counsel of record, so serving all parties:

JOSHUA GARDNER
Civil Division, Federal Programs Branch
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Tel: (202) 514-4336
joshua.e.gardner@usdoj.gov

*s/Cameron T. Norris*

3

**ATTACHMENT**

The instructions, rules of construction, and definitions set forth in Rules 26, 34, and 45 of the Federal Rules of Civil Procedure are incorporated herein as if fully set forth.

**DEFINITIONS**

1.      The "Coast Guard Academy" means the United States Coast Guard Academy and all present and former officers, directors, employees, agents, consultants, representatives, attorneys, subdivisions, and any other persons acting for or on behalf of any of these entities or individuals.

2.      "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

3.      "Complaint" means the Complaint SFFA filed in this action on October 5, 2023.

4.      "Concerning" means referring to, describing, evidencing, or constituting. Requests for "documents concerning" any subject matter include documents concerning communications regarding that subject matter.

5.      "Document" shall mean all items listed in Federal Rule of Civil Procedure 34(a)(1)(A) & (B) and L.R.26.5(c)(2).

6.      "Including" means including but not limited to.

7.      "Plaintiff" or "SFFA" means Students for Fair Admissions, Inc. and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals.

8.      The "present" means the date on which Your responses to these requests are submitted.

4

9.     The term "race" means race, ethnicity, or national origin.

10.     The term "racial or ethnic minorities" means individuals who are African American, Hispanic, Asian American, Pacific Islander, Native American, Native Hawaiian, or Native Alaskan.

11.     "Relate" means consisting of, referring to, reflecting, evidencing, or being in any way legally, logically or factually connecting with the matter referred to or having a tendency to prove or disprove the matter referred to.

12.     "Representative" means any and all agents, servants and employees.

13.     "You" and "Yours" means (a) the Office of The U.S. Coast Guard Headquarters, including the Office of the Commandant, Vice Commandant, and Chief Petty Officer of the United States Coast Guard; and (b) the Board of Visitors, Board of Trustees, Office of the Superintendent, Office of the Assistant Superintendent, Office of the Command Master Chief, and Admissions Office of the United States Coast Guard Academy, and all present and former officers or persons acting for or on behalf of any of these entities or individuals.

## **INSTRUCTIONS**

1.     In responding to these document requests, You shall produce separately all documents in Your possession, custody, or control, including documents in the possession, custody, or control of Your agents and representatives.

2.     Any request concerning a partnership, limited liability company, or corporate entity includes its subsidiaries, affiliates, employees, members, agents, representatives, or attorneys.

3.     Unless stated otherwise, requests concerning applications, admitted students, and enrolled students are limited to the application, admission, and enrollment of freshman and transfer students at the United States Coast Guard Academy.

5

4.      The term "or" is to be read in both the conjunctive and disjunctive and shall serve as a request for documents that would be responsive under a conjunctive reading in addition to all documents that would be responsive to a disjunctive reading.

5.      If You claim any form of privilege or any other objection, whether based on statute, common law, or otherwise as a ground for not producing any requested document, please furnish a list identifying each document for which the privilege or other objection is claimed together with the following information: date, sender, recipient, persons to whom copies were provided together with their job titles, subject matter, basis on which a privilege or other objection is claimed, and the paragraph(s) of this request to which such document responds.  If You claim privilege or any other objection with regard to only part of a document, produce the part as to which there is no objection.

6.      If any document or copy was, but is no longer in Your possession, custody, or subject to Your control, please state and specify in detail for each such document: date, sender, recipient, persons to whom copies were provided together with their job titles, the information contained therein, the date upon which it ceased to exist, the disposition that was made of it and the identity of all persons having knowledge of the contents thereof.

7.      Produce all documents in complete form, as kept in the normal course of business, and identify the file from which each document was taken.

8.      This Request for Production principally seeks documents and information prepared, sent, provided, received, in possession during, or relating to, the time period beginning with January 1, 2008, and continuing through April 1, 2013, or relating to this time period whenever prepared.  Any request seeking documents from this time period refer to the "Relevant Period." Any request seeking documents beyond the Relevant Period refer to documents "from any time."

## <u>DOCUMENTS TO BE PRODUCED</u>

1.      All documents from the Relevant Period prepared by You concerning any programs, initiatives, strategies, plans, or other organized efforts undertaken for the purpose of (a) increasing the number of racial or ethnic minority students who applied, were admitted, and/or matriculated to the Coast Guard Academy; or (b) increasing the percentage of all applicants, admitted students, and/or matriculants to the Coast Guard Academy who are racial or ethnic minorities, including but not limited to the strategies discussed in the following article: Jennifer McDermott, *Coast Guard Cadet Diversity Surges With Minority Wave*, The Day (July 5, 2010), perma.cc/U4AR-MJQV.

2.      Documents sufficient to show the total number of applicants, admitted students, matriculants, and graduates of each race for the Coast Guard Academy Classes of 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

# Exhibit B

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commandant
United States Coast Guard

2703 Martin Luther King Jr. Ave. SE
Stop 7213
Washington, DC 20593-7213
Staff Symbol: CG-LCL
Phone: (202) 372-3740
Fax: (202) 372-8325
Email: Valerie.willis@uscg.mil

5891

JUL 1 0 2024

Consovoy McCarthy PLLC
1600 Wilson Blvd
Suite 700
Arlington, VA 22209

Re: Subpoena Students for Fair Admissions v. The United Sates Naval Academy et al Case No.
1:23-cv-2699-RDB

Dear Mr. Norris:

On June 26, 2024, the U.S. Coast Guard's Office of Claims and Litigation received your subpoena dated June 26, 2024, concerning the above-named litigation. Our office previously received a virtually identical subpoena from you, which the Coast Guard treated as a request made pursuant to its *Touhy* regulations and was denied on June 18, 2024. In that denial, I informed you that because your subpoena relates to a matter that is currently in litigation in the District Court for the District of Maryland, your subpoena would be handled in accordance with the Department of Homeland Security *Touhy* regulations set forth in 6 C.F.R. § 5 (5.41-4.49). Despite this, your June 26th subpoena was not accompanied by a cover letter or any other writing addressing the reasons why your first subpoena was denied. Nor did the June 26th subpoena comply with the general regulatory requirements for making a *Touhy* request, *e.g.*, setting forth in writing the "relevance of the official information sought." 6 C.F.R. § 5.45(a). This alone is a basis for denying your request; nevertheless, I will again treat your subpoena as a *Touhy* request.

Your June 26th subpoena, like the first, broadly seeks documents related to Coast Guard Academy admissions efforts and strategies related to the period January 1, 2008, and continuing through April 1, 2013, along with demographic breakdowns for the Coast Guard Academy Classes of 2008 through 2017. Because your June 26th subpoena contains the same requests as your June 6th subpoena, save the second category of documents, a change to the definition of "You", and the deletion of Instruction 9 from the first subpoena, production of any documents or testimony related to the June 26, 2024, subpoena is denied for the same reasons as before. Please refer to my June 18, 2024, letter for the full articulation of those reasons.

In addition, consistent with Federal Rule of Civil Procedure 45(d)(2)(B), this letter provides the Coast Guard's written objections to the subpoena.

When determining whether to comply with a *Touhy* request, the Coast Guard must consider the factors set forth in 6 C.F.R. § 5.48. After evaluating these factors (particularly § 5.48(a)(1), (3), (4), (5) and (7)), I deny your request for the following reasons.

Your first request seeks:

5891

Re: Subpoena Students for Fair Admissions v. The United Sates Naval Academy et al Case No. 1:23-cv-2699-RDB

All documents from [January 1, 2008, and continuing through April 1, 2013, or relating to this time period whenever prepared] prepared by You concerning any programs, initiatives, strategies, plans, or other organized efforts undertaken for the purpose of (a) increasing the number of racial or ethnic minority students who applied, were admitted, and/or matriculated to the Coast Guard Academy; or (b) increasing the percentage of all applicants, admitted students, and/or matriculants to the Coast Guard Academy who are racial or ethnic minorities, including but not limited to the strategies discussed in the following article: Jennifer McDermott, *Coast Guard Cadet Diversity Surges With Minority Wave*, The Day (July 5, 2010), perma.cc/U4AR-MJQV.

Your subpoena amended the definition of "You" from consisting of the entire United States Coast Guard, including all present and former secretaries, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals, to consisting of (a) all of Coast Guard Headquarters;[1] and (b) the Board of Visitors, Board of Trustees, Office of the Superintendent, Office of the Assistant Superintendent, Office of the Command Master Chief, and Admissions Office of the United States Coast Guard Academy, and all present and former officers or persons acting for or on behalf of any of these entities or individuals.

This change does not meaningfully limit the definition of "You." Almost 4,000 civilian employees and military members work at Coast Guard Headquarters with the vast majority being military members who change billets every two to four years. Your "Relevant Period" definition covers more than five years so responding to your request as drafted would likely require identifying approximately 10,000 individuals who were assigned to Headquarters more than a decade ago. Undertaking this task would be unduly burdensome given that almost all these individuals would have no connection to the Coast Guard Academy's admissions process. Furthermore, any documents that might be located would almost certainly be duplicative of documents in the possession of the Coast Guard Academy (CGA) Admissions Office, rendering this effort superfluous.

In addition, both the CGA's Board of Visitors and Board of Trustees include individuals who are not members or employees of the Coast Guard. Accordingly, those individuals' documents are not in the possession, custody, or control of the Coast Guard.

Your amended definition of "You" also does not respond to my June 18, 2024, letter articulating the burdens of narrowing this term even to the CGA Admissions Office, which is the office most likely to have responsive records. All those burdens, which your subpoena does not address, remain just as significant now. Please refer to my June 18, 2024, letter for the full articulation of those burdens, which the Coast Guard incorporates by reference here.

---

[1] This includes the Office of the Commandant, Vice Commandant, and Chief Petty Officer of the Coast Guard. There is no Chief Petty Officer of the Coast Guard, but I understand your definition to mean the Master Chief Petty Officer of the Coast Guard.

2

5891

Re: Subpoena Students for Fair Admissions v. The United Sates Naval Academy et al Case No. 1:23-cv-2699-RDB

Your second and final request seeks:

Documents sufficient to show the total number of applicants, admitted students, matriculants, and graduates of each race for the Coast Guard Academy Classes of 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

Your first subpoena dated June 6, 2024, made an identical request, and this request in your second subpoena remains unchanged notwithstanding the detailed *Touhy* response the Coast Guard previously identified. Please refer to my June 18, 2024, letter for the full articulation of that response to this request, which the Coast Guard incorporates by reference here.

Considering that you have now propounded two successive subpoenas on the Coast Guard, any future Touhy request from you in connection with this litigation must include "a plan of all reasonably foreseeable demands" for testimony or documents pursuant to 6 C.F.R. § 5.45(b).

Consistent with Rule 45, the Coast Guard also objects to the subpoena. Although Instruction 9 has been deleted, this subpoena continues to include instructions that are identical to the instructions in the previous subpoena, despite the detailed objections the Coast Guard previously identified. Please refer to my June 18, 2024, letter for the full articulation of the Coast Guard's objections to Instructions Nos. 5, 6, and 7, as well as to the time provided for compliance.

For all the reasons stated above and those included in my June 18, 2024, denial, the Coast Guard again denies your *Touhy* request and objects under Rule 45 to your subpoena. Please note that the Coast Guard does not, by this letter, waive any other legal objections to your *Touhy* requests.

Sincerely,

BRIAN JUDGE
U.S. Coast Guard
Office of Claims and Litigation
By direction of the Commandant

3

# Exhibit C

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
## DISTRICT OF MARYLAND
### NORTHERN DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | )   Civil Action No.   No. 1:23-cv-2699-RDB |
| | ) |
| THE UNITED STATES NAVAL ACADEMY, et al., | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:   United States Coast Guard, Commandant CG-LCL, US Coast Guard HQ
Visitor Center, Gate 4, 1790 Ash St. SE, Washington, DC 20032

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached document.

| Place:  Consovoy McCarthy PLLC<br>1600 Wilson Blvd, Suite 700<br>Arlington, VA 22209 | Date and Time:<br><br>July 8, 2024 10:00AM ET |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  June 7, 2024

| *CLERK OF COURT* | |
|---|---|
| | OR |
| _____ | /s/ Cameron T. Norris<br>_____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  Students for Fair Admissions  _____ , who issues or requests this subpoena, are:

Cameron T. Norris, 1600 Wilson Blvd., Ste. 700, Arlington VA, 22209, cam@consovoymccarthy.com, 703-243-9423

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

### PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $      0.00     .

I declare under penalty of perjury that this information is true.

Date: _____                          _____
                                                         *Server's signature*

                                               _____
                                                         *Printed name and title*

                                               _____
                                                         *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c)  Place of Compliance.**

 **(1)  *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)  *For Other Discovery.*** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d)  Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)  *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)  *Command to Produce Materials or Permit Inspection.***
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)  *Quashing or Modifying a Subpoena.***
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e)  Duties in Responding to a Subpoena.**

 **(1)  *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)  *Claiming Privilege or Protection.***
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g)  Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

|  |  |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS<br><br>*Plaintiff*,<br><br>v.<br><br>THE UNITED STATES NAVAL ACADEMY,<br>*et al.*,<br><br>*Defendants*. | No. 1:23-cv-2699-RDB |

**<u>SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS</u>**

To: The United States Coast Guard, Commandant CG-LCL, US Coast Guard HQ Visitor Center, Gate 4, 1790 Ash St. SE, Washington, DC 20032.

**PRODUCTION**

You, or your representatives, are commanded to produce on or before July 8, 2024, the documents and electronically stored information described in Attachment A at the law firm of Consovoy McCarthy PLLC, 1600 Wilson Blvd, Ste. 700, Arlington, VA 22209.

Attached hereto as Attachment B is the text of:

    a.   Federal Rule of Civil Procedure ("FRCP") 45(c), relating to the place of compliance;

    b.   FRCP 45(d), relating to your protection as a person subject to a subpoena; and

    c.   FRCP 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Respectfully submitted,

*s/Cameron T. Norris*

Adam K. Mortara (*pro hac vice*)
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

Dated: June 7, 2024

Thomas R. McCarthy (*pro hac vice*)
Patrick Strawbridge (*pro hac vice*)
J. Michael Connolly (*pro hac vice*)
Cameron T. Norris
Bryan Weir (*pro hac vice*)
James F. Hasson (*pro hac vice*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
patrick@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
bryan@consovoymccarthy.com
james@consovoymccarthy.com

*Counsel for Students for Fair Admissions*

2

## **CERTIFICATION**

I hereby certify that on June 7, 2024, a true copy of the foregoing was emailed to the

following counsel of record, so serving all parties:

JOSHUA GARDNER
Civil Division, Federal Programs Branch
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Tel: (202) 514-4336
joshua.e.gardner@usdoj.gov

*s/Cameron T. Norris*

3

## ATTACHMENT A

The instructions, rules of construction, and definitions set forth in Rules 26, 34, and 45 of the Federal Rules of Civil Procedure are incorporated herein as if fully set forth.

## DEFINITIONS

1.      The "Coast Guard Academy" means the United States Coast Guard Academy and all present and former officers, directors, employees, agents, consultants, representatives, attorneys, subdivisions, and any other persons acting for or on behalf of any of these entities or individuals.

2.      "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

3.      "Complaint" means the Complaint SFFA filed in this action on October 5, 2023.

4.      "Concerning" means referring to, describing, evidencing, or constituting. Requests for "documents concerning" any subject matter include documents concerning communications regarding that subject matter.

5.      "Document" shall mean all items listed in Federal Rule of Civil Procedure 34(a)(1)(A) & (B) and L.R.26.5(c)(2).

6.      "Including" means including but not limited to.

7.      "Plaintiff" or "SFFA" means Students for Fair Admissions, Inc. and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals.

8.      The "present" means the date on which Your responses to these requests are submitted.

4

9.      The term "race" means race, ethnicity, or national origin.

10.     The term "racial or ethnic minorities" means individuals who are African American, Hispanic, Asian American, Pacific Islander, Native American, Native Hawaiian, or Native Alaskan.

11.     "Relate" means consisting of, referring to, reflecting, evidencing, or being in any way legally, logically or factually connecting with the matter referred to or having a tendency to prove or disprove the matter referred to.

12.     "Representative" means any and all agents, servants and employees.

13.     "You" and "Yours" means the United States Coast Guard and all of its sub-components, to include the United States Coast Guard Academy, and all present and former secretaries, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals.

## INSTRUCTIONS

1.      In responding to these document requests, You shall produce separately all documents in Your possession, custody, or control, including documents in the possession, custody, or control of Your agents and representatives.

2.      Any request concerning a partnership, limited liability company, or corporate entity includes its subsidiaries, affiliates, employees, members, agents, representatives, or attorneys.

3.      Unless stated otherwise, requests concerning applications, admitted students, and enrolled students are limited to the application, admission, and enrollment of freshman and transfer students at the Coast Guard Academy.

4.      The term "or" is to be read in both the conjunctive and disjunctive and shall serve as a request for documents that would be responsive under a conjunctive reading in addition to all documents that would be responsive to a disjunctive reading.

5.      If You claim any form of privilege or any other objection, whether based on statute, common law, or otherwise as a ground for not producing any requested document, please furnish a list identifying each document for which the privilege or other objection is claimed together with the following information: date, sender, recipient, persons to whom copies were provided together with their job titles, subject matter, basis on which a privilege or other objection is claimed, and the paragraph(s) of this request to which such document responds.  If You claim privilege or any other objection with regard to only part of a document, produce the part as to which there is no objection.

6.      If any document or copy was, but is no longer in Your possession, custody, or subject to Your control, please state and specify in detail for each such document: date, sender, recipient, persons to whom copies were provided together with their job titles, the information contained therein, the date upon which it ceased to exist, the disposition that was made of it and the identity of all persons having knowledge of the contents thereof.

7.      Produce all documents in complete form, as kept in the normal course of business, and identify the file from which each document was taken.

8.      This Request for Production principally seeks documents and information prepared, sent, provided, received, in possession during, or relating to, the time period beginning with January 1, 2008, and continuing through April 1, 2013, or relating to this time period whenever prepared.  Any request seeking documents from this time period refer to the "Relevant Period." Any request seeking documents beyond the Relevant Period refer to documents "from any time."

6

9.      These requests shall be deemed to be continuing so as to require supplemental answers from time to time until the date of trial.

## **DOCUMENTS TO BE PRODUCED**

1.      All documents from the Relevant Period prepared by You concerning any programs, initiatives, strategies, plans, or other organized efforts undertaken for the purpose of (a) increasing the number of racial or ethnic minority students who applied, were admitted, and/or matriculated to the Coast Guard Academy; or (b) increasing the percentage of all applicants, admitted students, and/or matriculants to the Coast Guard Academy who are racial or ethnic minorities, including but not limited to the strategies discussed in the following article: Jennifer McDermott, *Coast Guard Cadet Diversity Surges With Minority Wave*, The Day (July 5, 2010), perma.cc/U4AR-MJQV.

2.      All communications from the Relevant Period by or among Your employees or agents regarding the programs, initiatives, strategies, plans, or other organized efforts referenced in Paragraph 1 of this section.

3.      Documents sufficient to show the total number of applicants, admitted students, matriculants, and graduates of each race for the Coast Guard Academy Classes of 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

## ATTACHMENT B

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g)

(c) Place of Compliance.

(1) For a Trial, Hearing, or Deposition. A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

(2) For Other Discovery. A subpoena may command:

(A) production of documents, electronically stored information, or tangible things  at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises at the premises to be inspected.

(d) Protecting a Person Subject to a Subpoena; Enforcement.

(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction--which may include lost earnings and reasonable attorney's fees--on a party or attorney who fails to comply.

(2) Command to Produce Materials or Permit Inspection.

(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises--or to

8

producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) Quashing or Modifying a Subpoena.

(A) When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

9

(ii) ensures that the subpoenaed person will be reasonably compensated.

(e) Duties in Responding to a Subpoena.

(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:

(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.

(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) Claiming Privilege or Protection.

(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that

10

received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(g) Contempt. The court for the district where compliance is required--and also, after a motion is transferred, the issuing court--may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

# Exhibit D

U.S. Department of
**Homeland Security**

**United States
Coast Guard**

Commandant
United States Coast Guard

2703 Martin Luther King Jr. Ave. SE
Stop 7213
Washington, DC 20593-7213
Staff Symbol: CG-LCL
Phone: (202) 372-3740
Fax: (202) 372-8325
Email: Valerie.willis@uscg.mil

5891

JUN 1 8 2024

Consovoy McCarthy PLLC
1600 Wilson Blvd
Suite 700
Arlington, VA  22209

Re:  Subpoena Students for Fair Admissions v. The United Sates Naval Academy et al Case No.
1:23-cv-2699-RDB

Dear Mr. Norris:

On June 10, 2024, the U.S. Coast Guard's Office of Claims and Litigation received your
subpoena dated June 8, 2024, concerning the above-named litigation.  Your subpoena broadly
seeks documents related to Coast Guard Academy admissions efforts and strategies related to the
period January 1, 2008, and continuing through April 1, 2013, along with demographic
breakdowns for the Coast Guard Academy Classes of 2008 through 2017.

Your subpoena relates to a matter that is currently in litigation in the District Court for the
District of Maryland.  In cases where the Coast Guard is not a party to litigation and receives a
request for information the Coast Guard adheres to the *Touhy* regulations set forth in 6 C.F.R. § 5
(5.41-4.49) and 49 C.F.R. § 9, which are incorporated by reference pursuant to 6 C.F.R. §
5.41(b).  Therefore, the Coast Guard will treat your subpoena as a *Touhy* request.  In addition,
consistent with Federal Rule of Civil Procedure 45(d)(2)(B), this letter provides the Coast
Guard's written objections to the subpoena.

When determining whether to comply with a *Touhy* request, the Coast Guard must consider the
factors set forth in 6 C.F.R. § 5.48.  After evaluating these factors (particularly § 5.48(a)(1), (3),
(4), (5) and (7)), I deny your request for the following reasons.

Your first request seeks:

All documents from [January 1, 2008, and continuing through April 1, 2013, or relating
to this time period whenever prepared] prepared by You concerning any programs,
initiatives, strategies, plans, or other organized efforts undertaken for the purpose of (a)
increasing the number of racial or ethnic minority students who applied, were admitted,
and/or matriculated to the Coast Guard Academy; or (b) increasing the percentage of all
applicants, admitted students, and/or matriculants to the Coast Guard Academy who are
racial or ethnic minorities, including but not limited to the strategies discussed in the
following article: Jennifer McDermott, *Coast Guard Cadet Diversity Surges With
Minority Wave*, The Day (July 5, 2010), perma.cc/U4AR-MJQV.

5891

Re: Subpoena Students for Fair Admissions v. The United Sates Naval Academy et al Case No.
1:23-cv-2699-RDB

As a preliminary matter, because you have defined You to consist of the entire United States
Coast Guard, including all present and former secretaries, officers, employees, agents,
consultants, representatives, attorneys, and any other persons acting for or on behalf of any of
these entities or individuals, your request is overly broad and unduly burdensome. In addition
to implicating privilege and work product protection by the inclusion of attorneys, the Coast
Guard cannot identify all such entities that may have possibly possessed responsive documents
for that time period. I therefore am considering only the burden of searching for and locating
responsive documents in the possession of the Coast Guard Academy (CGA) Admissions Office,
which is the office most likely to have responsive records.

Even narrowing the scope, your request remains unduly burdensome and inappropriate under the
Federal Rules of Civil Procedure, not in the public interest, a failure to conserve the time of CGA
military members and civilian employee resources, and would adversely impact the CGA's
ability to fulfill its mission at a time of strained resources.

First, the documents you seek are all over ten years old and would likely have been destroyed in
compliance with the Coast Guard's records disposition schedule.

Second, searching for documents that might not have been disposed of would be extremely
burdensome, particularly at this time. The CGA Admissions Office is currently understaffed.
The Director of Admissions is retiring, and the Deputy position is currently vacant. Of the
remaining staff, none of the current Admissions Officers were serving in the office during the
period in question. As active-duty military members, they generally serve a three-year
assignment in the Admissions Office and rotate to another position elsewhere in the Coast
Guard. In fact, one will be transferring this summer. In addition, all the Directors of Admissions
for the period you are seeking have retired from the Coast Guard, as well as some of the other
staff. Consequently, the Coast Guard cannot search for these documents by contacting the
officers who would have been responsible for developing and implementing any responsive
policies. At best, we could search shared electronic drives and remotely stored physical files that
are not well organized for retrieving relevant documents. Furthermore, given the remoteness in
time and lack of knowledge of the staff of the particular material, the Coast Guard would be
unable to know if it located a full documentation of the policies and efforts at issue or merely a
non-representative fragment. Consequently, the parties would face significant difficulty
determining what, if any, probative value such evidence would have in this case. This would not
be in the public interest.

Your second request is broader still:

> All communications from [January 1, 2008, and continuing through April 1, 2013, or
> relating to this time period whenever prepared] by or among Your employees or agents
> regarding the programs, initiatives, strategies, plans, or other organized efforts referenced
> in Paragraph 1 of this section.

2

5891

Re: Subpoena Students for Fair Admissions v. The United Sates Naval Academy et al Case No.
1:23-cv-2699-RDB

All my reasons for denying your first request apply here as well. In addition, we could not
electronically search e-mail accounts for personnel who may have been assigned to the
Admissions Office during the period. The Coast Guard manages its e-mail and other electronic
messages under a Capstone Approach approved by the National Archives and Records
Administration. None of the personnel assigned to the Admissions Office are among the few
senior officials whose e-mails are permanent records. As a result, e-mail from the members of
the Admissions Office are temporary records and are disposed of after ten years.

Your third and final request seeks:

Documents sufficient to show the total number of applicants, admitted students,
matriculants, and graduates of each race for the Coast Guard Academy Classes of 2008,
2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

The Coast Guard does have documents responsive to this request, but I am also denying this
request. Based on the news article from The Day describing an increase in diversity for the
incoming Class of 2014 that you reference in your subpoena, my understanding is that you intend
to use this information to show that the racial diversity of an entering military academy class can
be increased using methods other than considering race. This theory ignores several important
distinctions between the CGA and the Naval Academy, other potential causal factors, and would
require more than just the demographic information to be probative and effective. In short, as
explained below, the Coast Guard's admissions practices are not relevant to the Naval
Academy's distinct admissions process.

While the CGA and the Naval Academy are both military institutions, as the article in The Day
notes the admissions process is quite different with the Naval Academy's process heavily based
on a system of congressional nominations while the CGA has no such process. The two services
also have different mission sets—in addition to its military mission the Coast Guard is tasked
with search and rescue, law enforcement, safety and security of the marine transportation system,
and marine environmental response— which attract different applicants. The two academies are
also vastly different in size. A Naval Academy incoming class typically will have over 400
minority midshipmen while an entire CGA incoming class will likely number less than 300. The
small size of a CGA class also means that variations in the composition of a class from one year
to the next may have less statistical significance, particularly when unknown variables may have
changed from year to year. For example, during the period that you have requested, the law
governing CGA admissions changed. The Coast Guard Authorization Act of 2010 removed the
requirement that appointment of cadets be made without regard to the sex, race, color, or
religious beliefs of an applicant. This might have had a greater impact on class composition than
any changes in recruiting strategy making the changes referenced in the article an anomaly.

In sum, the benefit of this information to the parties in this litigation is minimal. The two
admissions processes are too dissimilar to offer a useful comparison. Furthermore, the burden on
the Coast Guard is almost certainly more than it appears. Merely providing the demographic
information requested would likely lead to greater Coast Guard involvement in this case, not end

3

Re: Subpoena Students for Fair Admissions v. The United Sates Naval Academy et al Case No.
1:23-cv-2699-RDB

it. Both parties would desire more information about causal factors that may have caused any
demographic changes in class composition. This would lead to renewed calls to perform the
searches necessary to respond to your first two requests and likely deposition testimony as well.
This is the type of undue burden imposed on a nonparty that has supported quashing subpoenas.
*See Virginia Dep't of Corrections v. Jordan,* 921 F.3d 180, 189 (4th Cir. 2019) (stating that
"courts must give the recipient's nonparty status 'special weight,' leading to an even more
'demanding and sensitive' inquiry than the one governing discovery generally").

Consistent with Rule 45, the Coast Guard also provides the following written objections to the
subpoena. As an initial matter, the Coast Guard incorporates the above discussion regarding
relevance, burden, and proportionality into its Rule 45 objections. In addition, USCG objects to
the following instructions:

- Instruction No. 5 to the extent it requires a privilege log inconsistent with the
  requirements of Federal Rule of Civil Procedure 45(e)(2). Any privilege log USCG
  provides in this case will be made in accordance with Rule 45.

- Instruction No. 6 is inconsistent with the requirements of Federal Rule of Civil Procedure
  45. Any information produced in response to Plaintiff's subpoena will be made
  consistent with the requirements of Rule 45.

- Instruction No. *Ts* requirement that USCG "identify the file from which each document
  was taken" is inconsistent with the requirements of Rule 45. Any production of
  documents will be made consistent with the requirements of Rule 45.

- Instruction No. 9 is inconsistent with the requirements of Rule 45. As a non-party,
  USCG does not have, and will not undertake, a continuing supplementation duty. *See,
  e.g., Alexander* v. *FBI,* 192 F.R.D. 37, 38 (D.D.C. 2000) ("a non-party served with a
  subpoena duces tecum is under no duty to supplement its discovery responses"); *Munive
  v. Town of Cicero,* 2016 WL 8673072, at *9 (N.D. Ill. Oct. 14, 2016); *Lea/cs* v. *Target
  Corp.,* 2015 WL 092450, at *2 n.3 (S.D. Ga. July 6, 2015).

- Finally, USCG objects to the time that the subpoena provides for compliance. The
  subpoena requests documentation that would require the agency to undertake a time- and
  labor-intensive process to locate, review, and produce responsive, non-privileged
  documents. The Subpoena seeks voluminous information from January 1, 2008 to April
  1, 2013, as well as "all documents" "relating to this time period whenever prepared," and
  documents additionally pertaining to the classes 2008 through 2017. Accordingly, the
  July 8, 2024 compliance date is not reasonable-particularly given USCG's status as a
  non-party.

4

5891

Re:  Subpoena Students for Fair Admissions v. The United Sates Naval Academy et al Case No.
     1:23-cv-2699-RDB

For all the reasons stated above, the Coast Guard denies your *Touhy* request and objects under
Rule 45 to your subpoena.  Please note that the Coast Guard does not, by this letter, waive any
other legal objections to your *Touhy* requests.

Sincerely,

BRIAN JUDGE
U.S. Coast Guard
Office of Claims and Litigation
By direction of the Commandant

5

# Exhibit E



# United States Coast Guard Academy
# Class of 2021 Profile

## 2021 Admissions Funnel

| | |
|---|---|
| Online Applications received | 2314 |
| Applications Completed | 2021 |
| Appointed | 433 |
| Enrolled | 294* |

*plus ten International Cadets

## Background information

| | |
|---|---|
| 33% | Female |
| 35% | Underrepresented Minorities (URM) |
| 91% | High School Varsity Letter |
| 77% | Sports Team Captain |
| 22% | Band/Performing Arts Member |
| 41% | Attended AIM Program |
| 35% | Parents with Military Service |
| 18% | Attended CGA Scholars (Prep) |
| 9% | Attended College (1+ Year) |
| 74% | Intended Technical Majors |
| 228 | Average Applicant PFE Score* |

* 300 point scale

## Corps of Cadets*

| | Class of 2020 | | Entire Corps | |
|---|---|---|---|---|
| | # | % | # | % |
| Total** | 294 | - | | - |
| | | | 1036 | |
| Men** | 196 | 67 | 670 | 65 |
| Women** | 98 | 33 | 366 | 35 |
| URM** | 104 | 35 | 339 | 33 |
| Int'l | 10 | - | 28 | - |
| Total w/ Int'l | 304 | - | 1064 | - |

*On 26 June 2017
**Does not include International Cadets



### Academic Data

**High School Class Rank**

- Top 5%
- Top 10%
- Top 25%

% of Incoming Class of 2021

**High School Grade Point Average**
(converted to a 4.0 scale*)

- 4.0 & Above
- 3.5 & Above
- 3.0 & Above

% of Incoming Class of 2021

* Some Honors/ Advanced Placement coursework can result in a GPA over 4.0

**SAT Scores**
(25th through 75th Percentiles)

- SAT MATH
- SAT VERBAL

Score (on a scale of 200 to 800)

**ACT Scores**
(25th through 75th Percentiles)

- ACT MATH
- ACT READING

Score (on a scale of 1 to 36)

**For more information contact:**

| | |
|---|---|
| **Director of Admissions** | **1-800-883-USCG** |
| **U.S. Coast Guard Academy** | **www.uscga.edu** |
| **New London, CT 06320** | **Admissions@uscga.edu** |



# United States Coast Guard Academy
# Class of 2022 Profile

## 2022 Admissions Funnel

| | |
|---|---|
| Online Applications received | 2274 |
| Applications Completed | 2045 |
| Appointed | 390 |
| Enrolled | 279* |

*plus Eleven International Cadets

## Background information

| | |
|---|---|
| 41% | Female |
| 36% | Underrepresented Minorities (URM) |
| 85% | High School Varsity Letter |
| 70% | Sports Team Captain |
| 20% | Band/Performing Arts Member |
| 44% | Attended AIM Program |
| 41% | Parents with Military Service |
| 18% | Attended CGA Scholars (Prep) |
| 23% | Attended College (1+ Year) |
| 76% | Intended Technical Majors |
| 225 | Average Applicant PFE Score* |

* 300 point scale

## Corps of Cadets*

| | Class of 2022 | | Entire Corps | |
|---|---|---|---|---|
| | # | % | # | % |
| Total** | 279 | – | 1065 | – |
| Men** | 164 | 59 | 679 | 64 |
| Women** | 115 | 41 | 386 | 36 |
| URM** | 100 | 36 | 360 | 34 |
| Int'l | 11 | – | 31 | – |
| Total w/ Int'l | 290 | – | 1096 | – |

*On 2 July 2018
**Does not include International Cadets



## Academic Data

**High School Class Rank**
(Top 5%, Top 10%, Top 25%)
% of Incoming Class of 2022

**High School Grade Point Average**
(converted to a 4.0 scale*)
(4.0 & Above, 3.5 & Above, 3.0 & Above)
% of Incoming Class of 2022
* Some Honors/ Advanced Placement coursework can result in a GPA over 4.0

**SAT Scores**
(25th through 75th Percentiles)
SAT MATH, SAT VERBAL
Score (on a scale of 200 to 800)

**ACT Scores**
(25th through 75th Percentiles)
ACT MATH, ACT READING
Score (on a scale of 1 to 36)

**For more information contact:**

**Director of Admissions**     1-800-883-USCG
**U.S. Coast Guard Academy**     www.uscga.edu
**New London, CT 06320**     Admissions@uscga.edu

# Exhibit F

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS,<br>*Plaintiff,*<br><br>v.<br><br>THE UNITED STATES NAVAL ACADEMY,<br>    121 Blake Road<br>    Annapolis, Maryland 21402-1300<br>    Anne Arundel County<br><br>THE UNITED STATES DEPARTMENT OF<br>DEFENSE,<br><br>LLOYD AUSTIN, in his official capacity as Secretary of Defense,<br><br>CARLOS DEL TORO, in his official capacity as Secretary of the Navy,<br><br>BRUCE LATTA, in his official capacity as Dean of Admissions for the United States Naval Academy,<br>    121 Blake Road<br>    Annapolis, Maryland 21402-1300<br>    Anne Arundel County<br><br>REAR ADMIRAL FRED KACHER, in his official capacity as Acting Superintendent of the United States Naval Academy.<br>    121 Blake Road<br>    Annapolis, Maryland 21402-1300<br>    Anne Arundel County<br><br>*Defendants.* | No. _____<br><br>**<u>VERIFIED COMPLAINT</u>** |

Plaintiff, Students for Fair Admissions, brings this civil action for declaratory and injunctive relief against Defendants and alleges as follows:

## INTRODUCTION

1.      The United States Naval Academy is one of the crown jewels of the American military. The Academy has trained the future leaders of the Navy since 1845, producing some of our nation's most revered admirals.

2.      The Academy's mission is to "develop midshipmen morally, mentally, and physically and to imbue them with duty, honor, and loyalty" for a career of service in the United States Navy. *Mission of USNA*, perma.cc/XQ6X-2NQT.

3.      For most of its history, the Academy has evaluated midshipmen based on merit and achievement. For good reasons: America's enemies do not fight differently based on the race of the commanding officer opposing them, sailors must follow orders without regard to the skin color of those giving them, and battlefield realities apply equally to all sailors regardless of race, ethnicity, or national origin. To that end, President Truman desegregated the military well before other institutions followed suit. *See* Executive Order 9981 (July 26, 1948) ("[T]here shall be equality of treatment and opportunity for all persons in the armed forces without regard to race, color, religion, or national origin.").

4.      Over the past few decades, however, the Academy has strayed from that approach. Instead of admitting midshipmen solely on leadership potential and objective metrics—the Academy stopped requiring applicants to submit standardized scores three years ago—the Academy focuses on race.

5.      The Academy has no justification for using race-based admissions. Those admissions are unconstitutional for all other public institutions of higher education. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141 (2023) ("*SFFA*"). The Academy is not exempt from the Constitution. *See, e.g.*, *Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976) ("A succession of cases in this circuit and others ha[s] reiterated the proposition that the military is subject to the Bill

of Rights and its constitutional implications."). And its calls for blind judicial deference to the military on questions of racial discrimination are "'gravely wrong,'" both legally and historically. *SFFA*, 143 S. Ct. at 2162 n.3 (discussing the overruling of *Korematsu v. United States*, 323 U.S. 214 (1944)).

6.      Because the Academy discriminates based on race, its admission policy should be declared unlawful and enjoined.

## PARTIES

7.      Plaintiff, Students for Fair Admissions, is a voluntary membership organization formed for the purpose of defending human rights and civil liberties, including the right of individuals to equal protection under the law, through litigation and any other lawful means. SFFA is a nonprofit membership group of tens of thousands of individuals across the country who believe that racial preferences in college admissions, including the academies, are unfair, unnecessary, and unconstitutional. SFFA has members who are ready and able to apply to the United States Naval Academy.

8.      Defendant United States Naval Academy is a military service academy created under federal law and operating under the command and supervision of the Department of the Navy and Department of Defense. The Academy and its leadership are responsible for creating and executing its admissions policies for prospective midshipmen, including the policy at issue here.

9.      Defendant United States Department of Defense is an executive agency headquartered in Washington, D.C., and is responsible for all aspects of the military, including the policy at issue here.

10.      Defendant Lloyd Austin is the Secretary of Defense and is responsible for all aspects of the military, including the policy at issue here. Secretary Austin is sued in his official capacity.

11.      Defendant Carlos Del Toro is the Secretary of the Navy and oversees all Navy operations and policies, including the policy at issue here. Secretary Del Toro is sued in his official capacity.

12.     Defendant Rear Admiral Fred Kacher is Acting Superintendent of the United States Naval Academy and responsible for the creation, implementation, and oversight of all Academy policies, including the policy at issue here. Rear Admiral Kacher is sued in his official capacity.

13.     Defendant Bruce Latta is Dean of Admissions at the United States Naval Academy and responsible for the creation, implementation, and oversight of all Academy admissions policies, including the policy at issue here. Latta is sued in his official capacity.

## JURISDICTION & VENUE

14.     This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §1331.

15.     Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred here. *See* 28 U.S.C. §1391(b).

16.     The Academy cannot invoke sovereign immunity. Federal courts routinely apply the APA's waiver of sovereign immunity to constitutional claims. *See Standage v. Braithwaite*, 526 F. Supp. 3d 56, 86 (D. Md. 2021) (explaining, in a Fifth Amendment case against the Academy, that "the §702 waiver encompasses qualifying claims arising under non-APA authority"); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011) ("[T]he waiver in §702 is not limited to claims brought pursuant to the review provisions contained in the APA itself." (collecting cases)); *Food Town Stores, Inc. v. EEOC*, 708 F.2d 920, 921-22 (4th Cir. 1983) (similar). The military and its service academies meet the APA's definition of "agency." *Standage*, 526 F. Supp. 3d at 84-89.

## BACKGROUND

## I.     The Academy's Admissions Process

17.     Appointment (*i.e.*, "admission") to the Academy involves two stages: First, applicants must pass medical examinations and a physical-fitness test and secure a "nomination" from a member of Congress, the Vice President, the President, or the Secretary of the Navy. Applicants who satisfy the requirements for the first step are considered "qualified" for admission. Second, after securing a

nomination, applicants must be accepted by the academy's admissions office. The Academy's racial preferences kick in at the second stage, once applicants have received a qualifying nomination.

18. Admission to the Academy is highly selective: fewer than ten percent of applicants are given the honor of enrolling. *See, e.g.*, United States Naval Academy, *Class Portrait: Class of 2027*, perma.cc/2M9H-44RD.

19. The Academy typically enrolls slightly fewer than 1,200 midshipmen in each class. *See, e.g.*, *id.*; United States Naval Academy Admissions, *Class of 2026 Snapshot*, perma.cc/8PAR-PJUU.

20. ***Congressional Nominations.*** Representatives and senators have statutory authority to nominate their constituents for admission to the Academy. *See* 10 U.S.C. §8454(a). Legislators have unfettered discretion in how they allocate those nominations. However, each senator and congressman can have no more than five nominees attending the Academy at any given time. *See* §8454(a)(3)-(4).

21. Members can nominate up to ten of their constituents for consideration for each vacancy. §8454(a). "Typically, one appointment per DoD academy per Senator and Representative is available annually." Congressional Research Service, *Report RL33213: Congressional Nominations to U.S. Service Academies: An Overview and Resources for Outreach and Management*, (April 21, 2016), perma.cc/29FK-LBUG; *see also* Senator Mark Warner, *Academy Admissions*, perma.cc/787E-Y22V ("Most members of Congress" stagger their vacancies to ensure that they have "one open vacancy" at the Academy each year.).

22. Members of Congress have the option to either nominate all ten applicants equally or to nominate a "principal," or preferred, applicant, and nine ranked alternates. *See* §8454(a).

23. Congressional nominees comprise the vast majority of the Academy applicant pool. *See, e.g.*, *Class of 2026 Snapshot.*

24. ***Vice Presidential Nominations.*** Unlike members of Congress, who are authorized to nominate applicants from their home districts, the Vice President can nominate any U.S. citizen for admission to the Academy. *See* §8454(a)(2). Like members of Congress, the Vice President has unfettered discretion in how she allocates her nominations, but she cannot have more than five nominees enrolled at the Academy at any one time. *Id.*

25. Accordingly, Vice Presidential nominees "normally" fill only "one or two" seats in each incoming class. *Service Academy Nomination Process*, The White House, perma.cc/A7Q6-FTSP.

26. ***Presidential Nominations and Special Nominations.*** Presidential nominations occur automatically. They are awarded to the children of servicemembers who have either served at least eight consecutive years on active duty; served in the military reserves for the equivalent of eight active-duty years; or formally retired from military service and meet the requirements for retirement pay benefits. *See* §8454(b)(1)(A)-(D). One hundred seats are reserved for presidential nominees for each incoming class at the Academy. *See* §8454(b)(1).

27. A total of sixty-five additional seats across all four classes are reserved for applicants who receive "special nominations" because their parents were killed in action or received a 100% disability rating from the Department of Veterans Affairs due to service-connected injuries. *See* §8454(a)(1). Like presidential nominations, special nominations occur automatically.

28. If qualified applicants secure a presidential or special nomination in addition to a congressional nomination and they are not selected from the congressional nomination applicant pool, they can still be admitted if the admissions committee selects them from among the applicant pools for the other categories. The Academy does not publicly report the number of applicants who apply under these circumstances each year.

29. ***Secretary of the Navy Nominations.*** The Secretary of the Navy may nominate up to 85 active-duty sailors and Marines and 85 Navy and Marine Corps reservists for admission each year.

*See* §8454(b)(2)-(3). This category includes nominations for applicants who unsuccessfully applied to the Academy in the previous admissions cycle but were given the chance to attend the United States Naval Academy Preparatory School.[1] Of the 59 Secretary nominees who received appointments and enrolled in the class of 2027, only 3 were "directly from the fleet" (*i.e.*, sailors or Marines serving with active units). *Class of 2027: Class Profile.*

30.    ***ROTC Nominations.*** Each Navy and Marine Corps ROTC or Junior ROTC detachment can nominate up to three of its members for admission each year. *See* United States Naval Academy, *Naval/Marine Corps Reserve Officer Training Corps*, perma.cc/2KG8-V372. Junior ROTC detachments that are designated "Honor Units with Distinction" can nominate up to six of their members per year. *Id.* Army and Air Force Junior ROTC detachments that are designated "Honor Units with Distinction" can each nominate up to three members each year. *Id.* A total of twenty seats in each class are available for ROTC and Junior ROTC nominees. *See* §8454(b)(4).

## II.    The Academy's Racial Preferences in Admissions Decisions

31.    The Academy openly admits that "race" is a "factor" that it considers when making admissions decisions. Lois Elfman, *Military Academies Retain Affirmative Action in Admissions*, Diverse Issues in Higher Education, (Sept. 5, 2023), bit.ly/3PARu9t (quoting Academy spokesperson). The Academy disclaims racial quotas and characterizes its use of race as "holistic," like Harvard's and UNC's admissions programs in *SFFA*. *See, e.g.*, Br. of United States as *Amicus Curiae* in Support of Resp'ts 15, *Students for Fair Admissions v. President and Fellows of Harvard College*, 2023 WL 4239254, No. 20-1199 (U.S. June 29, 2023) ("SFFA U.S. Brief") (comparing the academies' use of race to "colleges and universities across the country"); *id.* at 24 (similar).

---

[1] The Navy considers midshipmen at the Prep School to be on active duty status. *See* United States Naval Academy Preparatory School, *Academic Year 2023-2024*, at 4, perma.cc/9NSH-DG6S.

32.    Terminology aside, the Academy's focus on race plays out across all areas of its admissions policy. Much like Harvard and UNC, *see SFFA*, 143 S. Ct. at 2156 n.1, the Academy's use of racial preferences "gives minorities an edge on admissions," Adam Clymer, *Service Academies Defend Their Use of Race in Admissions Policies*, THE NEW YORK TIMES, (Jan. 28, 2003), perma.cc/7HNU-QBGD. For instance, a diversity task force created by the Chief of Naval Operations in July 2020 and chaired by a two-star admiral recently recommended that the Navy "deemphasiz[e] the use of standardized academic tests" and prioritize subjective factors instead. Task Force One Navy, *Final Report* 20, (Jan. 26, 2021), perma.cc/Q6GK-L8JV. The purpose of this radical shift was to "improv[e] … minority representation" and ensure the officer corps "reflect[s] relevant national demographic percentages" because "recruiting efforts have not achieved equitable demographic representation of officers." *Id.* at 20, 37.

33.    In a 2010 *New York Times* op-ed discussing the Academy's racial preferences, an Academy professor stated: "I can confirm from the years I spent on the admissions board in 2002 and '03 and from my conversations with more recent board members, [that] if an applicant identifies himself or herself as non-white, the bar for qualification immediately drops." Bruce Fleming, *The Academies' March Towards Mediocrity*, THE NEW YORK TIMES, (May 20, 2010), nyti.ms/468PqwB. Notably, the "non-white" category described by Professor Fleming does not include Asian applicants. *See* Bruce Fleming, *Not Affirmative, Sir*, THE WASHINGTON POST, (January 16, 2003), perma.cc/C5SP-NGYE ("Members of three racial groups receive preference: African Americans, Hispanics, and Native Americans.").

34.    The magnitude of those racial preferences is stunning. According to Professor Fleming, "[i]f a 'majority' student scored 600 or more on each part of the SAT I test, math and verbal, we put a check mark and went on to consider other aspects of the application. We did so in the case of a 'minority' student if the scores were in the neighborhood of 550." *Id.* Professor Fleming also

recounted an episode where the board of admissions "debated whether students of Brazilian origin 'counted' as Hispanics" and should be eligible for preferred consideration. *Id.*

35. The demographics of the Academy's year-over-year enrollment reflect efforts to racially balance the incoming classes with surgical precision. Take the racial demographics of the Academy's classes of 2025 and 2026, for instance. For the class of 2025, the Academy enrolled 1,183 midshipmen, 672 of whom were white, 79 of whom were African American, and 115 of whom were Asian. *See Class of 2025: Snapshot*, perma.cc/NY52-FFBK. For the class of 2026, it enrolled 1,184 midshipmen, 676 of whom were white, 75 of whom were African American, and 117 of whom were Asian. *See Class of 2026 Snapshot.*

36. The Academy goes to great lengths to achieve this precise balance: A U.S. General Accounting Office report to the Senate Armed Services Committee noted that "the Academy makes offers of appointment to the majority of qualified minorities to achieve the Chief of Naval Operations' commissioning goals for minorities." GAO/NSIAD Report 93-54, *Naval Academy: Gender and Racial Disparities* 38 (1993), perma.cc/6MUR-62V5.

37. The Academy's racial preferences are determinative for hundreds of applicants each year. Congressional nominees comprise roughly 75% of each incoming class, and in most cases, up to ten qualified applicants compete against one another for the single slot afforded to their Senator or Representative each year. Because skin color can be—and often is—a decisive factor for successful applicants who are chosen from those congressional nominee pools, it is equally dispositive for the other qualified nominees who are turned away. Put differently, because race is a "positive" factor for some Academy applicants, it is necessarily a "negative" factor for others. *SFFA*, 143 S. Ct. at 2169.

## III. The Academy's Flawed Justifications for Its Race-Based Admissions Practices

38. Over the years, the Academy has offered several justifications for its use of race in admissions. In 2003, while the Supreme Court was considering Michigan's use of racial preferences in

*Grutter v. Bollinger*, 539 U.S. 306 (2003), the Academy's dean of admissions told the *New York Times* that its racial preferences were necessary because the Academy needs "a brigade [student body] that reflects our country." Clymer, *supra*. Racial preferences were also necessary, he said, because the Navy's officer corps needed to "reflect" the racial demographics "of the services of which we are a part." *Id.*

39.     Although the Solicitor General declined to defend Michigan's use of racial preferences in *Grutter*, a collection of retired former military officers submitted an amicus brief arguing that racial preferences in higher education served a national security interest. *See* Brief of Julius W. Becton, Jr., et al. as Amici Curiae Supporting Respondents at 6, *Grutter v. Bollinger* 539 U.S. 306 (2003) (No. 02-241) ("Becton Brief"). Unlike the Academy's then-dean of admissions, the *amici* did not argue that the racial makeup of the Navy's officer corps needed to reflect society at large. They argued that racial preferences were necessary because the racial composition of the military's officer corps needed to reflect the racial composition of its enlisted corps, and that proportional representation could only be achieved through racial preferences. *Id.*

40.     *Grutter* accepted the Becton brief's assertions, without any evidence or adversarial testing. It repeated the brief's assertion that, "to fulfill its mission, the military 'must be selective in admissions for training and education for the officer corps, *and* it must train and educate a highly qualified, racially diverse officer corps in a racially diverse educational setting.'" 539 U.S. at 331 (cleaned up). And it repeated the Becton brief's conclusory argument that "[a]t present, 'the military cannot achieve an officer corps that is both highly qualified and racially diverse unless the service academies and the ROTC use limited race-conscious … admissions policies.'" *Id.* (cleaned up).

41.     After *Grutter*, the Academy has leaned heavily on the justification put forth in the Becton brief: that the military "has a powerful interest in developing an officer corps that is prepared to lead a diverse force and that shares the diversity of the enlisted ranks." Br. of United States as *Amicus Curiae* in Support of Resp'ts 12, *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198 (No. 14-981) (2016)

("Fisher U.S. Brief"). A report of the Military Diversity Leadership Commission stressed that "[t]he military should mirror the demographic composition of the population it serves and that senior leaders should mirror the demographic composition of the troops they lead." Military Diversity Leadership Commission, *From Representation to Inclusion* 42, (Mar. 15, 2011), perma.cc/VR65-UFNE ("MDLC Report").

42.     Under this formulation, statistical parity with the racial makeup of the general population is not enough. Now, racial preferences are supposedly necessary to achieve racial balance between the enlisted corps—an all-volunteer force—and the officer corps. *See, e.g.*, SFFA U.S. Brief at 15 ("The military has not yet achieved its goal of building an officer corps that reflects the 'racial and ethnic composition' of the service members officers lead" because "White service members are 53% of the force but 73% of officers."); *see also id.* (listing similar statistical comparisons for black and Hispanic officers and enlisted service members).

43.     This goal is tantamount to a declaration that the Academy will *never* stop using race in admissions, since the percentage of sailors and Marines from certain racial categories who voluntarily enlist in the Navy will dictate the scope of the Academy's racial preferences. Indeed, the Defense Department acknowledges that the "demographic makeup" of society and the enlisted force is "continually changing" and states that the military "must change" alongside it "to maintain and sustain its future forces." Department of Defense, *DoD Diversity Strategic Plan 2012-2017* 3, perma.cc/TSN2-T62L.

44.     Even if the racial demographics of the officer corps do eventually mirror those of the enlisted corps, the continued use of race will be necessary to preserve that statistical parity going forward. In short, the Academy's use of race "lack[s] a 'logical end point.'" *SFFA*, 143 S. Ct. at 2170.

45.     As to *how* fostering diversity at the Academy through racial preferences is essential to fulfilling the Navy's mission to defend the nation, the Academy offers a scattershot of reasons devoid

of evidentiary support and naked appeals to deference. They can be broadly summarized as two propositions: (1) that racial preferences enhance the military's internal functioning; and (2) that racial preferences enhance the military's functional capacity by fostering internal confidence within the ranks and by bolstering its external legitimacy which, in turn, increases societal trust and recruitment efforts.

46.     Before the Supreme Court's decision in *SFFA*, the Academy also invoked the "educational benefits of diversity," like Harvard and UNC did in *SFFA*, as a third justification. Specifically, the Academy submitted that the racial "diversity" achieved through race-based admissions "reduc[ed] a sense of isolation and alienation" among ethnic minorities and "encourage[d] greater participation by minority students in the classroom." *Students for Fair Admissions v. President and Fellows of Harvard College*, No. 21-707, Tr. 145:1-146:11, (Oct. 31, 2022). Now that the Supreme Court has refused to allow colleges to justify their actions by reference to those undefined—and undefinable—"educational benefits," the Academy is left with its first two justifications.

## A.     Internal Functioning and Military Readiness

47.     The Academy posits several ways that racial preferences are critical to having a well-functioning Navy in a pluralistic society. All of them view sailors and Marines primarily as members of racial groups, rather than as individuals, and are grounded in the assumption that minority service members all think and feel the same way.

48.     First, the Academy argues that statistical parity between the racial demographics of officers and enlisted sailors and Marines is necessary to preserve unit cohesion and ward off racial strife within units. In support of that assertion, it highlights anecdotal incidents of racial tension among enlisted servicemembers during the Vietnam War, most of which occurred in a brief period from 1969 to 1972. That talking point, raised for the first time by the Becton brief in *Grutter* and repeated in virtually every government defense of racial preferences since, cherry-picks a few unfortunate

incidents and extrapolates them to the American military in general. At best, it is a textbook example of conflating correlation with causation.

49.     In fact, "racial animosity had been negligible within the U.S. armed forces" prior to 1967, and it has been virtually nonexistent post-Vietnam. James Maycock, *War Within War*, The Guardian (Sept. 14, 2001), perma.cc/PX5M-ELMJ. During the Korean War—just a few years after President Truman ordered desegregation in the military—"practical measures outweighed racial beliefs," and integration "failed to produce the violence or poor morale the military brass expected." Walt Napier, *A Short History of Integration in the U.S. Armed Forces*, United States Air Force (July 1, 2021), perma.cc/PYT6-SDXA. The "military brass" of that era were pro-segregation, and their predictions of "violence" and "poor morale" did not bear out. *Id.*

50.     The brief period of racial unrest that the Academy retells over and over was not produced by colorblind policies. It was a tragic byproduct of broader factors: "a changing social environment, a controversial war, and new conscription strategies" that allowed wealthier Americans to escape the draft through college deferments while sending disproportionate numbers of low-income draftees to frontline combat units based on their educational backgrounds. Br. of Veterans for Fairness and Merit as *Amicus Curiae* in Support of Pet'r at 7, *Students for Fair Admissions v. President and Fellows of Harvard College*, -- S. Ct. --, 2023 WL 4239254, No. 20-1199 (U.S. June 29, 2023) ("VFM Brief"). In short, the incidents that the Academy cites to justify open-ended racial preferences were the product of a "perfect storm for racial conflict" that has not existed for the past half century. *Id.*

51.     Moreover, the underlying assumption of the Academy's argument is that sailors view their peers and superiors foremost in terms of race, rather than in terms of their ability or character traits like loyalty, devotion, and selflessness. Put differently, it assumes that sailors apply the same racial stereotypes to one another that the Academy applies to them. There is no evidence to suggest that's the case, and plenty of evidence suggests that it isn't. *See generally id.*

- 13 -

52.     The Academy makes a related argument that officers will "often fai[l] to perceive racial tensions among enlisted personnel" if the officer corps does not have the same levels of racial and ethnic diversity as the enlisted ranks. Fisher US Brief 11. That argument relies on the same misguided assumptions.

53.     Second, the Academy claims that statistical parity between the racial demographics of the officer corps and those of the enlisted corps is necessary to "foster trust between the enlisted corps and its leaders." SFFA U.S. Brief 15; *see also* Fisher U.S. Brief 12 ("military leaders have concluded that an officer corps that shares the diversity of the enlisted ranks improves performance by 'facilitating greater confidence' in leadership"); *Students for Fair Admissions*, No. 21-707, Tr. 145:1-146:11 (discussing military academies, Solicitor General asserts that benefits of increased racial diversity include "cross-racial understanding," which can "lead[] to positive developments with cognitive development.").

54.     The Academy has never provided evidence to support that assertion, and indeed, all available evidence says otherwise. This argument relies on crude and infantilizing stereotypes about the men and women who volunteer to serve in our armed forces, and it defies common sense. It assumes that black sailors will be more likely to trust a black officer or a chain of command that includes black officers, that Hispanic Marines are more likely to trust Hispanic officers, and so forth—because of their skin color, not their trustworthiness. And it completely ignores reams of evidence showing that trust between sailors at sea or Marines on the battlefield is formed through performance, and that servicemembers in war zones are more concerned with their leaders' competency than with their skin color. *See, e.g.*, VFM Brief 18 ("[T]he immutable human element of warfare requires a color-blind warrior ethos for trust, unit cohesion, and combat effectiveness.").

55.     Third, the Academy broadly claims that the diversity produced by racial preferences makes Navy units "more effective at accomplishing their missions." SFFA U.S. Brief 15. It does not

define what it means to be racially "diverse," nor does it provide concrete evidence that military units that choose their members based on race are more successful on the battlefield than units who select their members based on objective measures of tactical competency, regardless of skin color.

56.     In *Fisher*, the Solicitor General extrapolated on this theme and claimed that units with greater racial diversity are more capable of interacting with and understanding partner forces from international allies. *See* Fisher U.S. Brief 12 ("Maintaining a diverse leadership corps also ensures that the military contains the cultural and racial identities necessary to better understand our partner forces."). The government did not elaborate on why it thinks that's true. Apparently, it thought it self-evident that individuals who share the same skin color also share a common "understand[ing]."

### B.     External Legitimacy and Societal Trust

57.     The Academy maintains that having an officer corps that does not reflect the racial makeup of the general population and the enlisted ranks will "undermine the military's legitimacy by fueling 'popular perceptions of racial/ethnic minorities serving as 'cannon fodder' for white military leaders." Fisher U.S. Brief 12 (quoting MDLC Report at 15); *see also* SFFA U.S. Brief 19 ("[G]overnment agencies that lack diversity risk losing legitimacy in the eyes of a diverse nation.").

58.     Again, this conclusory statement assumes that the American people assess the "legitimacy" and trustworthiness of an institution based on its racial makeup. That notion is both un-American and devoid of any evidentiary support. To the contrary, a significantly higher percentage of Americans expressed confidence in the U.S. military three decades ago than they do today. *See* Gallup, *Confidence in Institutions,* perma.cc/DEH2-M92Y. And half of Americans now think that military leaders' over-emphasis on social-justice issues and political correctness is "undermining military effectiveness." Ronald Reagan Institute, *Reagan National Defense Survey*, (Nov. 2022), perma.cc/32B9-RZTZ.

59.     Finally, the Academy argues that the Navy will lose "societal trust" if racial metrics between the officer and enlisted corps (and between the officer corps and society at large) are not

equivalent. The Academy further argues that this speculative loss of societal trust could, in turn, harm recruiting efforts. But today, at the apex of the Academy's use of racial preferences, the Navy is facing a recruiting crisis that is unprecedented in the modern, all-volunteer era. Navy recruiters are working six days a week, but the Navy still cannot meet recruiting goals. *See* Geoff Ziezulewicz, *Navy Forcing Its Recruiters to Work Six Days a Week*, Navy Times (June 29, 2023), perma.cc/P6HP-YBW2.

60.     If anything, the Academy's assertions about recruiting and retention are backwards. In-depth surveys and statistical studies of the military's personnel crisis—*i.e.,* the rigorous analyses that the Academy has failed to offer—show that the military's emphasis on non-merit factors in admissions and promotions decisions is a leading cause of junior officer attrition. "According to 9 out of 10 respondents, more officers would stay if the military was more of a meritocracy." Tim Kaine, *Why Our Best Officers Are Leaving*, The Atlantic, (February 2011), perma.cc/Y6AV-XZUC. And 71% of active-duty officers believe the military would retain more talent if opportunities were based solely on merit. Sayce Falk & Sasha Rogers, *Junior Military Officer Retention: Challenges and Opportunities*, Kennedy Sch. of Gov't, Harvard Univ. (2011), perma.cc/JW2V-Y24Y. To the extent that the Academy's mission is to solidify the public's trust, its race-based admissions policy shoots itself in the foot—especially since 70% of Americans agree that universities should not "be allowed" to "consider race in admissions." Anthony Salvanto, *CBS News Poll Finds Most Americans Say Colleges Shouldn't Factor Race Into Admissions*, CBSNews.Com, (June 21, 2023), perma.cc/PW5D-ZUAT.

61.     Flawed as they are, none of the Academy's justifications for racial preferences are new. In fact, nearly all its nebulous arguments for race-based admissions were made sixty-five years ago by opponents of desegregation. The military segregationists' arguments—like the arguments offered by the Academy—were long on racial stereotypes but short on actual evidence. Like the Academy, segregation proponents argued that a colorblind military would "create difficulties 'which would be reflected in morale and military efficiency.'" President's Committee on Equality of Treatment and

Opportunity in the Armed Services, *Freedom to Serve* 12, (May 22, 1950), perma.cc/C2F5-6SCD. Like the Academy, they claimed that colorblind policies would degrade the military's ability to accomplish its national-defense mission. *Id.* at 49-50. And, like the Academy, they warned that a colorblind approach would be inconsistent with "civilian sentiment" and pose external risks to the institution. *Id.*

62.     Truman's commission rejected all those arguments as unsupported and ideologically driven conjecture. In the process, the commission unequivocally affirmed that servicemembers should be treated as individuals in all circumstances, and that drawing inferences from a person's membership in a particular racial or ethnic group was immoral and illogical. "To put racial restrictions on job opportunities seemed to the Committee to ignore completely the essential factor of individual differences." *Id.* at 13.

**IV.    *SFFA v. Harvard***

63.     The Supreme Court held in *SFFA* that racial preferences in college admissions violate the Equal Protection Clause of the Fourteenth Amendment.

64.     Harvard and UNC both admitted to using race in admissions, but both institutions strenuously insisted that they did so in a "holistic" manner that treated race only as an optional "tip." Both institutions defended their consideration of race as necessary to further a compelling interest in "the educational benefits of diversity."

65.     The Court held both policies unconstitutional for several reasons.

66.     The Court deemed the universities' reasons for using race impermissibly vague and unmeasurable. Harvard claimed that its consideration of race was crucial for "(1) training future leaders in the public and private sectors; (2) preparing graduates to 'adapt to an increasingly pluralistic society'; (3) 'better educating its students through diversity'; and (4) 'producing new knowledge stemming from diverse outlooks.'" *SFFA*, 143 S. Ct. at 2166. UNC made similar arguments but added a fifth

justification to the list: "enhancing appreciation, respect, and empathy, cross-racial understanding, and breaking down stereotypes." *Id.*

67.     The Court held that those goals could not justify race-based admissions because they could not "be subject to meaningful review" and were thus "[in]sufficiently coherent for purposes of strict scrutiny." *Id.* Federal courts had no way of measuring the Universities' self-assessed progress toward achieving those goals. *Id.* Moreover, "[e]ven if [those] goals could somehow be measured," there was no way for courts "to know when they have been reached, and when the perilous remedy of racial preferences may cease." *Id.*

68.     The universities also "measure[d] the racial composition of their classes using the following categories," which come from the federal government: "(1) Asian; (2) Native Hawaiian or Pacific Islander; (3) Hispanic; (4) White; (5) African-American; and (6) Native American." *Id.* at 2167. But those categories are "imprecise," "arbitrary," "undefined," "opaque," and both over- and "under-inclusive." *Id.*

69.     "The Universities' main response to these criticisms [was], essentially, 'trust us.'" *Id.* at 2168. Accepting that proposition, however, would have meant forgoing any meaningful judicial review. And although the Court recognized that some "degree of deference" applies to universities' educational decisions, "deference does not imply abandonment or abdication of judicial review." *Id.*

70.     Both universities strenuously protested that, although they used race as a "positive" for certain applicants, "an individual's race is never a negative factor in admissions." *Id.* The Court found that argument "hard to take seriously." *Id.* Because "[c]ollege admissions are zero-sum," a "benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* Thus, by using race as a "positive" for some applicants, Harvard and UNC necessarily used it as a negative attribute for others.

71. Both universities assumed that increasing the percentage of racial minorities on campus would necessarily increase other students' exposure to different ideas and perspectives. In blunter terms, their policies assumed that all racial minorities had certain views and life experiences solely because of the color of their skin. But "[o]ne of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merits and essential qualities." *Id.* at 2170.

72. Neither Harvard's nor UNC's use of race had a logical end point. *See id.* at 2170-71. Neither institution could identify when they would stop using race or under what circumstances.

73. For example, UNC defined its racial "diversity" goals in relation to the racial demographics of the general population. *See id.* at 2171-72 ("The University frames the challenge it faces as 'the admission and enrollment of underrepresented minorities,' a metric that turns solely on whether a group's 'percentage enrollment within the undergraduate student body is lower than their percentage within the general population in North Carolina.'" (cleaned up)). As the Academy does, UNC claimed that it "ha[d] not yet fully achieved its diversity-related educational goals" because it still needed to "obtain closer to proportional representation." *Id.* at 2172.

74. The Court rejected that metric out of hand. It reiterated that "'outright racial balancing' is 'patently unconstitutional'" because "at the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Id.* (cleaned up). UNC's use of race to obtain "proportional representation" in incoming classes was further unconstitutional, the Court held, because it "'effectively assur[ed] that race will always be relevant and that the ultimate goal of eliminating' race as a criterion 'will never be achieved.'" *Id.* (cleaned up).

75. In sum, the Court held that both Universities failed strict scrutiny and their use of race was therefore unconstitutional because their "programs lack sufficiently focused and measurable

objectives warranting the use of race, unavoidably employ race in a negative manner, involve racial stereotyping, and lack meaningful end points." *Id.* at 2175.

76. In a footnote to the opinion, the Court declined to analyze the use of race by the military academies because "none of the courts below addressed the propriety of race-based admissions systems in that context." *Id.* at 2166 n.4. But *SFFA*'s reasoning makes it perfectly clear that the Academy's use of race in admissions is unconstitutional. *Compare United States v. Windsor*, 570 U.S. 744, 778 (2013) (Roberts, C.J., dissenting) (noting that the majority opinion, which declared unconstitutional a federal definition of marriage, left open the constitutionality of "state marriage definitions"), *with Obergefell v. Hodges*, 576 U.S. 644, 662-63 (2015) (explaining that virtually every court of appeals concluded that the logic of *Windsor* also deemed the state definitions unconstitutional).

77. The Academy has not changed its race-based admissions in light of *SFFA*. Officials at the academies told the press that "they would continue to use race as a factor while awaiting guidance from the Department of Defense"—guidance that has not been issued. Moreover, then-Superintendent Sean Buck reiterated to the House Armed Service Committee in July that the Academy will continue to consider applicants' race going forward.

## V.    Plaintiff and This Litigation

78. SFFA has members who are ready and able to apply to the United States Naval Academy, including Members A and B.

79. Member A is white, a U.S. citizen, and under the age of 23. He has long wanted to attend the United States Naval Academy.

80. Member A applied for admission to the Naval Academy for the class of 2026 and secured a nomination from a Member of Congress to attend. The Academy rejected his application.

81.     Member A is currently in college, medically qualified, under the age of 23, and lives in the southeast. He is ready and able to apply to the Naval Academy again were a court to order it to cease the use of race and ethnicity as a factor in admissions.

82.     Member A joined Students for Fair Admissions because he supports its mission and this lawsuit. Member A wishes to remain pseudonymous, however, because he fears reprisal from the Academy and others if his participation in this litigation becomes public.

83.     Member B is Asian, a U.S. citizen, and under the age of 23. The United States Naval Academy has been his dream school since he was in the sixth grade.

84.     Member B applied for admission to the Naval Academy for the class of 2027 and secured a nomination from a Member of Congress to attend. The Naval Academy rejected his application.

85.     Member B is currently in college, medically qualified, under the age of 23, and lives in the Western United States. He is ready and able to apply to the Naval Academy again were a court to order it to cease the use of race and ethnicity as a factor in admissions.

86.     Member B joined Students for Fair Admissions because he supports its mission and this lawsuit. Like Member A, he wishes to remain pseudonymous, because he fears reprisal from the Academy and others if his participation in this litigation becomes public.

87.     If the Academy is allowed to continue making admissions decisions based on applicants' race, SFFA's members—including Members A and B, and other similarly-situated applicants—will suffer irreparable harm because they will be denied the opportunity to compete for an Academy appointment on equal grounds.

## CLAIM FOR RELIEF
### COUNT
### Violation of the Fifth Amendment

88.     Plaintiff incorporates and restates all its prior allegations here.

89.     "It is undisputed that 'service academies are subject to the Fifth Amendment.'" *Lebrun v. England*, 212 F. Supp. 2d 5, 16 (D.D.C. 2002); *see also Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976) ("A succession of cases in this circuit and others ha[s] reiterated the proposition that the military is subject to the Bill of Rights and its constitutional implications."); *Frontiero v. Richardson*, 411 U.S. 677, 688 (1973) (similar).

90.     The Fifth Amendment contains an equal-protection principle that binds the federal government and is no less strict than the Equal Protection Clause that binds the States. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224 (1995). "[A]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Id.* That principle stems not only from the Fifth Amendment, but also from the Fourteenth Amendment's guarantee of equal citizenship, the Constitution's limits on the scope of federal power, and bedrock principles of equality laid out in the Declaration of Independence.

91.      Because the Academy's admissions policy relies on racial classifications, it must satisfy strict scrutiny. *Id.* In other words, it must employ measures that are "narrowly tailored" to "further compelling governmental interests." *SFFA*, 143 S. Ct. at 2162. The Academy's overt racial preferences cannot clear this bar.

92.     The Supreme Court has recognized compelling interests in the use of race in only the narrowest of circumstances, where those preferences are explicitly designed to remedy recent acts of discrimination and to make the *individual subjects* of that discrimination whole. *See id.* The Academy's admissions policy does not meet this standard, and the Academy makes no pretenses that it does.

93.     The Academy asserts compelling interests in facilitating organizational cohesion, forming culturally aware leaders, ensuring societal "legitimacy" (circularly defined by the Academy), and safeguarding the public trust. If those themes sound familiar, it's because the Supreme Court rejected

- 22 -

all of them in *SFFA*. *See* 143 S. Ct. at 2166-67 (rejecting Defendants' claim to have compelling interests in "training future leaders"; "preparing graduates to 'adapt to an increasingly pluralistic society'"; "better educating [their] students through diversity"; and "producing new knowledge stemming from diverse outlooks").

94.     None of the Academy's purportedly compelling interests can "be subjected to meaningful judicial review." *Id.* at 2166. There is no way for "courts … to measure these goals," and even if they could be measured, courts have no basis for assessing "when they have been reached." *Id.*; *see also id.* ("How is a court to know whether leaders have been adequately 'trained'; whether the exchange of ideas is 'robust'; or whether 'new knowledge' is being developed?" (cleaned up)).

95.     The Academy's appeal to the military benefits of diversity is no different from Harvard and UNC's appeal to the "educational benefits of diversity." In both instances, the purported benefits are vague and "elusive." *Id.* In fact, the only quantifiable aspects of the Academy's race-based admissions program are the racial and ethnic enrollment percentages set by the superintendent each year.

96.     Moreover, "the question in this context is not one of *no* diversity or of *some*: it is a question of degree. How many fewer leaders [the Academy] would create without racial preferences, or how much poorer the education at [the Academy] would be, are inquiries no court could resolve." *Id.* at 2167.

97.     The Academy's admissions program also fails narrow tailoring because it "fail[s] to articulate a meaningful connection between the means [it] employ[s] and the goals [it] pursue[s]." *Id.* The Academy claims that racial preferences are necessary to ensure an officer corps that reflects the racial demographics of the nation it serves and the enlisted corps it leads. That interest is not compelling; it is pure racial balancing.

98.     Besides, these categories are "imprecise in many ways." *Id.* "Some of them are plainly overbroad: by grouping together all Asian students, for instance, [the Academy is] apparently

uninterested in whether *South* Asian or *East* Asian students are adequately represented, so long as there is enough of one to compensate for a lack of the other." *Id.* (emphasis original). "Meanwhile, other racial categories, such as 'Hispanic,' are arbitrary or undefined." *Id.*

99.     Furthermore, the Academy produces only one-fifth of newly commissioned Navy officers each year. Federal law prohibits the Academy from increasing its annual enrollment in greater numbers than the annual increase in ROTC or Officer Candidate School enrollments. *See* §8454(h). Thus, even if it had a compelling interest in ensuring perfectly proportional racial representation between the officer corps and the general population, the Academy's use of the "invidious" practice of racial preferences barely moves the needle in terms of the demographics of the officer corps as a whole. *Id.* at 2166. Regardless, the Supreme Court has already rejected this premise for the civilian colleges and universities who produce eighty percent of the Navy's officers through ROTC and Officer Candidate School programs. *SFFA*, 143 S. Ct. at 2162-67; *see also id.* at 2247 (Sotomayor, J., dissenting) (the national security interests asserted by the military academies "are also implicated at civilian universities" with ROTC programs, but those universities' consideration of race is now unconstitutional).

100.     Nor has the government offered facts or evidence-based reasoning to support its excuses for using race at the academies. The government flatly asserts that the "service academies have carefully considered potential race-neutral alternatives" and "have concluded that, at present, those alternatives would not achieve the military's compelling interest in fostering a diverse officer corps." But it has never identified any studies, reports, or experiments "carefully considering" race-neutral alternatives.

101.     Contra the Academy, the service academies can achieve racially diverse student bodies through race-neutral means. The Coast Guard Academy provides a real-world example. Until 2010, that academy was prohibited by federal statute from using racial preferences in its admissions process.

In the two years before the Coast Guard Academy began considering race, it launched an aggressive advertising and recruiting campaign targeting minorities. At the end of those two years, the Coast Guard Academy had increased minority enrollment by 60%—from 15% to 24%. Those numbers were within a few percentage points of the other academies, which had been using explicit racial preferences for years.

102.    The Academy's race-based admissions violate the Fifth Amendment because "race may never be used as a 'negative'" or "operate as a stereotype." *Id.* at 2168 (cleaned up). As discussed above, the Academy openly acknowledges that race is determinative for some applicants. Because the Academy provides a racial "benefit" to "some applicants but not to others," it "necessarily advantages the former group at the expense of the latter." *Id.* Because race is a "positive" for minority applicants who receive preferences, it is necessarily a "negative" for all others. *Id.*

103.    The Academy's admissions program also relies on impermissible stereotypes. The Supreme Court has "long held that universities may not operate their admissions programs on the 'belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue,'" or "assum[e] that 'members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike.'" *Id.* at 2169 (cleaned up). The Academy does exactly that when it uses racial preferences to "foster trust between the enlisted corps and its leaders," to create "sociocultural competencies essential to multicultural leadership in the 21st century," and to "ensur[e] that the military contains the cultural and racial identities necessary to better understand our partner forces."

104.    By tethering its use of race to the racial demographics of the enlisted corps and the country as a whole, the Academy is violating equal protection by engaging in the "patently unconstitutional" practice of "[o]utright racial balancing." *Id.* 2172. It is not "'treat[ing] citizens as individuals,'" but as "'simpl[e] components of a racial … class.'" *Id.* (cleaned up).

105.     The Academy's use of race in admissions is also unconstitutional because it "lack[s] a 'logical end point.'" *Id.* at 2170 (cleaned up). Indeed, under its theory of "racial diversity," it would be impossible for the Academy to stop considering race. By tying its racial enrollment needs to the ever-shifting demographics of the country and the enlisted ranks, the Academy is essentially promising to use race in perpetuity. *Cf. id.* at 2172-74.

106.     The Academy's status as a military institution does not mean that courts must defer to its conclusory assertions that it needs to employ racial preferences, let alone diminish any of the constitutional violations described above. *See Owens v. Brown*, 455 F. Supp. 291, 300 (D.D.C. 1978) (courts are not compelled "to abdicate their responsibility to decide cases and controversies merely because they arise in the military context"). Although courts have been mindful of the military's unique role in society and the unique considerations that come with it, no level of deference justifies systematic racial discrimination. *See SFFA*, 143 S. Ct. at 2168 ("any deference must exist 'within constitutionally prescribed limits'").

107.     In fact, as the Court recognized in *SFFA*, blind deference to assertions of national security or military necessity can lead to "gravely wrong" outcomes and gross violations of civil rights. *Id.* at 2162 n.3. "[I]n the infamous case *Korematsu*," the "Court upheld the internment of 'all persons of Japanese ancestry in prescribed West Coast ... areas' during World War II because 'the military urgency of the situation demanded' it." *Id.* (cleaned up). The Supreme Court has "since overruled *Korematsu*, recognizing that it was 'gravely wrong the day it was decided.'" *Id.* (cleaned up).

108.     "The Court's decision in *Korematsu* nevertheless 'demonstrates vividly that even the most rigid scrutiny can sometimes fail to detect an illegitimate racial classification' and that '[a]ny retreat from the most searching judicial inquiry can only increase the risk of another such error occurring in the future.'" *Id.* (cleaned up).

- 26 -

109.    Because the Academy's use of racial classifications in admissions violates the Fifth Amendment, it should be declared unlawful and enjoined.

**WHEREFORE**, Plaintiff asks this Court to enter judgment in its favor and to provide the following relief:

a.    A declaratory judgment that the Academy's use of race in admissions is unconstitutional under the Fifth Amendment;

b.    A preliminary injunction prohibiting the Academy from considering or knowing applicants' race when making admissions decisions;

c.    A permanent injunction prohibiting the Academy from considering or knowing applicants' race when making admissions decisions; and

d.    All other relief that Plaintiff is entitled to, including but not limited to attorneys' fees and costs.

Respectfully submitted,

*s/Cameron T. Norris*

| | |
|---|---|
| Adam K. Mortara (*pro hac vice* forthcoming) | Thomas R. McCarthy (*pro hac vice* forthcoming) |
| LAWFAIR LLC | Patrick Strawbridge (*pro hac vice* forthcoming) |
| 40 Burton Hills Blvd., Ste. 200 | J. Michael Connolly (*pro hac vice* forthcoming) |
| Nashville, TN 37215 | Cameron T. Norris |
| (773) 750-7154 | Bryan Weir (*pro hac vice* forthcoming) |
| mortara@lawfairllc.com | James F. Hasson (*pro hac vice* forthcoming) |
| | R. Gabriel Anderson |
| Dated: October 5, 2023 | CONSOVOY MCCARTHY PLLC |
| | 1600 Wilson Boulevard, Suite 700 |
| | Arlington, VA 22209 |
| | (703) 243-9423 |
| | tom@consovoymccarthy.com |
| | patrick@consovoymccarthy.com |
| | mike@consovoymccarthy.com |
| | cam@consovoymccarthy.com |
| | bryan@consovoymccarthy.com |
| | james@consovoymccarthy.com |
| | gabe@consovoymccarthy.com |
| | |
| | *Counsel for Students for Fair Admissions* |

**VERIFICATION**

I, Edward Blum, declare as follows:

      1.      I am the President of Students for Fair Admissions, the plaintiff in this case.

      2.      I have reviewed this complaint.

      3.      For the allegations within my personal knowledge, I believe them all to be true.

      4.      For the allegations not within my personal knowledge, I believe them all to be true based on my review of the cited policies and documents and based on my conversations with members of Students for Fair Admissions, including Members A and B.

      5.      I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 5, 2023

Edward Blum
President of Students for Fair Admissions

# Exhibit G

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND
NORTHERN DIVISION**

STUDENTS FOR FAIR ADMISSIONS,

*Plaintiff,*

v.

THE UNITED STATES NAVAL ACADEMY,
*et al.*,

*Defendants.*

No. 1:23-cv-02699

**MEMORANDUM OF LAW
IN SUPPORT OF MOTION
FOR PRELIMINARY
INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 2

    I.     The Academy's Race-Based Admissions Process .................................... 2

    II.    The Academy's Justifications for Its Race-Based Admissions Practices .............. 4

    III.   Students for Fair Admissions and This Litigation ................................. 6

ARGUMENT ................................................................................................................. 7

    I.     SFFA is likely to prevail on the merits. ................................................. 8

         A.    The Academy has no compelling interest in race-based admissions. ........ 8

            1.    Internal Functioning .................................................... 9

            2.    External Legitimacy and Societal Trust ...................... 12

         B.    The Academy's use of race is not narrowly tailored ............................. 14

    II.    SFFA satisfies the remaining preliminary-injunction criteria. ............. 18

CONCLUSION ............................................................................................................ 19

CERTIFICATE OF SERVICE ................................................................................... 21

# TABLE OF AUTHORITIES

## Cases

*Adarand Constructors, Inc. v. Pena*,
    515 U.S. 200 (1995) ........................................................................................ 8

*Agudath Israel of Am. v. Cuomo*,
    983 F.3d 620 (2d Cir. 2020) ......................................................................... 18

*Berkley v. United States*,
    287 F.3d 1076 (Fed. Cir. 2002) .................................................................... 17

*Brown v. Board of Education*,
    347 U.S. 483 (1954) ........................................................................................ 8

*Centro Tepeyac v. Montgomery Cnty.*,
    722 F.3d 184 (4th Cir. 2013) .......................................................................... 7

*Coal. to Defend Affirmative Action v. Granholm*,
    473 F.3d 237 (6th Cir. 2006) ........................................................................ 18

*Coreas v. Bounds*,
    458 F. Supp. 3d 352 (D. Md. 2020) .............................................................. 19

*Crawford v. Cushman*,
    531 F.2d 1114 (2d Cir. 1976) .......................................................................... 1

*Dep't of Navy v. Egan*,
    484 U.S. 518 (1988) ...................................................................................... 17

*Doe's Assocs. v. Stuart*,
    85 F.3d 975 (2d Cir. 1996) ........................................................................... 19

*Giovani Carandola, Ltd. v. Bason*,
    303 F.3d 507 (4th Cir. 2002) ........................................................................ 19

*Greer's Ranch Café v. Guzman*,
    2021 WL 2092995 (N.D. Tex.) (May 18, 2021) ......................................... 18

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) .......................................................................... 4, 5, 16, 17

*Johnson v. California*,
    543 U.S. 499 (2005) ............................................................................... 12, 17

*Korematsu v. United States*,
    323 U.S. 214 (1944) ................................................................................. 2, 17

*Nken v. Holder*,
    556 U.S. 418 (2009) ...................................................................................... 19

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
    831 F.3d 500 (D.C. Cir. 2016) ...................................................................... 19

*Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*,
    584 F. Supp. 2d 766 (D. Md. 2008) .............................................................. 18

*Reed v. Franke*,
297 F.2d 17, 21 (4th Cir. 1969) ............................................................ 1

*Ross v. Meese*,
818 F.2d 1132 (4th Cir. 1987) .............................................................. 18

*Shelby Cnty., Ala. v. Holder*,
570 U.S. 529 (2013) ............................................................................ 10

*Singh v. Berger*,
56 F.4th 88 (D.C. Cir. 2022) ................................................................ 17

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
143 S. Ct. 2141 (2023) .................................................................. passim

*Trump v. Hawaii*,
138 S. Ct. 2392 (2018) ......................................................................... 17

*U.S. Navy Seals 1-26 v. Biden*,
27 F.4th 336 (5th Cir. 2022) ................................................................ 17

*Winter v. NRDC*,
555 U.S. 7 (2008) .................................................................................. 7

*Wygant v. Jackson Bd. of Educ.*,
476 U.S. 267 (1986) ............................................................................ 16

**Statutes**

10 U.S.C. §8454 ...................................................................................... 2

10 U.S.C. §8458 .................................................................................... 18

**Other Authorities**

Amicus Br. of Veterans for Fairness and Merit at 7, *Students for Fair Admissions v. President and Fellows of Harvard College*,
2023 WL 4239254, No. 20-1199 (U.S. June 29).................................. 10

Br. of United States as *Amicus Curiae* in Support of Resp'ts 12, *Fisher v. Univ. of Tex. at Austin*,
136 S. Ct. 2198 (No. 14-981) (2016).............................................. passim

Br. of United States as *Amicus Curiae* in Support of Resp'ts 15, *Students for Fair Admissions v. President and Fellows of Harvard College*,
2023 WL 4239254, No. 20-1199 (U.S. June 29, 2023)................... passim

Brief of Julius W. Becton, Jr., et al. as Amici Curiae Supporting Respondents at 6, *Grutter v. Bollinger*,
539 U.S. 306 (No. 02-241) (2003)......................................................... 5

Gallup, *Confidence in Institutions,* perma.cc/DEH2-M92Y........................ 13

President's Committee on Equality of Treatment and Opportunity in the Armed Services,
*Freedom to Serve* 12, (May 22, 1950), perma.cc/C2F5-6SCD ......... 13, 14

*Students for Fair Admissions v. President and Fellows of Harvard College*, No. 21-707, Tr.
145:1-146:11, (Oct. 31, 2022) ........................................................... 9, 10

## INTRODUCTION

The United States Naval Academy is one of the crown jewels of the American military. The Academy has trained the future leaders of the Navy since 1845, producing some of our nation's most revered admirals. The Academy's mission is to "develop midshipmen morally, mentally, and physically and to imbue them with duty, honor, and loyalty" for a career of service to the United States Navy. Ex. A.

For most of its history, the Academy has evaluated midshipmen based on merit and achievement. For good reasons: America's enemies do not fight differently based on the race of the commanding officer opposing them, sailors must follow orders without regard to the skin color of those giving them, and battlefield realities apply equally to all sailors regardless of race, ethnicity, or national origin. To that end, President Truman desegregated the military well before other institutions followed suit. *See* Executive Order 9981 (July 26, 1948) ("[T]here shall be equality of treatment and opportunity for all persons in the armed forces without regard to race, color, religion, or national origin.").

Yet the Academy has strayed from that approach. Instead of admitting midshipmen solely on leadership potential and objective metrics—the Academy stopped requiring applicants to submit standardized scores three years ago—the Academy focuses on race.

The Academy has no justification for using race-based admissions. Those admissions are unconstitutional for all other public institutions of higher education. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141 (2023) ("*SFFA*"). The Academy is not exempt from the Constitution. *See, e.g.*, *Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976) ("A succession of cases in this circuit and others ha[s] reiterated the proposition that the military is subject to the Bill of Rights and its constitutional implications."); *Reed v. Franke*, 297 F.2d 17, 21 (4th Cir. 1969) (similar). And calls for blind judicial deference to the military on

questions of racial discrimination are "'gravely wrong,'" both legally and historically. *SFFA*, 143 S. Ct. at 2162 n.3 (discussing the overruling of *Korematsu v. United States*, 323 U.S. 214 (1944)).

Because the Naval Academy discriminates based on race, its admissions policy should be declared unlawful and enjoined. Because its admissions cycle will begin and end before this case can be fully litigated (plus any appeals), SFFA respectfully requests that this Court preliminarily enjoin the Academy from considering race as a factor in admissions **by December 1, 2023**.

## BACKGROUND

### I.    The Academy's Race-Based Admissions Process

Admission to the Academy is highly selective: fewer than ten percent of applicants are given the honor of enrolling. *See, e.g.*, Ex. B at 1. The Academy typically enrolls slightly fewer than 1,200 midshipmen in each class. *See, e.g.*, *id.*; Ex. C.

Appointment (*i.e.*, "admission") to the Academy involves two stages: First, applicants must pass medical examinations and a physical-fitness test and secure a "nomination" from a member of Congress, the Vice President, the President, the Secretary of the Navy, or ROTC. *See generally* 10 U.S.C. §8454; Ex. Y; Ex. Z. Applicants who satisfy the requirements for the first step are considered "qualified" for admission. Second, after securing a nomination, applicants must be accepted by the Academy's admissions office.

When making selections, the Academy openly admits that "race" is a "factor" that it considers. Ex. I. The Academy disclaims racial quotas and characterizes its use of race as "holistic," like Harvard's and UNC's admissions programs in *SFFA*. *See, e.g.*, Br. of United States as *Amicus Curiae* in Support of Resp'ts 15, *Students for Fair Admissions v. President and Fellows of Harvard College*, 2023 WL 4239254, No. 20-1199 (U.S. June 29, 2023) ("SFFA U.S. Brief") (comparing the academies' use of race to "colleges and universities across the country"); *id.* at 24 (similar).

Terminology aside, the Academy's focus on race plays out across all areas of its admissions policy. Much like Harvard and UNC, *see SFFA*, 143 S. Ct. at 2156 n.1, the Academy's use of racial preferences "gives minorities an edge on admissions." Ex. J at 1. For instance, a diversity task force created by the Chief of Naval Operations in July 2020 and chaired by a two-star admiral recently recommended that the Navy "deemphasiz[e] the use of standardized academic tests" in admissions and prioritize subjective factors instead. Ex. V at 20. The purpose of this radical shift was to "improv[e] … minority representation" and ensure the officer corps "reflect[s] relevant national demographic percentages" because "recruiting efforts have not achieved equitable demographic representation of officers." *Id.* at 20, 37.

In a 2010 *New York Times* op-ed discussing the Academy's racial preferences a current Naval Academy professor stated: "I can confirm from the years I spent on the admissions board in 2002 and '03 and from my conversations with more recent board members, [that] if an applicant identifies himself or herself as non-white, the bar for qualification immediately drops." Ex. K at 2. Notably, the "non-white" category does not include Asian applicants. *See* Ex. U at 2 ("Members of three racial groups receive preference: African Americans, Hispanics, and Native Americans.").

The magnitude of those racial preferences is stunning. According to the professor, "If a 'majority' student scored 600 or more on each part of the SAT I test, math and verbal, we put a check mark and went on to consider other aspects of the application. We did so in the case of a 'minority' student if the scores were in the neighborhood of 550." *Id.* at 4. The professor also recounted an episode where the board of admissions "debated whether students of Brazilian origin 'counted' as Hispanics" and should be eligible for preferred consideration. *Id.* at 2-3.

The demographics of the Academy's year-over-year enrollment reflect efforts to racially balance the incoming classes. Take the racial demographics of the Academy's classes of 2025 and

2026, for instance. For the class of 2025, the Academy enrolled 1,183 midshipmen, 672 of whom were white, 79 of whom were African American, and 115 of whom were Asian. *See* Ex. L. For the class of 2026, it enrolled 1,184 midshipmen, 676 of whom were white, 75 of whom were African American, and 117 of whom were Asian. *See* Ex. C. The Academy goes to great lengths to achieve this balance: a U.S. General Accounting Office report to the Senate Armed Services Committee noted that "the Academy makes offers of appointment to the majority of qualified minorities to achieve the Chief of Naval Operations' commissioning goals for minorities." Ex. W at 38.

The Academy's racial preferences are determinative for hundreds of applicants each year. Congressional nominees comprise roughly 75% of each incoming class, and in most cases, up to ten qualified applicants compete against one another for the single slot afforded to their Senator or Representative each year. Because skin color can be—and often is—a decisive factor for successful applicants who are chosen from those congressional nominee pools, it is equally dispositive for the other qualified nominees who are turned away. Put differently, because race is a "positive" factor for some Academy applicants, it is necessarily a "negative" factor for others. *SFFA*, 143 S. Ct. at 2169.

## II.     The Academy's Justifications for Its Race-Based Admissions Practices

Over the years, the Academy has offered several justifications for its use of race in admissions. In 2003, while the Supreme Court was considering Michigan's use of racial preferences in *Grutter v. Bollinger*, 539 U.S. 306 (2003), the Academy's dean of admissions told the *New York Times* that its racial preferences were necessary because the Academy needs "a brigade [student body] that reflects our country." Ex. J at 4. Racial preferences were also necessary, he said, because the Navy's officer corps needed to "reflect" the racial demographics "of the services of which we are a part." *Id.* at 2.

Although the Solicitor General declined to defend Michigan's use of racial preferences in *Grutter*, a collection of retired former military officers submitted an amicus brief arguing that racial preferences in higher education served a national security interest. *See* Brief of Julius W. Becton, Jr., et al. as Amici Curiae Supporting Respondents at 6, *Grutter v. Bollinger* 539 U.S. 306 (No. 02-241) (2003) ("Becton Brief"). Unlike the Academy's then-dean of admissions, the *amici* did not argue that the racial makeup of the Navy's officer corps needed to reflect society at large. They argued that racial preferences were necessary because the racial composition of the military's officer corps needed to reflect the racial composition of its enlisted corps, and that proportional representation could only be achieved through racial preferences. *Id.*

*Grutter* accepted the Becton brief's assertions, without any evidence or adversarial testing. It repeated the brief's assertion that, "to fulfill its mission, the military 'must be selective in admissions for training and education for the officer corps, *and* it must train and educate a highly qualified, racially diverse officer corps in a racially diverse educational setting.'" 539 U.S. at 331 (cleaned up). And it repeated the Becton brief's conclusory argument that "[a]t present, 'the military cannot achieve an officer corps that is both highly qualified and racially diverse unless the service academies and the ROTC use limited race-conscious … admissions policies.'" *Id.* (cleaned up).

After *Grutter*, the Academy has leaned heavily on the justification put forth in the Becton brief: that the military "has a powerful interest in developing an officer corps that is prepared to lead a diverse force and that shares the diversity of the enlisted ranks." Br. of United States as *Amicus Curiae* in Support of Resp'ts 12, *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198 (No. 14-981) (2016) ("Fisher U.S. Brief"). A report of the Military Diversity Leadership Commission stressed that "[t]he military should mirror the demographic composition of the population it serves

and that senior leaders should mirror the demographic composition of the troops they lead." Ex. O at 42. This is necessary, the Academy insists, to ensure unit cohesion and internal trust and to maintain societal legitimacy. *See, e.g.*, SFFA U.S. Brief 15-19.

Under this formulation, statistical parity with the racial makeup of the general population is not enough. Racial preferences are supposedly necessary to achieve racial balance between the enlisted corps—an all-volunteer force—and the officer corps. *See, e.g.*, *id.* at 15 ("The military has not yet achieved its goal of building an officer corps that reflects the 'racial and ethnic composition' of the service members officers lead" because "White service members are 53% of the force but 73% of officers."); *id.* (listing similar statistical comparisons for black and Hispanic officers and enlisted service members).

This goal is tantamount to a declaration that the Academy will *never* stop using race in admissions, since the percentage of sailors and Marines from certain racial categories who voluntarily enlist in the Navy will dictate the scope of the Academy's racial preferences. Indeed, the Defense Department acknowledges that the "demographic makeup" of society and the enlisted force is "continually changing" and states that the military "must change" alongside it "to maintain and sustain its future forces." Ex. X at 3. Even if the racial demographics of the officer corps do eventually mirror those of the enlisted corps, the continued use of race will be necessary to preserve that statistical parity going forward. In short, the Academy's use of race "lack[s] a 'logical end point.'" *SFFA*, 143 S. Ct. at 2170. And the Academy has never adopted a sunset date for its use of race.

## III.    Students for Fair Admissions and This Litigation

SFFA is a voluntary membership organization formed for the purpose of defending human rights and civil liberties, including the right of individuals to equal protection under the law, through litigation and any other lawful means. Blum Decl. ¶2. SFFA is a nonprofit membership

group of tens of thousands of individuals across the country who believe that racial preferences in college admissions, including the academies, are unfair, unnecessary, and unconstitutional. ¶3. SFFA has members who are ready and able to apply to the United States Military Academy. ¶4.

Member A, for example, is white and a U.S. citizen. Member A Decl. ¶2. He has "long wanted to attend the United States Naval Academy." *Id.* He applied to the Academy for the class of 2026 and secured a nomination from a Member of Congress to attend. ¶3. The Academy rejected his application. *Id.* Member A is currently attending college in the Southeast and is a Midshipman in the Naval Reserve Officers Training Corps. ¶4. He is medically qualified and ready and able to reapply to the Naval Academy were a court to order it to cease its use of racial preferences in admissions. *Id.*

Member B is Asian and a U.S. citizen. Member B Decl. ¶2. The Naval Academy has been his dream school since he was in the sixth grade. *Id.* In 2023, he applied to the Academy for the class of 2027. ¶3. He secured a nomination from a Member of Congress to attend the Academy. *Id.* The Academy, however, rejected his application. *Id.* Member B is now a freshman in college, and he is medically qualified and ready and able to reapply to the Naval Academy were a court to order it to cease its use of racial preferences in admissions. ¶4.

## ARGUMENT

SFFA is entitled to a preliminary injunction if it can satisfy four factors: it is "likely to succeed on the merits," it is "likely to suffer irreparable harm in the absence of preliminary relief," the "balance of equities tips in [its] favor," and "an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013). SFFA satisfies all four.

I.      **SFFA is likely to prevail on the merits.**

*Brown v. Board of Education* proclaimed that the right to public education—a right inti-
mately connected with "service in the armed forces"—"must be made available to all on equal
terms." *Brown v. Board of Education*, 347 U.S. 483, 493 (1954). *SFFA* built on *Brown*'s legacy,
holding that "the Constitution is color blind," 143 S. Ct. at 2160, and that all "racial discrimination
in public education"—including the race-based admissions programs practiced at "[m]any univer-
sities"—is unconstitutional. *Id*. at 2160, 2176.

The Academy's admissions system is one such program. When it was before the Supreme
Court, the government bragged that the Academy uses race in the same way that Harvard and UNC
did. *See, e.g.*, SFFA U.S. Brief 5 (comparing the academies' use of race to "colleges and univer-
sities across the country"); *id.* at 24 (similar); *id.* at 7-8 (explaining that the academies use "admis-
sions policies like the one this Court approved in *Grutter*"). That concession is fatal. The strict-
scrutiny test that the Fifth Amendment applies to the Academy is "'the same'" as the strict-scrutiny
test that the universities flunked in *SFFA. Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224
(1995). So while *SFFA* "does not address" the military academies, 143 S. Ct. at 2166 n.4, its logic
leads to a straightforward conclusion: the Academy cannot use race either. Under strict scrutiny's
"daunting two-step examination," *id*. at 2162-63, the Academy's interests are not sufficiently com-
pelling, and its race-based admissions program is not narrowly tailored.

A.      **The Academy has no compelling interest in race-based admissions.**

To begin, none of the Academy's interests survive *SFFA*. Though the Academy asserts that
fostering racial diversity is essential to the Navy's national-security mission, that assertion is de-
void of evidentiary support and rests on naked appeals to deference. The Academy's supposed
interests in using explicit racial classifications can be broadly summarized as two propositions: (1)
racial preferences improve the military's internal functioning; and (2) racial preferences enhance

the military's functional capacity by fostering internal confidence within the ranks and by bolstering its external legitimacy which, in turn, increases societal trust and recruitment efforts.[1] Neither interest is compelling.

### 1.    Internal Functioning

The Academy posits several ways that racial preferences are critical to having a well-functioning Navy in a pluralistic society. All of them view sailors and Marines as members of racial groups, rather than as individuals—and all are grounded in the assumption that minority service members all think and feel the same way.

First, the Academy argues that statistical parity between the racial demographics of officers and enlisted sailors and Marines is necessary to preserve unit cohesion and ward off racial strife within units. In support of that assertion, it highlights anecdotal incidents of racial tension among enlisted servicemembers during the Vietnam War, most of which occurred in a brief period from 1969 to 1972. Further undermining this justification is that it was raised for the first time by a private amicus brief in *Grutter*—not by the government itself. The government later adopted the talking point and has repeated it in virtually every defense of racial preferences since. Post-hoc cherry picking a few unfortunate incidents and extrapolating them to the entire American military is not enough for strict scrutiny.[2]

---

[1] Before the Supreme Court's decision in *SFFA*, the Academy also invoked the "educational benefits of diversity," like Harvard and UNC did in *SFFA*. Specifically, it said that racial "diversity" "reduc[ed] a sense of isolation and alienation" among midshipmen who are ethnic minorities and "encourage[d] greater participation by minority students in the classroom." *Students for Fair Admissions v. President and Fellows of Harvard College*, No. 21-707, Tr. 145:1-146:11, (Oct. 31, 2022). Now that the Supreme Court has refused to allow colleges to justify their actions by reference to those undefined—and undefinable—"educational benefits," the Academy is left with its other justifications. *See SFFA*, 143 S. Ct. at 2166 n.4 (stressing that the academies must, at a minimum, identify "distinct" interests).

[2] What's more, the brief period of racial unrest that the Academy retells over and over was not produced by colorblind policies. It was a tragic byproduct of broader factors: "a changing

9

History paints a different picture. "[R]acial animosity had been negligible within the U.S. armed forces" prior to 1967, and it has been virtually nonexistent post-Vietnam. Ex. M at 2. During the Korean War—just a few years after President Truman ordered desegregation in the military—integration "failed to produce the violence or poor morale the military brass expected." Ex. N at 3. Moreover, the underlying assumption of the Academy's argument is that sailors and Marines view their peers and superiors foremost in terms of race, rather than in terms of their ability or character traits like loyalty, devotion, and selflessness. It assumes that sailors apply the same racial stereo-types to one another that the Academy applies to them. There is no evidence to suggest that's the case.

Second, the Academy claims that statistical parity between the racial demographics of the officer corps and those of the enlisted corps is necessary to "foster trust between the enlisted corps and its leaders." SFFA U.S. Brief 15; *see also* Fisher U.S. Brief 12 ("military leaders have con-cluded that an officer corps that shares the diversity of the enlisted ranks improves performance by 'facilitating greater confidence' in leadership"); *Students for Fair Admissions*, No. 21-707, Tr. 145:1-146:11 (discussing military academies, Solicitor General asserts that benefits of increased racial diversity include "cross-racial understanding," which can "lea[d] to positive developments with cognitive development").

---

social environment, a controversial war, and new conscription strategies" that allowed wealthier Americans to escape the draft through college deferments while sending disproportionate numbers of low-income draftees to frontline combat units based on their educational backgrounds. Amicus Br. of Veterans for Fairness and Merit at 7, *Students for Fair Admissions v. President and Fellows of Harvard College*, 2023 WL 4239254, No. 20-1199 (U.S. June 29). In short, the incidents that the Academy cites to justify open-ended racial preferences were the product of a "perfect storm for racial conflict" that has not existed for the past half century. *Id.*; *cf. Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 545-57 (2013).

The Academy has never provided evidence to support that assertion. Boiled down to its core, this argument simply relies on crude and infantilizing stereotypes about the men and women who volunteer to serve in our armed forces: It assumes that black sailors will be more likely to trust a black officer and that Hispanic Marines are more likely to trust Hispanic officers—not because of their trustworthiness, but merely because of their self-reported ethnicity. That's precisely the type of racial stereotyping that *SFFA* condemns. 143 S. Ct. at 2170. And such sad stereotypes completely ignore that trust between servicemembers is formed through battlefield performance, and that sailors and Marines in war zones are more concerned with their leaders' competency than with their race.

Third, the Academy broadly claims that the diversity produced by racial preferences makes Navy and Marine units "more effective at accomplishing their missions." SFFA U.S. Brief 15. It does not define what it means to be racially "diverse," nor does it provide concrete evidence that military units that choose their members based on race are more successful on the battlefield than units who select their members based on objective measures such as tactical competency. In *Fisher*, the Solicitor General extended this idea further, claiming that units with greater racial diversity are more capable of interacting with and understanding partner forces from international allies. *See* Fisher U.S. Brief 12 ("Maintaining a diverse leadership corps also ensures that the military contains the cultural and racial identities necessary to better understand our partner forces."). The government, however, did not elaborate on why it thinks that's true. Apparently, the government thought it self-evident that individuals who share the same skin color also share a common "understand[ing]." But that sort of assumption is precisely the racial stereotyping that *SFFA* prohibits. 143 S. Ct. at 2170.

### 2.    External Legitimacy and Societal Trust

The Academy also maintains that having an officer corps that does not reflect the racial makeup of the general population and the enlisted ranks will "undermine the military's legitimacy by fueling 'popular perceptions of racial/ethnic minorities serving as "cannon fodder" for white military leaders.'" Fisher U.S. Brief 12 (quoting Ex. O at 15); *see also* SFFA U.S. Brief 19 ("[G]overnment agencies that lack diversity risk losing legitimacy in the eyes of a diverse nation"). Again, this conclusory statement assumes that the American people assess the "legitimacy" and trustworthiness of an institution based on its racial makeup.

And that just isn't true. Less than a third of Americans think "selective colleges and universities" should take "race and ethnicity into account." Ex. P at 3; *see also* Ex. T at 3 (70% of Americans agree that universities should not "be allowed to consider race in admissions"). Even fewer think "diversity" is "very important." Ex. P at 5. And three-fourths of Americans—decisive majorities of every race—think employers should "[o]nly take a person's qualifications into account" when considering whether to hire them. *Id.* at 4. In-depth surveys of military personnel (the type of rigorous analyses that the Academy has failed to offer) paint the same picture. So, if anything, the Academy's claims about "diversity," "legitimacy," and "public trust" have it backwards: If its mission is to solidify the public's trust, the Academy should do away with race-based admissions, not double down on them. *See Johnson v. California*, 543 U.S. 499, 510-11 (2005) ("compliance with the [Constitution's] ban on racial discrimination … bolsters the legitimacy of the [government]").

The Academy also argues that the Navy will lose "societal trust" if racial metrics between the officer and enlisted corps—and between the officer corps and society at large—are not equivalent. This speculative loss of societal trust, the Academy claims, could, in turn, harm recruiting efforts. Not so. Today, at the apex of the Academy's use of racial preferences, the Navy is facing

a recruiting crisis that is unprecedented in the modern era—a crisis fueled by a lack of public

confidence in the military, that itself appears to be a direct result of the military's overemphasis

on "social justice" issues. *See* Gallup, *Confidence in Institutions,* perma.cc/DEH2-M92Y; *see also*

Ex. S at 2 (observing that over half of Americans think the military's overemphasis on social jus-

tice is "undermining military effectiveness").

The Academy's assertions about retention are again backwards. In-depth surveys and sta-

tistical studies of the military's personnel crisis confirm this. "According to 9 out of 10 respond-

ents, more officers would stay if the military was more of a meritocracy." Ex. R. at 3. And 71% of

active-duty officers believe the military would retain more talent if opportunities were based solely

on merit. *See, e.g.*, Ex. Q at 63.

Flawed as they are, none of the Academy's justifications for racial preferences are new. In

fact, nearly all its nebulous arguments for race-based admissions were made sixty-five years ago

by opponents of desegregating the military. The military segregationists' arguments—like the ar-

guments offered by the Academy—were long on racial stereotypes but short on actual evidence.

Like the Academy, segregation proponents argued that a colorblind military would "create diffi-

culties 'which would be reflected in morale and military efficiency.'" President's Committee on

Equality of Treatment and Opportunity in the Armed Services, *Freedom to Serve* 12, (May 22,

1950), perma.cc/C2F5-6SCD. Like the Academy, they claimed that colorblind policies would de-

grade the military's ability to accomplish its national-defense mission. *Id.* at 49-50. And, like the

Academy, they warned that a colorblind approach would be inconsistent with "civilian sentiment"

and pose external risks to the institution. *Id*.

Truman's commission rejected all those arguments. In the process, the commission une-

quivocally affirmed that servicemembers should be treated as individuals in all circumstances, and

that drawing inferences from a person's membership in a particular racial or ethnic group was immoral and illogical. "To put racial restrictions on job opportunities seemed to the Committee to ignore completely the essential factor of individual differences." *Id.* at 13. So too today.

    **B.**    **The Academy's use of race is not narrowly tailored.**

    The Academy's race-based admissions program also fails narrow tailoring. *See SFFA*, 143 S. Ct. at 2167 (requiring the Academy to prove that its "use of race" is "necessary" to achieve its interests). When *SFFA* reaffirmed that the Constitution is colorblind, it also reiterated many of the prohibitions that equal protection has long entailed. *Id.* at 2162. "[R]ace," the Court instructed, "may not operate as a stereotype." *Id.* at 2168. And it "may never be used as a negative." *Id.* Race-based admissions programs must always have a "logical end point." *Id.* at 2170. And they may never engage in "outright racial balancing." *Id.* at 2172. The Academy's admissions program transgresses each of these lines.

    Taking them in reverse order, the Academy's intentional racial balancing scheme is "patently unconstitutional." *Id.* The Academy concedes that it tries to create "equitable demographic representation" in each class of newly minted ensigns and second lieutenants, Ex. V at 20, using the ever-shifting demographics of the enlisted ranks and the general population as a measuring stick. That's just a fancy way of saying that the Academy sorts applicants by skin color and admits them according to preset racial goals. And the Academy is committed to achieving those goals at all costs, even if doing so requires wholesale changes to its admissions policies. *See id.*

    Because of this scheme—one that relies on racial balancing to preserve parity between officers, the enlisted, and the citizens they serve—the Academy's use of race "lack[s] a logical end point." *SFFA*, 143 S. Ct. at 2170. Indeed, under the Academy's theory, the only way it can "mirror the demographic composition of the population," Ex. O at 39, is by giving preferences to applicants of certain races, and adjusting the scope of those preferences year over year, to ensure the Academy

14

always "shares the diversity of the enlisted ranks and the general population." Fisher U.S. Brief 12. By tying its racial composition to the whims of demography, the Academy promises to use race in perpetuity—something that *SFFA* forbids. 143 S. Ct. at 2172-74.

The Academy's use of race also thwarts the fundamental command "that an individual's race may never be used against him." *Id*. at 2168. For starters, the Academy's admissions program, like all "[c]ollege admissions" programs, is "zero-sum," meaning that "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id*. at 2169. And because race can (and often is) a decisive "plus" factor for many Black, Hispanic, and Asian applicants, it's an equally dispositive "minus" for everyone else. *Id*. That's illegal. *Id.* at 2166.

If that weren't enough, the Academy's entire admissions program rests on racial stereotypes. The Supreme Court has "long held that universities may not operate their admissions programs on the 'belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue.'" *Id*. at 2170. But that's precisely what the Academy does. By relying on the "educational benefits of diversity," the Academy's program assumes "that there is an inherent benefit in race *qua* race"—an assumption which "rests on the pernicious stereotype that a black student" (or a white student, or a Hispanic student, or an Asian student) "can usually bring something that a [student of another race] cannot offer." *Id*. And by balancing its class to avoid "racial tensions among enlisted personnel" or to "foster trust between the enlisted corps and its leaders," Fisher U.S. Br. 11, the Academy is forced to assume that, among other stereotypes, some races won't respect or follow people who have a different skin color. Such sordid stereotyping is "contrary … to the 'core purpose'" of equal protection. *SFFA*, 143 S. Ct. at 2170.

The racial box-checking that the Academy uses also fails narrow tailoring. Such a system is borne of "incoherent and irrational" categories, which are "imprecise," "arbitrary," "undefined," "opaque," and "underinclusive." *Id*. at 2167. "[B]y grouping together all Asian students, for instance, [the Academy is] apparently uninterested in whether *South* Asian or *East* Asian students"—students who come from countries as diverse as Japan and Pakistan—"are adequately represented." *Id.* (emphasis original). And the Academy apparently thinks that a Mexican-American sailor is more likely to follow a white officer of Spanish descent, just because he checked the box for "Hispanic." It also seems not to know whether students of Brazilian heritage are sufficiently "Hispanic." *See* Ex. U at 2-3. This racial pseudoscience is not the stuff of strict scrutiny.

And, what's more, the Academy has never shown that comparable race-neutral programs won't work. Narrow tailoring demands "serious, good faith consideration of workable race-neutral alternatives." *Grutter*, 539 U.S. at 339; *accord Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 n.6 (1986) (narrow tailoring "require[s] consideration of whether lawful alternative[s] and less restrictive means could have been used"). The Academy has no studies, reports, or experiments "carefully considering" race-neutral alternatives. Yet the Coast Guard Academy provides a real-world example that these alternatives can (and do) work. Until 2010, that academy was prohibited from using racial preferences in its admissions process. *See* Ex. aa at 1. In the two years before the Coast Guard began considering race, it launched an aggressive advertising and recruiting campaign targeting minorities. *Id.* at 2. At the end of those two years, the Coast Guard had increased minority enrollment by 60%, from 15% to 24%. Ex. bb at 1-2. Those numbers were within a few percentage points of the other academies (which had been using explicit racial preferences for years), *see, e.g.*, Ex. cc, and nowhere does the Naval Academy try to prove that the difference stopped the Coast Guard from achieving its asserted interests. Nor could it: In *SFFA*, the government conceded that

the Merchant Marine Academy doesn't use race for most admissions, and that its admissions system (like the Coast Guard's admissions system) furthers the Academy's interests. *SFFA* U.S. Br. at 17 n. 3. The Naval Academy has long had a duty to prove that a race-based policy—rather than a race-neutral policy—is essential to its functioning. *Grutter*, 539 U.S. at 339. It cannot. And it's never tried, despite decades of opportunities.

For its final argument, the Academy tries the same path that Harvard and UNC tried in *SFFA*: "trust us." 143 S. Ct. at 2168. To be sure, courts must be mindful of the military's unique role in our nation. *See, e.g.*, *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988). But the Supreme Court "ha[s] been unmistakably clear that any deference must exist within constitutionally prescribed limits"—limits that categorically prohibit invidious racial discrimination. *SFFA*, 143 S. Ct. at 2168; *accord U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 349 (5th Cir. 2022); *Singh v. Berger*, 56 F.4th 88, 99 (D.C. Cir. 2022); *Berkley v. United States*, 287 F.3d 1076, 1091 (Fed. Cir. 2002). It has "refused to defer" to government officials' "judgments on race," even in "areas where those officials traditionally exercise substantial discretion." *Johnson*, 543 U.S. at 512 (prisons).

*Korematsu* provides a warning and a lesson. Deferring to the military's expert "judgment," the Supreme Court rubberstamped the systemic internment of Japanese Americans because "military authorities decided that the military urgency of the situation demanded that all citizens of [that race] be segregated." *Korematsu*, 323 U.S. at 223. The Supreme Court abrogated that case, *see Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018), and has cautioned courts to never "retreat from the most searching judicial inquiry" when considering "illegitimate racial classification[s]," *SFFA*, 143 S. Ct. at 2162 n.3. This Court should heed that instruction and find the Academy's race-based admissions program unconstitutional.

## II.     SFFA satisfies the remaining preliminary-injunction criteria.

Because SFFA is likely to prevail on its constitutional claims, it readily meets the other preliminary-injunction criteria.

*Irreparable Harm:* A "presumption of irreparable injury flows from a violation of consti- tutional rights." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020) (cleaned up); *see also Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987) ("[T]he denial of a constitutional right … constitutes irreparable harm."). "An Equal Protection Clause violation ... is therefore an irrep- arable injury." *Agudath Israel of Am.*, 983 F.3d at 636. Because the Academy's admissions policy subjects SFFA's members to racial discrimination that violates the Fifth Amendment's equal-pro- tection principle, they face irreparable harm without a preliminary injunction. *See id.*; *see also Greer's Ranch Café v. Guzman*, No. 4:21-cv-651, 2021 WL 2092995, at *8 (N.D. Tex.) (May 18, 2021) (finding irreparable harm and granting preliminary injunction because plaintiffs were "ex- periencing race and sex discrimination at the hands of government officials"); *Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*, 584 F. Supp. 2d 766, 795 (D. Md. 2008) ("Intentional discrim- ination under the Equal Protection Clause … constitute[s] irreparable injury.").

This irreparable harm is particularly acute because, without a preliminary injunction, entire admissions cycles will begin and end. SFFA's cases against *Harvard* and *UNC* took nearly a dec- ade to litigate, including at least five years in district court alone. *See SFFA*, 143 S. Ct. at 2156. Yet Members A and B are only eligible to reapply until they turn twenty-three years old. *See* 10 U.S.C. §8458(a)(1). Unless they get a preliminary injunction, they will entirely miss the chance to apply on an equal footing to the Academy. That is quintessential irreparable harm. *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006).

*Balance of Harms and Public Interest:* The balance of the equities and the public interest factors "merge when the Government is the party opposing the preliminary injunction." *Nken v.*

*Holder*, 556 U.S. 418, 435 (2009); *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 512 (D.C. Cir. 2016) ("[T]he government's interest is the public interest."). The Academy will not be harmed by an injunction requiring it to stop illegally denying equal treatment to applicants. *See, e.g.*, *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (government is "'in no way harmed by issuance of a preliminary injunction which prevents [it] from [taking actions] likely to be found unconstitutional. If anything, the system is improved by such an injunction.'"). And "upholding constitutional rights surely serves the public interest." *Id.* Again, the Coast Guard Academy operated for years without considering race as a factor in admissions, with no discernible consequences. The Naval Academy—like every other university this cycle— can too.[3]

## CONCLUSION

For these reasons, the Court should grant SFFA's motion. By December 1, 2023, the Academy should be preliminarily enjoined from considering race as a factor in admissions.

---

[3] The court should not require a bond. "[T]he court 'retains the discretion to set the bond amount as it sees fit or waive the security requirement.'" *Coreas v. Bounds*, 458 F. Supp. 3d 352, 362 (D. Md. 2020). Waiving the bond requirement is particularly appropriate here because SFFA is likely to succeed on the merits, and "there has been no proof of likelihood of harm" to the Academy by an injunction that stops it from violating the Constitution. *Doc's Assocs. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).

Respectfully submitted,

*s/ Cameron T. Norris*

Adam K. Mortara (*pro hac vice* forthcoming)
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

Dated: October 6, 2023

Thomas R. McCarthy (*pro hac vice* forthcoming)
Patrick Strawbridge (*pro hac vice* forthcoming)
J. Michael Connolly (*pro hac vice* forthcoming)
Cameron T. Norris
Bryan Weir (*pro hac vice* forthcoming)
James F. Hasson (*pro hac vice* forthcoming)
R. Gabriel Anderson (*pro hac vice* forthcoming)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
patrick@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
bryan@consovoymccarthy.com
james@consovoymccarthy.com
gabe@consovoymccarthy.com

*Counsel for Students for Fair Admissions*

## CERTIFICATE OF SERVICE

I certify that on October 6, 2023, I electronically filed the foregoing with the Clerk of the Court using the Court's ECF system, which will automatically send email notification to all counsel of record. I am also serving the foregoing by email and by certified mail, return receipt requested, to the addresses below:

United States Naval Academy
121 Blake Road, Annapolis, MD 21402

United States Department of Defense
1400 Defense Pentagon Washington, DC 20301-1400

Hon. Lloyd J. Austin III
Secretary of Defense
United States Department of Defense
1400 Defense Pentagon Washington, DC 20301-1400

Hon. Carlos Del Toro
Secretary of the Navy
Attn: General Counsel of the Navy
Naval Litigation Office
720 Kennon St., SE, Room 233
Washington Navy Yard, DC 20374-5013

Rear Admiral Fred Kacher
Acting Superintendent, United States Naval Academy
Attn: General Counsel of the Navy
Naval Litigation Office
720 Kennon St., SE, Room 233
Washington Navy Yard, DC 20374-5013

Bruce Latta
Dean of Admissions, United States Naval Academy
Attn: General Counsel of the Navy
Naval Litigation Office
720 Kennon St., SE, Room 233
Washington Navy Yard, DC 20374-5013

*s/ Cameron T. Norris*

# Exhibit H

# MISSION

In Service of Country and Humanity

(https://uscga.edu/)

ABOUT(HTTPS://USCGA.EDU/ABOUT/)

ACADEMICS(HTTPS://USCGA.EDU/ACADEMICS/)

ADMISSIONS(HTTPS://USCGA.EDU/ADMISSIONS/)

ATHLETICS(HTTPS://USCGA.EDU/ATHLETICS/)

CADET LIFE(HTTPS://USCGA.EDU/CADET-LIFE/)

MISSION(HTTPS://USCGA.EDU/MISSION/)

CAREERS(HTTPS://USCGA.EDU/CAREERS/)    **APPLY**(/ADMISSIONS/APPLY)

## Mission Conquered

The focus of the U.S. Coast Guard Academy is to develop officer-
ready leaders of character who embody Coast Guard values.

ready-cadets-s-s-aracter w-o embody Coast Guard-a ues, who influence and inspire others, and who decide what is right and demonstrate the courage to act accordingly.

## USCGA Mission

*"To graduate young men and women with sound bodies, stout hearts, and alert minds, with a liking for the sea and its lore, and with that high sense of honor, loyalty, and obedience which goes with trained initiative and leadership; well-grounded in seamanship, the sciences, and amenities, and strong in the resolve to be worthy of the traditions of commissioned officers in the United States Coast Guard in the service of their country and humanity."*

EXPLORE

# OUR MISSION



Future cadets are hardworking ordinary Americans who share one thing in common, the resolve to be worthy.

**WATCH VIDEO**

## Our Process

Leader development at the Coast Guard Academy is intentional, collaborative and continuous. Our process includes several components:

> **LEARN MORE**
> **(HTTPS://USCGA.EDU/MISSION/LEADER-DEVELOPMENT-PROCESS/)**

## Professional Development

Developing leaders and professionally ready officers is an integrated four-year process. The many components include: Curriculum, summer experiences, internships, simulation, career exploration weeks, speakers, and more.

> **LEARN MORE**
> **(HTTPS://USCGA.EDU/MISSION/NAUTICAL-SCIENCE-CURRICULUM/)**

## Four Year Leadership Journey

Experiential and fully integrated with the professional development program, cadets' leadership journeys are guided by a comprehensive curriculum, a dedicated team, and a culture of assessment.

# Four Years At a Glance

The Corps of Cadets is largely a self-directed organization that follows a standard military chain of command.

### Fourth Class Year


Fourth class cadets (freshmen) serve as followers, assimilating into the rigors of military life, while developing essential teamwork skills.

### Third Class Year


Third class cadets (sophomores) serve as personal and professional mentors for 4th class cadets.

**READ MORE**

READ MORE
(HTTPS://USCGA.EDU/MISSION/FOURTH-
CLASS-YEAR/)

(HTTPS://USCGA.EDU/MISSION/THIRD-
CLASS-YEAR/)

## Second Class Year

Second class cadets
(juniors) serve as Assistant
Division Officers,
mentoring, leading and
supervising third and fourth
class cadets.

READ MORE
(HTTPS://USCGA.EDU/MISSION/SECOND-
CLASS-YEAR/)

## First Class Year

First class cadets (seniors)
serve as leaders of the
corps, as Regimental Staff
Officers, Company
Commanders, Department
Heads, and Division Officers.

READ MORE
(HTTPS://USCGA.EDU/MISSION/FIRST-
CLASS-YEAR/)

## Helpful Links

Jobs (/about/jobs)

Search

FOIA
(https://www.dcms.uscg.mil/Our-
Organization/Assistant-
Commandant-for-
C4IT-CG-6/The-
Office-of-
Information-
Management-CG-
61/FOIA-Library/)

Accessibility
(/cadet-
life/accessibility/)

Contact Us
(/about/contact-
us/)

Download Reader
(https://get.adobe.com/reader/otherversions/)

## Connect

Facebook
(https://www.facebook.com/CoastGuardAcademy)

Twitter
(https://twitter.com/USCGAcademy)

YouTube
(https://www.youtube.com/user/CGAPublicAffairs)

Instagram
(https://www.instagram.com/uscgacademy)

LinkedIn
(https://www.linkedin.com/edu/school?id=19187&trk=tyah&trkInfo=tarId%3A1403730599221%2Ctas%3AUnited+States+Coast+Guar&viewAsMember=true)

Blog
(/cadet-life/cadet-
blogs/)

📍 31 Mohegan Avenue New London, CT
06320

📱 Admissions: 800.883.USCG (8724)

# Exhibit I



**Home** / **About** / **Mission of USNA**

# Mission of USNA

The Naval Academy has a unique clarity of purpose, expressed in our mission:

> *"To develop Midshipmen morally, mentally and physically and to imbue them with the highest ideals of duty, honor and loyalty in order to graduate leaders who are dedicated to a career of naval service and have potential for future development in mind and character to assume the highest responsibilities of command, citizenship and government."*

Our mission forms the basis for everything we do at the Academy. It also encourages a sense of spirit and pride found at few other schools.

This is an official **U.S. Navy Web Site**. URL: **https://www.usna.edu**   Page Last Updated: 2019-01-04