# Exhibit 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: MOTION TO COMPEL COMPLIANCE WITH SUBPOENA DIRECTED TO THE UNITED STATES COAST GUARD | No. 1:24-mc-00092-DLF |
| STUDENTS FOR FAIR ADMISSIONS,<br><br>*Plaintiff,*<br><br>v.<br><br>THE UNITED STATES NAVAL ACADEMY, *et al.*,<br><br>*Defendants.* | District of Maryland<br>No. 1:23-cv-02699-RDB |

## DECLARATION OF CAPT ANDREW BEHNKE

I, Andrew Behnke, pursuant to the provisions of 28 U.S.C. § 1746, declare, under penalty of perjury, as follows:

1. I am the Director of Admissions at the United States Coast Guard Academy.

2. My duties include oversight of the cadet recruitment process, the establishment and implementation of strategic priorities for meeting enrollment goals, and oversight of the collection and analysis of data pertinent to Coast Guard Academy admissions.

3. I have reviewed the subpoena from Students for Fair Admissions ("SFFA") that is the subject of the motion to compel in this action and considered the effort it would take the United States Coast Guard in general and the Coast Guard Academy in particular to respond to this subpoena.

4. SFFA's subpoena seeks two categories of documents. The first seeks "[a]ll

documents from the Relevant Period prepared by You concerning any programs, initiatives, strategies, plans, or other organized efforts undertaken for the purpose of (a) increasing the number of racial or ethnic minority students who applied, were admitted, and/or matriculated to the Coast Guard Academy; or (b) increasing the percentage of all applicants, admitted students, and/or matriculants to the Coast Guard Academy who are racial or ethnic minorities, including but not limited to the strategies" discussed in a 2010 news article. The second category of documents sought includes "[d]documents sufficient to show the total number of applicants, admitted students, matriculants, and graduates of each race for the Coast Guard Academy Classes of 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017."

5. The subpoena, by its terms, requires the Coast Guard to search all of Coast Guard Headquarters for documents responsive to the first category of documents. Approximately 4,000 people are assigned to Coast Guard Headquarters with the majority being military members who change billets every two to four years. The defined "Relevant Period" for the first requested category in the subpoena covers documents from January 1, 2008, and continuing through April 1, 2013, as well as documents relating to this time period whenever prepared, so the subpoena would include approximately 10,000 individuals who were assigned to Headquarters more than a decade ago. The Coast Guard does not have a database that can be easily searched to determine which individuals were assigned to Coast Guard Headquarters during this period. The Coast Guard could attempt to search individual personnel files, but with over 50,000 active duty and reserve members and 9,500 civilian employees any attempt to electronically review individual personnel files one at a time to determine if the individual was assigned to Coast Guard Headquarters during the Relevant Period would take approximately 1,000 hours even assuming an unrealistic review time of one minute per file. Only after the process of identifying all individuals assigned to Coast

Guard Headquarters during the relevant period could the Coast Guard begin to search for responsive records.

6. Even limiting the search to the Coast Guard Academy Admissions Office, which is the office most likely to have responsive documents, if any, would be unduly burdensome and complicated by a number of factors.

7. The Admissions Office is comprised of a mix of uniformed and civilian personnel. It is usually headed by a rotating Captain ("O6") who serves roughly 2-3 years in that role. I have recently taken on this position following the retirement of the former Director of Admissions. None of my predecessors remain on active duty. The Deputy position, a civilian position, is also currently vacant. The current Admissions Officers are all active-duty military members, and none were serving in the Admissions Office during the period in question. As active-duty military members, the Admissions Officers generally serve a two or three year tour of duty and rotate to another billet elsewhere in the Coast Guard. As a result, only three of the people who worked in the Admissions Office from 2008 through 2013 work there now. None of those three individuals held positions of decision-making authority or had any influence on admission selection policies at the time – one worked in Processing/Application Support, one in Marketing, and the third in Campus Programs Support – and therefore are not likely to have responsive documents.

8. The next problem is that the other people who worked in the Admissions Office from 2008 through 2013—including the Director of Admissions and the Deputy Director during that time—no longer work there. None of my predecessors as the Director of Admissions remain on active duty with the Coast Guard so their individual electronic records no longer exist. The same is true of other former members of the Admissions Office who have left the Coast Guard. In addition, the Coast Guard only retains e-mails for a period of seven years so Admissions Office e-

mails from the Relevant Period no longer exist. As a result, the Coast Guard cannot search by using the electronic records of the individuals most likely to have responsive documents.

9. The Admissions Office has a digital common drive but searching that would also require significant and undue burden. Again, the former employees most likely to have knowledge of the location and existence of any responsive records no longer work at the Admissions Office, and therefore would not be able to guide the conduct of such a search. In that absence, current personnel would be required to conduct a search "blind," clicking into and reviewing over 47,000 individual digital files to determine whether they are responsive. Such a search could easily take more than 4,000 hours. Moreover, the Coast Guard Academy uses multiple network servers at the Coast Guard Academy, i.e., the ".mil" and ".edu" servers. Military members and civilian employees use both servers and have both a .mil and a .edu address. In 2022, the Coast Guard as a whole transitioned to a new Microsoft-based cloud storage system. This process drastically changed the way digital information was stored on the ".mil" server. While this process did not impact the local ".edu" server, this change would make accessing admissions-related documents on the ".mil" server infeasible as electronic folders would have created dates that reflect the migration. Also, not all data would have been migrated to the new system prior to the aforementioned transition.

10. Finally conducting a complete search would require dedicating personnel to "searching the attic," meaning going through the Coast Guard Academy's paper files stored in the library -- by hand -- from a decade ago. It is not currently the practice of the Admissions Office to store such documents in this manner, but I cannot say the Admissions Office did not store paper records there during the Relevant Period. This being the case, any such search would likely take days and be both extremely burdensome and likely fruitless.

11. In addition to the burdens described above, any such search for responsive documents would also impose a substantial burden on the Admissions Office because we are currently short-staffed. Currently, nearly one-third of the Admissions Office (6 out of 20 positions) is vacant. The remaining 14 employees are engaged full-time on numerous mission-critical and time-sensitive work, such as recruiting/outreach travel and planning, processing thousands of applications, and managing daily interactions with guests and prospective cadets. I do not have any personnel I can task with the search and review required by the subpoena without diverting them from the work they are employed by the Coast Guard to perform. And even if I were to re-assign personnel to respond to the subpoena, it would take well over a year for two people to complete the work. By that time, I understand that the trial in the underlying case against the Naval Academy would be over. Needless to say, the request for production of documents in the short time (two weeks) that SFFA requests is not feasible.

12. The undue burden posed by SFFA's subpoena (inclusive of both its requests) is further compounded because of the lack of relevance of the information SFFA seeks to the underlying litigation against the Naval Academy. The Coast Guard Academy admissions process differs substantially from the Naval Academy admissions process and that of all the other U.S. service academies. For instance, the Coast Guard Academy is the only service academy that does not include a nomination requirement in the application process. This allows the Coast Guard Academy to review and consider for appointment all applications without the additional filtering and procedures associated with the nomination process. The lack of a nomination process better enables our staff to matriculate an incoming class that meets the needs of the Coast Guard and the Academy ranging from obtaining the right mix of academic majors to feed the critical skills the Coast Guard will need in the future officer corps to filling the Academy's twenty-four inter-

collegiate sports teams and other extra-curricular activities. This also makes it easier to assemble a racially diverse class.

13. There is also a significant difference in size between the academies. An incoming class at the Coast Guard Academy will generally consist of less than three hundred cadets while the Naval Academy offers over 1,250 appointments each year. As a result, when measured by percentage, as SFFA's subpoena references, a change in the racial composition at the Coast Guard will have very different meaning when compared to a change in the racial composition at the Naval Academy. Furthermore, despite its small size, the Coast Guard Academy produces approximately 45% of the Coast Guard officer corps, a much larger percentage than the Naval Academy. As a result, the Coast Guard Academy must produce a greater percentage of the various skills sets and backgrounds required by the officer corps than the Naval Academy. Finally, while the Coast Guard Academy and the Naval Academy do attract similar applicants, there are also significant differences in the applicant pools, including because of the Coast Guard's lack of a nomination requirement and because the Coast Guard has a number of missions beyond national defense and therefore attracts applicants who would not be interested in applying to the Naval Academy. In sum, the application processes and recruitment strategies for the two academies are quite different, making any comparison of the use of race neutral alternatives between the two academies particularly inapt.

Executed on August 1, 2024, in New London, CT.

Andrew Behnke
Captain, U.S. Coast Guard