UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS,<br>*Plaintiff*,<br>v.<br>THE UNITED STATES NAVAL ACADEMY, *et al.*,<br>*Defendants*. | No. 1:23-cv-2699-RDB<br><br>**DEFENDANTS' MOTION IN LIMINE REGARDING PLAINTIFF'S EXPERT WITNESSES** |

**TABLE OF CONTENTS**

INTRODUCTION ..............................................................................................................................1

BACKGROUND ..............................................................................................................................2

    A.      Brigadier General (Ret.) Christopher S. Walker ................................................................2

    B.      Lieutenant Colonel (Ret.) Dakota L. Wood ........................................................................3

    C.      Mr. Richard Kahlenberg ....................................................................................................4

LEGAL STANDARD ......................................................................................................................4

ARGUMENT ....................................................................................................................................6

I.      The Court Should Exclude the Expert Testimony of Brigadier General Walker and Lieutenant Colonel Wood In Their Entirety ................................................................6

    A.      The opinions of Brigadier General Walker and Lieutenant Colonel Wood on matters of national security are legally irrelevant and unhelpful to the Court. ...............................................................................................................6

    B.      Lieutenant Colonel Wood's opinions should be precluded as merely a conduit for hearsay. ................................................................................................10

II.      The Court Should Exclude Mr. Kahlenberg's Opinion About the Coast Guard Academy. .......................................................................................................................12

    A.      The opinion is not relevant. .................................................................................13

    B.      The opinion is not reliable. ..................................................................................14

CONCLUSION ...............................................................................................................................16

# INTRODUCTION

Pursuant to Federal Rule of Evidence 104 and the Court's pretrial order, ECF No. 71, Defendants, by and through undersigned counsel, respectfully move to exclude (1) the expert opinions and testimony of two retired military officers—Brigadier General (Ret.) Christopher S. Walker and Lieutenant Colonel (Ret.) Dakota L. Wood—in their entirety; and (2) the portion of Mr. Richard Kahlenberg's expert testimony and opinion concerning the United States Coast Guard Academy and any comparison to the United States Naval Academy.

According to their reports and their recent depositions, both Brigadier General Walker and Lieutenant Colonel Wood are former military officers who are expected to provide their opinion that a diverse corps of Navy and Marine Corps Officers is irrelevant to unit cohesion, lethality, recruitment, retention, and legitimacy both domestically and internationally. *See, e.g.*, Ex. 1, Expert Report of Christopher S. Walker ("Walker Report") at 14-15; Ex. 2, Expert Report of Lieutenant Colonel (Ret.) Dakota L. Wood ("Wood Report") at 12-15. Further, both former officers plan to provide their opinion that the decades-long consideration of race and ethnicity in Naval Academy admissions may be harmful to military readiness. Walker Report at 14-15; Wood Report at 12-15. But such opinions are irrelevant and stray far afield from the limited role the judiciary plays in evaluating military judgments. In fact, the Supreme Court has repeatedly instructed lower courts to disregard similar outside "expert" testimony. *Goldman v. Weinberger*, 475 U.S. 503, 509 (1986) (dismissing the views of outside experts on matters of good order and discipline as "quite beside the point."). Accordingly, because such testimony cannot be considered by the Court pursuant to longstanding Supreme Court precedent, it should be excluded at the outset as irrelevant, unhelpful, and a waste of judicial resources.

Moreover, even if the Court could consider Lieutenant Colonel Wood's testimony, a

portion of that expected testimony—his interviews with three other former military officers—would still need to be excluded because it is merely a conduit for impermissible hearsay.

Finally, Mr. Kahlenberg's testimony and opinion with respect to the Coast Guard Academy should be excluded because there are significant differences between the Coast Guard Academy and the Naval Academy that preclude probative comparison, his testimony would result in an unnecessary and wasteful mini-trial, and his opinions in this regard are not reliable.

Thus, these expert opinions should be excluded under Federal Rules of Evidence ("FRE") 702, 402, 403, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013).

## BACKGROUND

**A.  Brigadier General (Ret.) Christopher S. Walker**

Brigadier General Walker served in the United States Air Force from his graduation from the Air Force Academy in 1988 until his recent retirement. Walker Report at 1. Brigadier General Walker offers three principal opinions in his report. First, he opines that "the military has a singular, overriding purpose: to win the nation's wars." *Id.* at 15. In his view, the military accomplishes this goal "by ensuring that units … are tactically and technically proficient, have the time and resources necessary to train on their fundamental tasks, and have quality leadership." *Id.* Second, he opines that "unit cohesion and lethality, recruiting, retention, or the military's legitimacy will [not] suffer" if the Naval Academy ceases its limited consideration of race in the admission process. *Id.* Third, he opines that military readiness will improve if the Naval Academy stops considering race and ethnicity in its admissions process because the current approach "undermines trust in leadership and is counter-productive to unit cohesion." *Id.* Brigadier General Walker's report has no discernable methodology. Rather, he drew upon his "personal and

professional experience from [his] four decades of military service" as well as documents produced by the Naval Academy to render "the opinions and conclusions expressed in [his] report." *Id.* at 14. Brigadier General Walker has no specific knowledge of, nor has he reviewed, the Naval Academy's admission process. Ex. 3, Walker Depo. Tr. 278:7–9 (admitting that he "ha[s]n't studied the Naval Academy's admission process.").

### B. Lieutenant Colonel (Ret.) Dakota L. Wood

Lieutenant Colonel Wood served in the United States Marine Corps from 1985 to 2005 following his graduation from the Naval Academy. Wood Report at 1. Lieutenant Colonel Wood's report offers three principal opinions. First, he opines that "[a]ny perception, accurate or not, that officers earned their commission or command due to preferential treatment undermines their authority and, in turn, the effectiveness of their units." *Id.* at 14. Second, he opines that "the consideration of race in the admissions process at the Naval Academy is not essential to military readiness or the legitimacy of the U.S. military." *Id.* Finally, he opines that the consideration of race and ethnicity "in admissions imposes readiness costs without having any meaningful impact on the racial composition of the Navy or Marine officer corps." *Id.* at 14–15. Lieutenant Colonel Wood reached the opinions presented in his report based on (1) his "extensive military and post-military experience," (2) documents filed in conjunction with Plaintiff's Motion for Preliminary Injunction, and (3) "short interviews with various career professionals with whom [he has] worked during [his] long career." *Id.* at 13, 58. Other than having gone through the process himself more than 40 years ago, Lieutenant Colonel Wood has no specific knowledge of, nor has he reviewed, the Naval Academy's current admissions process. Ex. 4, Wood Depo. Tr. 250:12-13 (admitting that he is "not familiar with the academy's current admissions process….").

3

### C. Mr. Richard Kahlenberg

Plaintiff offers Richard Kahlenberg as an expert on race-neutral alternatives, and his report identifies various race-neutral methods through which he contends the Naval Academy could achieve racial diversity. One component of Mr. Kahlenberg's report is his proffered opinion that the Coast Guard Academy's experience demonstrates that race-neutral alternatives can be workable at the Naval Academy. Ex. 5, Expert Report of Richard Kahlenberg ("Kahlenberg Report") (excerpt) at 17-18. For this opinion pertaining to the Coast Guard Academy, Mr. Kahlenberg relied exclusively on four sources: two news articles, an oral argument transcript stating that the Coast Guard for a period of time did not consider race in admissions, and a subcommittee hearing transcript generally describing the Coast Guard's admissions efforts—all of which Mr. Kahlenberg admitted were provided to him by counsel, and portions of which Mr. Kahlenberg cherry-picked for his opinion. Mr. Kahlenberg has no specific knowledge of the Coast Guard Academy's's admissions process (either before or after its consideration of race), has no specific knowledge of the Coast Guard Academy's recruiting efforts that he contends increased racial diversity, did not review any Coast Guard materials, never spoke to anyone from the Coast Guard Academy, and could not recall any specific independent research he performed into the Coast Guard Academy or the results of any such independent research.[1]

### LEGAL STANDARD

Pursuant to Federal Rule of Evidence 702, an expert witness may testify only if he satisfies all of the following conditions:

  A. the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

[1] Mr. Kahlenberg's deposition occurred on August 21, 2024, the date of this filing, and the deposition transcript is therefore not yet available. Counsel will provide the relevant deposition citations and excerpts upon receipt of the transcript if helpful to the Court.

4

  B. the testimony is based on sufficient facts or data;
  C. the testimony is the product of reliable principles and methods; and
  D. the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Thus, the court must determine at the outset whether the proffered testimony is relevant, *i.e.*, helpful to the trier of fact, and whether it is reliable, *i.e.*, based on specialized knowledge—"not on belief or speculation"—and derived from sufficient facts or data "using scientific or other valid methods." *Oglesby v. Gen. Motors, Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (citing *Daubert*, 509 U.S. at 590); *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (trial courts must "act as gatekeepers to 'ensure that any and all [expert] testimony … is not only relevant, but reliable'" (quoting *Daubert*, 509 U.S. at 588-89)). And although "the gate keeping function of Rule 702 of the Federal Rules of Evidence carries less significance in a bench trial[,]" Plaintiff must nevertheless carry its burden to show that the proffered testimony meets Rule 702's twin requirements of relevance and reliability. *Cap. Funding Grp., Inc. v. Zuccari*, 2021 WL 1339387, at *5 (D. Md. Apr. 9, 2021) (Bennett, J.); *see also* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible"); Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."); *Marvel Characters*, 726 F.3d at 136 ("[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.").

# ARGUMENT

**I. The Court Should Exclude the Expert Testimony of Brigadier General Walker and Lieutenant Colonel Wood In Their Entirety.**

    **A. The opinions of Brigadier General Walker and Lieutenant Colonel Wood on matters of national security are legally irrelevant and unhelpful to the Court.**

Plaintiff Students for Fair Admissions argues that the Naval Academy's use of race in admissions violates the equal protection component of the Fifth Amendment. Accordingly, the Court must first review whether the Naval Academy's limited consideration of race in the admissions process is used to "further compelling governmental interests." ECF No. 60 at 23 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003)). And, if so, whether this consideration of race is "narrowly tailored"—meaning "necessary"—to achieve that interest. *Id.* (quoting *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311–12 (2013)). But as the Court has previously recognized, where this inquiry involves an assessment of military judgments, its review is appropriately deferential. *Id.* at 25-27.

Although the Supreme Court has declined to attach a "label[]" to the type of review applicable to military decisions which would traditionally trigger heightened scrutiny, *Rostker v. Goldberg*, 453 U.S. 57, 70 (1981), it has acknowledged that review of a military judgment "is far more deferential," *Goldman*, 475 U.S. at 507-08, and "the tests and limitations to be applied may differ because of the military context," *Rostker*, 453 U.S. at 67. Indeed, the Supreme Court has cautioned that courts "must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest[,]" *Goldman*, 475 U.S. at 507, and "must be particularly careful not to substitute … [their] own evaluation of evidence for a reasonable evaluation by" the military, *Rostker*, 453 U.S. at 68.

When applying this deferential standard of review, the Supreme Court has been particularly

dismissive of "expert testimony" seeking to undermine military judgments. For example, in *Goldman*, it dismissed plaintiff's "expert testimony" as "quite beside the point," 475 U.S. at 509, and *Rostker* rebuked the district court for "palpably exceed[ing] its authority" in "relying on [such] testimony," 453 U.S. at 81. Recently, in *Trump v. Hawaii*, 585 U.S. 667 (2018), the Supreme Court once again cautioned that courts "cannot substitute [their] own assessment for the Executive's predictive judgments on such matters" and that "the Executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of litigation involving 'sensitive and weighty interests of national security[,]'" *id.* at 708, and it remained unmoved that a particular national-security policy was not supported by the views of "former national security officials," 585 U.S. at 748 (Sotomayor, J., dissenting).

In a recent D.C. Circuit decision involving a challenge to the prior administration's policy regarding military service by transgender individuals, the panel relied upon the Supreme Court's holdings in *Rostker*, *Goldman*, and *Hawaii* when it vacated the district court's preliminary injunction for not being "appropriately deferential" to military views. *Doe 2 v. Shanahan*, 755 F. App'x 19, 24-25 (D.C. Cir. 2019). Two of the judges from the panel further explained their views regarding the Supreme Court's direction in *Rostker*, *Goldman*, and *Hawaii* "to provide some guidance to the parties and the District Court so that this matter can proceed in an efficient manner." *Doe 2 v. Shanahan*, 917 F.3d 694, 704-05 (Wilkins, J. concurring). Judge Williams expressed the view that plaintiffs should be foreclosed from all further discovery*, id.* at 736-37 (Williams, J., concurring in result), while Judge Wilkins would have allowed discovery into the "operation and purpose" of the policy including the "government's justifications" for the policy, *id.* at 705-06 (Wilkins, J. concurring). However, both judges agreed that the Supreme Court's precedents foreclosed the use or consideration of plaintiff's expert testimony. Citing to *Rostker*

7

and *Goldman*, Judge Wilkins recognized that "the [Supreme] Court noted that it was improper for lower courts to consider plaintiff expert testimony that contradicted the military experts about whether the policies at issue were justified under the circumstances." *Id.* at 706 (Wilkins, J., concurring) (citing *Rostker*, 453 U.S. at 80–81; *Goldman*, 475 U.S. at 509–10). And Judge Williams noted that "it does not appear that the Supreme Court considered *any* evidence uncovered by those trial courts' explorations [in *Rostker* and *Goldman*] to be necessary—or even pertinent—to its disposition of the cases." *Id.* at 736-37 (Williams, J., concurring in result).

Here, Plaintiff attempts to introduce "expert" testimony challenging the military judgments of the Navy and the Department of Defense that a diverse corps of Officers in the Navy and Marine Corps increases unit cohesion, lethality, readiness, recruitment, retention, and legitimacy both domestically and internationally.[2] *See, e.g.*, Declaration of Vice Admiral John V. Fuller, the Naval Inspector General (ECF No. 46-3); Declaration of Lisa M. Truesdale, the Deputy Assistant Secretary of the Navy for Military Manpower and Personnel (ECF No. 46-4); Declaration of Ashish S. Vazirani, the Acting Under Secretary of Defense for Personnel and Readiness ("P&R") for the Department of Defense (ECF No. 46-5). The opinions of Plaintiff's "experts" claiming that diversity is entirely irrelevant to these military interests are outliers and in direct conflict with decades of military judgment. *See also* Br. of Adm. Charles S. Abbot, et al., *Students for Fair Admissions, Inc. v. Harvard College*, 600 U.S. 181 (2023) (Nos. 20-1199 & 21-707) (in brief

---

[2] Nether Brigadier General Walker nor Lieutenant Colonel Wood analyzed the current Naval Academy admissions process or is even aware of how the current admissions process works. Walker Depo. Tr. 278:7–9 (admitting that he "ha[s]n't studied the Naval Academy's admission process."); Wood Depo. Tr. 250:12-13 (admitting that he is "not familiar with the academy's current admissions process…."). Their opinions appear to be limited purely to the issue of whether the military has a compelling interest in a diverse corps of Navy and Marine Corps Officers and do not address whether the Naval Academy's admissions process is narrowly tailored to meet that compelling interest.

8

signed by 33 flag officers (including 4 former Chairmen of the Joint Chiefs of Staff) noting that the "importance of maintaining a diverse, highly qualified officer corps has been beyond legitimate dispute for decades."); Br. of Lt. Gen. Julius W. Becton, Jr., *et al.*, *Fisher v. Univ. of Tex. at Austin,* 570 U.S. 297 (2013) (No. 11-345); Br. of Lt. Gen. Julius W. Becton, Jr., *et al.*, *Fisher v. Univ. of Tex. at Austin,* 579 U.S. 365 (2016) (No. 14-981); Consolidated Brief of Lt. Gen. Julius W. Becton, Jr., *et al.*, *Grutter v. Bollinger,* 539 U.S. 306 (2003) (Nos. 02-241 & 02-516). Thus, the testimony of Brigadier General Walker and Lieutenant Colonel Wood would likely be excluded even in the civilian context. *See Nease v. Ford Motor Co.*, 848 F.3d 219, 228 (4th Cir. 2017) ("Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support with the community may properly be viewed with skepticism.") (quoting *Daubert*, 509 U.S. at 593-94).

But decades of Supreme Court precedent shows that this type of "expert" testimony is entirely irrelevant when it pertains to a military judgment. The Supreme Court has declined time and again to allow review of miliary judgments to become a battle of the experts not because military judgments cannot reasonably differ, but because control of the military is constitutionally committed to the coordinate branches. The "Constitution itself requires" deference to the military choices of the political branches. *Rostker*, 453 U.S. at 67; *see*, *e.g.*, U.S. Const. art. II, § 1, cl. 1. This includes deference to the judgments of current military officials (both uniformed and civilian)—not exclusively because of their expertise—but because "the military authorities have been charged by the" coordinate branches "with carrying out our Nation's military policy." *Goldman*, 475 U.S. at 507-08.

In *Goldman*, an Air Force colonel challenged on First Amendment grounds an Air Force regulation banning the wearing of a yarmulke while in uniform. *Id.* at 509. The plaintiff provided

9

expert testimony from former military officials which contradicted the Air Force's rationale for the prohibition and claimed that the Air Force's interest in good order and discipline and uniformity were exaggerated. *Id.* at 504. The Supreme Court rejected this evidence, finding expert testimony to have no relevance in the context of a constitutional challenge to military policy. *Id.* Here, like the dress regulation at issue in *Goldman*, the military's judgment that a diverse corps of Officers in the Navy and Marine Corps furthers unit cohesion, lethality, readiness, recruitment, retention, and legitimacy both domestically and internationally reflects the considered judgment of senior military officials. As such, that judgment should be given appropriate weight and rejected only if the Court finds it to be irrational or implausible. *See*, *e.g.*, *id.* at 512 (Stevens, J., concurring) ("Because professionals in the military attach great importance to that plausible interest [in uniformity], it is one that we must recognize as legitimate and rational … even though personal experience … might persuade us that the Government has exaggerated the importance of that interest."). SFFA's attempt to attack this judgment through the testimony of former military officers only invites the Court to do exactly what it is prohibited from doing—substitute its own judgment (or the judgment of Plaintiff's "experts") for a reasonable evaluation by the military. *Rostker*, 453 U.S. at 68; *see also Hawaii*, 585 U.S. at 708. Accordingly, the Court should preclude SFFA from introducing the testimony and opinions of former military officers to opine on matters of unit cohesion, lethality, readiness, recruitment, retention, and legitimacy.

    **B.  Lieutenant Colonel Wood's opinions should be precluded as merely a conduit for hearsay.**

At a minimum, portions of Lieutenant Colonel Wood's testimony should be excluded because it is merely a conduit for the hearsay testimony of three former military officers he interviewed, and who were not otherwise disclosed in discovery as individuals who Plaintiff intends to rely upon or to call at trial. *See* Wood Report at 59-71.

10

FRE 703 permits experts to base their conclusions upon data that would not otherwise be admissible as hearsay, so long as experts in that particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject. But "an expert's testimony cannot simply serve as a conduit for testimonial hearsay." *Good v. Am. Water Works Co.*, 2016 WL 5441517, at *8 (S.D.W. Va. Sept. 16, 2016) (citing *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009)). "The key question for the court is whether the expert is offering an independent judgment, based on the application of his training and experience to the sources before him, or whether he is merely acting as a transmitter for testimonial hearsay." *Id.*; *see also Marvel Characters*, 726 F.3d at 136 ("Although the Rules permit experts some leeway with respect to hearsay evidence, a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.").

At a minimum, portions of Lieutenant Colonel Wood's testimony should be excluded because his report and opinions are "undergirded by hearsay statements," *Marvel Characters*, 726 F.3d at 136. Lieutenant Colonel Wood's testimony is largely based on "short interviews with various career professionals with whom [he has] worked during [his] long career." Wood Report at 13. He maintains the contents of those interviews are relevant because "[t]hese individuals have broad and deep experiences in military affairs across a range of settings." *Id.* Unsurprisingly, "[t]he individuals [Lieutenant Colonel Wood] interviewed all supported [the] general conclusions outlined in [his] report." *Id.* To the extent SFFA seeks to introduce the views of Colonel (Ret.) James Reilly, *id.* at 59, Colonel (Ret.) Stephen Davis, *id.* at 64, or Colonel (Ret.) Harold van OpDorp, *id.* at 68, it would have needed to disclose these individuals in either its initial disclosures or through Rule 26(a)(2)(B) expert reports, make them available for deposition, and call these individuals as witnesses and subject their testimony to the adversarial process. *See Marvel*

*Characters*, 726 F.3d at 136 ("The appropriate way to adduce factual details of specific past events is, where possible, through persons who witnessed those events. And the jobs of judging these witnesses' credibility and drawing inferences from their testimony belongs to the factfinder."). Having done none of these things, SFFA may not now evade the general prohibition on the admissibility of hearsay by smuggling the testimony of these witnesses through Lieutenant Colonel Wood's report or testimony.

The Court should also exclude this testimony because there is no indication that Lieutenant Colonel Wood conducted any sort of methodologically-sound survey of views that would lead to reliable conclusions. Given that he had known these individuals for decades, *see* Wood Report at 59, 64, 68, it is apparent Lieutenant Colonel Wood chose only to interview former military officials who he already knew would support his opinions.[3] "[F]ailing to adequately account for contrary evidence is not reliable or scientifically sound." *In re Lipitor*, 174 F. Supp. 3d 911, 932 (D.S.C. 2016) (citing *McEwen v. Balt. Wash. Med. Ctr. Inc.*, 404 F. App'x 789, 791-92 (4th Cir. 2010)); *EEOC v. Freeman*, 778 F.3d 463, 469 (4th Cir. 2015) (Agee, J., concurring) ("[C]ourts have consistently excluded expert testimony that 'cherry-picks' relevant data." (citing cases)).

**II. The Court Should Exclude Mr. Kahlenberg's Opinion About the Coast Guard Academy.**

Among his other opinions regarding race-neutral alternatives, Mr. Kahlenberg opines that the Coast Guard Academy's experience demonstrates that race-neutral alternatives can be workable at the Naval Academy. Kahlenberg Report at 17-18. The Court should exclude this opinion because it is neither relevant nor reliable.

---

[3] When asked at his deposition whether Lieutenant Colonel Wood interviewed any other former military officers, counsel instructed him not to answer. Wood Depo. (excerpt), Tr. 94:1-10; 336:15-22.

### A. The opinion is not relevant.

Mr. Kahlenberg's proffered testimony and opinion about the Coast Guard Academy does not help the Court to understand the evidence or to determine a fact in issue, Fed. R. Evid. 702(a), and instead promises only to confuse the issues and require a wasteful mini-trial over the admissions process of an entirely different service academy, Fed. R. Evid. 403.

As set forth in earlier papers and supported by a detailed declaration from the Coast Guard, the Coast Guard Academy and the Naval Academy are not appropriate comparators. *See* ECF No. 81 at 9-10; ECF No. 81-2 ¶¶ 12-13. A key difference is that the Coast Guard Academy does not use a congressional nomination system. ECF No. 81-2 ¶ 12. By contrast, under federal law (10 U.S.C. § 8454), the Naval Academy is required to accommodate congressional nominations, which account for more than 50% of an entire class and are disproportionately given to White applicants. That system imposes a significant constraint on the racial diversity of every Naval Academy class—an obstacle the Coast Guard Academy does not face in building a diverse class.[4] As Mr. Kahlenberg admitted at his deposition, this is an important distinction between the academies. Attempting comparison between the two academies, despite these critical differences, is therefore not probative, and only confuses the issues.

Moreover, if Mr. Kahlenberg were permitted to offer his irrelevant opinions regarding the Coast Guard Academy, that would necessitate the Naval Academy in turn presenting evidence of the substantial differences between the two academies. The resulting mini-trial over a different service academy's distinct admissions efforts, in a case that challenges the *Naval Academy's* admissions process, would only contravene FRE 403 by wasting time and unnecessarily diverting

---

[4] Other important differences include the academies' different missions, different applicant pools, and different class sizes (300 appointments per class at the Coast Guard Academy versus 1,250 at the Naval Academy). ECF No. 81-2 ¶¶ 12-13.

the parties' and the Court's resources.

### B. The opinion is not reliable.

An expert's opinion must also be reliable, which means it must be "based on sufficient facts or data" and apply "reliable principles and methods." Fed. R. Evid. 702; *Oglesby*, 190 F.3d at 250 (excluding testimony that "depended on an imperfect syllogism constructed from unsupported suppositions"). Mr. Kahlenberg's opinions regarding the Coast Guard Academy fail both tests.

First, Mr. Kahlenberg's opinions about the Coast Guard Academy are not "based on sufficient facts or data." Fed. R. Evid. 702(b). He relies on just four sources: two news articles published in 2010 and 2011, a Supreme Court oral argument transcript from *Grutter* in 2002 stating that for, a period of time, the Coast Guard Academy did not consider race in admissions, and a 2009 congressional hearing transcript generally describing the Coast Guard Academy's admissions efforts. Kahlenberg Rep. at 17-18 nn.34-40. Mr. Kahlenberg admitted at his deposition that he did *not* rely on (and did not review) any specific information from the Coast Guard Academy, never spoke to anyone from the Coast Guard Academy, and he offers only speculation as to the Coast Guard Academy's admissions efforts and how it achieved the racial composition of any given class. "An expert opinion that simply accepts and regurgitates [purported] facts without any testing, corroboration, or analysis is suspect and fails to satisfy Rule 702." *Morgan v. On Deck Capital, Inc.*, 2019 WL 4093754, at *5 (W.D. Va. 2019); *see also, e.g.*, *Freeman*, 778 F.3d at 466-67; *id.* at 472 (Agee, J., concurring) ("[T]rial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable."); *United States v. Taveres*, 843 F.3d 1, 6 (1st Cir. 2016) ("Expert testimony … can for the most part be no better than the information provided to the

14

expert. That principle is summed up in the familiar phrase 'garbage in, garbage out.'").

Furthermore, Mr. Kahlenberg does not employ "reliable principles and methods" in reaching his opinions regarding the Coast Guard Academy. Fed. R. Evid. 702(c)-(d). Mr. Kahlenberg testified at deposition that the only four sources he relied upon for his opinion were provided to him by counsel; that he could not recall any specific independent research he conducted into the Coast Guard Academy; and that to the extent he conducted any independent research, he would have done so through Google searches. Just as "Google searches by an expert to support an opinion are not an encouraging and confidence building method of research for a purported expert in a field," *Nobles v. DePuy Synthes Sales, Inc.*, 2020 WL 6710810, at *2 (D.S.C. Aug. 3, 2020), so Mr. Kahlenberg's method of finding sources for his opinion—to the extent he even performed any independent research—is not reliable. And Mr. Kahlenberg's admission that the four sources identified in his report were all provided to him by counsel only confirms the unreliability of his opinion. *See, e.g.*, *NuVasive, Inc. v. Kormanis*, 2019 WL 9633645, at *2 (M.D.N.C. Mar. 18, 2019); *In re TMI Litig.*, 193 F.3d 613, 697-98 (3d Cir. 1999); *Munoz v. Orr*, 200 F.3d 291, 301-02 (5th Cir. 2000).

Additionally, Mr. Kahlenberg's cherry-picking of information even from the sole four sources he cited renders his opinion unreliable. *See, e.g.*, *In re Lipitor*, 892 F.3d 624, 634-35 (4th Cir. 2018) ("cherry-picking[] undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion"). For example, Mr. Kahlenberg characterized the 2009 congressional hearing as evidence of the Coast Guard Academy's use of race-neutral alternatives as contrasted with the Naval Academy's use of race. But that very hearing transcript—which Mr. Kahlenberg confessed to not reading in its entirety and not reading closely—in fact reflected Congress holding the Naval Academy up as an example

of "implement[ing] a comprehensive effort" on race-neutral alternatives such as increased targeted recruiting. *See* Ex. 6, Hearing Before the Subcommittee on Coast Guard and Maritime Transportation (June 19, 2009), at 5. The hearing transcript in fact reflected the Coast Guard Academy's aspiration to "find and explore deeper in some of [the Naval Academy's] best practices and how we can perhaps copy those over to our institution." *Id.* at 17. The hearing transcript in fact reflected extensive testimony by the Dean of the Naval Academy on the Naval Academy's various and increased recruitment efforts. *Id.* at 22-27. Yet Mr. Kahlenberg cited none of that additional information—in a document he relied on—in explaining his opinions regarding the Coast Guard Academy. Such "result-driven analysis" fails the reliability test. *In re Lipitor*, 892 F.3d at 634.

For all these reasons, the Court should preclude Mr. Kahlenberg from offering any testimony and opinions regarding the Coast Guard Academy, including its use of race-neutral alternatives and any attempted comparison to the Naval Academy.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant the Defendants' motion *in limine* and exclude the testimony and opinions of Brigadier General Walker and Lieutenant Colonel Wood—in their entirety; as well as the testimony and opinions of Mr. Kahlenberg regarding the Coast Guard Academy and any comparison to the Naval Academy.

Dated: August 21, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch


*/s/ Catherine M. Yang*
JOSHUA E. GARDNER
*By Special Appearance*
Special Counsel
ANDREW CARMICHAEL
*By Special Appearance*
Senior Trial Counsel
CHRIS EDWARD MENDEZ
*By Special Appearance*
JOHN ROBINSON
*By Special Appearance*
CATHERINE M. YANG
*By Special Appearance*
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 514-4336
E-mail: catherine.m.yang @usdoj.gov

MEDHA GARGEYA
*By Special Appearance*
Counsel
United States Department of Justice
Civil Division, Office of the Assistant
Attorney General
950 Pennsylvania Avenue NW
Washington, DC 20530

*Counsel for Defendants*

17