# Exhibit 2

CONFIDENTIAL

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
# NORTHERN DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS<br>*Plaintiff*,<br><br>v.<br><br>THE UNITED STATES NAVAL<br>ACADEMY, *et al.*,<br>*Defendants.* | No. 1:23-cv-2699-RDB |

## EXPERT REPORT OF DAKOTA L. WOOD

CONFIDENTIAL

# TABLE OF CONTENTS

I.    Background ................................................................................ 1

      A.    Professional Qualifications ................................................ 1

      B.    Military Career ............................................................... 5

      C.    Post-Marine Corps Career ............................................ 10

II.   Purpose .................................................................................. 12

III.  Summary of Conclusions ........................................................ 13

IV.   Military readiness requires trust in leadership and shared identity
      among members of a unit ........................................................ 15

V.    The consideration of race in the admissions process at the Naval
      Academy is not essential to military readiness or the legitimacy of the
      U.S. military. ......................................................................... 26

      A.    Cohesion and Lethality ................................................. 29

      B.    Recruiting and Retention .............................................. 33

      C.    Legitimacy ................................................................... 35

VI.   The Academy's use of race imposes readiness costs without having
      any meaningful impact on the racial composition of the Navy or
      Marine officer corps. ............................................................. 36

Appendix A: Curriculum Vitae .......................................................... 40

Appendix B: Publications ................................................................. 47

Appendix C: Documents Relied Upon or Considered ........................... 58

Appendix D: Summary of Interviews .................................................. 59

      A.    Colonel James Reilly, USMC (Ret.) .............................. 59

      B.    Colonel Stephen Davis, USMC (Ret.) ........................... 64

      C.    Colonel Harold van OpDorp, USMC (Ret.) .................... 68

CONFIDENTIAL

## I.  Background

## A.  Professional Qualifications

I am a retired lieutenant colonel who served in the U.S. Marine Corps from 1985 to 2005. I am also a graduate of the U.S. Naval Academy Class of 1985. In combination, I have 24 years of direct, personal uniformed experience with the Academy, the U.S. Navy, and the U.S. Marine Corps—as well as the other branches of the U.S. military and the militaries of several allied and partner countries—in operational, garrison, training, and academic environments. Following my retirement from active duty in August 2005, I have remained intimately involved in military, national defense, national security, and foreign policy matters for the past 19 years. For example, as a civilian I served as the strategist for Marine Force Special Operations Command ("MARSOC") and advised "the Pentagon's internal think tank,"[1] the Office of Net Assessment.

During my twenty years in the Corps, I served in billets at nearly all levels of the service in operational, garrison, and academic settings/organizations. This included

1. postings at Marine Corps installations in Hawaii, North Carolina, Okinawa (Japan), Washington DC, and Florida;

2. academic and training organizations aboard U.S. Army installations in Virginia and Missouri; and

---

[1] Greg Jaffe, *Yoda's Replacement: Air Force Veteran to Lead Legendary Pentagon Office*, The Washington Post (May 13, 2015), https://perma.cc/ZE8K-AVVT.

**CONFIDENTIAL**

3.  year-long resident schools at the U.S. Naval War College (where I graduated "with distinction") and the Marine Corps' School of Advanced Warfighting at Quantico, VA (where I was the Distinguished Military Graduate).

My contingency/crisis operations experiences include:

1.  Operation Desert Storm;

2.  the NATO Implementation/Stabilization Force ("I/SFOR") in Bosnia and Herzegovina;

3.  Operation Silver Wake, the evacuation of U.S. citizens and third-country nationals from Albania;

4.  Operation Guardian Retrieval, which involved staging forces in Congo for the possible evacuation of U.S. citizens from Zaire during the First Congo War;

5.  Operation Enduring Freedom; and

6.  Operation Iraqi Freedom.

Among my 32 service decorations, I have been awarded:

1.  The Defense Meritorious Service Medal

2.  The Meritorious Service Medal (two awards)

3.  The Joint Service Commendation Medal

4.  The Navy/Marine Corps Commendation Medal (two awards)

5.  The National Defense Service Medal

6.  The Global War on Terrorism Service Medal

7.  The Korea Defense Service Medal

8.  The Armed Forces Service Medal

9.  The Humanitarian Service Medal

10. The Armed Forces Expeditionary Medal

**CONFIDENTIAL**

11. The Southwest Asia Service Medal

12. The Iraq Campaign Medal

13. The Global War on Terrorism Expeditionary Medal

14. The NATO Medal

15. The Kuwait Liberation Medal (Kuwait), and

16. Five awards of the Sea Service Deployment Ribbon.[2]

In addition to the Naval Academy, my professional military education includes:

1. The Basic School (TBS), located at Marine Corps Base Quantico in Virginia (1985);

2. Motor Transport Officers Course (MTOC), MCB Camp Johnson, NC (1986);

3. Landing Force Logistic Officers Course, MCB Camp Johnson, NC (1989);

4. Transportation Officers Advanced Course, Ft. Eustis, VA (1990);

5. Naval Command and Staff College, located at the Naval War College in Newport, Rhode Island (1997-1998); and

6. The School of Advanced Warfighting, Marine Corps University, MCB Quantico, VA (1998-1999).

I have published more than 85 articles and major reports since my retirement from the Corps. I also originated and edited ten annual editions of a multi-author volume, *The Index of U.S. Military Strength*, assessing the status of U.S. military

---

[2] DD Form 214, WOOD Dakota Lee,

CONFIDENTIAL

power.[3] The *Index* comprises the work of 20+ contributing authors each year, has grown from 350 pages in the inaugural 2015 edition to 650 pages in 2024, and is substantiated with approximately 2,500-3,000 citations in each edition. It has been widely recognized as an authoritative summary of the U.S. military's readiness—in fact, the only comprehensive assessment available to the public—by members of Congress, the Wall Street Journal editorial board, analysts with the Congressional Research Service and Congressional Budget Office, and the Defense Acquisition University, among many others.[4] I have testified before Congress on multiple occasions and have given approximately 1,700 interviews about military and foreign affairs issues to television, radio and podcast, and print media outlets in the last ten years. The focus of my work is tracking, analyzing, and reporting on the ability of the U.S. military to perform its central function—to win in combat against opponents large and small, anywhere in the world—across the full spectrum of military operations, including the training of foreign forces, single-service operations (*e.g.,* naval operations), "joint operations" involving multiple U.S. service branches, and "combined operations" involving U.S. and allied forces.

---

[3] Dakota L. Wood, ed., *The Index of U.S. Military Strength*, The Heritage Foundation, https://perma.cc/TMW7-5CC3.
[4] *See, e.g.*, Editorial, *The U.S. Military's Growing Weakness*, Wall Steet Journal, (Oct. 17, 2022), https://on.wsj.com/466WU44. Internationally, each annual release features a well-attended special presentation to the ministers of defense affairs and military attachés of the diplomatic community in Washington, D.C.

Taken together, my experience with military affairs and the factors that contribute to unit effectiveness spans 43 years.

## B.    Military Career

My direct exposure to military life began as a midshipman at the U.S. Naval Academy, when I arrived in Annapolis from a small town in northeast Oklahoma in July 1981. Classroom instruction included, among others, mathematics, physics, literature, history, sciences that involved oceanography, biology, meteorology, engineering (electrical and "steam"), and naval classes that included leadership, law, navigation, and ship-handling. Our instructors were split between military and civilians, and each class was a mix of midshipmen from various companies and disparate backgrounds. Our instruction inside and outside of the classroom emphasized teamwork, uniformity, and mission over self.

Like most midshipmen, I participated in a wide range of summer training, including: (1) a six-week deployment aboard the USS Lockwood, from Hong Kong to the Philippines, after my plebe year; (2) time with the Marines at Quantico, naval aviators at Naval Air Station in Pensacola, and submariners out of Naval Submarine Base New London, Connecticut, after my third-class year; and (3) a six-week deployment aboard the USS Belleau Wood, on its way from Australia to the Philippines, after my second-class year.

My time at the Naval Academy taught me the value of perseverance, courage, focus, reliance on teammates, how to be there for others while dealing with my own challenges, and where to find the extra ounce of reserve required to take another hit and keep swinging.

I commissioned as a Second Lieutenant in the Marine Corps upon graduation from the Academy. My first assignment as a young Marine Corps Second Lieutenant was as a Platoon Commander at Marine Corps Air Station Kaneohe Bay, Hawaii. I led a truck operations platoon that averaged 35-40 Marines: a mixture of male and female, and Black, White, and Hispanic Marines. Leadership and staffing within the larger unit were also mixed in age, race, gender, geographic or regional home identities, and economic strata.

Shortly thereafter, I was reassigned to 1st Battalion, 3rd Marines to take charge of a motor transport platoon that included both maintenance and operations sections. As with nearly any military unit, the platoon featured a mixture of races, ethnicities, and individual backgrounds. There, too, my fellow Marines and I came from various family structures, grew up in different parts of the country, and were raised in rural and urban settings alike. In 1989, I was transferred to Camp Kinser, a Marine base in southern Okinawa, Japan, adjacent to the city of Naha, to join the Headquarters and Service Battalion, 3rd Force Service Support Group, III Marine Expeditionary Force.

My first assignment to a "shore billet" followed my graduation from a U.S. Army school for advanced logistics located at Ft. Eustis, Virginia, in 1991. I reported for duty to the Aviation Support Logistics Branch ("ASL"), Department of Aviation, Headquarters Marine Corps, to assume duties pertaining to the ground support capabilities of Marine Corps aviation units worldwide. Soon thereafter, I deployed in support of Operation Desert Storm as part of a four-man team assessing aviation operations. During my time at ASL, I conduced a global survey of Marine Wing Support Group/Squadron organizational designs and capabilities and a force-wide assessment of ground equipment capabilities used by the Corps to support Marine aviation operations across a range of settings.

In 1994, I was assigned to the 2nd Special Operations Training Group ("SOTG-2"), out of Camp Lejeune, where I had the privilege of working alongside some of the most experienced special operators in the Marine Corps. The Group's job was to train Marine Corps units, like the 26th Marine Expeditionary Unit to which I was later assigned, and certify them as "special operations capable" in higher-level skills associated with the special operations community.

Later in 1994, I was assigned to the 26th Marine Expeditionary Unit in Camp Lejeune, North Carolina. I served as the Assistant Logistics Officer (S-4A) through our first deployment to the Mediterranean, then fleeted-up to be the S-4 for the second half of my three years with the command. This assignment included a second

CONFIDENTIAL

deployment to the Mediterranean in an on-call posture to lend support to the multinational effort to bring peace between warring factions in Bosnia and Herzegovina. In all, my three years with the 26th MEU spanned two six-month deployments, at least three crisis taskings, and several bi-lateral and multi-lateral exercises with partner countries from Europe, Africa, and the Middle East.

From 1991-2001, I served in the Strategic Initiatives Group ("SIG") at Headquarters Marine Corps in the Pentagon. The SIG was the in-house "think tank" for the Commandant of the Marine Corps. As such, my teammates and I directly supported the 32nd Commandant of the Marine Corps, General James L. Jones. Our team had a diverse mix of specialties, and our task was to survey the landscape of military affairs, paying specific attention to matters outside the Marine Corps that might influence the Corps' ability to support national security interests. My portfolio at SIG included discrete national security and foreign policy issues, the evolution of various technologies, advances in social and entertainment forums (that often provided new platforms and technologies for information operations), and emerging trends in public attitudes towards national security and military affairs. In short, our team tracked just about anything that could affect military power and national security.

From 2001 to 2003, I was assigned to the Office of Net Assessment, Office of the Secretary of Defense. The Office serves as the Pentagon's "internal think tank"

**CONFIDENTIAL**

to support the Secretary of Defense, just as SIG supported the Commandant of the Marine Corps. Its "assessments are highly classified, tightly controlled in distribution, and provide strategic-level management insights for the Secretary of Defense and other senior DoD leaders."[5] The Office was staffed by officers who were hand selected and detailed from each of the services, as well as a few carefully selected civilians. Among a broad range of studies that addressed highly technical, strategic, and operational matters, our assignments included studying the quality of training within armed forces (U.S. and others), promoting leadership development, assessing power and authority distribution in military hierarchies, and analyzing the extent to which cultural norms affected a nation's ability to wage war. As part of these efforts, the Office commissioned work from socio-anthropologists, economists, historians, physicists, country-specific scholars (Sinologists, Sovietologists, scholars of Islam and Judaism), and demographers.

My last assignment on active duty was as Executive Officer (XO) of the Marine Detachment at Fort Leonard Wood in Missouri, which, at that time, was the largest standing detachment in the Corps. My staff of approximately 300 Marines, almost all of whom were instructors, trained roughly 5,000 Marines each year—or one out of every seven Marines recruited into the force. The command element oversaw four occupational specialty schools and their corresponding training companies,

---

[5] Department of Defense, *Office of Net Assessment*, https://perma.cc/GA5F-BUCL.

each led by a captain and staffed with senior non-commissioned officers. Together, the command staff, instructors, and Marines who arrived at Fort Leonard Wood for initial skills training represented the entirety of the United States.

## C.   Post-Marine Corps Career

After retiring from the Corps, I accepted a position as Senior Fellow with the National Security Affairs Group at Systems Planning and Analysis, Inc. ("SPA"), a prominent defense contractor that worked primarily with the Department of the Navy and Department of Homeland Security. In this capacity, I conducted risk assessments for DHS, analyzing various threat vectors that terrorist groups might employ to attack the United States. Based on the high quality of my work, I was assigned to a specialized team responsible for creating and operationalizing a government capability to detect and provide early warning of biological threats that threatened human life or U.S. economic interests.

From 2006-2011, I served as a Senior Fellow with the Center for Strategic and Budgetary Assessments (CSBA), a 501(c)(3) institute that worked almost exclusively for Department of Defense sponsors, with most assignments coming directly from the Office of Net Assessment, Office of the Secretary of Defense. My projects were focused on military matters—exploring the capabilities and approaches to warfare of adversarial countries; assessing the U.S. military's capabilities, organizational designs, concepts of operation, and force posture; and providing

recommendations for how to sustain or improve the U.S. military's advantages and minimize its vulnerabilities. My work included independent research, workshops, and wargames involving a broad cross-section of active-duty officers, retired military veterans, academics who specialized in the study of conflict, and current and former government officials who had experience in dealing with crises.

In 2012, I accepted a role as the Strategist for Marine Forces Special Operations Command,[6] advising the Commander on strategic level issues and policies affecting the future of Marine Corps special operations missions, capabilities, and programs. MARSOC is responsible for the three Marine Raider Battalions,[7] which operate alongside other elite units like Navy SEAL teams and Army Rangers. The command's mission was to support the U.S. military's geographic combatant commands by executing sensitive and complex operations that the military confronted. (United States Central Command, or "CENTCOM," which is responsible for all military operations in the Middle East, is an example of a geographic combatant command.) My routine interaction with the special operations community in this role—building upon my time in uniform dealing with similar issues—kept me fully aware of current

---

[6] *See* Marine Forces Special Operations Command, https://perma.cc/27LY-3ZWH.
[7] MARSOC's three Raider Battalions fall under the Marine Raider Regiment that, along with a Support Group and Training Center, enable the Command to provide trained and ready forces to U.S. Special Operations Command (USSOCOM). See: https://perma.cc/NP3N-TTDU.

measures used to enhance tactical effectiveness and maintain the highest levels of military readiness.

In 2014, I joined The Heritage Foundation, a conservative public policy institute located in Washington, DC, as a senior research fellow for defense programs. My primary work focused on the production of the *Index of U.S. Military Strength*, a comprehensive annual report analyzing the readiness, capabilities, and capacities of each branch of the U.S. military. I created the *Index* in 2014 and served as the editor-in-chief throughout my decade with Heritage. The *Index* addressed the military and political environments of allies and partners of the United States, as well as those of major adversaries like China, Russia, and Iran.

In the Spring of 2024, I left Heritage and opened my own consulting firm, Hot Gates Consulting LLC. I advise clients on private sector issues that overlap with national security and foreign affairs and conduct original research and draft model policies on a wide range of military readiness topics.

## II.   Purpose

I have been retained by the Plaintiff in this case, Students for Fair Admissions, to provide expert opinion in this matter. I have been asked by SFFA to answer two questions:

(1) Whether the use of race in admissions at the United States Naval Academy is vital to national security, including whether there is any evidence that racial

**CONFIDENTIAL**

diversity is critical to cohesion and lethality, recruitment, retention, or the military's legitimacy in the nation and the world; and

(2) Whether there are any harmful effects to using race in admissions at the United States Naval Academy.

I am being paid $400 per hour for my work in this case. My compensation is not contingent upon reaching any opinion or achieving any outcome in this case. The opinions expressed herein are my own.

In rendering the opinions and conclusions expressed in this report, I drew upon my extensive military and post-military experience. My curriculum vitae and list of publications are contained in Appendices A and B. I have also considered various documents that were produced by the Academy in this case. A list of those documents is contained in Appendix C. Finally, I conducted short interviews with various career professionals with whom I have worked during my long career. These individuals have broad and deep experiences in military affairs across a range of settings. The individuals I interviewed all supported my general conclusions outlined in this report. The contents of three of these interviews and their biographies are contained in Appendix D.

I have not testified as an expert at trial or deposition in the past four years.

### III.   Summary of Conclusions

I have reached three main conclusions:

CONFIDENTIAL

First, military readiness requires trust in leadership and a shared identity among servicemembers within units. Military officers earn the trust of the troops in their formations by exceeding objective standards and leading through example. Any perception, accurate or not, that officers earned their commission or command due to preferential treatment undermines their authority and, in turn, the effectiveness of their units. Creating a shared identity among members of units is critical for sustaining the commonality of purpose, discipline, and self-sacrifice necessary to prevail in combat. Conversely, imposing distinctions that define team members in any way other than as a fellow sailor or Marine is the quickest way to damage trust within a unit and disrupt its internal functioning.

Second, the consideration of race in the admissions process at the Naval Academy is not essential to military readiness or the legitimacy of the U.S. military. There is no evidence that statistical alignment between the racial demographics of the officer corps and the racial demographics of the enlisted ranks or broader society fosters cohesion and lethality, aids recruitment of top talent, increases retention, or bolsters the military's domestic and international legitimacy. Moreover, as I explain below, there is ample evidence that racial preferences are counterproductive to those goals.

Third, the Academy's use of racial preferences in admissions imposes readiness costs without having any meaningful impact on the racial composition of the

14

Navy or Marine officer corps. The Academy produces fewer than one in five new Navy ensigns and fewer than one in six new Marine second lieutenants each year. Accordingly, the Academy has very little leverage to move the needle in terms of force wide demographics, whether it considers race or not—especially since the Academy's own witnesses have conceded that they make no effort to balance the racial demographics of the units to which they assign graduating midshipmen. The Academy's use of racial preferences will, however, harm its institutional credibility and increase the likelihood of backlash and resentment within the ranks.

Put simply, there is no evidence that the Academy's consideration of race in admissions improves the military's ability to deter its enemies or win in combat. Worse yet, the Academy's policy is a net negative for military readiness as traditionally understood.

## IV. Military readiness requires trust in leadership and shared identity among members of a unit.

The Department of Defense defines military "readiness" as "the ability of military forces to fight and meet the demands of assigned missions."[8] DoD's "enduring mission," as summarized by the 2018 National Defense Strategy, "is to provide combat-credible military forces needed to deter war and protect the security of our

---

[8] Joint Chiefs of Staff, Joint Publication 1, *Doctrine for the Armed Forces of the United States*, DOD, incorporating change 1, July 12, 2017, p. GL-10.

nation. Should deterrence fail, the Joint Force (*i.e.*, the Army, Navy, Air Force, Marines, and Space Force) must be "prepared to win."[9]

Thus, a layman's standard for whether something "enhances military readiness," or "detracts from military readiness" is straightforward: on balance, does it help the U.S. military win wars or not? As then-Secretary of Defense James Mattis explained in remarks introducing the National Defense Strategy, if the military is not "prepare[d] to win," it "will pay the cost."[10] And "[t]he cost will not be measured in abstract concepts … it will be measured in American lives."[11] Accordingly, a readiness-first approach requires leaders and policymakers to "prioritize what is most important to field a lethal, resilient, and rapidly adapting" force.[12]

Racial identity is irrelevant to military proficiency and effectiveness. Bullets and bombs do not discriminate; they are equally lethal against everyone regardless of nationality, race, gender, ethnicity, religion, economic or social status, or political views. The realities of combat are equally unforgiving to units that stray from a focus on warfighting or that short-change time spent on what's most important: preparing for combat. While chance always plays a role in war, battles are usually won through

---

[9] U.S. Department of Defense, *Summary of 2018 National Defense Strategy of The United States of America*, https://perma.cc/9RAK-AD25.

[10] U.S. Department of Defense, *Remarks of Secretary Mattis on National Defense Strategy*, (Dec. 1, 2018). https://perma.cc/VBX9-AYSM.

[11] U.S. Department of Defense, *Remarks of Secretary Mattis on National Defense Strategy*, (Dec. 1, 2018). https://perma.cc/VBX9-AYSM.

[12] U.S. Department of Defense, *Summary of 2018 National Defense Strategy of The United States of America*, https://perma.cc/9RAK-AD25.

CONFIDENTIAL

a combination of competent and trusted leadership, the discipline and selfless service fostered by a common identity, proper resources to sustain a fight, and tactical proficiency (choosing when and how to fight). Of these four elements, the first two—which encompass the human element of warfare—are perhaps the most important. Indeed, the history of warfare on land, sea, and in the air repeatedly demonstrates that success in battle stems from disciplined forces, unified purpose, a shared identity, enforced discipline, and the absence of divisive and divergent individualized identities and personal agendas.[13] Success is not individualized; it's collective.

*Competent and Trusted Leaders.* As hierarchal entities, military units rise and fall based on the quality of their leaders and the level of trust troops place in those leaders. Whether military personnel act as they need to—at the individual or unit level—directly correlates to the quality of their leadership. Good leaders can succeed with a unit that starts out in poor shape, and bad leaders can waste the potential of even the very best units. Crucially, military units are not democracies. They are

---

[13] Acknowledging the thousands of books that have attempted to capture the nature of comradery and its importance to warfighting, perhaps the one that most succinctly accomplishes the mission is the Corps' *Leading Marines FMFM 1-0*, issued by General C.E. Mundy, 30th Commandant of the Marine Corps, in 1995. *See e.g.*, FMFM 1-0, 15-16 ("This cohesion between Marines is not a function of a particular unit within the Corps. It is a function of the Corps *itself*. When a Marine reports to a unit, he or she may be unknown personally, but is a known quantity professionally. Regardless of anything else known about them, their leaders know that they have been trained as Marines and that they bear, consequently, that indelible stamp of 'rifleman.'"); *id.* at 16-17 ("Service with the Marine Corps means service with a team. Everything that the Marine Corps does is a team effort."); *id.* at 17 ("The small units were successful because individual Marines are team players, trained to handle themselves in any situation and to subordinate their own desires to the objectives of the team.").

hierarchical in design, for reasons that are rooted deep in the history of warfare. There is a clearly defined chain of command that is known to all and that must be enforced if the unit is to succeed. Commanders do not gather their forces around them to discuss the pros and cons of an ongoing operation or to account for the perspectives of the individual sailors or Marines in their formations. To be sure, good leaders solicit input from their staff, but the final decision is not determined by popular vote.

This "command dominant" condition cannot just appear in the moment of crisis. It is a framework and organizational reality that must pervade a unit in training and day-to-day operations to be able to survive the ultimate stress test combat imposes. According to military doctrine, leadership is also a function of *authority*, which comes in various forms: legal authority (obtained by rank or billet/position), technical authority (*i.e.*, acknowledged expertise in a field), personal authority (earned interpersonal respect or force of personality), and cultural authority (a group norm that demands youth respect their elders, for example).[14] Legal or rank-based

---

[14] Categorizations of sources of authority are not unique to military theory, however, and are used as a lens for analyzing societal interactions by a wide range of academic disciplines. *See, e.g.*, Britannica, *Authority*, https://perma.cc/BJ7W-VXJ9 (noting types of authority include state or legal authority—with military officers serving as representatives of the state and duly empowered to exercise authority over others, hierarchical authority that exists in any organization, and social convention). Many discussions about sources of authority refer to German sociologist and political economist Max Weber's seminal work *Politics as a Vocation* (1919). Per Weber, there are three primary types of authority or power: societal norms or customs, charisma or personality, and legal or demonstrated competence that reflect the prevailing rules of a system. *See id.* at 4.

authority is the only source that leaders enjoy by default. It serves as a starting point for servicemembers, especially those who are new to the military. But sailors and Marines quickly learn to take the measure of those appointed over them, observing their behavior, competence, and decisions. When these aspects disappoint, the junior will still render the senior formal respect per protocol, but it will be hollow. Lasting and trusted authority must be earned. And it can be earned only through example, by rigorous adherence to standards and upholding the integrity of the mission.[15]

Because officers are expected to lead their teams by example and exceed the standards they expect of others, any suspicion (accurate or not) that they obtained their commission or command due to preferential treatment undermines their authority from day one. The military cannot use race as a factor that influences the selection of its leaders, and then expect those who are led to ignore the presence of race in all other aspects of the leader's career.

*Shared Identity.* Creating a shared sense of team is critical to building and maintaining an effective fighting force, both from a socio-psychological standpoint and a practical standpoint. From a sociological standpoint—how else do you get young men and women in their prime to willingly risk their own lives for a higher

---

[15] *See, e.g.*, MCWP 6-11, *Leading Marines*, 35 ("The tradition of leadership education in our Corps since its earliest days has often been described as 'leading by example.' In fact, leadership, in the long run, depends on the example set by the leader, not only as a warfighter, but also as a citizen and human being.").

purpose, or convince physically exhausted and uncomfortable troops to place the interests of the unit above their own? Practically speaking, it is impossible to promote and satisfy the varying interests, "lived experiences" or "identities" of each individual in a 45-man platoon or in a division aboard a ship, and any attempt to do so risks perceptions of favoritism and will certainly result in either chaos or immobilizing dysfunction.

Military units cannot function effectively if they are "individual-focused," just as a sports team cannot perform at its best if it is a collection of players who act as individuals, however talented they may be. Battalions, squadrons, and ship's companies must operate as a team, meaning that each individual subordinates their personal interests as the core or primary driver of their actions and perspective, replacing it with a unit-centered perspective. To instill this "team first" mentality, instructors at boot camp and other military training courses often attribute the failures of an individual—being late to formation or forgetting a required item, for example—to that individual's entire team or squad. The lesson: success or failure doesn't exist in a vacuum; it's all about the unit. There is a very practical reason for this approach—in combat, individual oversights can have deadly consequences for everyone else involved.[16] Fixating on individual characteristics or identities such as race, on the

---

[16] Examples of this are legion. A few to illustrate: falling asleep on watch creates opportunities for an enemy to attack a position; placing a first aid kit someplace other than dictated by the unit's Standard Operating Procedure means a teammate might not be able to locate it when seconds

CONFIDENTIAL

other hand, compromises team identity and team cohesion by erecting a filter that keeps the individual from fully identifying with the team and the team with that person.

Shared identity is fostered through equal enforcement of standards. If there is a "first sin" that damages trust within a team, it is imposing distinctions that define team members in any way other than as a fellow sailor or Marine.

In other words, perceptions of legitimacy are crucial. People will obey an order or take to heart a recommendation from someone more experienced for a number of reasons: because they must, but also because they've come to respect and trust the person, or have seen them be successful or more effective and they want to emulate them or obtain the same achievement. But this can easily be undermined or destroyed when authority is perceived to be illegitimate. This directly affects the cohesion and sense of team within a military unit, which in turn influences its performance.

Moreso than any other military in the modern era, American military units operate far from home and in foreign environments. They conduct their business in distant, strange lands amidst people who frequently do not speak English and practice customs unfamiliar to most, if not all, members of the unit. These settings can

---

matter for saving a life; failing to perform necessary maintenance when it is your turn to do so can result in a critical piece of equipment failing when it is needed the most.

quickly induce feelings of isolation and prompt troops to seek comfort amongst their teammates and what is familiar. When a military unit is committed to battle, it will almost always operate among people hostile to it, wary of it, or reluctant to support it. In these situations, military norms and expected behaviors like command authority, discipline, and respect become even more important. When stress is high and one's world is filled with danger, unknowns, and confusion, the certainties of team, habit, rules, endlessly practiced responses to commands, and trusted relationships mean the difference between winning and losing in combat, which is usually measured in life or death.

Ships at sea are no less susceptible to such stressors. A ship and its crew are just as isolated, often more so, than a ground unit deployed in a foreign land because crew members have nowhere else to go. They are physically confined not only to the hull of the ship, but even to the limits of their normal workspaces, dining area and berthing space. In practical terms, there are no completely private spaces aboard a ship in which one can find physical and emotional "space" in which to find calm. Consequently, interpersonal friction among a small team can dramatically exacerbate conditions that wear on people even in the best of circumstances. Persistent doubts about the legitimacy of those appointed over you or whether a teammate had to meet the same levels of performance as you did can quickly become team-breakers that destroy warfighting effectiveness.

If everything is standards-based, and service members believe those standards have not been manipulated to favor preferred outcomes, then the entire unit has certainty about one another's capabilities. In this way, merit-based systems legitimize credibility and allow everyone to begin from a position of good faith rather than overcoming perceptions—warranted or unwarranted—of unfairness, favoritism, or "tokenism."

This was precisely the approach in practice when I was the Executive Officer (the deputy commander, in other words) tasked with overseeing the training companies and staff responsible for military occupational specialty training for newly minted Marines at Fort Leonard Wood, Missouri. These young men and women came from all walks of life, all races and ethnicities, and every geographic region in the United States. How do you train such a disparate group of new Marines, regardless of their separate background prior to becoming a Marine? By focusing on their common identity—they are all Marines. That means:

1. Treating these Marines the same regardless of race, ethnicity, gender, religion, economic or social status, or political views;

2. Holding each accountable to a common standard without exception;

3. Forming units that work in collective tasks;

4. Enforcing respect for authority regardless of "surface characteristics,"; and

5. Demanding that each adhere to the same principles in their interactions with each other.

CONFIDENTIAL

Units will succeed only by stripping away individual identity, emphasizing a common identity—being a Marine—and holding everyone to the same standard. This is not to say that men and women are turned into automatons with no individuality; they are not cogs in a machine. But to create effective teams, the individual must subordinate their personal interests and shift their priority of focus to that of their team and to being a good teammate—the opposite of leading with their individual identity.

One powerful example comes to mind. In the Fall of 2004, I attended the Marine Corps Birthday Ball, held for our Marine Detachment at Fort Leonard Wood. After the formal ceremony commemorating the 229th birthday of the Corps, there was dinner, dancing, and general socializing. Toward the end of the evening, Billy Joel's "Goodnight Saigon"—his ode to the Marines and soldiers who fought in Vietnam—began to play. At the start of the song, most of the Marines formed a giant circle on the dance floor, linked together with arms across shoulders, drawing their fellow Marines in tight. They belted out all the lyrics, swaying from side to side:

> And it was dark
> So dark at night
> And we held on to each other
> Like brother to brother
> We promised our mothers we'd write
> ***And we would all go down together***
> We said we'd all go down together
> Yes we would all go down together

These young Marines sang with particular gusto the refrain "And we would all go down together." Because that is how they all felt. It was a beautiful moment. All these Marines of different ranks, races and ethnicities, male and female, joined together by a common bond and a unifying identity. They were Marines, pure and simple. All had earned their title through hard training and long hours working to accomplish whatever task had been handed to them. And since they knew that of each other, they trusted each other. That's what team building, and unit cohesion is all about. No one needed a special session to acknowledge each other as White, Black, Hispanic, or Pacific Islander to have that camaraderie. In fact, highlighting their differences would have wrecked the good that had come from the shared experience of earning the title "Marine," a process that very intentionally ignores such differences.

In sum, merit-based systems create a context that forces people to perform to standard. If they pass muster, their credibility cannot be legitimately denied. Merit and fair treatment generate trust. People place their faith in leaders they do not doubt. But "equitable" outcomes based on personal characteristics like race are wholly incompatible with this standard. If troops believe that their leaders have been placed into their positions of authority for reasons other than merit and proven performance, they will doubt the integrity, competence, and deservedness of the person in the billet. This undermines everything: influence, credibility, respect, trust, reputation, and

CONFIDENTIAL

cohesion. In turn, this leads to a breakdown of team identity, team performance, and unit effectiveness.

## V. The consideration of race in the admissions process at the Naval Academy is not essential to military readiness or the legitimacy of the U.S. military.

I understand that the Defendants in this case assert that the Naval Academy's consideration of race in admissions furthers the Department of the Navy's institutional goal of producing an officer corps whose racial demographics mirror the demographics of the enlisted corps and those of society at large. I likewise understand that the Defendants further assert that a racially balanced (or, racially "representative") officer corps, in turn, furthers military readiness and national security interests by (1) fostering cohesion and lethality; (2) aiding recruitment of top talent; (3) increasing retention; and (4) bolstering the military's domestic and international legitimacy.[17]

As I explain below, there is no evidence that proportional racial representation achieves any of the benefits Defendants assert. Before turning to each assertion in detail, however, I make a few observations about the nature of Defendants' assertions and their characterization of them.

As an initial matter, I am highly skeptical that there is any consensual "military judgment" about using race at the military academies.[18] The military reflects the

---

[17] Def's Response to Plaintiff's Interrogatory No. 13.

[18] Defendants' Response to Plaintiff's Interrogatory No. 13 ("considered military judgment").

orders and priorities of an elected Commander in Chief, and active-duty military officers are duty-bound to implement them. For example, the Department of Defense under then-President George W. Bush proposed ***discontinuing the consideration of race for prep school admissions in 2007*** after it conducted a multi-year study of the issue.[19] The Bush-era DoD ultimately shelved those plans, and President Obama was then elected the new Commander-in-Chief the following year. In 2011, then-President Barack Obama issued Executive Order 13583, requiring the Department of Defense to create and implement a "Diversity and Inclusion Strategic Plan."[20] DoD issued its plan in 2012 and, in turn, required the Department of the Navy to issue a Diversity and Inclusion Strategic Plan of its own.[21] Thus, when the Department of the Navy published its Diversity and Inclusion Roadmap in 2017, it was "simply complying with a directive issued by Mr. Obama in 2011."[22]

But the DoD's conception of its asserted diversity interests has flip flopped between administrations since then. For example, the Navy had to cancel its planned diversity audit in fall 2020 because the audit was banned by President Trump's

---

[19] Peter Schmidt, *Defense Department May Restrict U.S. Service Academies' Affirmative-Action Efforts*, Chronicle of Higher Education, (May 9, 2007), https://bit.ly/3WiO7IY.

[20] E.O. 13583, *Establishing a Coordinated Government-Wide Initiative to Promote Diversity and Inclusion in the Federal Workforce*, (Aug. 18, 2011), https://perma.cc/36LP-RY2M.

[21] Rowan Scarborough, Navy Releases Roadmap for Diverse Force Protected Against Discrimination, The Washington Times (Feb. 5, 2017), https://bit.ly/3LfJwRs.

[22] Rowan Scarborough, Navy Releases Roadmap for Diverse Force Protected Against Discrimination, The Washington Times (Feb. 5, 2017), https://bit.ly/3LfJwRs.

CONFIDENTIAL

Executive Order 13950.[23] That order was then itself reversed by President Biden's Executive Order 13985.[24]

In addition, although the Academy insists that the brigade of midshipmen should "represent the diversity of the nation"[25] race and ethnicity are the only categories where the Academy targets statistical parity with societal demographics. According to data compiled by the U.S. Census Bureau for 2020,[26] females account for 50.9 percent of the U.S. population. If the Department of the Navy applied its theory of representative diversity consistently, one would expect the Academy to establish a goal of having women constitute half of each incoming class in the Brigade of Midshipmen. But the Academy does not do that.[27] Nor to my knowledge does it seek representative parity based on religion, even though that is often the most important characteristic an individual would identify about himself or herself. Nor does it seek representative parity based on political ideology. Why doesn't the Naval Academy seek parity along these lines? I assume it's because the Academy understands that emphasizing these characteristics is pointless at best and counterproductive at worst.

---

[23] USNA-00010224.

[24] E.O. 13985, *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*, (Jan. 20, 2021).

[25] USNA-00020994.

[26] United States Census Bureau, *Census Bureau Releases New 2020 Census Data on Age, Sex, Race, Hispanic Origin, Households and Housing*, (May 25, 2023), https://perma.cc/Z3J4-FC9W.

[27] USNA-00026839.

CONFIDENTIAL

## A.     Cohesion and Lethality

*Cohesion.* I am aware that the Academy has pointed to historical examples of racial unrest within the U.S. military as evidence of the necessity for racial preferences.[28] But the most recent occurrences the Navy identifies are more than a half-century old and reflected the ills afflicting all aspects of American society at that time, not anything unique to the military. The U.S. military of 2024 is vastly different than the draft-reliant force of the 1960s and early '70s. The Academy's emphasis on the Vietnam era ignores the profound changes in military policies and societal attitudes since then.[29]

The Academy also contends that minority junior members—enlisted and officer—will feel more connected to the force if they see someone who looks like them elsewhere in the force and that the crew of a ship or Marines in a battalion will be more effective if its racial composition (of officers and enlisted) mirror that of society.[30] But under the standard rotational policies of both services, officers and enlisted serve in a command for a period of time, then receive orders transferring them to another assignment (and often an entirely new duty station). As people arrive and

---

[28] *See* Defendants' Response to Plaintiff's Interrogatory No. 13.

[29] Suzanne C. Nielson, LTC US Army, addressed such changes in her monograph *An Army Transformed: The U.S. Army's Post-Vietnam Recovery and the Dynamics of Change in Military Organizations*, U.S. Army War College Press, https://perma.cc/48FQ-EEF4. Though she was writing about the Army, the basic evolution occurred within the other services, including the U.S. Navy and U.S. Marine Corps.

[30] *See* Defendants' Response to Plaintiff's Interrogatory No. 13.

depart, the composition of the unit changes. Accordingly, even if the racial composition of the officer corps as a whole matches that of the enlisted ranks or of broader society, that doesn't mean the same ratio can be achieved on each ship, naval station, or shore command. And the Navy's own witnesses have conceded that they make no effort at all to achieve this balance by assigning servicemembers to units based on race.[31]

***Lethality.***   The Navy and DoD contend that racial balancing is essential to increasing the lethality and effectiveness of the force,[32] but I am not aware of any DOD, DON, USN, or USMC document that explains how this increase manifests itself in real world operations or how it works in practice over time. Nor am I aware of any controlled studies of military units to back this assertion.

Empirically, I am aware of no evidence that supports this claim. If the unit's warfighting effectiveness is tied to its racial composition, the Navy and the Corps should see fluctuations in unit performance as its composition changes. But I am aware of no one making this argument.  Nor do there seem to be reasonable, consistent, and repeatable ways to measure this in any event.

If racial composition and officer/enlisted proportionality were directly related to team effectiveness, then one would expect to see meaningful differences between

---

[31] USNA-00012659-60.
[32] Defendants' Response to Plaintiff's Interrogatory No. 13.

CONFIDENTIAL

ships, aviation squadrons, battalions, and other organizations based on their racial composition. Those realities should be observable even between two subcomponents of a larger unit (e.g., between two battalions within a regiment). For example, two destroyers home-ported in Naval Station Norfolk or two battalions based at MCB Camp Pendleton should exhibit different levels of performance based on their minority populations. I am not aware of any such differences in reported unit performance that were in any way attributable to such a factor. In almost every case of unit readiness and performance in operational settings, the effectiveness of a unit has been tied to other metrics, such as the quality of leadership in the unit.

I am also aware that the Naval Academy has asserted that racial preferences in officer selections improve lethality by improving cultural awareness and enhancing U.S. forces' ability to interact with local nationals and foreign militaries during overseas deployments.[33] This argument makes little sense. On very rare occasions, specific types of people are assembled for specific missions. For example, soldiers with dwarfism were recruited for tunnel operations in Vietnam, and all-female teams were assembled to interact with and search Muslim women in Afghanistan and Iraq. Sometimes, intelligence or special operations missions work best when surface characteristics (skin color, hair color, body type) enable an American to be less noticeable moving within a foreign population. But other than these unique circumstances, I'm

---

[33] *See* Defendants' Response to Plaintiff's Interrogatory No. 13.

CONFIDENTIAL

aware of no evidence that a person's race improves his or her performance as a sol-dier while abroad. Indeed, with very rare exceptions, there isn't any relevant racial or ethnic connection between an American and the locals of whatever country the U.S. military is in. Someone from Congo, Zimbabwe, Tajikistan, or Uruguay would not view an American, regardless of skin color, as familiar or connected because there would be no common context or experiences. That was precisely my experi-ence when I deployed to Africa where my unit established the ability to rescue Amer-icans should that be needed during the First Congo War or when working with the Japanese or Taiwanese or even representatives of European allies. Local context means everything because it shapes perspective and how people view the world in ways that absolutely dominate similarities in skin color or surname.

Foreign service-members and their American counterparts will have grown up in fundamentally different contexts. The military forces of other countries want to work with the United States—or fear the United States—because American forces have great equipment, lots of money, superior training, and access to resources. The racial composition of American units is irrelevant.

Finally, I am aware that the Navy broadly asserts that racial diversity enhances lethality because racially diverse teams are more innovative and better at solving complex problems than racially homogeneous teams. But they offer no evidence to support this claim aside from a few studies from university settings or inapplicable

CONFIDENTIAL

civilian office environments like stock trading. Indeed, documents Navy has produced in this case concede that "[t]he military has no wide range studies that examine whether diverse teams solve complex problem sets better than nondiverse ones."[34] Besides, the argument presumes a collaborative environment akin to a marketing team brainstorming ways to sell sneakers. The world of military planning and the execution of tactical actions is profoundly different, profoundly hierarchical; it demands "unity of command," not collaboration, and celerity in following orders.

## B.   Recruiting and Retention

Defendants contend that "a more diverse officer population" helps the Navy "recruit the top talent" and aids "the Navy and Marine Corps' ability to retain servicemembers."[35] I disagree.

For starters, Defendants' assertion is curious, considering that the military is currently in the throes of its greatest recruiting crisis of the modern era; the Navy is certainly struggling. In fiscal year 2023, the Navy fell short of its active duty recruiting goals, missing them by twenty percent. In the first half of fiscal year 2024, it enlisted only two-thirds of its target number. And it currently has 18,000 fewer sailors than it needs.[36]

---

[34] USNA-00009358.

[35] Defendants' Response to Plaintiff's Interrogatory No. 13.

[36] Diana Stancy, *Navy Continues to Struggle in Recruiting as Other Services Near Goal*, Navy Times (Apr. 17, 2024), https://perma.cc/CQG6-XG8C.

I believe that emphasis on divisive policies—like racial preferences—is contributing to lower trust in military leadership. Prospective recruits have the sense that the military has been politicized, and this contributes to lower recruiting numbers. Intuitively, this makes sense. High standards are essential to high performance. High performance leads to success. Success attracts people who want to be part of a winning team. People are drawn to elite teams, and some are inspired to do what they must to become a part of them. They are motivated by the challenge of proving that they have what it takes to be among the best. In my own case, I applied to the U.S. Naval Academy because I wanted to serve my country in uniform and the Academy possessed an extraordinary reputation for excellence (and was a conduit to the Corps). I sought a commission in the U.S. Marine Corps because its reputation for success in combat and its demand for the highest levels of performance intimidated me. In both cases, I wondered whether I could meet the challenge, whether I had what it would take to succeed. People are drawn to challenges; those who seek the easiest path, and who are helped along the way never get that sense of satisfaction from truly accomplishing anything. They certainly never grow as people and aren't equipped to deal with any serious challenge.

But the best performing teams only remain so—and only continue to attract high performers—by keeping their standards high. Once standards are lowered to accommodate those who want to be a member, but who do not meet the high

CONFIDENTIAL

standards, then the team slips into mediocrity and membership on the team begins to lose its luster.

## C.    Legitimacy

Defendants contend that racial parity between the officer corps and "the increasingly diverse population of the United States instills trust in the American public" and "enables the military to protect its legitimacy among its international partners."[37] I disagree.

A military is legitimate if it is seen as competent and effective in operations, treats its people fairly, and has the interests of its country at heart rather than its own (i.e., establishing itself as a political power). Treating people fairly includes the absence of prejudice but also the absence of favoritism. Everyone must have an equal opportunity to join and to compete for position, rank, reward, and so forth. The operative word is *equal*, meaning without bias or unfair advantage. If everyone knows the process is fair, there is no legitimate basis for complaint. To the extent the military adjusts standards to favor preferred outcomes, the process is no longer fair, and the military's reputation is damaged.

Internationally, a military's reputation among friends and foes comes directly from its performance: the force (unit, crew, individual) is either professional and effective or it isn't. No one cares about its composition, whether the force mirrors its

---

[37] Defendants' Response to Plaintiff's Interrogatory No. 13.

CONFIDENTIAL

larger society, or whether the composition of the force relates in any way to a partner force (and certainly not to an enemy). Taiwan and America's NATO allies care whether the U.S. military can help if conflict erupts. The racial composition of the force is irrelevant.

In sum, I am aware of no evidence to support any of the Academy's assertions. There certainly isn't enough evidence to justify its admissions policy's marked departure from longstanding pillars of military culture and widely accepted principles of military readiness.

## VI.   The Academy's use of race imposes readiness costs without having any meaningful impact on the racial composition of the Navy or Marine officer corps.

*__Achieving Proportional Representation Among Officers.__* The central justification for the Academy's use of racial preferences in the first place is to achieve proportional representation in the officer corps. But its use of racial preferences cannot achieve this goal. The Academy produces fewer than one in five new Naval officers each year.[38] Its share of the Marine Corps officer pool is even smaller, as the Academy produces only one-sixth of new Marine second lieutenants each year.[39] Its matriculation of minority midshipman into the commissioned ranks of the Navy and Marine Corps would have to compensate for any shortfalls resulting from low

---

[38] Jatin G. Khona, et al., *Retention of Women in the Naval Officer Corps* United States Naval Institute (March 2022), https://perma.cc/T2YU-2TQR.
[39] Kyle P. McCarley, *Marine Corps Officer Modeling: Retention Analysis Based on Source of Accession* at p.9 Naval Postgraduate School (June 2021), https://perma.cc/U25M-FWNP.

CONFIDENTIAL

numbers in the other sources generating 80 to 85 percent of new officers. As a matter of basic math, there is simply no way for the Academy to move the needle in a meaningful way force wide.

**Harm to USNA's Institutional Credibility.** The Academy's use of race in admissions is not costless. On the contrary, it inflicts tangible harms to the military's institutional credibility, to morale and unit cohesion, and to the minority officers it is supposed to benefit.

The Academy's open and unapologetic preference for individuals of some races and ethnicities over others contradicts longstanding DoD policy that the military services will not discriminate or deny opportunities based on race, ethnicity, religion, or any other protected characteristic.[40]

But by tying the use of racial preferences to the makeup of the all-volunteer enlisted ranks and to the demographics of society at large, the Academy's policy perpetuates race as a characterization that differentiates people and for which allowances have to be made, which are at odds with DOD personnel policy that does not

---

[40] *See* Department of Defense Instruction 1350.02, *DOD Military Equal Opportunity Program* 4, Office of the Under Secretary of Defense for Personnel & Readiness, September 4, 2020; *see also* U.S. Navy, *Navy Harassment Prevention and Military Equal Opportunity*, MyNavy HR, https://perma.cc/6VLZ-XKF6 ("It is DoD and DON policy to prohibit harassment and prohibited discrimination against persons or groups based on race, color, religion, sex (including pregnancy), gender identity, national origin, or sexual orientation. This applies to, but is not limited to, recruitment, recruitment advertising, training, advancement and promotion, job assignments, collateral duties, transfers, and all other aspects of employment.").

CONFIDENTIAL

discriminate against classes of people, but presumably also does not favor classes of people.

**_Likelihood of Backlash and Resentment._** If the Academy's objective is to graduate a specific number of racial or ethnic minorities each year to achieve a desired representation of young officers in the service, and it weights race as a factor to achieve a certain level of representation in each entering class, how can anyone be assured that preferential treatment won't continue throughout a midshipmen's time at the Academy to ensure they graduate in the desired numbers? And once this precedent is established, how can anyone be certain that preferential treatment based on race won't continue throughout an officer's career? In fact, there is no logical reason why that _wouldn't_ be the case. If the objective is to have a force with a certain racial composition at all ranks, why would racial preferences be okay only at the beginning of someone's career and not throughout it?

As I stated earlier, to the extent such preferential treatment is known or suspected within the force, people will view a minority achieving rank or being selected for a billet with suspicion, thinking that the only reason the person was awarded such was because of their race, rather than earning it on competitive merit. This can quickly undermine their perceived legitimacy and authority, which leads to skepticism, cynicism, and loss of trust within the force.

CONFIDENTIAL

The end result for the force as a whole of preferential treatment at the beginning for some, is a military that is less cohesive, less trusting, less unified in its identity and common purpose, and less effective on the battlefield. This outcome, then, leads to loss of legitimacy and reputation among friend and foe alike.

The U.S. Naval Academy's use of race in its admissions process, in any way and at any time, is ultimately harmful to the good order and discipline of the force, harmful to the efficacy of the force in peace and war, and is injurious to the interests of the United States.

Dated: July 15, 2024                                /s/ Dakota L. Wood                    _

                                                    Dakota L. Wood, LtCol USMC (Ret)

CONFIDENTIAL

# APPENDIX A: CURRICULUM VITAE

**Dakota L. Wood, LtCol USMC (Ret)**

**U.S. National Security Analyst**

Proven record of outstanding performance in complex, highly sensitive, and extremely dynamic environments; routinely hand-selected by senior leaders for critical, high-visibility positions and projects. Extensive success in strategy, policy, and concept development at the highest levels of Military Service, Department of Defense, and nationally-recognized defense analytic community. Demonstrated ability to routinely challenge prevailing assumptions, effectively present alternative views – "communication skills unmatched." Exceptional ability to clearly and succinctly communicate complex issues to any audience: from highest-level decision makers to lay audiences.

**Expertise includes**:

- Complex problem identification, definition, and resolution
- Analysis of evolving global security environment, associated trends and implications for U.S. interests
- Development and analysis of Defense policy in context of national and international political environment
- Development and execution of strategic and operational concepts
- Cooperative planning, coordination, and execution of initiatives in military, government, and academic settings

**PROFESSIONAL EXPERIENCE:**

**OWNER/CEO, HOT GATES CONSULTING, LLC**                Feb 2024 to present

Providing services as a strategic analyst and developer of tactical implementation measures for policy recommendations; integrator of multi-contributor projects; lead writer for complex documents to make them accessible to the widest targeted audience; and organizer of, and facilitator for, conferences, workshops, and panel discussions.

- Spring 2024. Lead writer/strategist for the Global Tech Security Strategy, Global Tech Security Commission, organized by the Krach Institute for Tech Diplomacy at Purdue. Commission comprised of 38 leading technologists and globally-recognized industry leaders, representing a dozen critical tech sectors, 20 strategic lines of effort, and six countries, committed to ensuring that "technology advances freedom."

CONFIDENTIAL

### SENIOR RESEARCH FELLOW, DEFENSE PROGRAMS

**The Heritage Foundation** – Washington, DC          Jan 2014 to Mar 2024

Led the Foundation's analytic efforts pertaining to U.S. defense programs and military capabilities, Joint and Service operational concepts, and military posture (organizational and operational) to inform Heritage's defense policy recommendations and engagement in related public policy debate on national defense/national security matters.

- Originator and Senior Editor for Heritage flagship publication "Index of U.S. Military Strength," an authentically unique, comprehensive annual assessment of the status of America's military portfolio as it pertains to defending U.S. critical national security interests from relevant top-level threats. Conceived, shaped, and managed the development of the Index that annually involved over twenty authors/contributors plus editing/publication staff and marketing efforts. Index is now in its tenth edition.

- Originator and lead author of Heritage's "Rebuilding America's Military Project (RAMP)," a series of papers addressing the future of America's military services. Authored the first two papers—*Thinking About the Future*, and *The United States Marine Corps*—establishing the model and intellectual framework for the remaining papers.

- Author of numerous articles on defense and national security matters, routinely gave presentations on same, and was engaged as a subject matter expert by Congress and media for expert commentary on defense and foreign affairs.

- Widely recognized subject matter expert on defense and national security matters within the Washington DC defense analytic/think tank community.

### STRATEGIST

**U.S. Marine Corps Forces Special Operations Command** Nov 2012 to Dec 2013

Responsible for advising the Commander on strategic level guidance and policies affecting the future of MARSOC missions, capabilities, and programs to include the political, military, and foreign affairs aspects of strategy, plans, and policy germane to the development and execution of MARSOC initiatives and employment.

- Within five months of assuming position, personally organized, developed, and facilitated the execution of a critical, senior level, classified wargame that explored options for integrating the capabilities of special operations and forward-deployed maritime expeditionary forces in support of Geographic Combatant Commander requirements; exercise culminated in Commander U.S. SO-COM, Commandant of the Marine Corps, and Vice Chief of Naval Operations

CONFIDENTIAL

concurrence on a series of limited objective experiments leading to force-wide implementation of concept.

- Instrumental in shaping organizational position on and explanation of the role, utility, and force enabling aspects of forward-deployed Marine Corps Special Operations Forces in support of special and conventional operations.

- During this period, authored "After the Wars, New Battlefronts for the Marine Corps," published by The American Interest (April 2013), outlining challenges facing the Corps after a decade of sustained combat operations.

### CANDIDATE FOR U.S. CONGRESS, OKLAHOMA'S SECOND DISTRICT

**Oklahoma's Second Congressional District**               Oct 2011 to June 2012

Gained extensive experience in public relations, development and dissemination of key messages via multiple media formats (to include social media), fundraising, organization development, and campaign model/strategy from concept to implementation and execution. Even competitors noted the quality and integrity of effort, impeccable career of public service, and personal knowledge of/and experience with the widest range of issues and challenges affecting the U.S.

### SENIOR FELLOW                                               Dec 2006 to Sep 2011

**Center for Strategic and Budgetary Assessments** – Washington, DC

Nationally recognized 'thought leader' in expert analysis of U.S. defense and national security strategies for senior leaders of the Department of Defense, military Services, the National Intelligence Community, federal law enforcement, various agencies supporting the U.S. Congress, and private industry with particular emphasis on land warfare, irregular warfare, and defense transformation issues.

- Led or materially contributed to numerous seminar-style wargames for various Department of Defense sponsors, with topics that included: Conventional operations against a nuclear-armed adversary; Operational challenges of a protracted global irregular warfare (IW) campaign; Tactical, operational, and strategic implications of the proliferation of advanced technologies and weapons to many more potential adversaries; Evolving security challenges within the Western Hemisphere; and Development of transformation strategies to improve the ability of the U.S. military to protect the U.S. and its interests against any adversary, under any conditions, anywhere in the world.

- Co-authored the highly influential monograph, "Of IEDs and MRAPs: Force Protection in Complex Irregular Operations," that addressed the challenges of conducting operations in complex operational environments. Authored an equally influential monograph, "The U.S. Marine Corps: Fleet Marine Forces

CONFIDENTIAL

for the 21st Century" and widely read and distributed essay, "Caught on a Lee Shore," published in The American Interest (Sept-Oct 2010), outlining the various challenges facing the U.S. Marine Corps at those times and providing recommendations for adjusting USMC programs and initiatives accordingly.

**SENIOR STAFF**                                                    Aug 2005 to Dec 2006

**National Security Affairs Group, Systems Planning and Analysis, Inc** – Alexandria, VA

Proven performance in assisting clients to define and understand complex issues and the implications of issue resolution, to include: articulation of desired objectives or end-state, development of an effective plan or process to achieve stated objectives, and development and implementation of the tools necessary for successful plan execution.

- Co-developed and served as Operations Officer for the National Biosurveillance Integration System, Dept. of Homeland Security (DHS). Responsible for conducting mission analysis, concept of operations development, creation of operational tools and processes and assisting with policy development and interagency support agreements. Led the operations team that acquired, integrated, and analyzed biosurveillance information and disseminated resulting products to stakeholders across the Federal government.
- Led development of a detailed process by which the Risk Management Division of DHS could conduct mission area analyses to determine program portfolio effectiveness and relevance.
- Initiated and guided development of a conceptual framework and analytic methodology for assessing and analyzing terrorist threat streams. Analytic products included a risk mitigation strategy supported by policy and regulatory recommendations and intelligence collection cueing.

**EXECUTIVE OFFICER**                                                    2003 to 2005

**U.S. Marine Corps Detachment** – Ft. Leonard Wood, MO

Directed the daily and long-range staff actions of a 300-person command–the largest standing detachment in the Marine Corps–charged with training 6,500 Marines annually in a multi-service training environment. Supervised all critical staff actions pertaining to operations, training, administration, supply and general logistics support as well as development of a $1.4 million budget and management of $5.5 million in assets.

**MILITARY ASSISTANT TO THE DIRECTOR**                                  2001 to 2003

**Office of Net Assessment, Office of the Secretary of Defense** – Washington, DC

Personally selected by the Commandant of the Marine Corps to serve as USMC representative to the Director. Duties included accomplishing comparative analysis of military, technological, political, economic, and other factors governing the relative military capabilities of nations, with specific focus on identifying emerging or potential threats and opportunities for the United States. Noted for contributions to the policy and strategy advice provided by the Office of Net Assessment to the Secretary of Defense and other senior decision makers.

- Developed a plan to assess near term and future Asian security issues, initiating a 'net assessment' study of military balance trends in Asia focusing on the historical change of the military condition of the region over time, extrapolating possible future trends, and deriving implications for relevant U.S. military capabilities and concepts.
- Developed a comprehensive bilateral US-Israel conference on urban warfare.
- Initiated an effort to study emerging unconventional nuclear warfare issues.
- Co-led effort to develop new methods and techniques of visualizing and depicting trends and change in global military and broader security conditions over time.

STRATEGIC ANALYST                                                    1999 to 2001

**Strategic Initiatives Group, Headquarters Marine Corps** – Washington, DC

Excelled at continuous analysis of a wide range of defense, policy, and political issues affecting the strategic direction of the Marine Corps. Responsible for rapid generation of a variety of papers, speeches, and briefs for the Commandant and executive leadership of the Marine Corps. Routinely recognized for "unmatched" and "penetrating" insight.

- Led the establishment and cultivation of a critical, sensitive network of leading national security experts to keep CMC and USMC senior leaders informed of emerging issues with potential to impact the Marine Corps and the U.S.
- Principal briefer for numerous, diverse presentations lauded by CMC and senior USMC leadership.

LOGISTICS OFFICER                                                    1994 to 1997

**26th Marine Expeditionary Unit (Special Operations Capable)** – MCB Camp Lejeune, NC

Led a highly experienced team of logistics planners and supply, financial, maintenance, and transportation specialists in providing the full range of support necessary for a deployed air-ground combat task force of 2,100 Marines and Sailors to be successful in a

wide variety of operational environments having international visibility. Cited for outstanding leadership and extraordinary planning and organizational skills.

- Led logistical support planning and execution for non-combatant evacuation and humanitarian assistance operations (NEO/HA) in Albania – **Operation SILVER WAKE** (1997) – and for a potential NEO in Zaire – **Operation GUARDIAN RETRIEVAL** (1997).

**AVIATION GROUND SUPPORT COORDINATOR, LOGISTICS, AND TRANSPORTATION OFFICER**                                                                   1986 to 1994
Various Leadership and Managerial Assignments – Headquarters Marine Corps (Wash DC), Hawaii, Japan, South Korea

## SELECT MAJOR OPERATIONAL EXPERIENCE:

**Operation IRAQI FREEDOM** (2003) – Recruited by name to both augment and lead operational analysis and logistical planning and execution efforts for logistics support to I MEF combat forces.

- Cited for role in spearheading analysis and preparations for, and execution of, extended range sustainment of major combat forces; noted for ability to maintain exceptional performance level under extremely adverse conditions.

**Operation ENDURING FREEDOM** (2001-2002) – Hand-selected to represent the Marine Corps within an exclusive team of theater-level planners requested by the Combatant Commander, U.S. Central Command. Cited as a "Principal Author" and the "Lead Operational Planning Element Member" for the logistics concept of support for combat operations in Afghanistan.

- Developed the logistics concept of support and provided logistics sustainability analysis for numerous classified and compartmentalized plans. "Planner of choice" for several compartmentalized plans.

- Selected to be lead logistics planner for non-combatant evacuation operations and WMD counter-proliferation plans; orchestrated logistics support for the bed-down of special operations forces in Uzbekistan and Pakistan in the early phases of Operation ENDURING FREEDOM.

**Operations DESERT SHIELD/DESERT STORM** (1991) – Conducted strategic and operational level logistical support planning at Headquarters Marine Corps in support of Marine Aviation forces deployed in theater. Hand-selected for Departmental-level team tasked to conduct in-theater, post-combat operational analysis of aviation ground support.

## EDUCATION:

CONFIDENTIAL

**B.S. – Oceanography**, U.S. Naval Academy, Annapolis, MD, 1985

**M.A. – National Security and Strategic Studies**, U.S. Naval War College, Newport, RI, 1998

- Graduated with Distinction
- Led winning team that received the James V. Forrestal award for "Excellence in Strategy and Force Planning"

**Honor Graduate – School of Advanced Warfighting**, Marine Corps U., Quantico, VA, 1999

- Selected by peers to receive the General Clifton B. Cates Award for Academic Excellence

CONFIDENTIAL

# APPENDIX B: PUBLICATIONS

### *Index of U.S. Military Strength*

Dakota L. Wood, ed., *The 2024 Index of U.S. Military Strength*, The Heritage Foundation, January 2024, https://www.heritage.org/sites/default/files/2024-01/2024_IndexOfUSMilitaryStrength_0.pdf

Dakota L. Wood, ed., *The 2023 Index of U.S. Military Strength*, The Heritage Foundation, October 2023, https://www.heritage.org/sites/default/files/2022-10/2023_IndexOfUSMilitaryStrength.pdf

Dakota L. Wood, ed., *The 2022 Index of U.S. Military Strength*, The Heritage Foundation, September 2021, https://www.heritage.org/sites/default/files/2021-09/2022_IndexOfUSMilitaryStrength.pdf

Dakota L. Wood, ed., *The 2021 Index of U.S. Military Strength*, The Heritage Foundation, November 2020, https://www.heritage.org/sites/default/files/2020-11/2021_IndexOfUSMilitaryStrength_WEB_0.pdf

Dakota L. Wood, ed., *The 2020 Index of U.S. Military Strength*, The Heritage Foundation, November 2019, https://www.heritage.org/sites/default/files/2019-11/2020_IndexOfUSMilitaryStrength_WEB.pdf

Dakota L. Wood, ed., *The 2019 Index of U.S. Military Strength*, The Heritage Foundation, September 2018, https://www.heritage.org/sites/default/files/2018-09/2019_IndexOfUSMilitaryStrength_WEB.pdf

Dakota L. Wood, ed., *The 2018 Index of U.S. Military Strength*, The Heritage Foundation, October 2017, https://www.heritage.org/sites/default/files/2017-10/2018_IndexOfUSMilitaryStrength-2.pdf

Dakota L. Wood, ed., *The 2017 Index of U.S. Military Strength*, The Heritage Foundation, October 2016, https://www.scribd.com/document/331733871/2017-Index-of-Military-Strength-Heritage-pdf

Dakota L. Wood, ed., *The 2016 Index of U.S. Military Strength*, The Heritage Foundation, November 2015, https://s3.amazonaws.com/ims-2016/PDF/2016_Index_of_US_Military_Strength_FULL.pdf

CONFIDENTIAL

Dakota L. Wood, ed., *The 2015 Index of U.S. Military Strength*, The Heritage Foundation, January 2015, https://archive.org/details/isbn_9780891952886/mode/2up

### *Papers*

Dakota L. Wood, *Military Might: Are We Still a Superpower?*, Jewish Policy Center *in*Focus Quarterly, October 3, 2022, https://www.jewishpolicycenter.org/2022/10/03/military-might-are-we-still-a-superpower/

Frederico Bartels, ed., *Improving the National Defense Authorization Act for Fiscal Year 2022*, The Heritage Foundation Backgrounder No. 3673, December 3, 2021, https://www.heritage.org/sites/default/files/2021-12/BG3673.pdf

Dakota Wood, *The U.S. Marine Corps: A Service in Transition*, The Heritage Foundation Backgrounder No. 3501, June 16, 2020, https://www.heritage.org/sites/default/files/2020-06/BG3501_0.pdf

Frederico Bartels, Patty-Jane Geller, et al., *Assessing the Pentagon's Fiscal Year 2021 Budget Request*, The Heritage Foundation Backgrounder No. 3478, April 1, 2020, https://www.heritage.org/sites/default/files/2020-03/BG3478.pdf

Frederico Bartels, ed., *How the 2021 National Defense Authorization Act and the Defense Appropriations Act Can Prepare the U.S. for Great Power Competition*, The Heritage Foundation Special Report No. 222, March 23, 2020, https://www.heritage.org/sites/default/files/2021-03/SR222.pdf

Frederico Bartels, Thomas Callender, et. al., *How Congress Can Improve the President's 2020 Defense Budget Request*, The Heritage Foundation Backgrounder No. 3402, March 27, 2019, https://www.heritage.org/sites/default/files/2019-03/BG3402.pdf

Dakota L. Wood, *Rebuilding America's Military: The United States Marine Corps*, The Heritage Foundation Special Report No. 211, March 21, 2019, https://www.heritage.org/sites/default/files/2019-03/SR211_0.pdf

Dakota L. Wood, *Rebuilding America's Military: Thinking About the Future*, The Heritage Foundation Special Report No. 203, July 24, 2018, https://www.heritage.org/sites/default/files/2018-07/SR-203_web_0.pdf

CONFIDENTIAL

Thomas Spoehr, Frederico Bartels, et al., *House and Senate Make Strong Start Toward the 2019 NDAA*, The Heritage Foundation Issue Brief No. 4869, June 25, 2018, https://www.heritage.org/sites/default/files/2018-06/IB4869.pdf

Frederico Bartels, ed., *How Congress Can Improve the 2019 President's Budget Request for Defense*, The Heritage Foundation Backgrounder No. 3303, March 30, 2018, https://www.heritage.org/sites/default/files/2018-03/BG3303_0.pdf

Frederico Bartels, ed., *The 2019 NDAA Must Continue to Rebuild the Military and Make It More Efficient*, The Heritage Foundation Special Report No. 198, February 9, 2018, https://www.heritage.org/sites/default/files/2018-02/SR-198_1.pdf

Justin Johnson, Ted Bromund, et al., *The 2017 NDAA Should Begin Rebuilding America's Military*, The Heritage Foundation, March 27, 2016, https://www.heritage.org/defense/report/the-2017-ndaa-should-begin-rebuilding-americas-military

Dakota Wood, Charlotte Florance, and James Philiips, *Intervention in Libya: Lessons in Leading*, The Heritage Foundation, April 7, 2015, https://www.heritage.org/africa/report/intervention-libya-lessons-leading

James Carafano, Dakota Wood, et. al., *National Security Priorities for the Next Secretary of Defense*, The Heritage Foundation, November 26, 2014, https://www.heritage.org/defense/report/national-security-priorities-the-next-secretary-defense

Nile Gardner, James Carafano, et al., *After the Malaysian Airlines Atrocity: 10 Ways the U.S. Should Respond to Russia's Role in Ukraine*, The Heritage Foundation, July 22, 2014, https://www.heritage.org/europe/report/after-the-malaysian-airlines-atrocity-10-ways-the-us-should-respond-russias-role

Dakota L. Wood, *After the Wars: New Battlefronts for the Marine Corps*, The American Interest, April 12, 2013, https://www.the-american-interest.com/2013/04/12/after-the-wars-new-battlefronts-for-the-marine-corps/

Dakota L. Wood, *Caught on a Lee Shore*, The American Interest, September 1, 2010, https://www.the-american-interest.com/2010/9/1/caught-on-a-lee-shore/

CONFIDENTIAL

Dakota L. Wood, *The U.S. Marine Corps: Fleet Marine Forces for the 21st Century*, Center for Strategic and Budgetary Assessments, November 17, 2008, https://csbaonline.org/uploads/documents/2008.11.17-US-Marine-Corps.pdf

Andrew F. Krepinevich and Dakota L. Wood, *Of IEDs and MRAPS: Force Protection in Complex Irregular Operations*, Center for Strategic and Budgetary Assessments, October 17, 2007, https://csbaonline.org/uploads/documents/2007.10.17-Of-IEDs-and-MRAPs.pdf

Dakota L. Wood, *Organization of Joint Forces: Componency Doctrine for the Operational Commander*, U.S. Naval War College, February 13, 1998, https://apps.dtic.mil/sti/tr/pdf/ADA348538.pdf

### *Articles*

Dakota Wood, "The U.S. Marines: They've Got the Answer, but Not the Ships," Real Clear Defense, June 18, 2024, https://www.realcleardefense.com/2024/06/18/the_us_marines_theyve_got_the_answer_but_not_the_ships_1038724.html

Dakota Wood, "In 2024, the U.S. Military is Weak…and That Should Scare You," The National Interest, February 13, 2024, https://nationalinterest.org/blog/buzz/2024-us-military-weak…and-should-scare-you-209335

Cully Stimson and Dakota Wood, "New Department of Defense Rule Neuters the Brave Men and Women Who Serve in the Armed Forces," The Daily Signal, September 1, 2023, https://www.dailysignal.com/2023/09/01/new-department-defense-rule-requires-highest-military-awards-use-gender-neutral-pronouns/

Dakota Wood, "D-Day May Not Be an Official Holiday, but It Deserves Reverence Akin to That of Memorial Day," The Daily Signal, June 5, 2023, https://www.dailysignal.com/2023/06/05/remembering-d-day-liberation-europe-saving-western-world/

Dakota Wood, "In Praise of Americans Who Have Given Their All," The Daily Signal, May 26, 2023, https://www.dailysignal.com/2023/05/26/in-praise-of-americans-who-have-given-their-all/

Dakota Wood, "A Year After Russia Invaded Ukraine, What Does This War Teach Us?," The Daily Signal, March 8, 2023,

CONFIDENTIAL

https://www.dailysignal.com/2023/03/08/a-year-after-russia-invaded-ukraine-what-does-this-war-teach-us/

Dakota Wood, "Attack of the Balloons! Inflated Peril or Real World Danger?," The Daily Signal, February 15, 2023, https://www.dailysignal.com/2023/02/15/attack-of-the-balloons-inflated-peril-or-real-world-danger/

Dakota Wood, "Continuing U.S. and Allied Military Support to Ukraine," The Heritage Foundation Fact Sheet No. 243, February 14, 2023, https://www.heritage.org/sites/default/files/2023-02/FS243_0.pdf

Dakota L. Wood, "Is Biden's Pentagon and warfighting organization? Amid China threat, you have to wonder," FoxNews.com, February 7, 2023, https://www.foxnews.com/opinion/biden-pentagon-warfighting-organization-amid-china-threat-wonder

Dakota Wood, "Yes, The U.S. Military Is Weak," 1945, October 26, 2022, https://www.19fortyfive.com/2022/10/yes-the-u-s-military-is-weak/

Dakota Wood, "The U.S. Marine Corps Has a Choice: Transform or Die," Defense One, Oct 16, 2022, https://www.defenseone.com/ideas/2022/10/us-marine-corps-transform-or-die/378464/

Dakota Wood, "Why Putin's Delusional Nuclear Gambit Can't Be Dismissed Out of Hand," The Daily Signal, October 4, 2022, https://www.dailysignal.com/2022/10/04/why-putins-delusional-nuclear-gambit-cant-be-dismissed-out-of-hand/

Dakota L. Wood, "Navy Secretary's One-Year Status Report Talks About Everything…Except Sea Power," Real Clear Defense, September 1, 2022, https://www.realcleardefense.com/articles/2022/09/01/navy_secretarys_one-year_status_report_talks_about_everything_except_sea_power_851269.html

Dakota Wood, "One Year Later: Heroism and Horror at Afghanistan's Abbey Gate," The National Interest, August 26, 2022, https://nationalinterest.org/feature/one-year-later-heroism-and-horror-afghanistan's-abbey-gate-204386

Dakota Wood, "Biden's Fairy-Tale View of Land Mines Threatens the Lives of Our Armed Forces," The Daily Signal, June 29, 2022, https://nationalinterest.org/feature/one-year-later-heroism-and-horror-afghanistan's-abbey-gate-204386

CONFIDENTIAL

Dakota Wood, "Joe Biden's 'Minor Incursion' Russia Remark: History Proves It Was A Mistake," 1945, January 24, 2022, https://www.19fortyfive.com/2022/01/joe-bidens-minor-incursion-russia-remark-history-proves-it-was-a-mistake/

Thomas Spoehr, Dakota Wood, et al, "6 More Items on Our Christmas National Defense Wish List," The Daily Signal, December 15, 2021, https://www.dailysignal.com/2021/12/15/6-more-items-on-our-christmas-national-defense-wish-list/

Thomas Spoehr, Dakota Wood, et al, "7 Items on Our Christmas National Defense Wish List," The Daily Signal, December 14, 2021, https://www.dailysignal.com/2021/12/14/7-items-on-our-christmas-national-defense-wish-list

Dakota Wood, "Joe Biden's Global Posture Review Was A Nothingburger," 1945, December 9, 2021, https://www.19fortyfive.com/2021/12/joe-bidens-global-posture-review-was-a-nothingburger/

Thomas Spoehr, Luke Coffey, and Dakota Wood, "5 Questions Congress Must Ask Austin, Milley, McKenzie About Afghanistan Pullout Debacle," The Daily Signal, September 27, 2021, https://www.dailysignal.com/2021/09/27/5-questions-congress-must-ask-austin-milley-mckenzie-about-afghanistan-pullout-debacle

Dakota Wood, "Critical Race Theory Will Destroy Our Military," The Daily Signal, June 16, 2021, https://www.dailysignal.com/2021/06/16/critical-race-theory-will-destroy-our-military/

Dakota Wood and Mike Gonzalez, "The woke takeover of the US military endangers us all," New York Post, May 23, 2021, https://nypost.com/2021/05/23/the-woke-takeover-of-the-us-military-endangers-us-all/

Dakota Wood, "America and Its Allies are Unprepared for the Next Great War," The National Interest, May 8, 2021, https://nationalinterest.org/feature/america-and-its-allies-are-unprepared-next-great-war-184533

Dakota Wood, "Real Defense Budgets and Imaginary Worlds," Real Clear Defense, May 5, 2021, https://www.realcleardefense.com/articles/2021/05/05/real_defense_budgets_and_imaginary_worlds_775825.html

**CONFIDENTIAL**

Dakota Wood, "Identity Politics and Critical Race Theory Have No Place in US Military," The Daily Signal, March 29, 2021, https://www.dailysignal.com/2021/03/29/identity-politics-and-critical-race-theory-have-no-place-in-us-military

Dakota Wood, "When Climate Change Distracts the U.S. Military," Washington Times, December 7, 2020, https://www.washingtontimes.com/news/2020/dec/7/when-climate-change-distracts-the-us-military/

Dakota Wood, "The Myth of Endless Wars," The National Interest, October 31, 2020, https://nationalinterest.org/feature/myth-endless-wars-171712

Dakota Wood, "The Status of US Military Power in 2020," The Daily Signal, October 15, 2020, https://www.dailysignal.com/2020/10/15/the-status-of-us-military-power-in-2020/

Dakota Wood, "Strengthening America's Armed Forces," The Daily Signal, September 23, 2020, https://www.dailysignal.com/2020/09/23/strengthening-americas-armed-forces-military/

Dakota Wood, "Increasing Defense Budgets to Maintain America's Military Security a Priority," The Heritage Foundation (reprint from The Washington Times), September 18, 2020, https://www.heritage.org/defense/commentary/increasing-defense-budgets-maintain-americas-military-security-priority

Dakota Wood, "Let's Keep the NDAA Focused on Defense," Real Clear Defense, August 1, 2020, https://www.realcleardefense.com/articles/2020/08/01/lets_keep_the_ndaa_focused_on_defense_115512.html

Dakota Wood, "This Is Not Your Parents' Military. We Can't Fund It the Same Way," Defense One, July 27, 2020, https://www.defenseone.com/ideas/2020/07/not-your-parents-military-you-cant-fund-it-same-way/167151/

Dakota Wood, "The price of cutting defense spending," Washington Times, July 20, 2020, https://www.washingtontimes.com/news/2020/jul/20/the-price-of-cutting-defense-spending/

Dakota Wood, "The Marines: To Boldly Go Where the Corps Has Gone Before," The Washington Times, June 26, 2020, https://www.washingtontimes.com/news/2020/jun/24/marines-boldly-go-where-corps-has-gone/

CONFIDENTIAL

Dakota Wood and Thomas Spoehr, "The Navy Was Right To Fire Capt. Crozier Over His Coronavirus Warnings," The National Interest, April 15, 2020, https://nationalinterest.org/blog/buzz/navy-was-right-fire-capt-crozier-over-his-coronavirus-warnings-144162

Dakota Wood, Thomas Spoehr, et al, "In the Wake of the USS Theodore Roosevelt Fracas, Some Insights on Military Protocols and Leadership," The Daily Signal, April 13, 2020, https://www.dailysignal.com/2020/04/13/in-the-wake-of-the-uss-theodore-roosevelt-fracas-some-insights-on-military-protocols/

Dakota Wood, "Pandemic in 2020: Dark Times Lead to Brighter Days," The Daily Signal, March 26, 2020, https://www.dailysignal.com/2020/03/26/pandemic-in-2020-dark-times-lead-to-brighter-days/

Dakota Wood, "Distancing, Quarantine, Isolation: Tools to Combat a Pandemic," The Daily Signal, March 23, 2020, https://www.dailysignal.com/2020/03/23/distancing-quarantine-isolation-tools-to-combat-a-pandemic/

Thomas Spoehr, Dakota Wood, et al., "The Case of Navy SEAL Eddie Gallagher: Trusting the Military Justice System and Its Essential Role in National Security," The Daily Signal, December 5, 2019, https://www.dailysignal.com/2019/12/05/the-case-of-navy-seal-eddie-gallagher-trusting-the-military-justice-system-and-its-essential-role-in-national-security/

Dakota Wood, "Is America's Military Headed for a "Rocky" Experience?," The Philadelphia Inquirer, November 6, 2019, https://www.inquirer.com/opinion/commentary/america-russia-relations-defense-spending-rocky-20191106.html

Dakota Wood, "Mayday, Mayday: Is the U.S. Military Old and Worn Out?," The National Interest, October 29, 2019, https://nationalinterest.org/blog/buzz/mayday-mayday-us-military-old-and-worn-out-91901

Dakota Wood, "In a War Against China, Numbers Tell Only Part of the Story," The Heritage Foundation (reprinted from The Washington Times), September 18, 2019, https://www.heritage.org/defense/commentary/war-against-china-numbers-tell-only-part-the-story

**CONFIDENTIAL**

Dakota Wood, "In Military Affairs, Quantity Really Does Matter," The Daily Signal, August 18, 2019, https://www.dailysignal.com/2019/08/18/in-military-affairs-quantity-really-does-matter/

Dakota Wood and James Phillips, "The Syria Safe Zone Will Cripple the Kurds," The National Interest, August 15, 2019, https://nationalinterest.org/blog/middle-east-watch/syria-safe-zone-will-cripple-kurds-73916

Dakota Wood, "Iran Took Advantage of the Royal Navy's Weakness," The National Interest, July 28, 2019, https://nationalinterest.org/feature/iran-took-advantage-royal-navys-weakness-69132

Dakota Wood, "What Ross Perot Gave to America," The Daily Signal, July 10, 2019, https://www.dailysignal.com/2019/07/10/what-ross-perot-gave-to-america/

Dakota Wood, "What It Will Take to Rebuild and Sustain the Military," The Daily Signal, June 17, 2019, https://www.dailysignal.com/2019/06/17/what-it-will-take-to-rebuild-and-sustain-the-military/

Dakota Wood, "Lessons Learned: The Legacy of Andrew W. Marshall," The Daily Signal, April 9, 2019, https://www.dailysignal.com/2019/04/09/lessons-learned-the-legacy-of-andrew-w-marshall/

Dakota Wood, "The U.S. Marine Corps Faces Hard Decisions Ahead," The Washington Times, March 4, 2019, https://www.washingtontimes.com/news/2019/mar/4/us-marine-corps-faces-hard-decisions-ahead/

Dakota Wood, "Today is the Marine Corps' Birthday. And I Could Not Be More Proud," The National Interest, November 10, 2018, https://nationalinterest.org/blog/buzz/today-marine-corps-birthday-and-i-could-not-be-more-proud-35807

Dakota Wood, "Our Shrinking and Overworked Military Can Barely Pass Inspection," The Heritage Foundation (reprint from The Chicago Tribune), October 8, 2018, https://www.heritage.org/defense/commentary/our-shrinking-and-overworked-military-can-barely-pass-inspection

CONFIDENTIAL

Dakota Wood, "The Case for Rebuilding the U.S. Military," The Washington Times, July 30, 2018, https://www.washingtontimes.com/news/2018/jul/30/the-case-for-rebuilding-the-us-military/

Dakota L. Wood, "The Story Gathers and America Is Unready," War on the Rocks, October 11, 2017, https://warontherocks.com/2017/10/the-storm-gathers-and-america-is-unready/

Dakota Wood, "U.S. Military in a Death Spiral," The Heritage Foundation (reprint from the Sacramento Bee), October 8, 2017, https://www.heritage.org/defense/commentary/us-military-death-spiral

Dakota Wood, "US remains the world's most dominant military power. But that power is dwindling rapidly," Fox News, October 5, 2017, https://www.foxnews.com/opinion/us-remains-the-worlds-most-dominant-military-power-but-that-power-is-dwindling-rapidly

Dakota Wood, "Failure to Adequately Fund Our Military Puts America at Risk," The Daily Signal, October 4, 2017, https://www.dailysignal.com/2017/10/04/failure-adequately-fund-military-puts-america-risk/

Dakota Wood, "Military Expansion Goals: Big, Modern, Ready," The Heritage Foundation, February 27, 2017, https://www.heritage.org/defense/commentary/military-expansion-goals-big-modern-ready

Dakota Wood, "U.S. Defense Budget for Fiscal Year 2018," Testimony before the Senate Armed Services Committee, U.S. Senate, January 24, 2017, https://www.heritage.org/testimony/us-defense-budget-fiscal-year-2018

Dakota Wood, "The Heritage Foundation's Recommendations for U.S. Military Force Levels," The Heritage Foundation, September 8, 2016, https://www.heritage.org/defense/commentary/the-heritage-foundations-recommendations-us-military-force-levels

Dakota Wood, "The Obama Doctrine: Where Too Little Meets Too Late," The National Interest, March 30, 2016, https://nationalinterest.org/feature/the-obama-doctrine-where-too-little-meets-too-late-15621

Dakota Wood, "Destroying ISIS: Consequences, Implications, and Concerns," The Philadelphia Inquirer, December 6, 2015,

CONFIDENTIAL

https://www.inquirer.com/philly/opinion/currents/20151206_To_beat_Islamic_State__U_S__needs_ground_troops_and_a_long-term_occupation_plan.html

Dakota Wood, "The Real Problem with America's Military," The National Interest, May 22, 2015, https://nationalinterest.org/feature/the-real-problem-americas-military-12944

Dakota Wood, "A weak America is a recipe for disaster," The Heritage Foundation (reprint from Stars and Stripes), March 3, 2015, https://www.heritage.org/defense/commentary/weak-america-recipe-disaster

Dakota Wood, "The Dangerous Allure of Advanced Technology," The Daily Signal, December 3, 2014, https://www.dailysignal.com/2014/12/03/dangerous-allure-advanced-technology/

Dakota Wood, "America's Options: Combating ISIS in Iraq," The National Interest, June 13, 2014, https://nationalinterest.org/feature/americas-options-combating-isis-iraq-10658

Diem Salmon and Dakota Wood, "Congress Should Support the Marines' New Amphibious Combat Vehicle Plan," The Heritage Foundation, April 23, 2014, https://www.heritage.org/defense/report/congress-should-support-the-marines-new-amphibious-combat-vehicle-plan

Dakota Wood and Brian Slattery, "Congress Should Avert Delays in the Army's Aviation Restructuring Plans," The Heritage Foundation, April 7, 2014, https://www.heritage.org/defense/report/congress-should-avert-delays-the-armys-aviation-restructuring-plans

Nile Gardiner, James Carafano, et. al., "If Russia Attacks: How the U.S. Should Respond to Further Aggression Against Ukraine," The Heritage Foundation, March 28, 2014, https://www.heritage.org/homeland-security/report/if-russia-attacks-how-the-us-should-respond-further-aggression-against

Dakota Wood, "America's Defense Death Spiral," The National Interest, March 2, 2014, https://nationalinterest.org/commentary/americas-defense-death-spiral-9980

## APPENDIX C: DOCUMENTS RELIED UPON OR CONSIDERED

In addition to the documents referenced in my report, I relied upon and/or considered the following documents:

- Verified complaint, Doc 1
- Defendants' memo, Doc 46
- Exhibit A, Doc 46-2
- Exhibit B, Doc 46-3
- Exhibit C, Doc 46-4
- Exhibit D, Doc 46-5
- Exhibit E, Doc 46-6
- Exhibit F, Doc 46-7
- Exhibit G, Doc 46-8
- Exhibit H, Doc 46-9
- Reply in Support of Motion for Preliminary Injunction, Doc 54
- Memorandum opinion, Doc 60
- Stipulated Protective Order, Doc 63
- Plaintiff's Memo of Law in Support of Motion for Preliminary Injunction, Doc 9-1
- Rebuttal Declaration of LTG Tom Spoehr, Doc 54-1.

## APPENDIX D: SUMMARY OF INTERVIEWS

### A.    Colonel James Reilly, USMC (Ret.)

Colonel Reilly and I were classmates while attending the Marine Corps' School of Advanced Warfighting in 1998-1999.

Over the course of Colonel Reilly's 30-year career, he earned direct experience in nearly every aspect of Marine Corps activities, in garrison and in the field, from recruit training, to conventional Marine Corps operations, to working with the special operations community, Marine Reserve Forces, and international partners in three major geographic regions (Europe, the Middle East, and as the Asia-Pacific), and in managing the service's officer corps. Highlights of his biographical record include:

- Leadership positions with four infantry battalions
- Chief of Staff positions for USMC headquarters associated with EUCOM, CENTCOM, and INDOPACOM
- Commander/Officer in Charge of Marine Corps force reconnaissance forces and special operations training elements
- Director for Marine Corps engagement efforts throughout the Pacific theater
- Organized, trained, and personally led advanced reconnaissance forces for the major Marine Corps combatant command during the invasion phase of Operation Iraqi Freedom

In drawing upon his extensive experiences working with Marines and the special operations components of the other services, composed of personnel from across the United States, and engaged in some of the most sensitive missions undertaken in combat operations, Col. Reilly has concluded that the racial composition of military

59

CONFIDENTIAL

units has nothing to do with their readiness for action or their performance in combat operations.

Unit effectiveness and team building are based on standards and by everyone involved meeting the standards set by the organization. So long as everyone understands the standard(s), sees them adhered to in practice, and all are equally required to meet them on an individual basis, then everyone accepts that expectation. When people are not held to a common standard or aren't expected to meet a standard—as can happen when any particular group or individual receives preferential treatment—it short-sells the individual and hazards the organization. Advancement by favor presumes the individual could not make it on their own merit; they receive that message and those around them also get that message, leading to frictions among everyone involved.

Over a 54-year period of his personal life—his father was a Marine, so the family moved multiple times, which continued when Reilly began own career—he was exposed to multiple settings, people, organizations, etc. Reilly's takeaway from all of this has been that leadership is central to success and that good leaders set the focus, tone, expectations, and example for everyone under their charge. For good leaders and great organizations, race is never an issue.

Recalling his time in command of 2nd Force Recon, he noted that the majority of Marines in the unit were White, but not because of preference, bias, or prejudice.

CONFIDENTIAL

Everyone who wanted to compete for a spot on the team had an equal opportunity to earn a position. The unit's composition was purely the result of skill sets and interests that resulted in many people dropping from the grueling evaluation process that was based exclusively on standards. You either met standards or you didn't.

His unit Sergeant Major was a Black Marine, "One of the finest Marines [Reilly] ever worked with and with whom [he] maintains contact to this day." His SgtMaj's success had nothing to do with race; it had everything to do with him being a "phenomenal leader." His SgtMaj had earned his promotions, positions, reputation, and the respect of his fellow Marines by virtue of hard work, meeting standards, and holding others accountable to the same. He would have been offended had anyone accused him of achieving his success through favorable treatment.

When Col. Reilly commanded HQ Bn, 3rd MARDIV, he found it to be almost the polar opposite of 2d FORRECON in mission, types of people, and occupational specialties. Rather than infantrymen, communications experts, explosives ordnance disposal techs, and combat corpsman, HQ Bn consisted of supply types, logisticians, engineers, and so forth. It was much more a cross-section of the Corps in backgrounds, races, and ethnicities. The unit was fantastic. His top subordinate commander was a Black officer who commanded Communications Company. His success, the example he set, the respect he earned, and the effectiveness of his unit had nothing to do with race; it had everything to do with leadership. Of his company

commanders, his top three consisted of two Black commanders and one Hispanic commander. Again, not because of race, but because of talent, hard work, and solid leadership. They were good because they were good, not because they were artificially placed into positions. Had it been otherwise—leaders placed in their position by preferential treatment—the unit would have suffered from a breakdown in trust, confidence, and a loss of faith in in fairness.

Col. Reilly emphasized that good leaders make themselves available to the unit. A good leader will know their people and be involved enough and attuned enough to know whether things are good or there are troubles, regardless of race. In other words, it doesn't require a minority officer to know whether there are race-related problems in his unit. Any good leader will sense when things aren't clicking as they should.

Reilly spent three years as a recruit company commander at MCRD San Diego, leading/overseeing 12 training cycles. During the summer, his team handled 80 recruits; during the winter, there were 40 recruits per cycle. He and his drill instructors "saw it all" in terms of a cross-section of America west of the Mississippi. All recruits were placed in open squad-bay barracks, all endured the same training, ate the same food, and had to deal with the same drill instructors. They came from different backgrounds, were raised differently, had different family and school settings, and represented different racial and ethnic groups. They didn't spend any time at all

CONFIDENTIAL

trying to "understand each other based on individual lived experiences." They had more than they could handle just surviving their new environment and learning they had to lean on each other for support and be willing to give such support, to see beyond themselves in order to succeed. What bound them together was the unifying aspect of standards. You either met them or you didn't, and if you didn't then the Drill Instructors would work with you to meet standards…but would not give a pass to someone who ultimately could not.[41]

In every case across 12 cycles, Reilly was inspired to see the success of young men (all male recruit training units in his case) brought together from diverse backgrounds and stripped of those different identities, to be remade as Marines with a commonly earned identity. The system/approach used at the Marine Corps Recruit Depots produced 'phenomenal single units' of trained Marines sharing a common identity and respect for each other and for the organization in which they had earned a place.

---

[41] Col. Reilly's experience at a recruit training depot dates back some 37 years ago. To see if anything has changed since then, if Reilly's observations are outdated, I interviewed my son, a young lance corporal serving as an 0311 Rifleman, with 1st Battalion, 8th Marines, currently deployed aboard the USS Wasp (LHD-1) with 24 MEU(SOC), somewhere in the Mediterranean. He trained at MCRD Parris Island, SC, during the Spring-Summer of 2022. Asked whether race was a factor in any training, relating to Drill Instructors, or team building within his platoon, he replied, "Dad, it was all we could do to make it from one meal to the next. The only thing we cared about was whether everyone in the squad or platoon was doing what they were supposed to do. It didn't matter who the DI was. (His senior drill instructor was Hispanic.) All you knew was that they were telling you to do something and you had to get it done and get it done the right way."

To the general argument that minorities see themselves in, and better connect with, others who look like them (race, ethnicity, etc.)—the Academy's assertion that young minority officers are needed in the fleet so that enlisted personnel can see someone who looks like them, thus enhancing trust and a unit's effectiveness—Col. Reilly believes that argument ignores the reality that outward appearance is a very poor predictor of "trust" or connection and is, in fact, a shallow way of thinking about unity, trust, and team effectiveness.

**B.    Colonel Stephen Davis, USMC (Ret.)**

Colonel Davis and I met while serving in the Strategic Initiatives Group, HQMC, 2000-2001. Similar to Col. Reilly, Colonel Steve Davis' experiences ran the gamut from command of Fleet Marine Force units to high-level staff assignments, and from the service's training grounds for new Marines to tight-knit units of the most elite U.S. special operations forces and close interaction with international part-ners in some of the most challenging combat actions in recent U.S. history.

In discussing the assertions that: the racial composition of a unit affects its performance; that the ratio of racial identity groups within the force should reflect that of the larger American public to enhance the force's legitimacy; and that the proportion of racial groups in the officer corps should roughly mirror that of the enlisted ranks so as to increase trust, the legitimacy of authorities, and to enhance the ability of minority groups to see potential for themselves, the Colonel had this to

say: "People should stop thinking about what divides us. Rather, they should think about how lucky we are to be Americans, devoid of hyphenation. America is not without flaws but is better than anything else out there. The professional finds facts, finds truth, and makes a reasoned assessment. For example, one cannot ignore the fact that half of the American population holds strong religious views. The point here is that some people have a preferred view of things and try to force others to become that reality. In doing this, they try to deny the reality that others live. 'Get rid of the hyphenation' – meaning that the view should be that we are all Americans, who do come from different backgrounds, yes, but by focusing and emphasizing those differences, we will always be divided and see each other through these differentiators instead of as fellow Americans. The priority seems to be placed on the difference rather than the common, when it should be reversed…the common at the front while acknowledging each has his own story."

He went on to say, "What does the Corps do better than anyone else? Take young Americans to boot camp and strip away these individual, differentiating identities, then rebuild young Marine recruits as 'Marines' according to 'our' [meaning the service's] values, principles, standards, etc. These youngsters become Marines…a common identity built on everyone, regardless of where they came from…everyone meeting common standards."

**CONFIDENTIAL**

Tom Ricks, the celebrated author, spent three months with Davis, when Davis was Director, Drill Instructor School, at MCRD Parris Island. Davis believes that Ricks got it right in his book, "Making the Corps." Ricks saw what it took to gain commonality among the recruits, how to instill a commonly shared identity as a Marine that supplanted individually held identities as Black, White, Hispanic, and so forth. The focus of DI's was to get everyone to think of themselves as an American and as a Marine rather than a hyphenated something else.

Does the racial composition of a unit affect its combat effectiveness? Davis hasn't seen it. When it comes to unit effectiveness, it is all about leadership. Do people with different backgrounds bring different perspectives? Absolutely. Any good commander will leverage such. But this is different than forcing a particular mix and expecting a specific outcome. By artificially promoting a person because of a characteristic, there is no guarantee that the person will be effective, even if they are a "really good person" in character, values, etc. It's about meeting standards and performing well.

Col Davis is stunned at what we are seeing in the war in Ukraine. He thinks people have forgotten what "real war" is like, with its losses and attrition. He believes that U.S. experiences in recent conflicts have led people to believe that combat is antiseptic, painless, and cost free; it isn't. War won't abide academic theories about racial composition or anything else that isn't standards-based and leadership-

focused. Davis had ample experience with casualties in Iraq: 111 KIA during his command of RCT-2, that included 80 Marines, 14 soldiers, 1 sailor, and 16 Iraqi Army. The U.S. Army's 3rd Battalion of the 25th Regiment worked for him. That unit took more KIA than any other unit in the war (at least to his knowledge). But these losses would pale in comparison to those in a war with China or Russia. All of this to say that standards, proven skills, hard training, and fairness across the board are what make units effective and the people within them connected in ways that far surpass similarities in skin color or racial identity.

Per Davis, the easiest job in the military is to take the worst platoon in any rifle company and give it good leadership. The racial composition of the unit or its leadership does not matter. A good leader sets the example, holds people to standards, imposes discipline, and cares for their people. Showing favoritism or preferential treatment or subdividing a team into constituent racial, ethnic, gender, or religious subsets is a recipe for disaster.

At the U.S. Naval Academy, the whole purpose of plebe year is to strip high school graduates down to nothing, down to a common denominator. They are no longer high performers in academics or sports, compared to former classmates in high school. They are now equally plebes, subject to the same grilling and following orders, and memorizing rates regardless of their varied backgrounds. Give everyone

the same opportunity? Yes. Ensure everyone has the same outcome? No. When you force a desired outcome, "you skew the deal."

**C.      Colonel Harold van OpDorp, USMC (Ret.)**

Col van OpDorp and I met while I was assigned to the Strategic Initiatives Group and he was assigned to the Current Operations Branch, PP&O, HQMC, 2000-2001. Highlights of his biographical record include: serving as Chief of Staff for the Under Secretary of Defense, Chief of Staff for the Secretary of the Navy, Deputy Legislative Assistant to the Commandant of the Marine Corps, and Division Chief on the Joint Staff (serving as the lead planner for combat operations in the Middle East). Col van OpDorp's crisis/combat experiences include operations Desert Shield, Desert Storm, Eastern Exit (the evacuation of diplomatic staff from Somalia in 1991), and Iraqi Freedom.

Colonel van OpDorp was assigned command of 1st Battalion, 24th Marines, a reserve battalion readying to deploy to Iraq (2006-2007), with only two-week's notice. He shared the following story to illustrate several points: His unit spent a great deal of time operating in Fallujah, the city at the center of some of the fiercest fighting during U.S. operations in that country. One of the Navy corpsman assigned to the battalion was a Hispanic sailor. In an attack on a combat patrol, a Marine was badly wounded. The corpsman was quick to provide life-saving treatment, making it possible to medevac the Marine to the nearest field hospital. The attending doctor

CONFIDENTIAL

made it a point to emphasize the exceptional treatment given by the corpsman, without which the Marine would have died. The corpsman, a reservist serving with 1/24, was an EMT at his regular job back in CONUS. He brought those elevated skills with him to the deployment. Colonel van OpDorp emphasized that the corpsman's contribution to the unit and his life-saving skills had nothing to do with him being Hispanic. His battlefield success had to do with his proficiency in his responsibilities, his attitude, and his commitment to being a team-player. No one in the unit cared about his race or ethnicity. They just wanted competent medical care.

For much of its deployment, 1/24's primary task was to lead, and support, rebuilding Fallujah. The unit became less a combat battalion—though everyone was trained and competent for such—and more a "small city department of public works." This circumstance brought to the fore all of the civilian experiences and career skills within and across the reserve battalion. The Marines weren't Black, White, Hispanic, or any other subgroup; they were Marines who had exceptional skills as electricians, plumbers, carpenters, and cops. It wasn't their individual identities that led to success in Fallujah, it was what each brought to the game and how they contributed to a common mission.

As has been observed by the other gentlemen previously mentioned, Col van OpDorp emphasized that unit effectiveness is about trust between leader and those led. Those who are led want to see consistency and equal justice in the commander's

approach to things, not favoritism of any sort. The commander sets conditions; he or she cannot look the other way when someone is falling short. A Marine might be a clown back in garrison but an excellent machine gunner in the field. The commander cannot ignore substandard performance in garrison just to keep a good machine gunner for when the unit deploys. And vice-a-versa: Keeping someone who is well-liked, easy going, and pleasant to be around but who cannot master the skills needed in operational setting does a disservice to the unit and, ultimately, a disservice to the Marine. Disparity in justice and in holding people accountable to a common standard always destroys trust and with it, unit cohesion and effectiveness.

Colonel van OpDorp was also quick to note that people look for challenges and will rise to a challenge if allowed to, especially young people who want to prove themselves in an adult world. When he was Director of Officer Candidate School, the Marine Corps changed its fitness evaluation program to include pullups for women. Up to this point, upper body strength and stamina for women was measured with the flexed-arm hang. The policy change was somewhat controversial in that some people feared women would score poorly in an event traditionally associated with men, which would result in lower fitness evaluations and, consequently, a decline in retention of women already in the Corps and a more difficult time in accessing women.

70

CONFIDENTIAL

After the decision was made, the incoming freshman college class (those interested in applying for OCS later in their college track) was told this was a new requirement: the class of 2014 would have to do pullups in OCS/PLC. The minimum number was 3 and the maximum (for the most points) was 8. The women's class in 2014 averaged 12+. The point here: young people will rise to a challenge if it is explained, mandated, and appropriate support and opportunity given to achieve it.

As stated by Col van OpDorp: "The service wants you here; you're now here. Here's what we expect of you. Give people the challenge, the opportunity to embrace it, and the resources to get the job done, and they'll amaze you with what they can accomplish. If you don't want to be here, fine. No obligation. But the organization can't, and shouldn't, lower standards to achieve a goal, presuming that the high standard will intimidate those who do want to be there from trying."