# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND
# NORTHERN DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS *Plaintiff*, <br><br> v. <br><br> THE UNITED STATES NAVAL ACADEMY, *et al.*, *Defendants.* | No. 1:23-cv-2699-RDB |

# OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* REGARDING PLAINTIFF'S EXPERT WITNESSES

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. i

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 2

    A.    SFFA's Opening Expert Reports. ................................................................. 2

    B.    The Naval Academy's Opening Expert Reports ....................................... 5

    C.    SFFA's Rebuttal Expert Reports ................................................................. 6

STANDARD OF REVIEW .................................................................................................. 6

ARGUMENT ...................................................................................................................... 7

    I.    The Court should not exclude the expert testimony of Brigadier General Walker and Wood. ................................................................................................. 7

        A.    The opinions of Brigadier General Walker and Wood are relevant to the issues in this case. ........................................................................... 8

        B.    The Court owes no deference to military officials' judgments when the military uses racial classifications. ........................................................ 10

        C.    Regardless of the deference due to the military, the Court cannot exclude the testimony of Brigadier General Walker and Wood. .................................... 15

    II.    The Court should not exclude portions of Wood's opinions as hearsay. ................. 18

    III.    The Court should not exclude Kahlenberg's opinions about the Coast Guard Academy. .................................................................................................................... 21

        A.    The Coast Guard opinion is relevant. .................................................... 21

        B.    The Coast Guard opinion is reliable. ..................................................... 23

CONCLUSION .................................................................................................................. 26

CERTIFICATE OF SERVICE ........................................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*720 Lex Acquisition LLC v. Guess? Retail, Inc.*,
No. 9-cv-7199, 2014 WL 4184691 (S.D.N.Y. Aug. 22, 2014) .................................. 7

*Adarand Constructors v. Peña*,
515 U.S. 200 (1995) ..................................................................................... 10, 13

*Berger v. Philip Morris USA Inc.*,
No. 9-cv-14157, 2014 WL 10715266 (M.D. Fla. Aug. 29, 2014) ......................... 20

*Berkley v. United States*,
287 F.3d 1076 (Fed. Cir. 2002) ........................................................................... 11

*Bresler v. Wilmington Tr. Co.*,
No. 9-cv-2957, 2015 WL 1396265 (D. Md. Mar. 24, 2015) .................................. 26

*Cammermeyer v. Aspin*,
850 F. Supp. 910 (W.D. Wash. 1994) .................................................................. 15

*Cap. Funding Grp., Inc. v. Zuccari*,
No. 19-cv-1272, 2021 WL 1339387 (D. Md. Apr. 9, 2021) ......................... 6, 7, 23

*Christian v. United States*,
46 Fed. Cl. 793 (2000) ........................................................................................ 11

*Contra Muñoz v. Orr*,
200 F.3d 291 (5th Cir. 2000) .............................................................................. 25

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ................................................................................. 8, 9, 10

*Deal v. Hamilton Cty. Bd. of Educ.*,
392 F.3d 840 (6th Cir. 2004) ............................................................................... 7

*Doe 2 v. Shanahan*,
755 F. App'x 19 (D.C. Cir. Jan. 4, 2019) ............................................................ 12

*Doe 2 v. Shanahan*,
917 F.3d 694 (D.C. Cir. 2019) ............................................................... 11, 16, 17

*Fisher v. Univ. of Tex. at Austin*,
570 U.S. 297 (2013) ..................................................................... 2, 10, 21, 23

*Goldman v. Weinberger*,
475 U.S. 503 (1986) .................................................................................... 12, 16

*Good v. Am. Water Works Co., Inc.*,
No. 4-cv-1374, 2016 WL 5441517 (S.D. W.Va. Sept. 26, 2016) .......................... 20

*Gratz v. Bollinger*,
539 U.S. 244 (2003) ........................................................................................... 10

*Grayson O Co. v. Agadir Int'l LLC,*
856 F.3d 307 (4th Cir. 2017) ................................................................................ 17

*Grutter v. Bollinger,*
539 U.S. 306 (2003) ............................................................................................. 18

*Hamdi v. Rumsfeld,*
542 U.S. 507 (2004) ............................................................................................. 14

*Hartmann v. Stone,*
68 F.3d 973 (6th Cir. 1995) .................................................................................. 14

*Hirabayashi v. United States,*
828 F.2d 591 (9th Cir. 1987) ................................................................................ 13

*In re TMI Litig.,*
193 F.3d 613 (3d Cir. 1999) ................................................................................. 25

*Johnson v. California,*
543 U.S. 499 (2005) ................................................................................ 10, 12, 13

*Jordan v. Town of Fairmount Heights,*
No. 22-cv-2680, 2024 WL 732011 (D. Md. Feb. 21, 2024) ................................. 25

*Korematsu v. United States,*
323 U.S. 214 (1944) ....................................................................................... 10, 13

*Mack v. AmerisourceBergen Drug Corp.,*
671 F. Supp. 2d 706 (D. Md. 2009) ....................................................................... 8

*Nall v. C.R. Bard, Inc.,*
No. 13-cv-1526, 2018 WL 524632 (S.D.W.Va. Jan. 23, 2018) .............................. 8

*NuVasive, Inc. v. Kormanis,*
No. 18-cv-282, 2019 WL 9633645 (M.D.N.C. Mar. 18, 2019) ............................ 25

*Pollock v. Marshall,*
656 F. Supp. 957 (S.D. Ohio 1987) ...................................................................... 12

*Pollock v. Marshall,*
845 F.2d 656 (6th Cir. 1988) ................................................................................ 12

*Purvis v. Bryant,*
No. 17-cv-1532, 2018 WL 6604231 (D.S.C. Dec. 17, 2018) ............................... 25

*Rice v. Cayetano,*
528 U.S. 495 (2000) ............................................................................................. 12

*Roe v. Dep't of Def.,*
947 F.3d 207 (4th Cir. 2020) ................................................................................ 15

*Roe v. Shanahan,*
359 F. Supp. 3d 382 (E.D. Va. 2019) ................................................................... 15

*Rostker v. Goldberg*,
  453 U.S. 57 (1981) ..................................................................................12, 16

*Ruiz v. Affinity Logistics Corp.*,
  No. 5-cv-2125, 2009 WL 10664190 (S.D. Cal. Dec. 1, 2009) ....................19, 20

*Rushing v. Yeargain*,
  No. 19-cv-653, 2022 WL 4545612 (M.D. La. Jun. 10, 2022) .............................19

*Sample v. Diecks*,
  885 F.2d 1099 (3d Cir. 1989) ....................................................................12

*SFFA v. Harvard*,
  600 U.S. 181 (2023) ...........................................................................*passim*

*SFFA v. West Point*,
  No. 23A696 (U.S.) ...................................................................................18

*Steffan v. Perry*,
  41 F.3d 677 (D.C. Cir. 1994) .................................................................11, 16

*Traxys N.A., LLC v. Concept Mining, Inc.*,
  808 F. Supp. 2d 851 (W.D. Va. 2011) ..........................................................7

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ..........................................................................12, 16

*United States v. Brown*,
  415 F.3d 1257 (11th Cir. 2005) ...................................................................7

*United States v. Wood*,
  741 F.3d 417 (4th Cir. 2013) ......................................................................7

*Vance v. United States*,
  434 F. Supp. 826 (N.D. Tex.) ...................................................................11

*Vance v. United States*,
  565 F.2d 1214 (5th Cir. 1977) ..................................................................11

*Watkins v. U.S. Army*,
  875 F.2d 699 (9th Cir. 1989) ....................................................................14

## Other Authorities

Amicus Brief of the United States, *SFFA v. Harvard*,
  No 20-1199, 2022 WL 3108833 (U.S. Aug. 1, 2022) .............................................22

Amicus Brief of the United States, *Grutter v. Bollinger*,
  No. 2-241, 2003 WL 176635 (U.S. Jan. 17, 2003) ................................................18

Amicus Brief of Veterans for Fairness and Merit, *SFFA v. Harvard*,
  No. 20-1199, 2022 WL 2919025 (U.S. May 9, 2022) ............................................17

O.A. Tr. 150, *SFFA v. Harvard*,
  No. 21-707, 2022 WL 22297227 (U.S. Oct. 31, 2022)........................................................... 13

O.A. Tr., *Grutter v. Bollinger*,
  No. 2-241, 2003 WL 1728613 (U.S. Apr. 1, 2003) ............................................................ 18, 22

Press Release, *USMA Hosted the 62nd Annual COSAS* (Apr. 11, 2023),
  https://tinyurl.com/4d7ew9zs.................................................................................................. 23

U.S. Dep't of Justice, *Confession of Error: The Solicitor General's Mistakes During the*
  *Japanese-American Internment Cases* (May 20, 2011), perma.cc/6RQMY9SN ......................... 13

United States Coast Guard Academy, *Mission*, https://perma.cc/5XD7-2TYK ..................... 21

United States Naval Academy, *Mission of USNA*, https://perma.cc/AJK2-R83F ................. 22

Weinstein & Berger, 4 Weinstein's Fed. Evid. §703.04[3] (2d ed. 2005) .................................. 19

**Rules**

Fed. R. Evid. 702 ......................................................................................................................... 6

Fed. R. Civ. Proc. 26 .................................................................................................................... 5

**INTRODUCTION**

The Naval Academy asks the Court to exclude SFFA's expert witnesses and instead give blind "deference to the judgments of current military officials." Mot. 9. No caselaw supports this astonishing request. Nor is there any reason to exclude portions of SFFA's experts' testimony—especially in a bench trial, where the Court's gatekeeping function is significantly relaxed. The Court should hear SFFA's experts' testimony in full.

The Naval Academy makes only one argument for excluding Brigadier General Christopher Walker and Dakota Wood—that their testimony is not "relevant" because this Court must defer to the judgment of current military officials. That is plainly wrong. Because the Academy uses racial classifications, it has the burden to satisfy strict scrutiny—the "'most rigid,' 'searching,'" and "daunting" form of constitutional scrutiny. *SFFA v. Harvard*, 600 U.S. 181, 206, 229 (2023). No deference is due to the military when it employs these highly suspect tools. Yet even if the Naval Academy's determinations were somehow viewed less critically, that still would not warrant *excluding* SFFA's experts. Not a single case supports that proposition; indeed, Fourth Circuit precedent holds otherwise. And the Academy's argument isn't even internally consistent: the Academy relies on multiple *civilian* experts to support its case. The Academy has no explanation for why these experts should be immune from criticism.

The Academy's request to exclude portions of Wood's expert testimony can be quickly rejected. Experts can conduct interviews, and Wood's selection and discussion of his interviews was entirely proper. Because SFFA has no plans to use his interviews as "a conduit for hearsay," Mot. 10, the Court should not exclude portions of Wood's expert testimony.

1

Finally, SFFA's expert on race-neutral alternatives, Richard Kahlenberg, should be free to discuss the Coast Guard Academy at trial. Under strict scrutiny, the Naval Academy has the "burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice." *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013). Kahlenberg reviewed publicly available documents showing that one of the United States' service academies (the Coast Guard Academy) increased minority enrollment through race-neutral means. The documents he reviewed informed his opinion that the Naval Academy should have considered the experience of the Coast Guard Academy before determining that no race-neutral alternatives exist. Kahlenberg's opinion on this issue is both relevant and reliable.

The Court should deny the Naval Academy's motion *in limine*.

## BACKGROUND

### A.    SFFA's Opening Expert Reports.

On July 15, SFFA produced expert reports from four individuals: Brigadier General Christopher Walker, Dakota Wood, Richard Kahlenberg, and Peter Arcidiacono. Only the first three individuals are relevant to this motion.

**Brigadier General Christopher Walker.** Brigadier General Walker is a retired United States Air Force General officer with over forty years in uniform. Dkt. 85-1 (Walker Rep.) 1. He is a Level-3 Joint Qualified Officer, which means he can speak with expert certainty about issues affecting any of the service branches. *Id.* He has combat experience in the Balkans, Afghanistan, and Iraq, and he has lived or been deployed to more than twenty countries on behalf of the United States Department of Defense. *Id.* at 2. He also served as the Senior Military Advisor to the Secretary of the Air Force's Office of Diversity and Inclusion, where

he provided strategic advice to the Air National Guard regarding the implementation of Air Force diversity and inclusion initiatives. *Id.* at 2-3. His career culminated with his service as the Assistant Adjutant General-Air of the West Virginia National Guard and Commander of the West Virginia Air National Guard. *Id.* at 2. When he was appointed, Brigadier General Walker became the first African-American General officer in the West Virginia National Guard. *Id.* at 50. He has received numerous military awards and decorations. *Id.* at 3.

In his expert report, Brigadier General Walker reaches three main conclusions. *Id.* at 14-15. First, the military wins wars by ensuring that units—and the troops that comprise them—are tactically and technically proficient, have the time and resources necessary to train on their fundamental tasks, and have quality leadership. *Id.* at 15-21. Second, unit cohesion and lethality, recruiting, retention, and the military's legitimacy will not suffer if the Academy is ordered to cease its use of racial preferences. *Id.* at 15, 21-48. Third, removing racial preferences will improve military readiness because using race as a factor in officer accessions undermines trust in leadership and is counter-productive to unit cohesion. *Id.* at 15, 48-54.

**Dakota Wood.** Dakota Wood served in the U.S. Marine Corps from 1985 through 2005 and is a graduate of the U.S. Naval Academy. Dkt. 85-2 (Wood Rep.) 1. Throughout his career, he served in billets at nearly all levels of the service in operational, garrison, and academic settings. *Id.* at 1-2. His contingency and crisis operations experiences include, among others, Operation Desert Storm, Operation Enduring Freedom, and Operation Iraqi Freedom. *Id.* at 2. He has received numerous decorations and awards. *Id.* at 2-3. Since his retirement from the military in 2005, he has remained intimately involved in military, national defense, national security, and foreign policy matters. *See id.* at 3-4. He has published more than 85

articles and major reports, and he originated and edited ten annual editions of *The Index of U.S. Military Strength*. *Id.* Taken together, his experience with military affairs and the factors that contribute to unit effectiveness spans 43 years. *Id.* at 5.

In his expert report, Wood reaches multiple conclusions. First, military readiness requires trust in leadership and shared identity among members of a unit. *Id.* at 14-26. Second, the consideration of race in the admissions process at the Naval Academy is not essential to military readiness or the legitimacy of the U.S. military. *Id.* at 14, 26-36. Third, the Naval Academy's use of race imposes readiness costs without having any meaningful impact on the racial composition of the Navy or Marine officer corps. *Id.* at 14-15, 36-39.

**Richard Kahlenberg.** Richard Kahlenberg is the Director of the American Identity Project at the Progressive Policy Institute, a non-profit, non-partisan research organization. Ex. A (Kahlenberg Rep.) 3.[1] He is also a professorial lecturer at the George Washington University Trachtenberg School of Public Policy and Administration. *Id.* He is widely known as "'the nation's chief proponent of class-based affirmative action in higher education admissions.'" *Id.* at 3. He is the author or editor of 18 books, including four books that address race-neutral affirmative action strategies. *Id.* at 3-4. He has researched and published numerous articles on race-neutral alternatives to racial preferences. *Id.* at 4. He testified as an expert witness at trial in both *Harvard* and *UNC*.

In his opening report, Kahlenberg reaches three main conclusions. *Id.* at 8. First, there is extensive empirical evidence and academic research documenting the myriad ways in which colleges such as the Naval Academy can use race-neutral alternatives to produce substantial

---

[1] All exhibit citations are to the exhibits of the attached Connolly Declaration.

socioeconomic and racial diversity. *Id.* at 8-23. Second, the Naval Academy failed to fully consider any of the numerous available race-neutral alternatives, such as providing socioeconomic preferences and increasing admissions of enlisted members. *Id.* at 8, 23-74. Third, an analysis of the Academy's admissions data and other data shows that there are race-neutral alternatives available that could produce racial and socioeconomic diversity at the Naval Academy without the use of racial preferences. *Id.* at 8, 74-93.

**B.      The Naval Academy's Opening Expert Reports**

On July 15, the Naval Academy provided reports for two witnesses per Federal Rule of Civil Procedure 26(a)(2)(B):

- Beth Bailey, a professor at the University of Kansas.

- Jason Lyall, a professor at Dartmouth College.

The Naval Academy also provided disclosures for five witnesses per Federal Rule of Civil Procedure 26(a)(2)(C):

- John Sherwood, a civilian historian with the Naval History and Heritage Command.

- Dr. Jeannette Haynie, a Senior Advisor to the Office of the Under Secretary of Defense for Personnel and Readiness at the Department of Defense.

- Stephanie Miller, the Deputy Assistant Secretary of Defense for Military Personnel Policy, in the Office of the Under Secretary of Defense for Personnel and Readiness.

- Lisa Truesdale, the Deputy Assistant Secretary of the Navy within the Office of the Assistant Secretary of the Navy.

- Lieutenant Colonel Katherine A. Batterton, the Assistant Director, Policy Integration, Officer & Enlisted Personnel Management, Military Personnel Policy, Office of the Under Secretary of Defense for Personnel & Readiness.

C.       SFFA's Rebuttal Expert Reports

On July 31, SFFA's experts each submitted rebuttal reports.[2] Relevant here, Brigadier General Walker argued that "USNA's experts' assertions about racial preferences and military effectiveness are unsupported, internally inconsistent, and largely based on stereotypes." Ex. B (Walker Rebuttal Rep.) 3-16 (discussing the reports of Lyall, Truesdale, and Haynie). Brigadier General Walker also argued that "USNA's experts improperly recast political judgments about racial balancing as military conclusions." *Id.* at 16-19. In Wood's rebuttal report, Wood argued that "Sherwood and Bailey's historical analyses are incomplete and irrelevant to the all-volunteer military of the 21st Century." Ex. C (Wood Rebuttal Rep.) 10-14. Wood also argued that "the Academy's other experts all rely on conclusory and unsupported assertions about diversity and military effectiveness." *Id.* at 15-39.

## STANDARD OF REVIEW

"Rules 702 through 704 of the Federal Rules of Evidence govern the admissibility of expert opinions at trial." *Cap. Funding Grp., Inc. v. Zuccari*, No. 19-cv-1272, 2021 WL 1339387, at *3 (D. Md. Apr. 9, 2021) (Bennett, J.). Rule 702 provides that an expert witness may testify in the form of an opinion or otherwise if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

---

[2] The Naval Academy submitted one rebuttal report from Stuart Gurrea, which is not at issue in this motion.

As this Court has recognized, "'the gate keeping function of Rule 702 of the Federal Rules of Evidence carries less significance in a bench trial.'" *Cap. Funding*, 2021 WL 1339387, at \*5 (listing cases); *see United States v. Wood*, 741 F.3d 417, 425 (4th Cir. 2013) (when "the district court [is] also the trier of facts, the district court's evidentiary gatekeeping function [is] relaxed."). That is because "'[t]he 'gatekeeper' doctrine was designed to protect juries,'" not courts. *Traxys N.A., LLC v. Concept Mining, Inc.*, 808 F. Supp. 2d 851, 853 (W.D. Va. 2011) (quoting *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004)); *Wood*, 741 F.3d at 425 ("'There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.'" (quoting *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005))). As a consequence, "unless the disputed evidence is wholly irrelevant or so speculative as to have no probative value," a court may freely receive the evidence and disregard it later if it fails to satisfy Rule 702 and *Daubert*. *720 Lex Acquisition LLC v. Guess? Retail, Inc.*, No. 9-cv-7199, 2014 WL 4184691, at \*10 (S.D.N.Y. Aug. 22, 2014); *see, e.g.*, *Traxys*, 808 F. Supp. 2d at 853 (exercising "discretion to deny the motion at this stage, reserving to trial a decision as to the reliability and relevancy of the expert's opinions").

## ARGUMENT

### I. The Court should not exclude the expert testimony of Brigadier General Walker and Wood.

The Court should not exclude the expert testimony of Brigadier General Walker and Dakota Wood because (1) their testimony is relevant to the issues in this case; (2) the Court owes no deference to military officials' judgments when the military uses racial classifications; and (3) their testimony is admissible even if the Academy were to receive more deference than civilian colleges.

A.      **The opinions of Brigadier General Walker and Wood are relevant to the issues in this case.**

The Naval Academy does not dispute that Brigadier General Walker and Wood are highly qualified to provide reliable testimony in this case. The Academy instead makes only one argument: that Brigadier General Walker's and Wood's opinions should be excluded because they are "legally irrelevant and unhelpful to the Court." Mot. 6. That argument fails.

Expert testimony is relevant when it helps "'the trier of fact to understand the evidence or to determine a fact in issue.'" *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993)); *see Nall v. C.R. Bard, Inc.*, No. 13-cv-1526, 2018 WL 524632, at *1 (S.D.W.Va. Jan. 23, 2018) (expert testimony is "relevant" when it "relates to any issues in the case'") (citing *Daubert*, 509 U.S. at 591-92). Rule 702 "favors admissibility if the testimony will assist the trier of fact, and doubt regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Mack v. AmerisourceBergen Drug Corp.*, 671 F. Supp. 2d 706, 709 (D. Md. 2009) (cleaned up).

Brigadier General Walker's and Wood's opinions are unquestionably "relevant" to the issues in this case. *Daubert*, 509 U.S. at 591. As the Naval Academy has recognized, its race-based admissions process "must satisfy 'strict scrutiny.'" Dkt. 46 at 13 (quoting *Harvard*, 600 U.S. at 206-07); *see also* Dkt. 60 (P.I. Op.) at 3 ("[I]t is imperative that a factual record be developed in this matter such that this Court can determine whether … the Naval Academy's admissions practices … survive strict scrutiny."). Under this "daunting two-step examination," the Academy must prove that its racial classifications "'further compelling governmental interests'" and are "'narrowly tailored'—meaning 'necessary'—to achieve that interest." *Harvard*, 600 U.S. at 206-07 (citations omitted). To satisfy its burden, the Academy appears ready to

8

argue that (1) "the lack of diversity in military leadership [during the Vietnam-war era] led to racial conflict that 'threatened the integrity and performance of the Nation's military'"; and (2) that using racial preferences in admissions at the Naval Academy increases racial diversity in the officer corps, which will, in turn, improve unit cohesion, lethality, recruitment, retention, and the military's legitimacy. Dkt. 46 at 26-38.

Unsurprisingly, SFFA disputes the Naval Academy's assertions—racial preferences in admissions will not further the Academy's asserted interests and the Academy's methods are not narrowly tailored to achieve these interests. SFFA will offer Brigadier General Walker's and Wood's testimony, among other witnesses, to "assist the trier of fact to understand or determine [the] fact[s] in issue." *Daubert*, 509 U.S. at 592. For example, they will testify that the historical arguments made by Sherwood and Bailey "omit crucial historical context and ignore fundamental differences between today's military and the Vietnam-era military." Ex. C (Wood Rebuttal Rep.) 10-14. Unit cohesion will not suffer if the Academy stops using race in admissions because "servicemembers are primarily concerned about the competence of those around them, rather than race or ethnicity." Walker Rep. 24-30. A racially balanced force will not be "more culturally aware and better able to interact with foreign partners and local nationals." *Id.* at 37; *see, e.g.*, *id.* ("Just because I am Black doesn't mean that I would understand the cultural background of a Kenyan Air Force officer or Nigerian Army officer any more than a White United States officer would. I know that firsthand from my deployment to Kenya."). There is "no evidence that statistical alignment between the racial demographics of the officer corps and the racial demographics of the enlisted ranks or broader society fosters

cohesion and lethality, aids recruitment of top talent, increases retention, or bolsters the military's domestic and international legitimacy." Wood Rep. 14. And "because Academy graduates comprise a relatively small percentage of new Navy and Marine officers each year, it is simply not possible for USNA alone to raise minority representation in the officer corps to match the fleet enlisted share." Walker Rep. 35-36 (cleaned up). These opinions are plainly "relevant" to the issues in this case. *Daubert*, 509 U.S. at 591.

### B. The Court owes no deference to military officials' judgments when the military uses racial classifications.

Despite the obvious relevance of Brigadier General Walker's and Wood's opinions, the Naval Academy argues that the Court should exclude their testimony because the Court must "defer[] to the judgments of current military officials." Mot. 9. That is wrong.

Because "all" racial classifications must satisfy strict scrutiny, *Johnson v. California*, 543 U.S. 499, 505-06 (2005), "[a]ny" governmental exception to race neutrality must pass that "daunting" test, *Harvard*, 600 U.S. at 206. "'[A]ny person … has the right to demand that any governmental actor … justify any racial classification … under the strictest of judicial scrutiny.'" *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003). And "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed … under strict scrutiny." *Adarand Constructors v. Peña*, 515 U.S. 200, 227 (1995). "Any" and "all" could not be clearer; the caselaw leaves no room for a military-academy exception.

Courts do, in fact, require the military to satisfy strict scrutiny when it classifies citizens based on race. Strict scrutiny was "first articulated," after all, in *Korematsu*—a case involving an (infamous) racial classification by the military. *Fisher*, 570 U.S. at 316 (Thomas, J., concurring); *see Korematsu v. United States*, 323 U.S. 214, 216 (1944) (stating that courts must subject "all legal

restrictions" based on race "to the most rigid scrutiny"). Courts have applied strict scrutiny to the military's racial classifications ever since. *E.g.*, *Vance v. United States*, 434 F. Supp. 826, 833-34 (N.D. Tex.), *aff'd*, 565 F.2d 1214 (5th Cir. 1977); *Christian v. United States*, 46 Fed. Cl. 793, 803-06 (2000). Per the D.C. Circuit, strict scrutiny applies when "the military" makes decisions "based on race." *Steffan v. Perry*, 41 F.3d 677, 689 & n.9 (D.C. Cir. 1994) (en banc); *accord Doe 2 v. Shanahan*, 917 F.3d 694, 703 (D.C. Cir. 2019) (Wilkins, J., concurring) ("[E]ven in the military context, classifications based on race … trigger strict scrutiny." (cleaned up)). And per the Federal Circuit, "a strict scrutiny analysis is required" whenever the military "'treat[s] any person unequally because of his or her race.'" *Berkley v. United States*, 287 F.3d 1076, 1084, 1090-91 (Fed. Cir. 2002).

When courts apply strict scrutiny to the military's racial classifications, they apply real strict scrutiny—not a watered-down version that gives the government special deference. *Christian* is a good example. There, the court applied the established strict-scrutiny standard to a "race-based affirmative action policy" issued by the Army. 46 Fed. Cl. at 804-13. In doing so, it cited the same strict-scrutiny cases that the Supreme Court applies outside the military context. *See id.* at 804-13 (relying on *Bakke*, *Adarand*, and others). And the court applied the traditional strict-scrutiny framework, recognizing that "the burden" is on "the government," that racial classifications "may not have an infinite life span," and that military leadership—like civilians—can consider race only when the "most exact connection between justification and classification" exists. *Id.* at 806-11. It then held that "the Army's affirmative action program … does not come close to the exact fit required" by strict scrutiny. *Id.* at 814-15.

None of the Academy's cited cases support giving deference to the Naval Academy. *See* Mot. 6-10. Not a single one involves racial classifications—distinctions that are "'by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.'" *Rice v. Cayetano*, 528 U.S. 495, 517 (2000); *see Goldman v. Weinberger*, 475 U.S. 503 (1986) (the Free Exercise clause permitted the Air Force to enforce a facially neutral dress code policy even though its effect was to restrict the wearing of yarmulkes); *Rostker v. Goldberg*, 453 U.S. 57 (1981) (statute authorizing registration of only men for the military draft did not violate the Due Process Clause); *Trump v. Hawaii*, 585 U.S. 667 (2018) (a facially neutral Presidential proclamation denying admission to foreign nationals of certain countries did not violate Establishment Clause and survived rational-basis review); *Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. Jan. 4, 2019) (dissolving a preliminary injunction involving a military policy concerning transgender individuals). The Naval Academy's failure to identify on-point precedent is not surprising—"'[r]acial and ethnic distinctions *of any sort* are inherently suspect.'" *Harvard*, 600 U.S. at 209 (emphasis added).

This lack of deference comes from the Supreme Court's precedents. Prisons, for example, normally get the same level of deference as the military. *Sample v. Diecks*, 885 F.2d 1099, 1109 (3d Cir. 1989); *Pollock v. Marshall*, 656 F. Supp. 957, 962 (S.D. Ohio 1987), *aff'd*, 845 F.2d 656 (6th Cir. 1988). But when prisons classify citizens based on race, the Supreme Court applies normal strict scrutiny. *Johnson*, 543 U.S. at 505-06. Giving "deference" to "prison officials" when they use race, the Court explained, would create a "hands-off approach to racial classifications" that "is fundamentally at odds with our equal protection jurisprudence." *Id.* at 506-07 & n.1. "[S]earching judicial review of racial classifications" is all the more "necessary"

12

in contexts where "the government's power is at its apex." *Id.* at 511. Universities, too, usually get "'a degree of deference'" in their "'academic decisions.'" *Harvard*, 600 U.S. at 217. But not when they "us[e] race to benefit some applicants but not others." *Id.* As the Court held in *Harvard*, courts cannot "defer to universities and 'experts' in determining who should be discriminated against"; both "history" and "law" expose "the folly in that approach." *Id.* at 218 n.5. In *Harvard* itself, the Court outlawed the use of race at all universities, giving no deference to the government's assertion that it was "critically important" for universities to keep using race because far "more officers come from [civilian universities'] ROTC programs" than from the service academies. O.A. Tr. 150, *SFFA v. Harvard*, No. 21-707, 2022 WL 22297227 (U.S. Oct. 31, 2022).

*Korematsu* offers an example and a warning. Though *Korematsu* was right to say that the military's racial classifications must pass strict scrutiny, all agree that the Court did not faithfully apply that standard. It allowed the military to intern citizens because it deferred to the "judgment" of the "military authorities" that Japanese-Americans were a threat to national security. *Korematsu*, 323 U.S. at 218-19. As it turned out, the military's policy was "'carried out without adequate security reasons.'" *Adarand*, 515 U.S. at 236; *Hirabayashi v. United States*, 828 F.2d 591, 601 (9th Cir. 1987); U.S. Dep't of Justice, *Confession of Error: The Solicitor General's Mistakes During the Japanese-American Internment Cases* (May 20, 2011), perma.cc/6RQMY9SN. *Korematsu* has since been "overruled," precisely because courts cannot tolerate "any retreat from the most searching judicial inquiry" in the race context. *Harvard*, 600 U.S. at 207 n.3 (cleaned up). Of course, rejecting applicants from the Naval Academy is not placing Americans

in concentration camps. But it's notable that the Academy asks this Court to defer—on matters of race—to the very institutions that authorized that internment and that (in the Academy's words) have a long "history of racial tension," "racial violence," and "racial strife." Dkt. 46 at 22-24. Such institutions should be "the very *last* ones to be allowed to make race-based decisions, let alone be accorded deference in doing so." *Harvard*, 600 U.S. at 227 n.8; *cf. Watkins v. U.S. Army*, 875 F.2d 699, 729 (9th Cir. 1989) (Norris, J., concurring in the judgment) ("As recently as World War II both the Army chief of staff and the Secretary of the Navy justified racial segregation in the ranks as necessary to maintain efficiency, discipline, and morale. Today, it is unthinkable that the judiciary would defer to the Army's prior 'professional' judgment that black and white soldiers had to be segregated to avoid interracial tensions." (citation omitted)).

This Court should not repeat history's mistakes. *Korematsu* deferred to actual military tactics in an active world war, and yet still was "'gravely wrong the day it was decided.'" *Harvard*, 600 U.S. at 207 n.3. Deference is even less warranted here, where the military is discriminating against high-schoolers when making college-admissions decisions in the hopes that some of them will attend, graduate, and become officers many years later. *Cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 535-36 (2004) (military policy violated "individual liberties" and didn't directly involve "the strategy or conduct of war"); *Hartmann v. Stone*, 68 F.3d 973, 985 (6th Cir. 1995) (military policy injured "people not in the Armed Forces"). Because the Court cannot "defer[] to the judgments of current military officials," Mot. 9—the only argument made by the Academy for excluding Brigadier General Walker and Wood—the motion must be denied.

14

**C.    Regardless of the deference due to the military, the Court cannot exclude the testimony of Brigadier General Walker and Wood.**

Even if the Naval Academy is "due more deference than were the private and public universities in *Harvard*," Dkt. 60 (P.I. Op.) at 26, that would not mean that the Court must *exclude* SFFA's experts. The Naval Academy does not identify a single case in which a court excluded a plaintiff's expert testimony because of "deference" owed to the military. That is not surprising. In cases against the military, courts still hear expert testimony and make factual findings, just like any other trial.

Consider *Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020). There, members of the Air Force diagnosed with HIV sued the military seeking to enjoin a policy prohibiting them from serving due to their HIV infection. Even though the Fourth Circuit gave deference to the military's determinations (strict scrutiny did not apply), the court rejected the military's "proffered justifications" for the policy because the military "fail[ed] to account for current medical literature and expert opinion about current HIV treatment and transmission risks." *Id.* at 226; *see Roe v. Shanahan*, 359 F. Supp. 3d 382, 412, 414-16 (E.D. Va. 2019) (discussing the multiple expert witnesses put forth by the plaintiffs). Indeed, the district court faulted the Air Force for failing "to respond to plaintiffs' experts" and instead "rely[ing] only on conclusory assertions about their 'professional military and medical judgment' … and on circular restatements of their policies" *Roe*, 359 F. Supp. 3d at 416; *see also Cammermeyer v. Aspin*, 850 F. Supp. 910, 923 (W.D. Wash. 1994) (crediting the testimony of "plaintiff's expert, Dr. Lawrence Korb, the [former] Assistant Secretary of Defense" who refuted "defendants' assertion that allowing homosexuals to serve in the military will adversely affect recruitment and retention of military personnel").

15

None of the Academy's cases remotely support excluding SFFA's witnesses. *See* Mot. 6-10. Again, none of these cases instructs district courts to defer to military officials using racial preferences, and so none supports excluding the expert testimony here. But even if some sort of deference were warranted (it isn't), no case holds that district courts should *exclude* expert testimony challenging the military's justifications for racial classifications. In *Goldman*, the Court said that an expert witness's testimony "that religious exceptions to [a dress regulation] are in fact desirable" was "quite beside the point" because—as a matter of law—"the First Amendment does not require the military to accommodate [religious] practices in the face of its view that they would detract from the uniformity sought by the dress regulations." 475 U.S at 509-10. The Naval Academy obviously has no similar free rein to use racial classifications in the military. In *Rostker*, the Supreme Court did not "rebuke[] the district court" for relying on expert testimony, as the Academy asserts, Mot. 7; the Supreme Court merely declined to rely on *legislative history* to override Congress's findings. 453 U.S. at 81 (citing Senate hearings). Similarly, the Supreme Court in *Trump v. Hawaii* did not reject expert testimony from "'former national security officials,'" like the Academy claims, Mot. 7; the majority simply did not rely on the assertions of an *amicus brief* from former national security officials. *See Hawaii*, 585 U.S. at 747-48 (Sotomayor, J., dissenting). Nor does either concurrence in *Shanahan*, 917 F.3d 694, bolster the Academy's position. Judge Wilkins' concurrence supports SFFA, as he stressed that the military has no "license to discriminate in matters of military policy" and that "even in the military context, '[c]lassifications based on race … of course … trigger strict scrutiny.'" *Id.* at 702-3 (Wilkins, J., concurring) (quoting *Steffan*, 41 F.3d at 689 n.9). And Judge Williams believed no discovery was warranted *at all* because he would have "dismiss[ed] …

plaintiffs' claims" on the grounds that "[t]he Constitution does not compel the military" to allow "transgender individuals to serve in their preferred gender rather than their biological sex." *Id.* at 707-08 (Williams, J., concurring).

In fact, the Naval Academy's motion to exclude makes no sense even on its own terms. The Academy argues that SFFA's experts must be excluded because the Court must "defer[] to the judgments of current military officials." Mot. 9. But three of the Academy's primary experts—Professor Beth Bailey, Professor Jason Lyall, and John Sherwood—*are not in the military*.[3] The Academy has *no* argument for why these civilians' opinions cannot be criticized by Brigadier General Walker and Wood.

The Naval Academy suggests that the testimony of Brigadier General Walker and Wood "would likely be excluded even in the civilian context" because prior amicus briefs from former military officials show "'[w]idespread acceptance'" for the Academy's views. Mot. 8-9. To the extent the Academy is making a "reliability" argument under *Daubert*, it is undeveloped and therefore waived. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument … by failing to develop its argument—even if its brief takes a passing shot at the issue." (cleaned up)). The Academy is wrong in any event. In the *Harvard* case, more than 600 veterans—who have "fought at every enlisted and officer level"—filed an amicus brief taking the opposite view, explaining why using race "erodes trust, undermines unit cohesion, and compromises military effectiveness." Amicus Brief of Veterans for Fairness and Merit at 1-3, 27, *SFFA v. Harvard*, No. 20-1199, 2022 WL 2919025 (U.S. May 9, 2022).

---

[3] Sherwood, a historian, is a civilian employee of the Navy, not on active duty. *See* Dkt. 46-7 at 1-2.

The United States, too, has not always had the Academy's views. The United States opposed race-based admissions in *Grutter*. *See* Amicus Brief of the United States, *Grutter v. Bollinger*, No. 2-241, 2003 WL 176635 (U.S. Jan. 17, 2003). As Solicitor General Olson explained at oral argument, the former military officials supporting Michigan were wrong to suggest that "black soldiers will only fight for … black officers" or that "race neutral means" would not work "in the academies." O.A. Tr. 19, *Grutter v. Bollinger*, No. 2-241, 2003 WL 1728613 (U.S. Apr. 1, 2003).[4]

At bottom, this Court has repeatedly emphasized that "it is imperative that a factual record be developed in this matter such that this Court can determine whether the 'potentially distinct interests that military academies may present' allow the Naval Academy's admissions practices to survive strict scrutiny." Dkt. 60 (P.I. Op.) at 3; *see also* Order, *SFFA v. West Point*, No. 23A696 (U.S. Feb. 2, 2024) (declining to review SFFA's challenge to the use of race in admissions at West Point because "[t]he record before this Court is underdeveloped"). The Court therefore should permit—and indeed welcome—testimony from Brigadier General Walker and Wood.

## II.  The Court should not exclude portions of Wood's opinions as hearsay.

As part of his research, Wood conducted interviews of former military officials: Colonel James Reilly, Colonel Stephen Davis, and Colonel Harold van OpDorp. *See* Wood Rep. 59-71. Wood describes these interviews in Appendix D of his report. *Id.* The Naval Academy

---

[4] The fact that the Supreme Court in *Grutter* credited the views of "high-ranking *retired* officers and civilian leaders of the United States military" over the views of the United States, *see Grutter v. Bollinger*, 539 U.S. 306, 331 (2003) (emphasis added), is further evidence that the views of former military officers (like Brigadier General Walker and Wood) are not "legally irrelevant," Mot. 6.

asks the Court to exclude "portions of Lieutenant Colonel Wood's testimony" because "it is merely a conduit for the hearsay testimony of three former military officers he interviewed." Mot. 10. The Court should reject this request.

As an initial matter, the Academy misleadingly describes Wood's opinions as "largely based on [the] 'short interviews'" he conducted. Mot. 11; *see also id.* (asserting that his "report and opinions are 'undergirded by hearsay statements'"). Wood's opinions stem primarily from his "extensive military and post-military experience," not these three interviews. Wood Rep. 13. Indeed, neither his opening report nor his rebuttal report ever cites these interviews as authority. Wood conducted these interviews simply to "get[] other opinions on … this same issue," to see whether there were "things [he] hadn't considered," and to "make sure that [he] wasn't mistaken" about his "own recollection of conditions in the Navy and the Marine Corps." Ex. H (Wood Depo.) 10:18-11:4, 205:10-206:6; *see id.* at 339:2-9 (conducting interviews to "access[] the experiences and the perspectives of people who had different experiences than [he] did" as "a crosscheck of [his] own views of these things").

None of his interviews were improper. "'The number of sources on which an expert may reasonably rely 'is virtually infinite,' and such sources *include interviews*, reports prepared by third parties, scientific theories or test results, clinical and other studies, technical publications, business, financial, and accounting records, economic statistics, opinions of other experts, and general knowledge or experience.'" *Rushing v. Yeargain*, No. 19-cv-653, 2022 WL 4545612, at *10 (M.D. La. Jun. 10, 2022) (emphasis added) (quoting Weinstein & Berger, 4 Weinstein's Fed. Evid. §703.04[3] (2d ed. 2005)) *see, e.g.*, *Ruiz v. Affinity Logistics Corp.*, No. 5-cv-2125, 2009

WL 10664190, at *6 (S.D. Cal. Dec. 1, 2009) (allowing expert to discuss interviews he conducted "in order for [him] to explain how he reached his opinions").

Nor does the Academy cite any evidence for its (baseless) accusation that Wood "chose only to interview former military officials who he already knew would support his opinion." Mot. 12. To the contrary, Wood testified that he conducted these interviews to "make sure that [he] wasn't mistaken" about his own views and assumptions. Ex. H at 10:18-11:4. And far from cherry-picking officials, Wood chose these individuals because they "represented a broad swath of experiences in different settings at different points within the Marine Corps," such as "recruiting and training," working with "general purpose forces [and the] special operations community," and "all the way up to the senior levels." Ex. H at 337:14-339:9.[5]

To be sure, expert testimony cannot "simply serve as a conduit for testimonial hearsay." *Good v. Am. Water Works Co., Inc.*, No. 4-cv-1374, 2016 WL 5441517, at *8 (S.D. W.Va. Sept. 26, 2016). But SFFA has no such plans. The Court thus has no basis to exclude portions of Wood's testimony. *See Berger v. Philip Morris USA Inc.*, No. 9-cv-14157, 2014 WL 10715266 (M.D. Fla. Aug. 29, 2014) ("To the extent otherwise admissible, Dr. Grunberg may testify as to opinions based on his conversation with Mrs. Berger. Hearsay evidence offered under [FRE 702], if relevant, will be evaluated from the bench.").

---

[5] As the Academy well knows, counsel's instructions to Wood not to discuss whether he interviewed other former military officers were entirely proper under the parties agreed-upon protective order. *See* Dkt. 63 at 13-14 (protecting an expert's "drafts or preliminary materials" from discovery). That is presumably why the Academy dropped the line of questioning after an off-the-record conference and never moved to compel answers to these questions.

### III. The Court should not exclude Kahlenberg's opinions about the Coast Guard Academy.

The Naval Academy seeks to exclude a small portion of expert testimony from Richard Kahlenberg, who also provided expert testimony on race-neutral alternatives in *Harvard* and *UNC*. Mr. Kahlenberg has devoted much of his professional career to studying and writing about alternatives to racial preferences, including at numerous universities that have achieved significant levels of racial diversity without using an applicant's skin color as a basis for admission. *See* Ex. A (Kahlenberg Rep.) at 3-18. His opinion speaks directly to the Academy's noncompliance with its "ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice." *Fisher*, 570 U.S. at 312. Here, the Naval Academy wants to prohibit a narrow portion of testimony from Mr. Kahlenberg about the United States Coast Guard Academy's race-neutral admissions success with its class of 2014, when the Coast Guard Academy was prohibited by law from using race in admissions. The Academy contends that Kahlenberg's Coast Guard opinion is (1) irrelevant and (2) unreliable. Neither argument has merit.

### A.     The Coast Guard opinion is relevant.

The Academy's primary argument against the admission of Kahlenberg's Coast Guard opinion is that the Naval Academy and the Coast Guard Academy are not "appropriate comparators," Mot. 13, mainly because the Coast Guard Academy does not use Congressional nominations for its applicants. This assertion is borderline absurd. Setting aside their similar missions,[6] the United States itself has repeatedly conceded—as recently as 2022—that the two

---

[6] *Compare* United States Coast Guard Academy, *Mission*, https://perma.cc/5XD7-2TYK (accessed July 22, 2024), ("'To graduate young men and women with sound bodies,

academies have similar applicant pools and admissions procedures. *See* Amicus Brief of the United States at 17, *SFFA v. Harvard*, No 20-1199, 2022 WL 3108833 (U.S. Aug. 1, 2022) (explaining that "the service academies" all draw from "a nationwide applicant pool and require a combination of academic excellence, leadership skills, physical ability, and personal character for success"). The United States in *Grutter* likewise pointed to the Coast Guard Academy as evidence that "race neutral" alternatives are available and "should be used in the [service] academies." O.A. Tr. 19-22, *Grutter*, 2003 WL 1728613.

The Academy's own documents further undermine its contention that the two academies are far too different to compare. Admissions and diversity officers at both schools regularly communicate with one another and compare notes. *See, e.g.,* Ex. D (email between admissions deans at the Naval Academy and the Coast Guard Academy discussing application rates); Ex. E (email between diversity officers discussing attrition among minority students). Indeed, the Superintendents of all the academies—including the Naval Academy and the Coast Guard Academy—meet in person every year for the Conference of Service Academy Superintendents (COSAS), which is attended by the admissions directors and at which admissions trends and

---

stout hearts, and alert minds, with a liking for the sea and its lore, and with that high sense of honor, loyalty, and obedience which goes with trained initiative and leadership; well-grounded in seamanship, the sciences, and amenities, and strong in the resolve to be worthy of the traditions of commissioned officers in the United States Coast Guard in the service of their country and humanity.'"), *with* United States Naval Academy, *Mission of USNA*, https://perma.cc/AJK2-R83F (accessed July 22, 2024), ("'To develop Midshipmen morally, mentally and physically and to imbue them with the highest ideals of duty, honor and loyalty in order to graduate leaders who are dedicated to a career of naval service and have potential for future development in mind and character to assume the highest responsibilities of command, citizenship and government.'").

policies are discussed. *See* Ex. F (admissions deans coordinating COSAS gatherings); Ex. G at

USNA-00018394 (draft 2023 COSAS report noting that admissions deans of all the acade-

mies—including the Coast Guard Academy—discussed the achievement in diversity among

the service academies' applicants if race cannot be used in the admissions process).[7] If the

Naval Academy and the Coast Guard Academy are so different that one admissions process

is irrelevant to the other, why do the two schools so often meet, communicate, and strategize

about their admissions processes?

Of course, there are some differences between those schools (like any two colleges).

The government is free to explore this issue with Mr. Kahlenberg at trial. But the Naval Acad-

emy bears the burden of demonstrating that no workable race-neutral alternatives are available,

*see Fisher*, 570 U.S. at 312, and another service academy's experiences with achieving diversity

without the use of race is not so radically different as to be utterly irrelevant and unhelpful to

the Court in considering a complete record in this bench trial, *see Cap. Funding*, 2021 WL

1339387, at *3-6.

**B.    The Coast Guard opinion is reliable.**

The Naval Academy contends that Mr. Kahlenberg's opinions about the Coast Guard

Academy are not "'based on sufficient facts or data'" and are not the product of "'reliable

principles and methods.'" Mot. 13-15. Again, the Naval Academy is wrong. Mr. Kahlenberg's

---

[7] *See also* Press Release, *USMA Hosted the 62nd Annual COSAS* (Apr. 11, 2023), https://tinyurl.com/4d7ew9zs (noting that the "annual meeting of the superintendents is hosted by the academies on a rotating basis and includes the commandants, the deans, [and] the directors of Admissions and Athletics" who "discuss performance measures and other matters of collective interest").

opinion about the Coast Guard is both reasonably informed and the product of his ordinary and reliable research methods.

*First*, the Naval Academy's counsel contradict themselves. When SFFA subpoenaed information from the Coast Guard Academy, the *very same lawyers* who now argue that Mr. Kahlenberg lacks sufficient information to form his opinion sang a very different tune. Dkt. 81 at 14. Then, they argued that SFFA "already has the material it needs to attempt its desired comparison between the Coast Guard Academy and the Naval Academy" and noted that SFFA, among other things, "cites to public information" and had served Mr. Kahlenberg's report. *Id.* at 13. As a result, the government's lawyers contended that SFFA had no "genuine 'substantial need'" for more details about the Coast Guard's process. *Id.* Given those assertions, it is startling that the same attorneys now insist that Mr. Kahlenberg was required to obtain and review "specific information from the Coast Guard Academy," to interview their (represented) employees, and to describe the details of how the Coast Guard Academy "achieved the racial composition of any given class." Mot. 14.

In fact, Mr. Kahlenberg reviewed extensive Congressional testimony and news interviews with Coast Guard Academy officials on this very topic, as well as other relevant documents—including the United States' own assertions about the Coast Guard Academy in the *Grutter* case—to reach his opinion. *See* Ex. A (Kahlenberg Rep.) at 17-18. He also testified at his deposition that, consistent with his practices, he searched for additional information in

academic journals and online to determine whether it corroborated or contradicted that information he reviewed.[8] Under the circumstances, this is more than adequate to inform his opinion that the Naval Academy should have at least considered information from the Coast Guard Academy in exploring race-neutral alternatives.[9] An expert opinion is not rendered unreliable simply because it relies on publicly available information. *See, e.g., Jordan v. Town of Fairmount Heights*, No. 22-cv-2680, 2024 WL 732011, at *6 (D. Md. Feb. 21, 2024) (noting that "other courts have found that expert witnesses in various fields may rely on news articles as the factual basis for their expert opinions" and collecting cases).

*Second*, the Naval Academy complains that Mr. Kahlenberg failed to cite the testimony of Members of Congress and others from the transcript he reviewed that allegedly highlighted the Naval Academy's "comprehensive effort" to achieve racial diversity. Mot. 16. To begin, the Academy's argument here—that Mr. Kahlenberg should have credited testimony that the Coast Guard Academy and the Naval Academy can learn from one another's practices—flatly

---

[8] As of today's date, Mr. Kahlenberg's deposition (which occurred on August 21) has not been finalized.

[9] Contrary to the Naval Academy's argument, Mot. 15, there is nothing improper with Mr. Kahlenberg reviewing relevant materials—such as news articles, Congressional transcripts, and the like—that were among the hundreds of documents from this case provided to Mr. Kahlenberg. The cases the Naval Academy cites, like *In re TMI Litig.*, 193 F.3d 613, 697-98 (3d Cir. 1999), involve experts who "relied solely on information created by counsel, whether it be summaries or calculations, and not their independent analysis and other available evidence." *Purvis v. Bryant*, No. 17-cv-1532, 2018 WL 6604231, *5 (D.S.C. Dec. 17, 2018) (distinguishing *In re TMI* and other cases). None of the documents Mr. Kahlenberg reviewed regarding the Coast Guard Academy were created by counsel, and Mr. Kahlenberg independently reviewed them and looked for other examples to corroborate or contradict their observations. *Muñoz v. Orr*, 200 F.3d 291, 301-02 (5th Cir. 2000) (expert witness relied on "compilations of data … and did not seek to verify the information presented to him"); *NuVasive, Inc. v. Kormanis*, No. 18-cv-282, 2019 WL 9633645, at *2 (M.D.N.C. Mar. 18, 2019) (noting that "there is nothing inherently wrong with using a litigant's lawyer as a conduit for information to an expert," but excluding opinion based on unverified data and "summaries provided by a lawyer").

contradicts its prior claim that the academies are far too different to compare. It also makes little sense; the point of Mr. Kahlenberg's testimony here is that the Coast Guard Academy managed to achieve substantial racial diversity without using race, which the Naval Academy does. And other aspects of his report—which the Naval Academy does not challenge here—make quite clear that he extensively considered and examined *all* of the Naval Academy's current efforts to increase outreach and other race-neutral efforts. *See* Ex. A (Kahlenberg Rep.) at 23-74 (describing for *fifty pages* the Naval Academy's consideration, or failure to consider, "numerous race-neutral alternatives").

Rule 702 does not require Mr. Kahlenberg to quote in his disclosure every self-serving piece of testimony that the Naval Academy would like him to include. The Naval Academy, of course, can cross-examine Mr. Kahlenberg about his methods and sources, but "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned [to] that opinion rather than its admissibility." *Bresler v. Wilmington Tr. Co.*, No. 9-cv-2957, 2015 WL 1396265, at *3 (D. Md. Mar. 24, 2015).

## CONCLUSION

For the foregoing reasons, the Naval Academy's motion should be denied.

Dated: August 28, 2024

Respectfully submitted,

 */s/ Thomas R. McCarthy*

Adam K. Mortara*
(TN Bar No. 40089)
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

Thomas R. McCarthy*
Patrick Strawbridge*
J. Michael Connolly*
Bryan K. Weir*
Cameron T. Norris**
James F. Hasson*
R. Gabriel Anderson*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
patrick@consovoymccarthy.com
mike@consovoymccarthy.com
bryan@consovoymccarthy.com
cam@consovoymccarthy.com
james@consovoymccarthy.com
gabe@consovoymccarthy.com

*pro hac vice
**admitted to practice in the District of Maryland

*Counsel for Students for Fair Admissions*

**CERTIFICATE OF SERVICE**

I certify that on August 28, 2024, I e-filed the foregoing via ECF, which will automatically email all counsel of record.

*/s/ Thomas R. McCarthy*