# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

STUDENTS FOR FAIR ADMISSIONS,

*Plaintiff*,

v.

THE UNITED STATES NAVAL
ACADEMY, *et al.*,

*Defendants*.

Case No. 1:23-cv-02699-RDB

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# Table of Contents

I.   PROPOSED FINDINGS OF FACT ....................................................................................... 1

   A.   The United States Military's Compelling National Security Interest in a Diverse Officer
        Corps ............................................................................................................................... 1

       1.   Racial Tension in the Military and Lack of Diversity in the Senior Ranks ..................... 1

       2.   The Military's Judgment That a Diverse Officer Corps Is Vital to National Security .... 5

           a.   Diversity in the Officer Corps is Critical to Cohesion and Lethality ........................... 8

               i.   History of Combat Experience................................................................................ 8

               ii.   Empirical Evidence Shows that Diversity Aids Military Success ........................... 10

           b.   Diversity in the Officer Corps is Critical to Recruitment and Retention .................. 11

           c.   Diversity in the Officer Corps is Critical to the Military's Legitimacy in the Nation
                and the World.................................................................................................................. 13

   B.   Admission into the United States Naval Academy ........................................................... 14

       1.   Steps to Apply ................................................................................................................ 15

       2.   The Nomination Requirement ........................................................................................ 17

       3.   Selection of Candidates ................................................................................................. 18

           a.   Admissions Board .......................................................................................................... 18

           b.   Slate Review Committee ................................................................................................ 20

       4.   The Naval Academy's Limited Consideration of Race and Ethnicity ........................... 22

           a.   The Naval Academy's Individualized, Holistic Review ............................................... 22

           b.   The Naval Academy's Limited Consideration of Race is Directly Related to the
                Navy's Interest in a Diverse Officer Corps.................................................................... 24

           c.   The Naval Academy Does Not Use Quotas or Consider Minority Candidates in a
                Separate Review Process ................................................................................................ 25

           d.   The Naval Academy Does Not Use Race as a Negative or Stereotype...................... 25

           e.   The Naval Academy Does Not Intend to Use Race and Ethnicity as a Factor in its
                Admissions Process Indefinitely.................................................................................... 26

       5.   Race-Neutral Efforts ...................................................................................................... 27

   C.   Service Assignments and Retention ................................................................................. 29

   D.   The Navy's Closed Personnel System............................................................................... 30

II.  PROPOSED CONCLUSIONS OF LAW............................................................................... 31

i

A.   Standard Applied to Admissions Policies that Consider Race ............................................. 31

B.   Deference to the Executive in Matters of National Security ................................................ 32

C.   Compelling Interest ............................................................................................................ 36

D.   Distinct National Security Interest .................................................................................... 37

E.   Narrow Tailoring ................................................................................................................ 38

## I.   PROPOSED FINDINGS OF FACT[1]

### A.   The United States Military's Compelling National Security Interest in a Diverse Officer Corps

Our nation's security relies on its exceptional fighting force.  The United States cannot afford to lose its posture as the preeminent fighting force in the world with the continued increase and evolution of international threats.  For decades and across administrations, senior military and civilian leaders have concluded that the fighting force is stronger when it is racially and otherwise diverse at all levels.  *See, e.g.*, Defendants' Exhibit ("DX"), DX-46; DX-50; DX-191.  As Secretary of Defense Lloyd Austin recently testified before Congress, "[b]uilding a talented workforce that reflects our nation . . . is a national security imperative" that "improves our ability to compete, deter, and win in today's increasingly complex global security environment[.]"  DX-47 at 9.

In particular, the United States Armed Forces have long recognized that the nation's military strength and readiness depend on a pipeline of officers who are both highly qualified and racially and ethnically diverse, and who have been educated and trained in environments that prepare them to lead increasingly diverse forces.

### 1.   Racial Tension in the Military and Lack of Diversity in the Senior Ranks

The history of racial tension described below directly informed the military's judgment about the critical need for diversity in the Armed Forces generally and in the officer corps more specifically.  The military, including the Navy and Marine Corps, has faced internal racial strife that has risked mission readiness since its inception.

While racial minorities have served in the Armed Forces since the Revolutionary War, the military was racially segregated until the mid-20th century.  Furthermore, from the Revolutionary

---

[1] Defendants have endeavored to provide their primary findings of fact in this document, but respectfully reserve the right to adduce additional facts at trial.

War through World War II, the Navy frequently limited the number of Black Americans able to enlist, particularly during peacetime, and the Marine Corps largely banned Black Americans altogether.  DX-49 at 16-17.  Those that did serve were relegated to segregated units, and Black sailors were often assigned to menial positions such as cooks, stewards, and coal heavers, and worked at lower wages than White sailors.  DX-49.

This separate and unequal environment coincided with simmering racial tension.  During the "Red Summer" of 1919, White sailors were involved in racially motivated attacks against local Black community members in Charleston, South Carolina; Washington, D.C.; and Chicago, Illinois.  These tensions boiled over in 1944 when Black sailors protested or rioted in response to their oppressive conditions at Port Chicago, Mare Island, and Port Hueneme in California and Guam.  At that time, Black Americans comprised about 5% of the Navy's enlisted force and just 0.02% of the sailors that received an officer's or warrant officer's commission.  The first Black officer was not commissioned until 1943 when the Navy mistook him for being White, and 62% of Black sailors continue to serve as stewards as of 1948.  The other services experienced similar racial tensions and resulting disruption.

In 1948, President Truman directed the desegregation of the Armed Forces and established the Fahy Committee to evaluate the impact of integration on military efficiency.  *See* Exec. Order No. 9981, 13 Fed. Reg. 4313 (July 26, 1948).  The Fahy Committee ultimately concluded that "a policy of equality of treatment and opportunity will make for a better Army, Navy, and Air Force" and "will strengthen the nation."  President's Comm. on Equal. of Treatment & Opportunity in the Armed Serv., *Freedom to Serve: Equality of Treatment and Opportunity in the Armed Services*, United States GPO, Washington, D.C. (1950), at 68.

The Korean War accelerated integration efforts due to the need to rapidly build and deploy Armed Forces, but the military still deeply resisted integration.  DX-49 at 18.  Black personnel constituted only 3.4% of the Navy at the start of the Korean War, rose to 9.5% during the war, and then fell to 5.1% by 1962.  The numbers were even worse in the Navy's officer corps where only 0.2% of Navy officers were Black in 1962.

As discussed in a later report issued by a commission of senior military leaders, President Kennedy convened the Gesell Committee in 1962 to examine the military's continued racial disparities.  The Gesell Committee recommended that the Secretary of Defense pursue "greater institutionalization of the military's commitment to equality of treatment and opportunity."  DX-46 at 27.  But Secretary of Defense Robert McNamara instead issued only a general policy directive ordering the Department of Defense ("DoD" or "Department") to "conduct all of its activities in a manner which is free from racial discrimination[.]"  DoD, Equal Opportunity in the Armed Forces, DoDD 5120.36 (July 1963).  As the Military Leadership Diversity Commission ("MLDC"), a congressional commission comprised of military leaders, later concluded in 2011, "DoD's failure to implement the Gesell Committee's recommendation had high costs," as inequities persisted, "particularly in the leadership ranks."  DX-46 at 28.

The United States' accelerating involvement in the Vietnam War around that time contributed to an eruption of racial violence in the Marine Corps.  During the Vietnam War, the Marines expanded their typical recruiting practices to fill their ranks, leading to a large influx of enlistees, including more Black Americans.  Black Marines experienced a toxic environment in which certain units were still de facto segregated.  By the late 1960s, racial violence occurred both in Vietnam (the Army Stockade and the III Marine Amphibious Force Brig) and in the United States (Fort Dix, Fort Hood, Fort Bragg, and Camp Lejeune, to name a few).  At Camp Lejeune

alone, there were 160 assaults, muggings, and robberies described as having racial overtones in the first eight months of 1969.

The Navy also experienced significant racial tensions.  For example, in October 1969, a riot nearly broke out near Subic Bay in the Philippines when Black and White sailors from the destroyer *Collette* were on shore leave.  In 1972, Black sailors aboard the aircraft carrier *Constellation* staged a sit-in to protest the unfair treatment they faced due to their race, which forced the carrier to go offline for a period of time.  The *Constellation* going offline for any amount of time undercut combat effectiveness because another carrier—including its exhausted crew and aviators—was forced to stay online longer than planned.

That same year, race riots occurred on the aircraft carrier *Kitty Hawk* and the fleet replenishment oiler *Hassayampa*.  The racial riot on the *Kitty Hawk* threatened to take the carrier offline at a point during the Vietnam War in which the United States was relying on carriers for air power.  After White officers were unsuccessful in calming the situation and a Marine detachment was at the point of using live rounds to suppress the riot, a Black and Native American officer named Benjamin Cloud convinced the sailors to end the riot after giving them the Black Power salute and assuring the sailors that they would be treated fairly by the justice system.  Over the next several years, the situation worsened as racial unrest spread to hundreds of ships and shore installations.  From May 1 to June 30, 1974 alone, the Atlantic Fleet reported 57 racial incidents.

Major incidents also occurred on the dock landing ship *Trenton*, Naval Station Midway Island, the aircraft carrier *Ticonderoga*, the aircraft carrier *Intrepid*, the amphibious assault ship (helicopter) *Inchon*, and at Kaohsiung Fleet Landing, Taiwan.  A subsequent investigation by the 2nd Marine Regiment Commanding Officer concluded that the common theme among these incidents was the dearth of Black Americans in the Navy's chain of command, among other

4

contributing factors related to racial discrimination.  While many of the new sailors enlisting in the Navy were Black Americans, nearly all newly commissioned officers at that time were White. And a 1976 climate assessment into the Navy's equal opportunity programs reflected the same sentiment.  It found that Black sailors were the least likely to agree that military justice was equally administered and had less faith in the chain of command as an effective means of resolving equal opportunity problems.  The Naval Academy's Brigade of Midshipmen mirrored this problem. Rather than having the opportunity to serve as midshipmen, Black Americans were confined to positions as mess attendants and fulfilled domestic duties for midshipmen for much of the 19th century.  The first Black midshipman graduated from the Naval Academy in 1949, but then fewer than three dozen Black midshipmen graduated between 1949 to 1968.

The MLDC summarized this historical record as follows:  "During the Vietnam War, the lack of diversity in military leadership led to problems that threatened the integrity and performance of the Nation's military.  This is because servicemembers' vision of what is possible for their career is shaped by whether they see individuals with similar backgrounds excelling and being recognized in their Service."  DX-46 at 16.  Based on this historical record, as well as extensive analysis and input from those in the military, the MLDC concluded that "the diversity of our servicemembers is the unique strength of our military."  *Id.* at 3

## 2. The Military's Judgment That a Diverse Officer Corps Is Vital to National Security

This decades-long crisis left senior military leaders convinced that the level and extent of racial violence fundamentally threatened the military's ability to fulfill its national defense mission.  The threat to the military's fundamental mission posed by racially segregated forces was so grave that, even in the middle of an all-consuming war in Vietnam, the Navy ordered extensive reforms, including requiring a commanding officer to appoint a minority group officer or senior

5

petty officer as his special assistant for minority affairs, ensuring that the needs of minority personnel be met at base facilities, and creating focus groups of minority sailors to develop policies.

In particular, senior military leaders recognized that the scarcity of minority officers created distrust within the force and the nation and helped fuel the racial tensions that so critically undermined mission readiness.  As the MLDC  later stated, "During the Vietnam War, the lack of diversity in military leadership led to problems that threated the integrity and performance of the Nation's military[.]"  DX-46 at 16.  The Commission concluded in 2011 that this was because "the popular perceptions of racial/ethnic minorities serving as 'cannon fodder' for white military leaders" "estrange[d] the military from the people it represents and from which it ultimately draws its strength" and "the performance of the Nation's military is tied to the individual's belief that he or she will be treated fairly regardless of his or her background."  *Id.* at 16, 37.

Thus, starting in at least 1963, the military's senior leadership determined that a diverse officer corps is vital to mission success and national security.  And although early efforts led to "modest increases in minority demographic representation among junior to mid-grade officers," they failed to close the demographic gap and yielded even "less progress" in "diversifying the military's senior leadership."  DX-50 at 14.

The military has continued to evaluate the issue and repeatedly reaffirmed its judgment that a diverse officer corps prepared to lead an increasingly diverse military is critical for mission success.  In 2009, the MLDC, made up of thirty active and retired military leaders from all branches of services, concluded that the Armed Forces must "develop a demographically diverse leadership that reflects the public it serves and the forces it leads[.]"  DX-46 at 13.  The Commission underscored the importance of "[d]evelop[ing] future leaders who represent the face of America

and are able to effectively lead a diverse workforce," because it would "inspire future servicemembers," "engender trust among the population," and foster trust and confidence "between the enlisted corps and its leaders[.]" *Id.* at 30, 66.[2]  The Department of Defense reaffirmed the MLDC's conclusions and explained that "[d]iversity is a strategic imperative, critical to mission readiness and accomplishment, and a leadership requirement." DX-137 at 4.

The Department of Defense further explained why a racially and ethnically diverse fighting force is a strategic imperative:

> We defend the greatest nation in the world—a democracy founded on the promise of opportunity for all.  It is a nation whose demographic makeup parallels the environment in which we live—continually changing—and DoD must change to maintain and sustain its future forces.  To the degree we truly represent our democracy, we are a stronger, and more relevant force.  The Department views diversity as a strategic imperative.  Diverse backgrounds and experiences bring inherently different outlooks and ways of thinking, the key to innovation in organizations.  We gain a strategic advantage by leveraging the diversity of all members and creating an inclusive environment in which each member is valued and encouraged to provide ideas critical to innovation, optimization, and organizational mission success.

*Id.*  In 2020, a 15-member Board, led by the Secretary of the Air Force with officers and enlisted members from each service branch, once again concluded that "appropriate representation of minorities in military leadership positions is increasingly important in the context of the nation's demographic trends." DX-50 at 9.  And still today.[3]  The Deputy Under Secretary performing the

---

[2] *See also* DX-46 (quoting Professor Jerome Karabel: "It is easy to forget just how segregated the officer corps once was.  In 1968, African-American enrollment at West Point and Annapolis was less than 1 percent; as late as 1973, just 2.8 percent of all military officers were African-American. By contrast, during that period, African-Americans constituted as much as 17 percent of the rank and file.  In Vietnam, the consequences of this de facto segregation were devastating.").

[3] Per the most recent U.S. Census data, Black individuals comprise approximately 13.7% of the population and 17.5% of Navy sailors and 10.5% of Marines, but only 8.3% of the officer corps for the Navy and 5.9% for the Marines. *See* DX-53 at 27; DX-52.  Those of Asian and Pacific Islander origin make up approximately 6.4% of the population, and 7.3% of Navy sailors and 4.9% of the Marines, and 6.6% of the officer corps for the Navy and 4.8% for the Marines.  *See* DX-53 at 27; DX-52.  White individuals make up approximately 58.4% of the population, and 62.8% of

duties of the Under Secretary of Defense for Personnel and Readiness, *see* 10 U.S.C. § 136, Ashish Vazirani, will attest at trial to the Department's conclusion, using its best military judgment, that diversity, including racial diversity, enhances the military's ability to build successful teams and plan and prepare for, and if necessary, fight and win our nation's wars.

In particular, as detailed below, the military has made the judgment that diversity in the officer corps (1) fosters cohesion and lethality; (2) aids in recruitment of top talent and increases retention; and (3) bolsters its legitimacy in the eyes of the nation and the world.

### a. Diversity in the Officer Corps is Critical to Cohesion and Lethality

#### i. History of Combat Experience

As demonstrated most starkly in the Vietnam era, the military has determined that lack of internal unit cohesion jeopardizes mission success.  General James Mattis, then-Commander of United States Joint Forces Command and later Secretary of Defense, noted in 2010:

> I don't care how tactically or operationally brilliant you are, if you cannot create harmony—even vicious harmony—on the battlefield based on trust across service lines, across coalition and national lines, and across civilian/military lines, … your leadership in today's age is obsolete.

DX-46 at 14.  So too in the Navy.  Three-star Navy Vice Admiral Fuller will explain that in his 40 years of military experience, he has observed that Navy readiness and effectiveness, at all levels, depend on achieving and maintaining unit cohesion, and that a more diverse officer corps creates more effective and ready teams than a less diverse officer corps does.  Diverse teams are a force multiplier, and Vice Admiral Fuller is expected to testify that the best teams and force compositions incorporate a diverse mix of people, platforms, attributes, and capabilities. Similarly, based on his nearly three-decade career as a Navy officer, including his experience as

---

Navy sailors and 56.5% of Marines, and 75.5% of the officer corps for the Navy and 81.4% for the Marines.  *See* DX-53 at 27; DX-52.

the first Black commander of a SEAL team, Captain Jason Birch is expected to testify about his first-hand experience concerning how racial diversity in the officer corps makes for a more cohesive team, which translates to operational success in the battlefield.

Today, DoD recognizes that "[o]ur efforts will ultimately fail if we allow problems in our own ranks to undermine our cohesion, performance, and ability to advance our mission." DX-45 at 29. But cohesion cannot exist when there is internal strife, which has sometimes resulted from perceived racial imbalances between enlisted members and officers. The military learned these lessons most acutely during the Vietnam War era, when the lack of diversity in military leadership led to racial conflict that "threatened the integrity and performance of the Nation's military" and that revealed "how important ethnic, racial, and gender representation is to the psychological well-being and reputation of the U.S. military." DX-46 at 16, 37 (citations omitted). And racial tension in the military remains a concern today. *See, e.g.*, DX-51; DX-44; DX-177; DX-178; DX-179. As Deputy Assistant Secretary of the Navy (Military Manpower and Personnel) Lisa Truesdale is expected to testify at trial, a racially and ethnically diverse officer corps serves as a risk mitigator to prevent precisely the sort of racial tension that undermined the military's effectiveness in past conflicts.

Vice Admiral Fuller is expected to testify that, in his four decades of military experience, he has personally observed that the least effective officers did not demonstrate the ability to leverage diversity, and therefore introduced risk factors like failing to find common ground, not identifying and solving problems, or missing opportunities to learn from and adapt to unscripted challenges. And Captain Birch has experienced how the lack of racial diversity in the officer corps presents operational challenges such as raising the risk of incidents of racial discrimination, which are antithetical to unit cohesion.

ii.   **Empirical Evidence Shows that Diversity Aids Military Success**

Numerous internal and external studies demonstrate the importance of diversity, including racial and ethnic diversity, and the related concept of inclusion, to military effectiveness. *See, e.g.*, DX-38; DX-43; DX-168; DX-172; DX-173.   For instance, in 2022, DoD's Office of People Analytics ("OPA") evaluated the relationship between diversity and inclusion climates in the military and key military readiness outcomes.   DX-44.   Using statistical analysis, cluster analysis, and regression models, OPA analyzed active-duty survey response patterns and three years of associated personnel records and concluded that servicemembers who characterized their diversity climates as "healthy"—citing factors such as supervisors' attention to and efforts to stop "racial/ethnic harassment"—ranked their units' readiness far higher than those who characterized their diversity climates as "unhealthy." *Id.*   Those who characterized their diversity climates as unhealthy—with corresponding lower levels of readiness—were more likely to identify as underrepresented groups, such as racial or ethnic minorities. *Id.*

Professor Jason Lyall, the James Wright Chair in Transnational Studies at Dartmouth College and author of *Divided Armies: Inequality and Battlefield Performance in Modern War* (Princeton University Press, 2020), which informs DoD's work, has also conducted extensive research regarding how diversity and equality affect combat performance.   Creating a data set from information on nearly 300 armies, including Marines engaged in ground combat, in 250 wars since 1800, stress-tested by 134 coders over seven years, and using a Military Inequality Coefficient, Professor Lyall has concluded that evidence from quantitative and historical case studies demonstrates that a diverse and inclusive military is critical for battlefield success.   Professor Lyall determined that a diverse force is better at problem-solving, innovates faster, is more resilient and adaptive, and enhances legitimacy at home.   But the more Armed Forces treat their diverse

members unequally, (1) the greater losses they suffer as compared to those they inflict on enemy forces, (2) the more desertion and defection from the ranks they experience, (3) the more commanders coerce their soldiers to fight through fear of lethal punishment, and (4) the greater their tactical inflexibility.  Professor Lyall concluded, therefore, that high rates of military inequality are associated with a belligerent losing the war itself, such that whether a force is inclusive is often more decisive in battle than whether it has superior firepower.  He also observed that the negative effect of inequality on military effectiveness also extends to navies.

Dr. Jeanette Haynie, a Marine Corps combat veteran who graduated from the Naval Academy and who served as a Senior Advisor to the Under Secretary of Personnel and Readiness, is expected to testify about the extensive qualitative research that has provided similar findings. Especially in the areas of conflict and security, research demonstrates that including diverse perspectives of underrepresented groups at every level of leadership is key to developing the fullest understanding of the operational environment, bringing forth effective responses and strategies, and being more adept at complex problem-solving; and further that diverse groups make fewer mistakes and improve group thinking.  *See, e.g.*, DX-130; DX-13; DX-134; DX-135; DX-185. Indeed, research shows that diverse teams are 20% more likely to make innovative decisions, and 58% more likely to accurately assess a situation, and that diverse organizations are 35% more likely to outperform other organizations.  DX-38.

### b.     Diversity in the Officer Corps is Critical to Recruitment and Retention

Because the Navy and Marine Corps promote almost exclusively from within, the demographic diversity of future military leaders is directly shaped by who enters the officer corps. Currently, the military faces recruitment challenges, due to a shrinking population eligible for and interested in service.  To recruit the top talent in the country, the Navy must therefore make Naval

service more attractive to both the officer and enlisted recruiting population, and, as the Deputy Assistant Secretary of Defense for Military Policy, Stephanie Miller, is expected to testify, a more diverse officer population helps do so. *See, e.g.*, DX-46; DX-74. Moreover, Ms. Miller is expected to testify that because the military promotes almost exclusively from within and because the Naval Academy is a key officer commissioning source, particularly for those in the Unrestricted Line (the Navy's warfighting communities which produce the most Flag Officer and Command billets), Naval Academy graduates directly impact recruiting individuals to the Navy. Ms. Truesdale is expected to testify about her real-world experience as a recruiting officer and the benefits of a diverse group of recruiters in helping to attract diverse servicemembers.

Retaining top talent is also essential to sustaining a mission-ready force that is adaptable, responsive, and effective. Diversity and inclusion directly impact retention within the military. OPA's quantitative analysis found that active-duty members who identified their diversity climates as unhealthy—experienced most often by minority servicemembers—were nearly twice as likely to separate at the end of the survey period than those who identified their diversity climates as healthy, even when controlling for other variables. DX-44. Diversity in leadership also affects mentorship and advocacy for diverse servicemembers and junior officers. Vice Admiral Fuller will testify that he has directly observed the benefits from the additional opportunities afforded to servicemembers when interacting with, developing trust in, and receiving mentorship from leaders who share similar and dissimilar backgrounds and experiences, including to help mitigate broader retention challenges. So too has Captain Birch who has served as mentor for several midshipmen and those in the SEAL community. And Ms. Miller and Ms. Truesdale, who are responsible for DoD and Navy recruitment and retention policies, will testify about how a racially and ethnically diverse officer corps serves to help retain minority junior officers and enlisted servicemembers.

c.  **Diversity in the Officer Corps is Critical to the Military's Legitimacy in the Nation and the World**

Since the public perception crisis during the Vietnam era, when some of the country believed that the almost entirely White military leadership was treating Black servicemembers as expendable, *see* DX-46, DoD has made the military judgment that the all-volunteer force, and its leadership, must represent the country it defends.  A diverse officer corps that is reflective of the increasingly diverse population of the United States instills trust in the American public that the Armed Forces will faithfully execute their duty to protect all Americans.  DoD has therefore recognized, as the Deputy Under Secretary performing the duties of the Under Secretary of Defense for Personnel and Readiness will confirm, that it must "ensure that the military across all grades reflects and is inclusive of the American people it has sworn to protect[.]"  DX-50;at 7 *see also* DX-46.

A diverse officer corps that reflects our increasingly diverse nation also enables the military to protect its legitimacy among its international partners and strengthens its alliances and attracts new international partners.  *See* DX-185.  The military has learned that the more that military members are exposed to a wide range of demographic, cognitive, experiential, and cultural perspectives and backgrounds, the more they become attuned to the necessity of considering human-based elements across all operating environments.  For example, Captain Birch's experience as the first Black officer to command a SEAL team provides a powerful example of how racial diversity strengthens the military's strategic alliances.  As the commander of SEAL Team 10, Captain Birch experienced how meaningful it was for Somali leaders to see the United States military put a Black officer in charge of the team.  The connection he was able to foster encouraged cooperation and partners' willingness to work with their American counterparts, which made for a more cohesive and effective team.

**B.        Admission into the United States Naval Academy**

The Naval Academy "is a national institution reflective of the Nation it serves and the Naval Service of which it is a part." DX-4 at 2.  Established in 1845, the Naval Academy prepares students to become leaders and officers in the Navy and Marine Corps.  Admitted students to the Naval Academy "must possess the potential to develop great character, competence, vision and drive for the privilege, upon graduation, of serving as leaders and mentors of Sailors and Marines who have volunteered to serve the nation in times of war and peace." *Id.*  Upon entry, midshipmen are subject to the Uniform Code of Military Justice, trained in combat, learn to lead tactical operations, and endure physically demanding training.   Upon graduation, midshipmen are commissioned as active-duty officers in the Navy or Marine Corps with an obligation to serve a minimum of five years, and 95% of each graduating class accesses specifically into the Unrestricted Line.  DX-5.  Each year, approximately 28% of new Navy and Marine Corps officers in the warfighting communities are Naval Academy graduates.  Naval Academy graduates also account for a disproportionate percentage of senior officers in the Navy.  The Naval Academy is a vital pipeline to the officer corps, and especially to senior leadership.

Due to its nature as a military service academy, the Naval Academy's objectives differ substantially from those at civilian universities.  The Academy looks for individuals who, among other things, (1) are mentally and physically able to participate in rigorous academic, professional, and physical training programs; (2) show high interest in serving their country as professional officers in the Naval Service; (3) are likely, as a group, to choose fields of study that reflect the needs of the Naval Service; (4) show high potential for leadership; (5) appear likely to complete the four-year course and to remain in the service beyond the period of obligated service after commissioning; (6) are of excellent moral character and enthusiastically support the Naval Service Core Values; (7) are at least 17 years of age and have not passed their 23rd birthday on July 1 of

year of entry; (8) are U.S. citizens; and (9) are unmarried, not pregnant, and have no legal obligation to support a child or other individual. DX-3.  Congress has set the size of the Brigade of Midshipmen at a limit of 4,400, *see* 10 U.S.C. § 8454; accordingly, each incoming Naval Academy class currently consists of approximately 1,180 midshipmen before attrition.

The Naval Academy's admissions process is governed by federal statute (10 U.S.C. §§ 8453–58), Department of Defense directives (DoDI 1322.22), Department of Navy regulations (SECNAVINST 1531.2D and OPNAVINST 5450.330B), and internal guidance issued every year by the Superintendent and Dean of Admissions.  *See, e.g.*, DX-3; DX-4.  Only applicants determined to meet all qualification requirements may receive an offer of appointment.  Race or ethnicity may not be considered in determining qualification.  And at the limited stages where race or ethnicity can be considered, it is only as one of many non-determinative factors in the applicant's file, and it is to contextualize that applicant's experience and speak to traits that would support admission as part of a holistic, individual assessment of that applicant.  DX-4.  At no point in the admissions process can race or ethnicity be the basis for points in favor of or against an applicant.  DX-4.  The Naval Academy does not employ racial quotas. DX-6.

### 1. Steps to Apply

Candidates may begin the application process as early as January of the year before they enter the Naval Academy (their junior year for candidates applying directly from high school). DX-159.  For this admissions cycle, new applications were not accepted after December 31, 2024, and applications were required to be completed by January 31, 2025  *Id.*

A candidate must complete five steps, as well as receive a nomination.  First, candidates must complete the Preliminary Application.  Students meeting the age eligibility and citizenship requirements may then complete the remaining Application components, such as an essay,

personal history and family background information, teacher recommendations, and academic and extracurricular information.  The Application additionally provides opportunities for candidates to supply information regarding their race, gender, ethnicity, first-generation college status, adversity experience, unusual life experience, first-generation American status, language(s) spoken at home, and whether they have received hardship funding.  DX-145.

The candidate must also complete a candidate fitness assessment,[4] undergo a medical evaluation,[5] interview with a Blue and Gold Officer (with certain exceptions for certain recruited athletes and enlisted members of the fleet),[6] and submit college entrance examination scores. Candidates need not complete these other steps in sequential order, but all must be completed by January 31 of the matriculation year.

---

[4] The Candidate Fitness Assessment (CFA) is "an important component of the admissions process" at the Naval Academy and is "used to determine if candidates can meet the physical rigors of military life."  DX-78.  The CFA measures and evaluates a candidate's potential to successfully complete the physical programs at the Naval Academy.  DX-78. The CFA consists of six physical and motor fitness events that are designed to measure muscular strength and endurance, cardio-respiratory endurance, power, balance, and agility.  *Id.*

[5] All Naval Academy applicants are required to undergo a medical examination administered by the Department of Defense Medical Examination Review Board (DoDMERB).  DX-77.  If DoDMERB identifies one or more disqualifying medical condition, the Naval Academy begins a waiver process if a waiver might be possible and the applicant is likely to receive an offer of appointment.  *Id.*  Many waiver requests are for recruited athletes.  The waiver process involves an in-depth review of the applicant's medical history and may require the applicant to provide additional information or undergo an evaluation by a specialist.  DX-77.  The Naval Academy may grant a medical waiver only if the medical condition would not prevent the applicant from successfully completing their four years at the Naval Academy and being commissioned in either the Navy or Marine Corps to fulfill the service commitment.  *Id.*; DX-4.

[6] "Blue and Gold Officers" are volunteers who serve as field representatives of the admissions process at the Naval Academy.  The interview with a Blue and Gold Officer aims for the Academy to learn about "the candidate and their motivation towards the Naval Academy" and the candidate to better understand the "admissions process and life as a Midshipman."  DX-94.

## 2.   The Nomination Requirement

Unlike applicants to civilian universities, under federal law, a Naval Academy candidate must also secure a nomination for the admissions cycle in which they wish to be considered.  *See* 10 U.S.C. § 8454.  Nominations are necessary but not sufficient for admission.

There are two types of nominations:  those from a "statutory nominating authority" (or congressional nominations) and "service-connected" nominations.   10 U.S.C. §§ 6954, 8454.  Statutory nominating authorities include the Vice President, Members of Congress, Delegates to Congress from U.S. territories and the District of Columbia, and the Governor and the Resident Commissioner of Puerto Rico. 10 U.S.C. § 8454; DX-15; DX-27.  Service-connected nominations are reserved for children of certain servicemembers; candidates who are already members of the Navy or Marine Corps, or members of Reserve Officers' Training Corps ("ROTC") programs; and candidates selected by the Superintendent.  DX-87; DX-15.

Nominations from congressional authorities make up more than 80% of the Naval Academy's Brigade of Midshipmen.  DX-23.  If a candidate is admitted (or "appointed") pursuant to a nomination by a Member of Congress, then they are "charged" to that member.  DX-87.  Each Member of Congress may have five "charges" at any one time.  DX-23.  When a Member has fewer than five charges at the end of the academic year, the Member is considered to have a "vacancy" for the following admissions cycle. *Id.*  For each vacancy, Members can nominate up to a specified number of candidates—for the upcoming class of 2029, up to 15 candidates (the number for previous classes was 10).  DX-93.  The Naval Academy has no authority or control over which candidates Members of Congress nominate.

Congressional nomination authorities, such as Members of Congress, may nominate their slate of candidates using one of three methods:  (i) "competitive," in which the Member submits

nominees to the Naval Academy without any order of preference; (ii) "principal competitive-alternate," in which the Member identifies a principal nominee and a list of unranked alternates; or (iii) "principal numbered-alternate," in which the Member identifies a principal nominee and a ranked list of alternates.  DX-23.  The Naval Academy has no authority or control over which nomination method Members of Congress use.  The method used by a Member of Congress may dictate the candidate whom the Naval Academy selects for admission.

Because of the nomination requirement, congressional nominating authorities play a large, and often determinative, role in the Naval Academy's admissions process.

### 3.  Selection of Candidates

The Naval Academy's process for selecting candidates also differs substantially from the typical process used at civilian universities.

### a.  Admissions Board

First, a computer-generated "Whole Person Multiple" ("WPM") is calculated by an algorithm based on specified information in candidates' records to assist in determining a candidate's qualification.  DX-3; DX-12; DX-72.  Race or ethnicity is not part of the WPM algorithm.  *Id.*  WPM scores are "designed to assist in predicting first year success at the Naval Academy as well as comparing candidates when being considered for offers of appointment from official nominating sources."  DX-3.

Candidate files are then randomly assigned, by computer, to a member of the Admissions Board for review and briefing to the full Board.  The Admissions Board performs three tasks: (1) determine whether a candidate is qualified, (2) recommend candidates for "Early Notify," and (3) recommend candidates for one of the Naval Academy preparatory programs.  Each of these tasks requires a majority vote of the Board, which is composed of approximately 20-25 members from a cross-section of the Naval Academy.

WPMs generally range from 40,000 to 80,000. DX-161. Candidates normally need a WPM of at least 58,000 to be considered "qualified" for admission to the Naval Academy, and applicants with scores at 70,000 or above are considered highly qualified. Race and ethnicity are not considered in determining a candidate's qualification.

In determining qualification, the Board may adjust a candidate's initial WPM through "Recommendations of the Admissions Board" ("RABs") set out in guidance. DX-1. The Board may adjust a candidate's WPM by up to +9,000 points. Some RABs are automatic, such as high school quality, "legacy" (defined at the Naval Academy as a candidate whose parent is currently on active duty or is retired from the United States military, whose parent is a reservist who qualifies for a Presidential nomination, or whose parent or sibling attended a military service academy), and exceptionally strong or weak performance on the candidate fitness assessment. DX-1; DX-2. Most RABs are manual and require judgment, such as rigor of high school coursework, demonstrated interest in science and mathematics, teacher recommendations, low socioeconomic status, overcoming significant adversity or hardship, unusual leadership experience, attending more than three high schools for factors out of their control, exceptional life experiences that would profoundly impact their moral development, maturity, cultural understanding, integrity, and ability to react under pressure, learning English as a second language, significant employment experience, first-generation American status, being first in their family to attend college, year-round or unique athletic participation, and exceptional personal statement. DX-1; DX-2; DX-160. The guidance sets forth the range of points that may be awarded (or, in certain cases, subtracted) for each RAB category. DX-1; DX-2. Neither race nor ethnicity is a RAB category. DX-1; DX-2. Points on the basis of race or ethnicity are not permitted. DX-4.

The Admissions Board additionally recommends "Early Notify" candidates whom it believes should be considered by the Dean of Admissions for a Letter of Assurance (*i.e.*, conditional offer of appointment). DX-3; DX-108. In making those recommendations, the Board considers factors accounting for varied experiences, such as exceptional athletic ability, experience as an enlisted member serving in the fleet, STEM interest, overcoming adversity, unique cultural experiences, first in family to attend college, and many others. DX-3; DX-108; DX-127.

The Admissions Board may also recommend desirable candidates who would benefit from a preparatory year in one of the Naval Academy preparatory programs. DX-126; DX-146; DX-81. The preparatory programs are the primary avenue for enlisted members of the fleet, most of whom have been away from the academic setting for several years and thus are not as directly prepared for the Naval Academy curriculum. DX-126. Recruited athletes and students residing in under-represented districts are additional focuses for the prep programs. DX-146; DX-149. In deciding to recommend an applicant for a preparatory program, the Admissions Board may consider a number of factors, including "socio-economic status, environmental factors, medical status, athletic prowess, and level or type of academic support" required. DX-149.

### b. Slate Review Committee

The Slate Review Committee—comprised of the Dean of Admissions, the Director of Nominations and Appointments, and the Director of Candidate Guidance—evaluates and selects candidates for offers of appointment.

Congressional nominations—and their corresponding congressional "slates"—"drive the process for filling the class." DX-127. Each year, the Slate Review Committee aims to fill at least one vacancy for each Member of Congress, and may fill two or more vacancies for a given Member depending on class size limitations. When a Member designates a "principal" nominee and that candidate meets all qualification requirements (including eligibility requirements, Board

qualification, medical qualification, and candidate fitness assessment qualification), the Naval Academy must offer an appointment to that candidate before considering other candidates on the slate.  If the principal nominee is not qualified or declines the offer, and the Member of Congress used the "numbered-alternate" method for their remaining nominations, the Academy must offer admission to the fully qualified candidate in the order specified by the Member of Congress.  If the Member used the "competitive-alternate" method for their remaining nominations, the Academy usually offers admission to the fully qualified candidate on the Member's list with the next highest WPM.  Approximately 35% of congressional nominations use the "principal" nomination method.

When the Member nominated a slate of candidates using the "competitive" method, the Academy generally offers an appointment to the fully qualified nominee on that slate with the highest WPM after reviewing their record.  When the highest WPM scores on a slate are within approximately 4,000 points of one another, the Slate Review Committee may review the two records side-by-side for closer scrutiny to ensure that the best qualified candidate is selected.  DX-27 at 2.  After doing so, the Slate Review Committee generally selects the slate winner with the highest WPM score but occasionally selects the slate winner out-of-WPM order.[7]

For the class of 2027, 564 midshipmen out of 1175 total were charged to congressional districts, and 177 were charged to service-connected appointments.  DX-15.

If a fully qualified candidate is not selected for the vacancy for which he or she was nominated, that candidate may still be offered an appointment.  The Naval Academy appoints a specified number of "qualified alternates"—200 for the upcoming class of 2029; 150 for previous

---

[7] The Naval Academy uses the same process for candidates with certain non-congressional nominations, such as service-connected nominations.

class years—based solely on the WPM.  DX-27.  All qualified alternates must have congressional nominations.  *Id*.  If the Academy at that point still has not filled its class, it may offer appointment to other remaining qualified candidates, known as "additional appointees."  *Id*.  75% of those candidates must have congressional nominations.  *Id*.  For the class of 2027, 100% of the additional appointees had congressional nominations.  DX-15.

The Slate Review Committee additionally determines which candidates to extend an offer for one of three Naval Academy preparatory programs.  DX-149.  Principal consideration for selection for the Naval Academy Preparatory School ("NAPS") is made for fleet candidates.  *Id*. Other considerations, both for NAPS and the two civilian preparatory programs, include recruited athletes, socioeconomic status, and residence in under-represented districts.  DX-149; DX-146. Candidates who complete the preparatory program may reapply for the Naval Academy the following year, and are evaluated for admission that next year based on their performance during the program.  DX-147; DX-148.

### 4.  The Naval Academy's Limited Consideration of Race and Ethnicity

### a.  The Naval Academy's Individualized, Holistic Review

The Naval Academy conducts an individualized, holistic review of each candidate that considers numerous factors reflected within their application record, including leadership, adversity, life experiences, military exposure, fitness, athletic prowess, socioeconomic status, academic progression, recommendations, STEM interest, cultural exposure, language fluency, first generation college status, residence in under-represented district, multi-year applicant, and many others.  At some points in this process, the Naval Academy may consider race and ethnicity as a nondeterminative factor to contextualize an applicant's experience and speak to traits that would support admission as part of its holistic assessment of that candidate.  No candidate is admitted based solely on his or her race.

As part of the process for Letters of Assurance ("LOAs") (conditional offers made by the Dean of Admissions, selected from the pool of candidates recommended by the Admissions Board for early notification), race or ethnicity may be considered among the many nondeterminative factors reflected in the holistic assessment.  An LOA is a conditional offer of admission—the candidate must still pass physical fitness standards, become medically qualified, receive a nomination, and complete any remaining requirements for admission.  If the candidate fails to satisfy any of those requirements, their offer will be rescinded.

For candidates competing on congressional slates that used the "competitive" nomination method (or the "principal competitive-alternate" method when the principal candidate is not qualified or declines an offer) and service-connected nominations, the Slate Review Committee occasionally selects a fully qualified candidate with a slightly lower WPM than the candidate with the highest WPM on that slate, as noted above.  Race or ethnicity may be considered among the many nondeterminative factors reflected in the candidates' records, though selections are made based on the strength of the overall record, including class rank, grades, academic progression, leadership, life experience, STEM interest, and recommendations.  White candidates with slightly lower WPMs can be and have been selected over minority candidates with slightly higher WPMs on the basis of a stronger overall record.  And often the candidate with the comparatively higher score will be extended an offer, either as a qualified alternate or additional appointee.

The same holistic review is used when fully qualified candidates are considered for "additional appointee" slots.  In extending such appointments, the Naval Academy may consider race and ethnicity as a nondeterminative factor in contextualizing a candidate's experience, just as it considers all the other information contained in the candidate's record.  All candidates receive this holistic evaluation, and 62% of the 255 additional appointees in the class of 2027 were White.

Theoretically, race or ethnicity could be one of the many nondeterminative factors considered as part of the Superintendent's review in extending Superintendent nominations. But race and ethnicity have not been a factor in Superintendent nominations since at least 2009. Instead, Superintendent nominations are most often used for top, highly sought-after athletes, and occasionally for other candidates that are highly qualified and motivated to attend the Naval Academy, and to compete for candidates applying to other service academies. Although the Superintendent may nominate up to 50 candidates in any given year, the Superintendent provided only 14 nominations for the Class of 2027, 12 of which were for athletes. DX-15. The remaining two were used to incentivize candidates considering other service academies.

At all of these stages of the admissions process, the consideration of race and ethnicity is cabined by the fact that only qualified candidates may ultimately be appointed to the Naval Academy, and race is not a factor in determining whether a candidate is qualified.

### b. The Naval Academy's Limited Consideration of Race is Directly Related to the Navy's Interest in a Diverse Officer Corps

The Naval Academy uses race in admissions in this limited fashion only to further the military's strategic and operational interest in developing a diverse officer corps that enables the military to meet its critical national security mission, by enhancing cohesion and readiness, assisting recruitment and retention, and ensuring domestic and international legitimacy. As discussed above, the Navy generally has a closed hiring system where it must obtain officers from accessioning sources such as the Naval Academy. If accessioning sources are not bringing in diverse officers on the front end, the Navy has no ability to develop a racially and ethnically diverse officer corps to meet its critical national security interest on the back end. And as the testimony will show, despite its efforts to increase the diversity of the applicant pool, the Naval Academy has faced challenges getting racially and ethnically diverse students both to apply and complete

their applications.   Accordingly, the Naval Academy's consideration of race and ethnicity to increase the pool of qualified applicants who will ultimately become officers directly relates to the military's interest in a diverse officer corps.   Candidates are evaluated with an eye towards the myriad ways in which they might contribute to the Navy or Marine Corps as future officers— including, for example, overcoming of adversity, life experiences, leadership potential, athletic prowess, and academic accomplishments.

### c.   The Naval Academy Does Not Use Quotas or Consider Minority Candidates in a Separate Review Process

In building diverse incoming classes, the Naval Academy neither uses floors nor ceilings for particular demographic groups nor offers appointments to candidates based on their race or ethnicity.   The Academy does not have any numerical commitments or otherwise "balance" its classes based on race.   Indeed, admissions and enrollment data show substantial fluctuations in the share of racial groups within each class year after year.   The Naval Academy also does not put members of certain racial groups on separate admissions tracks or insulate members of certain racial groups from competition for admission.   The same qualification standards and review process applies to all candidates.

### d.   The Naval Academy Does Not Use Race as a Negative or Stereotype

As discussed above, the congressional nomination method (which the Naval Academy does not control) and the WPM score (which does not factor in race and ethnicity) dictate a vast majority of admissions decisions, as does the candidate's ability to be deemed medically qualified and pass the candidate fitness assessment (none of which considers race or ethnicity).   Thus, unlike admissions at civilian universities, which may be zero-sum, race is not considered at all for many offers of appointment to the Naval Academy.   Even for the subset where race could be considered as a nondeterminative factor, appointment decisions are not made because of race; instead, race

could be considered only to the extent it provides context in an individualized and holistic evaluation of candidates. Moreover, because minorities account for a relatively small number of overall candidates, the Naval Academy's limited consideration of race has a relatively small impact on the admissions rate for White candidates.

The admissions process does not rely on racial stereotypes. The Naval Academy does not seek to admit diverse candidates on the assumption that they express a particular viewpoint shared by others of the same background. Rather, the Naval Academy seeks to admit diverse candidates so that midshipmen can learn how to be effective battlefield commanders and so that the Navy can achieve its interest in cohesion and lethality, recruiting and retention, and legitimacy through a diverse officer corps. And the Naval Academy's admissions process is grounded not in stereotyped *assumptions* about how midshipmen—and ultimately officers—of particular races and ethnicities will or will not contribute to those military interests; it is grounded in professional military judgments—supported by extensive experience and research—that a diverse officer corps directly facilitates those interests and serves as a risk mitigator. *See supra* at 5-15.

### e. The Naval Academy Does Not Intend to Use Race and Ethnicity as a Factor in its Admissions Process Indefinitely

The Naval Academy does not intend to use race as a factor in its admissions process indefinitely. The Naval Academy aims to recruit and admit highly qualified individuals who are generally reflective of the demographics of the nation they will serve.

Black individuals comprise approximately 14% of the population. DX-53. Yet just 7.4% of the Naval Academy class of 2027 was Black, and only 8.3% of Navy officers and 5.9% of Marine Corps officers are Black. DX-52; DX-113. Similarly, while Hispanic individuals make up approximately 20% of the population, they accounted for approximately 15% of the Naval Academy class of 2027. DX-53; DX-113. These are improvements from even four years ago

(when 7% of the class of 2023 was Black and 12% was Hispanic), but it is evident that the Naval Academy's incoming classes are not yet reflective of the general population.  DX-109.

The Naval Academy reviews its admissions process, including the limited use of race and ethnicity, annually and has conducted substantive legal reviews on at least four occasions in the past twenty years.  DX-6.  The Naval Academy anticipates that once it is able to achieve and maintain the diversity of its student body at a level reflective of the general population, it will no longer have a need to continue its limited consideration of race in the admissions process.

### 5.    Race-Neutral Efforts

Both within and outside of the admissions process, the Naval Academy has implemented extensive race-neutral factors.  Additionally, over time, the Naval Academy has added more race-neutral efforts and, correspondingly, narrowed its use of race.

Within the admissions process, the Naval Academy makes concerted efforts to contact minority applicants who have started but not yet completed their application to encourage them to complete the application.  The Naval Academy has also added numerous race-neutral factors to its WPM and RABs to award points to candidates based on various race-neutral characteristics.  For example, the Naval Academy awards additional points for based on socioeconomic status, adversity, hardship, unusual life experience, first-generation college status, first-generation American status, English as second language, and military exposure. DX-1; DX-2. Beyond points, throughout the admissions process, the Naval Academy also considers and highly values those same characteristics, as well as additional race-neutral characteristics such as candidates applying from the fleet, residence in under-represented districts, and recruited athletes, among others.  DX-4.

The Naval Academy has also invested heavily in expanding its recruitment and outreach efforts, including targeted focus on minority recruitment, to broaden its applicant pool.  Such

efforts include: (a) frequent visits to Navy and Marine Corps units; (b) the Naval Academy's Summer Seminar, Summer STEM, and INSPIRE programs for high school students; (c) the hosting of STEM events by Naval Academy alumni in middle school; (d) candidate visit days and weekends; (e) Centers of Influence programs with education administrators, counselors, teachers, and principals; (f) admissions forums in under-represented areas and for under-served populations; (g) Operation Information programs focusing on under-represented areas; (h) midshipmen music tours by the Naval Academy Gospel Choir and the Mariachi Band; (i) field counselors in five major cities whose primary responsibility is to visit schools to educate students and teachers; (j) Platform Q Education virtual outreach to engage students, parents, and counselors; and (k) marketing through text messaging, social media, and mass emailing. *See, e.g.*, DX-29; DX-80; DX-84; DX-97; DX-106; DX-154; DX-155; DX-162.

Indeed, the Naval Academy has continually increased its investment in its outreach efforts. For example, the Naval Academy launched its INSPIRE program in the fall of 2021 as a pilot program to attract highly qualified minorities. DX-116. The program began with 53 students and 55 parents in the fall of 2021, with a cost of $70,000; by 2023, the Naval Academy had more than tripled its investment in the program, bringing in 101 students and 103 parents for a cost of $223,000. *Id* at 2. As another example, in the last few years the Naval Academy invested substantial funds in a contract with a marketing and enrollment management company focused on increasing the pool of qualified diverse candidates. DX-23; DX-24; DX-119.

Moreover, recognizing that congressional nominations drive a substantial portion of the admissions process, the Naval Academy regularly meets with Members of Congress, such as during Congressional Academy Days, to educate them on the nomination process and encourage

them both to nominate students (because many do not, including in under-represented districts) and to nominate diverse students. *See, e.g.*, DX-23; DX-106.

These efforts have helped improve minority representation, but they alone have not enabled the Naval Academy to admit a brigade of midshipmen that is reflective of the U.S. population. During each admissions cycle, the Naval Academy has found that relying only on race-neutral factors is not sufficient in building a diverse class.

### C.    Service Assignments and Retention

Upon graduation, midshipmen are commissioned as active-duty officers in the Navy or Marine Corps. In their final year, Naval Academy midshipmen are placed into one of 24 different career choices in the Navy or Marine Corps. DX-157. The service assignment process is governed by USNA Instruction 1305.5L. *Id.* Race and ethnicity play no role in the service selection process. *Id.* Service assignments are based on specific requirements provided to the Naval Academy by the Department of the Navy leadership for each community and consider a midshipman's qualifications, aptitude, and desires for a particular assignment. *Id.* at 2. Generally, "[m]idshipmen qualifications and the needs of the Navy and Marine Corps drive the service assignment process; however, midshipmen preferences are honored as often as possible." *Id.* at 1. Approximately 83% of midshipmen in the Class of 2024 received their first choice of service assignment and 10% received their second choice.

The Deputy Chief of Naval Operations sets the number of slots available to midshipmen per community, and each community sets requirements for midshipmen to be selected into the community. One such requirement is being physically qualified, which is determined by the Navy Bureau of Medicine and Surgery. The Deputy Chief of Naval Operations has prioritized the Navy Unrestricted Line or Marine Corps for physically qualified midshipmen. *Id*. at 2. As discussed above, the Unrestricted Line consists of the warfighting communities: SEAL, Surface Warfare,

Submarine, Aviation, and Explosive Ordnance Disposal.  *Id.*.  Midshipmen not physically qualified midshipmen for those communities will be assigned to the Restricted Line and Staff Corps.  *Id*. at 2.  Once midshipmen rank their first through sixth preferences, Community Assignment Boards (comprised of representatives of each community) review midshipmen who rank their community first and determine whether they want to offer a midshipman an offer to join their community.  *Id*. at 5-6.  The Service Assignment Review Board (SARB) reviews the initial service assignments, and if there are shortfalls or excesses after completion of the initial screening boards, the SARB will review midshipmen's records "to identify best-fit assignments for midshipmen in an excess status and qualified candidates to fill the shortfalls in the requirements."  *Id*. at 7.  The Superintendent provides final approval on assignments.

The evidence will show that as the racial and ethnic diversity of the Naval Academy's classes has increased, so too has the number of racially and ethnically diverse officers in the Navy and Marine Corps.  The evidence will further show that long-term retention rates for minority officers are better than the retention rates for non-minority officers.

### D.     The Navy's Closed Personnel System

Unlike graduates of civilian universities, Naval Academy graduates are immediately active-duty officers and required to serve a minimum of five years in the Navy or Marine Corps.  Also, unlike civilian universities, the Naval Academy provides a vital pipeline for the future leaders of the Navy and Marine Corps.  The military has determined that for its future officers to perform these weighty and unique roles, its officers-in-training must comprise, train with, and be exposed to, individuals of different backgrounds.

Further, the Navy's closed-personnel system requires reliance on a diverse pipeline of future leaders, which it cannot achieve without the approximately 1,100 Naval Academy graduates who commission every year.  This is because the Navy and Marine Corps do not generally

commission new Unrestricted Line officers above the rank of O1 or O2.  Nor do the Navy and Marine Corps generally accept lateral transfers of civilians into the military at a rank of O3 or higher.  To achieve a more diverse officer corps, particularly at the senior leadership ranks, DoD, the Navy, and Marine Corps must develop, promote, and retain a diverse pipeline of leaders.

Accordingly, the Naval Academy's graduating classes also serve as a critical pipeline for a diverse *senior* military leadership, particularly in the Unrestricted Line communities which account for the majority of Flag Officer and Command billets.  Naval Academy graduates account for 40% of senior naval officers and 91% of Chiefs of Naval Operations—the highest-ranking officer in the Navy—have been Naval Academy graduates.

## II.   PROPOSED CONCLUSIONS OF LAW

### A.   Standard Applied to Admissions Policies that Consider Race

Governmental classifications based on race must satisfy "strict scrutiny." *Students for Fair Admissions v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 206–07 (2023) ("*SFFA*"). To determine whether an action satisfies strict scrutiny, the Court must first consider whether consideration of race would "further compelling governmental interests." *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003).  It must then determine whether the government's use of race is "'narrowly tailored'—meaning 'necessary'—to achieve that interest." *SFFA*, 600 U.S. at 207 (quoting *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311–12 (2013) ("*Fisher I*")).  In *SFFA*, the Supreme Court concluded that the admissions programs of Harvard College and the University of North Carolina failed to satisfy strict scrutiny.  600 U.S. at 230.  But it left open the possibility that other admissions programs *could* satisfy strict scrutiny if they are designed to achieve one or more compelling interests that can be "subjected to meaningful judicial review" and are narrowly tailored to achieve those interests. *Id.* at 214.

31

By its own terms, *SFFA* does not apply to military academies. The Supreme Court explained that the *SFFA* "opinion . . . does not address" "the propriety of race-based admissions systems" "at our Nation's military academies," because of "the potentially distinct interests that military academies may present." *Id.* at 213 n.4.

The Supreme Court has underscored that "strict scrutiny must take relevant differences into account, and courts must calibrate their narrow-tailoring inquiry to the relevant context." *Grutter*, 539 U.S. at 327 (quotation omitted); *see also id.* at 327 ("Context matters when reviewing race-based governmental action."); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 725 (2007) (explaining that *Grutter* arose in "the unique context of [civilian] higher education[]"). Thus, courts must calibrate their narrow-tailoring inquiry in the context of the distinct interests presented by service academies—as the Supreme Court recognized in *SFFA*. *SFFA*, 600 U.S. at 213 n.4. The relevant context here is the military's distinct national security interests served by a diverse officer corps. *Grutter*, 539 U.S. at 308 ("High-ranking retired officers and civilian military leaders assert that a highly qualified, racially diverse officer corps is essential to national security."). As a result, the narrow tailoring inquiry applicable to civilian universities' use of race to achieve educational diversity, *see Grutter*, 539 U.S. at 334, cannot be mechanistically applied to the Naval Academy's use of race to achieve an altogether different compelling national security interest. The Supreme Court has had "no occasion to define the contours of the narrow-tailoring inquiry" in this distinct military context. *Id.* at 333; *see SFFA*, 600 U.S. at 213 n.4.

### B.    Deference to the Executive in Matters of National Security

The "Constitution vests '[t]he complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force' exclusively in the legislative and executive branches." *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1511 (D.C. Cir. 1989) (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)). And "courts traditionally have been reluctant to

intrude upon the authority of the Executive in military and national security affairs." *Department of Navy v. Egan*, 484 U.S. 518, 530 (1988); *see also Students for Fair Admissions v. United States Naval Acad.*, No. RDB-23-2699, 707 F. Supp. 3d 486 (D. Md. 2023) ("[C]ourts have consistently deferred to the military regarding its personnel decisions.  Accordingly, the Naval Academy is due more deference than were the private and public universities in *Harvard* given the explicit caveat in footnote 4 of *Harvard*[.]"); *Hrdlicka v. Del Toro*, No. RDB-22-2299, 2023 WL 4108267 at *6 (D. Md. June 21, 2023) ("Courts are traditionally reluctant to interfere with the military establishment, including military personnel decisions"); *Selland v. Perry*, 905 F. Supp. 260, 264 (D. Md. 1995), *aff'd*, 100 F.3d 950 (4th Cir. 1996) ("Deference is warranted when the policy in question concerns the 'complex, subtle, and professional decisions as to the composition, training, equipping and control of a military force,' and is a 'studied choice of one alternative in preference to another for furthering that goal.'") (internal citations omitted); *Gilligan*, 413 U.S. at 10 (stating, in reference to the Ohio National Guard's "training, weaponry, and orders," that it is "difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible—as the Judicial Branch is not—to the electoral process.").

Indeed, "[t]he Constitution itself requires deference to the military choices of the political branches.  This includes deference to the judgments of military officials—not because of their expertise—but because the military authorities have been charged by the constitutionally responsible branches—that is, the Executive and Legislative Branches—with carrying out our Nation's military policy."  *Doe 2 v. Shanahan*, 917 F.3d 694, 730 (D.C. Cir. 2019) (Williams, J., concurring) (quotation omitted). "Judicial deference is at its apogee" in assessing the judgments of military officials because "[n]ot only are courts ill-equipped to determine the impact upon

33

discipline that any particular intrusion upon military authority might have, but the military authorities have been charged by the Executive and Legislative Branches with carrying out our Nation's military policy." *Goldman v. Weinberger*, 475 U.S. 503, 507–08 (1986) (quotation marks, alterations, and citations omitted).

While "mindful that 'military interests do not always trump other considerations,'" courts "'give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.'" *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020). Accordingly, when the judiciary is called to review a decision by the Armed Forces, the Supreme Court has stressed that "the tests and limitations to be applied may differ because of the military context," including when constitutional claims are involved. *Rostker v. Goldberg*, 453 U.S. 57, 67 (1981). *See, e.g.*, *Austin v. U.S. Navy SEALs 1-26*, 142 S. Ct. 1301 (2022) (partially staying order precluding the Navy from considering vaccination status in making "deployment, assignment, and other operational decisions"); *id.* at 1302 (Kavanaugh, J., concurring) (expressing concern over "judicial intrusion into military affairs . . . because the Navy has an extraordinarily compelling interest in maintaining strategic and operational control over the assignment and deployment [of] personnel[]"); *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) (reversing preliminary injunction prohibiting the Navy from conducting sonar exercises, and deferring to "declarations from some of the Navy's most senior officers, all of whom underscored the threat posed by enemy submarines and the need for extensive sonar training to counter this threat"); *Goldman*, 475 U.S. at 507 ("Our review of [a constitutional challenge to] military regulations . . . is far more deferential than constitutional review of similar laws or regulations designed for civilian society."); *Rostker¸* 453 U.S. at 64–68 (judgments concerning registration and the draft "are based on judgments

concerning military operations and needs" and "unquestionably due" deference).[8]

Although the Supreme Court has declined to attach a "label[]" to the type of review applicable to military decisions which would traditionally trigger heightened scrutiny, *Rostker*, 453 U.S. at 70, it has cautioned that courts "must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest[,]" *Goldman*, 475 U.S. at 507, and "must be particularly careful not to substitute . . . [their] own evaluation of evidence for a reasonable evaluation by" the military. *Rostker*, 453 U.S. at 68; *see also Hrdlicka*, 2023 WL 4108267 at *6 ("Courts are generally not equipped to review professional military judgments."); *see also Trump v. Hawaii*, 585 U.S. 667, 708 (2018) (emphasizing that courts "cannot substitute [their] own assessment for the Executive's predictive judgments on such matters" and that "the Executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of litigation involving 'sensitive and weighty interests of national security and foreign affairs.'" (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010)).

---

[8] *See also Gilligan*, 413 U.S.at 4, 10; *Egan*, 484 U.S. at 530; *Chappell v. Wallace*, 462 U.S. 296, 301-02–302 (1983); *Haig v. Agee*, 453 U.S. 280, 291-94–294 (1981); *Schlesinger v. Councilman*, 420 U.S. 738, 757-58–758 (1975); *United States v. Nixon*, 418 U.S. 683, 710 (1974); *Orloff v. Willoughby*, 345 U.S. 83, 93–94 (1953); *Burns v. Wilson*, 346 U.S. 137, 142, 144 (1953); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 645 (1952) (Jackson, J., concurring) (the Court "should indulge the widest latitude" to sustain the President's "function to command the instruments of national force[]"); *Wimmer v. Lehman*, 705 F.2d 1402, 1403 (4th Cir. 1983), *cert. denied*, 464 U.S. 992 (1983) (upholding the Naval Academy's midshipmen removal process and deferring to Navy's interpretation of statutes guiding it); *Doolen v. Wormuth*, 5 F.4th 125, 133 (2d Cir. 2021) (similar); *Berry v. Bean*, 796 F.2d 713, 716 (4th Cir. 1983) ("[C]ourts accord decisions of military authorities great deference."); *Selland*, 905 F. Supp. at 266 ("Deference towards Congressional and Presidential judgment in the military context . . . counsels that courts should proceed with caution even in an equal protection claim.").

Repeatedly, the Supreme Court has granted the political branches significant latitude to choose "among alternatives" in furthering military interests, *Rostker*, 453 U.S. at 71–72, as well as where to "draw[] the line" on particular standards, *Goldman*, 475 U.S. at 510.  And it has routinely accepted the judgments of senior military leaders regarding matters of readiness and operational risk.  *Winter*, 555 U.S. at 26 (deferring to the judgment of the Chief of Naval Operations regarding military readiness needs); *Austin*, 142 S. Ct. at 1302 (2022) (Kavanaugh, J. concurring) (deferring to the judgment of the Vice Chief of Naval Operations regarding operational risk and observing that lower court improperly "inserted itself into the Navy's chain of command, overriding military commanders' professional military judgments.").

### C.      Compelling Interest

The military's interests in manning, readiness, and training is a compelling government interest.  *See, e.g.*, *Austin*, 142 S. Ct. at 1302 (Kavanaugh, J., concurring) ("the Navy has an extraordinarily compelling interest in . . . control over decisions about military readiness."); *Rostker*, 453 U.S. at 70 ("No one could deny that . . . the Government's interest in raising and supporting armies is an 'important governmental interest.'").  Indeed, several Circuits have recognized that the law enforcement context is one in which the operational benefits of diversity constitute a compelling interest—and that is just as true, if not more so, in the military context.[9]

---

[9] *See, e.g., Patrolman's Benevolent Ass'n v. City of New York*, 310 F.3d 43, 52 (2d Cir. 2002), *cert. denied*, 538 U.S. 1032 (2003)  ("We have recognized that 'a law enforcement body's need to carry out its mission effectively, with a workforce that appears unbiased, is able to communicate with the public and is respected by the community it serves,' may constitute a compelling state interest . . . and several courts have relied on the 'operational need' of law enforcement and correctional agencies to uphold hiring or assignment practices that favored minorities, even in the absence of past discrimination.") (citing cases); *Petit v. City of Chicago*, 352 F.3d 1111, 1114 (7th Cir. 2003), *cert. denied*, 541 U.S. 1074 (2004) (finding a "compelling need for diversity in a large metropolitan police force charged with protecting a racially and ethnically divided major American city like

### D.      Distinct National Security Interest

*SFFA* does not suggest otherwise.  *SFFA* did not address national security.  Its reasoning cannot be extended to the national security context.  In *SFFA*, the Supreme Court rejected two civilian institutions' interest in educational diversity because it was not sufficiently measurable; a court could not know, for example, whether student leaders have been adequately "train[ed]" or whether the exchange of ideas in the classroom is "robust." 600 U.S. at 214.  By contrast, no precedent, not even *SFFA*, requires courts to quantify or measure the military's national security interests before upholding policies based on those interests. *See Larsen v. U.S. Navy*, 486 F. Supp. 2d 11, 29 (D.D.C. 2007) ("tak[ing] the Navy's" "stated justifications for its policy[]" "at its word" as the policy "concern[ed] 'operational, strategic, or tactical matters'") (internal citation omitted). On the contrary, the Supreme Court has cautioned that "a searching inquiry into the persuasiveness" of national security interests "is inconsistent" with the deference owed to the Executive in this sphere.  *Trump*, 585 U.S. at 686.  *See Rostker*, 453 U.S. at 65 (observing that when it comes to collecting evidence and drawing factual inferences in this area, "the lack of competence on the part of the courts is marked.").

For example, in *Goldman,* a Free Exercise challenge, the Supreme Court did not seek to "measure" the military's interest in duty and discipline in reviewing the constitutionality of an Air Force regulation mandating uniform dress requirements for military personnel.  *See generally Goldman*, 475 U.S. at 503.  And in *Winter*, the Court did not seek to "measure" the Navy's interest in the effective training of its sailors in assessing a challenge to the Navy's use of sonar during training exercises. *See generally Winter*, 555 U.S. at 7.  And with good reason.  Under separation

---

Chicago," and holding that Chicago "has set out a compelling operational need for a diverse police department").

of powers principles, the courts are not well positioned to measure the nature of the military's interests in national defense.

To the extent that the measurability analysis transfers to the distinct military academy context, the Naval Academy's interest is measurable.  The Naval Academy seeks to develop a diverse officer corps to bolster national security by limiting racial tensions that can undermine unit cohesion, harm recruitment, increase attrition, and erode international and public legitimacy. Those threats to national security are measurable. For one, senior military leaders have testified that racial disharmony can measurably affect national security, and courts must defer to those assessments. *See, e.g.*, DX-50. Likewise, the prevalence of racial riots (or lack thereof), recruitment numbers, survey data on command climate, and demographic data of the general population compared to the officer corps are all measurable.[10]  Indeed, the military's interest here is no less measurable than in the prison context, which *SFFA* discussed, where success is measured by the "prevent[ion] [of] harm." *SFFA*, 600 U.S. at 215 (citing *Johnson v. California*, 543 U.S. 499, 512–13 (2005)); *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 521 (1989) (Scalia, J., concurring in judgment).  If anything, prevention of such harm within the military is of even greater significance than in prisons, given the national security consequences.

### E.    Narrow Tailoring

 "The purpose of the narrow tailoring requirement is to ensure that the means chosen fit the compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Grutter*, 539 U.S. at 333 (cleaned up).  It is "calibrate[d] to the relevant context." *Grutter*, 539 U.S. at 327.  To be narrowly tailored, an

---

[10]  This examination of demographic data is different from UNC's and Harvard's use of demographic data to meet "numerical commitment[s]" and enroll minorities in proportion to the general population.  *SFFA*, 600 U.S. at 222–25.

admissions program that considers race must treat each applicant "as an individual in the admissions process."  *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 318 (1978); *see also Grutter*, 539 U.S. at 337.  "[T]ruly individualized consideration demands that race be used in a flexible, nonmechanical way," and thus universities *may* "consider race or ethnicity . . . flexibly as a 'plus' factor in the context of individualized consideration of each and every applicant." *Grutter*, 539 U.S. at 334; *see also Fisher I*, 570 U.S. at 312.  The fact that race and ethnicity "play[] a role in only a small portion of admissions decisions" is also itself a "hallmark of narrow tailoring[.]" *Fisher v. Univ. of Tex. at Austin*, 579 U.S. 365, 384–85 (2016) ("*Fisher II*"). But race may not be a "defining feature" and educational institutions must consider "the broad range of qualities and experiences that may be considered valuable contributions" beyond race and ethnicity. *Grutter*, 539 U.S. at 337-38.  "[A]pplicants of all races" must be "afford[ed] this individualized consideration." *Id.* at 337.  The Naval Academy's admissions process, including its limited consideration of race, complies with these standards.

Educational institutions may not "establish quotas for members of certain racial groups," "put members of those groups on separate admissions tracks," or "insulate applicants who belong to certain racial or ethnic groups from the competition for admission."  *Id.* at 334; *see also Bakke*, 438 U.S. at 315–20.[11]  "[S]ome attention to numbers, without more, does not transform a flexible admissions system into a rigid quota." *Grutter*, 539 U.S. at 335-36 (quotations omitted).  "Properly understood," a "quota"  reserves "a certain fixed number or proportion of opportunities . . . exclusively for certain minority groups," thereby "impos[ing] a fixed number or percentage which

---

[11] *SFFA* did not overrule *Grutter*, *Fisher*, or *Bakke* insofar as those cases define the contours of the narrow-tailoring inquiry.  Indeed, the Court *relied* on those cases in striking down Harvard's and UNC's admissions programs that considered race, making clear that the guidance in those cases survives *SFFA* and should continue to guide lower courts as they consider such programs.

must be attained, or which cannot be exceeded." *Id.* at 335 (quotations omitted); *see also SFFA*, 600 U.S. at 211, 223. The Naval Academy admissions process does not establish quotas for members of certain racial groups, put members of such groups on separate admissions tracks, or insulate applicants within any racial group from competition for admission.

Courts must also consider whether there is a meaningful connection between the means employed by universities and the goals pursued, *SFFA*, 600 U.S. at 215; whether race is used as a "negative" or stereotype, 600 U.S. at 218; whether the use of race is "limited in time," *Grutter*, 539 U.S. at 342;[12] *see also SFFA*, 600 U.S. at 212; and whether "workable race-neutral alternatives that will achieve the diversity the university seeks" were considered in "good faith," *Grutter*, 539 U.S. at 339; *see also Fisher I*, 570 U.S. at 312; *Fisher II*, 579 U.S. at 399 (Alito, J., dissenting). Critically, the consideration of race-neutral alternatives does not require "exhaustion of every conceivable race-neutral alternative," nor does it require "a university [to] choose between maintaining a reputation for excellence or fulfilling a commitment to provide educational opportunities to members of all racial groups." *Grutter*, 539 U.S. at 339.

Consistent with these standards, there is a close connection between the Naval Academy's limited consideration of race and the military's compelling national security interest; the Naval Academy's use of race does not operate as a negative or stereotype; and the Naval Academy does not intend to use race in the admissions process indefinitely. Additionally, there are no workable, race-neutral alternatives that the Naval Academy is not already using that would result in the level of racial and ethnic diversity sought by the Academy and that would not compromise its high academic standards and the myriad characteristics it seeks in future military leaders. The Naval

---

[12] Because *SFFA* explicitly declined to consider service academies' "distinct interests," its requirement of an end point does not apply in this national security context. "[R]elevant differences" must be taken "into account." *Johnson*, 543 U.S. at 515.

Academy's consideration of race is narrowly tailored to further the military's national security interests.

Dated: September 4, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch


_/s/ John Robinson_
JOSHUA E. GARDNER
*By Special Appearance*
Special Counsel
ANDREW E. CARMICHAEL
*By Special Appearance*
Senior Trial Counsel
CHRIS EDWARD MENDEZ
*By Special Appearance*
JOHN ROBINSON
*By Special Appearance*
CATHERINE M. YANG
*By Special Appearance*
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 616-8489
Email: john.j.robinson@usdoj.gov

MEDHA GARGEYA
*By Special Appearance*
Counsel
U.S. Department of Justice
Civil Division, Office of the Assistant
Attorney General
950 Pennsylvania Avenue NW
Washington, DC 20530

*Attorneys for Defendants*