# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND NORTHERN DIVISION

STUDENTS FOR FAIR ADMISSIONS,

*Plaintiff*,

v.

THE UNITED STATES NAVAL ACADEMY, *et. al*,

*Defendants*.

No. 1:23-cv-02699

## PLAINTIFF'S PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

TABLE OF CONTENTS ..............................................................................................................ii

PROPOSED FINDINGS OF FACTS ......................................................................................1

I.      The Parties .......................................................................................................................1

II.     The Naval Academy's Admissions Process ...............................................................2

III.    The Naval Academy engages in racial balancing ....................................................5

IV.     The Naval Academy gives racial preferences to Blacks, Hispanics, and Asians ......................6

V.      The Naval Academy has no defined end point for stopping its use of race ..............................7

VI.     The Naval Academy failed to consider or implement race-neutral alternatives ......................8

VII.    The Naval Academy's use of race does not achieve—and, in fact,
        undermines—the goals the Academy claims to pursue. ...............................................9

PROPOSED CONCLUSIONS OF LAW ..............................................................................11

I.      SFFA has Article III standing .....................................................................................11

II.     The Naval Academy must satisfy strict scrutiny ...................................................11

III.    The Naval Academy fails strict scrutiny ..................................................................11

        A.      The Naval Academy's use of race does not further compelling governmental
                interests. ................................................................................................................12

        B.      The Naval Academy's use of race is not narrowly tailored. .........................16

CERTIFICATE OF SERVICE ..............................................................................................23

Per the Court's scheduling order, Students for Fair Admissions provides the following proposed findings of facts and conclusions of law.[1]

## PROPOSED FINDINGS OF FACTS

### I.   The Parties

SFFA is a voluntary membership association whose purpose is to "'defend human and civil rights secured by law, including the right of individuals to equal protection under the law.'" Dkt. 108 at 12. SFFA has identified four members (known by the parties as Members A, B, C, and D) who applied to, and were rejected by, the Naval Academy. *Id.*; *see* Dkts. 75-1, 98 (summary judgment briefing). Members A, B, and C are ready and able to apply to the Naval Academy, for the next open admissions cycle, if a court orders the Academy to stop using race and ethnicity as a factor in admissions. Dkt. 75-1 at 2-5. Member D is applying to the Naval Academy this Fall and wants to be treated equally regardless of his race or ethnicity. *Id.* at 5-7.

The Naval Academy was established in 1845 to "prepare midshipmen to become professional Officers of competence, character, and compassion in the U.S. Navy and Marine Corps." Dkt. 60 (P.I. Op.) at 9 (cleaned up). The Naval Academy's admissions process is highly selective. Congress has set the size of the Brigade of Midshipmen at a limit of 4,400. 10 U.S.C. § 8454(a). As such, each incoming class currently consists of about 1,180 midshipmen before attrition. Midshipmen who graduate from the Academy are commissioned as officers in either

---

[1] Defendants today are also filing proposed findings of facts and conclusions of law. The parties have agreed that these filings are preliminary in nature and that neither side should be precluded from presenting facts or legal arguments because of these pre-trial filings.

the Navy or Marine Corps and are obligated to serve five years on active duty following com-

missioning. 10 U.S.C. § 8459(a)(2)(A).

## II.     The Naval Academy's Admissions Process

The Naval Academy uses race throughout the admissions process. In its "Preliminary

Application," the Academy asks applicants to self-report their race. P049 at USNA-00003754.

In the "personal data record" component of the application itself, the Academy requires stu-

dents to "provide a brief explanation of [the] ethnic/racial heritage" they previously identified.

P049 at USNA-00003754. The Academy also asks candidates to designate a school official to

complete a "Candidate Academic Information" form, which requires the school official to

answer whether the student is a member of a minority group. Officials cannot specify which

"minority group," nor can they explain how that applicant's race or ethnicity affected the stu-

dent's life; they can only answer "yes" or "no" as to whether the student is a minority. P049

at USNA-00003775.  In the early stages of each admissions cycle, the admissions office circu-

lates weekly reports tracking how many Black, Hispanic, and Asian students have begun ap-

plications and how many have already completed them. The tracking reports compare those

numbers to the admissions figures at the same point in the admissions cycle the year before.

*See, e.g.*, P574 at Slide 2.

Completed applications are routed to the Board of Admissions for review. Despite its

official-sounding name, the Board has no binding authority on any element of the admissions

process. It does not decide which applicants are admitted and which are rejected, or even

which candidates are *eligible* for admission. Rather, the Board only makes recommendations to

the Dean of Admissions about whether it considers an applicant "qualified" or "unqualified"

for admission, whether it believes an applicant is a good candidate for admission to the Naval Academy Preparatory School or one of the Academy's civilian prep programs, and whether it believes an applicant deserves "a conditional offer of admission" (also known as a "letter of assurance" or "LOA"). Race can be—and is—considered when the Board makes these recommendations. *See generally* P5-P9. Race is particularly important when candidates fall below the "Whole Person Multiple" score that is "typically" required for an LOA. In those situations, race may be "a plus factor"—but only for "minority groups."

Aside from the Superintendent, the Dean of Admissions wields sole power to decide whether an applicant is ultimately admitted. The Dean can, and does, overrule the Board's determinations about who is "qualified." The first wave of offers each year are the "conditional offers" given to LOA recipients. The Dean of Admissions is also the sole arbiter of whether a candidate receives an LOA; those applicants who receive an LOA are essentially guaranteed admission if they complete the remaining requirements. The Academy emphasizes that LOAs are "conditional," and that LOA recipients must still obtain a nomination to be fully admitted. However, if an applicant with an LOA fails to obtain a nomination on his or her own, then the Director of Nominations and Appointments will contact congressional offices on their behalf to obtain one for them.

Once the offer process begins in earnest, the admissions office changes its weekly reports to track how many minority applicants have received offers and how those figures compare to the number of offers that had been extended to minority applicants on the same day the previous year. Race continues to be a plus for "minority candidates" throughout the rest of the Academy's admissions. For most congressional and service-connected nominees, a

student's race can be decisive when choosing slate winners. When two applicants on the same congressional slate have Whole Person Multiple scores within 4,000 points of one another, the Academy considers race when selecting a candidate: it can and regularly will select a minority candidate with a lower score over a nonminority candidate with a higher one. But the opposite is not true: the Naval Academy does not use a white candidate's race as a plus when picking between two applicants who are fewer than 4,000 points apart. Race also plays a role in "Superintendent nominations," which are offers of admission extended directly by the Superintendent—or the Dean of Admissions acting on his behalf—and can fill up to fifty seats in each incoming class.

Federal law requires the Academy to set aside 150 seats[2] in each class for "qualified alternates" selected by order-of-merit (i.e., WPM score) from the remaining congressional nominees who did not win their congressional slates. The Academy's description of its process strongly implies that qualified alternates are chosen sequentially, after the winners of all congressional slates have been determined. *See* Dkt. 46-2 ("After USNA determines the slate of candidates to fill congressional vacancies, it combines all remaining these [sic] candidates into a nationwide pool. The 150 highest-ranked candidates by WPM are appointed as qualified alternates."). In practice, however, the Academy admits candidates as "qualified alternates" throughout the admissions cycle and routinely moves candidates on and off the qualified-alternate list. For example, when the admissions office wants to admit a candidate with a low WPM from a congressional district where it has already designated a higher scoring candidate

---

[2] Beginning with the application cycle for the Class of 2029, there will be 200 slots for Qualified Alternates. *See* 10 U.S.C. §§ 8454(a), (b)(5) (as amended by Pub. L. 118-31 §§ 561(b)(1)-(2)).

as the slate winner, it makes the lower-scoring candidate—whose WPM is too low for a qualified alternate slot—the new slate winner and "shifts" the higher-scoring candidate on to the qualified alternate list. After the Academy has chosen its desired incoming class, it identifies the 150 non-slate winners with the highest WPMs and "charges" those seats as qualified alternates.

At the end of the admissions cycle, the Academy considers race again when selecting "additional appointees." The Academy selects "additional appointees" in two ways, and both use racial preferences. The Academy automatically appoints anyone who received a letter of assurance—an award that, itself, can be influenced by race. The Academy also considers race as a factor when appointing any remaining candidates. In either case, a student's race and ethnicity can be used as a plus only for "minority groups." Even the Academy's internal "wait list plan" prioritizes minority applicants over nonminority candidates when filling available seats.

## III.   The Naval Academy engages in racial balancing

The Naval Academy admits that its goal is to achieve a brigade of midshipmen that matches the racial demographics of the eligible U.S. population. The admissions office closely monitors the racial makeup of the admitted applicant pool as each incoming class takes shape, including through detailed numerical charts that compare the composition of the current class with those of previous classes at the same point in the admissions cycle. Everyone in the admissions chain of command—from the Superintendent to regional admissions staff—is kept abreast of the Academy's progress.

If the admissions office believes it is on track to admit too few racial minorities in general, or too few of a certain racial group, it prioritizes applicants from those racial groups when filling the remaining seats in the class. It does this through a variety of methods, including prioritizing racial minorities for appointments to "second vacancies" for particular congressional districts and using race as a filtering mechanism when choosing applicants from the wait list.

Given these efforts, the Academy has kept the racial makeup of its classes remarkably stable over the past decade:

| Share of Students Admitted by Race | | | |
|---|---|---|---|
| | African-American | Hispanic | Asian-American/Other |
| Class of 2017 | 9% | 10% | 13% |
| Class of 2018 | 9% | 11% | 13% |
| Class of 2019 | 10% | 11% | 14% |
| Class of 2020 | 9% | 10% | 14% |
| Class of 2021 | 11% | 11% | 16% |
| Class of 2022 | 11% | 10% | 14% |
| Class of 2023 | 10% | 12% | 17% |
| Class of 2024 | 10% | 11% | 15% |
| Class of 2025 | 10% | 13% | 17% |
| Class of 2026 | 11% | 13% | 18% |
| Class of 2027 | 12% | 13% | 19% |

P39; P45.

## IV.     The Naval Academy gives racial preferences to Blacks, Hispanics, and Asians

The Naval Academy claims that it considers an applicant's race as "a nondeterminative factor in its holistic assessment of candidates." Dkt. 46 at 46. But that is not true. SFFA's econometric expert, Peter Arcidiacono, conducted extensive statistical analysis of the Academy's admissions data, employing techniques that have been endorsed by peer-reviewed

economics journals for analyzing race in admissions decisions. Arcidiacono's analysis shows that the Academy affords significant racial preferences throughout its admissions process to non-white applicants over their white counterparts, with especially large preferences for Black applicants over all other applicants.

The Academy's admissions program is zero-sum: Because there are limited seats for admission and many candidates compete for those slots, any benefit provided to applicants of favored races necessarily disadvantages applicants of the disfavored races. And because race can be (and often is) a decisive factor for minority applicants, it is an equally dispositive factor in the rejection of white applicants. Indeed, the Academy's own admissions personnel concede that their classes would look different—i.e., more non-minority candidates would be admitted—if it stopped using race.

## V.   The Naval Academy has no defined end point for stopping its use of race

Academy officials cannot identify a general range, much less pinpoint a specific level, of racial diversity at which point the Naval Academy will no longer need to consider applicants' race. According to the Academy, it will stop using race in the admissions process only when it "both achieves and maintains the racial and ethnic diversity of [the Academy's] student body at a level comparable to the ethnic and racial diversity of the general population." P284 at 61.

But by tying its racial composition to demography, the Academy is committing to using race in perpetuity. Indeed, the Academy is not even adhering to its own standard for success; the Brigade of Midshipmen has had a greater percentage of Asian-Americans than the general population for years, but Academy officials have never even considered altering the racial preferences they still provide to Asian-Americans.

## VI.    The Naval Academy failed to consider or implement race-neutral alternatives

The Naval Academy has not undertaken good-faith efforts to determine whether comparable race-neutral programs would work about as well as its explicit consideration of race. It has never consulted—and vehemently resisted discovery into—the Coast Guard Academy's success when the law required it to use race-blind admissions. Moreover, it has never conducted any modeling to determine the racial composition of incoming classes if it stopped considering race. Nor has it engaged in any other meaningful studies about the feasibility of ceasing its use of race. The Academy's only attempt to "evaluate" race-neutral alternatives consists of five "informal" excel spreadsheets generated by its Dean of Admissions that identified the number of midshipmen in the admitted applicant pool for the Classes of 2026 and 2027 who were deemed to have faced "hardship or adversity," spoke English as a second language, or possessed a few other characteristics that might feature in a race-neutral admissions plan. The spreadsheets were unaccompanied by any narrative reporting, were not discussed with others in the admissions office, and do not describe what would happen if the Academy stopped using race.

In fact, the Academy can and will remain racially diverse if it stops using race. There is extensive empirical evidence and academic research documenting the myriad (and innovative) ways in which colleges like the Naval Academy can use race-neutral alternatives to produce substantial socioeconomic and racial diversity. Moreover, expert analysis of the Academy's data shows that there are race-neutral alternatives available that could produce racial and socioeconomic diversity at the Academy about as well as its current use of racial preferences.

## VII.  The Naval Academy's use of race does not achieve—and, in fact, undermines— the goals the Academy claims to pursue.

The Academy has argued that using racial preferences in admissions at the Naval Academy (1) increases racial diversity in the officer corps, which will, in turn, (2) improve unit cohesion, lethality, recruitment, retention, and the military's legitimacy. Dkt. 46 at 26-38. The first assertion is vastly overstated, and the second assertion is false. To the contrary, using race *harms* the goals the Academy claims to be pursuing.

***Racial Diversity in the Officer Corps.*** The Academy's use of race has little effect on the racial diversity of the officer corps. The Academy produces only 16-20 percent of the total new Naval officers each year. Indeed, the Navy retained the Boston Consulting Group to study the issue, and it concluded that "USNA alone has low leverage to change the composition of overall fleet officers." P79 at USNA-00016839. Because Academy graduates comprise a relatively small percentage of new Navy and Marine officers each year, it simply is "not possible for USNA alone to raise minority representation" in the officer corps "to match [the] fleet enlisted share." *Id.* For example, "[i]f USNA grads mirrored fleet enlisted composition (52%/48%), this would only have a 5% impact on fleet officer corps in total." *Id.* Even if every officer the Academy commissioned each year were members of racial minority groups, the percentage of racial minorities in each new class of officers still would not match the percentage of minorities in the population at large. And Academy officials themselves have no idea what effect eliminating racial preferences would have on the Academy's makeup; they have never analyzed the effect that ending racial preferences would have on its demographic makeup.

9

    ***The Purported Benefits of Racial Diversity***. Even if the Academy's use of race had a meaningful impact on the racial composition of the officer corps, it would produce none of the benefits that the Academy claims:

- ***Unit Cohesion and Lethality***. When life and death are on the line, servicemembers care about the *competence* of those around them, not their race or ethnicity. There is no evidence that servicemembers will not follow leaders who do not "look like them" or that racially balanced units are more effective at their missions.

- ***Recruitment and Retention***. Young people of all backgrounds join the military because they want to serve their country, be part of something greater than themselves, develop useful skills, and overcome challenges. And whether they stay in the military depends on myriad other factors that are far more important than the race of the servicemembers and officers around them. There is no evidence that using racial preferences at the Naval Academy plays any meaningful role in recruiting or retention.

- ***Legitimacy***. A military is seen as legitimate at home if it is competent and effective in operations, treats its people fairly, and has the interests of its country at heart rather than its own. Internationally, a military's reputation among friends and foes comes from its performance. The racial composition of the officer corps has no effect on the perceived legitimacy of the military, either domestically or internationally. For example, the assertion that Black officers will be able to interact better with officers from Kenya or Nigeria because of the color of their skin is nothing but racial stereotyping.

## PROPOSED CONCLUSIONS OF LAW

### I.      SFFA has Article III standing

SFFA has Article III standing. SFFA has standing because its "'members would otherwise have standing to sue in their own right'"; "'the interests [SFFA] seeks to protect are germane to [its] purpose'"; and "'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *SFFA v. Harvard*, 600 U.S. 181, 198-99 (2023); *see also* Dkts. 75-1, 98.

### II.     The Naval Academy must satisfy strict scrutiny

As the Naval Academy has recognized, its race-based admissions process "must satisfy 'strict scrutiny.'" Dkt. 46 at 13 (quoting *Harvard*, 600 U.S. at 206-07); *see also* P.I. Op. at 3 ("[I]t is imperative that a factual record be developed in this matter such that this Court can determine whether … the Naval Academy's admissions practices … survive strict scrutiny."). Under this "daunting two-step examination," the Academy must prove that its racial classifications "'further compelling governmental interests'" and are "'narrowly tailored'—meaning 'necessary'—to achieve that interest." *Harvard*, 600 U.S. at 206-07.

The Naval Academy has argued that the Court must "defer[] to the judgments of current military officials." Dkt. 85 at 9. That is incorrect. Because "'*all* racial classifications'" must satisfy strict scrutiny, *Johnson v. California*, 543 U.S. 499, 505-06 (2005), the Academy must too. *See* Dkt. 101 at 10-14 (SFFA explaining why no deference is due to military officials).

### III.    The Naval Academy fails strict scrutiny

The Naval Academy cannot use race to pursue the so-called "educational benefits" of diversity. *Harvard* rejected these benefits as "inescapably imponderable" and "not sufficiently coherent for purposes of strict scrutiny." 600 U.S. at 214-15. No amount of deference could

make them ponderable or coherent. That is why *Harvard* said the military academies would need to identify "potentially *distinct* interests." *Id.* at 213 n.4 (emphasis added). And the Academy must recognize this, as it has disclaimed the educational benefits of diversity as an interest that could sustain its use of race. *See, e.g.,* Dkt. 46 at 11.

After *Harvard*, the Supreme Court's precedents identify "only two compelling interests that permit resort to race-based government action." 600 U.S. at 207. The first is "remediating specific, identified instances of past discrimination." *Id.* The second is "avoiding imminent and serious risks to human safety in prisons." *Id.* The Academy has never relied on either of these interests. So to rule for the Academy, this Court would have to recognize a new interest and announce—for the first time—that this interest allows the government to explicitly use race. The Naval Academy has argued that using racial preferences in admissions at the Naval Academy (1) increases racial diversity in the officer corps, which will, in turn, (2) improve unit cohesion, lethality, recruitment, retention, and the military's legitimacy. Dkt. 46 at 26-38. But racial preferences in admissions will not further the Academy's asserted interests, and the Academy's methods are not narrowly tailored to achieve these interests.

## A.   The Naval Academy's use of race does not further compelling governmental interests.

The Academy has claimed that admitting cadets based on race furthers four interests: unit cohesion and lethality, recruitment, retention, and legitimacy. *Id.* at 28. None can justify explicit racial classifications. They are impossibly vague and unmeasurable, and there is no evidence that racial balancing furthers them. They are also fatally inconsistent.

***Unmeasurable***. None of the Academy's interests are "sufficiently measurable to permit judicial review." *Harvard*, 600 U.S. at 214 (cleaned up). According to the Academy, racial

preferences allow service members to see themselves as part of "a diverse and inclusive Navy." Dkt. 46 at 31 n.15, 34-35. And that, the Academy says, "enhances cohesion, increases lethality, and improves decisionmaking," *id.* at 31 n.15, which, in turn, increases "military effectiveness," *id.* at 32.

The problem is that "[i]t is unclear how courts are supposed to measure any of these goals," or "know when they have been reached." *Harvard*, 600 U.S. at 214. The Academy has never offered any metric that courts could use to determine whether a sufficient percentage of civilians "can better visualize themselves joining [the] ranks," Dkt. 46 at 34, or whether units have attained the necessary cohesion levels for "innovation" and "problem-solving," *id.* at 30, 33; *see also Harvard*, 600 U.S. at 214-15 ("There is no particular point at which there exists sufficient 'innovation and problem-solving…'"). And a discriminator cannot survive strict scrutiny by surveying the beneficiaries of its discrimination and asking them if they approve. *Grutter v. Bollinger*, 288 F.3d 732, 804-05 (6th Cir. 2002) (en banc) (Boggs, J., dissenting). UNC said it could measure its interests through "surveys" too. UNC-SFFA-Br.6. The Academy's interest in the supposed military benefits of diversity is as standardless as civilian universities' interest in the supposed educational benefits.

The Naval Academy's remaining interests—recruiting, retention, and public legitimacy—are even more elusory and amorphous. How can courts tell if the Academy's racial preferences are causing it to recruit or retain "the top talent in the country"? Dkt. 46 at 34, 36. Or "creat[ing] a culture of inclusion and espirit de corps"? *Id.* at 41. The Academy has never said. It simply declares that "a more diverse officer population" makes "Naval service more attractive," even though diversity—as the Academy admits—isn't a top factor that prospects

regularly consider. *Id.* at 34. And the Academy would still be racially diverse without racial preferences; it just might not be the particular mix that the Academy has now. In any event, the Supreme Court has already held that recruitment and retention are not compelling interests that could justify government classifications based on race. S*ee Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 273-75 (1986). The "question [of] whether a particular mix of minority [cadets] produces" public and international legitimacy is not reliably knowable either. *See Harvard*, 600 U.S. at 215; *see also Saunders v. White*, 191 F. Supp. 2d 95, 129 (D.D.C. 2002) ("The Army's desire to create the perception of equal treatment is not an important enough governmental interest to justify [its] racial classifications" in promotion procedures.).

The Academy has said that its interests "are far more analogous" to those in *Johnson*, Dkt. 46 at 57-58, a case that didn't involve admissions, affirmative action, or the military. In *Johnson*, a prison sought to avoid a violent race riot—an event that posed "imminent and serious risks to human safety" and could be averted only through a defined period of "racial segregation." *Harvard*, 600 U.S. at 207, 215. Recounting that case in *Harvard*, the Supreme Court observed that the prison's interests were compelling only because the means for achieving them were "temporary" and "measurable": either the government "prevent[ed] harm to those in the prison," or it didn't. *Id.* at 214-15. The Academy's metrics—"confidence," "cohesion," and "legitimacy," Dkt. 46 at 28—are intangible, abstract, and not reliably measured.

Even if these outcomes could be measured, the Court would have to assess whether the Academy's use of race was "'necessary'" to achieve them. *Harvard*, 600 U.S. at 207. It would need to assess whether racial preferences are why these outcomes are being achieved, and whether the outcomes would no longer be achieved if racial preferences ended and were

14

replaced with race-neutral alternatives. *Id.* at 215. That task is impossible for courts. It's apparently impossible for the Academy too, as it cannot identify any method that even tries to answer these causal (or reverse causal) questions.

***Unsupported***. The Academy has made the puzzling claim that its goals are "concrete" and "measurable" because courts can "carefully consider" the views of senior military leadership (and presumably defer to them). Dkt. 46 at 40-41. That is not the law, and even the Military Leadership Diversity Commission knows it. "This is not an area where traditional judicial deference to the military applies. Proof is needed." MLDC, Issue Paper 36, Compelling Interests and Diversity Policy 3 (May 2010). At a minimum, it is "far from evident" that cohesiveness and the Academy's other asserted interests depend on a racially diverse military. *Harvard*, 600 U.S. at 216.

To be sure, the Academy purports to have such evidence. But the "studies" and other expert testimony that Academy possesses are flawed, irrelevant, conclusory, or misinterpreted. Most crucially, none of the Academy's sources or expert testimony can definitively say that ending the use of racial preferences at the Academy will cause the harms it seeks to avoid. *See Harvard*, 600 U.S. at 215 ("[T]he question in this context is not one of no diversity or of some: it is a question of degree."). None of the Academy's unsupported assertions are sufficient to survive strict scrutiny.

The Academy's reliance on the history of racial violence in the military (from World War I through the Vietnam War) fares no better. When it comes to race, the year 2024 is nothing like 1917, 1944, or 1970—half a century or more in the past. All agree that racial relations in this country—and the military's treatment of racial minorities—have vastly

improved since this time period. Indeed, for much of the 20th century, the military practiced racial segregation; African Americans were relegated to menial positions in the military and prohibited from ever advancing; and there was blatant and open racism, including the regular use of racial slurs. That racial unrest occurred under these circumstances is not surprising. When marginalized and disfavored groups are mistreated, the military will undoubtedly suffer problems. The Naval Academy has no evidence that ending racial preferences at the Academy will cause any racial violence to erupt at all, let alone that violence will rise to the level seen more than 50 years ago.

*Inconsistent.* The Naval Academy has said that racial classifications are "vital to national security," "'essential'" to the Navy, and "'critical for overall mission success.'" Dkt. 46 at 26-31. But it's hard to imagine how those classifications are essential to the Navy—a 343,000 person fighting force—when they affect fewer than one hundred officers every year. The Naval Academy commissions "approximately 1,100" graduates per year, *id.* at 39, and the number who get in because of race, graduate, and are still serving is a fraction of that. So race cannot possibly be "'essential.'" *Id.* at 31. If anything, it's a drop in the bucket. Strict scrutiny does not allow the Naval Academy to use race—the most odious classification known to law—for benefits that are "minimal" at best. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,* 551 U.S. 701, 733-35 (2007).

### B.   The Naval Academy's use of race is not narrowly tailored.

The Naval Academy's use of race is not narrowly tailored for numerous reasons.

*Use of Race as a Negative*. The Naval Academy says it doesn't use race as a "'negative,'" Dkt. 46 at 52-54, but admits that it "consider[s] race or ethnicity flexibly as a 'plus'

factor" for some races, *id.* at 44 (cleaned up). In the "zero-sum" world of competitive admissions, "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Harvard*, 600 U.S. at 218-19. So by offering "a plus" to some races—as the Academy admits it does—the Academy awards a minus to all others. That violates *Harvard*, which holds repeatedly that "race may never be used as a 'negative'" and that universities can't "employ race in a negative manner," "use race as a … negative," or turn "an individual's race … against him." 600 U.S. at 212, 218, 230. Nothing in *Harvard* limits this rule to negative uses of race that "'*unduly* har[m] nonminority applicants.'" *Cf.* Dkt. 46 at 52 (emphasis added).

    ***Incoherent Categories***. The Naval Academy relies on six racial categories: "Asian," "Native Hawaiian or Other Pacific Islander," "Hispanic," "White," "African American," and "American Indian or Alaska Native." Harvard and UNC used the same categories. *See Harvard*, 600 U.S. at 216. They come from the federal government. *Id.* at 291 (Gorsuch, J., concurring). But as *Harvard* explains, these racial categories are too "imprecise" to satisfy strict scrutiny. *Id.* at 215-16 (majority opinion, citing Justice Gorsuch's concurrence). "Asian," for example, sweeps in "60% of the world's population," lumping together Indians, Japanese, Pakistanis, and Koreans. *Id.* at 291-92 (Gorsuch, J., concurring). The "white" category covers Europe, West Asia, and North Africa, including peoples as diverse as Italians, Iranians, Norwegians, Moroccans, the Turkish, and the Welsh. *Id.* at 292. And "Pacific Islander" doesn't include all Pacific Islanders; "Filipino Americans remain classified as 'Asian.'" *Id.* The remaining categories are equally incoherent. *See generally* Bernstein, *The Modern American Law of Race*, 94 S. Cal. L. Rev. 171 (2021). That is why *Harvard* found them "overbroad," "underinclusive,"

"incoherent," and "irrational." 600 U.S. at 216-17. People within these categories don't even reliably "look like" each other, *see id.* at 292 (Gorsuch J., concurring); Bernstein 182 n.43, putting the lie to the government's repeated use of that phrase.

The Naval Academy's racial categories weren't designed to achieve its interests. "[N]one of the career civil servants and appointed officials who shaped the [categories] had any awareness" that those categories would be used to "grant preference[s] in jobs, government contracts, and university admissions." Graham, *The Origins of Official Minority Designation* 289 (2002). And when the government issued them, it stressed that "[t]hese classifications should not ... be viewed as determinants for eligibility for participation in any Federal [affirmative-action] program." 43 Fed. Reg. 19,260, 19,269 (May 4, 1978).

The Academy comes nowhere close to proving that, say, a Puerto Rican sailor from Brooklyn is less likely to follow a black officer from Brooklyn than a white Hispanic whose parents grew up in Spain. The Academy's "use of these opaque racial categories undermines ... [its] goals." *Harvard*, 600 U.S. at 217.

***Racial Stereotyping***. The Academy's purported interests in cohesion relies on "'impermissible racial stereotypes.'" *Id.* at 220. The Academy claims that its racial preferences will "foster trust and confidence 'between the enlisted corps and its leaders.'" Dkt. 46 at 28. Minority sailors, it says, are more likely to trust leaders "who look like them." *Id.* at 34, 36. The Academy thus assumes that minority sailors will be less "inspire[d]," "confiden[t]," and "'trust[ing],'" *id.* at 28—and "'more likely to'" leave the Navy altogether—whenever a different race is at the helm, *id.* at 36. So minority sailors are presumptively prejudiced: They trust certain

races more than others simply because of their skin color. These unfounded assumptions are textbook stereotyping. *Harvard*, 600 U.S. at 219-21.

The same stereotypes underlie the remaining interests. The Academy says that minority civilians will "los[e] confidence in the military" if it doesn't look like them, Dkt. 46 at 37; that minority recruits "will be discouraged from serving" if leaders don't look like them, *id*. 46 at 35; and that minority leaders are best suited to interact with people abroad because they do look like them. All are stereotypes. The first two assume that minorities are so race-obsessed that they'll refuse to support the troops or defend their country whenever the Academy's campus is too white. And the last one assumes that minorities can better interact with "diverse" overseas populations—not because of their unique traits or talents, but because their skin color more closely resembles that of our "international partners." *Id.* at 38. This type of race essentialism, arguing that a black lieutenant from San Diego can relate to a Somali militant with the same skin color better than his white counterpart from Houston can, cannot justify racial classifications. And one presumes the Navy would never dare argue that white Marines are essential to establishing the legitimacy of a hypothetical campaign to support forces in Ukraine. Such a suggestion would rightly be viewed as offensive and demeaning to our qualified military troops.

***No End Date***. "All race-conscious admissions programs must have a termination point," *Harvard*, 600 U.S. at 212 (cleaned up), but the Academy's doesn't. Because the Academy balances every class to "reflec[t] the diversity of the nation," Dkt. 46 at 43, it promises to use race in perpetuity. The nation's racial composition will always change, so the Academy's racial balancing will always need to adjust. Harvard and UNC had the same problem. 600 U.S.

at 221. Like the Academy, those universities said that they would stop considering race when the composition of their classes mirrored "the general population." *Id.* at 221-23. But, as *Harvard* observed, that was no real stopping point. "By promising to terminate their use of race only when some rough percentage of various racial groups is admitted," these "admissions programs effectively assure that race will always be relevant." *Id.* at 223-24 (cleaned up). The Academy's promises of "periodic review" do not solve the problem. *Id.* at 225.

The Academy says Harvard's end-date rule doesn't apply to it, Dkt. 46 at 57-58, but *Harvard* said that "'all race-conscious admissions programs'" must "'have a logical end point'" and be "'temporary.'" 600 U.S. at 212, 215.  The point is not that, over time, the interest will stop being important, but that the explicit use of race to achieve that interest will prove to be an unwarranted failure. *See id.* at 212-13. That time came for civilian universities in 2023; it's come for the Academy now too.

**Racial Balancing**. "'[O]utright racial balancing' is 'patently unconstitutional.'" *Harvard*, 600 U.S. at 223 (quoting *Fisher v. University of Tex. at Austin (Fisher I)*, 570 U.S. 297, 311 (2013)). That is so because "'[a]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class.'" *Id.* (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). Allowing it would "effectively assur[e] that race will always be relevant in American life, and that the 'ultimate goal' of 'eliminating entirely from ... decisionmaking such irrelevant factors as a human being's race' will never be achieved." *Parents Involved*, 551 U.S. at 730.

The Academy is engaged in racial balancing. Throughout the admissions cycle, the admissions office monitors the racial makeup of the admitted class and compares it to the racial makeup of the class from the prior year. If fewer racial minorities are on track to be admitted, the admissions offices makes special efforts to increase those numbers.

The admissions data confirm that the Academy is racial balancing. *Supra* p.6; *compare with Harvard*, 600 U.S. at 222 (identifying admitted classes by race over the prior ten years before suit was filed). Just as in *Harvard*, the Academy's "focus on numbers is obvious." 600 U.S. at 222. And indeed, those numbers are so important that the Academy vows to keep using race until a perfect racial balance between the Academy's classes and society in general is achieved. Such a goal is never legitimate. *See Parents Involved,* 551 U.S. at 732-33.

**Race-Neutral Alternatives**. Race-based admissions were never narrowly tailored if explicit racial classifications were not "'necessary' for a university to use race to achieve the educational benefits of diversity." *Fisher I*, 570 U.S. at 312. Race is not necessary if "a university could achieve sufficient diversity without using racial classifications." *Id.* The Naval Academy must consider race-neutral alternatives "*before* turning to racial classifications." *Id.* (emphasis added); *Parents Involved*, 551 U.S. at 735 ("[R]acial classifications [are] permitted only 'as a last resort.'"). And that consideration must be "serious" and in "good faith." *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003). The Academy also must prove that "no workable race-neutral alternatives would produce the educational benefits of diversity." *Fisher I*, 570 U.S. at 312. A race-neutral alternative does not need to be perfect; it only needs to achieve the benefits of diversity "'about as well and at tolerable administrative expense.'" *Id.* The Naval Academy fails both requirements.

The Academy has not considered race-neutral alternatives in good faith, either today or before it turned to racial classifications. The Academy never studied the Coast Guard's success to see if it could be duplicated at the Naval Academy; never conducted any modeling to determine what would happen if the Academy stopped using race; and conducted no meaningful studies into the availability of race-neutral alternatives. Informally reviewing a few spreadsheets of admissions data is not a "serious" and "good faith" consideration of race-neutral alternatives. *Grutter*, 539 U.S. at 339. And even today, Academy officials have no idea what would happen if they eliminated racial preferences.

Moreover, the Academy has workable alternatives to racial preferences to achieve diversity in the Brigade of Midshipmen. The Academy can maintain racial diversity—and increase diversity more broadly—by, among other things, increasing socioeconomic preferences. Adopting this alternative would make the Academy even more racially diverse, more socioeconomically diverse, and bring more racial minorities from disadvantaged communities onto the Academy's campus. And it can be implemented at tolerable expense.

Respectfully submitted,

Adam K. Mortara

LAWFAIR LLC

40 Burton Hills Blvd., Ste. 200

Nashville, TN 37215

(773) 750-7154

mortara@lawfairllc.com

/s/ Thomas R. McCarthy

Thomas R. McCarthy

Patrick Strawbridge

J. Michael Connolly

Cameron T. Norris

Bryan Weir

James F. Hasson

CONSOVOY MCCARTHY PLLC

1600 Wilson Boulevard, Suite 700

Arlington, VA 22209

(703) 243-9423

tom@consovoymccarthy.com

patrick@consovoymccarthy.com

mike@consovoymccarthy.com

cam@consovoymccarthy.com

bryan@consovoymccarthy.com

james@consovoymccarthy.com

Dated: September 4, 2024

*Counsel for Students for Fair Admissions*

## CERTIFICATE OF SERVICE

I certify that on September 4, 2024, I filed this document through the Court's CM/ECF

system, which will serve all parties.

/s/ Thomas R. McCarthy