**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS,<br>*Plaintiff,*<br><br>v.<br><br>THE UNITED STATES NAVAL<br>ACADEMY, *et al.,*<br>*Defendants.* | No. 1:23-cv-2699-RDB |

**PLAINTIFF'S POST-TRIAL PROPOSED
FINDINGS OF FACTS AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

Introduction.................................................................................................................1

Proposed Findings of Fact ..........................................................................................1

    I.     Students for Fair Admissions and Its Members...................................1

    II.    The Naval Academy's Race-Based Admissions Process .....................1

    III.   The Effect of the Academy's Use of Race in Admissions ..................20

    IV.   Defendants' Purported Interests ........................................................32

         A.    Lethality and Unit Cohesion.................................................34

         B.    Recruitment and Retention....................................................54

         C.    Domestic and International Legitimacy..................................58

    V.     The Academy's Purported Tailoring.....................................................61

         A.    The Effect of the Academy's Race-Based Admissions on the Officer Corps......64

         B.    Race Neutral Alternatives ....................................................71

Proposed Conclusions of Law....................................................................................75

    I.     SFFA has Article III standing. ...........................................................75

    II.    Defendants have the burden to prove that the Academy's race-based admissions process satisfies real strict scrutiny. ...................................75

    III.   Defendants proved no compelling governmental interest. ..................85

         A.    Lethality and Unit Cohesion.................................................89

          B.    Recruitment and Retention....................................................92

          C.    Domestic and International Legitimacy..................................93

    IV.   Defendants did not prove narrow tailoring. .......................................95

         A.    Defendants did not prove that the Academy's use of race is necessary to achieve any of its interests. ....................................96

         B.    The Academy gives racial preferences to Asians....................100

         C.    The Academy's use of race has no end date. .........................103

         D.    The Academy uses race as a negative....................................105

         E.    The Academy engages in racial stereotyping.........................106

         F.    The Academy failed to consider and implement workable race-neutral alternatives. ...................................................109

Conclusion ...............................................................................................................111

Certificate of Service ................................................................................................112

## INTRODUCTION

Now that trial has ended, SFFA asks the Court to make the following findings of fact and conclusions of law. SFFA preserves every argument and all evidence presented at trial or elsewhere in this litigation.

## PROPOSED FINDINGS OF FACT

### I.    Students for Fair Admissions and Its Members

1.      SFFA is a voluntary membership association. Doc.112 at 8.

2.      SFFA's primary mission is "challenging the use of race in admissions." Doc. 112 at 8.

3.      SFFA filed this suit on behalf of its members, including four individuals whose prior applications to the U.S. Naval Academy were denied. Doc.112 at 9.

4.      SFFA seeks injunctive and declaratory relief. Doc.112 at 9 n.4. Prior to trial, the Academy conceded that SFFA's members "need not testify." Doc. 112 at 9.

5.      SFFA has members who are either currently reapplying to the Academy, or who are able and ready to reapply for the next open admissions cycle should a court order the Academy to stop considering race. Doc.112 at 15, 9-11.

### II.   The Naval Academy's Race-Based Admissions Process

6.      Admission to the Academy is highly competitive. The size of its student body is capped by statute. 10 U.S.C. §8454(a). Each cycle, around 15,000 students apply and around 1,400 are offered admission. P259 ¶11. The Academy always has many hundreds "more qualified applicants than it has space for." Tr.2 (Sept 17) 170:5-24 (Latta).

7.      The Academy has a few minimum eligibility requirements. Applicants must be a U.S. citizen, between 17-23 years old, unmarried, and not pregnant; have no dependents; and

have a valid social-security number. Doc.112 at 10-11 (citing 10 U.S.C. §8458 and the Academy's website); Tr.2 165:17–166:3 (Latta). If an applicant meets those requirements, he can apply for admission to the Academy. Tr.2 144:20-22 (Latta).

8.    The Academy requires no "minimum test score" on the SAT or ACT. Tr.1 (Sept 16) 227:6-11 (Hwang); Tr.2 69:17–70:2 (Latta). The Academy requires no minimum GPA either. Tr.2 69:14-16 (Latta). In fact, other than the candidate fitness assessment, the Academy has "no actual minimum requirements" for any part of the application. P880 164:21–166:11 (Rule 30(b)(6) deposition).

9.    Applicants need their current school to fill out a candidate academic information form. Tr.2 156:22–157:3 (Latta). One "[r]equired" entry tells the school to "indicate if the candidate is from a Minority Group." P49 at USNA-00003775. The school cannot specify which "minority group" or explain how that applicant's race affected the student's life; it can answer only "yes" or "no" as to whether the student is a racial minority. P49 at USNA-00003775.

10.    As mentioned above, applicants also must complete a candidate fitness assessment. Tr.2 156:10-13 (Latta).

11.    Applicants also must complete the medical qualification process. Tr.2 12:11-13 (Hwang). The initial qualification decision is made by the Department of Defense's Medical Examination Review Board (or DODMERB). Tr.2 12:14–13:10 (Hwang). Candidates who are medically disqualified by DODMERB can get a medical waiver from the Academy, allowing them to still be admitted. Tr.2 12:8-10, 13:25–14:15 (Hwang); P531 at USNA-00018814, 16. The Academy seeks waivers for the applicants it wants to admit, including applicants who

"already have a conditional offer," "potential slate winners," and "any other students" that the dean of admission chooses. Tr.2 13:14-21 (Hwang); P531 at USNA-00018814 (same). The Academy grants several hundred waivers each year. *See, e.g.*, P19 at USNA-00002643 (321 waivers granted for Class of 2027 as of April 2023); P20 at USNA-00002646 (276 waivers for Class of 2026 as of April 2022).

12.     Applicants also must, at some point before being admitted, receive a nomination. *See* P259 ¶29; 10 U.S.C. §8454. Applicants can, and frequently do, receive multiple nominations from different sources in the same cycle. Tr.2 6:22–7:18 (Hwang); *e.g.*, P352 at lines 2-3 (same applicant received congressional nomination and JROTC nomination), lines 8-9 (same applicant received nominations from senator and congressman), lines 10-11 (same applicant received congressional nomination and Children of Deceased or Disabled Veterans nomination), lines 12-13 (same applicant received congressional nomination and presidential nomination); *see also* P43 at slide 11 ("Students should apply to all nomination sources for which they are eligible."); P880 178:12–179:19 (30(b)(6) deposition).

13.     Some nominations are service connected. Applicants are eligible for service-connected nominations if they are enlisted sailors or Marines on active duty or reserve status or if they are the children of current or former servicemembers who meet certain criteria (such as deceased or fully disabled veterans and veterans who receive retirement benefits).

14.     The number of seats reserved for service-connected nominees each year is capped by federal law and makes up a small percentage of each incoming class. 10 U.S.C. §8454(a)(1), (b)(1)-(4), (c); P259 ¶¶42-46. For example, the Secretary of the Navy can nominate no more than 85 sailors and Marines from the active duty ranks each year, and no more than

85 from the Navy or Marine Corps reserve. P259 ¶44. These caps remain in place even though enlisted midshipmen "bring a wealth of experience," have proven "leadership and other qualities that are important to naval officers," and are drawn from a pool that is "well over 50 percent racial and ethnic minorities." Tr.2 209:13–210:15 (Latta). Sixty-five seats are also set aside for the children of deceased or disabled veterans, P259 ¶45; twenty are reserved for members of the Junior Reserve Officer Training Corps, P259 ¶44; and another 100 are set aside for the children of active and retired servicemembers ("presidential" nominees), P259 ¶43.

15.     Another source of nominations is the Academy's superintendent. *See* 10 U.S.C. §8454(d). The Superintendent has unfettered discretion to "nominate" (*i.e.*, directly admit) up to fifty candidates each year, provided his use of those nominations does not cause the number of midshipmen at the Academy to exceed the statutory maximum. P259 ¶47. In practice, the Superintendent rarely uses all fifty of his nominations. P259 ¶48.

16.     The Vice President can nominate candidates and can have no more than five nominees enrolled at the Academy at any point. *See* 10 U.S.C. §8454(a)(2); P259 ¶39.

17.     The most common nomination sources, however, are members of Congress. 10 U.S.C. §8454(a)(3)-(4). Each Member of Congress can nominate his constituents for up to five seats at the Academy at one time. (Put differently, a Member can fill five seats across all four classes of midshipmen currently enrolled at the Academy.) When one of those five seats becomes available, the Member has a "vacancy" for the following admission cycle. P259 ¶31. When a candidate receives an appointment to fill the congressional vacancy for which she was

nominated, that candidate is "charged" to the Member. P259 ¶31. This system gives the Academy "great geographic diversity." Tr.2 211:16-17 (Latta); Tr.1 217:12-19 (Hwang).

18.     Before the current admissions cycle, each Member could submit a "slate" of up to ten nominees per vacancy. P259 ¶31. But Congress recently expanded the number of nominees per vacancy from ten to fifteen beginning in the Class of 2029, *see* Tr.1 232:3-22 (Hwang), allowing more candidates to compete for congressional appointments and giving the Academy a more diverse applicant pool to choose from. *See* 10 U.S.C. §8454(a) (as amended by Pub. L. 118-31 §§561(b)(1)-(2)). There is no statutory constraint on the number of vacancies a Member can fill each year; and because Members are allotted five vacancies for every four years, they can—and often do—submit slates of nominees for multiple vacancies in the same cycle. P880 185:11-19 (30(b)(6) deposition).

19.     When Members of Congress nominate applicants, they can use one of three methods. The first method is the "'competitive' method, in which all nominees are submitted to USNA Admissions without order of preference." P259 ¶34. The second method is the "'principal numbered-alternate' method, in which the Member identifies a principal, or first choice nominee, and provides a ranked list of alternates" to be selected in order of priority if the principal is not admitted. P259 ¶35. The third method is the "principal competitive-alternate" method, in which the Member identifies a principal nominee but allows the Academy to choose its preferred alternate if the principal is not offered admission. P259 ¶36. Among members of Congress, 65% use the competitive method, while 35% use one of the other two methods. Tr.1 198:18–199:18 (Hwang); P259 ¶37.

20.     If an applicant cannot secure a nomination, the Academy can help her get one—a process called a "nomination assist." Tr.1 200:18–201:5 (Hwang). The Academy does 20-30 nomination assists per cycle. Tr.2 11:25–12:3 (Hwang); P880 124:13-17 (30(b)(6) deposition). It is especially willing to do them for applicants "who already have an LOA." Tr.1 224:5-9, Tr.2 18:11-15, 11:19-24 (Hwang); *see* P63 (excel spreadsheet titled "LOA No Nom[ination]," tracking potential nomination assists for Class of 2026). When the Academy asks members of Congress for a nomination, the member usually agrees. Tr.1 200:25–201:2 (Hwang). And if the Academy cannot get a nomination assist, it can "seek other categories of nominations" for an applicant that do not require a member of Congress. Tr.2 5:9-19 (Hwang); P880 123:6–124:1 (30(b)(6) deposition).

21.     In terms of mechanics, the Academy's admissions process starts with a preliminary application on the Academy's website. Tr.2 143:13-14 (Latta); P43 at slide 8.

22.     If an applicant meets the minimum eligibility criteria for enrollment at the Academy, he is assigned a candidate number and given access to the entire application. P43 at slide 8. The application requires students to check at least one of five boxes for race: "American Indian or Alaskan native"; "Black or African American," "Asian," "White," "Pacific Islander or Native Hawaiian," or "decline to respond." DX99 at USNA-00002368; Tr.1 211:17-24 (Hwang).

23.     Once an applicant submits all required documents, an examiner reviews the application to make sure it's complete. Tr.2 180:14-24 (Latta). If the application is complete, a counselor reviews the application and makes a preliminary recommendation. Tr.2 180:25–

181:25 (Latta). The counselor then sends the application to the admissions board. Tr.2 181:23-25 (Latta).

24.     The primary function of the admissions board is to determine whether a candidate is qualified to attend the academy. P491 at USNA-0000785; DX79 at 19; P813 at 15; Tr.2 135:3–136:3 (Latta).

25.     The admissions board assigns each applicant a whole person multiple (or WPM) score. P43 at slides 15-16. The WPM is a "good guide" to "how qualified" an applicant is for admission. Tr.2 17:4-6 (Hwang); *see also* P532 at slide 11 (WPM is "the entering argument" for each applicant). High WPMs are positively correlated with admission. Tr.3 (Sept 18) 143:23–144:13, 146:7-12 (Arcidiacono). And they have a "strong correlation" with a student's later performance at the Academy. Tr.5 (Sept 20) 83:4-7 (Vahsen); *accord* Tr.2 161:7-11 (Latta). A candidate's initial WPM is calculated using a weighted combination of his or her standardized test scores, rank in class, Math and English teacher-recommendation scores, and extracurricular-activities score. DX72 at USNA-00029695.

26.     The initial WPM is usually then adjusted up or down based on "Recommendations of the Admissions Board" (or RABs). P384. There are two varieties of RABs: automatic and manual. *E.g.*, P384 at USNA-00000329.

        a.     Automatic RABs are generated by the Academy's admissions platform, based on the information a candidate supplies about their background. For example, candidates receive an additional 500-2,000 points on their WPM for attending a high school where graduates attend a 4-year college. P384 at USNA-00000329. They receive 2,000 points if 95-100% of graduates matriculate to 4-year colleges, 1,500 points if that

7

figure is between 85-94% of graduates, and so forth. P384 at USNA-00000329. If an applicant attends a high school where fewer than 65% of graduates go on to attend a 4-year college, then he receives no additional points.

    b.    Manual RABs are awarded at the discretion of the board and can be given for things like "overcom[ing] significant adversity/hardship" or having "unusual life experience[s]." P383 at USNA-00000356. The board can award up to 9,000 additional points on its own accord and amounts greater than 9,000 points with Dean Latta's approval. P259 ¶55.

27.    A determination of "qualified" is a "[w]hole person qualification." P43 at slide 15. An applicant is "qualified" if he or she is "able to compete for an [appointment]." P491 at USNA-00000748; DX79 at 15. The board makes this determination based on a "holistic" process that the Academy calls a "whole person assessment." P100; *see also* P491 at USNA-00000748 ("Assessment of the Whole Person); DX79 at 21-26; P43 at slide 17 (August 2022 Admissions Board Training) (same). The board makes one of three main recommendations: qualified, not qualified, or defer. DX79 at 26; Tr.2 135:22–136:14, 236:1-24 (Latta); P23 at USNA-00006565. If the admissions board deems an applicant not qualified, the dean of admissions can overrule the board's decision and deem that applicant qualified. Tr.2 66:22–69:13 (Latta); *e.g.*, P119 ("change [of] board action from NQ to Qualified"); P13 (similar).

28.    For applicants deemed "qualified," their applications are reviewed by the slate review committee. Tr.2 242:16-23 (Latta); P259 ¶¶57-58 n.7; P26. This committee decides who will receive an offer of admission, including who will get off the waitlist. Tr.2 185:20-21,

236:25–237:7 (Latta); P259 ¶58; P26. "The selection process [is] managed by the Director of Nominations and Appointments," Melody Hwang. P26 at USNA-00006558.

29.     The Academy also deems certain applicants "early notify." *See generally* P23. The board's designation of a candidate as "Early Notify" functions as a "recommendation that [the candidate] should receive an LOA," or Letter of Assurance. P880 116:12-117:4. When the Academy designates an applicant "Early Notify," she is highly likely to be admitted, regardless of whether she receives an LOA. Indeed, "over 85 percent of those who are admitted"—or 1,200 students per cycle—"received an early notify designation." Tr.3 133:2-3 (Arcidiacono).

30.     LOAs are the "USNA version of Early Action used by other schools." P44 at USNA-00003309. A candidate who receives an LOA is "[g]uaranteed [a] seat in the incoming class" if they obtain a nomination, achieve minimum passing scores on the fitness assessment, meet with a Blue and Gold Officer, and receive medical clearance from DODMERB or a medical waiver from the Academy. P23 at USNA-00006568. As noted above, if a candidate with a LOA does not obtain a nomination on their own, the admissions office gets them one.

31.     Although early-notify designations from the Board are the most common way that LOA candidates are identified, the Academy sometimes selects LOA recipients from the broader pool of "qualified" applicants. P880 116:12-117.

32.     LOAs are chosen at the dean of admission's sole discretion. P880 115:17–116:11 (30(b)(6) deposition).

33.     The Academy extends "approximately 500-600 [LOAs] each year." P51 at USNA-00004540.

34.     Once the nominees on a congressional slate have been through the board review process, the slate review committee reviews the entire slate and selects a winner to fill the vacancy. Aside from the Superintendent, the Dean of Admissions has the sole authority to extend offers to applicants as slate winners. P26 at USNA-00006558.

35.     Slate winners are often identified on a tentative basis, and the candidate who is initially chosen as the slate winner sometimes is no longer designated as such by the end of the admissions cycle. Changes can—and frequently do—occur even after an offer of admission has been extended to the tentative winner, because candidates are not "charged" as slate winners until the new class arrives on Induction Day ("I-Day") at the end of June, and offers of appointment do not specify the pathway through which a candidate was admitted. P880 114:2-115:3 (30(b)(6) deposition); *e.g.*, P93; P123. These shifts are often accompanied by changes to the qualified alternate list, as described in greater detail below.

36.     Federal law requires the Academy to set aside 200 seats (150 seats, prior to the Class of 2029) in each class for "qualified alternates," who are selected by order-of-merit (*i.e.*, WPM score) from the remaining congressional nominees who did not win their congressional slates. 10 U.S.C. §8454(b)(5). (Although applicants must have a congressional nomination to be selected as a qualified alternate, QA slots are not charged to Members of Congress and do not count against their allowable vacancies. *See, e.g.,* P543.)

37.     The Academy's description of its process strongly implies that qualified alternates are chosen sequentially, after the winners of all congressional slates have been determined. *See* P259 ¶62a ("After USNA determines the slate of candidates to fill congressional vacancies, it combines all remaining these [sic] candidates into a nationwide pool. The 150

highest-ranked candidates by WPM are appointed as qualified alternates."). In practice, how-ever, the Academy admits candidates as "qualified alternates" throughout the admissions cycle and routinely moves candidates on and off the qualified-alternate list. For example, when the admissions office wants to admit a candidate with a low WPM from a congressional district where it has already designated a higher scoring candidate as the slate winner, it makes the lower-scoring candidate—whose WPM is too low for a qualified alternate slot—the new slate winner and "shifts" the higher-scoring candidate on to the qualified alternate list. *See* P880 109:20–110:21, 171:5-15 (30(b)(6) deposition). "[T]his shifting of candidates in this manner" is "done because the [lower] whole person multiple candidate might not actually become a qualified alternate" and be admitted otherwise. P880 98:18–99:3 (30(b)(6) deposition). The Academy does this even when the lower-scoring candidate has a WPM that is more than 4,000 points lower than the higher-scoring candidate. *See* P880 96:21–98:7 (30(b)(6) deposition). Again, the Academy does not formally "charge" candidates as qualified alternates until I-Day. P880 112:1-18 (30(b)(6) deposition).

38. Once the Academy has extended offers to slate winners and qualified alternates, it fills the remainder of the class through the "additional appointee" process. The Academy can choose whomever it wants to be additional appointees, provided that at least 75% of the total number have congressional nominations. 10 U.S.C. §8456(b); *see* P26 at USNA-00006558 (describing the "discretion in selecting the Additional Appointees"). The Academy views the additional-appointee process as a tool that "enables the Academy to fill the entering class to the desired number and attain a composition that meets the needs of the Naval Service." P51 at USNA-00004536; *see also* P26 at USNA-00006558.

39.     The Academy considers race as a factor in admissions. *E.g.*, P491 at USNA-00000792; DX79 at 22; P376 at USNA-00018258. When the Academy considers race, it treats race as a positive factor that weighs in favor of that applicant's admission. *See* P391 at USNA-00019434 (email from Dean Latta stating that "[t]riggers are the factors that warrant a discussion at the board per both the Supe and the Dean's guidance. They can be both positive and negative" (emphasis original)); P71 at slide 3 (listing "racial/ethnic diversity" as a positive "trigger" that merits additional board consideration).

40.     In the version of the application that the Academy sees, the first page sorts applicants into one of the five racial categories: "American Indian or Alaskan native"; "Black or African American"; "Asian"; "White"; "Pacific Islander or Native Hawaiian", or "decline to respond." Tr.1 234:20–235:18 (Hwang); *e.g.*, DX145 at USNA-00016108. The admissions office can consider an applicant's race "just from the check of the box," even if the applicant "doesn't mention" their race "anywhere in their essays or anywhere else in their application." Tr.1 212:12-20 (Hwang).

41.     The Academy considers race for "all minority groups." Tr.2 47:21-23 (Latta); *see* P259 ¶58 ("Race or ethnicity (across all minority groups) could potentially be one of many nondeterminative factors that bear on the decision"); *see also* P259 ¶73, ¶74, ¶75, ¶76, ¶77, ¶99, ¶107 (all emphasizing the Academy's consideration of race "across all minority groups"). Minority groups, according to the Academy, are blacks, Hispanics, Asian Americans/Other, and Native Americans. Tr.2 47:24–48:8 (Latta); *e.g.*, P39 (listing Asian/Other candidates alongside

African American and Hispanic candidates as composite groups that make up Academy's "Minority SAT Average"). Whites are not included. *E.g.,* Tr.2 213:6-15 (Latta) (distinguishing between "minority candidates" and "majority candidates").

42.    Asian Americans have been "overrepresented" at the Academy, compared to the general population, since at least 2014. Tr.2 103:19–104:16 (Latta). In the class of 2018, for example, 13% of midshipmen identified as Asian American alone or in combination with other races, compared to 6% of the general population. P437 at USNA-00032518.  For the Class of 2019, those figures were 12% and 6%, respectively. *See* P438 at USNA-00032514. For the Class of 2020, 14% of midshipmen identified as Asian-American alone or in combination with other races, compared to 6% of the population. *See* P439 at USNA-00032510. The pattern has continued to hold for all subsequent classes. *See* P440 at USNA-00032506 (15% of midshipmen entering the Class of 2021 versus  6% of the general population at the time); P441 (12% of midshipmen entering the Class of 2022 versus 6% of the population at the time); P519 at USNA-00004383 (16% of midshipmen entering the Class of 2023 versus 7% of the general population at the time); P522 at USNA-00004391 (13% of midshipmen entering the Class of 2024 versus 7% of the general population at the time); P523 at USNA-00004395 (15% entering the Class of 2026 versus 7% of the general population at the time); P520 (18% of midshipmen entering the Class of 2027 versus 7% of the general population at the time).

43.    Though this racial group is overrepresented at the Academy, the Academy still awards racial preferences to Asian-American applicants. P259 ¶58; P2; *see* P352 at line 6,840 (slate review entry by "SBL [Stephen Bruce Latta]" for Asian-American candidate, stating

"probable offer as diversity"), line 10,592 (entry for Asian-American candidate from Dean Latta stating "Offer as Diversity"), line 11,025 (similar entry from Melody Hwang).

44.     The Academy has no plans to stop considering race for Asian-American applicants. Tr.2 104:18–106:19 (Latta). It thinks it would be "another form of discrimination" to give racial preferences to black and Hispanic applicants but not Asian Americans. Tr.2 104:18-24 (Latta).

45.     The Academy considers race when deciding whether an applicant is early notified. Tr.1 225:13-19 (Hwang); Tr.2 240:15-18, 52:21-23, Tr.3 100:17-25 (Latta). It likewise considers race when deciding whether an applicant—early notify or not—receives an LOA. Tr.2 18:14-15 (Hwang); P44 at USNA-00003310; P23 at USNA-00006569.

46.     The Academy considers race when deciding whether applicants are qualified. "For a number of years," Tr.3 100:11-16 (Latta), the admissions board has received training from senior admissions officials—like the director of nominations and appointments and the dean of admissions—at the beginning of each admissions cycle in August. *E.g.,* P491; DX79; P43. One slide of that training says "[r]ace, ethnicity, or gender should not be the basis for points in favor of an applicant," but should instead be "[c]onsidered as one of many factors." P491 at USNA-00000740; DX79 at 26. Another slide notes that the "Board" is "tasked to conduct [a] whole person assessment & determine qualification." P491 at USNA-00000748; DX79 at 15. Under another slide titled "Assessment of the Whole Person," the training lists five bullets: "Unique Life Experiences," "*Ethnic heritage (racial and ethnic diversity)*," "Language fluency/English as a second language," "Significant adversity/hardship," "Familiarity with the

14

Academy and the Naval Service," and "Candidates from Under-represented Districts." P491 at USNA-00000792 (emphasis added); DX79 at 22.

47.     Together, as Ms. Hwang testified, this training "tell[s] the board that it cannot award a RAB or a bonus to the WPM for race but can consider it as one factor in the board's overall work." Tr.1 204:7-10 (Hwang). Captain Birch, who sits on the Academy's admissions board, likewise testified that he considers race when deciding whether applicants are "qualified." Tr.5 45:5-8, 56:7-11, 59:5-14. Dean Latta agreed that the board can "conside[r]" race "as one of many factors." Tr.2 52:1-8, 226:4-13. That same understanding is reflected in documents that the Academy generated before this litigation. *E.g.*, P376 at USNA-00018258 ("race and ethnicity" are "factors considered by the Admissions Board" in "assess[ing] applications for admission"). And the Academy's data shows that Hispanic applicants have higher RAB scores than white applicants, despite having lower scores on all the WPM components—indicating that race affects RAB awards. Tr.3 144:20–145:5, 146:5–147:8 (Arcidiacono).

48.     Though Hwang suggested on cross-examination that the board could use race only when deeming applicants "early notify," that suggestion is not credible. It contradicts her other testimony and the testimony of Captain Birch, who was sequestered and didn't hear Hwang's equivocation. Hwang agreed on redirect that race—just like every other item in the training's bulleted list—is "a factor in determining whether someone is qualified." Tr.2 27:9-12, 25:24–26:5. She also admitted that her prior testimony omitted any "early notify" limitation, Tr.2 20:13-25, and that such a limitation does not appear in the training or in any other

document produced in this case, Tr.2 21:4-25, 27:13–28:7. A few weeks before trial, the Academy changed the bullet about "racial and ethnic diversity" from its training material to "cultural fluency." *See* Tr.3 97:22–99:22 (Latta).



**Assessment of the Whole Person**

- Unique Life Experiences
  - Experience living in another culture/overseas
  - First Generation American
  - First Generation college student
- Ethnic heritage (racial and ethnic diversity)
- Language fluency/English as a second language
- Significant adversity/hardship
- Familiarity with the Academy and the Naval Service
  - Personal military service
  - Family military background
- Candidates from Under-represented Districts

**Assessment of the Whole Person**

- Unique Life Experiences
  - Experience living in another culture/overseas
  - First Generation American
  - First Generation college student
- Cultural fluency
- Language fluency/English as a second language
- Significant adversity/hardship
- Familiarity with the Academy and the Naval Service
  - Personal military service
  - Family military background
- Candidates from Under-represented Districts

*Comparing* DX79 at 22, *with* P813 at 22. This surreptitious change—made on "advice of counsel" a few weeks before trial, Tr.3 99:10-22, without notice to SFFA—confirms that the prior training materials instructed the board to consider race and ethnicity as one factor when making its whole-person qualification decisions, as Captain Birch testified, Tr.5 45:5-8, 56:7-11, 59:5-14.

49.     The Academy considers race when choosing slate winners under the competitive method of nomination. P259 ¶58; Tr.1 211:5-9 (Hwang); Tr.2 49:24–50:7, Tr.3 6:3-14, 94:6-15 (Latta). If two nominees have WPMs within 4,000 points of one another, P26 at USNA-00006558, the committee can use race to choose the nominee with the lower WPM, P259 ¶58; Tr.3 95:4-9 (Latta).

50.     The Academy considers race when choosing an alternate under the principal-competitive-alternate method of nomination. Tr.3 4:11-22, 5:10-22 (Latta).

51.     The Academy considers race when selecting candidates with service-connected nominations, "such as presidential nominations," to the same extent that it does for competitive congressional nominations. P259 ¶59; P880 221:22–223:20 (30(b)(6) deposition).

52.     When a Member of Congress submits slates of nominees for more than one vacancy, the slate review committee explicitly prioritizes racial minorities when filling the second vacancy. Tr.2 64:22–65:1 (Latta); DD7 at 11. For example, the Academy's "[m]ultiple vacancy priorities" for choosing candidates in the Class of 2027 were, in order: "i. Underrepresented [congressional district] first; ii. *Strategic Imperative (gender/diversity)*; iii. Best qualified vs [sic] principal nominations; and iv. NAPS/Foundation." P19 at USNA-00002642-43 (emphasis added).

53.     The Academy says it does not consider race when selecting qualified alternates, which are chosen based solely on merit. That is not true, in at least two respects.

   a.     The Academy regularly reroutes would-be congressional slate winners on competitive slates (*i.e.*, qualified candidates with the highest WPM) to be admitted as qualified alternates instead. Tr.3 133:16–134:11 (Arcidiacono). When that rerouting occurs due to race, race affects applicants' ability to compete for qualified-alternate spots by adding more high-WPM applicants to the pool. This happens many times each year. P464.

   b.     The Academy's admissions data reveals that the WPM threshold for qualified alternates drops over time, and that the Academy rejects some qualified applicants with WPM scores above the final threshold. Tr.3 186:1-187:16 (Arcidiacono); PD3 at 39-40. As shown by a model of qualified-alternate decisions between the initial

WPM threshold and the final WPM threshold, the Academy employs racial preferences that favor minorities in the selection of qualified alternates between the thresholds. Tr.3 189:22-191:11 (Arcidiacono); PD3 at 41-42.

54.     The Academy considers race when deciding which applicants will be additional appointees. Tr.2 48:19-21, Tr.3 10:15–11:3 (Latta). A majority of additional appointees are racial minorities. P283.

55.     The Academy considers race when deciding which applicants to admit off the waitlist. DD7 at 11; Tr.2 62:15–63:21, 238:11-17 (Latta).

56.     The Academy can consider race when awarding superintendent nominations. Tr.2 51:18-21 (Latta); P259 ¶76. Though the Academy says it has not considered race when awarding these nominations for many years, the Academy reserves and defends its right to do so.

57.     The Academy closely tracks the racial composition of its classes.

        a.      During the admissions cycle, senior members of the admissions office—including Dean Latta, the other members of the slate review committee, and the regional admissions directors—meet almost every week. P23 at USNA-00006575; Tr.2 172:6-10 (Latta). At each of these meetings, Dean Latta receives a "Dean's Brief" from the various members of the admissions office, totaling over two dozen briefs per cycle. P465; P550-P576 (Dean's Briefs for Class of 2026); Tr.2 76:11–77:20 (Latta). These briefs contain a chart comparing the class so far to the class last year on that date-–solely by race. Tr.2 72:6–74:16; *e.g.*, P558. Race is tracked in four columns: total minority, African American, Hispanic, and Asian/Native American. Tr.2 74:4-16 (Latta); *e.g.*,

P558. The "goal" is to "see" where the Academy is "in these categories … compared to … the previous year." Tr.1 207:2-6 (Hwang). No such comparisons are generated for socioeconomic status, first-generation status, English as a second language, or hardship/adversity. Tr.2 74:17–75:18 (Latta).

b.     More than once during the admissions cycle, the Academy generates "qualified no offer" reports. Tr.2 78:5-7 (Latta). These reports are titled "African American Qualified No Offers," "Hispanic or Latino Qualified No Offers," and "Asian and Other Qualified No Offers." Tr.2 78:8–81:11 (Latta); *e.g.*, P2, P3, P4. They reflect applicants of those races who were deemed qualified but who have not yet received an offer from the Academy. Tr.2 78:1-14 (Latta); *e.g.*, P2, P3, P4. The purpose of the reports is straightforward: to narrow the eligible candidate pool only to individuals of certain races to ensure they receive extra consideration for offers of appointment. And the results speak for themselves: Of the candidates listed on the "African American Qualified No Offers" reports produced by the Academy in this case, 63.5% were admitted to the Academy and 70% were admitted to either the Academy or the prep school. P469. The Academy does not generate qualified-no-offer reports for socioeconomic status, first-generation status, or hardship/adversity. Tr.2 81:12-24 (Latta).

c.     Dean Latta's decision to seek out "qualified no offer" reports for minority applicants is consistent with his requests for racially specific reports at other points during the admissions cycle. At the beginning of the admissions cycle for the Class of 2027, for instance, Dean Latta asked a subordinate to "build [him] reports" listing only the candidate number, name, gender, race, ethnicity, charging source, and blue-chip

status for all "candidates who accepted offers for the Classes of 2022, 2023, 2024, 2025, and 2026." P104 at USNA-00019280

    d.      Near the end of the admissions cycle, the Academy generates a class comparison report. Tr.2 82:2-18 (Latta); *e.g.*, P39; P41; P207; P289. These reports track the class that was just admitted to the seven previous classes along two dimensions: "Females" and "Minorities." Tr.2 87:9-13 (Latta); *e.g.*, P39; P41; P207; P289. Minorities are tracked in three racial categories: "African Am.," "Hispanic," and "Asian/Other." Tr.2 90:9-11 (Latta); *e.g.*, P41. The report tracks no other information, like socioeconomic status. *See, e.g.*, P39; P41; P207; P289.

## III.    The Effect of the Academy's Use of Race in Admissions

    58.    The percentages of each racial group admitted to the Academy have remained remarkably stable each year. Just like Harvard, the Academy's racial percentages have stayed within narrow ranges over the last ten years in the record:

| Share of Students Admitted to Harvard by Race | | | |
|---|---|---|---|
| | African-American Share of Class | Hispanic Share of Class | Asian-American Share of Class |
| Class of 2009 | 11% | 8% | 18% |
| Class of 2010 | 10% | 10% | 18% |
| Class of 2011 | 10% | 10% | 19% |
| Class of 2012 | 10% | 9% | 19% |
| Class of 2013 | 10% | 11% | 17% |
| Class of 2014 | 11% | 9% | 20% |
| Class of 2015 | 12% | 11% | 19% |
| Class of 2016 | 10% | 9% | 20% |
| Class of 2017 | 11% | 10% | 20% |
| Class of 2018 | 12% | 12% | 19% |

Brief for Petitioner in No. 20–1199 etc., p. 23.  Harvard's focus on numbers is obvious.[7]
*SFFA v. Harvard*, 600 U.S. 181, 222 (2023).

| Class Portraits | | | |
|---|---|---|---|
| | African-American Share of Class | Hispanic Share of Class | Asian-American Share of Class |
| Class of 2018 | 6% | 12% | 7% |
| Class of 2019 | 7% | 12% | 7% |
| Class of 2020 | 6% | 11% | 7% |
| Class of 2021 | 7% | 12% | 7% |
| Class of 2022 | 8% | 11% | 7% |
| Class of 2023 | 7% | 12% | 8% |
| Class of 2024 | 7% | 12% | 8% |
| Class of 2025 | 7% | 15% | 10% |
| Class of 2026 | 6% | 15% | 10% |
| Class of 2027 | 8% | 15% | 11% |

P437; P438; P439; P440; P441; P519; P499; P521; P523; P520

PD1 at 13; *accord* Doc.110 at 8 (similar). This is true whether single-race designations are used (above) or a definition of African-American and Asian-American that accommodates multiracial identity is used:

| Share of Students Admitted to Harvard by Race | | | |
|---|---|---|---|
| | African-American Share of Class | Hispanic Share of Class | Asian-American Share of Class |
| Class of 2009 | 11% | 8% | 18% |
| Class of 2010 | 10% | 10% | 18% |
| Class of 2011 | 10% | 10% | 19% |
| Class of 2012 | 10% | 9% | 19% |
| Class of 2013 | 10% | 11% | 17% |
| Class of 2014 | 11% | 9% | 20% |
| Class of 2015 | 12% | 11% | 19% |
| Class of 2016 | 10% | 9% | 20% |
| Class of 2017 | 11% | 10% | 20% |
| Class of 2018 | 12% | 12% | 19% |

| Class Portraits (Including Multi-racial) | | | |
|---|---|---|---|
| | African-American Share of Class | Hispanic Share of Class | Asian-American Share of Class |
| Class of 2018 | 10% | 12% | 13% |
| Class of 2019 | 11% | 12% | 14% |
| Class of 2020 | 10% | 11% | 14% |
| Class of 2021 | 12% | 12% | 15% |
| Class of 2022 | 11% | 11% | 12% |
| Class of 2023 | 11% | 12% | 16% |
| Class of 2024 | 10% | 12% | 13% |
| Class of 2026 | 9% | 15% | 15% |
| Class of 2027 | 12% | 15% | 18% |

P437; P438; P439; P440; P441; P519; P499; P523; P520

Brief for Petitioner in No. 20–1199 etc., p. 23. Harvard's focus on numbers is obvious.[7]

*SFFA v. Harvard*, 600 U.S. 181, 222 (2023).

PD1 at 14.

59. Defendants' expert Dr. Gurrea suggested that these racial admit shares were not remarkably stable, highlighting the percentage change in the shares from year to year. Tr.7 (Sept 24) 187:21–188:10; DD5.55. But this is the exact same argument (using essentially the same table) that Harvard advanced against Plaintiff's racial-balancing theory there. *Compare* DD5.55, *with* P878 at 82. Justice Sotomayor credited that argument in *Harvard*, *see* 600 U.S. at 350 (Sotomayor, J., dissenting) (noting that the numbers "varied considerably year to year, a pattern 'inconsistent with the imposition of a racial quota or racial balancing'"). But the majority explicitly rejected it, *see id.* at 222 n.7, deeming the stable numbers "outright racial balancing," *id.* at 223.

60. An expert for SFFA, Professor Peter Arcidiacono, conducted extensive statistical analysis of the Academy's admissions data, employing techniques that have been endorsed

by peer-reviewed economics journals for analyzing race in admissions decisions—including a multiple regression analysis. Tr.3 110:1-21, 112:22–113:25, 116:9-14, 170:22–172:16 (Arcidiacono).

61.     In organizing the applicant data across racial groups, Professor Arcidiacono employed the same racial categorization method that he employed in both *Harvard* and *UNC*. Tr.3 131:2-13 (Arcidiacono). Dean Latta categorized race the same way on numerous occasions. *E.g.*, P4, P207.

62.     Professor Arcidiacono's analysis shows that "race plays a significant role throughout [the Academy]'s various admissions channels." Tr.3 109:14-19, 182:3–183:25, 184:11–185:10 (Arcidiacono); PD3 at 37.

63.     Professor Arcidiacono focused his primary analysis on domestic non–Blue Chip, non-prep applicants who qualified medically and physically and had completed applications and nominations. Tr.3 170:8-13 (Arcidiacono).

64.     For that group of applicants, the Academy affords "large racial preferences, especially for Black applicants, over all other applicants, but then for Hispanic and Asian applicants over White applicants." Tr.3 109:13-19 (Arcidiacono); *see also* Tr.3 179:12-15 (Arcidiacono).

65.     Within that subgroup of applicants, Professor Arcidiacono showed that the admission rates for whites, blacks, and Hispanics are similar: 36.11%, 37.28%, and 35.91%. PD3 at 15. Yet there are substantial differences in these groups' academic and non-academic qualifications. The average SAT scores for admitted black and Hispanic applicants, for example, are nearly tied or are lower than the average SAT scores for *rejected* white applicants. PD1 at 4.

White applicants and admits are also stronger than black and Hispanic applicants and admits on the fitness assessment, class rank, athletic and non-athletic extracurricular scores, combined school recommendation score, and the WPM (net of RABs). Tr.3 146:13-19; PD3 at 15-16; PD1 at 3.

66.    Comparing applicants with similar qualifications reveals significant disparities in admit rates across racial groups. Tr.3 151:24–152:10; 154:19–155:3. Based on the Academy's data, applicants can be broken into deciles by WPM—where the tenth decile is the top 10% of WPMs in the applicant pool, the first decile is the worst 10% of WPMs, and so on. Tr.3 148:8-9 (Arcidiacono); *see also Harvard*, 600 U.S. at 197 n.1. Proceeding from lower to higher deciles, admit rates increase steadily, which means that having a high WPM is related to an applicant's chance of admission. Tr.3 149:15-24 (Arcidiacono); PD3 at 20. But there are stark differences across racial groups, particular in the middle of the distribution. Tr.3 154:19-20 (Arcidiacono); PD3 at 20.

67.    For example, going down the top three deciles, black admission rates hold steady (at above 90%) while white admission rates are cut in half (from 88.54% to 46.6%). White applicants in the third highest decile have about the same chance of admission (46.6%) as black applicants in the fourth lowest decile (46.97%). And minority applicants in the fifth decile have an admission rate around 1.5x, 2x, or 3x higher than white applicants.

**Admit Rates by WPM-23 Decile & Race**
(No BCA, No Prep Pool)

| Decile | White | Black | Hispanic | Asian | Total |
|--------|-------|-------|----------|-------|-------|
| 10 | 88.54 | 94.74 | 90.91 | 95.79 | 89.94 |
| 9 | 65.92 | 90.32 | 83.64 | 86.67 | 71.41 |
| 8 | 46.60 | 92.86 | 68.94 | 78.24 | 55.04 |
| 7 | 33.48 | 75.93 | 63.51 | 59.52 | 42.17 |
| 6 | 27.64 | 69.35 | 44.68 | 51.72 | 35.83 |
| 5 | 20.10 | 59.72 | 29.73 | 38.17 | 25.84 |
| 4 | 12.86 | 46.97 | 20.23 | 11.57 | 15.75 |
| 3 | 9.72 | 32.73 | 10.29 | 21.52 | 12.66 |
| 2 | 4.60 | 11.76 | 1.69 | 1.09 | 4.93 |
| 1 | 3.07 | 4.00 | 3.00 | 4.65 | 3.53 |
| Total | 36.11 | 37.28 | 35.91 | 54.78 | 38.43 |

Notes: Sample restricted to non-Blue-Chip, non-Prep-Pool, domestic, complete applications that received a nomination and passed the fitness and medical exams, and that have a valid WPM Score. Deciles are computed separately by Class Year. WPM-23 refers to raw WPM (i.e., net of RAB points) that is calculated using the 2023-2024 component weights for all years.

PD3 at 20; *see* Tr.3 154:19-20, 154:24–155:3.

68.     Professor Arcidiacono also estimated a logit model of Academy admissions. Tr.3 156:12–157:12.

69.     As this Court knows, "[m]ultiple regression analysis is a statistical tool used to understand the relationship between two or more variables" that is "often employed in the analysis of data about competing explanations for the relationships among a number of explanatory variables." *In re Titanium Dioxide Antitrust Litig.*, 2013 WL 1855980, at *14 n.14 (D. Md. May 1) (citing Rubinfeld, *Reference Guide on Multiple Regression*, in *Reference Manual on Scientific Evidence* 305 (Fed. Judicial Ctr., 3d ed. 2011)). Logistic regression models are "the most useful tools" for measuring the effect of race in admissions because they "can isolate the effects of race by controlling for other variables affecting the modeled outcome." *SFFA v. Harvard*, 980 F.3d 157, 181 (1st Cir. 2020), *rev'd*, 600 U.S. 181. "Logistic regression models can be used to measure the effect of one explanatory variable (here, race) on a response variable (here, …

24

admission to [the Academy]) while controlling for other explanatory variables (*e.g.*, standardized tests scores, grades, parental income, etc.)." *Id.* at 181 n.18 (citing Agresti, *Foundations of Linear and Generalized Linear Models* 165, 202 (2015)).

70.     Professor Arcidiacono's logit model revealed large racial preferences in favor of minority applicants, particularly black applicants. Tr.3 109:14-19; 167:23–168:17; PD3 at 25.

71.     Professor Arcidiacono employed several econometric techniques to quantify the effect of the Academy's racial preferences. Tr.3 170:22–172:16. Those techniques demonstrated in different ways that the Academy affords large racial preferences to minority applicants, particularly black applicants. Tr.3 179:12-15.

72.     Professor Arcidiacono's transformational analysis revealed that a white applicant with a 25% chance of admission would have a 86.5% chance of admission if given the racial preference that the Academy affords to black applicants. Tr.3 173:10-24; PD3 at 28. That same white applicant would have a 52.4% chance of admission if treated as a Hispanic and a 58.7% chance of admission if treated as an Asian American. Tr.3 173:10-20; PD3 at 28.

73.     Professor Arcidiacono also computed the average marginal effect of race on admissions for non-Blue Chip, non-prep applicants. The average marginal effect is the difference between the overall admission rate for this subgroup, minus the admission rate without racial preferences. Tr.3 174:25–175:9. The average marginal effect of race on admissions is 24.5% for blacks; 11.4% for Hispanics; and 17.2% for Asians. Tr.3 175:11-24; PD3 at 31.

74.     Professor Arcidiacono also conducted an "admitted minority" analysis, where he started with the set of admitted minorities and computed what their probability of admission would have been in the absence of racial preferences. Tr.3 176:19–177:21. That analysis

revealed that an admitted non-Blue Chip, non-prep pool black applicant would on average have only a 32.7% chance of admission without racial preferences. Tr.3 178:2-9. In other words, that admitted black applicant would turn into a likely reject.

75.     Professor Arcidiacono also employed a "capacity constraints" analysis to determine how many admissions slots were attributable to the Academy's racial preferences over the five-year period. Tr.3 179:17–181:6. His analysis reveals that—over the five-year period—the Academy admitted 165 black applicants, 104 Hispanic applicants, and 156 Asian-American applicants on the basis of race. Tr.3 181:1–182:1; PD3 at 35. In other words, race produced approximately 33 black admits, 21 Hispanic admits, and 31 Asian admits per year over the five-year period. PD3 at 35.

76.     The Academy, by contrast, presented no affirmative case on the effect of race in its admissions process. The Academy does not know how many fewer racial minorities it would admit if it stopped considering race in admissions. The Academy never modeled that question before this litigation began, and it presented no model or other data during this litigation. *See, e.g.*, Tr.1 213:8-19 (Hwang); Tr.2 43:13–44:22, 106:20-23 (Latta); Tr.4 (Sept 19) 74:14-18 (Kahlenberg); Tr.5 49:14-21 (Birch); 184:8-14 (Sherwood); *see also* Tr.1 81:1-6 (opening) (record contains "virtually nothing" about "what the racial and ethnic composition at the Naval Academy would look like in the absence of the limited consideration of race"); Tr.9 (Sept 26) 54:20-21 (closing) (denying "that the Naval Academy and DoD need to put forward statistical modeling").

77.     Though he's never measured it and does not know the numbers, Dean Latta feels that the use of race has "helped increase" the racial diversity of the Academy's "student

body." Tr.3 38:14-19. He is "very concerned" that, if the Academy stopped considering race, the numbers of admitted blacks and Hispanics "would drop dramatically." Tr.3 38:24–39:13.

78.     Yet Defendants hired Dr. Stuart Gurrea—and paid him "more than a half-million dollars" plus a "share" of "hundreds of thousands" more, Tr.7 191:2–192:5—to criticize and minimize Professor Arcidiacono's model, the only evidence quantifying the Academy's use of race in admissions. *See generally* DX200.

79.     Dr. Gurrea is not qualified to testify about Professor Arcidiacono's model. He has "never before testified about logit models with binary outcomes"; nor has he ever "published in the academic peer-reviewed literature about binary outcome logit models." Tr.7 225:16-21 (Gurrea). Indeed, Dr. Gurrea has never published academic work of any kind in a peer-reviewed journal. Tr.7 206:24–207:4 (Gurrea).

80.     Professor Arcidiacono's approach is reliable and probative.

        a.     Professor Arcidiacano, as the district court explained in *UNC*, is "[h]ighly [q]ualified" and has "very impressive" credentials. *SFFA v. UNC*, 567 F. Supp. 3d 580, 612-13 (M.D.N.C. 2021) (cleaned up). The district court in *Harvard* likewise stressed that Professor Arcidiacono is "very well-qualified" and "highly respected." *SFFA v. Harvard*, 397 F. Supp. 3d 126, 158-59 & n.40 (D. Mass. 2019). He "has a Ph.D. in economics from the University of Wisconsin and has been a professor of economics at Duke University for more than two decades, earning tenure in 2006. His research focuses on labor economics and applied microeconomics, and he has also completed studies on the economics of higher education. Professor Arcidiacono …

has published about forty papers, almost all of which have involved econometric modeling, and almost a quarter of which relate to affirmative action. Additionally, he has served as a coeditor or associate editor for multiple journals and has been appointed as a research associate for the National Bureau of Economic Research. In 2018, Professor Arcidiacono was elected as a Fellow of the Econometric Society and in 2020 was elected as a Fellow of the International Association for Applied Econometrics." *UNC*, 567 F. Supp. 3d 580, 612-13; *see* Tr.3 110:1-9, 110:25–111:3, 114:1-9; 115:3-22 (Arcidiacono).

b.     The Supreme Court relied in part on Professor Arcidiacono's work when ruling for SFFA. *See Harvard*, 600 U.S. at 197 n.1.

c.     After Professor Arcidiacono testified in *Harvard* and *UNC*, his work in those cases was published in five articles in peer-reviewed journals. Tr.3 116:9-20 (Arcidiacono).

d.     Harvard's expert, Nobel-winning economist David Card, "agreed" with "Arcidiacono" that "logistic regressions are the most useful econometric tool in evaluating the probable effect of race and other traits." *Harvard*, 397 F. Supp. 3d at 165; *see* Tr.7 213:16–214:12 (Gurrea).

e.     As the district courts found in both *Harvard* and *UNC*, Professor Arcidiacono "presented a viable econometric model," *Harvard*, 397 F. Supp. 3d at 175, that "contribute[s] to the overall understanding of [the university's admissions] process," *UNC*, 567 F. Supp. 3d at 612. To the extent those courts disagreed with Professor Arcidiacono, they did so to explain why they adopted *another* model produced by the

28

other side's expert economist. *UNC*, 567 F. Supp. 3d at 634, 620; *see also Harvard*, 397 F. Supp. 3d at 175 (using a hybrid model that accounted for both experts). Those models were "broadly similar" to Professor Arcidiacono's model there (and here). *Harvard*, 397 F. Supp. 3d at 167; *accord UNC*, 567 F. Supp. 3d at 615 ("Professor Hoxby's process mirrored Professor Arcidiacono's in many ways"). And when Professor Arcidiacono modeled something that Harvard's expert didn't, the *Harvard* court credited Professor Arcidiacono's model. *See* 397 F. Supp. 3d at 169.

81.     Dr. Gurrea's criticisms of Professor Arcidiacono's model are unpersuasive.

        a.      Dr. Gurrea suggested that a logit model is not up to the task of reliably modeling the Academy's admissions process. Tr.3 194:10-16 (Arcidiacono); PD3 at 23. Relying on an econometrics textbook by Professor Kenneth Train (a textbook that Professor Arcidiacono uses in teaching his "Discrete Choice" course), Dr. Gurrea reads Professor Train's textbook to mean that a logit model cannot make reliable predictions if the choices being modeled are interdependent. Tr.3 194:10–195:19 (Arcidiacono); PD3 at 23. But Dr. Gurrea misreads and misunderstands Professor Train: The concern highlighted by Professor Train relates to models that include a lagged dependent variable, which Professor Arcidiacono's model does not. Tr.3 195:22–196:23 (Arcidiacono); PD3 at 23. In any event, Dr. Gurrea effectively conceded the interdependence point by admitting on cross-examination the numerous similarities between the Academy's and Harvard's admissions processes: that both have a limited number of seats, make admissions decisions over time, employ standards that change over time, seek to

enroll a diverse class, seek a diversity of intended concentrations or majors, and consider geographic diversity. Tr.7 215:6–220:12. Dr. Gurrea also conceded that Nobel Prize winner David Card employed a logit model to model the Harvard admissions process. Tr.7 215:6–220:12; 214:22-25 (Gurrea).

 b. Dr. Gurrea suggested that Professor Arcidiacono should have excluded fleet applicants from his model and that he should have controlled for (*i.e.*, included variables for) underrepresented district, hardship, adversity, life experience, and RABs. Tr.3 197:9-21; 199:8-12; 199:24–200:2 (Arcidiacono). Professor Arcidiacono, however, demonstrated that excluding fleet applicants yields *larger* race coefficients and *larger* average marginal effects of race. Tr.3 198:17–199:6 (Arcidiacono); PD3 at 53-54. He likewise demonstrated that including variables for hardship, adversity, life experience, and RABs would yield similar or larger racial preferences. Tr.3 200:3–201:14 (Arcidiacono); PD3 at 55. As for underrepresented districts, Professor Arcidiacono explained that he captures the effect of such districts through including controls for various characteristics of districts, including the number of nominees and qualified nominees on a slate, as well as the average WPM score on a slate. Tr.3 199:8-23 (Arcidiacono).

 c. Dr. Gurrea described Professor Arcidiacono's method of racial categorization as arbitrary and suggested that Professor Arcidiacono should have treated ethnicity separate from race and included a multiracial category. Tr.3 201:15–202:1 (Arcidiacono); Tr.7 175:20–176:4 (Gurrea). But Professor Arcidiacono demonstrated that his method of racial categorization resulted in more accurate admissions predictions for the relevant subset of applicants (multiracial and Hispanic) and that his model was

robust to the method of categorization. Tr.3 201:18–202:18; 202:21–203:21 (Arcidiacono); PD3 at 56-57.

     d.     Dr. Gurrea suggested that the unobservables in the Academy's admissions process (that is, the factors that Professor Arcidiacono did not or could not include in his model) might not be informed by the observables. Tr.7 163:4-8 (Gurrea). But as Professor Arcidiacono explained, unobservables are always present in econometric modeling, and the common assumption is that they are uncorrelated with race (*i.e.*, do not affect the analysis) or that they run in the same direction as the observables (meaning the estimates of race are conservative). Tr.3 204:9–206:11 (Arcidiacono). By making the assumption that the unobservables are uncorrelated with race, Professor Arcidiacono explained that his estimates were conservative; allowing for a positive correlation with the observed variables that would imply even larger racial preferences Tr.3 205:18–206:6 (Arcidiacono).

     e.     Dr. Gurrea created a model of admissions without race variables and suggested that race must have little effect on admissions because that model predicts admissions decisions with only somewhat less accuracy than Professor Arcidiacono's admissions model. Tr.3 206:13-23 (Arcidiacono). Professor Arcidiacono explained, however, that this is statistical sleight of hand that tends to mask the effect of the Academy's racial preferences by spreading them across the entire pool. Tr.3 206:24–208:6 (Arcidiacono). Professor Arcidiacono explained the point using the example of enormous preferences for basketball players. Because those preferences affect so few, removing those preferences from an admissions model would make the model "way

off' in terms of predicting admissions for basketball players but hardly change the accuracy of the model overall. Tr.3 206:24–207:14 (Arcidiacono).

82.    Even if Dr. Gurrea's criticisms were valid, his ultimate conclusion is that Professor Arcidiacono *overstates* the effect of race on Academy admissions decisions. Tr.7 149:6-8; 213:12-15 (Gurrea). In fact, Dr. Gurrea suggested that the effect of race is much smaller than Professor Arcidiacono's capacity constraints analysis showed. Tr.7 212:6-16 (Gurrea). And the effect could even be zero. Tr.7 208:3-17 (Gurrea).

## IV.    Defendants' Purported Interests

83.    In *Fisher* and *Harvard*, the Academy (represented by the United States) argued that its race-based admissions process was modeled on *Grutter* and that it pursued *Grutter*'s interest in the educational benefits of student-body diversity. *E.g.*, U.S.-*Fisher I*-Br. 13, 2012 WL 3418588 ("The services have concluded that fostering student-body diversity is vital to the service academies' … ability to provide a rigorous education for all students and prepare cadets for leadership roles."); U.S.-*Fisher II*-Br. 12-13, 2015 WL 6735838 (same); U.S.-*Harvard*-Br. 5, 2022 WL 3108833 ("the Nation's service academie[s ]have relied extensively on *Grutter* in shaping their admissions systems"); U.S.-*Harvard*-Br. 24 (same).

84.    Still today, the Academy claims that its race-based admissions process pursues *Grutter*'s interest in the educational benefits of student-body diversity. *E.g.*, P31 at USNA-00000389; P491 at USNA-00000737; DX79 at 26; P29 at USNA-00000197; Tr.6 (Sept 23) 32:18-23 (Vazirani).

85.    The Academy no longer claims that its race-based admissions can survive strict scrutiny based on the educational benefits of student-body diversity. Doc.109 at 36-38; *see also id.* at 32 (contrasting "civilian universities' use of race to achieve educational diversity" with

"the Naval Academy's use of race to achieve an altogether different compelling national security interest"); Tr.9 47:13-15 (closing) (denying "that the Naval Academy's interest is only in educational benefits, just like in *Grutter*"); 57:8-10 (contrasting the "unique context of higher education, as presented in *Grutter*," with "the unique context of military preparation as presented here").

86.     The Defense Department has a formal definition of "diversity": "All the different characteristics and attributes of individuals from varying demographics that are consistent with the DoD's core values, integral to overall readiness and mission accomplishment, and reflective of the nation we serve." P303 at USNA-00012525. This definition focuses on "diverse backgrounds, experiences, outlooks," "ways of thinking," "perspectives," and "expertise." P303 at USNA-00012514.

87.     The Academy's consideration of race does not further the Defense Department's broad definition of diversity. As Defendants admit, a person's skin color says nothing about his knowledge, experiences, or views. *See, e.g.,* Tr.9 64:23–65:2 ("[T]he Court has heard witness after witness testify that the Naval Academy and the Department of Defense, more generally, absolutely are not making any type of assumptions that a particular minority is going to bring a particular experience or a particular viewpoint."); Tr.7 124:5–125:24 (Fuller); Tr.6 20:23–21:3 (Vazirani); Tr.7 49:10-18 (Lyall); Tr.2 226:14-16 (Latta); P259 ¶79.

88.     The Academy does not claim a compelling interest in using race to remedy supposed pro-white disparities in congressional nominations. The Academy cannot use racial classifications to remedy mere disparate impacts. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277-78 (1986) (plurality). And Defendants not only failed to produce a "strong basis in evidence"

suggesting intentional discrimination by Members of Congress, *id.* at 277, but also affirmatively denied that Members consider race when making nominations, *see* Pretrial Conf. Tr. 26:4-7 ("race does not play a role … in terms of getting a congressional nomination"). To the extent the congressional-nomination requirement is a problem, moreover, that problem is chargeable to Defendants—the federal agencies and officials that administer the statute and represent the United States here. *Cf.* 5 U.S.C. §702; *Alexander v. Estepp*, 95 F.3d 312, 316 (4th Cir. 1996) ("the government should sever its ties to the discriminating entity before resorting to reliance on a suspect classification").

89.     The Academy instead says that it uses race in admissions to make the racial composition of its student body mirror the racial composition of the general population. P293 at 74; Tr.1 64:22-23 (opening); Tr.9 74:10-11 (closing). At various times, the Academy has claimed that proportional representation in its student body furthers three military interests: lethality and unit cohesion, recruitment and retention, and legitimacy domestically and abroad. Doc.109 at 8; Doc.46 at 11.

### A.     Lethality and Unit Cohesion

90.     Earlier in this case, Defendants argued that racial diversity makes the Navy "more lethal" and is "crucial to 'maintain maritime superiority and dominance on the battle-field.'" Doc.46 at 1, 37.

91.     But Defendants no longer make these assertions. Defendants concede that racial diversity has no effect on the lethality of ships or military operations. Their own witness, Admiral Fuller, denied the relationship between these interests and race. *See* Tr.7 115:11-22 (Fuller) ("Q. Is it your view that a ship with a racially diverse leadership is better at launching Tomahawk missiles than a nondiverse unit? A…. [I]f the single difference between two ships

is the race of the crew, there's no credibility to say there's any difference. I don't know how you'd make that assessment. Q. Is it your view that a ship with a racially diverse leadership is better at detecting enemy submarines than a nondiverse ship? A. Same thing. If the only difference is the racial composition of the crew, there's no way to say that that's a reasonable assumption to make.").

92.    The Academy claims that racial diversity "improv[es] unit cohesion and trust." Tr.6 14:6-24 (Vazirani). According to the Academy, a diverse officer corps "draw[s] from a range of … different lived experiences" and thus is "able to understand the people that they lead" and "address problems from different perspectives," which then causes them to "be able to carry out a mission more effectively." Tr.6 16:6-14 (Vazirani); *see* 23:10-13 (Vazirani) (racial diversity "creates an avenue for discussion and an avenue for understanding"); 38:14–40:17 (Vazirani) (asserting that all dimensions of diversity, including diversity of gender identity, improves unit performance and gives us "an advantage over our enemies").

93.    ***Brigadier General Walker & Lieutenant Colonel Wood***. SFFA's witnesses persuasively demonstrated that racial diversity has no effect on unit cohesion or lethality.

94.    Brigadier General Christopher S. Walker spent more than 40 years in uniform. He served in combat positions and leadership positions all over the world. Brigadier General Walker also served as a senior military advisor to the Secretary of the Air Force Office of Diversity and Inclusion. Brigadier General Walker is a Level III joint qualified officer, which makes him qualified to address issues concerning the Navy and the military as a whole. Brigadier General Walker is an expert in military operations at the tactical, operational, and strategic level. Tr.1 89:14–92:8, 93:2–111:21 (Walker).

95.     Lieutenant Colonel Dakota Wood was in active duty in the U.S. Marine Corps for 20 years. During this time, he served in all types of environments, including combat, operations, garrison, training, schools, education, and headquarters environments. After leaving the force, Colonel Wood continued to work in the field of military readiness, including by analyzing, researching, assessing, and writing about issues of military readiness. Colonel Wood is thus a leading expert on the issue of military readiness. Tr.4 192:12–196:21, 197:11–210:24.

96.     Military readiness and lethality depend on factors like leadership, tactical proficiency, and resources—issues that are unrelated to the racial makeup of the officer corps. Tr.1 119:9-10 (Walker); Tr.4 212:16-21 (Wood).

97.     Racial diversity does not affect whether the Navy has good leaders. Tr.4 212:22–214:15 (Wood); Tr. of Truesdale Depo. (Aug. 8, 2024) 117:5-8; 129:4–130:7.

98.     Service members are not more likely to follow leaders who share their race or ethnicity. Tr.1 132:24-133:4 (Walker); *e.g.,* 133:5-14 (Walker) (the "vast majority" of people Brigadier General Walker led were white and they "will tell you that they'd follow me to the ends of the earth and back"); 175:5-9 (Walker) ("Every situation is going to be different, but I'm telling you it's leadership. Leadership, leadership, leadership. Whether the commander is Black, whether the commander is White, if it's a bad leader, then there's going to be no unit cohesion."); Truesdale Depo. 49:14-18.

99.     Racial preferences, by contrast, *undermine* minority leaders. Tr.1 150:21–151:9 (Walker) ("[L]et's say that you're my superior officer and you come to me and say, 'Hey, I'm going to give this to you because you're a Black man.' That would be condescending to me. That would … seem like you don't think that I can reach … the standards of everybody else.");

*id.* 151:10-13 (Walker) ("Q. What would happen to your leadership ability if those you commanded believed you were put in your position because of your race? A. It would totally destroy my leadership capability.").

100.    Racial diversity does not affect whether the Navy has sufficient resources to conduct a war. Tr.4 224:3-9 (Wood).

101.    There are no studies showing that the percentage of racial-minority officers affects unit performance in the operational setting. Tr.4 227:23–228:5 (Wood); Tr.1 148:7-15 (Walker); *see also* Tr.1 149:13-23 (Walker) ("[T]hrough all of the declarations … everybody was just parroting what … the Secretary of the Navy was saying, who was parroting what the Secretary of Defense was saying, who was parroting what the MLDC was saying, who were parroting what Congressman James Clyburn said. It's an ostinato of the same narrative.… I did not see credible data that supported it. So I would implore the Court, if they do show data, please look at it carefully because, from what I saw, it doesn't prove their point.")

102.    Numerous real-world examples prove how race has no impact on operations. For example, when Brigadier General Walker was stationed in Iraq, he would often undertake dangerous missions between the Green Zone and the Baghdad International Airport. When he was assembling teams for these missions, he was not concerned with their race or ethnicity. All he cared about was "who was a good driver and who was a good shooter." Tr.1 100:2-5 (Walker). Indeed, in his entire year in Baghdad, he could not recall "any time … when a person's race had any effect on [the] mission." Tr.1 98:11–100:10 (Walker).

103.    Many other examples disprove that race has any connection to a unit's effectiveness. *See* Tr.1 94:1–95:8 (Walker) (General Walker was the only black officer in the 53rd

Weather Reconnaissance Squadron and the racial makeup had no effect on the squadron's effectiveness); 95:11–96:17 (Walker) (General Walker was one of three Black officers in the 50th Airlift Squadron, which was deployed in combat in the Balkans and elsewhere, and the racial makeup had no impact on the squadron's effectiveness); 120:24–122:6 (Walker) (irrelevant when flying missions into Afghanistan); Tr.4 224:23–225:12 (Wood) (no effect on joint military drills with South Korea); 225:13-24 (Wood) (no effect "at central command [when military leaders were] planning the invasion of Afghanistan"); 225:25–226:7 (Wood) (no effect on the lethality of the "invasion forces into Iraq"); Truesdale Depo. 126:18-22.

104.    Race has no effect on a unit's effectiveness precisely because a person's race tells you nothing about that person. Tr.1 123:24–125:3 (Walker); Truesdale Depo. 41:10-12, 42:2-5, 128:5-8. As Brigadier General Walker put it:

> [Y]ou can't tell anything by someone's skin color. Let's say that whole jury area was filled with Black people. There's nobody in this court or in this world who could point to any of them and tell me what traits they have, what strengths they have, what ideas they have, or how they think. Anybody attempting to do that would only be stereotyping.

Tr.1 124:3-9.

105.    If racially balancing a unit made it more lethal, the military "absolutely" would be doing this racial balancing because the military is always "looking for an edge to win." Tr.1 127:9-17 (Walker). But the Court heard no evidence of any military unit ever attempting to balance a unit by race in order to make the unit more lethal. *See* Tr.1 127:5-8 (Walker). As a practical matter, it would not even be possible for the Navy to ensure a certain racial makeup of individuals in a platoon or on a ship. The "racial composition of any one unit is constantly in flux" with rotations and changes in assignments. Tr.4 227:17-18 (Wood). So each platoon

and ship will have "one complexion one day, and six months later it'll have something completely different." Tr.4 227:7-22 (Wood).

106.    The Academy does not know the "number," or even the "range," of racial-minority officers that the Navy needs to "foster cohesion and lethality." Tr.2 125:6-13 (Latta). No evidence of that number or range was submitted by any Defendant.

107.    Unit cohesion is not obtained by emphasizing the differences among service members within the unit. Tr.4 217:13–218:12 (Wood); Tr.1 130:8-20 (Walker).

108.    Servicemembers care about the competence of the people in their unit, not their race. Tr.1 130:21–131:7 (Walker). For example, when airmen have gone into combat, they "tr[y] to cajole the scheduler to keep them on crews with the top people and avoid being on crews with the scrubs." Tr.1 131:8-15 (Walker); *see also* 131:16-19 (Walker) (Brigadier General Walker never saw "any airmen trying to be assigned to a crew for a combat mission because of the race of the crew member").

109.    As far back as World War II during segregation, white bomber pilots and crews "wouldn't normally want to be fighting alongside Black service members," but by the end of the war they were requesting the Tuskegee Airmen to do their escort missions because these all-black crews were outstanding and the "White bomber crews … wanted to live." Tr.1 131:25–132:22 (Walker).

110.    Racial diversity does not affect unit cohesion. Tr.4 218:19–219:9 (Wood); Tr.4 226:8-23 (Wood) (no effect when training Marines); Tr.1 133:15-24 (Walker).

111.    Defendants' witnesses established no link between racial diversity and lethality or cohesion, let alone a connection between those interests and the Academy's race-based

admissions. They, at most, testified about broad-based "diversity" or racial diversity in general without any specificity about the amount needed.

112.   ***Ashish Vazirani & Vice Admiral John Fuller.*** Vazirani and Vice Admiral Fuller provided high-level assertions about why racial diversity further various military interests. But neither witness identified any studies or data to support their conclusions.

113.   Drawing firm conclusions without such studies is not how the military usually operates, even on issues of diversity. For example, when the Air Force was analyzing whether current height restrictions were disproportionately affecting women, numerous studies were conducted and reams of data on the issue were collected. *See* Tr.1 107:6–108:8, 147:11–148:15 (Walker) ("We mostly pulled in people, mostly women, who did not meet our height restrictions. And we brought them into different aircraft and said, 'Can you reach these controls? Can you push these rudder pedals? In the back as a load master, can you reach this static line?' And many of them could…. [S]o after all of that data, we said then our height restrictions were ridiculous.").

114.   Vazirani conceded that "a lack of diversity will [not] lead to mission failure." Tr.6 35:25–36:1 (Vazirani). Vazirani asserted only that racial diversity helps "to mitigate risk." Tr.6 36:1-4 (Vazirani); *see also* Tr.8 (Sept 25) 75:25–76:5 (Miller) (the Academy uses race in the admissions process as a "*hedge against the risk* of experiencing some of those racial tensions that we saw in the past and a *potential disinterest* by other minority groups … of potentially serving in the military where they don't see themselves represented and they don't believe that they may be successful" (emphases added)).

115.    Vazirani could not identify any unit that will, in fact, perform better with more racial diversity. The most he could say is that there is "the *potential for improvement* of readiness if there were a greater level of diversity." Tr.6 60:23-25 (Vazirani) (emphasis added).

116.    Defendants are "not aware of any study to determine the level of racial representation in the [Navy's] officer corps that would successfully promote trust within a unit." Tr.6 64:7-10 (Vazirani); *accord* Tr.7 124:17-25 (Fuller).

117.    Defendants are "not aware of any study to determine the level of racial representation in the Navy's officer corps that would best promote unit cohesion." Tr.6 64:11-14 (Vazirani); *accord* Tr.7 124:17-25 (Fuller).

118.    Vice Admiral Fuller attended the Academy and has had an exceptional and commendable career in the United States Navy. There is no evidence that Vice Admiral Fuller was admitted to the Academy because of racial preferences. Indeed, race likely played no role since Vice Admiral Fuller was a recruited athlete. Tr.7 91:3-9 (Fuller).

119.    ***Dr. Jeannette Haynie***. Dr. Haynie is "not familiar with the admissions processes" at the Academy. Tr.6 187:3. She offered no opinion on whether the Academy's use of race in admissions is necessary to achieve any goal.

120.    Dr. Haynie testified about the military benefits of "diversity," defined at so high a level that it has no relevance to this case. Dr. Haynie discussed diversity "in a general sense," Tr.6 102:2, 122:19-20 ("'overall diversity'"), 148:17-20 ("'broader approach to diversity'"), 230:13 ("broader diversity")—as in the uniqueness of each individual, *see* Tr.6 117:18-24 ("[W]e're all intersectional people.... Each of us comes from all these different backgrounds. Cognitive diversity, experiential diversity, all of these combine to make us who we are and

how we experience the world and how we see it."); 132:4 ("different people can see different things"); 127:4 ("th[e] human element"). Dr. Haynie's testimony discussed diverse "skill sets," "backgrounds," "perspectives," and "experiences"—not skin colors. Tr.6 101:17-18, 119:10, 128:5, 132:7-8. When asked about racial diversity in particular, Dr. Haynie pivoted to "diversity more broadly" and "diversity in general." *E.g.*, Tr.6 157:10-17, 117:15–118:4.

121.    Dr. Haynie sometimes also pivoted to points about sex and gender that were irrelevant to race. *E.g.*, Tr.6 117:15–118:4 (asserting that "gender diversity" was relevant to issues of "racial and ethnic diversity" because "we're all intersectional people").

122.    The few times that Dr. Haynie discussed racial diversity in particular, her testimony rested on unsupported generalizations and stereotyping. *See* Tr.6 119:9-12 (asserting a connection between "race and ethnicity" and "diverse perspectives"); 141:2-7 ("you don't want someone leading a team that looks completely different"); 110:5-7 ("those experiencing the most unhealthy climates may be experiencing it in part because of how they present").

123.    And Dr. Haynie elsewhere agreed that people in the military should be treated based on their individual merit, not their race. *E.g.*, Tr.6 127:22-24 (stressing the need for "the right person with the right skill set and the right team with the right leader"); P865 at 2 ("Lower, different standards are biased because they separate Marines into two categories based on nothing but stereotypical beliefs that certainly don't apply to any individual ….").

124.    By focusing on individual differences, Dr. Haynie's testimony has little relevance to the military, which prioritizes conformity and sacrifice of self to the team and mission. *See* Tr.4 222:14–223:3 (Wood).

125.    Dr. Haynie conceded that the Defense Department "has never done any kind of quantitative analysis, large or small, that examines whether diverse teams resolve complex problem sets better than nondiverse teams." Tr.6 217:17-21; *accord* 124:15-21 (no DOD "study that examines whether diverse teams solve complex problem sets better than nondiverse ones in the military setting"). And only "'limited systematic research has been conducted with the military population to demonstrate the link between D&I climate and key readiness and retention outcomes that are important to the military mission and DoD goal to create and maintain a diverse military force.'" Tr.6 105:17–106:3 (Haynie).

126.    Dr. Haynie also conceded that racial diversity does not affect training or tactical proficiency. Tr.6 126:22-25 (Haynie).

127.    Dr. Haynie conducted a "literature review" to find all the relevant academic and nonacademic literature on the effect of racial diversity in the military. Tr.6 94:20–95:4, 164:2-5 (Haynie). Yet Dr. Haynie never reviewed an article entitled "Assessing the Relationship Between Diversity and Navy Unit Performance," which was a March 2024 study from the Naval Postgraduate School. Tr.6 164:6–165:4; *see* P800. Dr. Haynie did not review this study even though she signed the interrogatory response for the Defendants stating that this study was one "created by, commissioned for, or relied upon by Defendants concerning their compelling interests in the limited consideration of race in the United States Naval Academy's admissions process." P293 at 5, 57, 85; Tr.6 166:7-22 (Haynie).

128.    The March 2024 report found that "[d]espite recent focus by the Navy and other military branches on promoting healthy cultures to enable performance among an increasingly diverse workforce, there exists little research on the relationship between diversity and military performance." P800 at 12; Tr.6 167:22–168:4.

129.    The March 2024 report further found that, "As part of our literature review, our team reviewed 2,482 technical reports available in DTIC published between January 2000 and September 2023 that included the search terms 'diversity,' 'performance,' 'manpower,' and 'talent.' On our review, none of these reports empirically examined the relationship between diversity and unit performance in any setting, let alone in operational context." P800 at 12-13; *see* Tr.6 168:5-15.

130.    The March 2024 study further found that, "[o]verall, our data do not support a one-size-fits-all conclusion about the empirical relationship between Navy unit diversity and unit performance." P800 at 44; *see* Tr.6 169:16-24.

131.    The March 2024 study "empirically assessed relationships between crew diversity and crew performance across six years of observation of the U.S. Navy's fleet of destroyer ships, DDGs." It found that "[a]cross all diversity and performance indicators examined, there was non-uniformity in the relationships observed, and none of the diversity indicators was consistently and reliably associated with both indicators of performance." P800 at 44; *see* Tr.6 171:3-7.

132.    The March 2024 study also found that "[g]ender diversity was *negatively* associated with the likelihood of winning a Battle Efficiency Award." P800 at i, v; P800 at 39 ("The negative beta for [percent] female indicated that, after controlling for crew experience and

aptitude, crews with a higher percentage of female sailors were less likely to be awarded a Battle E."); *see* Tr.6 177:17-21.

133.   Even though Dr. Haynie had never read this study, Dr. Haynie felt confident stating that the study did not "chang[e] [her] overall conclusions in this case." Tr.6 229:18-23; *cf.* 157:5-9 (discussing "confirmation bias").

134.   Dr. Haynie relied on studies that analyzed diversity in the corporate setting. Tr.6 211:16-23. But studies about diversity in the corporate setting are not relevant to the military. *See* Tr.1 148:23–149:5 (Walker) ("It's apples and oranges. In the military, we have to get our troops to charge hills with machine gun nests. We have to get our folks to fly into airspace that is rife with antiaircraft artillery and surface-to-air missiles. We have to get our sailors to sail into a battle where missiles are going to be raining down on them. I don't know of any corporate setting that has anything even near that."); Tr.6 67:22–68:10 (Vazirani) (Defense Department unaware of any business in which the leaders have "authority to give orders which endanger their subordinates' lives and to administer criminal sanctions on those subordinates").

135.   Dr. Haynie relied on flawed and irrelevant studies to support her position. *See* Tr.6 212:14–215:4 (relying on study based on heavily criticized McKinsey study); 215:3–217:16 (relying on 2004 "math paper with a computer experiment" in which "no actual human decisions were studied"); 217:22–224:12 (relying on the Slapakova study, which exaggerated and misreported its supporting evidence); 224:17-23 (discussing OPA study (P275) that surveyed service members); *but see* 224:17–225:18 (discussing MacCoun article (P827) relied upon in report but not discussed on direct, possibly because it notes that "[t]here is broad agreement

45

among social scientists that people are often unable to reliably and validly perceive and report on the causes of their behavior").

136. ***Professor Jason Lyall.*** Professor Lyall's testimony offers no credible justification for the Academy's use of race in admissions and his analysis is irrelevant to the issues presented in this case. Indeed, Defendants never mentioned Professor Lyall or his research in their closing. *See* Tr.9 46:23–47:12 (stressing Defendants' "two distinguished historians," Miller and Vazirani).

137. Professor Lyall's primary conclusion is the unremarkable observation that militaries perform poorly when their countries oppress minority groups who are then in their ranks. A military will perform poorly "if marginalized groups from society at large are brought into the military and continue to be treated as marginalized groups." Tr.221:22-25 (Wood). In other words, "[w]hen you treat people poorly, you're going to get bad or poor results." Tr.4 221:25–222:1 (Wood).

138. Professor Lyall's primary conclusion has no bearing on this case.

a. Unlike the examples in Professor Lyall's database, the United States does not oppress black, Hispanic, and Asian servicemembers and force them to fight. The U.S. military is an all-volunteer force. Tr.8 101:8-9 (Miller); *cf.* Tr.7 13:21–14:22 (Lyall) (Maydiyya had "near-genocidal levels of violence" and soldiers were "chained to the ground so they could not flee"). Indeed, Professor Lyall's Project Mars database lists the U.S. military as being in the lowest band of inequality for every conflict it has participated in since 1900. Tr.7 78:2–79:4 (Lyall).

b.      Professor Lyall does not—and cannot—argue that the U.S. military would adopt these oppressive practices if the Academy could not use race in admissions.

139.   Professor Lyall's "military inequality coefficient" is unpersuasive and has no bearing on this case.

a.      Professor Lyall never calculated a coefficient for the current U.S. military or Navy. Tr.7 30:13-19 (Lyall). Instead, he discussed a "hypothetica[ll]" coefficient that he could have done. Tr.7 30:17–33:15, 79:8–81:16.

b.      Professor Lyall's "hypothetical" coefficient does not rely on any official state policies of repression. *See* Tr.7 24:17–26:6 (Lyall) (relying on mixed surveys of "harassment/discrimination").

c.      This hypothetical coefficient also treats "all non-White racial groups in the United States, including Latinos, African Americans, Asian Americans and American Indians," as "holding no political power" and "lacking the ability to wield influence at the national level of executive power." Tr.7 82:12-19 (Lyall). According to Professor Lyall, this lack of political power is "functionally equivalent to explicit discrimination by federal authorities." Tr.7 82:20-22 (Lyall). But this assertion is nonsensical. Professor Lyall conceded that "all non-White racial groups in the United States, including Latinos, African Americans, Asian Americans and American Indians in fact do hold some political power and the ability to wield influence at the national level and executive power." Tr.7 83:22–84:2 (Lyall). Prominent minorities wielding political power include

Vice President Kamala Harris, Secretary of Defense Lloyd Austin, United Nations Ambassador Linda Thomas-Greenfield, Secretary of Health and Human Services Xavier Becerra, among many others. Tr.7 84:3-20 (Lyall).

d.      Regardless of the United States' "inequality coefficient," Professor Lyall provided no evidence that this "inequality" had any meaningful impact on battlefield performance. Professor Lyall conceded that the United States ground forces "have fared quite well on the battlefield since 1900, despite varying levels of historic mistreatment of minorities." Tr.7 78:2–79:4 (Lyall).

e.      Instead, what matters to Professor Lyall's equation is "how a nation treats the members of the army in terms of access to the basic rights of citizenship and participation in society." Tr.7 68:21–69:5. And the United States' treatment of racial minorities, of course, has become exponentially better in the past century. The United States today "does not impose anything like state-sanctioned discrimination on minorities the way the country did in the first half of the 20th century." Tr.7 78:2–79:3 (Lyall).

f.      Professor Lyall's equation also leads to bizarre results. Under his equation, "a nation that represses all ethnic groups but also excludes them from the military will … register very low on the inequality scale." Tr.7 69:11-16 (Lyall). Accordingly, the Confederate States of America—which practiced slavery—scored lower on the "military inequality coefficient" than the Union. Tr.7 69:20–70:11 (Lyall). Indeed, the CSA scored in the lowest bands of inequality. Tr.7 71:6–72:5. (Lyall). Similarly, Nazi Germany—which was "engaged in one of the most horrific genocides this planet has ever

seen"—scored in the lowest band of inequality because it didn't allow those it oppressed into the military. Tr.7 74:25–75:16 (Lyall).

140.    Professor Lyall's Project Mars database is also unpersuasive. It lacks numerous datapoints that obviously inform the outcome of a battle or a war. It does not include insurgencies like the later U.S.-military actions in Afghanistan. It does not include purely naval battles. It does not account for air battles, such as when the United States dropped atomic bombs on Hiroshima and Nagasaki. And it does not account for technological superiority. Tr.7 76:1–78:1 (Lyall).

141.    Even if the United States were somehow at risk of a degraded military performance due to "inequality," there is no evidence that stopping the use of race at the Academy will cause this result.

142.    Professor Lyall conceded that "the prospect of Vietnam-era race riots in today's military is remote." Tr.7 42:25–43:7.

143.    Professor Lyall admitted that his work "does not support any finding that ethnic or racial diversity in the military in and of itself improves battlefield performance." Tr.7 68:6–20 (Lyall); *see also* Tr.4 222:8-11 (Wood) (there is no "historical evidence showing that racially balancing the officers corps leads to battlefield success"). Professor Lyall admitted that nothing in the military inequality-coefficient analysis "depends upon the difference between the number of minorities in the military and their numbers in society at large" or "turns upon the relative representation of minorities in the military's officer corps." Tr.7 78:2–79:4 (Lyall).

144.    Professor Lyall conceded that "nothing in [his] work addresses racial preferences in college admissions"; that he "know[s] nothing about Naval Academy admissions";

and that "nothing in [his] work says anything about what would happen if the Naval Academy stopped using race as one factor in its admissions process." Tr.7 42:11-24.

145.    Professor Lyall provided no evidence that ending the use of race at the Academy would have any meaningful impact on race relations within the Navy. *See* Tr.7 85:12-19 (no opinion on whether stopping the use of race would affect "the members of the military who report discrimination" or the "members of the Navy's beliefs that they share the same battlefield fate"); 85:20–86:4 (no opinion on whether stopping the use of race would "stoke any dissatisfaction among members of the United States Navy" or "corrode interracial or interethnic bonds at the United States Navy").

146.    To the contrary, Professor Lyall confirmed that using racial preferences can *increase* racial hostility among the ranks in the military. *See* Tr.7 45:14–48:14 (paper describing the "resentment and tension" caused by affirmative action in the South African army).

147.    Professor Lyall also admitted to misstating the findings of a study from the Naval Postgraduate School. Professor Lyall relied on a 2020 study, entitled *The Effects of Diversity Among Peers and Role Models on U.S. Navy Retention*, and claimed that "an increase in same-minority senior leadership increase[d] retention of first-term non-Hispanic and Black officers." Tr.7 53:21–54:8 (Lyall). In fact, the study showed that a 10-percent increase in senior black officer leadership on the ships studied *decreased* junior black officer retention by 2.8 percent. P872 at 62-63; Tr.7 58:15–59:3 (Lyall). In his expert report, however, Professor Lyall claimed that the opposite had occurred. *See* DX195 at 22. He then used this inaccurate summary to

assert that, "[p]ut simply, increasing representation among officers can have significantly positive effects on retention among the same groups that comprise an important share of the enlisted ranks." DX195 at 22.

148.   ***Captain Jason Birch***. Captain Birch has had an admirable and commendable career in the Navy. But there is no evidence that Captain Birch was admitted to the Academy because of racial preferences. So Captain Birch likely would have achieved all his successes regardless whether the Academy used race in the admissions process. *E.g.*, Tr.5 49:22–50:18, 50:22–51:11, 52:22-25 (Birch doesn't know whether race played a role in his admission).

149.   Captain Birch identified some troubling incidents of racism that occurred during his decades-long career. Tr.5 29:4–31:13; 38:7–39:13 (Birch). Because "the military is a microcosm of society," it "would be ridiculous" to claim "that there are no racists in the military." Tr.1 169:23-25 (Walker). But unlike the Vietnam era when open racism was tolerated, the military today has "zero tolerance" for racism. Tr.1 135:1-12 (Walker); *see, e.g.*, Tr.6 31:1-13, 41:3-8 (Captain Birch explaining that perpetrators of racist acts were punished). Indeed, Captain Birch conceded that "White battalion officer[s]" also "would have taken action" to punish perpetrators of racism. *See* Tr.5 41:11-16.

150.   ***Professor Beth Bailey & Dr. John Sherwood.*** Professor Bailey and Dr. Sherwood provided historical evidence of racial violence and racial unrest that occurred in the military during World War I, World War II, and the Vietnam War. But this history has no bearing on the central issues in this case.

51

151.   Defendants presented no evidence or testimony that ending the Academy's use of race will cause significant racial unrest like the kind that occurred during the twentieth century. *See* T5.149:1-6 (Bailey) ("My historical expertise is historical. I don't prognosticate. I don't predict."); 159:9-11 (Sherwood) (conceding that he is not "offering any opinions trying to predict the future based on the past"); 183:16–184:5 (Sherwood "conducted [no] studies" showing that "the increase in Black Naval Academy graduates caused the decrease in racial incidents experienced in the Navy and Marine Corps"); 184:15–185:1 (Sherwood is "not predicting that there will be significant outbreaks of racial unrest if the Naval Academy stops using race in the admissions process").

152.   The only testimony the Court heard on this issue was that it was "ridiculous" to assert that "[i]f the racial demographics of the officer corps is not the same as society as a whole" that this "will cause the military to experience racial unrest like occurred in the Vietnam era." Tr.1 136:3-7 (Walker); *see also* 136:19-24 ("each and every unit I've been in" had "only a few Black officers" and the lack of black officers did not increase racial tensions within the unit "one iota").

153.   Defendants could not present this evidence because they concede—as they must—that the racial unrest in the military during the 20th century was not caused solely or primarily by a lack of black officers. There were many "significant causes" of this racial unrest in the military, including

    a.   legalized segregation in the military during World War I and World War II, Tr.5 143:12–145:5, 178:2-13;

    b.   Jim Crow laws and other legalized segregation throughout the country, Tr.5 178:14-16;

    c.   significant racial violence and unrest in society as a whole during the Vietnam War era, Tr.5 125:2-4, 178:23–179:17; Tr.4 219:18–220:21; Tr.1 134:9-19;

    d.   the military draft during the Vietnam War that was viewed as heavily biased against African Americans, Tr.5 126:24-25;

    e.   discrimination in promotion and job assignments for African-American sailors, Tr.5 179:22-25, 181:6-13;

    f.   a climate of racism as demonstrated by the regular use of racial slurs by whites against blacks, Tr.5 180:1-3, 14-17; Tr.5 125:22-24; Tr.5 178:17-22; Tr.1 134:3-8;

    g.   a disciplinary system that was perceived to be biased by black sailors, Tr.5 180:4-14, 18-21; and

    h.   ineffective minority affairs councils with no real power in the chain of command, Tr.5 180:15-18, 181:22-25.

154.    Defendants are thus left to argue that the lack of black representation in the officer corps, at most, "contributed to" racial tension and unrest. Tr.5 158:13-21; *see, e.g.,* 181:6-25 (acknowledging that other factors were "significant cause[s]" of racial unrest and violence during the Vietnam War era).

155.    The U.S. military is profoundly different on issues of race than it was during the Vietnam War. The U.S. military today has zero tolerance for racism. Tr.4 220:22–221:9 (Wood); Tr.1 134:20–135:12 (Walker).

156.    The country as a whole has also changed dramatically on issues of race since these incidents of racial violence occurred. *See* Tr.1 136:9-18 (Walker) ("[M]ost servicemembers today in uniform, the vast majority weren't even born then. That was a whole different time. That was just when the Civil Rights Act of 1964 came into being, and the country was trying to turn itself into the country we are today. So trying to compare us now, 2024, with the Vietnam era, … anybody should laugh at that. That's ridiculous. We are a much different military now.").

157.    In fact, the military took steps to address those incidents of racial violence in the military—none of which involved introducing or increasing the use of race in admissions at the Academy. *See* Tr.5 139:2-4 (Bailey) (discussing "significant reforms in leadership, in training and education, in military justice, and in efforts to increase the number of Black leaders at all levels and all ranks"); P285 at 6 ("USNA does not have any records identifying when race was specifically included as a factor in the admissions process. USNA can confirm that race has been considered as a factor in admissions since at least 2002").

158.    The last significant incident of racial violence occurred more than 50 years ago, despite prominent incidents of racial unrest in society at large during this time period. Tr.5 147:8-10 (Bailey); *see* 146:16-18; 139:10-13, 183:4-6; Tr.4 221:7-9 (Wood); Tr.1 135:13–136:2 (Walker).

159.    ***Commander Lisa Truesdale***. Commander Truesdale merely relied on a "compilation of policy statements by uniformed and elected officials." Tr.4 223:7-8 (Wood). Commander Truesdale identified no research or analysis of any kind. Tr.4 223:4-11 (Wood); Tr.1 147:1-10 (Walker).

160.    Individuals currently in the Navy must assert that racial diversity is a national imperative because of the chain of command; others in the military reject this position. *See* Tr.1 168:24–169:1 (Walker) (disagreement "happens quite often within the military. It's just that once the commander makes the decision then everybody has to be one voice").

## B.    Recruitment and Retention

161.    Defendants claim that racial diversity in the officer corps "helps us with recruiting" because the presence of minority officers allows "young people … [to] see that people … from an underrepresented community … will have an opportunity to serve and to advance

in the military." Tr.6 22:8-13 (Vazirani); 14:25–15:5 (Vazirani) (racial diversity "creates a model for young people to join an organization where they think they can … succeed based on their performance and their merits"); Tr.7 117:3-13 (Fuller) ("[W]e'd like people to be able to see themselves in that position. So if you relate to someone because of their race, you may relate to someone because of where they grew up, you may relate to someone because of what they do."); Tr.8 104:12-20 (Miller) ("Q. How does having a diverse officer corps positively impact recruiting? A. Again, this goes to our ability to successfully model outcomes.").

162.    But the primary reasons that young people join the military are following in their family's footsteps, being part of something bigger than themselves, serving their country, needing money for college, or simply gaining maturity and skills before they decide what to do with their lives. Racial statistics are not one of them. Tr.1 137:13-24 (Walker). As Dr. Haynie has explained, the "top three reasons" cited for rejecting military service are "fear of death, worries over post-traumatic stress disorder, and leaving friends and family," and the fourth is "the concern that the youth would be putting their life on hold." P816 ¶29.

163.    Defendants concede that they are currently struggling with recruiting for reasons entirely unrelated to the racial makeup of the officer corps. *See, e.g.*, Tr.6 24:19–25:6 (Vazirani) (recruiting problems stem from a "shrinking pool" of "people who qualify for military service" based on their "academic performance," "physical capabilities," or "moral factors"); Tr.8 77:19–78:4 (Miller) (only 23 percent of Americans are eligible to serve in the military without a waiver due to "disqualifying factors such as mental health and behavioral health and obesity"); *see also* Tr.4 229:16–230:5 (Wood).

164.    Defendants have failed to implement many of the recommendations made by the Military Leadership Diversity Commission report, which was released in 2011, to increase minority recruitment to the officer corps. Tr.8 117:13–129:13 (Miller).

165.    Defendants presented no studies or data showing that proportional racial representation among the officer corps will increase recruitment. *See, e.g.,* Tr.7 126:17–127:2 (Fuller's testimony not based on any studies, surveys, or interviews); Tr.6 64:15-19 (Vazirani) (Vazirani "not aware of any study to determine the level of racial representation in the Navy's officer corps that would allow the minority recruits to see themselves as future leaders in the military").

166.    Defendants do not know the "number," or even the "range," of racial-minority officers that the Navy needs to "aid in the recruitment of top talent." Tr.2 125:14–126:5 (Latta). No evidence of that number or range was submitted by any Defendant.

167.    As for retention, Defendants claim that racial diversity in the officer corps "help[s]" because it allows people to "see that they can continue to succeed … regardless of their particular background." Tr.6 15:6-10, 27:7-14 (Vazirani); Tr.7 118:17–119:2 (Fuller) ("When you're getting mentored or mentoring, …[y]ou like to hear from somebody who has things like you…. [T]here's a relatability to someone who's got the same characteristics.").

168.    The primary concerns of servicemembers in combat are how effective their units are and "[w]hether they're going to come back to their family alive." Tr.1 142:14-18 (Walker). The race of their fellow officers is not one of them. Tr.1 142:8-18 (Walker).

169.    Defendants presented no studies or data showing that proportional racial representation among the officer corps will improve retention. *See, e.g.,* Tr.7 126:17–127:2 (Fuller's

testimony not based on any studies, surveys, or interviews); Tr.6 64:15-19 (Vazirani "not aware of any study to determine the level of racial representation in the Navy's officer corps that would allow the minority recruits to see themselves as future leaders in the military").

170.     Though Professor Lyall relied on *The Effects of Diversity Among Peers and Role Models on U.S. Navy Retention* (P872), that study's conclusions refute Defendants' claims about retention. Though the study found that increased racial diversity had a small positive effect on the retention of certain black male *enlisted* sailors, Defendants' interest is tied to the retention of officers. Their study found that increased racial diversity had a larger "*negative* impact on junior black officer retention." P872 at 62 (emphasis added); *see* Tr.7 53:6–59:17.

171.     Defendants presented no evidence that servicemembers will be more likely to leave the military if they do not have mentors of the same race. Indeed, Defendants conceded that it "would be a mistake to assume that you have to have a mentor or coach that looks exactly like you." Tr.8 68:2-13 (Miller).

172.     Defendants acknowledge that they have "seen in our minority populations[,] Black and Hispanic in particular, … strong retention over time." Tr.8 95:13-17 (Miller). In fact, the evidence shows that "Black/African American and Hispanic retention is generally *higher* than White retention across the entire career pipeline." DX151 at 3 (*Racial/Ethnic Minority Representation in the Officer Corps: Examining Black/African American, Hispanic, Asian Retention and Promotion Rates Among Cohorts of Active Duty Officers, 2001 to 2019*); DX151 at 3 ("Black/African American and Hispanic officers overwhelmingly choose to stay on active duty for 20 years and make the military a career, unlike many of their White peers."); Tr.6 207:16-24 (Haynie).

173.    The Academy does not know the "number," or even the "range," of racial-minority officers that the Navy needs to "increase retention in the armed forces." Tr.2 125:14–126:5 (Latta). No evidence of that number or range was submitted by any Defendant.

174.    The report from the Office of People Analytics (P275) does not try to show that the racial demographics of the officer corps matter to recruiting or retention. It measured the "diversity and inclusion climate," not officers' racial makeup. Even then, the report shows that the percentage of people who thought there was too much attention paid to issues of diversity and inclusion in the military exceeded those who believed that there was an unhealthy D&I climate. Tr.6 40:21–42:12 (Vazirani); P275 at iii. And of the people who believed that the military had an unhealthy D&I climate, nearly a quarter (22%) reported that "one of the reasons the military has an unhealthy D&I climate is too much attention is paid to racial and ethnic harassment and discrimination." Tr.6 42:13–46:2 (Vazirani); P275 at 13, 16.

### C.    Domestic and International Legitimacy

175.    Defendants claim that racial diversity in the officer corps improves domestic legitimacy because the American people "want to know that people like them are protecting them." Tr.7 119:7-23 (Fuller); *see also* Tr.8 81:22-25 (Miller) ("If we were a … predominantly homogenous organization, I think that we would lack credibility with the American people.").

176.    Defendants claim that racial diversity in the officer corps improves international legitimacy because it "demonstrat[es] the values of the people of the United States" when our forces are abroad. Tr.6 28:18-22 (Vazirani); *see also* Tr.6 119:24–120:20 (Fuller) ("[A]s you watch the sailors go ashore, you see these diverse groups going out there …. [H]ow the people looked and how they worked together was a great example of how far a diverse group picked

the best people."); Tr.8 81:22-25 (Miller) ("If we were a … predominantly homogenous or-
ganization, I think that we would lack credibility with … many of our foreign partners."); Tr.5
34:13–35:1 (Captain Birch's presence allowed the people who saw him in China to "visually
see that in America" a person can be "put in a position of command and responsibility" "re-
gardless of what you look like"); Tr.6 142:7-12 (Haynie) ("If we're going to go operate in
multicultural, multinational, diverse environments around the world, we have to be able to
operate effectively in those environments both with other militaries and security organizations
that we engage with as well as with the people who live there.").

177.    Defendants also claim that "[t]he diversity of the officer corps … helps [the
Navy] to improve our cultural understanding and our cultural competency," which "helps with
our legitimacy as well with our allies and partners." Tr.6 28:23–29:1 (Vazirani).

178.    Domestically, public opinion polls weigh *against* the actions that the Academy
has been taking. Pew Research consistently finds that racial preferences in college admissions
are widely disfavored by the American public. Tr.4 84:20–85:4, 85:18–86:22 (Kahlenberg).

179.    While *cultural* knowledge can benefit the military abroad, Tr.4 225:13-19
(Wood); Tr.1 122:7-22 (Walker); Tr.8 89:23–90:1 (Miller discussing the need for "regional ex-
pertise, language expertise, and cultural expertise"), a person's *race* does not affect her
knowledge of other cultures, *see* Tr.3 98:9–99:2 (Latta); *e.g.,* Tr.1 122:23–123:8 (Walker) (white
servicemember knew Japanese and understood Japanese culture because he was a Mormon
who did his mission in Japan); 123:9-21 (black servicemember learned Japanese and became
the first United States Air Force exchange officer with the Japanese air self-defense force as a
C130 instructor pilot); *see also* Tr.1 165:13-18 (Walker) (diversity like "language skills," "cultural

skills," "STEM skills," "experiences from living in Alaska or … a tropical climate" are beneficial, but "skin color" provides no benefits); MLDC Issue Paper #36, *Compelling Interests and Diversity Policy* 4 (May 2010) ("Regarding culture, there is little evidence that demographic group membership will inherently provide these benefits…. [I]n the current military data system, someone who speaks … Arabic because he or she is of Arab descent would be classified as white.").

180.    Having a racially diverse officer corps has no meaningful impact on Americans' interactions with foreign forces. *See* Tr.4 224:23–225:12 (Wood) ("All the South Koreans cared about was that America was there to support them and to help them get better in case a North Korean threat materialized.").

181.    Having a servicemember who "looks like" the individuals in the host country has no meaningful impact on military operations. *See* Tr.1 126:12-18 (Walker) ("the color of my skin" would provide no benefit in Haiti); 126:19-21 (being black provided no benefit in Africa because "I was just another American"); *cf.* Tr.5 32:10–33:6 (Captain Birch met Somali leaders and his race merely "sparked different conversations" and "interest").

182.    None of the Defendants' assertions with regard to legitimacy are supported by studies or data. *See, e.g.,* Tr.7 126:17–127:2 (Fuller's testimony not based on any studies, surveys, or interviews); *see also* Tr.7 119:7-23 (Fuller discussing "my opinion"); Tr.8 81:22-25 (Miller) ("*I think* that we would lack credibility … with many of our foreign partners." (emphasis added)).

183.    Dr. Haynie framed the question of international "legitimacy" as the United States' need to "walk-the-walk"—to show that it "compl[ies] with democratic norms," which

"call for representation and inclusion across a nation." Tr.6 142:5-17. Defendants never explained how the United States' status as a multicultural democracy turns on the use of racial preferences at the Academy. Nor did Defendants account for the strong democratic norm against the government classifying citizens by race. *Harvard*, 600 U.S. at 230; *see also Maryland Troopers Ass'n, Inc. v. Evans*, 993 F.2d 1072, 1076 (4th Cir. 1993) ("State-sponsored racial criteria in particular may sacrifice the indivisible character of American citizenship. It thus remains our constitutional premise that race is an impermissible arbiter of human fortunes.").

184.    The Academy does not know the "number," or even the "range," of racial-minority officers that the Navy needs to "bolster the armed forces' legitimacy in the eyes of the nation and the world." Tr.2 126:6-15 (Latta). No evidence of that number or range was submitted by any Defendant.

**V.    The Academy's Purported Tailoring**

185.    The Academy does not know when it started considering race in admissions. *See* P285 at 6 ("USNA does not have any records identifying when race was specifically included as a factor in the admissions process. USNA can confirm that race has been considered as a factor in admissions since at least 2002."); P293 at 74 ("USNA … cannot identify the specific individual or individuals who made the initial, decades-old decision to consider race in USNA's admissions process"). The undocumented, unknown origins of this policy undermine the notion that it was carefully crafted to achieve military objectives.

186.    The Academy did not change, in response to the Supreme Court's decision in *Harvard*, how it considers race in its admissions process. Tr.1 212:24–213:6 (Hwang); *see also* P285 at 8 (identifying only "one change," which was made before *Harvard* and merely "provide[d] greater clarity").

187.    When describing how it uses race in admissions, the Academy claims that it considers race in the manner that was approved in *Grutter*. It says that race is "not a basis to provide points," that race is only "one of … many nondeterminative factors," and that the Academy engages in holistic review of the "whole" person. Tr.1 74:2-14 (opening); Tr.2 15:16-18 (Hwang); Tr.2 45:9-10 (Latta); Tr.9 64:15-17 (closing); P259 ¶¶58, 73-78; Doc.46 at 11, 17-19; Doc.109 at 25-29.

188.    The Academy does not know when it will stop considering race in admissions. Prior to 2020, the notion of an end date "hadn't been discussed." Tr.2 97:23–98:3 (Latta). After a "legal review" in 2020 or 2021, the Academy took the position that it "anticipates" stopping the use of race "once it both achieves and maintains the racial and ethnic diversity of USNA's student body at a level comparable to the ethnic and racial diversity of the general population." Tr.2 95:11–97:11 (Latta) (quoting P293 at 74). The Academy has no estimate of when that date might be. *See* P293 at 74; Tr.2 97:23-98:3 (Latta). And its race-based admissions policy has no sunset date. *See* P293 at 74; Tr.3 46:19–47:1 (Latta); Tr.2 97:23-98:3. In this litigation, the Academy's primary position is that it needs no "end date." Tr.1 81:12-13 (opening); *accord* Tr.9 58:5-18 (closing) ("none of this even matters if the Court [con]cludes, as we think it should, that there is no end date to national security").

189.    The Academy does not get direction from the Defense Department about how many racial minorities to admit. The Secretary of Navy's instructions about the Academy's admissions process do not even mention using race as a factor. *See* P260; Tr.2 166:4-12 (Latta).

And the Chief of Naval Operations' instructions state only that the Academy should "encourag[e]" some unspecified number of "qualified" candidates from traditionally underrepresented populations "to apply." P261 at 6; Tr.2 167:2-13.

190.    According to the Academy, it has never hit its goal of admitting blacks and Hispanics in proportion to their general population. Tr.9 74:11-12. It says the percentages of these two groups at the Academy are "far behind" their percentages in the general population and thus "far below" the Academy's "goal." Tr.1 82:4-10, 86:4-6 (opening); Tr.3 37:20–38:5 (Latta).

191.    When Defendants make this point, they count only students who identify as black alone or Hispanic alone; they exclude multiracial students who partly identify as one of those races. *E.g.*, P259 ¶72; Tr.2 93:15-20 (Latta). And they never even mention Asian Americans, *e.g.*, DD1 at 47, whose percentage of the Academy's student body is more than double their percentage of the general population—and has been for years. FF ¶42, ¶300.

192.    Other times, the Academy counts multiracial students as belonging to all of the races they identify with. *E.g.*, P207; P4. When using that method of counting, the percentage of blacks, for example, becomes 12% (as opposed to 8%). PD1 at 13-14.

193.    Defendants say that the Academy is "seeking to increase" the number of blacks and Hispanics that it admits. Tr.1 86:2-6 (opening); Tr.9 63:12-15 (closing) ("Again, the Naval Academy actually is not looking to maintain the numbers [of black, Hispanic, and Asian admits]. [It's] looking to increase them.").

A.    **The Effect of the Academy's Race-Based Admissions on the Officer Corps**

194.    ***Total Number of Officers.*** Defendants claim that the Academy must consider race in the admissions process in order to create a racially diverse officer corps. But the Academy's use of race has little effect on the racial composition of the officer corps.

195.    To begin, merely *admitting* minority applicants does not achieve Defendants' purported interests in a racially diverse officer corps; these applicants must actually *graduate*.

196.    Yet the evidence shows that racial-minority midshipmen are somewhat less likely to graduate than white midshipmen. P151-4 (graduation tab); Tr.5 68:18–69:1 (Vahsen). Black midshipmen, in particular, graduate at substantially lower rates. P151-4 (graduation tab); Tr.4 71:5-10 (Vahsen); *see also* Tr.4 71:15–73:5 (Vahsen); P479 (identifying graduation rates by race and ethnicity). Similarly, black midshipmen are 4.6 times more likely to be subject to academic separation than white midshipmen. Tr.5 83:8-11, 85:6-25 (Vahsen); P148 at USNA-00024572.

197.    Even if every minority applicant admitted to the Academy graduated, that result would do little to further Defendants' purported interests because the Academy produces only 16-20% of the total number of officers in the Navy and Marines. Tr.2 113:9–114:20 (Latta); P259 ¶10.

198.    Of the three main ways to become an officer (Naval ROTC, Officer Candidate School, and the Academy), the Academy produces the fewest officers. *See* P56 at USNA-00004899-5001.

199.    The U.S. military "does not consider race in ROTC or OCS accessions." Tr.6 30:17–31:20 (Vazirani); *accord* Tr.8 111:25–112:13 (Miller) (race not considered because "the Navy has a policy of an equal playing field as service members come into the military").

200.    In addition, "[a]fter someone enters the military, race or ethnicity are not considered … in making personnel decisions." Tr.6 30:1-3 (Vazirani). The military doesn't use race in personnel decisions because it claims to "really prid[e] itself on being a meritocracy where people are advanced based on their capabilities, based on their merit." Tr.6 30:5-11 (Vazirani). Academy admissions is the "only place" that race can be used. Truesdale Depo. 205:17–206:8.

201.    Defendants, including the Secretary of Defense and the Secretary of the Navy, have the power to change their policies to consider race when making assignments. Tr.6 46:7–47:5 (Vazirani). If Defendants changed these policies (*e.g.*, by considering race as a factor), they could "deliver more Black officers to nuke school, more Black officers to SEAL training, and more Black officers to flight school." Tr.6 59:20–63:13, 71:23–72:9, 75:8–78:10 (Vazirani).

202.    Even for the unrestricted line, the Academy produces only 28% of those officers. Tr.2 113:14–114:9 (Latta); P259 ¶10. Accordingly, 72% of the unrestricted-line officers attend civilian universities, becoming officers through either ROTC or OCS. Tr.2 114:10–115:4, 117:19-22 (Latta); *accord* Tr.8 108:14–109:7 (Miller) (a "relatively small number" of officers in the Navy come from the Academy).

203.    The Boston Consulting Group examined this precise issue in a comprehensive study that it conducted with the Academy's support and participation. Tr.2 117:23–122:23 (Latta).

204.    The Boston Consulting Group concluded that the Academy has "'low leverage to change the composition of the overall fleet officer corps.'" Tr.2 121:9-20 (Latta). Because so many officers come from other sources, it is simply "not possible for the Naval Academy alone to raise minority representation among officers to match the fleet enlisted share." Tr.2 122:15-20 (Latta). Even if "USNA grads mirrored fleet enlisted composition (52% [minority]/48% [white]), this would only have a 5% impact on fleet officer corps in total given that USNA only represents [about] 30% of [unrestricted line] officer commissions." P330 at USNA-00022846.

205.    Accordingly, even if the Academy could achieve its stated goal of "maintain[ing] the racial and ethnic diversity of [the Academy's] student body at a level comparable to the ethnic and racial diversity of the general population," P284 at 61, this racial balancing would have almost no impact on the racial makeup of the officer corps.

206.    ***Number of Flag Officers.*** Defendants started asserting at trial that the Academy must consider race in admissions so that the Navy can have more flag officers who are racial minorities. *See* Tr.6 51:2–53:2 (Vazirani); Tr.8 44:2-15 (Miller).

207.    To become a flag officer in the Navy or Marines, an officer must have achieved the rank of admiral (one-star through four-star, O7-O10). Tr.8 42:6–43:6 (Miller). It takes about 25 to 26 years to become a flag officer, Tr.6 53:4-9 (Vazirani), and about 35 or more years to become the chief of naval operations. Tr.8 48:22-24 (Miller). So the civilians applying to the Academy this cycle—for the Class of 2029—could not be flag officers until about 2054 or 2055. Tr.6 53:4-9 (Vazirani); Tr.8 48:22-24 (Miller).

208.     Defendants assert that the use of race at the Academy allows them to be "cautiously optimistic" that, "in 20 to 30 years," the military "may see larger representation in our senior ranks." Tr.8 74:14-75:4 (Miller).

209.     In other words, Defendants' interests depend on a string of contingencies: The Academy's use of race will allow it to admit additional minority midshipmen in 2025; the few midshipmen who get in because of racial preferences will not separate and will graduate in 2029; these midshipmen will stay beyond their initial commitment of five years; these midshipmen will then stay for another 10 to 15 additional years; and then, if they are good enough on merit, they will get promoted to flag officer sometime after the year 2050. Tr.6 53:24–57:6 (Vazirani).

210.     Defendants presented no evidence that the individuals the Academy is admitting through racial preferences are likely to become flag officers.

211.     Defendants presented no evidence comparing the race of flag officers who come from ROTC and OCS to the race of flag officers who graduate from the Academy.

212.     Defendants presented no "charts or information about the senior-level officers that run the Navy today [showing] what their accession sources were." Tr.8 110:22-25 (Miller); *see also id.* 110:5-9 (current chief of naval operations, Lisa Franchetti, did not graduate from the Academy).

213.     According to the Academy, it is *impossible* to determine which of its graduates, including its flag officers, "would not have been admitted without the use of race in the admissions process." P284 at 61.

214.    Defendants presented testimony on officer accessions from Stephanie Miller. But Miller is not an expert on the Academy's admissions and does not set the Academy's admissions policies. Tr.8 105:11–106:3. Miller has no idea "how many graduates of the Naval Academy in any given year were admitted, in part, because of their race." Tr.8 107:1-5. Nor does she know "how many graduates of the Naval Academy in any given year would have still been admitted to the Naval Academy if it did not use race." Tr.8 107:13-20.

215.    ***The Lim Report***. A report by the Rand Corporation, led by Nelson Lim and entitled "Improving Demographic Diversity in the U.S. Air Force Officer Corps," provides strong evidence that the Academy's use of race in admissions will not increase the racial diversity of flag officers. DX171; *see* Tr.6 206:11-15, 181:25–201:14 (Haynie).

216.    The Lim report was commissioned by the Defense Department to investigate why minority groups are "underrepresented in the active-duty line [Air Force] officer population, especially at senior levels." DX171 at USNA-00011344; Tr.6 144:4-10. The Lim report "investigate[d] officer eligibility, accessions, retention, and promotions by race/ ethnicity and gender" in order to "identify factors that led" to this racial makeup and to "identify potential policy avenues" to "improve [the racial diversity] at the most senior levels of the military." DX171 at USNA-00011356; Tr.6 144:4-10.

217.    Despite being offered by the Defendants in this case, the Lim report reached multiple conclusions that refute Defendants' unsupported assertions that the Academy's use of race will increase the number of flag officers.

218.    The Lim report found "no evidence to suggest that the Air Force promotion system is unfair." DX171 at USNA-00011403. Racial minorities and whites "face the same

68

promotion outcomes the vast majority of the time once differences in background, technical abilities, assignment history, performance awards, career field characteristics, and commissioning source are taken into account." DX171 at 00011396; Tr.6 190:14–191:9 (Haynie); *see also* Tr.4 82:12-83:3 (Vahsen) (although black midshipmen are less likely to graduate than white midshipmen, when students are normalized by SAT math score, most of these differences go away).

219.    The Lim report found that "many of the predictors of promotion to the more senior levels actually begin with characteristics that are determined early in an officer's career." DX171 at USNA-00011403. These factors include "order of merit" and the "career field" chosen upon graduation. DX171 at USNA-00011402-03; *see* Tr.6 196:6-9 (Haynie) (Lim report found that overall order of merit was "highly correlated with things that might cause promotion").

220.    "The implication of these findings for minority groups in the Air Force is that when these groups, on average, lack these vital characteristics, their promotion prospects will be greatly diminished." DX171 at USNA-00011403. For example, "African Americans tend to have lower USAFA order of merit ranks," and "[t]he data show that this lower order of merit ranking is strongly correlated with (though not necessarily causally related to) promotion, and that this lower ranking could translate into lower promotion rates for African Americans." DX171 at USNA-00011403. In addition, "some career fields have higher promotion likelihoods than others," and "[b]ecause minorities tend to locate in different (and less-promoted) career fields than whites, they have lower promotion rates." DX171 at USNA-00011403.

221.    The Lim report thus concluded that "[r]ecruiters, college selection officials for ROTC and the USAFA, and those responsible for final selection for commissioning need to identify applicants of all racial/ethnic groups who are of high and *comparable* quality." DX171 at USNA-00011407; *accord* USNA-00011403 ("[I]f improving promotion prospects for minorities is a policy goal, the Air Force likely needs to begin with recruiting. The accession sources should seek *comparable quality* across ethnic/minority groups in their admission and selection processes, since competitiveness even at this stage is a predictor of promotion success." (emphasis added)). The Lim report thus stressed that "high school students selected for ROTC and the USAFA need to be comparably strong, that ROTC programs should draw from highly selective colleges and universities, and that minority cadets at the USAFA *should have the same level of qualifications, on average, as White cadets*." DX171 at USNA-00011407 (emphasis added). This comparable quality is essential because, "even a small change in the rankings of minority USAFA undergraduates can lead to notable changes in diversity later." DX171 at USNA-00011407.

222.    Finally, the Lim report recommended that "more racial/ethnic minorities and women who are cadets and officers need to be in rated career fields which have the highest promotion rates, (*e.g.*, pilot, navigator, air battle manager, combat systems officers, flight surgeon)." DX171 at USNA-00011407; Tr.6 205:23–206:3.

223.    Instead of criticizing the Lim report, Dr. Haynie actually claimed to have *relied on it* in forming her expert opinion. *See* Tr.6 183:8-22, 166:7-15 (Haynie); P293 at 23, 85.

224.    The evidence presented in this case is fully in line with the Lim report and shows that individuals admitted through racial preferences are unlikely to become flag officers.

225.     Racial minorities are far less likely to be high order of merit than white midshipmen. For example, only 0.1 percent of the midshipmen who were ranked in the top overall order of merit were black. Tr.5 87:11–89:1 (Vahsen); P148 at USNA-00024579.

226.     On the flip side, racial minorities are far more likely to be low order of merit. For example, although black midshipmen make up roughly seven percent of the entire brigade, they "make up about 26 percent and 35 percent of those midshipmen having an OOM within the intervals 1,001 to 1100 to 1200 respectively." Tr.5 87:11–88:17 (Vahsen); P148 at USNA-00024579.

227.     In addition, flag officers disproportionately come from assignments that prioritize high order of merit, such as submarines, aviation, and SEALS. Tr.5 82:2-10, 88:18–89:1 (Vahsen); Tr.8 7:20-8-3 (Sundberg); Tr.5 48:2-4 (Birch); Tr.8 132:18–134:14 (Miller).

228.     But black and Hispanic officers get relatively few of these assignments out of the Academy. Tr.6 48:20-23 (Vazirani); Tr.8 50:7-10 (Miller); P610; DX171 at USNA-00011398; DX151 at 20 (discussing "the low representation of Black/AA officers in many tactical operations occupations (*e.g.*, special forces, pilots, submarine warfare)," which "hurts diversity at the GO/FO [general officer/flag officer] level.").

### B.     Race Neutral Alternatives

229.     The Academy provides a number of admissions preferences that benefit white applicants over racial-minority applicants. Tr.4 92:2–94:24 (Kahlenberg).

230.     The Academy is "strikingly lacking in socioeconomic diversity." Tr.4 82:12–83:17 (Kahlenberg).

231.     The Academy has underinvested in programs that could increase minority enrollment, such as ensuring that minority students complete their applications to the Academy. Tr.4 90:11–92:1 (Kahlenberg).

232.     Given our nation's history of discrimination and segregation, black and Hispanic students are disproportionately found among lower socioeconomic-status families and living in lower socioeconomic-status neighborhoods. Black and Hispanic students thus would disproportionately benefit from socioeconomic preferences. Tr.4 84:4-9 (Kahlenberg).

233.     In the 1970s, the first programs that the Academy successfully used to increase the number of black officers did not involve using race in admissions. Tr.5 175:10–176:10, 182:5-23 (Sherwood) (discussing NROTC expansion to historically black colleges and Project BOOST for "underprivileged people of all races"); 182:17–183:2 (Academy "did not change its standards in order to admit more African Americans" during the 1970s).

234.     Polling shows that socioeconomic preferences are much more broadly accepted by the American public and are much less divisive than racial preferences. Tr.4 84:20–85:4, 85:18–86:22 (Kahlenberg).

235.     In recent years, many universities across the country have employed race-neutral strategies that achieved as much black and Hispanic representation as the use of racial preferences had before those preferences were banned. Tr.4 86:23–88:6 (Kahlenberg).

236.     When the Coast Guard Academy was banned from using race in admissions, it used race-neutral strategies to increase the number of racial minorities it admitted (from 11% to 24%) over a short period of time. The Coast Guard Academy is a meaningful analog to the

Naval Academy because they both have a fitness and medical requirement; provide free tuition, room, and board to all students; and enroll students who are willing to make a commitment to serve their country and potentially put themselves in harm's way. Tr.4 88:7–89:21 (Kahlenberg).

237.   Unlike Harvard and UNC, the Academy did not form a committee to examine the availability of race-neutral alternatives either before or after this litigation began. Tr.4 74:6–75:1 (Kahlenberg); P285 at 7; Tr.2 106:24–108:3 (Latta).

238.   The Academy created no simulations forecasting the results of any race-neutral strategy—another stark departure from *Harvard* and *UNC.* Tr.4 109:24–110:8 (Kahlenberg).

239.   Instead, the Academy merely reviewed a handful of spreadsheets listing the names of applicants and their various characteristics. Tr.2 107:9–113:13 (Latta); Tr.4 74:6–75:1 (Kahlenberg); *see* P343; P344; P345; P346; P347.

240.   SFFA's expert, Richard Kahlenberg, is the nation's leading expert on race-neutral alternatives. *See* Tr.4 68:2–71:21. He presented similar testimony in *Harvard* and *UNC.* As the *Harvard* court explained in 2019, "Mr. Kahlenberg is a senior fellow at The Century Foundation, where he has worked for the last twenty years. He graduated from Harvard College in 1985 and received a juris doctor from Harvard Law School in 1989. Mr. Kahlenberg has published works on numerous socioeconomic subjects, including the use of race-neutral alternatives in college admissions." *SFFA v. Harvard*, 397 F. Supp. 3d 126, 177 n.50 (D. Mass. 2019). Kahlenberg is now with the Progressive Policy Institute. Tr.4 67:15–68:1.

241.   Kahlenberg produced numerous simulations that estimate what would happen if various race-neutral alternatives were employed at the Academy. These simulations replicated, with as much fidelity as possible, the Academy's existing system of admissions. In total, SFFA identified 70 viable race-neutral simulations. Tr.4 95:1-7; 95:14–96:24; 97:5-12.

242.   These simulations produced a high level of racial diversity, expanded socioeconomic diversity, and increased the class's academic preparedness. Tr.4 96:25–97:4; *see* Tr.4 97:17–108:11 (discussing results of various simulations); PD4.19-30 (same).

243.   For example, Simulation 9 has the Academy increase the number of completed, underrepresented minority applications by 50 percent, an approach that is broadly consistent with the Coast Guard Academy's results when it could not use race. The Academy would then provide a small socioeconomic preference (0.5% of the boost currently provided to black applicants). Tr.4 106:12–107:5, 107:16-19; *see* Tr.4 99:13-18.

244.   In Simulation 9, the Academy obtained higher levels of racial diversity, higher levels of socioeconomic diversity, and a similarly strong level of academic preparedness:



PD4.26; Tr.4 107:6-15.

245.    The race-neutral strategies that SFFA identified are feasible. Because the Academy already provides free tuition and room and board, there would be no new additional costs associated with them. Tr.4 108:12–109:1. Nor would the current nominations process need to change. Tr.4 109:2-15.

246.    The Academy could likely obtain even greater levels of racial diversity than SFFA predicts because SFFA lacked access to other relevant data, such as family wealth, more detailed family income levels, and whether the applicant came from a single-parent household. Tr.4 110:9–114:9.

## PROPOSED CONCLUSIONS OF LAW

### I.    SFFA has Article III standing.

247.    To have standing in this case, SFFA "must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *SFFA v. Harvard*, 600 U.S. 181, 199 (2023).

248.    This Court previously granted SFFA partial summary judgment because the Academy identified no genuine, material dispute of fact regarding Article III standing. Doc. 113. Nothing at trial affects this Court's prior conclusion.

### II.    Defendants have the burden to prove that the Academy's race-based admissions process satisfies real strict scrutiny.

249.    Because *Harvard* "does not address" race-based admissions at the military academies, it cannot hold that the Academy's use of race is *lawful*. 600 U.S. at 213 n.4. It simply leaves open that the academies "may" have "potentially" distinct interests. *Id.* The opinion

does not exempt the Academy from strict scrutiny, narrow tailoring, or any of the Court's analysis of its prior decisions on strict scrutiny or race-based admissions.

250.    The Academy's race-based admissions "must comply with strict scrutiny." *Id.* at 213. That standard applies "[a]ny" time the government classifies citizens based on race. *Id.* at 206; *accord id.* at 209 ("'any'"); *id.* at 204 ("all"); *id.* at 206 ("all"); *id.* at 211 ("all"); *id.* at 212 ("all"); *id.* at 214 ("'all'"). Including the federal government. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). And the military. *See id.* at 235 (citing *Hirabayashi* and *Korematsu*); *Christian v. United States*, 46 Fed. Cl. 793, 805-06 (2000). Even Defendants concede that the Academy's race-based admissions must satisfy strict scrutiny. *See, e.g.*, Doc.109 at 34 (admitting that "Governmental classifications based on race must satisfy 'strict scrutiny' (quoting *Harvard*)); Doc.46 at 22 (same). The Supreme Court appears to agree. *Cf. Harvard*, 600 U.S. at 213 & n.4 (framing the issue as whether the academies have distinct compelling interests); *SFFA v. West Point*, 144 S. Ct. 716 (2024) (stressing the need for a developed record).

251.    Strict scrutiny is a "daunting" two-step test. *Harvard*, 600 U.S. at 206. Defendants first must prove that the Academy's use of race furthers a "'compelling governmental interes[t].'" *Id.* at 206-07. Then they must prove that its use of race is "'narrowly tailored'" to achieve that interest. *Id.*

252.    Defendants bear the "burden" on both steps. *Fisher I*, 570 U.S. at 310, 313. The "risk of nonpersuasion—operative in all trials—must rest with the Government, not with the citizen." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 818 (2000). So Defendants cannot win any contested proposition if they submit "no probative evidence." *Id.* at 821; *accord Eisenberg ex rel. Eisenberg v. Montgomery Cnty. Pub. Sch.*, 197 F.3d 123, 128-29 (4th Cir. 1999). If they

rely on "'assertion and conjecture.'" *Republican Party of Minn. v. White*, 536 U.S. 765, 781 (2002). Or even if the evidence is in equipoise. *Playboy*, 529 U.S. at 819.

253.    To prevail under strict scrutiny, Defendants must prove that the Academy's use of race in admissions is necessary to achieve a "distinct" interest—some new reason for using race that the Supreme Court has never recognized. *Harvard*, 600 U.S. at 213 n.4. The Supreme Court has recognized "only two compelling interests that permit resort to race-based government action." *Id.* at 207. The first is "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," *id.*, but that "remedial" interest cannot justify race-based admissions, *id.* at 227 n.8. The second is "avoiding imminent and serious risks to human safety in prisons," *id.* at 207, but military academies are not prisons. Though the Supreme Court once upheld the use of race based on "'military urgency,'" that decision has been overruled. *Id.* at 207 n.3 (discussing *Korematsu*). And though universities once used race to pursue the "educational benefits" of student-body diversity, *id.* at 209-11 (discussing *Bakke* and *Grutter*), that interest is no longer valid after *Harvard*, *see id.* at 214-15, 231.

254.    To be compelling, the Academy's new interests must be "exceedingly persuasive." *Harvard*, 600 U.S. at 217. And they must be "measurable and concrete" enough to permit "meaningful judicial review." *Id.* at 217, 214.

255.    "'Racial balancing'" is not a legitimate interest. *Fisher I*, 570 U.S. at 311. The government pursues racial balancing when it tries to achieve "proportional representation," or when it otherwise defines its racial goals in terms of "'some specified percentage.'" *Harvard*, 600 U.S. at 223; *Fisher I*, 570 U.S. at 311; *accord Podberesky v. Kirwan*, 38 F.3d 147, 160 (4th Cir. 1994); *Tuttle v. Arlington Cty. Sch. Bd.*, 195 F.3d 698, 707 (4th Cir. 1999).

256. If Defendants can identify a compelling interest, narrow tailoring requires them to prove that the Academy's use of race is "'necessary'" to achieve that interest. *Harvard*, 600 U.S. at 207. Defendants must prove "[h]ow many fewer" racial minorities would become officers "without racial preferences." *Id.* at 215. And they must prove that this difference would make their interests no longer "adequately be met." *Id.* at 224. Defendants cannot simply compare the racial "composition" of the Academy with the racial "composition" of the country: "Without *evidence* … that the use of a non-discriminatory policy would not achieve its goal," a court "simply cannot hold that [its] policy [i]s narrowly tailored." *Hayes v. N. State L. Enf't Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993); *accord Wis. Legislature v. WEC*, 595 U.S. 398, 404 (2022) (requiring a "strong basis in evidence"); *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799-800 (2011) (requiring a "direct causal link").

257. The use of race is not necessary if the Academy could achieve its compelling interests "'about as well'" and at "'tolerable administrative expense'" through race-neutral alternatives. *Fisher I*, 570 U.S. at 312. Defendants must prove that, "before turning to racial classifications," they gave "'serious, good faith consideration'" to workable race-neutral alternatives. *Id.* And they must prove that "available, workable race-neutral alternatives" in fact "do not suffice." *Id.*

258. Defendants also fail strict scrutiny if they lack "a meaningful connection between the means they employ and the goals they pursue." *Harvard*, 600 U.S. at 215. That connection must be "'the most exact.'" *Id.* at 217. It is missing if, for example, the Academy "random[ly] inclu[des]" racial groups that do not need racial preferences. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 506 (1989); *accord Wygant*, 476 U.S. at 280 n.6 (explaining that narrow

tailoring requires that the use of race "'fit'" the stated interest "with greater precision than any alternative means," including "'a nonracial approach or a more narrowly-tailored racial classification'"). In fact, such "overinclusiveness" "strongly impugns" the Academy's stated interests as pretextual. *Croson*, 488 U.S. at 506.

259.    The Academy's use of race likewise violates "narrow tailoring" if it "'provides only ineffective or remote support for'" the stated interests. *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999). "'[M]arginal changes'" cannot justify "'the cost of subjecting hundreds of students to disparate treatment based solely upon the color of their skin.'" *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 734-35 (2007). And a "minimal effect" reveals that "other means" besides racial classifications "would be effective" at achieving the stated interests. *Id.* at 733.

260.    For the Academy's race-based admissions to satisfy strict scrutiny, an applicant's race can "never be used as a 'negative.'" *Harvard*, 600 U.S. at 218; *accord id.* at 213. Race is a negative if it's a positive for only "some applicants" in a "zero-sum" process, or if without it "some racial groups would be admitted in greater numbers." *Id.* at 218-19.

261.    The Academy also can "never use race as a stereotype." *Id.* at 213; *accord id.* at 220-21, 218. Stereotyping occurs when applicants can "obtain preferences on the basis of race alone." *Id.* at 220. Preferences based on "race *qua* race"—"at the very least"—stereotype minority students by assuming that there's something about them that makes them "different from nonminority students." *Id.* at 220-21 (cleaned up).

262.    "'*All* race-conscious admissions programs must have a termination point," including the Academy's. *Id.* at 212 (emphasis added). The Academy's use of race must have a

"'sunset'" date. *Harvard*, 600 U.S. at 212; *see, e.g.*, *Tuttle v. Arlington Cty. Sch. Bd.*, 195 F.3d 698, 706 (4th Cir. 1999). Its use of race must be set to expire "soon"; "periodic review" is insufficient. *Harvard*, 600 U.S. at 225. And the Academy's use of race must have a "'logical end point.'" *Id.* at 221. Saying race-based admissions will end when the percentage of racial minorities on campus mirrors "'the general population'" is not a valid endpoint. *Id.* at 223.

263.    The Academy is not "exempt" from "the requirement that *all* governmental use of race must have a logical end point." *Grutter v. Bollinger*, 539 U.S. 306, 342 (2003) (emphasis added). The question here is not whether "national security" has an end point, *cf.* Tr.9 58:5-18 (closing), any more than the question in *Harvard* was whether "education" has an end point. The question is how long racial classifications can be used as the means to pursue those interests. Because racial classifications deviate from the "unambiguous guarantee of equal protection," adopting "'a permanent justification'" for them would itself "'offend'" the Constitution. *Harvard*, 600 U.S. at 212. Racial classifications must be limited even when life, limb, and national security are at stake. The use of racial segregation to quell prison riots must be "temporary." *Harvard*, 600 U.S. at 215 (citing *Johnson*, 543 U.S. at 512-13); *see also Johnson*, 543 U.S. at 509 (quoting the United States arguing that racial segregation, as a "'response to a race riot or other serious threat of race-related violence,'" must be "'necessary and temporary'"). Even *Korematsu* assumed that the wartime measure challenged there had to be "temporary." *Korematsu v. United States*, 323 U.S. 214, 219, 223 (1944); *see also id.* at 225-26 (Roberts, J., dissenting) (dissenting because the orders were not temporary).

264.    When applying strict scrutiny, the Academy gets no meaningful deference. "The analysis and level of scrutiny applied to determine the validity of a racial classification do not

vary simply because the objective appears acceptable. While the validity and importance of the objective may affect the outcome of the analysis, the analysis itself does not change." *Fisher I*, 570 U.S. at 314 (cleaned up). "Like other claims conflicting with the asserted constitutional rights of the individual, the military claim must subject itself to the judicial process of having its reasonableness determined and its conflicts with other interests reconciled." *Hamdi v. Rumsfeld*, 542 U.S. 507, 535-36 (2004) (cleaned up; quoting *Korematsu*, 323 U.S. at 233-34 (Murphy, J., dissenting)).

     a.     Even when deference is warranted for other constitutional rights, citizens' right to be free from racial discrimination is unique. Prisons, for example, normally get the same level of deference as the military. *Sample v. Diecks*, 885 F.2d 1099, 1109 (3d Cir. 1989); *Pollock v. Marshall*, 656 F. Supp. 957, 962 (S.D. Ohio 1987), *aff'd*, 845 F.2d 656 (6th Cir. 1988). But when prisons classify citizens based on race, the Supreme Court applies normal strict scrutiny. *Johnson*, 543 U.S. at 505-06. Giving "deference" to "prison officials" when they use race, the Court explained in *Johnson*, would create a "hands-off approach to racial classifications" that "is fundamentally at odds" with "equal protection." *Id.* at 506-07 & n.1. "[S]earching judicial review of racial classifications" is all the more "necessary" in contexts where "the government's power is at its apex." *Id.* at 511. As Justice Kavanaugh put it, the "court of history" has "rejected" giving "overly broad judicial deference" when "the government has invoked emergency powers" to "override equal-treatment … principles." *Calvary Chapel Dayton Valley v. Sisolak*, 140 S.Ct. 2603, 2614-15 (2020) (Kavanaugh, J., dissental). "There are certain

constitutional red lines that a State may not cross even in a crisis," and "[t]hose red lines include racial discrimination." *Id.*

      b.     Tellingly, Defendants have never cited a single case giving the military meaningful deference in the context of race. The caselaw holds the opposite. *See, e.g.*, *Vance v. United States*, 434 F. Supp. 826, 833-34 (N.D. Tex.), *aff'd*, 565 F.2d 1214 (5th Cir. 1977); *Christian*, 46 Fed. Cl. at 803-06; *Berkley v. United States*, 287 F.3d 1076, 1084, 1090-91 (Fed. Cir. 2002); *see also Steffan v. Perry*, 41 F.3d 677, 689 & n.9 (D.C. Cir. 1994) (en banc).; *Doe 2 v. Shanahan*, 917 F.3d 694, 703 (D.C. Cir. 2019) (Wilkins, J., concurring). As the United States stressed in *Johnson*, "[R]acial classifications are uniquely invidious and particularly likely to lead to abuse. For that reason, in many contexts where government action generally is reviewed deferentially or not at all, government action based on race is subject to strict scrutiny. … [N]otwithstanding the high degree of deference generally owed to the political branches in the conduct of military affairs, even military officials acting during wartime are subject to strict scrutiny when they take expressly race-based actions." U.S.-Br.18-19, *Johnson v. California*, 2004 WL 1261255 (U.S. June 4) (cleaned up); *accord Compelling Interests and Diversity Policy* 3 ("[Race] is not an area where traditional judicial deference to the military applies.").

      c.     *Harvard* rejects the notion of giving meaningful deference to the government in this context. 600 U.S. at 217. Though footnote 4 leaves open the potentially distinct interests of the military academies, it never suggests that the academies would get something less than real strict scrutiny. *See id.* at 213 n.4. In the next footnote, the Court reiterates that deference would "abando[n] the demands of strict scrutiny." *Id.* at

218 n.5. And in the prior footnote, the Court explains that *Korematsu* was overruled not because it held that the military's racial classifications must survive strict scrutiny, but because it "'retreat[ed] from [that] most searching judicial inquiry'" in its application. *Id.* at 207 n.3. Deference here "'can only increase the risk of another such error.'" *Id.*

        d.      Far from dicta, the Supreme Court actively refused to give the military deference in *Harvard*. There the United States argued—on behalf of the whole military—that race-based admissions policies at *civilian* universities were critically important to the military and national security. *See, e.g.*, U.S.-*Harvard*-Br. 12, 2022 WL 3108833 ("The military … depends on the benefits of diversity at civilian universities"); *UNC* O.A. Tr. 151 (Solicitor General: "the military's critical interest … [is] not just confined to the service academies"). Using race at civilian universities was *more* important, the United States stressed, because the military gets twice as many officers from civilian universities (via ROTC and OCS) than from the service academies. U.S.-*Harvard*-Br. 16-18, 2022 WL 3108833; *accord UNC* O.A. Tr. 150 (Solicitor General: "it is critically important … because, actually, more officers come from ROTC programs"); *Fisher I* O.A. Tr. 69 (Solicitor General: "43 percent of the Officer Corps comes from the ROTC. It's a very significant source of our military leadership."); *Grutter v. Bollinger*, 539 U.S. 306, 331 (2003) ("'[T]he military cannot achieve an officer corps that is both highly qualified and racially diverse unless the service academies *and the ROTC* used limited race-conscious recruiting and admissions policies.'" (emphasis added)). Yet the Supreme Court outlawed race-based admissions at all civilian universities—a holding that

cannot be right if the Academy could get outcome-determinative deference by invoking the same interests here.

e.      The Court cannot defer to the Academy here unless it would also defer to the Academy if it adopted an admissions process that "discriminated *against* black and Latino applicants." *Harvard*, 600 U.S. at 229-30. Treating those cases differently would create "a judiciary that picks winners and losers based on the color of their skin." *Id.* "That is a remarkable view of the judicial role—remarkably wrong." *Id.* at 230.

f.      Even if the military sometimes got deference when it racially classified citizens, this case would not be one of those times. The Academy's use of race affects U.S. citizens, not foreigners. It injures young adults who are "not in the Armed Forces" yet, rather than current midshipmen or sailors. *Hartmann v. Stone*, 68 F.3d 973, 985 (6th Cir. 1995). And ending it would not force the Academy to admit anyone or retain anyone it didn't want to. This case also involves college admissions, not "the strategy or conduct of war." *Hamdi*, 542 U.S. at 535-36. The students in question could not even be officers in the Navy or Marines for five more years—or, for flag officers, decades from now.

265.    Even if the Academy got deference in defining its interests, it would get "no deference" on narrow tailoring. *Fisher I*, 570 U.S. at 311. Whether its use of race in admissions meaningfully changes the number of racial minorities who graduate from the Academy, for example, is an empirical question that involves no military judgment. And even on the Academy's stated interests, courts should at least "ensure that there is a reasoned, principled expla-

nation" behind them, and courts should at most give "some, but not complete, judicial defer-ence." *Fisher I*, 570 U.S. at 310. No amount of deference could allow the Academy to stereo-type, racially balance, use race as a negative, have no end date, or violate any of the other basic rules in *Harvard*.

266.   The Academy's use of race "would not pass even rational basis review," since "race" has "absolutely no bearing on … military service." *Steffan*, 41 F.3d at 689.

## III.   Defendants proved no compelling governmental interest.

267.   The Academy's use of race in admissions serves no legitimate interest because it is racial balancing, which is "'patently unconstitutional.'" *Harvard*, 600 U.S. at 223. The Acad-emy admits that it uses race to match the percentages of blacks and Hispanics at the Academy to the percentages of blacks and Hispanics in the general population. FF ¶89; *see Wessmann v. Gittens*, 160 F.3d 790, 799 (1st Cir. 1998) ("Underrepresentation is merely racial balancing in disguise"). And its focus on numbers is as "obvious" as Harvard's was. FF ¶¶58-59; *see Harvard*, 600 U.S. at 222 & n.7 ("For all the talk of holistic and contextual judgments, the racial prefer-ences at issue here in fact operate like clockwork."). "Although the [Academy's] policy does not necessarily apply 'hard and fast quotas,' its goal of keeping certain percentages of ra-cial/ethnic groups [in each class] to ensure diversity is racial balancing." *Eisenberg ex rel. Eisen-berg v. Montgomery Cnty. Pub. Sch.*, 197 F.3d 123, 131 (4th Cir. 1999) (cleaned up).

268.   Though the Academy claims that it pursues this mirroring to achieve certain military benefits, racial balancing is both the Academy's means and end. *Tuttle*, 195 F.3d at 707. The Academy "offer[s] no definition of the interest[s] that suggests [they] diffe[r] from racial balance," *Parents Involved*, 551 U.S. at 732 (plurality), and proportional representation is the Academy's only yardstick for measuring success, *Harvard*, 600 U.S. at 223. The Academy

"offer[s] no evidence that the level of racial diversity necessary to achieve the asserted [military] benefits happens to coincide with the racial demographics of the [general population]." *Parents Involved*, 551 U.S. at 727 (plurality). It "work[s] backward to achieve a particular type of racial balance, rather than working forward from some demonstration of the level of diversity that provides the purported [military] benefits." *Id.* at 729.

269.    While Defendants elicited testimony about the need for racial "diversity," they put on no testimony or evidence about the need for proportional representation—meaning not just the presence of racial minorities, but their presence in numbers proportionate to their representation in the general population. Defendants are "not aware of any study that [the Department of Defense] has ever conducted to determine whether the racial representation of the American public is an appropriate benchmark for the racial representation of officers at the U.S. Navy." Tr.6 64:20-24 (Vazirani). And the Academy's arguments and evidence all assume that, if the Academy stopped considering race in admissions, the number of racial-minority officers in the Navy and Marines would either be zero or so low that people would assume intentional racial discrimination. *E.g.*, Tr.8 81:22-23 (Miller) (discussing a hypothetical military that was "predominantly homogenous"); Tr.7 117:3-13 (Fuller) ("[W]e'd like people to be able to see themselves in that position"). That assumption is false—especially when factoring in race-neutral alternatives. FF ¶¶290-91; *Harvard*, 600 U.S. at 215.

270.    Nor do Defendants have a coherent definition of proportionality.

a.    They seem to mean proportional to the racial percentages reported in the census. But that number does not match the logic behind its interests, since less than a quarter of the general population is fit for military service. Tr.8 101:24-25. In

terms of that population, Defendants neither proved its racial demographics nor explained why outside observers would know those numbers or use them to judge the military.

     b.    Also unexplained is why the Academy shouldn't seek proportionality with the enlisted ranks, as the Academy itself has claimed it is doing, *see, e.g.*, P803 at USNA-00001370 (academic year 2020); P804 at USNA-00001366 (academic year 2021); P805 at USNA-00001376 (academic year 2022); P806 at USNA-00021775 (academic year 2023). Under Defendants' logic, a mismatch between the enlisted ranks and the officer corps could disrupt cohesion, make the military seem less open to promoting minorities, and the like. *Cf.* Tr.8 90:15-16 (Miller) ("We have a hard enough time with young Americans even understanding what the difference between an officer and an enlisted service member are").

     c.    And all these numbers can be easily manipulated, as the Academy does when it sometimes counts and sometimes omits multiracial students. FF ¶¶191-92; *see Schuette v. BAMN*, 572 U.S. 291, 308 (2014) (op. of Kennedy, J.) ("[I]n a society in which [racial] lines are becoming more blurred, the attempt to define race-based categories also raises serious questions of its own.").

271.    Defendants also fail strict scrutiny because they cannot "articulate a meaningful connection between the means [the Academy] employ[s] and the goals [it] pursue[s]." *Harvard*, 600 U.S. at 215. Harvard tracked race under six categories: "(1) Asian; (2) Native Hawaiian or Pacific Islander; (3) Hispanic; (4) White; (5) African-American; and (6) Native American." *Id.*

at 216. The Supreme Court called those categories "opaque," "undefined," "imprecise," "arbitrary," "'incoherent,'" "'irrational stereotypes,'" and both "underinclusive" and "plainly overbroad." *Id.* at 216-17 (quoting Justice Gorsuch's concurrence); *see* Bernstein, *The Modern American Law of Race*, 94 S. Cal. L. Rev. 171 (2021). "Bureaucrats" invented them "in the 1970s to facilitate data collection," "'without any input from anthropologists, sociologists, ethnologists, or other experts.'" *Harvard*, 600 U.S. at 291 (Gorsuch, J., concurring); *see* Graham, *The Origins of Official Minority Designation* 289 (2002). Yet the Academy uses the same categories. FF ¶40.

272.    That the military also uses these categories is circular and irrelevant. These categories were not designed to achieve any public-policy objective, let alone military ones. *Harvard*, 600 U.S. at 291 (Gorsuch, J., concurring); *see* 43 Fed. Reg. 19,260, 19,269 (May 4, 1978). Because they don't reflect how people see themselves, they "undermin[e]" all of Defendants' interests. *Harvard*, 600 U.S. at 217 (majority). And because they reveal no real information, they make it impossible for courts to "scrutinize" whether the Academy is satisfying strict scrutiny. *Id.*

273.    Even simpler than causation, Defendants failed to prove *correlation* between the Academy's use of race and their stated interests. As explained, the Academy says it has never come close to hitting proportional representation for blacks or Hispanics. FF ¶190. Yet racial strife in the military is low, recruitment is low, retention is high, and legitimacy is presumably high. FF ¶158, ¶163, ¶172, ¶176. These divergent and disconnected trends prove that Defendants' interests are driven by other factors, not the racial proportionality of the Academy's student body. And the Academy obviously cannot prove that proportional representation is

"'necessary'" to achieving these interests when it's not hitting complete proportionality now and never has. *Harvard*, 600 U.S. at 207; FF ¶190.

274.   Defendants' identified interests also have specific defects and failures of proof that make them unable to satisfy strict scrutiny.

### A.   Lethality and Unit Cohesion

275.   Defendants did not sufficiently prove their interest in lethality and unit cohesion. *See* FF §IV.A.

a.   "[R]ace" has "absolutely no bearing" on "military service." *Steffan*, 41 F.3d at 689. What the Fourth Circuit once observed about police officers holds equally true for military officers: "'[A] police officer's effectiveness … is dependent upon his education, skill, training, attitude and sense of professionalism. The unalterable pigment of his skin has no bearing on these facts and neither enhances nor depreciates his professional enforcement effectiveness.'" *Hayes*, 10 F.3d at 216 n.7 (quoting *Detroit Police Officers*, 446 F. Supp. 979, 1002 (E.D. Mich. 1978)); *see* FF ¶104.

b.   Defendants' evidence from the Vietnam era (and earlier) does not help carry their burden. Defendants lack any "strong objective evidence why the situation [more than three decades ago] is analogous to the present circumstances." *Hayes*, 10 F.3d at 214-15; *see* FF ¶142, ¶¶149-58. Especially because the military took "serious steps in subsequent years" to improve matters. *Middleton v. City of Flint*, 92 F.3d 396, 409 (6th Cir. 1996); *see, e.g.*, FF ¶149, ¶155, ¶157; Tr.6 147:7-17 (Haynie). Both the military and broader American society have changed dramatically in the last half century. FF ¶¶155-56. It would be "ridiculous" to suggest that, if the Academy can no

longer use race as one factor in admissions, race relations in the military would return to anything like the Vietnam era. FF ¶152.

c.     Defendants presented no studies showing that the percentage of racial-minority officers has any effect on unit performance in the operational setting. FF ¶101, ¶¶126-131. Witnesses' "opinion[s]," FF ¶182, and "belie[fs]," *e.g.*, Tr.8 75:20-24, about the importance of racial diversity in the officer corps are insufficient for the government to survive strict scrutiny. *See Croson*, 488 U.S. at 500 (the government "cannot rest upon a generalized assertion as to the [racial] classification's relevance to its goals" and must instead provide a "strong basis in evidence of its conclusion[s]"); *Hayes*, 10 F.3d at 214 (rejecting as overly "subjective evidence" the police chief's "opinion" about the need for racial classifications, though "based on his significant experience in the field of law enforcement").

d.     Studies about diversity in the *corporate* setting provide little guidance as to the importance of racial diversity in the *military*. *See* FF ¶134. And any guidance these studies do provide is insufficient in the context of strict scrutiny. *See H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 261 (4th Cir. 2010) (Niemeyer, J., concurring) ("data from the private sector" is too "flimsy" to "justify governmental decisionmaking based on race").

e.     Defendants also provided no study or evidence identifying what level of racial representation in the officer corps is needed to achieve their interests. *See, e.g.*, FF ¶116 (the military has no study showing what level of racial representation in the officer

corps is needed to "successfully promote trust within a unit" or to "promote unit cohesion"). Defendants cannot satisfy strict scrutiny without properly identifying these basic metrics. CL ¶256.

     f.    Defendants also provided no evidence that "lethality" and "unit cohesion" will be meaningfully diminished if the Academy stops using race in the admissions process. The Academy's use of race has little impact on the total number of racial minorities in the officer corps. *See* FF ¶¶194-205. And there is no evidence that the Academy's use of race will lead to more flag officers 25 years down the line. FF ¶¶206-28. That the challenged racial classification provides such "'ineffective'" and "'remote support'" for the stated interests means that it fails strict scrutiny. *Greater New Orleans Broad.*, 527 U.S. at 188.

276.    The Academy's use of race, if anything, decreases lethality and unit cohesion. "*All*" racial classifications "incite racial hostility" because they "'are likely to be viewed with deep resentment by the individuals burdened.'" *Hayes*, 10 F.3d at 216; *see* FF ¶146. They also inflict "stigmatic harm" against their beneficiaries by "'reinforc[ing] common stereotypes holding that certain groups are unable to achieve success without special protection.'" *Hayes*, 10 F.3d at 216; *see* FF ¶99.

277.    Defendants' interests in lethality and unit cohesion are not "sufficiently measurable to permit judicial review." *Harvard*, 600 U.S. at 214 (cleaned up). "It is unclear how courts are supposed to measure" these goals or "know when they have been reached." *Id.* Defendants never offer any metric that courts could use to judge whether a unit is cohesive or lethal enough. And "[t]here is no particular point at which there exists sufficient 'innovation

and problem-solving.'" *Id.* at 214-15. When it comes to racial classifications of citizens, the answer cannot be "'trust us.'" *Id.* at 217. Defendants cannot receive deference because they refuse to offer evidence on even the most basic links in their chain of causation, like how many racial minorities are admitted because of the Academy's use of race, how many of those minorities become officers, what effect do they have on the racial composition of the broader officer corps, and how much racial diversity is needed to achieve the broad-based diversity that's supposedly needed for lethality and cohesion. FF ¶76, ¶106.

### B.   Recruitment and Retention

278.   Defendants' interest in recruitment and retention is not a compelling reason to use racial classifications. The Academy cannot use race so that minority officers will serve as "mentors and role models" for other racial minorities, supposedly encouraging people to join or stay in the military. *Podberesky*, 38 F.3d at 159. This role-model theory "has no logical stopping point": By "tying" the number of minority officers to the number of minority sailors or recruits, it requires "year-to-year calibration." *Wygant*, 476 U.S. at 275 (plurality). "Carried to its logical extreme," the "idea that black [sailors] are better off with black [officers] could lead to the very system the Court rejected in *Brown v. Board of Education*." *Id.* at 276; *accord Hayes*, 10 F.3d at 214-15.

279.   Defendants' interest in recruitment and retention is not judicially measurable. *Harvard*, 600 U.S. at 214. Courts cannot tell whether racial preferences at the Academy are needed to make service more "attractive." Doc.109 at 14-15. Nor can they tell whether racial preferences at the Academy help the military recruit or retain "the top talent." Doc.109 at 14-15. And courts certainly cannot disentangle the effects of race-based admissions at the Academy with all the myriad other factors that affect recruitment and retention. FF ¶163.

280.    Defendants presented no studies or data showing that proportional racial representation among the officer corps will increase recruitment or retention. FF ¶165. The one on-point study goes against Defendants. FF ¶170. And their witnesses' opinions and beliefs about the importance of diversity for recruitment and retention, *e.g.,* Tr.8 104:12-20 (Miller) ("I think it helps …."), are insufficient under strict scrutiny, *see Croson*, 488 U.S. at 500; *Hayes*, 10 F.3d at 214.

281.    The Academy's use of race, if anything, decreases recruitment and retention. The most on-point study in the record proved a negative correlation between racial diversity in the Navy's officer corps and minority officer retention. FF ¶170. The law says, moreover, that racial classifications incite "'deep resentment by the individuals burdened'" and inflict "stigmatic harm" against their beneficiaries, perceptions that deter people from joining or trying to progress in a system they don't perceive as fair. *Hayes*, 10 F.3d at 216; *see* Tr.6 40:20–46:62 (sizable percentages told OPA that the military focused too much on diversity and inclusion efforts). The military understands this, which is why in every other area it insists on maintaining a strict "meritocracy" and an "equal playing field." Tr.6 30:5-11 (Vazirani); Tr.8 111:25–112:13 (Miller).

### C.    Domestic and International Legitimacy

282.    Defendants' interest in domestic and international legitimacy is not a compelling reason to use racial classifications. The Academy cannot use race to "gain the confidence and acceptance" of the domestic or international community. *Hayes*, 10 F.3d at 214. This interest is "subjective" and circular. *Id.* "If this is found to be enough evidence to justify the need for race-conscious policies," then "others could use this same rationale for a much less benign

purpose." *Id.* at 214-15; *accord Christian*, 46 Fed. Cl. at 806 ("The government's desire to manipulate private perceptions can never by itself justify the use of race-conscious policies. Private attitudes are simply too subjective to rely upon as a justification for trampling an individual's right to be treated equally regardless of race. Because of this inherent subjectivity, the thought management rationale may be used to exculpate almost any instance of racial discrimination while simultaneously avoiding any meaningful judicial scrutiny." (cleaned up)). "[P]erceptions are, of course, inherently subjective"; "one person's perception of equal opportunity is another person's perception of outright discrimination." *Saunders v. White*, 191 F. Supp. 2d 95, 129 (D.D.C. 2002).

283.    The "question [of] whether a particular mix of minority [midshipmen] produces" public and international legitimacy is not judicially measurable. *Harvard*, 600 U.S. at 215. Again, courts cannot measure whether the Academy's use of race is necessary for the military to "instil[l] trust in the American public" or "protect its legitimacy among its international partners." Doc.109 at 16. Nor could a court assess what level of legitimacy is "sufficient" for Defendants to achieve their interests. *Harvard*, 600 U.S. at 214-15.

284.    Defendants did not sufficiently prove their interest in domestic and international legitimacy. Defendants provided no studies or data showing that Americans or foreigners find the U.S. military more legitimate when it has racial diversity. FF ¶182. There was ample evidence showing that servicemembers' race has no effect on combat operations overseas. FF ¶¶102-03, ¶¶180-81. The most Defendants could show was that *cultural* diversity (like language fluency) is beneficial, but those skills do not depend on servicemembers' race. FF ¶179.

285.    Defendants also do not know the "number," or even the "range," of racial-minority officers that the Navy needs to "bolster the armed forces' legitimacy in the eyes of the nation and the world." Tr.2 126:6-15 (Latta). Defendants cannot satisfy strict scrutiny without these metrics. CL ¶256.

286.    The Academy's use of race, if anything, decreases domestic and international legitimacy. "The Constitution's guarantee of equal protection of the laws presumes that private perceptions will improve when the government treats all persons consistently and even-handedly in both word and deed," and "[d]iscrimination in the name of equality only … retards" this improvement. *Christian*, 46 Fed. Cl. at 806-07. Indeed, because public-opinion polls show that Americans *oppose* the use of race in college admissions, there is no reason to believe that Americans will find the Navy less "legitimate" if the Academy admits applicants in a race-neutral fashion. FF ¶178, ¶234. Even more so after *Harvard* held that race-based admissions at civilian universities violate the Constitution's guarantee of equality.

## IV.    Defendants did not prove narrow tailoring.

287.    Defendants cannot satisfy strict scrutiny because their asserted military objectives are not the interests that the Academy's race-based admissions process is designed to further. *See Podberesky*, 38 F.3d at 158 ("narrow tailoring" means the racial classification cannot "furthe[r] a different objective from the one it is claimed to remedy"). The United States argued for years that the Academy's process pursued *Grutter*'s educational benefits of diversity. FF ¶¶83-84. The Academy still regularly describes its goal in those terms, FF ¶84, and did not change its race-based admissions process after *Harvard*, FF ¶186. That process is modeled after the process approved in *Grutter*, supposedly considering race as one small factor in an "indi-

vidualized" and "holistic" review of each applicant. FF ¶187. But "[t]he point" of those requirements from *Grutter* was to ensure that the use of race was "part of a broader assessment of diversity"—the overall, student-body diversity that *Grutter* recognized as a compelling interest. *Parents Involved*, 551 U.S. at 722-23. Admissions policies that are tailored to achieve the *Grutter* interest are "not" tailored to achieving a particular percentage of racial minorities, *id.* at 723, let alone military objectives or any other non-educational interest, *id.* at 724-25.

288.     The Academy's use of race fails narrow tailoring for several other reasons as well. It violates precedent in two ways that were not present in *Harvard*. And it violates precedent in all the ways that were present in *Harvard*.

### A.     Defendants did not prove that the Academy's use of race is necessary to achieve any of its interests.

289.     Defendants fail narrow tailoring because they did not prove that the Academy's use of race in admissions has more than a "minimal effect." *Parents Involved*, 551 U.S. at 733-35; *see* CL ¶259.

290.     In terms of the number of racial minorities on campus, ending the Academy's race-based admissions would cause it to admit about 33 fewer blacks and 21 fewer Hispanics per year. PD3 at 35; Tr.4 178:16–181:1. And those numbers assume, unrealistically, that the Academy would adopt no race-neutral alternatives. If the Academy adopted Simulation 9, for example, the drop in black midshipmen would be substantially lower, and the number of Hispanic midshipmen would *increase. See* P223.

291.     Defendants did not prove that SFFA's estimates are too low. Dr. Gurrea testified that SFFA's estimates are *not low enough*, even suggesting that the number of blacks and Hispanics who get into the Academy because of racial preferences might be zero. FF ¶82.

292.    The Academy itself refused to offer any evidence quantifying the decrease in racial minorities if it ended race-based admissions. FF ¶76. Though Dean Latta said the numbers of blacks and Hispanics would drop "dramatically," he did not define what counts as "dramatic" or say that his undisclosed numbers were higher than Professor Arcidiacono's numbers. FF ¶77. And Dean Latta's assumptions are based on no study or model of the Academy's admissions process—just his thoughts and feelings. Tr.3 37:14–38:13. Dean Latta also gestured to what he's "seen in the news lately" about civilian universities who cannot use race after *Harvard.* Tr.3 39:22–40:3. But Defendants introduced no evidence about civilian universities' post-*Harvard* admissions numbers, and they have repeatedly and strenuously resisted comparisons to those institutions.

293.    Further, the number of racial minorities who become officers because of the Academy's race-based admissions is even smaller than the number who are admitted. Not all racial minorities who are admitted graduate. FF ¶196. And some of the racial minorities who would be rejected under race neutrality would presumably still become officers because they would do ROTC or OCS instead.

294.    The number of racial minorities who become flag officers because of the Academy's race-based admissions is even lower—*much* lower—than the number of officers. Fewer than one-third of each new class of officers remains in the service past the fifteen-year mark, *see* DX204 at USNA-00032582, and a tiny portion of those officers will eventually attain one of the 230 flag officer positions available across all year groups, *see* Tr.7 127:25-128:6 (Fuller). Out of the 1,000 new officers who graduated in Vice Admiral Fuller's class, for instance, only three reached the three-star level. Tr.7 91:15-24 (Fuller). Moreover, using the percentage of

minorities who become flag officers as a metric for the effectiveness of the Academy's racial preferences all but concedes that the Academy's goals will not be measurable for the next three decades, as it "usually" takes "about 25 to 30 years" to progress from an ensign or second lieutenant (O-1) to an admiral or general (O-7 or above). Tr.8 48:5-13 (Miller); *see also id.* at 71:10-19 (even "at O6, [each demographic figure] represents the population that inherently would have been there 20, 25 years ago").

295.   In terms of Defendants' stated interests—lethality/cohesion, recruitment/retention, and legitimacy—Defendants offered no evidence that the military's ability to achieve these interests turns on the admission of, at most, 33 black and 21 Hispanic midshipmen per year. Defendants refused to put on any evidence of the number (or even the rough range) of racial minorities needed to achieve these interests. FF ¶106, ¶166, ¶173, ¶285. Defendants failed to prove that these interests require proportional representation. *E.g.*, FF ¶163, ¶165, ¶169. And regardless, the Academy has never achieved proportional representation for blacks and Hispanics, FF ¶190, and is far overshooting it for Asians, FF ¶42; yet Defendants did not argue or prove that the military is not lethal, cohesive, talented, or legitimate.

296.   Based on SFFA's evidence and Defendants' omissions, Defendants cannot carry their burden under strict scrutiny. They needed "evidence" that race neutrality "would not achieve" their goals. *Hayes*, 10 F.3d at 217. That showing is impossible when Defendants cannot quantify the number of racial-minority officers they need, let alone the number of racial minorities that would be left on campus without racial preferences. When the government uses racial classifications, it "cannot rest upon a generalized assertion as to the classification's relevance to its goals" or "render race a legitimate proxy for a particular condition merely by

declaring that the condition exists." *Croson*, 488 U.S. 469, 500-01. "The history of racial classifications in this country suggests that blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis. *See Korematsu v. United States*, 323 U.S. 214, 235-40 (1944) (Murphy, J., dissenting)." *Id.* at 501; *accord Wessmann*, 160 F.3d at 800 (rejecting "broad generalizations by a few witnesses" without "solid and compelling evidence" about "whether a particular percentage of a particular racial or ethnic group is sufficient or insufficient," "[g]iven both the Constitution's general prohibition against racial balancing and the potential dangers of stereotyping").

297.    Other universities understood that strict scrutiny requires them to prove the precise number of racial minorities who are admitted because of race-based admissions.

a.      In *Grutter*, the parties "introduced voluminous evidence at trial" to "quantify the extent to which the Law School actually considers race in making admissions decisions." *Grutter*, 539 U.S. at 320. The law school hired an expert to show, through statistical modeling, what its racial numbers would be if it stopped considering race in admissions. *Id.*; *see also* 137 F. Supp. 2d 821, 857-59, 861-62 (E.D. Mich. 2001). The law school won because "the consideration of race was viewed as indispensable in more than tripling minority representation at the law school—from 4 to 14.5 percent." *Parents Involved*, 551 U.S. at 734-35 (citing *Grutter*, 539 U.S. at 320).

b.      The university in *Fisher* won because it proved that its consideration of race under holistic admissions increased the share of Hispanics by "54 percent" and blacks by "94 percent"—increases that the Supreme Court said were a "meaningful, if

still limited, effect on the diversity of the University's freshman class." *Fisher II*, 579

U.S. at 384.

      c.     Though it lost, Harvard hired an expert economist and empaneled a

committee to prove that "without considering race, the share of African American and

Hispanic or Other students enrolled at Harvard would decrease by 45%." *SFFA*, 980

F.3d at 191. UNC likewise hired an expert economist to prove that "race explains 1.2%

of in state and 5.1% of out of state admissions decisions." *Harvard*, 600 U.S. at 219 n.6;

*UNC*, 567 F. Supp. 3d at 633, 644.

298.    Defendants thus cannot carry their burden under strict scrutiny. In *Parents In-*

*volved*, the Supreme Court held that a racial tiebreaker failed strict scrutiny because it affected

only "307 student assignments" each year (and was outcome determinative for "only 52 stu-

dents"). *Parents Involved*, 551 U.S. at 733-34. Such "'marginal changes'" to pursue such an

"amorphous end" cannot justify "'the cost'" of racial classifications. *Id.* at 734-35. And this

"minimal" effect "casts doubt on the necessity of using racial classifications" and "suggests

that other means would be effective." *Id.* at 733-34. So too here.

**B.    The Academy gives racial preferences to Asians.**

299.    The Academy's race-based admissions is "overinclusiv[e]," and "not narrowly

tailored," because it gives preferences to Asian Americans "'without attention to whether their

inclusion was justified by evidence.'" *Croson*, 488 U.S. at 506; *Alexander*, 95 F.3d at 316.

300.    While the Academy says it uses race to "achiev[e] … the racial and ethnic diver-

sity of USNA's student body at a level comparable to the ethnic and racial diversity of the

general population," P293 at 74, its preference for Asians *hinders* that goal. Asian Americans

are "overrepresented" at the Academy: Their percentage on campus is 2-3 times higher than

their percentage of the general population. FF ¶42. And blacks and Hispanics are underrepre-sented, a problem that the Academy worsens by making them "share" racial preferences with Asians. *Croson*, 488 U.S. at 506.

301.    Though the Academy also says it uses race to "maintai[n]" proportional racial representation, P293 at 74, its preference for Asians does not serve that interest either. If the Academy stopped using race (and adopted no race-neutral alternatives), the percentage of Asian Americans admitted to the Academy would be 11.6%, P223 (simulation 1)—still higher than the Asian percentage of the general population.

302.    Defendants have never argued or proved that the Academy needs to *exceed* pro-portional representation (let alone double or triple it) to achieve any of its interests. Though Defendants' closing suggested that "Dean Latta testified" Asians would drop below propor-tional representation if the Academy couldn't use race, Tr.9 59:9-15, Dean Latta offered no such testimony. The referenced testimony discusses only "African American" and "Hispanic" students. *See* Tr.3 37:20–40:3. And even his evidence-free prediction of "dramatic drops" wouldn't bring Asian Americans under proportional representation, given how large their overrepresentation is now. Tr.3 39:24. Dean Latta was referencing "MIT" when he said this, given its "very similar-type curriculum"; but "the news" certainly does not suggest that the end of racial preferences *decreased* the number of Asians at MIT. Tr.3 39:22–40:3.

303.    Maintaining proportional representation is not a compelling interest for using racial classifications anyway. *See Hayes*, 10 F.3d at 217 ("even when race can be taken into account to *attain* a balanced work force, racial classifications may not be employed to *maintain* a balanced work force").

304.    Though Defendants concede that the Academy gives racial preferences to Asians, FF ¶41, ¶¶43-44, they have never offered a plausible defense of that Asian preference. The point was mostly ignored by Defendants at trial, even though it was a major focus of Plaintiffs.

305.    Contra Dean Latta, the Academy does not have to give racial preferences for Asians to avoid "discrimination." Tr.2 104:18-24.

a.    Ending racial preferences is not discrimination. *See Schuette*, 572 U.S. at 310 (op. of Kennedy, J.); *id.* at 316 (Scalia, J., concurring in the judgment).

b.    The law does not say that racial preferences must be extended to all racial minorities; the cases repeatedly fault defendants for including minority groups that do not match the stated interests. *E.g.*, *Croson*, 488 U.S. at 506 (faulting a race-based program's "'undifferentiated" treatment of minorities); *Alexander*, 95 F.3d at 316 (faulting a race-based program for "treat[ing] all minority groups alike"); *H.B. Rowe*, 615 F.3d at 257 (majority) ("[B]ecause the State has failed to justify its application of the statutory scheme to … Asian American[s], … we cannot find those applications constitutional."). Per the Fourth Circuit, "an affirmative action program may not give benefits to minorities in general." *Alexander*, 95 F.3d at 318.

c.    Defendants often cite *Grutter* to defend the Academy's race-based admissions. But, notably, the law school in *Grutter* gave racial preferences to black and Hispanic applicants but not Asians because the latter "were already being admitted to the Law School in significant numbers." 539 U.S. at 319.

306.    Dean Latta needn't worry about discrimination: Because the Academy gives an Asian preference, it should not be allowed to consider race for anyone. Its "random inclusion" of Asians reveals that its stated interests are pretextual. *Croson*, 488 U.S. at 506. And its "failure to match" its stated interests with the "particular racial or ethnic groups" that receive racial preferences "shows that the program as currently structured is not narrowly tailored." *Alexander*, 95 F.3d at 316. The Academy's race-based admissions program thus fails strict scrutiny and must end.

### C.    The Academy's use of race has no end date.

307.    The Academy is not exempt from the requirement that "all race-conscious admissions programs must have a termination point." *Harvard*, 600 U.S. at 212 (quoting *Grutter*, 539 U.S. at 342); *see* CL ¶263. But the Academy's "anticipate[d]" termination point—"once it both achieves and maintains the racial and ethnic diversity of USNA's student body at a level comparable to the ethnic and racial diversity of the general population"—is insufficient and invalid. P293 at 74.

308.    The Academy's race-based admissions lacks a "logical end point." *Harvard*, 600 U.S. at 221. Harvard and UNC likewise "promis[ed] to terminate their use of race only when some rough percentage of various racial groups is admitted." *Harvard*, 600 U.S. at 223. But the Supreme Court rejected that supposed end point as mere "'racial balancing,'" effectively assuring "'that race will always be relevant.'" *Id.* at 223-24. Even worse than Harvard and UNC, the Academy wants to use race to both "achieve *and maintain*" proportional representation. P293 at 74 (emphasis added). "[E]ven when race can be taken into account to *attain*" balance, however, "racial classifications may not be employed to *maintain*" that balance. *Hayes*, 10 F.3d at 217.

309.     Defendants' end point, moreover, is not sincere. The Academy has achieved and maintained high levels of Asian-American enrollment for years, and yet Defendants refuse to let go of its racial preferences for Asians. FF ¶¶42-44. The Academy has been using race in admissions for at least two decades, FF ¶185, and it didn't even *discuss* an end date until a few years ago, FF ¶188. Even today, it makes no real promise to stop: It merely "anticipates" that, once it reaches proportional representation, it will "no longer have a need" to consider race. P293 at 74.

310.     Even if it had a logical end point, the Academy's race-based admissions lacks an actual end point. Its use of race has no "'sunset date'"; it is "not set to expire … any time at all." *Harvard*, 600 U.S. at 225; *see id.* at 212 ("All race-conscious admissions programs … must have sunset provisions" (cleaned up)); *see* FF ¶188. The Academy's promises of "periodic review" cannot substitute for an endpoint. *Harvard*, 600 U.S. at 225. Its reviews also aren't very periodic (only four in twenty years, P293 at 74), and they aren't much of a review (the Academy refuses to model the effect of its racial preferences, FF ¶76).

311.     At a minimum, Defendants didn't prove that the Academy's race-based admissions will end "any time soon." *Harvard*, 600 U.S. at 225. Defendants offer no prediction for when the Academy will achieve proportional representation for blacks and Hispanics. FF ¶188. And like UNC, the Academy "suggests that it might soon use race to a *greater* extent than it currently does." *Harvard*, 600 U.S. at 225; *see* FF ¶193. If the Academy is truly interested in creating racial-minority flag officers, moreover, it will take *decades* to see if the midshipmen admitted today will ever reach those positions. FF ¶294.

### D. The Academy uses race as a negative.

312.   Equal protection demands that "race may never be used as a 'negative,'" yet the Academy's race-based admissions process "unavoidably" uses race in that way. *Harvard*, 600 U.S. at 218, 230.

313.   The Academy uses race as a negative in every way that Harvard and UNC did.

      a.   Under the Academy's process, "race is determinative for at least some … of the students [it] admit[s]." *Harvard*, 600 U.S. at 219. Under SFFA's model, race is determinative for dozens of black and Hispanic students each year. FF ¶75. Though Defendants didn't measure it, Dean Latta insisted that eliminating race-based admissions would cause the number of black and Hispanic admits to "drop dramatically." Tr.3 39:3-13.

      b.   The Academy uses race as a negative because, "in its absence, members of some racial groups would be admitted in greater numbers." *Harvard*, 600 U.S. at 219. Defendants reject SFFA's race-neutral alternatives precisely because they would change the racial percentages that "currently exis[t] at the Naval Academy." Tr.9 77:11–78:6 (closing).

      c.   The Academy provides a "benefit" to some racial groups "but not to others" in a "zero-sum" process. *Harvard*, 600 U.S. at 218-19. The Academy gives racial preferences to black, Hispanic, and Asian American applicants—but not to whites. FF ¶41. And the Academy's admissions process is zero sum. FF ¶6. Because there are more applicants than seats, applicants must compete against each other; and a "benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Harvard*, 600 U.S. at 218-19.

314.   Race is a negative in the Academy's process, even assuming that "race is not considered at all" for some offers of appointment. Doc.109 at 28. Every admissions process has students for whom race plays no role: either because they're so impressive that they'd get in regardless of race, or because they're so uncompetitive that they'd be denied regardless of race. At Harvard, for example, only a "'small percentage'" of applicants were "competitive enough" to be considered for admission. Harvard-Br.15-16, 2022 WL 2987146 (U.S. July 2022). Yet the Supreme Court still found that Harvard used race as a negative. For one thing, universities cannot argue that "race is not a negative factor because it does not impact many admissions decisions" while also arguing, as the Academy does, that "the demographics of their admitted classes would meaningfully change if race-based admissions were abandoned." *Harvard*, 600 U.S. at 219; *see* FF ¶77. For another thing, universities fail strict scrutiny if even one "*individual's* race" is "used against him in the admissions process," *id.* at 218 (emphasis added), as it is for numerous white applicants in all (or nearly all) parts of the Academy's admissions process, *see* FF ¶¶45-56.

### E.   The Academy engages in racial stereotyping.

315.   Equal protection also demands that "race may never be used as a stereotype," yet the Academy's race-based admissions process engages in "stereotyping." *Harvard*, 600 U.S. at 218, 220.

316.   Throughout this case, Defendants have misunderstood *Harvard*'s holding on stereotyping. The Supreme Court held that *all* admissions systems that use racial classifications engage in stereotyping. "[R]ace-based admissions programs" stereotype because "some students may obtain preferences on the basis of race alone." *Id.* at 220. They assume there is an "inherent benefit in race *qua* race," that race "'bring[s] something'" or "'says something.'" *Id.*

The racial classification itself "further[s] stereotypes that treat individuals as the product of their race." *Id.* at 221 (cleaned up). So "*when a university admits students on the basis of race*, it engages in the offensive and demeaning assumption that students of a particular race, because of their race, think alike—at the very least alike in the sense of being different from nonminority students." *Id.* at 221-22 (emphasis added; cleaned up). The Court "forcefully rejected the notion that government actors may intentionally allocate preference to those who may have little in common with one another but the color of their skin." *Id.* at 220 (cleaned up).

317.    The Academy's race-based admissions cannot escape this holding. It gives preferences based on race, FF ¶40, ¶¶40-44, ¶¶64-65, which is why it concedes that it must satisfy strict scrutiny, CL ¶250. And by tying itself to *Grutter*, the Academy concedes that it uses race just like Harvard and UNC did. FF ¶¶83-84, ¶¶186-87. Though Defendants deny that the Academy assumes all racial minorities think alike, Harvard and UNC of course denied that charge too. *See, e.g.*, Harvard-Br.33, 2022 WL 2987146 ("Harvard considers whether race adds another dimension to otherwise highly qualified candidates precisely because minority students do not all share a monolithic experience of being a racial minority.… Acknowledging that race, among many other characteristics, is part of an applicant's background is not remotely the same as assuming that race predicts or determines how individuals act or think" (cleaned up)). But they lost because race-based admissions necessarily rest on that kind of stereotyping, "at the very least" on a high level. *Harvard*, 600 U.S. at 219-21.

318.    Defendants here explicitly assume that racial minorities, by virtue of their race, are "different from nonminority students." *Id.* at 221-22. They frequently glom all nonwhite races together into a single category called "minority." *E.g.*, P39 ("Minority Accept Rate"); P41

("Minority SAT Average"); P45 (similar); P67 ("Minority" application completion rate); P100 at USNA-00018695 ("[i]nterest in attending USNA among … minority students" and "representation of minority students at USNA"); P101 (target application and enrollment numbers for Summer STEM program are "2,668 minorities" and "224 minorities"); P121 at USNA-00020573 ("Minority composition" of brigade); P138; P141 ("Minority graduation rates"); P142 (reporting percentages for "caucasian Midshipmen" and "Minority midshipmen"); P143 at USNA-00023879 (percentage of "minority" midshipmen who major in STEM fields); P151; P167; P173; P386; P558.

319.    Despite their denials, moreover, Defendants sometimes do assume that race is correlated with people's views, backgrounds, experiences, and perspectives. Their "lethality" and "cohesion" arguments, for example, assumes that racial diversity yields overall, broad-based diversity of viewpoints, experiences, and backgrounds—the same assumption that Harvard and UNC were making. *E.g.*, FF ¶122, ¶120, ¶92; *see Harvard*, 600 U.S. at 220.

320.    Even if the Academy's race-based admissions didn't engage in the stereotyping identified in *Harvard*, the Academy's use of race creates other, new stereotypes. For example:

      a.    The "recruitment" and "retention" arguments assume that racial minorities care about the racial percentages of the officer corps. *E.g.*, FF ¶161, ¶167.

      b.    The cohesion argument even worries that racial minorities might riot if the racial percentages are off. *E.g.*, FF ¶150, ¶154, ¶114, ¶142.

      c.    The retention argument also assumes that racial-minority officers are more likely to stay in the military if they have mentors of the same race. *E.g.*, FF ¶167.

d.     The "legitimacy" argument assumes that racial minorities, the broader American public, and even other countries care about the racial percentages of the U.S. military's officer corps. *E.g.*, FF ¶¶175-76.

e.     The "legitimacy" argument also assumes that racial minorities are more likely than non-minorities to connect with other cultures. *E.g.*, FF ¶177, ¶179.

321.   Defendants cannot transform impermissible stereotypes into compelling interests by relabeling them "professional military judgments." Doc.109 at 29. Defendants' so-called judgments about race are not based on any studies or evidence presented here. *E.g.*, FF ¶106, ¶¶116-17, ¶125, ¶151, ¶159, ¶165, ¶169, ¶182. And their military witnesses often denied any necessary connection between race and the asserted interests. *E.g.*, FF ¶87, ¶104, ¶171.

### F.     The Academy failed to consider and implement workable race-neutral alternatives.

322.   A race-based admissions process is not narrowly tailored if it is not "'necessary' for a university to use race to achieve" the benefits it seeks. *Fisher I*, 570 U.S. at 312; *accord Harvard*, 600 U.S. at 207. Race is not necessary if "a university could achieve sufficient diversity without using racial classifications." *Fisher I*, 570 U.S. at 312.

323.   Defendants must prove that the Academy considered race-neutral alternatives "*before* turning to racial classifications." *Id.* (emphasis added); *accord Parents Involved*, 551 U.S. at 735 ("[R]acial classifications [are] permitted only 'as a last resort.'"). And that consideration must be "serious" and in "good faith." *Grutter*, 539 U.S. at 339.

324.   Defendants also must prove that the Academy, in fact, has "no workable race-neutral alternatives." *Fisher I*, 570 U.S. at 312. A race-neutral alternative does not need to be

perfect; it only needs to achieve the benefits of diversity "'about as well and at tolerable administrative expense.'" *Id.*

325.    Defendants fail both requirements.

326.    Defendants have not considered race-neutral alternatives in good faith, either today or before the Academy turned to racial classifications. Defendants never studied the Coast Guard's success to see if it could be duplicated at the Naval Academy; never conducted any modeling to determine what would happen if the Academy stopped using race; and conducted no meaningful studies into the availability of race-neutral alternatives. FF ¶¶236-39. Informally reviewing a few spreadsheets of admissions data, FF ¶239, is not a "serious" and "good faith" consideration of race-neutral alternatives, *Grutter*, 539 U.S. at 339; *see* FF ¶239.

327.    Even today, Academy officials have no idea what would happen if they eliminated racial preferences. FF ¶76, ¶82. And unlike Harvard and UNC, Defendants presented *no simulations* showing how the Academy's class would change under various race-neutral alternatives. FF ¶238; *cf. Harvard*, 397 F. Supp. 3d at 178-81 (Harvard's experts "examined numerous race-neutral alternatives," including "eliminating early action, tips for ALDC applicants, the practice of offering deferred admissions or z-listing applicants, and consideration of standardized test scores" and "expanding recruiting and partnership efforts, admitting more transfer students, utilizing a place-based quota system, and expanding preferences for economically disadvantaged applicants"); *id.* at 179 ("Professor Card reasonably estimated that eliminating tips for race and ALDC status, along with eliminating deferred admissions, would cause African American enrollment to decline from 14% to 5% and Hispanic enrollment to decline from 14% to 9%."); *UNC*, 567 F. Supp. 3d at 640-48 (UNC's expert "completed 109

simulations" of race-neutral alternatives, including "socioeconomic simulations," "top X percent simulations," and "geography-based simulations").

328.    Moreover, the Academy has numerous workable alternatives to racial preferences to achieve diversity in the Brigade of Midshipmen. The Academy can maintain racial diversity and increase diversity more broadly by, among other things, increasing socioeconomic preferences. *See* FF ¶¶241-42, ¶¶230-33.

329.    For example, under Simulation 9 (which uses a small socioeconomic preference and a boost in recruiting), the Academy would obtain higher levels of racial diversity, higher levels of socioeconomic diversity, and a similarly strong level of academic preparedness. FF ¶244.

330.    SFFA presented a menu of other race-neutral alternatives that would produce a high level of racial diversity, expand socioeconomic diversity, and increase the class's academic preparedness. FF ¶¶241-42, ¶246.

331.    SFFA's race-neutral alternatives can be implemented at tolerable expense. FF ¶245.

## CONCLUSION

This Court should enter judgment in favor of Plaintiff and against Defendants. It should declare that the Academy's race-based admissions process fails strict scrutiny. It should enjoin Defendants from considering race as a factor in Academy admissions.

Respectfully submitted,

*/s/ Thomas R. McCarthy*

Adam K. Mortara*
Lawfair LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154

Thomas R. McCarthy*
Patrick Strawbridge*
J. Michael Connolly*
Cameron T. Norris
James F. Hasson*
R. Gabriel Anderson*
Consovoy McCarthy PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com

*pro hac vice

# CERTIFICATE OF SERVICE

On October 2, 2024, I e-filed this document with the Court, which will email all parties.

*/s/ Thomas R. McCarthy*