**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS,<br><br>        *Plaintiff*,<br><br>   v.<br><br>THE UNITED STATES NAVAL<br>ACADEMY, *et al.*,<br><br>        *Defendants*. | Case No. 1:23-cv-02699-RDB |

**DEFENDANTS' POST-TRIAL PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

PROPOSED FINDINGS OF FACT .............................................................................. 2

I.     The Military's Compelling National Secuirty Interest in a Diverse Officer Corps ........... 2

     A.     A Diverse Officer Corps is Vital to National Security ........................................... 3

          1.     Unit Cohesion and Lethality ................................................. 8

          2.     Recruitment and Retention ................................................. 20

          3.     Domestic and International Legitimacy ................................................. 30

     B.     The Military's Judgment Is Informed by History ................................................. 33

          1.     The Importance of History to the U.S. Military ................................................. 33

          2.     World Wars I and II ................................................. 33

          3.     Korean War and Integration ................................................. 36

          4.     Vietnam War ................................................. 87

          5.     Focus on Diversifying the Officer Corps ................................................. 43

II.     The United States Naval Academy ................................................. 47

     A.     Structure of the Admissions Office ................................................. 51

     B.     Steps to Apply to the Naval Academy ................................................. 53

     C.     The Nomination Requirement ................................................. 55

     D.     Criteria Considered for Admission ................................................. 59

          1.     The Whole Person Multiple ................................................. 59

          2.     Personal Essay ................................................. 61

          3.     Personal History and Family Background Information ................................................. 62

          4.     Candidate Academic Information Form ................................................. 63

          5.     Blue and Gold Officer Interviews ................................................. 64

          6.     Athletic Activities ................................................. 65

          7.     Socioeconomic Information ................................................. 66

     E.     The Admissions Board's Review of a Candidate ................................................. 66

     F.     The Slate Review Committee's Review of a Candidate ................................................. 70

     G.     The Naval Academy's Preparatory Schools ................................................. 74

     H.     The Naval Academy's Limited Consideration of Race ................................................. 76

          1.     The Manner in Which the Naval Academy Considers Race ................................................. 76

        2.      <u>Plaintiff's Statistical Analysis of the Naval Academy's Consideration of Race is Unreliable</u>.................................................................... 82

    I.    Race-Neutral Efforts ........................................................................ 100

        1.      <u>The Naval Academy's Race-Neutral Efforts</u> ........................................ 100

        2.      <u>Plaintiff's Race-Neutral Alternatives Expert</u> ........................................ 105

III.   The Navy and Marine Corps' Closed Personnel System ................................................ 113

    A.    Service Assignments .................................................................... 113

    B.    Accession Sources and Policies .................................................................... 115

PROPOSED CONCLUSIONS OF LAW .................................................................... 118

I.    Standard Applied to Admissions Policies that Consider Race ........................................ 118

II.   Deference to the Executive in Matters of National Security ........................................ 119

III.  The Government Has Established Its Distinct National Security Interests ................... 123

IV.  The Naval Academy's Admissions Process Is Narrowly Tailored................................ 126

    A.    The Naval Academy Considers Each Candidate as an Individual...................... 127

    B.    The Naval Academy Does Not Engage in Racial Balancing or Quotas ............. 130

    C.    The Naval Academy's Limited Consideration of Race Furthers the Government's Compelling National Security Interests ...................................... 132

        1.      <u>Naval Academy Graduates Have an Outsized Impact on the Officer Corps</u>.................................................................... 132

        2.      <u>The Naval Academy's Consideration of Race is Not Overinclusive</u>............ 135

        3.      <u>The Naval Academy's Consideration of Race Does Not Impair its Ability to Commission Qualified Officers into the Navy and Marine Corps</u> ........... 136

        4.      <u>The Naval Academy Employs Racial and Ethnic Categories That Further the Interest It Seeks</u>.................................................................... 137

    D.    The Naval Academy Does Not Use Race As a Negative or as a Stereotype...... 137

    E.    The Naval Academy Does Not Intend to Use Race and Ethnicity as a Factor in its Admissions Process Indefinitely.................................................................... 140

    F.    The Naval Academy Has Undertaken Serious, Good Faith Consideration of Race-Neutral Alternatives .................................................................... 143

CONCLUSION.................................................................... 147

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Estepp*,
  95 F.3d 312 (4th Cir. 1996) ............................................................................ 131

*Austin v. U.S. Navy SEALs 1-26*,
  142 S. Ct. 1301 (2022) ......................................................................... 122, 123

*Berry v. Bean*,
  796 F.2d 713 (4th Cir. 1986) ........................................................................ 122

*Burns v. Wilson*,
  346 U.S. 137 (1953) ...................................................................................... 122

*Chappell v. Wallace*,
  462 U.S. 296 (1983) ...................................................................................... 121

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*,
  333 U.S. 103 (1948) ...................................................................................... 141

*Dep't of Navy v. Egan*,
  484 U.S. 518 (1988) ............................................................................ 119, 121

*Doe 2 v. Shanahan*,
  917 F.3d 694 (D.C. Cir. 2019) ..................................................................... 120

*Doolen v. Wormuth*,
  5 F.4th 125 (2d Cir. 2021) ............................................................................ 122

*Eisenberg v. Montgomery Cnty. Pub. Schs.*,
  197 F.3d 123 (4th Cir. 1999) ........................................................................ 132

*Fisher v. Univ. of Tex. at Austin*, ("*Fisher I*")
  570 U.S. 297 (2013) ...................................................................................... 118

*Fisher v. Univ. of Texas at Austin*, ("*Fisher II*")
  579 U.S. 365 (2016) ................................................................................ *passim*

*Gilligan v. Morgan*,
  413 U.S. 1 (1973) ................................................................ 119, 120, 121, 123

*Goldman v. Weinberger*,
  475 U.S. 503 (1986) ................................................................................ *passim*

*Grutter v. Bollinger*,
  288 F.3d 732 (6th Cir. 2002) ........................................................................ 127

*Grutter v. Bollinger*,
   539 U.S. 306 (2003) ................................................................................................ *passim*

*Haig v. Agee*,
   453 U.S. 280 (1981) ...................................................................................................... 121

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) .................................................................................................. 122, 125

*Hrdlicka v. Del Toro*,
   No. RDB-22-2299, 2023 WL 4108267 (D. Md. June 21, 2023) ................................. 119, 122

*Johnson v. California*,
   543 U.S. 499 (2005) .............................................................................................. 126, 140

*Kreis v. Sec'y of Air Force*,
   866 F.2d 1508 (D.C. Cir. 1989) .................................................................................... 119

*Larsen v. U.S. Navy*,
   486 F. Supp. 2d 11 (D.D.C. 2007) ................................................................................ 124

*Orloff v. Willoughby*,
   345 U.S. 83 (1953) ........................................................................................................ 122

*Richmond v. J.A. Croson Co.*,
   488 U.S. 469 (1989) ...................................................................................................... 126

*Roe v. Dep't of Def.*,
   947 F.3d 207 (4th Cir. 2020) ........................................................................................ 121

*Rostker v. Goldberg*,
   453 U.S. 57 (1981) ................................................................................ 121, 122, 123, 124

*Schlesinger v. Councilman*,
   420 U.S. 738 (1975) ...................................................................................................... 122

*Seattle Sch. Dist. No. 1*,
   551 U.S. 701 (2007) ...................................................................................................... 118

*Selland v. Perry*,
   905 F. Supp. 260 (D. Md. 1995) ............................................................................ 120, 122

*SFFA v. Harvard*,
   397 F. Supp. 3d 126 (D. Mass. 2019) ............................................................................. 82

*SFFA v. UNC*,
   567 F. Supp. 3d 580 (M.D.N.C. 2021) ............................................................................ 82

*SFFA v. U.S. Naval Acad.,*
  707 F. Supp. 3d 486 (2023) .................................................................................... *passim*

*Harvard*
  600 U.S. 181 (2023) ................................................................................................ *passim*

*Trump v. Hawaii,*
  585 U.S. 667 (2018) ........................................................................ 122, 124, 141

*United States v. Nixon,*
  418 U.S. 683 (1974) ........................................................................................ 122

*Wimmer v. Lehman,*
  705 F.2d 1402 (4th Cir. 1983) ....................................................................... 122

*Winter v. Nat. Res. Def. Council,*
  555 U.S. 7 (2008) ................................................................................... 121, 125

*Wygant v. Jackson Bd. of Educ.,*
  476 U.S. 267 (1986) ...................................................................... 124, 144, 146

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ...................................................................... 120, 122

**Legislative Materials**

National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 557,
  134 Stat. 3637 (2021) ........................................................................................ 25

**Statutes**

10 U.S.C. § 136 ................................................................................................... 6

10 U.S.C. § 6954 ............................................................................................... 55

10 U.S.C. § 8451 ............................................................................................... 47

10 U.S.C. § 8454 ............................................................................................... 55

10 U.S.C. § 8456 ............................................................................................... 74

## INTRODUCTION

The evidence at trial has shown that this case is nothing like *Students for Fair Admissions v. President and Fellows of Harvard College*, 600 U.S. 181 (2023) ("*Harvard*").  The government's compelling national security interests are, in fact, "distinct."  600 U.S. 181, 213 n.4 (2023).  The United States Naval Academy's admissions process and applicant pool are also meaningfully different, constrained by a statutorily mandated nominations process, fitness and medical assessments, and other requirements absent from civilian universities.  And the Naval Academy is not a typical college; it is a military installation led by a three-star Admiral.  After leaving the Academy, its graduates are leading Sailors and Marines on missions around the world.

Witness after witness came before the Court to testify about the military's interest in a diverse officer corps.  There is no serious dispute that this national security interest is longstanding, bipartisan, and compelling.  The evidence demonstrated overwhelmingly that a more diverse officer corps makes a more effective fighting force:  more cohesive and lethal, more likely to attract and retain top talent, and more legitimate in the eyes of the nation and the world.  That judgment, informed by a painful history of racial tension in the military and backed by Congress, is entitled to deference.

The Naval Academy's limited consideration of race in the admissions process is narrowly tailored to serve the military's compelling national security interest.  The Academy treats each candidate as an individual and considers race as only one factor at limited points in the context of a holistic, individualized assessment.  Race is not used as a negative, does not operate as a stereotype, and is not applied as part of a quota.  And the Academy has seriously considered race-neutral alternatives in good faith.  Even Plaintiff's race-neutral alternatives expert acknowledges that no such alternatives exist that would permit the Academy to achieve the level

of diversity it seeks.  Accordingly, the United States respectfully requests that the Court enter

judgment in its favor.

## PROPOSED FINDINGS OF FACT

These proposed findings reflect the evidence presented during the trial conducted

between September 16 and September 26, 2024.  Fourteen witnesses testified on behalf of

Defendants:  (i) Ashish Vazirani, Performing the Duties of the Under Secretary of Defense for

Personnel and Readiness ("Under Secretary Vazirani"); (ii) Stephanie Miller, the Deputy

Assistant Secretary of Defense for Military Personnel Policy; (iii) Dr. Jeannette Haynie, a former

Senior Advisor to Mr. Vazirani and expert on the relevance of diversity and inclusion to the

military; (iv) Lisa Truesdale, the Deputy Assistant Secretary of the Navy for Military Manpower

and Personnel;[1] (v) Vice Admiral John V. Fuller, the Inspector General of the Department of the

Navy; (vi) Captain Jason Birch, the former commanding officer of Navy SEAL Team 10 and

current Third Battalion Officer at the Naval Academy; (vii) Professor Jason Lyall, a professor at

Dartmouth and an expert on diversity and battlefield performance; (viii) Dr. Stuart Gurrea, an

expert economist; (ix) Dr. Beth Bailey, an expert historian at the University of Kansas; (x) Dr.

John Sherwood, an expert historian at the Naval History and Heritage Command; (xi) Stephen

Bruce Latta, Dean of Admissions at the Naval Academy; (xii) Melody Hwang, Director of

Nominations and Appointments at the Naval Academy; (xiii) Steve Vahsen, Executive Director

for Strategy at the Naval Academy; and (xiv) Captain Ed Sundberg, Deputy Commandant for

Professional Development at the Naval Academy.

---

[1] Due to unavailability, Ms. Truesdale testified by deposition designations.

I.       **The Military's Compelling National Security Interest in a Diverse Officer Corps**

1.       For decades, senior military and civilian leaders have concluded that the nation's fighting force is stronger when it is racially and otherwise diverse at all levels.  Day 6 Tr. 146:24–147:17 (Haynie); P445 (2011 MLDC Report); P210 (DoD 2020 Board Report); DX194-016-020 (Haynie Report).  This military judgment has been reaffirmed across administrations by some of the nation's most respected military leaders, such as the former Chairmen of the Joint Chiefs of Staff, General Colin Powell and Admiral Mike Mullen.  Day 1 Tr. 166:25–168:15 (Walker).  Those leaders have concluded that "[f]or the United States military, a highly qualified and racially diverse officer corps is not a lofty ideal," but is "a mission-critical, national security interest."  *Id.* at 167:22–168:1.  "Based on decades of experience, the modern United States military regards a highly qualified . . . and racially and ethnically diverse officer corps as vital to military effectiveness."  *Id.* at 168:11–15.

2.       That military judgment remains true today.  As Secretary of Defense Lloyd Austin recently testified before Congress, "[b]uilding a talented workforce that reflects our nation . . . is a national security imperative" that "improves our ability to compete, deter, and win in today's increasingly complex global security environment."  P270 (Austin testimony) at 9.

3.       In particular, the United States Armed Forces have long recognized that the nation's military strength and readiness depend on a pipeline of officers who are both highly qualified and racially and ethnically diverse, and who have been educated and trained in environments that prepare them to lead increasingly diverse forces.  Day 6 Tr. 11:14–17 (Vazirani); Day 8 Tr. 82:4–7 (Miller); Day 6 Tr. 146:24–147:17 (Haynie); P507 (Truesdale Decl.).

### A.      A Diverse Officer Corps is Vital to National Security

4.      Since at least 1963, the military's senior leadership has determined that a diverse

officer corps is vital to mission success and national security.  Day 6 Tr. 11:14–17 (Vazirani)

(military has made this judgment "since post-World War II"); Day 8 Tr. 82:4–7 (Miller).

5.      As explained below, this judgment was informed by a history of racial tensions in

the military.  The military has continued to evaluate the issue and has repeatedly affirmed its

judgment.

6.      In 2009, Congress, "[r]ecognizing existing disparities and seeking to look ahead,"

mandated the creation of the Military Leadership Diversity Commission (MLDC).  P445 (MLDC

Report) at USNA-00011611.  The Commission, made up of thirty active and retired military

leaders from all branches of services, "conduct[ed] a comprehensive evaluation and assessment

of policies that provide opportunities for the promotion and advancement of minority members

of the Armed Forces, including minority members who are senior officers."  *Id.*  The

Commission concluded that the Armed Forces must "develop a demographically diverse

leadership that reflects the public it serves and the forces it leads."  *Id.* at USNA-00011617.  The

Commission underscored the importance of "[d]evelop[ing] future leaders who represent the face

of America and are able to effectively lead a diverse workforce," because it would "inspire future

servicemembers," "engender trust among the population," and foster trust and confidence

"between the enlisted corps and its leaders."  *Id*. at USNA-00011634, USNA-00011670.

7.      The Department of Defense reaffirmed the MLDC's conclusions in its 2012

Strategic Plan on Diversity and Inclusion, explaining that "[d]iversity is a strategic imperative,

critical to mission readiness and accomplishment, and a leadership requirement."  DX137-004

4

(Strategic Plan).  The Department further explained why a racially and ethnically diverse fighting

force is a strategic imperative:

> We defend the greatest nation in the world—a democracy founded on the promise
> of opportunity for all.  It is a nation whose demographic makeup parallels the
> environment in which we live—continually changing—and DoD must change to
> maintain and sustain its future forces.  To the degree we truly represent our
> democracy, we are a stronger, and more relevant force.  The Department views
> diversity as a strategic imperative.  Diverse backgrounds and experiences bring
> inherently different outlooks and ways of thinking, the key to innovation in
> organizations.  We gain a strategic advantage by leveraging the diversity of all
> members and creating an inclusive environment in which each member is valued
> and encouraged to provide ideas critical to innovation, optimization, and
> organizational mission success.

*Id.*; *see also* DX20-001 (2013 Marine Corps memo "conclud[ing] it is imperative that the Corps

take a fresh approach to diversity, one that reflects our reputation for performance and

leadership").

8.      In 2020, then-Secretary of Defense Mark Esper directed the creation of "an

internal DoD Board on Diversity and Inclusion to undertake a more comprehensive evaluation

and assessment of military policies, processes, and practices to improve racial diversity in our

ranks."  DX177-002 (Esper Memo).  Secretary Esper noted that "[t]o ensure the morale,

cohesion, and readiness of the military, it is essential that our ranks reflect and are inclusive of

the American people we have sworn to protect and defend."  *Id.* at 001; Day 6 Tr. 12:24–13:2

(Vazirani).

9.      In accordance with Secretary Esper's direction, the Department established a 15-

member Board, chaired by the Secretary of the Air Force, with the support of the Senior Enlisted

Advisor to the Chairman of the Joint Chiefs of Staff, the Under Secretary of Defense for

Personnel and Readiness, and officers and enlisted members from each service branch.  P210

(Board Report).  The Board evaluated the military's policies, reviewed data and reports, and

made recommendations on how to improve diversity and inclusion in the military.  *Id.* at USNA-

00012627.  The Board emphasized that the Department of Defense "recognize[d] diversity and
inclusion . . . as strategic imperatives—to ensure that the military across all grades reflects and is
inclusive of the American people it has sworn to protect and defend."  *Id.* at USNA-00012626.
The Board concluded that "appropriate representation of minorities in military leadership
positions is increasingly important in the context of the nation's demographic trends."  *Id.* at
USNA-00012640; *see also* DX179 (Acting Secretary of Defense Christopher C. Miller directing
implementation of the Board's recommendations).

       10.     The Board's judgment remains the judgment of the Department of Defense today.
Day 6 Tr. 9:6–8; *id.* at 11:8–10 (Vazirani).  Ashish Vazirani is Performing the Duties of the
Under Secretary of Defense for Personnel and Readiness.  *Id.* at 4:4–5; *see* 10 U.S.C. § 136.  He
reports directly to the Secretary of Defense and serves as the Secretary's principal staff assistant
on personnel and readiness matters.  Day 6 Tr. 4:7–13; *id.* at 5:9–10 (Vazirani).  In that position,
he advises the Secretary on military readiness, which is the ability of the nation's forces to fight
and meet the demands of mission assignments and the Department's "strategic objectives over
and across threats and different time horizons."  *Id.* at 4:19–5:2.

       11.     Mr. Vazirani testified that, as reflected in the 2022 National Defense Strategy, the
Department of Defense believes that "[t]o meet this moment," it must "tap into our core
strengths:  our dynamic, diverse and innovative society; our unmatched network of allies and
partners; and the tremendous men and women of our armed forces."  Day 6 Tr. 8:4–10
(Vazirani); DX45-006 (2022 National Defense Strategy).  The Department views the United
States' diversity "as a strength that our competitors cannot match and part of the foundation for a
defense strategy that will keep America secure, prosperous, and free."  Day 6 Tr. 10:15–25
(Vazirani).

12.     The Department of the Navy also holds this judgment.  Lisa Truesdale is the

Deputy Assistant Secretary of Military Manpower Personnel for the Department of the Navy.

DX210 Tr. 6:2–6 (Truesdale).  A member of the Senior Executive Service, Ms. Truesdale is

responsible for the establishment and oversight of policies related to U.S. Navy and U.S. Marine

Corps active and reserve component service members and their families, including, among other

responsibilities, human resource management (accessions, recruiting, assignments, force

management, promotions, and compensation).  P507 (Truesdale Decl.) ¶¶ 2–3.

13.     Ms. Truesdale explained that a "highly qualified, diverse Navy and Marine Corps

officer corps, educated and trained to command and lead our Nation's racially diverse forces is

essential to the [Department of the Navy's] ability to fulfill its principal missions and to provide

national security."  P507 (Truesdale Decl.) ¶ 6.  Accordingly, Ms. Truesdale explained that the

Navy has made a military judgment that a racially diverse officer corps is necessary for mission

execution and maritime dominance, recruitment and retention, and the Navy's legitimacy in the

United States and abroad.  *Id.* ¶ 7.  This judgment was made over decades by senior military and

civilian leaders, including the Secretary of the Navy, the Chief of Naval Operations, and the

Marine Corps Commandant.  DX210 Tr. 33:18-21; *id.* 34:5-35:6 (Truesdale).

14.     As recently as 2024, Congress identified an underrepresentation of racial and

ethnic minorities in the Military Service Academies as a concern, and directed that the

Secretaries of Army, Navy, and Air Force take measures to increase the racial, ethnic, gender

and socioeconomic diversity of the incoming classes.  DX128-002 (Senate Armed Services

Report on FY2024 NDAA).

15.     As detailed below, the military has made the judgment that diversity in the officer

corps (1) fosters cohesion and lethality; (2) aids in recruitment of top talent and increases

retention; and (3) bolsters its legitimacy in the eyes of the nation and the world.  *See, e.g.*, Day 7

Tr. 108:15–18 (Fuller); Day 8 Tr. 81:1–25 (Miller).[2]

        1.    <u>Unit Cohesion and Lethality</u>

    16.    The military has determined that a lack of internal unit cohesion jeopardizes

mission success.  General James Mattis, then-Commander of United States Joint Forces

Command and later Secretary of Defense, noted in 2010:

> I don't care how tactically or operationally brilliant you are, if you cannot create
> harmony—even vicious harmony—on the battlefield based on trust across service
> lines, across coalition and national lines, and across civilian/military lines, … your
> leadership in today's age is obsolete.

P445 (MLDC Report) at USNA-00011618.

    17.    "Increased diversity of the officer corps helps [the military] from an operational

perspective by improving unit cohesion and trust," which is "critical to the ability for a unit to

carry out its mission."  Day 6 Tr. 14:9–15 (Vazirani).  "By increasing unit cohesion and trust,

that increases communication, . . . increases a better understanding of mission requirements,

and . . . increases trust in the officers that lead that particular unit."  *Id.*  As units become more

cohesive, "it will improve their proficiency and their effectiveness and therefore their lethality."

*Id.* at 16:1–5 ; *see also* Day 7 Tr. 110:6–21 (Fuller); Day 7 Tr. 23:7–10 (Lyall) ("[T]rust is

essential for a military to be able to perform on the battlefield.  Inequality can destroy the trust

necessary to be lethal on the battlefield.").

---

[2] During closing arguments, Plaintiff suggested that "until very . . . recently," the Naval
Academy asserted only an interest in the educational benefits of diversity, as opposed to these
distinct national security interests.  Day 9 Tr. 22:17–23:11 (citing P31 (2022 Memo for the
House Armed Services Committee)).  That is incorrect.  In the same 2022 memo on which
Plaintiff relies, the Naval Academy made clear that maintaining a diverse student body prepares
midshipmen for "the roles and responsibilities that will be expected of them as Navy and Marine
Corps Officers leading a diverse Fleet routinely conducting operations in a diverse world," which
is precisely the national security interest that the Academy asserts today.  P31 at USNA-
00000389.

18.     Unit cohesion is especially important in a shipboard environment.  Day 7 Tr. 110:23–111:23 (Fuller).  On a ship, different divisions combine into departments that are led by a commanding officer.  *Id.* at 111:2–23.  Because the ship is operating "24/7," it is "a constantly operating environment" that "requires a lot of unit cohesion where the teams are working well together."  *Id.*  Unit cohesion "is the glue that keeps the ship operating safely and, when necessary, will make sure they are able to operate lethally in a combat situation."  *Id.*

19.     A diverse officer corps furthers unit cohesion and trust because "[a]n officer corps that's diverse and is drawing from a range of different experiences" is better "able to understand the people that they lead."  Day 6 Tr. 16:8–14 (Vazirani); *see also* Day 7 Tr. 108:13–18 (Fuller). A diverse officer corps is better "able to address problems from different perspectives, having learned from people with different perspectives, and then be able to carry out a mission more effectively."  Day 6 Tr. 16:8–14 (Vazirani).  As Vice Admiral Fuller testified, a diverse officer corps helps create "an environment where you have respect," are "able to work through unscripted scenarios," and can "operate . . . coherently."  Day 7 Tr. 112:1–6 (Fuller).  "[W]hen you have a wide array of experiences, you're able to adapt more eloquently to unscripted or even difficult situations."  *Id.* at 114:13–23.  A diverse officer corps also helps to "mitigate the risk of having groupthink or being unable to think outside the problem."  *Id.*  As the officer corps has become more diverse in recent decades, the Department of Defense has "seen the impact of improved diversity on the organizational climate and performance of units."  Day 6 Tr. 18:12–18 (Vazirani).[3]

---

[3] During closing arguments, Plaintiff suggested that the government "shift[ed]" its focus away from its interest in "fostering cohesion and lethality" midway through the trial.  Day 9 Tr. 31:6–17.  That is incorrect.  Plaintiff's sole basis for its assertion is Vice Admiral Fuller's testimony that racial diversity alone will not necessarily make a ship better at specific tasks, such as

20.     A lack of racial diversity in the officer corps can also present operational challenges, such as increased incidents of racial discrimination, which are antithetical to unit cohesion.  For example, Captain Jason Birch testified that while he was assigned to SEAL Team 8, a Black special operator was subject to racially discriminatory behavior when the operator's biography was altered to reflect racial stereotypes, such as references to his hair as "nappy" and "brill[o]-like," and comments on "the size of his lips." Day 5 Tr. 29:2–30:13 (Birch).  Captain Birch testified that had it not been for the presence of a Black officer on SEAL Team 8, the operator may not have reported the incident.  *Id.* at 30:18–25.  The incident harmed unit cohesion as it "tore at the trust" on the team, "brought down morale," and forced the team to "take some individuals offline" while a portion of the team was deployed.  *Id.* at 31:14–32:9; *see also* DX205 & DX206 (reflecting discipline imposed on perpetrators).  Taking SEALs "offline" has serious operational consequences, as it involves changing or relieving team members of their responsibilities or flying them back to headquarters to physically remove them from the environment.  Day 5 Tr. 31:21–32:4 (Birch).

21.     Surveys of servicemembers further demonstrate that the discriminatory behavior described by Captain Birch is not isolated.  In 2020, the Inspector General of the Department of the Air Force conducted an "Independent Racial Disparity Review," which found that 50% of black enlisted Airmen said they had been discriminated against by a member of the Air Force because of their race or ethnicity.  DX192-105; *see also, e.g.*, DX169-020 ("Significant racial

---

launching Tomahawk missiles or detecting enemy submarines.  Day 7 Tr. 115:11–22.  But immediately following that exchange, Admiral Fuller—like all of Defendants' witnesses— testified that the benefits of diversity include "people who treat each other with respect, people who think through difficult problems, and people who are not overwhelmed by unusual problems."  *Id.* at 115:23–116:16; *see also id.* at 108:15–18, 111:21–23 ("[a] diverse officer corps helps with unit cohesion[,]" which is "the glue that keeps the ship operating safely and, when necessary, will make sure they are able to operate lethally in a combat situation").

disparities exist across the investigative and military justice systems.").  Plaintiff's expert

witness, General Christopher Walker, agreed that racial prejudice exists in the military today and

that because "the military is a microcosm of society[,] it would be ridiculous . . . [to] say that

there are no racists in the military."  Day 1 Tr. 169:23–25 (Walker).

22.     At a strategic level, "having diversity in the officer corps . . . helps [the military]

innovate by having an officer corps that has an ability to see problem sets from different

perspectives."  Day 6 Tr. 14:9–24 (Vazirani).  This "helps [the military] understand various risks

and mitigate risks."  *Id.*; *see also id.* at 19:25–20:5.  For example, in Iraq and Afghanistan, the

Department of Defense found that the inclusion of women in combat units "led to the ability for

those units to engage more effectively with the communities that they engaged with."  *Id.* at

20:15–25.  Women in those combat units "allowed for a level of communication that improved

with the communities th[ey] . . . were engaged [in] and, as a result, improved the effectiveness."

*Id.*  Vice Admiral Fuller believes that the racial and ethnic diversity of the officer corps is a

strategic advantage over other nations, particularly those that are ethnically homogenous.  Day 7

Tr. 116:2–7 (Fuller).

23.     Several witnesses testified about their personal experience that diverse units are

more cohesive.  Mr. Vazirani testified about his experience as being the only officer of color in a

12-officer wardroom while serving on a submarine.  Day 6 Tr. 16:17–21 (Vazirani).  Mr.

Vazirani found that, as he was serving, "certain members of [the] crew[] would reach out to

[him] to engage just to gain a perspective of how to fit in within a crew where they were

underrepresented."  *Id.* at 16:22–25.  That "created an avenue for communication and trust."  *Id.*

at 16:25–17:1; *see also id.* at 17:7–14 (discussing example of young African American

torpedoman who went to Mr. Vazirani for advice).

24. Vice Admiral Fuller similarly testified about his experiences on single-gender and mixed-gender ships. Day 7 Tr. 112:20–25 (Fuller). In his judgment, there was a "greater degree of respect and [a] greater sense of professionalism [with] a mixed-gender crew." *Id.* at 112:25–113:2.[4] Vice Admiral Fuller also testified about how his presence as a Black officer on a ship helped to change other officers' perspectives, including one of his commanding officers, who had initially held biases against him because he was a Black football player. *Id.* at 113:12–114:10.

25. Internal and external studies confirm the military's judgment that diversity and inclusion support military effectiveness. Dr. Jeanette Haynie, a Marine Corps combat veteran who graduated from the Naval Academy and served as a Senior Advisor to Under Secretary of Defense for Personnel and Readiness, testified that in her expert opinion, and based upon a wealth of research, diversity and inclusion support military effectiveness and mission accomplishment. Day 6 Tr. 96:18-20; *see also* DX194–002–010 (Haynie Report). Professor Lyall, the James Wright Chair in Transnational Studies at Dartmouth College, likewise testified that study after study conclude that racial and ethnic diversity is an advantage in modern combat. Day 7 Tr. 15:19–22; *see also* DX195–004–007 (Lyall Report).

26. As Dr. Haynie explained, because "war is at heart a human endeavor," and "to fully understand war . . . we need to understand that people are impacted differently in war, and we need to take those opinions and use them to make . . . decisions in conflict and security decision-making." Day 6 Tr. 97:1–99:2. "No degree of technological development or scientific

---

[4] Ms. Miller and Dr. Haynie testified about the relevance of gender diversity in this context. *See, e.g.*, Day 8 Tr. 106:13–25 (Miller) (examples from gender context are relevant to showing that "shared experiences [can] lead to positive outcomes for recruiting and retention); Day 6 Tr. 117:15–118:4 (Haynie).

calculation will diminish the human dimension in war." DX174-023 (Warfighting). This is reflected in military doctrine, including *Warfighting*, the Marine Corps' foundational manual that lays out its philosophy and approach to duty in war, in crisis, and in peace. Day 6 Tr. 99:3–18 (Haynie); DX174-022–023 (Warfighting).

27.     The Department of Defense has conducted studies on the benefits of diversity and inclusion in the military. Day 6 Tr. 102:18–22 (Haynie). For example, in 2022, the Department's Office of People Analytics (OPA) evaluated the relationship between diversity and inclusion climates in the military and key military readiness outcomes. P275 (2022 OPA Study). Using statistical analysis, cluster analysis, and regression models, the authors analyzed active-duty survey response patterns and three years of associated personnel records and concluded that servicemembers who characterized their diversity climates as "healthy"—citing factors such as supervisors' attention to and efforts to stop "racial/ethnic harassment"—ranked their units' readiness far higher than those who characterized their diversity climates as "unhealthy." *Id.* at 7. Those who characterized their diversity climates as unhealthy—with corresponding lower levels of readiness—were more likely to identify as underrepresented groups, such as racial or ethnic minorities. *Id.*

28.     As Dr. Haynie explained, this 2022 OPA Study "tells us [about] the importance of building teams through leaders who can recognize how different people may be impacted by climates and to help mitigate these obstacles and barriers and build unit morale and cohesion in order to accomplish the mission." Day 6 Tr. 110:5–13 (Haynie).

29.     Academic research further teaches that diverse and inclusive teams can benefit from a "diversity bonus." Day 7 Tr. 18:3–5 (Lyall). Diverse teams are better at solving problems, are more innovative and flexible in how they approach problems, and are more

resilient and adaptive to surprises.  *Id.* at 18:6–19; Day 6 Tr. 101:25–102:6 (Haynie)

("[R]esearch talks about how diverse teams can bring increased innovation and creativity."); Day

6 Tr. 124:6–14 (Haynie) ("[Research] says there are ways in which diverse and inclusive teams

can provide benefits such as increased creativity and innovation [and] problem-solving in

complex environments.  And it talks about homogeneity in teams as being a risk and

vulnerability because it can have the opposite effect."); DX195-008 (Lyall Report); P275 (2022

OPA Study) at 16 (noting that diversity "is associated with improved performance outcomes");

DX168-006 (Schuette Paper) (summarizing research in this area); DX188 (Rock & Grant article)

(summarizing research); DX135 (article on how "groups of diverse problem solvers can

outperform groups of high-ability problem solvers"); DX16-018 (diverse teams are more

innovative and more likely to accurately assess a situation); DX22-051–052 (discussing benefits

of diversity to Marine Corps).[5]

     30.    For example, a 2022 RAND study—*Leveraging Diversity for Military*

*Effectiveness*—summarizes the academic literature on this issue.  P597.  The research team

"conducted a comprehensive review of existing academic and non-academic literature . . . to

identify existing findings regarding links between diversity and organisational effectiveness in

the military, as well as in related contexts (*e.g.*, international development, peacekeeping and

research and development)."  *Id.* at USNA-00033394.  As the study explains, "Supported by a

growing body of literature on diversity and inclusion, many military organisations now recognise

---

[5] Dr. Haynie acknowledged that the Department of Defense has not conducted a wide-ranging study that examines whether diverse teams solve complex problem sets better than nondiverse ones in the military setting.  Day 6 Tr. 124:15–21.  As she explained, there would be logistical and ethical constraints that would make conducting such a study difficult.  *Id.* at 124:24–125:15. Nonetheless, she has concluded based on the weight of the research and her own experiences in the Marine Corps that diversity and inclusion are important to the functioning of teams in the military context.  *Id.* at 125:16–126:10.

and foster the contributions of diversity to military readiness and other elements of organisational effectiveness." *Id.* at USNA-00033392.  The researchers concluded that "[e]xisting literature recognises the role of diversity in improving organisational outcomes, such as innovation performance, problem-solving, knowledge creation and organisational commitment." *Id.* at USNA-00033396; *see also* DX168-007 (Schuette Paper) ("Collectively, the research shows that the Army would benefit by having a diverse group of senior officers leading the military's most vital formations.").[6]

31.    Dr. Haynie testified that she has experienced how diversity can be valuable to teams in the military context.  For example, when she was flying attack helicopters over Iraq in the middle of the night during one of her deployments, she was the only member of her team that noticed "families sleeping up on the roofs of their houses."  Day 6 Tr. 134:4–11 (Haynie).  That experience taught her that minorities or other "individuals who don't necessarily fit the norm" may "see something outside of what the institution or the organization sees."  *Id.* at 134:24–135:4.

32.    Professor Jason Lyall also testified about his research that demonstrates that diversity and inclusion support battlefield performance.  Day 7 Tr. 5:22–6:25; DX195 (Lyall Report).  Over the course of seven years, Professor Lyall and a team of 134 researchers analyzed

---

[6] On cross-examination of Dr. Haynie, Plaintiff cited one recent study of crewmembers on Navy guided-missile destroyers that found "nonuniform" associations between diversity and certain performance indicators, such as the likelihood of winning a "Battle Efficiency Award."  Day 6 Tr. 171:3–21 (Haynie).  For example, whereas "racial and cultural diversity were positively associated with aggregated afloat training group evaluations of critical mission areas," gender diversity was "negatively associated with the likelihood of winning a Battle Efficiency Award." *Id.*  Dr. Haynie explained that this study does not change her conclusions about the value of gender diversity (let alone racial and ethnic diversity) in the military and that the weight of the evidence still demonstrates that diversity and inclusion support military effectiveness and mission accomplishment.  *Id.* at 178:2–9, 230:5–24.

825 armies in 250 conventional wars that were fought between 1800 and 2011 and summarized that work in what is known as Project Mars. Day 6 Tr. 246:11–23; DX195-005–006 (Lyall Report). Professor Lyall and his team sought to determine whether there was a relationship between an army's level of inequality and its battlefield performance. Day 6 Tr. 246:16–23. For each army studied, Professor Lyall calculated a "military inequality coefficient"—a score from 0 (representing perfect equality) to 1 (representing perfect inequality). Day 6 Tr. 247:15–248:10; DX195-010 (Lyall Report). Professor Lyall then compared the army's military inequality coefficient to four measures of battlefield performance: (i) loss-exchange ratio, (ii) mass desertion, (iii) mass defection, and (iv) blocking units. Day 7 Tr. 6:5–15; DX195-016 (Lyall Report).

      33.    Professor Lyall's findings are reflected in the table below:

| | Inequality | | Battlefield Measures | | | | | Observations |
|---|---|---|---|---|---|---|---|---|
| Bands | Mean Military Inequality Coefficient | Number of Ethnic Groups in Army | LER Below Parity | Mass Desertion | Mass Defection | Blocking Units | BP Index | N |
| Low | 0.079 | 4.22 | 24.6% (115) | 21.1% (99) | 8.3% (39) | 9.4% (44) | 0.841 | 467 |
| Medium | 0.286 | 5.57 | 45.4% (98) | 43.5% (94) | 24.5% (53) | 24.1% (52) | 0.656 | 216 |
| High | 0.461 | 5.67 | 66.1% (78) | 68.6% (81) | 40.7% (48) | 33.1% (39) | 0.479 | 118 |
| Extreme | 0.651 | 4.50 | 75.0% (18) | 95.8% (23) | 45.8% (11) | 45.8% (11) | 0.343 | 24 |
| *Mean* | 0.205 | 4.79 | 37.5% (309) | 36.0% (297) | 18.3% (151) | 17.7% (146) | 0.726 | 825 |

DX195-016 (Lyall Report, Table 1).

      34.    As the table demonstrates, "[r]ising levels of inequality are associated with worsening battlefield performance across all four measures" of battlefield performance. DX195-016. At low levels of inequality, belligerents have only a 25% likelihood of suffering more casualties than they inflict on enemy forces. *Id.* At the midpoint of military inequality (about a 0.4), that likelihood has doubled to over 50%. *Id.* at 017. At extreme levels, it becomes a near certainty that belligerents will suffer a loss-exchange ratio below parity. *Id.*

16

35.     The relationship between military inequality and battlefield performance that Professor Lyall found can be tested using statistical analysis.  Figure 1 below illustrates how a belligerent's rising inequality (the X-axis) increases the probability (the Y-axis) of observing the four indicators of battlefield performance.



DX195-017 (Lyall Report, Figure 1).

36.     As this figure demonstrates, as an army's inequality increases, there is a greater likelihood that the army will suffer unfavorable battlefield outcomes.  Day 7 Tr. 9:24–10:8 (Lyall).  This pattern persists even if one divides Project Mars into two historical periods (1800–1917, 1918–2011) to reflect changes in warfare.  DX195-017 (Lyall Report).  And the statistical model controls for variables typically used to explain battlefield performance, including the relative size of armies, distance to the battlefield, and the nature of their political systems.  *Id.*

37.     Professor Lyall's findings are published in his book, *Divided Armies:  Inequality and Battlefield Performance in Modern War* (Princeton University Press, 2020), which has won numerous awards.  Day 6 Tr. 238:8–11 (Lyall); Day 7 Tr. 11:11–12:8 (Lyall).  The Department of Defense and the Department of the Navy have relied on Professor Lyall's research.  Day 6 Tr. 113:15–17, 114:7–10 (Haynie) (noting that Professor Lyall has spoken to the Department about his research); Day 6 Tr. 241:8–18 (Lyall) (discussing recent briefing at the Pentagon); DX210 Tr. 270:5-271:15 (Truesdale) (explaining that Dr. Lyall's work is among the research she finds informative concerning the benefits of diversity to performance).

38.     Professor Lyall also testified about how contexts analogous to modern combat demonstrate that diversity and inclusion can affect mission performance.  Day 7 Tr. 36:5–10; DX195-024 (Lyall Report).  For example, evidence from United Nations peacekeeping since 1945 suggests that greater ethnic diversity at the mission and unit level is associated with improved performance across multiple indicators.  DX195-025 (Lyall Report).  There is also substantial evidence from studies of policing in the United States and elsewhere that officer diversity is associated with improved community relations, perceptions of fairness, and fewer officer-initiated shootings.  *Id.*  And in the counterinsurgency context, ethnic diversity within units can help armies acquire reliable information from local citizens by bringing language skills, cultural awareness, and experience working in mixed teams to the challenge of winning over the hearts and minds of a wary population.  *Id.* at 026.

39.     The research on the benefits of diversity and inclusion is especially relevant to the officer corps.  Because "[o]fficers set the tone and culture for their units," the officer corps "has an outsized influence in how we lead the department and the missions that we face."  Day 6 Tr. 128:14–24 (Haynie); *see also* Day 7 Tr. 20:24–21:10 (Lyall) ("[O]fficers occupy a special

position in being able to create the climate of inclusion so that you can harness the diversity. . . .

[O]fficers are culture carriers.  They set the tone."); DX210 Tr. 116:6-9 (Truesdale) (noting that

officers set the climate).

40.     Plaintiff does not deny that the Department of Defense has long held the view that

a racially and ethnically diverse officer corps is a national security imperative.  Plaintiff

nonetheless called two witnesses—Brigadier General Christopher S. Walker and Lieutenant

Colonel Dakota Wood—who opined that, in their personal opinion, a racially and ethnically

diverse officer corps does not further unit cohesion or lethality.[7]  Plaintiff offered Brigadier

General Walker as an expert in military and tactical operations and Lieutenant Colonel Wood as

an expert in military readiness.  Day 1 Tr. 112:7–8 (Walker); Day 4 Tr. 192:24–25 (Wood).

41.     As an initial matter, the personal opinions of Brigadier General Walker and

Lieutenant Colonel Wood are legally irrelevant, for the reasons explained in Defendants' motion

*in limine* on this issue.  *See* Defs.' Mot. in Lim. Regarding Pl.'s Expert Witnesses, ECF No. 85;

*Goldman v. Weinberger*, 475 U.S. 503, 509 (1986) (dismissing the views of outside experts on

good order and discipline as "quite beside the point").

42.     Brigadier General Walker's and Lieutenant Colonel Wood's opinions are also

unpersuasive and unhelpful to the Court.  Neither witness provided any discernible methodology.

Day 1 Tr. 179:17–21 (Walker); Day 5 Tr. 6:15–17 (Wood).  Neither witness conducted any

studies or surveys to arrive at their opinions.  Day 1 Tr. 177:19–25 (Walker); P221 (Wood

Report).

---

[7] The Court found that Brigadier General Walker and Lieutenant Colonel Wood lacked a
sufficient basis to address the Naval Academy's other asserted interests in recruitment, retention,
and legitimacy.  *See* Day 1 Tr. 116:12–23, 141:19-29, 144:10–11 (Walker); Day 4 Tr. 229:11–14
(Wood).

43.     Brigadier General Walker also lacks an adequate basis to opine on matters of unit cohesion as applied to the Navy and Marine Corps.  Brigadier General Walker served as a career officer in the Air Force and has never been deployed on a Navy ship.  Day 1 Tr. 178:23–179:6 (Walker).  Although he is "joint qualified," he could never be put in command of a Navy vessel.  Day 7 Tr. 99:14–21 (Fuller).  As Vice Admiral Fuller explained, there are significant cultural differences between the Navy and the Air National Guard in which Brigadier General Walker served.  *Id.* at 99:2–13.  Given the significant differences between the services, Admiral Fuller explained that there would be limits in the ability of a senior officer from the Air National Guard (such as Brigadier General Walker) to opine on matters such as military readiness and unit cohesion in the Navy.  *Id.* at 99:22–100:20.

44.     Brigadier General Walker's active participation in political organizations opposed to affirmative action also calls into question the objectivity of his opinions.  Brigadier General Walker is a member of STARRS, which stands for Stand Together Against Racism and Radicalism in the Services.  Day 1 Tr. 187:25–188:5 (Walker).  Part of STARRS's mission is to end affirmative action at the service academies.  *Id.* at 188:6–8.  Brigadier General Walker was so involved in STARRS that while he was still a Department of Defense employee, he was reporting back to the CEO of STARRS about Department policies that were under consideration but had not yet been made public.  *Id.* at 189:4–12.

45.     Lieutenant Colonel Wood similarly lacks an adequate basis to opine on matters of military readiness and unit cohesion in Navy units, given that he last served on a ship nearly 30 years ago.  Day 5 Tr. 15:4–11 (Wood).  As Vice Admiral Fuller explained, shipboard life has changed dramatically in the past 30 years due to the proliferation of technology and the way people are trained.  Day 7 Tr. 101:12–102:15 (Fuller).

2.    Recruitment and Retention

46.    The Navy and Marine Corps seek to build the strongest possible warfighting force by recruiting and retaining the best America has to offer.  DX66-006 (SECNAV Strategic Guidance); Day 6 Tr. 21:20–22:4, 25:13–20 (Vazirani) (recruitment and retention are "particularly important for the Department of Defense since we are an all-volunteer force and we aspire to be an all-professional force"); Day 7 Tr. 105:3–5 (Fuller).  The Navy and Marine Corps seek to cultivate the talent and unique insights of individuals from diverse, cultural, and professional backgrounds.  DX66-006 (SECNAV Strategic Guidance); Day 6 Tr. 21:24–22:4 (Vazirani); Day 7 Tr. 105:3–5 (Fuller).  To accomplish this goal the Navy must recruit and retain the best from America.  DX67–014 (Del Toro Congressional Statement); DX19-001–02 (implementing diversity efforts within the Marine Corps "to attract, develop and retain our most valuable assets – our Marines and their families").

47.    Approximately 23% of 17-24 year olds are eligible to serve in the military.  Day 8 Tr. 77:21–78:4 (Miller).  This is in large part due to the prevalence of disqualifying factors in America's youth population.  Day 8 Tr. 77:21–78:4 (Miller).  Accordingly, the Navy faces an extremely competitive job market for talent to improve its warfighting force.  DX67–013 (Del Toro Congressional Statement); *see also* Day 6 Tr. 24:19–25:6 (Vazirani) (describing the reasons for current recruitment challenges).

48.    The Navy has made a military judgment that a diverse workforce improves its ability to recruit and retain the best from America so every child in America can see themselves wearing the uniform or working in the military's civilian ranks.  DX67-014 (Del Toro Congressional Statement).  This is a national security imperative.  *Id.*

49.    Specifically, the Secretary of the Navy informed Congress:

> In order to meet the challenges of a complex world, we must continue to recruit, retain, train, and promote the best from all of America. We need a diverse force, so every child in America can see themselves wearing the uniform or working in our civilian ranks tomorrow, and every viewpoint is represented in our operations today, so that we can draw talent from all of America to build our warfighting advantage.

DX67-014 (Del Toro Congressional Statement).

50.     At trial, Vice Admiral Fuller agreed that it is imperative that the Navy have the best workforce possible to ensure the Navy maintains its national strategic objectives.  Day 7 Tr. 107:7–17 (Fuller).

51.     The Deputy Assistant Secretary of Defense for Military Personnel Policy, Stephanie Miller, represents the Department of Defense on matters of recruiting and retention in the military.  Day 8 Tr. 30:5–32:11 (Miller).  Ms. Miller similarly testified that a diverse officer corps is an "imperative" for the Department's recruiting and retention efforts.  Day 8 Tr. 81:19–20 (Miller).

52.     Under Secretary Vazirani echoed this view.  Day 6 Tr. 14:25–15:1 (Vazirani). More specifically, Mr. Vazirani testified that an officer corps reflective of the people that they lead and the nation they serve creates a model for young people to join and serve in an organization where they succeed based on their performance and their merits.  *Id.* at 15:1–5 (Vazirani).

53.     And Deputy Assistant Secretary of the Navy Truesdale explained that the consideration of racial and ethnic diversity is important to help maximize the ability to recruit and retain the talent it needs, which in turn helps the Navy execute its missions.  DX210 Tr. 43:10-44:11 (Truesdale).  For these reasons, a racially diverse force is "a strategic imperative." DX210 Tr. 49:19-50:2, 50:8-10 (Truesdale).

a.   Recruitment

54.     The military has been an all-volunteer force for approximately the last 50 years.

Day 8 Tr. 101:8–9 (Miller).  Accordingly, the Department of Defense's "ability to support

national defense priorities is inherently tied to [its] ability to successfully recruit each year" and

tap into the next "generation of service."  *Id.* at 101:9–13 (Miller).

55.     Under Secretary Vazirani testified that "[r]ecruitment is particularly important for

the Department of Defense since we are an all-volunteer force."  Day 6 Tr. 21:22–23.  "[H]aving

a diverse officer corps . . . helps us to ensure that we can draw from the diverse talent of the

U.S." and to tap into "one of the strengths of the U.S., which is our diversity."  *Id.* at 22:1–3.

56.     Deputy Assistant Secretary of the Navy Truesdale similarly explained that a

diverse officer corps serves as a "maximizer" for recruitment and that ensuring there is

representation of different racial and ethnic groups "can be a huge selling point to someone

making a choice to serve or not to serve."  DX210 Tr. 81:11–15, 83:13–18, 84:4–9, 121:6–

123:19.  Based on her personal experience of over twenty years as a Navy Officer who has been

responsible for recruitment efforts, Ms. Truesdale explained that an individual considering

joining the military who sees someone in a leadership position who looks like them may give

them the belief that they also could succeed in the military.  DX210 Tr. 65:19–67:17.

57.     The Department also faces challenges with youth propensity to serve as well as

youth influencers (family and friends) becoming less willing to recommend military service.

Day 8 Tr. 102:2–6 (Miller); Day 6 Tr. 137:12–14 (Haynie).  Youth propensity to serve in the

military, however, is generally higher for African Americans and Hispanics.  Day 6 Tr. 137:15–

20 (Haynie); DX187-005 (2022 Propensity Update); DX194-010 (Haynie Report).  This data

"demonstrates that recruiting and retaining top talent from those underrepresented communities

who report higher propensity to serve can pay greater dividends to the military."  DX194-011 (Haynie Report).

58.      The Department has conducted robust research in an effort to boost overall recruitment.  Day 8 Tr. 102:9–103:24 (Miller).  The Department has found that a diverse officer corps helps provide potential recruits with "a realistic example of what life in the military looks like as opposed to the misperceptions that are often formulated by the media and by well-intentioned but perhaps not well-knowledged influencers."  *Id.* at 104:17–20.  This has led to positive outcomes in both recruiting and retention.  *Id.* at 106:13–15.

59.      Ms. Truesdale likewise explained that based on her own real-world experience as a recruiting officer for the Department of the Navy, a diverse group of recruiters helps to attract diverse servicemembers.  DX210 Tr.  214:5–216:14.  For example, Ms. Truesdale explained that seeing female senior leaders in the Navy led her to believe there was an opportunity for her to be a senior leader.  *Id.* at 69:16–71:9.  This personal experience contributes to her judgment that a young person of color might also believe there are opportunities in the military if they saw other people of color in the military.  *Id.* at 71:14-19.

60.      Under Secretary Vazirani likewise testified that having a diverse officer corps "creates a model for young people as they look at the service."  Day 6 Tr. 22:8–9.  This helps young people to see service leaders of "various backgrounds" and that "someone from their background, their experience will have an opportunity to serve and to advance in the military." *Id.* at 22:9–13.

61.      Vice Admiral Fuller testified that the diversity of the officer corps improves recruiting, as it makes the force more relatable to those they are trying to recruit.  Day 7 Tr.

116:24–117:13.  Potential recruits can see themselves as a pilot or member of the special forces

when they see officers similar to them in those positions.  *Id.* at 119:8–23.

62.     Vice Admiral Fuller testified that this relatability can also contribute to parents,

teachers, and other influencers being more willing to recommend military service to potential

recruits.  Day 7 Tr. 119:8–23.  Vice Admiral Fuller provided specific examples of parents

approaching him after he spoke at a Junior Reserve Officers' Training Corps ("ROTC") event

and asking if their children could take a picture with him because they did not know the Navy

had any African American three-star Admirals.  *Id.* at 117:14–25.

63.     Within the Special Forces community specifically, the Department of Defense,

Special Operations Command, and the Assistant Secretary of Defense for Special Operations and

Low-Intensity Conflict have all recognized that it is necessary to improve the diversity of the

special operations community.  Day 8 Tr. 88:9–21 (Miller); *see also* DX021 (studying and

making recommendations to overcome barriers to increasing Black representation in the Marine

Corps aviation community).  Congress shares this view.  Day 8 Tr. 87:13–24 (Miller); *see also*

National Defense Authorization Act for Fiscal Year 2021, National Defense Authorization Act

for Fiscal Year 2021, Pub. L. No. 116-283, § 557, 134 Stat. 3637 (2021) (requiring Department

of Defense to sponsor study to assess barriers to minority participation in the special operations

communities); DX152-005 (Study on Reducing Barriers in Minority Participation ("Barriers

Study")).

64.     This view is formed in part by the "kinetic and geographic requirements" special

forces must meet to accomplish their missions.  *Id.* at 88:22–25.  These include the ability to be

adaptable, flexible, and creative in solving challenging operational experiences, as well as the

need to accomplish certain missions such as insertion and infiltration in foreign countries.  Day 8 Tr. 89:3–8, 16–22 (Miller).

65.    Recruiting individuals into the special forces community is particularly challenging due to the high level of qualifications.  Day 8 Tr. 91:5–7 (Miller); DX152-057 (Barriers Study).  This means military recruiters must often spend additional time with qualified potential recruits and influencers to convince those potential recruits to join the special forces community.  Day 8 Tr. 91:8–12 (Miller); DX152-057 (Barriers Study).

66.    A diverse pool of recruiters who can respond to the unique concerns of women and minorities improves and furthers special forces recruiting efforts.  Day 8 Tr. 92:10–15 (Miller); DX152-057 (Barriers Study).

67.    A diverse group of special forces officers helps recruit new special forces members because it demonstrates broad representation across demographics, which helps overcome initial concerns of potential recruits and influencers.  Day 8 Tr. 93:9–15 (Miller).

68.    As the Third Battalion Officer at the Naval Academy serving as a senior mentor to approximately 750 midshipmen, Captain Birch testified that his background as a Black officer demonstrates to midshipmen that it is possible to become an officer in the special warfare community and helps recruit into that community.  Day 5 Tr. 35:23–36:22.

69.    Neither Brigadier General Walker nor Lieutenant Colonel Wood offered opinions about how a diverse officer corps can support recruitment, as the Court found that they lacked an adequate basis to opine on the issue.  *See* Day 1 Tr. 141:19-29, 144:10–11 (Walker); Day 4 Tr. 229:11–14 (Wood).

b.  Retention

70.    Retention is also critical in an all-volunteer force.  Day 6 Tr. 25:14 (Vazirani).

71.     Under Secretary Vazirani testified that DoD is doing "quite well on the retention front."  Day 6 Tr. 26:5–7 (Vazirani).  Currently, the Department's retention levels are "very high" and "in certain cases historically high." *Id.* at 26:5–7 (Vazirani).

72.     The Department of Defense invests anywhere between $250,000 and $400,000 in the training and education of each individual service academy graduate.  Day 8 Tr. 63:6–8 (Miller).  The Department seeks to retain the largest pool of talented service academy graduates to promote and eventually be selected for senior leadership opportunities. *Id.* at 94:2–4.

73.     Retention of officers who graduate from the Naval Academy has been steadily improving over the past twenty years, as the diversity of the officer corps has improved.  DX204 (Retention Analysis of Navy and US Marine Corps Active Duty Officers Commissioning Through the Naval Academy); Day 8 Tr. 94:2–4 (Miller).  In particular, the Department of Defense has seen strong retention rates over time in minority populations, including Blacks and Hispanics.  Day 8 Tr. 95:13–17 (Miller).

74.     Ms. Miller testified that greater diversity in the officer corps leads to greater retention.  Day 8 Tr. 100:8–101:1 (Miller).  This conclusion is supported by the Department of Defense's internal data and research.  DX204 (Retention Analysis); Day 8 Tr. 100:8–101:1 (Miller); P275 (2022 OPA Study).

75.     More specifically, Ms. Miller explained that the Department of Defense has found that senior leaders from diverse backgrounds are often able to better respond to some of the unique concerns of women and minority officers in light of the shared experiences of minority communities writ large.  Day 8 Tr. 100:8–101:1 (Miller).

76.     Under Secretary Vazirani testified that as DoD improves the diversity of its officer corps, other officers, particularly in the junior ranks, see that they can continue to succeed

27

"regardless of their particular background, their race, their ethnicity, their gender, that there's an opportunity for them to carry on in the military and advance to a senior level."  Day 6 Tr. 26:10–15.

77.     Vice Admiral Fuller similarly testified that a diverse officer corps improves retention because it provides a greater cross-section of mentors and perspectives.  Day 7 Tr. 118:17–25.

78.     Deputy Assistant Secretary of the Navy Truesdale explained that the racial and ethnic diversity of the officer corps helps to maximize the ability of the Navy to retain talent, which in turn helps the Navy execute on its missions.  DX210 Tr. 43:10–44:11 (Truesdale).

79.     Captain Birch testified that racism still exists in the special forces community, described those behaviors as "harmful," "distracting," and "hurtful," and explained that it has had a negative impact on retention.  Day 5 Tr. 37:25–38:6.  These behaviors have made him question whether he "wanted to remain on active duty and remain a part of the [special operations] community as well."  *Id.*  However, Captain Birch testified that his presence as a senior African American SEAL has helped root out and put a stop to many of these behaviors in units where he served.  *Id.* at 31:14–32:9.

80.     Dr. Haynie likewise testified that, in her expert opinion, a diverse and inclusive officer corps supports recruitment and retention.  Day 6 Tr. 136:2–8.  As Dr. Haynie explained, a 2022 study by the Department's Office of People Analytics found that unhealthy diversity climates were associated with negative readiness and retention outcomes, as well as the lowest estimated retention over a three-year period, losing close to 25% of the survey group by the end of the study period.  DX194-012 (Haynie Report); P275 (2022 OPA Study).  "[R]etention intention, satisfaction with the military way of life, member and unit preparedness, as well as

member and unit morale were the highest among those who characterized their [diversity and

inclusion] climate as healthy—and lowest among those who characterized their . . . climate as

unhealthy."  P275-7 (2022 OPA Study); *see also* P597-USNA-00033397 (2022 RAND Study)

(concluding that militaries can leverage diversity and inclusion to "improv[e] the Armed Forces'

ability to attract, retain and foster skills needed to address current and evolving national security

imperatives").  Plaintiff did not challenge Dr. Haynie's opinions on recruitment and retention.

> 81.     Professor Lyall further testified about how unhealthy diversity climates can affect

morale and retention.  Day 7 Tr. 24:17–30:10; DX195-020–21 (Lyall Report).  According to a

2017 survey of active duty members:

> Overall, about one in five active duty members (17.9%) indicated experiencing
> racial/ethnic harassment and/or discrimination in the 12 months prior to taking the
> survey.  Black (31.2%) and Asian (23.3%) members were more likely to indicate
> experiencing *Racial/Ethnic Harassment/Discrimination* than other active duty members,
> whereas White members (12.7%) were less likely.

DX75-020 (OPA 2017 WEOA Survey).  "These figures should be viewed as the floor, not the

ceiling, of racial and ethnic discrimination or harassment in the military."  DX195-021 (Lyall

Report); Day 7 Tr. 26:18–27:7 (explaining why discrimination is likely underreported).

> 82.     Professor Lyall also examined a 2019 survey of reserve component members,

which reflects the same patterns.  DX195-021 (Lyall Report); DX42-003 (OPA 2019 WEOR

Survey).  "Individuals who had experienced workplace racial or ethnic

discrimination/harassment were less willing to stay in military service (a 14 percentage point

drop) compared to those who had not experienced such an incident."  DX195-023 (Lyall

Report); DX42-003 (OPA 2019 WEOR Survey).  "Satisfaction with military life declined 22

percentage points, while satisfaction with one's immediate supervisor dropped nearly a full point

on a five-point scale."  DX195-023 (Lyall Report).  "Individuals who had experienced racial

discrimination were less likely to agree that they were 'well-prepared' for wartime duties (13

percentage points); that the unit was well-prepared for war (a staggering 24 percentage point

drop); and were much less likely to agree that their own morale as well as their unit's was high."

*Id.*  Professor Lyall found these survey results to be "significant," reflecting "a large shift" for

those servicemembers who had experienced harassment.  Day 7 Tr. 29:23–30:6 (Lyall).  Plaintiff

presented no evidence at trial that contradicts these findings.

83.     Neither Brigadier General Walker nor Lieutenant Colonel Wood offered opinions

about how a diverse officer corps can support retention, as the Court found that they lacked an

adequate basis to opine on the issue.  *See* Day 1 Tr. 141:19-29, 144:10–11 (Walker); Day 4 Tr.

229:11–14 (Wood).

### 3.   Domestic and International Legitimacy

84.     Since the crisis during the Vietnam era, when some of the country believed that

the almost entirely White officer corps was treating Black servicemembers as expendable, *see*

P445-USNA-00011641 (MLDC Report), the Department of Defense has made the military

judgment that the all-volunteer force, and its leadership, must represent the country it defends.

Day 6 Tr. 28:5–12 (Vazirani).  "As we have a diverse military and diverse officer corps, that

demonstrates the fact that the military is representative of a nation with diverse values and

democratic values and that . . . [the] military will carry out the missions of the people that we

serve."  *Id.*

85.     A diverse officer corps that is reflective of the increasingly diverse population of

the United States instills trust in the American public that the Armed Forces will faithfully

execute their duty to protect all Americans.  Day 6 Tr. 140:10–141:10 (Haynie); Day 7 Tr.

18:17–19, 21:5–10 (Lyall); DX194-013 (Haynie Report).  As Vice Admiral Fuller explained, he

has met "[p]arents, influencers, teachers, and . . . students" of color who were "interested in the

fact that they could be a three-star"—that they could "be a pilot, . . . be a SEAL, . . . [or] be an engineer." Day 7 Tr. 119:8–23 (Fuller). "[F]rom a credibility purpose, they want to know that people like them are protecting them." *Id.*

86.    Deputy Assistant Secretary of the Navy Truesdale similarly explained that it was important that the Navy's ceremonial guard had racial, ethnic, and gender diversity for ensuring its legitimacy in the eyes of the American people. DX210 Tr. 220:5–222:9 (Truesdale).

87.    The Department of Defense has therefore recognized that it must "ensure that the military across all grades reflects and is inclusive of the American people it has sworn to protect." P210-USNA-00012626 (2020 DoD Board Report); P445-USNA-00011641 (MLDC Report) ("In a democracy, it is believed that a broadly representative military force is more likely to uphold national values and to be loyal to the government—and country—that raised it.").

88.    A diverse officer corps that reflects our increasingly diverse nation also enables the military to protect its legitimacy among its international partners and strengthens its alliances and attracts new international partners. Day 6 Tr. 28:15–29:1 (Vazirani); Day 7 Tr. 120:1–22 (Fuller); Day 6 Tr.141:16–142:17 (Haynie); DX194-013–016 (Haynie report). The military has learned that the more that military members are exposed to a wide range of demographic, cognitive, experiential, and cultural perspectives and backgrounds, the more they become attuned to the necessity of considering human-based elements across all operating environments. Day 6 Tr. 28:15–29:1 (Vazirani); Day 7 Tr. 121:1–122:4 (Fuller).

89.    For example, Captain Birch's experience as the first Black officer to command a SEAL team provides a powerful example of how racial diversity strengthens the military's strategic alliances. As the commander of SEAL Team 10, Captain Birch experienced how meaningful it was for Somali leaders to see the United States military put a Black officer in

charge of the team.  Day 5 Tr. 32:10–33:13 (Birch).  Captain Birch's race "sparked different conversations," including an "interest in how [he] gained [his] position," which "helped to dissuade some of the natural apprehension that many of our foreign partners have when they work with the U.S. military."  Day 5 Tr. 32:23–33:9 (Birch).

90.      And, as Captain Birch noted, diversity in the officer corps serves as an important marker to other nations regarding American values.  Day 5 Tr. 34:13–35:1 (describing how bringing a diverse delegation to a visit to China showed that it is possible to serve in "a position of command and responsibility" "regardless of your background" and "what you look like" in a country that does not "have the same core values that we have"); Day 5 Tr. 35:2–22 (explaining how his race "was powerful to . . . put on display . . . our values, both in the Navy and our American values" while stationed at an embassy in Bangladesh during his assignment with Special Operations Command Pacific).

91.      Academic research further supports the military's judgment that a diverse officer corps supports the domestic and international legitimacy of the nation's fighting forces.  Day 6 Tr. 139:24–25 (Haynie); DX194-013–16 (Haynie report).  For example, a 2022 RAND study on leveraging diversity and inclusion found that "[i]n relation to the Armed Forces, representation of civilian society has been linked to various factors that shape the military's effectiveness, namely its legitimacy, engagement with and support from the civilian population."  P597-USNA-00033396 (2022 RAND Study).  "In domestic contexts, representation consequently presents opportunities for strengthening the military's contributions to national prosperity and social mobility."  *Id.* at USNA-00033396-97.  "Within overseas operational contexts, diversity may also improve the Armed Forces' effectiveness by improving cooperation with the local civilian population as well as military and civilian leaders, through enhancing trust, strengthening the

military's understanding of the human terrain and improving its information-gathering capability."  *Id.* at USNA-00033397; *see also* DX172 (Bove Paper) (finding that diversity in nationality increases UN peacekeeping effectiveness).

92.     Once again, Plaintiff presented no evidence to contradict these findings.  Neither Brigadier General Walker nor Lieutenant Colonel Wood offered opinions about this issue.

**B.     The Military's Judgment Is Informed by History**

1.     <u>The Importance of History to the U.S Military</u>

93.     The history of racial violence and tension in the military has directly informed the military's judgment about the critical need for diversity in the Armed Forces generally and in the officer corps more specifically.  Under Secretary Vazirani explained that " part of the reason for the focus on diversity is that the experience that the Department had through the Vietnam era and during the Vietnam War [with] an officer corps that was not diverse, . . . led to a lack of unit cohesion, a lack of trust, [and] diminishment of the capability."  Day 6 Tr. 36:5–13.  "And so since that time, the Department has been focused on improving our diversity and ensuring that we have an officer corps that understands the force that they lead."  *Id.* at 11:11–25.

94.     Under Secretary Vazirani expounded that this focus on history is in line with the Department being "a learning organization."  Day 6 Tr. 36:19–206; *see also* Day 5 Tr. 147:17–18 (Bailey) ("The U.S. military has traditionally put an enormous amount of emphasis on history.")  Mr. Vazirani noted that the Department "really goes back and looks at the history and tries to understand the factors that have contributed to its ability to perform effectively.  So from learning that history and from addressing these factors, the Department has been able to mitigate those risks by increasing the diversity of the force."  Day 6 Tr. 36:16–37:1 (Vazirani); DX210 Tr. 127:1–12 (Truesdale) (explaining that a diverse officer corps serves to take "risk factors off

the table" based on the history of racial tensions resulting from diverse enlisted servicemembers being led by a predominantly White officer corps during Vietnam).

95.     As Professor Bailey and even Plaintiff's experts, Brigadier General Walker and Lieutenant Colonel Wood, all explained, this education concerning military history also happens at the servicemember level.  Professor Bailey expounded that "[t]he services train their members to understand their own histories, the history of the U.S. Navy, the Marine Corps, the Army, the Air Force, even the brief history of the Space Force.  They train their officers in military history, and they emphasize the importance to their leaders of looking to history for lessons, for lessons learned."  Day 5 Tr. 147:18–23 (Bailey).  Lieutenant Colonel Wood confirmed that the "history of warfare," and "particularly" the Vietnam era, is studied in formal, professional education. Day 4 Tr. 219:18–25 (Wood).  And in the words of Brigadier General Walker, "any flag officer who hasn't [studied military history] is making a big mistake."  Day 1 Tr. 131:22–24 (Walker).

## 2.    World Wars I and II

96.     Since its inception, the military, including the Navy and Marine Corps, has faced internal racial strife that has risked mission readiness.  From the Revolutionary War through World War II, the Navy frequently limited the number of Black Americans able to enlist, particularly during peacetime, and the Marine Corps largely banned Black Americans altogether. DX197 (Sherwood Report) ¶¶ 10–12; Day 5 Tr. 116:19–20 (Bailey); Day 5 Tr. 159:13–20, 160:12–18 (Sherwood).  Those that did serve were relegated to segregated units and were often assigned to positions that involved menial labor—such as messmen preparing food, serving food, and cleaning; coal heaving; and coaling ships.  Day 5 Tr. 159:24–160:11 (Sherwood).  There were no African American officers in the Navy before World War II.  *Id.* at 159:21–23.  At times, even when the military did not have enough manpower, the military turned away Black

individuals seeking to serve.  For example, in World War II, despite the dramatic need for nurses to care for servicemembers fighting and dying, the military "denied access to African-American nurses who repeatedly appealed to be admitted to the U.S. military."  Day 5 Tr. 117:5–24 (Bailey)

97.     Segregation and unequal environment coincided with simmering racial tension. During the "Red Summer" of 1919, White sailors were involved in racially motivated attacks against local Black community members in Charleston, South Carolina; Washington, D.C.; and Chicago, Illinois.  Day 5 Tr. 160:19–161:3 (Sherwood).  Incidents were big and small, including one race riot that broke out in the Virginia ammunitions base.  These incidents stigmatized the Navy in the eyes of Black communities and made Black families reluctant to send their children to the Navy.  *Id.* at 161:4–8.

98.     The lack of Black representation in the Navy's officer corps contributed to racial tension and unrest during World War II, which hindered naval readiness, national security, and domestic security.  Day 5 Tr. 158:11–16 (Sherwood).  In 1945, Black Americans comprised about 5% of the Navy's enlisted force and just 0.02% of the sailors that received an officer's or warrant officer's commission.  DX197 (Sherwood Report) ¶ 22.  The first Black sailor was not commissioned until 1943, when the Navy mistook him for being White.  *Id.*

99.     In 1944, an explosion occurred at Port Chicago Naval Magazine near San Francisco that killed 320 munitions workers (220 of which were Black sailors).  DX197 (Sherwood Report) ¶ 26.  Black sailors were disproportionately killed because they were assigned some of the most dangerous and menial work in the Navy.  Day 5 Tr. 161:24–162:6 (Sherwood).  After the explosion, fifty sailors were convicted of mutiny for refusing to work and were sentenced to 15 years of prison and hard labor.  DX197 (Sherwood Report) ¶ 27.  In

solidarity with the sailors at Port Chicago, 258 Black sailors subsequently protested at the Mare Island Annex, which resulted in 208 sailors receiving bad conduct charges.  DX197 (Sherwood Report) ¶ 26; Day 5 Tr. 161:16–20 (Sherwood).

100.     In December 1944, Black sailors in Guam protested oppressive conditions and violent racism on the base.  DX197 (Sherwood Report) ¶ 27.  Nearly fifty Black sailors were arrested and imprisoned because of the protest.  *Id.*; Day 5 Tr. 161:21–22 (Sherwood).  Approximately three months later, about one thousand Black Seabees at Port Hueneme, California initiated a two-day hunger strike to protest racial bias in housing assignments and promotions.  DX197 (Sherwood Report) ¶ 28.

101.     These instances of racial tension impacted the Navy because they occurred on some of the most important logistics facilities in the Pacific at a time in which the United States was preparing to invade Japan.  Day 5 Tr. 162:7–20 (Sherwood).  Port Chicago and Mare Island Annex were important for moving munitions across the Pacific.  *Id.*  Port Hueneme is the major Seabee base on the West Coast, and Guam is known as the "great supermarket of the Pacific." *Id.*

### 3.     Korean War and Integration

102.     In 1948, President Truman directed the desegregation of the Armed Forces pursuant to Executive Order 9981 and established the Fahy Committee to evaluate the impact of integration on military efficiency.  DX197 (Sherwood Report) ¶¶ 30–31.  The Fahy Committee ultimately concluded that "a more inclusive military that enables all members to use their talents and skills to the fullest is a more effective fighting force."  P445 (MLDC Report) at 4.

103.     The Korean War accelerated integration efforts due to the need to rapidly build and deploy Armed Forces, but the military still deeply resisted integration.  P272 (CRS Report)

at 18; Day 5 Tr. 120:1–14 (Bailey) ("The Secretary of the Army pretty much downright refused to desegregate the military and was relieved of his position.").  Black personnel constituted only 3.4% of the Navy at the start of the Korean War, rose to 9.5% during the war, and then fell to 5.1% by 1962.  DX197 (Sherwood Report) ¶ 32.  The numbers were even worse in the Navy's officer corps, where only 0.2% of Navy officers were Black in 1962.  *Id.*  Sixty-five percent of African Americans in the Navy were serving in the steward branch.  Day 5 Tr. 120:9–10 (Bailey).

104.    Racial discrimination continued during the Korean War despite desegregation being ordered.  Day 5 Tr. 120:15-17 (Bailey).  For example, *Black Soldier, White Army*, an official Army publication produced by the U.S. Army's Center of Military History, concluded that failures of the traditionally Black 24th regiment in combat were largely due to the "corrosive effects of segregation and the racial prejudices," as attempts to prevent Black officers from commanding any white men yielded a system that "crippled the trust and mutual confidence so necessary among the soldiers and leaders of combat units and weakened the [unit's cohesion,] producing profound effects on the battlefield."  DX196-017 (Bailey Report).  Congressman Adam Clayton Powell Jr. stated that the U.S. Navy was a "modernized twentieth-century form of slavery," in which at least half of Black sailors serve as "nothing more than man-servants to the admiral clique."  *Id.* at 017–018.  "Intelligent, ambitious Negroes," he claimed, "are boycotting the United States Navy because they are not interested in making the world safe for democracy by shining shoes, nor are they interested in fighting communism with frying pans."  *Id.* at 018.

105.    As discussed in a later report issued by a commission of senior military leaders, President Kennedy convened the Gesell Committee in 1962 to examine the military's continued racial disparities.  The Gesell Committee recommended that the Secretary of Defense pursue

"greater institutionalization of the military's commitment to equality of treatment and opportunity."  P445 (MLDC Report) at 5.  But Secretary of Defense Robert did not implement "the recommendations that might have enabled the Armed Forces to avoid harmful racial tensions and conflicts that occurred in the decades that followed."  *Id.* at 6.  As the MLDC, a congressional commission comprised of military leaders, later concluded in 2011, "DoD's failure to implement the Gesell Committee's recommendation had high costs," as inequities persisted, "particularly in the leadership ranks."  *Id.*

106.    The military also attempted to implement "color-blind policies," though the policies "defaulted white."  Day 5 Tr. 122:2–11 (Bailey).  For example, "Black officers who were facing promotion boards often found that the promotion boards were all White and that the White members were not familiar with things like the historically Black colleges and universities they had attended when they were assessing their record."  *Id.* at 122:12-16.

5.    Vietnam War

107.    The lack of Black representation in the officer corps contributed to the eruption of full-blown race riots during the Vietnam War, which threatened naval readiness, national security, and domestic security. Day 5 Tr. 148:1-22 (Bailey), 158:17–21 (Sherwood).

108.    "[M]ilitary leaders across services found the level of racial violence and conflict was so extreme that it was threatening the ability of the U.S military to fulfill its mission of national defense."  Day 5 Tr. 123:5–11 (Bailey).  These leaders "put a great deal of time and attention in trying to figure out how to manage, how to solve this crisis that they were confronting, this problem of race."  *Id.* at 123:13–15.

109.    In the late 1950s and through the 1960s, military leaders were surprised when violence exploded in the military because they believed that the violence that was existing in civilian society would not profoundly affect the military.  Day 5 Tr. 123:20–25 (Bailey).

110.    Starting in the late 1960s, violence broke out in confrontations, big and small, spanning installations across the United States and in Vietnam, West Germany, Korea, Thailand, and Okinawa.  DX196-023 (Bailey Report); Day 5 Tr. 124:2–9 (Bailey).

111.    Racial riots in the military during the Vietnam Era did not simply reflect societal conflict.  *See* Day 4 Tr. 220:6–21 (Wood).  Rather, policies and practices within the military inflamed racial tensions.  Day 5 Tr. 125:12–126:10 (Bailey).

112.    Nor were these riots in the Vietnam Era simply a by-product of the draft.  *See* Day 4 Tr. 220:6–21 (Wood).  In fact, "some of the [installations where] there was the most racial violence was not where people were primarily drafted."  Day 5 Tr. 126:18–23 (Bailey).  The draft contributed to racial tensions in the military during this time, but "it certainly was not the primary or sole factor."  *Id.* at 126:24–25.

113.    Major instances of racial violence first erupted in the Marine Corps during the late 1960s.  Day 5 Tr. 127:4–18 (Bailey); *id.* at 162:22–163:1 (Sherwood).  After the Marines expanded their typical recruiting practices to fill their ranks, there was a large influx of Black enlistees who experienced a toxic environment in which certain units were still de facto segregated.  DX197 (Sherwood Report) ¶ 38.  By the late 1960s, racial violence occurred both in Vietnam (the Army Stockade and the III Marine Amphibious Force Brig) and in the United States (Fort Dix, Fort Hood, Fort Bragg, and Camp Lejeune, to name a few).  *Id.*

114.    "In July of 1969, a group of about 40 African American and Puerto Rican service members started attacking random White fellow Marines with sticks and broom handles.  And

one White corporal who had been wounded three times in Vietnam was surrounded by a group of fellow Marines while he was lying prone, kicked repeatedly, and died a week later of massive head injuries.  This event sparked an investigation on the part of Congress into racial violence and racial conflict within the U.S. military, which concluded that the events at Camp Lejeune were not restricted to the Marine Corps."  Day 5 Tr. 127:8–18 (Bailey).

115.    At Camp Lejeune alone, there were 160 assaults, muggings, and robberies described as having racial overtones in the first eight months of 1969.  DX197 (Sherwood Report) ¶ 38.

116.    The Navy also experienced racial tension during the late 1960s.  For example, in October 1969, a riot nearly broke out near Subic Bay in the Philippines when Black and White sailors from the destroyer *Collette* were on shore leave.  Day 5 Tr. 163:16–164:1 (Sherwood).  Fights had broken out between Black and White sailors that threatened to spill over on the destroyer.  *Id.* at 163:16–164:1.  One of the *Collette*'s officers, an African American named William Kelley, quelled the potential riot by putting on his dress blue uniform with his sword and confronting both Black and White sailors returning to the destroyer.  *Id.* at 163:16–164:1.

117.    The Navy did not experience widescale racial violence during the Vietnam War until 1972 because there were not many Black sailors during that period.  Day 5 Tr. 163:10–15, 164:8–17 (Sherwood).  Instead of relying on the draft for recruitment, the Navy practiced "qualitative recruitment," meaning it focused its recruitment efforts on individuals with high Armed Forces Qualification Test scores.  *Id.* at 164:8–19 (Sherwood); DX197 (Sherwood Report) ¶ 39.  Potential servicemembers with high test scores tended to be White and typically tried to join the Navy or Air Force to decrease the likelihood they would have to serve in land combat in Vietnam.  Day 5 Tr. 164:8–17 (Sherwood).

118.     This dynamic changed when there was an influx of African Americans into the Navy in 1972.  Day 5 Tr. 164:20–165:5 (Sherwood).  The influx of Black sailors was caused by the Nixon administration's decision to scale back the draft, which caused the Navy to change its recruitment standards to man its ships.  *Id.* at 164:20–166:4.  Major instances of racial violence began shortly thereafter.

119.     In 1972, there was a race riot on the aircraft carrier *Kitty Hawk*, where Black sailors mainly worked in menial jobs, lived in segregated berthing, and were commonly brought up to disciplinary proceedings.  Day 5 Tr. 167:16–23 (Sherwood).  While at Subic Bay in the Philippines, Black sailors took makeshift weapons and assaulted other sailors, some of whom were asleep in their racks.  *Id.*  at 168:2–5.  Several officers, including the commander of the Marine detachment, which was assigned to the carrier to protect nuclear weapons, unsuccessfully tried to stop the riot.  *Id.* at 168:2–169:4.  Forty-seven sailors were injured because of the riot. *Id.* at 167:24–168:1.

120.     Conditions during the riot deteriorated to the point in which the Marine detachment was on the verge of opening fire against the rioters.  Day 5 Tr. 169:5–17 (Sherwood).  Opening fire aboard the ship would have killed scores of sailors and marines, damaged aircraft, and set off munitions.  *Id.* at 169:5–17.  In addition, the *Kitty Hawk* would have almost certainly been pulled offline, which would have impaired the military's air power during Operation Linebacker I.  *Id.* at 169:18–170:10.

121.     Fortunately, this devastation did not come to pass due to the leadership of a Black and Native American officer named Benjamin Cloud.  Day 5 Tr. 168:13–23 (Sherwood).  He approached the rioters, gave them the Black Power salute, quoted Martin Luther King Jr., and convinced them to lay down their arms.  *Id.* at 168:13–23.  He even took off his shirt to

emphasize his identity as a Black man and to signal that he was willing to lay down his life.  Day 5 Tr. 168:13–23 (Sherwood).  Benjamin Cloud's background as a Black officer is one of the main reasons why the riot ended without a full-scale massacre.  *Id.* at 170:11–17.

122.    In solidarity with the *Kitty Hawk*, more than 100 Black sailors aboard the aircraft carrier *Constellation* staged a sit-in protest in San Diego.  Day 5 Tr. 170:18–171:6 (Sherwood); DX197 at ¶ 45.  The *Constellation* was subsequently taken offline and did not arrive in Vietnam in time for the critical part of Operation Linebacker II, which resulted in more B-52 planes being lost than expected had the *Constellation* arrived on time.  Day 5 Tr. 171:7–18 (Sherwood).  That same year, eleven Black sailors rioted on the *Hassayampa*, which was one of only six ocean class oilers, injuring five White sailors.  Day 5 Tr. 171:19–25 (Sherwood); DX197 at ¶ 45.  The availability of oilers like the *Hassayampa* is critical because ships cannot be on the line for very long and frequently need to return for fuel and ammunition. Day 5 Tr. 171:19–25 (Sherwood).

123.    The main causes of the incidents on the *Kitty Hawk*, *Constellation*, and *Hassayampa* included perceived discrimination in job assignments, an unfair disciplinary system, ineffective minority affairs councils, a toxic liberty environment, and, most importantly, the lack of African Americans in the chain of command.  Day 5 Tr. 172:1–9 (Sherwood).

124.    Over the next several years, the situation worsened as racial unrest spread to numerous ships and shore installations.  From May 1 to June 30, 1974 alone, the Atlantic Fleet reported 57 racial incidents.  Day 5 Tr. 166:5–10 (Sherwood); DX197 (Sherwood Report) at ¶ 47.  Major incidents also occurred on the dock landing ship *Trenton*, Naval Station Midway Island, the aircraft carrier *Ticonderoga*, the aircraft carrier *Intrepid*, the amphibious assault ship (helicopter) *Inchon*, and at Kaohsiung Fleet Landing, Taiwan.  Day 5 Tr. 167:5–13 (Sherwood); DX197 (Sherwood Report) at ¶ 47.

125.    Subsequent investigations of these six events revealed that the following contributed to the incidents: discrimination in promotion and job assignments (*Ticonderoga* and *Intrepid*); a climate of racism (Naval Station Midway Island, *Intrepid*, and Kaohsiung Fleet Landing); a disciplinary system perceived to be biased against Black sailors (*Trenton* and *Intrepid*); and ineffective minority affairs councils (Naval Station Midway Island and *Inchon*). Day 5 Tr. 166:5–167:13 (Sherwood); DX197 (Sherwood Report) at ¶ 47.  The most significant factor—and one that was present for each of the six incidents—was the lack of African Americans in the chain of command.  Day 5 Tr. 166:16–167:4 (Sherwood); DX197 (Sherwood Report) at ¶ 47.

126.    Violence during this time risked partnerships with international allies.  For example, in South Korea, a conflict between military personnel and almost 1000 South Koreans, which had been provoked by attacks on Korean businesses and nationals by a group of Black servicemembers, was treated as a significant diplomatic incident.  DX196-027–028 (Bailey Report). In the end, the House Foreign Affairs Committee blocked $50 million in military aid to South Korea until (in the words of the Black Congressional Caucus) "Korean leaders deal effectively with the abuse of minority servicemen."  *Id.*

127.    Violence during this time also sparked congressional concern.  In addition to the investigations noted earlier, in 1972, the Congressional Black Caucus held hearings about racism in the U.S. military.  Day 5 Tr. 131:8–9 (Bailey).

    6.    Focus on Diversifying the Officer Corps

128.    This decades-long crisis left senior military leaders convinced that the level and extent of racial violence fundamentally threatened the military's ability to fulfill its national defense mission.  DX196-029–033 (Bailey Report).  Military leaders felt this "was a crisis of

almost existential proportions, [and thus] valued almost any suggestion that someone could come forward with that seemed to bear some promise of working."  Day 5 Tr. 132:11–14 (Bailey).

129.    The threat to the military's fundamental mission posed by racially segregated forces was so grave that, even in the middle of an all-consuming war in Vietnam, the Navy ordered extensive reforms, including requiring a commanding officer to appoint a minority group officer or senior petty officer as his special assistant for minority affairs, ensuring that the needs of minority personnel be met at base facilities, and creating focus groups of minority sailors to develop policies.  DX197 (Sherwood Report) ¶ 41.

130.    In particular, senior military leaders recognized that the scarcity of minority officers created distrust within the force and the nation and helped fuel the racial tensions that so critically undermined mission readiness.  Day 5 Tr. 132:15–18 (Bailey).  Military leaders, upon encountering "this massive level of racial violence that they believed threatened the ability of the services to defend the United States against its enemies, [w]anted all tools available at their disposal.  *Id.* at 148:5–8.  Many believed that visible Black leadership and more Black officers would make a difference.  *Id.* at 148:8–10 (Bailey).  At that time, "they weren't available" and the military's "hands were tied."  *Id.* at 148:10–11.  The military thus focused on cultivating and including diverse leadership.

131.    The Pentagon's civil rights office publicly relieved 10 to 12 senior military officers of command because they were "failing to adequately manage racial problems  within their command."  Day 5 Tr. 132:21–25 (Bailey).  At the time, the Department of Defense assessed that "race relations is a leadership requirement. . . If you don't understand, if you can't understand race relations, you can't be a leader in today's Army; a sentiment that extended to the other services."  *Id.* at 133:1–4.

132.     Leaders were also evaluated on their ability to manage race relations, including through Officer Efficiency Reports, which added an item on "how well the officer" "was managing race relations."  Day 5 Tr. 133:20–24 (Bailey).

133.     Additionally, the Navy started a training program on race relations in 1971.  The Department standardized these trainings and the process in the Defense Race Relations Institute to improve communications among those from different backgrounds, assist commanders with race relations, and train members on race relations.  Day 5 Tr. 133:20–24 (Bailey).

134.     Military leaders were focused too on the officer corps' makeup.  Day 5 Tr. 134:19–21 (Bailey).  The Department asked the services to come up with "affirmative actions" to "enhance race relations," which focused on "an attempt to increase the number of Black officers and visible Black leadership."  *Id.* at 135:1–8.

135.     Military leaders were focused on increasing the number of Black officers because they thought that it would quell racial violence and ameliorate the sense of alienation and anger on the part of young, Black servicemembers, Day 5 Tr. 134:19–23 (Bailey), and improve public legitimacy, Day 5 Tr. 136:18–25 (Bailey).

136.     Because the military "couldn't do a lateral hire, the only place they could focus was on increasing the number of junior officers coming into the military."  Day 5 Tr. 138:5–8 (Bailey).

137.     As the Naval Academy and other commissioning sources commissioned more Black officers beginning in the 1970s, Black representation in the officer corps increased and the Navy has not since experienced major incidents of racial unrest.  Day 5 Tr. 158:22–159:2 (Sherwood).

138.    Wesley Brown was the first African American to graduate from the Naval Academy in 1949.  *Id.* at 172:20–24.  Although several African Americans had been admitted to the Naval Academy from 1872 to 1945, none graduated because of the severe institutional and individual racism they experienced.  *Id.* at 173:3–25.

139.    The Naval Academy made little progress in the decades that followed.  From 1949 to 1968 fewer than three dozen Black midshipmen graduated from the Naval Academy.  DX197 (Sherwood Report) at ¶ 60; *see also* Day 5 Tr. 174:1–11 (Sherwood) (noting there was little to no increase in Black representation in the brigade until the 1970s).  There was an effort starting in the mid-1960s to increase the number of African Americans in the brigade.  Day 5 Tr. 174:12–20; *id.* at 175:23–176:1 (Sherwood).

140.    Similarly, there was little increase in Black representation in the Navy's officer corps until the 1970s.  Day 5 Tr. 174:21–175:3 (Sherwood).  To increase the number of Black officers, the Navy established Naval Reserve Officer Training Core units at historically Black colleges and universities, instituted a program named BOOST to prepare promising leaders from educationally underprivileged backgrounds to successfully complete the Navy's commissioning programs, and increased Black enrollment at the Naval Academy and the Naval Academy Preparatory School.  *Id.* at 175:10–176:1.

141.    There have been no major instances of racial unrest in the Navy since the mid-1970s.  Day 5 Tr. 139:10–13 (Bailey); *id.* at 177:3–5 (Sherwood).  African Americans have enjoyed more opportunities to work in a variety of positions and the Navy has increased Black representation in the officer corps.  Day 5 Tr. 177:6–14 (Sherwood).  For example, the percentage of officers in the Navy increased from 0.2% in 1962 to 2.1% in 1978.  *Id.* at 175:4–9.  And, as the Navy's flagship commissioning source, the Naval Academy has played a critical role

in diversifying the officer corps.  *Id.* at 176:11–21.  Approximately 40% of admirals and 90% of

Chiefs of Naval Operations are Naval Academy graduates.  Day 5 Tr. 176:11–21 (Sherwood).

142.     Plaintiff did not present any historians at trial to dispute this history of racial

violence and tension in the military, and it did not present any evidence to rebut the above

historical record that plays an important role in the military's judgment about the importance of

racial and ethnic diversity in the officer corps.

## II.     The United States Naval Academy

143.     The Naval Academy "is a national institution reflective of the Nation it serves and

the Naval Service of which it is a part."  P28 (2028 Superintendent's Guidance) at 2.  Established

in 1845, the Naval Academy is a four-year, federally established undergraduate institution that

prepares students to become leaders and officers in the Navy and Marine Corps.  P259 (Latta

Decl.) ¶ 7; 10 U.S.C. § 8451.  The Academy's mission is to "develop midshipmen morally,

mentally, and physically, and to imbue them with the highest ideals of duty, honor, and loyalty in

order to graduate leaders who are dedicated to a career of Naval service and have the potential

for future development in mind and character to assume the highest responsibilities of command,

citizenship, and government."  P260 (SECNAV Instruction 1531.2D) at 2; DX159-016; Day 2

Tr. 164:17–165:1 (Latta).  Once they enter the Naval Academy, midshipmen are active-duty

members of the Navy and receive an annual salary, room and board, health care, and are subject

to the Uniform Code of Military Justice.  P259 (Latta Decl.) ¶ 7.

144.     The Naval Academy develops the next generation of Navy and Marine officers

through its academic instruction, professional training, and Character Development program.

P259 (Latta Decl.) ¶ 8.  Professional courses and training are essential components of the Naval

Academy's integrated program.  *Id*.  Required courses in naval science, engineering, navigation,

and weapons systems gives midshipmen a working knowledge of modern naval operations and technology. *Id.* Courses in leadership, ethics, and military law help prepare midshipmen for leadership responsibilities as commissioned officers. *Id.*

145. The Naval Academy's Character Development program reflects its deep and abiding commitment to the moral development of midshipmen and to instilling the Naval Academy's core values of honor, courage, and commitment into its midshipmen. P259 (Latta Decl.) ¶ 9. The program begins plebe summer in which new midshipmen receive lessons in the concept of the professional military officer, which follows three pillars as warriors who possess the toughness, courage, competence, and courage to prevail in an unending commitment to accomplishing the mission with excellence, development of leaders of characters, and servants to the nation. *Id.* It concludes senior year with a capstone course that underscores the core values of honor, courage, and commitment. *Id.* All midshipmen follow an honor concept, which is inculcated throughout their four years at the Naval Academy. *Id.*

146. The Naval Academy is distinct from a civilian university because, at its core, its sole purpose is to develop and provide future officers for the Navy, Marine Corps, and Department of Defense. Day 8 Tr. 143:17–21 (Miller); P28 at USNA-00000153 (admissions objectives "must promote this vital mission" of admitting future "leaders and mentors of Sailors and Marines"). The Naval Academy is uniquely different from civilian academic institutions, driven by those military necessity and national defense priorities. Day 8 Tr. 143:22–24 (Miller).

147. As Dr. Haynie—herself a Naval Academy graduate—explained, "members of my class were leading . . . Sailors and Marines" within months of graduation. Day 6 Tr. 130:19–25 (Haynie). Dr. Haynie discussed her experience visiting the Naval Academy cemetery and

Memorial Hall and the sobering effect it had on her early in her career.  *Id.* at 131:11–18.  As she put it, the Naval Academy "is not a normal college."  *Id.*

148.    Each year, the Naval Academy provides newly commissioned officers to the Navy and Marine Corps that have been immersed in the history, traditions, and professional values of the Naval Service and developed to be leaders of character, dedicated to a career of professional excellence in service to the nation.  DX81 (DODI 1322.22) at 1; Day 8 Tr. 38:5–19 (Miller).  The accession of those officers generates a core group of innovative leaders capable of thinking critically who will exert positive peer influence to convey and sustain these traditions, attitudes, values, and beliefs essential to the long-term readiness and success of the Naval Service.  Day 8 Tr. 38:5–19 (Miller).

149.    Congress has recognized that the service academies provide exceptional leadership training and educational opportunities.  DX128-002 (Senate Armed Services Report on FY2024 NDAA).  Congress has further recognized that the service academies are a key pipeline into the leadership of the Departments of the Army, Navy, and Air Force.  *Id.*

150.    The Naval Academy is a major source of officer commissions for the Navy and Marine Corps, comprising about 28% of new Navy and Marine Corps officers each year in the warfighting communities and 20% of the overall officer corps for both services.  Day 2 Tr. 114:1–9 (Latta); Day 8 Tr. 143:17–21 (Miller).

151.    One of the primary missions of the Naval Academy is to produce officers for the unrestricted line.  Day 2 Tr. 114:10–13 (Latta).  The unrestricted line is the category of communities within the United States Navy that encompass the Navy's warfare specialties.  Day 8 Tr. 39:11–13 (Miller).  Examples of unrestricted line communities are Surface Warfare, Aviation, Submarines, and Special Forces.  *Id.* at 39:16–19.  Most command billets in the Navy

are held by Unrestricted Line Officers.  *Id.* at 40: 17–19.  Unrestricted line officers are the only officers in the Navy that can command the Navy's warfare fighting platforms such as ships, submarines, and aircraft squadrons.  *Id.* at 39:20–23, 40:5–16.  Ninety-five percent of Naval Academy graduates access into the unrestricted line.  Day 3 Tr. 103:11–13 (Latta); Day 8 Tr. 39:3–6 (Miller).

152.    The remaining 5% of graduates go into the Restricted Line or Staff Corps.  Day 3 Tr. 103:23–104:21 (Latta).  The Restricted Line communities largely fill combat support roles. Day 8 Tr. 41:11–13 (Miller).  These communities include intelligence, supply, cryptology and logistics officers.  *Id.* at 41:11–13.  The Staff Corps is a cadres of officers with unique training or a professional license or degree that typically correlates to a profession outside of the military. *Id.*  Staff corps officers include doctors, dentists, lawyers, and chaplains.  *Id.*

153.    The entire Navy's officer corps comprises approximately 55,000 officers, of which approximately half go into the unrestricted line.  DX210 Tr. 200:13–21 (Truesdale).

154.    Naval Academy graduates hold a disproportionate number of warfare command billets in the Navy and Marine Corps.  Day 8 Tr. 41:2–8 (Miller).  Warfare command billets are critically important to the Navy and Marine Corps particularly at the O6—Navy Captain and Marine Corps Colonel—level.  *Id.* at 40:22–25.  Eight of the twelve aircraft carriers in the United States Navy are currently being commanded by Naval Academy graduates.  *Id.* at 41:2–8.

155.    Flag Officers (O7–O10) are the senior-most leadership cadre within the Department of the Navy.  Day 8 Tr. 41:2–8 (Miller).  A Flag Officer at the O7 or O8 level is typically the first opportunity to command an integrated warfare group such as a carrier strike group.  *Id.* at 41:2–8.  A carrier strike group is made up of an aircraft carrier, an air wing, one or more cruisers, and a destroyer squadron.  Day 7 Tr. 96:24–97:4 (Fuller); Day 8 Tr. 42:17–20

(Miller).  Flag Officers at the O9 level may serve as a deputy commanding general of a Combatant Command or other joint integrated global organization.  Day 8 Tr. 42:21–24 (Miller). Flag Officers at the O10 level may serve as a Combatant Commander or a Service Chief.  *Id.* at 42:25–43:6.  Sixty-eight percent of Flag Officers are Unrestricted Line Officers. *Id.* at 43:11–12. Forty percent of Flag Officers are graduates of the Naval Academy.  Day 7 Tr. 127:12–18 (Fuller); Day 8 Tr. 43:11–12 (Miller).

156.    The Chief of Naval Operations is an O10, the Navy Service Chief, and highest-ranking officer in the Navy.  Day 5 Tr. 176:25–177:2 (Sherwood); Day 8 Tr. 43:25–42:5 (Miller).  Approximately 90% of the Chiefs of Naval Operations have been graduates of the Naval Academy.  Day 5 Tr. 176:17–21 (Sherwood).

A.    **Structure of the Admissions Office**

157.    The Naval Academy's Admissions Office has approximately 47 employees and is a mixture of military and civilian personnel.  Day 2 Tr. 134:9–11 (Latta).

158.    The Admissions Office serves three different functions.  Day 2 Tr. 134:12–24 (Latta).  First, Candidate Guidance, the largest group of about 20 people, identifies and counsels candidates, as well as works with candidates to process their applications to send applications to the Admissions Board.  *Id.*  Second, Strategic Outreach is responsible for outreach efforts.  *Id.* Third, Nominations is responsible for the selection process and oversight of the medical clearance process.  *Id.*

159.    As the Dean of Admissions, Dean Bruce Latta has overall responsibility for the outreach to and recruitment of prospective students and oversight of the admissions process. Day 2 Tr. 133:16–134:8 (Latta).  Dean Latta reports to the Superintendent.  *Id.* at 41:5–6.  The Superintendent is the Commanding Officer of the Naval Academy.  *Id.* at 41:7–9.  The

Superintendent has delegated to the Dean of Admissions the authority to make offers of appointment. *Id.* at 133:16–134:8.

160.    The Naval Academy also has an Admissions Board.  The Board has approximately 21–23 members in each admissions cycle and represents a cross-section of the Naval Academy.  Day 2 Tr. 135:3–12 (Latta); DX159-027.  It includes prior enlisted, faculty, staff, military members from different warfare specialties, and junior and senior officers.  Day 2 Tr. 135:3–12 (Latta); DX159-027.

161.    The Admissions Board's primary responsibility is to review completed applications and provide recommendations on applicants' qualifications for admissions.  Day 2 Tr. 135:22–136:14 (Latta); DX159-031.  The Board does not make decisions to admit a candidate; rather, that is the responsibility of the Slate Review Committee and the Dean of Admissions.  Day 2 Tr. 137:14–138:7, 185:5–22 (Latta).

162.    The Slate Review Committee comprises the Dean of Admissions, the Director of Candidate Guidance, and the Director of Nominations.  Day 2 Tr. 138:8–12 (Latta).

163.    Melody Hwang is the current Director of Nominations.  Day 1 Tr. 214:25–215:2 (Hwang).  The Director of Nominations works directly with congressional offices to make sure all congressional nominations are received and to advise the congressional offices on the number of vacancies they have.  Day 2 Tr. 140:3–18 (Latta).  The Director of Nominations puts together the congressional lists and nomination sources to present to the Slate Review Committee.  *Id.* at 140:3–18.  The Director of Nominations also notifies members of Congress after selections are completed.  *Id.*

164.    The Naval Academy's admissions process is governed by, among other things, instruction from the Office of the Chief of Naval Operations.  P261; Day 2 Tr. 167:2-21 (Latta).

165.    For example, OPNAVIST 5450.330B requires that the Naval Academy ensure that "a minimum of 65 percent of Navy-option midshipmen complete a technical degree program before receiving a Navy commission." P261 at 4.  The Naval Academy interprets this instruction as requiring that it identify students with STEM interest and that it graduates at least 65 percent of students with STEM degrees.  Day 2 Tr. 169:3–18 (Latta).  STEM interest is "an important factor in making an admissions decision."  *Id.* at 169:21–170:4.  For example, where there are two equally qualified candidates, the Naval Academy will often choose the candidate who has expressed a strong interest in STEM over a student who is interested in pursuing a humanities degree.  *Id.*

### B.    Steps to Apply to the Naval Academy

166.    To apply to the Naval Academy, an applicant must first complete a preliminary application.  Day 2 Tr. 143:11–17 (Latta).  The preliminary application asks for information such as the applicant's name, address, birthdate, gender, race and ethnicity, congressional district, if they are interested in being recruited for a sport, their interest in a major, and class rank.  *Id.* at 143:22–144:4.  Office of Management and Budget ("OMB") rules and Department of Defense guidance require the Naval Academy to ask applicants for information about their race and ethnicity.  *Id.* at 144:5–11.  The Naval Academy does not use the racial and ethnic information contained on the Preliminary Application for any purpose.  *Id.* at 144:12–14.

167.    The Admissions Office screens the preliminary application to ensure that the candidate meets basic legal eligibility requirements, including not being younger than 18 or older than 23 by induction day, being a U.S. citizen, and not being married or having any dependents.  DX79-005 (Admissions Board Training); DX159-017; Day 2 Tr. 144:12–22, 165:14–166:1 (Latta).  None of these requirements can be waived.  Day 2 Tr. 165:14–166:3 (Latta).

168.    Once the preliminary application is completed, and assuming all legal eligibility requirements are satisfied, the applicant receives an email with a candidate number and instructions to log into the candidate information system to complete the remaining steps in the application process.  Day 2 Tr. 144:23–145:5 (Latta).  The candidate information system includes a number of forms or steps that must be completed, including the completion of the candidate information form, the submission of letters of recommendation, an essay, the submission of a candidate fitness assessment, and the submission of a personal history questionnaire.  *Id.* at 144:23–145:5, 156:10–13.  The candidate also must participate in a "Blue and Gold Officer" ("BGO") interview and submit college board exams.  *Id.* at 144:23–146:4.  Candidates may also submit additional letters of recommendation.  *Id.* at 144:23–146:4.  In addition, all candidates must receive a nomination to attend the Naval Academy.  *Id.* at 178:15–179:8.

169.    All of the information requested in the application is used in the Naval Academy's holistic process to help provide context to an applicant's entire file.  Day 2 Tr. 155:20–156:9 (Latta).  The Naval Academy does not have a minimum GPA or SAT score for admission.  Day 2 Tr. 69:14–24 (Latta); Day 2 Tr. 16:21–17:22 (Hwang); DX122-002 (August 2022 Superintendent's remarks to Admissions Board noting that the Naval Academy does not have a minimum or cutoff SAT score).  Rather, the Naval Academy conducts a whole person assessment and looks at a variety of data in assessing a candidate for admission.  Day 2 Tr. 69:14–24 (Latta); Day 2 Tr. 16:21–17:22 (Hwang).

170.    When the Admissions Board meets, each member will brief the other members on the candidates assigned to them.  Day 2 Tr. 179:24–184:15 (Latta).  Each Admissions Board member will review the entire record of the presented candidates and then discuss each candidate

to make a recommendation concerning the candidate's qualifications. *Id.* at 179:24–184:15; *see, e.g.*, DX123 (standard Admissions Board briefing template).

### D.     The Nomination Requirement

171.     Unlike applicants to civilian universities, under federal law, a Naval Academy candidate must also secure a nomination for the admissions cycle in which they wish to be considered. Nominations are necessary but not sufficient for admission.

172.     There are two types of nominations: those from a "statutory nominating authority" (or congressional nominations) and "service-connected" nominations. 10 U.S.C. §§ 6954, 8454. Statutory nominating authorities include the Vice President, Members of Congress, Delegates to Congress from U.S. territories and the District of Columbia, and the Governor and the Resident Commissioner of Puerto Rico. 10 U.S.C. § 8454; DX15 (2027 Charging Memo); P26 (2023 Slate Review Memo); Day 1 Tr. 196:10–17 (Hwang). Service-connected nominations are reserved for children of certain servicemembers; candidates who are already members of the Navy or Marine Corps, or members of ROTC programs; and candidates selected by the Superintendent. DX87 (Nominations & Appointments Brief); DX15 (2027 Charging Memo).

173.     Nominations from congressional authorities make up more than 80% of the Naval Academy's Brigade of Midshipmen. DX23 (MSA Nominations); Day 1 Tr. 217:7–9 (Hwang). The Naval Academy seeks representation from as many congressional districts as possible, which is one reason why Congressional nominations make up such a large percentage of every class. Day 1 Tr. 217:10–19 (Hwang).

174.     The Naval Academy provides training to congressional offices on nominations, including two trainings a year at the Naval Academy for congressional staffers. Day 1 Tr.

219:23–220:15 (Hwang).  During these trainings, the Academy emphasizes that congressional offices should look beyond a candidate's grades and test scores and consider other factors such as leadership experiences, unusual life experiences, whether the candidate is first to attend college or first-generation American, and if the candidate has a cultural or diverse background.  *Id.* at 219:23–220:19.  During these trainings, the Naval Academy encourages congressional staff to use the competitive nominating method discussed below because it provides the Naval Academy the most flexibility in choosing competitive candidates.  *Id.* at 223:12–20.

175.    If a candidate is admitted (or "appointed") pursuant to a nomination by a Member of Congress, then they are "charged" to that member.  DX87 (Nominations & Appointments Brief).  Each Member of Congress may have five "charges" at any one time.  DX23 (MSA Nominations).  When a Member has fewer than five charges at the end of the academic year, the Member is considered to have a "vacancy" for the following admissions cycle.  *Id.*  For each vacancy, Members can nominate up to a specified number of candidates—for the upcoming class of 2029, up to 15 candidates (the number for previous classes was 10).  DX93 (Congressional Guide).  The Naval Academy has no authority or control over which candidates Members of Congress nominate.  Day 2 Tr. 5:16–6:10 (Hwang).[8]

176.    Congressional nomination authorities, such as Members of Congress, may nominate their slate of candidates using one of three methods.  Day 1 Tr. 197:5–198:17 (Hwang); DX091-009 (Nominations & Appointments Brief).

---

[8] At trial, Plaintiff suggested that because the Naval Academy can request that a Member of Congress provide a nomination to a candidate through a "nom assist," that request indicates that it has some measure of control over the nominations process.  The Naval Academy has no more control over the nominations process through requesting a nomination from a Member of Congress than the Department of Justice has over this Court when it files a motion requesting certain relief.

177.     First, a nomination may be submitted using the competitive method, in which nominations are not ranked by the member of Congress.  Day 1 Tr. 197:5–198:17 (Hwang). Under the competitive method, the Naval Academy may select the candidate it believes is the most competitive from the list of nominees.  *Id.* at 197:5–198:17.  The Naval Academy ranks candidates within that slate based on the candidate's Whole Person Multiple ("WPM") score. P259 (Latta Decl.) ¶ 34.

178.     Second, a nomination may be submitted using the principal numbered-alternate method, where the Member of Congress identifies their first choice, and then ranks the remaining nominees.  Day 1 Tr. 197:5–198:17 (Hwang); P259 (Latta Decl.) ¶ 25.  Under this method, the Naval Academy must extend an offer to the principal nominee if they are qualified, and it does not matter how the principal nominee compares against other students on the slate.  Day 1 Tr. 197:5–198:17, 223:6–8 (Hwang).  If the principal nominee is found not qualified by the Admissions Board or declines an offer, then the Naval Academy must follow the order of the remaining ranked nominees in extending offers.  *Id.* at 197:5–198:7; P259 (Latta Decl.) ¶ 35.

179.     Third, a nomination may be submitted using the principal competitive-alternate method, in which the Member indicates a principal candidate, and in the case the principal is not fully qualified or declines an offer of appointment, the Naval Academy ranks the remaining candidates in the slate by their WPMs.  P259 (Latta Decl.) ¶ 36; Day 1 Tr. 197:5–198:17 (Hwang).  Under this method, if a principal is fully qualified, that student must be extended an offer, and it does not matter how the principal nominee compares against the other students on the slate.  Day 1 Tr. 223:6–8 (Hwang).

180.     Approximately 35% of Members of Congress use the principal nominating methods, with the remaining 65% using the competitive method.  Day 1 Tr. 198:18–20, 223:9–11 (Hwang).

181.     Members of Congress decide which students they will nominate.  Day 1 Tr. 219:1–4 (Hwang).  The Naval Academy has no authority or control over which nomination method Members of Congress use.  *Id.* at 219:5–7.  The method used by a Member of Congress may dictate the candidate whom the Naval Academy selects for admission.

182.     White students receive the majority of congressional nominations.  Day 1 Tr. 219:8–12 (Hwang).  Certain districts such as Vermont, South Dakota, and North Dakota typically nominate fewer minorities because their constituents tend to have smaller minority populations.  *Id.* at 219:13–22.  The Naval Academy's efforts to inform members of Congress described above have been only minimally successful, if at all, in increasing the diversity of congressional nominations.  *Id.* at 221:20–23.

183.     Because of the nomination requirement, congressional nominating authorities play a large, and often determinative, role in the Naval Academy's admissions process.

184.     Occasionally (around 20–30 times a year), the Naval Academy will assist a qualified candidate with obtaining a nomination.  Day 1 Tr. 200:5–7, 223:23–224:9 (Hwang).  This is known as a "nom assist."  *Id.* at 199:19–24.  Nom assists are primarily used for recruited athletes.  *Id.* at 200:5–7, 223:23–224:9.  They are also sometimes used for candidates coming from preparatory programs who fail to obtain a nominating source during their preparatory year, and for candidates who have already received a letter of assurance.  *Id.* at 223:23–224:9.

185.     The Naval Academy does not pursue nomination assists because of a candidate's race or ethnicity.  Day 1 Tr. 224:10–12; Day 2 Tr. 6:11–14 (Hwang).

186.     Even when the Naval Academy seeks to assist a candidate with obtaining a nomination, a congressional office may still decline to provide a nomination.  Day 1 Tr. 200:15–24 (Hwang).  Ultimately, the Naval Academy has no control over whether a congressional office will agree to provide a nomination at the Naval Academy's request; that decision is solely one made by the Member of Congress.  Day 2 Tr. 5:16–6:10 (Hwang).

### E.     Criteria Considered for Admission

#### 1.     The Whole Person Multiple

187.     A computer-generated Whole Person Multiple score is initially calculated by an algorithm based on SAT scores,[9] class rank, teacher recommendations, and extracurricular activities.  DX12 (Overview of Admissions Whole Person Multiple); DX72 (Whole Person Multiple (WPM) Analysis).  Once the computer-generated WPM is calculated, the Admissions Board is responsible for making Recommendations of the Admissions Board ("RAB"), which are adjustments to the WPM that may be both positive and negative.  Day 2 Tr. 187:6–188:8, 191:2–6 (Latta); DX1 (Guidance for Recommendations of the Admissions Board (RABs)).  The final WPM score, including all RAB adjustments, will ultimately include both objective and subjective components.  Day 2 Tr. 187:6–189:3 (Latta).  The WPM and RAB adjustments do not use race as a factor.  DX1; DX12; DX72; DX161-010 ("Race/ethnicity/gender are not included in the algorithm.").

---

[9] During the COVID-19 pandemic, the Naval Academy implemented a test-flexible policy under which standardized test scores were optional.  Day 2 Tr. 189:4–190:12 (Latta).  This applied to the classes of 2025 through 2027.  *Id.*  Beginning with the class of 2028, and based on a change in the National Defense Authorization Act, the Naval Academy has reverted back to a test-mandatory policy.  *Id.*

188.    The WPM was designed to reduce first-year attrition at the Naval Academy.  Day 2 Tr. 161:5–9 (Latta).  While the WPM score may be a useful tool for comparing candidates, it cannot account for everything about an applicant.  *Id.* at 155:20–15.

189.    It is not uncommon for an applicant to have a comparatively lower WPM score but other strong factors in their application.  Day 2 Tr. 215:16–23 (Latta).  For example, this is often the case with athletes and students who may have strong leadership skills but relatively weak academics.  *Id.* at 215:16–216:10.  Although there are some minority applicants who have lower WPM scores than non-minority applicants, Dean Latta is not concerned about that difference because the Admissions Board does a thorough job in reviewing an applicant's entire file, which is reflected in similar graduation rates between minorities and non-minorities.  *Id.* at 213:6–214:4 (Latta); DX13-001 (Institutional Effectiveness Assessment Report noting that the "minority graduation rate (88.9%) was the highest in USNA history" and was comparable with the overall graduation rate of 90.2%); DX166-001 (noting second highest minority graduation rate in 2021–2022).

190.    One explanation for the difference in WPM scores between minority and non-minority students is that more than half of African-American students are Blue Chip athletes, where the Naval Academy accepts some academic risk given the other valuable qualities recruited athletes possess, such as leadership, teamwork, and perseverance.  Day 2 Tr. 214:5–215:9 (Latta); DX122-002 (August 2022 Superintendent remarks to the Admissions Board noting that the Naval Academy is willing to accept risk in making offers to underserved groups, fleet candidates, and those from underrepresented Congressional districts because "many do not have the benefit of a traditional education").  Most Blue Chip athletes matriculate to the Naval Academy from the Naval Academy Preparatory School ("NAPS"), and NAPS students tend to

have lower WPM scores than those who directly enter the Naval Academy from high school.

Day 2 Tr. 214:5–215:9 (Latta).  For those coming from NAPS to the Naval Academy, the WPM

score is not considered and instead the Naval Academy considers the applicant's performance at

NAPS.  Day 2 Tr. 215:10–15 (Latta); Day 3 Tr. 32:1–6 (Latta).

191.    Both positive and negative character issues are not considered as part of the

WPM, but they are commonly considered as part of the whole-person evaluation when making

qualification recommendations.  Day 2 Tr. 231:24–233:8 (Latta).  As discussed below, there are

a number of other factors that may be considered outside the WPM in the Naval Academy's

whole-person review of a candidate.

2.    Personal Essay

192.    The personal essay is "extremely important" to making admissions decisions

because it "provides a lot of insight into [a candidate's] background and helps [the Naval

Academy] make an assessment of their overall whole person."  Day 2 Tr. 146:5–23, 150:2–9

(Latta).  The personal essay is not included in the Whole Person Multiple score, but rather is part

of the subjective evaluation by an Admissions Board member.  Day 2 Tr. 150:2–17 (Latta).

193.    The personal essay gives the Naval Academy insight into a candidate's

motivation and can reflect character-forming experiences.  Day 2 Tr. 146:5–23 (Latta).  The

essays commonly provide information about overcoming hardship as well as a candidate's

socioeconomic status.  Day 2 Tr. 146:24–148:20, 149:11–24 (Latta).  In fact, the essays are

"often a dominant factor" for many students regarding socioeconomic information.  Day 2 Tr.

149:11–17 (Latta).  The essays can often reveal information such as a candidate having to quit

extracurricular activities to care for a sick parent to growing up in a single-parent household.

Day 2 Tr. 149:11–24 (Latta).

194.     The essays provide information that the Naval Academy uses to subjectively evaluate a candidate, and essays can make the difference in admissions decisions.  Day 2 Tr. 146:5–23 (Latta).  For example, one applicant who was ranked in the middle of his class submitted a powerful personal statement demonstrating leadership skills as class president, and that statement led to him being offered admission to the Naval Academy's preparatory school.  Day 2 Tr. 146:24–147:20 (Latta).  Another candidate was not involved in any school activities, had a very high class rank but low SAT scores, and submitted an essay explaining how she had overcome the hardship of being homeless.  Day 2 Tr. 148:2–20 (Latta).  This essay helped paint a complete picture of the candidate, whose score by the Admissions Board otherwise was not very high, and contributed to her receiving an offer to the Naval Academy's preparatory program.  Day 2 Tr. 148:2–25 (Latta).  Another candidate with average grades was captain of her soccer team and discussed a circumstance where she effectively led her soccer team to the state championships once her coach became ill.  Day 2 Tr. 148:21–149:10 (Latta).  That personal statement led to the Admissions Board recommending the candidate for an offer of appointment to the Naval Academy.  Day 2 Tr. 148:21–149:10 (Latta).

3.     Personal History and Family Background Information

195.     The Naval Academy also requests personal history and family background information from applicants because it helps inform the Naval Academy's judgment about whether a student would be an effective leader in the Navy and Marine Corps after graduation.  Day 2 Tr. 150:22–151:4 (Latta).

196.     The personal history and background information is not always captured in the WPM scores, but the Admissions Board nevertheless considers it in making qualification recommendations as part of its holistic evaluation of a candidate.  Day 2 Tr. 154:4–21 (Latta).

The personal history and family background information can be important in making admissions decisions because those that graduate from the Naval Academy are expected to work on teams, and the Admissions Board is looking at characteristics that will be important in a military environment.  Day 2 Tr. 152:21–153:6 (Latta).  The personal history and family background information can provide a multitude of valuable information about a candidate, such as whether they have unique life experiences such as living overseas, speaking multiple languages, overcoming hardship, or having financial difficulties.  Day 2 Tr. 150:22–151:16 (Latta).

197.    For example, one candidate who had a fairly low WPM score described an incident where he was stabbed several times trying to save his sister from being murdered by an ex-boyfriend.  Day 2 Tr. 153:7–154:3 (Latta).  This story was important to the Admissions Board's decision to qualify the applicant, as it reflected a character-forming experience that showed he had the potential to be a great officer after graduation.  Day 2 Tr. 153:7–154:3 (Latta).

198.    The personal history questionnaire includes questions about, among other things, unusual life experiences, overcoming hardship, adversity, language fluency, ties to their cultural heritage, and their financial status.  Day 2 Tr. 144:23–145:15, 151:17–152:20, 154:22–155:19 (Latta).

4.    Candidate Academic Information Form

199.    The Candidate Academic Information ("CAI") form is a form that must be completed by a school official, typically a college counselor, and includes information such as the candidate's class rank, GPA, whether the candidate has taken Advanced Placement or International Baccalaureate courses, the number of students who matriculate to a two- or four-year college, whether the candidate belongs to a minority group or a disadvantaged background, and whether the candidate has been the subject of disciplinary issues.  Day 2 Tr. 156:22–157:24

(Latta).  Information about whether a student is on a free or reduced lunch, the Special

Supplemental Nutrition Program for Women, Infants, and Children, and other financial

assistance programs is often disclosed in the CAI.  Day 2 Tr. 158:14–159:2 (Latta).  The school

official can also describe a student through the use of a write-up in the CAI form. Day 2 Tr.

156:22–157:21 (Latta).  The CAI asks for information concerning whether an applicant belongs

to a minority group because it helps to provide context to an applicant's background.  Day 2 Tr.

158:14–20 (Latta).  The race information contained in the CAI is not used to make qualification

decisions.  Day 2 Tr. 159:2–4 (Latta).  The information contained in the CAI feeds into the WPM

score, particular with respect to class rank and GPA.  Day 2 Tr. 157:25:6 (Latta).  However, the

Admissions Board also considers information contained in the CAI outside of the WPM score.

Day 2 Tr. 158:7–9 (Latta).

     5.    Blue and Gold Officer Interviews

    200.    The Blue and Gold Officer ("BGO") interviews are "the eyes and ears in the local

community that not only mentor the students through the admissions process, but . . . also

provide an evaluation of them."  Day 2 Tr. 175:18–176:9 (Latta).  Interviewers are typically

Naval Academy graduates, those in the military, and parents and Naval Academy advocates in

the local community.  Day 2 Tr. 177:8–24 (Latta).  Every student receives an interview, except

varsity football and basketball players (due to NCAA rules) and members of the Fleet (because

they are required to receive a recommendation from their commanding officer).  Day 2 Tr.

176:10–18 (Latta).

    201.    Information received from the BGO interviews is important in considering an

applicant.  Day 2 Tr. 177:8–24 (Latta).  The interviews are "pretty comprehensive" and address,

among other things, "leadership potential, their organizational skills, time management,

communication skills, and other background information." *Id*. at. 176:23–178:7 (Latta).  The interviewers give the Naval Academy "a breadth of data based on their observations of the candidate." *Id*.  For example, because interviewers have been trained to ask for information the Naval Academy values in the admissions process, the interviews often reveal life experiences, hardship, single-parent homes, language skills, and other personal observations the Admissions Board may not see elsewhere in an application file.  *Id*. at 177:8–24 (Latta).

202.    There are occasions where a BGO interviewer's notes conflict with other information in an applicant's file.  Day 2 Tr. 234:12–235:6 (Latta).  For example, a candidate who attended a Naval Academy summer program may have received a very positive review, but a negative BGO interview write-up. *Id*.  When there is a conflict between the BGO interviewer notes and other information in the file, the Admissions Board may seek another BGO interview or other information from school officials to resolve the conflict.  *Id*.

203.    The Admissions Board may make RAB adjustments to the WPM based on the BGO interviews, but the Naval Academy may also consider information from the interviews outside of the RAB adjustments.  Day 2 Tr. 177:25–178:14 (Latta).  For example, the Admissions Board member responsible for preparing a candidate's file has a panel [she] can complete about all of the aspects in the candidate's record that [she] believes is important.  *Id*. Similarly, the Slate Review Committee reviews the BGO interviews in making admissions decisions.  *Id*.

            6.    Athletic Activities

204.    The Naval Academy also seeks information on athletic activities because those activities reflect the teamwork, communication skills, time management, persistence, and ultimately, the warrior ethos necessary to becoming a military leader.  Day 2 Tr. 162:10–25

(Latta).  More than 90% of admitted students have participated in varsity high school athletics.  *Id*.. RAB points may be awarded for athletic participation, and the Naval Academy does not limit the award of RAB points to certain sports.  *Id*. at 163:1–17.

       7.    <u>Socioeconomic Information</u>

205.    The application also asks for self-reported family income information.  Day 2 Tr. 219:3–9 (Latta).  This self-reported family income information is commonly inaccurate.  *Id.* at 219:10–220:14. For example, the Naval Academy has seen circumstances where parents of an applicant who are senior military officers are reported to make less than $20,000 a year.  *Id*.

206.    To determine the accuracy of self-reported income, the Naval Academy will review the entirety of an applicant's file, including the counselor's comments, the interview, and the personal statement.  Day 2 Tr. 219:10–220:14 (Latta). These sources of information can reveal whether an applicant is on social security, food stamps, or similar forms of government assistance.  *Id.*

207.    The Naval Academy considers all of the socioeconomic information provided by an applicant in making admissions decisions by reviewing the entirety of an application file.  Day 2 Tr. 220:20–25 (Latta).  Socioeconomic information can come from a wide variety of sources, including, among other things, the personal statement, teacher recommendations, interviews, and other letter of recommendations.  *Id*. at 220:23–221:20 (Latta).

    **F.**    **The Admissions Board's Review of a Candidate**

208.    Once an applicant has submitted the materials necessary to be considered by the Admissions Board, an Admissions Office examiner will review the file to make sure it contains the correct information and to determine if there are any character issues.  Day 2 Tr. 179:24–184:15 (Latta).  Once the examiner's review is complete, the file goes to the Admissions Office

counselor who has been assigned that applicant to conduct a preliminary review of the record. *Id*.  That review includes a detailed review for certain "triggers," such as good or bad grades, honors and AP courses, unusual life experiences, and character issues.  *Id*.  The Admissions Office counselor may also provide a recommendation to the Admissions Board and provide other written feedback on the applicant.  *Id*.

209.    Assuming the Admissions Office counselor concludes that an application is in order, he will forward the application to the Admissions Board member randomly assigned to that candidate.  Day 2 Tr. 179:24–184:15 (Latta).  The Admissions Board member will then review the file and look at the overall qualities in the record, including both objective and subjective factors, and prepare the record to brief the rest of the Admissions Board.  *Id*.  The Admissions Board member responsible for the application will provide written comments on the applicant, as well as an overall summary, and include any RAB adjustments to the WPM score. *Id*.

210.    The Admissions Board starts meeting in late August on a weekly basis.  Day 2 Tr. 9:16–10:7 (Hwang).  The Naval Academy begins to receive some congressional nominations in October, with more nominations coming in November and December.  *Id*. Congressional offices must submit their nominations by January 31.  *Id*.

211.    The Admissions Board receives guidance on how to make RAB adjustments. DX1 (RAB Guidance); DX2 (RAB Quick Reference Guide); Day 2 Tr. 191:7–192:1 (Latta). Some RAB adjustments reflect objective factors, such as the number of AP courses a student has taken.  Day 2 Tr. 191:7–192:1 (Latta).  Other RAB adjustments are more subjective, such as evaluating hardship, unusual life experiences, subjective comments written by teachers, financial

difficulties, and socioeconomic status.  *Id*.  The RAB adjustments do not use race as a factor.  DX1.

212.    As reflected in the guidance to the Admissions Board on the use of RABs, "[a]lthough each [a]dmissions [b]oard member must use their good judgment when evaluating candidate records, the [b]oard must strive for consistent application of RABs throughout the whole class."  DX1 (RAB Guidance) (emphasis omitted); Day 2 Tr. 202:12–20 (Latta).  Although the Admissions Board applies some RABs consistently, there may be variances for factors such as hardship or unique life experience.  Day 2 Tr. 202:21–203:11 (Latta).  Given these variations, a new RAB was created for the upcoming admissions cycle for socioeconomic status so that it does not get confused for other RABs such as hardship or unique life experience.  *Id*. at 203:12–22 (Latta).

213.    It is common for the Admissions Board to also consider subjective factors outside of the RABs.  Day 2 Tr. 192:6–13, 193:7–18 (Latta).  For example, the Admissions Board may consider an unusual life experience in considering whether an applicant is qualified without making a specific RAB adjustment to the WPM score. *Id.* at 192:6–13.  The Admissions Board may also consider character issues in making qualification recommendations without necessarily making RAB adjustments to the WPM score.  *Id.* at 192:14–193:21.

214.    The Admissions Board may recommend that a candidate: (1) is qualified or not qualified; (2) be considered for a Letter of Assurance (by designating the candidate "early notify"); (3) be considered for a preparatory program; or (4) defer a recommendation because more information is needed.  DX079-030 (Admissions Board Training); P491 at USNA-00000796 (Admissions Board Training); DX159-031 (Office of Admissions Presentation); Day 2 Tr. 235:21–236:24 (Latta).

215.    Race is not considered in determining whether a candidate is qualified or not qualified.  Day 1 Tr. 224:13–15, 225:21–24 (Hwang); Day 2 Tr. 31:3–7 (Hwang); Day 2 Tr. 50:4–5, 186:17–19 (Latta); Day 5 Tr. 44:14–45:4, 56:7–11, 58:21–59:4 (Birch).

216.    There is no minimum test score required for a candidate to be qualified by the Admissions Board or to receive an offer from the Naval Academy.  Day 1 Tr. 227:6–11 (Hwang).  The Naval Academy conducts a whole-person assessment of every applicant.  *Id.* at 227:12–24.

217.    The Naval Academy does not make offers to students who are not qualified.  Day 2 Tr. 16:18–20 (Hwang).

218.    After reaching a consensus on a candidate, the Admissions Board will annotate its recommendation in the applicant's record.  Day 2 Tr. 179:24–184:15 (Latta).

219.    The Superintendent has delegated to the Dean of Admissions final approval for determining whether an applicant is qualified or not qualified.  Day 2 Tr. 66:22–67:2 (Latta). Although the Dean rarely overrides the Admissions Board, he may change a candidate from "unqualified" to "qualified" on rare occasions.  *Id.* at  67:3–6, 216:16–18.  This is typically done for efficiency reasons when new information is received from an applicant but the Admissions Board is not in session.  *Id.* at 216:19–217:4 .  Dean Latta has never changed an applicant from "unqualified" to "qualified" where he had concerns about an applicant's academic performance at the Naval Academy, and race is not a consideration in making this change.  *Id.* at 218:19–25.

220.    For example, Dean Latta once changed an Admissions Board recommendation of "not qualified" to "qualified" because the candidate was a principal nominee, and the Admissions Office received new information reflecting her grade for pre-calculus.  Day 2 Tr. 68:14–23.  Because this new information came late in the admissions cycle when the Board was

not regularly meeting, this was "one of the rare cases" where Dean Latta changed a recommendation from "not qualified" to "qualified" where he was confident the Board would have requalified her anyway. *Id*. at 68:14–69:6.

221.    Dean Latta has also on occasion changed a "qualified" recommendation to "unqualified." Day 2 Tr. 217:21–218:18 (Latta). This can happen when character issues arise when the Admissions Board is not in session or when new information from an applicant is received reflecting a decline in grades. Day 2 Tr. 217:21–218:18 (Latta).

222.    Once the Admissions Board makes a recommendation, the applications are matched with each nominating list to which the applicant has been nominated. Day 2 Tr. 179:24–184:24 (Latta). If the Admissions Board determines that an applicant is qualified for admission, the applicant will then be reviewed by the Slate Review Committee. Day 2 Tr. 186:3–11 (Latta).

**G.    The Slate Review Committee's Review of a Candidate**

223.    Once the Admissions Board recommends that a candidate is qualified, the applicant's file goes to the Slate Review Committee for a review of the nominations list as well as a final admissions decision. Day 2 Tr. 242:16–23 (Latta). Congressional nominations—and their corresponding congressional "slates"—"drive the process for filling the class" because of Title 10 requirements. DX127-012 (Admission Early Notify). The Slate Review Committee reviews congressional slates as they are submitted with the goal of designating a slate winner who will then become the charge to that congressional office. Day 1 Tr. 201:9–14, 228:2–8 (Hwang). The slate winner will be extended an offer to the Naval Academy. *Id*. at 201:9–14.

224.    The Slate Review Committee's decision on the admission of an applicant depends in part on the method Congress uses to nominate a candidate. Day 3 Tr. 2:22–3:22 (Latta); Day

1 Tr. 229:3–24 (Hwang).  For example, if a member of Congress has nominated a candidate using either the principal ranked alternate or principal unranked method and the principal nominee is fully qualified, that candidate will be given an offer of appointment regardless of how they compare to the other candidates on the congressional slate.  Day 3 Tr. 2:22–3:22 (Latta); Day 1 Tr. 229:3–24 (Hwang).

225.     In a circumstance where a member of Congress has nominated a candidate using the competitive method or the principal unranked method and the principal either declines an offer or is not qualified, the Slate Review Committee will review candidates in WPM order.  Day 3 Tr. 2:22–3:22, 4:10–23 (Latta).  In this circumstance, the Committee needs all of the records from each candidate on the slate to be completed and reviewed by the Admissions Board for qualification before it can determine a slate winner.  Day 1 Tr. 229:3–24 (Hwang).

226.     In making offers on congressional slates using the competitive method, the Slate Review Committee considers more than just standardized test scores or the WPM score.  Day 2 Tr. 16:21–17:22 (Hwang).  Although the WPM is a good "starting point" for considering a candidate, the Slate Review Committee wants to "look at the entire application to see what other factors contribute to the makeup of [a] candidate," to determine if a "candidate shows potential to succeed as a midshipman and to be a great future naval officer."  *Id*.

227.     The Slate Review Committee reviews the entire application, and when it is conducting its second review of an application, it will focus on the personal statement and comment fields reflecting recommendations from school officials and Blue and Gold Officers.  Day 1 Tr. 235:22–236:11 (Hwang).  This review ensures that the Admissions Board did not miss anything during its review of the application.  *Id.* Narrative information that the Slate Review Committee focuses on can be found on DX145-011 (Candidate Application), which is the

comment box for the school counselor; DX145-012, which reflects the English teacher's recommendation; DX145-013, which reflects the math teacher's recommendation; and DX145-016-017, which reflects the Blue and Gold Officer's interview comments.  Day 1 Tr. 236:12–237:3 (Hwang).

228.    There are circumstances where the Slate Review Committee values particular traits such as unusual life experience differently depending on where it is in the admissions cycle.  Day 3 Tr. 12:9–18 (Latta).  For example, as the Slate Review Committee is trying to fill the remaining spots toward the end of the admissions cycle, it may provide greater consideration to factors such as unusual life experience.  *Id.*

229.    The Slate Review Committee may also consider whether a candidate is from an "underrepresented district."  Day 1 Tr. 232:23–233:10 (Hwang); P27 at 3 (Dean's Supplemental Guidance).  Underrepresented districts are congressional districts that do not commonly provide nominees to the Naval Academy.  Day 1 Tr.  232:3–22 (Hwang).  If a Member of Congress from an underrepresented district submits nominees for two vacancies, the Slate Review Committee will make an effort to fill both vacancies.  *Id.* at 232:23–233:10.  The Naval Academy prioritizes underrepresented districts in its admissions process because it wants the brigade of midshipmen to represent as many districts as it can.  *Id.* at 233:11–19.  Underrepresented districts tend to include minority populations.  *Id.* at 233:20–22.

230.    The Slate Review Committee's consideration of candidates is iterative, meaning that in making admissions decisions, the Committee is often looking across multiple slates of nominations and comparing candidates on multiple slates.  Day 3 Tr. 17:16–18:1 (Latta).  For example, the Slate Review Committee commonly compares candidates on a slate against each other in making admissions decisions.  *Id*. at Tr. 12:19–25.  Although the WPM is a good tool to

compare candidates, the Slate Review Committee believes it is important to review a candidate's entire file because the WPM does not capture the entirety of a candidate's application. *Id*. at 13:1–23.  Comparing candidates' entire files helps ensure that the Slate Review Committee is making informed admissions decisions. *Id*.

231.    The Slate Review Committee also commonly compares candidates on one slate against candidates on other slates.  Day 3 Tr. 14:3–6 (Latta).  For example, a candidate may have a nomination from both his Representative and one or both Senators.  *Id*. at 14:7–15:9.  In that circumstance, the Slate Review Committee may compare a candidate that is on three different slates against other applicants on those three slates in making offers of appointment.  *Id*.  When a candidate has multiple congressional nominations, the Slate Review Committee will prioritize the congressional slates because the Naval Academy is looking for representation from every congressional district in the country.  *Id*. at 15:10–19 (Latta); Day 2 Tr. 7:12–8:18 (Hwang). When the Slate Review Committee selects a slate winner who is on multiple slates, that permits the Slate Review Committee to then choose another slate winner for the other slate.  Day 2 Tr. 7:12–8:18 (Hwang).

232.    Before designating a slate winner, the Slate Review Committee will review a candidate's entire file to ensure that it did not overlook anything in the application.  Day 1 Tr. 229:25–230:13 (Hwang).

233.    This process will occasionally result in the Slate Review Committee selecting as the slate winner a candidate with a slightly lower WPM than the candidate with the highest WPM on a competitive slate.  In this circumstance, the candidate with the relatively higher WPM commonly will still be offered an appointment as a qualified alternate or an additional appointee. Day 3 Tr. 6:12–24 (Latta).

234.    Qualified alternates are the top 150 candidates offered appointment based solely on their WPM score who are not designated as congressional slate winners (the number is now the top 200 for the upcoming class year).  P26 (Nomination Process and Congressional Slate Review Guidance – Class of 2023); Day 2 Tr. 237:18–20 (Latta); Day 3 Tr. 7:9–12 (Latta).  Race or ethnicity is not a factor in making offers to those who will ultimately be designated qualified alternates.  Day 3 Tr. 8:3–6 (Latta).

235.    If the Naval Academy at this point still has not filled its class (with congressional appointments and qualified alternate appointments), it may offer appointments to other remaining qualified candidates, known as additional appointees.  P26 (Nomination Process and Congressional Slate Review Guidance – Class of 2023); Day 3 Tr. 8:7–13 (Latta).  At least three-fourths of additional appointees "shall be from qualified alternates."  10 U.S.C. § 8456(b); P259 (Latta Decl.) ¶ 62(b).

236.    The Naval Academy's goal is to notify students of their admissions status by no later than April 15.  Day 2 Tr. 172:23–173:9 (Latta).  This could include notifying the student that she has been accepted or declined an offer, that she has been accepted to the prep pool, or that she has been placed on a wait list.  *Id*.  Students then have until May 1 to notify the Naval Academy of their decision.  *Id*.

**H.    The Naval Academy's Preparatory Schools**

237.    As noted above, the Admissions Board may recommend, and the Slate Review Committee may choose to offer, some candidates a seat at one of the Naval Academy's preparatory schools.  Day 2 Tr. 186:20–187:1 (Latta)

238.    The Naval Academy has three prep school programs.  Day 3 Tr. 19:11–20:7 (Latta).  The first is the Naval Academy Preparatory School ("NAPS").  *Id*.  NAPS is a

government-funded program in Newport, Rhode Island that was established in the early 1900s primarily to provide an additional year of preparation for enlisted sailors and marines. *Id*. The second prep program is Foundation, which is a civilian program run through the Naval Academy Alumni Association and affiliated with several civilian schools across the country to provide opportunities similar to NAPS. *Id*. The third prep program is Civilian Prep, where students may attend a school of their choice and pay on their own. *Id*.

239.    NAPS is limited to approximately 310 students, and the Naval Academy typically places between 235-245 students at NAPS. Day 3 Tr. 23:25–25:9 (Latta). Other institutions such as Naval ROTC also place their candidates at NAPS. *Id*.

240.    Decisions to extend a prep school offer typically are based on the judgment that a candidate needs additional academic or physical preparation before attending the Naval Academy. DX79-032 (Admissions Board Training); Day 3 Tr. 21:16–22:24 (Latta). The majority of candidates recommended for NAPS are members of the fleet, recruited athletes, and those from underrepresented congressional districts. P64 ("Principal consideration for selection for NAPS will be made from fleet candidates . . . ."); DX146-003 ("Consideration for Under-Represented Districts, Fleet Candidates, and Recruited Athletes"); Day 3 Tr. 21:16–22:24 (Latta). A large portion of recruited athletes recommended for NAPS are minorities, and in particular African Americans. *Id*. at 29:14–30:1. Although recruited athletes tend to have weaker grades, they tend to have demonstrated exceptional leadership skills. *Id*. at 29:14–30:3.

241.    Many applicants from the fleet are recommended for a prep program because they have been out of school for at least a year, and they tend to have lower high school grades. Day 3 Tr. 21:16–22:24 (Latta). Fleet applicants are given priority at NAPS because NAPS was originally created for members of the fleet. *Id*. at 22:25–23:5; P64 (Guidance For Review and

Selection of Candidates to Attend Academic Year 2020 Preparatory Programs).  Members of the

fleet are more likely to enter the Naval Academy through NAPS than directly from the services.

DX104 (Prior Enlisted Entering USNA); Day 3 Tr. 23:6–21 (Latta).

242.    Like recruited athletes and those coming from the fleet, those from

underrepresented districts tend to come from weak school systems and require an extra year of

preparation.  Day 3 Tr. 21:16–22:24 (Latta).

243.    In admitting students to the Naval Academy from any of the prep schools, the

Naval Academy does not consider WPM score.  Day 2 Tr. 215:10–15 (Latta).  Instead, the Naval

Academy's senior leaders review the candidate's performance at the prep program.  P62 (NAPS

Admissions Guidance); Day 2 Tr. 215:10–15 (Latta); Day 3 Tr. 32:1–6 (Latta).  Race or ethnicity

is not a consideration in deciding whether to admit a candidate from the prep programs to the

Naval Academy.  Day 3 Tr. 32:1–6 (Latta).

**I.    The Naval Academy's Limited Consideration of Race**

1.    <u>The Manner in Which the Naval Academy Considers Race</u>

244.    No candidate is admitted based solely on his or her race.  Day 2 Tr. 16:2–4

(Hwang) (candidates "never" receive offers based solely on their race or ethnicity); *id.* at 51:10–

14 (Latta) ("It just may be one of the nondeterminative factors.  So we don't select somebody

because of their race or ethnicity.").  Plaintiff identified no evidence of a candidate admitted

based solely on his or her race.

245.    Candidates also are not determined to be qualified or not qualified based on their

race.  Day 1 Tr. 224:13–15, 225:21–24 (Hwang); Day 2 Tr. 31:3–7 (Hwang); Day 2 Tr. 46:9–15,

50:4–5, 52:12–53:1, 186:17–19 (Latta); Day 3 Tr. 10:4–8 (Latta); Day 5 Tr. 44:14–45:4, 56:7–

11, 58:21–59:4 (Birch).  Plaintiff identified no evidence of a candidate determined qualified or

not qualified based on their race.

246.    There are certain points in the admissions process where the Naval Academy may consider race or ethnicity.  The Naval Academy considers this information, along with all the other information it considers, because the Academy is trying to create a brigade with a wide range of life experiences and backgrounds that will ultimately lead a diverse enlisted force.  Day 3 Tr. 32:7–21, 33:5–34:18, 35:1–4 (Latta); P31 at USNA-00000389–90 (Mem. Regarding the Use of Affirmative Action).

247.    In such circumstances where the Naval Academy may consider race or ethnicity, it is a nondeterminative factor in an individualized, holistic review to contextualize an applicant's experience, along with numerous other factors reflected within a candidate's file, including leadership, adversity, life experiences, military exposure, fitness, athletic prowess, socioeconomic background, academic progression, recommendations, STEM interest, cultural exposure, language fluency, first-generation college status, residence in underrepresented congressional district, and many others.  P28 at USNA-00000153–544 (Superintendent Guidance for the Class of 2028); P29 at USNA-00000197–98 (Superintendent Guidance for the Class of 2027); P491 at USNA-00000737–40 (Admissions Board Training Presentation); Day 1 Tr. 235:22–237:3 (Hwang) (discussing sample application, DX145); Day 2 Tr. 15:13–16:1 (Hwang) ("Their race and ethnicity, it can just help us kind of paint a better picture of the overall candidate . . . and just kind of serves as one data point in the overall application review."); Day 2 Tr. 45:14–21 (Latta) ("So we do a holistic review.  And we do collect race and ethnicity data, but it's in the context of their diverse experiences along with other holistic factors . . . ."); *id.* at 51:10–14 (Latta) ("It just may be one of the nondeterminative factors.  So we don't select somebody because of their race or ethnicity.  It could be used in the context of other factors that we would see in the records we're comparing."); *id.* at 64:22–65:1 (Latta) ("Again, within the

context of all the other holistic factors that we look at."); *id*. at 152:5–20 (Latta) ("[T]he more information we can fill in, the brighter that picture actually becomes."); Day 3 Tr. 9:19–10:3 (Latta) ("It would be after there's a detailed review of their admissions file, reviewing all of the factors that we looked at both at the admissions board and the slate review committee."); Day 2 Tr. 155:20–156:9 (Latta) (information on numerous different characteristics "help[s] provide context to everything that we're reading in the file").  "[I]f there's no context to the race and ethnicity, then it doesn't factor in an admissions decision."  Day 2 Tr. 45:11–21, 52:12–53:8 (Latta).

248.    First, as part of the process for Letters of Assurance (conditional offers made by the Dean of Admissions, selected from the pool of candidates recommended by the Admissions Board for early notify), race or ethnicity may be considered among the many nondeterminative factors reflected in the holistic assessment to provide context to a candidate's overall application. Day 1 Tr. 225:12–20 (Hwang); Day 2 Tr. 30:17–22 (Hwang); Day 2 Tr. 240:15–241:8 (Latta); DX127-006–07; P259 ¶¶ 63, 66–68 (Latta Decl.).  A Letter of Assurance is a conditional offer of admission used to compete with other schools and service academies—the candidate must still pass physical fitness standards, become medically qualified, receive a nomination, and complete any remaining requirements for admission.  DX127-005; P259 ¶ 64; Day 2 Tr. 173:18–174:23 (Latta).  If the candidate fails to satisfy any of those requirements, their offer will be rescinded. DX127-005; P259 ¶ 64 (Latta Decl.); Day 2 Tr. 173:18–174:23 (Latta).

249.    Second, when extending offers to additional appointees, the Naval Academy may consider race or ethnicity, again as a nondeterminative factor among the constellation of factors reflected in the holistic assessment to provide context to a candidate's overall application.  Day 2

Tr. 49:18–23 (Latta); Day 3 Tr. 9:19–10:3 (Latta); P259 ¶ 75 (Latta Decl.); P26 (Nomination

Process and Congressional Slate Review Guidance Class of 2023).

250.    Third, when filling congressional slates that used the competitive nomination

method, the Naval Academy may consider race or ethnicity, again as a nondeterminative factor

among all the information contained in candidates' files, in deciding whether and which

candidate to designate the winner of that competitive slate.  Day 2 Tr. 49:24–51:4, 62:15–23,

63:11–19, 64:22–65:1, 238:8–22 (Latta); Day 1 Tr. 210:20–211:8 (Hwang); P259 ¶ 77.

Although most of those competitive slate decisions are made based on WPM score, when the top

scores are close, a candidate with the relatively lower WPM may be selected as the winner based

on the strength of their overall application.  Day 2 Tr. 49:24–51:4 (Latta); P259 ¶ 77 (Latta

Decl.).  In that circumstance, race or ethnicity does not dictate the selection; rather, race is used

"in the context of other factors that [the Slate Review Committee] would see in the records [it] is

comparing."  Day 2 Tr. 51:5–14 (Latta); P259 ¶ 77.[10]

251.    Fourth and finally, race or ethnicity could theoretically be one of the many

nondeterminative factors considered as part of the Superintendent's review in extending

Superintendent nominations.  Day 2 Tr. 51:18–21 (Latta); Day 3 Tr. 11:16–25 (Latta); P259 ¶ 76

(Latta Decl.).  However, race and ethnicity have not been a consideration in extending a

Superintendent nomination since at least 2009; rather, Superintendent nominations are most

---

[10] In similar fashion, when a slate winner declines their offer, and the slate is one that used the competitive nomination method, the Slate Review Committee may consider race or ethnicity among the many nondeterminative factors in choosing a backup slate winner.  Day 1 Tr. 209:10–18, 231:13–23 (Hwang); P497 (Slate Declines).  As with all other circumstances where race or ethnicity may be considered, race or ethnicity may not be the reason for selecting a new slate winner, and the Slate Review Committee does not make any admissions decisions off the "slate declines" lists.  Day 1 Tr. 230:14–231:19 (Hwang).  Rather, the Slate Review Committee pulls up the individual slates, reviews the records of the candidates on those slates, and further gives priority to underrepresented congressional districts.  *Id*. at 231:5–234:10.

often used for Blue Chip athletes and, otherwise, occasionally to compete with other service academies.  Day 3 Tr. 10:12–11:25 (Latta); P259 ¶ 76.  Plaintiff did not present any evidence that a candidate received a Superintendent nomination that considered the candidate's race.

252.    The Naval Academy does not set any targets or quotas for the racial and ethnic composition of the class.  Day 2 Tr. 16:5–7 (Hwang); Day 3 Tr. 84:12–14 (Latta).  It tracks the demographics (race and gender) of each class for visibility, but does not use that tracking in making admissions decisions.  Day 3 Tr. 42:12–43:25, 84:22–85:16 (Latta); Day 2 Tr. 79:9–20, 80:15–21 (Latta); P18 (Class Comparisons); P558 at 2 (Dean's Brief Mar. 15, 2022); P2; P3; P4. The number of offers extended to minority groups fluctuate year over year, as do the numbers of minority students who enroll.  *See, e.g.*, P18 at USNA-00002648 (offers fluctuating from 449 to 563—a 25% differential); P558 at 2 (offers fluctuating from 235 to 378—a 60% differential); DX109–DX113 (Class of 2023 to 2026 Snapshots) (every year, enrollment numbers fluctuating); DD5 at 55 (fluctuating enrollment shares).

253.    Race or ethnicity may not be the basis for points.  Day 1 Tr. 225:25–226:4 (Hwang) ("[Race] cannot be the basis for points."); Day 2 Tr. 241:23–242: 15 (Latta) ("[T]he admissions board follow[s] this guidance" and the Dean has not "seen members of the admissions board assign points based on an applicant's race or ethnicity"); P28 at USNA-00000154 (Superintendent Guidance for the Class of 2028) ("[A]t no point during the admissions process should race, ethnicity, or gender be the basis for 'points' in favor of or against an applicant."); P29 at USNA-00000198 (Superintendent Guidance for the Class of 2027) (same); P25 at USNA-00001861(Overview of Admissions Whole Person Multiple) (race not used as a factor in WPM algorithm); DX1 (RAB Guidance) (race not used as a factor in the RAB adjustments to the WPM score); P31 at USNA-00000389 (Mem. Regarding the Use of

Affirmative Action) ("No points or quotas exist for race."); P491 at USNA-00000740

(Admission Board Guidance) ("Race, ethnicity or gender should not be the basis for points in

favor of an applicant."); DX158-002 (Race Considerations Regarding Admissions to the United

States Naval Academy)  ("At no point in the review process are race, ethnicity, or gender the

basis for points in favor of or against an applicant.").

254.    As a result of the Naval Academy's efforts, over the past 30 years, minority

representation among incoming classes has increased from approximately 17% in the class of

1997 to 24% for the class of 2002 to over 40% in the class of 2026.  Day 2 Tr. 91:13–17 (Latta);

P31 at UNSA-00000389 (Mem. Regarding Use of "Affirmative Action").

255.    However, the Naval Academy is not yet at the point where it can build a diverse

brigade that reflects American society without the limited consideration of race or ethnicity.  Day

2 Tr. 92:14–18 (Latta).

256.    Each year, Dean Latta reviews the demographics of the applications being

submitted as well as of the admitted class.  Despite the use of numerous race-neutral alternatives,

minority representation in the applicant pool and the admitted class—particularly with respect to

African Americans and Hispanics—is far below the racial demographics of the general

population.  Day 3 Tr. 36:11-38:8 (Latta).  Dean Latta's judgment, based on his 22 years

working in the admissions office, is that the limited consideration of race has helped to increase

the diversity of the class, and those diverse midshipmen are succeeding and graduating at very

high rates.  *Id*. at 37:14–23, 39:4–13 (Latta); P031 at USNA-00000390 (Mem. Regarding Use of

"Affirmative Action") (explaining that "[o]ver the past last several years, minority students have

graduated at about 87%, which is roughly on par with the overall class graduation rates.").

Based on his experience across 23 admissions cycles, Dean Latta's judgment is that if the Naval

Academy no longer considered race, the number of minorities—and in particular African Americans and Hispanics—would "drop dramatically."  Day 3 Tr. 37:24–38:13.  Dean Latta's views are confirmed by the recent enrollment numbers at civilian universities, and in particular MIT—a main competitor to the Naval Academy—which have reported a significant drop in their minority numbers now that they are prohibited from considering race in their admissions processes.  *Id*. at 38:19–39:3.

2.  Plaintiff's Statistical Analysis of the Naval Academy's Consideration of Race is Unreliable

a.  Professor Arcidiacono is an opponent of affirmative action whose opinions were rejected in *Harvard* and *UNC*

257.    Plaintiff seeks to support its claim that the Naval Academy's limited consideration of race results in large disparities between minority and nonminority applicants through expert testimony from Professor Peter Arcidiacono.

258.    Professor Arcidiacono is an opponent of affirmative action whose similar opinions in the *Harvard* and *UNC* cases were rejected and whose opinions in this case similarly are unreliable.  *See, e.g. SFFA. v. Harvard*, 397 F. Supp. 3d 126, 169 (D. Mass. 2019) (finding that Professor Arcidiacono's model "likely overstates the direct effect of Asian American identity on the personal rating" and "likely suffers from considerable omitted variable bias"); *SFFA v. UNC*, 567 F. Supp. 3d 580, 623 (M.D.N.C. 2021) (finding that Professor Arcidiacono's model was "somewhat overfit and therefore more susceptible to picking up spurious correlations in the data"); *id.* at 624–25 (noting aspects of Professor Arcidiacono's methodology that court found "troubling" and "very concerning" and that "undermined [his] ultimate conclusions").

259.    Professor Arcidiacono has previously testified as an expert for Students for Fair Admissions in two cases challenging the consideration of race in the admissions processes at Harvard College and the University of North Carolina.  Day 3 Tr. 209:3–14 (Arcidiacono).

82

260.     As in this case, Professor Arcidiacono prepared statistical models and provided opinions to support his basic conclusions.  Day 3 Tr. 211:14–20 (Arcidiacono).

261.     Professor Arcidiacono's opinions in the University of North Carolina and Harvard cases were not accepted by the trial courts in those cases.  Day 3 Tr. 211:21–24 (Arcidiacono).

262.     Professor Arcidiacono has received approximately $50,000 from the Searle Freedom Trust for two affirmative action papers he authored.  Day 3 Tr. 211:25–212:8 (Arcidiacono).  The Searle Freedom Trust is also a funder of Students for Fair Admissions.  *Id.* at 213:8–10 (Arcidiacono).

263.     One of the papers funded by the Searle Freedom Trust was written in 2012 while Professor Arcidiacono was chair of Duke's graduate economics department's admissions committee, and the article inflamed racial tensions on Duke's campus.  Day 4 Tr. 3:22–6:21 (Arcidiacono).  That article studied racial differences in choice of majors and concluded that the grade point average of White and African American students got closer between freshman and sophomore years.  *Id.*  The article concluded that African Americans tended to switch from natural sciences, engineering, and economics majors toward majors in the humanities and social sciences.  *Id.*  In reaching his conclusion, Professor Arcidiacono wrote that natural sciences, engineering, and economic courses are more difficult, associated with higher study times, and have harsher grading standards and that this translates into students with weaker academics—in particular, minorities—being less likely to choose these majors.  *Id.*

264.     Before this lawsuit, Professor Arcidiacono had never studied the admissions practices of service academies and had little familiarity with their admissions processes.  Day 3 Tr. 213:11–18 (Arcidiacono).

265.     In reaching his opinions in this case, Professor Arcidiacono did not speak with anyone from the Naval Academy's admissions office, any former or current applicants to the Naval Academy, or any current or former members of Students for Fair Admissions.  Day 3 Tr. 213:19–214:12 (Arcidiacono).

266.     Professor Arcidiacono is skeptical of holistic admissions process and believes that the Naval Academy's admissions process is murky and nontransparent.  Day 3 Tr. 222:2–21 (Arcidiacono).  Professor Arcidiacono believes that the Naval Academy is not being forthcoming about the extent to which it uses race in its admissions process.  *Id*. at 222:22–25.

267.     In contrast to his current views in litigation to support SFFA, when Professor Arcidiacono was chair of Duke's admissions board for the graduate school economics department, he was personally responsible for implementing a holistic admissions process.  Day 4 Tr. 6:20–10:25 (Arcidiacono).  For example, he thought he could improve the admissions process by instituting interviews.  *Id*. at 6:13–7:22.  He believed this was an important innovation because it allowed the admissions committee to determine if candidates had that "research spark" and would help assess qualities such as communication skills, truthfulness, creativity, and intellectual curiosity.  *Id*. at 7:23–10:17.  He believed the information he received during these fifteen-minute interviews was important in making admissions decisions.  *Id*. at 10:21–25.  The purpose of these interviews was to observe nonquantitative factors that could not be observed through the application.  *Id*. at 11:1–5.

268.     Professor Arcidiacono acknowledged that, while he was chair of Duke's admissions board for the graduate school economics department, when he was looking at two candidates with comparable academic qualifications, characteristics such as communication

skills, social skills, trust, and integrity could be important in choosing applicants.  Day 4 Tr. 23:15–24 (Arcidiacono).[11]

> b.  Plaintiff's estimate of the consideration of race is unreliable

269.    The Department of Justice retained Dr. Stuart Gurrea to assess the analysis presented by Professor Arcidiacono.  Day 7 Tr. 145:2–6 (Gurrea).

270.    Dr. Gurrea is an economist with over twenty years of experience who works as a Managing Director for Secretariat, an economics consultancy.  Day 7 Tr. 133:24–134:4 (Gurrea). Dr. Gurrea received the equivalent of a bachelor's degree in economics from the University of Seville in Spain, and received both a masters and a doctoral degree in economics from Northwestern University.  *Id.* at 134:5–135:15.  Dr. Gurrea's doctoral studies focused on financial economics, industrial organizations and econometrics.  *Id.* at 135:16–19.  Econometrics is the application of mathematics and statistics to the analysis of economic data.  *Id.* at 135:20–22.

271.    Dr. Gurrea has worked on about 100 cases as an economics consultant over his more than 20-year career.  Day 7 Tr. 142:9–11 (Gurrea).  His consulting work has spanned a wide range of industries, including among others, telecommunications and energy sectors,

---

[11] The year before Professor Arcidiacono became chair, the number of African Americans admitted to the Duke Graduate department of economics was about 7.5%.  Day 4 Tr. 13:2–15:25 (Arcidiacono).  The year after he became chair, the number of African American admits declined from four students to one student, resulting in a decline from 7.5% to 2.7%.  *Id.*  Professor Arcidiacono acknowledges that these statistics do not reveal anything about whether he was discriminating against African Americans in Duke's admissions process or the reasons that he made decisions on specific people he invited to join the economics department.  Day 4 Tr. 16:4–17:4.  Professor Arcidiacono's acknowledgement that the decline in admissions for minorities at Duke reveals nothing about the reasons for the decline holds equally true for the Naval Academy.  Indeed, Professor Arcidiacono admitted that his model does not provide any information about intent, and he is not offering any opinions about the motivations of the Naval Academy in making admissions decisions.  Day 3 Tr. 214:17–24.

pharmaceuticals, consumer goods, and the education industry.  *Id.* at140:18–22.  Although Dr.

Gurrea lacked any direct experience in these industries, he was able to conduct an economic

analysis by familiarizing himself with the specifics of these industries by interviewing officials,

collecting public data, and reviewing documents.  *Id.* at 140:23–141:9.

272.    Dr. Gurrea used that same approach in this case.  Day 7 Tr. 141:10–142:8

(Gurrea).  This included visiting the Naval Academy to speak with knowledgeable decision-

makers such as Melody Hwang, Dean Latta, and others about the admissions process, reviewing

documents produced in this case, reviewing public documents, and consulting economics

textbooks and journals.  *Id.* 141:15–142:8.

273.    Dr. Gurrea has been qualified as an expert in economics, economic modeling, the

analysis of economic and survey data, and impact evaluation multiple times, including in federal

courts in California, the U.S. District Court for the District of Maryland, and the Court of Federal

Claims.  Day 7 Tr. 144:1–12 (Gurrea).  No court has ever found Dr. Gurrea not to be qualified to

offer expert testimony.  *Id.* at 144:13–14.  Dr. Gurrea is a member of the American Economic

Association and the American Finance Association.  *Id.* at 144:24–145:1.[12]

---

[12] As reflected in Dr. Gurrea's report, the Department of Justice compensated his "employer, Secretariat, for [his] work in this matter (approximately 460 hours) at an hourly rate of $750" and "[t]his rate applies to [his] work preparing this report and to any testimony Counsel ask[ed him] to provide at deposition or trial."  DX200-007.  In addition, "Secretariat's compensation is independent of all opinions [Dr. Gurrea] render[s] in this case and of the outcome of this matter." *Id.*  At trial, Plaintiff's counsel moved to strike Dr. Gurrea's report under Rule 26 on the grounds that Dr. Gurrea received a portion of revenue generated from those who assisted him in developing his opinions, and that this compensation structure was not disclosed in his report. Day 7 Tr. 192:6–6–8.  Plaintiff's counsel admitted, however, that he only moved to strike Dr. Gurrea's report "to draw the Court's attention," that he "expected the Court to carry it and [his] cross to continue" and that the reason Dr. Gurrea did not identify this compensation structure was based on the Department of Justice's interpretation of the agreement between counsel regarding expert disclosures.  *Id.* at 201:20–4.  Any misunderstanding between the parties regarding the scope of the disclosure of compensation in Dr. Gurrea's report should not reflect

274.     Professor Arcidiacono has estimated a coefficient that purports to measure the impact of race on the admissions process.  Day 7 Tr. 152:10–24 (Gurrea); DD5.10.  But because the Naval Academy considers information that is not reflected in Professor Arcidiacono's dataset, some of which is correlated with race, Professor Arcidiacono's estimate reflects a mix of both the contribution of the Naval Academy's consideration of race and information not captured by the model that is also correlated with race, such as socioeconomic status.  Day 7 Tr. 155:12–21 (Gurrea).

275.     The result is that Professor Arcidiacono's estimate of the contribution of race to the Academy's admissions decisions is overstated because he fails to account for information that is a strength for minority candidates, and this results in a misattribution of the effect that he quantifies to the consideration of race by the Naval Academy.  Day 7 Tr. 148:25–149:13 (Gurrea); DD5.2.

276.     This issue is commonly referred to as omitted variable bias.  Day 7 Tr. 155:22–23 (Gurrea).  Omitted variable bias, which is the concept that bias might be explained by another variable or a variable not contained in the observable data, is a well-recognized concept in economics.  Day 4 Tr. 21:20–22:10 (Arcidiacono).  Omitted variable bias is a concern in modeling claimed discrimination.  *Id.* at 22:11–13.

277.     Professor Arcidiacono acknowledges that his model does not allow him to forecast an applicant's admissions decision perfectly because there are unobserved variables.  Day 4 Tr. 23:25–24:11 (Arcidiacono).

---

on the credibility of Dr. Gurrea or his opinions.  And, in any event, Plaintiff's expert Professor Arcidiacono is being compensated at $900 an hour for his testimony.  P218 at 9.

278.     Professor Arcidiacono and Dr. Gurrea both agree that there is information that Professor Arcidiacono did not observe in his data that contributes to admissions decisions and that this biases his estimates.  Day 7 Tr. 157:9–16 (Gurrea); DD5.15; P218 at 96.

279.     Professor Arcidiacono's model assumes that the unobservable information considered by the Naval Academy is uncorrelated with the observable data in his model.  Day 4 Tr. 24:12–23 (Arcidiacono).

280.     The basis for this assumption is an article by Professor Altonji and others that concludes that if someone is stronger on observable characteristics, the assumption is that the person is also stronger in the unobservable characteristics.  Day 7 Tr. 160:13–23 (Gurrea); DD5.18.

281.     As Dr. Gurrea explained at trial, the study Professor Arcidiacono relies on expressly states that it is inappropriate to infer too much about selection on unobservables from observable information if the observables are unlikely to be representative of the full range of factors.  Day 7 Tr. 160:24–161:6 (Gurrea).

282.     Professor Arcidiacono admitted that if his assumption was incorrect and there is a negative correlation between the observables and the unobservables, then he is overestimating the estimate of racial preferences in this case.  Day 4 Tr. 24:24–25:3 (Arcidiacono).

283.     Professor Arcidiacono acknowledges that the Naval Academy considers factors beyond academics in making admissions decisions, that some of those non-academic factors are unobservable to him but are observable to the Naval Academy, and that these unobservable factors are important to the Naval Academy's admissions process.  Day 4 Tr. 19:15–21:19, 27:13–15 (Arcidiacono).  This would include factors such as motivation, leadership potential, discipline issues, and the strength of high school curriculum.  *Id.* at 25:21–26:13, 27:13–25.  In

fact, Professor Arcidiacono agrees that "there is a whole host of information" that is not visible to him but is observable to the Naval Academy.  *Id.* at 28:2–5.

284.    Professor Arcidiacono never investigated whether his assumption that drives his model is supported by the facts in this case.  For example, the Naval Academy obtains socioeconomic information from sources such as letters of recommendation, interview notes, and personal statements, and this information is relevant to making admissions decisions.  Day 7 Tr. 156:4–25 (Gurrea); Day 4 Tr. 27:9-12 (Arcidiacono).  Professor Arcidiacono acknowledged that he did not apply a statistical analysis to this information.  Day 4 Tr. 26:14-27:8 (Arcidiacono); Day 7 Tr. 157:1–3 (Gurrea); DD5.14.

285.    Professor Arcidiacono never investigated whether there were applicants who had relatively weaker grades but a strong essay.  Day 4 Tr. 34:8–16 (Arcidiacono).  He acknowledged, however, that it is certainly possible that a Black applicant for admission to the Naval Academy may have relatively weaker grades but a strong essay about having to overcome racism while growing up.  *Id.* at 34:17–21.

286.    Professor Arcidiacono also never investigated whether there were applicants who had relatively weaker grades but strong letters of recommendation.  Day 4 Tr. 35:5–8 (Arcidiacono).  He acknowledges it is possible that a Black applicant to the Naval Academy may have relatively weaker grades but strong letters of recommendation highlighting leadership skills.  *Id.* at 35:9–13.  Professor Arcidiacono has no idea how common this circumstance may be because that is not something he investigated.  *Id.* at 35:9–36:13.

287.    Professor Arcidiacono did not review any letters of recommendations in this case, and only scanned one or two personal statements.  Day 4 Tr. 29:25–30:6 (Arcidiacono). Professor Arcidiacono reviewed fewer than 100 school counselor forms and concluded that the

information contained in those forms was not relevant to admissions decisions. *Id.* at 30:7–19. Professor Arcidiacono did not consider Dean Latta's trial testimony that the information in the school counselor forms is highly relevant and important to admissions decisions, and he has no reason to disagree with that testimony. *Id.* at 31:1–6. And Professor Arcidiacono does not remember whether he saw any school counselor form that discussed an applicant's socioeconomic status, such as whether an applicant was on food stamps or other government assistance. *Id.* at 31:17–25.

288.    Professor Arcidiacono agreed that there is no real way to test his assumption about the lack of correlation between the variables he can observe in his model and the unobservable information considered by the Naval Academy in the admissions process. Day 4 Tr. 25:4–7 (Arcidiacono). He concedes that if there were unobserved factors that were massive and perfectly correlated with race, it would be possible that the race coefficient in his model would not reveal anything about the impact of race on the Naval Academy's admissions process. *Id.* at 25:9–15.

289.    Although Professor Arcidiacono acknowledges that an assumption that "drives" his model is that unobserved factors are independent across all applicants, he acknowledged at trial that, for at least a subset of applicants, that assumption was unreasonable. Day 4 Tr. 28:6–16 (Arcidiacono). For example, he agrees that because Black applicants are more likely to come from more socioeconomically disadvantaged households, schools, and neighborhoods, Black applicants who are missing socioeconomic information will appear to be coming from more socioeconomically advantaged households than is actually the case. *Id.* at 28:18–24.

290.     Both parties' experts agree that African Americans are more likely to come from socioeconomically disadvantaged households.  Day 7 Tr. 163:20–164:16 (Gurrea); DD5.21; P218 at 63; P219 at 29.

291.     The evidence shows that the Naval Academy positively values socioeconomically disadvantaged background in making admissions decisions.  Day 7 Tr. 164:18–165:4 (Gurrea); DD5.22; DD5.23.

292.     As Dr. Gurrea explained at trial, the direction of the bias in Professor Arcidiacono's model serves to overstate the true impact of race in the admissions process.  Day 7 Tr. 158:2–11 (Gurrea).

293.     Although Professor Arcidiacono's "model 8" tries to account for socioeconomic data, he failed to reliably account for socioeconomic status in his model.  Day 7 Tr. 165:20–166:8 (Gurrea); DD5.24.

294.     Professor Arcidiacono attempts to model socioeconomic status by reliance on only two factors that can be observed in the data through the RABs:  first-generation college students and self-reported income under $80,000.  Day 4 Tr. 54:19–55:15 (Arcidiacono).

295.     There are a number of problems with this data.  First, when Professor Arcidiacono attempts to account for this information, the sample size in his model 8 shrinks by 38% because much of the socioeconomic data considered by the Naval Academy is unobservable.  Day 4 Tr. 54:3–5 (Arcidiacono).

296.     Second, Professor Arcidiacono agrees that because income information is self-reported, it is possible that his regression analysis includes applicants who have misreported income.  Day 4 Tr. 56:8–11 (Arcidiacono).  Indeed, as Dean Latta testified, self-reported income data is unreliable; Plaintiff's own expert Mr. Kahlenberg noted "limitations" in the income data.

Day 2 Tr. 219:10-220:14 (Latta); Day 4 Tr. 111:19–24 (Kahlenberg); Day 7 Tr. 167:4–13 (Gurrea); DD5.25; DD5.26; P219 at 90-92.  Professor Arcidiacono admitted that he has no reason to dispute Dean Latta's testimony that applicants frequently misreport income, because Professor Arcidiacono never investigated this issue.  Day 4 Tr. 56:12–18 (Arcidiacono).[13]  He conceded that if applicants who reported income were wrong, that would lead to measurement error that would attenuate his coefficient.  *Id.* at 56:19–22.

297.    Third, even if this self-reported income were accurate, Professor Arcidiacono failed to consider that purchasing power varies across geography and over time, with the inflation rate of 20% over the period of time he considered.  Day 7 Tr. 165:20–166:8 (Gurrea).

298.    In addition, Professor Arcidiacono includes a measure of average salary per ZIP code, but ZIP codes encompass a broad average that has no direct connection with average or individual salaries.  And he fails to include any measure of wealth in his model.  Day 7 Tr. 165:20–166:8 (Gurrea).

299.    Professor Arcidiacono's failure to properly account for socioeconomic status in his model results in his misattribution and overestimation of the impact of the consideration of race in his model.  Day 7 Tr. 167:14–168:9 (Gurrea); DD5.27.

300.    The omitted variable bias affects both the reliability of Professor Arcidiacono's estimate of the magnitude of racial preferences at the Naval Academy and at NAPS.  Day 7 Tr. 169:4–169:10 (Gurrea).

---

[13] As Dean Latta explained at trial, the lack of reliably reported income data is one reason the Naval Academy considers broader sources of information in assessing the socioeconomic status of applicants.  Day 2 Tr. 219:10–220:14 (Latta); Day 7 Tr. 166:9–17 (Gurrea); DD5.25.

c.   Professor Arcidiacono's use of a logit model is inappropriate in this case

301.    Professor Arcidiacono's logit model assumes that the Naval Academy is making each admissions decision independent of every other decision.  As the facts of this case reveal, however, admissions decisions are interdependent, rendering Professor Arcidiacono's use of a logit model inappropriate and his results unreliable.  Day 4 Tr. 52:2–6 (Arcidiacono); Day 7 Tr. 169:11–170:4 (Gurrea); DD5.28.

302.    Interdependence means that decisions made today have an impact on the decisions made tomorrow.  Day 7 Tr. 170:1–4 (Gurrea).

303.    If admissions decisions are correlated or interdependent with each other, then the statistical analysis and estimates derived cannot be used because the assumptions underlying the model are violated.  Day 7 Tr. 170:5–9 (Gurrea).

304.    Both Professor Arcidiacono and Dr. Gurrea agree that admissions decisions are interdependent.  Day 4 Tr. 52:11–14 (Arcidiacono); Day 7 Tr. 170:10–13 (Gurrea); DD5.30.

305.    Professor Arcidiacono further acknowledged that interdependence is a concern when decisions today enter into the model and affect the next decision.  Day 3 Tr. 195:22-196:15 (Arcidiacono); Day 7 Tr. 170:23–171:1 (Gurrea).

306.    Dr. Gurrea explained that admissions decisions made by the Naval Academy at a given point in time impact subsequent decisions for at least five reasons.  Day 7 Tr. 171:2–5 (Gurrea); DD5.32.

307.    First, one source of interdependence is the competition among applicants for a limited number of appointments based on a fixed class size.  Day 7 Tr. 171:6–18 (Gurrea); DD5.32; DD5.33.  Because admissions decisions are made on a rolling basis, the admission of

one applicant affects the prospects of admission of subsequent applicants.  Day 7 Tr. At 171:6–14 (Gurrea).

308.     Professor Arcidiacono's model attempts to deal with this form of interdependence by assuming that applicants do not compete against each other but rather compete against a fixed common standard.  Day 7 Tr. 171:19–172:13 (Gurrea); DD5.33.  Yet Professor Arcidiacono acknowledged that admissions standards are not constant over time, and that the standard decreases as the admissions process progresses and some applicants decline offers.  Day 7 Tr. 171:19–172:13 (Gurrea); DD5.33; P518 at 6.  In other words, Professor Arcidiacono's model includes a critical assumption that he acknowledges is inconsistent with how admissions decisions operate at the Naval Academy.  Day 7 Tr. 171:19–172:13 (Gurrea).

309.     Second, both Professor Arcidiacono and Dr. Gurrea agree that competition within a slate also creates interdependence.  Day 4 Tr. 52:11-14 (Arcidiacono); Day 7 Tr. 172:14–173:1 (Gurrea).  This form of competition is unique to the service academies and reflects the fact that congressional slates have a limited number of nominees who are competing against each other for an appointment.  Day 7 Tr. 172:14–173:1 (Gurrea); DD5.34.  Although Professor Arcidiacono's model attempts to deal with interdependence within a single slate by controlling for certain slate characteristics, he does not address the competition between multiple slates, which Dean Latta explained commonly happens during the admissions cycle.  Day 3 Tr. 14:3-6; Tr. 17:16-18:1 (Latta); Day 7 Tr. 173:2–10 (Gurrea).

310.     Third, the Naval Academy's admissions process is interdependent because the Academy seeks diversity beyond just racial and ethnic diversity.  Day 7 Tr. 173:11–17 (Gurrea); DD5.35.  Diversity relates to the concept of variety, meaning that candidates with the same characteristics become less valuable when considering subsequent applicants.  *Id.* at 173:11–24.

For example, Dean Latta explained that the consideration of unique life experiences can be given more weight later in the admissions process as the Naval Academy seeks to increase the overall diversity of the class.  Day 3 Tr. 12:9-18 (Latta); Day 7 Tr. 173:11–17 (Gurrea): DD5.35. Professor Arcidiacono never addressed this source of interdependence either in his expert reports or at trial.  Day 7 Tr. 174:8–12 (Gurrea).

311.    Fourth, the requirement that the Naval Academy must graduate at least 65% of the class as STEM majors is another form of interdependence because the strength of an applicant that offers these characteristics will depend on prior admissions decisions and whether the Naval Academy is closer to this threshold.  DX159-020; Day 7 Tr. 174:13–23 (Gurrea); DD5.36.  This is another form of interdependence that Professor Arcidiacono failed to address in his model. Day 4 Tr. 53:7-12 (Arcidiacono); Day 7 Tr. 174:24–175:1 (Gurrea); DD5.37.

312.    Fifth, the Naval Academy gives priority to candidates from underrepresented districts, which creates interdependence because the status of an applicant as coming from an underrepresented district depends on prior admissions decisions.  Day 7 Tr. 175:2–8 (Gurrea); DD5.38.  Professor Arcidiacono's model fails to control for this form of interdependence.  Day 7 Tr. 175:2–11 (Gurrea); DD5.38.

313.    The consequence of Professor Arcidiacono's failure to control for these various sources of interdependence means that the critical assumption in his model—that an admissions decision today does not impact future admissions decisions—is not met and that his logit model cannot be reliably used in this case.  Day 7 Tr. 175:12–18 (Gurrea).

314.    Dr. Gurrea acknowledged that Harvard's expert Dr. David Card used a logit model with binary outcomes to model Harvard's admission process and explained that the Naval Academy's process is different.  Day 7 Tr. 214:22–25, 218:13–15 (Gurrea).  Dr. Gurrea

explained that the Naval Academy's admissions process has unique features in terms of variety and competition with respect to the congressional nominations process and the interactions between candidates within a slate and among multiple slates.  *Id.* at 226:17–227:13.  Unlike the Naval Academy, Harvard does not use a congressional nomination process or have a requirement to graduate at least 65% of its class as STEM majors.  *Id.* at 227:14–18.  These unique features of the Naval Academy's admissions process introduce additional forms of interdependence that Dr. Card did not consider in using a logit model with binary outcomes in the Harvard case.  *Id.* at 227:19–25.

> d.  Professor Arcidiacono admits that he has not presented a realistic model of the Naval Academy's admissions process in the absence of race

315.    Professor Arcidiacono has presented a simulation depicting a world in which the Naval Academy does not consider race that is inconsistent with his own views about what would happen if the Naval Academy discontinued the use of race.  Day 7 Tr. 182:2–7 (Gurrea).

316.    Although Professor Arcidiacono presented four methods that he used to quantify the Naval Academy's use of race in the admissions process—the transformational analysis, the average marginal effects analysis, the admitted minority analysis, and the capacity constraint analysis—the first three analyses only reflect what would happen if you changed just one person's race from a minority to a non-minority.  Day 4 Tr. 46:4–22 (Arcidiacono); Day 7 Tr. 182:8–183:8 (Gurrea); DD5.48.

317.    To estimate the entire class composition and what it would look like without the consideration of race, Professor Arcidiacono used a capacity constraint analysis.  Day 4 Tr. 46:23–47:1 (Arcidiacono).

318.    Professor Arcidiacono's capacity constraint model improperly assumes that in a counterfactual world where the Naval Academy no longer considers race, the Naval Academy

does not change any other aspect of its admissions process and that applicant behavior does not change.  Day 7 Tr. 183:19–184:11 (Gurrea).

319.     This assumption is unwarranted because, as Professor Arcidiacono conceded at trial, in a world where the Naval Academy did not consider race it is likely that the Naval Academy would make changes to its admissions process, including the weight it gives to various applicant attributes, and that applicant behavior would change.  Day 4 Tr. 48:24–49:8 (Arcidiacono); Day 7 Tr. 183:19–184:11 (Gurrea).

320.     In fact, years after his work in the *Harvard* and *UNC* cases, Professor Arcidiacono published a peer-reviewed article about his work in the Harvard case in which he acknowledged that if affirmative action were banned, he expected that both prospective students and universities would change their application portfolios or their recruiting strategies.  Day 4 Tr. 49:9–18 (Arcidiacono).  Professor Arcidiacono's article cautioned that the results of his model in *Harvard* are "not meant to estimate the impact of an affirmative action ban."  Day 7 Tr.  185:4–24 (Gurrea); DD5.52.  "In particular, when we remove racial preferences, we do not allow schools to adjust their preferences for all other applicant attributes."  Day 7 Tr. 185:4–24 (Gurrea); DD5.52.

321.     In other words, years after Professor Arcidiacono presented his model in the *Harvard* case, he wrote an article acknowledging that his capacity constraint model does not accurately model the counterfactual or but-for world.  Day 7 Tr. 185:25–186:4 (Gurrea).

322.     Professor Arcidiacono acknowledged at trial that he believes the Naval Academy likely would change its admissions process and that applicants likely would change their application behavior in the but-for world, despite his model assuming the opposite.  Day 4 Tr. 49:13-50:17 (Arcidiacono).

323.    For example, Professor Arcidiacono observed that after affirmative action was banned in California, colleges responded by lowering the emphasis on test scores and giving more weight to being from less affluent backgrounds.  Day 4 Tr. 49:22–50:9 (Arcidiacono).  Professor Arcidiacono believes there is a good possibility that the Naval Academy would use some of these same methods if it could no longer consider race in its admissions process.  *Id.* at 49:22–50:13.

324.    Professor Arcidiacono made no effort to model how applicant behavior would change if the Naval Academy no longer considered race.  Day 4 Tr. 51:17–20.  Professor Arcidiacono conceded that if the applicant behavior changed and the Naval Academy changed its admission process because it could no longer consider race, then his estimate would not necessarily be accurate.  *Id.* at 50:23–51:25.

e.   Professor Arcidiacono's model arbitrarily categorizes race and ethnicity

325.    Professor Arcidiacono's model also arbitrarily categorizes race and ethnicity.  Day 7 Tr. 175:19–176:19 (Gurrea); DD5.39; DD5.40.  Professor Arcidiacono's categorization is based on how Harvard categorized races.  Day 7 Tr. 176:20–21 (Gurrea).

326.    Professor Arcidiacono's model eliminates the distinction between race and ethnicity and artificially assigns multiracial candidates to single-minority groups.  Day 7 Tr. 175:19–176:19 (Gurrea); DD5.40.  Professor Arcidiacono's arbitrary categorization of race is inconsistent with the Navy's instructions regarding the reporting of race and ethnicity data.  DX101 (Aug. 2, 2007 Navy Memorandum regarding collection and reporting of demographic data); DX102 (Navy Personnel Manual requirements for collection and reporting of demographic data).

98

327.    For example, Professor Arcidiacono categorizes any candidate who self-identifies as multi-racial as Black if one of that candidate's races is Black.  Day 7 Tr. 175:19–176:19 (Gurrea); DD5.40.  Similarly, if a candidate identifies as both Hispanic and Black, Professor Arcidiacono categorizes that applicant as Black and not Hispanic.  Day 7 Tr. 177:1–20 (Gurrea); DD5.41.  The consequence of these categorization rules is that Professor Arcidiacono's White category does not include any White Hispanics because they would all be categorized as Hispanic, and he omits a category for multiracial applicants even though applicants can and do self-identify as multiracial.  Day 7 Tr. 177:1–20 (Gurrea); DD5.41.

328.    Professor Arcidiacono's arbitrary categorization of race is material to his predictions about the impact of race on the admissions process.  Day 7 Tr. 177:22–24 (Gurrea); DD5.42.  One of the metrics Professor Arcidiacono uses to measure the impact of race on the admissions process is the average marginal effect of race and ethnicity, which purports to measure the contribution of race to admissions decisions.  Day 7 Tr. 177:21–178:13 (Gurrea); DD5.42.  Professor Arcidiacono calculates this marginal effect by turning on and off the coefficient that he estimates.  Day 7 Tr. 177:21–178:13 (Gurrea).  An alternative categorization of race, where multiracial applicants are a separate category and race and ethnicity are not blended, results in the coefficient on Black preferences fall from 24.35% to 18.88%.  *Id.* at 177:21–178:13; DD5.42.

329.    The contribution of race on the admissions process would likely be less than 18.88%, however, because, as discussed above, Professor Arcidiacono's calculation reflects a biased estimate due to the failure to account for unobservables in his model.  Day 7 Tr. 179:2–15 (Gurrea).

330.    Dr. Gurrea concluded that when employing an alternative categorization of race and ethnicity, Professor Arcidiacono's estimate of the marginal effect of race on the admissions process also dropped for Asian Americans.  Day 7 Tr. 179:16–22 (Gurrea).

> f.  Plaintiff offered no expert testimony that the Naval Academy's admissions process is "zero sum"

331.    Plaintiff offered no expert testimony that the Naval Academy's admissions process is zero sum, and Plaintiff presented no evidence to support such a claim.

332.    By contrast, Dr. Gurrea demonstrated that the Naval Academy's admissions process is not zero sum.  Day 7 Tr. 179:23–180:15 (Gurrea).  Zero sum is the concept that admission of one candidate comes at the expense of another candidate, and that an advantage given to one racial group during the admissions process comes at the expense of another racial group. *Id.* at 180:10–15.

333.    As Dr. Gurrea explained at trial, however, the number of White applicants to the Naval Academy is seven times the number of Black applicants.  Day 7 Tr. at 180:16–181:6 (Gurrea); DD5.44.  This means that while the absence of the consideration of race has a massive impact on African Americans—a decline in admissions of over 22% based on Professor Arcidiacono's calculation—the impact on White applicants is a much more modest increase in admissions by 4.2%.  Day 7 Tr. 181:7–18 (Gurrea); DD5.44.  In other words, the magnitude of the loss for Black applicants is diluted among all White applicants because there are so many more White applicants.  Day 7 Tr. 181:9–18 (Gurrea); DD5.44.  The consequence is that the admissions rate for Black applicants has a relatively small impact on the prospects of individual White applicants.  Day 7 Tr. 181:19–182:1 (Gurrea).

**J.    Race-Neutral Efforts**

1.    <u>The Naval Academy's Race-Neutral Efforts</u>

334.    The Naval Academy has implemented extensive race-neutral factors both within and outside of its admissions process in an attempt to achieve its sought-after diversity.

335.    Within the admissions process, the Naval Academy has incorporated numerous race-neutral factors to its WPM and RABs to award points to candidates based on race-neutral characteristics.  For example, the Naval Academy awards additional points for socioeconomically disadvantaged background, adversity, hardship, unusual life experience, first-generation college status, first-generation American status, English as second language, and military exposure.  DX1; DX2; Day 3 Tr. 79:19–9, 86:20–87:1 (Latta).

336.    Beyond points, when the Naval Academy is making offers of appointment, it also considers and highly values those same characteristics, as well as additional race-neutral characteristics such as enlisted members applying from the fleet, residence in under-represented congressional districts, and recruited athletes—groups with large minority populations.  DX4-003; DX28-003; P27 at USNA-00000148–49; Day 1 Tr. 233:11–19 (Hwang); Day 2 Tr. 209:7–211:21 (Latta); Day 3 Tr. 32:7–21, 105:21–106:7 (Latta).

337.    Outside of the admissions process, the Naval Academy has significantly increased and expanded its outreach efforts over the years to underrepresented communities, requested additional funding and billets to increase its social media presence, paid BGO officers to conduct outreach, and expanded its focus to include ninth, tenth, and eleventh graders.  Day 3 Tr. 75:14–77:11 (Latta).  The Admissions Office has substantially increased its outreach budget in recent years, with a current budget of approximately $3.2 million.  *Id.* at 50:9–15.  However, because the Naval Academy is a federally funded institution dependent on Congressional appropriations, with numerous cost centers to support (including, most significantly, the Academic Dean and

Provost center responsible for teaching the academic curriculum and providing leadership and ethics training), the money available to the Admissions Office is finite. *Id.* at 49:10-51:6.

338.    Nevertheless, the Admissions Office spends its allocated money strategically to achieve the maximum impact.  Its recruitment and outreach efforts, including those with specific focus on underrepresented communities, include:

a.    Summer STEM camp, which brings students grades 9–11 to the Naval Academy to "expose them to life as a midshipman," and has been successful in attracting more interest from minority candidates and in increasing applications to the Academy. Day 1 Tr. 216:15–25 (Hwang); Day 3 Tr. 54:19–57:20 (Latta); DX25-003; DX97-004; DX106-002; DX155-011; DX162-022; DX23-003.

b.    Additional STEM events, including a one-day STEM program, remote STEM, STEM Underway, and STEM on Deck, which target cities with large minority populations and are intended to encourage students grades 9–11 to apply to the Naval Academy.  Day 3 Tr. 70:17–72:16 (Latta); DX106-004; DX155-012; DX162-022.

c.    Summer Seminar, which brings rising seniors to the Naval Academy for a week to experience life at the Academy, the vast majority of which (70%) go on to complete their applications to the Naval Academy.  Day 1 Tr. 216:9–14 (Hwang); Day 3 Tr. 57:21–59:24 (Latta); DX97-004; DX106-002; DX155-013; DX162-022; DX23-003.

d.    INSPIRE, a program launched in 2021 to compete with other elite institutions for "highly qualified minorities in underrepresented groups by providing them and at least one parent [with] a personalized experience" at the Naval Academy.  DX106-004.  This program has been successful in encouraging more minorities to apply for and complete their applications, and the Naval Academy has tripled its investment in the

program since its initial launch.  P50; DX106-004; DX155-017; DX29-021; Day 3 Tr. 72:17–74:6 (Latta).

      e.      Candidate Visit Weekends, during which students room with midshipmen to experience life at the Naval Academy.  The Naval Academy sees high application rates resulting from this program, and it has increased interest by minority applicants as well. Day 3 Tr. 61:23–63:9 (Latta); DX106-003; DX155-016; DX162-022; DX23-003.

      f.      Centers of Influence programs, which bring influencers from underrepresented areas and underserved groups across the nation to the Naval Academy to help them learn about the Academy, with the goal of them returning to their communities and serving as a force multiplier for the Academy.  There is anecdotal evidence that these programs have helped encourage minority students to apply to the Naval Academy.  Day 3 Tr. 63:10–65:12 (Latta); DX84-005; DX154; DX155-019; DX162-022; DX24-032.

      g.      Operation Information ("OPINFO") events that send midshipmen back to their hometowns to encourage students to apply to the Naval Academy, and which have been successful in encouraging minority students to apply.  Day 3 Tr. 69:2–70:16 (Latta); DX106-004; DX115-006; DX155-014; DX162-022.  Last year, the Naval Academy scheduled 2,700 OPINFO events in cities with large minority populations that engaged nearly 33,000 prospective students.  DX106-004.

      h.      Traveling musical groups, including the Naval Academy Gospel Choir and Mariachi Band, to visit local high schools to engage with and encourage interest by minority groups.  DX84-002; DX106-003; DX162-022; Day 3 Tr. 66:16–67:13 (Latta).

i.      Targeted outreach to Title I high schools, which tend to have larger minority and socioeconomically disadvantaged populations, to generate awareness and interest in the Naval Academy.  DX28-003; Day 3 Tr. 79:19–81:11 (Latta).

j.      Admissions Forums in underserved communities across the country to enhance participation by local students.  DX28-004; DX155-009–010; DX162-022; DX24-014; Day 3 Tr. 81:12–82:6 (Latta).

k.      Frequent visits to Navy and Marine Corps units to encourage enlisted members of the fleet (who are disproportionately minorities) to apply.  DX28-003; DX29-021; Day 3 Tr. 77:14–79:7 (Latta).

l.      Retention of the EAB marketing firm within the last few years to assist in outreach efforts to minority populations.  The Naval Academy's investment in marketing efforts through EAB has increased from $800,000 in the first year to close to $2 million in 2024, and the outreach efforts contributed to a 14% increase in applications to the Naval Academy for the class of 2027.  Day 3 Tr. 51:19–53:8 (Latta); DX29-021; DX80-004; DX119; DX24-046; DX23-003.

m.      Expansion of the use of social media (including dedicating a staff member to focus on social media outreach), virtual campus tours, search engine marketing, texting, integration of smartphone technology, and other digital outreach efforts.  DX106-002; DX24-043; DX80-005; DX84-002; DX155-020–021; DX17-027–032; Day 3 Tr. 59:25–61:22, 67:16–68:16 (Latta).

339.    Moreover, recognizing that congressional nominations drive a substantial portion of the admissions process, the Naval Academy regularly meets with Members of Congress— through trainings at the Naval Academy, Congressional Academy Days hosted by Members of

Congress, and engagements with the Congressional Minority Caucuses—to educate them on the nomination process and to encourage them to nominate diverse candidates.  Day 1 Tr. 219:23–220:22 (Hwang); Day 3 Tr. 65:13–66:15, 82:10–83:1 (Latta); DX106-003; DX162-022; DX24-018; DX24-035–041.  Those efforts have been only minimally successful, however, because the Naval Academy ultimately cannot control the actions and priorities of Members of Congress. Day 1 Tri. 221:20–222:12 (Hwang); Day 2 Tr. 230:4–231:14 (Latta); Day 3 Tr. 66:7–15, 83:2–12 (Latta).

340.    Although the Naval Academy is "doing everything [it] can," and its efforts have helped improve minority representation, it faces challenges with minority applicant pools—particularly the African American and Hispanic applicant pools—that have not allowed the Academy to rely exclusively on its race-neutral alternatives.  Day 3 Tr. 46:2–48:8, 68:17–69:1, 75:14–17 (Latta).  Reasons for those challenges include lack of awareness, reluctant influencers such as parents and school counselors, skepticism of the military, and declining eligibility and propensity.  Id. at 46:2–48:8, 74:14–75:13.

341.    Despite the Naval Academy's race-neutral efforts, African American and Hispanic application completion rates continue to lag the overall application completion rate, resulting in smaller applicant pools for those populations.  Day 3 Tr. 48:12–49:7 (Latta).

342.    Dean Latta's professional judgment, based on his 22 years of experience in the Admissions Office, is that application of all the above race-neutral alternatives have not been sufficient to achieve the level of diversity sought by the Naval Academy, particularly with respect to African American and Hispanic students.  Day 3 Tr. 87:2–11 (Latta).  That testimony and experience is unrebutted and unchallenged.

2.      Plaintiff's Race-Neutral Alternatives Expert

343.    Plaintiff offered Richard Kahlenberg as an expert witness to opine on race-neutral

alternatives available to the Naval Academy.  Day 4 Tr. 65:22–25 (Kahlenberg).  Mr.

Kahlenberg is a proponent of institutions using socioeconomic preferences instead of considering

race.  *Id.* at 68:8–69:17, 83:18–21.  Mr. Kahlenberg, however, agrees there are important benefits

to racial diversity in the college experience and does not object to the Naval Academy's goal of

wanting a racially diverse class.  *Id.* at 117:11–16.

344.    Despite having published on the topic of the use of race and socioeconomic status

in education policy, Mr. Kahlenberg's publications and research have all focused on civilian

institutions.  Day 4 Tr. 120:25–121:13, 123:23–124:12 (Kahlenberg).  Mr. Kahlenberg has never

published on the military service academies and race-neutral alternatives.  *Id.* at 121:14–16.

345.    Mr. Kahlenberg has no expertise in military interests or affairs.  Day 4 Tr. 75:14–

16, 77:16–78:2, 117:21–25, 125:5–20 (Kahlenberg).  He agrees there are important differences

between the Naval Academy's admissions process and those at civilian universities—including,

for example, the congressional nominations process, the eligibility requirements, the physical

fitness requirement, and the medical qualification requirement—that result in a narrower

applicant pool for the Naval Academy.  *Id.* at 121:17–22, 122:12–123:14.

346.    Mr. Kahlenberg also has no experience either working in the admissions office of

any college, university, or service academy, or in evaluating available race-neutral alternatives

on behalf of any college, university, or service academy.  Day 4 Tr. 120:18–24 (Kahlenberg).

347.    Although Mr. Kahlenberg discussed the possibility that racial preferences can

generally have costs, such as leading to animosity, he professed no expertise on such costs in the

military context.  Day 4 Tr. 125:5–14 ("I have not studied and don't claim expertise on the

particular role that racial animosity might play in the military context.") (Kahlenberg).  Nor has

Mr. Kahlenberg conducted any studies on whether and to what extent considering race in admissions causes animosity, and at trial he identified a lone study from 1997 for that proposition.  *Id.* at 127:2–128:3.  He additionally relied on public opinion polls, but acknowledged they reflect only polling on racial preferences—not any associated costs—and further that the same polling reflected unpopularity with other preferences Mr. Kahlenberg himself has advocated for.  *Id.* at 127:14–20, 130:12–24.

348.    Despite having run five sets of 14 simulations each (for a total of 70) of possible race-neutral alternatives, at trial Mr. Kahlenberg presented the results of only five simulations. Day 4 Tr. 97:5–12 (Kahlenberg); PD4 at 21 (simulation 6 with 50% socioeconomic boost), *id.* at 23 (simulation 7 with 50% socioeconomic boost), *id.* at 24 (simulation 7 with 150% socioeconomic boost), *id.* at 26 (simulation 9 with 50% socioeconomic boost), *id.* at 27 (simulation 9 with 150% socioeconomic boost).

349.    Mr. Kahlenberg's simulations apply different levels of "boosts" for socioeconomic status (from 50% on the low end to 150% on the high end) and rely exclusively on Dr. Arcidiacono's flawed modeling and calculations.  Day 4 Tr. 95:10–21, 99:13–18, 104:19–105:10, 132:15–133:4 (Kahlenberg).

350.    Across the board, none of Mr. Kahlenberg's simulations account for leadership ability, moral character, STEM interest, intended academic concentration, graduation rate, underrepresented congressional districts, geographic diversity, gender diversity, or any form of diversity other than racial diversity and socioeconomic diversity—despite Mr. Kahlenberg's agreement that it is appropriate for the Naval Academy to consider many different characteristics (including those) when evaluating candidates for admission.  Day 4 Tr. 118:7–119:6, 134:21–137:10 (Kahlenberg).

351.    Across the board, none of Mr. Kahlenberg's simulations measure against the demographics of the United States population.  Day 4 Tr. 137:11–15, 188:9–11 (Kahlenberg).  Instead, they all measure against the "status quo"—what currently exists at the Naval Academy.  *Id.* at 137:17–21.

352.    Mr. Kahlenberg's simulation 1 reflects Professor Arcidiacono's calculation of what the Naval Academy's class would look like without the consideration of race.  PD4 at 18;  Day 4 Tr. 140:6–9 (Kahlenberg).  Under that simulation, the White population increases by 10 percentage points with a corresponding decrease to minority representation—a "meaningful decline" to Mr. Kahlenberg.  Day 4 Tr. 140:22–141:4 (Kahlenberg).

353.    Mr. Kahlenberg's simulations 2 and 3 add certain socioeconomic preferences.  PD4 at 18; Day 4 Tr. 142:3–6 (Kahlenberg).  Under those simulations, the White population increases and minority representation decreases relative to what currently exists at the Naval Academy.  Day 4 Tr. 150:24–151:5, 151:21–154:2 (Kahlenberg); P223 at 36, 256.

354.    Mr. Kahlenberg's simulations 4 and 5 remove legacy preferences (defined at the Naval Academy to be candidates whose parent has served in the United States military or whose parent or sibling attended any of the military service academies, *see* DX1-004)) and preferences for all sports except football and basketball.  PD4 at 19; Day 4 Tr. 154:3–8, 155:5–12 (Kahlenberg).  Mr. Kahlenberg acknowledged, however, that for a military academy there are benefits to having "applicants who are familiar with military life"; that all athletes possess valuable characteristics for a military academy; and that he is not aware of any college or university that considers participation in football and basketball only to the exclusion of all other sports.  Day 4 Tr. 154:11–155:4, 155:13-156:2 (Kahlenberg).

355.    Mr. Kahlenberg further admitted that for the Naval Academy, his simulations 4 and 5 "really didn't help racial diversity," "did not really have much of a benefit in terms of racial diversity," and he "wouldn't advocate them" as workable race-neutral alternatives.  Day 4 Tr. 100:9–20, 156:7–157:10 (Kahlenberg).

356.    Mr. Kahlenberg's simulation 6 adds an extra socioeconomic preference and removes certain aspects that tend to advantage White applicants.  PD4 at 20; Day 4 Tr. 157:11–16 (Kahlenberg).  He admitted, however, that simulation 6 "wouldn't end up making much difference in terms of the overall racial results" at the Naval Academy and was "not optimal." Day 4 Tr. 100:21–101:16, 158:10–159:9 (Kahlenberg).

357.    Indeed, under simulation 6, White representation increases and minority representation decreases relative to what currently exists at the Naval Academy.  PD4 at 21; Day 4 Tr. 159:16–160:5 (Kahlenberg).

358.    Mr. Kahlenberg's simulations 7 and 8 propose changes to NAPS: simulation 7 keeps seats for recruited athletes and gives all remaining seats to socioeconomically disadvantaged students; and simulation 8 doubles the size of NAPS.  PD4 at 22, 33.  Mr. Kahlenberg admitted, however, that he has no experience with the Naval Academy preparatory programs; that his proposal ignores the seats that currently go to enlisted members (for whom NAPS was established) and students from underrepresented congressional districts; that his proposal to double the size of NAPS is "a more dramatic change" and "a structural change"; and that "it would be challenging" to conclude that the Naval Academy could double the size of NAPS "and still meet all of its statutory and regulatory obligations."  Day 4 Tr. 160:14–16, 161:1–162:18, 165:1–17, 165:22–166:13 (Kahlenberg); DX124-008 (noting that "NAPS is the primary accession path for enlisted sailors and marines").

359.    In any event, under simulation 7, White representation increases and minority representation decreases relative to what currently exists at the Naval Academy.  PD4 at 23, 24; Day 4 Tr. 162:19–164:5 (Kahlenberg).  Likewise, under simulation 8, even after making the dramatic, structural change to double the size of NAPS, White representation increases and minority representation decreases relative to what currently exists at the Naval Academy.  P223 at 39; Day 4 Tr. 166:14–167:2 (Kahlenberg).

360.    Mr. Kahlenberg's simulation 9 assumes that, as a result of "increas[ing] recruiting and outreach," the Naval Academy could increase "the number of completed, underrepresented minority applications by 50%, which is an approach that's broadly consistent with the Coast Guard Academy."  Day 4 Tr. 106:15–23 (Kahlenberg).  Mr. Kahlenberg acknowledged that the Naval Academy already is doing "good things" with outreach—and opined simply that the Naval Academy could invest more.  Day 4 Tr. 167:7–11 (Kahlenberg).

361.    Mr. Kahlenberg admitted, however, that (i) he has no experience with the recruiting efforts of any college, university, or service academy; (ii) the Naval Academy cannot make someone apply or complete an application; (iii) neither he nor Professor Arcidiacono performed any analysis into the number or diversity of applications if the Naval Academy Admissions Office received every dollar requested for recruiting; (iv) there was likewise no analysis into whether and to what extent increased investment in recruitment could achieve his assumption of a 50% increase in completed applications by underrepresented minorities; (v) and neither was there any analysis into whether there are enough underrepresented minorities who currently have the propensity to serve to achieve Mr. Kahlenberg's assumption of a 50% increase in completed applications.  Day 4 Tr. 170:25–18, 172:22–173:6, 174:14–175:16 (Kahlenberg).

362.     Mr. Kahlenberg further admitted, with respect to his reference to the Coast Guard Academy, that he has never had any involvement with the Coast Guard Academy, did not speak to anyone at the Coast Guard Academy or review any internal Coast Guard Academy materials, and that the "most important difference" between the Naval Academy and civilian institutions—the lack of a congressional nomination system—is also an important difference between the Naval Academy and the Coast Guard Academy.  Day 4 Tr. 175:17–176:21 (Kahlenberg).

363.     In any event, under simulation 9 using the smallest 50% socioeconomic boost, White representation increases and minority representation decreases relative to what currently exists at the Naval Academy.  PD4 at 26; Day 4 Tr. 178:17–179:7 (Kahlenberg).

364.     It is only under simulation 9 using the largest 150% socioeconomic boost that Mr. Kahlenberg presented his first and only simulation where White representation decreases slightly—by one percentage point—and minority representation increases slightly by a corresponding amount.  PD4 at 27; Day 4 Tr. 179:8–23 (Kahlenberg).  Even under this most aggressive simulation, Black representation and Asian representation decrease relative to what currently exists at the Naval Academy.  PD4 at 27; Day 4 Tr. 179:24-180:2 (Kahlenberg).  Likewise, academic metrics are all lower under this most aggressive simulation—despite Mr. Kahlenberg agreeing that the Naval Academy has a legitimate interest in considering the academic preparedness of candidates.  PD4 at 27; Day 4 Tr. 118:11–13, 180:7–21 (Kahlenberg).

365.     Mr. Kahlenberg did not present any other simulation where White representation decreases and minority representation increases relative to what currently exists at the Naval Academy.  PD4.

366.     In every chart Mr. Kahlenberg presented at trial, Black and Asian representation decreases relative to what currently exists at the Naval Academy.  PD4 at 21, 23, 24, 26, 7; Day 4 Tr. 187:6–12 (Kahlenberg).

367.     Mr. Kahlenberg opined that his simulations reflect a floor rather than a ceiling, and that additional ideas—such as the Naval Academy requesting more information pertaining to socioeconomic status, increasing the number of enlisted members offered admission, using more race-neutral alternatives in the ROTC program, and changing the congressional nominations process—could achieve greater numbers than those reported in his simulations.  Day 4 Tr. 110:9–115:12 (Kahlenberg).  However, Mr. Kahlenberg did not present any simulations based on these other ideas.  PD4; Day 4 Tr. 110:9–16, 180:24–181:6, 182:18–20 (Kahlenberg).  He also admitted that (i) the Naval Academy application already requests substantial information pertaining to socioeconomic status; (ii) he did not consider the academic preparedness and ability to meet eligibility requirements for enlisted applicants; (iii) ROTC is not a Naval Academy matter and is not a matter that he studied; and (iv) the Naval Academy cannot dictate the choices of Members of Congress, and any attempt to change the congressional nominations process "would not be workable without Congress's cooperation."  Day 4 Tr. 142:8–25, 145:13–147:10, 181:7–25, 182:1–17, 183:4–186:7 (Kahlenberg).

368.     Mr. Kahlenberg also acknowledged, repeatedly, that the demographic results reported in all of his simulations would further drop if they reported race the way the Naval Academy is required to report race.  Day 4 Tr. 138:17–138:13, 139:23–140:1, 151:6–9, 160:6–9, 180:3–6, 187:13–16 (Kahlenberg).

369.    Mr. Kahlenberg did not present any simulation where White representation and minority representation reflect the demographics of the United States population.  PD4; Day 4 Tr. 137:11–15, 188:9–11 (Kahlenberg).

370.    Mr. Kahlenberg agreed that there may be instances when race-neutral alternatives cannot achieve the sought-after racial diversity, such as instances when an institution is not able to overcome challenges with a particular applicant pool.  Day 4 Tr. 119:11–17, 120:7–17 (Kahlenberg).

371.    Mr. Kahlenberg also agreed that it is acceptable for an institution to consider race when race-neutral alternatives do not produce the sought-after racial diversity.  Day 4 Tr. 119:7–10 (Kahlenberg).

### III.    The Navy and Marine Corps' Assignment and Accession Policies

#### A.    Service Assignments

372.    Upon graduation, midshipmen are commissioned as active-duty officers in the Navy or Marine Corps.  The Chief of Naval Personnel directs that up to 95% of the Naval Academy's graduates are assigned primarily to the warfighting communities.  Day 8 Tr. 8:16–18 (Sundberg).  The Chief of Naval Personnel also sets the number of billets and some of the requirements, including physical and training specifications, for each community.  *Id.* at 8:14–16.  Plaintiff failed to present any evidence that requirements for accession into certain communities deter minority midshipmen.  *Id*. at. 20:14–27:20.

373.    The service assignment process uses three factors: (1) midshipmen's preferences; (2) the needs of the Navy; and (3) midshipmen aptitude and performance.  Day 8 Tr. 8:22–9:3 (Sundberg); DX157 (Midshipmen Service Assignment) at 1.

374.    Race plays no role in the service assignment process.  Day 8 Tr. 7:13–14 (Sundberg).

375.     Midshipman can rank up to six preferences.  Day 8 Tr. 9:24 (Sundberg).

"[M]idshipmen preferences are honored as often as possible."  DX157 (Midshipmen Service

Assignment) at 1; *see also* Day 8 Tr. 9:8–9 (Sundberg).  This mandate rests on the notion that if

midshipmen get assigned to a community that they select, "they're going to perform better,"

"have a better attitude," and will be "more successful in that community."  Day 8 Tr. 9:19–22

(Sundberg).

376.     The focus on midshipmen's preferences in this process is reflected in the

proportion of midshipmen who get their first or second choice community: between 83% and

84% of midshipmen get their first-choice preference, and about 94% of midshipmen get their

first- or second-choice preference.  Day 8 Tr. 10:5–10 (Sundberg).

377.     The Naval Academy's Officer Accessions and Talent Optimization Department

(OATO) "allocates midshipmen to the various communities based on their first-choice

preferences."  Day 8 Tr. 10:13–17 (Sundberg).  Community Assignment Boards, comprised of

representatives of the community, then rank midshipmen using the criteria assigned to them by

the Chief of Naval Personnel and USNA Instruction 1301.5L: Midshipmen Service Assignment.

*See* DX157; Day 8 Tr. 11:4–9 (Sundberg).

378.     Plaintiff wrongly suggests that order of merit plays a disproportionate role in the

service assignment process.  Order of merit plays less of a role in service assignment than it

previously did.  Day 5 Tr. 81:15–20 (Vahsen).  "Each community determines the attributes they

deem necessary for projected success in the assigned warfare specialty and how those attributes

are evaluated," and order of merit is but one of many factors considered in determining the best-

qualified midshipmen.  DX157 (Midshipmen Service Assignment) at 7.  Each community

weighs various factors differently based on what they deem is necessary for projected success in

that specialty.  Day 8 Tr. 11:21–24, 19:11–15 (Sundberg).  *See* Day 5 Tr. 81:21–25 ("[E]very community chooses the rubric by which they decide how to select individuals or opt to select individuals.  Everyone is different.").

379.    Once communities rank midshipmen, OATO redistributes midshipmen based on their next community of choice and the process is iterative until all billet goals set by the Chief of Naval Personnel are met.  Day 8 Tr. 14:5–14 (Sundberg).  The Service Assignment Review Board is tasked with ensuring the latter.  *Id*. at 14:15–22.

380.    Race plays no role in the ranking and reviews done by the Community Assignment Boards and Service Assignment Boards. Day 8 Tr. 15:12–14 (Sundberg).

381.    Because the Naval Academy has a finite number of members in a graduating class, moving an individual from one community does not add to the overall force; rather, it only redistributes that officer to another community.  Day 8 Tr. 51:7–18 (Miller).

382.    A midshipman's choice of community is a significant factor in community assignment because the Department of Defense has seen high attrition among midshipmen who are forced into a community they did not choose.  Day 8 Tr. 51:2–6 (Miller).

   **B.    Accession Sources and Policies**

383.    Along with the Naval Academy, there are two other primary commissioning sources for the Navy and Marine Corps:  the Navy Reserve Officer Training Corps (ROTC) and Officer Candidate School.  Day 8 Tr. 51:24–25 (Miller).

384.    Whereas the Naval Academy offers admission to a four-year service academy in which a civilian is immediately accessed into the military upon induction, ROTC awards scholarships to students already attending or admitted to civilian universities.  Day 8 Tr. 52:13–24 (Miller); Day 6 Tr. 31:12–18 (Vazirani).

385.     Unlike the Naval Academy, the Navy and Marine Corps are not permitted to consider race when awarding ROTC scholarships.  DX 120 (DoD Information Paper of Dec. 1, 2021); Day 8 Tr. 52:13–24 (Miller).

386.     The Department of Defense tries to ensure that a diverse group of officers commissions through ROTC by maintaining a broad representation of ROTC units across the country to include historically Black colleges and universities and other minority-serving institutions.  Day 8 Tr. 53:4–8 (Miller); Day 6 Tr. 31:12–24 (Vazirani).

387.     Despite these efforts, officers commissioned through ROTC have been less racially and ethnically diverse than those commissioned through the Naval Academy since at least 2016.  DX 120 (DoD Information Paper of Dec. 1, 2021).

388.     The Department of Defense is monitoring the state of diversity in ROTC to assess whether the recent inability to consider race and ethnicity in admissions to civilian colleges will decrease the racial and ethnic diversity of ROTC units.  Day 8 Tr. 54:3–13 (Miller).

389.     If the racial and ethnic diversity of officers commissioned through ROTC decreases, this would make the limited consideration of race and ethnicity at the Naval Academy of even greater importance.  Day 8 Tr. 54:19–25 (Miller).

390.     Regardless of whether an officer accesses through the Naval Academy, ROTC, or Officer Candidate School, subsequent promotions are governed by a "closed-loop promotion system."  Day 7 Tr. 109:19–24 (Fuller); Day 8 Tr. 49:4–7 (Miller).  This means there is limited opportunity to access a civilian into the military beyond the entry level officer ranks.  Day 8 Tr. 45:3–5 (Miller).

391.     Vital warfare command billets such as commander of a destroyer, commander of a destroyer squadron, and commander of a carrier strike group cannot be achieved until 15, 20,

and 30 or more years of military service.  Day 8 Tr. 46:8–10, 47:5–13 (Miller).  Neither the Navy nor the Marine Corps can bring in a mid-grade or senior level officer from the civilian sector to fill these critical warfare billets.  Day 8 Tr. 47:9–12, 48:14–17, 49:4–7 (Miller).

392.    The closed loop system means the Naval Academy is a critically important insertion point for commissioned officers who will lead the Navy and Marine Corps in future years.  Day 7 Tr. 109:17–24 (Fuller).

393.    The closed loop system applies not only to the Navy and Marine Corps but to the Naval Academy as well because the number of individuals that can be brought into the Naval Academy is constrained by Congressional requirements.   Day 8 Tr. 51:12–18 (Miller).

394.    The Navy and Marine Corps are generally prohibited from considering race and ethnicity after a midshipman starts at the Naval Academy.  DX210 Tr. 23:15–25:11 (Truesdale).  This includes promotions, assignments, and compensation.  *Id*. at 24:16–25:14; Day 8 Tr. 112:14–18 (Miller).  This prohibition is based on a Department of Defense instruction, as well as Executive Order 9,981 (July 26, 1948).  DX210 Tr. 25:15–26:6 (Truesdale).

395.    The prohibition on the consideration of race post-accession makes the limited consideration of race for Naval Academy admissions decisions even more important because of the closed loop promotions policy.  DX210 Tr. 203:1–204:15 (Truesdale).  In other words, given the military's goal to have an officer corps reflective of the general population, the only opportunity the Navy has to shape the diversity of the officer corps to meet that strategic imperative is on the front-end during admissions decisions.  *Id*. at 203:1–204:15.

## PROPOSED CONCLUSIONS OF LAW

### I.    Standard Applied to Admissions Policies that Consider Race

1.    Governmental classifications based on the race of an individual must satisfy

"strict scrutiny." *Students for Fair Admissions v. President and Fellows of Harvard Coll.*, 600

U.S. 181, 206–07 (2023) ("*Harvard*").  To determine whether an action satisfies strict scrutiny,

the Court must first consider whether consideration of race would "further compelling

governmental interests." *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003).  It must then determine

whether the government's use of race is "'narrowly tailored'—meaning 'necessary'—to achieve

that interest." *SFFA v. U.S. Naval Acad.,* 707 F. Supp. 3d 486, 502 (2023) (quoting *Fisher v.

Univ. of Tex. at Austin*, 570 U.S. 297, 311–12 (2013) ("*Fisher I*")).

2.    In *Harvard*, the Supreme Court concluded that the admissions programs of

Harvard College and the University of North Carolina failed to satisfy strict scrutiny.  600 U.S.

at 230.  But it left open the possibility that other admissions programs *could* satisfy strict scrutiny

if they are designed to achieve one or more compelling interests that can be "subjected to

meaningful judicial review" and are narrowly tailored to achieve those interests.  *Id.* at 214.

3.    By its own terms, *Harvard* does not apply to military academies.  The Supreme

Court explained that the *Harvard* "opinion . . . does not address" "the propriety of race-based

admissions systems" "at our Nation's military academies," because of "the potentially distinct

interests that military academies may present."  600 U.S. at 213 n.4.

4.    The Supreme Court has underscored that "strict scrutiny must take relevant

differences into account," and courts must "calibrate[]" their narrow-tailoring inquiry to the

relevant context.  *Grutter*, 539 U.S. at 327, 334 (quotation omitted); *see also id.* at 327 ("Context

matters when reviewing race-based governmental action."); *Parents Involved in Cmty. Schs. v.

Seattle Sch. Dist. No. 1*, 551 U.S. 701, 725 (2007) (explaining that *Grutter* arose in "the unique

context of [civilian] higher education[]").

5.      Thus, courts must calibrate their narrow-tailoring inquiry in the context of the

distinct interests presented by service academies—as the Supreme Court recognized in *Harvard*.

600 U.S. at 213 n.4.

6.      The relevant context here is the military's distinct national security interests

served by a diverse officer corps.  *Grutter*, 539 U.S. at 308 ("High-ranking retired officers and

civilian military leaders assert that a highly qualified, racially diverse officer corps is essential to

national security.").

7.      As a result, the narrow tailoring inquiry applicable to civilian universities' use of

race to achieve educational diversity, *see Grutter*, 539 U.S. at 334, cannot be mechanistically

applied to the Naval Academy's use of race to achieve an altogether different compelling

national security interest.  The Supreme Court has had "no occasion to define the contours of the

narrow-tailoring inquiry" in this distinct military context.  *Id.* at 333.

## II.      Deference to the Executive in Matters of National Security

8.      The "Constitution vests '[t]he complex, subtle, and professional decisions as to

the composition, training, equipping, and control of a military force' exclusively in the

legislative and executive branches." *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1511 (D.C. Cir.

1989) (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)).  And "courts traditionally have been

reluctant to intrude upon the authority of the Executive in military and national security affairs."

*Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988); *see also SFFA v. U.S. Naval Acad.*, 707 F.

Supp. 3d 486, 504 (D. Md. 2023) ("[C]ourts have consistently deferred to the military regarding

its personnel decisions.  Accordingly, the Naval Academy is due more deference than were the

private and public universities in *Harvard* given the explicit caveat in footnote 4 of *Harvard*."

(citations omitted)); *Hrdlicka v. Del Toro*, No. RDB-22-2299, 2023 WL 4108267 at *6 (D. Md.

June 21, 2023) ("Courts are traditionally reluctant to interfere with the military establishment, including military personnel decisions"); *Selland v. Perry*, 905 F. Supp. 260, 264 (D. Md. 1995), *aff'd*, 100 F.3d 950 (4th Cir. 1996) ("Deference is warranted when the policy in question concerns the 'complex, subtle, and professional decisions as to the composition, training, equipping and control of a military force,' and is a 'studied choice of one alternative in preference to another for furthering that goal.'") (internal citations omitted); *Gilligan*, 413 U.S. at 7, 10 (stating, in reference to the Ohio National Guard's "training, weaponry, and orders," that it is "difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible—as the Judicial Branch is not—to the electoral process.").

9.      Indeed, "[t]he Constitution itself requires deference to the military choices of the political branches.  This includes deference to the judgments of military officials—not because of their expertise—but because the military authorities have been charged by the constitutionally responsible branches—that is, the Executive and Legislative Branches—with carrying out our Nation's military policy."  *Doe 2 v. Shanahan*, 917 F.3d 694, 730 (D.C. Cir. 2019) (Williams, J., concurring) (quotation omitted). "Judicial deference is at its apogee" in assessing the judgments of military officials because "[n]ot only are courts ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have, but the military authorities have been charged by the Executive and Legislative Branches with carrying out our Nation's military policy."  *Goldman v. Weinberger*, 475 U.S. 503, 507–08 (1986) (quotation marks, alterations, and citations omitted); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum.").

10.      While "mindful that 'military interests do not always trump other considerations,'" courts "'give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.'" *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008)).  Accordingly, when the judiciary is called to review a decision by the Armed Forces, the Supreme Court has stressed that "the tests and limitations to be applied may differ because of the military context," including when constitutional claims are involved.  *Rostker v. Goldberg*, 453 U.S. 57, 67 (1981); *see, e.g.*, *Austin v. U.S. Navy SEALs 1-26*, 142 S. Ct. 1301 (2022) (Mem.) (partially staying order precluding the Navy from considering vaccination status in making "deployment, assignment, and other operational decisions"); *Austin*, 142 S. Ct.  at 1302 (Kavanaugh, J., concurring) (expressing concern over "judicial intrusion into military affairs . . . because the Navy has an extraordinarily compelling interest in maintaining strategic and operational control over the assignment and deployment [of] personnel[]"); *Winter*, 555 U.S. at 24 (reversing preliminary injunction prohibiting the Navy from conducting sonar exercises, and deferring to "declarations from some of the Navy's most senior officers, all of whom underscored the threat posed by enemy submarines and the need for extensive sonar training to counter this threat"); *Goldman*, 475 U.S. at 507 ("Our review of [a constitutional challenge to] military regulations . . . is far more deferential than constitutional review of similar laws or regulations designed for civilian society."); *Rostker*, 453 U.S. at 64–68 (judgments concerning registration and the draft "are based on judgments concerning military operations and needs" and "unquestionably due" deference).[14]

---

[14] *See also Gilligan*, 413 U.S. at 4, 10; *Egan*, 484 U.S. at 530; *Chappell v. Wallace*, 462 U.S. 296, 301–02 (1983); *Haig v. Agee*, 453 U.S. 280, 291–94 (1981); *Schlesinger v. Councilman*,

11.     Although the Supreme Court has declined to attach a "label[]" to the type of review applicable to military decisions which would traditionally trigger heightened scrutiny, *Rostker*, 453 U.S. at 70, it has cautioned that courts "must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest[,]" *Goldman*, 475 U.S. at 507, and "must be particularly careful not to substitute . . . [their] own evaluation of evidence for a reasonable evaluation by" the military. *Rostker*, 453 U.S. at 68; *see also Hrdlicka*, 2023 WL 4108267 at *6 ("Courts are generally not equipped to review professional military judgments."); *see also Trump v. Hawaii*, 585 U.S. 667, 708 (2018) (emphasizing that courts "cannot substitute [their] own assessment for the Executive's predictive judgments on such matters" and that "the Executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of litigation involving 'sensitive and weighty interests of national security and foreign affairs.'" (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010)).  And the Supreme Court has found that "demanding hard proof—with 'detail,' 'specific facts,' and 'specific evidence' . . . would be a dangerous requirement." *Holder*, 561 at 34–35.  Rather, in the national security context, the Court has recognized that "conclusions must often be based on informed judgment rather than concrete evidence, and that reality affects what we may reasonably insist on from the Government." *Id.*

---

420 U.S. 738, 757–58 (1975); *United States v. Nixon*, 418 U.S. 683, 710 (1974); *Orloff v. Willoughby*, 345 U.S. 83, 93–94 (1953); *Burns v. Wilson*, 346 U.S. 137, 142, 144 (1953); *Youngstown*, 343 U.S. at 645 (Jackson, J., concurring) (the Court "should indulge the widest latitude" to sustain the President's "function to command the instruments of national force[]"); *Wimmer v. Lehman*, 705 F.2d 1402, 1403 (4th Cir. 1983), *cert. denied*, 464 U.S. 992 (1983) (upholding the Naval Academy's midshipmen removal process and deferring to Navy's interpretation of statutes guiding it); *Doolen v. Wormuth*, 5 F.4th 125, 133 (2d Cir. 2021) (similar); *Berry v. Bean*, 796 F.2d 713, 716 (4th Cir. 1986) ("[C]ourts accord decisions of military authorities great deference."); *Selland*, 905 F. Supp. at 266 ("Deference towards Congressional and Presidential judgment in the military context . . . counsels that courts should proceed with caution even in an equal protection claim.").

12.     Repeatedly, the Supreme Court has granted the political branches significant latitude to choose "among alternatives" in furthering military interests, *Rostker*, 453 U.S. at 71–72, as well as where to "draw[] the line" on particular standards, *Goldman*, 475 U.S. at 510.  And it has routinely accepted the judgments of senior military leaders regarding matters of readiness and operational risk.  *Winter*, 555 U.S. at 26 (deferring to the judgment of the Chief of Naval Operations regarding military readiness needs); *Austin*, 142 S. Ct. at 1302 (Kavanaugh, J. concurring) (deferring to the judgment of the Vice Chief of Naval Operations regarding operational risk and observing that lower court improperly "inserted itself into the Navy's chain of command, overriding military commanders' professional military judgments").

## III.     The Government Has Established Its Distinct National Security Interests

13.     At the preliminary injunction stage, this Court held that Plaintiff was unlikely to succeed in "showing that the Naval Academy's consideration of race and ethnicity in admission does not serve a compelling national security interest."  *SFFA v. U.S. Naval Acad.*, 707 F. Supp. 3d at 503.  At trial, the government presented overwhelming evidence of its national security interests in military readiness, unit cohesion, recruitment, retention, and legitimacy.  *See supra* Proposed Findings of Fact, Section I.

14.     These interests are unquestionably compelling and subject to the traditional principles of military deference the Supreme Court has applied for decades.  *Gilligan*, 413 U.S. at 10 (recognizing that matters of the "composition, training, equipping, and control of a military force are essentially professional military judgments"); *see also Austin*, 142 S. Ct. at 1302 (Kavanaugh, J., concurring) ("[T]he Navy has an extraordinarily compelling interest in . . . control over decisions about military readiness."); *Rostker*, 453 U.S. at 70 ("No one could deny

that . . . the Government's interest in raising and supporting armies is an 'important

governmental interest.'" (internal citation omitted)).[15]

15.     *Harvard* does not suggest otherwise.  In *Harvard*, the Supreme Court rejected two

civilian institutions' interests in educational diversity because they were not sufficiently

measurable; a court could not know, for example, whether student leaders had been adequately

"train[ed]" or whether the exchange of ideas in the classroom was "robust."  600 U.S. at 214.

16.     By contrast, no precedent requires courts to quantify or measure the military's

national security interests before upholding policies based on those interests.  Indeed, the

Supreme Court has cautioned that "a searching inquiry into the persuasiveness" of national

security interests "is inconsistent" with the deference owed to the Executive in this sphere.

*Trump*, 585 U.S. at 686; *see also Rostker*, 453 U.S. at 65 (observing that when it comes to

collecting evidence and drawing factual inferences in this area, "the lack of competence on the

part of the courts is marked"); *Larsen v. U.S. Navy*, 486 F. Supp. 2d 11, 29 (D.D.C. 2007)

("tak[ing] the Navy's" "stated justifications for its policy[]" "at its word" as the policy

"concern[ed] 'operational, strategic, or tactical matters'") (internal citation omitted).

17.     For example, in *Goldman*, a Free Exercise challenge, the Supreme Court did not

seek to "measure" the military's interest in duty and discipline in reviewing the constitutionality

of an Air Force regulation mandating uniform dress requirements for military personnel.  *See*

---

[15] Plaintiff is wrong that "recruitment and retention are not compelling interests."  Pl.'s Proposed
Findings of Fact & Conclusions of Law at 14, ECF No. 110 (citing *Wygant v. Jackson Bd. of
Educ.*, 476 U.S. 267, 273–75 (1986)).  In *Wygant*, the Court held that a school board could not
invoke a "role model theory" to justify race-conscious hiring and layoff practices designed to
remedy past discrimination.  *Id.* at 275–76.  Here, by contrast, the Naval Academy is not relying
on a "role model" theory to remedy past discrimination.  Rather, based on the evidence presented
at trial that the presence of minority officers enhances recruitment and retention, the military
seeks to increase the number of diverse officers to mitigate the risk of racial violence and tension
that it experienced in the past and which serve to harm the military's effectiveness.

475 U.S. at 504.  In fact, the Supreme Court rejected the plaintiff's argument that the military

needed to support its judgment with "actual experience or a scientific study."  *Id.* at 509–10.

Likewise, in *Holder*, a First Amendment challenge to Executive Branch efforts to combat

terrorism, the plaintiffs demanded "hard proof—with 'detail,' 'specific facts,' and 'specific

evidence'—that [their] proposed activities will support terrorist attacks."  561 U.S. at 34.  The

Supreme Court rejected such a requirement as "a dangerous requirement."  *Id.*  In the national

security context, "conclusions must often be based on informed judgment rather than concrete

evidence, and that reality affects what we may reasonably insist on from the Government."  *Id.* at

34–35.  And in *Winter*, the Court did not seek to "measure" the Navy's interest in the effective

training of its sailors in assessing a challenge to the Navy's use of sonar during training

exercises.  *See generally Winter*, 555 U.S. 7.  And with good reason.  Under separation of

powers principles, courts are not well positioned to measure or quantify the nature of the

military's interests in national defense.

18.     Thus, as this Court recognized in its preliminary injunction opinion, "the Naval

Academy is due more deference than were the private and public universities in *Harvard* ."

*SFFA v. U.S. Naval Acad.*, 707 F. Supp. 3d at 504.

19.     Even if *Harvard*'s "measurability" requirement applied in the military context,

the government's asserted interests here are measurable.  This Court previously concluded that it

was "confident" that, "at a minimum," a court could "examine demographic data to determine

whether the government is meeting its goals."  *SFFA v. U.S. Naval Acad.*, 707 F. Supp. 3d at

505.  Per the most recent U.S. Census data, Black individuals comprise approximately 13.7% of

the population and 17.5% of Navy sailors and 10.5% of Marines, but only 8.3% of the officer

corps for the Navy and 5.9% for the Marines.  *See* DX53-001 (2023 Census Data); DX52-0054

(DoD 2022 Demographics).  Those of Asian and Pacific Islander origin make up approximately 6.4% of the population, and 7.3% of Navy sailors and 4.9% of the Marines, and 6.6% of the officer corps for the Navy and 4.8% for the Marines.  *See* DX53-001; DX52-054.  White individuals make up approximately 58.4% of the population, and 62.8% of Navy sailors and 56.5% of Marines, and 75.5% of the officer corps for the Navy and 81.4% for the Marines.  *See* DX53-001 (U.S. Census Quick Facts); DX52-054.  Thus, while progress has been made, minority racial and ethnic groups generally remain underrepresented in the officer corps.

20.    The Court can also examine demographic data to evaluate recruitment and retention trends.  That data shows that retention rates, across all racial groups, are gradually increasing at the 5-year mark.  DX204-012 (Retention Analysis); Day 8 Tr. 62:3–10 (Miller).  At the 15-year mark, minority graduates from the Naval Academy are retaining at higher rates than their White counterparts.  DX204-023; Day 8 Tr. 65:24–66:7 (Miller).  Again, the data shows steady progress as the officer corps gradually diversifies.  DX204-006; Day 8 Tr. 58:2–59:6.

21.    The Court can also examine other metrics to measure the benefits from a diverse officer corps, if such measurability is required.  For example, a court can examine whether internal race riots have occurred since the Navy and Marine Corps made an effort to diversify their officer corps.  None have.  Day 5 Tr. 139:10–13 (Bailey), 177:3–5 (Sherwood).  That alone demonstrates success.  But the Naval Academy must continue to foster diversity in the officer corps to maintain this achievement.  The military's consideration of race and ethnicity is therefore no less measurable than in the prison context, where success is measured by the "prevent[ion] [of] harm."  *Harvard*, 600 U.S. at 215; *Johnson v. California*, 543 U.S. 499, 512–13 (2005); *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 521 (1989) (Scalia, J., concurring in

126

judgment).  If anything, prevention of such harm within the military is of even greater

significance than in prisons, given the national security consequences.

IV.     **The Naval Academy's Admissions Process Is Narrowly Tailored**

22.     Narrow tailoring must be "calibrate[d]" to the relevant context.  *Grutter*, 539 U.S.

at 327.  To be narrowly tailored, an admissions program that considers race must treat each

applicant "as an individual in the admissions process." *Grutter v. Bollinger*, 288 F.3d 732, 745

(6th Cir. 2002) (citation omitted).  "[T]ruly individualized consideration demands that race be

used in a flexible, nonmechanical way," and thus universities *may* "consider race or ethnicity . . .

flexibly as a 'plus' factor in the context of individualized consideration of each and every

applicant." *Grutter*, 539 U.S. at 334

A.     **The Naval Academy Considers Each Candidate as an Individual**

23.     To be narrowly tailored, a race-conscious admissions program "must remain

flexible enough to ensure that each applicant is evaluated as an individual and not in a way that

makes an applicant's race or ethnicity the defining feature of his or her application." *Grutter*,

539 U.S. at 337.  This "individualized consideration . . . is paramount," and the requisite

flexibility prohibits "mechanical, predetermined diversity 'bonuses' based on race or ethnicity."

*Id.*; *see also Fisher v. Univ. of Texas at Austin* ("*Fisher II*"), 579 U.S. 365, 375 (2016)

(permitting consideration of race when it "is contextual and does not operate as a mechanical

plus factor for underrepresented minorities").

24.     The Naval Academy engages in a highly individualized, holistic review of every

candidate and all the information in their record.  Unrebutted testimony established that the

Naval Academy seeks to paint a picture of each individual candidate, and in doing so, reviews

"th[e] whole entire application," with particular focus on the narrative portions of the

application—including the personal statement, and all recommendations and interview

comments.  Day 1 Tr. 235:22–237:3 (Hwang) (discussing sample application, DX145); Day 2

Tr. 15:13–16:1 (Hwang) ("Their race and ethnicity, it can just help us kind of paint a better

picture of the overall candidate . . . and just kind of serves as one data point in the overall

application review."); Day 2 Tr. 152:5–20 (Latta) ("[T]he more information we can fill in, the

brighter that picture actually becomes."); Day 2 Tr. 155:20–156:9 (Latta) (information on

numerous different characteristics "help[s] provide context to everything that we're reading in

the file").  The Naval Academy's guidance and training documents underscore the same point.

*E.g.*, P28 at USNA-00000153–54; P29 at USNA-00000197–98; P491 at USNA-00000737–40.

25.     The Naval Academy does not treat a candidate's race or ethnicity as the defining

feature of his or her application.  On the contrary, as noted above, the Naval Academy carefully

reviews all the information pertaining to a candidate.  When it considers race as one of many

nondeterminative factors in that holistic review, the Naval Academy does so to contextualize a

candidate's individual experience.  Day 2 Tr. 16:2–4 (Hwang) (candidates "never" receive offers

based solely on their race or ethnicity); Day 2 Tr. 45:14–21 (Latta) ("So we do a holistic review.

And we do collect race and ethnicity data, but it's in the context of their diverse experiences

along with other holistic factors . . . ."); *id.* at 51:10–14 (Latta) ("It just may be one of the

nondeterminative factors.  So we don't select somebody because of their race or ethnicity.  It

could be used in the context of other factors that we would see in the records we're

comparing."); Day 2 Tr. 64:22–65:1 (Latta) ("Again, within the context of all the other holistic

factors that we look at."); Day 3 Tr. 9:19–10:3 (Latta) ("It would be after there's a detailed

review of their admissions file, reviewing all of the factors that we looked at both at the

admissions board and the slate review committee."); *see also, e.g.*, P28 at USNA-00000153–54;

P29 at USNA-00000197–98; P491 at USNA-00000737–40.

26.     The Naval Academy's individualized process is such that it does not result in "points" or a "mechanical, predetermined diversity 'bonus[]' based on race or ethnicity." *Grutter*, 539 U.S. at 337.  Guidance and testimony are unequivocal that race or ethnicity may not be the basis for points.  Day 1 Tr. 225:25–226:4 (Hwang) ("[Race] cannot be the basis for points."); Day 2 Tr. 241:23–242: 15 (Latta) ("[T]he admissions board follow[s] this guidance" and the Dean has not "seen members of the admissions board assign points based on an applicant's race or ethnicity"); P28 at USNA-00000154 ("[A]t no point during the admissions process should race, ethnicity, or gender be the basis for 'points' in favor of or against an applicant."); P29 at USNA-00000198 (same); P25 at USNA-00001861 (race not used as a factor in WPM algorithm); DX1 (race not used as a factor in the RAB adjustments to the WPM score); P31 at USNA-00000389 ("No points or quotas exist for race."); P491 at USNA-00000740 ("Race, ethnicity or gender should not be the basis for points in favor of an applicant."); DX158-002 ("At no point in the review process are race, ethnicity, or gender the basis for points in favor of or against an applicant.").

27.     The Naval Academy also does not put minorities "on separate admissions tracks." *Grutter*, 539 U.S. at 309.  Applications are randomly assigned by computer to members of the Admissions Board for review (with exceptions only for home school, athletic, fleet, and college candidates).  Day 2 Tr. 136:15–137:7 (Latta).  No particular Board member is assigned to review the applications of minority candidates.  *Id*. at 137:11–14.

28.     The Naval Academy has also cabined its consideration of race to only three points in the admissions process:  Letters of Assurance, additional appointees, and filling congressional

slates that used the competitive nomination method.[16]  *See supra* Proposed Findings of Fact

Section II.G.1.  Even then, race or ethnicity is just one nondeterminative factor within the

holistic review of all other information in the applicant's file.  *E.g.*, Day 2 Tr. 15:13–16:1

(Hwang); Day 2 Tr. 45:14–21 (Latta).  Many of the admissions decisions continue to be made

based on WPM score.  Day 2 Tr. 49:24–51:4 (Latta); P259 ¶ 77.  And these considerations do

not operate to the exclusion of White candidates; for instance, White candidates also receive

Letters of Assurance, and 62% of the additional appointees in the class of 2026 were White.

P259 ¶¶ 74–75.

29.     By cabining its consideration of race to these three points in the process, the

Naval Academy has ensured that its consideration of race is narrowly tailored.  *Fisher II*,

579 U.S. at 384.

### B.      The Naval Academy Does Not Engage in Racial Balancing or Quotas

30.     An institution may not engage in "racial balancing" or "establish quotas for

members of certain racial or ethnic groups."  *Grutter*, 539 U.S. at 329–30, 334.  "Properly

understood, a 'quota' is a program in which a certain fixed number or proportion of opportunities

are 'reserved exclusively for certain minority groups.'  Quotas 'impose a fixed number or

percentage which must be attained, or which cannot be exceeded.'"  *Id.* at 335 (citations

omitted).

31.     Unrebutted testimony and documents establish that the Naval Academy does not

engage in racial balancing or establish racial quotas.  Day 2 Tr. 16:5–7 (Hwang); Day 3 Tr. 33:5–

---

[16] Theoretically, race could be among the factors considered in extending a Superintendent nomination, but evidence at trial established—and Plaintiff did not rebut—that race has not been considered for Superintendent nominations since at least 2009.  Day 3 Tr. 10:12–11:25 (Latta); P259 ¶ 76.  Accordingly, the Court should not consider that point in the process as one where race actually factors among the considerations.

10 (Latta) ("No points or quotas exist for race."); P31 at USNA-00000389 (same).  Unlike in

*Alexander v. Estepp*, 95 F.3d 312, 318 (4th Cir. 1996), the Naval Academy does not set any

"caps," informal or formal, on the number or percentage of racial minorities in each class.  On

the contrary, the number of offers extended to minority groups fluctuate year over year, as do the

numbers of minority students who enroll.  *See, e.g.*, P18 at USNA-00002648 (offers fluctuating

from 449 to 563—a 25% differential); P558 at 2 (offers fluctuating from 235 to 378—a 60%

differential); DX109–DX113 (every year, enrollment numbers fluctuating); DD5 at 55; Day 7 Tr.

187:18–188:15 (Gurrea).

33.       Similarity in the percentage of each class comprised of individual minority groups

does not, "without more," demonstrate racial balancing or quotas.  *Grutter*, 539 U.S. at 336

("'[S]ome attention to numbers,' without more," is not evidence of unconstitutionality).

Likewise, reports "keep[ing] track of the racial and ethnic composition of the class" do not

suggest racial balancing or quotas, when admissions officials "testif[y] without contradiction that

they never gave race any more or less weight based on the information contained in [such]

reports."  *Id.*  Unrebutted testimony established that the Naval Academy does not make

admissions decisions based off of "class stats" documents such as P41 or P558.  Day 3 Tr.

42:12–43:9 (Latta) (the information in "class comparison" documents such as P41 "doesn't

affect how [the Naval Academy] continues to make offers"); *id*. at 43:17–25 (Latta) (the

information in "class stats" documents such as P558 is "not used to make decisions at all").

33.       *Harvard* does not hold to the contrary.  There, the Supreme Court found that

Harvard had made a "numerical commitment" to minority groups, as demonstrated by its

maintenance of similar percentages of each group year over year, coupled with testimony by

Harvard admissions officials that they used class comparison documents to make admissions

decisions.  600 U.S. at 221–22; *see also Eisenberg v. Montgomery Cnty. Pub. Schs.*, 197 F.3d 123, 131 (4th Cir. 1999) (finding racial balancing when a policy "assign[ed] a numbered category for each race at each school" and then administered the policy "with an end toward maintaining this percentage of racial balance in each school").  That is the "more" that was missing in *Grutter*, and that is missing with respect to the Naval Academy here.  *Grutter*, 539 U.S. at 336.

## C.   The Naval Academy's Limited Consideration of Race Furthers the Government's Compelling National Security Interests

34.     "The purpose of the narrow tailoring requirement is to ensure that the means chosen fit the compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Grutter*, 539 U.S. at 333 (cleaned up).  The Naval Academy's admissions policies are directly connected to the Navy's goal of building an officer corps that reflects the diversity of the country it serves.

### 1.   Naval Academy Graduates Have an Outsized Impact on the Officer Corps

35.     Plaintiff contends that because other accession sources collectively produce more officers, the Naval Academy has low leverage to affect the composition of the overall officer corps.  But "it is not a failure of narrow tailoring for the impact of racial consideration to be minor." *Fisher II*, 579 U.S. at 384.  Even if the effect of the consideration of race is "limited," it can still be "meaningful." *Id.*  The Naval Academy is undisputedly producing more and more diverse officers to the overall officer corps, and its graduates disproportionately lead the Navy and stay in the Navy.

36.     Minority representation of officers commissioning from the Naval Academy has steadily increased over the last 20 years, as demonstrated in Department of Defense data. DX204-008.



Figure 1. Trend line of O1 percent representation in each Year Group, by racial category

37.    Accordingly, from the day Naval Academy graduates commission as ensigns and second lieutenants, they are diversifying the overall corps.  Day 8 Tr. 74:14–20 (Miller). Plaintiff does not provide any authority for the proposition that the Naval Academy needs to make the biggest numerical impact on the officer corps to serve the military's compelling interest.

38.    Moreover, Under Secretary Vazirani, Ms. Miller, and Dean Latta all testified that graduates of the Naval Academy have outsized impact on the officer corps.  As Dean Latta explained, "the value of the Naval Academy education is retention throughout [a] servicemember's career in the officer corps.  And Naval Academy graduates tend to retain at much higher rates, particularly at the 20-year mark and beyond, and they're disproportionately represented in the O-6 ranks and in the flag ranks."  Day 3 Tr. 41:10–15 (Latta).

39.    Ms. Miller similarly explained that Plaintiff's allegation "reflects a lack of appreciation for how important those officers are and the knowledge, skills, and abilities that they graduate with by virtue of having spent four to five years at the Naval Academy or truly any service academy."  Day 8 Tr. 44:2–11 (Miller).  She added that "proportionately, [t]hose that

133

retain [from the Naval Academy are] selected at higher rates than other commissioning sources for those senior positions, both O-6 and admiral." *Id*. at 44:13–15.

40.     Indeed, 40% of flag officers in the Navy are Naval Academy graduates. Day 3 Tr. 41:16–19 (Latta); Day 5 Tr. 176:17–18 (Sherwood); Day 8 Tr. 44:19–23 (Miller). Around 90% of the Chiefs of Naval Operations, the highest-ranking naval officer, are Naval Academy graduates. Day 5 Tr. 176:18–177:2 (Sherwood).

41.     A disproportionate number of warfare command billets are filled by Naval Academy graduates. Day 8 Tr. 41:2–4 (Miller). For example, of the 12 Navy aircraft carriers, 8 are currently commanded by Naval Academy graduates. Day 8 Tr. 41:4–6. In Ms. Miller's words, that means "67% of the largest warfighting platform in the United States Navy is commanded by a Naval Academy graduate." Day 8 Tr .41:6–8.

42.     To achieve these command posts and flag ranks, an officer must remain in the Navy for at least 25 years. Day 6 Tr. 53:5–9 (Vazirani); Day 8 Tr. 48:11–13 (Miller). For an officer to become Chief of Naval Operations, she must serve for around 35 years. Day 8 Tr. 48:22–24 (Miller).

43.     The military cannot poach someone from the private sector; they must grow their own. Day 5 Tr. 185:20–187:4 (Sherwood). Dr. Bailey testified that "when [the military] seeks to increase the number of Black leaders, they can't poach from corporate America. They can't go into civilian government offices and draw over people who have become accomplished leaders in that sphere. They have to grow their own. And to grow an O-6 can take 20 years." Day 5 Tr. 137:15–21 (Bailey).

44.     Plaintiff also suggests that because minorities do not choose communities that promote officers to the flag level, the Navy should simply assign Black officers to those

specialties.  Day 6 Tr. 59:20–22 (Vazirani).  But the Navy does not take race or ethnicity into consideration in assignment.  DX210 Tr. 24:16–25:14 (Truesdale).  *See also* Day 8 Tr. 9:19–22 (Sundberg) ("If somebody gets assigned a community that they are choosing and want to . . . they're going to perform better," "have a better attitude," and will be "more successful in that community."); Day 8 Tr. 51:2–6 (Miller) (similar).

        2.      <u>The Naval Academy's Consideration of Race is Not Overinclusive</u>

45.      Plaintiff also contends that because Asian Americans are not currently underrepresented at the Academy in comparison to the general public, the Naval Academy's use of race is overinclusive and thus not narrowly tailored to serve the compelling interest it identifies.  *See, e.g.*, Day 9 Tr. 19:1–4.  This argument is flawed for at least two reasons.

46.      First, as Dean Latta testified at trial, in the absence of the limited consideration of race in the admissions process, the number of admitted minorities would "drop dramatically." Day 3 Tr. 37:24–38:13 (Latta).  Dean Latta's judgment is bolstered by recent events at civilian universities that have seen large decreases in minority enrollment post-*Harvard*.  *Id*. at 38:19– 39:3.

47.      Second, Ms. Miller noted that Asian American Naval officers at the O-6 rank are only 2.9% as of 2023, which is "well below" the general population's approximately 7%.  Day 8 Tr. 71:1–20 (Miller).  She noted that the 2.9% reflects "the population [from] 20, 25 years ago," and because representation is around 8–9% for new O-1s now, the Navy could be "cautiously optimistic that [it] may see higher retention at O-6 [levels in] 20 to 30 years."  *Id.* at 71:1–72:1 (Miller).

3.      The Naval Academy's Consideration of Race Does Not Impair its
Ability to Commission Qualified Officers into the Navy and Marine
Corps

48.     Plaintiff also wrongly contends that because Black and Hispanic midshipmen disproportionately leave the Academy before graduation, the Naval Academy's consideration of race in admissions fails to increase the number of minority officers.

49.     First, Plaintiff fails to consider absolute numbers: because of the small number of midshipmen that identify within individual minority groups, attrition of just a handful of midshipmen has a more pronounced effect on the graduation rates for those minority groups.  For example, if one Native American midshipman of three for a class leaves, the graduation rate for Native Americans would drop from 100% to 67%.  Day 5 Tr. 69:9–20 (Vahsen).

50.     Second, attrition happens for many reasons.  As Captain Vahsen explained, most attrition happens during the first two years before the service commitment takes force.  Day 5 Tr. 77:16–78:8.  That is especially the case for voluntary resignations, which account for about 50% to 60% of all attrition and roughly 5% to 6% of a given class.  *Id*. at 78:6–8, 91:12–22 (Vahsen).  Notably, "African Americans tend to be on the lower scale of all race and ethnicity [groups]" for that type of attrition.  *Id.* at 86:18–22 (Vahsen).  Meanwhile, academic attrition is a "very small component[] of why somebody leaves the Academy or separated from the Academy."  Day 5 Tr. 86:15–16 (Vahsen); *id.* at 92:4–6 (Vahsen) (academics is not the most frequent reason why African American midshipmen leave the Naval Academy before graduating).  Plaintiff's reliance on P148 (Midshipman Equity Report) is misplaced, as Captain Vahsen explained that the data appeared "cherry-pick[ed]."  Day 5 Tr. 83:8-87:3 (Vahsen).

51.     Third, to the extent attrition increased for minority groups for the Class of 2023, that was largely due to the COVID-19 pandemic.  Day 5 Tr. 97:18–98:9 (Vahsen); DX201-012.  During the pandemic, attrition for varsity athletes, who tend to disproportionately be minorities,

was particularly high because athletes were unable to fully participate in the sports they joined

the Naval Academy to play.  Day 5 Tr. 98:18–99:5 (Vahsen).  The opening of the transfer portal

and "name, image, and likeness" rights were important factors as well for varsity athlete attrition.

*Id.* at 99:6–8.

52.     Thus, the graduation rates of minority midshipmen do not suggest that the limited

consideration of race in the admissions process fails to increase the number of minority officers

graduating from the Academy.

4.     <u>The Naval Academy Employs Racial and Ethnic Categories That Further
the Interests It Seeks</u>

53.     Plaintiff wrongly contends that the Naval Academy uses "incoherent" racial

classifications.  ECF No. 110 at 17 (citing *Harvard*, 600 U.S. at 216).  In fact, there is no

"mismatch between the means [the Naval Academy] employ[s] and the goals [it] seek[s.]"

*Harvard*, 600 U.S. at 216.  The Naval Academy uses the racial categories required by OMB and

used by the U.S. Census, and the Naval Academy measures the racial and ethnic diversity of its

student body against that of the general population as reported by the Census.  Day 3 Tr. 40:9–

16, 90:11–16 (Latta); DX53; DX101; DX102.  Indeed, it would be "incoherent" for the Naval

Academy to use different racial categorization than that used by the Census given that it uses the

Census's population figures to assess its progress.

**D.     The Naval Academy Does Not Use Race As a Negative or as a Stereotype**

54.     In *Harvard*, the Court held that civilian universities could not use race as a

"negative" to help achieve the educational benefits of diversity.  600 U.S. at 213.  According to

the Court, race is used as a negative where it "unduly harm[s] nonminority applicants."  *Id.* at

212.  The Court cited evidence of such undue harm and noted Harvard's admissions process was

"zero-sum," meaning that "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* at 218–19.

55.     In holding that civilian universities cannot use race as a "negative," however, the Court did not hold that race can never be considered as a factor in admissions at *military* service academies, should those academies establish "distinct" national security interests. *Harvard*, 600 U.S. at 213 n.4. If it had, footnote four of the Court's opinion would have been meaningless.

56.     Accordingly, *Harvard*'s discussion of how civilian universities cannot use race in the context of "zero-sum" admissions processes is not binding on the military service academies.

57.     In any event, as this Court observed in its preliminary injunction opinion, the Naval Academy's admissions process "is distinguishable from the admissions policies at issue in *Harvard*." *Naval Academy*, 707 F. Supp. 3d at 506. Unlike Harvard's admissions program, admission into the Naval Academy is not "zero-sum"; nor has a review of admissions shown a significant decrease in White applicants' admission. *Harvard*, 600 U.S. at 218–219; *see* Day 7 Tr. 180:10–15 (Gurrea) (explaining concept of "zero-sum" admissions).

58.     Rather, the Naval Academy has cabined its consideration of race to three discrete points in the admissions process: Letters of Assurance, additional appointees, and filling congressional slates that used the competitive nomination method. *See supra* Proposed Findings of Fact Section II.G.1.

59.     Plaintiff offered no expert or fact testimony suggesting that the Naval Academy's admissions process is zero-sum.

60.     By contrast, Dr. Gurrea demonstrated that the Naval Academy's admissions process is not zero sum. Day 7 Tr. 179:23–180:15 (Gurrea). As he explained, the number of White applicants to the Naval Academy is seven times the number of Black applicants. *Id.* at

180:16–181:6; DD5.44.  This means that while the absence of the consideration of race has a massive impact on African Americans—a decline in admissions of over 22%—the impact on White applicants is a much more modest increase in admissions by 4.2%.  Day 7 Tr. 181:7–18 (Gurrea); DD5.44.  In other words, the magnitude of the loss for Black applicants is diluted among all White applicants because there are so many more White applicants.  Day 7 Tr. 181:9–18 (Gurrea); DD5.44.  The consequence is that the admissions rate for Black applicants has a relatively small impact on the prospects of individual White applicants.  Day 7 Tr. 181:19–182:1 (Gurrea).

61.     Furthermore, the Naval Academy's admissions process does not rest on a "belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue."  *Grutter*, 539 U.S. at 333.  Rather, the military has recognized that "[j]ust as growing up in a particular region or having particular professional experiences is likely to affect an individual's views, so too is one's own, unique experience of being a racial minority in a society" and, later, in the military.  *Id.* at 333.

62.     This recognition does not mean that the Naval Academy believes everyone of the same race has the same perspective.  *See, e.g.*, Day 7 Tr. 124:9–125:24 (Fuller).  The Naval Academy has assessed that the effect of being a racial minority, like the effect of growing up in a particular region or with a certain household income, may have different impacts on different individuals.  No testimony suggested that the Naval Academy is trying to link racial diversity to a particular perspective.  In fact, ample evidence was provided to the contrary.

63.     As Admiral Fuller explained, diversity, including racial and ethnic diversity, yields "a wider range of perspective" which permits the military to "adapt more eloquently to unscripted or even difficult situations," and provide "a greater opportunity to work through

solutions" and "mitigate the risk of having groupthink or being unable to think outside the problem."  Day 7 Tr. 114:13–23 (Fuller).

64.     Under Secretary Vazirani underscored this point, noting that the limited consideration of race ensures that the military has "a mix [of] those individuals who are training there to gain a perspective of people with different perspectives, different backgrounds, [and] different lived experiences."  Day 6 Tr. 32:19–23 (Vazirani).  A diverse officer corps brings with it "diversity of thought and experiences and perspectives," which can help "mitigate risk."  Day 7 Tr. 114:24–115:10 (Fuller).

65.     Dr. Haynie similarly noted that "we're all intersectional people" and that "[c]ognitive diversity [and] experiential diversity" all "combine to make us who we are and how we experience the world and how we see it."  Day 6 Tr. 117:18–24 (Haynie).  Dr. Haynie's unrebutted testimony shows that "research [supports the] need to bring in different perspectives . . . to understand war and security phenomena."  *Id.* 119:5–12.  And "one part of those diverse perspectives can be race and ethnicity."  *Id.*

**E.     The Naval Academy Does Not Intend to Use Race and Ethnicity as a Factor in its Admissions Process Indefinitely**

66.     Because *Harvard* explicitly declined to consider service academies' "distinct interests," its requirement of an end point does not apply in this national security context. "[R]elevant differences" must be taken "into account."  *Johnson*, 543 U.S. at 515 (holding that no end point is required for racial classification enacted to mitigate danger and violence in prisons).

67.     No court has held that national security has an end date.  Rather, the Supreme Court has commanded that courts "cannot substitute [their] own assessment for the Executive's predictive judgments on [matters related to national security risks], all of which 'are delicate,

complex, and involve large elements of *prophecy*.'"  *Trump*, 585 U.S. at 708 (citing *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) (emphasis added)).

68.     National security presents enduring, unpredictable risk that requires ongoing mitigation.  The risks of not having a diverse officer corps manifest not only as concerns over racial violence among the force, *supra* Proposed Findings of Fact Section I.G, but as lacking a necessary "weapon" to "defend the United States" against its enemies, Day 5 Tr. 148:5–15 (Bailey), and underutilizing talent and manpower.  Under Secretary Vazirani testified that— across administrations—the Department of Defense has assessed that "a lack of diversity in the officer corps . . . led to racial tensions . . . and it led to a degradation in [the military's] capability," and therefore, has "focused on improving [the military's] diversity and ensuring that we have an officer corps that understands the force that they lead and has a degree of empathy and compassion that can understand that force and help lead that force."  Day 6 Tr. 11:19–12:7. The Department has adjudged that a diverse officer corps takes "risk factors off the table," DX 210, Tr. 127:5–16 (Truesdale), and courts cannot replace their predictions on the longevity and breadth of national security risks.

69.     Although the military does not need to establish an end date to justify its use of race, unrebutted testimony and documents establish that the Naval Academy anticipates that, once it both achieves and maintains the racial and ethnic diversity of its student body at a level comparable to the ethnic and racial diversity of the general population, it will no longer need to continue its limited consideration of race in the admissions process.  *See, e.g.*, Day 2 Tr. 95:11– 18 (Latta).

70.     Plaintiff wrongly contends that this end point is a new one.  Documents over the past decade and more show that the military has long intended for the officer corps to match the

general population.  The 2011 National Military Strategy noted that "[a]n all-volunteer force must represent the country it defends."  DX137-004  (Strategic Plan).  The 2012 Diversity and Inclusion Strategic Plan noted "the demographic composition of the nation" and understood that it was "changing," which would "create[e] a more diverse pool for DoD military accessions and civilian hires."  *Id*.  Secretary of Defense Esper wrote that the military, as the "greatest fighting force in history and the most respected institution in the country," should "fully represent[] the American people it has sworn to protect and defend."  DX177 (Secretary of Defense Memorandum) at 3.  The Naval Academy has echoed this goal, seeking to "attract and admit talented young men and women who reflect the diversity of our nation."  P805 at USNA-00001373 (2022 Institutional Assessment Report); P806 at USNA-00021775 (2023 Institutional Assessment Report).  As Dean Latta explained, the Academy's Institutional Assessment Reports correctly note that "[t]his goal supports the Naval Academy's Strategic Plan 2030 in attracting and admitting talented young men and women who reflect the diversity of our nation."  P803; Day 3 Tr. 40:4–16 (Latta).

71.    Finally, Plaintiff incorrectly suggests that the Naval Academy lacks a process for terminating the consideration of race in admissions.  Day 9 Tr. 8:4–5.  Upon approaching its stated goal, the Superintendent would be responsible for making the decision to end the use of race, in consultation with Navy leadership as well as Dean Latta and his senior leadership team.  Day 2 Tr. 95:19–24 (Latta).  Dean Latta does not have a precise range or a number in mind for when the Naval Academy would discontinue the consideration of race in the admissions process, because despite significant efforts to increase diversity, the Naval Academy is not close to having a student body whose diversity is comparable to that of the general population.  Day 3 Tr.

44:20–46:1 (Latta).  *See also Fisher II*, 579 U.S. at 381 ("increasing minority enrollment . . . is
not . . . a goal that can or should be reduced to pure numbers").

### F.   The Naval Academy Has Undertaken Serious, Good Faith Consideration of Race-Neutral Alternatives

72.     Narrow tailoring "require[s] serious, good faith consideration of workable race-
neutral alternatives that will achieve the diversity the university seeks." *Grutter*, 539 U.S. at
339.

73.     To start, the Naval Academy has engaged in "serious, good faith consideration" of
race-neutral alternatives.  *SFFA v. U.S. Naval Acad.*, 707 F. Supp. 3d at 508 ("This Court is
unpersuaded by SFFA's assertion that no 'serious, good faith consideration' appears anywhere in
the record." (quoting *Grutter*, 539 U.S. at 349)).  Unrebutted testimony and documents
established that the Naval Academy has explored and implemented a multitude of race-neutral
alternatives, both outside of the admissions process as well as during the admissions process.
Examples of the race-neutral alternatives applied outside of the admissions process include:
various STEM camps and events, Summer Seminar, INSPIRE, Candidate Visit Weekends,
Centers of Influence programs, OPINFO events, traveling music tours, outreach to Title I high
schools, Admissions Forums, visits to Navy and Marine Corps units, trainings and engagements
with Members of Congress, and expansion of social media, digital outreach, and marketing
efforts.  *See, e.g.*, DX28; DX106; DX155-008–021; DX162-022; P50.  Examples of the race-
neutral factors applied during the admissions process include: extra points and consideration for
disadvantaged socioeconomic background, adversity, hardship, unusual life experience, first-
generation college status, first-generation American status, English as second language, military
exposure and background, and residence in underrepresented congressional districts.  *See, e.g.*,
DX1; DX2; DX4-003; DX28-003; P27 at USNA-00000148–49; Day 1 Tr. 233:11–19 (Hwang);

Day 2 Tr. 209:7–211:21 (Latta); Day 3 Tr. 32:7–21, 79:19–80:9, 86:20–87:1, 105:21–106:7 (Latta).

74.     With respect to whether a race-neutral alternative is "workable," numerous considerations shape the analysis.  A "workable" alternative must "achieve the diversity the university seeks."  *Grutter*, 539 U.S. at 339; *see also Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 n.6 (1986) (alternatives must serve the interest "about as well").  A "workable" alternative does not require an institution to "sacrifice all other aspects of diversity," *Fisher II*, 579 U.S. at 386, or "the academic quality of all admitted students," *Grutter*, 539 U.S. at 340.  A "workable" alternative does not impose intolerable "administrative expense." *Wygant*, 476 U.S. at 280 n.6.  A "workable" alternative must be a "lawful alternative," and one within the institution's ability to implement.  *Id.*; *Grutter*, 539 U.S. at 339.

75.     Although Plaintiff offered a race-neutral alternatives expert, Richard Kahlenberg, who proposed additional ideas beyond the "good things" the Naval Academy is already doing, Day 4 Tr. 167:7–11 (Kahlenberg), Mr. Kahlenberg's ideas are not workable race-neutral alternatives for the Naval Academy.  Indeed, Mr. Kahlenberg expressly acknowledged that many of his ideas are not workable alternatives for the Naval Academy.  PD4 at 19 ("In USNA's case, these moves really didn't help racial diversity."); *id.* at 20 (simulation 6 "had a relatively small effect on diversity"); Day 4 Tr. 156:9–157:10, 158:6–159:15 (Kahlenberg).

76.     Even where Mr. Kahlenberg did not explicitly admit the unworkability of his ideas, they are nevertheless not workable alternatives as defined by the Supreme Court.  First, none of his ideas "achieve the diversity the university seeks." *Grutter*, 539 U.S. at 339.  The Naval Academy seeks to be reflective of the United States population, but none of Mr. Kahlenberg's simulations measure against the demographics of the United States population;

rather, they measure against what currently exists at the Naval Academy.  Day 4 Tr. 137:11–15, 188:9–11 (Kahlenberg).  Thus, at the outset, and across the board, Mr. Kahlenberg's ideas are not workable for this reason alone.  *Grutter*, 539 U.S. at 339.

77.     Moreover, Mr. Kahlenberg's ideas are not workable even for achieving the diversity that currently exists at the Naval Academy.  At trial, Mr. Kahlenberg presented a single simulation resulting in an increase to minority representation—of one percentage point—relative to the status quo.[17]  PD4 at 27.  Even under that most aggressive simulation, Black and Asian representation decrease, and academic metrics also fall materially.  *Id*.; Day 4 Tr. 179:8–180:21 (Kahlenberg).  *See Grutter*, 539 U.S. at 339–40 (a "workable" alternative must "achieve the diversity the university seeks" and does not require an institution to sacrifice "the academic quality" of students).  Every other simulation Mr. Kahlenberg presented at trial reflected a decrease in minority representation—of up to seven percentage points—and a corresponding increase in the representation of White midshipmen.[18]  PD4 at 21, 23, 24, 26; Day 4 Tr. 159:16–160:5, 162:19–164:5, 178:17–179:7 (Kahlenberg).

78.     Across the board, Mr. Kahlenberg's ideas also are not workable because they privilege one characteristic—socioeconomic diversity—above all others, with no consideration

---

[17] Mr. Kahlenberg additionally acknowledged, repeatedly, that the results reported in all of his simulations would further drop if they reported race the way the Naval Academy is required to report race.  Day 4 Tr. 138:17–139:13, 139:23–140:1, 151:6–9, 160:6–9, 180:3–6, 187:13–16 (Kahlenberg).  Mr. Kahlenberg's simulations are further infirm because they rely exclusively on the calculations and models of Dr. Arcidiacono, which are themselves overstated and unreliable.  Day 4 Tr. 132:16–133:4 (Kahlenberg); *see supra* Proposed Findings of Fact, Section II.G.2.

[18] Mr. Kahlenberg presented the results of only five of his 70 simulations at trial.  PD4 at 21, 23, 24, 25, 27.  Accordingly, the Court should not consider any simulations not presented by Mr. Kahlenberg at trial or covered during cross-examination of Mr. Kahlenberg.  Day 3 Tr. 231:14–16 ("To the extent that there's something in a report and it's not discussed by the expert and there's no cross by it by the opponent, I'm just not going to consider it.") (Court).

for the range of other characteristics sought by the Naval Academy. *Fisher II*, 579 U.S. at 386; *Grutter*, 539 U.S. at 340. Mr. Kahlenberg admitted that his simulations do not report any results for considerations important to the Naval Academy, such as leadership ability, moral character, STEM interest, intended academic concentration, graduation rate, underrepresented congressional districts, geographic diversity, gender diversity, or any form of diversity other than racial diversity and socioeconomic diversity. Day 4 Tr. 135:5–137:10 (Kahlenberg).

79.     Mr. Kahlenberg's primary suggestion, that the Naval Academy double its recruiting and outreach budget, is not a workable alternative for an additional reason. *Wygant*, 476 U.S. at 280 n.6 (requiring "tolerable administrative expense"). As a federally funded institution, the money available to the Naval Academy—and specifically Naval Academy Admissions—is finite. Day 3 Tr. 49:10–51:6 (Latta). The Naval Academy already invests more than $3 million in outreach, and Mr. Kahlenberg's proposal that it simply increase or double that budget is not tolerable administrative expense. Day 3 Tr. 50:9–15 (Latta).

80.     Mr. Kahlenberg's remaining suggestions are not workable either, because they fail to account for the Naval Academy's statutory and regulatory obligations and propose ideas beyond the Naval Academy's ability to control. *Wygant*, 476 U.S. at 280 n.6; *Grutter*, 539 U.S. at 339. For example, the Naval Academy cannot control the outcome of efforts related to Members of Congress. Day 1 Tr. 221:20–222:12 (Hwang); Day 3 Tr. 83:2–12 (Latta); Day 4 Tr. 182:2–17 (Kahlenberg). The Naval Academy cannot overhaul its preparatory program without disregarding the reason for its establishment (to give first priority for enlisted members of the fleet), ignoring capacity constraints, and jeopardizing its statutory obligation to fill congressional vacancies in incoming classes. Day 3 Tr. 23:22–25:9 (Latta). The Naval Academy cannot make someone start or complete an application. Day 4 Tr. 171:16–18, 173:3–6 (Kahlenberg).

81.     Given that race-neutral alternatives do not produce the racial diversity sought by the Naval Academy, the testimony of Plaintiff's own race-neutral alternatives expert establishes that it is acceptable for the Naval Academy to consider race in admissions.  Day 4 Tr. 119:7–10 ("Q. You would agree that it's acceptable for an institution to use race when a race-neutral alternative does not produce sufficient racial diversity, correct?  A. I do.") (Kahlenberg).

82.     "Narrow tailoring does not require exhaustion of every conceivable race-neutral alternative."  *Grutter*, 539 U.S. at 339.  The Naval Academy has satisfied its burden of demonstrating that workable race-neutral alternatives are not available to permit it to achieve its sought-after diversity.

## CONCLUSION

The Court should enter judgment for Defendants.

Dated: October 2, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch


*/s/ John Robinson*
JOSHUA E. GARDNER
*By Special Appearance*
Special Counsel
ANDREW E. CARMICHAEL
*By Special Appearance*
Senior Trial Counsel
CHRIS EDWARD MENDEZ
*By Special Appearance*
JOHN ROBINSON
*By Special Appearance*
CATHERINE M. YANG
*By Special Appearance*

Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 616-8489
Email: john.j.robinson@usdoj.gov

MEDHA GARGEYA
*By Special Appearance*
Counsel
U.S. Department of Justice
Civil Division, Office of the Assistant
Attorney General
950 Pennsylvania Avenue NW
Washington, DC 20530

*Attorneys for Defendants*