IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| STUDENTS FOR FAIR ADMISSIONS, | * | |
| *Plaintiff*, | * | |
| v. | * | Civil Action No. RDB-23-2699 |
| THE UNITED STATES NAVAL ACADEMY, *et al.*, | * | |
| | * | |
| *Defendant*s. | | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

RICHARD D. BENNETT, Senior District Judge.

## Table of Contents

I.   Introduction ................................................................................................................1

II.  Parties & Procedural History ......................................................................................3

  A.  Parties ....................................................................................................................3

  B.  Procedural History ................................................................................................4

III. Trial Findings of Fact .................................................................................................6

  A.  Findings of Fact: The Government Has a Compelling Interest in a Diverse Officer
  Corps, and the United States Naval Academy Is a Vital Pipeline to the Officer Corps. ......6

    1.  The Military Has Made the Judgment, Informed by History, that a Highly Qualified
    and Diverse Officer Corps Is Critical for Mission Effectiveness. ....................................8

      a.  History of Internal Racial Strife Risking Mission Readiness ..............................11

      b.  A Diverse Officer Corps is Vital to National Security ..........................................20

    2.  The Naval Academy is a Vital Pipeline to the Officer Corps ..................................28

      a.  The Naval Academy's Mission and Programming ................................................28

      b.  Postgraduate Service Assignments ....................................................................31

      c.  While Only Accounting for One-Fifth of the Officers Entering the Navy and
      Marine Corps Annually, the Academy Is a Vital Pipeline to the Officer Corps, and
      Especially to Senior Leadership ..............................................................................32

  B.  Findings of Fact: The United States Naval Academy's Admissions Procedures
  Mandate a Holistic Evaluation of Candidates. ............................................................34

    1.  Naval Academy Admissions Overview ..................................................................35

    2.  Applying to the Naval Academy ............................................................................36

      a.  The Preliminary Application ................................................................................36

      b.  Candidate Information System ............................................................................37

      c.  The Nomination Requirement ............................................................................38

    3.  The Application Review Process ............................................................................41

      a.  The Naval Academy's Admissions Office ............................................................42

      b.  Criteria Considered for Admission ......................................................................44

      c.  Admissions Review Process................................................................................50

      d.  The Manner in Which the Academy Considers Race............................................57

  C.  Findings of Fact: Statistical Analysis Does Not Demonstrate Discrimination. ...........61

    1.  Background on the Parties' Economic Experts ......................................................61

    2.  Overview of Research Questions and Process ......................................................63

      a.  Professor Arcidiacono ......................................................................................64

b.    Dr. Gurrea ................................................................................66

3.    Descriptive Analysis ........................................................................68

4.    Professor Arcidiacono's Econometric Modeling ..........................70

5.    Dr. Gurrea's Criticisms .................................................................75

a.    Arcidiacono's Estimates Are Unreliable. ...............................76

b.    Arcidiacono's Modeling Relies on the Erroneous Assumption that the Academy's Admissions Decisions Are Independent. .....................................82

c.    Arcidiacono's Modeling Arbitrarily Blends Race and Ethnicity and Assigns Multiracial Applicants to Other Categories. ....................................84

d.    Arcidiacono's Estimates Do Not Imply a Large Impact on White Applicants. 86

e.    Arcidiacono's Prediction of the Racial Breakdown of Admissions in a World Without the Academy's Consideration of Race is Misleading. .....................................87

f.    Professor Arcidiacono Does Not Provide Any Empirical Evidence to Support Plaintiff's Claim that Admissions Decisions Are Designed to Achieve Racial Balancing. .................................................................................88

D.    Findings of Fact: The Naval Academy Has Made a Serious, Good Faith Effort to Consider Race-Neutral Alternatives. .........................................................88

1.    The Academy's Race-Neutral Efforts ............................................89

a.    Race-Neutral Efforts Within the Admissions Process ..........89

b.    The Academy's Extensive Recruiting Efforts and Outreach ...........90

i.    Partnership with Marketing Firm ......................................92

ii.    Digital Outreach Efforts ....................................................93

iii.    Outreach Events .................................................................93

2.    SFFA's Proposed Race-Neutral Alternatives ................................99

a.    Increase Socioeconomic Preferences ..................................100

b.    Increase the Share of Enlisted Members Admitted .............101

c.    Increase Recruitment Efforts ..............................................102

d.    Modify and Expand Preparation Programs .........................103

e.    Reduce or Eliminate Preferences that Favor Non-Minorities ..........104

f.    Pursue Changes to the Nomination Process ........................106

IV.    Principles of Constitutional Review ......................................................107

A.    Overview ...............................................................................................107

B.    Students For Fair Admissions Has Standing. .......................................108

C.    Standard of Review ...............................................................................108

D.  Strict Scrutiny in Affirmative Action Cases .................................................111
    1.  Supreme Court Precedents on Race-Conscious Admissions ..................112
    2.  *SFFA v. President & Fellows of Harvard College* ............................115
E.  Judicial Deference to the Legislative and Executive Branches in Military Matters ...119
    1.  Deference to Coordinate Branches' Judgments in Constitutional Challenges .......120
        a.  Deference in Equal Protection Challenges ........................120
            i.  Equal Protection Challenges Based on Race ....................121
            ii.  Equal Protection Challenges Based on Sex......................124
        b.  Deference in First Amendment Challenges........................126
    2.  Deference to Military Personnel Regulations ...........................127
V.  Conclusions of Law: The Naval Academy's Race-Conscious Admissions Program Withstands Strict Scrutiny. ..........................................132
    A.  Conclusions of Law: Defendants Have Established a Compelling National Security Interest in a Diverse Officer Corps. ...............133
        1.  Unit Cohesion and Lethality ...........................................134
        2.  Recruitment and Retention ...........................................138
        3.  Domestic and International Legitimacy....................................144
    B.  Conclusions of Law: A Compelling National Security Interest Need Not Be Measurable, But Defendants Have Shown Their Compelling Interests Are Measurable. 146
    C.  Conclusions of Law: The Naval Academy's Admissions Process Is Narrowly Tailored to Its Compelling National Security Interests. ...............150
        1.  Conclusions of Law: The Naval Academy's Limited Consideration of Race Furthers the Government's Compelling National Security Interests. ............151
        2.  Conclusions of Law: The Naval Academy's Race-Conscious Admissions Policies Require Holistic Candidate Assessment Without Quotas or Racial Balancing. ............155
        3.  Conclusions of Law: The Naval Academy Does Not Use Race as a Negative or Stereotype....................................................160
        4.  Conclusions of Law: The Naval Academy's Consideration of Race Will Not Continue Indefinitely..........................................164
        5.  Conclusions of Law: The Use of Race is Necessary to the Government's Compelling National Security Interests. ..........................168
        6.  Conclusions of Law: The Naval Academy Has Undertaken Serious, Good Faith Consideration of Race-Neutral Alternatives. ...................170
VI.  Conclusion ....................................................................173

## I. Introduction

The Plaintiff Students for Fair Admissions ("SFFA" or "Plaintiff") brought this action on October 5, 2023, against the named U.S. Naval Academy Defendants ("the Naval Academy" or "the Academy") in the wake[1] of its successful litigation in *Students for Fair Admissions v. President & Fellows of Harvard College* ("*Harvard*"), 600 U.S. 181 (2023). In the *Harvard* case, the Supreme Court held that the race-based admissions programs of Harvard College and the University of North Carolina violated the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution in that these programs did not survive strict scrutiny. The Supreme Court specifically noted that its opinion did not address "the propriety of race-based admissions systems" "at our nation's military academies . . . in light of the potentially distinct interests that military academies may present." *Id.* at 213 n.4. In this action, SFFA addresses that exemption and seeks to expand the *Harvard* decision to include the Naval Academy. After an intense period of pre-trial discovery, exhaustive legal briefing, excellent legal advocacy by counsel for both parties, and a nine-day bench trial, that effort has FAILED.

The U.S. Naval Academy is distinct from a civilian university. Its mission is to prepare its students to become officers in the Navy and Marine Corps. The applicants to the Naval Academy include not only high school seniors, but enlisted personnel of the U.S. Navy and Marine Corps. Upon admission all students become active-duty members of the Navy and are required to take courses in Naval science, engineering, navigation, and weapons systems. The Academy does not set any racial quotas nor engage in racial balancing, and no candidate

---

[1] As those familiar with the U.S. Navy well know, a wake is a trail of water—often choppy—that appears behind a moving boat. *Wake*, MERRIAM-WEBSTER DICTIONARY (11th ed. 2020). It also refers to the aftermath of something that has passed. *Id.*

is admitted based solely on his or her race. During the admissions procedure, which is distinct from that of a civilian university, race or ethnicity may be one of several non-determinative factors considered.

Over many years, military and civilian leaders have determined that a racially diverse officer corps is a national security interest. That judgment has been based on American military history and a 2009 diversity commission mandated by the United States Congress.[2] Indeed, a U.S. Senate Committee on Armed Services Report[3] issued this year has noted the continuing problem of underrepresentation of racial and ethnic minorities in the military service academies. This is fundamentally a military personnel issue.

SFFA's challenge to *any* consideration of race by the Naval Academy necessarily includes analysis of Supreme Court precedents on not only race-conscious college admissions, but also judicial deference to the legislative and executive branches in military matters. It has not escaped the attention of this Court that the extensive legal briefing of SFFA has included minimal analysis of judicial deference to executive and legislative judgments in military affairs.[4] The footnote exempting military academies from the Supreme Court's opinion in the *Harvard* case is consistent with a long history of Supreme Court deference.

---

[2]  (PX445 (Report of Military Leadership Diversity Commission).)

[3]  (DX128 (Senate Committee on Armed Services Report for Fiscal Year 2024 National Defense Authorization Act) (noting "concern[] that the Military Service Academies do not maintain a strong presence in communities with significant populations of students who are racial minorities or who are from low-income households" and "direct[ing] the Secretaries of Army, Navy, and Air Force to brief the Committees on Armed Services of the Senate and the House of Representatives . . . on measures each is taking to increase the diversity of its student classes").)

[4]  Despite submitting hundreds of pages of briefing during this litigation, Plaintiff provided minimal discussion of judicial deference to military judgments in approximately twenty pages of its collective briefing. *See* (ECF No. 9 (Motion for Preliminary Injunction); ECF No. 54 (Reply in Support of Preliminary Injunction); ECF No. 80 (Motion to Compel); ECF No. 101 (Response in Opposition to Defendants' Motion *in Limine*); ECF No. 148 (Plaintiff's Post-Trial Proposed Findings of Fact and Conclusions of Law).)

This Court concludes that the Naval Academy's race-conscious admissions program withstands the strict scrutiny in the ambit of the Supreme Court's opinion in the *Harvard* case. The program survives strict scrutiny because the Naval Academy has established a compelling national security interest in a diverse officer corps in the Navy and Marine Corps. Specifically, the Academy has tied its use of race to the realization of an officer corps that represents the country it protects and the people it leads. The Academy has proven that this national security interest is indeed measurable and that its admissions program is narrowly tailored to meet that interest. Quite simply, this Court defers to the executive branch with respect to military personnel decisions. Specifically, as noted *infra*, "under Article II of the Constitution, the President of the United States, not any federal judge" ultimately makes such decisions.[5] Accordingly, as a result of this Court's findings of fact and conclusions of law, JUDGMENT SHALL BE ENTERED IN FAVOR OF DEFENDANT NAVAL ACADEMY AND THE NAMED INDIVIDUAL DEFENDANTS.

## II. Parties & Procedural History

### A. Parties

The Plaintiff Students for Fair Admissions is a voluntary membership association, and its members include four individuals whose prior applications to the U.S. Naval Academy were denied. These four members are either currently reapplying to the Academy or ready and able to reapply. SFFA's primary mission is "challenging the use of race in admissions." (ECF No. 148 ¶¶ 1–5.)

---

[5] *Austin v. United States Navy Seals 1–26*, 142 S. Ct. 1301, 1302 (2022) (Mem.) (Kavanaugh, J., concurring); *see also infra* Section IV.E.2.

The Defendant United States Naval Academy ("the Naval Academy" or "the Academy") is a four-year federally established undergraduate institution that prepares students to become officers in the Navy and Marine Corps. (ECF No. 149 ¶ 143.) Once students enter the Academy, they become active-duty members of the Navy; receive an annual salary, room and board, and healthcare; and are subject to the Uniform Code of Military Justice. (*Id.*) The Defendant U.S. Department of Defense ("DoD") is the federal agency responsible for all aspects of the military. (ECF No. 1 ¶ 9.) Defendant Lloyd Austin is the Secretary of Defense and is responsible for all aspects of the military. (*Id.* ¶ 10.) Defendant Carlos del Toro is the Secretary of the Navy and oversees all Navy operations and policies. (*Id.* ¶ 11.) Defendant Rear Admiral Fred Kacher was the Acting Superintendent of the United States Naval Academy.[6] (*Id.* ¶ 12.) Defendant Bruce Latta is the Dean of Admissions at the Academy. (*Id.*) The individual Defendants are all sued in their official capacities.

### B. Procedural History

This lawsuit was initiated on October 5, 2023, just three months after the Supreme Court's opinion in the *Harvard* case on June 29, 2023.[7] The one-count Complaint alleges a violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution and the equal protection privilege contained therein as a result of the Naval Academy's consideration

---

[6] On January 11, 2024, Rear Adm. Kacher was relieved by Vice Adm. Yvette Davids. *Davids Confirmed as Superintendent at Naval Academy*, U.S. NAVAL ACAD. (Jan. 11, 2024), available at *https://www.usna.edu/NewsCenter/2024/01/DAVIDS_CONFIRMED_AS_SUPERINTENDENT_AT_NAVAL_ACADEMY.php*.

[7] Earlier in that three-month period, SFFA filed a similar action in the United States District Court for the Southern District of New York against the United States Military Academy at West Point. (ECF No. 148 ¶ 250); *Students for Fair Admissions v. U.S. Mil. Acad. at West Point*, 709 F. Supp. 3d 118 (S.D.N.Y. 2024) *injunction pending appeal denied Students for Fair Admissions v. U.S. Mil. Acad. at West Point*, 144 S. Ct. 716 (2024) (Mem.). That case remains pending.

of race in its admissions process. (ECF No. 1.) On October 6, 2023, the Plaintiff filed a Motion for Preliminary Injunction. (ECF No. 9.) A briefing schedule was established by this Court's Letter Order on October 23, 2023. (ECF No. 21.) A response in Opposition was ultimately filed by the Defendants on December 1, 2023. (ECF No. 46.) The Court held a hearing on the request for preliminary injunction on December 14, 2023, and DENIED the requested injunctive relief. (ECF No. 57.)

In addition to the reasons set forth on the record during the hearing, the Court filed a Memorandum Opinion (ECF No. 60) setting forth the reasons for the denial on December 20, 2023. The Court's analysis was clearly guided by the Supreme Court's opinion in *Harvard*, 600 U.S. 181 (2023), and its footnote noting "potentially distinct interests" presented by military academies. *Id.* at 213 n.4. The Court noted the need to develop a factual record. On December 20, 2023, a scheduling order was entered with the consent of the parties setting a trial date of September 9, 2024. (ECF No. 61.) That date was subsequently extended to September 16, 2024. (ECF No. 71.)

SFFA filed a Motion for Summary Judgment on its standing to bring this action. (ECF No. 74.) At the conclusion of discovery and after a hearing, the Court GRANTED the motion as memorialized in a Memorandum Opinion. (ECF No. 112.) The Court found that SFFA has Article III standing. The Court addressed any discovery disputes (ECF No. 71; ECF No. 73) and pre-trial motions *in limine* (ECF No. 114; ECF No. 115; ECF No. 118). The parties agreed to the introduction of numerous documents, including expert reports and deposition testimony. (ECF No. 108.) The bench trial on the Plaintiff's one-count Complaint began on September 16, 2024, and lasted nine days, concluding with closing arguments on

September 26, 2024.   The Court heard testimony from eighteen witnesses, including designated deposition testimony and 420 exhibits.  On October 2, 2024, the parties submitted Proposed Findings of Fact and Conclusions of Law.  (ECF No. 148; ECF No. 149.)

Based on the evidence admitted at trial, the Court now makes the following findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## III.  Trial Findings of Fact

### A. Findings of Fact: The Government Has a Compelling Interest in a Diverse Officer Corps, and the United States Naval Academy Is a Vital Pipeline to the Officer Corps.

At trial, the Defendants produced substantial and credible evidence, which is not seriously disputed, that the Government has made the judgment, informed by history and experience, that a diverse officer corps is vital to national security, and that the United States Naval Academy is a vital pipeline to the officer corps.  On this topic, the Court heard compelling testimony from several witnesses testifying on behalf of Defendants.  These witnesses included current and former senior military and civilian leaders, as well as historians, including, in the order called: (1) Captain Jason Birch, the former commanding officer of SEAL Team 10 and current Third Battalion Officer at the Naval Academy (ECF No. 143 at 18:2–60:13); (2) Dr. Beth Bailey, an expert historian at the University of Kansas (*id.* at 103:23–149:18; DX196);[8] (3) Dr. John Sherwood, an expert historian at the Naval History and

---

[8]  "PX" refers to an exhibit offered by Plaintiff, and "PD" refers to demonstrative evidence presented by Plaintiff.  Similarly, "DX" refers to an exhibit offered by Defendants, and "DD" refers to demonstrative evidence presented by Defendants.  The parties did not provide consistently Bates-numbered exhibits. Accordingly, the Court cites to exhibit page numbers where such consistent numbering was provided, and cites to the exhibit overall where no such page numbers were provided.

Heritage Command (ECF No. 143 at 149:19–187:15; DX197); (4) Ashish Vazirani, Performing the Duties of the Under Secretary of Defense for Personnel and Readiness ("Under Secretary Vazirani") (ECF No. 144 at 3:8–79:24); (5) Dr. Jeannette Haynie, a former Senior Advisor to Under Secretary Vazirani and expert on the relevance of diversity and inclusion to the military (*id.* at 80:3–232:10; DX194); (6) Professor Jason Lyall, a professor at Dartmouth and an expert on diversity and battlefield performance (ECF No. 144 at 232:11–252:7; ECF No. 145 at 3:2–88:22; DX195); (7) Vice Admiral John V. Fuller, the Inspector General of the Department of the Navy (ECF No. 145 at 89:8–132:8); (8) Stephanie Miller, the Deputy Assistant Secretary of Defense for Military Personnel Policy (ECF No. 146 at 28:8–148:10); and (9) Lisa Truesdale,[9] the Deputy Assistant Secretary of the Navy for Military Manpower and Personnel (DX199; DX210). On behalf of Plaintiff, the Court heard testimony from two retired military officers—(1) Brigadier General Christopher S. Walker, a retired U.S. Air Force General officer with over forty years of military experience (ECF No. 139 at 88:11–190:3; PX224); and (2) Lieutenant Colonel Dakota Wood, who served in the U.S. Marine Corps for 20 years before retiring from active duty in 2005 and has since studied military readiness (ECF No. 142 at 189:21–231:6; ECF No. 143 at 3:6–17:8; PX221; PX225). Brig. Gen. Walker and Lt. Col. Wood did not deny that the Department of Defense has long held the view that a racially and ethnically diverse officer corps is a national security imperative, but rather expressed their personal opinions that a racially and ethnically offer corps does not further unit cohesion or lethality. Simply stated, the personal opinions of Brig. Gen. Walker and Lt. Col. Wood and other evidence produced by Plaintiff do not undermine the

---

[9] Due to the witness's availability, Lisa Truesdale testified by deposition designation. (DX210.)

Government's well informed and reasoned determination that a diverse officer corps is "not a lofty ideal," but a "mission critical national security interest," (DX190), and that the Naval Academy is a vital pipeline to the officer corps.  A summary of the evidence adduced during the nine-day bench trial follows.

>    1.  **The Military Has Made the Judgment, Informed by History, that a Highly Qualified and Diverse Officer Corps Is Critical for Mission Effectiveness.**

The Department of Defense ("DoD") is America's oldest and largest government agency.  Tracing its roots back to pre-Revolutionary times, the DoD's mission "is to provide the military forces to deter war and ensure the nation's security."  (ECF No. 144 at 101:5–6 (Haynie).)  At its highest level of organization, DoD contains three military departments—the Departments of the Army, Navy, and Air Force.  Collectively, these departments are responsible for overseeing and managing five military services: the Department of Army manages the Army; the Department of the Navy manages the Navy and the Marine Corps; and the Department of the Air Force manages the Air Force and the Space Force.[10]  In addition, these departments are responsible for overseeing and managing the department's respective federal service academies, with the Department of the Navy overseeing the United States Naval Academy, whose race-conscious admissions are the subject of the instant litigation.

The U.S. military services are comprised of two primary categories of personnel: enlisted members, who make up the majority of the force, and officers, who compose

---

[10] The sixth branch of the U.S. Armed Forces is the United States Coast Guard, which is overseen by the Department of Homeland Security during peacetime and the Navy during wartime.  14 U.S.C. § 103(a)–(b).

approximately 18 percent of the Armed Forces and manage operations and enlisted personnel. To become an officer in any of the military services, there are limited paths of accession. To become an officer, an individual must (1) graduate from a federal service academy—for the Navy and Marine Corps, the Naval Academy; (2) attend a civilian college or university and participate in the Reserve Officers' Training Corps ("ROTC") program—for the Navy and Marine Corps, Naval ROTC ("NROTC"); (3) attend Officer Candidate School ("OCS") after graduating from college; (4) receive a direct commission after earning a professional degree; or (5) advance through the enlisted ranks and then complete officer training (collectively, "officer accession sources").

The United States military has long made the judgment that developing and maintaining a fighting force that is qualified and demographically diverse at all levels is critical for mission effectiveness. (*Id.* at 146:24–147:17 (Haynie); PX210; PX445; DX194.) Since at least 1963, and "[b]ased on decades of experience," the military has concluded that a highly qualified and racially diverse officer corps is "not a lofty ideal," but a "mission-critical national security interest." (DX190; PX270; PX507; ECF No. 144 at 11:14–17 (Vazirani), 146:24–147:17 (Haynie); ECF No. 146 at 82:4–7 (Miller).)

Unlike private and other public institutions, the military operates as a "closed-loop" promotion system, with its top officers chosen not from outside, but rather promoted from lower ranks. (DX190; ECF No. 145 at 109:12–25 (Fuller); ECF No. 146 at 44:24–50:6 (Miller).) That is, "[t]hey have to grow their own." (ECF No. 143 at 137:20 (Bailey).) Accordingly, the demographic composition of initial officer accessions is critical to the achievement of a diverse officer corps. (DX190; ECF No. 145 at 109:12–25 (Fuller); ECF

No. 146 at 44:24–50:6 (Miller).)  To achieve diversity in military leadership, the officer accession sources and DoD, more generally, engage in extensive minority outreach and recruiting.  (DX190.)

Prior to the Supreme Court's June 2023 decision in *Harvard*, 600 U.S. 181 (2023), service academies and the civilian colleges and universities offering ROTC programs could modestly consider race and ethnicity as part of their individualized, whole-person review of admissions applicants.  However, following the Supreme Court's decision in *Harvard*, only federal service academies such as the Naval Academy may consider race and ethnicity as part of the admissions process.  *Id.* at 213 n.4, 214; (ECF No. 146 at 52:13–53:14 (Miller).)

While the importance of maintaining a diverse, highly qualified officer corps has been beyond legitimate dispute for several decades, Students for Fair Admissions invites the Court to second guess the military's half-a-century-long judgment that a diverse officer corps enables the military to meet its critical national security mission by enhancing unit cohesion, assisting recruitment and retention, and ensuring domestic and international legitimacy.  The military's judgment is informed by the military's specific history of racial discrimination and racial tensions within the military's ranks, as well as observations on how such racial strife impacted our Nation's military performance.  Nevertheless, Plaintiff insists that the Government's interest is not one of national security, but in the educational benefits of student body diversity, and that any claimed national security interest is groundless.  At bottom, the Court, considering all evidence before it, finds that the military's interest in growing and maintaining a highly qualified and diverse officer corps is informed by history and learned experience, and that a highly qualified and diverse officer corps remains critical for military effectiveness and thus

for national security.  Plaintiff's suggestion to the contrary contradicts decades of broad historical and military consensus.

### a. History of Internal Racial Strife Risking Mission Readiness

As Under Secretary Vazirani explained, the DoD is a "learning organization," meaning it looks to history to try and "understand the factors that have contributed to [the military's] ability to perform effectively."  (ECF No. 144 at 36:5–37:18 (Vazirani); DX210; ECF No. 143 at 147:18–23 (Bailey).)  As noted throughout trial and the instant filing, our military's commitment to fostering racial diversity and inclusivity across its leadership draws from lessons learned the hard way.  In short, the military's history of racial discrimination and racial tensions, and resulting "lack of unit cohesion," "lack of trust," and "diminish[ed] . . . capability," directly informed the military's judgment about the critical need for diversity in the Armed Forces generally and in the officer corps more specifically.  (ECF No. 144 at 36:5–37:18 (Vazirani).)  While DoD "has been able to mitigate those risks by increasing the diversity of the force," "to go backward in [this] regard" would be "a dangerous experiment" that could lead to "mission failure" and "loss of life."  (*Id.* at 36:5–37:18 (Vazirani).)  Though the below is nowhere near exhaustive, the Court briefly attempts to summarize how and why this broad historical and military consensus was reached.

Since its inception, our Nation's armed services, including the Navy and Marine Corps, have faced internal strife that has threatened mission readiness.  From the Revolutionary War through World War II, the Navy frequently limited the number of Black Americans able to enlist, and the Marine Corps largely banned Black Americans all together.  (ECF No. 143 at 116:19–20, 159:13–20 (Bailey), 160:12–18 (Sherwood); DX197 ¶¶ 10–12.)  Black

11

servicemembers served in segregated units and were often limited to "the worst positions" involving menial labor, such as messmen or coal heavers. (ECF No. 143 at 159:24–160:11 (Sherwood).) Even when the military did not have enough manpower, the Armed Forces often turned away Black individuals seeking to serve. (*Id.* at 117:5–24 (Bailey).)

After World War I, an outbreak of racial violence known as the "Red Summer" of 1919 erupted in the United States, with white sailors and marines attacking Black communities throughout the country. (*Id.* at 160:19–161:8 (Sherwood).) This racial violence, combined with the segregation and unequal treatment practiced by the Navy, stigmatized the Navy in the eyes of Black Americans and made Black Americans "very reluctant to want to send their children to the Navy, especially given the jobs that their kids would have to perform in the Navy." (*Id.* at 161:4–161:8 (Sherwood).)

Prior to World War II, the Navy had no Black officers. (*Id.* at 158:11–160:11 (Sherwood).) In 1943, the Navy commissioned its first Black officer after it mistook him for being white. (DX197 ¶ 22.) In 1945, Black servicemembers comprised about 5 percent of the Navy's enlisted force and just 0.02 percent of the sailors that received an officer's commission or warrant officer's commission. (*Id.* ¶ 22.)

This lack of Black representation in the Navy's officer corps contributed to racial tension and unrest during World War II, which hindered naval readiness, national security, and domestic security. (ECF No. 143 at 158:11–16 (Sherwood).) Between July 1944 and March 1945, several large-scale incidents of racial unrest occurred at "some of the most important logistics facilities in the Pacific" during World War II. (*Id.* at 162:7–20 (Sherwood).)

On July 17, 1944, a deadly munitions explosion at the Port Chicago Naval Magazine near San Francisco killed 320 munitions workers, including 220 Black sailors. (DX197 ¶ 26; ECF No. 143 at 161:24–162:6 (Sherwood).) As Dr. Sherwood explained, the majority of those killed by the explosion were Black because the job of munitions worker was one of the most dangerous and menial jobs in the Navy, and thus commonly assigned to Black sailors. (DX197 ¶ 26; ECF No. 143 at 161:24–162:6.) Soon after the disaster, surviving personnel were transferred to the nearby Mare Island Annex, and, in protest, 258 Black sailors refused to carry out their duties, resulting in 208 Black sailors receiving bad conduct charges and 50 Black sailors being convicted for mutiny and sentenced to 15 years of prison and hard labor. (DX197 ¶¶ 26–27; ECF No. 143 at 161:24–162:6 (Sherwood).)

In December 1944, Black sailors in Guam protested the oppressive conditions and violent racism they endured on base. (DX197 ¶ 27; ECF No. 143 at 161:16–20 (Sherwood).) As a result of the protest, 48 Black sailors were arrested and imprisoned. (DX197 ¶ 27; ECF No. 143 at 161:16–20 (Sherwood).)

In March 1945, approximately 1,000 Black Seabees at Port Hueneme, California, staged a two-day hunger strike to protest racial bias in promotions and segregated practices at the base, as the commanding officer refused to promote any Black Seabee to chief petty officer and instituted segregated living and mess quarters. (DX197 ¶ 28.) While the Seabees refused to eat, they continued performing all scheduled duties. (*Id.* ¶ 28.) Eventually the commanding officer and many other officers were relieved of their duties, with the oncoming commanding officer promising to reexamine promotions. (*Id.* ¶ 28.)

13

In 1948,[11] President Truman issued Executive Order 9981, directing the desegregation of the Armed Forces and establishing the Fahy Committee to evaluate the impact of integration on military efficiency. (*Id.* ¶¶ 30–31.) The Fahy Committee concluded that "a more inclusive military that enables all members to use their talents and skills to the fullest is a more effective fighting force. (PX445.)

When the United States intervened in the Korean War in 1950, the Armed Forces were faced with the need to rapidly build and deploy servicemembers, but still deeply resisted integration, and racial discrimination continued to corrode military effectiveness. (PX272; ECF No. 143 at 120:15–17 (Bailey); DX196.) Black sailors constituted 3.4 percent of the Navy. (DX197 ¶ 32.) While that number grew to 9.5 percent during the Korean War, Black representation fell to 5.1 percent by 1962. (*Id.*) And in 1962—almost a decade after the end of the Korean War—only 0.2 percent of Naval officers were Black, and 65 percent of Black sailors were serving in the steward branch. (*Id.*; ECF No. 143 at 120:9–10 (Bailey).)

In 1962, President John F. Kennedy convened the Gesell Committee to examine the military's continued racial disparities and recommend new policies to the Secretary of Defense. (PX445.) The Gesell Committee recommended that then-Secretary of Defense Robert

---

[11] Wesley Anthony Brown was the Academy's first Black graduate, graduating and commissioning as an officer in 1949. (ECF No. 143 at 172:20–174:20 (Sherwood).) Dr. Sherwood explained that "[a]fter Wes Brown graduated in 1949, there were only a very small number of African Americans who graduated from the Naval Academy year by year, up until the mid-'70s," when President Lyndon B. Johnson ordered the Academy to start recruiting Black midshipmen. (*Id.* at 172:20–174:20.) The Court finds it prudent to note that the Academy began admitting Black midshipmen during the Reconstruction Era, admitting the first Black midshipman, James H. Conyers, in September 1872. (*Id.* at 172:20–174:20 (Sherwood).) At the Academy, "[Conyers] was cursed at, spat on, and physically abused, with some of his classmates even attempting to drown him." (DX197 ¶ 55.) Conyers resigned from the Academy in October 1873. (*Id.*) While a small number of Black midshipmen were nominated, and a very small number were admitted between 1872 and 1945—though it is worth noting that no Black midshipmen were successfully appointed between 1897 and 1936—"they all experienced severe institutional racism and individual racism that prevented them from graduating." (ECF No. 143 at 172:20–174:20 (Sherwood).)

McNamara pursue "greater institutionalization of the military's commitment to equality of treatment and opportunity," but McNamara failed to implement such changes. (*Id.*) As the DoD Military Leadership Diversity Commission[12] ("MLDC") reflected in 2011, "DoD's failure to implement the Gesell Committee's recommendation had high costs," with "[i]nequities persist[ing] at all levels of the military, particularly in the leadership ranks." (*Id.*)

At trial, Dr. Bailey noted that, during this time, the DoD "adopted a set of policies and procedures that were summed up by a phrase that the Army often used, 'I see only one color, and that's [olive drab, Army green].'" (ECF No. 143 at 121:18–122:23.) In other words, the military adopted color-blind policies, attempting to remove racial designations from military forms as a way to enforce equal opportunity and promote a color-blind military. (*Id.* at 121:18–122:23 (Bailey).) Dr. Bailey explained that, while these policies were better than what came before, as a tactic, they had limits and often "defaulted white." (*Id.* at 121:18–122:23.)

Major instances of racial violence first erupted in the Marine Corps during the late 1960s. As background, during the Vietnam War, a disproportionate number of Black enlistees and draftees were recruited to ground services such as the Marine Corps and Army than compared to the Air Force and Navy. (DX197 ¶ 38.) This was due to higher recruiting standards in the latter two forces and most military-age males with a low draft number and high test scores opting to join the Navy or Air Force to avoid ground combat in Vietnam. (ECF No. 143 at 127:4–18 (Bailey), 162:22–163:1 (Sherwood); DX197 ¶ 38.) This influx of Black recruits into the Marine Corps, which was still de facto segregated, combined with

---

[12] The DoD MLDC is a commission of senior military leaders established by Congress in late 2008. (PX445.)

existing racial tensions, led to significant incidents of violence both in Vietnam and in military bases in the United States.  (DX197 ¶ 38.)

The incidents at Camp Lejeune in North Carolina, a major east coast Marine base, are particularly noteworthy.  (*Id.*; ECF No. 143 at 127:8–18 (Bailey).)  During the first eight months of 1969, there were 160 race-related assaults, muggings, and robberies at Camp Lejeune alone.  (DX197 ¶ 38; ECF No. 143 at 127:8–18 (Bailey).)  The worst incident—and the one that finally commanded Congress's attention on the issue—left one white corporal dead and several marines injured.  (DX197 ¶ 38; ECF No. 143 at 127:8–18 (Bailey).)  The event sparked an investigation on the part of Congress into racial violence and conflict in the military, which concluded that the events of Camp Lejeune were not restricted to the Marine Corps.  (ECF No. 143 at 127:8–18 (Bailey).)

While racial conflict and violence were slower to engulf the Navy, the Navy also experienced racial tension during the late 1960s.  To be clear, and as Dr. Sherwood aptly noted: "[t]his is not a testament to superior treatment of African American sailors in the Navy, but rather the outcome of qualitative recruitment, which had kept the proportion of Blacks in the Navy very low compared to that of other services until 1972."  (DX197 ¶ 39; ECF No. 143 at 163:10–164:19.)  While fewer minorities resulted in fewer incidents of racial unrest, the Navy was not impervious to racial tension during this period.  (DX197 ¶ 39.)  One such example occurred in 1969 when a riot nearly broke out in the Philippines when Black and white sailors from the destroyer *Collette* were on shore leave.  (*Id.*; ECF No. 143 at 163:10–164:19 (Sherwood).)  After hearing of the unrest, a Black officer named William Kelley quelled the potential riot by putting on his dress blue uniform with his sword and advising returning sailors

that he would not tolerate such behavior on his ship.  (DX197 ¶ 39; ECF No. 143 at 163:10–164:19 (Sherwood).)

When President Richard Nixon's administration made the decision to scale back the draft in the early 1970s and eliminate it all together in 1973, the Navy had to change its recruitment standards to man its ships, resulting in an influx of minority sailors.  (ECF No. 143 at 164:20–166:4 (Sherwood).)  Major instances of racial violence began shortly thereafter.

The first incident in the Vietnam period to receive widespread attention from Naval leaders was the race riot on the *Kitty Hawk* aircraft carrier on October 12, 1972—which resulted in 47 injuries and led to numerous charges, primarily against Black sailors despite allegations of unequal treatment.  (*Id.* at 167:16–170:10 (Sherwood).)  Other riots demonstrate that the racial unrest experienced onboard the *Kitty Hawk* was not isolated.  On October 17, 1972, Black sailors frustrated with conditions aboard the fleet replenishment oiler *Hassayampa* rioted, injuring 5 white sailors.  (*Id.* at 171:19–25 (Sherwood); DX197 ¶ 45.)  In November 1972, more than 100 Black sailors serving on board the aircraft carrier *Constellation* staged a sit-in in the mess deck of the ship to air their complaints of unfair treatment due to their race, resulting in a critical mission disruption.  (ECF No. 143 at 170:18–171:18 (Sherwood); DX197 ¶ 45.)

Between the fall of 1972 and the end of 1975, racial unrest spread to hundreds of ships and shore installations.  (DX197 ¶ 47.)  During the two-month period from May 1 to June 30, 1974, the Atlantic Fleet alone reported 57 racial incidents at various locations, including the dock landing ship *Trenton*, Naval Station Midway Island, the aircraft carrier *Ticonderoga*, the aircraft carrier *Intrepid*, the amphibious assault ship *Inchon*, and Kaohsiung Fleet

Landing in Taiwan.  (*Id.*; ECF No. 143 at 166:5–13 (Sherwood).)  Official investigations into these six events revealed the following underlying causes: discrimination in promotion and job assignments; a climate of racism; a disciplinary system perceived to be biased against Black sailors; ineffective minority affairs councils; and, most significantly, the lack of Black sailors in the Navy's chain of command.  (DX197 ¶ 47; ECF No. 143 at 166:5–167:4 (Sherwood).)

Racial violence during this time risked partnerships with international allies including West Germany and South Korea and sparked Congressional concern.  (ECF No. 143 at 129:22–131:17 (Bailey).)  As Dr. Bailey explained:

> Racial violence and racial conflict was pervasive and highly disruptive during the U.S. war in Vietnam. . . . [M]ilitary leaders across services . . . worried that the level of racial violence and conflict was so extreme that it was threatening the ability of the U.S. military to fulfill its mission of national defense.  [As such,] military leaders, particularly Navy and Army leaders, put a great deal of time and attention in trying to figure out how to manage, how to solve this crisis that they were confronting, this problem of race.

(*Id.* at 123:5–15; DX196.)  She further explained that:

> [M]ilitary leaders in this era believed that the lack of visible Black leadership played a significant role in fostering racial conflict, and the presence of Black military leaders might ameliorate racial conflict.  When [military leadership] encountered this massive level of racial violence that they believed threatened the ability of the services to defend the United States against its enemies, they wanted all tools available at their disposal.  And many believed that visible Black leadership, that more Black officers would make a difference.  And they weren't available.  Their hands were tied. . . . I go as far as saying they didn't have a weapon they needed because of decisions that had been made in the past.

(ECF No. 143 at 148:1–15.)[13]

---

[13] While Dr. Bailey acknowledged that the draft played a role in racial tensions, she emphasized that "historians never think of historical events as mono-causal" and that some of the military installations that saw the most racial violence were not places where people were primarily drafted.  (ECF No. 143 at 126:12–25.)

As such, the military then focused on cultivating and including diverse leadership. (*Id.* at 134:19–23, 135:1–8, 136:18–25 (Bailey).) To increase the number of racially diverse officers in the Navy and Marine Corps, the Navy established NROTC units at Historically Black Colleges and Universities, instituted a program named BOOST to prepare promising leaders from educationally underprivileged backgrounds to successfully complete the Navy's commissioning programs, and increased minority enrollment at the Academy and the Naval Academy Preparatory School ("NAPS"). (*Id.* at 175:10–176:1 (Sherwood).) While these efforts have been somewhat successful, the broad military consensus is that diversity in our Armed Services, and in our officer corps, more specifically, is imperative to national security, as further explored below.

Today, the Navy is the most diverse branch of the Armed Forces, but it has the "widest gap in minority representation among officers and enlisted." (PX330; *see also* DX65.) As the Navy faces the challenges of an all-volunteer force, recent demographic studies indicate that 52 percent of enlisted Naval servicemembers are racial minorities but just 31 percent of Naval officers are minorities. (PX330; *see also* DX65 (showing 46 percent of enlisted Naval force in 2020 were minorities but only 23 percent of the Naval officer corps in 2020 were minorities); ECF No. 140 at 210:12–15 (Latta) (testifying that the fleet is "well over 50 percent racial and ethnic minorities").) Within the Navy's senior-most leadership cadre, this racial disparity is even wider. There are 218 Admirals on active-duty in the United States Navy. (DX65). During his testimony, the Court asked Vice Admiral Fuller "how many flag rank officers [i.e., Admirals] are there in the U.S. Navy who are of color?" (ECF No. 145 at 127:19–20.) Vice Admiral Fuller responded: "I'd say less than a dozen," and further noted: "I don't have them

all memorized.  But it's small." (*Id.* at 127:19–128:14.)  Indeed, the number is small: it was reported that as of May 2020, 201—or 92 percent—of the 218 Admirals in the Navy were white, and all ten officers at the highest rank, O-10, were white.  (DX65.)

For comparison, the Marine Corps, which is among the least racially diverse of the Armed Forces, faces a much smaller representation gap between officers and enlisted members.  The Marine Corps struggles with racial and ethnic diversity more broadly, however, and is "disproportionately white, particularly among the enlisted ranks." (PX330)  Just 35 percent of enlisted Marines are minorities, while 29 percent of Marine Corps officers are minorities. (*Id.*)

### b.  A Diverse Officer Corps is Vital to National Security

For decades, our Nation's military leaders have determined that a diverse officer corps is vital to mission success and national security.  (ECF No. 144 at 7:5–12:10 (Vazirani); ECF No. 146 at 80:24–82:9 (Miller); DX137; DX177; PX270 DX190; DX67.)  The military's successes and challenges with integration and inclusion inform its position that "developing and maintaining qualified and demographically diverse leadership is critical for mission effectiveness." (PX445.)  As Deputy Assistant Secretary Miller explained at trial, this is a "military judgment formed over many years, over many senior leaders, political and uniformed, and . . . over multiple different administrations." (ECF No. 146 at 82:1–7.)

The military has actively evaluated and consistently reaffirmed its position that diversity at all levels is mission essential.  So too has Congress, consistently, and as recently as this year.  (DX128.)  The National Defense Authorization Act for Fiscal Year 2009 established the Military Leadership Diversity Commission, which aimed to evaluate and assess policies related

to diversity among military leaders and recommend improvements to promote a more inclusive force. (PX445.) The Commission, comprised of thirty active and retired military leaders, "conduct[ed] a comprehensive evaluation and assessment of policies that provide opportunities for the promotion and advancement of minority members of the Armed Forces, including minority members who are senior officers." (*Id.*) The MLDC concluded that the Armed Forces must "develop a demographically diverse leadership that reflects the public it serves and the forces it leads," underscoring the importance of "[d]evelop[ing] future leaders who represent the face of America and are able to effectively lead a diverse workforce," because it would "inspire future servicemembers," "engender trust among the population," and foster trust and confidence "between the enlisted corps and its leaders." (*Id.*) In its Diversity and Inclusion Strategic Plan for 2012 to 2017, DoD reenforced the MLDC's conclusion: "Diversity is a strategic imperative, critical to mission readiness and accomplishment, and a leadership requirement." (DX137.)

In June 2020, former Secretary of Defense Mark T. Esper directed the creation of an "internal DoD Board on Diversity and Inclusion to undertake a more comprehensive evaluation and assessment of military policies, processes, and practices to improve racial diversity in our ranks." (DX177.) He recognized:

> For more than 200 years the U.S. military has fought to defend our great Nation and our interests abroad, earning the reputation as the greatest military force in history. . . . We have also reached this level of mission excellence because we attract the best America has to offer: young men and women . . . [that] represent a wide range of creeds, religions, races, ethnicities, sexual orientations, and other attributes that distinguish us as individuals, and make us stronger together.

> To ensure the morale, cohesion, and readiness of the military it is essential that our ranks reflect and are inclusive of the American people we have sworn to protect and defend.

> While the military has often led on these issues throughout history, we are not immune to the forces of bias and prejudice. We know this bias burdens many of our uniformed personnel and has direct and indirect impacts on the experiences of our minority members and their representation in our ranks, especially in our officer corps. . . . We can and must do better.

(*Id.*)

Following a review of the military's policies and data and reports, the fifteen-member DoD Board on Diversity and Inclusion made recommendations on how to improve diversity and inclusion in the military. (PX210.) The Board emphasized that DoD "recognize[d] diversity and inclusion . . . as strategic imperatives—to ensure that the military across all grades reflects and is inclusive of the American people it has sworn to protect and defend" and concluded that "appropriate representation of minorities in military leadership positions is increasingly important in the context of the nation's demographic trends." (*Id.*)

As Under Secretary Vazirani[14] testified at trial, the Board's judgment remains the judgment of the DoD today. (ECF No. 144 at 9:6–11:10.) He explained that the DoD believes that "[t]o meet this moment," it must "tap into our core strengths: our dynamic, diverse and innovative society; our unmatched network of allies and partners; and the tremendous men and women of our armed forces." (*Id.* at 8:4–10; *see also id.* at 10:15–25 (Vazirani); DX45.)

The Department of the Navy also holds this judgment. Deputy Assistant Secretary Truesdale[15] explained that "a highly qualified, diverse Navy and Marine Corps officer corps,

---

[14] Under Secretary Vazirani is the current Under Secretary of Defense for Personnel and Readiness. (ECF No. 144 at 4:4–5); 10 U.S.C. § 136. In this role, he reports directly to the Secretary of Defense and serves as the Secretary's principal staff assistant on personnel and readiness matters. (ECF No. 144 at 4:7–5:10 (Vazirani).)

[15] Deputy Assistant Secretary Truesdale is the current Deputy Assistant Secretary of Military Manpower Personnel for the Department of the Navy, responsible for the establishment and oversight of policies related to the Navy and Marine Corps' active and reserve component servicemembers and their families, including human resource management. (DX210 at 6:2–6 (Truesdale); PX507 ¶¶ 2–3.)

educated and trained to command and lead our Nation's racially diverse forces is essential to the [Department of the Navy's] ability to fulfill its principal missions and to provide national security." (PX507 ¶ 6.)  As such, the Navy has made a military judgment—made over decades by senior military and civilian leaders—that a racially diverse officer corps is necessary for mission execution and maritime dominance, recruitment and retention, and domestic and international legitimacy.  (*Id.* ¶ 7; *see also* ECF No. 145 at 108:15–18 (Fuller); ECF No. 146 at 81:1–25 (Miller); DX210 at 33:18–35:6 (Truesdale).)

### i.    Unit Cohesion

First, the military has made the informed determination that a diverse officer corps positively impacts unit cohesion when effectively managed.  As Under Secretary Vazirani testified at trial:

> Increased diversity of the officer corps helps . . . from an operational perspective by improving unit cohesion and trust[,] . . . [which] is critical to the ability for a unit to carry out its mission.  By increasing unit cohesion and trust, that increases communication, it increases a better understanding of mission requirements, and it increases trust in the officers that lead that particular unit.

(ECF No. 144 at 14:6–15; *see also id.* at 16:8–18:18; ECF No. 145 at 108:13–18, 110:23–114:23 (Fuller).)  A diverse officer corps furthers unit cohesion, as it allows for a wider range of perspectives, experiences, and problem-solving approaches, leading to stronger decision-making and a more adaptable unit.  (ECF No. 144 at 14:6–18:18 (Vazirani); ECF No. 145 at 108:13–114:23 (Fuller).)   As then-Commander of the United States Joint Forces Command and later Secretary of Defense James B. Mattis recognized in 2010:

> In this age, I don't care how tactically or operationally brilliant you are, if you cannot create harmony—even vicious harmony—on the battlefield based on trust across service lines, across coalition and national lines, and across civilian/military lines, you really need to go home, because your leadership in

today's age is obsolete. We have got to have officers who can create harmony across all those lines.

(PX445.)

At trial, the Court heard from several witnesses who testified about their personal experiences that diverse units are more cohesive at a strategic level. (ECF No. 144 at 14:9–24, 16:17–17:14, 19:25–20:25 (Vazirani); ECF No. 145 at 116:2–7, 112:20–114:10 (Haynie).) These personal experiences are also supported by internal and external studies, and testimony from Defendants' experts Dr. Haynie, a Naval Academy graduate and Marine Corps combat veteran who previously served as a Senior Advisor to Under Secretary of Defense for Personnel and Readiness, and Professor Lyall. (ECF No. 144 at 80:3–232:10 (Haynie); DX194; ECF No. 144 at 232:11–252:7 (Lyall); ECF No. 145 at 3:2–88:22 (Lyall); DX195; DX16; DX22; DX135; DX168; DX174; DX188; PX275; PX597.) While Dr. Haynie acknowledged that DoD has not conducted a wide-ranging study that examines whether diverse teams solve complex problems better than non-diverse ones in a military setting, she explained that there would be logistical and ethical constraints that would make conducting such a study "really challenging." (ECF No. 144 at 124:15–126:10.)

As noted above, the military learned the importance of racial diversity in its leadership the hard way, and it must not be forgotten that our military's efforts to increase the diversity of the officer corps follow centuries of institutionalized discrimination. While our military leadership is more diverse today and our military much stronger for it, the military is "not immune to the forces of bias and prejudice." (DX177.)

The Court heard compelling testimony from CAPT Birch on this point, who testified about his personal experience as a Black Academy graduate and Naval officer. One particular

24

incident that CAPT Birch described illustrates the importance of having diversity in the officer corps, as the presence of diverse officers allows the military to address instances of racial discrimination more effectively.  When CAPT Birch was leading SEAL Team 8 in Somalia,[16] a Black enlisted sailor was the victim of racial caricatures and epithets written in his biography, which had been placed in a team room area. (ECF No. 143 at 29:2–32:9 (Birch).)  CAPT Birch testified that, if not for CAPT Birch's presence as a Black officer on the team, the enlisted sailor might not have reported the incident. (*Id.* at 29:2–32:9.)

The discriminatory behavior described by CAPT Birch is not isolated.  (DX169; DX192.)    On  cross-examination,  Brig.  Gen.  Walker  acknowledged  that  "racial prejudice . . . still exist[s] in the military," noting "the military is a microcosm of society; so it would be ridiculous for me to try and say that there are no racists in the military."  (ECF No. 139 at 169:21–25.)  Such forces threaten unit cohesion, and the military has made the perhaps obvious judgment that diversity in the officer corps can help mitigate and counter, if not prevent, these corrosive and real internal threats.

### ii.    Recruitment and Retention

As  Under  Secretary  Vazirani  explained  at  trial,  recruitment  and  retention  are "particularly  important"  for  DoD  as  "an  all-volunteer  force  and  we  aspire  to  be  an all-professional force."  (ECF No. 144 at 21:20–22:4.)  DoD has made the informed determination that a diverse officer corps is a strategic imperative to the mission of recruiting,

---

[16]  It is noteworthy that CAPT Birch was the "first Black officer to command a SEAL team."  (ECF No. 143 at 32:18–19 (Birch).)

developing, and retaining the best of America's diverse talent pool. As Secretary of the Navy

Carlos Del Toro explained:

> In order to meet the challenges of a complex world, we must continue to recruit,
> retain, train, and promote the best from all of America. We need a diverse force,
> so every child in America can see themselves wearing the uniform or working
> in our civilian ranks tomorrow, and every viewpoint is represented in our
> operations today, so that we can draw talent from all of America to build our
> warfighting advantage.

(DX67; *see also* DX19; DX66; DX210 at 43:10–44:11, 49:19–50:10 (Truesdale); ECF No. 144

at 14:25–15:5, 21:20–22:4 (Vazirani); ECF No. 145 at 105:3–5, 107:17 (Fuller); ECF No. 146

at 30:5–32:11, 81:19–20 (Miller).)

Retaining top talent is critical to sustaining an all-volunteer force. (ECF No. 144 at

21:20–22:4 (Vazirani).) As a closed-loop personnel system, the Navy and Marine Corps cannot

replace officers from outside their ranks, and high rates of attrition present an organizational

risk—and could unwind any gains from recruiting diverse junior officers. As several witnesses

testified, research demonstrates that diversity directly impacts retention within the military.

(ECF No. 144 at 26:10–15 (Vazirani), 136:2–8 (Haynie); ECF No. 145 at 24:17–30:10 (Lyall),

118:17–25 (Fuller); ECF No. 146 at 100:8–101:1 (Miller); DX210 at 43:10–44:11 (Truesdale);

PX275; PX597; DX42; DX75; DX195; DX204; PX275; PX597.)

There are external constraints on the military's recruiting efforts. Due to the increasing

prevalence of disqualifying factors in America's youth population, only 23 percent of 17- to

24-year-olds are eligible to serve without a waiver. (ECF No. 146 at 77:21–78:4 (Miller).) DoD

further faces challenges with youth propensity to serve, as well as youth influencers becoming

less willing to recommend military service. (ECF No. 144 at 137:12–14 (Haynie); ECF No.

146 at 102:2–6 (Miller).) Youth propensity to serve in the military is generally higher for Black

and Hispanic young people than their white and Asian counterparts.  (ECF No. 144 at 137:15–20 (Haynie); DX187; DX194.)  "These datapoints demonstrate that recruiting and retaining top talent from those underrepresented communities who report higher propensity to serve can pay greater dividends to the military."  (DX194.)  Real-world experience suggests that representation matters for recruiting.  Deputy Assistant Secretary Truesdale noted that a diverse group of recruiters helps to attract diverse recruits.  (DX210 at 214:5–216:14.)  Vice Admiral Fuller testified that diverse representation can also contribute to parents, teachers, and other influencers being more willing to encourage military service.  (ECF No. 145 at 119:8–23.)

### iii.   Domestic and International Legitimacy

Lastly, DoD has made the informed and well-reasoned determination that the all-volunteer military and its leadership must represent the Nation it defends to preserve its domestic and international legitimacy.  (PX445; ECF No. 144 at 28:5–12 (Vazirani).)  As Under Secretary Vazirani explained, "[our] diverse military and diverse officer corps . . . demonstrates the fact that the military is representative of a nation with diverse values and democratic values and that . . . [the] military will carry out the missions of the people that we serve."  (ECF No. 144 at 28:5–12 (Vazirani); *see also* ECF No. 144 at 140:10–141:10 (Haynie); ECF No. 145 at 18:17–21:10 (Lyall), 119:8–23 (Fuller); DX210 at 220:5–222:9 (Truesdale); DX194; PX210; PX445.)  "Not only do diversity and inclusion support legitimacy within the U.S., but they similarly have been linked to legitimacy and influence while enabling collaboration globally, all of which shapes the military's effectiveness."  (DX194.)

## 2. The Naval Academy is a Vital Pipeline to the Officer Corps

The United States Naval Academy prepares its students—called midshipmen—to become leaders and officers in the Navy and Marine Corps. (PX259 ¶ 7); 10 U.S.C. § 8451. Midshipmen at the Naval Academy are active-duty members of the Navy, receiving pay and healthcare, plus tuition, room, and board. (PX259 ¶ 7.) Immediately upon graduation, midshipmen are commissioned as officers in the Navy or Marine Corps and are required to serve on active duty for a minimum period of five years after graduating.[17] 10 U.S.C. § 8459.

### a. The Naval Academy's Mission and Programming

The Naval Academy's mission is to "[d]evelop midshipmen morally, mentally, and physically, and to imbue them with the highest ideals of duty, honor, and loyalty in order to graduate leaders who are dedicated to a career of naval service and have potential for future development in mind and character to assume the highest responsibilities of command, citizenship, and government." (ECF No. 140 at 64:19–24 (Latta); DX79.) The Naval Academy advances this endeavor through comprehensive programming that includes academic instruction, professional military training, and a strong emphasis on character development, preparing midshipmen to become leaders with the necessary skills and moral compass for service in the Armed Forces. (PX259 ¶ 8.)

With respect to academic education, professional courses and training are an essential component of the Naval Academy's "integrated program." (*Id.*) Sixty-five percent of the midshipmen are required to graduate with a STEM major. (ECF No. 140 at 169:3–170:4

---

[17] The mandatory five-year service requirement is triggered at the commencement of a midshipmen's third (junior) year at the Naval Academy with the "two for seven" signing, where midshipmen make a seven-year commitment to the United States Navy: two more years at the Academy, and 5 years minimum in the Navy or Marine Corps. (ECF No. 143 at 77:16–78:8 (Vahsen).)

(Latta); OPNAVINST 5450.330B.)  Midshipmen are required to take courses in naval science, engineering, navigation, and weapons systems to attain working knowledge of modern naval operations and technology.  (PX259 ¶ 8.)  Courses in leadership, ethics, and military law help prepare midshipmen for leadership responsibilities as commissioned officers.  (*Id.*)

The Naval Academy's Character Development program—which is "perhaps the single most important feature that distinguishes USNA from other educational and officer-commissioning sources"—demonstrates the Academy's deep and abiding commitment to the moral development of our midshipmen and to instilling the Naval Service's core values of honor, courage, and commitment into midshipmen.  (*Id.* ¶ 9.)  Starting during plebe summer,[18] midshipmen are instructed on the concept of the professional military officer, which follows three pillars as warriors who possess the toughness, competence, and courage to prevail in an unending commitment to accomplishing the mission with excellence, and development of leaders of character and servants to the nation.  (*Id.*)  The Character Development curriculum is ongoing throughout a midshipman's education at the Academy, concluding in senior year with a capstone course on the core values of honor, courage, and commitment.  (*Id.*)

The Naval Academy is undisputably distinct from a civilian university.  As Deputy Assistant Secretary Miller explained at trial: "our service academies are quintessentially a military organization that also happen to be a four-year degree-granting institution."  (ECF No. 146 at 143:8–10.)  "[A]t its core, [the Academy's] sole purpose is to develop and provide

---

[18]  Plebe summer is a required seven-week training program that prepares incoming freshmen to become midshipmen.  *Plebe Summer*, U.S. NAVAL ACAD., available at https://www.usna.edu/PlebeSummer/index.php.

future officers to the Navy and ultimately the Department of Defense." (*Id.* at 143:19–21 (Miller).)  The Naval Academy is "driven by . . . military necessity and national defense priorities." (*Id.* at 143:23–24 (Miller).)  As Dr. Haynie explained at trial: "[w]ithin a few weeks of graduating, members of my class were leading . . . sailors and Marines in different places." (ECF No. 144 at 130:20–22.)  As she aptly noted, the Academy "is not a normal college." (*Id.* at 131:17–18.)

The Naval Academy is also distinct from other officer accession sources, such as ROTC and OCS.[19]  While officers commissioning from the service academies, ROTC, and OCS "all obtain a baseline level of requirements to be a successful naval or Marine Corps officer[,] . . . the academies . . . [are] specifically designed to ensure a higher degree of experience, education, qualification, and preparation for officership." (ECF No. 146 at 38:11–16 (Miller).)  As Deputy Assistant Secretary Miller explained: "the academies are innovative and specific institutions that [the military] rel[ies] upon to have a steeped officer corps that graduates with a greater degree of knowledge, expertise, and understanding of military tradition and history[.]" (*Id.* at 38:6–10; DX81.)  The Navy and Marine Corps "rely upon [Academy graduates] to be a positive peer influence to [those] from other commissioning sources to help convey that military and Navy history and tradition." (ECF No. 146 at 38:16–19 (Miller).)

---

[19]  Congress shares this view. (DX128.)  The Senate Armed Services Report for Fiscal Year 2024 National Defense Authorization Act recognized: "Military Service Academies provide exceptional leadership training and educational opportunities to our nation's high school graduates.  Providing approximately 20 percent of the annual commissioned officer population for the armed services, they are also a key pipeline into the leadership of the Departments of the Army, Navy and Air Force." (*Id.*)

### b.  Postgraduate Service Assignments

As noted, upon graduation from the Naval Academy, midshipmen are commissioned as officers in the Navy or Marine Corps and are required to serve on active duty for a minimum period of five years after graduating.  10 U.S.C. § 8459.  In practice, this means that the Naval Academy produces about 20 percent of the officers who enter the Navy and Marine Corps every year.  (ECF No. 140 at 114:1–13 (Latta).)  Pursuant to OPNAV Instruction 5450.330B, at least 95 percent of the Naval Academy graduates commission into the unrestricted line communities,[20] which include surface warfare, submarine warfare, naval aviation, and Marine Corps roles.  (ECF No. 146 at 39:3–6 (Miller); DX5.)  The remaining 5 percent of Academy graduates go into the restricted line[21] or staff corps,[22] whose total officer communities comprise a "[l]ittle less than half" of the total officers in the Navy.  (ECF No. 141 at 104:23–105:12 (Latta); DX210 at 196:15–19 (Truesdale).)

Assignments are based on specific requirements provided to the Naval Academy by Department of the Navy leadership and consider both a midshipman's aptitude and preference for a particular assignment.  (ECF No. 146 at 8:22–10:17 (Sundberg); DX157.)  The Naval Academy endeavors to match personal preferences with aptitude and ability, placing midshipmen in the community best suited to their strengths to set them up for successful

---

[20]  The unrestricted line is "the category of communities within the United States Navy that broadly encompass . . . warfare specialties," such as surface warfare, aviation, submarines, and special forces.  (ECF No. 146 at 39:11–19 (Miller).)  Unrestricted line officers are eligible to command the Navy's ships, submarines, aircraft squadrons, fleets, and shore bases, while restricted line officers are not.  (*Id.* at 39:20–23, 40:5–16 (Miller).)  Most command billets are held by unrestricted line officers.  (*Id.* at 40:17–19 (Miller).)
[21]  The restricted line communities are "combat support roles," such as intelligence, supply, cryptology, and logistics.  (ECF No. 146 at 41:9–13 (Miller).)
[22]  "A staff corps officer is a cadre of officers that usually correlate to a profession outside of the military," such as doctors, dentists, lawyers, and chaplains.  (ECF No. 146 at 41:14–18 (Miller).)

careers of Navy and Marine Corps service.  (ECF No. 146 at 8:22–10:17 (Sundberg), 51:2–6 (Miller); DX157.)

At a high level, the process of assigning midshipmen is a collaborative effort between the Academy's Officer Accessions and Talent Optimization ("OATO") Department; Community Assignment Boards, which are comprised of representatives from the respective communities; and a Service Assignment Review Board.  (ECF No. 146 at 10:13–17, 11:4–9, 14:5–22 (Sundberg); DX157.)  First, the OATO Department "allocates midshipmen to the various communities based on their first-choice preferences."  (ECF No. 146 at 10:13–17 (Sundberg).)  Subsequently, the Community Assignment Boards rank midshipmen using the criteria assigned to them by the Chief of Naval Personnel and USNAINST 1301.5L.  (ECF No. 146 at 11:4–9 (Sundberg).)  After the Community Assignment Boards rank the midshipmen, OATO redistributes midshipmen based on their next community of choice, and the process is iterative until all billet goals set by the Chief of Naval Personnel are met.  (*Id.* at 14:5–14 (Sundberg).)  The Service Assignment Review Board is tasked with ensuring the service assignment process is completed consistent with the number of billets and requirements set by the Chief of Naval Personnel.  (*Id.* at 14:15–22 (Sundberg).)

### c. While Only Accounting for One-Fifth of the Officers Entering the Navy and Marine Corps Annually, the Academy Is a Vital Pipeline to the Officer Corps, and Especially to Senior Leadership

While the Academy accounts for one-fifth of officers commissioning into the Navy and Marine Corps every year, the Academy produces approximately 28 percent of the officers entering the Navy and Marine Corps' warfighting communities.  (ECF No. 140 at 114:1–13

(Latta).)  Though these numbers may seem modest, the Academy's representation in the Navy and Marine Corps senior leadership proves otherwise.

The commissioned officer corps is divided into 10 pay grades—O-1 through O-10, with O-1 through O-3 officers considered company grade officers; O-4 through O-6 officers considered field grade officers; and O-7 through O-10 reserved for general officers in the Army, Marine Corps, and Air Force and flag officers in the Navy.  In the Army, Marine Corps, and Air Force, these pay grades correspond to the ranks of second lieutenant (O-1), first lieutenant (O-2), captain (O-3), major (O-4), lieutenant colonel (O-5), colonel (O-6), brigadier general (O-7), major general (O-8), lieutenant general (O-9), and general (O-10).  In the Navy, these paygrades correspond to ensign (O-1), lieutenant junior grade (O-2), lieutenant (O-3), lieutenant commander (O-4), commander (O-5), captain (O-6), rear admiral lower half (O-7), rear admiral upper half (O-8), vice admiral (O-9), and admiral (O-10).

As officers advance through pay-grades, being selected for and performing well in a warfare command billet is important for promotion in the Navy and Marine Corps, especially as officers advance into pay-grades O-6 and beyond.  (ECF No. 146 at 40:22–41:1 (Miller).)  A disproportionate number of warfare command billets are filled by Naval Academy graduates.  (*Id.* at 41:2–9 (Miller).)  Accordingly, 68 percent of flag officers—the Navy's senior-most leadership cadre—are unrestricted line officers.  (*Id.* at 43:10–12 (Miller).)  As much as 78 percent of O-9 and O-10 officers are unrestricted line positions.  (*Id.* at 43:12–14 (Miller).)

Perhaps unsurprisingly, 40 percent of flag officers are Naval Academy graduates.  (*Id.* at 44:19–22 (Miller); ECF No. 145 at 127:12–18 (Fuller).)  The Chief of Naval Operations is

an O-10 level position and the highest-ranking officer in the Navy. (ECF No. 146 at 43:25–44:5 (Miller).) Approximately 90 percent of Chiefs of Naval Operations have been Academy graduates. (ECF No. 143 at 176:17–177:2 (Sherwood).) Simply stated, the Academy is a vital accession source to the officer corps, and especially to senior leadership.

### B. Findings of Fact: The United States Naval Academy's Admissions Procedures Mandate a Holistic Evaluation of Candidates.

The Court heard testimony from the Naval Academy's Dean of Admissions Stephen Bruce Latta and Director of Nominations and Appointments Melody Hwang, who both testified in great detail about the Naval Academy's admissions process. Dean Latta and Hwang—both Academy graduates themselves—have worked in the Academy's Admissions Office since 2002 and 2014, respectively. The Court also briefly heard testimony on the topic of the Academy's admissions process from another Navy graduate, Captain Jason Birch. CAPT Birch is the former commanding officer of SEAL Team 10 and is currently assigned as the 3rd Battalion Officer at the Academy, where he is sitting on the Academy's Admissions Board for a second year during the current admissions cycle. Dean Latta, Hwang, and CAPT Birch each described a complex, robust, whole-person review process where every candidate is evaluated as a unique individual. (ECF No. 139 at 192–237 (Hwang); ECF No. 140 at 4–31 (Hwang), 38–249 (Latta); ECF No. 141 at 3–108 (Latta); ECF No. 143 at 18–60 (Birch).) Based on their credible testimony and other evidence, and for the reasons detailed below, the Court finds that the Naval Academy's admissions policies mandate that, in practice, race is only taken into consideration in limited circumstances: (1) when offering letters of assurance;

(2) when deciding between two candidates with very close whole person multiple scores[23] for nominations using the "competitive" method, service-connected nominations, and in some circumstances the "principal competitive alternate" method; (3) when extending Superintendent nominations, though Defendants insist that race and ethnicity have not played a factor in a Superintendent nomination since at least 2009; and (4) when extending offers to additional appointees.[24]  In each of those circumstances, race is nondeterminative and taken into consideration only as one of many factors in order to assess the candidate's potential as a midshipman and eventual officer in the Navy or Marine Corps.

### 1.  Naval Academy Admissions Overview

Preliminarily, the Court briefly notes that the admissions process at the Academy is governed by (1) federal statute—10 U.S.C. §§ 8453–8458; (2) Department of Defense directives; (3) Department of Navy regulations; and (4) internal guidance.  As noted throughout trial and the instant filing, these requirements play imposing roles in the Academy's admissions decisions.  In particular, 10 U.S.C. § 8454 and OPNAVINST[25] 5450.330B require, respectively, that candidates secure a nomination for the admissions cycle in which they wish to be considered and that the Academy graduate at least 65 percent of students with science,

---

[23] As explained *infra*, a whole person multiple score is a computer-generated score assigned to applicants based on various objective criteria.  *See infra* Section III.B.3.b.i.

[24] It is worth noting that Dean Latta testified that race or ethnicity may be a nondeterminative consideration in deciding whether to extend an offer of appointment to a candidate off the waitlist, though he noted that this was "pretty rare."  (ECF No. 140 at 62:15–63:21, 238:11–17 (Latta).)  In any event, the Court, weighing all evidence before it, finds that such consideration of race is limited to the above-noted circumstances.  In other words, where a candidate is offered appointment following placement on the waitlist, race and ethnicity are only considered to the extent that the decision to offer the candidate an appointment overlaps with circumstances (2) (deciding between candidates with very close WPMs for nominations using the competitive method, service-connected nominations, and in some circumstances the principal competitive alternate) and (4) (additional appointees) above.

[25] OPNAVINST stands for Office of the Chief of Naval Operations Instruction.

technology, engineering, and mathematics ("STEM") degrees.

Section 8454 of Title 10 limits the size of the Brigade of Midshipmen to 4,400, meaning each incoming class consists of approximately 1,170 to 1,180 midshipmen before attrition. (ECF No. 140 at 170:17–22 (Latta).)  To achieve an incoming class of that size, the Academy extends between 1,380 to 1,400 offers of appointment.  (*Id.* at 170:17–22 (Latta).)  In a typical admissions cycle, the Naval Academy receives approximately 14,000 to 16,000 applications, though more than 60 percent of those applications are incomplete or withdrawn and thus not ultimately considered for admission to the Academy.[26]  (PX33; PD3.)

### 2.  Applying to the Naval Academy

From an applicant's standpoint, the application process for the Naval Academy functions as follows.

### a.  The Preliminary Application

All students[27] applying to the Naval Academy must complete an initial application for the admissions cycle in which they wish to be considered, referred to as the "preliminary application."  (ECF No. 140 at 143:11–14, 170:11–15 (Latta).)  Applicants may submit the preliminary application as early as January of the year before matriculation (i.e., for high school applicants, January of junior year), and must submit a completed preliminary application no later than December 31 the year prior to matriculation (i.e., for high school applicants,

---

[26]  "In a typical year, approximately 5,000 candidates receive nominations."  (DX79.)

[27]  Students that applied to the Naval Academy Summer Seminar ("NASS") are not required to complete a preliminary application, as the Academy considers an application for NASS to be a preliminary application for admission.  (ECF No. 140 at 143:11–14, 170:11–15 (Latta).)  As further detailed *infra*, NASS is a program managed by the Strategic Outreach Department within the Office of Admissions that brings promising prospective candidates to the Naval Academy the summer before their senior year of high school to expose them to the Academy and provide them with valuable insight and experiences into life at the Academy.  (PX21; DX94); *see also infra* Section III.D.1.e.

December 31 of senior year).  (PX21; DX94.)

This preliminary application is used as a screening tool to determine whether an applicant meets the basic statutory eligibility requirements and to assess whether the applicant is likely to meet minimum academic standards.[28]  (ECF No. 140 at 144:14–22 (Latta).)  To be eligible for admission to the Naval Academy, applicants must be a U.S. citizen (except for limited quotas of international midshipmen specifically authorized by Congress) by July 1st of the year of matriculation (i.e., Induction Day or I-Day); be at least 17 and not yet 23 years of age by I-Day; be unmarried, not pregnant, and have no obligations of parenthood; and have a valid Social Security number.  10 U.S.C. § 8458; DoDINST 1322.22; (ECF No. 140 at 144:14–22 (Latta); PX21; PX813; DX94; DX79; DX159.)  These eligibility requirements cannot be waived.  (ECF No. 140 at 166:2–3 (Latta).)

### b.  Candidate Information System

After completing the preliminary application, and assuming the basic eligibility requirements are met, the applicant—thereon referred to as a candidate—receives an email with a candidate number and instructions to log into the Candidate Information System.  (ECF No. 140 at 145:1–5 (Latta); PX21; DX94.)  This system includes a number of forms and steps required for review by the Academy's Admissions Board and other information.  (ECF No. 140 at 145:6–146:4, 156:10–13 (Latta).)  For first-time applicants applying from high school,[29]

---

[28]  It is worth noting that Office of Management and Budget ("OMB") rules and DoD guidance require the Naval Academy to ask applicants about their race and ethnicity in the preliminary application, though Dean Latta testified that the Naval Academy does not use this information contained on the preliminary application for any purpose.  (ECF No. 140 at 144:5–14.)

[29]  The application process varies somewhat for non-high school applicants, such as candidates from the Naval Academy Preparatory School, reapplicants (i.e., transfers), and enlisted servicemembers.  (PX21; DX94.)

mandatory forms and steps are: (1) submission of SAT/ACT test results;[30] (2) submission of

a high school transcript; (3) submission of high school Mathematics and English teachers'

recommendations; (4) submission of extracurricular activities; (5) submission of a Personal

Data Record, which requests personal information about the candidate and the candidate's

family, including a personal statement, family background information, foreign language

enrollment history, and the disclosure of any citations, arrests, convictions, or fines; (6)

successful completion of the required Candidate Fitness Assessment; and (7) completion of a

Blue and Gold Officer[31] interview.   (PX21; DX 94; DX79; PX813.)   In addition to the

foregoing, candidates must receive a nomination from a Member of Congress, the Vice

President, President, or Secretary of the Navy, and pass a physical examination and review

performed by the Department of Defense Medical Examination Review Board

("DoDMERB").  These components are not required as part of a completed application.  10

U.S.C. § 8454; (PX21; DX 94; DX79; PX813.)  That is, while the nomination and the

DoDMERB's determination of medical qualification are required for consideration for an

offer of appointment, an application may be reviewed prior to these two components being

fulfilled.  (PX21; DX 94; DX79; PX813.)

### c.  The Nomination Requirement

As noted *supra*, applicants to the Naval Academy are required by statute to secure a

---

[30]   During the COVID-19 pandemic, the Naval Academy implemented a test-flexible policy under which
standardized test scores were optional.  (ECF No. 140 at 189:4–190:12 (Latta).)  While this test-flexible policy
applied to the classes of 2025 through 2027, it no longer applies, pursuant to a change in the National Defense
Authorization Act for Fiscal Year 2024.  (*Id.* at 189:4–190:12 (Latta).)

[31]   Blue and Gold Officers are volunteer "[f]ield representatives of the [Academy's Admissions Office] who
cover[] a specific geographic area[.]"  (PX21; DX94.)

nomination for the admissions cycle in which they wish to be considered.[32]  10 U.S.C. § 8454.

There are two types of nominations: (1) nominations from a "statutory nominating authority,"

commonly referred to as congressional nominations; and (2) "service-connected"

nominations.  *Id.*  Statutory nominating authorities include the Vice President, Members of

Congress, Delegates to Congress from U.S. territories and the District of Columbia, and the

Governor and the Resident Commissioner of Puerto Rico.  *Id.*; (DX15; PX26; ECF No. 139

at 196:10–17 (Hwang).)  Service-connected nominations are reserved for children of certain

servicemembers; candidates who are already members of the Navy or Marine Corps or

members of Reserve Officers' Training Corps ("ROTC") programs; and candidates selected

by the Academy's Superintendent.  10 U.S.C. § 8454; (DX15; DX87.)

Given the influential role nominations play in the Academy's admissions process, some

additional background on the requirement is crucial.  Where a candidate is appointed to the

Naval Academy pursuant to a nomination by a Member of Congress, that candidate is

"charged" to that Member.[33]  (DX87.)  Each Member may have five "charges" at the Naval

---

[32]  At trial, Hwang explained that, approximately 20 to 30 times a year, the Academy "help[s] a candidate acquire a nomination."  (ECF No. 139 at 199:19–24, 200:5–7, 223:23–224:9.)  These nomination assists, or nom assists, are primarily used for recruited athletes, but are sometimes used for candidates coming from the Academy's preparatory programs who fail to obtain a nomination during their preparatory year and for candidates who have already received a letter of assurance.  (*Id.* at 199:19–24, 200:5–7, 223:23–224:9 (Hwang).)  Nom assists are never pursued because of a candidate's race or ethnicity.  (*Id.* at 224:10–12 (Hwang); ECF No. 140 at 6:11–14 (Hwang).)  The congressional office may still decline to provide a nomination.  (ECF No. 139 at 200:15–24; ECF No. 140 at 5:16–6:10 (Hwang).)

[33]  As discussed throughout the instant filing, appointees that received congressional nominations account for more than 80% of the Brigade of Midshipmen.  (DX23; ECF No. 139 at 217:7–9 (Hwang).)  The Academy prioritizes representation from as many congressional districts as possible, which is one of the reasons why congressional nominations make up such a large percentage of every class.  (ECF No. 139 at 217:10–19 (Hwang).)  As further discussed *infra*, recognizing this outsized role that congressional nominations play in the admissions process, the Naval Academy periodically provides training to congressional offices on admissions and nominations, including two trainings a year at the Naval Academy for congressional staffers as well as admissions forums.  (*Id.* at 219:23–222:12 (Hwang).)  During these trainings, the Academy emphasizes that congressional offices should look beyond a candidate's transcripts and test scores and consider other factors

Academy at one time.  10 U.S.C. § 8454(a); (DX23.)  When a Member has fewer than five charges at the end of the academic year, the Member has a "vacancy" for the following admissions cycle.  10 U.S.C. § 8454(a); (DX23.)  For each vacancy, Members can nominate up to a specified number of candidates.  While Members were previously limited to 10 candidates per vacancy, Members can nominate up to 15 candidates per cycle beginning in the class of 2029.  10 U.S.C. § 8454(a); (DX93.)

Congressional nominating authorities may nominate their slate of candidates using one of three methods: (1) "competitive"—where the Member submits nominees to the Academy without any order of preference, allowing the Academy to select the best qualified candidate within that slate; (2) "principal competitive alternate"—where the Member identifies a principal nominee and a list of unranked alternates; and (3) "principal numbered alternate"— where the Member identifies a principal nominee and a ranked list of alternates.  10 U.S.C. § 8454(a); (ECF No. 139 at 197:5–198:17, 223:6–8 (Hwang); PX259 ¶¶ 25, 34–36; DX91.) Approximately 35% of Members of Congress use the principal nominating methods, with the remaining 65% using the competitive method.  (ECF No. 139 at 198:18–20, 223:9–11 (Hwang).)  Ultimately, Members of Congress decide which students they will nominate, and the Naval Academy has no authority or control over which nomination method the nominating source uses.  (*Id.* at 219:1–7 (Hwang).)  As discussed *infra*, testimony at trial documented the racial disparity in nominations, with white students receiving the majority of

---

such as "any leadership experience[s]," "unusual life experiences," first-generation college student, "first-generation American," and "cultural or diverse background."  (*Id.* at 220:20–221:11 (Hwang).)  The Naval Academy also encourages nominating sources to use the competitive nominating method because it provides the Naval Academy the most flexibility in choosing competitive candidates.  (*Id.* at 223:12–20 (Hwang).)

congressional nominations and certain districts typically nominating fewer minorities because their constituents tend to have smaller minority populations.  (*Id.* at 219:8–22 (Hwang).)  While the Naval Academy strives to inform Members of Congress about this disparity, the Academy's efforts have been "minimally [successful], if at all" in increasing the diversity of congressional nominations.  (*Id.* at 221:20–222:12 (Hwang).)

### 3.  The Application Review Process

The Naval Academy's mission is "[t]o develop midshipmen morally, mentally, and physically and to imbue them with the highest ideals of duty, honor and loyalty in order to graduate leaders who are dedicated to a career of naval service and have potential for future development in mind and character to assume the highest responsibilities of command, citizenship, and government."  (DX79; PX813.)  Pursuant to SECNAVINST[34] 1531.2D, the Naval Academy's admissions procedures must support the primary objectives of selecting candidates who "[a]re mentally and physically able to undertake rigorous academic, professional education, as well as physical training programs," "[s]how interest in serving their country as professional officers in the Naval Services," "[s]how capabilities and interests in fields of study that reflect the needs of the Navy and Marine Corps," "[s]how potential for leadership in the Naval Services," "[s]how the capacity and desire to complete the 4-year course and remain in Service beyond the period of obligated service after commissioning," and exhibit "good moral character."  Accordingly, the Naval Academy's review process functions quite differently from the application review process of a civilian university.  In brief, to be eligible to compete for an appointment to the Academy, an applicant must (1) obtain a

---

[34]  SECNAVINST stands for Secretary of the Navy Instruction.

nomination; (2) be determined whole person qualified; (3) be determined medically qualified by the DoDMERB or obtain a waiver; and (4) be determined physically qualified. The Court begins with an overview of the Academy's Admissions Office before turning to the criteria considered and admissions review process.

### a. The Naval Academy's Admissions Office

The Naval Academy's Office of Admissions has approximately 47 staff members comprised of an assortment of military and civilian personnel, though the effort of recruiting and selecting the Brigade of Midshipmen certainly involves many more. (ECF No. 140 at 134:9–11 (Latta).) At a high level, the Naval Academy's Admissions Office consists of three entities: the Candidate Guidance Office; the Strategic Outreach Department; and the Nominations and Appointments Department. (*Id.* at 134:14–24 (Latta).) While members of the Admissions Office are involved in selecting the Brigade of Midshipmen to varying degrees, the task of reviewing applications and making recommendations on their qualifications falls to the Admissions Board, with the ultimate task of offering appointment to the Naval Academy falling to the Slate Review Committee.

With respect to the three entities composing the Admissions Office, the Candidate Guidance office is the largest with approximately 20 staff members. (*Id.* at 134:15–18 (Latta); PX21; DX94.) Candidate Guidance identifies and counsels candidates and is the department that first processes candidate applications. (ECF No. 140 at 134:15–18 (Latta); PX21; DX94.) The Director of Candidate Guidance leads a staff of active-duty officers, civilian administrators, and all Blue and Gold Officers. (PX21; DX94.)

Strategic Outreach is the department responsible for leading efforts to market the

Naval Academy throughout the United States and its territories. (ECF No. 140 at 134:19–22 (Latta); PX21; DX94.) It leads efforts to develop strategies and plans to create awareness of the Naval Academy among middle and high school students. (PX21; DX94.) It also plans and executes Office of Admissions' marketing programs, which, as detailed *infra*, are expansive and target prospective candidates, community influencers, and Members of Congress alike. (PX21; DX94.)

The Nominations and Appointments Department is responsible for the midshipmen selection process and oversight of the medical clearance process as well as all service-connected nominations. (ECF No. 140 at 134:23–24 (Latta); PX21; DX94.) The department also plays an important role as the Academy's liaison to congressional staffs. (PX21; DX94.) Since 2018, Melody Hwang has served as the Director of Nominations and Appointments. (ECF No. 139 at 214:20–22 (Hwang).) In this role, she works directly with congressional offices, advising offices on vacancies, making sure all congressional nominations are received, and communicating the Academy's selections to the nominating source. (ECF No. 140 at 140:3–18 (Latta).)

The Admissions Board ("AB") is comprised of a cross section of approximately 21 to 23 faculty and staff members designated in writing by the Academy's Superintendent each admissions cycle with the goal of representing a cross section of "experiences" and "expertise." (ECF No. 140 at 135:3–12 (Latta); DX79; DX159; PX813.) The Admissions Board reviews applications submitted by candidates and makes recommendations to the Dean of Admissions on the qualifications of each candidate following a review of their file. (ECF No. 140 at 135:3–12 (Latta); DX159.) The AB's primary responsibility is to review completed

applications and provide recommendations on applicants' qualifications for admission. (ECF No. 140 at 135:22–136:14 (Latta); DX159.)  While the AB assigns a score to each candidate and makes recommendations as to whether the candidate is qualified, not qualified, or deferred (i.e., the application is put on hold for further review or pending additional information), the AB does not make admissions decisions; rather, that is the responsibility of the Slate Review Committee and Dean of Admissions.  (ECF No. 140 at 137:14–138:7, 185:6–22 (Latta).)

The Slate Review Committee ("SRC" or "Committee") is a panel comprised of the Dean of Admissions, the Director of Candidate Guidance, and the Director of Nominations and Appointments that reviews nomination slates to determine slate winners and offers of appointment to the Naval Academy, after the Director of Nominations and Appointments puts together the congressional lists and nomination sources to present to the Committee. (*Id.* at 137:21–139:3, 140:3–18 (Latta).)  In addition to these "corporate members," the SRC includes an additional regional expert from the Candidate Guidance office which varies according to the location of the slate being considered.  (*Id.* at 137:21–139:3 (Latta).)

### b.  Criteria Considered for Admission

The criteria considered by the Admissions Board for whole person qualification determinations are as follows.

### i.  The Whole Person Multiple

Once a candidate's application to the Naval Academy is completed, a computer-generated score known as the Whole Person Multiple—or WPM—is calculated by an algorithm based on SAT/ACT scores, class rank, teacher recommendations, and extracurricular activities.  (DX12; DX72.)  After the initial computer-generated WPM is

calculated, the Admissions Board reviews the candidate's file and makes Recommendations of the Admissions Board, known as RABs, which are adjustments to the WPM that may be both positive and negative.  (ECF No. 140 at 187:6–188:8, 191:2–6 (Latta); DX1; DX2.)  The final WPM score—including all RAB adjustments—includes both objective and subjective components, but race, ethnicity, and gender are not accounted for in the WPM or RAB adjustments.  (ECF No. 140 at 187:6–189:3 (Latta); DX1; DX12; DX72; DX161.)

The WPM was "designed to reduce first-year attrition at the Naval Academy."  (ECF No. 140 at 161:7–9 (Latta).)  While Dean Latta described the WPM as an "excellent tool for comparing candidates," he also explained that there are "other things" in the application that "actually help provide context."  (*Id.* at 155:20–156:9.)  In other words, the WPM does not tell the whole story.  For example, a recruited student athlete may have a comparatively lower WPM due to relatively weak academics, but because recruited athletes possess other valuable qualities such as leadership, teamwork, and perseverance, the Academy is willing to accept some academic risk.  (*Id.* at 214:5–215:9 (Latta); DX122.)  Moreover, the Naval Academy Preparatory School, which offers a 10-month college preparatory program designed to strengthen the academic foundation of incoming midshipmen candidates, mitigates this academic risk, as many athletes matriculate to the Academy through NAPS.  (ECF No. 140 at 214:5–215:9 (Latta).)  The Naval Academy also considers character—both positive attributes and negative issues—when making qualification recommendations, but character is "not actually a component of the [WPM]."  (*Id.* at 231:17–233:8 (Latta).)

### ii.   Personal Statement

Candidates are also required to submit a personal statement, though this aspect of a

candidate's application is not included in the WPM.  (ECF No. 140 at 146:5–150:17 (Latta).)

At trial, Dean Latta explained that the essay is an "extremely important" component of the

Academy's holistic review of a candidate's record, affording the Naval Academy an exceptional

opportunity to get insight into the candidate.  (*Id.* at 146:5–150:17.)  The essay allows the

Academy to learn what motivates the candidate to serve, what informs their interest in the

Academy, as well as any character forming experiences.  (*Id.* at 146:7–23 (Latta).)  The essays

commonly reveal instances of overcoming hardship and important socioeconomic

information.  (*Id.* at 146:24–150:17 (Latta).)  Powerful personal statements commonly inform

and influence admissions decisions. (*Id.* at 147:8–148:1, 148:5–24, 148:24–149:10 (Latta).)

### iii.    Personal History and Family Background Information

While not always captured in the Whole Person Multiple, the Naval Academy also

requests personal history and family background information from candidates, which helps

inform the Academy's assessment of whether a student would be an effective leader in the

Navy and Marine Corps after graduation.  (ECF No. 140 at 145:10–15, 150:18–156:9 (Latta).)

Important components of this record include unusual life experiences, overcoming hardship,

adversity, language fluency, cultural literacy, and socioeconomic status.  (*Id.* at 145:10–15,

150:18–156:9 (Latta).)

### iv.    Candidate Academic Information Form

The Candidate Academic Information ("CAI") form must be completed by a school

official.  (ECF No. 140 at 156:22–162:5 (Latta).)  The CAI includes information such as class

rank and GPA, indicating whether such information is weighted; the school's curriculum,

including whether the school offers Advance Placement ("AP"), International Baccalaureate

("IB"), or honors courses; the percentage of students matriculating to two- and four-year colleges; and, in some instances, can offer insight into a candidate's aptitude for leadership. (*Id.* at 157:5–158:9 (Latta).)  The CAI form also inquires as to whether the applicant is a member of a minority group or a disadvantaged background, including whether the student is on free or reduced lunch, a recipient of Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC") funding, or other financial assistance program.  (*Id.* at 158:10–159:1 (Latta).)  While some of this information—such as class rank or, where class rank is unavailable, GPA—factors into the WPM, some of the information contained in the CAI form that the Academy considers falls outside of the WPM.  (*Id.* at 158:2–9 (Latta).)

### v.  Blue and Gold Officer Interviews

With the exception of varsity football and basketball players[35] and members of the Fleet,[36] an interview with a Blue and Gold Officer ("BGO") is a mandatory requirement in the Naval Academy's admissions process.  (ECF No. 140 at 175:18–178:14 (Latta).)  Blue and Gold Officers are volunteer "[f]ield representative[s] of the Office of Admissions who cover[] a specific geographic area, usually defined by assigned high schools," who "market the [Academy] and encourage exceptional individuals to seek a career in the naval service through the Naval Academy and other officer accession programs."  (PX21; DX94.)  In addition, the BGOs "provide counseling and information to candidates and prospective candidates."  (PX21; DX94.)  While many BGOs have served as naval officers and graduated from the

---

[35]  At trial, Dean Latta explained that varsity football and basketball recruits are excepted from the BGO interview requirement due to concerns with the National Collegiate Athletics Association's rules regulating booster activities.  (ECF No. 140 at 176:10–18.)

[36]  At trial Dean Latta explained that Fleet applicants are not interviewed by a BGO because they are required to get a recommendation from their commanding officer.  (*Id.* at 176:10–18.)

Academy, prior service or graduation from the Academy are not prerequisites for assignment; rather, any "mature adult who has a sincere interest in fulfilling the mission of the Naval Academy and the needs of the naval service may be considered for assignment" as a BGO. (PX21; DX94; ECF No. 140 at 177:8–24 (Latta).)

The BGO interviews are "comprehensive," and BGOs, who the Naval Academy trains on what the Academy is looking for in midshipmen, provide the Academy with "a breadth of data based on [the BGO's] observations of the candidate" as well as "an overall recommendation" of the interviewed candidate. (ECF No. 140 at 176:23–177:24 (Latta).) In addition to discussing academic interests and career options as well as whether the candidate is interested in NAPS, the BGOs evaluate "leadership potential, . . . organizational skills, time management, communication skills, and other background information." (*Id.* at 177:1–7 (Latta).) Dean Latta explained that the BGO interviews often reveal information about hardship, family background, language skills, and other personal information that might not be revealed anywhere else in the file. (*Id.* at 177:8–24.) While the BGO interview may justify a RAB adjustment, the Academy also considers information from the interviews outside of RAB adjustments. (*Id.* at 177:25–178:14 (Latta).)

Occasionally, a BGO's assessment of a candidate conflicts with other information in an applicant's file. (*Id.* at 234:12–235:20 (Latta).) For example, a candidate who attended a Naval Academy summer program such as Naval Academy Summer Seminar ("NASS")[37] or

---

[37] NASS is an outreach program offered at the Naval Academy to rising high school seniors during one of three one-week sessions in June. (PX21; DX94.) Students experience all aspects of a midshipman's life, including academics and athletics. (PX21; DX94.) As noted *infra*, an application for NASS is considered an initial application for admission, and students who participate in the program are encouraged to continue their application. (PX21; DX94.)

Summer STEM Camp[38] may have received a very positive review, but a negative BGO interview write-up.  (*Id.* at 234:12–235:20 (Latta).)  When such a conflict exists, the Admissions Board may seek another BGO interview or other information from school officials to resolve the conflict.  (*Id.* at 234:12–235:20 (Latta).)

### vi.    Athletic Activities

The Academy also seeks information on participation in athletics because of the "warrior ethos," teamwork, communication and leadership skills, and time management that athletes exhibit.  (ECF No. 140 at 162:6–164:3 (Latta).)  Indeed, more than 90 percent of admitted candidates participated in athletic activities in high school.  (*Id.* at 162:21–25 (Latta).)  Participation in athletics may justify a RAB adjustment, and the Naval Academy does not limit the award of RAB points to certain sports.  (*Id.* at 163:1–164:3 (Latta).)

### vii.    Socioeconomic Information

The Academy also seeks information on socioeconomic status, requesting—but not requiring—self-reported family income information, though other application sections are also illuminating on this topic.  (ECF No. 140 at 219:3–224:25 (Latta).)  At trial, Dean Latta explained that the self-reported family income information was "not [an] entirely reliable metric."  (*Id.* at 219:3–220:14.)  To evaluate the accuracy of this self-reported information, the Academy will review the entirety of an applicant's file, including information from the counselor, the BGO, or the personal statement, as these sources can reveal whether an applicant receives some form of government assistance.  (*Id.* at 219:10–220:14 (Latta).)  Still,

---

[38]  The Summer STEM Camp offers several hundred rising ninth- to eleventh-grade students the opportunity to participate in a six-day residential program focused on science, technology, engineering, and mathematics. (PX21; DX94.)

the Academy considers all of the socioeconomic information provided in a candidate's record in making admissions decisions by reviewing the entirety of the application file.  (*Id.* at 220:20–25 (Latta).)

### c.  Admissions Review Process

#### i.  Admissions Office Examiner and Admissions Office Counselor Review

After an applicant has submitted the materials necessary to be considered by the Academy, an Admissions Office examiner will conduct a review of the submitted materials to confirm the candidate's record contains the correct information and to determine if there are any character issues requiring additional information.  (ECF No. 140 at 180:6–24 (Latta); DX79; PX813.)  After that initial review concludes, the record goes to the Admissions Office counselor randomly assigned to that candidate who conducts a preliminary review of the record.  (ECF No. 140 at 180:25–181:25 (Latta); DX79; PX813.)  The counselor reviews the candidate's file for any "triggers"—meaning "anything that stands out," such as good or bad grades, honors and AP courses, unusual life experiences, or character issues.  (ECF No. 140 at 180:25–181:25 (Latta).)  The counselor fills out a form "with all the things they observe in the record for the [AB] member to review," typically including a recommendation to the member of the AB.  (*Id.* at 181:8–14 (Latta).)

#### ii.  The Admissions Board's Review

Assuming the Admissions Office counselor concludes the application is ready for review by the Admissions Board, the record is sent to the Board member randomly assigned to the candidate.  (ECF No. 140 at 181:23–184:15 (Latta).)  The Board member reviews the file and analyzes the overall qualities in the record, including both objective and subjective

factors, and prepares the record to brief the other Board members, including written comments and recommended RAB adjustments to the WPM as well as an overall summary. (*Id.* at 181:23–184:15 (Latta).) The Admissions Board convenes weekly during the admissions cycle,[39] and following the briefing on a candidate to the full Board, the full Board votes on any RAB adjustments to the WPM, which require majority vote; and subsequently, the full Board votes on whether to recommend the candidate as qualified to the Slate Review Committee. (DX1; DX2; DX3; DX79; PX813.)

With respect to this first task, the Academy provides AB members guidance on how to make RAB adjustments, which must be approved by a majority vote following a briefing to the entire Admissions Board. (DX1; DX2; DX79; PX813; ECF No. 140 at 191:7–192:1 (Latta).) The Guidance for Recommendations of the Admissions Board (RABs) notes: "The Admissions Board is authorized to adjust a candidate's Whole Person Multiple (WPM) over a range of up to +9000 points, generally in increments of 500 points (one RAB equals 500 points)." (DX1.)

Bases for RABs include high school quality, high school courses, interest in STEM, teacher recommendations, life experience/hardship, military family, performance on the Candidate Fitness Assessment, extracurricular activities, evaluation following candidate's attendance of NASS, BGO interview, adverse character issues, and personal statement. (*Id.*) Importantly, *race and ethnicity cannot justify a RAB adjustment*. (*Id.*) While some RAB adjustments reflect objective factors, such as the number of AP courses, IB program enrollment, or

---

[39] While the Academy begins receiving congressional nominations as early as October and nominations must be submitted no later than January 31, the Admissions Board begins meeting on a weekly basis in late August. (ECF No. 140 at 9:16–10:7 (Hwang).)

attendance to a competitive entry school, the RAB adjustments also reflect more subjective factors, such as hardship, unusual life experiences, teacher recommendations, and socioeconomic information.  (ECF No. 140 at 191:7–192:13 (Latta).)  Still, the Academy aims to apply RABs consistently: "Although each [AB] member must use their good judgment when evaluating candidate records, the [B]oard must strive for consistent application of RABs throughout the entire class."  (*Id.* at 202:12–16 (Latta); DX1.)

When the Admissions Board meets, each member briefs the other members on the candidates assigned to them.  (ECF No. 140 at 179:24–184:15 (Latta).)  Each member will review the entire record of the candidates presented and then discuss each candidate to make a recommendation on the candidate's qualifications.  (*Id.* at 179:24–184:15 (Latta); DX123.)

Following a briefing to and majority vote by the full Board, the AB may recommend that: (1) a candidate is qualified or not qualified; (2) if qualified, that the candidate be considered for a Letter of Assurance (by designating the candidate "early notify"); or (3) a candidate be considered for a preparatory program, such as NAPS; or (4) alternatively, the Board may defer a recommendation because more information is needed.  (ECF No. 140 at 235:21–236:24 (Latta); DX79; PX491; DX159; PX813.)  To be admitted to the Naval Academy, a candidate must be qualified.  (ECF No. 140 at 16:18–20 (Hwang).)  WPMs generally range from 40,000 to 80,000.  (PX259 ¶ 50.)  Candidates normally need a WPM of 58,000 to be considered "qualified" for admission to the Naval Academy, with WPM scores of 70,000 or above considered highly qualified and appropriate for early notify.  (*Id.* ¶¶ 51–53; DX3.)

There is no minimum test score or GPA required for qualification determinations, as

the Naval Academy considers every candidate's whole record in assessing their candidacy for an offer of appointment. (ECF No. 139 at 227:6–24 (Hwang).) As several witnesses testified at trial, race and ethnicity are not considered in determining whether a candidate is qualified or not qualified. (*Id.* at 224:13–15, 225:21–24 (Hwang); ECF No. 140 at 31:3–7 (Hwang), 50:4–5, 186:17–19 (Latta); ECF No. 143 at 44:14–45:4, 56:7–11, 58:21–59:4 (Birch).)

Once the AB reaches majority consensus on a candidate, the AB will annotate its recommendation in the candidate's record. (ECF No. 140 at 179:24–184:15 (Latta); DX79; PX813.) Pursuant to authority delegated from the Superintendent, the Dean of Admissions has "final approval" for determining whether an applicant is qualified or not qualified, though he does not typically "override" the AB's determination. (ECF No. 140 at 66:22–67:6, 216:16–18 (Latta).) At trial, Dean Latta explained that, on the rare occasion that he does override the AB's determination and change a candidate from unqualified to qualified, it is "done for efficiency in the admission process and usually when the [AB] is not in session" but new information is received from the candidate. (*Id.* at 68:14–69:6, 216:19–217:4.) Dean Latta emphasized that he has never overridden the Board's determination where he had concerns about the candidate's academic potential and that race is not considered when making such a change. (*Id.* at 218:19–25.) Dean Latta also testified that he has occasionally changed a candidate from qualified to unqualified, noting this change typically only happens when character issues arise when the AB is not in session or when new information is received reflecting a decline in grades. (*Id.* at 217:21–218:18.)

After the AB makes a recommendation, the records are matched with each nominating list to which the applicant has been nominated. (*Id.* at 179:24–184:24 (Latta).) If the AB

determines a candidate is qualified for admission, the candidate's record will be reviewed by the Slate Review Committee.  (*Id.* at 186:3–11 (Latta).)

### iii.    The SRC's Review of a Candidate

If the AB determines a candidate is qualified, the candidate's record is passed along to the Slate Review Committee, which reviews the nomination lists and makes final admission decisions.  (ECF No. 140 at 242:16–23 (Latta).)  The Naval Academy aims to notify students of their admission status (i.e., offered appointment, denied appointment, accepted to prep pool, or placed on waitlist) no later than April 15—though admissions decisions are made and communicated on a rolling basis, and admitted students have until May 1 to notify the Academy of their decision.  (*Id.* at 172:23–173:9 (Latta).)

As noted, the SRC's review and ultimate selections are largely driven by Title 10's congressional nomination requirement.  (DX127.)  The SRC reviews congressional slates as they are submitted with the goal of designating a slate winner who will then become the charge to that congressional office.  (ECF No. 139 at 201:9–14, 228:2–8 (Hwang).)  The slate winner is extended an offer to the Naval Academy.  (*Id.* at 201:9–14 (Hwang).)

The slate winner depends in large part on the nomination method utilized by the nomination source.  (ECF No. 141 at 2:22–3:22 (Latta); ECF No. 139 at 229:3–24 (Hwang).)  For example, if the nominating source utilized either principal nominating method and the principal nominee is fully qualified, the SRC must admit that candidate an offer of appointment regardless of how the principal candidate compares to other candidates on the congressional slate.  (ECF No. 141 at 2:22–3:22 (Latta); ECF No. 139 at 229:3–24 (Hwang).)  Where a nominating source utilized either the competitive method or the principal competitive

alternate method and the principal either declines an offer or is not qualified, the SRC will review the candidates in WPM order. (ECF No. 141 at 2:22–3:22, 4:10–23 (Latta).)

The SRC may also consider whether a candidate is from an "unrepresented district," meaning a congressional district that does not commonly provide nominees to the Academy. (ECF No. 139 at 232:3–233:22 (Hwang); PX27.) Where a Member of Congress from an underrepresented district submits nominees for multiple vacancies, the SRC will make an effort to fill the vacancies. (ECF No. 139 at 232:23–233:10 (Hwang).) Because the Academy wants the Brigade of Midshipmen to represent as many districts as possible, the Naval Academy prioritizes underrepresented districts in the admissions process. (*Id.* at 233:11–19 (Hwang).)

Dean Latta described the SRC's process as "iterative," explaining that in addition to comparing candidates on a single slate, the SRC often looks across multiple slates of nominations, comparing candidates on multiple slates. (ECF No. 141 at 13:19–19:25.) Where a candidate has multiple congressional nominations (e.g., a nomination from a Member of Congress and a Member of the Senate), the SRC prioritizes the congressional slate, as the Academy aims for every congressional district to be represented in the Brigade of Midshipmen. (*Id.* at 13:19–19:25 (Latta); ECF No. 140 at 7:12–8:18 (Latta).) When the SRC selects a slate winner who is on multiple slates, this selection permits the SRC to choose another slate winner for the other slate. (ECF No. 140 at 7:12–8:18 (Latta).)

Occasionally, rather than selecting the candidate with the highest WPM, the SRC selects a candidate with a relatively lower WPM. (ECF No. 141 at 6:19–7:24 (Latta).) If a qualified candidate is not appointed to the vacancy for which they were nominated, the

candidate may be offered an appointment under two other statutory provisions. (*Id.* 141 at 7:12–24 (Latta).)

First, the Naval Academy may appoint up to 200[40] "qualified alternates"—qualified candidates who receive a statutory nomination but did not win the vacancy. 10 U.S.C. § 8454(b)(5). The Naval Academy appoints qualified alternates solely based on WPM, *which does not consider race or ethnicity.* (PX26; ECF No. 140 at 237:18–20 (Latta); ECF No. 141 at 7:9–8:6 (Latta).) Then, if the Naval Academy has filled each nomination vacancy, admitted 200 qualified alternates, and still has not filled its class, the Academy may offer appointment to other remaining qualified nominees, known as "additional appointees," so long as three-fourths are selected from qualified alternates nominated under 10 U.S.C. § 8454(a)(2)–(8). 10 U.S.C. § 8456(b); (ECF No. 141 at 9:7–13 (Latta); PX26; PX259 ¶ 62.)

The AB may recommend, and the SRC may choose to offer, some candidates admission into one of the Naval Academy's preparatory schools—NAPs, Foundation,[41] or Civilian Prep[42]—rather than direct admission to the Naval Academy. (ECF No. 140 at 186:20–187:1 (Latta); PX21; DX94.) The Naval Academy typically extends a prep school offer to candidates who would benefit from additional academic or physical preparation before attending the Naval Academy. (PX26; DX79; PX813; ECF No. 141 at 22:16–23:24 (Latta).)

NAPS is limited to approximately 310 students, with the Naval Academy typically accounting for between 235 to 245 students and other institutions such as NROTC and the

---

[40] Until the current admissions cycle, 10 U.S.C. § 8454(b)(5) limited the number of qualified alternates to 150.

[41] Foundation is a civilian program run through the Naval Academy Alumni Association and affiliated with several civilian schools across the country to provide a similar opportunity to NAPS. (ECF No. 141 at 20:1–21:07 (Latta).)

[42] Civilian Prep ("CivPrep") is the smallest of the three programs, where students attend a school of their choice and pay on their own. (ECF No. 141 at 20:1–21:07 (Latta).)

Coast Guard Academy accounting for the remaining spots. (ECF No. 141 at 24:22–26:4 (Latta).) The majority of Academy candidates recommended for NAPS are members of the Fleet, recruited athletes, and those from underrepresented congressional districts. (PX64; DX146; ECF No. 141 at 22:16–23:24 (Latta).) Fleet Sailors and Marines who apply to the Naval Academy but are not appointed are considered for, but not guaranteed, admission to NAPS. (PX21; DX94; PX64.) Dean Latta explained that many such applicants are recommended because they have been out of school for at least a year and tend to have lower high school grades. (ECF No. 141 at 22:16–23:24.) Dean Latta testified that many of the recruited athletes recommended for NAPS are minorities. (*Id.* at 30:3–31:3.) He further testified that while recruited athletes tend to have weaker grades, athletes tend to have "unusual athletic prowess" and "great leadership experience[.]" (*Id.* at 30:3–31:3.) Lastly, Dean Latta testified that candidates from underrepresented districts tend to come from weaker school systems, making an extra year of academic preparation appropriate. (*Id.* at 22:16–23:24.)

In admitting students to the Naval Academy from any of the prep programs, the Naval Academy does not consider WPM. (ECF No. 140 at 215:10–15 (Latta).) Rather, the Academy's senior leaders review the candidate's performance at the prep program. (PX62; ECF No. 140 at 215:10–15 (Latta).) Dean Latta testified that race and ethnicity are not considered when determining whether to admit a candidate from a prep program to the Academy. (ECF No. 141 at 33:1–6.)

### d. The Manner in Which the Academy Considers Race

At trial, the Court heard testimony that no candidate is admitted based solely on his or her race or ethnicity. (ECF No. 140 at 16:2–4 (Hwang), 51:10–14 (Latta).) The Court further

heard testimony that no candidate is deemed qualified or not qualified based solely on his or her race or ethnicity.  (ECF No. 139 at 224:13–15, 225:21–24 (Hwang); ECF No. 140 at 31:3–7 (Hwang), 46:9–15, 50:4–5, 52:12–53:1, 186:17–19 (Latta); ECF No. 141 at 10:4–8 (Latta); ECF No. 142 at 44:14–45:4, 56:7–11, 58:21–59:4 (Arcidiacono).)  Nevertheless, the Naval Academy admits that there are certain points in the admissions process where the Naval Academy may consider race or ethnicity as one of many nondeterminative factors, explaining the Academy is trying to create a Brigade with a wide range of life experiences and backgrounds that will ultimately lead a diverse enlisted force.  (ECF No. 139 at 235:22–237:3 (Hwang); ECF No. 140 at 15:13–16:1 (Hwang), 45:11–21, 51:10–14, 52:12–53:8, 64:22–65:1, 152:5–20, 155:20–156:9 (Latta); ECF No. 141 at 9:19–10:3, 32:7–21, 33:5–34:18, 35:1–4 (Latta); PX28; PX29; PX389; PX491.)

There are four instances where the Naval Academy considers race: (1) when offering letters of assurance; (2) when deciding between two candidates with very close WPMs for nominations using the "competitive" method, service-connected nominations, and in some circumstances the "principal competitive alternate" method; (3) when extending Superintendent nominations; and (4) when extending offers to additional appointees.

First, letters of assurance ("LOAs") refer to conditional offers made by the Dean of Admissions, selected from the pool of candidates recommended by the Admissions Board for early notify.  (ECF No, 139 at 225:12–20 (Hwang); ECF No. 140 at 30:17–22 (Hwang), 173:18–174:23, 240:15–241:8 (Latta); DX127; PX259 ¶¶ 63–64, 66–68.)  "A candidate's race or ethnicity can be considered as part of a holistic assessment in the letter of assurance process[.]"  (ECF No. 139 at 78:24–25 (Hwang).)  LOAs are conditional offers of admission,

used to compete with other schools and service academies—the candidate must still pass physical fitness standards, become medically qualified, receive a nomination, and complete any remaining requirements for admission.  (ECF No. 139 at 209:10–18, 225:12–20, 230:14–234:10 (Hwang); ECF No. 140 at 30:17–22 (Hwang), 173:18–174:23, 240:15–241:8 (Latta); DX127; PX259 ¶¶ 63–64, 66–68; PX497.)

Second, when selecting slate winners for congressional slates that used the "competitive" method or the "principal competitive alternate" method when the principal candidate is deemed unqualified or declines an offer of appointment, the Academy may consider race or ethnicity as one of the many nondeterminative factors that inform the decision.  (ECF No. 139 at 210:20–211:8 (Hwang); ECF No. 140 at 49:24–51:4, 62:15–23, 63:11–19, 64:22–65:1, 238:8–22 (Latta); PX259 ¶ 77.)  While the Academy typically selects the candidate with the highest WPM score as the slate winner, in limited circumstances—where the highest WPM scores are very close—the qualified candidate with a slightly lower WPM may be selected over the qualified candidate with the slightly higher WPM after an in-depth review of their entire records.  (ECF No. 140 at 49:24–51:4 (Latta); PX259 ¶ 77.)  The key considerations in making this decision include class rank, grades, academic progression, leadership, life experiences, and teachers' recommendations.  (PX259 ¶ 58.)  Though race or ethnicity may also be one of many nondeterminative factors that inform this decision, the Naval Academy uses race and ethnicity "in the context of other factors that [the Slate Review Committee] would see in the records [it] is comparing."  (ECF No. 140 at 51:5–14 (Latta); PX259 ¶¶ 58, 77.)

Third, race or ethnicity could be one of many nondeterminative factors considered in

extending Superintendent nominations. (ECF No. 140 at 51:18–21 (Latta); ECF No. 141 at 11:16–25 (Latta); PX259 ¶ 76.) The Academy insists that race and ethnicity have not played a factor in a Superintendent nomination since at least 2009. (ECF No. 141 at 10:12–11:25 (Latta); PX259 ¶ 76.) On the rare occasions in which Superintendent nominations are used, they are typically used for sought-after athletes, for candidates that are highly qualified and motivated to attend the Academy, and for candidates applying to other service academies. (ECF No. 141 at 10:12–11:25 (Latta); PX259 ¶ 76.)

Fourth, at the end of the admissions cycle, if the Naval Academy has not reached its class size, the Academy may consider race and ethnicity as one of many nondeterminative factors in its holistic assessment of candidates to identify those who are expected to make valuable contributions in extending offers to additional appointees. (ECF No. 140 at 49:18–23 (Latta); ECF No. 141 at 9:19–10:3 (Latta); PX26; PX259 ¶ 75.)

Lastly, the Court notes that Dean Latta testified that race or ethnicity may be a nondeterminative consideration in deciding whether to extend an offer of appointment to a candidate off the waitlist, though he noted that this was "pretty rare." (ECF No. 140 at 62:15–63:21, 238:11–17.) In any event, the Court, weighing all evidence before it, finds that such consideration of race is limited to the above-noted circumstances. In other words, where a candidate is offered appointment following placement on the waitlist, race and ethnicity are only considered to the extent that the decision to offer the candidate an appointment overlaps with the SRC's decision between candidates with very close WPMs for nominations using the competitive method, service-connected nominations, and in some circumstances the principal competitive alternate, and where a waitlist candidate is appointed as an additional appointee.

### C. Findings of Fact: Statistical Analysis Does Not Demonstrate Discrimination.

To support its claim that the Naval Academy's race-conscious admissions process results in large disparities between minority and nonminority applicants, Plaintiff presented statistical evidence through economic expert Professor Peter Arcidiacono. (ECF No. ECF No. 141 at 108:4–228:11; ECF No. 142 at 3:2–63:11; PX218; PX222; PX518; PD3.) To rebut Professor Arcidiacono's testimony and analysis, Defendants presented testimony and analysis from economic expert Dr. Stuart Gurrea. (ECF No. 145 at 133:6–228:10; DX200; DD5.)

While Professor Arcidiacono constructed a logit model of the Naval Academy's admissions process purporting to demonstrate the role that race plays in the Academy's admissions decisions, Dr. Gurrea took the position that unique features of the Academy's admissions process make the process unconducive to modeling. In sum, as discussed more fully below, the Court finds that Professor Arcidiacono's estimates on the size of impact of the Academy's consideration of race are overstated. There are non-racial observable and unobservable factors considered in the Academy's admissions process that are not included in Professor Arcidiacono's modeling, some of which are correlated with race and ethnicity. The Court further finds that Professor Arcidiacono's assumption that the Academy's admissions decisions are independent undermines his methodology.

#### 1. Background on the Parties' Economic Experts

Both of the parties' experts are highly respected economists. Beginning with Plaintiff's, Professor Arcidiacono received his B.S. degree in 1993 from Willamette University, and a Ph.D. in Economics in 1999 from the University of Wisconsin. (PX218.) He is the William Henry Glasson Distinguished Professor of Economics—that is, the chair of the Economics

Department—at Duke University, where he teaches undergraduate- and graduate-level economic courses and has published numerous peer-reviewed articles. (ECF No. 141 at 109:24–119:2.) His research is focused on labor economics, and more narrowly, higher education. (*Id.* at 110:25–111:8.)

Notably, Professor Arcidiacono testified in SFFA's cases challenging Harvard and UNC's consideration of race in the admissions process and has written two papers on affirmative action funded by the Searle Freedom Trust, which is also a funder of Plaintiff Students for Fair Admissions. (ECF No. 141 at 112:25–113:25, 210:3–14, 212:25–214:10.) Prior to this lawsuit, Professor Arcidiacono had never studied the admissions practices of a service academy, nor did he speak with anyone from the Naval Academy's admissions office, any former or current applicants to the Naval Academy, or any current or former members of SFFA in reaching his opinions in this case. (*Id.* at 214:11–215:12.)

Dr. Gurrea is an experienced economist who currently works as a Managing Director for Secretariat, an economics consultancy, where he specializes in industrial organization, financial economics, and econometrics. (ECF No. 145 at 133:24–135:22.) He received his B.A. degree from the University of Seville, and his M.A. and Ph.D. in Economics from Northwestern University. (DX200.) During his more than twenty-year tenure with Secretariat, Dr. Gurrea has worked as an expert in the field of economics and economic modeling on approximately 100 cases across a wide range of industries. (ECF No. 145 at 140:18–141:9, 142:9–11.) To prepare his testimony and opinion in this case, Dr. Gurrea visited the Naval Academy, spoke with Dean Latta, Hwang, and others knowledgeable about the

admissions process, reviewed documents produced in this case, reviewed public documents, and consulted economic textbooks and journals.  (*Id.* at 141:1–142:8.)

Both parties challenge the credibility of the other party's economic expert—with Plaintiff noting Dr. Gurrea's compensation[43] and his qualifications more generally,[44] and Defendants noting Professor Arcidiacono's prior history as an expert for Students for Fair Admissions and stated skepticism of holistic admissions practices.  Nevertheless, the Court is satisfied that both experts exercised independent judgment and are entirely qualified to offer the testimony and opinions proffered in this case.

### 2.  Overview of Research Questions and Process

The Court begins with a brief description of the questions that each expert testified that they sought to answer and an overview of how each conducted their work.

---

[43]  To be clear, Professor Arcidiacono was handsomely compensated for his expert testimony, receiving $900 an hour for his testimony, though Defendants did not address this point during cross-examination.  (PX218.)  Moreover, the Court finds it prudent to note that Secretariat—Dr. Gurrea's employer, not Dr. Gurrea—received $750 an hour for Dr. Gurrea's work in this matter, with Dr. Gurrea receiving a share of revenue from work performed by himself and others at Secretariat on the matter.  (DX200; ECF No. 145 at 190:11–204:11.)  Nevertheless, Plaintiff's counsel moved to strike Dr. Gurrea's report pursuant to Fed. R. Civ. P. 26, suggesting Secretariat's revenue share compensation was improperly excluded from his report.  (ECF No. 145 at 190:11–204:11.)  As counsel for Defendants noted, however, the reason Dr. Gurrea did not disclose this revenue share compensation structure was due to a misunderstanding on behalf of the Government with respect to an agreement between counsel regarding expert disclosures.  (*Id.*)  The Court finds that the misunderstanding—which was between counsel—does not reflect the credibility of Dr. Gurrea or his opinions.  Moreover, like Professor Arcidiacono who noted his compensation was "not dependent on reaching any particular result or conclusion," Dr. Gurrea noted Secretariat's "compensation is independent of all opinions [he] render[ed] in this case and of the outcome of this matter."  (PX218; DX200.)

[44]  Plaintiff makes much of the fact that Dr. Gurrea has "never before testified about logit models with binary outcomes" and "never published in the academic peer-reviewed literature about binary outcome logit models" or published any peer-reviewed literature more generally, arguing that this means Dr. Gurrea is not qualified to testify about Professor Arcidiacono's model.  (ECF No. 145 at 206:24–207:4, 225:16–21.)  In brief, the Court finds that Dr. Gurrea is undoubtedly qualified to offer such testimony.  (*Id.* at 136:6–145:24.)

### a. Professor Arcidiacono

Professor Arcidiacono testified that he sought to understand the role that race and ethnicity play in admissions decisions to the Academy and NAPS. (ECF No. 141 at 122:13–16.) To answer these questions, he completed what he described as a multi-part "academic" approach to data analysis. (*Id.* at 122:20–124:3.)

"[S]tep zero" involved "familiariz[ing]" himself with the literature, broadly and in the "particular institutional setting" at issue. (*Id.* at 122:23–25.) The first step was to create a data set. (*Id.* at 123:4–8.) The Naval Academy provided application data to Plaintiff for the admissions cycles covering the classes of 2023 to 2027, meaning the 2018–2019, 2019–2020, 2020–2021, 2021–2022, and 2022–2023 admissions cycles. (*Id.* at 124:4–12.) This included over 70,000 applications. (*Id.* at 124:13–14.) For each application, the Academy provided the following data: (1) WPM components, which include, among other things, test scores (where applicable), class rank, teacher recommendations, and extracurricular activities; (2) CFA, medical exam, BGO Interviews; (3) demographics[45] and socioeconomic status; (4) whether an applicant was a blue chip athlete, meaning an athlete designated as highly desired by one of the Academy's sports teams; (5) whether the applicant is applying from one of Navy's preparatory programs (NAPS, CivPrep, or Foundation); and (6) where an applicant is admitted, and if the candidate accepts the offer of appointment, how the candidate was admitted (i.e., assigned as slate winner, qualified alternate, additional appointee, or service-connected). (PX218; ECF No. 141 at 124:15–125:10.)

---

[45] With respect to race, Professor Arcidiacono explained that he categorized race and ethnic identifications in "the same way [he] did in Harvard and UNC," meaning he allocates multiracial students to various racial groups. (ECF No. 141 at 131:2–17.)

Professor Arcidiacono "supplement[ed] the data files . . . with those from several different public sources." (PX218; ECF No. 141 at 125:14–126:1.)  Of relevance to the Court's discussion, in order to "get more measures of socioeconomic status," Professor Arcidiacono supplemented the data with demographic information on ZIP codes from the U.S. Census Bureau's American Community Survey and income information on ZIP codes from the Internal Revenue Service Statistics of Income.  (PX218; ECF No. 141 at 125:14–126:1.)  In order to "merge in characteristics of [the applicant's] school," Professor Arcidiacono supplemented the data with public and private secondary school characteristics from the National Center for Education Statistics' Common Core of Data and Private School Universe Survey.  (PX218; ECF No. 141 at 125:14–126:1.)

To prepare the dataset for examining admissions to the Academy, Professor Arcidiacono took the beginning sample of 70,508 applicants and 7,009 admits, and removed: non-US citizens; those who receive nominations from foreign delegates; those who withdraw or have incomplete applications; those without a nomination; those who did not qualify medically or physically; those with missing WPM components; those designated as blue chip athletes; and those admitted from NAPS, Foundation, and Civilian Prep.  (PX218; ECF No. 141 at 126:14–128:1.)   After removing the aforementioned from the sample, the dataset included 12,304 applicants and 4,728 admits.  (PX218; ECF No. 141 at 128:2–13.)

The second step in Professor Arcidiacono's analysis was to complete a descriptive analysis of the remaining applications.  (ECF No. 141 at 130:22–131:1.)  In this step, Professor Arcidiacono "analyz[ed] the patterns in the data, and in particular, patterns with regard to race."  (*Id.* at 130:22–131:1.)

To "reveal the effect that race has on admission to the Naval Academy," Arcidiacono "model[ed] the [Academy's] admissions decisions," creating a logit model[46] in which the dependent variable is the decision to admit (e.g., admission to the Academy or rejection). (*Id.* at 156:12–161:5.) The logit model produces two relevant metrics. First, it assigns a "coefficient" to each variable, meaning a number that represents how much weight that factor receives in the model compared to the baseline. (*Id.* at 159:1–161:5.) A "positive" coefficient means an applicant with that trait is more likely to be admitted; a "negative" coefficient means an applicant with that trait is less likely to be admitted. (*Id.*) The magnitude of a coefficient "matters," especially "when the scale of the things are the same," as it relates to how strongly a predictor variable influences the outcome. (*Id.*) Second, a logit model produces a predicted probability of admission. (*Id.*)

Then, based on those metrics, Professor Arcidiacono attempted to quantify the effect of race in his model by modifying the race of individual applicants to see how such a change would alter the model's projection for a student's probability of admission. (*Id.* at 170:22–182:1.) In other words, Professor Arcidiacono attempted to "turn off" "racial preferences" within the model itself. (*Id.*)

### b. Dr. Gurrea

Dr. Gurrea testified that he sought to "assess the analysis presented by Professor Arcidiacono." (ECF No. 145 at 145:2–6.) To conduct his analysis, Dr. Gurrea "scrutinized

---

[46] A "logit model is a way of getting predicted probabilities of admission that depends on the characteristics of the applicants." (ECF No. 141 at 156:25–157:2.)

Dr. Arcidiacono's model results, implementation of his estimation methods, and presentation of results . . . following the generally accepted principles in economics. (*Id.* at 145:7–12.)

His expert report provides additional detail on his process. (DX200.) In addition to reviewing Professor Arcidiacono's workpapers, Dr. Gurrea "constructed a database containing a subset of the fields available for completed applications reviewed by USNA's Admissions Board from domestic civilians not already in a Naval preparatory program" using the raw data provided by the Academy. (*Id.*) His database differs in a few ways from Professor Arcidiacono's. Most importantly, Dr. Gurrea chose different conditions for identifying whether an application was sufficiently complete for the Academy's consideration. (*Id.*) While Dr. Gurrea opted to use the Board's review of an application as a sign the application is complete "[b]ased on [his] understanding that the Board reviews applications as they become complete," Professor Arcidiacono "relied on the Academy's record of its final decision on the application." (*Id.*) Dr. Gurrea also opted to exclude applicants from the Navy itself. (*Id.*)

Like Arcidiacono, Dr. Gurrea applied several filters to his dataset. Specifically, Dr. Gurrea took his beginning sample of 70,449 applicants and first removed applications missing Board results, and then removed from the pool of applicants with a Board decision those applications that are from foreign countries, from within the fleet, and from NAPS, Foundation and CivPrep schools. (*Id.*) Thereafter, the dataset included 22,400 individual applications reviewed by the Board. (*Id.*)

As further explained below, Dr. Gurrea took the position that Professor Arcidiacono's reliance on erroneous assumptions about the Academy's admissions undermine his methodology. Specifically, Dr. Gurrea contends that Professor Arcidiacono erroneously

assumes that the Academy's admissions decisions are independent. According to Dr. Gurrea, unique features of the Academy's admissions process make the process unconducive to modeling. Accordingly, Dr. Gurrea did not offer an alternative estimation strategy. As such, the Court looks to the results of Professor Arcidiacono's analysis before turning to Dr. Gurrea's critiques.

### 3. Descriptive Analysis

The first part of Professor Arcidiacono's analysis produced a set of descriptive statistics, focused on domestic non-blue chip athlete, non-prep applicants who qualified medically and physically and had completed applications and nominations. (ECF No. 141 at 170:8–13.) Sorting applicants by race and/or ethnicity—namely white, Black, Hispanic, or Asian, with any multiracial students being allocated to various racial groups—Professor Arcidiacono's summary statistics show comparable admission rates for white, Black, and Hispanic applicants, with the admission rates for Asian applicants being an outlier. (PD3; PX218.) More specifically, this included 8,022 white applicants, who were admitted 36.11% of the time; 778 Black applicants, who were admitted 37.28% of the time; 1,551 Hispanic applicants, who were admitted 35.91% of the time; and 1,444 Asian applicants, who were admitted 54.78% of the time. (PD3; PX218.)

Professor Arcidiacono contends that "despite the similar admit rates for white, Black, and Hispanic applicants, there are large differences in qualifications." (PX218.) He contends that: "[w]ith the exception of RABs where Hispanics score slightly better than whites, white applicants score better . . . than Black and Hispanic applicants on all components." (*Id.*) He

emphasizes white applicants' higher SAT math and verbal scores, CFA scores, and BGO interview scores.  (ECF No. 141 at 144:20–145:5, 146:13–20.)

To further attempt to illustrate this alleged disparity, Professor Arcidiacono sorted applicants into deciles by raw WPM, with the tenth decile consisting of the top 10% of WPMs in the applicant pool and the first decile being the worst 10% of WPMs, and within those deciles by race.  (*Id.* at 148:8–9.)  Predictably, admission rates increase according to higher deciles.  (*Id.* at 149:15–24.)  While admission rates to the Academy[47] are not different across races in the top and bottom deciles, Professor Arcidiacono contends there are stark differences across racial groups in the middle of the distribution.  (*Id.* at 154:8–20.)  For example, the eighth decile—the third highest decile—consists of 1,359 total applicants, consisting of 942 white applicants, who were admitted 46.6% of the time; 28 Black applicants, who were admitted 92.86% of the time; 132 Hispanic applicants, who were admitted 68.94% of the time; and 193 Asian applicants, who were admitted 78.24% of the time, for an average admissions rate of 55.04%.  (PD3; ECF No. 141 at 154:19–23.)

The Court finds it prudent to briefly note that the Academy has steep admissions standards and does not make offers to students who are not qualified.  (ECF No. 140 at 16:18–20.)  Indeed, Professor Arcidiacono confirmed on cross-examination he was "not second-guessing the Naval Academy's judgment that it's admitting qualified students."  (ECF No. 141 at 216:15–17.)  More importantly, while Professor Arcidiacono testified that his descriptive analysis "provides a hint that there might be racial preferences operating here," he

---

[47]  Professor Arcidiacono separately conducted a descriptive analysis regarding admissions to NAPS, which he contended also showed "pretty big differences overall in admit rates."  (ECF No. 141 at 155:7–156:11.)

acknowledged that the descriptive analysis does not "reveal the effect that race has on admission to the Naval Academy." (*Id.* at 156:8–15.)   Accordingly, the Court finds that Professor Arcidiacono's decile analysis fails to provide evidence of racial preferences, let alone that race is a predominant factor in admissions.   The Court next addresses Professor Arcidiacono's econometric modeling and Dr. Gurrea's respective criticism.

### 4. Professor Arcidiacono's Econometric Modeling

After organizing a data set and producing descriptive statistics, Professor Arcidiacono turned to assess what role does race and/or ethnicity play in the Naval Academy's admissions decisions.[48]   To do so, Professor Arcidiacono built a logit model to approximate the Naval Academy's actual admissions process of non-blue chip athletes and non-prep candidates who are both physically and medically qualified as best as he could.  (ECF No. 141 at 158:23–25.)

Professor Arcidiacono began by choosing several variables to add as "inputs to the logit model for Naval Academy admissions." (*Id.* at 157:13–158:3.)  In his preferred model—Model 6—which forms the basis of his analysis, Professor Arcidiacono used the following factors:

- race/ethnicity;
- gender;
- class year indicators;
- household and community indicators;[49]
- Raw WPM components (excluding RABs);
- Maximum CFA score;
- class $\geq$ 2025 times each of SAT math and SAT verbal;

---

[48]  Professor Arcidiacono separately modeled admissions to NAPS, which he contended showed "the same pattern"—that is, "large preferences for Black applicants, followed by Hispanic and Asian American applicants."  (ECF No. 141 at 109:10–23; 191:13–194:7.)

[49]  Household and community indicators include first-generation college, household income less than $80,000, percentage of high school going to four-year college, percentage of high school free and reduced price lunch, private high school, IRS salary of ZIP code, missing indicators for each of the last five variables.  (PX200.)

- class rank;
- athletic and nonathletic extracurriculars;
- nomination type indicators[50] and characteristics of the slates where the applicant received a nomination;[51]
- legacy variables;
- RAB points for AP, IB, or honors courses; and
- BGO interview score.

(PX200 at 62; PD3; ECF No. 141 at 164:1–165:21.)

Notably, Professor Arcidiacono did not consider whether an applicant belonged to an underrepresented district and excluded RABs for participation in NASS, super STEM, teacher recommendations, life experience/hardship, extracurriculars and year-round sports, character issues, and personal statement. With respect to his decision to exclude these RABs, in his expert report, Professor Arcidiacono noted that he did so to "avoid[] concerns about the RAB points being influenced by preferences for any group." (PX200 at 64.) At trial, Professor Arcidiacono testified that he found "the RAB components hard to interpret," but explained that "it wouldn't matter if we controlled for those RABs . . . [as those] estimates are really not that much different." (ECF No. 141 at 169:25–170:7.)

Professor Arcidiacono attempted to measure how well his model incorporating the above-observable variables could predict the "probability of admission and [] probability of rejection." (*Id.* at 158:5–7.) He testified that this model output—the probability of admission and rejection—was necessary as opposed to a binary admit/reject decision because "you can't

---

[50] Nomination type indicators include any congressional, multiple congressional, Secretary of the Navy, valor, applying from nuclear power school. (PX200.)
[51] Characteristics of the slates where the applicant received a nomination include nominated on a one vacancy competitive ("Type 1") slate, nominated on a two vacancy competitive ("Type 2") slate, nominated on a slate with a principal, principal on a slate, within 4000 WPM of top WPM on Type 1 slate, within 4000 WPM on Type 2 slate, max WPM on and 4000+ above others, minimum of log of qualified Type 1 competitors, minimum of log of qualified Type 2 competitors, minimum of average WPM on Type 1 and Type 2 slates, and indicators for number of nominations. (PX200.)

account for everything." (*Id.* at 158:8–12.)  He explained: "That's sort of the point of holistic admissions. There's going to be some unobservable associated with that.  So we're only going to be able to get probabilities." (*Id.*)  He acknowledged that some of the unobserved variables—such as motivation, leadership potential, personal statement, the full transcript information, the text of teacher recommendations, discipline issues, and high school curriculum, to name a few—were observable to Naval Academy's admissions officers.  (ECF No. 142 at 25:21–28:5.)

In addition to estimating the probability that a candidate would be admitted or rejected, Professor Arcidiacono's model also estimated the relative importance of the variables in the admissions process by providing a coefficient for each of them.  (ECF No. 141 at 159:1–161:25.)  As briefly noted above, a "positive" coefficient means an applicant with that trait is more likely to be admitted; a "negative" coefficient means an applicant with that trait is less likely to be admitted.  (*Id.* at 159:1–161:25.)  These coefficients provided the basis for his subsequent quantitative evaluations.

According to Professor Arcidiacono, his logit model revealed large racial preferences in favor of minority applicants, particularly Black applicants.[52]  (*Id.* at 109:13–19, 167:12–168:15; PD3; PX200.)  His preferred model, for example, assigned coefficients 2.958, 1.195, and 1.450 to Black, Hispanic, and Asian candidates, respectively.  (PD3; PX200.)

---

[52]  Professor Arcidiacono further performed a nested logit model—a logit within the logit, treating the admissions process as if it proceeds in two stages: first, a decision to admit, and second, a decision on the channel through which to admit the applicant—to determine whether racial preferences existed in the different channel of admissions and if so, how they operated.  (ECF No. 141 at 182:3–185:10; PD3; PX200.)  Professor Arcidiacono testified that this demonstrated that the racial preference given to Black applicants is higher in the qualified alternate channel than it is in the congressional channel, and even higher in the additional appointee channel.  (ECF No. 141 at 182:3–185:10; PD3; PX200.)

To illustrate the size of these alleged racial preferences, Professor Arcidiacono performed four calculations: (1) a transformational analysis, (2) an average marginal effect of race analysis, (3) an admitted minority analysis, and (4) a capacity constraints analysis. The first type of calculation that Professor Arcidiacono performed was a transformational analysis. (PD3; PX200; ECF No. 141 at 172:19–174:8.) In this calculation, Professor Arcidiacono began by creating a hypothetical white, non-blue chip, non-prep candidate with a specific probability of admission in his preferred model. (PD3; PX200; ECF No. 141 at 172:19–174:8.) From there, he considered how their probability of admission would change if the hypothetical white student was not white, but Black, Hispanic, or Asian. (PD3; PX200; ECF No. 141 at 172:19–174:8.) According to Professor Arcidiacono, this analysis revealed that a white candidate with a 25% chance of admission would have an 86.5% chance of admission if given the racial preference that he alleges the Academy affords to Black candidates. (PD3; PX200; ECF No. 141 at 172:19–174:8.) He similarly testified that if the same hypothetical white applicant was treated as Hispanic or Asian, his admission probability would be 52.4% or 58.7%, respectively. (PD3; PX200; ECF No. 141 at 172:19–174:8.)

The second type of calculation performed by Professor Arcidiacono to quantify the effect of race was the average marginal effect of race in the admissions process for non-blue chip, non-prep applicants. (PD3; PX200; ECF No. 141 at 174:10–176:17.) The average marginal effect is the difference between the overall admission rate for this subgroup, minus the admission rate without racial preferences. (PD3; PX200; ECF No. 141 at 174:10–176:17.)

For Black candidates, Professor Arcidiacono testified that removing his coefficient for race would reduce the average probability of admissions from 37.4% to 12.9%. (PD3; PX200;

ECF No. 141 at 174:10–176:17.)  For Hispanic candidates, Professor Arcidiacono testified that removing his coefficient for race would reduce the average probability of admissions from 35.9% to 24.5%.  (PD3; PX200; ECF No. 141 at 174:10–176:17.)  For Asian candidates, Professor Arcidiacono testified that removing his coefficient for race would reduce the average probability of admissions from 54.8% to 37.6%.  (PD3; PX200; ECF No. 141 at 174:10–176:17.)  Professor Arcidiacono then compared the before-and-after percentages for each group and extrapolated that race is responsible for 24.5% of Black candidate admissions, 11.4% of Hispanic candidate admissions, and 17.2% of Asian candidate admissions.  (PD3; PX200; ECF No. 141 at 174:10–176:17.)

The third analysis that Professor Arcidiacono conducted was an admitted minority analysis, which asks "how many of those who were admitted with racial preferences would still be admitted without racial preferences?"  (PD3; PX200; ECF No. 141 at 176:19–179:15.)  In this calculation, Professor Arcidiacono started with all of the minority candidates that the Naval Academy admitted, excluding blue chip athletes and prep school applicants.  (PD3; PX200; ECF No. 141 at 176:19–179:15.)  Then, Professor Arcidiacono worked backward to determine each candidate's probability of admission under his model if they were treated as a white candidate.  (PD3; PX200; ECF No. 141 at 176:19–179:15.)  Professor Arcidiacono testified that the average admitted Black candidate would have a 32.7% chance of being admitted without racial preferences; that the average admitted Hispanic candidate would have a 67.3% chance of being admitted without racial preferences; and that the average admitted Asian candidate would have a 68.7% chance of being admitted without racial preferences. (PD3; PX200; ECF No. 141 at 176:19–179:15.)

The fourth analysis performed by Professor Arcidiacono was a capacity constraints analysis, which included blue chip athletes and candidates from the prep pool, to determine how many admissions slots were attributable to the Academy's racial preferences over the five year period included in his dataset.  (PD3; PX200; ECF No. 141 at 179:17–182:1.)  In brief, Professor Arcidiacono turned off racial preferences and calculated new probabilities for all candidates.  (PD3; PX200; ECF No. 141 at 176:19–179:15.)  He then built five new incoming classes with students his model estimated would have the highest probability of admissions based on the Naval Academy's limited capacity of available spaces for admitted students.  (PD3; PX200; ECF No. 141 at 176:19–179:15.)  He testified that, over the course of the five admissions cycles he studied under his model, the Academy would have admitted 435 more white students, and 165 fewer Black students, 104 fewer Hispanic students, and 156 fewer Asian students.  (PD3; PX200; ECF No. 141 at 176:19–179:15.)

### 5. Dr. Gurrea's Criticisms

While Dr. Gurrea took the position that unique aspects of the Academy's admissions process make the process unconducive to modeling, he offered several criticisms of Professor Arcidiacono's modeling.  (DD5; DX200; ECF No. 145 at 133:6–228:10.)  Most significantly, Dr. Gurrea highlights that the observables in Professor Arcidiacono are not representative of the full range of factors that determine an outcome, and certain omitted variables are those that are available to Professor Arcidiacono that he intentionally omitted from his admissions analyses.  Such omitted variables that are observable and relevant factors for admission include whether a candidate belonged to an underrepresented district and RABs for participation in NASS, interest in STEM, teacher recommendations, life experience and hardship,

extracurriculars and year-round sports, character issues, and personal statements. Undoubtedly, some of these excluded variables correlate with race and ethnicity.  Dr. Gurrea further opines that Professor Arcidiacono's modeling relies on erroneous assumptions; that Professor Arcidiacono's modeling arbitrarily blends race and ethnicity and assigns multiracial applicants to other categories; that the overall impact on white applicants resulting from the Academy's race-conscious admissions is small; that Professor Arcidiacono's predictions of class racial composition in a counterfactual world without the Academy's consideration of race and ethnicity are misleading; and that admissions and enrollment data do not show any evidence of racial balancing in admissions decisions.  His criticisms—which are largely well-taken—are discussed in turn below.

### a. Arcidiacono's Estimates Are Unreliable.

First, Dr. Gurrea opines that Professor Arcidiacono's estimates of the size of impact of the Naval Academy's consideration of race are biased because they confound the contributions of the Academy's consideration of race and other omitted factors, and likely overstated because omitted factors likely explain the selection of minorities for reasons other than race.  (DD5; DX200; ECF No. 145 at 148:1–149:13, 151:15–169:10.)  Dr. Gurrea notes that Professor Arcidiacono acknowledges that his estimates of the magnitude of the Academy's consideration of race on admissions decisions are likely biased because his econometric models of admissions do not account for all the relevant information accounted for by the Academy, as noted above.  (DD5; DX200.)  Dr. Gurrea emphasizes that, as a result of these omissions, Professor Arcidiacono acknowledges that his estimates of the magnitude of the impact of race on admissions to the Academy are not only attributable to the Academy's

consideration of race, but also to other factors not accounted for in his model. (DD5; DX200.) Further, Dr. Gurrea highlighted that Professor Arcidiacono predicts that, because of his acknowledged bias, his estimate of the magnitude of the impact of race is understated—a conclusion that Dr. Gurrea characterizes as "unsupported and speculative." (DD5; DX200.) According to Dr. Gurrea, "the unique and broad goals of the Academy's admissions process suggest that [Professor] Arcidiacono ignores factors that, if accounted for, likely would reduce his estimate of the impact of the Academy's consideration of race. (DD5; DX200.)

To begin, Dr. Gurrea agrees with Professor Arcidiacono that admission rates are very similar for white, Black, and Hispanic applicants that are non-blue chip athletes and non-prep. (ECF No. 145 at 151:22–152:2.) To independently estimate admission rates at the Academy, Dr. Gurrea compiled admissions data, replicated Professor Arcidiacono's analysis, and obtained very similar results. (*Id.* at 152:3–6.) However, Dr. Gurrea disagrees with Professor Arcidiacono's interpretation of the coefficient in his model because the "coefficient accounts for race and everything that's not explicitly modeled that is correlated with race." (*Id.* at 152:10–18.)

As noted above, according to Professor Arcidiacono, almost two-thirds of the admission rate for Black, non-blue chip, non-prep candidates can be attributed to the consideration of race, with only about one-third of such candidates admitted to the Academy based on the strength of their applications. (*Id.* at 152:25–153:10.) While Dr. Gurrea agrees that the Academy considers race in the admissions process, he opines—convincingly—that Professor Arcidiacono's estimate of the extent to which the Academy does so is overstated. (*Id.* at 153:11–21.)

To be clear, Dr. Gurrea concedes that Professor Arcidiacono's model "fit" the data "very well." (*Id.* at 153:22–25.)  Nevertheless, Dr. Gurrea explained that "how well the model fits the data doesn't tell us anything about whether there is bias or not." (*Id.* at 154:1–4.)  Dr. Gurrea testified that "fit is how well the model explains the outcomes," and noted Professor Arcidiacono's model "does a fairly good job of explaining decisions." (*Id.* at 154:17–19.)  He noted, however, that "bias concerns the interpretation of the coefficients and whether there's actually an issue of whether simply we're observing some correlation or whether there's an actual causation." (*Id.* at 154:20–23.)  Dr. Gurrea testified:

> [I]n this case there's a correlation with the coefficients, with the observed outcome.  So that means the model is doing a good job.  But simply because there's that correlation and we observe the inclusion of a race variable explains well in the outcome doesn't mean that that race variable is entirely attributable to the Academy's consideration of race.  But anything else that is not in the model that is not accounted for in Professor Arcidiacono's dataset would capture some of that effect.

(*Id.* at 154:24–155:8.)

According to Dr. Gurrea, "the portion that Professor Arcidiacono attributes to the [Academy's] racial consideration is actually, in part, explained by other attributes of [minority] applicants that are just simply not observed in his data." (*Id.* at 154:11–14; *see also id.* at 155:12–21.)  This omitted variable bias—that is, the "bias resulting from not accounting for relevant factors"—results in part from the inability to observe in the data all the information that determined the observed admission outcomes, such as the narratives contained in letters of recommendation, personal statements, and BGO interview notes.  (DX200.)  Critically, it also results from Dr. Arcidiacono's omission of observable variables such as the Naval Academy's prioritization of underrepresented districts and certain RABs excluded in his model.  (ECF

No. 145 at 155:22–23; DX200; DD5.)  Dr. Gurrea explained that "Professor Arcidiacono's model is entirely reliant on information that can be codified and incorporated into a dataset and is amenable to statistical analysis." (ECF No. 145 at 156:6–8.)  While the information that Professor Arcidiacono considered is relevant to the admissions process, the Academy's admissions decisions are "based on a broader set of information," including whether an applicant is from an underrepresented district, the excluded RABs,[53] and the narratives contained in letters of recommendation, personal statements, and BGO interview notes. (*Id.* at 156:9–21.)

Both Dr. Gurrea and Professor Arcidiacono agree that, because his model does not observe this information, Professor Arcidiacono's coefficient estimates are "not an accurate measure of the magnitude of racial preferences." (*Id.* at 156:22–158:1.)  They disagree as to the "direction of the bias," with Professor Arcidiacono contending the bias has the effect of understating the true impact, and Dr. Gurrea contending that the measure that Professor Arcidiacono is estimating is actually overstating the impact. (*Id.* at 158:2–11.)

With respect to his position, Professor Arcidiacono assumes that minorities are weaker in the factors excluded in his model. (PX218.)  That is, according to Plaintiff's expert, "applicants who are strong on characteristics that are observed are likely also to be strong on characteristics that are unobserved." (*Id.*)

As Dr. Gurrea pointed out at trial, "Professor Arcidiacono's estimates are constrained by the information that's incorporated into his model," and "the strength of his predictions

---

[53] Other RABs excluded from Arcidiacono's preferred model include RABs for participation in NASS, STEM interest, life experience/hardship, extracurriculars and year-round sports, and character issues. (DX200.)

are as good as the richness of his data." (ECF No. 145 at 158:12–159:9.) Indeed, during cross-examination of Plaintiff's expert, Professor Arcidiacono acknowledged that "if there were unobserved factors that were massive and perfectly correlated with race," his estimate of the impact of the Academy's consideration of race goes away. (ECF No. 142 at 25:4–15.) Dr. Gurrea characterized Professor Arcidiacono's assumption that minorities are weaker in factors unaccounted for as "unreasonable." (ECF No. 145 at 160:8–161:6.) Dr. Gurrea noted that a 2005 article, upon which Professor Arcidiacono relied to justify his assumption, in fact explicitly warned "it is dangerous to infer too much about selection on the unobservables from selection on the observables if the observables . . . are unlikely to be representative of the full range of factors that determine an outcome.[54] (*Id.*) To illustrate this point, Dr. Gurrea noted that while it might make sense to assume that applicants with higher SAT scores in math may have higher high school math grades, assuming socioeconomic characteristics strictly based on SAT scores "makes no sense." (*Id.* at 161:7–162:5.) Stated otherwise, "if what you don't observe is beyond the range of what you observe, then there's no real basis to make that assumption." (*Id.* at 162:3–5.)

To prove that his assumption about data that is unaccounted for in his modeling is reliable, Professor Arcidiacono "gradually incorporates observable information into his model," "find[ing] that the coefficient on Black [candidates] increases gradually as more information is included." (*Id.* at 162:7–21.) While Professor Arcidiacono concludes this corroborates his assumption, Dr. Gurrea finds this approach unreliable, citing to a 2019 article

---

[54] Joseph Altonji, *et al.*, *Selection on Observed and Unobserved Variables: Assessing the Effectiveness of Catholic Schools*, 113 J. POL. ECON. 151, 182 (2005).

Professor Arcidiacono relies on in his report, which cautioned: "A common approach to evaluating robustness to omitted variable bias is to observe coefficient movements after inclusion of controls.  This is informative only if selection on observables is informative about selection on unobservables."[55]  (*Id.* at 162:7–163:18.)  To illustrate an example of source bias that likely results in Professor Arcidiacono's estimates overstating the impact of the Academy's consideration of race, Dr. Gurrea discussed socioeconomic disadvantage, a characteristic that is correlated with race and is something that the Academy considers positively.  (*Id.* at 163:20–168:22.)  Dr. Gurrea posits that Professor Arcidiacono includes poor measures of income—that is reported household income less than $80,000 and average salary by ZIP code—and does not include a measure of wealth.  (*Id.*)  Because this "significant variable" and others are correlated with race and not fully accounted for in the model, Dr. Gurrea contends that Professor Arcidiacono dramatically overstates the estimate of consideration of race.  (*Id.*)

At bottom, the Court finds that Professor Arcidiacono's estimates of the impact of the Academy's consideration of race are biased because they confound the contributions of the Academy's consideration of race and other omitted factors.  Such factors that the Academy positively considers and were excluded from Professor Arcidiacono's modeling include whether an applicant belonged to an underrepresented district; whether an applicant participated in NASS; whether an applicant is interested in STEM; whether an applicant is socioeconomically disadvantaged, has exceptional life experience or endured hardship; and whether an applicant participates in extracurriculars and year-round sports.  Further excluded

---

[55]  Emily Oster, *Unobservable Selection and Coefficient Stability: Theory and Evidence*, 37 J. BUS. & ECON. STAT. 187, 187 (2019).

from Professor Arcidiacono's modeling were the strength of teacher recommendations, BGO interview notes, and personal statements, as well as any character issues. Because the Court heard testimony that the Academy values such factors in their admissions decisions and agrees that Professor Arcidiacono's assumption that minorities are weaker in factors unaccounted for is unreasonable, the Court finds that Professor Arcidiacono's estimates of the impact of the Academy's consideration of race are likely overstated because significant omitted factors likely explain the selection of minorities for reasons other than race. Accordingly, the Court finds Professor Arcidiacono's estimates unreliable.

### b. Arcidiacono's Modeling Relies on the Erroneous Assumption that the Academy's Admissions Decisions Are Independent.

Dr. Gurrea further opines that Professor Arcidiacono's reliance on erroneous assumptions—that is, Professor Arcidiacono's model assumes that admissions decisions are independent—undermine his methodology. (DD5; DX200; ECF No. 145 at 149:16–24, 169:10–175:18.) Dr. Gurrea explained that Professor Arcidiacono relies on an econometric model for causal inference that assumes admissions decisions for each individual applicant are independent of each other, as if made in isolation. (ECF No. 145 at 169:20–25.) According to Dr. Gurrea, this assumption is erroneous, as the Academy's decisions are interdependent as they are made on a rolling basis throughout the admissions cycle for a fixed class size and because they are guided by class composition with the goal of having a class from a variety of backgrounds and congressional districts. (*Id.* at 170:1–171:14.)

To begin, Dr. Gurrea contends that admissions decisions are interdependent due to competition among applicants for a limited number of appointments. (*Id.* at 171:2–172:13.) "Because the class size is fixed, the likelihood of being admitted is dependent on prior

admissions." (DX200.) While Professor Arcidiacono does not deny that this competition creates interdependence, he assumes that applicants compete against a common standard. (PX518.) However, Professor Arcidiacono also acknowledges that the common standard changes over time—that is, as an admissions cycle progresses, the Academy's admissions standard decreases. (*Id.*) In other words, to deal with the competition among applicants for a limited number of appointments as a source of interdependence, Professor Arcidiacono imposes an assumption that he acknowledges is not fully consistent with what actually happens in practice. (ECF No. 145 at 171:2–172:13.)

Somewhat relatedly, Dr. Gurrea further notes that competition within a slate create interdependence—a form of competition that is unique to service academies. (*Id.* at 172:13–173:10.) "[C]ongressional slates have a limited number of nominees. And within those slates, when they are competitive, applicants are competing for a limited—or actually one or maybe two appointments within the slate." (*Id.* at 172:17–22.) While Professor Arcidiacono acknowledges that slate competition creates interdependence and attempted to control for this by controlling for some slate characteristics in his modeling, Dr. Gurrea posits that Professor Arcidiacono failed to account for the strength of competing slate candidates being dependent on their inclusion in multiple slates. (*Id.* at 173:2–173:10.)

More generally, Dr. Gurrea testified that the Academy's admissions goals are defined in terms of class composition and variety—beyond just racial and ethnic diversity—meaning that candidates with the same characteristics become less valuable when considering subsequent applicants. (*Id.* at 173:12–175:11.) For example, the Academy considers positively whether an applicant is from an underrepresented district or has unique life experiences, but

these considerations depend on the selection decision for prior candidates.  (DX200.)
Similarly, the Academy is required to graduate at least 65 percent of the class with STEM
degrees.  (DX159.)  As Dr. Gurrea explained "the strength of an applicant that offers these
characteristics will depend on prior admissions decisions."  (ECF No. 145 at 174:17–23.)
According to Dr. Gurrea, Professor Arcidiacono fails to address these sources of
interdependence.  (*Id.* at 173:12–175:11.)

The Court shares Dr. Gurrea's concern that the necessary conditions for Professor
Arcidiacono's logit model to yield reliable estimates are not satisfied because the Academy's
admissions decisions are not independent.  Rather, the Court finds that the Academy's
admissions decisions are interdependent, informed by the applicant pool, the constrained class
size, and certain admissions requirements and goals.

### c. Arcidiacono's Modeling Arbitrarily Blends Race and Ethnicity and Assigns Multiracial Applicants to Other Categories.

Third, Dr. Gurrea opines that Professor Arcidiacono arbitrarily blends race and
ethnicity and assigns multiracial applicants to other categories, and this undermines the
reliability of his predictions as his estimates are sensitive to his racial categorization.  (DD5;
DX200; ECF No. 145 at 150:1–10, 175:19–179:22.)  To begin, Dr. Gurrea explains that the
Academy collects applicant data on self-identified race and ethnicity, with options for race and
ethnicity identification being "American Indian or Alaska Native," "Asian," "Black or African
American," "Hispanic," "Native Hawaiian or Other Pacific Islander," and "White," and the
option to identify one or more races/ethnicity or choose not to identify.  (DX200.)
"Altogether, the race and ethnicity self-identities available across all years in the data amount
to 64 possible combinations," Professor Arcidiacono "flattens these 64 race and ethnicity

possibilities into six mutually exclusive categories by adopting a waterfall assignment rule that blends race and ethnicity and assigns multiracial applicants."[56]  (*Id.*)

Professor Arcidiacono explains that this method was followed in *Harvard*, though Dr. Gurrea notes that this is inconsistent with the categorization of race followed by the Academy. (ECF No. 145 at 176:20–25.)  At trial, Dr. Gurrea testified that this arbitrary categorization of race and ethnicity has implications, as Professor Arcidiacono's "Black" category includes all multiracial Black applicants; his "Hispanic" category does not include Black Hispanic applicants; his "White" category does not include white Hispanic applicants; and Professor Arcidiacono does not categorize any applicant as multiracial.  (*Id.* at 177:2–20; DD5; DX200.) Dr. Gurrea further testified that this categorization was "material to the predictions offered by Professor Arcidiacono," because his estimates are sensitive to race and ethnicity categorization.  (ECF No. 145 at 177:22–179:22; DD5; DX200.)  For example, with respect to Professor Arcidiacono's average marginal effect analysis, which attempts to measure the difference in admission rate after controlling for the model's explanatory variables between each racial group, Professor Arcidiacono estimates the average marginal effect for Black applicants is 24.35 percent.  (DD5.)  Under the alternative categorization of race and ethnicity, the estimate falls to 18.88 percent.  (*Id.*)  The numbers also go down for Asian and Hispanic applicants, though by smaller numbers.  (ECF No. 145 at 177:22–179:22; DX200.)

---

[56] Specifically, where a candidate selected Black or African American, Arcidiacono categorizes them as Black. (ECF No. 145 at 176:5–19.)  Where a candidate did not identify as Black and identified as Hispanic, they are categorized as Hispanic.  (*Id.*)  Where an applicant did not identify as Black or Hispanic and identified as either American Indian or Alaska Native or Native Hawaiian or Other Pacific Islander, they are categorized as Native American/Hawaiian.  (*Id.*)  Where an applicant did not identify as any of the above but identified as Asian, they are characterized as Asian.  (*Id.*)  Where an applicant did not identify as any of the above but identified as white, they are characterized as white.  (*Id.*)  Those that decline to respond are flagged as missing.  (*Id.*)

The Court agrees with Dr. Gurrea that Professor Arcidiacono's blending of race and ethnicity and assignment of multiracial applicants to other categories appears to be arbitrary. At the very least, his categorization is inconsistent with the Navy's instructions regarding the reporting of race and ethnicity data. (DX101; DX102.) However, because the Court finds Professor Arcidiacono's estimates unreliable for other reasons, further discussion of Professor Arcidiacono's racial and ethnic categorization is unnecessary.

### d. Arcidiacono's Estimates Do Not Imply a Large Impact on White Applicants.

Next, Dr. Gurrea opines that Professor Arcidiacono's estimates of the impact of the Academy's consideration of race on minorities does not imply a large impact on white applicants, as race plays a role for a small percentage of applicants and the impact of race on a majority has a small impact on the majority. (DD5; DX200; ECF No. 145 at 150:11–24, 179:23–182:1.) As Dr. Gurrea aptly notes, Black applicants, and minorities in general, account for a relatively small number of applicants and admitted candidates. (ECF No. 145 at 180:18–182:1; DX200.) To put it into perspective, across the five years that Professor Arcidiacono studied, the number of white applicants to the Naval Academy is seven times the number of Black candidates. (DD5; ECF No. 145 at 180:18–182:1.) Dr. Gurrea testified that this means that Professor Arcidiacono's modeling projects that, in a counterfactual world without the consideration of race, a massive impact is observed on Black candidates—specifically, a decline in admissions of 22.39 percent based on Professor Arcidiacono's estimates. (DD5; ECF No. 145 at 180:18–182:1.) By contrast, the impact on white applicants is much more modest—an increase in admissions by only 4.02 percent. (DD5; ECF No. 145 at 180:18–182:1.)

### e. Arcidiacono's Prediction of the Racial Breakdown of Admissions in a World Without the Academy's Consideration of Race is Misleading.

Dr. Gurrea further opines that Professor Arcidiacono's predictions of the racial breakdown of admissions in a world without the Academy's race-conscious admissions are misleading. (DD5; DX200; ECF No. 145 at 150:25–151:7, 182:2–187:8.) First, Dr. Gurrea explains that Professor Arcidiacono's first three analyses—the transformational analysis, the average marginal effect analysis, and the admitted minority analysis—are irrelevant to the question of what the Academy's admissions would look like without the consideration of race, as these analyses do not consider the fixed size of the class. (ECF No. 145 at 182:10–183:8.) In other words, only Professor Arcidiacono's capacity constraints analysis is connected with this question. (*Id.*) Indeed, Professor Arcidiacono agreed. (ECF No. 142 at 46:19–47:1.)

Preliminarily, Dr. Gurrea noted that any estimated differences in selection rates by race and ethnicity reflect the contribution of factors other than the consideration of race and ethnicity, as discussed above. (ECF No. 145 at 183:19–24.) Further, the contribution of those factors is estimated when the Academy is considering race and ethnicity, and the significance of those factors would be different for all applicants in the absence of racial consideration. (*Id.* at 183:25–187:8.) Moreover, the pool of applicants may change in response to such a change. (*Id.*) Dr. Gurrea highlights that, while Professor Arcidiacono implemented this capacity constraints analysis approach in *Harvard*, in a subsequent work published in 2023 he added a qualifier noting "[t]his exercise is not meant to estimate the impact of an affirmative action ban[,] . . . [as] when we remove racial preferences, we do not allow schools to adjust their preferences for all other applicant attributes." (*Id.*; DD5.) At trial, Professor Arcidiacono was asked whether "the reason [he] didn't model what the Naval Academy's admissions

process would look like in the absence of the consideration of race" was "because [he] believe[s] it's difficult to do," and he responded affirmatively. (ECF No. 142 at 51:8–12.)

The Court notes that neither party purports to model what the Academy's admissions would look like in a counterfactual world without the Academy's consideration of race or ethnicity. As Dr. Gurrea noted: the parties "can't develop precise estimates because we [cannot] observe the data that the Academy [would] consider[] to make their admissions decisions" and doing so would require "very strong assumptions about the counterfactual world." (ECF No. 145 at 187:2–6.)

### f. Professor Arcidiacono Does Not Provide Any Empirical Evidence to Support Plaintiff's Claim that Admissions Decisions Are Designed to Achieve Racial Balancing.

The Court finds it appropriate to briefly address Dr. Gurrea's sixth and final opinion, though it is not directly targeted towards Professor Arcidiacono's econometric modeling. For his final opinion, Dr. Gurrea opines that Professor Arcidiacono does not provide any empirical evidence to support Plaintiff's claim that the Academy's admissions decisions are designed to achieve racial balancing. (DD5; DX200; ECF No. 145 at 151:8–14, 187:9–188:15.) Dr. Gurrea contends that "[e]nrollment data for classes of 2023–2027 do not show any evidence of racial balancing of admissions decisions," but rather "show substantial fluctuations in the share of racial and ethnic groups within each class." (DX200.) While this opinion is not directly responsive to Professor Arcidiacono's econometric modeling, the Court finds the record wholly devoid of evidence that the Naval Academy engages in racial balancing.

### D. Findings of Fact: The Naval Academy Has Made a Serious, Good Faith Effort to Consider Race-Neutral Alternatives.

Under the strict scrutiny rubric established by the Supreme Court in the *Harvard* case,

the Naval Academy may consider race to achieve diversity only if there is no workable race-neutral alternative to the consideration of race to ensure a sufficiently diverse class. *See* 600 U.S. 181, 213 (2023). SFFA introduced models on race-neutral alternatives through Richard Kahlenberg, the same expert who testified in the *Harvard* case. Defendants introduced testimony and exhibits demonstrating extensive race-neutral efforts both within and outside of its admissions process to try and achieve its sought-after diversity.

The Academy's race-conscious admissions policy has a significant impact on the racial diversity of its class. Any race-neutral alternative will be deemed workable only if it would allow the Government to achieve the benefits that it derives from its current degree of diversity within a given class year, while also being practicable, affordable, and not requiring a material decline in academic quality or any of the other measures of excellence valued by the Naval Academy. In sum, the Court finds that no workable race-neutral alternatives will currently permit the USNA to achieve the level of diversity the Government has credibly found necessary for its national security mission.

### 1. The Academy's Race-Neutral Efforts

The Court first considers the extent to which the Naval Academy has already engaged in serious, good faith consideration of workable race-neutral alternatives. The Court finds that the Naval Academy has implemented extensive race-neutral factors both within and outside of its admissions process in an attempt to achieve its sought-after diversity.

### a. Race-Neutral Efforts Within the Admissions Process

Within the admissions process, the Naval Academy has incorporated numerous race-neutral factors to its whole person multiple scores and recommendation of the Admission

Board points to award points to candidates based on race-neutral characteristics.  (ECF No. 141 at 87:20–88:1 (Latta).)   Such factors include where a candidate is socioeconomically disadvantaged; where a candidate faced adversity and/or hardship; where a candidate has unusual life experience; where a candidate is first-generation college; where a candidate is first-generation American; where a candidate speaks English as a second language; and where a candidate has had prior exposure to the military.  (DX1; DX2; ECF No. 141 at 80:19–81:9, 87:20–88:1 (Latta).)   While the Academy awards WPM points to candidates based on these race-neutral characteristics, the Academy also considers and highly values the same characteristics outside of the points, as well as additional race-neutral characteristics, such as enlisted members applying from the fleet and candidates from underrepresented districts. (DX4; DX3; DX28; PX27; ECF No. 139 at 233:11–19 (Hwang); ECF No. 140 at 209:7–211:21 (Latta).)

### b.  The Academy's Extensive Recruiting Efforts and Outreach

Most impressive are the Naval Academy's expansive recruiting efforts and outreach programs, which are perhaps more important than the above efforts within the admissions process.  At trial, the Court heard testimony that the Naval Academy has difficulty encouraging minorities to apply, and particular difficulty encouraging minorities to complete their applications.  (ECF No. 141 at 47:2–50:7, 69:17–70:1, 76:14–17 (Latta).)   The Academy has observed that this recruitment problem stems from a confluence of factors, including lack of awareness of opportunities at the Naval Academy; reluctant influencers such as parents and guidance counselors; skepticism of the military; declining eligibility for service; and declining propensity to serve.  (*Id.* at 47:2–49:8, 69:17–70:1, 75:14–78:11 (Latta).)

To help attract exceptionally strong and diverse applicant pools, the Academy—primarily through the Strategic Outreach Department of the Admissions office—engages in extensive and multifaceted outreach efforts.  Over the years, the Naval Academy has significantly increased and expanded its outreach efforts to underrepresented communities. (*Id.* at 76:14–78:11 (Latta).)  Dean Latta testified that the Academy endeavors to increase awareness of opportunities at the Naval Academy and to increase applications and application completion rates across the board.  (*Id.* at 76:17–78:11.)

Preliminarily, the Court notes that these efforts have required the Admissions office to substantially increase its outreach budget over the past several years.  (*Id.* at 50:8–52:6 (Latta).) At trial, Dean Latta testified that in fiscal year 2021, the Admissions' outreach budget was "about $800,000 in appropriated money and a little over a million dollars in nonappropriated money or private philanthropy."  (*Id.* at 51:9–20.)  While the outreach budget is now $3.2 million, "with the increase in appropriated fundings, [the office] has lost some . . . nonappropriated funding."  (*Id.* at 51:9–20 (Latta).)  It is worth emphasizing that the Naval Academy is funded principally by the federal government in appropriations that come through DoD and the Department of the Navy with numerous cost centers to support, with the Admissions office representing the Academy's "smallest cost center."  (*Id.* at 50:8–52:7 (Latta).)  In other words, the money available to the Academy's Admissions office and available for outreach more specifically is finite.  (*Id.* at 50:8–52:7 (Latta).)

Nevertheless, the Strategic Outreach Department leads expansive efforts to develop strategies and plans to create awareness of the Naval Academy among prospective candidates throughout the United States and its territories.  (PX21; DX94.)  Such efforts include (1)

partnering with a third-party marketing firm; (2) expanded digital outreach efforts; and (3) expanded focus to reach prospective candidates earlier and more consistently, and to include enlisted units. (ECF No. 141 at 76:17–78:11 (Latta).) An overview of these efforts follows.

### i. Partnership with Marketing Firm

First, over the last several years, the Naval Academy has partnered with EAB,[57] a third-party marketing firm that specializes in internet electronic outreach, to assist in outreach efforts. (ECF No. 141 at 52:19–54:8, 57:11–23 (Latta); DX23, DX24; DX29; PX22; DX80; DX119.) While the Naval Academy started with "an $800,000 budget [for] a basic contract" with EAB during the first-year of the partnership, the Naval Academy spent close to $2 million this year for such assistance from EAB. (ECF No. 141 at 54:4–8 (Latta).) EAB's efforts on behalf of the Academy include correspondence in the form of mail-outs, emails, and text message and more across-the-board marketing and leveraging electronic platforms. (*Id.* at 57:11–23 (Latta); DX29.)

Dean Latta credited the Naval Academy's partnership with EAB as a "contributing factor" for the 14% increase the Naval Academy saw in overall applications for admission to the Class of 2027. (ECF No. 141 at 52:17–54:1; DX106.) Still, Dean Latta noted that the service academies experienced a big drop in applications following COVID and due to military recruiting downtrends in recent years. (ECF No. 141 at 53:11–54:1.) In other words, the 14% increase in overall applications for admission to the Class of 2027 was merely a return to more normal numbers.

---

[57] EAB stands for the Education Advisory Board, which was EAB's original moniker, though the company's name was officially shortened to EAB in 2014. *See About Us*, EAB, available at https://eab.com/about/.

### ii.  Digital Outreach Efforts

Relatedly, through its partnership with EAB and efforts within the Admissions office, the Strategic Outreach Department has expanded digital outreach efforts, including expanding social media, search engine marketing, upgrading virtual campus tours, and integrating smartphone technology.  (ECF No. 141 at 60:25–62:22, 68:16–69:16 (Latta); DX17; PX573; DX24; DX80; DX84 DX106; DX155.)  Again, while Dean Latta noted that "all these things are contributing to increased outreach," he emphasized that these initiatives had only come online in the last several years, and it was going to take time to determine overall impact.  (ECF No. 141 at 61:8–62:22.)  Moreover, Dean Latta emphasized that "this is all trying to keep up with the trends in college admissions." (*Id.* at 62:6–7.)

### iii.  Outreach Events

More generally, the Naval Academy puts on outreach events to target prospective candidates across the United States and its territories, as well as community influencers, such as guidance counselors and parents, and enlisted members of the Navy and Marine Corps. With respect to outreach events targeted towards prospective high schoolers, the Naval Academy offers several programs designed to encourage high school students to pursue a course of study in science, technology, engineering, and mathematics.  (ECF No. 139 at 216:9– 25 (Hwang); ECF No. 141 at 54:19–59:24, 70:17–72:16 (Latta); DX23; DX25; DX97; DX106; DX155; DX162.)  These programs include Summer Seminar (or NASS), Summer STEM, and additional events, including one-day STEM programming such as STEM 2, STEM Underway, and STEM On Deck.  (ECF No. 139 at 216:9–25 (Hwang); ECF No. 141 at 54:19–59:24, 70:17–72:16 (Latta); DX23; DX25; DX97; DX106; DX155; DX162.)

Starting in the 1970s under a different name, the Naval Academy Summer Seminar—or NASS—is an outreach program offered to rising high school seniors at the Naval Academy during one of three one-week sessions in June going into senior year.  (ECF No. 139 at 216:9–14 (Hwang); ECF No. 141 at 58:21–60:24 (Latta); PX21; DX94.)   During this one-week session run by midshipmen, students experience all aspects of a midshipman's life, including academics and athletics.  (ECF No. 139 at 216:9–14 (Hwang); ECF No. 141 at 58:21–60:24 (Latta); PX21; DX94.)  As noted *supra*, an application for NASS—which opens in January every year—is considered an initial application for admission, and students who participate in the program are encouraged to continue their application.  (ECF No. 139 at 216:9–14 (Hwang); ECF No. 141 at 58:21–60:24 (Latta); PX21; DX94.)  Dean Latta explained that "[i]n a given year, somewhere around 68 to 70 percent of [NASS participants] actually finish an application" to join the Brigade of Midshipmen.  (ECF No. 141 at 59:17–22 (Latta).)

Similarly, since around 2008, Summer STEM has offered several hundred rising ninth to eleventh grade students the opportunity to participate in a six-day program at the Academy focused on STEM.  (ECF No. 139 at 216:15–25 (Hwang); PX21; DX94.)   Dean Latta emphasized that Summer STEM "was intentionally meant to be an outreach program," noting the Academy recognized that many students—particularly those from underserved communities—did not have access to classes needed to prepare themselves for a STEM school.  (ECF No. 141 at 56:20–57:5.)  In conjunction with this programming, the Naval Academy runs a parents' program, as the Academy appreciates that the importance of selling the Academy and the Navy and Marine Corps to influencers in the prospective candidate's life.  (*Id.* at 60:1–6 (Latta).)

At trial, Dean Latta also explained that there is more interest in NASS and Summer STEM than the Academy can accommodate between those programs. (*Id.* at 72:1–16.) Accordingly, the Academy offers additional programming, including admissions forums, Summer STEM 2, STEM Underway, and STEM On Deck. (*Id.* at 72:1–16, 82:12–83:6 (Latta).) Summer STEM 2 is a one-day program at the Academy in August, where students attend hands-on sessions led by midshipmen and faculty to expose students to opportunities at the Academy and in the STEM fields. (*Id.* at 72:1–16 (Latta).) STEM Underway is a program where midshipmen and faculty travel to do STEM programs in targeted locations to promote interest in and awareness of STEM subjects and opportunities at the Academy. (*Id.* at 72:1–16 (Latta).) STEM On Deck brings students to the Academy for a day-long STEM event led by faculty and midshipmen. (*Id.* at 72:1–16 (Latta).)

The Naval Academy continues to expand its outreach programs for students and parents/guardians. In 2021, the Naval Academy launched the INSPIRE program, which is designed to invite highly qualified candidates from underrepresented groups and one accompanying parent/guardian to Annapolis in order to experience the daily midshipman routine and learn more about the admissions process. (*Id.* at 73:17–75:6 (Latta); PX21; DX94; PX50; DX29; DX106; DX155.) The Academy hosts the INSPIRE program several times per recruitment cycle, inviting seniors in the fall and juniors and some select seniors in the spring and paying for their visit. (ECF No. 141 at 73:17–75:6 (Latta); PX21; DX94; PX50; DX29; DX106; DX155.) While the program is still new, it has been successful in encouraging more minorities to apply for and complete their applications. (ECF No. 141 at 73:17–75:6 (Latta); PX21; DX94; PX50; DX29; DX106; DX155.) In light of this observation, the Academy has

tripled its investment in the program since its initial launch in 2021.  (ECF No. 141 at 73:17–75:6 (Latta); PX21; DX94; PX50; DX29; DX106; DX155.)

Similarly, the Naval Academy hosts invitation-only visits to the Academy offered to competitive prospective candidates, called Candidate Visit Weekend ("CVW").  (ECF No. 141 at 62:23–64:9 (Latta); PX21; DX94; DX23; DX106; DX155; DX162.)  While CVW is a self-paid program, the Academy offers opportunities for scholarships for financially disadvantaged students.  (ECF No. 141 at 63:20–22 (Latta).)  Dean Latta explained that these weekend visits are "helpful," as students who attend a CVW are more likely to complete their application.  (*Id.* at 63:23–64:3; DX29 (noting the importance of getting students and their parents on campus, as such candidates are more likely to complete their application).)

As noted, the Naval Academy appreciates the important role that influencers like parents, guidance counselors, principals, and other community leaders play in a candidate's decision to apply to the Academy.  In addition to the parallel programming for parents during Summer STEM and the INSPIRE programs, the Naval Academy hosts Center of Influence ("COI") programs, which are orientation programs hosting educators or other influential community leaders from around the country to introduce them to the exceptional opportunities the Naval Academy has to offer prospective candidates.  (ECF No. 141 at 64:10–66:12 (Latta); PX21; DX94; PX573; DX24; DX84; DX154; DX155; DX162.)  Dean Latta explained that COI programs target underrepresented districts with the hope that these influencers—typically primarily school superintendents, principals, directors, and guidance counselors—attend the weekend and return to the community as a "force multiplier" for the Academy.  (ECF No. 141 at 64:10–66:12 (Latta); DX29.)

96

The Academy also appreciates that midshipmen are "a very powerful recruiting tool" who "do a lot to help facilitate application completion rates" and interest in the Academy. (ECF No. 141 at 70:2–71:16 (Latta).)   In addition to their active involvement in the aforementioned summer programming, the Academy formally facilitates this through initiatives such as Operation Information ("OPINFO") and traveling musical groups, including the Naval Academy Gospel Choir and Mariachi Band.  (*Id.* at 67:16–68:13, 70:2–71:16 (Latta); PX21; DX94; DX84; DX106; DX115; DX155; DX162.)   The OPINFO program sends midshipmen into their home communities to encourage students to apply. (ECF No. 141 at 70:2–71:16 (Latta); PX21; DX94; DX106; DX115; DX155; DX162.)  During the 2023 recruitment cycle, the Academy scheduled 2,700 OPINFO events, engaging nearly 33,000 prospective students.  (DX106.)

In addition to the above initiatives, the Naval Academy specifically targets Title I schools,[58] which are often underrepresented districts at the Academy, and frequently visits Navy and Marine Corps units.  (ECF No. 141 at 78:14–80:7, 80:19–82:1 (Latta); DX28; DX29.)  The Naval Academy recognizes that these populations tend to be more diverse, thus recruiting more students from Title I schools and the enlisted corps might increase diversity in the applicant pool and the Brigade of Midshipmen.  (ECF No. 141 at 78:14–80:7, 80:19–82:1 (Latta); DX28; DX29.)

Because the Academy's admissions process is largely driven by the nomination

---

[58]  Title I, Part A of the Elementary and Secondary Education Act, as amended by the Every Student Succeeds Act, provides financial assistance to local educational agencies and schools with high percentages of children from low-income families to help ensure that all children meet state academic standards.  20 U.S.C. §§ 6301–6304.

requirement, the Naval Academy's Strategic Outreach Department also regularly meets with and coordinates programming for Members of Congress. (ECF No. 139 at 219:23–220:22, 221:20–222:12 (Hwang); ECF No. 140 at 230:4–231:14 (Latta); ECF No. 141 at 66:13–67:15, 83:2–84:12 (Latta); DX24; DX106; DX162.) Such efforts include trainings at the Naval Academy, Congressional Academy Days ("CADs"), and programming targeted towards the Congressional Minority Caucuses. (ECF No. 139 at 219:23–220:22, 221:20–222:12 (Hwang); ECF No. 140 at 230:4–231:14 (Latta); ECF No. 141 at 66:13–67:15, 83:2–84:12 (Latta); DX24; DX106; DX162.) Through these engagements, the Naval Academy encourages nominating sources to nominate diverse candidates. (ECF No. 139 at 219:23–220:22, 221:20–222:12 (Hwang); ECF No. 140 at 230:4–231:14 (Latta); ECF No. 141 at 66:13–67:15, 83:2–84:12 (Latta).) At trial, Hwang explained that such efforts have been "minimally" successful at increasing the diversity of congressional nominations, if at all, as it ultimately is the nominating source's decision. (ECF No. 139 at 221:20–222:12.)

In sum, despite the Academy's efforts to utilize race-neutral alternatives in the admissions process and to improve minority representation in the applicant pool and in the Brigade of Midshipmen, it is clear that the Academy faces challenges attracting minority candidates. With respect to outreach, it is clear that the Academy has already reached, or nearly reached, the maximum returns in increased socioeconomic and racial diversity that can reasonably be achieved through its recruiting efforts. (ECF No. 141 at 47:2–50:7, 69:17–70:1, 75:14–76:17, 88:2–11 (Latta).)

## 2. SFFA's Proposed Race-Neutral Alternatives

At trial, SFFA proffered Richard Kahlenberg[59] as an expert witness on race-neutral alternatives. (ECF No. 142 at 64:17–188:23; PX219; PX223; PD4.) Kahlenberg opined that the Academy could achieve racial and socioeconomic diversity without the use of racial preferences by (1) utilizing socioeconomic preferences, (2) increasing the share of enlisted members, (3) increasing its recruitment efforts, (4) modifying and expanding its preparation programs, (5) reducing or eliminating preferences that favor non-minorities, and (6) pursuing changes to the Congressional appointments process. Kahlenberg also presented the Court with the results of five simulations. These simulations were a selection of 70 simulations developed by Plaintiff's expert Professor Arcidiacono to replicate as closely as possible the Academy's existing system of admissions, while removing the "advantages associated with race" in order to make the admissions process race-neutral and applying different levels of "boosts" for socioeconomic status.

The Court addresses each of Kahlenberg's proposals in turn below, incorporating discussion of his proffered simulations as necessary. At bottom, the Court, considering all evidence on race-neutral alternatives before it, finds that the Academy has conducted good faith, serious consideration of ways in which its admissions policies can become race-neutral. The Court finds that the Academy has demonstrated that there are not workable or viable

---

[59] Kahlenberg is currently Director of the American Identity Project at the Progressive Policy Institute, which is a non-profit, non-partisan research organization founded in 1989, and a professorial lecturer at George Washington University, where he teaches on issues of civil rights and economic inequality. (ECF No. 142 at 65:13–19; PX219.) He received his A.B. degree *magna cum laude* in 1985 from Harvard College, and received his J.D. degree *cum laude* in 1989 from Harvard Law School. (ECF No. 142 at 66:3–12 (Kahlenberg); PX219.) Kahlenberg has published works on numerous socioeconomic subjects, including the use of race-neutral alternatives in college admissions, and previously testified as SFFA's expert in litigation against Harvard and the University of North Carolina. (ECF No. 142 at 71:3–21 (Kahlenberg); PX219.)

race-neutral alternatives that would allow it to achieve its current level of diversity about as well as its current race-conscious admissions process, despite Kahlenberg's assertion to the contrary.

### a. Increase Socioeconomic Preferences

In general, Kahlenberg contends that the USNA could achieve its current level of racial diversity by altering its admissions process to place greater emphasis on socioeconomic factors, such as considering where a candidate is first-generation college, where a candidate's family is low-income, and where a candidate comes from a working-class background. (ECF No. 142 at 82:9–116:1; PX219 at 38–45, 74–93.) While Kahlenberg recognizes that the Academy considers socioeconomic status as part of its admissions process, (ECF No. 142 at 142:7–143:8), he argues that the Academy's commitment to socioeconomic diversity is modest and that the admissions process "effectively *penalizes* socioeconomically disadvantaged students compared with those who are more socioeconomically advantaged." (PX219 at 38–45.)

The Court is unpersuaded. As noted above, the Academy has incorporated numerous race-neutral factors to its WPM and RABs to award points to candidates based on race-neutral characteristics, including socioeconomic status. (ECF No. 141 at 87:20–88:1 (Latta).) Notwithstanding the inaccuracies commonly observed in submitted applications on this topic, the Academy requests information on first-generation college status, parental education, household income information, single-parent household information, hardship funding, and adversity experience, among other things. (ECF No. 140 at 219:3–220:20 (Latta); ECF No. 142 at 142:7–143:8 (Kahlenberg).) While the Academy awards WPM points to

socioeconomically disadvantaged candidates, the Academy also considers and highly values the same characteristics outside of the points.  (DX1; DX2; DX4; DX3; DX28; PX27.) Moreover, even Kahlenberg's most aggressive simulations demonstrate that an admissions process that heavily favored low-socioeconomic status does not achieve the racial diversity attained through the Academy's race-conscious policies.  (ECF No. 142 at 173:7–175:16 (Kahlenberg); PD4.)

### b.  Increase the Share of Enlisted Members Admitted

Kahlenberg also recommends that, "[g]iven the higher levels of racial diversity found among enlisted men and women, USNA could boost the share of enlisted members in its incoming class as a race-neutral means of achieving racial and ethnic diversity."  (ECF No. 142 at 113:19–114:2, 180:22–181:25 (Kahlenberg); PX219 at 46.)  Preliminarily, this Court notes that the Naval Academy actively recruits enlisted members.  (ECF No. 141 at 26:5–29:8 (Latta); ECF No. 142 at 180:22–181:25 (Kahlenberg).)  Nevertheless, several legal and logistical roadblocks exist, precluding many enlisted members from getting to the Academy. First, 10 U.S.C. § 8458 requires that each candidate be not yet 23 years of age by I-Day, and DoDINST 1322.22 provides that "[o]n the first day of enrollment, those appointed as . . . midshipmen[] or preparatory school students must not have dependents, be responsible for an existing pregnancy, or be pregnant."  As such, enlisted members are often precluded from the Academy, and because enlisted members tend to be less academically prepared than those matriculating directly from high school, the Academy is unable to offer some eligible enlisted members the opportunity to matriculate through NAPS.  (ECF No. 141 at 26:5–29:8 (Latta).)  Practical roadblocks include the pay cut involved in attending the Academy as an

enlisted member and the requirement that enlisted members receive a recommendation from their commanding officer.  (ECF No. 141 at 26:5–29:8 (Latta).)

### c.  Increase Recruitment Efforts

Despite the expansive recruiting and outreach efforts outlined *infra*, Kahlenberg nevertheless contended at trial that the Academy could increase such efforts.  (ECF No. 142 at 89:23–92:1, 167:3–175:16; PX219 at 47–52.)  Kahlenberg insists that the Naval Academy could increase completed application rates and better fund outreach efforts, making much of a Boston Consulting Group ("BCG") analysis from May 2022 that found that the Academy lags in digital presence.  (ECF No. 142 at 91:5–92:1; PX330.)  Kahlenberg emphasized that BCG recommended the Academy "invest more in admissions[, including] improving social media, deeper engagement with geographies and where USNA appointments are [under competitive], and better leveraging USNA's massive cohort of [BGOs]."  (ECF No. 142 at 91:5–92:1.)

The Court finds that the Academy already engages in these types of activities and makes significant outreach efforts well beyond the suggestions proffered by Plaintiff's expert.  On cross-examination, Kahlenberg conceded that there are "financial constraints" on the Academy and noted "there are [a] number of good and promising things that just need more resources."  (ECF No. 142 at 168:4–24.)  Indeed, and as noted above, it is clear that the Academy has already reached, or nearly reached, the maximum returns in increased socioeconomic and racial diversity that can reasonably be achieved through its recruiting efforts.

### d. Modify and Expand Preparation Programs

Kahlenberg further opines that the USNA could boost racial diversity without racial consideration by modifying and expanding its preparation programs, noting about 20 percent of each incoming class matriculates through a preparatory pipeline. (PX219 at 52–56; ECF No. 142 at 103:4–106:11.) As noted *supra*, the Naval Academy has three preparatory programs—NAPS, Foundation, and Civilian Prep—though Kahlenberg's recommended modifications are largely limited to NAPS, which was established for the benefit of enlisted sailors and marines.

Preliminarily, this Court notes that Kahlenberg's proposed expansions of NAPS are dramatic, structural changes that are unworkable for several reasons. First, capacity at NAPS is limited to 310 students total, and the Academy is not the only school utilizing NAPS as a preparatory program. (ECF No. 141 at 24:22–26:4 (Latta).) Second, Kahlenberg's proposed expansion overlooks the limited funding available to commit towards such programs. (ECF No. 142 at 165:22–166:7 (Kahlenberg).) Third, expanding NAPS impacts the Academy's ability to offer congressional vacancies. (ECF No. 141 at 25:18–21 (Latta).) As Kahlenberg conceded on cross-examination, "it would be challenging" for the Academy to implement these changes and "still meet all of its statutory and regulatory obligations." (ECF No. 142 at 166:8–13 (Kahlenberg).)

Turning to Kahlenberg's proposed modifications of NAPS, Kahlenberg testified that "the NAPS program is one of the great things that the Naval Academy does," noting NAPS was "unusual on a national level, [as] it provides students who . . . are not fully ready to be at the Naval Academy [with] a year of extra training." (ECF No. 142 at 103:9–12.) Nevertheless,

Kahlenberg was critical that "[t]hese [preparatory] programs do not appear to be aimed at promoting socioeconomically diversity." (PX219 at 54–55.)  Accordingly, Kahlenberg opines that the Academy "could have explored what would happen if NAPS were modified to be race-neutral and emphasize socioeconomic disadvantage instead of race." (*Id.* at 55–56.)

First, Kahlenberg suggests "expand[ing] the share of seats . . . devoted to [prep applicants] from about 20% to something higher." (*Id.* at 55.)  This suggestion is unworkable, as it is unclear how the Academy could implement such a change and "still meet all of its statutory and regulatory obligations." (ECF No. 142 at 166:8–13 (Kahlenberg).)

Second, Kahlenberg suggests that "NAPS could make the very reasonable policy shift to devote most or even all of its seats to socioeconomically disadvantaged students on the theory that students who have faced socioeconomic disadvantage are the most likely to benefit from an extra year of preparation." (PX219 at 55–56.)  Kahlenberg notes that NAPS could most likely maintain or exceed its current Black and Hispanic populations in light of the fact that such "students are much more likely to be socioeconomically disadvantaged than white students." (*Id.* at 56.)  Notably, Kahlenberg's suggestion overlooks the fact that, aside from recruited athletes, members of the fleet and applicants from underrepresented districts are the Academy's top priorities for offering spots at NAPS. (ECF No. 142 at 160:17–165:5 (Kahlenberg).)  Moreover, minority representation decreases relative to what currently exists at the Academy pursuant to Kahlenberg's simulation on this proposal. (*Id.* at 160:17–165:5 (Kahlenberg).)

### e.  Reduce or Eliminate Preferences that Favor Non-Minorities

Kahlenberg opines that the USNA could boost racial diversity without racial

preferences by reducing or eliminating preferences that favor non-minorities, such as legacy preferences; preferences for athletes in boutique sports such as rowing, sailing, squash, and water polo; preferences for students who attend wealthy high schools or participate in expensive programs (i.e., preferences for students who attend a high school with high percentage of students who are college bound, for students who take a large number of AP or IB courses, for students involved in extracurricular activities).  (PX219 at 56–66.)  While it is true that these preferences benefit wealthy students, the Court notes that Kahlenberg's simulations adopting these proposals did not benefit racial diversity, with the share of each individual minority group falling in simulations modeling removal of these preferences.  (ECF No. 142 at 100:6–20, 154:3–160:9 (Kahlenberg).)

Moreover, Defendants put forth evidence at trial affirming the reasoning and importance of these preferences, as Kahlenberg reluctantly conceded on cross-examination.  (*Id.* at 154:3–160:9 (Kahlenberg).)  Briefly, with respect to legacy preferences, the Naval Academy, as a military academy, has a legitimate interest in considering whether candidates come from a military family.  (*Id.* at 154:11–18 (Kahlenberg).)  Dean Latta explained that such candidates "have a strong motivation to serve" and have a better appreciation for what life at the Naval Academy and in the Navy or Marine Corps will look like.  (ECF No. 140 at 226:17–229:20.)  Furthermore, the legacy preference—which, to be clear, is provided to anyone whose parent is currently on active duty in the U.S. military, not just to applicants with a family member who attended one of the service academies—often operates as a proxy for hardship because of the realities of the military lifestyle.  (ECF No. 140 at 226:17–229:20 (Latta); DX1; DX2; DX79; PX813.)

With respect to preferences for athletes in boutique sports, the Naval Academy values recruited athletes because of the skills exhibited by such candidates, such as warrior ethos, leadership, teamwork, communication, time management, and persistence.  (ECF No. 141 at 162:6–164:3 (Arcidiacono).)  It is axiomatic that these skills are valuable to a federal service academy with the mission of "develop[ing] midshipmen morally, mentally, and physically . . . in order to graduate leaders who are dedicated to a career of naval service and have potential for future development in mind and character to assume the highest responsibilities of command, citizenship, and government."  (DX79; PX813.)

Finally, with respect to preferences for students who attend a high school with a high percentage of students who are college bound, for students who take a large number of AP or IB courses, and for students involved in extracurricular activities, the Naval Academy is "an extremely difficult school to succeed in."  (ECF No. 140 at 159:2–162:5 (Latta).)  "Students have to have a strong foundation in math and science [and] across the board to not only succeed in the first year but beyond the first year."  (*Id.* at 159:2–162:5 (Latta).)  Moreover, Kahlenberg described this proposed race-neutral alternative as "not optimal."  (ECF No. 142 at 157:11–160:9.)

### f.  Pursue Changes to the Nomination Process

Perhaps most untenable is Kahlenberg's suggestion that the Naval Academy "seek tweaks to the Congressional appointments process."  (PX219 at 66–73.)  As Kahlenberg aptly notes in his expert report, the Congressional appointment process is written into federal statute.  (*Id.* at 66); 10 U.S.C. § 8454.  Indeed, Plaintiff appears to recognize that changes to the nomination process are improbable.  (ECF No. 148 ¶ 245 (claiming the race-neutral

strategies identified by Kahlenberg are feasible but noting the current nominations process would not need to change to facilitate the Academy's incorporation of such race-neutral alternatives).)

## IV. Principles of Constitutional Review

### A. Overview

SFFA's challenge to the Naval Academy's race-conscious admissions practices sits at the intersection of two lines of precedent: race-conscious admissions and deference to the executive and legislative branches' military judgments.  Under the Supreme Court's affirmative action precedents, the use of race in college admissions must survive strict scrutiny.  That is, the Naval Academy must show that its consideration of race is narrowly tailored to a compelling governmental interest.  Even in cases implicating strict scrutiny, however, the military deference doctrine mandates deference to the political branches' military judgments. As explained *infra*, Defendants' military judgment that the Navy and Marine Corps have a compelling national security interest in enhancing unit cohesion and lethality, recruitment and retention, and domestic and international legitimacy is entitled to judicial deference.  Also as explained *infra*, Defendants have met their burden to prove that the Naval Academy's race-conscious admissions practices are narrowly tailored to that compelling national security interest.  The Naval Academy's race-conscious admissions policy withstands strict scrutiny. That policy must receive the deference traditionally extended to military judgments.  In short, that military judgment is set by the President of the United States and not the federal judiciary.

**B. Students For Fair Admissions Has Standing.**

Before reaching SFFA's substantive claim, this Court reiterates its previous holding that SFFA has Article III standing. (ECF No. 112.) To invoke associational standing, an organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Here, only the first element of associational standing was in dispute. In an equal protection challenge to an admissions policy, an association meets this first element where at least one of its members is ready and able to apply to the defendant institution. *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003). SFFA has already shown that Member D is ready and able to apply to the Naval Academy because he applied to the Class of 2027 and intends to complete his application for the Class of 2029 soon.[60] Accordingly, SFFA has Article III standing to challenge the Naval Academy's race-conscious admissions practices.

**C. Standard of Review**

The Fifth Amendment of the Constitution provides that "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. Although the Fifth Amendment does not contain an explicit Equal Protection Clause, its "equal protection guarantee . . . is coextensive with that of the Fourteenth" Amendment. *United States v. Paradise*, 480 U.S. 149, 166 n.16 (1987); *see also Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 217–18 (1995) (collecting cases). Accordingly, courts' "'approach to Fifth

---

[60] No evidence at trial contradicted this showing or otherwise raised a genuine dispute as to standing.

Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment.'" *Adarand*, 515 U.S. at 217 (quoting *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975)).  The equal protection principles within the Fifth Amendment "'require[] equality of treatment before the law for all persons without regard to race or color.'" *Harvard*, 600 U.S. 181, 205 (2023) (quoting *Browder v. Gayle*, 142 F. Supp. 707, 715 (M.D. Ala. 1956)).

"Any exception to the Constitution's demand for equal protection must survive a daunting two-step examination known . . . as 'strict scrutiny.'" *Id.* at 206–07 (citing *Adarand*, 515 U.S. at 227); *see also Adarand*, 515 U.S. at 227 (applying strict scrutiny to race-conscious construction contracts); *Shaw v. Reno*, 509 U.S. 630, 650 (1993) (applying strict scrutiny to race-conscious voting districting); *Johnson v. California*, 543 U.S. 499, 505 (2005) (applying strict scrutiny to race-conscious prison housing assignments).  Under that standard, courts must ask (1) whether the racial classification is used to "further compelling governmental interests," and, if so, (2) whether the government's use of race is "narrowly tailored—meaning necessary—to achieve that interest." *Harvard*, 600 U.S. at 206–207 (first quoting *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003); and then quoting *Fisher v. Univ. of Tex. at Austin* (*Fisher I*), 570 U.S. 297, 309, 312 (2013)).  A governmental actor imposing a racial classification— including a race-conscious admissions policy—must prove that classification complies with the stringent demands of strict scrutiny. *Adarand*, 515 U.S. at 224.

All parties agree that the Naval Academy considers race in admissions.  As such, Defendants bear the burden to prove that the Naval Academy's consideration of race is narrowly tailored to achieve a compelling governmental interest. *See Harvard*, 600 U.S. at 228,

206–207 (first citing *Grutter*, 539 U.S. at 326; and then citing *Fisher I*, 570 U.S. at 311–12).

Under the Supreme Court's ruling in *Harvard*, civilian colleges and universities can only satisfy

strict scrutiny if they can show that their race-conscious admissions programs do not use race

as a negative, do not rest on stereotypes about the viewpoint of minority candidates, and have

a "logical end point." *Id.* at 218, 219, 221.

Before applying strict scrutiny here, it bears reiterating that "at [their] heart our service

academies are quintessentially a military organization that also happen to be a four-year

degree-granting institution." (ECF No. 146 at 143:8–10 (Miller).) Just as the Naval Academy

treats its midshipmen as servicemembers, Congress, the executive branch, and the judiciary

treat the Naval Academy as a military institution. (PX259 ¶ 7); 10 U.S.C. § 8459. "Midshipmen

enrolled in the Naval Academy are subject to . . . the Naval Academy's own regulations and

the Directives of the Department of Defense applicable to the armed forces generally."[61]

*Steffan v. Perry*, 41 F.3d 677, 682 (D.C. Cir. 1994); *see also Dougherty v. Lehman*, 688 F.2d 158,

160–61 (3d Cir. 1982) (explaining the Secretary of the Navy's "power to discharge an Academy

midshipman 'from the Naval Academy and from the Naval service'" (quoting 10 U.S.C. §

6962)). Although time spent at the Naval Academy does not accrue toward length of military

service, "a cadet in the Military or Naval Academies has always been considered to be a

member of the military forces of the United States." *Miller v. United States*, 42 F.3d 297, 301

(5th Cir. 1995) (quoting *Travis v. United States*, 146 F. Supp. 847, 850 (Ct. Cl. 1956)). Courts

---

[61] As discussed *infra*, former servicemembers such as Dr. Jeanette Haynie testified to the distinction between the Naval Academy and a civilian institution. Dr. Haynie emphasized that "within a few weeks of graduating, members of [her] class were leading . . . sailors and Marines . . . in all kinds of different places." (ECF No. 144 at 130:19–25 (Haynie).)

evaluate claims by a cadet as they would claims by a servicemember. *See Doe v. Hagenbeck*, 870

F.3d 36, 49 (2d Cir. 2017) (explaining sexual assault of cadet occurred incident to military

service because "academic and military pursuits are inextricably intertwined" at West Point);

*Mentavlos v. Anderson*, 249 F.3d 301, 314 (4th Cir. 2001) (explaining "cadets at military

academies have been considered to be 'in the military' for the purposes of the *Feres* doctrine"

(quoting *Feres v. United States*, 340 U.S. 135, 146 (1950)).  The Supreme Court recognized

military service academies' unique status when it exempted them from *Harvard*.  600 U.S. at

213 n.4.

Because strict scrutiny is a searching analysis, its application varies according to the

context and compelling interest claimed.  *See, e.g.*, *Grutter*, 539 U.S. at 327 ("Context matters

when reviewing race-based governmental action under the Equal Protection Clause.").  As the

Supreme Court acknowledged in *Harvard*, the application of strict scrutiny to civilian

institutions' race-conscious admissions programs does not necessarily mirror its application to

race-conscious distinctions in the military context.  *See Harvard*, 600 U.S. at 213 n.4.  This case

implicates both race-conscious admissions and national security interests.  Each stage of the

strict scrutiny analysis, therefore, requires this Court to determine the appropriate application

of both strict scrutiny and judicial deference to military judgments.  Accordingly, it is useful to

review the Supreme Court's jurisprudence in each area.

### D. Strict Scrutiny in Affirmative Action Cases

This case follows closely on the heels of SFFA's successful actions against Harvard

College and the University of North Carolina ("UNC"), decided jointly in *Harvard*, 600 U.S.

181 (2023).  In that case, the Supreme Court held that race-conscious admissions policies in

higher education violate the Equal Protection Clause of the Fourteenth Amendment. *Id.* at

230. In doing so, the Court applied strict scrutiny to the admissions practices, requiring

Harvard and UNC to prove that (1) "the racial classification is used to 'further compelling

governmental interests'" and (2) "the use of race is narrowly tailored—meaning necessary—

to achieve that interest." *Id.* at 206–207 (first quoting *Grutter v. Bollinger*, 539 U.S. 306, 326

(2003); and then quoting *Fisher I*, 570 U.S. 297, 311–12 (2013)). The Court further determined

that race-conscious admissions policies cannot use race as a negative or rest on stereotypes

about minority candidates' viewpoints, and they must have a logical end point. *Id.* at 218, 219,

221.

The Supreme Court explicitly exempted military institutions from its decision in

*Harvard* "in light of the potentially distinct interests that military academies may present." *Id.*

at 213 n.4. Though *Harvard* does not apply to military academies, its robust discussion of the

legal precedents that govern affirmative action remains instructive as to the strict scrutiny

analysis the Court must apply here. Accordingly, this Court provides a brief overview of

*Harvard* and its predecessors, keeping in mind the Supreme Court's emphasis on the

importance of context in race-conscious admissions cases. *See id.* at 229 (critiquing principal

dissent for failing to consider case law in context).

### 1. Supreme Court Precedents on Race-Conscious Admissions

As the Supreme Court explained in *Harvard*, it first considered the constitutionality of

the use of race in college admissions in *Regents of University of California v. Bakke*, 438 U.S. 265

(1978). *Harvard*, 600 U.S. 181, 208 (2023). There, a fractured Court partly upheld the use of

race-based admissions practices, and Justice Powell wrote the opinion that would ultimately

become "the touchstone for constitutional analysis of race-conscious admissions policies." *Grutter v. Bollinger*, 539 U.S. 306, 323 (2003); *see also Bakke*, 438 U.S. at 320 (opinion of Powell, J.) (overturning lower court's prohibition of any use of race in admissions). Justice Powell's opinion recognized the University of California's compelling interest in the educational benefits of a diverse student body but advocated careful limitations on race-conscious admissions, including prohibiting racial quotas and requiring that race be considered only as a factor in overall diversity. *Bakke*, 438 U.S. at 311–12, 317 (opinion of Powell, J.); *see also Harvard*, 600 U.S. at 209–210 (summarizing Justice Powell's opinion).

Twenty-five years later,[62] the Supreme Court again considered the constitutionality of race-based admissions practices in higher education in the companion cases *Grutter v. Bollinger*, 539 U.S. 306 (2003), and *Gratz v. Bollinger*, 539 U.S. 244 (2003).[63] In *Grutter*, the Court accepted diversity in higher education as a compelling interest that satisfied the second prong of the strict scrutiny analysis. 539 U.S. at 328, 333. It required, however, that race-conscious policies be narrowly tailored to achieving that interest. *Id.* at 333. Accordingly, a higher education institution could not "establish quotas for members of certain racial groups or put members of those groups on certain admission tracks;" "insulate applicants who belonged to certain racial or ethnic groups from competition for admission;" base admissions on "any belief that

---

[62] The decades that elapsed between *Bakke* and its progeny proved significant to the Supreme Court in both *Grutter* and *Harvard*. Justice Sandra Day O'Connor's majority opinion in *Grutter* noted that twenty-five years had passed since *Bakke* and suggested affirmative action policies should conclude within the next twenty-five years. *Grutter v. Bollinger*, 539 U.S. 306, 343 (2003). In *Harvard*, Chief Justice John Roberts echoed Justice O'Connor's words, lamenting, "[t]wenty years later, no end is in sight." 600 U.S. 181, 213 (2023).

[63] In *Gratz v. Bollinger*, the Court held that the University of Michigan's admissions policy of automatically assigning a twenty-point bonus to underrepresented minority applicants was not narrowly tailored to the university's compelling interest in a diverse student body. 539 U.S. 244, 273, 275 (2003). Therefore, the Court held that the University of Michigan's policy violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 275.

minority students always (or even consistently) express some characteristic minority viewpoint on an issue;" or "assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin." *Id.* at 328, 334, 333, 329–30, 307. Moreover, the *Grutter* Court held that "race-conscious admissions policies must be limited in time" in recognition that racial preferences "may be employed no more broadly than the interest demands." *Id.* at 342. Specifically, the Court noted that racial classifications must not "unduly harm nonminority applicants" competing for admission. *Id.* at 341.

In *Fisher v. University of Texas at Austin* (*Fisher II*), 579 U.S. 365 (2016), the Supreme Court considered another equal protection challenge to race-conscious admissions practices at a public university.[64] *Id.* at 369. As in *Grutter*, the Court accepted diversity on campus as a compelling governmental interest but emphasized that race-conscious admissions are only constitutional if they are narrowly tailored to achieving that goal. *Id.* at 377. In *Fisher II*, the University of Texas at Austin ("UT Austin") filled seventy-five percent of its freshman class, as required by Texas law, with students who graduated in the top ten percent of their class at a Texas high school and considered race as a subfactor in the admission of the remaining twenty-five percent of the class.[65] *Id.* at 373–74. In upholding this race-conscious admissions policy, the Court cited three principles established in *Fisher I*: (1) race-conscious admissions

---

[64] *Fisher II* was the second time the Supreme Court considered the policies at the University of Texas at Austin. The first time the case went to the Supreme Court, the Court vacated and remanded the district court's judgment because the lower courts had improperly reviewed the race-conscious policies under a "good faith" standard, rather than under strict scrutiny. *See Fisher I*, 570 U.S. 297, 311–13 (2013) (chastising the Court of Appeals for failing "perform th[e] searching examination" mandated by strict scrutiny and placing the burden on the petitioner).

[65] UT Austin adopted a policy by which applicants not admitted under the Top Ten Percent statute received an Achievement Index ("AI") and a Personal Achievement Index ("PAI"). *Fisher II*, 579 U.S. 365, 371 (2016). Race was considered as a subfactor within an applicant's PAI, which itself was comprised of two components: a score based on two application essays and a score based on a holistic review of the applicant's full file. *Id.* at 373–74.

programs are subject to strict scrutiny; (2) a university's determination that diversity is a compelling interest is entitled to "'some, but not complete, judicial deference;'" and (3) courts extend no deference to a university's conclusion that its race-conscious admissions policies are narrowly tailored to achieving diversity. *Id.* at 376–77 (quoting *Fisher I*, 570 U.S. 297, 309 (2013)). The Court deemed the race-conscious admissions policy at issue narrowly tailored because UT Austin provided statistical and anecdotal evidence that the policy "had a meaningful, if still limited, effect on the diversity of the University's freshman class," continually studied the impact of the policy, and showed no workable alternatives were available. *Id.* at 384, 383–84, 385–86, 388.

### 2. *SFFA v. President & Fellows of Harvard College*

It was against this backdrop that the Supreme Court recently considered the race-conscious admissions practices of Harvard and UNC. In *Harvard*, the Court for the first time held that the benefit that flows from a diverse student body no longer constitutes a compelling governmental interest that justifies race-conscious admissions at civilian colleges and universities. 600 U.S. 181, 214 (2023). Although SFFA called for the Court to overrule *Grutter*, the Court declined. *See* Brief for Petitioner at 49–71, *Students for Fair Admissions v. Pres. & Fellows of Harv. Coll.*, 600 U.S. 181 (2023) (Nos. 20–1199, 21–707); *Harvard*, 600 U.S. at 211–214. After carefully recounting *Grutter*'s strict scrutiny analysis, the Court in *Harvard* relied heavily on *Grutter* as authority.[66] *See Harvard*, 600 U.S. at 211–13 (reasoning that the Court had

---

[66] Justice Brett Kavanaugh wrote separately "explain[ing] why the Court's decision . . . is consistent with and follows from . . . the Court's precedents on race-based affirmative action." *Harvard*, 600 U.S. at 311 (Kavanaugh, J., concurring). This Court notes that Justice Clarence Thomas wrote separately and stated "Grutter is, for all intents and purposes, overruled," *id.* at 287 (Thomas, J., concurring), and Justice Sonia Sotomayor's dissent accused the majority of "overruling decades of precedent" while "'disguis[ing]' its rulings

permitted race-based admissions "only within the confines of narrow restrictions" and the respondents' admissions programs failed each of these criteria); *id.* at 220 (reasoning that "by accepting race-based admissions programs in which some students may obtain preferences on the basis of race alone, respondents' programs tolerate the very thing that *Grutter* foreswore: stereotyping"); *id.* at 221 (reasoning that the respondents' admissions programs were unconstitutional under *Grutter* because they lacked a logical end point). It seems that *Harvard*, at most, partially overruled *Grutter*.

In *Harvard*, the Supreme Court held that the race-based admissions practices at issue failed to survive strict scrutiny. *Id.* at 230. The Court carefully evaluated the case law in its context, chiding the principal dissent for both "wrench[ing] case law from its context" and relying on *Fisher II*, which evaluated race-based admissions practices geared toward achieving a "critical mass." *Id.* at 228–29 (quoting *Fisher I*, 570 U.S. 297, 297 (2013)). The Court expressly acknowledged that a higher educational institution's decision to use race in admissions merits deference "'within constitutionally prescribed limits.'" *Id.* at 217 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 328 (2003)). Even in striking down the race-based admissions policies at issue, however, the Court was careful to note that "nothing in this opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise." *Id.* at 230.

The Supreme Court explained that Harvard and UNC had failed to identify a compelling governmental interest because the interests they claimed were not "sufficiently

---

as an application of 'established law,'" *id.* at 341–42 (Sotomayor, J., dissenting) (quoting *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 573 (2022) (Sotomayor, J., dissenting)).

measurable to permit judicial review under the rubric of strict scrutiny." *Id.* at 214.  Next, the Court determined that Harvard and UNC failed to show that their race-based admissions programs were narrowly tailored to their claimed compelling interests.  *Id.* at 215.  The Court rejected the categories the schools used to track racial diversity on campus, noting that racial categories such as Asian American are grossly overbroad, while ethnic categories like "Hispanic[] are arbitrary or undefined."  *Id.* at 216.

The Court also held that the race-based admissions practices at issue "fail[ed] to comply with the twin commands of the Equal Protection Clause that race may never be used as a 'negative' and that it may not operate as a stereotype."  *Id.* at 218.  Crucially, the Court deemed college admissions "zero-sum," so an admissions bonus given only to certain applicants inherently decreases the admissions chances of applicants who do not receive that bonus.  *Id.* at 218–19.  The Court further concluded that providing an admissions preference based on race alone amounted to unconstitutional stereotyping by assuming that a student of one race offers something unique solely because of her skin color.  *Id.* at 220.

Finally, the Court returned to *Grutter*'s requirement of an end point for the use of race in college admissions.  *Id.* at 221.  The Court first determined that the relative stability in the racial makeup of each Harvard class showed that Harvard was engaged in impermissible racial balancing.  *Id.* at 222.  The Court concluded that UNC's claimed interest in achieving an undergraduate student body whose racial composition more closely approximated that of the general population of North Carolina also amounted to unconstitutional racial balancing.  *Id.* at 223.  The Court quickly rejected Harvard and UNC's assertions that (1) race-based admissions should be permitted to continue until 2028 in respect of the Court's 25-year sunset

provision in *Grutter*, and (2) frequent review of the race-based admissions policies precluded the need for an end date.[67]  *Id.* at 224–25.

Under *Harvard*, race-based admissions programs are still subject to strict scrutiny, but the benefit of diversity on campus is no longer a compelling governmental interest that can justify the use of race in admissions.  A civilian institution's claimed interest in the use of race-conscious admissions practices can only be compelling if it is sufficiently measurable to allow judicial review.  *Id.* at 214–15.  The Court also clarified that the narrow tailoring prong of the strict scrutiny analysis requires civilian institutions to concretely demonstrate the beneficial effects of their race-conscious admissions policies.  *Id.* at 216–17.  Additionally, the Court imposed further requirements on the constitutional use of race in admissions: (1) race may never be used as a negative; (2) the use of race may not rest on the principle that minority students always express the same viewpoint on an issue; and (3) race-conscious admissions policies must have a logical end point.  *Id.* at 218, 219, 221.

In declining to apply *Harvard* to military service academies, however, the Court made clear that service academies may identify distinct and compelling governmental interests that justify their use of race in admissions.[68]  *Id.* at 214 n.4.  This determination rests atop the long

---

[67]  The Supreme Court's consideration of affirmative action more generally extends far beyond *Bakke*, *Grutter*, *Fisher I* and *Fisher II*, and *Harvard*.  *See, e.g.*, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 477, 511 (1989) (striking down ordinance requiring city to set aside certain portion of construction contracts for "minority business enterprises"); *Swann v. Charlotte-Mecklenburg Bd. Of Educ.*, 402 U.S. 1, 32 (1971) (upholding desegregation plan that considered race in K-12 education); *Parents Involved Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 747–48 (2007) (striking down policy that considered race in K-12 school assignments).  Because this case challenges race-conscious admissions practices at a military service academy, however, this Court reviews only those cases that considered the constitutionality of race-conscious admissions in the context of higher education.

[68]  The scope of *Harvard* is now subject to litigation in many circuits, including the Fourth Circuit.  *See, e.g.,* Brief for Appellants at 50, *Hierholzer v. Guzman*, No. 24-1187 (4th Cir. April 23, 2024), ECF No. 14 (contending that *Harvard* applies to all challenges to racial classifications under strict scrutiny); *see also Ossmann v. Meredith Corp.*,

line of cases in which the Supreme Court distinguished military matters by deferring to the military judgments of the legislative and executive branches. Under these cases, the Naval Academy's claimed compelling governmental interests are entitled to deference.

### E. Judicial Deference to the Legislative and Executive Branches in Military Matters

Although premised at least in part on the Court's reluctance to decide an issue not fully briefed, the footnote exempting service academies from the decision in *Harvard* is firmly in line with the Supreme Court's "healthy deference to legislative and executive judgments in the area of military affairs." *Rostker v. Goldberg*, 453 U.S. 57, 66 (1981). This deference reflects not only the judiciary's limited competence to review national security determinations, but also the Constitution's assignment of military authority to the executive and legislative branches. Here, Defendants' compelling national security interest in furthering unit cohesion and lethality, recruitment and retention, and the legitimacy of the Navy and Marine Corps at home and abroad implicates such deference. The Court has treated the military separate and apart from civilian institutions in at least three areas: (1) constitutional challenges; (2) military personnel policies; and (3) military justice.[69] Although the Court's emphasis on the distinctions between

---

82 F.4th 1007, 1019–20 (11th Cir. 2023) (rejecting plaintiff's attempt to apply *Harvard* to employment discrimination case); *Smyer v. Kroger Ltd. P'ship I*, 2024 WL 1007116, at *7 (6th Cir. Mar. 8, 2024) (Boggs, J., concurring) (discussing application of *Harvard* to employment discrimination case); *Ultima Servs. Corp. v. United States Dep't of Agric.*, 683 F. Supp. 3d 745, 764–65 (E.D. Tenn. 2023) (applying *Harvard* to Equal Protection challenge to program providing federal funding for small businesses); *Robinson v. Ardoin*, 86 F.4th 574, 593 (5th Cir. 2023) (declining to apply *Harvard* in voting districting context); *Mid-Am. Milling Co. v. United States Dep't of Transp.*, 2024 WL 4267183, at *7–*10 (E.D. Ky. Sept. 23, 2024) (applying *Harvard* in challenge to federal Disadvantaged Business Enterprise Program). It remains unclear whether *Harvard* is limited to the higher education context or applies more broadly to all governmental uses of a racial classification. Given the Supreme Court's emphasis on context and the content of footnote four of the *Harvard* opinion, this Court construes *Harvard* to apply to race-conscious admissions at *civilian* colleges and universities.

69 The Supreme Court has long distinguished the military justice system from the civilian justice system. *See, e.g., Solorio v. United States*, 438 U.S. 435, 447–451 (1987) (discussing historical deference to military justice and

military and civilian life has never wavered, its application of deference differs in each of these areas.

### 1. Deference to Coordinate Branches' Judgments in Constitutional Challenges

The Court has repeatedly noted that it applies the same analysis to constitutional challenges regardless of whether the challenge arises in the military or civilian context. *See, e.g., Rostker v. Goldberg*, 453 U.S. 57, 67 (1981) ("We of course do not abdicate our ultimate responsibility to decide the constitutional question, but simply recognize that the Constitution itself requires such deference to congressional choice."). Rather than adjusting its standard of review in constitutional challenges, the Court defers to the judgment of Congress and the Executive, including military leaders, regarding the military's needs. *See Schlesinger v. Ballard*, 419 U.S. 498, 510 (1975). In cases implicating strict scrutiny in the military context, therefore, the judiciary defers to its coordinate branches' logical determinations about the existence of a compelling governmental interest. This deference is most apparent in the Court's consideration of equal protection and First Amendment challenges.

#### a. Deference in Equal Protection Challenges

Ample case law demonstrates that the judiciary defers to congressional and executive leaders' determinations of a compelling governmental interest in equal protection cases involving the military. The Supreme Court has considered numerous equal protection challenges to military policy beginning in the Second World War and continuing to the present day. Regardless of the standard of review—heightened scrutiny or rational basis—the Court

---

deferring to distinct needs of the military justice system). The nature of SFFA's challenge here, however, does not require discussion of the Supreme Court's deference to the military justice system.

applied deference to the legislative and executive branches' determinations about national security and military needs.

### i.    Equal Protection Challenges Based on Race

In *Hirabayashi v. United States*, decided at the height of the Second World War, the Court deferred to the national security determinations of Congress and the Executive to affirm the constitutionality of a federal statute and military proclamation as applied to Gordon Hirabayashi. 320 U.S. 81 (1943).  The Court evaluated the constitutionality of a federal statute and associated military proclamation—both imposed pursuant to the President's Executive Order Number 9066 ("EO 9066")—that authorized criminal punishment of Japanese Americans who failed to obey the military's curfew and exclusion orders. *Id.* at 83, 89.  In considering Hirabayashi's challenge to both Congress's delegation of authority to a military commander and the resulting regulation's explicit discrimination against Japanese Americans, the Court emphasized its deference to the political branches on issues of national security.[70]

The Court determined that, under the federal government's war power, "it was within the constitutional power of Congress and the executive arm of the Government to prescribe this curfew order for the period under consideration." *Id.* at 92.  The Court evaluated the restriction in context, reciting Japan's various attacks in the Pacific, including on Pearl Harbor, espionage efforts in the United States, and information provided by the military and Congress regarding the risk of espionage. *Id.* at 94–95, 102–104.   The Court acknowledged that

---

[70] Hirabayashi raised a due process challenge because the Fifth Amendment does not contain an explicit equal protection clause, and the Court analyzed his claim under the equal protection principles implicit in the Fifth Amendment.  *See Hirabayashi v. United States*, 320 U.S. 81, 100 (1943) ("[L]egislative classification or discrimination based on race alone has often been held to be a denial of equal protection.").

legislative distinctions by race typically violate equal protection principles but explicitly declined to apply those principles to Hirabayashi's case because of the military judgments at issue. *Id.* at 98–99. In deference to those judgments, the Court upheld the race-based curfew order. *Id.* at 102–103, 104.

Just a year later, in *Korematsu v. United States*, the Court upheld the constitutionality of exclusion orders requiring Japanese Americans to leave military areas and, ultimately, face federal detention. 323 U.S. 214, 221 (1944) *abrogated by Trump v. Hawaii*, 585 U.S. 667 (2018). In *Korematsu*, the Court addressed the constitutionality of Exclusion Order Number 34 ("Exclusion Order"), under which all persons of Japanese ancestry were excluded from the military area of San Leandro, California. *Id.* at 215–16. Like the curfew in *Hirabayashi*, the Exclusion Order was issued pursuant to EO 9066. *Id.* at 216. In upholding the Exclusion Order, the Court overtly recognized the military's unique ability to judge national security. *Id.* at 219. As in *Hirabayashi*, the Court cited its inability to reject military authorities' conclusion that the national loyalties of individual Japanese Americans could not efficiently be determined. *Id.* at 219. The Court concluded by distinguishing the military context of the case from an ordinary equal protection case: "To cast this case into outlines of racial prejudice, without reference to the real military dangers which were presented, merely confuses the issue."[71] *Id.* at 222–23.

---

[71] Even in the most famous dissent to *Korematsu*, Justice Jackson still urged deference to military decisions regarding national security. 323 U.S. 214, 245 (1944) (Jackson, J., dissenting) *abrogated by Trump v. Hawaii*, 585 U.S. 667 (2018). He argued that courts lack capacity to evaluate the constitutionality of military judgments because those judgments rest on determinations that are often unprovable. *Id.* Though he warned of the dangers of civil courts that deem military commands constitutional merely because they rest on "reasonable military grounds," he concluded that judges are ill-equipped to evaluate military judgments. *Id.* at 244, 247. Therefore, he contended that the Court should have evaluated the law only as applied to Korematsu. *Id.* at 248.

Proper application of *Korematsu* demands consideration of *Trump v. Hawaii*, 585 U.S. 667 (2018), the case that ultimately abrogated its holding. In *Trump v. Hawaii*, the Supreme Court grappled with the application of Establishment Clause principles in the national security arena when it reversed the grant of a preliminary injunction against President Trump's Executive Order Number 13769 ("EO 13769") barring the entry into the United States of immigrants from eight foreign countries. 585 U.S. at 710. The Trump Administration justified EO 13769 as critical to national security because the targeted countries failed to properly investigate their emigrants for potential ties to terrorism. *Id.* at 679–80. The Court deferred to the President's national security determinations because "[b]y its terms [the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*,] § 1182(f) exudes deference to the president in every clause," and a searching review of the persuasiveness of the President's reasoning would be "inconsistent with the . . . deference traditionally accorded the President in this sphere." *Id.* at 684, 686. The Court rejected the plaintiffs' argument that history, statutory structure, or legislative purpose overcame the broad grant of discretion to the president in the text of § 1182(f). *Id.* at 688. The Court acknowledged President Trump's repeated anti-Islam rhetoric but emphasized that EO 13769 was facially neutral and premised on legitimate national security concerns. *Id.* at 702, 706–707. The Court concluded by distinguishing its decision to uphold President Trump's Executive Order from its decision in *Korematsu. Id.* at 710 ("*Korematsu* was gravely wrong the day it was decided, has been overruled

in the court of history, and—to be clear—has no place in law under the Constitution." (internal quotation omitted)).[72]

### ii.  Equal Protection Challenges Based on Sex

The Supreme Court's next spate of equal protection challenges in the military context arose in the Vietnam War Era.  In *Schlesinger v. Ballard*, the Court heard an equal protection challenge to the military separation statute's different application to male and female servicemembers.  419 U.S. 498 (1975).  A male lieutenant in the United States Navy challenged the statute, 10 U.S.C. § 6382, after he faced mandatory discharge when he failed for a second time to receive a promotion after nine years serving as a commissioned officer.[73]  *Schlesinger*, 419 U.S. at 499–500.  He then filed an action in federal court, alleging the separation statute violated the equal protection principles of the Fifth Amendment's Due Process Clause by guaranteeing women thirteen years of commissioned service before mandatory discharge but subjecting men to mandatory discharge after two failures to promote.  *Id.* at 500, 500 n.2. Applying rational basis review, the Court upheld the statute.[74]  *Id.* at 508.

---

[72]  Here, SFFA argues that *Korematsu* was overruled because it was too deferential to military urgency.  (ECF No. 148 ¶¶ 253, 264(c).)  This argument misstates the Supreme Court's language in *Trump v. Hawaii* and *Harvard*. While the Supreme Court made clear in *Trump v. Hawaii* that the holding of *Korematsu* was repugnant, it did not discuss its reasons for deeming the decision "overruled in the court of history."  585 U.S. at 710.  As such, *Trump v. Hawaii* critiques the outcome of *Korematsu* without offering any insight into the Supreme Court's reason for abrogating that outcome.  In *Harvard*, the Supreme Court explained in a footnote that *Korematsu* demonstrates that "even the most rigid scrutiny" at times fails to detect an illegitimate racial classification and "[a]ny retreat from the most searching judicial inquiry can only increase the risk of another such error."  *Harvard*, 600 U.S. 181, 207 n.3 (2023) (citations omitted) (alterations in original).  This language does not suggest that the Court rejects deference to military judgments, which has long existed within the rigid strict scrutiny analysis. Rather, the Court's language characterizes *Korematsu* as an application of "the most rigid scrutiny."  *Id.*

[73]  The Navy and Marine Corps ultimately discontinued these "up-or-out policies" in recognition of the various factors that may lead an individual to fail to promote.  (ECF 146 at 138:11-140:1 (Miller).)

[74]  The application of rational basis review may itself have reflected deference to the military concerns at issue. Two years earlier, in *Frontiero v. Richardson*, the Court explicitly departed from "'traditional' rational basis analysis with respect to sex-based classifications" and evaluated a gender-based classification under strict scrutiny.  411 U.S. 677, 684, 690–91 (1973).  Writing in dissent in *Ballard*, Justice Brennan argued that "[s]uspect classifications

The Court distinguished the mandatory discharge scheme from its prior equal protection precedents regarding sex discrimination, *Frontiero v. Richardson*, 411 U.S. 677 (1973), and *Reed v. Reed*, 404 U.S. 71 (1971). Unlike *Frontiero* and *Reed*, where the different treatment at issue was rooted in gender stereotypes, the Navy's promotion scheme reflected that "male and female line officers in the Navy are not similarly situated with respect to opportunities for professional service." *Ballard*, 419 U.S. at 508. The Court pointed to the restriction of female officers in combat communities and noted that Congress could have rationally concluded that, absent combat experience, women might need a longer period to reach the same rank as their male counterparts. *Id.* at 508. Additionally, the Court emphasized that Congress only applied the statute at issue to Navy and Marine Corps communities where officers were not similarly situated. *Id.* at 509. The Court explicitly noted that the Constitution assigned Congress and the President—not the judiciary—the responsibility to prepare and maintain the Armed Forces. *Id.* Once again, therefore, the Court deferred to the determinations of the legislative and executive branches regarding military readiness.

Less than a decade later, in *Rostker v. Goldberg*, the Supreme Court revisited the equal protection implications of military policies that differentiate by sex. 453 U.S. 57 (1981). There, the Court upheld the Military Selective Service Act ("the Act") against an equal protection challenge alleging that it violated the Fifth Amendment by requiring men but not women to register for the draft. *Id.* at 59, 83. The Court began its analysis by explaining the interaction

---

can be sustained only if the Government demonstrates the classification serves compelling interests that cannot otherwise be achieved." *Schlesinger v. Ballard*, 419 U.S. 498, 511 (1975) (Brennan, J., dissenting). The intermediate scrutiny test for sex-based classifications was not firmly established until 1976. *See Craig v. Boren*, 429 U.S. 190 (1976).

between deference on military matters and the heightened scrutiny applied in some equal protection cases. *Id.* at 64–72. Although the Court declined to apply lesser scrutiny merely because *Rostker* implicated military judgments, it noted that Congress's broad constitutional authority informed its review. *Id.* at 71. Specifically, the Court explained that it affords the greatest deference to Congress's sweeping "authority over national defense and military affairs," in which the judicial branch is ill-equipped to intervene. *Id.* at 64, 69; *see also id.* at 65–66 ("'[I]t is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive branches.'" (alteration and emphasis in original) (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)). Given its history of "healthy deference" to the executive and legislative branches' military determinations, the Court concluded that "constitutional tests and limitations" may differ in the military context. *Id.* at 66, 67.

### b. Deference in First Amendment Challenges

The Court is similarly deferential to its coordinate branches' judgments of national security and military affairs in First Amendment challenges. In 1986, in *Goldman v. Weinberger*, the Court upheld an Air Force regulation barring an Orthodox Jewish servicemember from wearing his yarmulke on base. 475 U.S. 503, 504–505 (1986). The Court explained that it had "repeatedly held that 'the military is, by necessity, a specialized society separate from civilian society.'" *Id.* at 506 (quoting *Parker v. Levy*, 417 U.S. 733, 743 (1974)). Therefore, the Court deferred to the considered judgment of the Air Force that it required standardized uniforms—

126

regardless of religious dress—to encourage a unified identity. *Id.* at 508.  In support of its ruling, the Court cited the Air Force regulation itself, which detailed the limitations and exceptions applicable to servicemembers' garb. *Id.* at 508–509.

In *Holder v. Humanitarian Law Project*, the Court considered a due process and free speech challenge to 18 U.S.C. § 2339B ("Material Support Statute"), which prohibits the knowing provision of "material support or resources" to foreign terrorist organizations.  561 U.S. 1, 7 (2010) (quoting 18 U.S.C. § 2339B(a)(1)).  In *Holder* a group of citizens and domestic organizations alleged that the Material Support Statute violated their First Amendment rights of free speech and association by preventing them from supporting the non-terroristic humanitarian and political activities of covered organizations.[75]  *Id.* at 10.  In its extensive discussion of the statute's alleged infringement upon free speech rights, the Court explained the deference owed the executive branch in its national security conclusions. *Id.* at 33–39.

## 2. Deference to Military Personnel Regulations

Even when a policy does not overtly implicate national security matters, the Supreme Court has repeatedly affirmed its deference on military matters.  In a series of cases challenging military personnel policies, the Court time and again deferred to the judgment of Congress, the Executive, and military leaders.  In *Orloff v. Willoughby*, 345 U.S. 83 (1953), the Supreme Court deferred to the legislative and executive branches' combined judgment regarding the commissioning of officers.

---

[75]  The plaintiffs also argued that the Material Support Statute was unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.  *Holder v. Humanitarian L. Project*, 561 U.S. 1, 11 (2010).  The Court rejected this argument.  *Id.* at 25.

Pertinently, the Court distinguished its own view of the functioning of the military from that of Congress and the Executive. *Id.* at 91. After explicitly noting the irrelevance of its own opinion of Orloff's fitness for the rank and duties of officer, the Court determined that the President had the right to set requirements for commissioning as an officer. *Id.* The Court emphasized the unique trust and honor the President places in military officers and held that it could not order the President to commission Orloff if he failed to complete a required loyalty certificate. *Id.* at 92. Similarly, the Court held that it could not order the Army to assign Orloff specific duties. *Id.* The only legal duty the government owed Orloff was to assign him duties in the "medical and allied specialist categories." *Id.* As the Court noted, this category left much discretion to military commanders. *Id.*

Although the Court acknowledged the frequent complaints of discrimination in the Army, it concluded that "judges are not given the task of running the Army." *Id.* at 93. In parting, the Court reiterated the importance of distinguishing the judiciary from the executive and legislative branches in making miliary determinations:

> The responsibility for setting up channels through which such grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters. While the courts have found occasion to determine whether one has been lawfully inducted and is therefore within the jurisdiction of the Army and subject to its orders, we have found no case where this Court has assumed to revise duty orders as to one lawfully in the service.

*Id.* at 93–94. The Court declined to exercise habeas jurisdiction because it would intrude on "affairs peculiarly within the jurisdiction of the military authorities." *Id.* at 94–95.

Nearly two decades later, the Court again confronted its role in reviewing military policies in *Gilligan v. Morgan*, 413 U.S. 1 (1973). There, the Supreme Court held injusticiable a civil suit alleging that the Ohio National Guard's "pattern of training, weaponry, and orders . . . ma[d]e inevitable the use of fatal force in suppressing civilian disorders" in violation of the Due Process Clause of the Fourteenth Amendment. *Id.* at 4, 6. The Court characterized the suit as asking it to "assume continuing regulatory jurisdiction" of the Ohio National Guard and held that such authority would unconstitutionally impinge on Congress's power to organize, arm, and discipline the military. *Id.* at 5–6 (citing U.S. CONST. art. I § 8, cl. 16). Similarly, the Court concluded that because Congress had authorized the President to regulate, organize, and discipline the National Guard, judicial interference would disrupt the President's statutory authority. *Id.* at 7.

In *Chappell v. Wallace*, the Court considered its role in addressing claims of racial discrimination in the Armed Forces. 462 U.S. 296 (1983). A group of enlisted Navy sailors serving on a combat vessel sued the vessel's commanding officer, four lieutenants, and three non-commissioned officers, alleging the officers had discriminated against them because of their minority race. *Id.* at 297. The U.S. Court of Appeals for the Ninth Circuit allowed the enlisted sailors' claims to advance as a *Bivens* action,[76] but the Supreme Court, in apparent deference to the unique needs of the military, reversed. *Id.* at 298. The Court noted that "[t]he

---

[76] In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court recognized a federal analog to 42 U.S.C. § 1983, which allows individuals to sue state officials for constitutional violations. 403 U.S. at 397. Under *Bivens*, a victim of a constitutional violation at the hands of a federal agent may recover damages against that agent despite the absence of any statute that provides such a right to damages. *Id.* at 395–97. Because *Bivens* exists independent of a federal statute authorizing such claims, the Supreme Court has tightly constrained its application. *See, e.g., Hernandez v. Mesa*, 589 U.S. 93, 99–102 (2020) (explaining the Supreme Court's rationale for sharply limiting the application *Bivens*).

need for special regulations in relation to military discipline . . . is too obvious to require extensive discussion." *Id.* at 300.  It went on the explain the differences between civilian life and military life:

> In the civilian life of a democracy many command few; in the military, however, this is reversed, for military necessity makes demands on its personnel "without counterpart in civilian life."  The inescapable demands of military discipline and obedience to orders cannot be taught on battlefields; the habit of immediate compliance with military procedures and orders must be virtually reflex with no time for debate or reflection.  The Court has often noted "the peculiar and special relationship of the soldier to his superiors," and has acknowledged that "the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty . . . ."  This becomes imperative in combat, but conduct in combat inevitably reflects the training that precedes combat; for that reason, centuries of experience has developed a hierarchical structure of discipline and obedience to command, unique in its application to the military establishment and wholly different from civilian patterns.  Civilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers; that relationship is at the heart of the necessarily unique structure of the military establishment.

*Id.* at 300 (internal citations omitted).[77]

The Court emphasized that the Framers—themselves familiar with military service—deliberately awarded Congress plenary power to regulate the military.  *Id.* at 300–301.  The Court refused to intervene to provide a remedy for sailors challenging their superior officers because such external remedy would disrupt the uniquely hierarchical nature of military life.

---

[77]  *Chappell* is not the only case in which the Supreme Court emphasized the unique nature of relationships within the military hierarchy.  In *United States v. Brown*, for example, the Court considered whether an honorably discharged veteran could maintain a suit in negligence under the Federal Tort Claims Act against the doctors at a veteran's hospital who treated his injury after he had left active service.  348 U.S. 110, 110–12 (1954).  The Court recited its previous determination that "[t]he peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty" barred negligence suits by military servicemembers for injuries suffered while on active duty.  *Id.* at 112.  Because the injury in *Brown* had not occurred during military service, however, the Court affirmed the lower court's judgment granting relief to Brown.  *Id.* at 112–13.

*Id.* at 304.  Though the Court ultimately held that enlisted sailors did not have a *Bivens* remedy against Naval officers, it was careful to note that military personnel still have some redress for constitutional wrongs suffered while in service.  *Id.* at 304–305.

In *Department of Navy v. Egan*, the Court considered the procedural protections owed a civilian employee, Egan, denied a security clearance and thus discharged from his position as a laborer at a Naval facility.  484 U.S. 518, 520 (1988).  Specifically, the Court considered whether the Merit Systems Protection Board ("Board") was statutorily authorized to review the Navy's substantive decision to deny a security clearance.  *Id.* at 520.  Egan obtained a position as a "noncritical-sensitive" laborer leader but lost his position after the Navy denied his security clearance.  *Id.* at 521, 521 n.1, 522.  Pursuant to 5 U.S.C. § 7513(d), he petitioned for review at the Board, which ordered him reinstated.  *Egan*, 484 U.S. at 522–23, 524.  On appeal, the full Board reversed its decision after determining that it lacked the authority to review a removal premised on denial of a security clearance.  *Id.* at 524–25.  After determining that Congress had a created a two-track removal scheme—one track for removals for cause and another for removals not for cause—the Court determined that the Board lacked authority to review the Navy's denial of Egan's security clearance.  *Id.* at 533–34.

As in its other cases, the Supreme Court explained its deference to Congress and the executive branch, including military personnel, on matters of national security.  *Id.* at 526–530.  The Court immediately distinguished ordinary administrative law cases from those cases implicating national security concerns and the discretion of the executive branch.  *Id.* at 526.  The Court noted its independent deference to the President, as the Commander in Chief of the Armed Forces, and executive branch as distinct from its deference to Congress.  *Id.* at 527.

Citing its considerable case law on the deference owed the Executive in military matters, the Court concluded, "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Id.* at 529. Accordingly, the Court refused to interpret the statute at issue to allow the Board to review the Navy's substantive decision. *Id.* at 533–34.

More recently, in its brief opinion in *Austin v. United States Navy Seals 1-26*, the Court granted an application for a partial stay of a preliminary injunction that would have barred the Navy from considering Navy Seals' vaccination statuses when making deployment, assignment, and other operational decisions. 142 S. Ct. 1301 (2022) (Mem.). Writing in concurrence, Justice Kavanaugh explained his view of the deference owed the Executive on issues of national security and the military. *Id.* at 1302 (Kavanaugh, J., concurring). Specifically, Justice Kavanaugh explained, "[u]nder Article II of the Constitution, the President of the United States, not any federal judge, is the Commander in Chief of the Armed Forces." *Id.* Accordingly, Justice Kavanaugh argued, courts are reluctant to intrude on military and national security affairs and have long recognized the deference owed military leaders in judgments regarding "strategic and operational control" and "military readiness." *Id.* (citing *Morgan*, 413 U.S. at 10).

## V. Conclusions of Law: The Naval Academy's Race-Conscious Admissions Program Withstands Strict Scrutiny.

The Naval Academy's race-conscious admissions policies are narrowly tailored to further a compelling governmental interest in national security. Defendants have proven that the Naval Academy's limited use of race in admissions has increased the racial diversity of the Navy and Marine Corps, which has enhanced national security by improving the Navy and

Marine Corps' unit cohesion and lethality, recruitment and retention, and domestic and international legitimacy. The Court addresses each prong of the strict scrutiny analysis in turn.

### A. Conclusions of Law: Defendants Have Established a Compelling National Security Interest in a Diverse Officer Corps.

To survive strict scrutiny, the government's asserted interest must be compelling. Unlike the civilian institutions in *Harvard* and other affirmative action cases, Defendants here do not claim the benefits that flow from a diverse student body as the compelling interest served by race-conscious admissions.[78] Instead, Defendants argue that the Naval Academy's race-conscious admissions policies serve a compelling interest in national security by improving the Navy and Marine Corps' unit cohesion and lethality, recruitment and retention, and domestic and international legitimacy.

"It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Sec'y of State*, 378 U.S. 500, 509 (1964)). In line with the decades of precedent recognizing "that the Constitution itself requires . . . deference to congressional choice" and to the Executive's "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force," this Court defers to Defendants' military judgments of a compelling national security interest. *Rostker v. Goldberg*, 453 U.S. 57, 65–66, 67 (1981); *see supra* Section IV.E. Put simply, Defendants' determination that there exists a compelling national security interest in a diverse Navy and Marine Corps is entitled to judicial deference.

---

[78] As discussed above, Harvard and UNC specified the benefits that flow from a diverse student body. *Harvard*, 600 U.S. 181, 214 (2023). Entirely distinct from the interests Defendants claim here, these benefits reflect the purpose and goals of a *civilian* educational institution.

Defendants identify three ways in which a diverse Navy and Marine Corps serve a compelling governmental interest in national security: (1) furthering unit cohesion and lethality; (2) improving recruitment and retention; and (3) enhancing the Navy and Marine Corps' domestic and international legitimacy.  As Defendants explain, these areas are inherently intertwined: a diverse officer corps trained in a diverse environment is better able to understand unique experiences and develop cultural competency, which improves unit cohesion, which in turn improves recruitment and retention, which bolsters legitimacy.  (ECF No. 144 at 29:9–19 (Vazirani).)  Defendants have met their burden to prove the existence of a compelling governmental interest.

### 1.  Unit Cohesion and Lethality

Defendants proved that race-conscious admissions at the Naval Academy help to develop a diverse Navy and Marine Corps, which serves national security by enhancing unit cohesion and lethality.  As explained *supra*, courts applying strict scrutiny defer to military personnel policies reflecting the military judgment that "esprit de corps" and a cohesive identity among servicemembers are critical to an effective military.  *See, e.g.*, *Goldman v. Weinberger*, 475 U.S. 503, 504–505 (1986).  Courts have recognized "a compelling national security interest in training Marine Corps recruits to strip away their individuality and adopt a team-oriented mindset committed to the military mission and defense of the Nation."  *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022).  Thus, courts have upheld restrictions on homosexuality and religious headwear in the military where such restrictions ostensibly advance "the military's compelling need to 'foster instinctive obedience, unity, commitment and esprit de corps.'"  *Cook v. Gates*, 528 F.3d 42, 62 (1st Cir. 2008) (quoting *Goldman*, 475 U.S.

at 503); *see also Goldman*, 475 U.S. at 510. Here, judicial deference extends to the longstanding military judgment of the Navy and Marine Corps and Department of Defense ("DoD") that a diverse officer corps mitigates risk by enhancing units' cohesion and lethality.

Defendants here presented significant evidence to support a compelling national security interest in unit cohesion and lethality. Defendants produced a 2020 memorandum from Secretary of Defense Mark T. Esper in which he expressed DoD's judgment that, "[t]o ensure the morale, cohesion, and readiness of the military, it is essential that our ranks reflect and are inclusive of the American people we have sworn to protect and defend."[79] (ECF No. 144 at 12:24–13:2 (Vazirani); DX177–001.) The testimony of senior DoD leaders, including Under Secretary of Defense Ashish Vazirani ("Under Secretary Vazirani") and Deputy Assistant Secretary of Military Manpower Personnel Lisa Truesdale ("Deputy Assistant Secretary Truesdale"), revealed that military leaders within DoD also deem unit cohesion critical to a unit's effective communication, proficiency, and lethality. (ECF No. 144 at 15:21–16:5 (Vazirani).) Under Secretary Vazirani explained that unit cohesion mitigates risk by improving effectiveness and increasing a unit's ability to assess risk. (*Id.* at 14:9–12; 14:19–24; 15:16–16:5; 29:9–19; *see also* DX65 ("[D]iverse teams are 58 percent more likely than non-diverse teams to accurately assess a situation.").) He testified that a diverse officer corps can draw from a range of experiences, which enables officers to better understand their own units and address problems from different perspectives. (ECF No. 144 at 16:6–14 (Vazirani).) Deputy Assistant Secretary Truesdale testified that unit cohesion and trust are imperative to

---

[79] Secretary of Defense Esper served under the first Trump Administration. (ECF No. 144 at 13:4–8 (Vazirani).)

avoiding a poor climate, and officers are responsible for building the culture of their team.[80] (DX 210 at 115:1–22.)

These informed judgments are rooted in the military's historical experience and data demonstrating the importance of diverse leadership in military settings. DoD cited its historical experience that a lack of diversity in the officer corps—including a lack of racial diversity—during the Vietnam War diminished cohesion, trust, and capability. (ECF No. 144 at 36:7–15 (Vazirani).) Similarly, expert testimony elucidated numerous studies that support DoD's military judgment regarding the importance of diversity to unit cohesion and thus to national security. *See, e.g.*, (PX275; DX170; PX597). Dr. Jeannette Haynie ("Haynie")—a former Marine, one of the first women to fly attack helicopters in combat, and an expert in the relevance of diversity and inclusion to the military and its mission—testified that climate studies show diverse leadership increases the likelihood that leaders recognize a climate's impact on their team members, mitigate obstacles, and improve morale and cohesion. (*Id.* at 95:11–19; 109:23–110:13 (Haynie).) DoD's own annual defense organizational climate survey likewise demonstrates the impact of improved diversity on the military's climate and the performance of its units. (*Id.* at 18:12–18 (Haynie).)

Plaintiff rejects Defendants' evidence as insufficient to demonstrate a compelling national security interest in unit cohesion and lethality. Instead, Plaintiff urges this court to narrowly define unit cohesion and lethality as a given unit's ability to complete the tasks necessary to its mission. Plaintiff emphasizes that the racial composition of a unit alone has

---

[80]   As noted *supra*, Deputy Assistant Secretary Truesdale was unavailable to testify at trial and testified by deposition designation, (DX210). *See supra* note 9; (ECF No. 139 at 18:18–19:13).

no effect, for example, on that unit's ability to complete tasks such as firing missiles. (ECF No. 145 at 115:11–116:1 (Fuller).) Defendants' witnesses conceded this point, and the parties agree that racial diversity alone does not enhance a unit's ability to complete the literal tasks of combat. (*Id.* (Fuller).) Plaintiff similarly offered testimony of former servicemembers in the Air Force and Navy and Marine Corps who disagree with DoD's judgment that diversity is important to unit cohesion. This Court respects the considered personal opinions of those servicemembers but finds the research-backed conclusions of DoD officials more convincing. Defendants' compelling national security interest in a diverse officer corps is about more than performance in immediate combat.

At bottom, Plaintiff's definition of unit cohesion and lethality contradicts that of DoD and military leaders. A central reason for judicial deference to military judgments is the judiciary's limited competence to evaluate military determinations. *See, e.g., Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010) (noting the importance of judicial deference to congressional and Executive officials' factual determinations regarding military matters). As the U.S. Court of Appeals for the Fourth Circuit has explained, "[t]he judiciary has no Armed Services Committee, Foreign Relations Committee, Department of Defense, or Department of State." *Thomasson v. Perry*, 80 F.3d 915, 925–26 (4th Cir. 1996). Moreover, given the peculiar expertise of the military in determining its own personnel regulations, contradictory expert testimony regarding the benefit of a military regulation is irrelevant. *Goldman*, 475 U.S. at 509 ("But whether or not expert witnesses may feel that religious exceptions to [the Air Force regulation at issue] are desirable is quite beside the point."). Here, this Court adopts the definition of unit cohesion and lethality used by Executive leaders with the expertise,

knowledge, and responsibility to run the Navy and Marine Corps.  Defendants have met their

burden to prove a compelling national security interest in unit cohesion and lethality.

### 2.  Recruitment and Retention

The Supreme Court has made clear that "judicial deference to . . . congressional

exercise of authority is at its apogee when legislative action under the congressional authority

to raise and support armies and make rules and regulations for their governance is challenged."

*Rostker v. Goldberg*, 453 U.S. 57, 70 (1981).  The Naval Academy's admissions process is

governed, in part, by statutory requirements imposed by Congress, such as the nomination,

STEM, and unrestricted line requirements.  Defendants do not contend that Congress

imposed a race-conscious admissions process here.  However, it is significant that Congress

has taken an interest in the diversity of the Navy and Marine Corps.  *See* (DX152

(congressionally mandated study of diversity in the Armed Forces); DX67 (Secretary of

Defense's remarks to Congress about diversity); PX31; PX376 (Naval Academy responses to

House Armed Services Committee's inquiries into use of race in admissions).)

The Supreme Court has consistently tied military recruitment to the governmental

interest in raising and supporting the Armed Forces.  *Rumsfeld v. F. for Acad. & Inst'l Rts., Inc.*,

547 U.S. 47, 67 (2006) ("Military recruiting promotes the substantial Government interest in

raising and supporting the Armed Forces[.]").  Courts in various contexts have noted the

importance of recruitment and retention in maintaining the United States' all-volunteer Armed

Forces.  *See, e.g., Clarkson v. Alaska Airlines, Inc.*, 59 F.4th 424, 428 (9th Cir. 2023) (noting

protections for veterans returning to civilian jobs "remain all the more important today, as our

nation relies on an all-volunteer military force"); *Harris v. Hahn*, 827 F.3d 359, 368 (5th Cir.

2016) (noting that "[b]ecause the military relies entirely on voluntary enlistment, Texas can promote national security by encouraging enlistment"). As the Fourth Circuit has recognized, "our nation's very preservation hinges on decisions regarding war and preparation for war." *Thomasson v. Perry*, 80 F.3d 915, 925 (4th Cir. 1996). Here, Defendants have proven that diversity in the officer corps serves a compelling interest in national security by improving recruitment and retention in the all-volunteer Navy and Marine Corps.

In a statement before Congress, Secretary of the Navy Carlos Del Toro ("Secretary Del Toro") explicitly stated: "We need a diverse force, so every child in America can see themselves wearing the uniform or working in our civilian ranks tomorrow, and every viewpoint is in our operations today, so that we can draw talent from all of America to build our warfighting advantage." (DX67.) Secretary Del Toro deemed a diverse Naval force a "national security imperative." (*Id.*) Secretary of Defense Esper likewise expressed this determination in his Message to the Force on DoD Diversity and Inclusiveness. (DX178.) In light of this military judgment, Secretary of Defense Esper announced an initiative to "increase racial diversity and ensure equal opportunity across all ranks, and especially in the officer corps." (*Id.*) This Court defers to the military judgment of the Secretary of Defense and the Secretary of the Navy regarding recruitment and retention in the Navy and Marine Corps.

Defendants presented significant evidence to support DoD's determination that recruitment and retention are essential to the combat readiness of the Navy and Marine Corps. Vice Admiral Vincent Fuller, Under Secretary Vazirani, Deputy Assistant Secretary Truesdale, and Deputy Assistant Secretary of Defense for Military Personnel Policy Stephanie Miller ("Deputy Assistant Secretary Miller"), testified that recruitment and retention are critical in an

all-volunteer military.  (ECF No. 145 at 117:11–13 (Fuller); ECF No. 144 at 21:22–24 (Vazirani); ECF No. 146 at 101:6–14 (Miller); DX210 at 43:19–44:11 (Truesdale).)  Deputy Assistant Secretary Miller, who oversees and maintains the all-volunteer force, explained that the Navy and Marine Corps' "ability to support national defense priorities is inherently tied to [their] ability to successfully recruit each year and each generation of service."  (ECF No. 146 at 101:8–13 (Miller).)  Under Secretary Vazirani testified to DoD's conclusion that one of the great strengths of the United States is its diversity, and the Navy and Marine Corps want to draw from that diverse talent.  (ECF No. 144 at 21:22–22:4 (Vazirani).)  Under Secretary Vazirani explained that the Navy and Marine Corps need to "retain capabilities and talents" to maintain a professional officer corps and to effectively innovate and utilize new technologies as new challenges arise.  (*Id.* at 25:12–26:3 (Vazirani).)

Defendants provided substantial data to support their position that a diverse officer corps improves recruitment and retention.  Deputy Assistant Secretary Miller explained that DoD reviews demographic data, marketing success, and characteristics of developed recruits to evaluate its recruitment programming.  (ECF No. 146 at 103:12–21 (Miller).)  Using these data, DoD has identified various recruiting challenges.  (*Id.* (Miller).)  For example, just 23 percent of Americans between the ages of 17 and 24 are eligible to serve in the military without some kind of waiver, and propensity to serve is just nine percent.  (*Id.* at 101:23–102:6 (Miller); ECF No. 144 at 137:10–14; 137:32–138:9 (Haynie).)  Citing the Institute for Defense Analyses' 2021 "Study on Reducing Barriers to Minority Participation in Elite Units of the Armed Forces," which Congress required DoD to conduct, Deputy Assistant Secretary Miller outlined recruiting challenges specific to minority servicemembers such as (1) a lack of

awareness and interest; (2) competing recruitment priorities; and (3) potential recruits' concerns over their own capacity to succeed and advance in the military. (ECF No. 146 at 87:5–12; 90:14–92:6 (Miller); DX152.) As Deputy Assistant Secretary Miller explained, addressing such challenges specific to recruitment of minority servicemembers is imperative because individuals of color have a higher propensity to serve in the military than white individuals. (ECF No. 146 at 104:2–11 (Miller).)

Defendants established that a diverse officer corps improves recruitment success despite these difficulties. Navy Strategic Guidance sets as an enduring priority the Navy and Marine Corps' need to develop a reputation as "great places to lead, work, grow, and build families" and explicitly identifies recruiting individuals of diverse personal, cultural, and professional backgrounds as critical to the Navy and Marine Corps' ability to address challenges. (ECF No. 145 at 104:5–8; 104:17–22 (Fuller).) Deputy Assistant Secretary Miller explained that a diverse officer corps, particularly in special forces units, enables individuals to envision themselves succeeding in the Navy and Marine Corps. (ECF No. 146 at 93:9–15; 104:14–24 (Miller).) Vice Admiral Fuller echoed this judgment, explaining that it is easier to recruit the most talented individuals when people can relate to the all-volunteer military— whether because of race, personal history, or professional interests. (ECF No. 145 at 117:3– 13 (Fuller).) Both Under Secretary Vazirani and Dr. Haynie tied a diverse officer corps to DoD's goal of maintaining a meritocratic military such that recruits see opportunities for success. (ECF No. 144 at 24:3–18, 15:1–5 (Vazirani), 136:13–20 (Haynie).) The "Department of Defense (DoD) Officer Retention and Promotion Barrier Analysis Study" explained that

"a lack of diversity in recruiters and advertisements" may contribute to a lack of diversity in the officer corps.  (DX150.)

Defendants similarly demonstrated that diversity in the officer corps improves retention of officers and enlisted servicemembers in the Navy and Marine Corps.  Defense experts presented studies demonstrating "the link between D&I [diversity and inclusion] climate and key readiness and retention outcomes."  (ECF 144 at 105:17–23 (Haynie); PX275.) Dr. Haynie explained the results of a DoD Office of People Analytics ("OPA") study that showed that individuals reporting the healthiest diversity and inclusion climate also reported the highest levels of intent to remain in the military.  (ECF No. 144 at 109:4–11 (Haynie).) Notably, servicemembers who identified their climate as healthy were more likely to be white, male, and/or heterosexual, while those reporting an unhealthy climate were more likely to be racial or ethnic minority members, females, and/or not heterosexual.  (*Id.* at 109:23–110:2 (Haynie); PX275.)  The "Department of Defense (DoD) Officer Retention and Promotion Barrier Analysis Study" also supports these conclusions, finding that perceived hostile environments and unwanted behaviors like racial and sexual hostility and harassment are "viable deterrents for women and racial/ethnic minorities joining the military."  (DX150.) Under Secretary Vazirani testified that retention levels have been historically high in the Navy and Marine Corps, which enables junior ranked servicemembers to see an opportunity for success in the military regardless of gender, race, background, or ethnicity.  (ECF No. 144 at 26:5–16, 26:24–27:14 (Vazirani); PX275.)  Moreover, Black/African American and Hispanic retention is higher than white retention across the twenty-year career pipeline.  (DX151.)

142

Plaintiff characterizes Defendants' interest in recruitment and retention as equivalent to the interest in diversity on campus in *Harvard* and contends that the Naval Academy engages in racial balancing. (ECF No. 148 ¶ 268.) This characterization is inaccurate and diminishes the contrary testimony of high-ranking DoD officials. Plaintiff also disputes the data and testimony Defendants presented, citing one competing study—"The Effects of Diversity Among Peers and Role Models on U.S. Navy Retention"—that showed a negative correlation between racial diversity in the officer corps and minority officer retention. (PX872.) As Plaintiff acknowledges, however, that same study suggested a positive correlation between racial diversity and retention of Black male enlisted servicemembers. (*Id.*) Thus, this study at least partly supports Defendants' national security interest in increasing the Navy and Marine Corps' overall diversity in accordance with DoD policy.

Plaintiff argues that any recruitment and retention interest cannot be based on a "role-model theory" that minority officers serve as career models for those joining the military. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 276 (1986) (plurality opinion) ("[T]he idea that black students are better off with black teachers could lead to the very system the Court rejected in *Brown v. Board of Education*, 347 U.S. 483 (1954)."). But Defendants evince no such theory. Defendants do not contend that servicemembers are somehow better off if their commanding officer shares their race or ethnicity. Defendants argue that DoD administers a meritocratic military, and much of the Navy and Marine Corps' recruiting reflects the notion that recruits can succeed on their own merit. Defendants have met their burden to prove a compelling governmental interest in recruitment and retention.

### 3. Domestic and International Legitimacy

Finally, Defendants have shown that diversity in the officer corps furthers the domestic and international legitimacy of the Navy and Marine Corps, which in turn serves a compelling national security interest. Courts, including the U.S. Court of Appeals for the Fourth Circuit, have rejected racial classifications supported solely by "subjective evidence" such as the need "to gain the confidence and acceptance of the community." *Hayes v. N. State L. Enf't Officers Ass'n*, 10 F.3d 207, 214 (4th Cir. 1993); *see also Christian v. United States*, 46 Fed. Cl. 793, 806 (Fed. Cl. 2000) ("The government's desire to manipulate private perceptions can never by itself justify the use of race-conscious policies." (citing *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 267 (1986) (plurality opinion))). In the context of the Armed Forces, however, the Fourth Circuit has recognized the need to preserve the integrity of military systems. *See United States v. Hamilton*, 699 F.3d 356, 371–72 (4th Cir. 2012) (collecting cases deeming the government's interest in preserving the integrity of the military honors system compelling). Here, Defendants do not support the Naval Academy's race-conscious admissions policies *only* by reference to the need to support the domestic and international legitimacy of the military. Rather, Defendants suggest that the Navy and Marine Corps' legitimacy—which is inextricably connected to its ability to recruit and retain officers and produce cohesive, lethal units—is one of several national security interests supported by race-conscious admissions.

Defendants demonstrated that the Navy and Marine Corps, as represented by Deputy Assistant Secretary Truesdale, Secretary Del Toro, and the Chief of Naval Operations, has made the military judgment that a racially diverse officer corps improves their domestic and international legitimacy. (PX507; DX210; ECF No. 144 at 15:11–15, 28:5–29:22 (Vazirani).)

144

This judgment is rooted in historical evidence that a lack of diversity in the officer corps decreased the legitimacy of the military during the Vietnam War.  (PX445.)  Defendants presented expert testimony that an officer corps reflective of the diversity of the United States population enhances public trust in the military.  (ECF No. 144 at 140:3–142:17 (Haynie); ECF No. 143 at 136:18–139:13, 139:15–141:3 (Bailey); ECF No. 145 at 18:17–20, 21:5–10 (Lyall).)  Defendants also presented lay opinion testimony from Captain Birch in which he described his personal experience of how his status as a Black Navy Seal Captain enhanced the legitimacy of his Navy unit in Somalia and the legitimacy of a Naval delegation in China. (ECF No. 143 at 32:15–33:15, 34:3–35:1 (Birch).)  Finally, Defendants showed that racial diversity among the enlisted corps far exceeds that among the officer corps, creating a visible divide between officers and enlisted servicemembers.  (DX65; PX330.)

Plaintiff emphasizes that legitimacy is a subjective opinion that cannot sustain the use of a racial classification.  (ECF No. 148 ¶ 282 (citing first *Hayes*, 10 F.3d at 214; and then citing *Christian*, 46 Fed. Cl. at 806).)  As explained *supra*, legitimacy *alone* is insufficient to sustain a racial classification.  Defendants here, however, claim national security—as furthered by improved unit cohesion and lethality, recruitment and retention, and domestic and international legitimacy—as the compelling interest that justifies the Naval Academy's race-conscious admissions practices.  It is difficult, if not impossible, to separate the domestic and international legitimacy of the Navy and Marine Corps from their unit cohesion and lethality and their recruitment and retention needs.  *See, e.g., Brown v. Dunleavy*, 722 F. Supp. 1343, 1353 (E.D. Va. 1989) (connecting recruiting to the peacetime Navy's integrity).  Therefore, Defendants have shown that a diverse officer corps serves the Navy and Marine Corps'

legitimacy, which in turn improves its unit cohesion and lethality and its recruitment and retention.

**B. Conclusions of Law: A Compelling National Security Interest Need Not Be Measurable, But Defendants Have Shown Their Compelling Interests Are Measurable.**

In *Harvard*, the Supreme Court explained that in the context of affirmative action at civilian colleges and universities, it has "required that universities operate their race-based admissions programs in a manner that is 'sufficiently measurable to permit judicial [review]' under the rubric of strict scrutiny." *Harvard*, 600 U.S. 181, 214 (2023) (alteration in original) (quoting *Fisher II*, 579 U.S. 365, 381 (2016)). This measurability requirement has been limited to cases contemplating race-based admissions programs. *Id.*; *see also Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995) (applying strict scrutiny to race-conscious construction contract scheme without requiring compelling interest claimed to be measurable); *Parents Involved Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007) (applying strict scrutiny to race-conscious K-12 school districting assignments without requiring compelling interest claimed to be measurable); *Johnson v. California*, 543 U.S. 499 (2005) (applying strict scrutiny to race-conscious prison housing assignment policy without requiring compelling interest claimed to be measurable); *Shaw v. Hunt*, 517 U.S. 899 (1996) (applying strict scrutiny to race-conscious voting districting plan without requiring compelling interest claimed to be measurable).[81]

---

[81] In his concurrence to *Parents Involved*, Justice Thomas explained that "'inherently immeasurable past wrongs'" cannot justify a racial classification. 551 U.S. 701, 755 (2007) (Thomas, J., concurring) (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989)). This reference to the language of *J.A. Croson*, in which the Court considered the constitutionality of Richmond's race-conscious construction contract program, does not impose any measurability requirement except to suggest that immeasurable past discrimination cannot support a racial classification. Since *Harvard*, some courts have applied the measurability requirement to racial classifications outside of the higher educational context. *See, e.g., Nuziard v. Minority Bus. Dev. Agency*, --- F. Supp. 3d ---, 2024

In the context of national security, the Supreme Court has explicitly rejected the notion that the government must present "hard proof—with detail, specific facts, and specific evidence—" to justify a restriction under strict scrutiny. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010) (internal quotation marks omitted).  The Supreme Court has specifically noted that a "searching inquiry into the persuasiveness" of national security interests "is inconsistent" with the deference owed the executive branch. *Trump v. Hawaii*, 585 U.S. 667, 686 (2018).  In *Harvard*, the Court explicitly recognized that military service academies may have compelling interests distinct from those of civilian colleges and institutions.  600 U.S. at 213 n.4.  Defendants here have established their distinct and compelling national security interests, and those interests do not have to be measurable.

Even in the unlikely event that the measurability requirement applies here, Defendants have shown that their compelling interest in preserving national security by improving recruitment and retention is measurable.  The measurability requirement is stringent.  As defined in *Harvard*, measurability requires the government to show "how many fewer leaders [the Naval Academy] would create without racial preferences[.]"[82]  *Id.* at 215.  The Naval Academy can easily meet this demanding burden in the context of its graduates.  The closed-loop nature of the Navy and Marine Corps' officer promotion systems and the requirement that Naval Academy graduates access into active duty means that the Navy and Marine Corps

---

WL 965299, at *24, *25 (N.D. Tex. Mar. 5, 2024) (noting that while strict scrutiny sounds simple, it has numerous variations including the measurability requirement).  No court has applied a measurability requirement in the context of national security.

[82]  The Supreme Court also suggested that Harvard would have had to show "how much poorer the education at Harvard would be" absent consideration of race in admissions.  *Harvard*, 600 U.S. at 215.  Given that Defendants claim no interest in diversity on campus, this framing of the measurability requirement is inapposite here.

can measure the diversity of the officer corps by accession source.  (ECF No. 146 at 43:25–44:5, 44:19–22, 56:8–18 (Miller); ECF No. 143 at 176:17–177:2 (Sherwood); *see also* DX65 (noting "[w]arfare communities are overall affected by the lack of racial minority inventory at accession")).  As explained *supra*, officer accession sources include (1) the Naval Academy; (2) ROTC; and (3) Officer Commissioning School.  DoD can, and does, measure demographic data at various points in officers' careers.  (DX204 *SEALED*.)

Defendants presented data that track racial demographics—according to officers' self-identified race and ethnicity categories—between 2001 and 2024 for Navy and Marine Corps officers who entered the officer corps via the Naval Academy.  (*Id.* *SEALED*.)  Those data show measurable improvement in the racial and ethnic diversity of the Navy and Marine officer corps between 2001 and 2024:[83]

---

[83]  In *Harvard*, the Supreme Court noted that the racial and ethnic categories Harvard and UNC employed to track demographic data—Asian, Native Hawaiian or Pacific Islander, Hispanic, White, African American, and Native American—were "imprecise," "plainly overbroad," and "arbitrary or undefined."  600 U.S. at 216.  Here, however, the Naval Academy tracks demographic data according to the categories employed by the United States Census and DoD.  Given that the Naval Academy exists to provide officers to serve in the Navy and Marine Corps' unrestricted line (or combat) communities and is tightly regulated by DoD and Congress, it defies common sense to suggest that it must use different categories to track racial and ethnic data than do DoD and Congress.  Accordingly, this Court determines that the critiques of the demographic categories in *Harvard* do not apply to the racial and ethnic categories used here.

| Racial or Ethnic Category | 2001 | 2024 | Difference |
|---|---|---|---|
| American Indian or Alaskan Native | 2 | 4 | +2 |
| Asian | 26 | 88 | +62 |
| Black | 48 | 64 | +16 |
| Multiple Races | 12 | 108 | +96 |
| Native Hawaiian or Other Pacific Islander | 2 | 4 | +2 |
| White | 785 | 719 | -66 |
| Declined to State Race | 44 | 17 | -27 |
| Hispanic | 78 | 124 | +46 |
| Not Hispanic | 615 | 526 | -89 |
| Declined to State Ethnicity | 226 | 354 | +128 |

(*Id.* *SEALED*.)  Thus, Defendants presented data that officers entering the Navy and Marine Corps from the Naval Academy in 2024 were more racially and ethnically diverse than such officers in 2001.  Specifically, these data prove that Defendants' national security interest in recruiting a racially and ethnically diverse officer corps is measurable.

The data similarly prove that Defendants' national security interest in retention is measurable.  The data show that the retention rate by racial group at the ten-year mark in officers' careers increased for American Indian or Alaskan Native, Asian, Black, and white officers between 2001 and 2024.  (*Id.* *SEALED*.)  Similarly, at the fifteen-year mark, the retention rate by racial group increased for Asian and Black officers between 2001 and 2024.  (*Id.* *SEALED*.)  Finally, the data show that the number of white officers at the twenty-year career mark stayed almost perfectly constant—1,316 officers versus 1,317 officers—and the number of American Indian or Alaskan Native, Asian, Black, and multiracial officers at the twenty-year mark increased between 2001 and 2023.  (*Id.* *SEALED*.)  These numbers are telling:

149

| Racial or Ethnic Category | Percentage of Officers at 20-year career mark in 2001 | Percentage of Officers at 20-year career mark in 2023 | Difference |
|---|---|---|---|
| American Indian or Alaskan Native | 0.001 | 0.003 | +0.002 |
| Asian | 0.006 | 0.031 | +0.025 |
| Black | 0.039 | 0.059 | +0.02 |
| Multiple Races | 0.002 | 0.014 | +0.012 |
| Native Hawaiian or Other Pacific Islander | 0.001 | 0.005 | +0.004 |
| White | 93.7 | 85.6 | -8.1 |

(*Id.* *SEALED*.)[84]  By providing these data, Defendants demonstrated that their compelling

interest in national security—as served by increased retention—is measurable.

### C. Conclusions of Law: The Naval Academy's Admissions Process Is Narrowly Tailored to Its Compelling National Security Interests.

The Naval Academy's race-conscious admissions practices are narrowly tailored to

furthering Defendants' compelling national security interest in a diverse Navy and Marine

officer corps.  Like the compelling interest prong of the strict scrutiny analysis, narrow tailoring

applies differently depending on the context.  *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003).

Because this case involves both a compelling national security interest and a race-conscious

admissions program, this Court must consider narrow tailoring at the junction of these two

---

[84] Because the Navy and Marine Corps' officer corps operates under a closed-loop promotion system—that is, the Navy and Marine Corps can only promote from within and only have a set number of positions available at each rank level—the decrease in the percentage of white officers likely reflects the increase in the percentage of minority officers at the twenty-year mark.  In a closed-loop system, absent expansion of the number of positions available at a given rank, any increase in the percentage of officers from one racial group will necessarily mean a decrease in the percentage of officers from another racial group.

lines of precedent.  Even in the national security context, however, Executive and military leaders receive very limited deference regarding whether a classification is narrowly tailored.[85]

A racial classification is narrowly tailored when it furthers the compelling interest claimed such that there is no possibility that the motive behind the classification is illegitimate. *Id.* at 333.  In the context of college admissions, narrow tailoring is best defined by the kind of racial classification it precludes.  A race-conscious admissions program is narrowly tailored where it (1) does not use a quota system but rather is flexible enough to consider all aspects of each applicant's diversity, *id.* at 334; (2) is necessary to achieve the compelling interest claimed, *Fisher I*, 570 U.S. 297, 311–12 (2013); (3) does not use race as a negative or stereotype, *Harvard*, 600 U.S. 181, 213 (2023); (4) has a "'logical end point,'" *id.* at 221 (quoting *Grutter*, 539 U.S. at 342); and (5) applies only because the governmental actor has determined after serious, good-faith consideration that race-neutral alternatives are insufficient to serve the compelling interest claimed, *Grutter*, 539 U.S. at 339.  The Court addresses each requirement in turn.

### 1. Conclusions of Law: The Naval Academy's Limited Consideration of Race Furthers the Government's Compelling National Security Interests.

"[I]t is not a failure of narrow tailoring for the impact of racial consideration to be minor." *Fisher II*, 579 U.S. 365, 384 (2016).  By the same token, however, a racial classification cannot be so overinclusive that it fails to further the claimed compelling governmental interest. *See Harvard*, 600 U.S. 181, 216 (2023).  Here, the Naval Academy's consideration of race is

---

[85]  In accordance with the judiciary's doctrine of deference to the executive branch's military judgments, deference may be appropriate in the narrow tailoring analysis to the extent that the executive branch makes a military judgment that a race-neutral alternative is not workable.

narrowly tailored to increase diversity in the Navy and Marine Corps. Defendants proved measurable increases in the racial diversity of the Navy and Marine officer corps over the last twenty years. (DX204 *SEALED*.) As explained *supra*, Naval Academy graduates commission directly into the officer corps and are more likely to stay in the Navy and Marine Corps and reach leadership ranks. (ECF No. 141 at 42:10–19 (Latta); ECF No. 146 at 44:2–11; 44:13–15 (Miller).) Similarly, Naval Academy graduates commissioned into the officer corps fill a disproportionate number of warfare command billets. For example, eight of the Navy's twelve aircraft carriers are presently commanded by Naval Academy graduates. (ECF No. 146 at 41:4–5 (Miller).) In other words, "67 percent of [the] largest warfighting platform in the United States Navy is commanded by a Naval Academy graduate." (*Id.* at 41:6–8 (Miller).) These numbers prove that the Naval Academy's consideration of race in admissions has furthered the Government's national security interests in a diverse Navy and Marine corps.[86]

There is no evidence that the Naval Academy's consideration of race fails to increase the number of minority officers. Plaintiff contends that Black and Hispanic midshipmen disproportionately leave the Naval Academy before graduation such that any benefit of their increased enrollment fails to reach the Navy and Marine Corps. Plaintiff relies on percentages to make this point, but those percentages can be misleading. When a small number of

---

[86] Plaintiff argues that the Navy could achieve the same result by considering race in officers' assignments. (ECF No. 148 ¶ 201.) This suggestion contradicts DoD policy and falls, in part, to the Department of the Navy, which is not a named Defendant in this action. Moreover, this Court is unwilling to impose its own judgment—or the judgment of Plaintiff—over the considered judgment of DoD and military officials. Currently, that judgment is that "officer promotions . . . occur only after a servicemember has entered the Armed Forces and proven that promotion is merited[.]" Brief of Adm. Charles S. Abbot *et al.* as Amici Curiae in Support of Respondents, *Harvard*, 600 U.S. 181 (2023) (Nos. 20-1199, 21-707); (ECF No. 146 at 49:11–14; 112:6–18 (Miller)).

midshipmen comprise an entire minority group, any one of those midshipmen leaving will result in a seemingly drastic decrease in that group's graduation rate. For example, if one Native Hawaiian/Pacific Islander midshipman in a class of four—such as the four Native Hawaiian/Pacific Islander midshipmen who graduated from the Naval Academy in 2023—leaves before graduation, the graduation rate for Native Hawaiian/Pacific Islander midshipmen that year falls by twenty-five percent.

Moreover, attrition is not a monolith. As Defendants' witnesses testified, midshipmen disproportionately leave the Naval Academy in the first two years, before the service commitment takes effect. (ECF No. 143 at 77:16–78:8 (Vahsen).) Voluntary resignations account for more than half of all attrition and approximately five percent of attrition in a given class. (*Id.* at 78:6–12, 91:12–22 (Vahsen).) In fact, the evidence in this case indicates that African American midshipmen are less likely than other racial groups to leave due to voluntary attrition, and academic attrition is not the most frequent reason that African American midshipmen leave the Naval Academy.[87] (*Id.* at 86:18–22 (Vahsen); PX 148.) Varsity athletes at the Naval Academy tend to be disproportionately minority midshipmen. The COVID-19 Pandemic, which prevented athletes from playing their sports, and the opening of "name, image, and likeness" ("NIL") rights[88] severely affected attrition of athletes, which is reflected

---

[87] Plaintiff repeatedly suggested that race-conscious admissions at the Naval Academy has led to the admission of "unqualified" candidates, and particularly to academically unqualified Black or African American candidates. Plaintiff presented no evidence to support this contention except Professor Arcidiacono's testimony that Black midshipmen had higher attrition rates. Defendants, however, presented repeated evidence that every candidate admitted to the Naval Academy is qualified and that academics are one of many factors—including leadership, moral character, life experience, language skills, and many more—that the Naval Academy seeks in midshipmen and, ultimately, in Naval officers.

[88] NIL rights refer to college athletes' right to control and profit from their own personal brand, including their name, image, and likeness. *See Name, Image, Likeness*, NCAA, https://www.ncaa.org/sports/2021/7/9/name-image-likeness.aspx (last visited November 15, 2024.)

in higher attrition numbers for minority midshipmen. (ECF No. 143 at 98:18–99:8 (Vahsen).) Finally, as discussed *supra*, Defendants presented data that prove that minority representation among Navy and Marine Corps officers who commissioned via the Naval Academy increased between 2001 and 2024.

This Court notes that the categories that Defendants use to track racial data are coherent and consistent with the United States Census and Office of Management and Budget ("OMB"). In *Harvard*, the Supreme Court determined that the "opaque racial categories" Harvard and UNC used in their demographic data created a "mismatch between the means [they] employ and the goals they seek," such that no court could scrutinize their admissions programs. 600 U.S. at 216. Unlike Harvard and UNC, however, the Naval Academy considers race to serve Defendants' compelling national security interest in creating a diverse Navy and Marine Corps. The Navy, Marine Corps, and DoD use the same racial and ethnic categorizations in tracking the race and ethnicity of officers that the Naval Academy uses in tracking the race and ethnicity of its candidates and midshipmen. *See, e.g.*, (DX65 (Task Force One Navy Final Report) (using national census data to compare demographics in the Navy to the national population)). Therefore, there is no "mismatch" between the means the Naval Academy uses and the goals Defendants seek.

Finally, Plaintiff argues that the Naval Academy's race-conscious admissions policies do not further any national security interest in a diverse officer corps because Asian midshipmen are overrepresented at the Naval Academy relative to their representation in the United States population. Specifically, Plaintiff contends that the proportional representation of Asian midshipmen is approximately double that of Asians among the overall United States

population.[89]   This contention ignores that Defendants claim a compelling interest in

furthering national security by creating a diverse Navy and Marine Corps.  Representation of

Asian officers in the Navy and Marine Corps is still well below their representation in the

national population: at the O-6 rank in 2023, for example, just 2.9 percent of officers were

Asian, but approximately 7 percent of the national population is Asian.[90]  Therefore, the Naval

Academy's race-conscious admissions policies do not result in an overrepresentation of some

minority racial groups relative to others.  Defendants have shown that the Naval Academy's

race-conscious admissions policies further their compelling national security interests.

### 2. Conclusions of Law: The Naval Academy's Race-Conscious Admissions Policies Require Holistic Candidate Assessment Without Quotas or Racial Balancing.

As the Supreme Court explained in *Grutter v. Bollinger*, a race-conscious admissions

program must be flexible such that it considers all aspects of diversity as to each applicant.

539 U.S. 306, 334 (2003); *see also Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 315–316 (1978)

(opinion of Powell, J.).  Specifically, a race-conscious admissions program cannot employ

quotas for specific racial groups "or put members of those groups on separate admissions

---

[89] Although Plaintiff does not provide citations for its data regarding the American population, Plaintiff appears to reach this conclusion by comparing the Naval Academy's population of Asian American midshipmen in combination with other races—that is, midshipmen who reported that they were Asian American alone or Asian American in combination with another race—with United States Census data, which categorizes Asian Americans as "Asian alone."  *See* (ECF No. 148 ¶ 42.)  This comparison is somewhat misleading.  The percentage of midshipmen who identified as "Asian American alone" in the class of 2023, for example, is comparable to the percentage of Americans who identified as "Asian alone" as of 2023.  *See* UNITED STATES CENSUS BUREAU, QUICK FACTS (2023), https://www.census.gov/quickfacts/fact/table/US#; (PX519).

[90]  As discussed *infra*, Defendants' reference to United States Census data is not unconstitutional racial balancing.  "A university is not permitted to define diversity as 'some specified percentage of a particular group merely because of its race or ethnic origin'" because that would amount to racial balancing.  *Fisher I*, 570 U.S. 297, 311 (2013) (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 307 (1978) (opinion of Powell, J.)). Plaintiff, not Defendants, raised the issue of an alleged "overrepresentation" of Asian Americans at the Naval Academy.  Neither the Naval Academy nor DoD has defined diversity as some specified percentage of a particular racial or ethnic group in the Brigade of Midshipmen or officer corps.  Rather, Defendants presented significant evidence that racial or ethnic diversity is just one factor of the broad diversity they seek.

tracks." *Grutter*, 539 U.S. at 334. In line with the proscription of racial quotas, racial balancing

is also unconstitutional. *Harvard*, 600 U.S. 181, 223 (2023). In *Harvard*, the Supreme Court

considered the consistency of the racial makeup of each class year at Harvard and UNC to be

evidence of racial balancing. *Id.* The Supreme Court determined that the schools' promise to

terminate their use of race upon reaching a specific percentage of various racial groups in each

class year was racial balancing. *Id.*; *see also Fisher II*, 579 U.S. 365, 375 (2016). Higher

educational institutions also must evaluate each candidate as an individual. *Grutter*, 539 U.S.

at 327. Therefore, race may only be used in a "flexible, nonmechanical way" such that it is

just one factor in the individualized consideration of every applicant. *Id.* at 327, 334. To that

end, institutions may not assign a specified number of points merely because of a candidate's

race. *Id.* at 337.

  The evidence in this case clearly indicates that the Naval Academy does not employ

quotas, admit candidates based solely on their race or ethnicity, or place minority candidates

on separate admissions tracks. *See, e.g.*, (ECF 140 at 16:2–7 (Hwang); ECF No. 141 at 34:5–

10 (Latta).) In response to a 2022 inquiry from the House Armed Services Committee about

the use of race at the Academy, the Academy explained that "[a]ll candidates are evaluated

using a holistic approach" and "[n]o points or quotas exist for race." (ECF No. 140 at 57:14–

20, 58:23–59:4 (Latta); PX31; PX376.) The data prove this. The number of offers extended

to candidates identifying as members of a racial minority group fluctuates by as much as sixty

percent each year. *See* (PX18 (showing offers fluctuating from 449 to 563); PX558 (showing

offers fluctuating from 235 to 378); DX109–DX113 (showing enrollment numbers fluctuating

across class years); ECF No. 145 at 187:18–188:15 (Gurrea)). Applications of candidates who

identify as racial or ethnic minorities are assigned for review in the same manner as applications of candidates who do not so identify.  (ECF No. 140 at 136:15–137:7 (Latta).)  Regardless of the racial or ethnic identity of a candidate, a computer randomly assigns each application to an Admissions Board member, and no particular board member is assigned to review applications from minority candidates.[91]

Moreover, the Naval Academy considers each candidate holistically such that race is only one aspect of an applicant's diverse qualities.  Explicit guidance to the Admissions Board, which assigns point-based adjustments to candidates' computer-generated Whole Person Multiple ("WPM") score, prohibits assigning points based on race.  (*Id.* (Latta); PX31; PX28; DX1; DX12; DX72; DX 161; DX158; ECF No. 140 at 59:2–4, 187:6–189:3, 241:23–242:15 (Latta); ECF No. 139 at 204:2–10; 225:24–226:4 (Hwang).)  Instead, the Naval Academy evaluates candidates' applications holistically, considering their WPM—the numerical value based on their standardized test scores, high school GPA, the college attendance rate of the high school they attended, and more—their personal statement, their teacher and counselor recommendations, and the Blue and Gold Officer's feedback from their BGO interview. (ECF No. 139 at 235:22–237:3 (Hwang); ECF No. 140 at 15:13-16:1 (Hwang), 152:5-20, 155:20-156:9, 231:17–233:8 (Latta); PX28; PX29; PX491.)  Dean Latta and Hwang, who is the director of nominations, both testified to the importance of the narrative portions of the application.  (ECF No. 139 at 236:16–237:3 (Hwang); ECF No. 140 at 146:5–149:10, 152:5–

---

[91] Candidates who are homeschooled, athletes, fleet candidates, and candidates who are applying while already enrolled in another college or university are not randomly assigned to a board member.  Instead, their applications are reviewed by a designated board member because the unique circumstances of their applications make review by an assigned board member more efficient.  (ECF No. 140 at 136:22–137:13 (Latta).)

20, 177:8–24 (Latta).)    The Naval Academy considers a particular applicant's race or ethnicity—if it considers it at all—only after a holistic review of that applicant's entire application at both the Admissions Board and the Slate Review Committee.  (ECF No. 140 at 155:20–156:9 (Latta).)    Even when race is considered, it is one of many nondeterminative factors the Naval Academy evaluates.  (*Id.* at 15:12–16:4 (Hwang), 51:10–14 (Latta); ECF No. 139 at 224:13–15, 225:21–24 (Hwang); ECF No. 141 at 10:4–8 (Latta); ECF No. 142 at 44:14– 45:4, 56:7–11, 58:21–59:4 (Arcidiacono).)

Finally, the Naval Academy does not engage in racial balancing.  Plaintiff argues that the Naval Academy's collection of demographic data across the admissions cycle and intent to practice race-conscious admissions until racial diversity in the Navy and Marine Corps matches that of the United States population amounts to racial balancing.  The Supreme Court has repeatedly made clear that racial balancing—that is, seeking some proportional representation or attempting to work backwards to achieve representation based on some demographic target—is unconstitutional.  *See, e.g.*, *Parents Involved Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 730–32 (2007); *Fisher I*, 570 U.S. 297, 311 (2013); *Bakke*, 438 U.S. at 398; *Harvard*, 600 U.S. 223–224; *City of Richmond v. J.A. Croson, Co.*, 488 U.S. 469, 507-508 (1989). Quite simply, the Naval Academy implements its admissions policies without reference to the ethnic or racial makeup of its midshipmen class as compared to that of the United States.  *See, e.g.*, (ECF No. 141 at 42:12–43:9; 44:21–25 (Latta) (explaining racial demographics of class are not used to make admissions decisions); ECF No. 140 at 71:10-74:16 (Latta) (explaining that Admissions Office tracks racial demographics between class years but not mentioning any comparison to United States Census); PX558.)

The Naval Academy does not argue that it will end its race-conscious admissions policy "only when some rough percentage of various racial groups is admitted." *Harvard*, 600 U.S. at 223. Rather, the Naval Academy contends that it will conclude its use of race-conscious admissions practices, which are narrowly tailored toward the national security interest in a diverse Navy and Marine Corps, when the Navy and Marine officer corps represents the American population that it defends. Defendants do not seek to match the population of each class of midshipmen—or even the population of the Brigade of Midshipmen overall—to the United States Census. This much is clear from the data alone.[92] Moreover, unlike Harvard or UNC, the Naval Academy does not have consistent representation of each race across class

---

[92] The most recent United States Census data—from July 1, 2023—reveal the following:

| Racial or Ethnic Group | Percentage of Population |
|---|---|
| White alone | 75.3 percent |
| Black or African American alone | 13.7 percent |
| American Indian and Alaska Native alone | 1.3 percent |
| Asian alone | 6.4 percent |
| Native Hawaiian or Other Pacific Islander alone | 0.3 percent |
| Two or More Races | 3.1 percent |
| Hispanic or Latino (ethnicity) | 19.5 percent |
| White alone, not Hispanic or Latino (ethnicity) | 58.4 percent |

UNITED STATES CENSUS BUREAU, QUICK FACTS (2023), https://www.census.gov/quickfacts/fact/table/US#.
Plaintiff cites to various Naval Academy Class Portraits and Class Snapshots to evaluate the population of different racial groups at the Academy. *See* (ECF No. 148 ¶ 42.) For example, the Naval Academy's Class of 2023 Snapshot reveals the following:

| Racial or Ethnic Group | Percentage of Naval Academy Class of 2023 (1,181 total) |
|---|---|
| White | 58.9 percent (696/1,181) |
| Black or African American | 7.2 percent (85/1,181) (in combination with other races: 10.8 percent (128/1,181)) |
| American Indian | .08 percent (1/1,181) |
| Native Hawaiian or Other Pacific Islander | .25 percent (3/1,181) |
| Multiple Races | 11.5 percent (136/1,181) |
| Hispanic | 11.9 percent (141/1,181) |
| International | 1.27 percent (15/1,181) |
| Asian American | 7.96 percent (94/1,181) (in combination with other races: 15.9 percent (188/1,181)) |

(PX519.) As these data suggest, Defendants are not engaging in racial balancing, or, if they are, they are failing to produce anything close to racially balanced classes of midshipmen.

years.[93]  *See, e.g.,* (DX109–DX113 (showing enrollment numbers fluctuating across class years); ECF No. 145 at 187:18–188:15 (Gurrea)).  The Naval Academy's practice of tracking each class's demographic data throughout the application process does not evidence racial balancing.  As Dean Latta repeatedly testified, the information in the class comparison documents he compiles does not affect admissions offers and is "not used to make decisions at all."  (ECF No. 141 at 42:12–43:9; 44:21–25 (Latta).)  Therefore, there is no evidence that the Naval Academy is engaged in unconstitutional racial balancing.

### 3.  Conclusions of Law: The Naval Academy Does Not Use Race as a Negative or Stereotype.

Under *Grutter v. Bollinger* and *Harvard*, race is used as a negative when it "'unduly harm[s]' nonminority applicants.'"  *Harvard*, 600 U.S. 181, 212 (2023) (quoting *Grutter v. Bollinger*, 539 U.S. 306, 341 (2003)).  The Supreme Court has deemed admissions at civilian colleges and universities "zero-sum:" a benefit to one candidate is a disadvantage to another.  *Id.* at 218–19.  In such zero-sum admissions, consideration of a candidate's race is a negative where it is a determinative factor that disadvantages at least some candidates not of the same race.  *Id.* at 219.  While civilian college admissions may be zero-sum, Naval Academy admissions are much more complex.  Unlike admissions at a civilian institution, the Naval Academy's admissions process is subject to several statutory restraints.  Under these unique requirements, each

---

[93] One of Defendants' fact witnesses and Defendants' Proposed Conclusions of Law (ECF No. 149) suggest that the Naval Academy will stop using race-conscious admissions policies once it "achieves and maintains the racial and ethnic diversity of its student body at a level comparable to the ethnic and racial diversity of the general population."  (ECF No. 149 ¶ 69; ECF No. 140 at 95:11–18 (Latta).)  This testimony is inconsistent with the testimony of other witnesses, who connected the Naval Academy's use of race-conscious admissions to the Government's national security interest in a diverse Navy and Marine Corps.  (ECF No. 146 at 44:2–15; 76:6–78:25; 80:24–81:25; 107:9–12; 109:14–25 (Miller); ECF No. 145 at 108:11–18; 109:12–110:4; 115:23–116:16; 67:15–18 (Fuller); ECF No. 144 at 11:10–12:2; 14:9–15:15; 31:25–33:4; 55:7–56:1 (Vazirani).)  As this testimony and the demographic data demonstrate, the Naval Academy is not attempting to match the racial and ethnic makeup of its midshipmen to the racial and ethnic makeup of the United States.

candidate's admission to the Naval Academy is inherently intertwined with others', and one candidate's admission may *increase* another qualified candidate's chances of admission.

As detailed *supra*, the Naval Academy is required by statute to admit candidates with a nomination. The nomination requirement means that a candidate cannot be admitted to the Naval Academy if they do not obtain some form of nomination—whether service-connected, congressional, presidential, or superintendent. By official policy, the Naval Academy seeks to admit candidates that represent every congressional district in the United States. (ECF No. 139 at 233:11–19 (Hwang).) Because Congress includes both senators and representatives, congressional districts include representative districts *and* the state at large. The Naval Academy encourages candidates to seek nominations from multiple sources, such that one candidate may receive a nomination from her congressional representative and a nomination from one or both of her senators. (ECF No. 140 at 179:9–23 (Latta), 6:15–7:11 (Hwang); DX91; DX79; PX813.)

Where a candidate successfully obtains nominations from multiple sources, that candidate's admission may improve another qualified candidate's chances of admission. For example, if Candidate A has received both her senator's nomination and her congressperson's nomination under the competitive nomination method, then she may be admitted under either nomination. The Naval Academy's choice to admit Candidate A under her congressperson's nomination means that her senator's nomination is still open. Therefore, it benefits every candidate nominated by Candidate A's senator when she is admitted under her congressperson's nomination. Essentially, candidates seeking admission to the Naval Academy can increase everyone's chance of admission by obtaining nominations from

multiple sources.  The same is not true of civilian college admissions.  Even where civilian colleges and universities consider residency goals—for example, universities like UNC might seek to admit a certain percentage of each class as North Carolina residents or may seek to limit new students from a specific state so as to ensure each class represents as many states as possible—an individual applicant cannot apply as a resident of multiple states such that the civilian institution chooses which residency attaches to her application.

Because of the way in which statutorily imposed requirements—including the nomination requirements—interact with application requirements, the Naval Academy's admissions process cannot be accurately modeled.  That is, the Naval Academy's admissions process is not zero sum because one candidate's admission may positively affect another candidate's admission.  Certainly, like civilian educational institutions, the Naval Academy has a limited number of seats.  Unlike civilian institutions, however, the Naval Academy can admit candidates via various interconnected avenues.[94]  Under this distinct admissions system, consideration of race as a nondeterminative factor in one candidate's admission does not disadvantage nonminority candidates.

Furthermore, the evidence in this case makes clear that consideration of candidates' race does not harm the admission chances of candidates of a different race.  First, the evidence shows that a candidate's race never determines her admission.  Second, in practice, the Naval

---

[94]  The Naval Academy also has its own preparatory school, Naval Academy Preparatory School ("NAPS"), a similar preparatory program, and various partner agreements with private institutions.  Neither NAPS nor the Naval Academy's preparatory program have a separate application.  Rather, candidates apply to the Naval Academy, which determines whether to admit them straight into the Naval Academy, admit them to a preparatory program, or deny their admission.  This structure is unique to the Naval Academy admissions process.  As with congressional nominations and admissions decisions, admission of one candidate into NAPS or another preparatory program benefits other candidates by leaving open a spot at the Naval Academy.

Academy considers race—if at all—as a nondeterminative factor in only three areas of the admissions process.  Specifically, race is a nondeterminative factor that may arise in (1) the issuance of Letters of Assurance; (2)  admissions decisions between two candidates with very close Whole Person Multiples ("WPMs") for some nomination methods; (3) admission of additional appointees; and, theoretically, (4) superintendent nominations.[95]    Because superintendent nominations have not considered race since 2009, however, the Naval Academy may consider race in only three areas of the overall admissions process.  If race is not a determinative factor, then it cannot unduly harm applicants not of the same race. Admissions data support this truth.  Absent consideration of race, the admissions rate of White applicants, who outnumber Black applicants seven to one, increases just 4.2 percent.  (ECF No. 145 at 180:16–181:6; 181:9–18 (Gurrea).)    Put simply, unlike the race-conscious admissions policies at issue in *Harvard*, the Naval Academy's consideration of race has not resulted in a significant decrease in white candidates' admission rate.

Nor does the Naval Academy use race as a stereotype.  Defendants proved that the Naval Academy's admissions process seeks broad diversity based on individuals' varied experiences.  *See, e.g.*, (*id.* at 124:17–125:24 (Fuller); ECF No. 144 at 32:19–23 (Vazirani); ECF No. 143 at 117:18–25, 119:5–12 (Bailey).)  Admissions officials emphasized that they consider race, if at all, as a characteristic that might affect an individual's worldview.  (ECF No. 141 at 4:17–22 (Latta).)  No witnesses from any party testified that the Naval Academy seeks out

---

[95]  As noted *supra*, the Court in weighing the evidence presented has determined that consideration of race in offers to candidates on the waitlist falls within these enumerated categories.  That is, race and ethnicity are considered in offers of appointment to candidates on the waitlist only to the extent that the decision to offer appointment to the waitlisted candidate falls within enumerated circumstances (2) and (4) above.

individuals of certain races because it believes those individuals inherently share the same beliefs. Similarly, the admissions documents presented evinced the Naval Academy and DoD's interest in developing a broadly diverse cadre of midshipmen and Navy and Marine Corps officers.

Plaintiff contends that, under *Harvard*, any use of race in college admissions is a stereotype because it assumes an "inherent benefit in race *qua* race." (ECF No. 148 ¶ 316 (quoting *Harvard*, 600 U.S. at 220).) The holding of *Harvard*, however, explicitly does not apply to military service academies because of their potentially distinct compelling governmental interests. Here, Defendants have shown that the Naval Academy does not consider race because it assumes some benefit inherent to a given racial identity. Defendants have shown that the Naval Academy's consideration of race is tailored to the Navy and Marine Corps' national security interest in a broadly diverse officer corps. The benefit Defendants seek, therefore, is not racial diversity for its own sake but racial diversity for national security. Specifically, the Naval Academy considers race in admissions based on the Navy and Marine Corps' determination that everyone has different experiences, including experiences affected by race, that allow them to perceive situations differently. This determination is the *opposite* of a stereotype: it assumes that everyone has unique aspects—including, but not limited to racial and ethnic identities—that inform their unique worldviews.

### 4. Conclusions of Law: The Naval Academy's Consideration of Race Will Not Continue Indefinitely.

There is no end date on national security. Even so, the Naval Academy recognizes that its race-conscious admissions practices should not continue indefinitely. (ECF No. 149 ¶ 69.)

While considering race-conscious admissions practices at a civilian university in *Grutter v. Bollinger*, the Supreme Court stated that "all governmental use of race must have a logical end point." 539 U.S. 306, 342 (2003). Although *Grutter* marked the first time the Supreme Court clearly elucidated such a requirement, it has long expressed concern at "timeless" racial classifications. *See Wygant v. Jackson Bd. Of Educ.*, 476 U.S. 267, 276 (1986) (plurality opinion) (rejecting idea of "timeless" affirmative action remedies); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989) (noting the government's interest in remedying past discrimination generally has "no logical stopping point" (quoting *Wygant*, 476 U.S. at 276 (plurality opinion))). The Supreme Court has applied this "logical end point" requirement largely in the context of civilian institutions' race-conscious admissions policies and affirmative action policies intended to remedy past discrimination. *See Grutter*, 539 U.S. at 342 (applying logical end point requirement to civilian university); *Harvard*, 600 U.S. 181, 221 (2023) (applying logical end point requirement to civilian college and university); *J.A. Croson*, 488 U.S. at 498 (expressing concern at race-based remedy that has no logical end point); *United States v. Paradise*, 480 U.S. 149, 182, 185 (1987) (permitting state government's race-conscious promotion scheme where it was "temporary and extremely limited").

In its national security jurisprudence, the Supreme Court has suggested that measures restricting constitutional rights or utilizing racial classifications must be temporary, but it has stopped short of requiring an identified "logical end point" for such measures. In *Hamdi v. Rumsfeld*, the Court permitted detention "for the duration of these hostilities, [of] individuals legitimately determined to be Taliban combatants[.]" 542 U.S. 507, 521 (2004). Similarly in *Korematsu v. United States*, the Supreme Court allowed the imposition of curfew and detention

orders on Americans of Japanese descent as a "temporary exclusion" supported by military necessity. 323 U.S. 214, 219 (1944) *abrogated by Trump v. Hawaii*, 585 U.S. 667, 710 (2018).[96] Therefore, Defendants are not required to identify a specific end point to their use of race as one non-determinative factor in admissions tailored to further national security.

Defendants have proven that their consideration of race in admissions is not indefinite. Rather, the Naval Academy's use of race is narrowly tailored to the goal of mitigating national security risks by developing a diverse Navy and Marine Corps. Across administrations, DoD has determined, based on historical evidence, that a lack of diversity in the officer corps leads to "racial tensions" and "a degradation in [the military's] capability." (ECF No. 144 at 11:14–12:7 (Vazirani).) Such racial tensions threatened the preparedness of the United States military at critical junctures during the Vietnam War when racial violence broke out across the Armed Forces. (ECF No. 143 at 131:8–132:18 (Bailey); 166:5–168:1 (Sherwood).) For at least the last fifteen years, DoD has determined that a diverse officer corps mitigates risk, and the officer corps should "represent the country it defends" and the servicemembers it leads. (DX137; DX177; PX805; PX803.) Therefore, the Naval Academy's race-conscious admissions will terminate when the incoming classes of midshipmen enable Defendants to develop a Navy and Marine officer corps that better represents racial and ethnic diversity among enlisted servicemembers and the American population.[97] (ECF No. 141 at 41:4–16

---

[96] Though *Trump v. Hawaii* abrogated the holding in *Korematsu* by suggesting it was unconstitutional to permit such detention, it did not question the characterization of the detention as "temporary." *See Trump v. Hawaii*, 585 U.S. 667, 710 (2018).

[97] The requirement that the Naval Academy's Dean of Admissions consult with Navy leadership—i.e., military officials—regarding the termination of race-conscious admissions policies further demonstrates that the use of race in admissions serves a compelling national security interest. (ECF No. 141 at 44:20–46:1 (Latta).)

(Latta).)  This goal, as expressed by DoD and the Naval Academy, meets the requirement that the government's use of race be time-bound.[98]

Plaintiff suggests that the Naval Academy's race-conscious admissions program is not appropriately time-bound because it does not meet the end date requirement discussed in *Harvard*.  As explained above—and as consistent with the Supreme Court's carveout for military service academies in *Harvard*—the Naval Academy is distinct from a civilian college or university.  While Harvard and UNC claimed their race-conscious admissions policies would end upon reaching "some rough percentage of various racial groups admitted," 600 U.S. at 223, Defendants have tied the Naval Academy's use of race to the realization of an officer corps that represents the country it protects and the people it leads.  Although Plaintiff balks at the suggestion that it may take decades to see if midshipmen admitted today reach flag officer positions—that is, a rank of O-7 and above—it is factual reality that the structure of the Navy and Marine Corps requires development of flag officers from within.  (ECF No. 146 at 42:6–16 (Miller); ECF No. 145 at 137:20–21 (Bailey) ("They have to grow their own.  And to grow an O-6 can take twenty years.").)  Factual constraints such as this underscore the importance of the Supreme Court's oft-repeated admonition that strict scrutiny is context dependent.  *See, e.g.*, *Grutter*, 539 U.S. at 327 ("Context matters when reviewing race-based

---

[98]  Defendants' stated goal—creating an officer corps that represents the people it protects and the servicemembers it leads—comes close to racial balancing.  Crucially, however, that goal is a military judgment related to Defendants' compelling national security interests and not to narrow tailoring of the Naval Academy's race-conscious admissions.  The Naval Academy has proven that it is not using race in admissions to create a class of midshipmen that matches any demographic target.  *See supra* Section V.C.2.  Defendants have established compelling national security interests in creating a Navy and Marine officer corps that represents the people it protects and the servicemembers it leads.  *See supra* Section V.A.  As discussed *supra*, this Court defers to executive leaders' informed, military judgment that an officer corps that represents the United States population is a national security imperative.  *See supra* Section IV.E; Section V.A.

governmental action under the Equal Protection Clause." (citing *Gomillion v. Lightfoot*, 364 U.S. 339, 343–44 (1960))).  This Court cannot fault Defendants for employing race-conscious admissions policies that reflect the peculiar context of the United States military.

### 5. Conclusions of Law: The Use of Race is Necessary to the Government's Compelling National Security Interests.

A race-conscious admissions policy is narrowly tailored only if the government can show that it is "'necessary . . . to the accomplishment of its purpose.'"  *Fisher I*, 570 U.S. 297, 309 (2013) (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 305 (1978) (opinion of Powell, J.)).  That is, the government must show that it could not meet its interest without using racial classifications.  *Id.* at 312.  A race-conscious admissions policy's minimal impact is not evidence that it fails narrow tailoring but rather "a hallmark of narrow tailoring."  *Fisher II*, 579 U.S. 365, 384–85 (2016).  Plaintiff here critiques the Naval Academy's race-conscious admissions policy for its minimal effect, alleging that only 33 fewer Black candidates and 21 fewer Hispanic candidates would be admitted without consideration of race in admissions.[99]  (ECF No. 141 at 178:16–181:2 (Arcidiacono).)   Placed in context, however, those numbers are not insignificant at all.

The Naval Academy admits approximately 1,000 midshipmen each year, and those midshipmen in turn enter the Navy and Marine officer corps for a five-year commitment upon their graduation.  In 2023, 64 Black midshipmen graduated and entered the Navy and Marine officer corps from the Naval Academy.  The decrease in Black candidates by 33 without consideration of race would thus result in a decrease of more than half in the number of Black

---

[99]  Plaintiff provided these numbers from its modeling but noted that, per the testimony of Dr. Gurrea, the numbers may be slightly overstated.  (ECF No. 148 ¶ 291.)

officers accessing into the officer corps via the Naval Academy that year. Far from minimal, this drop tends to prove Defendants' need to use race in admissions to achieve a broadly diverse officer corps. Similarly, in 2023, 124 Hispanic officers entered the Navy and Marine officer corps through the Naval Academy. A drop in admissions of Hispanic officers by 21 individuals would result in almost a seventeen percent reduction in representation of Hispanic officers entering the O-1 Rank of the Navy and Marine Officer corps through the Naval Academy.[100] In light of the Naval Academy's outsized impact on the officer corps—forty percent of flag officers and ninety percent of Chiefs of Naval Operations are Naval Academy graduates—these numbers have significant effect.

Defendants presented evidence that diversity in the officer corps is essential to the Navy and Marine Corps' national security interests in unit cohesion and lethality, recruitment and retention, and domestic and international legitimacy. Defendants showed that, mere decades ago, racial violence occurred within the Armed Forces due to an absence of racial diversity. Plaintiff argues that Defendants failed to meet their burden to show consideration of race is necessary because Defendants did not present statistical modeling of their admissions process absent race. Plaintiff notes that the civilian institutions in *Harvard*, *Grutter*, and *Fisher* presented such modeling. As explained repeatedly here and noted in *Harvard*, however, civilian institutions' admissions processes are not necessarily analogous to military service academies' admissions processes. 600 U.S. 181, 213 n.4 (2023). In the context of national security, the

---

[100] As Plaintiff acknowledges, due to attrition, the number of midshipmen admitted is not necessarily equivalent to the number of midshipmen who graduate and enter the officer corps. (ECF No. 148 ¶ 293.) However, given the Naval Academy's explicit purpose of developing Naval officers and Defendants' stated compelling interest in creating a broadly diverse officer corps, it is appropriate to compare admitted candidates to the midshipmen that graduate and enter the Navy and Marine Corps.

government need not present "hard proof—with detail, specific facts, and specific evidence—" to justify a restriction under strict scrutiny. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010) (internal quotation marks omitted).

### 6. Conclusions of Law: The Naval Academy Has Undertaken Serious, Good Faith Consideration of Race-Neutral Alternatives.

Narrow tailoring demands "serious, good faith consideration of workable race-neutral alternatives." *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003); *H.B. Rowe Co., Inc. v. Tippett*, 615 F.3d 233, 252 (4th Cir. 2010) (quoting *Grutter*, 539 U.S. at 339). A workable, race-neutral alternative is one that achieves the governmental interest "about as well" without imposing intolerable administrative expenses or requiring an institution to sacrifice its academic standards or other aspects of the claimed compelling interest. *See Wygant v. Jackson Bd. Of Educ.*, 476 U.S. 267, 280 n.6 (1986) (plurality opinion); *Grutter*, 539 U.S. at 339; *Fisher I*, 570 U.S. 297, 312 (2013). In *Grutter*, the Supreme Court determined that the University of Michigan Law School had given serious, good-faith consideration to race-neutral alternatives where it rejected those alternatives because they would prevent individualized review of applications and sacrifice academic standards. 539 U.S. at 339–40.

Here, the Naval Academy has proven that it has seriously considered—and in some cases employed—race-neutral alternatives. First, Defendants proved that the Naval Academy has implemented numerous race-neutral recruiting tactics at various stages of its admissions process. The Naval Academy has hired a marketing firm to improve its social media presence, digital outreach, and marketing efforts; implemented various STEM camps and summer programs; created Summer Seminar; created the INSPIRE program, which sends midshipmen into high schools to increase interest and access to the Naval Academy; hosted Candidate Visit

Weekends; hosted Centers of Influence programming at the Naval Academy; created OPINFO events; funded traveling music tours; and increased trainings and engagement with Congresspeople.  (DX28; DX106; DX155; DX162; PX50.)  Specific to applications, the Naval Academy has provided additional points and consideration to candidates with race-neutral characteristics such as (1) disadvantaged socioeconomic background; (2) adversity or hardship experiences; (3) unusual life experience; (4) first-generation college status; (5) first-generation American status; (6) speaking English as a second language; (7) military exposure and background; and (8) residence in underrepresented congressional districts.  (DX1; DX2; DX4-003; DX28; PX27; ECF No. 139 at 233:11–19 (Hwang); ECF No. 140 at 209:7–211:21 (Latta); ECF No. 141 at 32:7–21; 79:19–80:9; 86:20–87:1; 105:21–106:7 (Latta).)

Plaintiff's race-neutral alternatives expert, Richard Kahlenberg ("Kahlenberg"), acknowledged these tactics but suggested the Naval Academy should do more.  Specifically, Kahlenberg proposed that the Naval Academy increase its socioeconomic preferences.  Only one of the various simulations Kahlenberg presented produced greater minority representation—by one percentage point—at the Naval Academy than that which currently exists without his proposed socioeconomic preferences.  As Kahlenberg repeatedly acknowledged, the results would be even less successful if they were reported according to the racial demographic categories DoD and Congress require the Naval Academy to use.  (ECF No. 142 at 137:22–139:13; 139:23–140:1; 151:6–17; 160:6–9; 180:3–6; 187:13–16 (Kahlenberg).)  Despite only increasing diversity by one percentage point, Kahlenberg's proposed race-neutral alternative would cause academic metrics to fall.  In accordance with

*Grutter* and *Wygant*, this resulting decrease in the academic qualifications of admitted candidates means that Kahlenberg's proposed alternative is not workable.

Every other version of Kahlenberg's proposed alternative resulted in a decrease in minority representation and an increase in white representation at the Naval Academy. That is, every other version of this alternative did not further Defendants' compelling national security interest "about as well" as race-conscious admissions policies. Moreover, increasing the weight given to socioeconomic status does not account for the Naval Academy's need to evaluate each candidate's leadership ability, moral character, intended academic concentration, STEM interest, status as a member of a slate in an underrepresented congressional district, gender diversity, or geographic diversity. Accordingly, such alternative methods are not workable within the definition imposed under *Grutter* and *Wygant*.

Finally, Plaintiff's assertions that the Naval Academy should double its recruiting and outreach budget, overhaul its preparatory program, or tweak the congressional appointments process are equally unworkable. Kahlenberg ignores the distinction between Harvard and UNC and the Naval Academy. The Naval Academy is a federally funded institution that already invests more than $3 million in outreach efforts. (ECF No. 141 at 49:10–51:20 (Latta).) To double that budget is not the sort of "tolerable administrative expense" contemplated in the workability requirement for a race-neutral alternative. *Wygant*, 476 U.S. at 280 n.6 (plurality opinion). Similarly, the Naval Academy cannot overhaul its preparatory program without disregarding the reason for which it was created: to give priority to members of the enlisted fleet. To overhaul NAPS and similar preparatory programs would mean that fleet members—who face several unique challenges to apply and gain admission to the Naval Academy—would

no longer receive uniquely specialized consideration.  Finally, the congressional appointments process is controlled by Congress via statute.  Defendants—none of whom are Members of Congress—lack the authority to legislate.  As the Supreme Court explained in *Grutter*, "[n]arrow tailoring does not require exhaustion of every conceivable race-neutral alternative." 539 U.S. at 339.  Defendants have met their burden to prove serious, good-faith consideration—and, where workable, even implementation—of race-neutral alternatives.

## VI. Conclusion

The U.S. Naval Academy as a military academy was specifically exempted by the U.S. Supreme Court in the *Harvard* opinion.  In a footnote, Chief Justice Roberts noted the "potentially distinct interests that military academies may present."[101]  The record in this case demonstrates the wisdom of that caution.  The admissions policies of Harvard College and the University of North Carolina placed these civilian universities in the maelstrom of our Nation's continued struggle with race.  Justice Gorsuch in his concurring opinion acknowledged that "racial discrimination still occurs and the effect of past racial discrimination still persists."[102]  Justice Sotomayor in her dissenting opinion lamented "an endemically segregated society where race has always mattered and continues to matter."[103]

It is in this environment that the U.S. Naval Academy seeks to perform its mission to prepare its students to become officers in the U.S. Navy and Marine Corps.  Recent demographic studies of the all-volunteer Navy and Marine Corps indicate that 52 percent of enlisted Naval servicemembers are racial minorities, but minority officers constitute only 31

---

[101] *Harvard*, 600 U.S. 181, 213 n.4 (2023).
[102] *Id.* at 317 (Gorsuch, J., concurring).
[103] *Id.* at 318 (Sotomayor, J., dissenting).

percent of the entire officer corps of the U.S. Navy. [104]  Relatedly, in the Marine Corps—the least diverse branch of the Armed Services—only 35 percent of enlisted Marines are minorities, and minority officers make up just 29 percent of the Marine Corps officer ranks.[105] As Vice Admiral Fuller testified[106] and demographic data confirms, as recently as 2020 only about 17 of the 218 Admirals in the United States Navy were officers of color.[107]  In short, there is a significant deficiency in the number of officers of color in the officer corps of the Navy and Marine Corps.  Over many years, military and civilian leaders have determined that a racially diverse officer corps is a national security interest.  That judgment is based on studies mandated by the U.S. Congress.  A U.S. Senate Armed Services Report issued earlier this year has noted the continuing problem of underrepresentation of racial and ethnic minorities in the military service academies.

The U.S. Naval Academy does not set any racial quotas or engage in racial balancing in its admissions process.  No candidate for admission is admitted based solely on his or her race. However, the Academy is distinct from a civilian university and its admissions process is far more complex.  It is governed by federal statutes, Department of Defense directives, and Department of Navy regulations.  There is a nominations process which includes congressional nominations and service-connected nominations, among others.  The Academy must graduate at least 65 percent of its students with science, technology, engineering, and mathematics degrees.  There are certain points in the admissions process wherein the Academy

---

[104]  *See* (PX330.)

[105]  *See id.*

[106]  (ECF No. 145 at 127:12–22.)

[107]  (DX65.)

may consider race or ethnicity among many nondeterminative factors in seeking greater diversity in the Brigade of Midshipmen.  There are only four instances where race is considered.  These relate generally to the Academy's decision to extend appointment offers among candidates it has already deemed qualified for admission.

In this case, SFFA has challenged *any* consideration of race by the Naval Academy in its admissions process.  After an intense one-year period of discovery and a nine-day bench trial, this Court has found that the Academy's admissions program withstands the strict scrutiny mandated by the *Harvard* case.  The Naval Academy has established a compelling national security interest in a diverse officer corps in the Navy and Marine Corps.  Furthermore, that interest is indeed measurable, and the Academy's admissions program is narrowly tailored to meet that interest.  In short, this Court defers to the executive branch with respect to military personnel decisions.  Specifically, as noted by Justice Kavanaugh in *Austin v. United States Navy Seals*,  "the President of the United States, not [this] federal judge" ultimately makes such decisions.[108]  Accordingly, based on the foregoing Findings of Fact and Conclusions of Law, this Court enters the following:

## ORDER

IT IS THEREFORE ORDERED AND ADJUDGED THAT Judgment shall be ENTERED in favor of Defendants and AGAINST Plaintiff Students for Fair Admissions.

_____
Richard D. Bennett
United States Senior District Judge

---

[108] *Austin v. United States Navy Seals 1–26*, 142 S. Ct. 1301, 1302 (2022) (Mem.) (Kavanaugh, J., concurring).